# EXHIBIT F

*New Wallington Home LLC, et al.*

v.

*Borough of Wallington, et al.*

United States District Court for District of New Jersey

Case No.  20-CV-08178

Analysis of Impact and Effects on Segregation

Expert Report Prepared by
Justin Steil, Ph.D.

June 30, 2025

I.    Executive Summary .................................................................................................. 1

II.   Background to the Report ....................................................................................... 3

    a.    Questions Presented ........................................................................................ 3

    b.    Geographic and Demographic Context ........................................................... 3

    c.    Background ....................................................................................................... 3

    d.    Findings ............................................................................................................ 7

    e.    Qualifications ................................................................................................... 8

III.  Data ......................................................................................................................... 8

IV.   The Effect on Housing Availability by Race and Ethnicity of the Inability to Develop the Proposed Project ................................................................................. 9

    a.    Introduction ...................................................................................................... 9

    b.    Expected Racial and Ethnic Composition of The Proposed Development ....... 9

    c.    Evaluating Any Adverse Impact of the Inability to Develop the Project ......... 12

        i.    Comparing Members of the Protected Class Affected with Non-Members Affected by Race and Ethnicity .......................................................................... 13

        ii.   The Chi-Square Test of Independence ....................................................... 15

V.    The Effect on Housing Availability by Family Status ...................................... 16

    a.    Evaluating Any Adverse Impact of the Inability to Develop the Project ......... 19

        iii.  Comparing Members of the Protected Class Affected with Non-Members Affected by Family Status .................................................. **Error! Bookmark not defined.**

        iv.   The Chi-Square Test of Independence ...................... **Error! Bookmark not defined.**

    f.    Conclusion ....................................................................................................... 20

VI.   The Effect of the Borough's Actions on the Perpetuation of Racial Residential Segregation ............................................................................................................ 20

    a.    Perpetuation of Segregation ............................................................................ 20

VII.  Conclusion ............................................................................................................ 21

APPENDIX A: Curriculum Vitae ............................................................................. 23

I.    ACADEMIC POSITIONS ........................................................................................ 23

II.   EDUCATION ........................................................................................................... 23

III.  SELECTED PUBLICATIONS ................................................................................. 23

IV.   AWARDS ................................................................................................................ 29

V.    TEACHING ............................................................................................................. 30

VI.   ADVISING .............................................................................................................. 31

VII.  SERVICE ................................................................................................................ 31

VIII.  MEMBERSHIPS .................................................................................................... 32

i

IX.  SELECTED WORK EXPERIENCE........................................................................................... 32

APPENDIX B: DISCLOSURES................................................................................................ 34

APPENDIX C: ALTERNATIVE ANALYSES ...........................Error! Bookmark not defined.

## I.     Executive Summary

This report contains my expert opinion regarding the effect of the Borough of Wallington's delay and denial of permits for the construction of the proposed mixed-income development owned by New Wallington Home LLC and Morningside at Wallington on (1) access to housing by protected classes under the Fair Housing Act and (2) the perpetuation of segregation.

My review of the data available to me indicates that the inability to develop the proposed mixed-income multi-family housing development in Wallington had a significant adverse impact in making housing unavailable on the basis of race and family status.  My review of the data available to me also indicates that the inability to develop the proposed mixed-income multi-family housing development in Wallington perpetuated segregation on the basis of race in the New York-Jersey City-White Plains, NY-NJ Metropolitan Division, including Bergen County and Wallington.

As discussed in more detail below, I evaluated the available data in two different ways consistent with courts' analyses of disparate impacts to assess whether the Borough of Wallington's practices had an adverse impact on the basis of race and family status.  The results of both tests found that it did.

The first method compares the proportion of protected-class members adversely affected by the challenged policy to the proportion of persons not belonging to a protected class who are adversely affected.  Here, the Borough's actions blocking the proposed mixed-income multi-family development adversely affected potential non-white residents at 1.2 times the rate that it affected potential white residents and the Borough's actions blocking the proposed two- and

three-bedroom affordable units affected eligible residents with children under the age of 18 at 1.3 times the rate it affected eligible residents without children.

An alternative approach measures the likelihood that the difference between the racial and ethnic composition of the estimated residents of the proposed development and the composition of the Borough of Wallington could have occurred by chance. With greater than 99.99% certainty, the difference between the expected, substantially more diverse racial and ethnic composition of the proposed mixed-income multifamily development that the Borough blocked compared to the current population of Wallington would not occur by chance.

No matter which test one uses, the statistical evidence shows that the Borough's actions had an adverse impact on non-white residents, making housing disproportionately unavailable to Black, Latino, and Asian residents. The data also show that Borough's actions had an adverse impact on families with children.

By denying housing in which 55 percent or more of residents would likely have been non-white in a municipality that is 70 percent white and substantially less diverse than the neighboring jurisdictions, Bergen County overall, the Northern New Jersey sub-region, and the New York-Jersey City-White Plains, NY-NJ Metropolitan Division the Borough of Wallington's actions perpetuate residential segregation on the basis of race and deny residents the benefits of living in an integrated community.

## II.    Background to the Report

### a.  Questions Presented

The Fair Housing Act provides that it "is the policy of the United States to provide, within constitutional limitations, for fair housing" throughout the nation and prohibits making housing unavailable or discriminating in the provision of housing related services on the basis of race, color, national origin, religion, sex, family status, and disability.  42 U.S.C. §§ 3601 et seq. In light of this policy, I have been asked to assess the effect of the Borough of Wallington's actions obstructing the construction of the proposed mixed-income multifamily development on the availability of housing to classes protected by the Fair Housing Act and on the perpetuation of residential segregation by race.

### b.  Geographic and Demographic Context

The parcels at issue here are Lots 35.01 and 35.02 on Block 71 in the Borough of Wallington, New Jersey. The Borough of Wallington is in southwest Bergen County bordered by Garfield, South Hackensack, Woodridge, Carlstadt, and East Rutherford. Its western boundary is the Passaic River and the City of Passaic in Passaic County.  The Borough of Wallington has a substantially higher share of white, non-Hispanic residents than the rest of Southwest Bergen County, Bergen County as a whole, Northern New Jersey, and the New York–Jersey City–White Plains, NY–NJ Metropolitan Division (New York City, Westchester and Rockland Counties in New York and Bergen, Hudson, and Passaic Counties in New Jersey), as seen in Table 1.

### c.  Background

At issue here is a 6.7 acre property, Lot 35.02, Block 71, and an adjoining 3.7 acre property, Lot 35.01, Block 71, in Wallington, New Jersey.  The land is located in a zone that Wallington had designated as a Light Industrial-Commercial (LI-C) zone.  The properties are

located just north of a multi-family development known as Jasontown Apartments, located in

Wallington's Multifamily-Garden-Type Dwelling (R-3) zone.

*Table 1: Racial and Ethnic Composition of Relevant Geographies (U.S. Census Bureau, 2019-2023 American Community Survey 5-Year Estimates)*

| | Wallington | | PUMA 3400302 | | Bergen County | | Northern New Jersey | | Metro Division | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Population** | 11,825 | | 124,881 | | 954,717 | | 4,120,538 | | 12,133,498 | |
| White | 8,231 | 69.6% | 68,507 | 54.9% | 501,031 | 52.5% | 1,689,970 | 41.0% | 4,343,364 | 35.8% |
| Black | 456 | 3.9% | 3,507 | 2.8% | 50,548 | 5.3% | 614,127 | 14.9% | 2,119,152 | 17.5% |
| Asian | 430 | 3.6% | 14,630 | 11.7% | 158,311 | 16.6% | 436,627 | 10.6% | 1,620,250 | 13.4% |
| Hispanic | 2,332 | 19.7% | 34,356 | 27.5% | 211,044 | 22.1% | 1,211,924 | 29.4% | 3,501,664 | 28.9% |
| Other | 376 | 3.2% | 3,881 | 3.1% | 33,783 | 3.5% | 167,890 | 4.1% | 549,068 | 4.5% |

In litigation pursuant to *Southern Burlington County NAACP v. Township of Mt. Laurel*, 67 N.J. 151 (1975), the Superior Court of New Jersey Law Division on February 5, 2007 found that the Borough of Wallington's land use regulations for the site were invalid as they were not in compliance with the New Jersey Constitution, the Mt. Laurel Doctrine, the Fair Housing Act, and the regulations of the New Jersey Council on Affordable Housing. *The Wallington Group, LLC, and Morningside at Wallington, LLC v. Borough of Wallington, et al.*, Docket No. BER-L-00373-06, partial summary judgment order dated February 5, 2007.

