# EXHIBIT H

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE COMMITTEE ON OPINIONS

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: BERGEN COUNTY
DOCKET NO. BER-L-373-06

THE WALLINGTON GROUP, LLC,

    Plaintiff,
and

MORNINGSIDE AT WALLINGTON, LLC,

    Intervener,

    v.

BOROUGH OF WALLINGTON, a Municipal Corporation of the State of New Jersey, County of Bergen, MAYOR AND COUNCIL OF THE BOROUGH OF WALLINGTON, and PLANNING BOARD OF THE BOROUGH OF WALLINGTON,

    Defendants,

Decided: March 18, 2008

Ronald L. Shimanowitz, (Hutt & Shimanowitz, attorneys) argued the cause for plaintiff.

Gary T. Hall and Lisa W. Bonsall, (McCarter & English, LLP, attorneys) argued the cause for intervener.

Mark R. Peck, (Florio, Perucci, Steinhardt & Fader, LLC, attorneys) argued the cause for defendants, Borough of Wallington and Mayor and Council of the Borough of Wallington.

Martin S. Cedzidlo, (Law Office of Richard S. Greenberg, attorneys) argued the cause for defendant Planning Board of the Borough of Wallington.

JONATHAN N. HARRIS, J.S.C.

P000004

I. INTRODUCTION

This is a Mount Laurel[1] builder's remedy action that seeks a judicial determination that plaintiff and intervener shall be entitled to develop their industrially zoned land in Wallington for residential multi-family use at a density of thirty-eight dwelling units per acre. Without conceding that a builder's remedy is appropriate, the municipality nevertheless has proposed a zoning plan for the land in question that would yield twenty dwelling units per acre.

Following the successful prosecution of a motion for partial summary judgment that declared Wallington to be out of compliance with the New Jersey Constitution, the Fair Housing Act (FHA), N.J.S.A. 52:27D-301 to -329, and the Mount Laurel I and Mount Laurel II doctrines, I appointed a Special Master to assist the parties in reaching an appropriate disposition of their dispute. Settlement was not attainable, and the parties have placed into my hands the task of resolving their dispute.

After a trial[2] on the merits of plaintiff's and intervener's entitlement to a builder's remedy, I conclude that because the defendant municipality has not demonstrated 1) that the site is

---

[1] S. Burlington County N.A.A.C.P. v. Twp. of Mount Laurel, 67 N.J. 151, cert. denied, 423 U.S. 808, 96 S. Ct. 18, 46 L. Ed. 2d 28 (1975) (Mount Laurel I); S. Burlington County N.A.A.C.P. v. Twp. of Mount Laurel, 92 N.J. 158 (1983) (Mount Laurel II).

[2] As part of the trial process, I viewed the properties in the presence of the attorneys, the Special Master, and several representatives of the parties pursuant to the procedures of Morris County Land Improvement Co. v. Twp. of Parsippany-Troy Hills, 40 N.J. 539, 548-49 (1963).

2

environmentally constrained, 2) that construction of a high-density residential development would represent bad planning, or 3) that plaintiff or intervener has prosecuted this action in bad faith, a builder's remedy for plaintiff and intervener is warranted. This conclusion is tempered, however, by several factors. First, I note plaintiff and intervener did not seek relief from the zoning applicable to the properties before commencing litigation against the municipality. Second, at the present time, the uncertainty surrounding the Council on Affordable Housing's (COAH's) third round regulations constrains the court's ability to determine Wallington's fair share obligation with precision. Third, the court recognizes the disproportionality in density between the proposed development and the neighboring uses, which would unfairly put Wallington in the position of shouldering a greater-than-necessary proportion of the region's need for affordable housing. Rather, the appropriate measure of relief is best addressed with moderation and restraint along the lines suggested by the municipality. Thus, I grant a builder's remedy to plaintiff and intervener that will require Wallington to zone the lands in question for residential multi-family use at a density of not less than twenty dwelling units per acre.

