# EXHIBIT J

1

1

2

3

4

5        Meeting of Wallington Planning board of 5/16/17

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P000063

2

```
1         (Meeting starts 7:51 p.m.)
2         CHAIRMAN BAGINSKI:  I call the
3   meeting to order.   Opening of the meeting by
4   chairman Baginski stating the rules and regulations
5   of the Sunshine Law.  Adequate notice was serviced
6   to Bergen record and community news, posted on
7   bulletin board of the civic center and on file in
8   the office of borough clerk.  I need a roll call.
9         (Roll call by Mr. Cedzidlo)
10        Pawluczuk, here, Bazel, here,
11  Baginski, here, Wygonik, here, Rachelski, here,
12  Kasperek here, Melfi here, Tomko, here.
13        CHAIRMAN BAGINSKI:  At this time I
14  like everyone to stand for the flag salute.
15        (Pledge of Allegiance.)
16        CHAIRMAN BAGINSKI:  Still we have a
17  new member of the planning board.  Theresa Wygonik.
18  She's returning member of the board.  She was a
19  member in the past.  But, we need to have her sworn
20  in. So mayor Tomko, will have you sworn in.  I
21  will hold the Bible for you.
22        (Theresa Wygonik sworn in.) _
23        CHAIRMAN BAGINSKI:  Congratulations.
24  At this time the March 21, 2017 and April
25  18, 2017 minutes of the planning board having been
```

3

```
1   sent out via mail, motion to be made for passing of
2   same if no additions, corrections or omissions.
3         Bazel:  I make a motion to pass.
4         CHAIRMAN BAGINSKI:  I need a second
5   on that.
6         Rachelski:  Second.
7         Pawluczuk, aye.  Bazel, aye.  Baginski, aye,
8   Wygonik, aye, Rachelski aye, Kasperek aye, Melfi
9   aye, Tomko aye.
10        CHAIRMAN BAGINSKI:  Correspondence
11  list having been sent out via mail, anything to be
12  discussed should be discussed at this time.  If not
13  then need a motion and second to mark and file the
14  same.
15        Pawluczuk, motion.  Bazel, second.
16  Roll call:  Pawluczuk aye, Bazel aye, Baginski aye,
17  Wygonik aye, Rachelski aye, Kasperek aye, Melfi
18  aye, Tomko aye.
19        CHAIRMAN BAGINSKI:  At this time the
20  board attorney presentation of resolutions to be
21  adopted.
22        MR. CEDZIDLO:  Thank you,,
23  Mr. Chairman.  I have two resolutions for waivers
24  of site plan. I will just read the relevant parts
25  and move this along.   First one concerning Nuno
```

4

```
1   Lemos.  Whereas Nuno Lemos seeks waiver of site
2   plan approval for the property at located 457
3   Paterson Avenue.  Known as block 56, lot 7.01 on
4   the Borough tax map.  Applicant seeks an approval
5   on operating a barbecue take out restaurant at the
6   site business zone.   Mr. Lemos testified on behalf
7   of the application.  Site is currently vacant.  It
8   was a restaurant in the past.  He's going to open a
9   barbecue take out restaurant.  Expectations is the
10  business will be 60 percent take out and 40 percent
11  of his customers will eat at the restaurant.  He
12  will renovate the interiors of the premises.  Hours
13  of operation ten am to ten p.m. daily.  Nine
14  employees.  Currently eight parking spaces, already
15  owns the adjacent car wash.  Car wash parking
16  spaces will be available in the evening for the
17  restaurant customers.  Expect a large volume of
18  diners after the car wash closing.  The board
19  approved the application subject to the following
20  conditions.  Applicant must install knox box for
21  the fire department, re stripe the parking lot
22  spaces and provided a fence and dumpster space in
23  the rear of the property.  The vote at that time in
24  favor of the application was Polton, Baginski,
25  Kasperek, Bazel, Melfi and Rachelski.
```

5

```
1         CHAIRMAN BAGINSKI:  I need a motion
2   and second.  Rachelski, motion.  Kasperek, second.
3         Roll call:  Pawluczuk aye, Bazel aye,
4   Baginski aye.  Wygonik recuse.  Rachelski, aye,
5   Kasperek, aye, Melfi aye.  Tomko, aye.
6         MR. CEDZIDLO:  The second is for
7   Aneta Volgelgesang seeking a waiver of site plan
8   approval for property located at 46-52 Wallington
9   Avenue, block 15, lot 25.  Applicant sought
10  approval to operate a skin care business at the
11  site.  She testified that she was going to open a
12  skin care business at the location, facials, skin
13  treatment, and electrolysis.  No employees.  Closed
14  on Sundays and Monday.  Hours of operation from
15  9:30 a.m. to seven p.m.  Proposed uses is a
16  permitted one.  The board granted the approval on
17  the condition that Miss Vogelgesang will install a
18  knox box for fire department.  The vote was Polton,
19  Pawluczuk, Baginski, Kasperek, Bazel and Melfi and
20  Rachelski.
21        CHAIRMAN BAGINSKI:  I need a motiion.
22  Kasperek, motion.  Bazel, second.
23        roll call:  Pawluczuk, aye.  Baginski aye.
24  Wygonik, recused.  Rachelski, aye.  Kasperek aye,
25  Melfi aye.  Tomko  aye.
```

P000064

8

CHAIRMAN BAGINSKI: There being no
old business before the board we're going to move
on to new business. Applicant Morningside at
Wallington LLC, 551 Main Avenue, and new Wallington
Home, LLC, Main Avenue rear.

MR. MOORE: Good evening, members of
the board. For the record my name is Kevin Moore
with the firm of Sills Cummis & Gross and I
represent both new Wallington home, LLC, and
Morningside at Wallington, LLC which have common
control. Tonight we we have two applications for
an adjacent properties both with the address of 551
Main Avenue, block 71, lots 35.01 and 35.02. The
application for lot 35.02, the New Wallington
project is for amended preliminary and site plan
for approved 134 unit multifamily project. The
application for lot 35.01, the Morningside project
is for a preliminary and final site plan approval
and C bulk variances for a 73 unit multifamily
project. Although the two applications are for
separate projects, some of the testimony overlaps,
and the amended site plan application for the New
Wallington project is the result of the
construction of the Morningside project. So I
believe the easiest procedure would for us to

modified and additional will be added. We don't
have a use problem because it is for residential on
both sides.

MR. CEDZIDLO: So I just wanted
preliminarily for the record to go over that.
Issues like easement traffic, there is going to be
testimony concerning that.

MR. MOORE: Mr. Bertin will be
testifying to that this evening.

MR. CEDZIDLO: Thank you very much.

MR. MOORE: Also my office gave
notice of both applications by certified mail to
all parties entitled to receive notice under all
the law, all parties within 200 feet on may fifth.
It was also published in the record on May 5th and
I would request that the board take jurisdiction on
both applications.

MR. CEDZIDLO: I didn't get it
delivered and I saw it for the first time about 20
minutes ago. But the certified mailings were all
provided to the board. That was provided by your
office.

MR. MOORE: Yes, It was.

MR. CEDZIDLO: Thank you, Mr. Moore.

MR. MOORE: On May 11th.

7

present both projects before the board votes on
either one.

MR. CEDZIDLO: Quick procedural
question, Mr. Moore.

MR. MOORE: Yes.

MR. CEDZIDLO: You said there is
separate applications and separate projects.

MR. MOORE: Yes.

MR. CEDZIDLO: The prior approval
that was granted to the New Wallington Homes for
lot 35.02 contained easements from 35.02, over
35.01, and the traffic pattern required industrial
trucks from 35.01 to exit.

MR. MOORE: Right.

MR. CEDZIDLO: Through 35.02. So
just as a preliminary statement, these are still
going to be separate projects and they're still
going to require.

MR. MOORE: Cross easements and
actually there is an easement plan that was
submitted as part of the application set with both
applications, the plans that was submitted as part
of the application before you this evening. So,
some of the cross easements are in existence and
already been filed. Others will have to be

9

MR. CEDZIDLO: Okay. It's got a
cover letter May 11. This is discussing that you
provided it to the board.

MR. MOORE: Right.

MR. CEDZIDLO: Gotcha.

MR. MOORE: Is the board taking
jurisdiction.

MR. CEDZIDLO: Yes, we're good to go.

MR. MOORE: Good. So just to briefly
summarize before Mr. Bertin testifies, with respect
to the application for the amended preliminary and
final application for lot 35.02, the application
and owner is New Wallington Home, LLC. It's on
Main Avenue, Wallington New Jersey in the rear.
It's an approximately 6.735 acres in area. It's
in the PR-ML planned residential Mount Laurel zone
of the borough. The application is seeking amended
and final site plan approval, which is very minor
in nature. The current preliminary and final site
plan approval is for 134 apartment units, 27 of
which will be affordable housing units and related
parking and accessory uses, and that's not going to
change. The original approval as you all know is
memorialized by this board in resolution No.
16-300, findings of fact and conclusion of the

**P000065**

10

1  Wallington planning board. That was adopted on May
2  17, 2016. The proposed amendment to the current
3  preliminary and final site plan approval are minor
4  to implement changes relating to driveways, parking
5  spaces and trash enclosures which Mr. Bertin will
6  explain in a moment.
7        The second application is for lot 35.01.
8  The applicant and owner and I said they are
9  affiliated. This is Morningside at Wallington Home
10 LLC. The same street address because there is only
11 frontage on this lot, 551 Main Avenue, Wallington,
12 New Jersey it is 3.65 acres in area and also in the
13 PR-ML planned residential Mount Laurel zone. The
14 applicant is seeking preliminary and final site
15 plan approval and C bulk variances for 73 apartment
16 units, 15 of which will be affordable units, 205
17 parking spaces and an accessory uses for on site
18 use of apartment residents. The proposed accessory
19 uses include a gym, yoga studio and family
20 recreational center and are exclusively for the on
21 site use of residents only and customarily
22 incidental to the permitted principal apartment
23 use. The accessory use also includes a leasing
24 office for only the apartments, which are part of
25 the projects. There is three proposed buildings

11

1  that we're seeking preliminary and site plan, the
2  new preliminary and site plan approval for on lot
3  35.01, two of which are residential buildings and
4  one is a family recreation center. Family
5  recreation center is a conversion of the existing
6  roller rink building and will be exclusively for
7  the use of the residents of the complex. Access to
8  the family recreation center will be by key cards
9  and it will not be open to the public. We also
10 sought two partial submission waivers, which are
11 going to become moot. I will explain in a moment.
12 We requested a partial submission waiver 330-35B11
13 of your code and checklist from the required
14 inclusion of elevations on the site plan. And we
15 requested a partial waiver from 330-35B17 of your
16 ordinance and chechlist for the inclusion of floor
17 space of all buildings on the site plan. We did
18 that so we could get to this point. However, these
19 submissions waivers are needed because in our
20 initial submission we not submit architectural
21 plans. However we will be submitting architectural
22 plans at least 14 days before the June hearing
23 curing the need for the submission waivers at that
24 time. I also would request the planned application
25 and reports that the applicant has submitted as

12

1  part of its application to the board be made a part
2  of the record before the board this evening. We
3  have four witnesses. Though only two will be
4  testifying this evening. My first witness will be
5  Calisto Bertin with Bertin Engineering. He's our
6  site civil engineer for both the New Wallington
7  project and Morningside project. Dawson Bloom,
8  who is also with Bertin Engineering, is the project
9  traffic engineer for both projects. Jack Raker,
10 with Minno & Wasko architects and planners, he's
11 the architect for the Morningside project, And
12 Brigette Bogart, our professional planner, who is
13 the planner for the Morningside project. However,
14 tonight only Mr. Bertin and Mr. Bloom will be
15 testifying. Mr. Raker and Miss Bogart will
16 testify at the June hearing after the architectural
17 plans are submitted. With that after my long
18 winded introduction I would like to call Mr.
19 Bertin.
20 CALISTO BERTIN, sworn.
21      Q.    Mr. Bertin, can you give your
22 education license and professional experience for
23 the board?
24 A.    Yes. I have a degree in civil engineering
25 from Villanova university, masters Degree in