In response to the court's decision, the Wallington Group and Morningside proposed a development with a total of 396 dwelling units while the Borough of Wallington offered a proposal that would accommodate 208 homes. The parties were not able to come to an agreement and the case proceeded to trial. Following trial, the court ruled in favor of the Wallington Group and Morningside, granting them a builder's remedy and requiring the Borough of Wallington to rezone the properties at issue for multi-family residential use at a density of not less than twenty dwelling units per acre, including units restricted to low- and moderate-income families. These lots were thus rezoned in a Planned Residential – Mt. Laurel

Zone ("PR-ML Zone"). In its decision, the court declared that "Wallington's land use regulations remain invalid and unconstitutional insofar as they continue past exclusionary practices." *The Wallington Group, LLC, and Morningside at Wallington, LLC v. Borough of Wallington, et al.*, Docket No. BER-L-00373-06, order dated March 18, 2008.

New Wallington Home LLC then submitted an application to the Borough of Wallington Planning Board for a multi-family development consistent with the rezoning and the Superior Court's order, but the Planning Board denied the application on October 21, 2014. New Wallington Home LLC then filed a further lawsuit. The court invalidated the Planning Board's decision as "arbitrary, capricious, and unreasonable and contrary to law." *The Wallington Group, LLC, and Morningside at Wallington, LLC v. Borough of Wallington, et al.*, Docket No. BER-L-00373-06, order dated May 11, 2015.

After the Planning Board still did not approve the application, the Superior Court held on March 2, 2016, that "[t]he Planning Board has unreasonably delayed action in connection with the limited remand directed in the Court's May 11, 2015 Order reversing the Planning Board's denial of site plan approval." *The Wallington Group, LLC, and Morningside at Wallington, LLC v. Borough of Wallington, et al.*, Docket No. BER-L-00373-06, order dated March 2, 2016.

Morningside and New Wallington submitted revised site plans in February of 2017 and the Planning Board held three hearings. The proposed development was planned to contain 207 homes, including 165 market-rate apartments and 42 income-restricted affordable apartments. The proposed development would include 8 buildings, with 37 one-bedroom and 128 two-bedroom market rate units, and 6 one-bedroom, 27 two-bedroom and 9 three-bedroom affordable units. Project amenities would include a recreation center, community rooms, gym and yoga studio and covered parking.

At the three 2017 hearings, Planning Board members repeatedly objected to the expected number of children that the proposed development could accommodate in Wallington. At the May 16, 2017 hearing, then-Mayor Tomko asked, "I have one question at this time right now but, what is the estimation of children coming out of this development for our schools?" (p. 63: 23-25). He continued, "I think that's a $65,000 question that is on the minds of a lot of people, what is it, we're burdened right now…" (p. 64: 4-6). At the July 18, 2017 hearing, then-Mayor Tomko asked the project's planner who was describing her use of New Jersey's Open Public Records Act (OPRA) to gather data to estimate the number of children likely to live in the development: "What towns in this south Bergen area have you OPRA'd, because you know historically Route 4 is the Mason-Dixon line and we cannot compare with upper Bergen County. Things are different." (p. 65: 17-21). After this reference to the line separating Southern states fighting for slavery from Northern free states, the Mayor went on to say, "…we just picture the worst scenario. Three bedrooms, five, six kids coming out of there, packing them in" (p. 70: 4-5). At the September 19, 2017 hearing, Wallington's current Mayor, Melissa Dabal, stated, "They're definitely going to have children there. So I'd like to know what is Morningside going to do to ensure that only five children come out of that complex moving forward?" (p. 52: 4-7).

The Planning Board ultimately denied the site plan application on January 16, 2018. Morningside and New Wallington returned to Superior Court. After trial, the court found that the Wallington Planning Board had cited as the rationale for the 2018 rejection "that a number of children would 'emanate' from the multi-unit apartment buildings, and as a result, additional demand would be placed upon Wallington Schools; and that the additional students would be a 'burden.'" The court noted that the Planning Board's resolution was "devoid of any factors which would support the denial, other than improper consideration of fiscal reasons. The

Board's unfortunate focus on the project's impact to the public fiscal, rather than land use concerns, renders its decision palpably unreasonable, and ipso facto, arbitrary, unreasonable, and capricious." The court held that "the applicant has satisfied all of the criteria necessary for approval of both applications" and "based upon the tortured history of this application and the Township's recalcitrant stance toward satisfying its Mount Laurel obligation" granted all approvals. *Morningside at Wallington, LLC and New Wallington Home, LLC, v. Borough of Wallington Planning Board.*, Docket No. BER-L-1670-18, order dated January 17, 2019.

The plaintiffs state that the Borough's lengthy history of interference with inclusionary development and the substantial delays created by the Borough have made the proposed development at this point financially infeasible and allege that the Borough has engaged in practices that "have a disproportionately adverse effect on minorities and are otherwise unjustified by legitimate rationale" in violation of the Fair Housing Act. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S.Ct. 2507, 2513 (2015).

d. Findings

Based on my analysis of data and review of documents as described in this report it is my expert opinion, to a reasonable degree of certainty, that:

1)  The Borough of Wallington's actions blocking the proposed development had a statistically significant adverse impact on the basis of race in making housing unavailable to non-white residents;

2) The Borough of Wallington's actions blocking the proposed two- and three-bedroom affordable units had a substantial adverse impact on the basis of family status in making housing unavailable to families with children; and

3) The Borough of Wallington's actions blocking the proposed development perpetuated residential segregation on the basis of race and denied residents the benefits of living in an integrated community.

e. Qualifications

I am an Associate Professor of Law and Urban Planning at the Massachusetts Institute of Technology, where I teach classes on housing policy, land use policy, research design, and statistics, among other topics. I have a Ph.D. in Urban Planning, including graduate coursework in research design, research methods, and statistical analysis. I regularly publish statistical research regarding housing policies in leading peer-reviewed journals in the fields of public policy, housing studies, urban planning, sociology, and economics. I have submitted expert reports and testified on the statistical analysis of data in numerous cases alleging disparate treatment, disparate impact, or both under the Fair Housing Act, as identified in my curriculum vitae attached in Appendix A.

My complete curriculum vitae, along with a list of all publications that I have authored in the last ten years, and all matters in the last four years in which I have testified as an expert at trial or deposition, is provided in the Appendix A attached to this Report.

For work related to preparing this report and for all other work other than testimony, my fee is $400 per hour plus reimbursable expenses. I was assisted by a research assistant paid at a rate of $100 per hour. No portion of these fees was or is dependent on the nature of my findings or on the outcome of the case.

III.    Data

In the analyses for this report, I use the following public sources of data:

8

1) The United States Census Bureau's 2019-2023 5-Year American Community Survey, Data Profiles and table B04001 available at https://www.census.gov/data.html

2) The United States Census Bureau's 2019-2023 5-Year American Community Survey Individual Public Use Microdata Samples available at www.ipums.org

## IV. The Effect on Housing Availability by Race and Ethnicity of the Inability to Develop the Proposed Project

### a. Introduction

To analyze the effect of the Borough of Wallington's actions making the proposed development infeasible, I begin by estimating the expected racial composition of the proposed development compared to the current composition of Wallington.

### b. Expected Racial and Ethnic Composition of The Proposed Development

The proposed development would have included an estimated 207 rental homes, with 37 one-bedroom and 128 two-bedroom market rate units, as well as 6 one-bedroom, 27 two-bedroom and 9 three-bedroom income restricted affordable units. The affordable units would have included units affordable to very-low-income households (with incomes 30 percent or less of the area median income), low-income households (with incomes 50 percent or less of the area median income), and moderate-income households (with incomes between 50 and 80 percent of the area median income), as seen in Table 2.

*Table 2: Unit Mix, by Number of Bedrooms and Affordability*

| Bedrooms | Very Low Income | Low Income | Moderate Income | Market Rate | Total |
|---|---|---|---|---|---|
| One | 2 | 2 | 2 | 37 | 43 |
| Two | 3 | 11 | 13 | 128 | 155 |
| Three | 1 | 4 | 4 | 0 | 9 |
| Total | | | | | 207 |

9

The income limits for each household size for each of the income levels are presented in Table 3.