## II. BACKGROUND

The Borough of Wallington (Wallington) is nestled in southwest Bergen County surrounded by Garfield, South Hackensack, Woodridge, Carlstadt, and East Rutherford. Its western boundary is the Passaic River, and its municipal neighbor to the west is the City of Passaic in Passaic County. (See Map 1.) Wallington presents itself as a close-knit community that consists of well-maintained homes, a few multi-family developments, several industrial and commercial sites in the process of redevelopment, and as a place where its inhabitants earn modest incomes. In short, Wallington claims that it already has provided a de facto environment for low and moderate income families to find affordable shelter within its borders. Unfortunately, the evidence adduced during this litigation demonstrates that Wallington's subjective hometown feel does not equate with satisfaction of its objective fair share obligation under Mount Laurel principles.

Map 1

Plaintiff The Wallington Group, LLC (Wallington Group) owns 6.736 acres known as Block 71, Lot 35.02, which is located along the Saddle River in Wallington. It is bounded on the northeast by a New Jersey Transit railroad right of way and is surrounded on

4

the southwest and southeast by the land of intervener Morningside at Wallington, LLC. (Morningside). Wallington Group's land has no frontage upon a public road, but enjoys ingress and egress through one or more easements across the contiguous land of Morningside. The property is substantially vacant, containing only the remnants of prior commercial or industrial uses.

Morningside's land consists of 3.687 acres with full access to Main Avenue. It is improved with a one-story building that houses light industrial uses and a roller rink. (See Map 2.)



Map 2

The common address shared by Wallington Group and Morningside is 551 Main Avenue. All of the land is located in Wallington's Light Industrial-Commercial (LI-C) zone, which does not permit residential development. See Wallington Code § 323-27 and § 323-15 ("[a]ny use not specifically designated as a principal permitted use, an accessory use or a conditional use is specifically prohibited from any zone district in the borough.").

Wallington Group's and Morningside's properties are located immediately north of a multi-family garden apartment development known as Jasontown Apartments, which is located in Wallington's Multifamily-Garden-Type Dwelling (R-3) zone. Directly across Main Avenue from the properties is an active industrial center, commonly referred to as the Farmland Dairies facility, which is located in Wallington's Industrial (I) zone.

Although the parties made stray references to environmental contamination of Wallington Group's and Morningside's properties during the trial, and a view of the properties reveals the evident potential for improper dumping by third parties, no persuasive evidence suggests that the lands are inappropriate for housing redevelopment and residential use. Notwithstanding the proximity of the properties to the railroad and the dairy, Wallington concedes that the properties are appropriate redevelopment candidates for residential uses, albeit at a more reasonable density far below the urgings of Wallington Group and Morningside.

Indeed, the primary friction point that separates the parties is their dispute over the appropriate density for residential development. Wallington Group and Morningside proffer development that would produce a total of 396 dwelling units, in separate developments of 255 dwelling units (housed in six three- to four-story buildings) on the Wallington Group parcel, and 141 dwelling units (housed in four three- to four-story buildings) on the Morningside tract. Under the aggregate proposal of Wallington Group and Morningside, the affordable housing yield would be seventy-nine dwelling units with a 20% set aside and fifty-nine dwelling units with a 15% set aside.

Wallington argues that these proposals would amount to poor planning and that a reasonable density is closer to twenty dwelling units per acre. Wallington's approach would permit a total of approximately 208 dwelling units, of which forty-one dwelling units could be devoted to affordable housing employing a 20% set aside; if a 15% set aside were used, the yield of affordable dwelling units would be thirty-one.