13

1  engineering from Rensselaer Polytechnic institute,
2  licensed in New Jersey as a professional engineer
3  and, five other states. I'm a principal of Bertin
4  Engineering which is located at 66 s Glen Avenue,
5  in Glen Rock.
6       Q.    And you have testified before many
7  boards throughout the state including this one,
8  correct?
9  A.    Probably every town in Bergen County.
10      Q.    I offer Mr. Bertin as an expert in
11 the field of civil engineering.
12           CHAIRMAN BAGINSKI: We'll accept him
13 as an expert witness. Thank you.
14 A.    Thank you.
15      Q.    Mr. Bertin, what documents were
16 prepared for the two applications?
17 A.    We have a set of site plans that was
18 submitted. They have an original date of December
19 7, 2016, last revised March 24, 2017. Storm water
20 drainage calculations were submitted dated March
21 24, 2017. And we have a survey that's part of the
22 set. It was originally dated September of 2013,
23 but it was updated December 7, 2016.
24      Q.    I believe you have an exhibit that
25 you will be testifying from which I guess we would

P000066

14

1  mark as exhibit A-1, and if you can just describe
2  for the board so we have it in the record what the
3  name of that exhibit is?
4  A.    Exhibit A-1 is called a landscape rendering.
5  It's a colored version of the site plan without all
6  the notes and showing the landscaping.
7        Q.    What's the date?
8  A.    It has a revision date of today, 5/16/17.
9  So we'll mark it as A-1.
10        Q.    A-1.
11  A.    With today's date, 5/16/17
12        Q.    Mr. Bertin if you describe the site
13  and the surrounding area?
14  A.    Yes, as you mentioned, we have two sites.  I
15  don't know if you can see the property line that
16  runs through the property.  The top site, or I am
17  going to use up as north, is the New Wallington
18  Home site.  That already has site plan approval.
19  That site is 6.73 acres in size.  It's called lot
20  35.02 and block 71.  It is already approved for 134
21  dwelling units with 305 parking spaces.  The second
22  site is on the bottom of the page which we're
23  calling Morningside.  That is lot 35.01.  It is
24  3.65 acres.  It's approximately 890 feet deep and
25  about 300 feet wide.  There is currently two

15

1  buildings on the site.  This rendering shows what
2  we're proposing but there is two buildings.  The
3  roller rink building and in front of it is a
4  combination warehouse and once used as a bar
5  sometime ago but there is a building in front
6  between the roller rink and Main Avenue.  There is
7  a parking lot behind the roller rink with 97
8  parking spaces in it.
9        So we have Main Avenue on the east side of
10  the property.  Conrail tracks on the north side of
11  the property.  Saddle River is on the west and
12  Jasontown II apartments are below us to the south.
13        Q.    Can you describe the current
14  preliminary and final site plan approval for the
15  New Wallington project?
16  A.    Again the New Wallington project is the top.
17  And we did obtain site plan approval a few years
18  ago and I mentioned it was 6.73 acres.  It has as
19  134 units.  27 of those units are affordable
20  housing to comply with the zoning requirements.  I
21  said 27.
22        Q.    27.
23  A.    27 units, and there is a total of 305
24  parking spaces as approved.  There are some
25  accessory uses as you mentioned.  There is a club

16

1  room, a fitness room, leasing offices, maintenance
2  garages and storage.  There is also outdoor
3  recreation indicated around the property.  This all
4  part of the original approval.  And then we also
5  have open space along the Saddle River.  There is a
6  thing in the DEP called a riparian buffer.  So we
7  have a 50 foot setback from the stream which we're
8  not proposing to do any activities.
9        There is five buildings on this site, and we
10  numbered them one through five.  Building one is
11  that community center that I mentioned has the
12  accessory uses.  That's the one closest to Main
13  Avenue.  And buildings two, three, four and five
14  are the four buildings that create a square.  Those
15  are residential buildings.  It's three stories of
16  residential above a level of parking.  So open
17  parking garage.  Well, semi open.  It has windows
18  cut into it or openings.  So there is again a total
19  of 134 dwelling units.
20        The site had two access points.  One main
21  driveway from Main Avenue.  And we talked earlier
22  about easements and there was an easement granted
23  through the Morningside property to the New
24  Wallington Home property for this access driveway
25  to pass through the site.  Because really New

17

1  Wallington Home doesn't have any street frontage.
2  For whatever reason, that's how the lots were
3  created.  There was also a second access point.
4  There is another driveway on the south side of the
5  site on Main Avenue, which is an entrance only.
6  And there is a connection driveway between the
7  existing, I'm going to call it the roller rink
8  site, between an existing roller rink site and the
9  New Wallington Home site.  There was an access
10  driveway right behind the roller rink.  That
11  driveway is there now.  There is an established
12  travel way around the property.  I guess when the
13  property was in use the driveway on Main Avenue was
14  an entrance only.  And you would then exit through
15  what is now New Wallington Home.  We propose just
16  some minor changes to the New Wallington Home site.
17  And obviously a new site plan for the site below.
18        Q.    Can you describe the proposed
19  amendments to the current preliminary and final
20  site plan approval for the New Wallington Home
21  site?
22  A.    Yes.  In developing the Morningside site,
23  the lower site, we had to make some adjustments to
24  the New Wallington Home site.  The first is the
25  main driveway on Main Avenue, the entrance

P000067

20

driveway. That was re configured and the driveway that comes into the site was also re configured. We're trying to establish traffic control here. So that entrance configuration was changed. We have this center green area. It's not an oval. A long green area that runs between, well, just south of the building one. That stays the same. But on the south side of that green we also had ten parking spaces. The parking spaces stayed within the New Wallington Home site. They didn't encroach on to the Morningside site. Now that we're doing the Morningside site, we modified those ten parking spaces and created a longer full parking lot along the proposed buildings on Morningside. So we went from ten spaces to 54 spaces here. And those additional 44 spaces we're going to count towards the Morningside parking lot. I mentioned the connection driveway between the two sites, which is south of building No. 2. That driveway was widened from 20 feet to 24 feet. In the prior application we only had one way traffic flow. Now we have two way traffic flow. Plus we widened the driveway. So to widen this driveway, we had to make a few changes. There's a driveway that wraps around the south end of building two. Curbs move just a

19

little bit. But it's a change to the site plan. And there is a trash enclosure between buildings two and three that we had to shift. So we had to make a couple changes when we made that driveway a little bit wider. Moving between buildings two and, I mean, sorry, between building three and five, we had the trash enclosure located at the end of the parking aisle between those two buildings heading south. It's going to be clear why we moved that dumpster. We took the dumpster out of the New Wallington site and moved it on to the Morningside site. And then there is, because we added the building on the Morningside side and moved the trash enclosure, we are kind of rearranged the sidewalks just around building number one. There's a driveway that wrapped around the back of the property along the Saddle River. It ended on the New Wallington Home site. It just was a dead-end. That's why we the cul-de-sac we created on the northwest corner of the property. Now, it was time to connect that driveway to Morningside and it was always planned that we would connect this driveway when this application came in. When we originally designed it, we weren't exactly sure how the New Wallington Home site would be developed. So as it

turns out, the driveways are a slightly different location than we originally planned. So that's a modification to the plan. And in lengthening that driveway we had the opportunity to add a couple more parking spaces. So there is four more parking spaces behind building five. So the total number of parking spaces spaces on New Wallington Home site went from 305 to 309 parking spaces. It was a previously -- it only, it only requires 268 parking spaces. So we have an excess parking of 41 parking spaces.

There is an open space requirement in the ordinance. I mentioned that there is open recreation areas, lawns. There is a requirement for that. It has to be 25 percent of the site. In making some of the changes that we did, one site got a little smaller, part of it got a little bigger. But the net result is we have an additional 193 square feet of open space on the New Wallington Home site. Only again because to make, to accommodate the changes.

Now, a comment about the truck traffic. We have a plan and it was a plan for the New Wallington Home site and it's also part of this set for the two sites to show all the easements. But

21

there was an easement alongside the industrial building that is between the roller rink and Main Avenue because we had loading docks there. And so trucks would back up across the property line from Morningside onto New Wallington. That's been eliminated. So we don't need that truck turnaround anymore.

So now explaining the Morningside application. This application has 73 dwelling units on 3.65 acres which is exactly 20 units to the acre, which is the limit for this site. Of those 73 dwelling units, 15 are affordable. And on the site between the buildings and the parking lots we have 205 parking spaces. And there are some accessory uses. It was described earlier that we're going to keep the roller rink as an amenity for the residents of the complex. And then there would be some other ancillary uses that I will, that I will get into. With New Wallington site we numbered the buildings one through five. We kept the numbering system and going from the river towards Main Avenue we have building six, seven, and eight.

Q.    That's for new Morningside?

A.    For New Morningside -- **P000068** Morningside.

22

1  Not new Morningside, for Morningside.

2      Q.    Morningside?

3  A.    Building No. 6 is almost identical to
4  building No. 2. There is consistency in the
5  architecture. The architect will get into it.
6  It's just a few feet longer than building number
7  two but it is basically the same. It has three
8  floors of residential over parking, and there are
9  30 dwelling units. I have to comment that the site
10 plan says 29 dwelling units. The architectural
11 plans were done after the site plan were finished.
12 I mean there were changes. While the site plan
13 says 29 units, there is 30 units. We'll coordinate
14 that with the next submission. And there is 25
15 parking spaces inside the building.

16     I mentioned that we move the trash enclosure
17 from between buildings three and five. The front
18 door for building six faces the courtyard between
19 buildings three and five. So it would have been
20 looking out on the dumpster. Obviously, it made
21 sense to move the dumpster. Building seven is the
22 existing rink building. I don't know two years
23 ago, three years ago, all the floors were replaced
24 before this application. There was a tenant in
25 there, and that building is in pretty good shape.

24

1  there is an affordable set aside for the
2  Morningside tract. Again it's 20 percent of 73
3  units, which is 14 and a half units. Can't have a
4  half a unit so it is 15 units. So just over 20
5  percent set aside is provided on the Morningside
6  site. So in total between the two projects we have
7  207 dwelling units, 514 parking spaces.

8      I will go into how we calculated the parking
9  for Morningside. There is total 11 units. 40 of
10 them are one-bedroom units. And that requires 1.8
11 spaces per unit. This is on the front page, the
12 cover page. You don't have to write it down. I
13 am testifying. There are 30 two-bedroom units that
14 requires two spaces per unit and there is three
15 three-bedroom units which requires 2.1 spaces per
16 unit. So multiply that all out, you get 138 spaces
17 required. I mention we have 205 parking spaces in
18 various locations on the Morningside site. So we
19 have 67 extra parking spaces.

20     Now one of the reasons why we have
21 additional parking spaces is because we have a yoga
22 studio up front. We have a roller rink on the side
23 or the gym. I don't want to call a roller rink.
24 Most likely the gym and we want to provide some
25 additional parking around that facility. Because

23

1  Rather than demolish the building, our client said
2  we have an asset there. We might as well use it.
3  And so that building will remain. It's a roller
4  rink. It could be used as basketball courts and
5  anything else that you can do on a gym floor, and
6  that will remain. Again strictly for the use of
7  the residents. It's got a footprint, I want to
8  tell you this of 1,900 -- 19,950 square feet. So
9  building eight will replace the current industrial
10 building, bar building that was in the front of the
11 site. That building was bigger than the footprint
12 shown and it came much closer to Main Avenue.
13 We're going to put an L shaped building. The
14 buildings are shown in brown. But you will see a
15 lighter mustard color that indicates where the
16 building is over top of the parking. Because we do
17 have some parking that extends underneath the
18 building. So that building will contain 43 units
19 again.

20     The architects plans changed at the end. So
21 we say 44 units and now it's really 43. So the
22 total comes up to 73 units. On the ground floor of
23 building eight will be a yoga studio, again another
24 Pilates place for exercise. In addition to offices
25 for the landlord. I think I mentioned this before

25

1  if someone -- it doesn't make sense. But if
2  someone wants to drive to the gym from their
3  apartment, they have a place to drive and park.
4  You figure they are going to exercise but maybe
5  they are coming home from work and want to go right
6  to the gym and park by the gym, do their exercise
7  and then move to their apartment.

8      Q.    Or if it is a cold of winter,
9  correct?

10 A.    Or the cold of winter. Take longer to warm
11 up their car and drive over but, yes, people do
12 that. That's something that's common we do in
13 developments when we have community centers.