*Table 3: 2023 Income Restrictions by Household Size for Region 1 (Bergen, Hudson, Passaic and Sussex Counties)* (see https://ahpnj.org/resources/income-limits-rental-increases)

| Household Size | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| **Income Level** | | | | | | |
| **Moderate Income** | $67,431 | $77,064 | $96,329 | $104,036 | $119,449 | $127,155 |
| **Low Income** | $42,144 | $48,165 | $60,206 | $65,022 | $74,655 | $79,472 |
| **Very Low Income** | $25,286 | $28,899 | $36,124 | $39,013 | $44,793 | $47,683 |

Data from the U.S. Census Bureau's 2019-2023 5-year American Community Survey Individual Public Use Microdata Sample allows estimation of household sizes for renter households by number of bedrooms. These data indicate that the average number of residents for units by number of bedrooms among renters in multifamily buildings with three or more units in Northern New Jersey (Bergen, Essex, Hudson, Morris, Passaic, and Union Counties) was for a one-bedroom apartment 1.56 individuals, for a two-bedroom apartment 2.55 individuals, and for a three-bedroom apartment 3.58 individuals. Using these average household sizes, approximately 494 individuals would be expected to live in the 207 units.

Using the U.S. Census Bureau's 2019-2023 5-year American Community Survey Individual Public Use Microdata Sample for the Public Use Microdata Area of which Wallington is a part (PUMA 3400302 for "Bergen County Southwest" including Rutherford, North Arlington & Hasbrouck Heights), I identified the racial composition of renters with incomes

within the eligible range for the income-restricted affordable units and with incomes high enough that the market rate rents would not constitute more than 30 percent of household income.[1]

Using the 2019-2023 5-year American Community Survey Individual Public Use Microdata Sample data regarding the racial and ethnic composition of renter households in the Southwest Bergen County PUMA, white renters would be expected to make up 45 percent of the proposed development, Black renters 6 percent, Asian renters 18 percent, Hispanic renters 27 percent, and other race renters 5 percent.

Table 4 summarizes the racial and ethnic composition of the expected residents of the proposed rental units (affordable and market rate) based on data about income-qualified current renter households in the Southwest Bergen County PUMA, as well as in Bergen County as a whole, Northern New Jersey and the Metro Division.  These estimates are compared to the 2019-2023 5-year American Community Survey aggregate data regarding the racial composition of current residents of the Borough of Wallington. As seen in Table 4, the Borough of Wallington has a substantially lower share of non-white residents than would be expected from the likely residents of the project coming from any of the other geographies, and the comparison to the expected residents from the Southwest Bergen County PUMA is the most conservative estimate possible.

---

[1] Public Use Microdata Areas (PUMAs) are non-overlapping, statistical geographic areas that partition each state or equivalent entity into geographic areas containing no fewer than 100,000 people each." https://www.census.gov/programs-surveys/geography/guidance/geo-areas/pumas.html.  To calculate the expected racial composition of renters in the income-restricted affordable units, I used the Individual Public Use Microdata Sample for PUMA 3400302 for "Bergen County Southwest", Bergen County, Northern New Jersey, and the New York-Jersey City-White Plains, NY-NJ Metropolitan Division to identify the composition of renters by household size with incomes within the eligible range for the income-restricted affordable units, according to the income guidelines here https://ahpnj.org/resources/income-limits-rental-increases and reproduced in relevant part in Table 3. To calculate the expected racial composition of renters in the market rate units, I used the Individual Public Use Microdata Sample for PUMA 3400302 for "Bergen County Southwest" to identify the composition of renters by household size with incomes such that the rents projected in the "2025.-2.28 Forecast Model – Wallington Total Project (affordable 20%, no PILOT, 2025 const. start, 206 units).xls" would constitute no more than 30 percent of household income (creating a weighted average of the rent for each bedroom size, weighted by the number of units at each rent).

*Table 4: Racial and Ethnic Composition of Wallington Compared to Expected Residents of the Proposed Development Using 2019-2023 ACS IPUMS Estimates from Southwest Bergen County, Bergen County, Northern New Jersey, and the New York-Jersey City-White Plains, NY-NJ Metropolitan Division*

|  | Wallington | Expected Residents from PUMA 3400302 | Expected Residents from Bergen County | Expected Residents from Northern New Jersey | Expected Residents from the Metro Division |
|---|---|---|---|---|---|
| White | 70% | 45% | 42% | 37% | 43% |
| Black | 4% | 6% | 9% | 15% | 14% |
| Asian | 4% | 18% | 23% | 19% | 13% |
| Hispanic | 20% | 26% | 23% | 26% | 25% |
| Other | 3% | 5% | 3% | 4% | 5% |

c.  <u>Evaluating Any Adverse Impact of the Inability to Develop the Project</u>

In *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 547 (2015), the Supreme Court recognized the "Fair Housing Act's continuing role in moving the Nation toward a more integrated society." Unlawful discrimination under the Fair Housing Act can be established by a preponderance of evidence either of 1) disparate treatment on the basis of a protected characteristic or 2) of discriminatory effect on the basis of a protected characteristic. *Inclusive Communities Project, Inc.*, 576 U.S. at 545.

The Court in *Inclusive Communities* described suits targeting "unlawful practices" such as "zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods" as residing "at the heartland of disparate-impact liability."  576 U.S. at 539.  As examples of these "heartland" cases, the Supreme Court in *Inclusive Communities*, 576 U.S. at 539, cited *United States v. Black Jack*, 508 F. 2d 1179, 1184-1185 (8th Cir. 1974) (invalidating ordinance prohibiting construction of multifamily rental units); *Huntington v. Huntington Branch, NAACP*, 488 U. S. 15, 16-18 (1988) (invalidating ordinance prohibiting construction of new multifamily dwellings); and *Greater New Orleans Fair Housing Action Center v. St. Bernard Parish*, 641 F. Supp. 2d 563, 569, 577-578 (ED La. 2009) (invalidating

post-Hurricane Katrina ordinance restricting the rental of housing units to only "'blood relative[s]'" in an area of the city that was 88.3% white and 7.6% black).

Under the Fair Housing Act, there are two ways to establish the discriminatory effect of a challenged policy: (1) "adverse impact on a particular minority group" or other protected class, or (2) "harm to the community generally by the perpetuation of segregation." *MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 619 (2d Cir. 2016). HUD's regulation regarding discriminatory effect liability under the Fair Housing Act similarly states: "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500.

As discussed below, the data here confirm that the Borough's actions predictably and actually resulted in an adverse effect on Black, Hispanic, and other non-white home-seekers. Courts have used several methods to calculate whether a difference in the impact of a policy constitutes a disparate impact under the Fair Housing Act. Whichever method one uses, the dramatic racial disparities caused by the Borough's actions have an adverse effect on the basis of race, which continues today.

> i. *Comparing Members of the Protected Class Affected with Non-Members Affected by Race and Ethnicity*

A common approach to evaluating the disparate impact of a policy that courts have used is comparing the proportion of protected-class members adversely affected by the challenged policy to the proportion of persons adversely affected and not belonging to a protected class. *See, e.g.*, *Mount Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (concluding prima facie case of disparate impact was established by data showing that 23 percent of African American households and 32 percent of Latino households in the

Township would be affected by the challenged housing demolition, compared to only 3 percent of white households), *cert. granted*, 133 S. Ct. 2824 (2013), *cert. dismissed*, No. 11-1507, 2013 WL 6050174 (U.S. Nov. 15, 2013); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987-88 (4th Cir. 1984) (finding prima facie case of disparate impact established by data showing that policy adversely affected 75 percent of non-white residents but only 26 of white residents); *Mhany Mgmt. v. Cnty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016) (finding plaintiffs established disparate impact through analyses finding that Garden City's rejection of multifamily zoning in favor of more restrictive zoning had a significant disparate impact on minorities because it "largely eliminated the potential for the type of housing that minorities were disproportionately likely to need — namely, affordable rental units" and that the multifamily zoning "proposal would have created a pool of potential renters with a significantly larger percentage of minority households than the pool of potential renters for the zoning proposal ultimately adopted.")

Here, the expected residents of the project would be estimated to be between 55 percent and 63 percent non-white, and the inability to develop the proposed housing thus falls disproportionately on non-white residents. Looking at the expected racial composition of the proposed project based on 2019-2023 Census ACS IPUMS data for Southwest Bergen County, of the 494 expected residents, 272, or 55 percent, would be expected to be non-white and 222, or 45, percent would be expected to be white. This 10 percentage point difference means that non-white residents would disproportionately feel the adverse effects of the inability to develop the project, at an impact ratio of 1.2.

Comparing the expected racial composition of the proposed project based on 2019-2023 Census ACS IPUMS data and the composition of the Borough of Wallington, the Borough's interference with the development adversely affects the 272 expected non-white residents

compared to the 3,594 current non-white residents already in Wallington and 231 expected white residents compared to the 8,453 current white residents already in Wallington.  Taking into account the variation between the project and the Borough's existing residents, this difference in adverse impact means that non-white potential residents are adversely affected at 2.7 times the rate of white potential residents, as seen in Table 5.