III. DETERMINATIONS OF LAW

The principal question in this case is whether Wallington has created a realistic opportunity for the construction of its fair share of the region's needs for affordable housing. The answer is not simply a function of the historic and demographic development

7

of the community. Rather, it requires a review of the land use policies implemented pursuant to the Municipal Land Use Law. N.J.S.A. 40:55D-1 et. seq. viewed through the lens of more than two decades of lessons gleaned from the Mount Laurel doctrine. In reviewing a municipality's response to its constitutional duty, the court does not write upon a clean slate. The judiciary is admonished to harmonize its decisions wherever possible to the guidelines and policy of COAH. See Hills Dev. Co. v. Bernards Twp., 103 N.J. 1, 22 (1986). Courts hearing and deciding exclusionary zoning cases should follow COAH's fair-share methodology. Id. at 63; see Bi-County Dev. Corp. v. Mayor of Borough of Oakland, 224 N.J. Super. 455, 458-59 (Law Div. 1988); Mount Olive Complex v. Township of Mount Olive, 340 N.J. Super. 511, 527-28 (App. Div. 2001), certif. granted, 174 N.J. 359 (2002). The good faith or bad faith of the municipality is not a relevant consideration in determining the municipal obligation. Such matters, however, may be appropriate once a remedy must be imposed.

Presently, it is extremely difficult for the judiciary to apply COAH methodology because of the uncertainty surrounding COAH's current regulatory framework. In re Adoption of N.J.A.C. 5:94 and 5:95, 390 N.J. Super. 1 (App. Div. 2007) (finding COAH's third round growth share approach inconsistent with the Mount Laurel doctrine and ordering COAH to substantially revise its

third round rules). On December 17, 2007, COAH voted to propose its revised third round regulations resulting from the reworking order.³ The rules were published in the January 22, 2008 New Jersey Register. COAH is holding five public hearings throughout the State to garner input for the final adoption of third round regulations. In addition, written comments can be submitted to COAHmail@dca.state.nj.us until March 22, 2008. The final adoption of third round rules is not expected until June 2008. It is uncertain whether there will be litigation challenging the revised rules.

Notwithstanding the many variables that exist at present, I must address the contested issues in this case. Although the

---

³ ³ The following is a summary of the major provisions of the proposed revised rules, taken from COAH's website:

> 1)Continuation of the growth share approach, with affordable housing need measured as a percentage of residential and non-residential growth from 2004 to 2018; 2)New ratios are 1 affordable unit among 5 units and 1 affordable unit for every 16 jobs (previously ratios were 1 among 9 units and 1 for every 25 jobs); 3)New affordable housing need for the state is 115,000 affordable units (an increase from 52,000 units in previous adoption). Establishes payment in lieu standards (cost of constructing an affordable unit) averaging $161,000 per affordable unit; 4)Regional Contribution Agreement amounts increased from $35,000 per unit to $67,000 to $80,000 per unit (by COAH region); 5)Development fees for new construction increased from 1% of equalized assessed value (EAV) for residential to 1 ½% of EAV and from 2% of EAV to 3% of EAV for non-residential. [COAH Proposed New Third Round Rules, http://www.state.nj.us/dca/coah/dec07proposal.shtml (last visited March 17, 2008)].

9

procedural and conceptual issues remain formidable, there is no sound reason to await a final determination of COAH's rulemaking activities. The parties have not requested a stay of the instant proceedings, and I am obliged to resolve their dispute here and now.

The threshold step in determining municipal compliance with the Mount Laurel doctrine requires calculation of fair share. Wallington's updated (but not yet adopted) 1987-1999 affordable housing obligation as determined by COAH is five new units. Under the now-defunct third round rules, Wallington's obligation for new construction for the 1987-1999 era had been twenty dwelling units. Additionally, the updated data reveals that Wallington must accommodate seventy-one rehabilitation units, but under the old regime, it had only forty-one units of a rehabilitation share. Compare Proposed New Third Round Rules, Appendix B at 145 and Appendix C at 184 (available at http://www.state.nj.us/dca/coah/dec07proposal/594.pdf) to N.J.A.C. 5:94, Appendix C (available at http://www.state.nj.us/dca/coah/594files/appendices/c.shtml). Thus, Wallington's aggregate fair share obligation (not counting growth share) increased from sixty-one units to seventy-six units, largely fueled by the dramatic increase in its rehabilitation share. For the court's purpose, the new construction obligation (excluding Wallington's growth share) will be considered to be not less than five units and not more than twenty.