14     Q.    Can you describe the overall site
15 circulation Mr. Bertin. You have alluded to it a
16 bit already.

17 A.    I will go through it again. We have the in
18 and out driveways is Main Avenue. So sort of
19 center of the site. There is circulation around
20 the perimeter of the entire project between the two
21 sites. And there is a connecting driveway between
22 the two sites. It was always there. That's a two
23 way driveway. The driveway by, Al Ventura driveway
24 by Jasontown II is a one way entrance driveway.
25 And so the drive aisle along the south side of

P000069

26

1   building seven is one way.  So anybody coming
2   around the back from the river and heading easterly
3   towards Main Avenue along the southern property
4   line or coming from building six, you are going to
5   confront a do not enter sign.  So they will all
6   exit towards building No. 2 and come out the site.
7   So the only really exit for the site is the main
8   driveway.  But of course in the case of an
9   emergency, you know, they can use the entrance only
10  driveway but that would be only in an emergency.
11      All the garage doors are gated.  So that
12  people are not going to be to drive in underneath
13  the buildings if they don't belong there.  They
14  will have access control.  We do have sidewalks
15  throughout the site for pedestrians access.  We
16  have provided a loading zone along building seven
17  because we had the room for it.  Primarily the only
18  loading that will come in would be moving vans.
19  And we have sufficient parking for management to
20  say, okay, we're going to rope off an area, the
21  moving truck comes in, they can park there.
22  Because all moves in and out have to be scheduled
23  with management.  So we really anticipate the
24  trucks will park in the drive aisle or in parking
25  spaces.  Another reason for having extra parking.

27

1       We have two dumpster locations.  Again
2   Morningside we're talking about one on the extreme
3   west end by the river and one by building seven.
4   Your board engineer brought up a comment about the
5   orientation of that dumpster might be difficult for
6   a truck to pull in and he's correct.  We'll modify,
7   make it easier for a trust to get in.
8       There is a slight grade change.  I am going
9   to move to grading now.
10      Q.    Before you move to grading, is
11  operationally with the garbage versus the recycling
12  and how that is going to be handled?
13  A.    Thank you.  Each trash enclosure is a
14  double enclosure.  So we can have recycling in one
15  and garbage in the other.  It changes with towns
16  but now they are doing sole source recycling, so
17  bottles and cardboard are together.  At least they
18  changed it in my town.  I don't know if they
19  changed it here.  But we have the ability to
20  separate them or combine them.  That's the idea.
21  So we wanted to have a trash enclosure that could
22  do that.
23      Q.    I will let you go to grading, sorry
24  about that.
25  A.    No, that's all right.  That's why we have

28

1   breaks.  The site is not a floodplain.  We are
2   located along the Saddle River but we're not a
3   floodplain.  We have a letter of determination from
4   the DEP for the New Wallington Home site, and the
5   Morningside site does not front on the Saddle
6   River.  There is about 130 feet between the river
7   and the site.  The highest point of site is at that
8   entrance only driveway on Main Avenue.  I will give
9   you the elevation.  It's 34.  And when we finally
10  get to the far end, the northwest corner of site,
11  it goes down to 21.  So you can see there is a
12  grade change across the site but it's long site so
13  it is hard to notice.
14      We're going to -- obviously building seven
15  exists.  We can't change the grade around it.  But
16  we are going to adjust the grades in the property
17  to get proper drainage.  That's the whole point
18  about the grading.  And so we have a collection
19  system for the storm water.  We have a series of
20  inlets in the parking lots, and we have roof
21  drains.  And we have an underground storm water
22  detention system in the parking lot between
23  buildings six and seven.  That's for Morningside.
24  Haven't changed the one on New Wallington, which is
25  between buildings four and three, the underground

29

1   detention system.  Rainwater is collected.  The
2   building roof water is clean water.  That can go
3   right to the underground detention system.  The
4   parking lot water has to be treated.  So we have
5   what is called a water treatment unit.  That's the
6   a thing that -- it helps to remove the silt and
7   other debris that might be on the pavement.  The
8   state requires that we remove 80 percent of what we
9   call total suspended solids.  That's the silt, when
10  you see the street sweeper sweeping the roads in
11  the springtime.  This is also to help do that
12  because you get that silt and sand that might get
13  into the drainage system.  It goes into the
14  detention system which is underground, and that
15  detention system is open to the ground below.  So
16  water will recharge and go into the groundwater,
17  which is always a good thing.  Then we have what
18  call an outlet control structure because we're
19  required not only to maintain the rate at which
20  water leaves the site but to actually reduce the
21  rate at which water leaves the site.  And that's
22  supposed to overcome bad practices in the past
23  where we had too much water flowing in the rivers
24  and caused flooding.  This is a way to help
25  counteract that.  Our drainage system, the

P000070

32

1  underground detention system goes to an outlet
2  control structure, and then discharges into a pipe
3  that runs along the driveway on the south side of
4  the property. The county has a drain pipe and
5  easement that goes from Main Avenue out to Saddle
6  River. So drainage from Main Avenue is discharged
7  directly out to the Saddle River. We're going to
8  tie into that pipe. Because we're tying into the
9  pipe and it's the county's pipe, the county will be
10  reviewing our drainage design and in addition to
11  your board engineer reviewing it. So we have two
12  people reviewing the drainage calculations.
13      Q.    Do we meet -- you already alluded to
14  the fact we meet the water quality standards of the
15  regulations but do we meet the rate reduction
16  requirements?
17  A.    Yes, yes. Actually we exceed the rate
18  reductions. It's all in the report. Your engineer
19  has it but we're supposed to reduce the two storm
20  by 50 percent and we reduced it by 53 percent.
21  We're supposed to reduce the ten years storm, the
22  100 year storm, and we have done all those
23  reduction. Just so you understand the 100 year
24  storm is a storm that has a probability of it
25  happening once in a hundred years. So it could

31

1  happen more often but that's the probability.
2      Q.    We're not required to provide
3  recharge, correct?
4  A.    No, we're not required because of the area
5  we're in but we do provide recharge anyway. And if
6  we were to required to provide it, we would need
7  it. One thing that I'd like to mention here is
8  that it is not on the plan but we will add it is
9  that we're going to use rainwater harvesting. What
10  happens is you take the roof leaders, you put them
11  into a tank. If that tanks should overflow, it
12  goes into the drainage system just like we would.
13  But then rather than using clean potable water to
14  irrigate your landscaping, we're going to use
15  rainwater with a pump and we would landscape -- I
16  mean irrigate the plants with rainwater as opposed
17  to drinking water.
18      Q.    And the system meets RSIS
19  requirements?
20  A.    Yes, it meets all the Residential Site
21  Improvement Standards requirements.
22      Q.    Is there a proposal to modify the way
23  the street drainage is handled?
24  A.    Yes. I mentioned that street drainage from
25  Main Avenue, actually south of the site, comes

through a pipe along the southerly property line
out to the Saddle River. From that point the road
drops to go underneath the train trestle. And then
there is inlets at the bottom of that train
trestle. And like many places in Bergen and
Passaic county, that's lower than the rest of the
area. Some places they pump it. But in this case
the county has an easement to take the inlets
underneath that train trestle and bring a pipe on
to the site and discharge onto the site. Now,
fortunately, this is a very sandy site. We did
soil borings across the site, and the water
discharges into what I am going to call is a sand
basin, a sand trap, and it percolates into the
ground. If you were to go to the site, you will
see this pit that you can't walk down. It's very
steep. There is a guardrail around it, loaded with
bottles and other debris that just come from the
street drainage. So we propose to renew,
recondition that sand filter, and put retaining
walls around it, make it more accessible. So that
you can walk in there and maintain it. Right now
you can't maintain it. Also it will be a little
little bit more attractive. We did a wetlands
investigation earlier, several years ago on this

33

1  project, and we did find that there is isolated
2  ordinary resource value wetlands around that basin.
3  So anything we do to the basin will require DEP
4  approval because we're going to putz with their
5  wetlands. It's also going to require county
6  approval because it is the county's system that's
7  dumping into it. I don't even know if the county
8  has to approve it but we already made the
9  application to the county for the Morningside site
10  with those changes. So they will have their input
11  on that because I want to make sure it takes the
12  drainage from the site.
13      Q.    Can you describe the proposed
14  utilities?
15  A.    Yes.
16      Q.    To Morningside?
17  A.    Right. We proposed a new water main to com
18  into the site for the New Wallington Home. We also
19  would have a water main coming into the site for
20  Morningside. Those mains will be looped together
21  to promote better water flow through the site. And
22  then for Morningside all the electrical will come
23  underground, and we will connect the sanitary sewe
24  for the proposed three buildings into the sewer
25  system for New Wallington. Because the site is

P000071
06/04/2017 10:14:46

36

1  lower than the street, we have to pump the sewage
2  from the site up to the street, and the last
3  manhole in Wallington is just south of the
4  driveway, the entrance-only driveway.  And that's
5  at a higher elevation on the site.  So we're really
6  collecting all the sewage from the site into the
7  sewer pump and going to pump up to that manhole so
8  it goes into the municipal system.  The sewer
9  system has already been reviewed by the board's
10  engineer for the New Wallington site.  It's been
11  reviewed and approved.  We knew that this other
12  site was coming along.  We designed the pump so it
13  could take the additional flow.  We'll have to
14  modify our calculations and give them to the
15  municipal engineer or the board's engineer for them
16  to review the drainage -- I mean the sewer
17  calculations again.  From the municipal engineer,
18  it goes to Passaic Valley sewerage commission for
19  their review, and then we make an application to
20  the DEP.  We did not go to Passaic valley sewerage
21  commission yet and did not go to the DEP yet for
22  the New Wallington Home site because we knew
23  eventually we were going to modify it.  The
24  utilities will cross between the two sites.  So we
25  will add easements on the New Wallington Home site

1  we will change the lighting for the entire site and
2  comply with any comments that the board's engineer
3  may have made.
4      We are providing landscaping for the site.
5  We show now, again just the Morningside site we
6  have 20 major deciduous trees, nine ornamental
7  trees.  The board engineer made a comment about not
8  using flowering pear trees.  We'll have talk about
9  that.  Our client really likes the callery pear.
10  We'll talk with his landscape architect and come to
11  a solution.  Then there is 159 shrubs.  The
12  engineer also made another comment, which is
13  correct, it's kind of light in the shrubbery along
14  Main Avenue.  He's absolutely right so we'll
15  increase the landscaping along Main Avenue when we
16  make revised plans.
17      Q.    And when we come back next month
18  we'll also be proposing a monument sign, correct?
19  A.    Yes.  There are two signs shown on the plan.
20  The first is the welcome to Wallington sign that
21  exists and is sorts of in the middle of the site.
22  I forgot if it was for the county or for the site
23  plan approval, I think it was for the county, we
24  were going relocate that sign, the welcome to
25  Wallington sign, slide it back because it

35

1  for those utilities that are needed to connect to
2  the Morningside site.  I just mention that the
3  buildings in the front already are connected to the
4  street, but we're going to rearrange that and send
5  the sewage to the new pump rather than use pipes
6  that are maybe 80 years old.
7      Q.    Can you describe the site lighting?
8  A.    Our intent was to match the lighting that we
9  did for the New Wallington Home site, and that
10  would be 12 foot high acorn lanterns, high pressure
11  sodium.  Any lantern that was near a building would
12  have what we call a house shield so that it
13  doesn't, the light doesn't shine against the
14  building.  The board engineer made some comments
15  about the level of illumination being a little low.
16  Normally they don't complain about the lighting
17  being too low.  We usually get complaints about the
18  lighting is too high.  In talking with the client,
19  rather than using high pressure sodium, which is
20  what we originally designed on the other site,
21  we're going to redesign the lighting and use LED.
22  It's a lot more control with LED.  You can dim
23  them.  You can make them brighter.  You don't have
24  that kind of control with high pressure sodium.
25  Also they are much more economical to operate.  So

37

1  interfered with the sight distance from the
2  driveway.  Now that the site has been redesigned,
3  rather than having a sign in the middle of the
4  property near the parking we jammed in there, we're
5  proposing the sign closer to the railroad trestle
6  and creating an easement for that sign to be
7  located.  So we have the welcome to Wallington sign
8  closer to the train tracks along the frontage on
9  Main Avenue and an easement for it.  Along the
10  south side of our entrance driveway would be a good
11  place for a monument sign for these two projects.
12  We show the sign.  We call it out but we didn't
13  provide a detail, which we will.  Signs aren't
14  permitted.  Monument signs aren't permitted even
15  though this is a multifamily zone.  We looked at
16  the industrial zone.  Monument signs are permitted
17  no higher than six feet, no wider than six feet,
18  which this sign will comply with.  We have some
19  sketches already made and we'll submit that next
20  time.  We propose a monument sign by the driveway
21  to identify the property and put a street address
22  on.
23      Q.    And Mr. Bertin, to sort of finish up
24  your testimony, did you want to just go over the
25  zoning requirements and other requested variances