*Table 5: Adverse Effect of the Moratorium by Race and Ethnicity*

|  | Adverse Effect | No Adverse Effect | Total | Adverse Effect | Disparity Ratio |
|---|---|---|---|---|---|
| **White Non-Hispanic** | 222 | 8,231 | 8,453 | 0.026 | |
| **Black Non-Hispanic** | 31 | 456 | 487 | 0.064 | 2.41 |
| **Asian** | 87 | 430 | 517 | 0.168 | 6.38 |
| **Hispanic** | 131 | 2,332 | 2,463 | 0.053 | 2.02 |
| **Other** | 23 | 376 | 399 | 0.058 | 2.22 |
| **All Non-White** | 272 | 3,594 | 3,866 | 0.070 | 2.67 |

The adverse effects of denial of access to housing on these parcels fall significantly more heavily on all non-white potential residents compared to white potential residents.

### ii.   The Chi-Square Test of Independence

An alternative test some courts have suggested is a statistical test measuring the likelihood that the extent of the difference between the composition of a group able to access housing and a group denied access to housing could have occurred by chance.  *Langlois*, 234 F. Supp. 2d at 58.  A widely used statistical test to assess whether two variables are independent of each other is the Pearson chi-square test. It can test in this case whether the difference in the racial composition of the expected residents of the proposed developments and the current residents of the Borough of Wallington could occur by chance.  Mathematically, the chi-square test calculates the sum of the squared differences between the observed and expected values divided by the expected values.  That calculation generates a chi-square statistic that can be

compared to a chi-square table to calculate the likelihood that the difference between the observed and expected values could have happened by chance, also known as a p-value. A p-value is a widely accepted measure of statistical significance. In Table 6, below, I present the contingency tables representing the estimated values, as well as the chi-square value and the p-value.

*Table 6: Chi-Square Test of Independence by Race and Ethnicity Using 2019-2023 ACS Southwest Bergen County PUMA Estimates and Borough of Wallington Population*

|  | Adverse Effect | No Adverse Effect | Total | Adverse Effect |
|---|---|---|---|---|
| Non-white | 272 | 3,594 | 3,866 | 0.070 |
| White | 222 | 8,231 | 8,453 | 0.026 |
| Total | 494 | 11,825 | 12,319 | 0.040 |

|  |  |  |
|---|---|---|
| x2 stat. | 133.259 | Degrees of Freedom = 1 |
| pvalue | 0.00000 |  |

The chi-square test indicates that the difference between the expected racial composition of the proposed units 2019-2023 Census ACS IPUMS data and the population of the Borough of Wallington is extremely unlikely to occur by chance. In other words, the results of the chi-square test here demonstrate with greater than 99.99% certainty that the difference between the expected number of non-white residents in the proposed development and the current population is not by chance.

V.    **The Effect on Housing Availability by Family Status of the Inability to Develop the Proposed Project**

In *Southern Burlington County NAACP v. Township of Mt. Laurel*, 67 N.J. 151 (1975), the New Jersey Supreme Court noted the prevalence of discrimination by New Jersey municipalities against families with children, particularly families with low and moderate incomes, noting that towns "sharply limit the number of apartments having more than one bedroom. Further, they require that the developer must provide in its leases that no school-age

16

children shall be permitted to occupy any one-bedroom apartment and that no more than two such children shall reside in any two-bedroom unit." The court noted that the "design of such limitations is obviously to restrict the number of families in the municipality having school age children and thereby keep down local education costs." The court in *Mt. Laurel* found that such restrictions are "clearly contrary to the general welfare" and unconstitutional under the New Jersey Constitution.

The U.S. Congress similarly noted the prevalence and problematic nature of discrimination against families with children. See House Comm. on the Judiciary, Fair Housing Amendments Act of 1988, H.R. Rep. No. 100-711, at 19 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2180 (discussing the severity of the problem of discrimination against families with children and its consequences). Congress amended the Fair Housing Act in 1988 to make it unlawful to "make unavailable or deny . . . a dwelling to any person because of . . . familial status." 42 U.S.C. § 3604(a). The Fair Housing Act defines "familial status" as one or more persons under the age of eighteen living with a parent or designee of a parent. 42 U.S.C. § 3602(k).

The share of households with children under the age of 18 is relatively similar in the Borough of Wallington as in the surrounding geography, as seen in Table 7.

*Table 7: Family Status Composition of Relevant Geographies (U.S. Census Bureau, 2019-2023 American Community Survey 5-Year Estimates)*

| | Wallington | | PUMA 3400302 | | Bergen County | | Northern New Jersey | | Metro Division | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Households** | 4,905 | | 49,309 | | 353,307 | | 1,537,799 | | 4,648,733 | |
| Households with children under 18 | 1,516 | 30.9% | 14,425 | 29.3% | 113,102 | 32.0% | 501,847 | 32.6% | 1,300,143 | 28% |

Pursuant to *Mt. Laurel*, the development was required to include two- and three-bedroom units that could accommodate families and that would be affordable to families with low and moderate incomes.  21 percent of the units are one-bedroom units, substantially less likely to accommodate families with children and only 4 percent of the units are three-bedroom units, highly likely to accommodate families with children.  Overall, using the 2019-2023 5-year American Community Survey Individual Public Use Microdata Sample data regarding the renter households in the Southwest Bergen County PUMA, by unit size, the proposed development is not expected to have a larger share of households with children than the Borough of Wallington as a whole, as seen in Table 8.

*Table 8:*

|  | Wallington, NJ |  | Proposed Development |  |
|---|---|---|---|---|
| **Total HHs** | 4,905 | % | 207 | % |
| HHs w children | 1,516 | 32.2% | 58 | 27.9% |
| HHs no children | 3,389 | 69.1% | 149 | 72.1% |

The State of New Jersey's implementation of the *Mt. Laurel* decision requires builder's remedy projects to include affordable, income-restricted two- and three-bedroom units to address local government discrimination against low- and moderate-income households, including those with children.  Focusing on these two- and three-bedroom affordable units and using the 2019-2023 5-year American Community Survey Individual Public Use Microdata Sample data regarding the renter households in the Southwest Bergen County PUMA that could meet the income eligibility requirements for these units and focusing on their status as households with children under 18 years of age or not allows for estimation of the households that would benefit

from the these units and are adversely affected by their inability to be developed, as seen in

Table 9.

*Table 9: Income Eligible Households for Mt. Laurel 2- and 3-Bedroom Units in the Proposed*
*Development Using 2019-2023 ACS IPUMS Estimates from Southwest Bergen County*

|  |  | Southwest Bergen PUMA | % |
|---|---|---:|---:|
| *Very Low Income* |  |  |  |
| 2-bed VLI | with children | 1,211 | 69% |
| 2-bed VLI | without children | 555 | 31% |
| 3-bed VLI | with children | 831 | 91% |
| 3-bed VLI | without children | 86 | 9% |
| *Low Income* |  |  |  |
| 2-bed LI | with children | 670 | 39% |
| 2-bed LI | without children | 1,037 | 61% |
| 3-bed LI | with children | 677 | 61% |
| 3-bed LI | without children | 429 | 39% |
| *Moderate Income* |  |  |  |
| 2-bed MI | with children | 953 | 36% |
| 2-bed MI | without children | 1,727 | 64% |
| 3-bed MI | with children | 1,183 | 78% |
| 3-bed MI | without children | 327 | 22% |
| *Total* |  |  |  |
| All above units | with children | 5,525 | 57% |
| All above units | without children | 4,161 | 43% |

   a.   Evaluating Any Adverse Impact of the Inability to Develop the Project

Here, looking at the estimated 9,686 renter households in the Southwest Bergen County

region that would be able to qualify for the two- and three-bedroom affordable units, roughly

5,525 of those households have children under the age of 18 compared to 4,161 households

without children.  Comparing the proportion of protected-class members adversely affected by

the challenged policy to the proportion of persons adversely affected and not belonging to a

protected class as in *Mount Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658

19

F.3d 375, 382 (3d Cir. 2011), the inability to develop the project thus adversely affects 57 percent of the income eligible households for the affordable two- and three-bedroom units with children but only 43 percent of the income eligible households for the affordable two- and three-bedroom units without children. This 14 percentage point difference means that households with children would disproportionately feel the adverse effects of the inability to develop these two- and three-bedroom affordable units, at an impact ratio of 1.3. Data are not available at the geographic level of the Borough of Wallington to further compare the estimated residents of these proposed two- and three-bedroom affordable rental units to the residents of two- and three-bedroom rental units in Wallington, as above, or to conduct a chi-square test, as above.

 f. <u>Conclusion</u>

No matter which test one uses, the data consistently demonstrate that the Borough of Wallington's actions blocking the proposed development have had a significant adverse impact on non-white home-seekers. The data also demonstrate a substantial adverse impact on families with children for the inability to develop the two- and three-bedroom affordable units.