Wallington asserts that it believed in good faith that it had already satisfied its prior era fair share by crediting itself with dwelling units that were part of the Jasontown Apartments. No pre-litigation effort was made to establish any other compliance, such as the creation of a rehabilitation program or adoption of a housing element and fair share plan that would be acceptable to COAH. At trial, Wallington ultimately conceded that it was not entitled to any credits, whether generated by Jasontown or elsewhere.

Wallington Group and Morningside urge the court to adopt an ad hoc approach to fair share, utilizing the arcane methodology of its expert. The rationale for using a non-COAH approach is the defeat of the third round rules, and the need to address affordable housing fair share as a command of the Constitution and FHA. Nevertheless, I find that the proffered approach of Wallington Group and Morningside injects far too many idiosyncratic theories and data, and does not appropriately address the broader regional attributes that should inform a fair share calculus.

Accordingly, even in the face of uncertainty over the third round regulations, I conclude that the best tactic is to hew closely to familiar COAH methodologies, to the extent that the evidence supports it. By vitalizing the known obligations of at least five new affordable dwelling units and seventy-one

11

rehabilitation units and deferring growth share to the future, I can reasonably accommodate the governmental and private interests at stake. Arguably, this will leave Wallington vulnerable to a future growth share-based challenge; nevertheless, Wallington will have the opportunity to plan for that event and take ameliorative steps by seeking a COAH safe harbor.

A developer is entitled to a builder's remedy if: (1) it succeeds in Mount Laurel litigation; (2) it proposes a project with a substantial amount of affordable housing; and (3) the site is suitable, that is, the municipality fails to meet its burden of proving that the site is environmentally constrained or construction of the project would represent bad planning. Toll Bros. v. Twp. of W. Windsor, 173 N.J. 502, 559-560 (2002); Mount Laurel II, 92 N.J. at 279-280; Shire Inn, Inc. v. Borough of Avon-by-the-Sea, 321 N.J. Super. 462, 465 (App. Div.), certif. denied, 162 N.J. 132 (1999). "The builder's remedy is a device that rewards a plaintiff seeking to construct lower income housing for success in bringing about ordinance compliance through litigation." Allan-Deane Corp. v. Bedminster Township, 205 N.J. Super. 87, 138 (Law Div. 1985). Even if a developer satisfies these three prongs, it may still be disqualified from receiving a builder's remedy if it is found that the developer acted in bad faith or has used the Mount Laurel doctrine as a bargaining chip:

12

> Care must be taken to make certain that <u>Mount Laurel</u> is not used as an unintended bargaining chip in a builder's negotiations with the municipality, and that the courts not be used as the enforcer for the builder's threat to bring Mount Laurel litigation if municipal approvals for projects containing no lower income housing are not forthcoming. Proof of such threats shall be sufficient to defeat Mount Laurel litigation by that developer.
> [<u>Mount Laurel II</u>, 92 <u>N.J.</u> at 280.]

Otherwise-qualifying plaintiff-developers have forfeited their putative rights to a builder's remedy due to such conduct on several occasions. Indeed, in <u>Toll Bros.</u>, <u>supra</u>, 173 <u>N.J.</u> at 564, the court noted, "[a] survey of builder's remedy decisions provided by certain amici reveals that in thirteen Superior Court cases, eight builder's remedies were granted and five were rejected. At the same time, out of nine builder's remedy cases before COAH, only one was approved."

    The record produced at trial does not support the conclusion that Wallington Group or Morningside acted in bad faith or manifestly engaged in conduct prohibited by the <u>Mount Laurel</u> doctrine. On the other hand, the evidence is scant that they realistically attempted to obtain relief without resorting to litigation. This omission, however, is but one factor in the court's determination whether to award a builder's remedy. <u>Oceanport Holding, L.L.C. v. Borough of Oceanport</u>, 396 <u>N.J. Super.</u> 622, 630 (App. Div. 2007) (noting the requirement set forth in

13

Mount Laurel II that a plaintiff-developer must attempt to obtain relief without litigation is relevant only to a developer's entitlement to a builder's remedy).