**P000072**

1  and the fact there is two or not we're not going to
2  need that we applied for?
3  A.    Yes.  We are in the planned residential
4  Mount Laurel zone.  Multifamily is permitted use.
5  Accessory uses to the multifamily is a permitted
6  use.  So we comply with the use.  And we comply
7  with the density of 20 units per acre.  Actually if
8  you combine the sites, we are allowed to have one
9  more unit but the sites aren't combined.  So there
10  is one unit less than what we could do.
11      We eliminated one bulk variance of the
12  existing variance.  I said the existing warehouse,
13  former bar building that's on the front is only set
14  back 25 and a half feet.  The required setback is
15  50 feet.  So that building comes down, and the new
16  building is setback over 62 feet.  So we move the
17  building further back from the street and we
18  eliminated a variance and complied with the
19  ordinance.  Rather than going through all 30 or 40
20  requirements, I am just going to outline the
21  variances, and they are all enumerated on the cover
22  sheet of the plan.
23      We have one setback violation from the rear
24  of the building, rear of the site.  So building six
25  is setback to the rear property line.  We have 15

39

1  feet where 25 is required.  I can remedy that by
2  asking for a subdivision and moving the line.  So I
3  don't think that's an onerous variance to grant
4  because no one knows where the property line is
5  except us, and we could easily move the property
6  line.  It doesn't affect a neighboring property,
7  like a house or something else.
8      Q.    Also it helps with respect to
9  centering the center building No. 6 on the
10  courtyard, doesn't it?
11  A.    Yes, because we want to line up the front
12  door of the building with the drive aisle between
13  buildings three and five, yes.  We have a
14  front-to-rear setback variance between buildings
15  three and six.  The required spacing is supposed to
16  be 40 feet.  We have just over 35 feet.  We really
17  can't move building six any further south because
18  we're trying to provide a little bit of a landscape
19  buffer as required.  We're supposed to have a
20  buffer with a fence along Jasontown, and we could
21  move building three up northward but we wanted to
22  maintain the large buffers we had along the front
23  of that building.  So that's why we're asking for
24  the 35 foot buffer.  We rather keep buffers along
25  Morningside -- I mean along Jasontown and buffers

along the parking in the front of building No. 3.
2      The architect will talk about the maximum
3  building height.  We do have a variance for that.
4  For those that were here last time, we went to a
5  sloped roof as opposed to a mansard or a flat roof
6  for the buildings that required a variance, which
7  you granted and he will discuss that.
8      The next variance is the parking along Main
9  Avenue.  No parking is permitted within 50 feet,
10  and our parking is about half a foot, closest point
11  is half a foot from Main Avenue.  The existing
12  parking there, by the way, is in the right-of-way.
13  So we're moving it back but we did violate the 50
14  foot setback and again we want to create parking
15  where the fitness area is for in building No. 8.
16  But as I mentioned earlier, we'll add landscaping
17  which we should have done from the beginning.
18  We'll add landscaping along Main Avenue to help
19  buffer the parking.  The building coverage limit on
20  the site is 25 percent.  Currently it's 31 and a
21  half percent, and we brought it down a little bit
22  to 30 percent.  And the reason why our building
23  coverage is over is because we're maintaining
24  building No. 7.  We thought it was -- we have an
25  asset.  Rather than tear it down, we wanted to keep

41

1  that asset, which is the current roller rink
2  building.  The lot coverage again is a little bit
3  over.  Lot coverage being the total impervious
4  coverage.  Again it's a little over and that's part
5  because we kept that building.  We got all the
6  units that we need in the two buildings.  So the
7  building No. 7 is an extra building and we wanted
8  to keep.  There's an open space requirement.  New
9  Wallington Home meets the open space requirement.
10  It is 25 percent has been to be active open space,
11  30 percent open space.  Right now we have 17, just
12  over 17 percent open space on the New Wallington
13  site.  But the roller rink occupies about 17 and a
14  half percent.  So if we look at active usable
15  space, we're well over 34 percent.  And then we
16  have a yoga studio, which is another two percent,
17  but the reason we don't meet the active open space
18  is we have indoor active space.
19      Q.    It could be interpreted, we think the
20  interpretation, again how the board chooses to
21  interpret --
22  A.    Correct.
23      Q.    -- is, that is actually the
24  definition of open space and we would not need that
25  variance but that would be up to the board's

44

1  interpretation, obviously.
2  A.    It's a potential we don't need that variance
3  but we're conservative and leave it up to you.
4  There is another requirement for a buffer along the
5  southerly property line which is Jasontown II
6  apartments. It is either a buffer of a certain
7  width or a fence, a privacy fence, and we'll put a
8  privacy fence so we're going to eliminate that. I
9  mentioned the parking setback to Main Avenue, the
10  50 foot setback. It's also supposed to be a
11  buffer. So it's both a setback and buffer so I
12  guess they are two variances.
13           MR. MOORE: That concludes Mr.
14  Bertin's direct testimony.
15           CHAIRMAN BAGINSKI: Any board members
16  have any questions for Mr. Bertin.
17           Bazel: I am sure Mr. Bertin or maybe
18  Mr. Moore but can you clarify for us what is the
19  relationship between New Home and Morningside.
20           MR. MOORE: They're separate limited
21  liability companies but they are controlled by the
22  same ownership. But the way we created the
23  easements and crossings, they are to be controlled
24  by separate nonaffiliated ownership. The project
25  would still function.

43

1           Bazel: Okay thank you. I think I
2  missed, did you cover the impervious coverage on
3  the variance.
4  A.    Yes, I think I did. Yes I did. I talked
5  about the impervious. Yes, I did. Because I
6  mentioned we only have 17 percent impervious
7  coverage. We're supposed to have 30 and the
8  building number seven is over 17 percent of the
9  site. And the reason why we don't have the
10  impervious coverage, well, we exceed the impervious
11  coverage because we're keeping that existing
12  building. If we were to eliminate, it would all be
13  lawn and we would exceed the --
14       Q.    You would meet it?
15  A.    We would exceed it, the impervious
16  requirements.
17           CHAIRMAN BAGINSKI: Anyone else have
18  any questions.
19           Rachelski: I have a question. As
20  far as the roller skating rink, the definition is
21  vague. It basically states it's recreation is
22  this. Really are you going to leave it as open
23  space? Do you have a plan for it? Is this going
24  to be covered by the architect in the future?
25       Q.    It will be covered by the architect

44

1  but it is going to be I think -- I am looking to my
2  client. It's going to be a basketball court in
3  there. Is that correct.
4           Nuckel: There is a requirement for
5  an active recreation to the site. We thought this
6  would be --
7           CHAIRMAN BAGINSKI: Hold on one
8  second.
9           MR. MOORE: We have to bring you up.
10           CHAIRMAN BAGINSKI: Excuse me. We
11  need to have your applicant sworn in if he's going
12  to tive testimony.
13           MR. MOORE: Okay. Do you want to
14  describe it. You have to come up.
15           CHAIRMAN BAGINSKI: Just step
16  forward.
17  JAMES NUCKEL, sworn.
18       Q.    Mr. Nuckel are you the principal of
19  both applications this evening?
20  A.    I am.
21       Q.    Thank you. Mr. Nuckel could you
22  describe the recreational activities that you have
23  planned, recreational uses for the roller rink
24  once it is converted to a community center?
25  A.    Can I just talk about the building first?

45

1       Q.    Sure.
2  A.    Okay. It was originally built as I think a
3  tennis facility and then converted into a roller
4  rink. There is a requirement for active recreation
5  as I understand it in the zone. And as Mr. Bertin
6  explained, we have an existing building here. It's
7  a perfect recreation facility.
8       Q.    Look at them. I don't count.
9  A.    There is a perfect recreation facility and
10  it would be wonderful as far as using it to show in
11  websites in marketing the site to be able to have
12  recreation in that building. Whether it is
13  training for adults, active adults, basketball,
14  perhaps indoor soccer training or even we can
15  create a tennis court. Just I think if it is there
16  and we can use it, I believe it's a great idea  and
17  we want to preserve it rather than just get rid of
18  it. And yes, it is not a necessarily open but it
19  is definitely active. And also we can use it
20  through the winter when you couldn't use other open
21  space. So that's kind of the idea for this.
22           CHAIRMAN BAGINSKI: Does that answer
23  your question.
24           Mr. Rachelski: Thank you.
25           CHAIRMAN BAGINSKI: Anyone have any

P000074

**Page 46**

1   other questions for any questions for Mr. Nucker.

2       MR. MELFI: I have a couple of

3   questions for the engineer.

4       CHAIRMAN BAGINSKI: Do we have any

5   other questions.

6       Melfi: In regard to that, you call

7   it a recreation center. And I can probably direct

8   this to the engineer. If that were to be taken

9   down, you would need a lot less variances as far as

10   the parking in the front, shift the building back

11   and side yard location. I think it's a great idea

12   having it there. It's a beautiful building. I

13   know I have been in there a millions times. It's

14   been redone. My question is to you what would the

15   chances be, if it was to be kept, that the town

16   would be able to use it maybe a couple hours a week

17   or a couple hours a night as a rec center for the

18   kids in the community, I think have basketball.

19   Just throwing it out to you, what would the options

20   be for the community, to be able to, possibly use

21   that.

22       MR. NUCKEL: I think it's a great

23   idea. Fantastic idea.

24       MR. MELFI: And that's something,

25   that sitting on the recreation board also, we're

**Page 47**

1   always limited to school space as far as basketball

2   or soccer or training of any sort of thing. And

3   I'm not asking 24/7. If at all possible, set

4   amount of days or set amount of hours per day, or

5   if it is two days a week, just this time and this

6   time, between this time and this time. I think it

7   would be beneficial to the children of our

8   community.

9       MR. NUCKEL: I agree and I would be

10   open to working all kinds of things like that out

11   with the town. I love it. I have young kids in

12   recreation down in Florida right now. We have a

13   greatly facilities but up here in the north things

14   are challenged, and again I can say this is a great

15   facility. So I thought we should keep it.

16       MR. MELFI: Now I have no more

17   questions for you. You can go sit. A couple

18   questions I had as far as the sewage. I know we

19   have to pump station and everything. Are we going

20   to be doing or is a location set for a backup

21   generator on the site.

22   A.   Yes.

23       Melfi: You didn't discuss that.

24   A.   Sorry.

25       COURT3: I didn't take full note of

**Page 48**

1   it.

2   A.   Part of New Wallington Home application was

3   the sewer pump and a generator. So they're

4   located -- I am going to point to the plan. I

5   mentioned the welcome to Wallington sign. The

6   county's detention basin or seepage basin. Beyond

7   that along the river tracks there is three gray

8   things, one is the sewer pump and one is the backup

9   generator.

10       MR. MELFI: Now being it is two

11   separate entities, this is a little confusing to

12   people, to board members, possibly, maybe not. If

13   this is ever -- it is subdivided already. If one

14   part is sold off to whoever, Johnny buys A and

15   Peter owns B, A doesn't want put the pumping of

16   sewage on his property.

17       MR. MOORE: It will be easements.

18   A.   There is going to be an easement and then

19   beforehand before anything is sold, if it was to

20   sold, there will be an allocation as to which

21   property has what percentage of the sewer pump

22   maintenance, which is going to happen anyway,

23   because we have two corporate entities. One will

24   be paying 70 percent, another will be paying 30

25   percent or something like that. Unless the town

**Page 49**

1   uses the roller rink a lot more, then the sewage

2   changes but we'll get to that.

3       Melfi: Obviously the buildings will

4   all be sprinklered.

5   A.   Yes, yes. Multifamily, they have to be

6   sprinklered.

7       Melfi: They will be separate and

8   garages and everything. And you haven't done any

9   kind of testing as far as pressure whether any kind

10   of pumps would be needed for the sprinkler system.

11   A.   I don't recall. I know we investigated this

12   before but I don't remember. But one of the things

13   we're going to do is to submit the plans to the

14   water company and get their feedback. I think we

15   addressed it but I don't recall.

16       MR. MOORE: I think that was one of

17   the requests, that we would supply all that

18   information in your engineer's report. And it is

19   something, when we get to his report, a request

20   that we would be agreeing with.

21       Melfi: Okay. I have no more

22   questions at this time.

23       Kasperek: I have a concern. The

24   space between those two buildings, there is not

25   enough space. Would that be saved for the

P000075

---

**[Page 50]**

1    residents in case of fire emergency.