**VI. The Effect of the Borough's Actions on the Perpetuation of Racial Residential Segregation**

 a. *Perpetuation of Segregation*

Racial segregation is frequently measured through the dissimilarity index, which measures the evenness of the geographic distribution of two populations across a geography.[2] The dissimilarity index measures the share of one group's population that would have to change residence for each neighborhood (or other small geography, in this case, each Census Tract) to

---

[2] The dissimilarity index (D) is calculated using the equation: $D = \frac{1}{2} \sum_{i}^{n} \left| \frac{w}{W} - \frac{b}{B} \right|$

Where n= the number of spatial units (Census Tracts), w = the number of white residents in tract i, W = the total number of white residents in the larger geographical area (city, county, or metropolitan area), b = the total number of Black residents in tract i, and B = the total number of Black residents in the larger geographical area.

20

have the same share of that group as the metropolitan area (or other large geography). The possible values of the dissimilarity index range from 0.0, which would represent complete evenness of distribution or integration, to 1.0, which would represent complete separation or segregation.

Using the 2020 Decennial Census data, the Black-white dissimilarity index value for the New York-Jersey City-White Plains, NY-NJ Metropolitan Division, including Bergen County, is 0.74.[3] This dissimilarity index value means that more than 7 of every 10 Black residents of the metropolitan division would have to change neighborhood of residence in order for there to be a balanced geographic distribution of residents on the basis of race. Areas with a dissimilarity index greater than 0.60 have been categorized as "high segregation metropolitan areas."[4]

Siting a multifamily development in which 55 percent or more of the residents would be expected to be non-white, including 6 percent Black, 27 percent Latino, 6 percent Asian, and 5 percent other non-white, in a municipality in which 70 percent of the residents are white would further residential integration by race. The actions of the Borough of Wallington in blocking the proposed development perpetuates residential segregation on the basis of race.

## VII.    Conclusion

Based on the analyses above, I have formed the following opinions to a reasonable degree of statistical certainty: (1) The Borough of Wallington's actions blocking the proposed development have had a statistically significant adverse impact on the basis of race in making housing unavailable to non-white residents of the region; (2) The Borough of Wallington's actions blocking the proposed development's two- and three-bedroom affordable units have had

---

[3] See https://s4.ad.brown.edu/projects/diversity/segregation2020/msa.aspx?metroid=35614 .
[4] Massey, Douglas S., and Jonathan Tannen. "A research note on trends in black hypersegregation." Demography 52, no. 3 (2015): 1025-1034. Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4886656/

a substantial adverse impact on the basis of family status in making housing unavailable to households with children under the age of 18 in the region; (3) The Borough of Wallington's actions blocking the proposed development perpetuated residential segregation on the basis of race.

June 30, 2025

_Justin Steil_

_____

Justin Steil

**APPENDIX A: Curriculum Vitae**

## JUSTIN STEIL

MIT Department of Urban Studies and Planning, 77 Massachusetts Avenue, Room 9-515, Cambridge, MA 02139

(617) 253-2017 • steil@mit.edu

### I.    ACADEMIC POSITIONS

**Massachusetts Institute of Technology**, Cambridge, MA  2015-present
Associate Professor of Law and Urban Planning (with tenure), 2022-present
Associate Professor of Law and Urban Planning (without tenure), 2021-2022
Class of 1942 Career Development Associate Professor of Law and Urban Planning (without tenure), 2018-2021
Charles H. and Ann E. Spaulding Career Development Assistant Professor of Law and Urban Planning, 2015-2018

**Harvard University**, Cambridge, MA  2020-2021
W.E.B. Du Bois Fellow, Hutchins Center, Department of African and African American Studies

**New York University Law School**, New York, NY 2013-2015
Legal Research Fellow, Furman Center for Real Estate and Urban Policy.

### II.    EDUCATION

**Columbia University Graduate School of Architecture, Planning and Preservation**, New York, NY
Ph.D. in Urban Planning, 2015.
    *Dissertation:* Democracy and Discrimination: Analyzing Diverging Local Responses to Immigration
    *Committee:* Peter Marcuse, Susan Fainstein, Stacey Sutton, Clara Irazabal, Olatunde Johnson.

**Columbia University School of Law**, New York, NY
J.D., 2010.

**London School of Economics and Political Science**, London, UK
M.Sc. in City Design and Social Science, 2004.
    *Thesis:* "Threshold of Tolerance:" The Forced Dispersal of Asylum Seekers in the U.K.

**Harvard University**, Cambridge, MA
A.B. in African-American Studies, 2000.
    *Thesis:* Race and the Politics of Youth Imprisonment.

### III.    SELECTED PUBLICATIONS

**Books**

Steil, J., Kelly, N., Vale, L., & Woluchem, M. (Eds.). (2021). *Furthering Fair Housing: Prospects for Racial Justice in America's Neighborhoods*.  Philadelphia: Temple University Press.

Ellen, I. G. & Steil, J. (Eds.).  (2019).  *The Dream Revisited: Contemporary Debates about Housing, Segregation, and Opportunity*.  New York: Columbia University Press.

Marcuse, P., Connolly, J., Novy, J., Olivo, I., Potter, C. & Steil, J. (Eds.).  (2009). *Searching for the Just City: Debates in Urban Theory and Practice*.  London: Routledge.

**Journal Special Issues**

Simpson, S., Steil, J., Mehta, A. (Eds.) (2020) Planning, Policing, and Prisons. *Journal of Planning Education and Research* 40(2). Includes introductory essay, Simpson, S., Steil, J., Mehta, A. (2020) Planning Beyond Mass Incarceration. *Journal of Planning Education and Research* 40(2), 130-138.

**Refereed Articles**

Brennan, M., Freemark, Y., Steil, J., Dyer, S., Salvia, J., Segal, L. Serino. E., (2025). Mobility Risk: Using Ambulance Operations Data to Analyze the Spatial and Social Dimensions of Health Disadvantage. *Cities and Health*. https://doi.org/10.1080/23748834.2025.2481337

Hagan, M., Hepburn, P., Steil, J., & Weiss, B. (2025). Ensuring Housing Stability and Protections for the Nation's Renters: Avenues for Federal Action. *Housing Policy Debate*. https://doi.org/10.1080/10511482.2025.2479457

Nu, D., Muzio, J., Zheng, S., Steil, J. (2025) Understanding Housing Market Responses to Stringent Energy Codes. *Real Estate Economics*. http://doi.org/10.1111/1540-6229.12530

Summers, N & Steil, J. (2024). Pathways to Eviction. *Law and Social Inquiry* 50(1): 129-169. https://doi.org/10.1017/lsi.2024.23

Brennan, M., Srinivasakrishnan, T, & Steil, J. (2024). High and Dry: Rental Markets After Flooding Disasters. *Urban Affairs Review* 60(6): 1806-1838. https://doi.org/10.1177/1078087424124

Arcaya, M., Ellen, I., & Steil, J. (2024). Neighborhoods and Health: Interventions at the Neighborhood Level Could Help Advance Health Equity. *Health Affairs* 43(2): 156-163.

Brennan, M., Dyer, S., Jonasson, J., Salvia, J., Segal, L. Serino, E., & Steil, J. (2023). The policy case for designating EMS teams for vulnerable patient populations: Evidence from an intervention in Boston. *Health Care Management Science*. 27(1): 72-87.

Steil, J. & Arcaya, M. (2023). Residential Segregation and Health: History, Harms, And Next Steps. *Health Affairs Health Policy Brief, April 27, 2023.* DOI: 10.1377/hpb20230321.580719.

Steil, J. & Lens, M. (2023). Public Policies to Address Residential Segregation and Improve Health. *Health Affairs Health Policy Brief*, April 27, 2023. DOI: 10.1377/hpb20230321.466701.

Williams, R., & Steil, J. (2023) "The Past We Step Into and How We Repair It" A Normative Framework for Reparative Planning. *Journal of the American Planning Association* 89(4): 580-591.

Williams, D. A., Delgado, L. H., Cameron, N., & Steil, J. (2023). The Properties of Whiteness: Land Use Regulation and Anti-Racist Futures. *Journal of the American Planning Association* 89(4): 505-516.

Brennan, M., Steil, J., Dyer, S., Segal, L. Salvia, J., & Serino, E. (2022). Policy-Relevant Indicators of Urban Emergency Medical Services COVID-19-Patient Encounters. *Journal of Urban Health* 100: 11-15. https://doi.org/10.1007/s11524-022-00672-0.

Briggs, X., Martin, C., Reina, V., & Steil, J. (2022). Seeing More, Learning More: Equity in Housing and Community Development. *Cityscape: A Journal of Policy Development and Research*. 24(2): 117-137.