In this case, Wallington Group and Morningside satisfy all criteria of the three-prong test for entitlement to a builder's remedy. First, they successfully participated in obtaining summary judgment declaring Wallington's zoning scheme invalid, thereby necessitating rezoning and the appointment of the Special Master. Second, they have offered to make substantial contributions to the municipality's stock of low and moderate income housing units. Third, Wallington has failed to demonstrate that because of substantial planning concerns, a high-density residential use of the land is clearly contrary to sound land use principles. In fact, Wallington has proposed a significant zoning plan that would allow over twenty dwelling units per acre. Said another way, the competent evidence clearly establishes that the land is fully capable of being developed for residential use, and neither legitimate planning concerns nor environmental constraints would hinder appropriate development. The site is qualified for high-density affordable housing, but along the lines recommended by Wallington at approximately twenty dwelling units per acre.

This narrower builder's remedy accords with the limited new construction obligation of the municipality, and factors the unknown growth share that will be borne by Wallington once COAH's

14

regulations are finalized. In this vein, since I am not definitively deciding Wallington's third round obligations, but only concluding that it must comply with second round requirements, Wallington will remain vulnerable to future conventional builder's remedy lawsuits unless it immediately submits to COAH's substantive certification process. N.J.S.A. 52:27D-313 to -314; N.J.S.A. 52:27D-317(a).

In light of the foregoing, I shall enter an order granting plaintiffs' application for a builder's remedy to allow their lands in Wallington to be developed with high-density residential use in accordance with the plan as proposed by Wallington, to wit, with a maximum number of dwelling units not to exceed 208, of which at least forty-one shall be devoted to low and moderate income inhabitants. Although this remedy is less attractive to Wallington Group and Morningside, it nevertheless vindicates their participation as plaintiffs and adequately rewards those efforts, without imposing a disproportionate share of the region's affordable housing upon Wallington. Also tempering the remedy is the circumstance that neither Wallington Group nor Morningside made any meaningful effort to obtain relief before commencing litigation.

The order shall further declare that Wallington's land use regulations remain invalid and unconstitutional insofar as they continue past exclusionary practices. The Wallington Planning

15

Board and the governing body shall immediately prepare comprehensive compliance plans (including appropriate strategies to address the rehabilitation obligation), together with finalized zoning and planning legislation to satisfy the 1987-1999 fair share obligations in compliance with this decision. They shall complete the process of adopting meaningful Housing Element and Fair Share Plans, together with fee ordinances (if appropriate) and spending plans that are consonant with appropriate COAH rules. They shall exercise planning discretion in deciding whether to employ a program of rehabilitation grants, regional contribution agreements, accessory apartments, mobile homes, overlay zones, or any other incentive devices to meet the municipal obligation. This plan shall be completed, adopted, and presented to the court no later than June 30, 2008. A compliance hearing shall be conducted thereafter to determine the contours of the final judgment that will issue in this action. In default thereof, all development regulations in Wallington shall be permanently invalidated and a scarce resource order enjoining all land use development applications in Wallington (whether before the Planning Board or Board of Adjustment) shall become automatically effective. The Special Master shall remain active to consult regularly with designated representatives of the Planning Board and governing body during the preparation of the compliance plan, and he shall

16

provide appropriate input and constructive criticism throughout the process.

IV. CONCLUSION

Given the transitional period the court finds itself in, the remedy provided in this opinion appears adequate to provide appropriate relief to the successful plaintiffs, yet fine-tuned enough not to overburden the municipality with an outsized and lopsided obligation. It also consigns to the municipality the obligation to go forward with future compliance efforts or run the risk of losing the ability to chart its own course in land use matters. I request that the Special Master prepare the interlocutory order to memorialize this decision, and submit it to the court and all counsel as soon as possible.

P000020