2    A.    It's 35 feet and we have a lawn area.  So, a

3    ladder can get to there.  35 feet is --

4          Kasperek:  Want to make sure.

5    A.    Going to add it up, that's probably 35 feet.

6    I will count.  This is 36.  So it's this far.

7          Kasperek:  Should be enough.

8    A.    Should be enough.

9          Rachelski:  Mr. Mayor is the fireman

10   expert.

11         Mayor Tomko:  I think that what we're

12   concerned about, too.  To getting in there with a

13   ladder truck, you know.

14   A.    The architect can talk better about the fire

15   code.  We are not required to have -- the code

16   doesn't require 360 degrees access to every

17   building but you can see all these buildings have

18   access on a lot of sides.  So, the only place that

19   we have this 35 foot wide corridor between these

20   two buildings here, but we still have open space.

21   We have lawn area where a truck could pull in and

22   if someone had to erect a ladder we could.  And

23   there is just little space here.

24         MR. MELFI:  They are aall

25   sprinklered.

---

**[Page 51]**

1    A.    The buildings are all sprinklered, yeah.

2          CHAIRMAN BAGINSKI:  Anyone else have

3    any questions for Mr. Bertin.  Borough engineer.

4          MR. JUZMESKI:  Just going through

5    some of the comments in our letter.  I don't know

6    if you are going to get to that or not.

7          MR. MOORE:  Actually we were going to

8    do that after, after our traffic engineer's

9    testimony.  Then we are going to.

10         MR. JUZMESKI:  Some of them, since

11   the required testimony is going to hit on some of

12   them now, and then you can address the rest of them

13   with respect to the details.  You mentioned you

14   have a jurisdictional determination from the DEP.

15   The DEP permit for flood hazard.

16   A.    Correct.  We are not in a floodplain.

17         MR. JUZMESKI:  You will provide that

18   to our office.

19   A.    Yeah, I even have a copy here.  I will give

20   it to you.  We normally wouldn't have gotten it but

21   we just got it for the sake of it.

22         MR. JUZMESKI:  Have you submitted to

23   county and have you gotten county approval yet?

24   A.    We do not have county approval but, yes, we

25   have submitted to the county.  So the application

---

**[Page 52]**

1    is active.

2          MR. JUZMESKI:  Can you provide, we

3    want you to provide fire apparatus maneuverability

4    around the perimeter of the site and to each

5    building.  That's in our letter.  Details of the

6    signage you will provide.

7          The easement plan needs to be obviously

8    revised to included a lot more easements than are

9    shown.

10   A.    We don't have the utility easements on here.

11   But the easement plan has all the access easements.

12         MR. CEDZIDLO:  Can I just interrupt.

13   Mr. Bertin, you discussed earlier that New

14   Wallington Home plan, the road that wrapped around,

15   came along the back of the Saddle River just

16   dead-ends.  There was a lot of testimony about a

17   fire truck having to back out and how it would move

18   and everything.  Now it's going to be a road that

19   continues all the way around and links back up.

20   Has there been easements filed between the two

21   property owners for that.

22   A.    I mentioned that the easement was

23   anticipated coming into the middle of the rear lot

24   line for Morningside and we're going to move it.

25   So that has to be modified.  The easement that's

---

**[Page 53]**

1    shown on drawing 2.8, how that easement is going to

2    be modified.

3          MR. CEDZIDLO:  So there is no filed

4    easement currently but one will be filed if the

5    plans --

6          MR. MOORE:  Right, it will be a

7    condition of approval.

8    A.    Yes.

9          MR. CEDZIDLO:  I want to make sure

10   the record was clear what has been agreed upon,

11   what hasn't been agreed to because there was a

12   filed easement for the front.  Now we're changing

13   the back.  So there has to be easements for the

14   rear.

15         MR. MOORE:  Absolutely.

16         MR. CEDZIDLO:  And just want to know

17   where we stood as far as that.

18   A.    We have to redo --

19         MR. MOORE:  Obviously we want to wait

20   until we had the site plan approval because that

21   would determine the configuration of the easements

22   or whether we would be doing the easements or not.

23   A.    One thing, that turnaround, that cul-de-sac

24   that we used for the fire truck to maneuver is

25   still there.  We thought it was a vital part of the

---

1  project because the way the parking runs along the
2  north side of building four.
3       MR. CEDZIDLO:  Okay.
4       MR. JUZMESKI:  The roller rink, will
5  be used from for the residents of both sites or
6  just the lower site, how will that be used.
7  A.    Right now it's just for the one site.
8       MR. JUZMESKI:  Okay.
9  A.    Because it only limits -- it's limited to
10 onsite.  So we can discuss if you want to modify
11 that.
12      MR. JUZMESKI:  On the DEP website the
13 site is notified as a known contaminated site.  Do
14 you have, it shows there is an LSRP.  I guess you
15 are in the process of addressing those.  I know the
16 owners responsible for --
17 A.    Yes.
18      MR. JUZMESKI:  To get those orders
19 for residential use.  I am sure he knows all the
20 requirements.
21 A.    Right, we already met with the DEP and we're
22 working on that.  The site will be capped.
23      MR. JUZMESKI:  Do you have the
24 documentation?
25 A.    We have an LSRP.

55

1       MR. JUZMESKI:  You will provide the
2  documentation that is capped or whatever other
3  means you are using to make it to residential
4  standards.
5  A.    Yes, we are in the process of doing the
6  preliminary assessment.  The lot has been done.  We
7  just met with the DEP to finalize that.  That will
8  be submitted and then we will do a combination of
9  remedial action work plan and our actual capping
10 plan.  So that will happen next.  It's coming.
11      MR. JUZMESKI:  Getting into the rest
12 of the letter, I guess after whatever time you are
13 ready for it.
14      Rachelski:  Do you have any timeline
15 set for this project.  I know it's kind of
16 premature to ask.
17 A.    I would think with the things that we have
18 to do, it will be next year.  I mean obviously
19 we're not going to start construction this year but
20 it is possible to start construction next year.
21      MR. CEDZIDLO:  Mr. Bertin, when the
22 New Wallington Home project was originally before
23 the board, there was testimony before this board
24 that a no further action letter was issued by the
25 DEP and we asked for copies of that letter and it

57

1  was never given to us.  Hold on.  You are
2  responding.  Hold on.  You are responding before I
3  ask a question.  So was the testimony given to the
4  board last time that there was a no further action
5  letter required, that the site met DEP standards
6  truthful or not.
7  A.    I don't know who made that statement.  I
8  don't know if it was one of my engineers.  I didn't
9  because I testified on traffic last time.  There
10 may have been for like the removal of old heating
11 oil tanks there may have been a no further action
12 for that.  But for the whole site, because it is
13 got historic fill, they don't issue a no further
14 action.  We have to cap the site.  So.
15      MR. CEDZIDLO:  This board denied
16 Wallington Home's application last time and the
17 court overturned it.  One of the things the board
18 asked was for information about the contamination
19 at the site.  And what is not clear from what we've
20 heard so far is whether or not truthful testimony
21 was given to the board last time for lot 35.02.
22 Now you are telling us about lot 35.01 as being a
23 contaminated site as 35.02.
24 A.    The historic fill is more on lot 35.02, the
25 New Wallington Home site.

1       MR. CEDZIDLO:  Okay, hold on.  I want
2  to be precise here.  Is 35 -- because you have two
3  separate applications.  You are here to amend
4  35.02.  Is 35.02 a contaminated site as best you
5  know.
6  A.    Yes.
7       MR. CEDZIDLO:  Okay.  Is 35.01 a
8  contaminated site as best you know.
9  A.    Minor pieces of it as best I know.
10      MR. CEDZIDLO:  Which is yes.
11 A.    Oh, yes, there's some contaminants, some
12 historic fill on 35.01.
13      MR. CEDZIDLO:  So if I pull out the
14 transcripts with the testimony for 35.02 at the
15 next meeting and tell you who testified falsely,
16 you are going to refute that testimony was truthful
17 before the board last time.
18 A.    I guess I have to see the context.
19      MR. CEDZIDLO:  I have all the
20 transcripts and I will bring them.  But the board
21 was told it was not a contaminated site when we
22 denied the application the first go around.  So
23 your testimony is that you know that.  And again
24 our engineer looked this up for us because it was a
25 concern last time, no one told -- no one ever

1  provided the letter. We denied it. And what we
2  were told is, well, that's a DEP issue. You don't
3  have to worry about that. So, my concern is.
4        MR. MOORE: I don't want to be overly
5  argumentative here, we will be happy to supply.
6        MR. CEDZIDLO: Hold on, counsel, I am
7  just asking questions, because, I sat here through
8  that application in 2014. The board kept asking
9  New Wallington Home for documentation and it was
10  never provided. We denied the application. The
11  court approved it and what we were told is don't
12  ask these questions because it is not your
13  jurisdiction.
14        MR. MOORE: That's true. I was about
15  to just say --
16        MR. CEDZIDLO: Now it's a different
17  issue if it is a jurisdictional requirement but it
18  is also, it's now an issue because you are back
19  before the board, and the board has a right to know
20  is the testimony that we're being given by
21  applicants truthful or someone is lying to us.
22  Because credibility plays a huge role into whether
23  or not we are going to accept applications and, I
24  will tell you I have the transcripts, and there was
25  testimony that this was not a contaminated site in

59

1  the first application. I am just letting you know.
2        MR. MOORE: We'll be happy to provide
3  you all the information, we don't have to, with
4  respect to our LSRP in going through this. If it
5  is historic fill, historic fill is governed by the
6  DEP regulations, but I can see how someone would
7  think that historic fill is not contamination.
8        CHAIRMAN BAGINSKI: Anyone have any
9  other questions for Mr. Bertin. Mr. Bertin I do
10  have a question for you in regard to the sewer
11  study. I know there was some issues originally
12  during the original application, and there was not
13  in agreement to do a sewer study on the project.
14  Has there been a sewer study completed now.
15  A.    We worked with I I think it was Neglia
16  engineering at the time to do a sewer study. And
17  we did the sewer study down Main Avenue. I think
18  we presented maps or we presented drawings.
19        MR. JUZMESKI: I can answer that.
20  Mr. Bertin has submitted flow tests map profiles.
21  We reviewed them, confirmed there is capacity for
22  the development.
23        CHAIRMAN BAGINSKI: Okay.
24  A.    There is plenty of capacity.
25        CHAIRMAN BAGINSKI: I know it was an

1  issue in the beginning. You are talking about
2  relocating this welcome to Wallington sign to the
3  Northeast corner of the property. So when you are
4  driving into Wallington, you see this trestle and
5  now you are going to see this sign as you come out
6  of the trestle. You are never going to see welcome
7  to Wallington. You are going to welcome to
8  Wallington as you are leaving. I don't think it's
9  a good idea to put it where you are talking about
10  putting it, number one.
11  A.    We'll take your recommendations.
12        CHAIRMAN BAGINSKI: The other issue
13  is the driveway configuration, the egress and
14  ingress. Originally you testified during the first
15  application about the sight limitations for the
16  driveway at the middle of the property. Would it
17  not be more sensible and for safety reasons to move
18  it all the way to the south end of the property.
19  So this way there wasn't that limited view of sight
20  at the trestle and everything else. We would
21  provide a safer turning out and in and everything
22  else at that point, would it not.
23  A.    It could. But it is not unsafe here
24  because we actually provided photographs of what
25  this view is from the driveway and it was in

61

1  generally the same location. Because you can
2  actually see underneath the bridge to the road on
3  the other side. So this is not an unsafe location.
4  And the county is going to review this again as
5  well.
6        CHAIRMAN BAGINSKI: Now you are also
7  now going to limit the sight view from the middle
8  driveway because you are putting a parking space or
9  a vehicle in the parking spot six inches off the
10  property line is what you are testified to earlier.
11  So now that's line of sight from that middle
12  driveway looking to your south will be now limited
13  by the parking spaces.
14  A.    I don't think it's in the sight triangle but
15  I will confirm that to you.
16        CHAIRMAN BAGINSKI: Okay. Now, the
17  water retention or drainage basin, I know we had
18  issues in regard to under that trestle in the
19  Borough of Wallington where when we had heavy
20  flooding or heavy rains it floods.
21  A.    Okay.
22        CHAIRMAN BAGINSKI: Now the county
23  came in and I know it was a county retention
24  drainage basin. They had to come in and dig it
25  out. You guys are going reconfigure it. You are