Brennan, M., Mehta, A., and Steil, J. (2022). In Harm's Way? The Effect of Disasters on the Magnitude and Location of Low-Income Housing Tax Credit Allocations. *Journal of Policy Analysis and Management* 41(2): 486-514.

Boustan, L. P., Margo, R. A., Miller, M. M., Reeves, J. M., & Steil, J. P. (2022). Does Condominium Development Lead to Gentrification? *Journal of Urban Economics Insight* 133: https://doi.org/10.1016/j.jue.2022.103524.

Freemark, Y. & Steil, J. (2022). Local Power and the Location of Subsidized Renters in Comparative Perspective: Public Support for Low- and Moderate-Income Households in the United States, France, and the United Kingdom. *Housing Studies* 37(10), 1753-1781.

Srinivasakrishnan, T., Brennan, M., Steil, J., Mazereeuw, M. & Ovalles, L. (2022). A Perfect Storm? Disasters and Evictions. *Housing Policy Debate* 32(1): 52-83.

Robinson, D. & Steil, J. (2021). Eviction Dynamics in Market-Rate Multifamily Rental Housing. *Housing Policy Debate* 31: 647-669 (https://doi.org/10.1080/10511482.2020.1839936).

Preis, B., Janakiraman, A., Bob, A., & Steil, J. (2021) Mapping Gentrification and Displacement Pressure: An Exploration of Four Distinct Methodologies. *Urban Studies* 58(2), 405-424.

Freemark, Y., Steil, J., & Thelen, K. (2020).  Varieties of Urbanism: A Comparative View of Inequality and the Dual Dimensions of Metropolitan Fragmentation.  *Politics & Society* 48(2), 235-274.

Mehta, A., Brennan, M. & Steil, J. (2020). Affordable Housing, Disasters, and Social Equity: LIHTC as a Tool for Preparedness and Recovery. *Journal of the American Planning Association* 86(1), 75-88.

Anguelovski, I., Brand, A. Connolly, J. Corbera, E., Kotsila, P., Steil, J., Garcia-Lamarca, M., Triguero-Mas, M., Cole, H., Baro, F., Langemeyer, J., Perez del Pulgar, C., Shokry, G., Sekulova, F., and Ramos, L.. (2020) Expanding the Boundaries of Justice and Equity in Urban Greening Scholarship: Towards an Emancipatory, Intersectional, and Relational approach. *Annals of the American Association of Geographers* 110(6), 1743-1769.

Steil, J. & Mehta, A.  (2020).  When Prison is the Classroom: Collaborative Learning about Urban Inequality.  *Journal of Planning Education and Research* 40(2), 186-195.

Steil, J. & Kelly, N.  (2019).  Survival of the Fairest: Examining HUD Reviews of Assessments of Fair Housing.  *Housing Policy Debate* 29(5), 736–751.

Steil, J. & Kelly, N.  (2019).  The Fairest of Them All: Analyzing Affirmatively Furthering Fair Housing Compliance.  *Housing Policy Debate* 29(1), 85-105.

Steil, J. & Delgado, L.  (2019).  Limits of Diversity: Jane Jacobs, the Just City, and Anti-Subordination. *Cities: The International Journal of Urban Policy and Planning* 91, 39-48*.*

Steil, J. (2018).  Antisubordination Planning.  *Journal of Planning Education and Research* (https://doi.org/10.1177/0739456X18815739).

De la Roca, J., Ellen, I. G., & Steil, J. (2018).  Does Segregation Matter for Latinos? *Journal of Housing Economics* 40, 129-141.

Steil, J., Albright, L., Rugh, J. & Massey, D. S. (2018). The Social Structure of Mortgage Discrimination. *Housing Studies* 33(5), 759-776.

Ellen, I. G., Steil, J., & De la Roca, J. (2016).  The Significance of Segregation in the 21st Century. *City and Community* 15(3), 8-13.

Massey, D. S., Steil, J., Albright, L., & Rugh, J.  (2016).  'Riding the Stagecoach to Hell': A Qualitative Analysis of Racial Discrimination in Mortgage Lending.  *City and Community* 15(2), 118-136.

Steil, J., De la Roca, J. & Ellen, I. G. (2015).  *Desvinculado y Desigual:* Latino Segregation and Access to Opportunity. *Annals of the American Academy of Political and Social Science* 660(1), 57-76.

Steil, J. & Vasi, I. B.  (2014).  The New Immigration Contestation: Social Movements and Local Immigration Policymaking in the United States, 2000-2011.  *American Journal of Sociology* 119(4), 1104-1155.

Steil, J. & Ridgley, J.  (2012).  Small Town Defenders: The Production of Citizenship in Hazelton, Pennsylvania. *Environment and Planning D: Society and Space* 30(6), 1028-1045.

**Law Review Articles**

Summers, N. & Steil, J. (2025). Evicted by Default.  *Connecticut Law Review* 57(4): 1235-1255.

Steil, J. & Traficonte, D. (2025).  After the Storm: The Fair Housing Act and Post-Disaster Recovery.  *Virginia Environmental Law Journal* 43(2).

Steil, J. & Traficonte, D.  (2018).  A Flood—Not a Ripple—Of Harm: Proximate Cause Under the Fair Housing Act. *Cardozo Law Review* 40(3), 1237-1285.

Steil, J.  (2011).  Innovative Responses to Foreclosures: Paths to Neighborhood Stability and Housing Opportunity. *Columbia Journal of Race and Law* 1(1), 63-117.

**Book Chapters**

Steil, J. (2024) Climate Disasters and Environmental Justice. In A. Gorlin & V. Newhouse (Eds.) *Housing the Nation: Affordability and Social Equity*. New York: Rizzoli.

Steil, J. Kelly, N., Vale, L. & Woluchem, W. (2021). Fair Housing: Promises, Protests, and Prospects for Racial Equity in Housing. In J. Steil, N. Kelly, L. Vale, & M. Woluchem (Eds.). *Furthering Fair Housing: Prospects for Racial Justice in America's Neighborhoods* (pp. 3-43).  Philadelphia: Temple University Press.

Kelly, N., Woluchem, M., Jordan, R. & Steil, J. (2021). The Promise Fulfilled? Taking Stock of Assessments of Fair Housing. In J. Steil, N. Kelly, L. Vale, & M. Woluchem  (Eds.). *Furthering Fair Housing: Prospects for Racial Justice in America's Neighborhoods* (pp. 93-126).  Philadelphia: Temple University Press.

Steil, J. & Kelly, N. (2021).  From Suspension to Renewal: Regaining Momentum for Fair Housing. In J. Steil, N. Kelly, L. Vale, & M. Woluchem (Eds.). *Furthering Fair Housing: Prospects for Racial Justice in America's Neighborhoods* (pp. 229-233).  Philadelphia: Temple University Press.

Steil, J. & Charles, C. Z.  (2020).  The Sociology of Segregation and Fair Housing.  In V. Reina, W. Pritchett, & S. Wachter (Eds.). *Perspectives on Fair Housing*.  Philadelphia: University of Pennsylvania Press.

Steil, J. & Connolly, J.  (2019).  The Just City.  In A. Orum (Ed.), *The Wiley-Blackwell Encyclopedia of Urban and Regional Studies*.  London: Wiley-Blackwell.

Steil, J. & Delgado, L. (2018).  Contested Values: How Jim Crow Segregation Ordinances Redefined Property Rights.  In N. Davidson and G. Tewari (Eds.), *Global Perspectives on Urban Law* (pp. 7-26)*.  London: Routledge.

26

Steil, J. & Jordan, R.  (2018).  Changing Technology, Durable Segregation, and Household Residential Decisionmaking.  In C. Herbert, J. Spader, J. Molinsky, & S. Rieger (Eds.), *A Shared Future: Fostering Communities of Inclusion in an Era of Inequality* (pp. 114-125).  Cambridge, MA: Joint Center for Housing Studies.

Steil, J. & Connolly, J.  (2009).  Can the Just City Be Built from Below? Brownfields, Planning and Power in the Bronx. In P. Marcuse et al. (Eds.), *Searching for the Just City: Debates in Urban Theory and Practice*.  London: Routledge.

Connolly, J. & Steil, J.  (2009).  Finding Justice in the City.  In P. Marcuse et al. (Eds.), *Searching for the Just City: Debates in Urban Theory and Practice*.  London: Routledge.

**Book Reviews**

Steil, J.  (2018).  *Planning Sustainable Cities and Regions: Towards More Equitable Development* by Karen Chapple: A Review.  *Journal of Urban Affairs*, 40(1): 149-150.