**62**

1  going to update it to what it is supposed to be as
2  far as the sand pit. Who is going maintain that.
3  A.  We will. The applicant will.
4  CHAIRMAN BAGINSKI: I am clarifying
5  that.
6  A.  But right now if you look in there, it is a
7  pit. It's loaded with bottles or types of plastic
8  bottles. It is not maintained. You get leaves in
9  there, which there is a trees all around. The
10  leaves fall and they inhibit water from going into
11  the sand. When it is clean and maintained, and,
12  again it's sandy soil, you rake it and you get the
13  leaves and clean the bottles up, you shouldn't have
14  a flooding problem. But again we're depending on
15  the county to give us guidance.
16  CHAIRMAN BAGINSKI: I was concerned
17  who was going to maintain it after it was being
18  done. Because right now we don't have any
19  equipment, the manpower and everything for the
20  borough of Wallington to go in there and maintain
21  this. So we don't want to burden our residents
22  with having another job to do after you remediated
23  this and reconfigured this drainage area. We're
24  not going to be responsible for it.
25  A.  Correct. It's in our applicant's, in the

**63**

1  applicant's best interest to clean it because it is
2  right in the entrance to his property. And that's
3  the whole purpose of this.
4  CHAIRMAN BAGINSKI: Now, as far as
5  the sign, the Wallington sign as far as welcome to
6  Wallington, but you are also proposing the other
7  monument sign. We need to worry about where we're
8  going to be putting that so we're not blocking the
9  line of sight for egress and ingress wherever we
10  put it.
11  A.  We'll work with your engineer before we come
12  to the next meeting and see what we can do with
13  that.
14  CHAIRMAN BAGINSKI: Okay. You did
15  discuss the easement for the roadway that circles
16  the building so it would be the southwest corner.
17  I believe Mr. Cedzidlo had spoken about you are
18  going to perfect the easement where the road ended.
19  Now we're going to continue it.
20  A.  Yes, we always provided an easement from
21  where the dead-end was to the property, but it is
22  now in a different location so we have to refile.
23  CHAIRMAN BAGINSKI: Okay. Very good
24  thank you. That's all I have.
25  MAYOR TOMKO: I have one question at

**64**

1  this time right now. What is the estimation of
2  children coming out of this development for our
3  schools.
4  A.  The planner will be the better person to
5  answer that. I will make sure --
6  Mayor tomko: I think that's a
7  $65,000 question that is on the minds of a lot of
8  people. What is it, we're burdened right now, and
9  where are we going to go from here with the added
10  enrollment. And I know you have some one bedroom
11  but, we know one bedroom could fill up a few
12  people, too.
13  A.  We'll pass that on.
14  CHAIRMAN BAGINSKI: Any board members
15  have any questions for Mr. Bertin.
16  Bazel: I'd like to go back to the
17  history list of variances for the Morningside
18  property. Was there any attempt to develop the lot
19  and try to avoid those variances. Such as, no
20  off-street surface parking, maximum building
21  coverage, maximum impervious coverage and, open
22  space. Seems to me if you develop that from what I
23  see as the eastern part of the lot you would
24  probably eliminate all those variances.
25  A.  The lot is allowed to have 73 dwelling units

**65**

1  and we provided that. Again it is because we're
2  maintaining the existing recreation building. If
3  it weren't built -- the thing is I think it's a
4  preengineered building. We can't build on top of
5  it. We can't put units on top of it. We really
6  have to put our own buildings. And that's the
7  reason, keeping that building is the reason for
8  really all those variances. Because we have a
9  great asset that we'd like to keep. And as
10  Mr. Nuckel mentioned, it's all year round. We have
11  a basketball court over by the river but you can
12  only use that during nonwinter months and, when it
13  is not raining. So, that's the reason that causes
14  all those lot coverage and parking setbacks and all
15  that sort of thing.
16  Bazel: Thank you.
17  CHAIRMAN BAGINSKI: Okay. Any board
18  members have any other questions.
19  MR. MELFI: I know you talked about
20  the existing building was going to be used just for
21  this site of the project only. Right.
22  A.  Yes.
23  Melfi, the basketball court that's in
24  the back on the other side, is that going to be
25  used -- how are you going to stop people from this

68

1  building six or whatever going to use the outdoor
2  basketball court on the other side. You know what
3  I am saying. Are you going to stop building three
4  four, two, one, whatever, from going to seven.
5  Also going to prevent you from stopping six, seven
6  and eight from going over to the basketball courts
7  on the other side.
8  A.    We'll address that.
9       CHAIRMAN BAGINSKI: Anyone else have
10 any questions for Mr. Bertin.
11      MR. MELFI: One another. You are
12 talking about the sign of the monument. Is there a
13 possibility of putting the welcome to Wallington up
14 higher with the monument underneath it or lower.
15 Put a little pylon, not a big pylon.
16 A.    Actually, yes, that was one way of doing it.
17 We have done that with other signs where you put
18 the sign with the name of the site and then on the
19 base you put welcome to Wallington. I will work
20 that out with your -- I will come up with an
21 concept with your engineer but yes, that's
22 possible. Yes, yes, we'll take photographs and
23 we'll show how it works. Where you see it as you
24 travel on the road.
25      CHAIRMAN BAGINSKI: Any other board

67

1  members. That's it. We normally open this up to
2  hearing of citizens. We're to get testimony from
3  the next witness, there is only two, and then we'll
4  entertain the hearing of citizens after the two
5  witnesses and you can ask all the questions that
6  you want at that point in time. Is that acceptable
7  to everybody that's in the audience. It will help
8  expedite a process a little bit. Okay. So right
9  now Mr. Bertin is done but you will have your
10 opportunity to question Mr. Bertin once the other
11 witness has testified.
12      MR. MOORE: I like to call Mr. Dawson
13 Bloom.
14 DAWSON BLOOM, sworn.
15 Q.    Mr. Bloom, would you give your
16 educational background, licences and professional,
17 experience for the board?
18 A.    Certainly. I am graduate of New Jersey
19 institute of technology. I have both bachelor's
20 and master's degree in civil engineering from
21 there. I have 25 years of practical experience, 21
22 years as a licensed engineer in the State of New
23 Jersey. My license is currently in good standing.
24 I currently serve as a civil engineering manager at
25 Bertin Engineering.

1  Q.    What's your traffic engineering
2  experience?
3  A.    Again it's part and parcel to 25 years of
4  experience doing traffic engineering studies and
5  reports for roadway/highway design, site
6  engineering and the like.
7  Q.    I would offer Mr. Bloom as an expert
8  in the field of traffic engineering?
9       CHAIRMAN BAGINSKI: We accept as an
10 expert witness.
11 Q.    Mr. Bloom, did you or someone under
12 your supervision prepare a traffic impact study for
13 this project?
14 A.    We did. We prepared a traffic impact study
15 which was dated March 24, 2017.
16 Q.    And what was done to prepare this
17 study?
18 A.    We inventoried the existing roads and
19 traffic conditions around the site. We measured
20 traffic volumes, developed traffic projections,
21 checked the site distances, analyzed the traffic
22 impact for the proposed development, including
23 reviewing the proposed site plan.
24 Q.    Can you please explain the site and
25 the area?

69

1  A.    Certainly. The site is located in the
2  planned residential Mount Laurel zoning district,
3  located in block 71, lot 35.01. Land uses along
4  Main Avenue are predominantly residential in nature
5  with abandoned Farmland Dairies located across the
6  street. The site is surrounded by railroad tracks
7  to the north. Saddle River to the west.
8  Multifamily residential to the south. And Main
9  Avenue, abutting Main Avenue to the east. The
10 project site is approximately 3.65 acres in size,
11 and it has approximately 320 feet of frontage along
12 Main Avenue. Subject lot currently contains an out
13 of use roller skating rink and warehouse with two
14 existing driveways along Main Avenue. Main Avenue
15 is a county road. It's county road 61. Travels in
16 a general north-south direction in the vicinity of
17 the site. The road carries one lane of traffic in
18 each direction. Opposing lanes are separated by a
19 double yellow stipe. The speed limit in the
20 vicinity of site is 25 miles per hour.
21 Al Ventura road which is adjacent to the
22 southern area of the site is a private roadway.
23 That travels generally in an east-west direction
24 and provides access to the Jasontown II apartment
25 complex. There is no striping separating the two

70

1  way traffic on that roadway. The Main Avenue and
2  Midland Avenue intersection is a stop controlled
3  T-intersection which is approximately .43 miles to
4  the general west of the project site. Main Avenue
5  acts as both northbound and westbound approach to
6  the intersection with Midland Avenue as a
7  southbound approach. There are no turning
8  restrictions from any approach and it has one
9  approach lane in each direction.
10      Q.    Did you undertake traffic counts?
11  A.    We did. Traffic counts were taken at the
12  intersections of Main Avenue, Al Ventura road and
13  Midland Avenue respectively on Tuesday December 6,
14  2016, from four to six p.m. And Wednesday,
15  December 7, 2016 from seven to nine a.m.
16      Q.    And what is the access for the site
17  and did you review the onsite circulation?
18  A.    Yes. The site will have two way access
19  driveway at the north end of the Main Avenue
20  frontage. The two way access drive will have an
21  exclusive left turn only and right turn only
22  exiting the site. There is also an entrance only
23  driveway located at the southern end of the Main
24  Avenue frontage adjacent to Al Ventura road.
25      Q.    And did you check the sight distances

71

1  at the Main Avenue driveway?
2  A.    We did. The sight distances from the
3  northern site driveway location were investigated
4  to access the safety for motorists both entering
5  and exiting the site. The speed limit on Al
6  Ventura -- on Main Avenue is 25 miles an hour. As
7  such, the requirements, the AASHTO requirements
8  require that sight distances are analyzed for
9  speeds of 30 miles an hour, which we did. The
10  requirement is 335 feet for a left turn from stop
11  and 290 feet as for a right turn from stop.
12      We measured the available site distances at
13  that driveway, proposed driveway location, and they
14  both measured to be approximately 350 feet, which
15  are in accordance and exceed the requirements based
16  on the AASHTO. And I will mention that because
17  this is a county road, this will also be reviewed
18  by the county. And as part of that review we have
19  to show from a sight perspective there is no
20  obstructions within the sight triangle for both of
21  those movements. So the concerns regarding the
22  siting of the parking lots and the signs will be
23  addressed during that review, and we have to be
24  able to show that these obstructions will not
25  impact the required site distances for this

72

1  driveway.
2      Q.    What is the traffic projections for
3  the site?
4  A.    The amount of traffic that is proposed to be
5  generated by the residential complex was determined
6  from data published in the ninth edition of the
7  trip generation manual published by the Instutite
8  of Transportation Engineers. The mid rise
9  apartment land use was used to determine those
10  generated trips. For the site generated traffic
11  specific to the proposed develop, in the a.m. or
12  morning peak hour we're looking at a generated
13  number of trips of six trips into the site and 11
14  trips exiting the site. Total combined trips will
15  be 17 trips in the morning peak hour. And in the
16  p.m. peak hour we would have 14 trips into the
17  site. Nine trips leaving the site. With a total
18  of 23 trips in the p.m. peak hour.
19      We made assumptions that since the southern
20  driveway is an ingress only driveway, that all
21  entering trips would use the southern driveway,
22  while all exiting trips would be utilizing the
23  northern full movement driveway. In addition, we
24  also added, took into account the future
25  development of the adjacent New Wallington Home

73

1  development. And based upon that land use, we have
2  a total a.m. peak hour trip generation of 39 trips
3  and a total p.m. peak hour of 51 trips. All of
4  those trips we are assuming will enter the site,
5  access the site via the northern driveway.
6  Additionally, the traffic projections that I just
7  discussed take into account the use of mass
8  transportation systems in nearby vicinity. There
9  is several New Jersey Transit bus stops along Main
10  Avenue. The closest is located at Al Ventura road.
11  As well as the Bergen line train station located
12  less than a mile away in Garfield. It's very
13  likely that a percentage of residents will use that
14  public transportation, and in accordance with the
15  ITE manual there is an implied five percent vehicle
16  reduction for use of mass transit.
17      Q.    Did you assess the impact this
18  traffic will have on the adjoining streets?
19  A.    Yes. And just to discuss some of the
20  background in terms of how we developed that
21  projection, we anticipated that the residential
22  development would be completed at the time in 2017
23  which is considered to be the build, which we
24  considered to be the build year. Using that as the
25  build year, the traffic road rate which would be

P000081

1  used by the Department of Transportation, New

2  Jersey Department of Transportation in this area is

3  one percent per year.  We performed a capacity

4  analysis at Main Avenue, Al Ventura road

5  intersection during both a.m. and p.m. peak hours

6  using the above-mentioned conditions.  And we

7  assessed both the existing, no build and build year

8  conditions for the a.m. and p.m. peak hour.