Spicer, J. & Steil, J.  (2017).  *The Rise and Fall of Urban Economies: Lessons from San Francisco and Los Angeles* by Michael Storper, Thomas Kemeny, Naji P. Makarem, and Taner Osman: A Review.  *Journal of Economic Geography* 17(4): 921-923.

Steil, J.  (2012).  *Harlem is Nowhere* by Sharifa Rhodes Pitts: A Review.  *Cultural Geographies* 19(2): 273-274.

Steil, J.  (2010).  *Gentrification* by Loretta Lees, Tom Slater, and Elvin Wyly: A Review.  *Cultural Geographies* 17(3): 418-419.

**Selected Amicus Briefs, Expert Reports, and Other Publications**

Expert Reports

United States District Court for the District of South Carolina. 2023. Expert Declaration in *DHD Jessamine LLC v. Florence County et al*. No. 22-cv-01235.

United States District Court for the District of Columbia. 2023.  Expert Declaration in *Andersen et al. v. U.S. Department of Housing and Urban Development* No. 23-cv-01259

United States District Court for the Northern District of Ohio. 2022.  Expert Report in *Albert Pickett et al. v. City of Cleveland*, No. 19-cv-02911.

District of Columbia Superior Court. 2022. Expert Report in *District of Columbia v. Daro Realty, LLC.*, No. 2020 CA 001015 B.

United States District Court for the District of Oregon. 2021.  Expert Report in *Total Real Estate Group, LLC. V. Strode et al*. No. 21-cv-01677.

City of New York. Office of Administrative Trials and Hearings. 2021.  Expert Reports in *New York City Commission on Human Rights, ex rel. Watson et al. v. PPC Residential LLC et al.* Index No. 19/2245.

United States District Court for the Central District of Illinois.  2020.  Expert Report in *Hope Fair Housing Center v. City of Peoria, Illinois* No. 17 Civ. 01360.

United States District Court for the Southern District of New York.  2019.  Expert Reports in *Spooner v. Pelican Management, Inc.; Fordham One Company, LLC; Company, Cedar Two Company, LLC.* No. 18 Civ. 01564.

27

United States District Court for the District of Columbia. 2018. Expert Declaration in *National Fair Housing Alliance et al. v. Ben Carson et al*. No. 18 Civ. 1076.

United States District Court for the Southern District of New York.  2018.  Expert Report in *Fair Housing Justice Center, Inc. v. Town of Eastchester* No. 16 Civ. 9038.

Consulting Expert

United States District Court for the Northern District of New York. 2024.  Consulting in *Housing Opportunities Made Equal, Inc. v. Buffalo Management Group, Inc.*, No. 24-cv-01099.

United States District Court for the Northern District of Florida. 2022.  Consulting in *Oliver Hill et al. v. Tallahassee Housing Authority*, No. 22-cv-225.

United States District Court for the Eastern District of New York. 2022.  Consulting in *Kaseim Tripp and Kimberly Rosario. v. Ouriel Aryeh and Elite Connect Real Estate*, No. 21-cv-646.

Amicus Briefs

Commonwealth of Massachusetts Superior Court, Amicus Brief of William Berman, Matthew Desmond, David Robinson, Justin Steil, and the American Civil Liberties Union regarding the Disproportionate Adverse Effect of Eviction on Black Families, in *Mitchell Matorin et al., v. Commonwealth of Massachusetts et al*., 2084-cv-01344 (2020) (with Esme Caramello and Nicole Summers)

United States Court of Appeals for the Eleventh Circuit, Amicus Brief of International Municipal Lawyers Association and Housing Scholars, in *City of Miami v. Bank of America et al. and Wells Fargo et al.*, Nos. 14-14543, 14-14544 (2018) (with Daniel Traficonte)

United States District Court for the Northern District of California, Amicus Brief of National Fair Housing Alliance, Lawyers Committee for Civil Rights Under Law, Poverty and Race Research Action Council, and Housing Scholars in *City of Oakland v. Wells Fargo, et al.*, No. 15-cv-04321 (2017) (with Daniel Traficonte and Peter Damrosch)

United States Supreme Court, Amicus Brief of Housing Scholars in *Bank of America et al. and Wells Fargo et al. v. City of Miami, Nos. 15-1111, 15-1112*. (2016) (with Alan White)

Comments on Federal Rulemaking

Comment on the Department of Housing and Urban Development (HUD) Proposed Rule: FR-6123-P-02 Affirmatively Furthering Fair Housing, Submitted March 16, 2020 (with Noah Kazis, Sophie House, Matthew Murphy)

Comment on the Department of Housing and Urban Development (HUD) Proposed Rule: FR-6111-P-02 re: HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, Submitted October 18, 2019 (with Peter Damrosch, Somala Diby, and Daniel Traficonte)

Other Publications

Boustan, L. P., Margo, R. A., Miller, M. M., Reeves, J. M., & Steil, J. P. (working paper). Does Condominium Development Lead to Gentrification? (WP 26170). *National Bureau of Economic Research*.

Schuessler, A., Brennan, M., Mehta, A. & Steil, J. (2022) How Can Governments Adapt to Meet Affordable Housing Needs After Disasters? Analyses of government preparedness for and responses to post-disaster housing needs. MIT Center for Real Estate Report.

Brennan, M., Dyer, S., Salvia, J., Segal, L., Serino, E., & Steil, J. (2021). Pedestrians and Cyclists Struck in the City of Boston: Patterns and Interventions. Boston Emergency Medical Services.

Freemark, Y. & Steil, J. (2021) Lessons from Overseas Could Improve the US's Affordability Crisis. The Urban Institute, Urban Wire.

Robinson, D. & Steil, J. (2020) Evictions in Boston: The Disproportionate Effects of Forced Moves on Communities of Color (Report).

Steil, J. & Diby, S. (2020) Disaster, Abolition, and Repair. *Poverty & Race*.

Steil, J. (2019) Disparate Impact and an Antisubordination Approach to Civil Rights and Urban Policy. *Poverty & Race*.

Steil, J. (2015) Federal Anti-Segregation Milestones Demand Local Mobilization. *Metropolitics*.

Steil, J. (2014) The Challenge of Inequality. *Poverty & Race*.

Steil, J. & Menendian, S. (2014) Responding to Rising Inequality. U.C. Berkeley Othering & Belonging Institute Policy Brief.

### IV.   AWARDS

**Massachusetts Institute of Technology,** 2025
MacVicar Fellow, recognizing faculty who have made exemplary and sustained contributions to undergraduate education.

**Boston Emergency Medical Services,** 2023
Special Citation for "extraordinary actions improving Emergency Medical Services…through continuous contribution."

**Massachusetts Institute of Technology,** Department of Urban Studies and Planning Student Council, 2023
Excellence in Advising Award

**Massachusetts Institute of Technology,** Department of Urban Studies and Planning Student Council, 2022
Excellence in Advising Award

**Massachusetts Institute of Technology,** Office of the First Year, 2022
First Year Advising Award.

**Massachusetts Institute of Technology,** MIT Emergency Medical Services, 2022
John Wu Mentoring Award.

**Massachusetts Institute of Technology,** 2021
Harold E. Edgerton Award for exceptional contributions in research, teaching, and service.

**Massachusetts Institute of Technology,** Graduate Student Council, 2021
Frank E. Perkins Award for Excellence in Graduate Advising.

**International Municipal Lawyers Association,** 2019
Amicus Service Award

**Massachusetts Institute of Technology**, 2018

Paul Gray Award for Public Service, recognizing "a member of the MIT faculty who exemplifies building a better world" through his or her teaching, research, advising, and service."

**Massachusetts Institute of Technology**, Office of Graduate Education, 2018
Committed to Caring Award, recognizing "professors who go above and beyond expectations to make a positive impact on the lives of graduate students."