9       The conclusion of the capacity analysis at

10  those locations was that there was no further

11  degradation of the traffic.  So the levels of

12  service that are currently existing will exist

13  after this proposed development.  There is one

14  exception, if I could call it an exception, and

15  that's at the intersection of Main Avenue and

16  Midland Avenue.

17       Q.    Main Avenue and what?

18  A.    I'm sorry.  Midland Avenue.  There is -- the

19  westbound leg of Main Avenue currently operates at

20  level of service F, which is a failure.  That level

21  of service doesn't change.  But with the proposed

22  development there is a slight increase in the delay

23  at that intersection.  The delay from the existing

24  condition in the morning peak hour would increase

25  from roughly 113 seconds to 145 seconds.  And again

75

1  this is a projected algorithm that's really more of

2  exponential increase.  And on the evening peak

3  hour, the existing delay is 624 seconds, and that

4  would increase to 736 seconds.

5       In summary the proposed development adds a

6  total 13 or 14 trips to the westbound approach in

7  the a.m. peak hours.  Respectfully, with the

8  majority of those turning left, which is in

9  accordance with the current traffic patterns at

10  that intersection.  And again as I said, the

11  overall level of service, which is currently an F,

12  does not change with that proposed development.

13       Q.    Thank you, Mr. Bloom.  That concludes

14  Mr. Blooms direct testimony.

15       CHAIRMAN BAGINSKI:  Any board members

16  have any questions for Mr. Bloom.

17       Melfi:  I have just a couple.

18       MR. MOORE:  I did want to just --

19       CHAIRMAN BAGINSKI:  Sorry.

20  Mr. Melfi.

21       MR. MOORE: It relates to Mr. Blooms

22  testimony.  As part of our application before the

23  county, this is a county road, the county has

24  already asked us for a fair share contribution for

25  improvements to the Midland intersection.  So there

1  will be improvements to that intersection donemany

2  and  This project will be paying its share of those

3  improvements.

4       CHAIRMAN BAGINSKI:  Okay.  Thank you.

5       MR. MELFI:  In another 30 years.

6       MR. MOORE:  They are taking the money

7  from us now.

8       Melfi:  They are taking the money

9  from everybody for 30 years already.  On the

10  southeast corner of the single driveway going in

11  only.

12  A.    Yes.

13       MR. MELFI:  I am looking at an arrow

14  coming in from people making a left hand turn kind

15  of coming in at a quicker pace.  You have two lane

16  road coming out with a car that wouldn't be able to

17  go straight.  They have to make a left.

18  Danger-wise, as far as someone coming north on Main

19  zooming in to the left there and you have a car

20  that could be coming off from the back end to make

21  a left to go in.

22  A.    From the parking lot?

23       CHAIRMAN BAGINSKI:  From Main Avenue.

24  A.    From Main Avenue.

25       Melfi:  You are coming, you are going

77

1  north on Main.

2  A.    Yes.

3       MR. MELFI:  You are making a left.

4  A.    Yes.

5       MR. MELFI:  Then you have another,

6  you have the other arrows where it is a double lane

7  in the back on the south side of those buildings.

8  A.    Here?

9       MR. MELFI:  You have a double lane

10  there.  So you have someone flying in from the left

11  side of Main Avenue, trying to, and then you have a

12  car that's going to be trying to make a left at the

13  same time, what's the safety issue?  What's the

14  safety.

15  A.    Certainly the most positive way to deal with

16  that would be to actually have a stop sign for the

17  car making the left into the parking lot, and

18  that's something that we will take into account.

19  You want all the vehicles, whether it is a traffic

20  or not, to stop there and be certain somebody --

21       MR. MELFI:  At least I think there

22  should be a stop at both sides on the main street

23  side and on the Al Ventura side.  I will leave that

24  up to the engineer.

25       MR. JUZMESKI:  I will review that.

80

1    Stop bar on the two way traffic is a good idea.

2    MR. MELFI: Also I always ask these

3    questions of traffic engineer. When you did those

4    two studies on those two days in December, what was

5    the weather like. I ask weather because a lot of

6    guys do it on certain days and meanwhile you had a

7    foot of snow on the ground and there was no

8    traffic.

9    A.    No, it was --

10   MR. MELFI: Question I always ask.

11   If you don't have it, you can --

12   A.    Typically when we have it, it will be in the

13   data sheets.

14   Kasperek: Check the records.

15   A.    We have it. From the 7th it was cloudy, 40

16   degrees.

17   MR. MELFI: What date was that?

18   A.    December. I believe that a Wednesday. And

19   the 6th was cloudy, 45 degrees, Tuesday.

20   MR. MELFI: I always have that

21   curiosity.

22   A.    Certainly.

23   MR. MELFI: Sometimes sneak in with

24   six, eight inches of snow and nobody on the road.

25   A.    We want to have a valid study what we're

1    A.    True but also the trip generation tables in

2    the ITE manual does take into account similar

3    certain conditions for growth, and those are

4    factored into the analysis as well.

5    Wygonik: Okay. Thank you.

6    MAYOR TOMKO:. You have been told

7    right around that trestle over there, on the other

8    side, they are condemning property that's planned

9    for over 300 units. That it was approved.

10   A.    We have to take a look at that.

11   MAYOR TOMKO: I mean we're concerned

12   with the traffic. Let me tell you on a normal day

13   it's gridlock and that traffic is backed up all the

14   way to the shopping center from main and Midland.

15   We know that eventually that will traffic light is

16   going to be there. I hope it's within my lifetime.

17   Because it is going on and on and on. But we know

18   that there is some property that has to be taken

19   and things like that. We met with the county and

20   the county engineer over and over and over. But

21   we're concerned the way with the traffic backed up

22   in morning and four o'clock. They are cutting

23   through Jasontown, coming around out on Midland

24   Avenue. I can't tell you how many accidents on

25   Midland Avenue coming out of Stevens road. And

79

1    trying to show here.

2    MR. MELFI: That's all the questions

3    I have.

4    Wygonik: I have a question, when you

5    did the traffic study did you do it based on

6    current conditions meaning across the street the

7    Farmlands Dairy is empty, there is no activity over

8    there. Or did you take into consideration if that

9    someday gets developed or sold or a business comes

10   in there, how that might impact the traffic

11   patterns.

12   A.    When you do the counts, you take into

13   account what the existing conditions are. When we

14   project traffic we have to do a reasonable

15   assumption. But that includes are there any

16   currently planned developments. We can't really

17   generally make over assumptions on potential for

18   down the road. So we do make assumptions based on

19   what information is readily available and possible.

20   Otherwise, we could be really analyzing things that

21   are absolutely not practical. We try to make the

22   most practical judgment.

23   Wygonik: You realize if someday that

24   gets developed or sold, it could double the traffic

25   in that area?

81

1    then on the other side coming out. Plus down by Al

2    Ventura. And then I am thinking with this turning

3    or going in and out of there, with this added

4    traffic, not knowing what is going to be in South

5    Hackensack, not knowing what is going to be across

6    the street, not knowing what is going to be even

7    further, This isn't going to be called Wallington.

8    It's going to be called gridlock with quotes around

9    it, and we're never going to get anything around,

10   emergency vehicles, nothing. Because let me tell

11   you four o'clock you try and go with a fire truck,

12   an ambulance, a police car down Main Avenue, and,

13   boy, you better have good driving course to get

14   around. And I only foresee things worse with more

15   development, more people coming in. That's just my

16   opinion.

17   Rachelski: You did mention the

18   transportation. There is, nearby there is a

19   Conrail station in Garfield, and you don't have a

20   direct access to the Saddle River. I guess the

21   only way to get there would be to take Main Avenue

22   and go all the way to the light. It's quite a bit

23   of distance. I don't think this is going to be a

24   factor for anybody to walk probably a couple of

25   miles.

**P000083**

1  A.    No.  Certainly we would -- you're right.
2  Certainly but it is within a realm of possibility.
3  Exactly how many people would choose to do that,
4  I'm not certain.  They could bike.
5          MR. MELFI:  Driving, not walking.
6  A.    Driving.  Certainly there is other modes of
7  transportation, bicycles and other things that are
8  also viable as well.
9          CHAIRMAN BAGINSKI:  Any other board
10 members have any questions?
11         MR. JUZMESKI:  Two questions.  You
12 have a fair share improvement with the county.  Is
13 that related to a traffic signal going there at
14 some point?  Have they done a traffic signal
15 warrant at that location do you know?  Are you
16 privy?
17 A.    I'm not aware.
18         MR. JUZMESKI:  Can you find out?
19 A.    We can find out and report back,
20 absolutely.
21         MR. JUZMESKI:  It's important to know
22 at this point whether a traffic light is in the
23 words at that location.
24 A.    Sure.
25         CHAIRMAN BAGINSKI:  Any other board

83

1  members have any questions.  Okay.  At this point
2  in time what I would like to do is open up to the
3  hearing of citizens.  And these will be questions,
4  directed to the two expert witnesses that testified
5  today.  If anyone has any questions about anything
6  they talked about today, you are more than welcome
7  to step forward, state your name and ask questions
8  that you have.
9          MR. MOORE:  Mr. Chairman, to clarify,
10 these are questions rather than statements,
11 correct?  That will be later.
12         CHAIRMAN BAGINSKI:  These are
13 questions from the public.  It's open forum.  If
14 they make a statement, it's out of my control.  I
15 am asking them to ask questions to get the
16 information.  So if anybody wishes to be heard, if
17 you can just step forward and state your name.
18         ms. Mannuzza:  Rhonda Mannuzza,
19 RHONDA MANNUZZA, 119 Wallington Avenue, Wallington.
20 You said there was 207 units?
21         MR. BERTIN:  Yes.
22         MS. MANNUZZA:  That's total in all
23 the buildings?
24         MR. BERTIN:  Yes.
25         MS. MANNUZZA:  How many did you say

were two bedroom?
2          MR. MOORE:  You need to pull the
3  plan.
4          MR. BERTIN:  For the Morningside
5  site.
6          MS. MANNUZZA:  I want a total because
7  I want to know how many kids possibly could be
8  going to school in Wallington.  Because head law
9  says two children per bedroom are allowed.  So if
10 you have like 23 bedrooms, we're looking at 40 some
11 odd children.
12         MR. BERTIN:  That's not the case.  The
13 planner will testify but there is studies on what
14 typical occupancy with children.  So the planner,
15 next time when the planner testifying, she will
16 provide that.
17         MS. MANNUZZA:  This is something that
18 we need to take into consideration.
19         CHAIRMAN BAGINSKI:  Again we heard
20 from two witnesses today.  I don't want to cut you
21 off.  Every question is very important but we need
22 to direct the questions today to the two expert
23 witnesses.  Next month we will have more testimony,
24 and other witnesses and you can direct questions at
25 them.

85

1          MS. MANNUZZA:  He did mention how
2  many two bedrooms there was earlier.
3          CHAIRMAN BAGINSKI:  He did.
4          MR. CEDZIDLO:  Just, Miss Mannuzza,
5  there is a difference between questions that you
6  ask and then comments that you want to make about
7  it.  So asking how many two bedrooms there are is a
8  proper question.  For you to say, when you then
9  change this is something the board should take into
10 consideration, that's a statement or an opinion
11 that you have that you are allowed to make, it's
12 just not at this time.
13         MS. MANNUZZA:  But he can answer the
14 question?
15         MR. CEDZIDLO:  Of course.
16         CHAIRMAN BAGINSKI:  He can answer how
17 many two bedrooms units.
18         MS. MANNUZZA:  And three bedroom.
19         CHAIRMAN BAGINSKI:  And three bedroom
20 units.  If we can get some clarification in regards
21 to that.
22         MR. MOORE:  Absolutely.  We have to
23 get a bedroom for the prior project.
24 A.    We'll provide that.  I have to provide that
25 to the planner so the planner is

P000084

88

1  MS. MANNUZZA: Okay.

2  CHAIRMAN BAGINSKI: Thank you for

3  your question. Anybody else wishing to be heard in

4  regard to this or to the two professional

5  witnesses.

6  WILL.

7  MR. MENDYK: William, Mendyk,

8  M-E-N-D-Y-K. Six Azalea drive, Wallington I was

9  just wondering, are these all going to be private

10  roads.

11  MR. BERTIN: Yes, everything on site

12  is private.

13  MR. MENDYK: Streets maintained by the

14  applicant?