**Massachusetts Institute of Technology**, Department of Urban Studies and Planning Student Council, 2016
Excellence in Teaching Award

## V.    TEACHING

| Term | Course | Title | Units |
|------|--------|-------|-------|
| 2025 Spring | 11.367 | Law and Politics of Land Use | 12 |
| 2025 Spring | 11.265 | Housing Finance and Social Equity | 6 |
| 2025 Spring | 11.067 | Environmental Justice, Science, and Technology | 12 |
| 2024 Fall | 11.268 | Laws of the Land: Land Use & Environmental Law | 6 |
| 2024 Fall | 11.426 | Urban Emergency Medical Services | 12 |
| 2024 Fall | 11.A13 | Environmental Justice: Law and Literature | 3 |
| 2023 Spring | 11.367 | Law & Politics of Land Use | 12 |
| 2023 Spring | 11.S968 | Housing Finance and Social Equity | 6 |
| 2022 Fall | 11.220 | Quantitative Reasoning and Statistical Methods for Planning | 12 |
| 2022 Fall | 11.S967 | Laws of the Land: Land Use & Environmental Law | 6 |
| 2022 Fall | 11.A13 | Environmental Justice | 3 |
| 2022 Spring | 11.367 | Law & Politics of Land Use | 12 |
| 2021 Fall | 11.401 | Housing, Community, & Economic Development Policy | 12 |
| 2021 Fall | 11.S967 | Laws of the Land: Land Use & Environmental Law | 6 |
| 2021 Fall | 11.A13 | Environmental Justice: An Introduction to Civil Rights & Environmental Law | 3 |
| 2021 Fall | 11.S188 | Urban Emergency Medical Services | 6 |
| 2020 Spring | 11.367 | Law & Politics of Land Use | 12 |
| 2020 Spring | 11.S02 | Climate Justice & Cities | 3 |
| 2019 Fall | 11.401 | Housing, Community, & Economic Development Policy | 12 |
| 2019 Fall | 11.148 | Environmental Justice | 12 |
| 2018 Fall | 11.401 | Housing, Community, & Economic Development Policy | 12 |
| 2018 Fall | 11.360 | Community Growth & Land Use Practicum | 12 |
| 2018 Spring | 11.469 | Urban Sociology | 12 |
| 2017 Fall | 11.401 | Housing, Community, & Economic Development Policy | 12 |
| 2016 Fall | 11.148 | Environmental Justice | 12 |
| 2016 Fall | 11.401 | Housing, Community, & Economic Development Policy | 12 |
| 2016 Fall | 11.S942 | Research Design in Housing and Community Development | 12 |

| 2016 Spring | 11.469 | Urban Sociology | 12 |
| 2016 Spring | 11.S945 | Cities and Immigration | 12 |
| 2016 IAP | 11.S955 | Fair Housing and Community Development | 3 |
| 2015 Fall | 11.401 | Housing, Community, & Economic Development Policy | 12 |

## VI.  ADVISING

**Student Thesis Summary**

| | Total | Completed | In process |
|---|---|---|---|
| Ph.D. as Supervisor | 8 | 5 | 3 |
| Ph.D. as Reader | 16 | 11 | 5 |
| M.C.P. as Supervisor | 31 | 28 | 3 |
| Bachelor's | 10 | 10 | 0 |

## VII.  SERVICE

**Professional Service**

*Boston Emergency Medical Services*, Researcher in Residence,
        2020-present
*Inter-University Committee on International Migration*, Board Member
        2016-present
*Poverty and Race Research Action Council*, Board Member
        2016-present
*Mayor of Boston's Housing Advisory Task Force*, Member
        2018-present
*Mayor of Boston's Rent Control Advisory Committee*, Member
        2019-2020
*Boston Planning & Dev't Agency Technical Advisory Committee,* Community Nominated Member
        2018-2020
*Federal Reserve Bank of Boston*, Community Development Research Advisory Council, Board Member
        2017-2020
*Cambridge Housing Authority*, Grievance Panel Neutral Arbiter
        2017-2018

**Institute Committees and Working Groups**
Standing Committees
Committee on Undergraduate Admissions and Financial Aid, Chair since 2024
        2023-present
Committee on Sexual Misconduct Prevention and Response, Chair since 2024
        2019-present
Distinguished Fellowships Committee
        2019-2021
Working Groups and Ad-Hoc Committees
Women's and Gender Studies Program Steering Committee
        2019-2023
Working Group on Strengthening the Pipeline of Underrepresented and Minority Researchers
        2021-2022

31

President's Working Group on Campus Visitors and Safety, Co-Chair
        2020-2022
President's Working Group on Disclosures of Complaints of Violations of Conduct Policies
        2020-2021
President's Working Group on Sexual Harassment: Climate, Culture, and Consequences in Academia
        2019-2020
Vice-Chancellor's Working Group on Designing the First Year
        2017-2018
Chancellor's Working Group on Potential Post-Election Changes to Federal Law and Policy
        2016-2018

**Departmental Committees**
Standing Committees
Undergraduate Committee, Chair 2024-present, member 2017-2020,
        2024-present
Masters in City Planning Committee, Chair 2021-2023, member 2015-2017
        2021-2023
CoLab Faculty Advisory Board
        2015-2022

Ad-Hoc Committees
AWIT Promotion Committee for Jason Jackson, Chair
        2024-present
AWOT Promotion Committee for Devin Bunten
        2023-2024
AWOT Promotion Committee for Jason Jackson, Chair
        2022-2023
AWOT Promotion Committee for Catherine D'Ignazio
        2021-2022
Third-Year Review Committee for Devin Bunten
        2021-2022
Faculty Search Committee, Community Development
        2018-2019
Faculty Search Committee, Urban Economics
        2017-2018

## VIII.    MEMBERSHIPS
**Bar and Court Admissions**
New York State Bar; United States Supreme Court Bar; Ninth Circuit U.S. Court of Appeals; U.S. Court
        for the Southern District of New York.
**Professional Associations**
American Planning Association; American Sociological Association; Association of Law, Property, and
        Society; American Association of Geographers; Urban Affairs Association; National Registry of
        Emergency Medical Technicians (NREMT-P, also AHA ACLS and PALS certified).

## IX.    SELECTED WORK EXPERIENCE
**United States Court of Appeals, Ninth Circuit**
        2012–2013
        Law clerk for the Hon. M. Margaret McKeown,

**United States Court for the Southern District of New York**
2011–2012
Law clerk for the Hon. Kimba M. Wood.

**Foreclosure Prevention Project/South Brooklyn Legal Services**, *Legal Intern*, Brooklyn, NY
Spring 2010
Conducted legal research and assisted in the preparation of a joint pre-trial order in *Barkley v. Olympia Mortgage*.

**ACLU Immigrants' Rights Project**, *Legal Intern*, New York, NY
Fall 2009
Wrote memos on choice of law and standards for civil commitment. Analyzed DHS data on detention.

**The Brennan Center for Justice**, *Legal Intern, Access to Justice Project*, New York, NY
Summer 2009
Researched state legal issues regarding First Amendment rights of HIV-AIDS non-profits, prisoners and the census.

**Debevoise and Plimpton, LLP**, *Summer Associate*, New York, NY
Summer 2009
Assisted with FCPA and real estate practice.  Drafted U-Visa affidavit and memo to limited equity housing coop.

**Fair Housing Justice Center**, *Legal Intern,* New York, NY
Fall  2008
Researched discriminatory housing practices by suburban municipalities through FOIL requests, archival research and statistical analysis of housing data. Presented potential cases to E.D.N.Y. U.S. Attorney's Office Civil Rights Chief.

**Human Rights Now,** *Legal Intern*, Tokyo, Japan
Summer 2008
Wrote policy papers on refugee resettlement for discussion with the Ministries of Foreign Affairs and Justice.

**Youth Ministries for Peace and Justice**, *Community Development Program Manager*, Bronx, NY
2005–2007
Coordinated neighborhood sustainability planning and executed projects, including green roof construction.

**Neighborhood Economic Development Advocacy Project**, *Advocacy Director,* New York, NY
2004–2005
Coordinated advocacy for New Yorkers for Responsible Lending Coalition relating to state bills to curb abusive tax-refund anticipation loans and prevent deed-theft scams. Worked with Immigrant Financial Justice Campaign.

**Casa Amiga Centro de Crisis**, *Advocate*, Ciudad Juárez, Mexico
2003
Created and led workshops for municipal police to improve their ability to support survivors of sexual violence.

**The City School**, *Program Manager*, *The Prison Project*, Boston, MA
2000–2002
Taught courses for high-school students and prisoners, separately and together, about crime and justice.

**APPENDIX B: DISCLOSURES**

I testified at depositions in the matter *of Fair Housing Justice Center v. Town of Eastchester*, No. 16-CV-9038 (S.D.N.Y.); *Fair Housing Justice Center v. Pelican Management, Inc.* No. 18 Civ. 01564 (S.D.N.Y.); *Hope Fair Housing Center v. City of Peoria, Illinois* No. 17 Civ. 01360 (C.D. Ill.); *New York City Commission on Human Rights, ex rel. Watson et al. v. PPC Residential LLC et al.* Index No. 19/2245 (City of New York Office of Administrative Trials and Hearings); *Total Real Estate Group, LLC. v. Strode et al.* No. 21-cv-01677 (D. Or.); *Albert Pickett et al. v. City of Cleveland*, No. 19-cv-02911 (N.D. Oh.). I testified at trial in the matter of *Fair Housing Justice Center v. Pelican Management, Inc.* No. 18 Civ. 01564 (S.D.N.Y.).