15  MR. BERTIN: Yes.

16  MR. MENDYK: Lighting?

17  MR. BERTIN: Yes.

18  MR. MENDYK: Garbage removal?

19  MR. BERTIN: Yes.

20  MR. MENDYK: Snow removal?

21  MR. BERTIN: Yes.

22  MR. MENDYK: Everything?

23  MR. BERTIN: It's private property.

24  MR. MENDYK: Okay that's it. Thank

25  you.

87

1  CHAIRMAN BAGINSKI: Thank you.

2  Anyone else wishing to be heard or questions for

3  the two expert witnesses that we have.

4  MR. OLKOWSKI: In regard to their

5  testimony today -- Bryan Olkowski, 8 Iris Lane,

6  Wallington, O L K O W S Q K I. Just two questions.

7  First one is you talked about the sewer, sewerage

8  going up the hill. There is a pump that's powerful

9  enough to make sure it goes up the hill. Are any

10  concerns that we should be worried about? Because

11  I am worried about driving down there and --

12  MR. BERTIN: No.

13  MR. OLKOWSKI: -- something

14  happening?

15  MR. BERTIN: No, that's why we have a

16  backup generator and the pump is way off the road,

17  and it doesn't have to pump very far. This is not

18  unusual. Municipalities do it. It's a common

19  practice.

20  MR. OLKOWSKI: I know we were talking

21  about a sewer study. That was a concern.

22  CHAIRMAN BAGINSKI: Do you have a

23  second question also.

24  MR. BERTIN: Let me just explain one

25  other thing. From the buildings on the site it's

gravity flow to our pump. And there is what we

2  call a wet well where sewerage comes in and there

3  is two sets of pumps with float level alarms and

4  stuff like that. It will pump it up the street.

5  It's not pumping very far.

6  MR. OLKOWSKI: The second question

7  was about the historic fill. What kind of fill are

8  we talking about?

9  MR. BERTIN: Construction debris,

10  concrete and other construction debris, that's

11  what's in the site. We have done test pits and

12  borings and DEP records show that's what is in

13  there.

14  MR. OLKOWSKI: Thank you.

15  CHAIRMAN BAGINSKI: Any other

16  questions for the two expert witnesses. Any

17  citizens.

18  MR. ANDROWIS: Khaldown Androwis,

19  KHALDOWN ANDROWIS, 5 Ivy lane, Wallington. The

20  question, we have 207 units. What's the square

21  footage for each unit?

22  MR. MOORE: The architect will be

23  here to answer that at the next meeting.

24  MR. ANDROWIS: Okay. And what is

25  going to be the exact use? It going to be for

89

1  rented?

2  MR. MOORE: Rental.

3  MR. ANDROWIS: Okay. I will have my

4  other questions when the architect for the square

5  footage. Thank you.

6  CHAIRMAN BAGINSKI: Thank you. Any

7  other questions for the two expert witnesses today.

8  At this time I like to close to the hearing of

9  citizens. At this time any board members have any

10  further questions in regard to the testimony we

11  heard today.

12  I do have one question that was brought up

13  in regard to the sewer pit which is a wet well, or

14  retention wells as we call it, right. Is there

15  going to be a backup pump system or one single

16  pump.

17  MR. BERTIN: Two pumps.

18  CHAIRMAN BAGINSKI: Okay.

19  MR. BERTIN: Actually we've already

20  done near construction drawings and given it to

21  your engineer. Again just the calculations have to

22  be modified for the additional flow.

23  CHAIRMAN BAGINSKI: Okay. So all the

24  safety requirements are being met with the two

25  pumps system with the backup generator in case

**P000085**

90

1  there is a power failure.
2          MR. BERTIN: Yes, as a matter of fact.
3  Those plans also go to the DEP. In addition to
4  going to your municipal engineer reviewing them,
5  Passaic valley really doesn't review them that much
6  but the DEP will review them.
7          CHAIRMAN BAGINSKI: Okay thank you.
8  At this time anybody else have any questions.
9          MR. MOORE: We can respond to a
10  series of comments in your engineer's report, and,
11  we could address most of them now If that's the
12  boards pleasure.
13          CHAIRMAN BAGINSKI: Do you want to
14  wait until you have your experts testimony done and
15  then do it at the end.
16          MR. MOORE: They were mostly
17  engineering really and traffic.
18          MR. JUZMESKI: Is there anything that
19  you are opposed to doing? Rather do it that way
20  rather than going over --
21          MR. MOORE: We're not going
22  through -- almost everything we agree with. Going
23  through on C, on your number five, application
24  completeness, which was just addressing the
25  submission waivers and deferring them to the board,

91

1  obviously we will the materials at the next
2  meeting.
3          MR. JUZMESKI: 11 to 17.
4          MR. MOORE: Pardon.
5          MR. JUZMESKI: You will have items 11
6  and 17 you will have at the next meeting.
7          MR. MOORE: Yes. Then with respect
8  to the easement plan, you noted that it should be
9  noted that additional utility and drain easements
10  will be required for utility and drainage
11  facilities that traverse from one lot to the other.
12  We'll revise the easement plan to address all
13  those. Some of the easements have already been
14  filed, and others we'll have to modify and add new
15  ones. The applicant shall provide additional
16  privacy fencing along the perimeter of the
17  property. Right now the site shows privacy fencing
18  between buildings three and six. We think we don't
19  need privacy fencing along the remainder of the
20  northern perimeter because it is the New Wallington
21  Home project. And then the applicant will also
22  provide additional fencing along the southern
23  perimeter of the Morningside property. We think
24  the western perimeter doesn't require the privacy
25  fence because it is just up against the Saddle

92

1  River. I don't know if you are okay with that.
2          MR. JUZMESKI: Okay. It's up to the
3  board.
4          MR. MOORE: Then with respect to item
5  8.1 which talks about the size of the parking
6  stalls. Under the Wallington ordinance, since this
7  is residential, it would be RSIS.
8          MR. JUZMESKI: Waiver from our
9  ordinance.
10          MR. MOORE: Your ordinance doesn't
11  apply. So we don't need a waiver from your
12  ordinance because there is no jurisdiction for your
13  ordinance.
14          MR. JUZMESKI: Okay.
15          MR. MOORE: That's also true with
16  respect to the aisle width. Then with respect to
17  item 8.5, we'll be getting the additional
18  information. We'll perform a warrant analysis if
19  the county is not doing the signal.  But we're
20  hopeful to do a signal. We'll come back with the
21  additional information at the next meeting.
22          MR. JUZMESKI: Okay.
23          MR. MOORE: Then with respect to item
24  9.2, we recommend the applicant revise the chain
25  link fence door and enclosure to the dumpster area

93

1  to a board on board fence with steel posts. We
2  like to make -- we'll make the fence enclosure
3  solid. We prefer to do vinyl, because it is easier
4  to maintain and not so heavy. I don't know that.
5          MR. JUZMESKI: It just shows a chain
6  link.
7          MR. MOORE: We'll change ir from
8  chain link.
9          MR. BERTIN: A trash closure.
10          MR. JUZMESKI: It looks like you are
11  proposing chain link. You have a chain link fence
12  detail next to your dumpster enclosure. It may not
13  be together but, if it is vinyl, that's okay with
14  me.
15          MR. MOORE: We'll make it solid.
16          MR. BERTIN: The dumpster enclosure
17  is masonry, and then typically we use a chain link
18  with slats but we can make it a solid fence. You
19  are talking about the gates.
20          MR. JUZMESKI: Yes.
21          MR. BERTIN: The gates. And the
22  other privacy fence, we actually have a detail for
23  the vinyl fence rather that a board on board.
24          MR. JUZMESKI: I was just referencing
25  the trash enclosure area.

**P000086**

1    MR. BERTIN:  The what?
2    MR. JUZMESKI:  The trash enclosure.
3    MR. BERTIN:  Yeah, they will be
4    solid.
5    MR. MOORE:  Then 9.4, it says the
6    applicant does not provide sufficient illumination
7    between buildings seven and building number eight
8    within a parking area.
9    B:  We can increase it but I
10   mentioned we're going to change high pressure
11   sodium to LED lights.  So we'll have a new design.
12   MR. JUZMESKI:  Not increasing, you
13   are providing.  There is no lighting at all
14   proposed in that area.  Maybe just not depicted.
15   MR. BERTIN:  Between buildings.
16   MR. JUZMESKI:  It's really under the
17   area where the building goes over the parking.
18   MR. BERTIN:  Okay.  In the building
19   eight.
20   MR. JUZMESKI:  Recessed lighting.
21   MR. BERTIN:  There will be soffit
22   lighting in there.
23   MR. JUZMESKI:  That's what I meant
24   way.  It will be increased, I meant some lighting.
25   MR. BERTIN:  Here, yes, because it

95

1    will be soffit lights.  We didn't show the soffit
2    lights.  We will coordinate with the architect.
3    MR. MOORE:  Then with respect to the
4    landscaping we will come back and work with your
5    landscape architect on all of the various landscape
6    comments.  And then just one correction on 9.10
7    where it talks about relocating trees.  They
8    haven't actually been planted yet.  We are just
9    relocating them on the plans.   There is no actual
10   physical relocation of trees.
11   MR. BERTIN:  That was done just to
12   indicate where it was approved.  So it was clear
13   how we're modifying the prior approval.  I didn't
14   go in my testimony because that was sort of
15   insignificant.
16   MR. JUZMESKI:  Fair enough.
17   MR. MOORE:  We'll be coming back with
18   the revised planning schedule on the trees for your
19   review.  We'll discuss, Mr. Bertin's office and
20   your office.
21   CHAIRMAN BAGINSKI:  Do you have
22   anything else, Mr. Moore.
23   MR. MOORE:  No, I do not.
24   CHAIRMAN BAGINSKI:  At this time
25   since you will not be presenting any further, any

1    more expert witnesses this evening, We have no
2    other applications before this board, the
3    application noticed people 200 feet around the said
4    application, and they will not be noticing you
5    again.
6    MR. MOORE:  Right.  It's continuing.
7    CHAIRMAN BAGINSKI:  Next meeting will
8    be June 20, 2017, here at these council chambers.
9    So you will not be getting anything in the mail.
10   If anybody got anything in the mail, it's not going
11   to come again.  I am informing everyone now that
12   the next meeting is June 20, 2017  At the council
13   chambers.  So everybody is well aware of that and
14   they will not be getting noticed again in regard to
15   that.  So if anybody is here, wants to hear more
16   testimony from the other experts and has more
17   questions, feel flee to come to our next meeting.
18   At this time I need a motion to carry this
19   application to the next meeting.
20   Rachelski:  Motion.
21   MR. MELFI:  Before we do, take into
22   consideration that the board members know along
23   with the audience that June 20th is high school
24   graduation.  Just to put a thought in your head.
25   Usually the mayor is there and some council people.

97

1    CHAIRMAN BAGINSKI:  I am going by our
2    schedule that is posted at the beginning of the
3    year.
4    MR. MELFI:  I want to let everybody
5    know.
6    CHAIRMAN BAGINSKI:  That's the date
7    scheduled right now.  Anybody have problems with
8    that in regard to board members.  I know you just
9    said the mayor possibly has a problem.
10   MAYOR TOMKO:  I will be late.
11   CHAIRMAN BAGINSKI:  Anyone else have
12   a problem with that.  The 20th.  As far as the
13   citizens that are here to be heard in this matter,
14   the 20th.  It is high school graduation I was just
15   informed.  Does anybody have a problem with that.
16   Coming back on that date.  Is it possible to come
17   back a little later after the high school
18   graduation or whatever.  So we're going to keep it
19   set for June 20th, 2017 here at council chambers.
20   Same time as today.  And, I need a motion to carry
21   this to next month.
22   Rachelski:  Motion.
23   CHAIRMAN BAGINSKI:  I need a second.
24   Bazel:  Second.
25   Wygonik:  Second

P000087
06/04/2017 10:14:40

1
2  Roll call: Pawluczuk aye, Bazel aye, Baginski aye,
3  Wygonik aye, Rachelski aye, Kasperek aye, Melfi
4  aye, Tomko aye.
5          CHAIRMAN BAGINSKI:  If no further
6  business before the board, I need a motion to
7  adjourn.
8          Bazel:  Motion.
9          CHAIRMAN BAGINSKI:  Pawluczuk, aye,
10 Bazel,  yes.  Baginski aye, Wygonik aye, Rachelski
11 aye,  Kasperek, aye, Melfi,  aye, Tomko, aye.
12     (End at 9:57 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

99

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25