# EXHIBIT K

# In The Matter Of:

*In RE: Morningside at Wallington*

---

*Transcript of Proceedings*
*July 18, 2017*

---



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

In RE: Morningside at Wallington

---

**Page 1**

```
 1              BOROUGH OF WALLINGTON
                  PLANNING BOARD
 2

 3     IN THE MATTER OF:                    :

 4     MORNINGSIDE AT WALLINGTON, LLC       :
       551 Main Avenue, Block 71, Lot       :
 5     35.01, Zone LI-C                     :
                  and                       :
 6     NEW WALLINGTON HOME, LLC             :
       Main Avenue Rear                     :
 7     Block 71, Lot 35.02, Zone LI-C.      :

 8     - - - - - - - - - - - - - - - -

 9                     BOROUGH OF WALLINGTON
                       54 Union Boulevard
10                     Wallington, New Jersey
                       Tuesday, July 18, 2017
11                     7:58 p.m.

12     B E F O R E :

13     STANLEY BAGINSKI, CHAIRMAN
       THERESA WYGONIK
14     NICHOLAS MELFI
       MAYOR MARK TOMKO
15     KATHY POLTON
       DARIUS PAWLUCZUK
16

17     A L S O    P R E S E N T :

18     MARTIN CEDZIDLO, ESQ., BOARD ATTORNEY
       DOROTHY SIEK, BOARD SECRETARY
19     EVAN JACOBS NEGLIA, PE, BOARD ENGINEER

20     KEVIN MOORE, ESQ., FOR THE APPLICANT

21

22

23

24

25
```

**Page 2**

```
 1                    I N D E X

 2     WITNESS          EXAMINATION BY      PAGE
       CALISTO J.       MR. MOORE             5
 3     BERTIN, PE
       JACK RAKER       MR. MOORE            13
 4     BRIGETTE         MR. MOORE            35
       BOGART, PP
 5        ^                ^                  ^

 6

 7                  E X H I B I T S

 8     NUMBER           DESCRIPTION         PAGE
          ^                ^                  ^
 9        ^                ^                  ^

10        ^                ^                  ^

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 3**

1    CHAIRMAN BAGINSKI: The application for
2  Morningside at Wallington, LLC and New Wallington Homes.
3    MR. MOORE: Good evening, Mr. Chairman.  Is
4  this working?
5    CHAIRMAN BAGINSKI: It might be on.
6    MR. MELFI: No.  It's not going to be on.
7    CHAIRMAN BAGINSKI: No.  It's off.  We can
8  hear you.  I think everybody can hear you.
9    MR. MOORE: I'm a loud mouth.  Most people
10  can hear me.  I just wanted to make sure.
11    Mr. Chair, members of the board, good
12  evening.  For the record, my name is Kevin Moore with
13  the firm of Sills, Cummis & Gross representing New
14  Wallington Home, LLC and Morningside at Wallington Home,
15  LLC, two related applications.  To refresh the board's
16  memory, the application for Block 71, Lot 35.02, the New
17  Wallington Home, LLC project is for amended preliminary
18  and final site plan approval for an approved 134 unit
19  multi-family project and the application for the
20  adjacent block, Block 71, Lot 35.01, the Morningside at
21  Wallington Home, LLC project is for preliminary and
22  final site plan approval and (c) bulk variances for a 73
23  unit multi-family project.  Both properties have the
24  same street address of 551 Main Avenue.  The hearings
25  this evening on the two related applications are

**Page 4**

1  continued from the board's May 16th hearing.  Because of
2  the cancellation of the board's June meeting, the
3  applicants have re-noticed for the hearings this
4  evening.  My office noticed for the two hearings by
5  certified mail, return receipt requested to all property
6  owners within 200 feet and for all others required by
7  law to receive notice, and we published in the Bergen
8  Record on July 7th.  I would request that the board take
9  jurisdiction over the applications.
10    MR. CEDZIDLO: That's fine.
11    MR. MOORE: Everything's in order?
12    MR. CEDZIDLO: Everything is in order.
13    MR. MOORE: Great.  Thank you, very much.
14    When the previous May 16th hearing concluded
15  the applicant completed the application for the New
16  Wallington project and completed the direct testimony of
17  the applicant's engineer and traffic engineer on the
18  Morningside at Wallington Home project.  Before we move
19  on to our architect's testimony on the Morningside at
20  Wallington home project, I would like to briefly recall
21  Mr. Calisto Bertin, the applicant's engineer, to discuss
22  the changes made to the site plan for the Morningside at
23  Wallington Home project based on the comments of the
24  board members and the board's engineer.
25    Now, Mr. Bertin's been previously sworn and

Page 5

1  qualified.
2     CHAIRMAN BAGINSKI: Right.
3     MR. CEDZIDLO: Mr. Bertin, you're still
4  under oath.  Good to go.
5     MR. MOORE: Is that new, Calisto?
6     MR. BERTIN: No.  That's the same one.
7     MR. MOORE: That's the original A-1?
8     CHAIRMAN BAGINSKI: The microphones aren't
9  working, anyway, so speak loud.
10    MR. BERTIN: Hello.
11    CHAIRMAN BAGINSKI: Oh, they are.  Well, you
12  need this for the recording, don't you?
13    MR. BERTIN: All right.  I'm using here
14  exhibit A-1 that we presented at the last meeting.  I
15  didn't change it but we did make some minor site plan
16  changes based on the hearing and the comments from
17  Neglia Engineer's office and also the comments from
18  Bergen County.  The application is active before Bergen
19  County.  So the first change we made, I'm going to point
20  to the main driveway on Main Avenue.  We had it
21  presented with four lanes, two in and two out with a
22  divider.  That's what's shown here.  We have changed
23  that to one lane in and one lane out with a divider.  So
24  we've just narrowed the driveway, made it smaller.  That
25  was a requirement of Bergen County.  There's a parking

Page 6

1  lot between building number eight and Main Avenue.  We
2  made some minor changes to that.  We removed three
3  parking spaces and rotated it so it's parallel to the
4  building seven.  On this exhibit it's askew, so now it's
5  parallel and seven feet off.  We've lost a few parking
6  spaces but we've pulled it just a couple feet away from
7  Main Avenue, so it is a little change, and the driveways
8  line up a little bit better.  There's a driveway along
9  the southerly property line, right next to Al Ventura
10  Road.  We changed that.  I think we probably created a
11  little bit of confusion because part of it is two way
12  traffic and part of it is one way traffic and so we
13  elected to make the road one way.  This way there's no
14  confusion.  So anyone that parks in the parking lot
15  between building seven and eight would just have to go
16  around the site, but it's one way.  Now, by doing that
17  we were able to accomplish a few other things.  The
18  driveway doesn't have to be 20 feet or 24 feet wide.  We
19  made the driveway 18 feet wide, so we've enlarged a
20  little landscaped area that we had alongside of building
21  number eight, but we had no landscaping alongside of
22  building number seven.  You can see on the exhibit that
23  we had the pavement and a striped area and that really
24  wasn't attractive.  We're coming into a nice apartment
25  complex so we've now added a five foot wide landscaped

Page 7

1  strip along that building to soften the look, because
2  that's a block building.  It will be painted and fixed
3  up but the landscaping will add to it.
4     I mentioned at the last meeting that we have
5  a detention basin.
6     MR. MOORE: Didn't we add a privacy fence,
7  as well, Mr. Bertin?
8     MR. BERTIN: Yeah.  I was gonna get --
9     MR. MOORE: Okay.
10    MR. BERTIN: Okay.  You're right.  Along
11  this driveway, along the southerly driveway we added a
12  privacy fence, a six foot high privacy fence to remove a
13  variance.  Because originally we didn't put a fence
14  along that side and now we have it, so we've eliminated
15  one variance.
16    MR. MOORE: And also, just to keep
17  interrupting you and throwing you off your game, with
18  respect to the parking lot in front of building eight,
19  did we also add a stop bar?
20    MR. BERTIN: Yes.  We improved traffic
21  control on that driveway, that parking lot.
22    MR. MOORE: Thank you.
23    MR. BERTIN: Okay.
24    MR. CEDZIDLO: Mr. Bertin, that's why he
25  turned the mic off.

Page 8

1     MR. MOORE: But it doesn't do any good.
2     MR. BERTIN: Okay.  I mentioned there's a
3  drainage basin.  The drainage underneath the bridge, the
4  railroad bridge, comes on to the site and dumps into a
5  deep pit which has got a sand bottom and it's all sand
6  down there, below the pit.  We just changed the shape of
7  it because we wanted to make it more accessible for
8  maintenance.  If you were to look in there now, it's
9  loaded with trash and bottles and that sort of thing, so
10  there's a new shape and it's a more gradual slope coming
11  in from either the street side or the site side for
12  maintenance, and I think I mentioned that it would be
13  the responsibility of the applicant to maintain that
14  drainage basin.
15    MR. MOORE: Did we add retaining walls, as
16  well?
17    MR. BERTIN: Yes.  Yes.  There's -- there
18  were walls around it but we modified those walls and
19  we've added those details to the detail sheet.  We made
20  some adjustments to the plans to correct the unit
21  numbers in buildings eight and six.  They did not --
22  they were in conflict with the architect's plan so we've
23  corrected that.  There's a dumpster on the west side of
24  building five.  We just modified, rotated a little bit
25  to make it easier for trash, for a truck to pick it up,

---

Page 9

1  pick up the trash, so just, again, rotated it.  All
2  right.  And the doors to all the dumpsters, we changed
3  the detail.  We had a chain-link fence and I think it
4  had slats in it.  We were asked to make it a more solid
5  fence.  We were asked, suggested that it be board on
6  board fence.  Those are heavy, it's wood and they
7  usually don't last long in that kind of an application,
8  so we used the same type of privacy fence.  It's a
9  little -- it's lighter but it's a little bit more
10 durable as a gate, so that detail has been changed and
11 that's on the plan.  The New Wallington Home site was
12 designed a couple years ago and since then the use of
13 LED light is much more prominent, so we redesigned the
14 entire site, both New Wallington and Morningside, with
15 LED lights.  The same type of fixture but just LED so
16 they're -- so you can control them.  You can dim them at
17 night and that sort of thing.  We added lighting between
18 building seven and eight.  We didn't have the soffit
19 lights there because we figured that would be the
20 architect's realm, but we've added it.  We've added
21 soffit lights and building lights to provide lighting in
22 that area.  We made some changes to the landscaping,
23 part in response to your engineer's comments but also,
24 we did not have any landscaping between that front
25 parking lot and Main Avenue so -- and it's not shown

---

Page 10

1  here but it's on the plans, that we've added a hedge row
2  across the front of the -- that parking lot, to shield
3  at least the bottom of the cars.  This rendering shows
4  several street trees and they're just little dots, but
5  if you've been by this site there's a type of maple tree
6  but they probably have a six inch diameter trunk.
7  They're a nice looking tree, so they do provide a buffer
8  and we will add three more trees along the frontage of,
9  of -- to help shield that parking lot.  I think we'll
10 skip the Welcome to Wallington sign.  The architect came
11 up with a plan.  There was discussion about the location
12 of the Welcome to Wallington sign and it was correct
13 that you wouldn't see it in the place that we picked, so
14 it would be better further away from the bridge but also
15 closer to the road.  I guess it's up to you, but we have
16 a detail on sheet C3.5, which is a smaller Welcome to
17 Wallington sign on a post with a two foot wide by three
18 foot high post mounted sign and there's a detail of
19 that.  I live in Haworth and that's the sign that's
20 right outside my house on the Welcome to Haworth sign,
21 so that's why I used it, but we have an alternate, more
22 of a monument sign that we'll discuss and you can
23 choose, and the architect will discuss the monument
24 sign.  All right.  On drawings C2.5, that's where we
25 have our truck paths, we only provided the truck paths

---

Page 11

1  for the Morningside site because the prior application
2  had it for the New Wallington Home, so we've shown them
3  throughout the site.  Both the fire truck and tractor
4  trailer truck going around the site.  That's on drawing
5  2.8.
6      MR. MELFI: On two what?
7      MR. BERTIN: C2.8 has all the truck paths,
8  fire truck and tractor trailer truck.
9      MR. CEDZIDLO: C2.8 or 2.5?
10     MR. MOORE: C2.8.
11     MR. BERTIN: I thought --
12     MR. CEDZIDLO: Because you said C2.5 and
13 then you said C2.8.
14     MR. BERTIN: I said 2.5?  Okay.  I meant
15 2.8.  I wrote 2.8.
16     MR. CEDZIDLO: That's fine.  I'm just making
17 notes.
18     MR. BERTIN: If you look at the plans I bet
19 you it is 2.8.
20     MR. CEDZIDLO: I'm making notes and you said
21 C2 --
22     MR. BERTIN: Okay.  That's fine.  Maybe I
23 should put my glasses on because right above the 2.8 is
24 the 3.5, where the Welcome to Wallington sign is, so
25 I'll put my glasses on.

---

Page 12

1      MR. CEDZIDLO: No problem.
2      MR. BERTIN: Oh, that's so much better.
3      We did a little regrading of the parking
4  lots.  Not a big deal.  It's really an engineering
5  issue.  And then we updated the zoning chart.  One of
6  the changes we made before we had the variance for the
7  length of the building, because we have building seven
8  and eight connected, so the variance was changed from
9  the length of the building to having no buffer or no
10 setback between the buildings.  So that's -- the planner
11 and the attorney will take over that.  I just did what I
12 was told.  So anyway, we have the two buildings.
13 Together they're more than 200 feet but they are
14 separate buildings.
15     And that, in sum, is the bulk of the changes
16 that we made to the plans.
17     CHAIRMAN BAGINSKI: Okay.
18     MR. MOORE: Questions for Mr. Bertin on his
19 supplemental testimony?
20     CHAIRMAN BAGINSKI: Board members, any
21 questions for Mr. Bertin with regard to this?
22     MS. POLTON: Not at this time.
23     CHAIRMAN BAGINSKI: Okay.
24     MR. MOORE: Do you do the public after
25 everybody?

Page 13

1 CHAIRMAN BAGINSKI: Yes.
2 MR. MOORE: Okay. Then I'd like to call my
3 next witness, Mr. Jack Raker, the project architect.
4 JACK RAKER, RA, having been first duly sworn according
5 to law, testified as follows:
6 MS. BAUMANN: Please state your name and
7 spell your last name.
8 MR. RAKER: My name is Jack Raker,
9 R-A-K-E-R, and business address is 80 Lambert Lane in
10 Lambertville, New Jersey.
11 MS. BAUMANN: Thank you.
12 MR. MOORE: Mr. Raker, could you briefly
13 give your education, licenses and professional
14 experience for the board?
15 MR. RAKER: Yes. I'm a -- I have a
16 Bachelor's Degree in Architecture from New Jersey
17 Institute of Technology. I've been a practicing
18 architect for 20 years with Minno & Wasko in the field
19 of residential and multi-use architecture, mixed use
20 architecture for 20 years.
21 MR. MOORE: Are you licensed as a licensed
22 architect in the State of New Jersey?
23 MR. RAKER: I am a licensed architect in the
24 State of New Jersey.
25 MR. MOORE: And have you testified before

Page 14

1 planning boards and zoning boards in the State of New
2 Jersey?
3 MR. RAKER: Many planning boards, including
4 this one. Many planning boards and zoning boards.
5 Jersey City, Hoboken, East Rutherford, many in the area.
6 MR. MOORE: I would offer Mr. Raker as an
7 expert in the field of architecture.
8 CHAIRMAN BAGINSKI: Okay. We'd accept him
9 as an expert witness.
10 MR. MOORE: Thank you, very much.
11 Mr. Raker, could you describe the
12 architecture for the Morningside at Wallington Home
13 project?
14 MR. RAKER: Sure.
15 I'm going to start with building six and go
16 through the plans and then I'll go right into the
17 architecture.
18 MR. MOORE: Now, this is --
19 MR. RAKER: This is a copy. This set is a
20 copy of the submitted set.
21 MR. MOORE: Okay. So right now you're just
22 doing from the submitted set. You want to mark --
23 MR. RAKER: I have it on the board so
24 everybody can see it.
25 MR. MOORE: We don't need to, right?

Page 15

1 They're part of the submitted set.
2 MR. RAKER: I can mark it.
3 MR. MOORE: If it's not part of the set then
4 we have to mark it.
5 MR. RAKER: This is sheet A1. This is the
6 floor plan of building six. Building six has parking at
7 the ground floor and at the entry lobby. You can see
8 here, there's entrances at one end of the building and
9 parking spaces on either side of the drive aisle.
10 There's a lobby. They have access to the lobby from the
11 parking garage and access from the front of the building
12 into that same lobby, so you can pull into this
13 building, park your car in a pouring rainstorm, get out,
14 get into an elevator, go up into a hallway and right
15 into your unit without ever having to go outside. At
16 the upper floors there's a number of bedrooms, one
17 bedrooms and two bedrooms. The one bedrooms are in a
18 range of about 750 to 800 square feet and the two
19 bedrooms are in the range of 1,170 to 1,225 square feet.
20 In this particular building there are 15 one bedroom
21 units and 15 two bedroom units. They're all market
22 rate.
23 MR. MELFI: What are the size of the parking
24 stalls underneath that garage?
25 MR. RAKER: They're 9 by 18 and the drive

Page 16

1 aisle's 24 feet.
2 MR. MOORE: This is a colored rendering.
3 This would be exhibit A-2. If you could just describe
4 it for the board and mark it.
5 MR. RAKER: Sure.
6 Okay. This is the front elevation of
7 building six. You can see it's a very traditional style
8 pitched roof. We've gone with a character that we
9 believe fits well with the surrounding buildings in
10 Wallington, very traditional. There's a large amount of
11 brick. I would say this elevation's probably in the
12 neighborhood of 60 to 70 percent brick on the elevation.
13 We do have some horizontal siding, cementitious
14 horizontal siding, and we've broken that building up,
15 base, middle, top. We've created some feature elements
16 to allow your eye to go up and down along the building
17 so it's not one long repeat, repeat of window, window,
18 window. We've been able to break it up with a series of
19 different elements using base and a number of
20 architectural features.
21 Now, I'm going to move to the next building.
22 This is going to be sheet A3. Sheet A3, you'll see,
23 this is building eight plan. Building eight, you'll see
24 there's a slight difference from the ground floor and
25 the upper floor. There's an area, you can park

Page 17

1 underneath this building, so you can see this area here
2 is actually underneath the building.  Along the front
3 we'll have a leasing area for leasing the units on this
4 project.  In the back there will be Yoga and fitness for
5 an amenity, about 3,500 square feet, and utility rooms,
6 as well.  Along this edge there's tenant storage.  We've
7 treated this facade -- I'll show you a perspective
8 shortly.  You'll see this facade doesn't get treated any
9 differently.  You would never know that that's tenant
10 storage.  It gets treated with windows just like
11 anything else, and this is building two.  You can park
12 under.  Although it is open on this side, you can park
13 under, walk into the lobby and to the elevator and then
14 up to your unit.  This building has 25 one bedrooms, 15
15 two bedrooms and three three bedrooms.  Of that, 22 of
16 the 25 one bedrooms are market rate and then three
17 affordable, and of the two bedrooms, 15 are market rate,
18 I'm sorry, six are market rate and nine are affordable,
19 and the three bedrooms are affordable.  All the three
20 bedrooms are affordable.
21    MR. MELFI: You said there was 23 one
22 bedrooms or 25?
23    MR. RAKER: There are 25 one bedrooms and 22
24 are market rate.  Three are affordable.
25    MR. MELFI: Well, we have 23 market rate and

Page 18

1 one -- well, three market -- three low and moderate
2 and --
3    MR. RAKER: Oh, I apologize.  That's
4 correct.  You're right.  23, 23 one bedrooms, plus three
5 is 26 total.
6    MR. MELFI: Thank you.
7    MR. RAKER: That's correct.  Sorry.  And I
8 have my glasses on.
9    MR. CEDZIDLO: 23 one bedrooms?
10    MR. MELFI: 23 one bedroom market rate and
11 three one bedroom low, moderate.  Total of 26.
12    MR. RAKER: I'm going to bring up the
13 elevation of this building.  I have to show you --
14    MR. MOORE: This would be exhibit A-3.  If
15 you can just describe that for the board.  I bet it's
16 front elevation building eight.
17    MR. RAKER: Correct.  It's the front
18 elevation of building eight.  Again, this building,
19 because it has amenity on the ground floor, the ground
20 floor, we have open parking structures underneath.  The
21 first floor gets a little bit taller.  It's about
22 14 feet for the first floor, so in this case we did not
23 go with a pitched roof.  We went with a flat roof.
24 Right in the downtown we felt this building was close to
25 the street, it has a nice aesthetic for buildings at the

Page 19

1 street frontage and felt to have a little more of a
2 downtown flare.  Lots of glass on the ground floor in
3 the amenity and balconettes up on the upper level along
4 the street.  This building along the street frontage
5 will be all brick, brick and cast stone.  The height of
6 this building -- we already know we are asking for a
7 variance.  The height of this building is 48 feet,
8 one-quarter inch.  I didn't make the quarter inch.  The
9 way the ordinance is written, it's average grade to the
10 roof, so average grade, you know, became a decimal point
11 and that's what gave us the quarter inch.  I'm going to
12 quickly jump back.  I did not mention the height of the
13 first building, building six.  Building six height is 49
14 feet, three-and-an-eighth inches and that roof, that is
15 measured to the mid point of the pitched roof.  We could
16 potentially lower this building if we wanted to and go
17 with a flat roof but this building matches all the other
18 buildings in the project with a pitched roof so we felt
19 it would look kind of awkward being that one off
20 building, all residential building.  It was just, it was
21 sort of set back with the other buildings.  We felt it
22 should blend in with those and that's why we did that.
23 Jumping back to building eight, I'm going to mark this
24 as A-4, this is a color elevation of building eight.
25 It's a side elevation.  It's on the Al Ventura Road

Page 20

1 side.  This elevation shows you -- I thought it was
2 important to show you what this garage would look like.
3 It's an open parking garage.  There will be columns
4 there but we are continuing those materials around the
5 side, continuing with brick.  It's not just gonna change
6 to some other material.  They're doing brick.  There is
7 some siding at the top to break it down a little bit and
8 cast stone at the base.
9    Next item I'm going to show you is the
10 perspective view of the project.  This is a new --
11    MR. MOORE: That will be A-5.
12    MR. RAKER: A-5, this is a perspective view.
13 It includes buildings from both sides of the project.
14 This is the building eight, here, the existing warehouse
15 building's right behind you.  You can see a little of it
16 right there, behind the trees.  This is the building
17 from the previous project.  A little bit of our building
18 six is popping out in the background there and the green
19 landscaped plaza.  If you want, I could pass this around
20 so you could all get a better look at it.  I know you're
21 looking at it from a distance.
22    MR. MELFI: You might want to show the
23 residents.
24    MR. RAKER: I did invite them up earlier to
25 look at it.

Page 21

1 And the next exhibit I want to touch on
2 is --
3 MR. MOORE: Did everyone on the board see
4 the exhibit? Okay.
5 MR. RAKER: So this will be A-6. This will
6 be A-6. We did mention we wanted to do a --
7 MR. MOORE: Let's just describe for the
8 record what A-6 is.
9 MR. RAKER: -- monument sign.
10 Yeah. A-6 is what we would like to do for a
11 monument sign. So this is what we're proposing for our
12 project sign. It's got a nice brick base. We've kept
13 some of the detailing similar to the buildings, very
14 traditional. We'll have stand off letters on the sign.
15 I would have put the name of the project but I think
16 we're undecided yet so right now it's just project name.
17 MR. MELFI: I assume Welcome to Wallington.
18 MR. RAKER: Hum?
19 MR. MELFI: That would be a nice monument
20 sign, Welcome to Wallington.
21 MR. RAKER: Well, I have one here that I'm
22 very excited to show you.
23 So we have a two foot base here with the
24 brick, some pedestals up, a nice traditional top that --
25 where we can put the project signage. We feel it's

Page 22

1 important with cars and traffic nowadays to have a nice,
2 very visible project sign. It's just -- you know,
3 unfortunately people are using their phones, they're not
4 quite paying attention and we would like to, we would
5 like to, you know, have a nice, well lit, nice
6 attractive signage, which brings me to my last exhibit.
7 I worked today with the client --
8 MR. MOORE: This is A-7.
9 MR. BERTIN: -- to develop something that
10 was not the same as our project sign but something that
11 had a much more substantial feel. It's a pilaster. The
12 material would be, it would do a masonry or stucco
13 finish and then do stand off letters just like that,
14 Wallington. I did not write Welcome to Wallington. We
15 can obviously work with you on exactly what we want the
16 sign to say, but we have just done two different colors
17 to accent some of the banding in the sign.
18 MR. MOORE: We'll call that Wallington sign
19 A-7.
20 MR. RAKER: Yup, and that's the last of my
21 exhibits.
22 If anybody has any questions -- I can talk a
23 little bit about the dimensions if you'd like. This
24 one's about, it's about 4 feet, 10 in height. The pier
25 is about 2 by 2 and the overall length of the sign is

Page 23

1 about eight feet. Again, you know, we have to site it.
2 It might be -- the proportions my adjust but, you know,
3 we feel very comfortable with this, this design.
4 MR. MOORE: Mr. Raker, could you just
5 discuss the adequacy of the fire -- of the space around
6 the building and the access to the buildings,
7 particularly building six for fire access, fire code?
8 MR. RAKER: Sure. I'm just going to bring
9 up the site plan here.
10 I'm going to talk a little technical talk
11 about buildings and how they're constructed before I get
12 into just the area. The building code understands that
13 access, full vehicular access around every building is
14 not possible. It's not possible in any urban
15 environment, so the building code is written so that you
16 adjust your fire areas, your protected areas within your
17 building, and you can separate those areas to create
18 areas where you can't -- essentially, you're creating
19 two buildings within one building, so if there's a fire
20 in one, you can run to another section and, and be
21 entirely safe. Once you get over a certain fire area,
22 and all of this relates to how much perimeter access you
23 have. So the building code takes into account all of
24 that information. When we have access on two sides with
25 a vehicle and then we have 20 foot access around the

Page 24

1 rest of the perimeter for manned access or whatever it
2 be, for hoses, for any of that stuff, so we feel very
3 confident that if I were to take this, my open area
4 would be -- if I were to do a code calculation on this I
5 would take my open area on these two sides and knowing
6 that this side I have about the distance that I need for
7 access for -- while it's not vehicular access, I would
8 do a calculation based on that.
9 MAYOR TOMKO: How far do you get in there
10 with a truck?
11 MR. RAKER: Into here?
12 MAYOR TOMKO: Yeah.
13 MR. RAKER: You wouldn't take a truck
14 between these two buildings. You just wouldn't do it.
15 MAYOR TOMKO: Matter of opinion.
16 MR. RAKER: I mean, these fire trucks are,
17 you know, they're --
18 MAYOR TOMKO: Well, but I'm, you know, I'm
19 talking about -- what's the furthest access that you can
20 get?
21 MR. RAKER: Well, I can access this side
22 over here. Here, I can access all the way around, I'd
23 say all the way around, almost three, yeah,
24 three-quarters of the building.
25 MAYOR TOMKO: Okay.

Page 25

1    MR. RAKER: And I can access all along here,
2  as well.  This is all open.
3    MR. MELFI: On the bottom of that where
4  you're saying you can access, you're saying with a
5  truck?
6    MR. RAKER: Oh, yeah.  All this is with the
7  truck.
8    MR. MELFI: What's the width right down
9  below?
10   MR. RAKER: This is 24 feet of pavement.
11   MR. MELFI: So a fire truck opens up to
12 about 16 feet, 14, 16 feet.  That's leaving you eight
13 feet to a building to fight a fire with flames coming
14 out from me to that wall.
15   MR. RAKER: No.  No.  That's wrong.  24 feet
16 of pavement but I have another eight feet of distance to
17 the --
18   MAYOR TOMKO: Right.
19   MR. RAKER: And then I have space on the
20 other side, as well.  Looks like a couple of feet there.
21   CHAIRMAN BAGINSKI: That back section wasn't
22 affected like in the front, where it went from 24 feet
23 to 18, that was going to maintain 24 feet because that
24 was going to maintain two way traffic in the back
25 section of that parking area, correct?

Page 26

1    MR. RAKER: I can do two way traffic here.
2    CHAIRMAN BAGINSKI: Mr. Bertin reported he
3  was making that road 18 feet now, not 24 feet, one way
4  coming in on the south side of Al Ventura Road.
5    MR. RAKER: Oh, we're talking about this
6  building here?
7    CHAIRMAN BAGINSKI: That's what I'm asking.
8  Does the back section get affected also or that's going
9  to maintain two way traffic in the back section for that
10 parking lot?
11   MR. RAKER: I was talking about building
12 six.  This is painted.
13   CHAIRMAN BAGINSKI: I was talking about
14 building six.
15   MR. RAKER: This is  -- okay.  I mean, you
16 can definitely get a fire truck down to building six.
17   CHAIRMAN BAGINSKI: What I'm asking and what
18 Mr. Melfi asked and Mr. Tomko had asked, the space
19 between building six, right, and the fence, is that two
20 way traffic or one way traffic?
21   MR. RAKER: You would have to let Calisto
22 answer that question.
23   MR. BERTIN: That's two way.
24   CHAIRMAN BAGINSKI: That's going to maintain
25 the 24 feet there?

Page 27

1    MR. BERTIN: Actually, it's 22 feet of
2  pavement right through here because there's no back up
3  aisle, but all around -- that driveway on the south side
4  of building five is -- that's five or six?
5    CHAIRMAN BAGINSKI: I'm asking now because
6  earlier you said that that was going to be a one way,
7  from Al Ventura side, and the about 18 feet wide.
8    MR. BERTIN: I'm sorry.
9    CHAIRMAN BAGINSKI: I'm just clarifying.
10 That's all I'm doing.
11   MR. BERTIN: No.  The one way was just along
12 building seven and eight.
13   CHAIRMAN BAGINSKI: Okay.
14   MR. RAKER: Well, it looks like building
15 seven.  Eight you can circulate around.
16   MR. BERTIN: No.  This is the old rendering
17 in the plan, because we created a landscaped strip along
18 building seven.
19   MR. RAKER: Oh, okay.
20   CHAIRMAN BAGINSKI: You understand what I'm
21 saying now?
22   MR. BERTIN: Yeah.
23   CHAIRMAN BAGINSKI: Now you're saying it's
24 22 feet?
25   MR. BERTIN: Well, further in the site,

Page 28

1  absolutely.  Sorry for the confusion.
2    MR. RAKER: I was talking down in this, down
3  in this section.
4    CHAIRMAN BAGINSKI: So --
5    MR. RAKER: I shouldn't be testifying to any
6  of this.
7    MR. BERTIN: I don't do windows, you don't
8  do driveways.
9    CHAIRMAN BAGINSKI: So coming from the back
10 side, which would be the west side of the property,
11 correct?
12   MR. RAKER: Coming from here.
13   CHAIRMAN BAGINSKI: It's two way traffic to
14 get to the parking lot between building seven and
15 building six, to get to that parking area?
16   MR. BERTIN: Yeah.  Yeah.  Yeah.  This is
17 all two way.
18   MR. RAKER: Correct.
19   CHAIRMAN BAGINSKI: But you can only, and
20 then it's one way coming in from the east?
21   MR. RAKER: That's correct.
22   CHAIRMAN BAGINSKI: What's going to stop
23 people from going up that one way to exit?
24   MR. BERTIN: All right.  When it comes to
25 traffic, okay, we have do not enter signs along the side

---

Page 29

1  of the building.  That's the way the site exists now.
2  That's the way it was designed, but I thought we created
3  some confusion with two way traffic near building eight
4  so we just made it one way, but we'll have do not enter
5  signs so people do not head down that driveway along
6  building seven.
7      MR. MELFI: You're saying 22 feet you're
8  going to have between the property line and the other
9  building down there?
10     MR. BERTIN: Well, the driveway alongside of
11 building number six is 22 feet.  We use 24 for a back up
12 aisle, but if it's -- I mean, I could make it longer.  I
13 just, we have a little landscaping on either side of the
14 driveway and I thought that might have been more
15 important.
16     MR. MELFI: I'm just worried about when they
17 plow for snow.  Where is the snow gonna --
18     MR. BERTIN: That's why we have a little bit
19 of landscaping on either side of the driveway or they
20 just move it into the larger parking lot.  On the
21 southerly side of building number six there's not a lot
22 of room for snow piling.  They most likely have to move
23 out to Saddle River and put it in the lawn area there.
24     CHAIRMAN BAGINSKI: Okay.
25     MR. MOORE: Any further questions of these

---

Page 30

1  two witnesses?
2      MR. MELFI: Regarding the architect, yes,
3  because going back to page A5 you talked about a flat
4  roof on a building.  At the last hearing the other
5  buildings, the pre-approved ones that were done on the
6  first set, you guys were very adamant about not putting
7  a flat roof, period, and we granted you a variance
8  because we thought it would be aesthetically pleasing to
9  have the ridge roof and we granted a variance to put the
10 ridge roof because it looks nicer.  You guys testified
11 that the flat roof always leak, this and that, and now
12 why are we going back to a flat roof?
13     MR. RAKER: We think along the main
14 street --
15     MR. MELFI: Because of the height is
16 basically what it is, you can't meet the height
17 requirements if you put the ridge roof on.
18     MR. RAKER: Yeah.  We think along the front
19 edge of the build -- front edge of the main street we'd
20 like to put a flat roof building.  This building has a
21 slightly different aesthetic than the other building.
22     MR. MELFI: I understand that, but my
23 question is, the last time you were totally against any
24 flat building on that property because of future roof
25 leaks.  We agreed upon it.  We said we'll do a ridge

---

Page 31

1  roof, we'll give you the variance for the pitch roof,
2  not to put and flat roofs on, you guys were happy as a
3  pig in poop and now you're coming back and asking for a
4  flat roof.
5      MR. RAKER: Well, I'm not -- I don't recall
6  talking about roof leaks but I do recall talking about
7  the village look we were going for.  We definitely
8  achieved the village look with a pitched roof and I
9  think along the main street we definitely want a more
10 urban or more downtown feel.
11     MR. MELFI: Then you're asking for variances
12 for the ridge roof for other buildings?
13     MR. RAKER: Correct.
14     MR. MELFI: Okay.  I got ya.
15     MR. RAKER: We think that that building has
16 a, has a very village type feel on the interior.
17     MR. MELFI: No other questions.
18     MR. RAKER: You can take a look at the
19 perspective if you'd like.  I think it's, I think that
20 downtown, in and around the green, I think it looks
21 great with the pitched roof and up along the street
22 edge.
23     CHAIRMAN BAGINSKI: Excuse me.  Keep it
24 down.
25     MR. MOORE: Mr. Raker, just to go back with

---

Page 32

1  the aesthetics of the building number six, that's within
2  the development and that's the same arguments that were
3  made last time, why we need the ridge roof, correct?
4      MR. RAKER: Correct.  Correct.
5      MR. MOORE: And this flat roof, is this more
6  in keeping with the urban street structure?
7      MR. RAKER: Correct.  We're much closer to
8  the street in this building than we were in the other
9  buildings.
10     MR. MELFI: That wasn't the reason that was
11 given, but you can continue.  I have another couple of
12 questions.  The reason was because the flat roofs tend
13 to leak and aesthetically we figured and you thought it
14 would be nicer to have ridge roofs than flat roofs.
15     MR. MOORE: Well, we still think -- to
16 clarify, within the development and for building six --
17     MR. MELFI: You didn't say within the
18 development.
19     MR. MOORE: We still think it would look
20 better.
21     MR. MELFI: Those colors, the colors you're
22 proposing, is that the colors that are gonna stay or are
23 the colors subject to change?  The brick facade is -- I
24 want to make sure that's put in the resolution.  They
25 have to put the brick facade and whatever colors you

---

Page 33

1 decide, because I've seen a lot of towns when they
2 approve a project and all of a sudden they start
3 changing the facades to the building. They say well,
4 the brick is $3 million, we can do the siding and the
5 whole building for one million, so if you want to be
6 approved, I want to make sure it's in the resolution, it
7 has to be brick and whatever facade you have to chose.
8   MR. RAKER: I have not selected a particular
9 brick color yet.
10   MR. MELFI: I'm not talking about colors.
11 I'm talking about brick in general.
12   MR. RAKER: We are committed to this look.
13   MR. MELFI: So brick siding, not a stucco?
14 There's not going to be stucco changed from brick?
15   MR. RAKER: There are cementitious materials
16 all over this building of composite materials. They're
17 listed on the elevations. There are a variety of types
18 of cementitious materials. Materials nowadays are
19 composites. They're composites of paper and cement,
20 concrete made to look like stone.
21   MR. MELFI: You said the first two stories
22 of those other buildings are going to be brick?
23   MR. RAKER: Brick, correct.
24   MR. MELFI: That's what I want to make sure,
25 that it stays brick, not stucco, not tile, not whatever.

Page 34

1   MR. RAKER: Absolutely. Absolutely.
2   MR. MELFI: Okay. I have no questions.
3   CHAIRMAN BAGINSKI: Okay. Any other board
4 members have questions for the architect?
5   MAYOR TOMKO: No, I don't. I don't know.
6 I'm waiting for someone that will answer the question I
7 had last month. What is -- I don't know. I don't think
8 you're capable of doing that, but what is the expected
9 number of children to come out of --
10   MR. MOORE: That's our next witness.
11   MAYOR TOMKO: Okay. Very good. I'll hold
12 it for the next witness.
13   CHAIRMAN BAGINSKI: Any other questions?
14   MAYOR TOMKO: I'm going to keep asking till
15 I hit the right one.
16   MR. RAKER: Thank you.
17   CHAIRMAN BAGINSKI: All right. Thank you.
18   MR. MOORE: Chairman, I'd like to call my
19 final witness, Miss Brigette Bogart. Can we take a two
20 minute break?
21   CHAIRMAN BAGINSKI: Okay. Take a two minute
22 recess and we'll return and continue with this
23 application. If anybody needs to use the restroom or
24 get a drink of water, you're more than welcome to do so
25 at this time.

Page 35

1   (A brief recess was taken.)
2   CHAIRMAN BAGINSKI: If everybody could take
3 their seats, we'll resume the meeting.
4   MR. MOORE: Okay. Before Miss Bogart starts
5 her testimony, I just want to clarify, I think Mr.
6 Bertin did say, but if you guys want it wider than the
7 22 feet there in the back, you want the 24 feet, we'll
8 be happy to provide that.
9   MR. BERTIN: Yeah.
10   CHAIRMAN BAGINSKI: We'll discuss that with
11 our engineer.
12   MR. MOORE: Whatever you guys think is best,
13 we can accommodate it.
14   MS. BAUMANN: Could you identify yourself?
15   CHAIRMAN BAGINSKI: Let's get your expert
16 in.
17   MR. MOORE: She needs to be sworn first.
18 BRIGETTE BOGART, PP, having been first duly sworn
19 according to law, testified as follows:
20   MS. BAUMANN: State your name and address.
21   MS. BOGART: Brigette Bogart and my office
22 address is 648 Godwin Avenue in Midland Park, New
23 Jersey.
24   MR. CEDZIDLO: Spell your last name.
25   MS. BOGART: B-O-G-A-R-T.

Page 36

1   MR. MOORE: Miss Bogart, did you -- could
2 you give your education, licenses and professional
3 experience for the record.
4   MS. BOGART: Sure.
5   I have a Bachelors in Architecture degree
6 from North Carolina State University. I have a Masters
7 in City Regional Planning from the University of
8 Pennsylvania. I have been working as a Professional
9 Planner in the State of New Jersey since 1999. I grew
10 up in Bergen County and my family is from Wallington.
11   MR. MOORE: Are you a licensed Professional
12 Planner in the State of New Jersey?
13   MS. BOGART: I am.
14   MR. MOORE: Thank you.
15   I offer Miss Bogart as an expert in the
16 field of planning.
17   CHAIRMAN BAGINSKI: We will accept her as an
18 expert witness.
19   MR. MOORE: Thank you.
20   MS. BOGART: Thank you.
21   MR. MOORE: Miss Bogart, if you can begin
22 your testimony, that would be great.
23   MS. BOGART: Sure. May I sit?
24   So I apologize if my testimony seems
25 extremely long this evening. It's a complicated case

Page 37

1 and I want to make sure that I have all the proofs on
2 the record.  And feel free to ask any questions as I go
3 through my testimony.
4     As this board is aware, the site is
5 identified as Block 71, Lot 35.01. It's located at 551
6 Main Street.  It is a large site, at 3.65 acres.  It
7 currently is improved with two large masonry structures
8 that are in poor condition.  The proposal is to take
9 down one of them and maintain one as a recreation space.
10 The building fronting on Main Street that we're looking
11 to remove is a commercial industrial building.  It was
12 previously occupied by a bar and warehouse with loading
13 facilities.  The building to the rear was previously
14 occupied as a roller rink facility, I'm sure this board
15 is all aware.  There is a smaller paved parking area
16 located in the front of the bar/warehouse facility and
17 we're looking to improve that by moving that back,
18 because that existing parking area is located within the
19 right-of-way, so we're looking to move that back, add
20 additional landscaping and actually create an improved
21 and current parking area.  The site is also currently
22 improved with the gravel asphalt area between both the
23 buildings.  We're looking to improve that, as well, and
24 bring that up to present standards.  The existing rink,
25 as it stands today, obviously creates some issues with

Page 38

1 trying to improve the site itself.  What we're looking
2 to do, obviously, is to create a public amenity, but
3 that creates some issues with regard to the site layout
4 and that leads directly to the variances that are going
5 to be requested this evening.  What we're trying to do
6 is make sure that that existing rink becomes an
7 improvement on site that not only fits into the site but
8 fits into the site engineering wise and circulation
9 wise.  What that does is create some issues with regard
10 to the planning and zoning on site, so there are a
11 number of variances that we're requesting and most of
12 them are directly related to the fact that we are trying
13 to incorporate this existing rink facility into our
14 building design.  I believe that the key factors when
15 this board is reviewing this application is the fact
16 that we are trying to include this existing rink on
17 site, but also, most importantly is that we're trying to
18 develop this site with the adjacent Lot 13. -- 35.02, so
19 the Master Plan, the goals and objectives of this
20 township calls for developing this site in conjunction
21 with the adjacent lot and that's what we're trying to
22 do.  All the variances that we are requesting this
23 evening relate to the fact that we are trying to develop
24 not only with the adjacent lot, but also because of this
25 existing building, so we have two unique circumstances

Page 39

1 here.  We are trying to make sure that the circulation
2 on site, and not only pedestrian wise but also vehicle
3 circulation works with the adjacent lot, but also that
4 it works with that adjacent -- the existing building, so
5 we have two unique things on this property that warrant,
6 I believe from a planning perspective, warrant this
7 board's attention when reviewing this application and
8 the variances we are considering.  So from just a pure
9 property description perspective, I think those are
10 important things for this board to consider.
11     Keep going?
12     MR. MOORE: Keep going.
13     MS. BOGART: Okay.  So --
14     MR. MELFI: Mr. Chair, I'm sorry.  You said
15 we could ask questions as you go.
16     MS. BOGART: Of course.  I don't like to
17 just keep talking.
18     MR. MELFI: You could talk all night.  If
19 you say -- if that building were to be taken down,
20 because we're creating a lot of variances by leaving
21 that building, if that building were to be taken down
22 how many variances would we lose and would we be able to
23 conform, or you be able to conform with a lot of the
24 setbacks with the other buildings?
25     MS. BOGART: I don't believe that analysis

Page 40

1 has been completed, however, I think from a planning
2 perspective, the most important thing is to consider not
3 the number of variances that are being proposed but how
4 the site lays out, because I work for a number of
5 municipalities and when you're creating zoning
6 ordinances you don't typically understand the unique
7 circumstances of this situation, so it may not be an
8 analysis of this particular situation where you didn't
9 realize that this building is going to stay up and it
10 may not technically be a negative that the variances
11 should be granted.  It's -- and that's, I guess, what
12 this board should weigh.  I think that --
13     MR. MOORE: I'm sorry.
14     MS. BOGART: That's okay.
15     MR. MOORE: Aren't the variances also a lot
16 due to the fact that the irregular lot line between the
17 two sites?
18     MS. BOGART: Yes.  So it's not only the
19 building but also the irregular lot line and that we're
20 trying to be consistent with the development to the
21 adjacent lot.
22     MR. MELFI: But if the building were to be
23 taken down and everything got pushed back, you wouldn't
24 need the front yard setbacks.  You may not need the side
25 yard setbacks in some of these buildings.  The roller

---

Page 41

1 rink is probably as close to as big or near close to one
2 of the sizes of the apartments --
3    MS. BOGART: Right.
4    MR. MELFI: -- or buildings.
5    MS. BOGART: It is a large building and at
6 the May hearing the applicant had agreed to provide that
7 building for public amenities, public recreation
8 facilities, so I think that's also a benefit that this
9 board needs to consider, and with regard to all the
10 front yard setbacks, which I'll get into through my
11 testimony, we're actually improving the front yard
12 area --
13    MR. MELFI: Yeah, I know.
14    MS. BOGART: -- substantially.
15    MR. MELFI: You can continue.
16    MS. BOGART: Thank you.
17    MR. MELFI: Sorry.
18    MS. BOGART: No.
19    I had prepared an exhibit just quickly
20 discussing the surrounding land uses.
21    MR. MOORE: That would be A-8.  We'll call
22 it surrounding land uses.
23    MS. BOGART: Yes.
24    MR. MELFI: If you don't mind me asking,
25 what's the purple or violet on here?  It cut out on the

---

Page 42

1 bottom.
2    MS. BOGART: Let me see.
3    MR. MELFI: You have the chart here, the
4 legend?
5    MS. BOGART: You got a bad copy.
6    MR. MELFI: I think everybody has the same
7 thing.  Not sure what we're showing.
8    MS. WYGONIK: What's that?
9    MR. MELFI: Industrial commercial.
10    MS. BOGART: So I prepared the exhibit
11 regarding the surrounding land use based upon the New
12 Jersey DEP GIS data.  Just identifying the subject site
13 outlined in red, the adjacent parcel to the west, the
14 New Wallington Home site, and then you'll see the
15 railroad further west of that and then Saddle River to
16 the left outlined in blue.  You'll see the great big
17 orange area, which is multi-family homes.  Based upon
18 this exhibit, from a planning perspective this site, and
19 also reinforced in your Master Plan documents, is
20 appropriate for multi-family development.  You'll see
21 from this exhibit that the site itself has a very unique
22 lot shape, which lends itself to the fact that we need
23 the rear yard variance, which I'll get into in a second
24 in my testimony.  As I mentioned to you, the site, the
25 subject site outlined in red is going to be developed in

---

Page 43

1 conjunction with the adjacent site striped in red.
2    So as you heard from the previous witnesses,
3 the proposal is to develop this site in conjunction with
4 the PRML zone district, which is what this site is zoned
5 for, with 73 dwelling units, 15 which will be affordable
6 as a 20 percent set aside which is in conjunction and
7 consistent with your Housing Plan.  The existing roller
8 rink is to be converted to recreational use, as agreed
9 at the May 16th hearing.  We agreed that the borough
10 would be allowed to use the roller rink for recreational
11 purposes.  The existing masonry building along Main
12 Street is going to be demolished and we're going to
13 build building six and building eight to provide for
14 affordable housing and multi-family housing.  We're
15 going to have parking underneath both buildings and
16 we're going to provide, in building eight along Main
17 Street, a first floor leasing office, a Yoga studio and
18 a gym.  The reason that, from a planning perspective,
19 this is important with building eight is because it
20 provides an active storefront.  It's not retail,
21 building eight along Main Street, but it's going to
22 provide for active uses and so that residents on site
23 can actually utilize the uses, the Yoga studio and the
24 gym within that building itself.
25    MR. MELFI: I do have a question.

---

Page 44

1    MS. BOGART: Go ahead.
2    MR. MELFI: You're saying you're building
3 this in conjunction with the other lot, Lot 35.02,
4 whatever.  Are we consolidating both of these lots?  Are
5 these lots going to be consolidated?
6    MR. MOORE: No, they are not.
7    MS. BOGART: They're not going to be
8 consolidated and that's part of the reason for the
9 variances being requested.
10    Can I pull up the site plan?  You have one
11 with dimensions?  All right.  I'll take the rendered
12 one.
13    MR. BERTIN: I'll give you the site plan if
14 you'd like.
15    MS. BOGART: Perfect.  That's good.
16    So the one setback variance that we were
17 requesting is the rear yard setback and it's, from our
18 lot line -- can I draw on your plan or you're gonna'
19 kill me?
20    MR. BERTIN: Have at it.
21    MS. BOGART: Yeah?
22    MR. BERTIN: Go ahead, if you want.
23    MS. BOGART: Give me a marker.
24    So our lot line is here.
25    MR. BERTIN: Straight lines.  I'm joking.

Page 45

1    MS. BOGART: This is not helping. Our site
2  is right here.
3    CHAIRMAN BAGINSKI: Hours of work, Mr.
4  Bertin.
5    MS. BOGART: I know, and I just destroyed it
6  all.
7    MR. BERTIN: I was going to hang it up in my
8  office.
9    MS. BOGART: Well, now it's even better.
10  It's got the marker.
11    So the rear yard setback variance that we
12  are requesting is actually from this building to the
13  rear lot line of that lot, so it's actually internal to
14  our site. It's not to an adjacent site. If we were to
15  remove that lot line we would not be requesting that
16  variance. We are not looking to consolidate the lots.
17  They're two separate facilities, but technically we need
18  the variance because that lot line still exists.
19    CHAIRMAN BAGINSKI: Morningside at
20  Wallington and New Wallington Home, the principal owner
21  of that is the same?
22    MR. MOORE: Yes, but there's slightly
23  different ownership structures between the two buildings
24  so we really can't consolidate them.
25    CHAIRMAN BAGINSKI: So because he don't want

Page 46

1  to consolidate the residents of Wallington need to step
2  down, back up and say, oh, we'll just let him do
3  whatever he wants, leave the two lots separate? If he
4  was to consolidate them he wouldn't need all these
5  variances, correct?
6    MR. MOORE: He'd still need variances.
7    CHAIRMAN BAGINSKI: Not as many.
8    MR. MOORE: No, as many.
9    MS. BOGART: Not as many.
10    MR. MOORE: But it's different ownership
11  structures.
12    CHAIRMAN BAGINSKI: I'm just clarifying, but
13  the principal there is the same, between both LLC's.
14    MR. MOORE: But it's not the same --
15    CHAIRMAN BAGINSKI: Okay.
16    MR. MOORE: -- exact owners in each so they
17  really can't be consolidated.
18    MS. BOGART: And I guess from a pure
19  planning perspective, the reality is the outcome and the
20  design is going to be the same regardless of who owns
21  what or where the lot line is.
22    CHAIRMAN BAGINSKI: Well, you say that now,
23  but when Mr. Melfi asked the question about the flat
24  roofs you went from the -- or it went from we need the
25  pitched roofs to now flat roofs are better, so there's a

Page 47

1  balance. Isn't there? From everything you're saying
2  now to what was said earlier is different and I will
3  have to agree with Mr. Melfi in regards to that. If you
4  were to go back in the minutes of the transcript you
5  would see that you folks made the comment that, oh, no,
6  flat roofs are no good, we need to maintain the pitched
7  roofs and that's why there was -- the agreement was made
8  for the pitched roofs, for the height variance.
9    MR. MOORE: And we have the pitched --
10    CHAIRMAN BAGINSKI: Now we have a whole
11  different story today.
12    MR. MOORE: We have the pitched roof for
13  building six.
14    CHAIRMAN BAGINSKI: Now it would be okay for
15  this part, like Mr. Melfi said.
16    MS. BOGART: My comment from a planning
17  perspective was purely from the setbacks and lot lines,
18  because the reality is you don't see the lot lines when
19  you're walking down the street. All you're going to see
20  is the development and the development, what we're
21  trying to improve and trying to propose is a development
22  that's consistent with one another, so I will get into
23  the building height in a second, and I understand your
24  concern completely, but my comment was purely from a
25  setback perspective.

Page 48

1    MR. CEDZIDLO: Let me ask you a procedural
2  question, though, Miss Bogart. Because you have
3  separate owners, once you get approval, wouldn't you be
4  able to say we're not going to develop it like the
5  approval, we're going to sell it? Two years from now a
6  new owner could come in and say we're scrapping those
7  plans and building something else.
8    MR. MOORE: Well, no, because it's all
9  subject to this approval. The approval runs with the
10  land.
11    MR. CEDZIDLO: Correct, the approval runs
12  with the land, but you can decide, you know what, we
13  don't want to build it this way.
14    MR. MOORE: Well, then someone would have to
15  come back to this board.
16    MR. CEDZIDLO: Right. That's what I'm
17  saying. Here's the point that the chairman's making
18  that I just want to address. Because you're not
19  combining the two lots, Morningside at Wallington and
20  New Wallington Homes don't have an obligation to build
21  this. Like right now the presentation is we want to
22  jointly develop these two side by side tracts and we
23  have cooperating interests from New Wallington Homes and
24  cooperating interests from Morningside. Eight months
25  from now they can decide not to be cooperating with each

Page 49

1 other and now you've got approvals for one lot and
2 approvals for the other lot with ingress and egress
3 and --
4     MR. MOORE: You've got cross easements that
5 are recorded and are conditions of both approvals.
6     MR. CEDZIDLO: I agree, but people can
7 change their minds and decide we don't want to do it
8 that way and what happens is that the variance granted
9 for this, that you're asking for for this roller rink to
10 remain there, it might never get built this way or the
11 adjoining property owner may not build it this way and
12 now you've got a variance for something that may never
13 get built, right, and that variance --
14     MR. MOORE: Well, that's true of any
15 approval.
16     MR. CEDZIDLO: Well, it is, but it goes to
17 the points raised by Mr. Melfi and Mr. Baginski. This
18 is not a joint development. Okay. So you're asking for
19 things that is requesting variances because, well, we're
20 going to do it this way because we're going to cooperate
21 with the other side but you don't really have an
22 obligation to cooperate because it's not a joint
23 development. Okay. There's no requirement that they,
24 these adjoining property owners cooperate with each
25 other down the road because you are not combining it

Page 50

1 into one development.
2     MR. MOORE: We could make that a condition
3 of the approval with both developments.
4     MR. CEDZIDLO: Well, again, I think the
5 record should be clear, because Mr. Melfi and Mr.
6 Baginski both asked, can't you eliminate, just if you
7 eliminate this building, can't you eliminate some of the
8 variances so that the property doesn't require, you
9 know, as many deviations from the current zoning code as
10 it is. Miss Bogart very honestly answered, saying well,
11 yeah, but since we're developing it in conjunction with
12 that, we think from a planning perspective --
13     MR. MOORE: We checked it while you were,
14 you know, it would eliminate four variances.
15     MR. CEDZIDLO: Okay.  And from a planning
16 perspective --
17     MR. MOORE: That's all.
18     MR. CEDZIDLO: Her testimony is purely from
19 a planning perspective, from a planning perspective we
20 think it's best to have something that's, when you look
21 at the site in total, it's best to do it this way
22 because the Master Plan and zoning code doesn't take
23 into, for every single piece of property, every little
24 single thing that may develop, all of which is
25 100 percent true and I don't have a problem with her

Page 51

1 testimony, but it's all based upon the fact that this is
2 going to be a joint development.  Right?
3     MR. MOORE: Well, it's -- give your name.
4     MR. HERLINSKY: Victor Herlinsky.  I'm
5 co-counsel with Mr. Moore.
6     Look, there's a undercurrent that, you know,
7 when I'm talking to the board, we're hearing this, well,
8 you have this building --
9     MS. BAUMANN: I need you to not speak.
10     PUBLIC MEMBER: Sorry.
11     CHAIRMAN BAGINSKI: Thank you.
12     MR. HERLINSKY: There's a structurally sound
13 very valuable building at that site and one of the
14 amenities that we thought we would provide -- like, you
15 know, the idea of going through the expense to rip down
16 a very nice, valuable building that's there and not have
17 that amenity, just to our, you know, our mind doesn't
18 make any sense.  I know Mr. Melfi, last time when we
19 were here at the meeting, suggested, well, maybe that's
20 something we can include the town with, which we thought
21 was a great idea.  The fact of the matter is, I cannot
22 understand a business idea or even a planning idea of
23 why that building would come down.  To us it doesn't
24 really make, it doesn't make business sense and the
25 doesn't make, in our minds, planning sense, so the idea

Page 52

1 of what we're doing as far as putting these pieces
2 together, so to speak, and I understand your point, but
3 the point is, if you have something that can be for
4 definitely the betterment of our, our -- the people that
5 are going to live there, on the site, and we've already
6 offered it as an amenity that the town could take
7 advantage of, there isn't that kind of recreation space
8 in the immediate area that we could take advantage of.
9 Are we going to have another roller rink?  No, we're
10 not.  Everything is in control of this board.  Right now
11 you've got a very specific use, you know.  The number of
12 people that are going to be there are going to have --
13 you know, think this is great.  We have an indoor gym
14 that, you know, bar none, but the idea of why we would
15 just take it down, I don't understand the reason.  If
16 it's only for, you know, whether it's a height variance
17 or something like this, I mean, there is an advantage to
18 keeping it there in our perspective, unless somebody has
19 a differing point.  The one thing I'll just say to Mr.
20 Cedzidlo as far as, you know, we've been fighting this
21 for a long time.  This was originally an application
22 that we had, it went to Judge Mian, it's now Judge Mian,
23 he's put these residence, the number of apartments on
24 both sites really set in stone, so we're kind of, you
25 know, talking about the different things.  We will

Page 53

1 address Mayor Tomko's issues as far as, you know,
2 expanding the pavement area, we can certainly do that,
3 but we're really, you know, working on the edges. The
4 idea of what's going there is what we have but, you
5 know, the one thing as far as, you know, to have a real
6 conversation with the board, which I'd hope we have, is,
7 you know, we've been trying to get something built there
8 for six years. It's not like we're going to all of a
9 sudden get our application and, okay, you know, we, you
10 know, we had our first kiss, now we're going to go on to
11 somebody else. That's not how we're working.
12     MR. CEDZIDLO: Mr. Herlinsky, you're
13 absolutely 100 percent right. This whole track that's
14 been the subject of a builder's remedy suit, you know,
15 and Mount Laurel, going to back to -- when? Geez.
16     MR. HERLINSKY: We both had more hair.
17     MR. CEDZIDLO: I don't even know how --
18     MR. MELFI: I want to say 2008.
19     MR. CEDZIDLO: I did somehow in the barber
20 shop bring up the prior application that I used to get
21 my hair cut in, that barber shop, because I had hair at
22 that point, but --
23     MR. HERLINSKY: I don't think I called you
24 Mr. Cedzidlo when this application was still --
25     MR. CEDZIDLO: I was much, much younger, but

Page 54

1 we did have a builder's remedy suit, and again, that
2 was, the builder's remedy suit was contentious. The
3 rest, not so much, okay, but if we go back even to the
4 builder's remedy suit, we had an agreement worked out
5 where the tract owners and the owners all said -- we
6 came to an agreement, we said let's settle this with the
7 town, let's get this worked out, let's put a new zone,
8 get everything done. Judge Harris did a great job and I
9 think there was a 20 -- the compromise was 20 unit per
10 acre density. Correct?
11     MR. MELFI: Umm-hum.
12     MR. CEDZIDLO: I think that's what it was.
13 Now, this subject site that we're just here for, you
14 know, Morningside, this is a three acre site, I believe.
15     MR. MOORE: We're actually less than, like
16 at --
17     MS. BOGART: 3.65 acres.
18     CHAIRMAN BAGINSKI: 3.650 acres, yes.
19     MR. CEDZIDLO: 3.65, so we're within the 20
20 units per acre as part of the zone, correct?
21     MR. BERTIN: Correct.
22     MR. CEDZIDLO: But the 20 units per acre on
23 the tract are all against the road, all -- what is it?
24 60? How many units? I keep getting --
25     CHAIRMAN BAGINSKI: Well, there's 30 at

Page 55

1 building six.
2     MR. MELFI: 73 total.
3     CHAIRMAN BAGINSKI: Yeah, 73 total. There's
4 43 in building eight.
5     MR. HERLINSKY: I will make one point. Mr.
6 Melfi was very correct to point this out. In order to
7 be before this board and to separate the lots, we lost
8 this unit, so if the idea is making it less units, we
9 are coming in here with one less unit than we were
10 approved for --
11     MR. CEDZIDLO: Right, and I'm not --
12     MR. HERLINSKY: -- by the judge.
13     MR. CEDZIDLO: I'm not suggesting that. You
14 are absolutely complying with the density as far as the
15 total property and staying at 20 units or less and
16 everything else, you're actually doing that, but
17 basically, those 73 units are being built on half of the
18 property and the other half of the property is this
19 other building, so the units that are being built are
20 being built, you know, in a very dense space in the
21 front of the property here. Now, again, you don't need
22 a variance because overall, but it's just as far as
23 we're going to build the buildings higher, we're going
24 to go above the -- so now you need variances for height
25 because you're building the, you know, 73 units in a

Page 56

1 contained area. Right?
2     MR. HERLINSKY: Yeah, but --
3     MR. MELFI: If you built these 20 units per
4 acre right now, you're building 40 units on one acre.
5     MR. MELFI: But we're preserving an open
6 rec space that we will basically offer to the town.
7     MR. MELFI: Judge Harris' decision back in
8 the day, we all agreed, 20 units per acre, so every acre
9 you have you put 20 units. You got another acre,
10 20 units.
11     MR. MOORE: It's overall. When you got --
12 it's not how it works.
13     MS. BOGART: Yeah. That's not -- even if,
14 even if --
15     MR. MELFI: I understand that, but now you
16 want to cram the 73 in, leave the building -- you want
17 to raise the building to get them.
18     MR. MOORE: But the building is a true
19 amenity to both the development and the township and it
20 would seem to me --
21     MR. MELFI: Because you don't live here. We
22 have to live here. We have to see this and deal with it
23 every day. You're there representing him, he's
24 representing the owners, she's the planner and he's the
25 architect and everything. You're all gonna get your

Page 57

1 approval, you're gonna' walk away from town and say,
2 hey, we hit a grand slam, not a home-run, a grand slam
3 in Wallington, you know.  Sometimes you can't have your
4 cake and eat it, too.
5      MR. HERLINSKY: Look --
6      MR. MOORE: But they're very -- I mean, I
7 think they were very attractive buildings.
8      MR. MELFI: They're beautiful, and so is
9 Westmount Country, if you saw the original plans for
10 that, gorgeous.  What are they?  You got a box with
11 brown aluminum siding around the whole thing.
12      MR. MOORE: Down the line they did Town
13 Center in Robinsville, New Jersey, which is, you know,
14 Central New Jersey.
15      CHAIRMAN BAGINSKI: Sore subject.
16      MR. MELFI: Very sore subject.
17      CHAIRMAN BAGINSKI: Sore subject in this
18 town right now.  Robinsville is a sore subject in this
19 town.
20      MR. MOORE: What, did they beat you in a
21 sport?
22      CHAIRMAN BAGINSKI: In softball last night.
23      MR. MELFI: In state finals.
24      MR. MOORE: Anyway, maybe they --
25      MR. HERLINSKY: There is a state-of-the-art

Page 58

1 indoor softball training facility in there.
2      MR. MOORE: The type of elevations of our
3 front building, you know, on the main street there, with
4 this kind of quality architecture, which we agree to be
5 bound to conditions of any approval the board should see
6 fit to grant, and it looks great.  It looks awesome.
7      CHAIRMAN BAGINSKI: I don't think anybody is
8 denying that it looks great and awesome, you're right,
9 but now let's also face reality here.  Mr. Melfi says
10 oh, two months ago at the meeting, maybe we'll be able
11 to use that facility.  Well, what's it gonna take for
12 Wallington to use that facility?  What kind of money is
13 it going to cost Wallington to use that facility?
14 Because there's insurances that need to be bought,
15 because your client isn't gonna take liability if
16 somebody gets hurt on that property.  Wallington is
17 going to be responsible to pay that insurance.  Correct?
18 Obviously you got to protect your clients.  He's going
19 to have to have that piece of paper in front of him.
20      MR. HERLINSKY: I understand, but look --
21      CHAIRMAN BAGINSKI: Now, and the next
22 thing --
23      MR. HERLINSKY: But let me, let me, if I can
24 just cut for a second.
25      You hold the cards, so if you decide that

Page 59

1 you would like us to do something, we've already
2 extended the offer to do that.  That's something we can
3 certainly work out and we're committed to doing that.
4      MR. CEDZIDLO: The important thing is for
5 Miss Bogart, Mr. Moore, Mr. Herlinsky, is that, and it's
6 exactly the discussion, this is an open discussion
7 saying how we do this, should we do that, should we not
8 do this, is it better to do it this way, is it better to
9 do it that way, let's discuss what options there are,
10 you know, what assurances there are that it will be
11 built this way.  This is just, you know, questions so we
12 can figure out, is it best to keep the building, is it
13 not best to keep the building, is it best to keep that,
14 because I think the testimony, and trust me, I'm sure I
15 got this wrong, but you're talking about how the people,
16 if it does get developed jointly, both capital and
17 everything else, the adjoining property is going to use
18 that building, as well, correct?
19      MR. HERLINSKY: No.
20      MR. MOORE: No.  Not at this -- at this
21 moment that's not the plan.
22      MR. HERLINSKY: To reiterate my point, we
23 cannot --
24      MR. CEDZIDLO: I thought this was a rec
25 center.

Page 60

1      MR. MOORE: The way your zoning works, it
2 can only be an amenity for this lot.
3      MR. MELFI: If I'm not mistaken, at the last
4 meeting you testified that the people, if they want to
5 drive in they can drive from the other side of the units
6 and drive around the park to use this as a whole
7 complex.
8      MR. MOORE: No.  He was talking, he was
9 talking about driving from the buildings to the Yoga
10 center on this lot.
11      MR. HERLINSKY: They cannot, because as far
12 as what we have decided what we're going to do, we're
13 going to have card key access and it's only going to be
14 for the residents of this property.
15      MR. MELFI: Of the 73 units.
16      MR. HERLINSKY: 73 units, that's it.  As far
17 as any other usage, this board has complete control over
18 that.  We cannot extend it for anything else or we'd be
19 violating any approvals we get and violating your
20 ordinance, so the fact of the matter is it's for 73
21 people, 73 people are going to have one of the best
22 amenities they can possibly have.
23      MR. MELFI: You forgot the wives and the
24 kids.
25      MR. HERLINSKY: Excuse me.

Page 61

1    MR. MELFI: You forgot the wives and kids.
2  You said 73 people. You forgot the wives, the
3  boyfriends, family, kids.
4    I would like to let her finish her testimony
5  here.
6    CHAIRMAN BAGINSKI: Yeah. I was --
7    MR. HERLINSKY: I hear you, but look, if
8  this is going to be an issue I think it's important that
9  we engage the town and decide if this is something that
10  you would engage with us as far as what would be best
11  for everyone.
12    CHAIRMAN BAGINSKI: We'll let Miss Bogart
13  finish her testimony and we'll revisit this issue,
14  because I'm sure there will be some questions from the
15  public out there that will come up and maybe she'll have
16  an answer, be able to answer, and for the architect and
17  engineers and everybody, so let's let her finish. I
18  believe she's your last expert witness, right, for
19  tonight?
20    MR. MOORE: Then we'll address the Neglia
21  report.
22    CHAIRMAN BAGINSKI: Miss Bogart, sorry to
23  cut you off like that. I apologize. We'll let you
24  finish your report.
25    MS. BOGART: No worries. I got to take a

Page 62

1  deep breath.
2    So as our attorney had indicated, there are
3  four variances that would be removed if we remove that
4  building. One is open space, which is a technical
5  variance because we're providing recreational space.
6  Second is the building length, and that's also a
7  technical variance because we have that building
8  attached to the new multi-family building. The two
9  important variances that would be removed are building
10  coverage and lot coverage, and really, we're talking
11  about five percent of the entire lot that would be the
12  variance that would be removed. I think from a planning
13  perspective, this board needs to review the benefits of
14  providing a public recreation amenity versus a five
15  percent coverage variance, which is minimal, and the
16  only reason it's five percent is because we did it with
17  an existing facility, so I think from all those
18  perspectives, the board needs to look at keeping that
19  building and the benefits of keeping that building
20  versus any detriments.
21    So before all this came up I was about to
22  get into the expected school children. So Rutgers has a
23  study, which is a little bit outdated, but has a study
24  that provides for a ratio for school children per
25  multi-family development. If you look at the Rutgers

Page 63

1  School Hupa Study, it indicates that approximately 13.8
2  school children would come out of this facility, this
3  project. Of that, 11.7 would be public school children.
4  As I mentioned, this study is outdated and I've done a
5  number of studies throughout Bergen County on my own,
6  OPRA a number of Board of Educations throughout the
7  municipalities in Bergen County and what it seems to be
8  is in northern Bergen County, it's .07 children per unit
9  is the average in Bergen County. If you applied that to
10  this project, you're looking at about five school
11  children. So if you look at my studies, and I can give
12  you the municipalities and the studies I did and the
13  data I did, I believe that the project itself will
14  probably generate between five to 11 school children.
15    MS. WYGONIK: I have a question. So out of
16  the 200-something units that would be -- are you just
17  talking about this one?
18    MS. BOGART: Just the 73.
19    MS. WYGONIK: Okay. So even out of 73 units
20  there will only be 13 children, school children?
21    MS. BOGART: 13 school aged children, of
22  which approximately 11 would be public school children,
23  and if you look at actual data that I've compiled it's
24  probably going to be a little less than that.
25    MS. WYGONIK: To be -- I don't know. Just

Page 64

1  thinking about it, 73 families are going to come and
2  live there but there's only going to be 11 children or
3  13 children?
4    MS. BOGART: Yeah.
5    MS. WYGONIK: That seems very low.
6    MS. BOGART: Like I said, I could provide
7  you the data that I have. I've done, I've done it
8  personally. I've done OPRA requests to municipalities
9  throughout Bergen County. I have the data, the actual
10  data from existing multi-family developments throughout
11  northern Bergen County and I can provide that to you.
12    MS. WYGONIK: Okay. I mean, you must have
13  your facts and data. I don't -- I'm sure you did your
14  research, but just thinking logically, to me, it doesn't
15  make sense.
16    MS. BOGART: Well, I --
17    MS. WYGONIK: 73 families, usually two
18  children, I'm not saying every family has children, but
19  usually two, three children per family, out of 73 --
20    MS. BOGART: No. I understand that and
21  that's why I've done so much research, because it
22  doesn't make sense, and when you start to look at the --
23  and everybody questions it. No matter where I am,
24  everybody questions it. Whether I'm on your side of the
25  dais or on this side, everyone wants to know what the

Page 65

1 real facts are and that's why I've done so much research
2 and I have the data and I said I could provide that to
3 you.
4      MR. MELFI: I have a question on that.  You
5 said you OPRA'd many towns and municipalities regarding
6 this?
7      MS. BOGART: Yes.
8      MR. MELFI: Have you OPRA'd to see what our
9 ratio is in the three major complexes, as far as Mount
10 Pleasant Village and then --
11      MS. BOGART: I have.
12      MR. MELFI: How many units -- maybe you can
13 explain that to the public.
14      MS. BOGART: I have, and the board of ed
15 said they don't keep that data and they didn't get back
16 to me.
17      MAYOR TOMKO: What towns in this south
18 Bergen area have you OPRA'd, because, you know,
19 historically Route 4 is the Mason-Dixon line and we
20 cannot compare with upper Bergen County.  Things are
21 different.
22      MS. BOGART: You're talking to a girl that
23 went to North Carolina.  It's not the Mason-Dixon line.
24 Let's see.
25      MR. CEDZIDLO: Miss Bogart, let me just --

Page 66

1 building six has 15 two bedrooms?
2      MS. BOGART: Yes.
3      MR. CEDZIDLO: And building eight has how
4 many two bedrooms, and then three three bedrooms?
5      MS. BOGART: I have, in total, 40 one
6 bedrooms, 30 two bedrooms and 30 three bedrooms.
7      MS. WYGONIK: 30 two bedrooms?
8      MR. CEDZIDLO: So there's 30 two bedrooms
9 and three three bedrooms?
10      MS. BOGART: Yes.
11      MR. CEDZIDLO: And your -- see, the one
12 bedrooms I can understand, you know, the argument that
13 there's not going to be any school age children in a one
14 bedroom apartment, but you're talking about a lot of two
15 bedrooms and several three bedrooms, which has the
16 potential for 30 bedrooms, you know, over 30 bedrooms,
17 35 bedrooms where somebody other than the person paying
18 the rent can have a child.  Could be as much as 30,
19 right?
20      MS. BOGART: I agree with --
21      MR. CEDZIDLO: Statistically it may come out
22 to five and 11 but you've got over 30 second bedrooms in
23 this complex, right?
24      MS. BOGART: I understand completely, and
25 like I said, that's why I've done so much research in

Page 67

1 this area.  The record numbers show it's .09 for every
2 one bedroom and .30 for two to three bedrooms, which
3 equates to 13.8 for school age children.  The difference
4 here is elevators serve buildings.  Once kids hit school
5 age, the families don't want to live in elevator service
6 buildings, they don't want the kids to run down the
7 elevator to play outside by themselves.  They want
8 garden apartments, they want to be able to, to see them
9 outside, so it changes.  The amount of school children
10 you see for elevator shared buildings is substantially
11 less.  You don't want kids in, you know, in apartments
12 where you can't see them play, and I'm a mom of three, I
13 get it.  Like, you don't -- you want to be able to see
14 them go out and walk out the front door or in the
15 backyard, so if you live in a building that doesn't
16 provide that, the number of children generated drops
17 substantially.
18      MR. CEDZIDLO: My office is one block from
19 the George Washington Bridge in Fort Lee and I live in
20 Edge Water, along the waterfront, and every building
21 with an elevator in it is more occupied by people in
22 walkers than people with kids.
23      MS. BOGART: Yes.
24      MR. CEDZIDLO: Buildings with elevators are
25 dominated by people 60 and older who need the elevator

Page 68

1 to get up and downstairs.  Walkers, wheelchairs,
2 everything else.
3      MS. BOGART: So you agree with me?
4      MR. CEDZIDLO: There's credence to exactly
5 what you're saying.
6      MS. BOGART: Yes.
7      MR. CEDZIDLO: Like I said, I understand
8 that from personal experience, but where my office is in
9 Fort Lee, everybody knows all the housing, that's all
10 the glass towers that are being built, you know, next to
11 the George Washington Bridge, they're 47 stories high.
12      MS. BOGART: And I've worked on many of
13 those projects.
14      MR. CEDZIDLO: All of Edge Water is under
15 construction and all the buildings with elevators are
16 the more expen -- not only that, they're more expensive
17 buildings and the rent is high so they're, you know,
18 people 45 or 50 and older who are occupying those
19 buildings.
20      MS. BOGART: They're not moms and dads.
21      MR. CEDZIDLO: They're not 25 and
22 30-year-olds.
23      MR. MOORE: We're marketing this more
24 towards professionals, aren't we, really?
25      MS. BOGART: That's what it is.  Like I

Page 69

1 said, moms don't want kids running out, I want to go out
2 and play, go take the elevator downstairs and see what
3 happens.  That doesn't happen, so the numbers seem low
4 but it's a different market, it's a different project.
5      MS. WYGONIK: I have a question.  What do
6 you define as school age children?  Kindergarten through
7 eight or kindergarten through high school?
8      MS. BOGART: Through high school.
9      MS. WYGONIK: Through high school, okay.
10      MR. MOORE: Can I move Miss Bogart to her
11 variance testimony so we can get through this tonight?
12      CHAIRMAN BAGINSKI: Yes, please.
13      MS. BOGART: The school aged children would
14 be an issue but I hope you understand where I'm coming
15 from and all the data.
16      MAYOR TOMKO: I would just like to say I
17 hope you understand where we're coming from, because we
18 are, and I don't want to use the term gun-shy, in a
19 sense, but we're so apprehensive because we see what
20 other complexes have produced.  We have a very
21 problematic school situation right now and you, know, we
22 don't know what's in sight for the future.  Everything,
23 everything we're going through and planning is like the
24 domino affect, it's hinged on everything we do and, you
25 know, we're worried about this.  This is a big problem.

Page 70

1 I respect your research.  I question it, but I respect
2 your research and all and, you know, it makes us very
3 apprehensive on a lot of these things because, you know,
4 we just picture the worst scenario.  Three bedrooms,
5 five, six kids coming out of there, packing them in.
6 Like, you're saying you're looking for --
7      MR. MOORE: There's only three units,
8 though, and that's because the affordable housing
9 requires you to do that.
10      MAYOR TOMKO: Right.
11      MS. BOGART: And those three affordable
12 units will have the most kids out of this entire
13 complex, that's known, and I completely appreciate your
14 apprehension and your questioning, because I represent
15 two municipalities that have their own school districts
16 that have the same concern.  Borough of Park Ridge and
17 Borough of Emerson, they have very tight facilities with
18 regard to education and they go through the same
19 painstaking issues every time they have a development
20 application, so I get that.
21      MAYOR TOMKO: Well, whatever pains they
22 have, we have ulcers.
23      MS. BOGART: Exactly.  I get it.  I
24 understand completely and that's why I've done all the
25 research and I'm trying to provide you the most current

Page 71

1 and accurate data I can, because I don't want to be the
2 planner that three years from now you say that planner
3 came in and supported that project and all of a sudden
4 we've got 100 school children and she's awful.
5      MAYOR TOMKO: And we have your name.
6      MS. BOGART: Yes.  Exactly.  Everyone's got
7 my name.  I don't want to be that girl.
8      CHAIRMAN BAGINSKI: I don't want to cut off
9 the conversation.
10      MAYOR TOMKO: I know.  I'm sorry.
11      CHAIRMAN BAGINSKI: Let Miss Bogart finish
12 her testimony so we can continue moving on.
13      MS. BOGART: But you understand what I'm
14 saying?
15      MAYOR TOMKO: Yes.
16      MS. BOGART: Okay.  So the next portion of
17 my testimony, I wanted to talk a little bit about your
18 local Master Plan, because I think you've all understood
19 that I really take into consideration your local
20 concerns, your local impacts, your local zoning
21 regulations, but I think most important is your local
22 Master Plan goals.  I reviewed your 2006 Master Plan,
23 your 2008 Housing Plan and your 2013 Master Plan and I
24 think that a lot of the goals and objectives in those
25 documents pertain to what we're proposing this evening.

Page 72

1 So first and foremost, the 2006 Master Plan talks about
2 channeling developments for maximized benefits of
3 Wallington's present and future needs, to preserve the
4 tax base of the community by fostering the diversity of
5 rateables.  Obviously this proposal will increase
6 rateables within the township.  To preserve the tax
7 based community -- excuse me.  To provide a variety of
8 community facilities that will meet the needs of various
9 borough age groups, and that's what we're proposing to
10 provide through the existing facility that we're
11 proposing as a borough recreation facility.  To provide
12 adequate housing to meet the needs of the existing
13 population, and obviously not only we're proposing a
14 diversity of housing with multi-family, but also because
15 we're providing affordable units, I believe that we're
16 providing adequate housing to meet the needs of the
17 existing population.  And then lastly, to provide
18 diversity of housing to meet the needs of all age
19 groups, income levels, sexes, minorities, handicap and
20 variety of size housing, size facilities -- families.
21 Excuse me.  For all those reasons I think our project
22 meets all the goals and objectives in your 2006 Master
23 Plan.  Again, as the chairman had indicated and a number
24 of board members indicated, we are providing a project
25 that is completely compliant with your 2008 Housing

In RE: Morningside at Wallington

Page 73

1  Plan. The Housing Plan suggested that the PRML zone be
2  adopted, which is what we are applying under, and we're
3  complying with that, minus some minor modifications with
4  regard to coverage and the rear yard setback. The 2013
5  Master Plan talked a little bit about modifying the
6  plan's commercial zone but it really didn't have
7  anything to do with our site. So a review of those
8  plans for the last 11 years and the goals and objectives
9  that the planning board had indicated, I believe that
10  our proposal is completely on point to the planning
11  objectives of this municipality. With regard to the
12  zoning ordinance, as I mentioned, we are, and as this
13  board knows, we are in the PRML zone district. It was
14  rezoned to create multi-family density at 20 units per
15  acre. We are at 20 units per acre. The ordinance
16  permits the construction of not more than 208 units. We
17  are at 207. We are providing a 20 percent set aside, 15
18  were the two bedroom units, which will help in the
19  completion of the borough's Housing Plan, so we meet all
20  those objectives of the Housing Plan and the PRML zone
21  district. Not only that, we meet the fact that we
22  comply with the permitted uses, we comply with the
23  accessory uses, we comply with the minimum lot size and
24  we comply with the maximum density requirements, all set
25  forth in 365-25 (a), (b), (d) and (e) of your zoning

Page 74

1  ordinance, so we are completely consistent with your
2  Master Plan documents and your zoning documents. Where
3  we deviate is, as I mentioned to you, with regard to the
4  rear yard setback. As I indicated on the plan, it's
5  actually a technical deviation because we are really
6  just violating the setback based upon an internal lot
7  line. We are 22 feet. We're over 25 feet required.
8  However, your zoning ordinance suggests that it could be
9  reduced to zero if our planned development with the two
10  lots, 35.01 and the 35.02, which is what we're
11  suggesting here tonight, and there started to be a
12  dialogue with why can't we be developed as two lots, and
13  I think we can and I think this board has a right to
14  require that we develop in accordance with the plans
15  submitted. I know that there was some apprehension or
16  questions with regard to, well, how does this happen,
17  how do we acquire it, how do we maintain that, but you
18  have a right to do that. You can say that the plan
19  needs to be developed in accordance with what was
20  submitted and you can make our conditions, our approval
21  conditioned upon those approvals, like what we
22  submitted. So I think from those perspectives, the
23  board's concerns could be answered. Like I said, the
24  zoning ordinance says that a rear yard setback can be
25  reduced to zero and we're at 22 and it's an internal lot

Page 75

1  line. Not only is it an internal lot line but we also
2  have the river and the natural grading between the two
3  lots that add additional buffer. I believe that the
4  granting of the variance doesn't substantially impair
5  the intent and purposes of the zone plan, because the
6  zone plan suggests that zero, that rear yard setback is
7  appropriate, particularly when we're looking at a
8  uniform site plan. Additionally, if you're looking at
9  the two lots together, there's really minimal impact.
10  What we suggested was a buffer to the south to the
11  adjacent multi-family, but really, the whole key here is
12  to coordinate the development between the two lots to
13  make sure that the circulation works between the two
14  lots, and the engineering, the circulation between the
15  two lots is what creates the need for the variances that
16  we are requesting this evening. Technically, we could
17  request the variance for the rear yard setback based
18  upon a (c)1, based upon the criteria, that exceptional
19  narrowness, shallowness and shape of property, or by
20  reason of exceptional topography conditions of physical
21  features thereon. I believe that this is appropriate
22  for this site based upon not only the lot lines, but
23  also the shape of the property and the existing
24  conditions, not only the existing building but also the
25  buildings that were approved on the adjacent lot. We

Page 76

1  are meeting the density requirements and if the
2  ordinance allowed we could go up, add a story and reduce
3  the setback requirements, however, that's not the case
4  here. What we're doing is looking to provide for the
5  permitted density on site and just modify the setback
6  slightly. I believe that for a (c) variance we have to
7  talk about the purposes of the Municipal Land Use Law.
8  With regard to --
9     MR. MOORE: On the (c)1, did you want to
10  talk about the negative criteria on the (c)1 for this
11  one or are you going to do (c)1 and (c)2 for the same --
12     MS. BOGART: Yes. I'll do the negative
13  criteria together.
14     MR. MOORE: Okay. Great.
15     MS. BOGART: So if we were suggesting that
16  the setback variance could be granted under a (c)2, we
17  have to talk about the positive and negative criteria,
18  and the positive criteria is what purposes the Municipal
19  Land Use Law are, and I believe for the setback variance
20  there are four purposes, further purposes, (a),
21  municipal action to guide appropriate use in the
22  development of all land in a manner --
23     MS. BAUMANN: I'm sorry. Appropriate?
24     MS. BOGART: Appropriate use in the
25  development of all land in a manner that will promote

Page 77

1 the public health, safety, morals and general welfare.
2 I believe that the proposal that we've identified and
3 laid out for you is the most functional layout for the
4 property, given the existing development or the approved
5 development on the adjacent lot and the adjacent
6 building. I believe it allows for the most functional
7 layout of the entire site. It allows for building six
8 to move and be centered on site so that when you drive
9 down the aisle you're actually looking at the center of
10 the building. It allows for a sidewalk along building
11 six to connect to all the other buildings, as well as
12 the recreation facility, as well as the gym and Yoga
13 facility to the center, so with all those perspectives I
14 think that the layout itself of the entire site meets
15 and furthers purpose (a) of the Municipal Land Use Law.
16 The next purpose is to promote the establishment of
17 appropriate population densities and concentrations that
18 will contributes to the well-being of persons,
19 neighborhoods, communities, regions and preserve the
20 environment. As you heard from my testimony, the
21 density being proposed is permitted by ordinance and
22 also permitted by your Master Plan. All we're looking
23 to do is make sure that the site layout works, not only
24 with the adjacent facility but also the existing
25 building, so I think it serves that purpose. The next

Page 78

1 purpose is to promote desirable, visual environment
2 through creative development techniques and good civic
3 design and arrangement. As this board has heard and
4 seen and can sort of attest to, based upon the existing
5 conditions, the proposal rehabs the existing facility,
6 tears down the existing building in the front that needs
7 rehabilitation, rehabs the existing rink and creates a
8 great new facility for recreation and not only that,
9 creates brand new housing facilities and affordable
10 housing, so I think from those perspectives it meets the
11 purpose of promoting a desirable visual environment.
12 Lastly, purpose (o), to provide for development of
13 balance housing supply, and that was identified in your
14 municipal Master Plan and this project provides for the
15 much needed affordable housing in your community, so I
16 think from all those perspectives we advance the purpose
17 of the Municipal Housing Law by --
18     MR. MOORE: Land Use Law.
19     MS. BOGART: -- Municipal Land Use Law by
20 granting the variances that are requested. There are a
21 number of benefits to granting the setback variance.
22 Not only are we providing housing, providing a variety
23 of housing choices for the residents, we're providing
24 affordable housing for moderate income residents. We
25 are buffering 3. -- Lot 35.02 in Saddle River. The

Page 79

1 proposal is part of a union required site plan
2 application and, unfortunately, because we need a number
3 of variances, it's all due to the fact that we are
4 trying to create the most appropriate engineering plan
5 for this site. The subject parcel is consistent and the
6 proposal's consistent with the development pattern, as
7 you can see from the exhibit that I had submitted to you
8 this evening. I don't believe there are any detriments
9 to this application. From this board's perspective in
10 weighing the setback variance, you need to look at the
11 benefits and all the benefits of furthering the
12 Municipal Land Use Law purposes, furthering your Master
13 Plan purposes. Again, any detriments, I don't believe
14 there are any detriments. I believe the benefits
15 completely outweigh all the detriments. With regard to
16 the negative criteria, two things that as a Professional
17 Planner I need to discuss is how the project has a
18 detriment to the public good, and I dont believe it
19 does, because all the impacts, if any, are internal and
20 they're internal because of the fact that the two sites
21 are being developed together. There's really no public
22 impact. I believe the size of the property can support
23 the current design and the multi-family development
24 really fits into this site and fits into your Master
25 Plan. The second portion of the negative criteria, I

Page 80

1 have to prove there's no substantial detriment to your
2 Master Plan or Zone Plan and I don't believe that is so,
3 because that is exactly what your Master Plan or Housing
4 Plan calls for, is this development, this density on
5 this site. Yes, we need certain minor variances, but
6 they're all due to the fact that we're trying to make
7 this site work better from an engineering perspective,
8 so from all those perspectives I believe that the
9 benefits outweigh the detriments and we meet the
10 negative criteria for the setback variance.
11     I told you this was going to be boring. My
12 attorney is not even listening to me.
13     MR. MOORE: Yes, I am. I'm going through
14 this. I'm right up with you.
15     MS. BOGART: He's boring, too.
16     MR. MOORE: I am boring.
17     MS. BOGART: The next variance or two
18 variances pertain to minimum building setback and
19 there's two sections of the code that indicate that.
20 One, Section 365-25 (g)1, minimum building separation,
21 no less than 20 feet separation side by side or side to
22 front or side to rear, and Section 365-25(g)2, no less
23 than 40 feet front to front, front to back or back to
24 back, so we need two variances from your section, one
25 with regard to building six and one with regard to

---

Page 81

1 building seven and eight. Two separate issues here.
2 Building six, which is this building, which requires the
3 rear yard setback variance, needs a setback variance
4 from building five and building three and the reason it
5 needs the variance is because we're trying to propose
6 the drive aisle to the rear and we're trying to provide
7 buffering and landscaping on the property line. Not
8 only that, we're also trying to propose a sidewalk that
9 would connect the building to the rest of the site. So
10 again, as I started to mention to you, with regard to
11 the rear yard setback, it's all about engineering and
12 how to make this site work as a whole, and yes, we need
13 a setback variance, but we're trying to move building
14 six so that the entry is in the middle of the driveway
15 aisle. We're trying to make sure it has appropriate
16 pedestrian access and it has appropriate driveway
17 access, so technically we need minor variances from
18 that, from the regulations, but I think this is the most
19 appropriate engineering design. We also need building
20 setback variances for building seven and eight.
21 Building seven being the existing recreation facility
22 and building eight being the new residential facility.
23 This is a technical variance because they're really not
24 connected, but because they are side by side we need a
25 separation variance for those. I don't believe that the

---

Page 82

1 granting of the variances for either building six, seven
2 or eight substantially impair the intent and purposes of
3 the Zone Plan or Master Plan, because this is a unique
4 situation for this site and because we are preserving
5 that existing building. I believe that the deviation
6 can be granted because the proposed building location
7 and the reuse of the existing roller facility is a
8 better zoning alternative than the existing zoning
9 requirement of the ordinance. If we were to take down
10 that building you would probably still need some
11 separation regulations and this part would not have the
12 benefit of a new recreation facility as we're proposing
13 this evening.
14     MR. MOORE: Miss Bogart, that, that better
15 zoning alternative analysis also applies to the prior
16 variance you were talking about, as well, with the
17 building setback, too, doesn't it?
18     MS. BOGART: That's correct.
19     MR. MOORE: Thank you.
20     MS. BOGART: I believe that the walkway and
21 the additional landscaping that we're proposing, the
22 less impervious coverage, the more open space, the
23 better circulation for the ring road around the
24 property, they're all benefits to the variances that
25 we're requesting this evening with regard to building

---

Page 83

1 setbacks, and from a planning perspective and being a
2 planner on one side where you create a Master Plan, you
3 create the zoning regulations for a property, you can't
4 determine how it's all going to lay out in the end. The
5 zoning regulations are first and foremost, but when you
6 actually start to lay out a property and determine
7 what's best, I'm sorry, for the development of the
8 property, things change, and so that's what this board
9 is here for, to look at why things change and is it a
10 benefit to the development and how that benefits the
11 development, is it more appropriate than what was
12 originally contemplated, because when you create zoning
13 regulations you don't have a full engineered type plan.
14 So from all those perspectives, I think that the
15 benefits of this actually engineered site plan are much
16 better than what was originally contemplated when you
17 create the zoning regulations. So with regard to the
18 building setback variances, again, there are a number of
19 Municipal Land Use Law purposes that are furthered.
20 Purpose (a), municipal action to guide appropriate use
21 and development of all lands in the manner that will
22 promote the public health, safety and morals and general
23 welfare. I believe that this development is more
24 appropriate than originally contemplated based upon the
25 fact that it's fully engineered and it has more

---

Page 84

1 appropriate circulation than could be contemplated
2 without a fully engineered site plan. Purpose (e), to
3 promote established -- promote establishment of
4 appropriate population densities. Again, we are
5 promoting a development that has a population density
6 that is consistent with your zoning ordinance and your
7 Master Plan, Housing Plan. Purpose (g), to provide
8 sufficient space and appropriate locations for a variety
9 of uses, including residential. Your Master Plan
10 indicated this is the most appropriate place for a
11 residential, not only residential but multi-family
12 residential and affordable housing. Purpose (j), to
13 promote concentration of Historic District sites, open
14 space and valuable and natural resources in the state,
15 and I think that the preservation of this existing
16 recreation facility is important, and of course creates
17 variances for us, but obviously it's important to
18 provide for a couple reasons. Purpose (i), to promote a
19 desirable visual environment with the development
20 techniques, civic design. Yes, we need setback
21 variances, but they're all due to the fact that we're
22 trying to create appropriate walkways throughout the
23 site, appropriate landscaping and appropriate buffers
24 and an appropriate vehicle of design, so I believe from
25 those perspectives it meets and furthers purpose (i).

Page 85

1 Purpose (m), encourages development of various public
2 and private procedures and activities shaping land
3 development, basically lessening the cost of such
4 development and more efficient use of the land. I
5 believe that this municipality identified that this is
6 the most appropriate site for multi-family housing and
7 it's the least, or the most cost-effective to provide it
8 here, and that's what we're doing, so the coordination
9 of both the public and the private developer to make
10 sure that we have appropriate development is what we're
11 trying to achieve here, and from those perspectives I
12 believe we meet purpose (m). And lastly, purpose (o) is
13 to provide development bonds housing supply, and again,
14 as I mentioned to you previously, I believe we're
15 addressing that based upon your Housing Plan. Those are
16 the purposes of the Municipal Land Use Law we further.
17 Lastly, I just want to get into the benefits of granting
18 the variances for the separation of buildings. First of
19 all, I believe that the proposed separation distance
20 allows for, as I mentioned to you, the appropriate
21 internal circulation not only from the vehicle
22 perspective but also pedestrians. It allows for that
23 internal ring road, it allows for buffering, it allows
24 for the internal sidewalk that goes to the adjacent
25 buildings and it allows for the site to work as a whole,

Page 86

1 and I think from an engineering perspective, as you
2 heard, that this is the most appropriate layout for the
3 site. Also, the benefit is to provide for additional
4 recreation opportunities for the residents. It allows
5 for the existing recreation facility to be on site and
6 to be rehabbed, but also, it allows for a pedestrian
7 connection to that recreational facility. It reduces
8 impervious coverage and provides for open space, so from
9 all those perspectives I believe the benefits of
10 granting the variance for this building separation
11 outweighs any negatives. Lastly, addressing the
12 negative criteria, I believe that converting the roller
13 rink and reusing it will have no negative impact to the
14 surrounding community. In fact, I think it will have a
15 benefit. By removing it, you're really taking part of
16 the character of the community away. It allows for a
17 rink that has existed for a number of years to remain
18 and to be incorporated into a new environment and be a
19 public use, so I think that by allowing that to remain
20 is a huge benefit from a historic perspective.
21 Unfortunately, as I mentioned to you, we need a number
22 of variances based on the fact that we're keeping it,
23 however, we also have benefits. We are providing
24 appropriate circulation. We're providing appropriate
25 parking areas. We are making sure that there is

Page 87

1 additional parking in and around the new recreational
2 facility, and unfortunately, we do need distance
3 variances, but the reality is from an engineering
4 perspective it all lays out really well, so from all
5 those perspectives I don't believe there's any public
6 impact. In fact, I think there's a public benefit
7 because we are providing a public facility. We don't
8 believe there's any impact on the Master Plan
9 perspective because it calls for open space, recreation
10 and multi-family on this site. I believe that, lastly,
11 what we are proposing from a building separation
12 perspective is a better zoning alternative than the
13 existing requirements because it allows for the
14 recreation opportunities and it allows for a variety of
15 housing choices, and also provides for appropriate
16 internal circulation and sufficient parking on site. It
17 also allows for appropriate pedestrian circulation on
18 site and improves, actually, on site circulation which
19 is a requirement.
20     So that's all my testimony with regard to
21 building setbacks. I've got --
22     MR. MOORE: Building height?
23     MS. BOGART: -- building height variances to
24 address. I know it's --
25     CHAIRMAN BAGINSKI: Your testimony for

Page 88

1 building height is going to be just as long as it was
2 for setback?
3     MR. MOORE: Pretty much, and we've got a lot
4 of others, too.
5     MS. BOGART: I've got --
6     MR. HERLINSKY: If I can make a suggestion,
7 I see these poor woman that are typing away. Give them
8 a five minute break?
9     CHAIRMAN BAGINSKI: Well, what I was going
10 to suggest we'll continue her report next month, open
11 it up and hear the citizens for now on any testimony
12 that was heard, for a little while, so we can -- at
13 least they can speak and voice their opinion. Maybe
14 there will be some questions that will be valid, and
15 then we'll come back next month and continue, and we
16 have some reports for Mr. Neglia yet. It's not like
17 we're going to be voting on this application today.
18     MR. HERLINSKY: I would say the chairman
19 always knows best.
20     CHAIRMAN BAGINSKI: I definitely agree,
21 let's take a five minute recess, let the ladies get a
22 drink of water, rest their fingers. When we come back
23 we'll hold your report until next month. At that point
24 in time we'll open the hearing to the citizens, whatever
25 questions come up. This way maybe for next month we can

---

Page 89

1 address them and then do what we need to do about that.
2 We'll take a five minute recess. We'll come back here
3 at five after.
4    (A brief recess was taken.)
5    CHAIRMAN BAGINSKI: All right. We'll try to
6 get restarted now.
7    All right. As I said before recess, we'll
8 continue with testimony afterwards, next month, at the
9 next meeting. Our Neglia Engineering representative has
10 some testimony, also, but we'll hold that over till next
11 month.
12    At this time I'd like to open it up to
13 hearing the citizens. If anybody has any questions
14 about anything that was discussed to this point, we'll
15 take some time, we'll discuss some of it, bring out the
16 questions and it will be opened up again next month for
17 the citizens. It's not just a quick little brief thing.
18 Everybody's opinion is valuable here. Let's open it up
19 to hearing the citizens at this point in time. What
20 I'll have you do is step forward.
21    MS. KAPUSTA: I got a big enough mouth. I
22 was a cheerleader. I know how to project my voice.
23 Believe me, I still know how to do that.
24    MR. MOORE: Can you do a cartwheel for us?
25 It was a boring night.

---

Page 90

1    MS. KAPUSTA: I'm not dressed for a
2 cartwheel.
3 BRENDA KAPUSTA, having been first duly sworn according
4 to law, testified as follows:
5    MS. BAUMANN: May I have your name and your
6 street address?
7    MS. KAPUSTA: Brenda Kapusta, 90 Allwood
8 Street, Wallington, New Jersey. K-A-P-U-S-T-A. It's
9 Polish, Polish as you can get.
10    You're talking to us about, that only 13
11 kids are going to come out of all of those affordable
12 housing. Okay. Affordable housing, have you done any
13 studies in just Wallington itself to see what our
14 affordable housing that's already here has in it? And
15 I'll take an example. The nice little complex that's
16 next to where you're building there -- can you guarantee
17 us that they're gonna have a one bedroom house, one kid
18 in a one bedroom? Can you guarantee us they're not
19 gonna have more than four kids in a one bedroom with two
20 adults? Cuz it's happening in the complex next door.
21 What guarantees are you gonna give the residents of
22 Wallington that 208 units aren't gonna produce 500 kids
23 in our school system? And when you say affordable
24 housing, you're saying 13 kids in that whole thing, it's
25 not gonna happen. What guarantee can you give us

---

Page 91

1 residents that are going to have to deal with all the
2 extra children in the schools and everything else? On a
3 second side, you're talking about the roller rink and
4 only opening up to the one side, not letting the other
5 side, but yet allowing the Wallington residents to use
6 it. What guarantee are you gonna say that in a year
7 you're not going to let any Wallington residents use it
8 and that the other side isn't gonna get in there and use
9 it?
10    MR. MOORE: That will be a condition of the
11 approval, so that we would lose our Certificate of
12 Occupancy or be able to have Notices of Violation, so
13 that part is easy.
14    MS. KAPUSTA: But if nobody is monitoring it
15 how do we know?
16    MR. MOORE: Somebody can just drop a dime.
17    MS. KAPUSTA: We know how well dropping a
18 dime works with illegal homes and too many people and
19 families and overcrowding in one bedroom apartments, we
20 know how that works. So what kind of guarantees can you
21 give the residents of Wallington that you're building
22 all these nice new buildings and you got all these
23 affordable housings that a two bedroom is only going to
24 have one or two kids and then an adult? Again, did you
25 go and look at the housing in Wallington or in the

---

Page 92

1 neighboring towns? We all know what goes on. We know a
2 one bedroom just doesn't have one family in it. It has
3 multiple kids. What guarantee can you give the
4 residents of Wallington that only 13 kids are gonna come
5 out of that thing? And I'm not saying your study. Did
6 you check around just in Wallington how many houses are
7 one bedroom and have four kids coming out of them? What
8 guarantee can you give to us that your study is going to
9 actually only keep out 13, under 20 kids in there?
10    CHAIRMAN BAGINSKI: Okay. Miss Kapusta, is
11 there any other questions that you have?
12    MS. KAPUSTA: No.
13    CHAIRMAN BAGINSKI: Okay. Because you asked
14 the same question 10 times, so let her answer it now.
15    MS. KAPUSTA: I know, because we've all been
16 talking about it.
17    CHAIRMAN BAGINSKI: Let's let them try and
18 answer it now.
19    MS. BOGART: So as I mentioned to you, I did
20 the study with regard to the Rutgers numbers and the
21 standards and I also did my own study with regard to
22 existing developments in Bergen County and I am sure,
23 based upon those studies, that it's probably between
24 five to 10 kids. That being said, I also tried to do a
25 study within Wallington itself, because as you heard

Page 93

1 from my testimony, I'm very concerned about the local
2 impact, and I did do an OPRA request to the local Board
3 of Ed and they say they didn't maintain those records,
4 so I was not able to identify that from a local
5 perspective. But from a Bergen County perspective and
6 other municipalities, I can tell you that these six or
7 seven municipalities have an average school child per
8 unit ratio of .07, particularly when you look at
9 elevator serviced buildings, so I understand. I can't
10 guarantee my numbers are exactly correct in Wallington
11 because they won't give me that information. What I can
12 tell you is all the information that I have gathered
13 throughout Bergen County is completely accurate, between
14 five to 10 kids, and that has been true for new
15 developments within the last 10 years. All I can do is
16 give you the best information that I gathered.
17     MS. KAPUSTA: When they go into this housing
18 units will there be somebody monitoring the number of
19 people in each unit or the number of kids, not to
20 overload them?
21     MR. MOORE: Well, there's legal per -- I
22 mean, there's legal things about how many people you
23 can, you know, have occupy a unit. Again, that's code
24 enforcement.
25     MS. BOGART: The good news with regard to

Page 94

1 the affordable units is that they have to be monitored.
2 It is -- there are a specific number of occupants per
3 one bedroom, per two bedroom, and that's not true for
4 all the other units in town, so the state requires that
5 all affordable units be monitored, that you can't have
6 more than a certain number of occupants per bedroom, so
7 that actually is a benefit to this with regard to the
8 issues you're talking about.
9     MS. KAPUSTA: Okay.
10     CHAIRMAN BAGINSKI: Thank you, Miss Kapusta.
11 Anyone else wishing to be heard? You can
12 step forward.
13 MELISSA DABAL, having been first duly sworn according to
14 law, testified as follows:
15     MS. BAUMANN: State your name and your
16 address.
17     MS. DABAL: Melissa Dabal.
18     MR. MOORE: You know what, why don't you sit
19 here and use the mic.
20     MS. DABAL: Okay. Melissa Dabal, D-A-B-A-L,
21 66 Mount, M-O-U-N-T, Cedar Avenue.
22     My questions are mainly for Mrs. Bogart, Ms.
23 Bogart.
24     CHAIRMAN BAGINSKI: Melissa, could you pull
25 the microphone closer so this way we don't have --

Page 95

1     MR. CEDZIDLO: I don't think that works.
2     MS. DABAL: How's that? Better?
3     CHAIRMAN BAGINSKI: That might be the one
4 that's shut off.
5     MS. BOGART: Here, we can share.
6     MS. DABAL: So do you have any studies
7 post-development build that could corroborate or
8 substantiate anything that you had predicted in terms of
9 number of children coming out of those developments?
10     MS. BOGART: So all my studies that I
11 mentioned are post-development. They're all actual
12 developed units and all actual information provided by
13 the Board of Ed of those municipalities.
14     MS. DABAL: And those municipalities were in
15 northern Bergen County and even though technically we're
16 in northern Bergen County, like the mayor's comment, so
17 to speak, can you just give me a quick example of the
18 two municipalities that maybe you did studies on?
19     MS. BOGART: The Village of Ridgewood and
20 the Borough of Park Ridge.
21     MS. DABAL: Okay. So those are highly
22 affluent towns.
23     MS. BOGART: Ridgewood, yes. Park Ridge --
24     MS. DABAL: Yes. Well, I mean, much more
25 affluent than we are.

Page 96

1     MS. BOGART: I don't know that.
2     MS. DABAL: Well, I do. I work there and my
3 sister lives in Ridgewood, so I do know.
4     MS. BOGART: Okay.
5     MS. DABAL: Usually apartments in more
6 affluent areas, young, let's say millennials will move
7 in with children and I don't think that they stay there
8 for a very long time. I think they tend to want to buy
9 a home because they don't want to keep children in an
10 apartment. Here it's very different. We have a lot of
11 people in apartment complexes that have a lot of
12 children and for a very long time, I'm very involved in
13 the school system, year over year we have larger amounts
14 of children incoming into the school systems. For
15 instance, this year there was a high school class that
16 had upwards of -- I'm sorry. Middle school upwards of
17 30 children. There was a grammar school class two years
18 ago upwards of 28 children. Again, you know, I know you
19 can't give guarantees but this is a massive impact on
20 this town. It's massive for us. We all own homes or we
21 rent. We live here. I'm very, very concerned and
22 highly disappointed that -- and I'm not pointing the
23 finger at anyone. Please don't misunderstand me, but
24 that there was not greater planning for the number of
25 children that could come out of this development. We

In RE: Morningside at Wallington

---

Page 97

1 have three very large apartment complexes in town. We
2 also have one going up on Paterson Plank Road. I don't
3 know where we're going to put these children. I go to
4 Board of Education meetings and the officials at the
5 Board of Education level don't know where we're going to
6 put these children. My heart is breaking. Are we going
7 to put them in the hallway? I don't know what anybody
8 could do and I don't have the answer.
9     MS. BOGART: May I?
10    MS. DABAL: Absolutely.
11    MS. BOGART: So my response is sort of
12 twofold. One, your Master Plan and zoning ordinance
13 allows for this. It's not like we're looking for any --
14 your Master Plan and zoning ordinance allow for it.
15 We're not allowing or requesting any increase in density
16 or any more units than what the governing body has
17 already decided is appropriate for this site. We're not
18 looking to provide anything more, any additional
19 families than what was planned by this municipality.
20 That's number one. Number two, I understand your
21 comments with regard to school children completely, but
22 the other side of that is if you look at Ridgewood,
23 people are looking to rent there and pull in school
24 children because they think the school system is the
25 utmost be all of school systems ever, so while you say

---

Page 98

1 that people come in and rent and pull all school kids in
2 there and stay there for a while, it's the same scenario
3 in any town regardless of the income level.
4     MS. DABAL: But the number of apartments
5 here far exceed anything in Park Ridge, anything in
6 Ridgewood.
7     MS. BOGART: Ridgewood has about 700
8 apartments.
9     MS. DABAL: I'm gonna guess -- Nick?
10    MR. MELFI: Off the top of my head -- we
11 were just trying to figure that out.
12    MS. BOGART: Over 700 apartments. I think
13 there was about 850, so it's very similar.
14    MR. MOORE: I'd just like to clarify one
15 point and -- two points. One is that, one of these
16 projects was already approved, regardless of whether or
17 not this project gets approved or the amendments get
18 approved, so we're talking here about 73 units, not
19 about 208 units.
20    MS. DABAL: I wasn't -- I know that was --
21 you know, part B is to your point. I don't really
22 understand the full scope of the project. I mean, I
23 understand the redevelopment part but there's 200 --
24 what did you say -- 207 apartments?
25    CHAIRMAN BAGINSKI: 207.

---

Page 99

1     MS. DABAL: And 74 are affordable?
2     MS. WYGONIK: Total, 207.
3     MS. DABAL: Total, 207.
4     MS. BOGART: The proposal today is just
5 talking about 73.
6     MS. DABAL: And what is the breakdown in
7 terms of bedrooms? Anybody know a high level off the
8 top of their head?
9     MS. BOGART: 41 one bedrooms.
10    MR. MOORE: Mr. Raker testified to that
11 earlier. He can reiterate that.
12    MR. CEDZIDLO: 40, 33.
13    MS. DABAL: Yeah.
14    MR. CEDZIDLO: 40 one bedroom, 30 two
15 bedroom, three three bedroom.
16    MR. MOORE: Correct.
17    CHAIRMAN BAGINSKI: Now, again, to clarify,
18 this project, this was a project that, the original one,
19 when it came up, was denied by the planning board and it
20 went to the Courts of Hackensack and at that point in
21 time it was the -- Judge Harris was the judge?
22    MR. CEDZIDLO: This goes back, this goes
23 back 10 years, where the owners of these two pieces of
24 land sued the town, saying that the town had failed to
25 adopt low to moderate income housing requirements and

---

Page 100

1 meet their housing requirements under the Mount Laurel
2 decision, so they're called Mount Laurel lawsuits. Now,
3 if you want to go really far back, the person who was
4 the borough attorney 35 years ago told the town, we
5 don't need Mount Laurel housing because we have
6 apartments so we have cheap housing in town, which is
7 not the law. The borough attorney who supplanted him
8 didn't tell the mayor and council that we need the
9 requirements. I happen to know this because I happen to
10 know the current borough attorney.
11    MS. DABAL: He's awesome. He's awesome.
12    MR. CEDZIDLO: But the two borough attorneys
13 prior to him had told the town, you don't need to comply
14 with Mount Laurel, so when the builder's remedy came, I
15 represented the planning and zoning board during those
16 hearings and Judge Harris ruled that Wallington has
17 absolutely failed to plant anything and is not complying
18 with phase one, phase two, now we're in phase three of
19 Mount Laurel housing. Wallington was alone. Woodbridge
20 went through the same thing. Okay. So several towns
21 down here in south Bergen didn't do what they were
22 supposed to do under the law, so when the developers
23 sued, the judge granted them a right to build housing
24 and low income housing here. Okay. And nothing to do
25 with this planning board or the zoning board. I've been

Page 101

1 the board attorney for 10 years for both, had nothing to
2 do with anything the board did. Judge Harris said you
3 have a right to do it. As part of that litigation a
4 compromise was worked out, because some of the plans
5 that were suggested for the sites were five and six
6 stories with -- if you look at Westmount Station, where
7 there's Panera Bread and six stories above it, that's
8 what was proposed for these sites. The borough, as part
9 of a negotiation, settled that lawsuit in the best
10 interest of Wallington to limit it to 20 units per acre,
11 okay, when I think something like 40 units or more was
12 proposed at the time.
13     MR. MELFI: I think their proposal was
14 almost 70. We negotiated for 40 and we settled for 20.
15 It was almost 70 an acre.
16     MR. CEDZIDLO: So Wallington settled for 20
17 units an acre and the developers said we'll live with
18 that, that's okay. Okay. Because that's why we don't
19 have Westmount Station being built here. Okay. Now,
20 when the adjoining property owner came here in
21 compliance with the 20 units per acre, the board at that
22 time vote -- this board voted it down, saying we don't
23 like the plan, we don't like the roadway house, there's
24 certain things we don't like on this, and a judge in
25 Hackensack, that was Judge Mian, about a year-and-a-half

Page 102

1 or two years ago said you can't deny the builders. The
2 builders sued the town a couple years ago, they have a
3 right to build houses. The reasons you're giving for
4 not allowing this development to go forward are not
5 valid, in my opinion, under the law. I happen to think
6 the judge was wrong but he's the judge. He has final
7 say so. So it's not like the board has done anything,
8 and you mentioned the units over by the bowling alley, I
9 believe they're almost all one bedrooms to try and limit
10 the effect on the school system, by making them small
11 commuter apartments that aren't going to attract
12 families. Again, I grew up in town. I know the town.
13 I love the town. My brother decided to move back into
14 town, built a big house in town, probably pays as much
15 in taxes as anybody in town. He probably has the big --
16     MS. DABAL: He's actually the third highest.
17 He tells me quite often.
18     MR. CEDZIDLO: Again, my brother pays the
19 third highest taxes of anybody in this town. I get it
20 and I understand it. I still have the connection to the
21 town and I understand it, but the truth is that there's
22 very little -- okay, as long as the builder says I'm
23 going to build according to the settlement we have and I
24 only need, you know, a three or five foot setback from
25 the property line and I'm going to be a quarter inch

Page 103

1 above the building height, you know, these are rather
2 technical things, and you heard the discussion earlier,
3 this is a discussion to try and do what's best for the
4 town with the board and the developer acting to let's do
5 what we think is best. They're not trying to shove
6 anything down our throats. We're not trying to shove
7 anything down their throat, but these are real serious,
8 you know, issues that the town faces and it's, you know,
9 it's hard, it's hard to do. That's why, you know, like
10 I said, my office is in Fort Lee. I live in Edge Water.
11 Now, nobody has more development -- there's more units
12 being built within a thousand yards of my home than you
13 can imagine right now and there's more coming. I will
14 tell you, every building with an elevator, there's
15 nobody under age 50 because they can't afford it in Edge
16 Water. You just can't. There's a complex across from
17 the golf range which is, if you want 1,800 square feet,
18 it's $6,000 a month. There's no families with little
19 kids moving into those. It's different here, but again,
20 it's kind of what the planner was saying, these are nice
21 units with, you know -- these are not slapped together
22 little -- you know, the nicer development we can have,
23 more likely is you're going to attract higher rents and
24 less kids. It's difficult. It truly is.
25     CHAIRMAN BAGINSKI: Just in regards to what

Page 104

1 you're saying, you go all the way back to 35 years, the
2 town fathers in our town here were battling with the
3 state going back years ago, because if I'm not mistaken,
4 the Mount Laurel rulings have changed over the years.
5 It's not something that was set in stone, so everybody
6 kind of pushed it to the side and said they don't know
7 what they want yet so we don't have to do it. Am I
8 correct in what I'm saying? This is 15 years ago I
9 heard this.
10     MR. CEDZIDLO: I haven't brushed up on my
11 Mount Laurel law lately but it was Mount Laurel One,
12 Mount Laurel Two. Nick, you probably know this. What's
13 our requirement now? What do we have to have in town?
14 73 or 100? I forget what the latest requirement --
15     MR. MELFI: Now, what we're required now to
16 have?
17     MR. CEDZIDLO: Yeah.
18     MR. MELFI: I'm not sure off the top of my
19 head.
20     MS. BOGART: It's over 100.
21     MR. CEDZIDLO: It might be, like, 110 or
22 115.
23     MR. MELFI: I want to say 118, 120,
24 something like that.
25     MR. CEDZIDLO: We're required to maintain

Page 105

1 100, over 100 low income affordable housing in town,
2 designated as such.
3   CHAIRMAN BAGINSKI: Okay.
4   MR. CEDZIDLO: And this project is going to
5 allow us to meet our obligations so we're not subject to
6 another lawsuit.
7   MS. DABAL: Right.  Sure.
8   CHAIRMAN BAGINSKI: Okay.  Thank you.
9   Any other questions?
10   MS. DABAL: Just one more, just really for
11 my own edification.  The property owners now, or the
12 group -- I'm not sure.  I mean, I know Mr. Nuckels owns,
13 I guess both or a part.  Were they the original owners
14 of the land or has that changed hands since the dawn of
15 time?  I mean, I'm just curious.
16   MR. CEDZIDLO: I don't know how far back.  I
17 know part of these were the builders and from that the
18 builder's remedy suit, going back more than 10 years
19 ago, when the lawsuit was done, and I think, and I'm
20 sure I'll get it wrong, but as you heard, Wallington --
21 one of them was a joint partnership, I think, between
22 possibly all three of the Nuckel children.  It was
23 another that was -- I'm sure I'm wrong, but again, it
24 was different ownership interest.  It wasn't the same
25 people.  All part of the same -- it was different

Page 106

1 ownership percentages with different parcels for some
2 reason, and again, I'm sure I got it wrong, but it was
3 an interplay, so I do know when Counsel Moore told us, I
4 know he was being honest with us.
5   MS. DABAL: Just one more.  I know you're
6 trying to get through it.  When this was in the planning
7 stage or the conceptual stage or a vision, however you
8 want to call it, did anyone meet together as a group to
9 say, geez, maybe there's a better use for this land?  I
10 know that our hands are tied to some degree, we're not
11 the owners, obviously, but could we have found greater
12 rateables?
13   MR. MOORE: You were bound by court, so what
14 happened, what the attorney had been explaining to you
15 is my clients brought a builder's remedy lawsuit and an
16 affordable housing lawsuit and this land is court
17 ordered to be done as residential with an affordable
18 housing set aside and there's -- the towns hands are
19 totally tied.
20   MR. CEDZIDLO: The town actually had changed
21 and adopted in its Master Plan, what is, 2008, and
22 designated this as a residential site in connection with
23 the settlement of that lawsuit.  Now, bigger picture,
24 30 seconds, the planning board and zoning board's hands
25 are very tied and very limited.  What needs to happen is

Page 107

1 the mayor and council can have the town's Professional
2 Planner redraft up the zones, you know, two family zones
3 and the business zones and the commercial zones and
4 light industrial zones.  You got to redraw the map,
5 because right now what the zoning board, I'm the
6 attorney for the zoning board, we see it all the time,
7 they say we have an industrial piece of property that
8 was zoned industrial 50, 60 years ago and when it was a
9 warehouse it was, you know, 5,000 square foot warehouse
10 and the trucks would back up and the trucks were 20 feet
11 long, like the box trucks.  Now you can't warehouse in
12 there.  Now you have tractor trailers.  When we did
13 Liberty Plaza, a tractor trailer backing up to, you
14 know, the Liberty Plaza or the site next to it or the
15 site next to it, a tractor trailer would actually block
16 off the roadway, so you have loading docks that can't be
17 used, you have -- so you have what you would say
18 rateables, you know, people that would be paying taxes
19 that wouldn't put money into the school system, but it's
20 zoned in a way that it can't possibly be used.  We just
21 had a lawsuit, a developer in town wanted to build
22 housing near the Passaic Avenue bridge, over by --
23   CHAIRMAN BAGINSKI: Market Street.
24   MR. CEDZIDLO: Market Street Avenue.  I'm
25 getting my bridges wrong.  I'm out of town too long, but

Page 108

1 it was because that whole neighborhood flooded years
2 ago, across from where the toy factory used to be and
3 everything, that building sat vacant for three years
4 because of flooding and nobody would warehouse or put
5 anything in there so they said let me change it to
6 residential, put up eight units and I'll put it on
7 stilts, because we can't use it as -- there's no loading
8 dock, no anything, no access, there was no access, it
9 was in a flood zone, so it was rendered useless, and
10 then that, when it got -- when the board said okay,
11 build residential, that got challenged in court and the
12 court said no, there's no good reason to make it
13 residential but it's a piece of property that can't be
14 used, so the mayor and council -- zoning and planning
15 boards can only do what the town tells us, this is what
16 it's supposed to be used for and here's the
17 requirements.  The mayor and council has to turn around
18 at some point and say we have to address this on a major
19 planning scale, how do we get rateables and how do we
20 get property to produce income, where it's just not, you
21 know, lot by lot by lot.  Because Judge Harris, who is
22 no longer in Hackensack, he basically said there
23 shouldn't be any use variances ever granted but, you
24 know, they still exist in the law, but he said the
25 standards of changing uses by a board can't be met.

Page 109

1    MS. DABAL: Thank you, very much, Mr.
2 Cedzidlo, for that thorough explanation. Thank you,
3 everyone.
4    CHAIRMAN BAGINSKI: Okay. Anyone else
5 wishing to be heard at this time? Again, don't forget,
6 I opened it up to the citizens for questions. It will
7 be open again the hearing next month, so if you forgot
8 to ask something, it can be asked later. If there's any
9 other -- anybody else at this point in time need to be
10 heard? Is this in regards to anything with the
11 citizens?
12    MR. HERLINSKY: No.
13    CHAIRMAN BAGINSKI: At this time, if nobody
14 wishes to be heard tonight, what I'll do is close it to
15 the citizens.
16    MR. CEDZIDLO: Just one thing. Does anyone
17 have questions for Mr. Bertin, the engineer, or the
18 architect, not just Miss Bogart, but any of the other
19 experts who testified? Just to be clear, this would be
20 the time to ask any of the witnesses.
21    CHAIRMAN BAGINSKI: Okay. At this time,
22 then, I'd like to close it to the citizens and then we
23 can address Mr. Herlinsky's question.
24    MR. HERLINSKY: There's two issues I have,
25 since we're obviously coming back. The first is if you

Page 110

1 want us --
2    CHAIRMAN BAGINSKI: One second. Anybody
3 leaving, just understand that you're not going to get
4 re-noticed next month. If anybody was noticed for this
5 meeting it's going to be here next month. What's the
6 date?
7    MS. SIEK: 8-15.
8    CHAIRMAN BAGINSKI: August 15th, same time,
9 same location, but you won't get any notices in the
10 mail. You're being noticed right now. Thank you.
11    MR. HERLINSKY: The two issues that I would
12 want to address. One, there was an issue as far as
13 perhaps widening the pavement for fire trucks.
14    MR. MOORE: We agreed to that on the record.
15    MR. HERLINSKY: If the engineer has any, if
16 you want to work through the engineering and give us any
17 more feedback on that to make sure that we addressed any
18 of those issues and finalize it and we'll have those
19 amendments, and then the other thing is, this is the
20 second time we've had a meeting and they've discussed
21 possible, and again, I guess the issues that have come
22 up, the overcrowding in the schools, I would imagine the
23 overcrowding of whatever rec facilities you might have.
24 If I can suggest, if there's anyone that we can meet
25 with so we can work out some of the details. People

Page 111

1 mentioned things about insurance and other things, prior
2 to the next meeting it might be fruitful, at least if
3 you thought to adopt this, this would be something you
4 could work into a resolution, but we would be able to
5 work it out. If there's any -- I don't know if there's
6 going to be any board members that are on the rec
7 committee or any members of the public that we could
8 meet with, that would be something I would suggest.
9    CHAIRMAN BAGINSKI: Maybe what I could do,
10 suggest to the mayor over here, I know he's got a
11 council meeting coming up, maybe he can bring it up
12 during the council meeting and see if there's something
13 possibly the council or rec committee might want to set
14 up and reach out for you and see what we can do.
15    MR. HERLINSKY: That would be great.
16    CHAIRMAN BAGINSKI: All right.
17    MR. HERLINSKY: Thank you.
18    CHAIRMAN BAGINSKI: At this time, then, I'd
19 like to have a motion to hold this in abeyance till next
20 month.
21    MR. MELFI: Motion.
22    CHAIRMAN BAGINSKI: Second?
23    MS. POLTON: I'll second.
24    CHAIRMAN BAGINSKI: Like I said earlier,
25 August 15th, same location.

Page 112

1    (At 10:40 p.m. proceedings were concluded.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 113

```
 1                CERTIFICATE
 2
 3           I, MICHELLE GRUENDEL, a Certified Court
 4   Reporter and Notary Public of the State of New Jersey,
 5   do hereby certify that the foregoing is a true and
 6   accurate transcript of the testimony as taken
 7   stenographically and digitally at the time, place and on
 8   the date hereinbefore set forth, to the best of my
 9   ability.
10           I DO FURTHER CERTIFY that I am neither a
11   relative nor employee nor attorney nor counsel of any of
12   the parties to this action, and that I am neither a
13   relative nor employee of such attorney or counsel, and
14   that I am not financially interested in the action.
15
16
17
18
19           MICHELLE GRUENDEL, C.C.R.
             C.C.R. License No. 30X100190500
             Notary Public of the
20           State of New Jersey
21
22
23
24
25
```

BER-L-001670-18  08/30/2018 7:37:18 PM  Pg 31 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 133-14   Filed 02/26/26   Page 32 of 49
PageID: 1075
In RE: Morningside at Wallington                                    Transcript of Proceedings

**$**

**$3 (1)**
33:4
**$6,000 (1)**
103:18

**A**

**A1 (1)**
15:5
**A-1 (2)**
5:7,14
**A-2 (1)**
16:3
**A3 (2)**
16:22,22
**A-3 (1)**
18:14
**A-4 (1)**
19:24
**A5 (1)**
30:3
**A-5 (2)**
20:11,12
**A-6 (4)**
21:5,6,8,10
**A-7 (2)**
22:8,19
**A-8 (1)**
41:21
**abeyance (1)**
111:19
**able (12)**
6:17;16:18;39:22,23;
48:4;58:10;61:16;67:8,
13;91:12;93:4;111:4
**above (4)**
11:23;55:24;101:7;
103:1
**absolutely (7)**
28:1;34:1,1;53:13;
55:14;97:10;100:17
**accent (1)**
22:17
**accept (2)**
14:8;36:17
**access (22)**
15:10,11;23:6,7,13,
13,22,24,25;24:1,7,7,
19,21,22;25:1,4;60:13;
81:16,17;108:8,8
**accessible (1)**
8:7
**accessory (1)**
73:23
**accommodate (1)**
35:13
**accomplish (1)**
6:17
**accordance (2)**
74:14,19

**according (5)**
13:4;35:19;90:3;
94:13;102:23
**account (1)**
23:23
**accurate (2)**
71:1;93:13
**achieve (1)**
85:11
**achieved (1)**
31:8
**acquire (1)**
74:17
**acre (15)**
54:10,14,20,22;56:4,
4,8,8,9;73:15,15;
101:10,15,17,21
**acres (3)**
37:6;54:17,18
**across (3)**
10:2;103:16;108:2
**acting (1)**
103:4
**action (2)**
76:21;83:20
**active (3)**
5:18;43:20,22
**activities (1)**
85:2
**actual (4)**
63:23;64:9;95:11,12
**actually (19)**
17:2;27:1;37:20;
41:11;43:23;45:12,13;
54:15;55:16;74:5;77:9;
83:6,15;87:18;92:9;
94:7;102:16;106:20;
107:15
**adamant (1)**
30:6
**add (8)**
7:3,6,19;8:15;10:8;
37:19;75:3;76:2
**added (7)**
6:25;7:11;8:19;9:17,
20,20;10:1
**additional (6)**
37:20;75:3;82:21;
86:3;87:1;97:18
**Additionally (1)**
75:8
**address (14)**
3:24;13:9;35:20,22;
48:18;53:1;61:20;
87:24;89:1;90:6;94:16;
108:18;109:23;110:12
**addressed (1)**
110:17
**addressing (2)**
85:15;86:11
**adequacy (1)**
23:5
**adequate (2)**

72:12,16
**adjacent (16)**
3:20;38:18,21,24;
39:3,4;40:21;42:13;
43:1;45:14;75:11,25;
77:5,5,24;85:24
**adjoining (4)**
49:11,24;59:17;
101:20
**adjust (2)**
23:2,16
**adjustments (1)**
8:20
**adopt (2)**
99:25;111:3
**adopted (2)**
73:2;106:21
**adult (1)**
91:24
**adults (1)**
90:20
**advance (1)**
78:16
**advantage (3)**
52:7,8,17
**aesthetic (2)**
18:25;30:21
**aesthetically (2)**
30:8;32:13
**aesthetics (1)**
32:1
**affect (1)**
69:24
**affected (2)**
25:22;26:8
**affluent (1)**
95:22,25;96:6
**afford (1)**
103:15
**affordable (25)**
17:17,18,19,20,24;
43:5,14;70:8,11;72:15;
78:9,15,24;84:12;
90:11,12,14,23;91:23;
94:1,5;99:1;105:1;
106:16,17
**afterwards (1)**
89:8
**again (25)**
9:1;18:18;23:1;50:4;
54:1;55:21;72:23;
79:13;81:10;83:18;
84:4;85:13;89:16;
91:24;93:23;96:18;
99:17;102:12,18;
103:19;105:23;106:2;
109:5,7;110:21
**against (2)**
30:23;54:23
**age (7)**
66:13;67:3,5;69:6;
72:9,18;103:15
**aged (2)**

63:21;69:13
**ago (11)**
9:12;58:10;96:18;
100:4;102:1,2;104:3,8;
105:19;107:8;108:2
**agree (6)**
47:3;49:6;58:4;
66:20;68:3;88:20
**agreed (2)**
30:25;41:6;43:8,9;
56:8;110:14
**agreement (3)**
47:7;54:4,6
**ahead (2)**
44:1,22
**aisle (6)**
15:9;27:3;29:12;
77:9;81:6,15
**aisle's (1)**
16:1
**Al (4)**
6:9;19:25;26:4;27:7
**alley (1)**
102:8
**allow (3)**
16:16;97:14;105:5
**allowed (2)**
43:10;76:2
**allowing (2)**
86:19;91:5;97:15;
102:4
**allows (15)**
77:6,7,10;85:20,22,
23,23,25;86:4,4,16;
87:13,14,17;97:13
**Allwood (1)**
90:7
**almost (4)**
24:23;101:14,15;
102:9
**alone (1)**
100:19
**along (25)**
6:8;7:1,10,11,14;
10:8;16:16;17:2,6;
19:3,4;25:1;27:11,17;
28:25;29:5;30:13,18;
31:9,21;43:11,16,21;
67:20;77:10
**alongside (3)**
6:20,21;29:10
**alternate (1)**
10:21
**alternative (3)**
82:8,15;87:12
**Although (1)**
17:12
**aluminum (1)**
57:11
**always (2)**
30:11;88:19
**amended (1)**
3:17

**amendments (2)**
98:17;110:19
**amenities (3)**
41:7;51:14;60:22
**amenity (9)**
17:5;18:19;19:3;
38:2;51:17;52:6;56:19;
60:2;62:14
**amount (2)**
16:10;67:9
**amounts (1)**
96:13
**analysis (3)**
39:25;40:8;82:15
**answered (2)**
50:10;74:23
**apartment (5)**
6:24;66:14;96:10,11;
97:1
**apartments (12)**
41:2;5:22;3;67:8,11;
91:19;96:5;98:4,8,12,
24;100:6;102:11
**apologize (3)**
18:3;36:24;61:23
**applicant (3)**
4:15;8:13;41:6
**applicants (1)**
4:3
**applicant's (2)**
4:17,21
**application (18)**
3:1,16,19;4:15;5:18;
9:7;11:1;21:24;38:15;
39:7;52:21;53:9,20,24;
70:20;79:2,9;88:17
**applications (3)**
3:15,25;4:9
**applied (1)**
63:9
**applies (1)**
82:15
**applying (1)**
73:2
**appreciate (1)**
70:13
**apprehension (2)**
70:14;74:15
**apprehensive (2)**
69:19;70:3
**appropriate (31)**
42:20;75:7,21;76:21,
23,24;77:17;79:4;
81:15,16,19;83:11,20,
24;84:1,4,8,10,22,23,
23,24;85:6,10,20;86:2,
24,24;87:15,17;97:17
**approval (13)**
3:18,22;48:3,5,9,9,
11;49:15;50:3;57:1;
58:5;74:20;91:11
**approvals (5)**
49:1,2,5;60:19;74:21

BER-L-001670-18    08/30/2018 7:37:18 PM  Pg 32 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 33 of 49
PageID: 1076
In RE: Morningside at Wallington                                    Transcript of Proceedings

**approve (1)**
33:2
**approved (8)**
3:18;33:6;55:10;
75:25;77:4;98:16,17,
18
**approximately (2)**
63:1,22
**architect (11)**
10:10,23;13:3,18,22,
23;30:2;34:4;56:25;
61:16;109:18
**architect's (3)**
4:19;8:22;9:20
**architectural (1)**
16:20
**Architecture (8)**
13:16,19,20;14:7,12,
17;36:5;58:4
**area (25)**
6:20,23;9:22;14:5;
16:25;17:1,3;23:12,21;
24:3,5;25:25;28:15;
29:23;37:15,18,21,22;
41:12;42:17;52:8;53:2;
56:1;65:18;67:1
**areas (6)**
23:16,16,17,18;
86:25;96:6
**argument (1)**
66:12
**arguments (1)**
32:2
**around (19)**
6:16;8:18;11:4;20:4,
19;23:5,13,25;24:22,
23;27:3,15;31:20;
57:11;60:6;82:23;87:1;
92:6;108:17
**arrangement (1)**
78:3
**aside (3)**
43:6;73:17;106:18
**askew (1)**
6:4
**asphalt (1)**
37:22
**assume (1)**
21:17
**assurances (1)**
59:10
**attached (1)**
62:8
**attention (2)**
22:4;39:7
**attest (1)**
78:4
**attorney (9)**
12:11;62:2;80:12;
100:4,7,10;101:1;
106:14;107:6
**attorneys (1)**
100:12

**attract (2)**
102:11;103:23
**attractive (2)**
6:24;22:6;57:7
**August (2)**
110:8;111:25
**Avenue (8)**
3:24;5:20;6:1,7;
9:25;35:22;94:21;
107:22
**average (4)**
19:9,10;63:9;93:7
**aware (2)**
37:4,15
**away (5)**
6:6;10:14;57:1;
86:16;88:7
**awesome (4)**
58:6,8;100:11,11
**awful (1)**
71:4
**awkward (1)**
19:19

**B**

**Bachelors (1)**
36:5
**Bachelor's (1)**
13:16
**back (42)**
17:4;19:12,21,23;
25:21,24;26:8,9;27:2;
28:9;29:11;30:3,12;
31:3,25;35:7;37:17,19;
40:23;46:2;47:4;48:15;
53:15;54:3;56:7;65:15;
80:23,23,24;88:15,22;
89:2;99:22,23;100:3;
102:13;104:1,3;
105:16,18;107:10;
109:25
**background (1)**
20:18
**backing (1)**
107:13
**backyard (1)**
67:15
**bad (1)**
42:5
**BAGINSKI (89)**
3:1,5,7;5:2,8,11;
12:17,20,23;13:1;14:8;
25:21;26:2,7,13,17,24;
27:5,9,13,20,23;28:4,9,
13,19,22;29:24;31:23;
34:3,13,17,21;35:2,10,
15;36:17;45:3,19,25;
46:7,12,15,22;47:10,
14;49:17;50:6;51:11;
54:18,25;55:3;57:15,
17,22;58:7,21;61:6,12,
22;69:12;71:8,11;

**87:**25;88:9,20;89:5;
92:10,13,17;94:10,24;
95:3;98:25;99:17;
103:25;105:3,8;
107:23;109:4,13,21;
110:2,8;111:9,16,18,
22,24
**balance (2)**
47:1;78:13
**balconettes (1)**
19:3
**banding (1)**
22:17
**bar (3)**
7:19;37:12;52:14
**bar/warehouse (1)**
37:16
**barber (2)**
53:19,21
**base (6)**
16:15,19;20:8;21:12,
23;72:4
**based (16)**
4:23;5:16;24:8;
42:11,17;51:1;72:7;
74:6;75:17,18,22;78:4;
83:24;85:15;86:22;
92:23
**basically (5)**
30:16;55:17;56:6;
85:3;108:22
**basin (3)**
7:5;8:3,14
**battling (1)**
104:2
**BAUMANN (8)**
13:6,11;35:14,20;
51:9;76:23;90:5;94:15
**beat (1)**
57:20
**beautiful (1)**
57:8
**became (1)**
19:10
**becomes (1)**
38:6
**bedroom (20)**
15:20,21;18:10,11;
66:14;67:2;73:18;
90:17,18,19;91:19,23;
92:2,7;94:3,3,6;99:14,
15,15
**bedrooms (37)**
15:16,17,17,17,19;
17:14,15,15,16,17,19,
20,22,23;18:4,9;66:1,4,
4,6,6,6,7,8,9,12,15,15,
16,16,17,22;67:2;70:4;
99:7,9;102:9
**begin (1)**
36:21
**behind (2)**
20:15,16

**below (2)**
8:6;25:9
**benefit (8)**
41:8;82:12;83:10;
86:3,15,20;87:6;94:7
**benefits (14)**
62:13,19;72:2;78:21;
79:11,11,14;80:9;
82:24;83:10,15;85:17;
86:9,23
**Bergen (19)**
4:7;5:18,18,25;
36:10;63:5,7,8,9;64:9,
11;65:18,20;92:22;
93:5,13;95:15,16;
100:21
**Bertin (45)**
4:21;5:3,6,10,13;7:7,
8,10,20,23,24;8:2,17;
11:7,11,14,18,22;12:2,
18,21;22:9;26:2,23;
27:1,8,11,16,22,25;
28:7,16,24;29:10,18;
35:6,9;44:13,20,22,25;
45:4,7;54:21;109:17
**Bertin's (1)**
4:25
**best (14)**
35:12;50:20,21;
59:12,13,13;60:21;
61:10;83:7;88:19;
93:16;101:9;103:3,5
**bet (2)**
11:18;18:15
**better (17)**
6:8;10:14;12:2;
20:20;32:20;45:9;
46:25;59:8,8;80:7;
82:8,14,23;83:16;
87:12;95:2;106:9
**betterment (1)**
52:4
**big (7)**
12:4;41:1;42:16;
69:25;89:21;102:14,15
**bigger (1)**
106:23
**bit (12)**
6:8,11;8:24;9:9;
18:21;20:7,17;22:23;
29:18;62:23;71:17;
73:5
**blend (1)**
19:22
**Block (7)**
3:16,20,20;7:2;37:5;
67:18;107:15
**blue (1)**
42:16
**board (55)**
3:11;4:8,24;9:5,6;
12:20;13:14;14:23;
16:4;18:15;21:3;34:3;

**37:**4,14;38:15;39:10;
40:12;41:9;48:15;51:7;
52:10;53:6;55:7;58:5;
60:17;62:13,18;63:6;
65:14;72:24;73:9,13;
74:13;78:3;83:8;93:2;
95:13;97:4,5;99:19;
100:15,25,25;101:1,2,
21,22;102:7;103:4;
106:24;107:5,6;
108:10,25;111:6
**boards (6)**
14:1,1,3,4,4;108:15
**board's (8)**
3:15;4:1,2,24;39:7;
74:23;79:9;106:24
**body (1)**
97:16
**Bogart (106)**
34:19;35:4,18,21,21,
25;36:1,4,13,15,20,21,
23;39:13,16,25;40:14,
18;41:3,5,14,16,18,23;
42:2,5,10;44:1,7,15,21,
23;45:1,5,9;46:9,18;
47:16;48:2;50:10;
54:17;56:13;59:5;
61:12,22,25;63:18,21;
64:4,6,16,20;65:7,11,
14,22,25;66:2,5,10,20,
24;67:23;68:3,6,12,20,
25;69:8,10,13;70:11,
23;71:6,11,13,16;
76:12,15,24;78:19;
80:15,17;82:14,18,20;
87:23;88:5;92:19;
93:25;94:22,23;95:5,
10,19,23;96:1,4;97:9,
11;98:7,12;99:4,9;
104:20;109:18
**B-O-G-A-R-T (1)**
35:25
**bonds (1)**
85:13
**boring (4)**
80:11,15,16;89:25
**borough (11)**
43:9;70:16,17;72:9,
11;95:20;100:4,7,10,
12;101:8
**borough's (1)**
73:19
**Both (18)**
3:23;9:14;11:3;
20:13;37:22;43:15;
44:4;46:13;49:5;50:3,
6;52:24;53:16;56:19;
59:16;85:9;101:1;
105:13
**bottles (1)**
8:9
**bottom (4)**
8:5;10:3;25:3;42:1

BER-L-001670-18    08/30/2018 7:37:18 PM  Pg 33 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 34 of 49
PageID: 1077
In RE: Morningside at Wallington                                    Transcript of Proceedings

**bought (1)**
58:14
**bound (2)**
58:5;106:13
**bowling (1)**
102:8
**box (2)**
57:10;107:11
**boyfriends (1)**
61:3
**brand (1)**
78:9
**Bread (1)**
101:7
**break (4)**
16:18;20:7;34:20;
88:8
**breakdown (1)**
99:6
**breaking (1)**
97:6
**breath (1)**
62:1
**BRENDA (2)**
90:3,7
**brick (19)**
16:11,12;19:5,5;
20:5,6;21:12,24;32:23,
25;33:4,7,9,11,13,14,
22,23,25
**bridge (7)**
8:3,4;10:14;67:19;
68:11;107:22,24
**bridges (1)**
107:25
**brief (3)**
35:1;89:4,17
**briefly (2)**
4:20;13:12
**Brigette (3)**
34:19;35:18,21
**bring (6)**
18:12;23:8;37:24;
53:20;89:15;111:11
**brings (1)**
22:6
**broken (1)**
16:14
**brother (2)**
102:13,18
**brought (1)**
106:15
**brown (1)**
57:11
**brushed (1)**
104:10
**buffer (4)**
10:7;12:9;75:3,10
**buffering (3)**
78:25;81:7;85:23
**buffers (1)**
84:23
**build (12)**

30:19;43:13;48:13,
20;49:11;55:23;95:7;
100:23;102:3,23;
107:21;108:11
**builder (1)**
102:22
**builders (3)**
102:1,2;105:17
**builder's (7)**
53:14;54:1,2,4;
100:14;105:18;106:15
**building (183)**
6:1,4,15,20,22;7:1,2,
18;8:24;9:18,21;12:7,
7,9;14:15;15:6,6,8,11,
13,20;16:7,14,16,21,
23,23;17:1,2,11,14;
18:13,16,18,18,24;
19:4,6,7,13,13,13,16,
17,20,20,23,24;20:14,
16,17;23:6,7,12,13,15,
17,19,23;24:24;25:13;
26:6,11,14,16,19;27:4,
12,14,18;28:14,15;
29:1,3,6,9,11,21;30:4,
20,20,21,24;31:15;
32:1,8,16;33:3,5,16;
37:10,11,13;38:14,25;
39:4,19,21,21;40:9,19,
22;41:5,7;43:11,13,13,
16,19,21,24;44:2;
45:12;47:13,23;48:7;
50:7;51:8,13,16,23;
55:1,4,19,25;56:4,16,
17,18;58:3;59:12,13,
18;62:4,6,7,8,9,19,19;
66:1,3;67:15,20;75:24;
77:6,7,10,10,25;78:6;
80:18,20,25;81:1,2,2,4,
4,9,13,19,20,21,22;
82:1,5,6,10,17,25;
83:18;86:10;87:11,21,
22,23;88:1;90:16;
91:21;103:1,14;108:3
**buildings (40)**
8:21;12:10,12,14;
16:9;18:25;19:18,21;
20:13;21:13;23:6,11,
19;24:14;30:5;31:12;
32:9;33:22;37:23;
39:24;40:25;41:4;
43:15;45:23;55:23;
57:7;60:9;67:4,6,10,
24;68:15,17,19;75:25;
77:11;85:18,25;91:22;
93:9
**building's (1)**
20:15
**built (12)**
49:10,13;53:7;55:17,
19,20;56:3;59:11;
68:10;101:19;102:14;
103:12

**bulk (2)**
3:22;12:15
**business (4)**
13:9;51:22,24;107:3
**buy (1)**
96:8

## C

**c1 (4)**
75:18;76:9,10,11
**C2 (3)**
11:21;76:11,16
**C2.5 (2)**
10:24;11:12
**C2.8 (4)**
11:7,9,10,13
**C3.5 (1)**
10:16
**cake (1)**
57:4
**calculation (2)**
24:4,8
**Calisto (3)**
4:21;5:5;26:21
**call (5)**
13:2;22:18;34:18;
41:21;106:8
**called (2)**
53:23;100:2
**calls (3)**
38:20;80:4;87:9
**came (7)**
10:10;54:6;62:21;
71:3;99:19;100:14;
101:20
**can (103)**
3:7,8,10,6:22;9:16,
16;10:22;14:24;15:2,7,
12;16:7,25;17:1,11,12;
18:15;20:15;21:25;
22:15,22;23:17,20;
24:19,21,22;25:1,4;
26:1,16;27:15;28:19;
31:18;32:11;33:4;
34:19;35:13;36:21;
41:15;43:23;44:10,18;
48:12,25;49:6;51:20;
52:3;53:2;58:23;59:2,
12;60:2,5,22;63:11;
64:11;65:12;66:12,18;
69:10,11;71:1,12;
74:13,18,20,24;78:4;
79:7,22;82:6;88:6,12,
13,25;89:24;90:9,16,
18,25;91:16,20;92:3,8;
93:6,11,15,23;94:11;
95:5,17;99:11;103:13,
22;107:1;108:15;
109:8,23;110:24,24,25;
111:11,14
**cancellation (1)**
4:2

**capable (1)**
34:8
**capital (1)**
59:16
**car (1)**
15:13
**card (1)**
60:13
**cards (1)**
58:25
**Carolina (2)**
36:6;65:23
**cars (2)**
10:3;22:1
**cartwheel (2)**
89:24;90:2
**case (3)**
18:22;36:25;76:3
**cast (2)**
19:5;20:8
**Cedar (1)**
94:21
**CEDZIDLO (60)**
4:10,12;5:3;7:24;
11:9,12,16,20;12:1;
18:9;35:24;48:1,11,16;
49:6,16;50:4,15,18;
52:20;53:12,17,19,24,
25;54:12,19,22;55:11,
13;59:4,24;65:25;66:3,
8,11,21;67:18,24;68:4,
7,14,21;95:1;99:12,14,
22;100:12;101:16;
102:18;104:10,17,21,
25;105:4,16;106:20;
107:24;109:2,16
**cement (1)**
33:19
**cementitious (3)**
16:13;33:15,18
**Center (5)**
57:13;59:25;60:10;
77:9,13
**centered (1)**
77:8
**Central (1)**
57:14
**certain (4)**
23:21;80:5;94:6;
101:24
**certainly (2)**
53:2;59:3
**Certificate (1)**
91:11
**certified (1)**
4:5
**chain-link (1)**
9:3
**Chair (2)**
3:11;39:14
**CHAIRMAN (91)**
3:1,3,5,7;5:2,8,11;
12:17,20,23;13:1;14:8;

25:21;26:2,7,13,17,24;
27:5,9,13,20,23;28:4,9,
13,19,22;29:24;31:23;
34:3,13,17,18,21;35:2,
10,15;36:17;45:3,19,
25;46:7,12,15,22;
47:10,14;51:11;54:18,
25;55:3;57:15,17,22;
58:7,21;61:6,12,22;
69:12;71:8,11;72:23;
87:25;88:9,18,20;89:5;
92:10,13,17;94:10,24;
95:3;98:25;99:17;
103:25;105:3,8;
107:23;109:4,13,21;
110:2,8;111:9,16,18,
22,24
**chairman's (1)**
48:17
**challenged (1)**
108:11
**change (9)**
5:15,19;6:7;20:5;
32:23;49:7;83:8,9;
108:5
**changed (10)**
5:22;6:10;8:6;9:2,
10;12:8;33:14;104:4;
105:14;106:20
**changes (7)**
4:22;5:16;6:2;9:22;
12:6,15;67:9
**changing (2)**
33:3;108:25
**channeling (1)**
72:2
**character (2)**
16:8;86:16
**chart (2)**
12:5;42:3
**cheap (1)**
100:6
**check (1)**
92:6
**checked (1)**
50:13
**cheerleader (1)**
89:22
**child (2)**
66:18;93:7
**children (38)**
34:9;62:22,24;63:2,
3,8,11,14,20,20,21,22;
64:2,3,18,18,19;66:13;
67:3,9,16;69:6,13;
71:4;91:2;95:9;96:7,9,
12,14,17,18,25;97:3,6,
21,24;105:22
**choices (2)**
78:23;87:15
**choose (1)**
10:23
**chose (1)**

BER-L-001670-18    08/30/2018 7:37:18 PM  Pg 34 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 35 of 49
PageID: 1078
In RE: Morningside at Wallington                                    Transcript of Proceedings

33:7
**circulate (1)**
27:15
**circulation (12)**
38:8;39:1,3;75:13,
14;82:23;84:1;85:21;
86:24;87:16,17,18
**circumstances (2)**
38:25;40:7
**citizens (9)**
88:11,24;89:13,17,
19;109:6,11,15,22
**City (2)**
14:5;36:7
**civic (2)**
78:2;84:20
**clarify (4)**
32:16;35:5;98:14;
99:17
**clarifying (2)**
27:9;46:12
**class (2)**
96:15,17
**clear (2)**
50:5;109:19
**client (2)**
22:7;58:15
**clients (2)**
58:18;106:15
**close (5)**
18:24;41:1,1;109:14,
22
**closer (3)**
10:15;32:7;94:25
**co-counsel (1)**
51:5
**code (9)**
23:7,12,15,23;24:4;
50:9,22;80:19;93:23
**color (2)**
19:24;33:9
**colored (1)**
16:2
**colors (7)**
22:16;32:21,21,22,
23,25;33:10
**columns (1)**
20:3
**combining (2)**
48:19;49:25
**comfortable (1)**
23:3
**coming (17)**
6:24;8:10;25:13;
26:4;28:9,12,20;31:3;
55:9;69:14,17;70:5;
92:7;95:9;103:13;
109:25;111:11
**comment (4)**
47:5,16,24;95:16
**comments (2)**
4:23;5:16,17;9:23;
97:21

**commercial (4)**
37:11;42:9;73:6;
107:3
**committed (2)**
33:12;59:3
**committee (2)**
111:7,13
**communities (1)**
77:19
**community (6)**
72:4,7,8;78:15;
86:14,16
**commuter (1)**
102:11
**compare (1)**
65:20
**compiled (1)**
63:23
**complete (1)**
60:17
**completed (3)**
4:15,16;40:1
**completely (10)**
47:24;66:24;70:13,
24;72:25;73:10;74:1;
79:15;93:13;97:21
**completion (1)**
73:19
**complex (7)**
6:25;60:7;66:23;
70:13;90:15,20;103:16
**complexes (4)**
65:9;69:20;96:11;
97:1
**compliance (1)**
101:21
**compliant (1)**
72:25
**complicated (1)**
36:25
**comply (5)**
73:22,22,23,24;
100:13
**complying (3)**
55:14;73:3;100:17
**composite (1)**
33:16
**composites (2)**
33:19,19
**compromise (2)**
54:9;101:4
**concentration (1)**
84:13
**concentrations (1)**
77:17
**conceptual (1)**
106:7
**concern (2)**
47:24;70:16
**concerned (2)**
93:1;96:21
**concerns (2)**
71:20;74:23

**concluded (1)**
4:14;112:1
**concrete (1)**
33:20
**condition (3)**
37:8;50:2;91:10
**conditioned (1)**
74:21
**conditions (6)**
49:5;58:5;74:20;
75:20,24;78:5
**confident (1)**
24:3
**conflict (1)**
8:22
**conform (2)**
39:23,23
**confusion (4)**
6:11,14;28:1;29:3
**conjunction (6)**
38:20;43:1,3,6;44:3;
50:11
**connect (2)**
77:11;81:9
**connected (2)**
12:8;81:24
**connection (3)**
86:7;102:20;106:22
**consider (3)**
39:10;40:2;41:9
**consideration (1)**
71:19
**considering (1)**
39:8
**consistent (7)**
40:20;43:7;47:22;
74:1;79:5,6;84:6
**consolidate (4)**
45:16,24;46:1,4
**consolidated (3)**
44:5,8;46:17
**consolidating (1)**
44:4
**constructed (1)**
23:11
**construction (2)**
68:15;73:16
**contained (1)**
56:1
**contemplated (4)**
83:12,16,24;84:1
**contentious (1)**
54:2
**continue (7)**
32:11;34:22;41:15;
71:12;88:10,15;89:8
**continued (1)**
4:1
**continuing (2)**
20:4,5
**contributes (1)**
77:18
**control (4)**

7:21;9:16;52:10;
60:17
**conversation (2)**
53:6;71:9
**converted (1)**
43:8
**converting (1)**
86:12
**cooperate (3)**
49:20,22,24
**cooperating (3)**
48:23,24,25
**coordinate (1)**
75:12
**coordination (1)**
85:8
**copy (3)**
14:19,20;42:5
**corrected (1)**
8:23
**corroborate (1)**
95:7
**cost (2)**
58:13;85:3
**cost-effective (1)**
85:7
**council (7)**
100:8;107:1;108:14,
17;111:11,12,13
**Counsel (1)**
106:3
**Country (1)**
57:9
**County (16)**
5:18,19,25;36:10;
63:5,7,8,9;64:9,11;
65:20;92:22;93:5,13;
95:15,16
**couple (6)**
6:6;9:12;25:20;
32:11;84:18;102:2
**course (2)**
39:16;84:16
**court (4)**
106:13,16;108:11,12
**Courts (1)**
99:20
**coverage (6)**
62:10,10,15;73:4;
82:22;86:8
**cram (1)**
56:16
**create (3)**
23:17;37:20;38:2,9;
73:14;79:4;83:2,3,12,
17;84:22
**created (4)**
6:10;16:15;27:17;
29:2
**creates (6)**
37:25;38:3;75:15;
78:7,9;84:16
**creating (3)**

23:18;39:20;40:5
**creative (1)**
78:2
**credence (1)**
68:4
**criteria (9)**
75:18;76:10,13,17,
18;79:16,25;80:10;
86:12
**cross (1)**
49:4
**Cummis (1)**
3:13
**curious (1)**
105:15
**current (3)**
37:21;50:9;70:25;
79:23;100:10
**currently (2)**
37:7,21
**cut (5)**
41:25;53:21;58:24;
61:23;71:8
**Cuz (1)**
90:20

---

**D**

**DABAL (26)**
94:13,17,17,20,20;
95:2,6,14,21,24;96:2,5;
97:10;98:4,9,20;99:1,3,
6,13;100:11;102:16;
105:7,10;106:5;109:1
**D-A-B-A-L (1)**
94:20
**dads (1)**
68:20
**dais (1)**
64:25
**data (11)**
42:12;63:13,23;64:7,
9,10,13;65:2,15;69:15;
71:1
**date (1)**
110:6
**dawn (1)**
105:14
**day (2)**
56:8,23
**deal (3)**
12:4;56:22;91:1
**decide (6)**
33:1;48:12,25;49:7;
58:25;61:9
**decided (3)**
60:12;97:17;102:13
**decimal (1)**
19:10
**decision (2)**
56:7;100:2
**deep (2)**
8:5;62:1

BER-L-001670-18    08/30/2018 7:37:18 PM  Pg 35 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 36 of 49
PageID: 1079
In RE: Morningside at Wallington                                    Transcript of Proceedings

**define (1)**
69:6
**definitely (5)**
26:16;31:7,9;52:4;
88:20
**Degree (3)**
13:16;36:5;106:10
**demolished (1)**
43:12
**denied (1)**
99:19
**dense (1)**
55:20
**densities (2)**
77:17;84:4
**density (10)**
54:10;55:14;73:14,
24;76:1,5;77:21;80:4;
84:5;97:15
**deny (1)**
102:1
**denying (1)**
58:8
**DEP (1)**
42:12
**describe (4)**
14:11;16:3;18:15;
21:7
**description (1)**
39:9
**design (8)**
23:3;38:14;46:20;
78:3;79:23;81:19;
84:20,24
**designated (2)**
105:2;106:22
**designed (2)**
9:12;29:2
**desirable (3)**
78:1,11;84:19
**destroyed (1)**
45:5
**detail (5)**
8:19;9:3,10;10:16,18
**detailing (1)**
21:13
**details (2)**
8:19;110:25
**detention (1)**
7:5
**determine (2)**
83:4,6
**detriment (2)**
79:18;80:1
**detriments (6)**
62:20;79:8,13,14,15;
80:9
**develop (8)**
22:9;38:18,23;43:3;
48:4,22;50:24;74:14
**developed (6)**
42:25;59:16;74:12,
19;79:21;95:12

**developer (3)**
85:9;103:4;107:21
**developers (2)**
100:22;101:17
**developing (2)**
38:20;50:11
**development (42)**
32:2,16,18;40:20;
42:20;47:20,20,21;
49:18,23;50:1;51:2;
56:19;62:25;70:19;
74:9;75:12;76:22,25;
77:4,5;78:2,12;79:6,
23;80:4;83:7,10,11,21,
23;84:5,19;85:1,3,4,10,
13;96:25;102:4;
103:11,22
**developments (6)**
50:3;64:10;72:2;
92:22;93:15;95:9
**deviate (1)**
74:3
**deviation (2)**
74:5;82:5
**deviations (1)**
50:9
**dialogue (1)**
74:12
**diameter (1)**
10:6
**difference (2)**
16:24;67:3
**different (16)**
16:19;22:16;30:21;
45:23;46:10;47:2,11;
52:25;65:21;69:4,4;
96:10;103:19;105:24,
25;106:1
**differently (1)**
17:9
**differing (1)**
52:19
**difficult (1)**
103:24
**dim (1)**
9:16
**dime (2)**
91:16,18
**dimensions (2)**
22:23;44:11
**direct (1)**
4:16
**directly (2)**
38:4,12
**disappointed (1)**
96:22
**discuss (8)**
4:21;10:22,23;23:5;
35:10;59:9;79:17;
89:15
**discussed (2)**
89:14;110:20
**discussing (1)**

41:20
**discussion (5)**
10:11;59:6,6;103:2,3
**distance (5)**
20:21;24:6;25:16;
85:19;87:2
**district (4)**
43:4;73:13,21;84:13
**districts (1)**
70:15
**diversity (3)**
72:4,14,18
**divider (2)**
5:22,23
**dock (1)**
108:8
**docks (1)**
107:16
**documents (4)**
42:19;71:25;74:2,2
**dominated (1)**
67:25
**domino (1)**
69:24
**done (15)**
22:16;30:5;54:8;
63:4;64:7,7,8,21;65:1;
66:25;70:24;90:12;
102:7;105:19;106:17
**dont (1)**
79:18
**door (2)**
67:14;90:20
**doors (1)**
9:2
**dots (1)**
10:4
**down (29)**
8:6;16:16;20:7;25:8;
26:16;28:2,2;29:5,9;
31:24;37:9;39:19,21;
40:23;46:2;47:19;
49:25;51:15,23;52:15;
57:12;67:6;77:9;78:6;
82:9;100:21;101:22;
103:6,7
**downstairs (2)**
68:1;69:2
**downtown (4)**
18:24;19:2;31:10,20
**drainage (3)**
8:3,3,14
**draw (1)**
44:18
**drawing (1)**
11:4
**drawings (1)**
10:24
**dressed (1)**
90:1
**drink (2)**
34:24;88:22
**drive (7)**

15:9,25;60:5,5,6;
77:8;81:6
**driveway (15)**
5:20,24;6:8,18,19;
7:11,11,21;27:3;29:5,
10,14,19;81:14,16
**driveways (2)**
6:7;28:8
**driving (1)**
60:9
**drop (1)**
91:16
**dropping (1)**
91:17
**drops (1)**
67:16
**due (4)**
40:16;79:3;80:6;
84:21
**duly (4)**
13:4;35:18;90:3;
94:13
**dumps (1)**
8:4
**dumpster (1)**
8:23
**dumpsters (1)**
9:2
**durable (1)**
9:10
**during (2)**
100:15;111:12
**dwelling (1)**
43:5

**E**

**earlier (6)**
20:24;27:6;47:2;
99:11;103:2;111:24
**easements (1)**
49:4
**easier (1)**
8:25
**East (2)**
14:5;28:20
**easy (1)**
91:13
**eat (1)**
57:4
**ed (3)**
65:14;93:3;95:13
**edge (8)**
17:6;30:19,19;31:22;
67:20;68:14;103:10,15
**edges (1)**
53:3
**edification (1)**
105:11
**education (5)**
13:13;36:2;70:18;
97:4,5
**Educations (1)**

63:6
**effect (1)**
102:10
**efficient (1)**
85:4
**egress (1)**
49:2
**eight (33)**
6:1,15,21;7:18;8:21;
9:18;12:8;16:23,23;
18:16,18;19:23,24;
20:14;23:1;25:12,16;
27:12,15;29:3;43:13,
16,19,21;48:24;55:4;
66:3;69:7;81:1,20,22;
82:2;108:6
**either (5)**
8:11;15:9;29:13,19;
82:1
**elected (1)**
6:13
**elements (2)**
16:15,19
**elevation (8)**
16:6;12;18:13,16,18;
19:24,25;20:1
**elevations (2)**
33:17;58:2
**elevation's (1)**
16:11
**elevator (10)**
15:14;17:13;67:5,7,
10,21,25;69:2;93:9;
103:14
**elevators (3)**
67:4,24;68:15
**eliminate (4)**
50:6,7,7,14
**eliminated (1)**
7:14
**else (11)**
17:11;48:7;53:11;
55:16;59:17;60:18;
68:2;91:2;94:11;109:4,
9
**Emerson (1)**
70:17
**encourages (1)**
85:1
**end (2)**
15:8;83:4
**enforcement (1)**
93:24
**engage (2)**
61:9,10
**engineer (7)**
4:17,17,21,24;35:11;
109:17;110:15
**engineered (4)**
83:13,15,25;84:2
**engineering (11)**
12:4;38:8;75:14;
79:4;80:7;81:11,19;

BER-L-001670-18 08/30/2018 7:37:18 PM Pg 36 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME Document 133-14 Filed 02/26/26 Page 37 of 49
PageID: 1080
In RE: Morningside at Wallington Transcript of Proceedings

86:1;87:3;89:9;110:16
**engineers (1)**
61:17
**Engineer's (2)**
5:17;9:23
**enlarged (1)**
6:19
**enough (1)**
89:21
**enter (2)**
28:25;29:4
**entire (5)**
9:14;62:11;70:12;
77:7,14
**entirely (1)**
23:21
**entrances (1)**
15:8
**entry (2)**
15:7;81:14
**environment (6)**
23:15;77:20;78:1,11;
84:19;86:18
**equates (1)**
67:3
**essentially (1)**
23:18
**established (1)**
84:3
**establishment (2)**
77:16;84:3
**even (9)**
45:9;51:22;53:17;
54:3;56:13,14;63:19;
80:12;95:15
**evening (12)**
3:3,12,25:4:4;36:25;
38:5,23;71:25;75:16;
79:8;82:13,25
**everybody (10)**
3:8;12:25;14:24;
35:2;42:6;61:17;64:23,
24;68:9;104:5
**Everybody's (1)**
89:18
**everyone (4)**
21:3;61:11;64:25;
109:3
**Everyone's (1)**
71:6
**Everything's (1)**
4:11
**exact (1)**
46:16
**exactly (7)**
22:15;59:6;68:4;
70:23;71:6;80:3;93:10
**example (2)**
90:15;95:17
**exceed (1)**
98:5
**exceptional (2)**
75:18,20

**excited (1)**
21:22
**Excuse (4)**
31:23;60:25;72:7,21
**exhibit (13)**
5:14;6:4,22;16:3;
18:14;21:1,4;22:6;
41:19;42:10,18,21;
79:7
**exhibits (1)**
22:21
**exist (1)**
108:24
**existed (1)**
86:17
**existing (31)**
20:14;37:18,24;38:6,
13,16,25;39:4;43:7,11;
62:17;64:10;72:10,12,
17;75:23,24;77:4,24;
78:4,5,6,7;81:21;82:5,
7,8;84:15;86:5;87:13;
92:22
**exists (2)**
29:1;45:18
**exit (1)**
28:23
**expanding (1)**
53:2
**expected (2)**
34:8;62:22
**expen (1)**
68:16
**expense (1)**
51:15
**expensive (1)**
68:16
**experience (3)**
13:14;36:3;68:8
**expert (6)**
14:7,9;35:15;36:15,
18;61:18
**experts (1)**
109:19
**explain (1)**
65:13
**explaining (1)**
106:14
**explanation (1)**
109:2
**extend (1)**
60:18
**extended (1)**
59:2
**extra (1)**
91:2
**extremely (1)**
36:25
**eye (1)**
16:16

**F**

**facade (5)**
17:7,8;32:23,25;33:7
**facades (1)**
33:3
**face (1)**
58:9
**faces (1)**
103:8
**facilities (8)**
37:13;41:8;45:17;
70:17;72:8,20;78:9;
110:23
**facility (25)**
37:14,16;38:13;58:1,
11,12,13;62:17;63:2;
72:10,11;77:12,13,24;
78:5,8;81:21,22;82:7,
12;84:16;86:5,7;87:2,7
**fact (17)**
38:12,15,23;40:16;
42:22;51:1,21;60:20;
73:21;79:3,20;80:6;
83:25;84:21;86:14,22;
87:6
**factors (1)**
38:14
**factory (1)**
108:2
**facts (2)**
64:13;65:1
**failed (2)**
99:24;100:17
**families (8)**
64:1,17;67:5;72:20;
91:19;97:19;102:12;
103:18
**family (6)**
36:10;61:3;64:18,19;
92:2;107:2
**far (15)**
24:9;52:1,20;53:1,5;
55:14,22;60:11,16;
61:10;65:9;98:5;100:3;
105:16;110:12
**fathers (1)**
104:2
**feature (1)**
16:15
**features (2)**
16:20;75:21
**feedback (1)**
110:17
**feel (7)**
21:25;22:11;23:3;
24:2;31:10,16;37:2
**feet (41)**
4:6;6:5,6,18,18,19;
12:13;15:18,19;16:1;
17:5;18:22;19:7,14;
22:24;23:1;25:10,12,
12,13,15,16,20,22,23;
26:3,3,25;27:1,7,24;
29:7,11;35:7,7;74:7,7;

80:21,23;103:17;
107:10
**felt (4)**
18:24;19:1,18,21
**fence (9)**
7:6,12,12,13;9:3,5,6,
8;26:19
**few (2)**
6:5,17
**field (3)**
13:18;14:7;36:16
**fight (1)**
25:13
**fighting (1)**
52:20
**figure (2)**
59:12;98:11
**figured (2)**
9:19;32:13
**final (4)**
3:18,22;34:19;102:6
**finalize (1)**
110:18
**finals (1)**
57:23
**fine (3)**
4:10;11:16,22
**finger (1)**
96:23
**fingers (1)**
88:22
**finish (6)**
22:13;61:4,13,17,24;
71:11
**fire (13)**
11:3,8;23:5,7,7,16,
19,21;24:16,25:11,13;
26:16;110:13
**firm (1)**
3:13
**first (17)**
5:19;13:4;18:21,22;
19:13;30:6;33:21;
35:17,18;43:17;53:10;
72:1;83:5;85:18;90:3;
94:13;109:25
**fit (1)**
58:6
**fitness (1)**
17:4
**fits (5)**
16:9;38:7,8;79:24,24
**five (20)**
6:25;8:24;27:4,4;
62:11,14,16;63:10,14;
66:22;70:5;81:4;88:8,
21;89:2,3;92:24;93:14;
101:5;102:24
**fixed (1)**
7:2
**fixture (1)**
9:15
**flames (1)**

25:13
**flare (1)**
19:2
**flat (16)**
18:23;19:17;30:3,7,
11,12,20,24;31:2,4;
32:5,12,14;46:23,25;
47:6
**flood (1)**
108:9
**flooded (1)**
108:1
**flooding (1)**
108:4
**floor (10)**
15:6,7;16:24,25;
18:19,20,21,22;19:2;
43:17
**floors (1)**
15:16
**folks (1)**
47:5
**follows (4)**
13:5;35:19;90:4;
94:14
**foot (8)**
6:25;7:12;10:17,18;
21:23;23:25;102:24;
107:9
**foremost (2)**
72:1;83:5
**forget (2)**
104:14;109:5
**forgot (4)**
60:23;61:1,2;109:7
**Fort (3)**
67:19;68:9;103:10
**forth (1)**
73:25
**forward (3)**
89:20;94:12;102:4
**fostering (1)**
72:4
**found (1)**
106:11
**four (6)**
5:21;50:14;62:3;
76:20;90:19;92:7
**free (1)**
37:2
**front (24)**
7:18;9:24;10:2;
15:11;16:6;17:2;18:16,
17;25:22;30:18,19;
37:16;40:24;41:10,11;
55:21;58:3,19;67:14;
78:6;80:22,23,23,23
**frontage (3)**
10:8;19:1,4
**fronting (1)**
37:10
**fruitful (1)**
111:2

BER-L-001670-18    08/30/2018 7:37:18 PM  Pg 37 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 38 of 49
PageID: 1081
In RE: Morningside at Wallington                                    Transcript of Proceedings

**full (3)**
23:13;83:13;98:22
**fully (2)**
83:25;84:2
**functional (2)**
77:3,6
**further (6)**
10:14;27:25;29:25;
42:15;76:20;85:16
**furthered (1)**
83:19
**furthering (2)**
79:11,12
**furthers (2)**
77:15;84:25
**furthest (1)**
24:19
**future (3)**
30:24;69:22;72:3

## G

**g1 (1)**
80:20
**game (1)**
7:17
**garage (4)**
15:11,24;20:2,3
**garden (1)**
67:8
**gate (1)**
9:10
**gathered (2)**
93:12,16
**gave (1)**
19:11
**Geez (2)**
53:15;106:9
**general (3)**
33:11;77:1;83:22
**generate (1)**
63:14
**generated (1)**
67:16
**George (2)**
67:19;68:11
**gets (4)**
17:10;18:21;58:16;
98:17
**girl (2)**
65:22;71:7
**GIS (1)**
42:12
**given (2)**
32:11;77:4
**giving (1)**
102:3
**glass (2)**
19:2;68:10
**glasses (3)**
11:23,25;18:8
**goals (5)**
38:19;71:22,24;

72:22;73:8
**Godwin (1)**
35:22
**goes (5)**
49:16;85:24;92:1;
99:22,22
**golf (1)**
103:17
**gonna (16)**
7:8;20:5;29:17;
32:22;56:25;58:11,15;
90:17,19,21,22,25;
91:6,8;92:4;98:9
**gonna' (1)**
44:18;57:1
**Good (11)**
3:3,11;5:4;8:1;
34:11;44:15;47:6;78:2;
79:18;93:25;108:12
**gorgeous (1)**
57:10
**governing (1)**
97:16
**grade (2)**
19:9,10
**grading (1)**
75:2
**gradual (1)**
8:10
**grammar (1)**
96:17
**grand (2)**
57:2,2
**grant (1)**
58:6
**granted (8)**
30:7,9;40:11;49:8;
76:16;82:6;100:23;
108:23
**granting (6)**
75:4;78:20,21;82:1;
85:17;86:10
**gravel (1)**
37:22
**Great (12)**
4:13;31:21;36:22;
42:16;51:21;52:13;
54:8;58:6,8;76:14;
78:8;111:15
**greater (2)**
96:24;106:11
**green (2)**
20:18;31:20
**grew (2)**
36:9;102:12
**Gross (1)**
3:13
**ground (5)**
15:7;16:24;18:19,19;
19:2
**group (2)**
105:12;106:8
**groups (2)**

72:9,19
**guarantee (7)**
90:16,18,25;91:6;
92:3,8;93:10
**guarantees (3)**
90:21;91:20;96:19
**guess (6)**
10:15;40:11;46:18;
98:9;105:13;110:21
**guide (2)**
76:21;83:20
**gun-shy (1)**
69:18
**guys (5)**
30:6,10;31:2;35:6,12
**gym (4)**
43:18,24;52:13;
77:12

## H

**Hackensack (3)**
99:20;101:25;108:22
**hair (3)**
53:16,21,21
**half (2)**
55:17,18
**hallway (2)**
15:14;97:7
**handicap (1)**
72:19
**hands (4)**
105:14;106:10,18,24
**hang (1)**
45:7
**happen (7)**
69:3;74:16;90:25;
100:9,9;102:5;106:25
**happened (1)**
106:14
**happening (1)**
90:20
**happens (2)**
49:8;69:3
**happy (2)**
31:2;35:8
**hard (2)**
103:9,9
**Harris (5)**
54:8;99:21;100:16;
101:2;108:21
**Harris' (1)**
56:7
**Haworth (2)**
10:19,20
**head (4)**
29:5;98:10;99:8;
104:19
**health (2)**
77:1;83:22
**hear (5)**
3:8,8,10;61:7;88:11
**heard (13)**

43:2;77:20;78:3;
86:2;88:12;92:25;
94:11;103:2;104:9;
105:20;109:5,10,14
**hearing (11)**
4:1,14;5:16;30:4;
41:6;43:9;51:7;88:24;
89:13,19;109:7
**hearings (4)**
3:24;4:3,4;100:16
**heart (1)**
97:6
**heavy (1)**
9:6
**hedge (1)**
10:1
**height (15)**
19:5,7,12,13;22:24;
30:15,16;47:8,23;
52:16;55:24;87:22,23;
88:1;103:1
**Hello (1)**
5:10
**help (2)**
10:9;73:18
**helping (1)**
45:1
**Here's (2)**
48:17;108:16
**Herlinsky (29)**
51:4,4,12;53:12,16,
23;55:5,12;56:2,5;
57:5,25;58:20,23;59:5,
19,22;60:11,16,25;
61:7;88:6,18;109:12,
24;110:11,15;111:15,
17
**Herlinsky's (1)**
109:23
**hey (1)**
57:2
**high (9)**
7:12;10:18;68:11,17;
69:7,8,9;96:15;99:7
**higher (2)**
55:23;103:23
**highest (2)**
102:16,19
**highly (2)**
95:21;96:22
**hinged (1)**
69:24
**Historic (2)**
84:13;86:20
**historically (1)**
65:19
**hit (3)**
34:15;57:2;67:4
**Hoboken (1)**
14:5
**hold (5)**
34:11;58:25;88:23;
89:10;111:19

**Home (14)**
3:14,14,17,21;4:18,
20,23;9:11;11:2;14:12;
42:14;45:20;96:9;
103:12
**home-run (1)**
57:2
**Homes (5)**
3:2;42:17;48:20,23;
91:18;96:20
**honest (1)**
106:4
**honestly (1)**
50:10
**hope (3)**
53:6;69:14,17
**horizontal (2)**
16:13,14
**hoses (1)**
24:2
**Hours (1)**
45:3
**house (4)**
10:20;90:17;101:23;
102:14
**houses (2)**
92:6;102:3
**Housing (47)**
43:7,14,14;68:9;
70:8;71:23;72:12,14,
16,18,20,25;73:1,19,
20;78:9,10,13,15,17,
22,23,24;80:3;84:7,12;
85:6,13,15;87:15;
90:12,12,14,24;91:25;
93:17;99:25;100:1,5,6,
19,23,24;105:1;106:1,
18;107:22
**housings (1)**
91:23
**How's (1)**
95:2
**huge (1)**
86:20
**Hum (1)**
21:18
**Hupa (1)**
63:1
**hurt (1)**
58:16

## I

**idea (8)**
51:15,21,22,22,25;
52:14;53:4;55:8
**identified (4)**
37:5;77:2;78:13;
85:5
**identify (2)**
35:14;93:4
**identifying (1)**
42:12

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 38 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 39 of 49
PageID#: 1082

In RE: Morningside at Wallington                                          Transcript of Proceedings

**illegal (1)**
  91:18
**imagine (2)**
  103:13;110:22
**immediate (1)**
  52:8
**impact (7)**
  75:9;79:22;86:13;
  87:6,8;93:2;96:19
**impacts (2)**
  71:20;79:19
**impair (2)**
  75:4;82:2
**impervious (2)**
  82:22;86:8
**important (12)**
  20:2;22:1;29:15;
  39:10;40:2;43:19;59:4;
  61:8;62:9;71:21;84:16,
  17
**importantly (1)**
  38:17
**improve (4)**
  37:17,23;38:1;47:21
**improved (4)**
  7:20;37:7,20,22
**improvement (1)**
  38:7
**improves (1)**
  87:18
**improving (1)**
  41:11
**inch (5)**
  10:6;19:8,8,11;
  102:25
**inches (1)**
  19:14
**include (2)**
  38:16;51:20
**includes (1)**
  20:13
**including (2)**
  14:3;84:9
**income (7)**
  72:19;78:24;98:3;
  99:25;100:24;105:1;
  108:20
**incoming (1)**
  96:14
**incorporate (1)**
  38:13
**incorporated (1)**
  86:18
**increase (2)**
  72:5;97:15
**indicate (1)**
  80:19
**indicated (6)**
  62:2;72:23,24;73:9;
  74:4;84:10
**indicates (1)**
  63:1
**indoor (2)**

**52:13;58:1**
**industrial (5)**
  37:11;42:9;107:4,7,8
**information (5)**
  23:24;93:11,12,16;
  95:12
**ingress (1)**
  49:2
**instance (1)**
  96:15
**Institute (1)**
  13:17
**insurance (2)**
  58:17;111:1
**insurances (1)**
  58:14
**intent (2)**
  75:5;82:2
**interest (2)**
  101:10;105:24
**interests (2)**
  48:23,24
**interior (1)**
  31:16
**internal (10)**
  45:13;74:6,25;75:1;
  79:19,20;85:21,23,24;
  87:16
**interplay (1)**
  106:3
**interrupting (1)**
  7:17
**into (33)**
  6:24;8:4;14:16;
  15:12,12,14,14,15;
  17:13;23:12,23;24:11;
  29:20;38:7,8,13;41:10;
  42:23;47:22;50:1,23;
  62:22;71:19;79:24,24;
  85:17;86:18;93:17;
  96:14;102:13;103:19;
  107:19;111:4
**invite (1)**
  20:24
**involved (1)**
  96:12
**irregular (2)**
  40:16,19
**issue (5)**
  12:5;61:8,13;69:14;
  110:12
**issues (12)**
  37:25;38:3,9;53:1;
  70:19;81:1;94:8;103:8;
  109:24;110:11,18,21
**item (1)**
  20:9

**J**

**Jack (3)**
  13:3,4,8
**Jersey (13)**

**13:10,16,22,24;14:2,**
  5;35:23;36:9,12;42:12;
  57:13,14;90:8
**job (1)**
  54:8
**joint (4)**
  49:18,22;51:2;
  105:21
**jointly (2)**
  48:22;59:16
**joking (1)**
  44:25
**Judge (15)**
  52:22,22;54:8;55:12;
  56:7;99:21,21;100:16,
  23;101:2,24,25;102:6,
  6;108:21
**July (1)**
  4:8
**jump (1)**
  19:12
**Jumping (1)**
  19:23
**June (1)**
  4:2
**jurisdiction (1)**
  4:9

**K**

**KAPUSTA (13)**
  89:21;90:1,3,7,7;
  91:14,17;92:10,12,15;
  93:17;94:9,10
**K-A-P-U-S-T-A (1)**
  90:8
**keep (13)**
  7:16;31:23;34:14;
  39:11,12,17;54:24;
  59:12,13,13;65:15;
  92:9;96:9
**keeping (5)**
  32:6;52:18;62:18,19;
  86:22
**kept (1)**
  21:12
**Kevin (1)**
  3:12
**key (1)**
  38:14;60:13;75:11
**kid (1)**
  90:17
**kids (25)**
  60:24;61:1,3;67:4,6,
  11,22;69:1;70:5,12;
  90:11,19,22,24;91:24;
  92:3,4,7,9,24;93:14,19;
  98:1;103:19,24
**kill (1)**
  44:19
**kind (9)**
  9:7;19:19;52:7,24;
  58:4,12;91:20;103:20;

**104:6**
**Kindergarten (2)**
  69:6,7
**kiss (1)**
  53:10
**knowing (1)**
  24:5
**known (1)**
  70:13
**knows (3)**
  68:9;73:13;88:19

**L**

**ladies (1)**
  88:21
**laid (1)**
  77:3
**Lambert (1)**
  13:9
**Lambertville (1)**
  13:10
**land (21)**
  41:20,22;42:11;
  48:10,12;76:7,19,22,
  25;77:15;78:18,19;
  79:12;83:19;85:2,4,16;
  99:24;105:14;106:9,16
**lands (1)**
  83:21
**landscaped (4)**
  6:20,25;20:19;27:17
**landscaping (10)**
  6:21;7:3;9:22,24;
  29:13,19;37:20;81:7;
  82:21;84:23
**lane (3)**
  5:23,23;13:9
**lanes (1)**
  5:21
**large (5)**
  16:10;37:6,7;41:5;
  97:1
**larger (2)**
  29:20;96:13
**last (17)**
  5:14;7:4;9:7;13:7;
  22:6,20;30:4,23;32:3;
  34:7;35:24;51:18;
  57:22;60:3;61:18;73:8;
  93:15
**lastly (6)**
  72:17;78:12;85:12,
  17;86:11;87:10
**lately (1)**
  104:11
**later (1)**
  109:8
**latest (1)**
  104:14
**Laurel (10)**
  53:15;100:1,2,5,14,
  19;104:4,11,11,12

**law (19)**
  4:7;13:5;35:19;76:7,
  19;77:15;78:17,18,19;
  79:12;83:19;85:16;
  90:4;94:14;100:7,22;
  102:5;104:11;108:24
**lawn (1)**
  29:23
**lawsuit (7)**
  101:9;105:6,19;
  106:15,16,23;107:21
**lawsuits (1)**
  100:2
**lay (2)**
  83:4,6
**layout (6)**
  38:3;77:3,7,14,23;
  86:2
**lays (2)**
  40:4;87:4
**leads (1)**
  38:4
**leak (2)**
  30:11;32:13
**leaks (2)**
  30:25;31:6
**leasing (3)**
  17:3,3;43:17
**least (4)**
  10:3;85:7;88:13;
  111:2
**leave (2)**
  46:3;56:16
**leaving (3)**
  25:12;39:20;110:3
**LED (3)**
  9:13,15,15
**Lee (3)**
  67:19;68:9;103:10
**left (1)**
  42:16
**legal (2)**
  93:21,22
**legend (1)**
  42:4
**lends (1)**
  42:22
**length (4)**
  12:7,9;22:25;62:6
**less (10)**
  54:15;55:8,9,15;
  63:24;67:11;80:21,22;
  82:22;103:24
**lessening (1)**
  85:3
**letters (2)**
  21:14;22:13
**letting (1)**
  91:4
**level (4)**
  19:3;97:5;98:3;99:7
**levels (1)**
  72:19

BER-L-001670-18    08/30/2018 7:37:18 PM    Pg 39 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 40 of 49
PageID: 1083
In RE: Morningside at Wallington                                    Transcript of Proceedings

**liability (1)**
58:15
**Liberty (2)**
107:13,14
**licensed (4)**
13:21,21,23;36:11
**licenses (2)**
13:13;36:2
**light (2)**
9:13;107:4
**lighter (1)**
9:9
**lighting (2)**
9:17,21
**lights (4)**
9:15,19,21,21
**likely (2)**
29:22;103:23
**limit (2)**
101:10;102:9
**limited (1)**
106:25
**line (19)**
6:8,9;29:8;40:16,19;
44:18,24;45:13,15,18;
46:21;57:12;65:19,23;
74:7;75:1,1;81:7;
102:25
**lines (4)**
44:25;47:17,18;
75:22
**listed (1)**
33:17
**listening (1)**
80:12
**lit (1)**
22:5
**litigation (1)**
101:3
**little (29)**
6:7,8,11,20;8:24;9:9,
9;10:4;12:3;18:21;
19:1;20:7,15,17;22:23;
23:10;29:13,18;50:23;
62:23;63:24;71:17;
73:5;88:12;89:17;
90:15;102:22;103:18,
22
**live (11)**
10:19;52:5;56:21,22;
64:2;67:5,15,19;96:21;
101:17;103:10
**lives (1)**
96:3
**LLC (5)**
3:2,14,15,17,21
**LLC's (1)**
46:13
**loaded (1)**
8:9
**loading (3)**
37:12;107:16;108:7
**lobby (5)**

15:7,10,10,12;17:13
**local (8)**
71:18,19,20,20,21;
93:1,2,4
**located (3)**
37:5,16,18
**location (4)**
10:11;82:6;110:9;
111:25
**locations (1)**
84:8
**logically (1)**
64:14
**long (10)**
9:7;16:17;36:25;
52:21;88:1;96:8,12;
102:22;107:11,25
**longer (2)**
29:12;108:22
**look (29)**
7:1;8:8;11:18;19:19;
20:2,20,25;31:7,8,18;
32:19;33:12,20;50:20;
51:6;57:5;58:20;61:7;
62:18,25;63:11,23;
64:22;79:10;83:9;
91:25;93:8;97:22;
101:6
**looking (18)**
10:7;20:21;37:10,17,
19,23;38:1;45:16;
63:10;70:6;75:7,8;
76:4;77:9,22;97:13,18,
23
**Looks (7)**
25:20;27:14;30:10;
31:20;58:6,6,8
**lose (2)**
39:22;91:11
**lost (2)**
6:5;55:7
**Lot (60)**
3:16,20;6:1,14;7:18,
21;9:25;10:2,9;26:10;
28:14;29:20,21;33:1;
37:5;38:18,21,24;39:3,
20,23;40:15,16,19,21;
42:22;44:3,3,18,24;
45:13,13,15,18;46:21;
47:17,18;49:1,2;60:2,
10;62:10,11;66:14;
70:3;71:24;73:23;74:6,
25;75:1,22,25;77:5;
78:25;88:3;96:10,11;
108:21,21,21
**lots (15)**
12:4;19:2;44:4,5;
45:16;46:3;48:19;55:7;
74:10,12;75:3,9,12,14,
15
**loud (2)**
3:9;5:9
**love (1)**

102:13
**low (7)**
18:1,11;64:5;69:3;
99:25;100:24;105:1
**lower (1)**
19:16

**M**

**mail (2)**
4:5;110:10
**Main (15)**
3:24;5:20,20;6:1,7;
9:25;30:13,19;31:9;
37:6,10;43:11,16,21;
58:3
**mainly (1)**
94:22
**maintain (10)**
8:13;25:23,24;26:9,
24;37:9;47:6;74:17;
93:3;104:25
**maintenance (2)**
8:8,12
**major (2)**
65:9;108:18
**makes (1)**
70:2
**making (7)**
11:16,20;26:3;48:17;
55:8;86:25;102:10
**manned (1)**
24:1
**manner (3)**
76:22,25;83:21
**Many (16)**
14:3,4,5;39:22;46:7,
8,9;50:9;54:24;65:5,
12;66:4;68:12;91:18;
92:6;93:22
**map (1)**
107:4
**maple (1)**
10:5
**mark (5)**
14:22;15:2,4;16:4;
19:23
**marker (2)**
44:23;45:10
**market (11)**
15:21;17:16,17,18,
24,25;18:1,10;69:4;
107:23,24
**marketing (1)**
68:23
**Mason-Dixon (2)**
65:19,23
**masonry (3)**
22:12;37:7;43:11
**massive (2)**
96:19,20
**Master (25)**
38:19;42:19;50:22;

71:18,22,22,23;72:1,
22;73:5;74:2;77:22;
78:14;79:12,24;80:2,3;
82:3;83:2;84:7,9;87:8;
97:12,14;106:21
**Masters (1)**
36:6
**matches (1)**
19:17
**material (2)**
20:6;22:12
**materials (5)**
20:4;43:15,16,18,18
**Matter (4)**
24:15;51:21;60:20;
64:23
**maximized (1)**
72:2
**maximum (1)**
73:24
**May (14)**
4:1,14;36:23;40:7,
10,24;41:6;43:9;49:11,
12;50:24;66:21;90:5;
97:9
**Maybe (12)**
11:22;51:19;57:24;
58:10;61:15;65:12;
88:13,25;95:18;106:9;
111:9,11
**MAYOR (22)**
24:9,12,15,18,25;
25:18;34:5,11,14;53:1;
65:17;69:16;70:10,21;
71:5,10,15;100:8;
107:1;108:14,17;
111:10
**mayor's (1)**
95:16
**mean (11)**
24:16;26:15;29:12;
52:17;57:6;64:12;
93:22;95:24;98:22;
105:12,15
**meant (1)**
11:14
**measured (1)**
19:15
**meet (14)**
30:16;72:8,12,16,18;
73:19,21;80:9;85:12;
100:1;105:5;106:8;
110:24;111:8
**meeting (14)**
4:2;5:14;7:4;35:3;
51:19;58:10;60:4;76:1;
89:9;110:5,20;111:2,
11,12
**meetings (1)**
97:4
**meets (4)**
72:22;77:14;78:10;
84:25

**MELFI (74)**
3:6;11:6;15:23;
17:21,25;18:6,10;
20:22;21:17,19;25:3,8,
11;26:18;29:7,16;30:2,
15,22;31:11,14,17;
32:10,17,21;33:10,13,
21,24;34:2;39:14,18;
40:22;41:4,13,15,17,
24;42:3,6,9;43:25;
44:2;46:23;47:3,15;
49:17;50:5;51:18;
53:18;54:11;55:2,6;
56:3,7,15,21;57:8,16,
23;58:9;60:3,15,23;
61:1;65:4,8,12;98:10;
101:13;104:15,18,23;
111:21
**MELISSA (4)**
94:13,17,20,24
**MEMBER (1)**
51:10
**members (7)**
3:11;4:24;12:20;
34:4;72:24;111:6,7
**memory (1)**
3:16
**mention (3)**
19:12;21:6;81:10
**mentioned (14)**
7:4;8:2,12;42:24;
63:4;73:12;74:3;85:14,
20;86:21;92:19;95:11;
102:8;111:1
**met (1)**
108:25
**Mian (3)**
52:22,22;101:25
**mic (2)**
7:25;94:19
**microphone (1)**
94:25
**microphones (1)**
5:8
**mid (1)**
19:15
**middle (3)**
16:15;81:14;96:16
**Midland (1)**
35:22
**might (10)**
3:5;20:22;23:2;
29:14;49:10;95:3;
104:21;110:23;111:2,
13
**millennials (1)**
96:6
**million (2)**
33:4,5
**mind (2)**
41:24;51:17
**minds (2)**
49:7;51:25

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 40 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 41 of 49
PageID: 1084

In RE: Morningside at Wallington                                    Transcript of Proceedings

**minimal (2)**
62:15;75:9
**minimum (3)**
73:23;80:18,20
**Minno (1)**
13:18
**minor (5)**
5:15;6:2;73:3;80:5;
81:17
**minorities (1)**
72:19
**minus (1)**
73:3
**minute (5)**
34:20,21;88:8,21;
89:2
**minutes (1)**
47:4
**Miss (17)**
34:19;35:4;36:1,15,
21;48:2;50:10;59:5;
61:12,22;65:25;69:10;
71:11;82:14;92:10;
94:10;109:18
**mistaken (2)**
60:3;104:3
**misunderstand (1)**
96:23
**mixed (1)**
13:19
**moderate (4)**
18:1,11;78:24;99:25
**modifications (1)**
73:3
**modified (2)**
8:18,24
**modify (1)**
76:5
**modifying (1)**
73:5
**mom (1)**
67:12
**moment (1)**
59:21
**moms (2)**
68:20;69:1
**money (2)**
58:12;107:19
**monitored (2)**
94:1,5
**monitoring (2)**
91:14;93:18
**month (13)**
34:7;88:10,15,23,25;
89:8,11,16;103:18;
109:7;110:4,5;111:20
**months (2)**
48:24;58:10
**monument (5)**
10:22,23;21:9,11,19
**MOORE (107)**
3:3,9,12;4:11,13;5:5,
7;7:6,9,16,22;8:1,15;

11:10;12:18,24;13:2,
12,21,25;14:6,10,18,
21,25;15:3;16:2;18:14;
20:11;21:3,7;22:8,18;
23:4;29:25;31:25;32:5,
15,19;34:10,18;35:4,
12,17;36:1,11,14,19,
21;39:12;40:13,15;
41:21;44:6;45:22;46:6,
8,10,14,16;47:9,12;
48:8,14;49:4,14;50:2,
13,17;51:3,5;54:15;
56:11,18;57:6,12,20,
24;58:2;59:5,20;60:1,
8;61:20;68:23;69:10;
70:7;76:9,14;78:18;
80:13,16;82:14,19;
87:22;88:3;89:24;
91:10,16;93:21;94:18;
98:14;99:10,16;106:3,
13;110:14
**morals (2)**
77:1;83:22
**more (41)**
8:7,10;9:4,9,13;10:8,
21;12:13;19:1;22:11;
29:14;31:9,10;32:5;
34:24;53:16;67:21;
68:16,16,23;73:16;
82:22;83:11,23,25;
85:4;90:19;94:6;95:24;
96:5;97:16,18;101:11;
103:11,11,13,23;
105:10,18;106:5;
110:17
**Morningside (3)**
3:2,14,20;4:18,19,
22;9:14;11:1;14:12;
45:19;48:19,24;54:14
**Most (16)**
3:9;29:22;38:11,17;
40:2;70:12,25;71:21;
77:3,6;79:4;81:18;
84:10;85:6,7;86:2
**motion (2)**
111:19,21
**Mount (12)**
53:15;65:9;94:21;
100:1,2,5,14,19;104:4,
11,11,12
**M-O-U-N-T (1)**
94:21
**mounted (1)**
10:18
**mouth (2)**
3:9;89:21
**move (10)**
4:18;16:21;29:20,22;
37:19;69:10;77:8;
81:13;96:6;102:13
**moving (3)**
37:17;71:12;103:19
**Mrs (1)**

94:22
**much (20)**
4:13;9:13;12:2;
14:10;22:11;23:22;
32:7;53:25,25;54:3;
64:21;65:1;66:18,25;
78:15;83:15;88:3;
95:24;102:14;109:1
**multi-family (15)**
3:19,23;42:17,20;
43:14;62:8,25;64:10;
72:14;73:14;75:11;
79:23;84:11;85:6;
87:10
**multiple (1)**
92:3
**multi-use (1)**
13:19
**Municipal (11)**
76:7,18,21;77:15;
78:14,17,19;79:12;
83:19,20;85:16
**municipalities (11)**
40:5;63:7,12;64:8;
65:5;70:15;93:6,7;
95:13,14,18
**municipality (3)**
73:11;85:5;97:19
**must (1)**
64:12

---

## N

**name (13)**
3:12;13:6,7,8;21:15,
16;35:20,24;51:3;71:5,
7;90:5;94:15
**narrowed (1)**
5:24
**narrowness (1)**
75:19
**natural (2)**
75:2;84:14
**near (3)**
29:3;41:1;107:22
**need (38)**
5:12;14:25;24:6;
32:3;40:24,24;42:22;
45:17;46:1,4,6,24;
47:6;51:9;55:21,24;
58:14;67:25;75:15;
79:2,10,17;80:5,24;
84:20;86:21;87:2;89:1;
100:5,8,13;102:24;
109:9
**needed (1)**
78:15
**needs (15)**
34:23;35:17;41:9;
62:13,18;72:3,8,12,16,
18;74:19;78:6;81:3,5;
106:25

**negative (9)**
40:10;76:10,12,17;
79:16,25;80:10;86:12,
13
**negatives (1)**
86:11
**Neglia (4)**
5:17;61:20;88:16;
89:9
**negotiated (1)**
101:14
**negotiation (1)**
101:9
**neighborhood (2)**
16:12;108:1
**neighborhoods (1)**
77:19
**neighboring (1)**
92:1
**New (37)**
3:2,13,16;4:15;5:5;
8:10;9:11,14;11:2;
13:10,16,22,24;14:1;
20:10;35:22;36:9,12;
42:11,14;45:20;48:6,
20,23;54:7;57:13,14;
62:8;78:8;79:8;81:22;
82:12;86:18;87:1;90:8;
91:22;93:14
**news (1)**
93:25
**next (30)**
6:9;13:3;16:21;20:9;
21:1;34:10,12;58:21;
68:10;71:16;77:16,25;
80:17;88:10,15,23,25;
89:8,9,10,16;90:16,20;
107:14,15;109:7;
110:4,5;111:2,19
**nice (13)**
6:24;10:7;18:25;
21:12,19,24;22:1,5,5;
51:16;90:15;91:22;
103:20
**nicer (3)**
30:10;32:14;103:22
**Nick (2)**
98:9;104:12
**night (4)**
9:17;39:18;57:22;
89:25
**nine (1)**
17:18
**nobody (5)**
91:14;103:11,15;
108:4;109:13
**none (1)**
52:14
**North (2)**
36:6;65:23
**northern (4)**
63:8;64:11;95:15,16
**notes (2)**

11:17,20
**notice (1)**
4:7
**noticed (3)**
4:4;110:4,10
**Notices (2)**
91:12;110:9
**nowadays (2)**
22:1;33:18
**Nuckel (1)**
105:22
**Nuckels (1)**
105:12
**number (32)**
6:1,21,22;15:16;
16:19;29:11,21;32:1;
34:9;38:11;40:3,4;
52:11,23;63:5,6;67:16;
72:23;78:21;79:2;
83:18;86:17,21;93:18,
19;94:2,6;95:9;96:24;
97:20,20;98:4
**numbers (5)**
8:21;67:1;69:3;
92:20;93:10

---

## O

**oath (1)**
5:4
**objectives (6)**
38:19;71:24;72:22;
73:8,11,20
**obligation (2)**
48:20;49:22
**obligations (1)**
105:5
**obviously (9)**
22:15;37:25;38:2;
58:18;72:5,13;84:17;
106:11;109:25
**Occupancy (1)**
91:12
**occupants (2)**
94:2,6
**occupied (3)**
37:12,14;67:21
**occupy (1)**
93:23
**occupying (1)**
68:18
**off (14)**
3:7;6:5;7:17,25;
19:19;21:14;22:13;
61:23;71:8;95:4;98:10;
99:7;104:18;107:16
**offer (4)**
14:6;36:15;56:6;
59:2
**offered (1)**
52:6
**office (8)**
4:4;5:17;35:21;

BER-L-001670-18    08/30/2018 7:37:18 PM    Pg 41 of 48    Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 42 of 49
PageID: 1085

In RE: Morningside at Wallington                                    Transcript of Proceedings

43:17;45:8;67:18;68:8;
103:10
**officials (1)**
  97:4
**often (1)**
  102:17
**old (1)**
  27:16
**older (2)**
  67:25;68:18
**Once (3)**
  23:21;48:3;67:4
**one (94)**
  5:6,23,23;6:12,13,
  16;7:15;12:5;14:4;
  15:8,16,17,20;16:17;
  17:14,16,21,23;18:1,4,
  9,10,11;19:19;21:21;
  23:19,20;26:3,20;27:6,
  11;28:20,23;29:4;33:5;
  34:15;37:9,9;41:1;
  44:10,12,16;47:22;
  49:1;50:1;51:13;52:19;
  53:5;55:5,9;56:4;
  60:21;62:4;63:17;66:5,
  11,13;67:2,18;76:11;
  80:20,24,25;83:2;
  90:17,17,18,19;91:4,
  19,24;92:2,2,7;94:3;
  95:3;97:2,12,20;98:14,
  15,15;99:9,14,18;
  100:18;102:9;104:11;
  105:10,21;106:5;
  109:16;110:2,12
**one-quarter (1)**
  19:8
**ones (1)**
  30:5
**one's (1)**
  22:24
**only (32)**
  10:25;28:19;38:7,24;
  39:2;40:18;52:16;60:2,
  13;62:16;63:20;64:2;
  68:16;70:7;72:13;
  73:21;75:1,22,24;
  77:23;78:8,22;81:8;
  84:11;85:21;90:10;
  91:4,23;92:4,9;102:24;
  108:15
**open (18)**
  17:12;18:20;20:3;
  24:3,5;25:2;56:5;59:6;
  62:4;82:22;84:13;86:8;
  87:9;88:10,24;89:12,
  18;109:7
**opened (2)**
  89:16;109:6
**opening (1)**
  91:4
**opens (1)**
  25:11
**opinion (4)**

24:15;88:13;89:18;
102:5
**opportunities (2)**
  86:4;87:14
**OPRA (3)**
  63:6;64:8;93:2
**OPRA'd (3)**
  65:5,8,18
**options (1)**
  59:9
**orange (1)**
  42:17
**order (3)**
  4:11,12;55:6
**ordered (1)**
  106:17
**ordinance (13)**
  19:9;60:20;73:12,15;
  74:1,8,24;76:2;77:21;
  82:9;84:6;97:12,14
**ordinances (1)**
  40:6
**original (4)**
  5:7;57:9;99:18;
  105:13
**originally (5)**
  7:13;52:21;83:12,16,
  24
**others (2)**
  4:6;88:4
**out (43)**
  5:21,23;15:13;20:18;
  25:14;29:23;34:9;40:4;
  41:25;54:4,7;55:6;
  59:3,12;61:15;63:2,15,
  19;64:19;66:21;67:14,
  14;69:1,1;70:5,12;
  77:3;83:4,6;87:4;
  89:15;90:11;92:5,7,9;
  95:9;96:25;98:11;
  101:4;107:25;110:25;
  111:5,14
**outcome (1)**
  46:19
**outdated (2)**
  62:23;63:4
**outlined (3)**
  42:13,16,25
**outside (4)**
  10:20;15:15;67:7,9
**outweigh (2)**
  79:15;80:9
**outweighs (1)**
  86:11
**over (18)**
  4:9;12:11;23:21;
  24:22;33:16;60:17;
  66:16,22;74:7;89:10;
  96:13;98:12;102:8;
  104:4,20;105:1;
  107:22;111:10
**overall (3)**
  22:25;55:22;56:11

**overcrowding (3)**
  91:19;110:22,23
**overload (1)**
  93:20
**own (5)**
  63:5;70:15;92:21;
  96:20;105:11
**owner (4)**
  45:20;48:6;49:11;
  101:20
**owners (11)**
  4:6;46:16;48:3;
  49:24;54:5,5;56:24;
  99:23;105:11,13;
  106:11
**ownership (4)**
  45:23;46:10;105:24;
  106:1
**owns (2)**
  46:20;105:12

## P

**packing (1)**
  70:5
**page (1)**
  30:3
**pains (1)**
  70:21
**painstaking (1)**
  70:19
**painted (2)**
  7:2;26:12
**Panera (1)**
  101:7
**paper (2)**
  33:19;58:19
**parallel (2)**
  6:3,5
**parcel (2)**
  42:13;79:5
**parcels (1)**
  106:1
**park (10)**
  15:13;16:25;17:11,
  12;35:22;60:6;70:16;
  95:20,23;98:5
**parking (28)**
  5:25;6:3,5,14;7:18,
  21;9:25;10:2,9;12:3;
  15:6,9,11,23;18:20;
  20:3;25:25;26:10;
  28:14,15;29:20;37:15,
  18,21;43:15;86:25;
  87:1,16
**parks (1)**
  6:14
**part (19)**
  6:11,12;9:23;15:1,3;
  44:8;47:15;54:20;79:1;
  82:11;86:15;91:13;
  98:21,23;101:3,8;
  105:13,17,25

**particular (3)**
  15:20;33:8;40:8
**particularly (3)**
  23:7;75:7;93:8
**partnership (1)**
  105:21
**pass (1)**
  20:19
**Passaic (1)**
  107:22
**Paterson (1)**
  97:2
**paths (3)**
  10:25,25;11:7
**pattern (1)**
  79:6
**paved (1)**
  37:15
**pavement (6)**
  6:23;25:10,16;27:2;
  53:2;110:13
**pay (1)**
  58:17
**paying (3)**
  22:4;66:17;107:18
**pays (2)**
  102:14,18
**pedestals (1)**
  21:24
**pedestrian (4)**
  39:2;81:16;86:6;
  87:17
**pedestrians (1)**
  85:22
**Pennsylvania (1)**
  36:8
**people (25)**
  3:9;22:3;28:23;29:5;
  49:6;52:4,12;59:15;
  60:4,21,21;61:2;67:21,
  22,25;68:18;91:18;
  93:19,22;96:11;97:23;
  98:1;105:25;107:18;
  110:25
**per (17)**
  54:9,20,22;56:3,8;
  62:24;63:8;64:19;
  73:14,15;93:7,21;94:2,
  3,6;101:10,21
**percent (8)**
  16:12;43:6;50:25;
  53:13;62:11,15,16;
  73:17
**percentages (1)**
  106:1
**Perfect (1)**
  44:15
**perhaps (1)**
  110:13
**perimeter (2)**
  23:22;24:1
**period (1)**
  30:7

**permits (1)**
  73:16
**permitted (4)**
  73:22;76:5;77:21,22
**person (2)**
  66:17;100:3
**personal (1)**
  68:8
**personally (1)**
  64:8
**persons (1)**
  77:18
**perspective (29)**
  17:7;20:10,12;31:19;
  39:6,9;40:2;42:18;
  43:18;46:19;47:17,25;
  50:12,16,19,19;52:18;
  62:13;79:9;80:7;83:1;
  85:22;86:1,20;87:4,9,
  12;93:5,5
**perspectives (11)**
  62:18;74:22;77:13;
  78:10,16;80:8;83:14;
  84:25;85:11;86:9;87:5
**pertain (2)**
  71:25;80:18
**phase (3)**
  100:18,18,18
**phones (1)**
  22:3
**physical (1)**
  75:20
**pick (2)**
  8:25;9:1
**picked (1)**
  10:13
**picture (2)**
  70:4;106:23
**piece (4)**
  50:23;58:19;107:7;
  108:13
**pieces (1)**
  52:1;99:23
**pier (1)**
  22:24
**pig (1)**
  31:3
**pilaster (1)**
  22:11
**piling (1)**
  29:22
**pit (2)**
  8:5,6
**pitch (1)**
  31:1
**pitched (11)**
  16:8;18:23;19:15,18;
  31:8,21;46:25;47:6,8,9,
  12
**place (2)**
  10:13;84:10
**plan (62)**
  3:18,22;4:22;5:15;

8:22;9:11;10:11;15:6;
16:23;23:9;27:17;
38:19;42:19;43:7;
44:10,13,18;50:22;
59:21;71:18,22,22,23,
23;72:1,23;73:1,1,5,19,
20;74:2,4,18;75:5,6,8;
77:22;78:14;79:1,4,13,
25;80:2,2,3,4;82:3,3;
83:2,13,15;84:2,7,7,9;
85:15;87:8;97:12,14;
101:23;106:21

**Plank (1)**
97:2
**planned (2)**
74:9;97:19
**planner (10)**
12:10;36:9,12;56:24;
71:2,2;79:17;83:2;
103:20;107:2
**planning (31)**
14:1,3,4;36:7,16;
38:10;39:6;40:1;42:18;
43:18;46:19;47:16;
50:12,15,19,19;51:22,
25;62:12;69:23;73:9,
10;83:1;96:24;99:19;
100:15,25;106:6,24;
108:14,19
**plans (10)**
8:20;10:1;11:18;
12:16;14:16;48:7;57:9;
73:8;74:14;101:4
**plan's (1)**
73:6
**plant (1)**
100:17
**play (3)**
67:7,12;69:2
**plaza (3)**
20:19;107:13,14
**Pleasant (1)**
65:10
**Please (3)**
13:6;69:12;96:23
**pleasing (1)**
30:8
**plow (1)**
29:17
**plus (1)**
41:25
**pm (1)**
112:1
**point (20)**
5:19;19:10,15;48:17;
52:2,3,19;53:22;55:5,
6;59:22;73:10;88:23;
89:14,19;98:15,21;
99:20;108:18;109:9
**pointing (1)**
96:22
**points (2)**
49:17;98:15

**Polish (2)**
90:9,9
**POLTON (2)**
12:22;111:23
**poop (1)**
31:3
**poor (2)**
37:8;88:7
**popping (1)**
20:18
**population (5)**
72:13,17;77:17;84:4,
5
**portion (2)**
71:16;79:25
**positive (2)**
76:17,18
**possible (3)**
23:14,14;110:21
**possibly (4)**
60:22;105:22;
107:20;111:13
**post (2)**
10:17,18
**post-development (2)**
95:7,11
**potential (1)**
66:16
**potentially (1)**
19:16
**pouring (1)**
15:13
**PP (1)**
35:18
**practicing (1)**
13:17
**pre-approved (1)**
30:5
**predicted (1)**
95:8
**preliminary (2)**
3:17,21
**prepared (2)**
41:19;42:10
**present (2)**
37:24;72:3
**presentation (1)**
48:21
**presented (2)**
5:14,21
**preservation (1)**
84:15
**preserve (3)**
72:3,6;77:19
**preserving (2)**
56:5;82:4
**Pretty (1)**
88:3
**previous (3)**
4:14;20:17;43:2
**previously (4)**
4:25;37:12,13;85:14
**principal (2)**

45:20;46:13
**prior (5)**
11:1;53:20;82:15;
100:13;111:1
**privacy (4)**
7:6,12,12;9:8
**private (2)**
85:2,9
**PRML (4)**
43:4;73:1,13,20
**probably (11)**
6:10;10:6;16:11;
41:1;63:14,24;82:10;
92:23;102:14,15;
104:12
**problem (3)**
12:1;50:25;69:25
**problematic (1)**
69:21
**procedural (1)**
48:1
**procedures (1)**
85:2
**proceedings (1)**
112:1
**produce (2)**
90:22;108:20
**produced (1)**
69:20
**professional (6)**
13:13;36:2,8,11;
79:16;107:1
**professionals (1)**
68:24
**project (37)**
3:17,19,21,23;4:16,
18,20,23;13:3;14:13;
17:4;19:18;20:10,13,
17;21:12,15,16,25;
22:2,10;33:2;63:3,10,
13;69:4;71:3;72:21,24;
78:14;79:17;89:22;
98:17,22;99:18,18;
105:4
**projects (2)**
68:13;98:16
**prominent (1)**
9:13
**promote (8)**
76:25;77:16;78:1;
83:22;84:3,3,13,18
**promoting (2)**
78:11;84:5
**proofs (1)**
37:1
**properties (1)**
3:23
**property (33)**
4:5;6:9;28:10;29:8;
30:24;39:5,9;49:11,24;
50:8,23;55:15,18,18,
21;58:16;59:17;60:14;
75:19,23;77:4;79:22;

81:7;82:24;83:3,6,8;
101:20;102:25;105:11;
107:7;108:13,20
**proportions (1)**
23:2
**proposal (9)**
37:8;43:3;72:5;
73:10;77:2;78:5;79:1;
99:4;101:13
**proposal's (1)**
79:6
**propose (3)**
47:21;81:5,8
**proposed (6)**
40:3;77:21;82:6;
85:19;101:8,12
**proposing (9)**
21:11;32:22;71:25;
72:9,11,13;82:12,21;
87:11
**protect (1)**
58:18
**protected (1)**
23:16
**prove (1)**
80:1
**provide (26)**
9:21;10:7;35:8;41:6;
43:13,16,22;51:14;
64:6,11;65:2;67:16;
70:25;72:7,10,11,17;
76:4;78:12;81:6;84:7,
18;85:7,13;86:3;97:18
**provided (2)**
10:25;95:12
**provides (5)**
43:20;62:24;78:14;
86:8;87:15
**providing (12)**
62:5;14;72:15,16,24;
73:7;78:22,22,23;
86:23,24;87:7
**public (21)**
12:24;38:2;41:7,7;
51:10;61:15;62:14;
63:3,22;65:13;77:1;
79:18,21;83:22;85:1,9;
86:19;87:5,6,7;111:7
**published (1)**
4:7
**pull (5)**
15:12;44:10;94:24;
97:23;98:1
**pulled (1)**
6:6
**pure (2)**
39:8;46:18
**purely (3)**
47:17,24;50:18
**purple (1)**
41:25
**purpose (16)**
77:15,16,25;78:1,11,

12,16;83:20;84:2,7,12,
18,25;85:1,12,12
**purposes (1)**
43:11;75:5;76:7,18,
20,20;79:12,13;82:2;
83:19;85:16
**pushed (2)**
40:23;104:6
**put (22)**
7:13;11:23,25;21:15,
25;29:23;30:9,17,20;
31:2;32:24,25;52:23;
54:7;56:9;97:3,6,7;
107:19;108:4,6,6
**putting (2)**
30:6;52:1

---

## Q

**qualified (1)**
5:1
**quality (1)**
58:4
**quarter (3)**
19:8,11;102:25
**quick (2)**
89:17;95:17
**quickly (2)**
19:12;41:19
**quite (2)**
22:4;102:17

---

## R

**RA (1)**
13:4
**railroad (2)**
8:4;42:15
**rainstorm (1)**
15:13
**raise (1)**
56:17
**raised (1)**
49:17
**Raker (68)**
13:3,4,8,8,12,15,23;
14:3,6,11,14,19,23;
15:2,5,25;16:5;17:23;
18:3,7,12,17;20:12,24;
21:5,9,18,21;22:20;
23:4,8;24:11,13,16,21;
25:1,6,10,15,19;26:1,5,
11,15,21;27:14,19;
28:2,5,12,18,21;30:13,
18;31:5,13,15,18,25;
32:4,7;33:8,12,15,23;
34:1,16;99:10
**R-A-K-E-R (1)**
13:9
**range (3)**
15:18,19;103:17
**rate (7)**
15:22;17:16,17,18,

BER-L-001670-18    08/30/2018 7:37:18 PM  Pg 43 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 44 of 49
PageID: 1087
In RE: Morningside at Wallington                                    Transcript of Proceedings

24,25;18:10
**rateables (5)**
72:5,6;106:12;
107:18;108:19
**rather (1)**
103:1
**ratio (3)**
62:24;65:9;93:8
**reach (1)**
111:14
**real (3)**
53:5;65:1;103:7
**reality (4)**
46:19;47:18;58:9;
87:3
**realize (1)**
40:9
**really (23)**
6:23;12:4;45:24;
46:17;49:21;51:24;
52:24;53:3;62:10;
68:24;71:19;73:6;74:5;
75:9,11;79:21,24;
81:23;86:15;87:4;
98:21;100:3;105:10
**realm (1)**
9:20
**rear (14)**
37:13;42:23;44:17;
45:11,13;73:4;74:4,24;
75:6,17;80:22;81:3,6,
11
**reason (10)**
32:10,12;43:18;44:8;
52:15;62:16;75:20;
81:4;106:2;108:12
**reasons (3)**
72:21;84:18;102:3
**rec (5)**
56:6;59:24;110:23;
111:6,13
**recall (3)**
4:20;31:5,6
**receipt (1)**
4:5
**receive (1)**
4:7
**recess (6)**
34:22;35:1;88:21;
89:2,4,7
**record (8)**
3:12;4:8;21:8;36:3;
37:2;50:5;67:1;110:14
**recorded (1)**
49:5
**recording (1)**
5:12
**records (1)**
93:3
**recreation (14)**
37:9;41:7;52:7;
62:14;72:11;77:12;
78:8;81:21;82:12;

84:16;86:4,5;87:9,14
**recreational (5)**
43:8,10;62:5;86:7;
87:1
**red (3)**
42:13,25;43:1
**redesigned (1)**
9:13
**redevelopment (1)**
98:23
**redraft (1)**
107:2
**redraw (1)**
107:4
**reduce (1)**
76:2
**reduced (2)**
74:9,25
**reduces (1)**
86:7
**refresh (1)**
3:15
**regard (22)**
12:21;38:3,9;41:9;
70:18;73:4,11;74:3,16;
76:8;79:15;80:25,25;
81:10;82:25;83:17;
87:20;92:20,21;93:25;
94:7;97:21
**Regarding (3)**
30:2;42:11;65:5
**regardless (3)**
46:20;98:3,16
**regards (3)**
47:3;103:25;109:10
**Regional (1)**
36:7
**regions (1)**
77:19
**regrading (1)**
12:3
**regulations (7)**
71:21;81:18;82:11;
83:3,5,13,17
**rehabbed (1)**
86:6
**rehabilitation (1)**
78:7
**rehabs (2)**
78:5,7
**reinforced (1)**
42:19
**reiterate (2)**
59:22;99:11
**relate (1)**
38:23
**related (3)**
3:15,25;38:12
**relates (1)**
23:22
**remain (3)**
49:10;86:17,19
**remedy (7)**

53:14;54:1,2,4;
100:14;105:18;106:15
**remove (4)**
7:12;37:11;45:15;
62:3
**removed (4)**
6:2;62:3,9,12
**removing (1)**
86:15
**rendered (2)**
44:11;108:9
**rendering (3)**
10:3;16:2;27:16
**re-noticed (2)**
4:3;110:4
**rent (5)**
66:18;68:17;96:21;
97:23;98:1
**rents (1)**
103:23
**repeat (2)**
16:17,17
**report (4)**
61:21,24;88:10,23
**reported (1)**
26:2
**reports (1)**
88:16
**represent (1)**
70:14
**representative (1)**
89:9
**represented (1)**
100:15
**representing (3)**
3:13;56:23,24
**request (3)**
4:8;75:17;93:2
**requested (4)**
4:5;38:5;44:9;78:20
**requesting (9)**
38:11,22;44:17;
45:12,15;49:19;75:16;
82:25;97:15
**requests (1)**
64:8
**require (2)**
50:8;74:14
**required (5)**
4:6;74:7;79:1;
104:15,25
**requirement (6)**
5:25;49:23;82:9;
87:19;104:13,14
**requirements (9)**
30:17;73:24;76:1,3;
87:13;99:25;100:1,9;
108:17
**requires (3)**
70:9;81:2;94:4
**research (7)**
64:14,21;65:1;66:25;
70:1,2,25

**residence (1)**
52:23
**residential (12)**
13:19;19:20;81:22;
84:9,11,11,12;106:17,
22;108:6,11,13
**residents (13)**
20:23;43:22;46:1;
60:14;78:23,24;86:4;
90:21;91:1,5,7,21;92:4
**resolution (3)**
32:24;33:6;111:4
**resources (1)**
84:14
**respect (3)**
7:18;70:1,1
**response (2)**
9:23;97:11
**responsibility (1)**
8:13
**responsible (1)**
58:17
**rest (4)**
24:1;54:3;81:9;
88:22
**restarted (1)**
89:6
**restroom (1)**
34:23
**resume (1)**
35:3
**retail (1)**
43:20
**retaining (1)**
8:15
**return (2)**
4:5;34:22
**reuse (1)**
82:7
**reusing (1)**
86:13
**review (2)**
62:13;73:7
**reviewed (1)**
71:22
**reviewing (2)**
38:15;39:7
**revisit (1)**
61:13
**rezoned (1)**
73:14
**ridge (11)**
30:9,10,17,25;31:12;
32:3,14;70:16;95:20,
23;98:5
**Ridgewood (1)**
95:19,23;96:3;97:22;
98:6,7
**Right (56)**
5:2,13;6:9;7:10;9:2;
10:20,24;11:23;14:16,
21,25;15:14;18:4,24;
20:15,16;21:16;25:8,

18;26:19;27:2;28:24;
34:15,17;41:3;44:11;
45:2;48:16,21;49:13;
51:2;52:10;53:13;
55:11;56:1,4;57:18;
58:8;61:18;66:19,23;
69:21;70:10;74:13,18;
80:14;89:5,7;100:23;
101:3;102:3;103:13;
105:7;107:5;110:10;
111:16
**right-of-way (1)**
37:19
**ring (2)**
82:23;85:23
**rink (14)**
37:14,24;38:6,13,16;
41:1;43:8,10;49:9;
52:9;78:7;86:13,17;
91:3
**rip (1)**
51:15
**River (4)**
29:23;42:15;75:2;
78:25
**Road (11)**
6:10,13;10:15;19:25;
26:3,4;49:25;54:23;
82:23;85:23;97:2
**roadway (2)**
101:23;107:16
**Robinsville (2)**
57:13,18
**roller (9)**
37:14;40:25;43:7,10;
49:9;52:9;82:7;86:12;
91:3
**roof (27)**
16:8;18:23,23;19:10,
14,15,17,18;30:4,7,9,
10,11,12,17,20,24;
31:1,1,4,6,8,12,21;
32:3,5;47:12
**roofs (10)**
31:2;32:12,14,14;
46:24,25,25;47:6,7,8
**room (1)**
29:22
**rooms (1)**
17:5
**rotated (3)**
6:3;8:24;9:1
**Route (1)**
65:19
**row (1)**
10:1
**ruled (1)**
100:16
**rulings (1)**
104:4
**run (2)**
23:20;67:6
**running (1)**

BER-L-001670-18    08/30/2018 7:37:18 PM    Pg 44 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 45 of 49
PageID: 1088
In RE: Morningside at Wallington                                    Transcript of Proceedings

69:1
runs (2)
    48:9,11
Rutgers (3)
    62:22,25;92:20
Rutherford (1)
    14:5

## S

Saddle (3)
    29:23;42:15;78:25
safe (1)
    23:21
safety (2)
    77:1;83:22
same (23)
    3:24;5:6;9:8,15;
    15:12;22:10;32:2;42:6;
    45:21;46:13,14,20;
    70:16,18;76:11;92:14;
    98:2;100:20;105:24,
    25;110:8,9;111:25
sand (2)
    8:5,5
sat (1)
    108:3
saw (1)
    57:9
saying (21)
    25:4,4;27:21,23;
    29:7;44:2;47:1;48:17;
    50:10;59:7;64:18;68:5;
    70:6;71:14;90:24;92:5;
    99:24;101:22;103:20;
    104:1,8
scale (1)
    108:19
scenario (2)
    70:4;98:2
school (36)
    62:22,24;63:1,2,3,10,
    14,20,21,22;66:13;
    67:3,4,9;69:6,7,8,9,13,
    21;70:15;71:4;90:23;
    93:7;96:13,14,15,16,
    17;97:21,23,24,25;
    98:1;102:10;107:19
schools (2)
    91:2;110:22
scope (1)
    98:22
scrapping (1)
    48:6
seats (1)
    35:3
second (11)
    42:23;47:23;58:24;
    62:6;66:22;79:25;91:3;
    110:2,20;111:22,23
seconds (1)
    106:24
section (9)

23:20;25:21,25;26:8,
    9;28:3;80:20,22,24
sections (1)
    80:19
seem (2)
    56:20;69:3
seems (3)
    36:24;63:7;64:5
selected (1)
    33:8
sell (1)
    48:5
sense (6)
    51:18,24,25;64:15,
    22;69:19
separate (7)
    12:14;23:17;45:17;
    46:3;48:3;55:7;81:1
separation (8)
    80:20,21;81:25;
    82:11;85:18,19;86:10;
    87:11
series (1)
    16:18
serious (1)
    103:7
serve (1)
    67:4
serves (1)
    77:25
service (1)
    67:5
serviced (1)
    93:9
set (14)
    14:19,20,22;15:1,3;
    19:21;30:6;43:6;52:24;
    73:17,24;104:5;
    106:18;111:13
setback (29)
    12:10;44:16,17;
    45:11;47:25;73:4;74:4,
    6,24;75:6,17;76:3,5,16,
    19;78:21;79:10;80:10,
    18;81:3,3,11,13,20;
    82:17;83:18;84:20;
    88:2;102:24
setbacks (7)
    39:24;40:24,25;
    41:10;47:17;83:1;
    87:21
settle (1)
    54:6
settled (3)
    101:9,14,16
settlement (2)
    102:23;106:23
seven (16)
    6:4,5,15,22;9:18;
    12:7;27:12,15,18;
    28:14;29:6;81:1,20,21;
    82:1;93:7
several (3)

10:4;66:15;100:20
sexes (1)
    72:19
shallowness (1)
    75:19
shape (5)
    8:6,10;42:22;75:19,
    23
shaping (1)
    85:2
share (1)
    95:5
shared (1)
    67:10
sheet (5)
    8:19;10:16;15:5;
    16:22,22
shield (2)
    10:2,9
shop (2)
    53:20,21
shortly (1)
    17:8
shove (2)
    103:5,6
show (7)
    17:7;18:13;20:2,9,
    22;21:22;67:1
showing (1)
    42:7
shown (3)
    5:22;9:25;11:2
shows (2)
    10:3;20:1
shut (1)
    95:4
side (41)
    7:14;8:11,11,23;
    15:9;17:12;19:25;20:1,
    5;24:6,21;25:20;26:4;
    27:3,7;28:10,10,25;
    29:13,19,21;40:24;
    48:22,22;49:21;60:5;
    64:24,25;80:21,21,21,
    22;81:24,24;83:2;91:3,
    4,5,8;97:22;104:6
sides (3)
    20:13;23:24;24:5
sidewalk (3)
    77:10;81:8;85:24
siding (6)
    16:13,14;20:7;33:4,
    13;57:11
SIEK (1)
    110:7
sight (1)
    69:22
sign (20)
    10:10,12,17,18,19,
    20,22,24;11:24;21:9,
    11,12,14,20;22:2,10,
    16,17,18,25
signage (2)

21:25;22:6
signs (2)
    28:25;29:5
Sills (1)
    3:13
similar (2)
    21:13;98:13
single (2)
    50:23,24
sister (1)
    96:3
sit (2)
    36:23;94:18
site (82)
    3:18,22;4:22;5:15;
    6:16;8:4,11;9:11,14;
    10:5;11:1,3,4;23:1,9;
    27:25;29:1;37:4,6,21;
    38:1,3,7,7,8,10,17,18,
    20;39:2;40:4;42:12,14,
    18,21,24,25;43:1,3,4,
    22;44:10,13;45:1,14,
    14;50:21;51:13;52:5;
    54:13,14;73:7;75:8,22;
    76:5;77:7,8,14,23;79:1,
    5,24;80:5,7;81:9,12;
    82:4;83:15;84:2,23;
    85:6,25;86:3,5;87:10,
    16,18,18;97:17;
    106:22;107:14,15
sites (6)
    40:17;52:24;79:20;
    84:13;101:5,8
situation (4)
    40:7,8;69:21;82:4
six (37)
    7:12;8:21;10:6;
    14:15;15:6,6;16:7;
    17:18;19:13,13;20:18;
    23:7;26:12,14,16,19;
    27:4;28:15;29:11,21;
    32:1,16;43:13;47:13;
    53:8;55:1;66:1;70:5;
    77:7,11;80:25;81:2,14;
    82:1;93:6;101:5,7
size (5)
    15:23;72:20,20;
    73:23;79:22
sizes (1)
    41:2
skip (1)
    10:10
slam (2)
    57:2,2
slapped (1)
    103:21
slats (1)
    9:4
slight (1)
    16:24
slightly (3)
    30:21;45:22;76:6
slope (1)

8:10
small (1)
    102:10
smaller (3)
    5:24;10:16;37:15
snow (3)
    29:17,17,22
soffit (2)
    9:18,21
softball (2)
    57:22;58:1
soften (1)
    7:1
solid (1)
    9:4
somebody (6)
    52:18;53:11;58:16;
    66:17;91:16;93:18
somehow (1)
    53:19
someone (2)
    34:6;48:14
Sometimes (1)
    57:3
Sore (4)
    57:15,16,17,18
sorry (13)
    17:18;18:7;27:8;
    28:1;39:14;40:13;
    41:17;51:10;61:22;
    71:10;76:23;83:7;
    96:16
sort (9)
    8:9;9:17;19:21;78:4;
    97:11
sound (1)
    51:12
south (5)
    26:4;27:3;65:17;
    75:10;100:21
southerly (3)
    6:9;7:11;29:21
space (14)
    23:5;25:19;26:18;
    37:9;52:7;55:20;56:6;
    62:4,5;82:22;84:8,14;
    86:8;87:9
spaces (3)
    6:3,6;15:9
speak (5)
    5:9;51:9;52:2;88:13;
    95:17
specific (2)
    52:11;94:2
spell (2)
    13:7;35:24
sport (1)
    57:21
square (5)
    15:18,19;17:5;
    103:17;107:9
stage (2)
    106:7,7

BER-L-001670-18    08/30/2018 7:37:18 PM  Pg 45 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 46 of 49
PageID: 1089

In RE: Morningside at Wallington                                    Transcript of Proceedings

**stalls (1)**
15:24
**stand (1)**
21:14;22:13
**standards (3)**
37:24;92:21;108:25
**stands (1)**
37:25
**start (4)**
14:15;33:2;64:22;
83:6
**started (2)**
74:11;81:10
**starts (1)**
35:4
**state (13)**
13:6,22,24;14:1;
35:20;36:6,9,12;57:23;
84:14;94:4,15;104:3
**state-of-the-art (1)**
57:25
**Station (2)**
101:6,19
**Statistically (1)**
66:21
**stay (4)**
32:22;40:9;96:7;
98:2
**staying (1)**
55:15
**stays (1)**
33:25
**step (3)**
46:1;89:20;94:12
**still (10)**
5:3;32:15,19;45:18;
46:6;53:24;82:10;
89:23;102:20;108:24
**stilts (1)**
108:7
**stone (5)**
19:5;20:8;33:20;
52:24;104:5
**stop (2)**
7:19;28:22
**storage (2)**
17:6,10
**storefront (1)**
43:20
**stories (4)**
33:21;68:11;101:6,7
**story (2)**
47:11;76:2
**Straight (1)**
44:25
**street (24)**
3:24;8:11;10:4;
18:25;19:1,4,4;30:14,
19;31:9,21;32:6,8;
37:6,10;43:12,17,21;
47:19;58:3;90:6,8;
107:23,24
**strip (2)**

7:1;27:17
**striped (2)**
6:23;43:1
**structurally (1)**
51:12
**structure (1)**
32:6
**structures (4)**
18:20;37:7;45:23;
46:11
**stucco (3)**
22:12;33:13,14,25
**studies (4)**
63:5,11,12;90:13;
92:23;95:6,10,18
**studio (2)**
43:17,23
**study (9)**
62:23,23;63:1,4;
92:5,8,20,21,25
**stuff (1)**
24:2
**style (1)**
16:7
**subject (12)**
32:23;42:12,25;48:9;
53:14;54:13;57:15,16,
17,18;79:5;105:5
**submitted (7)**
14:20,22;15:1;74:15,
20,22;79:7
**substantial (2)**
22:11;80:1
**substantially (5)**
41:14;67:10,17;75:4;
82:2
**substantiate (1)**
95:8
**sudden (3)**
33:2;53:9;71:3
**sued (3)**
99:24;100:23;102:2
**sufficient (2)**
84:8;87:16
**suggest (4)**
88:10;110:24;111:8,
10
**suggested (5)**
9:5;51:19;73:1;
75:10;101:5
**suggesting (3)**
55:13;74:11;76:15
**suggestion (1)**
88:6
**suggests (2)**
74:8;75:6
**suit (5)**
53:14;54:1,2,4;
105:18
**sum (1)**
12:15
**supplanted (1)**
100:7

**supplemental (1)**
12:19
**supply (2)**
78:13;85:13
**support (1)**
79:22
**supported (1)**
71:3
**supposed (2)**
100:22;108:16
**sure (30)**
3:10;14:14;16:5;
23:8;32:24;33:6,24;
36:4,23;37:1,14;38:6;
39:1;42:7;59:14;61:14;
64:13;75:13;77:23;
81:15;85:10;86:25;
92:22;104:18;105:7,
12,20,23;106:2;110:17
**surrounding (5)**
16:9;41:20,22;42:11;
86:14
**sworn (6)**
4:25;13:4;35:17,18;
90:3;94:13
**system (5)**
90:23;96:13;97:24;
102:10;107:19
**systems (2)**
96:14;97:25

**T**

**talk (8)**
22:22;23:10,10;
39:18;71:17;76:7,10,
17
**talked (2)**
30:3;73:5
**talking (26)**
24:19;26:5,11,13;
28:2;31:6,6;33:10,11;
39:17;51:7;52:25;
59:15;60:8,9;62:10;
63:17;65:22;66:14;
82:16;90:10;91:3;
92:16;94:8;98:18;99:5
**talks (1)**
72:1
**taller (1)**
18:21
**tax (2)**
72:4,6
**taxes (3)**
102:15,19;107:18
**tears (1)**
78:6
**technical (6)**
23:10;62:4,7;74:5;
81:23;103:2
**technically (5)**
40:10;45:17;75:16;
81:17;95:15

**techniques (2)**
78:2;84:20
**Technology (1)**
13:17
**tells (2)**
102:17;108:15
**tenant (2)**
17:6,9
**tend (2)**
32:12;96:8
**term (1)**
69:18
**terms (2)**
95:8;99:7
**testified (9)**
13:5,25;30:10;35:19;
60:4;90:4;94:14;99:10;
109:19
**testifying (1)**
28:5
**testimony (24)**
4:16,19;12:19;35:5;
36:22,24;37:3;41:11;
42:24;50:18;51:1;
59:14;61:4,13;69:11;
71:12,17;77:20;87:20,
25;88:11;89:8,10;93:1
**thereon (1)**
75:21
**thinking (2)**
64:1,14
**third (2)**
102:16,19
**thorough (1)**
109:2
**though (3)**
48:2;70:8;95:15
**thought (10)**
11:11;20:1;29:2,14;
30:8;32:13;51:14,20;
59:24;111:3
**thousand (1)**
103:12
**three (37)**
6:2;10:8,17;17:15,
15,16,19,19,24;18:1,1,
4,11;24:23;54:14;
64:19;65:9;66:4,4,6,9,
9,15;67:2,12;70:4,7,11;
71:2;81:4;97:1;99:15,
15;100:18;102:24;
105:22;108:3
**three-and-an-eighth (1)**
19:14
**three-quarters (1)**
24:24
**throat (1)**
103:7
**throats (1)**
103:6
**throughout (7)**
11:3;63:5,6;64:9,10;
84:22;93:13

**throwing (1)**
7:17
**tied (3)**
106:10,19,25
**tight (1)**
70:17
**tile (1)**
33:25
**till (3)**
34:14;89:10;111:19
**times (1)**
92:14
**today (5)**
22:7;37:25;47:11;
88:17;99:4
**Together (7)**
12:13;52:2;75:9;
76:13;79:21;103:21;
106:8
**told (5)**
12:12;80:11;100:4,
13;106:3
**TOMKO (17)**
24:9,12,15,18,25;
25:18;26:18;34:5,11,
14;65:17;69:16;70:10,
21;71:5,10,15
**Tomko's (1)**
53:1
**tonight (4)**
61:19;69:11;74:11;
109:14
**top (6)**
16:15;20:7;21:24;
98:10;99:8;104:18
**topography (1)**
75:20
**total (9)**
18:5,11;50:21;55:2,
3,15;66:5;99:2,3
**totally (2)**
30:23;106:19
**touch (1)**
21:1
**towards (1)**
68:24
**towers (1)**
68:10
**town (37)**
51:20;52:6;54:7;
56:6;57:1,12,18,19;
61:9;94:4;96:20;97:1;
98:3;99:24,24;100:4,6,
13;102:2,12,12,13,14,
14,15,19,21;103:4,8;
104:2,2,13;105:1;
106:20;107:21,25;
108:15
**towns (1)**
33:1;65:5,17;92:1;
95:22;100:20;106:18
**town's (1)**
107:1

In RE: Morningside at Wallington

Transcript of Proceedings

**township (3)**
38:20;56:19;72:6
**toy (1)**
108:2
**track (1)**
53:13
**tract (2)**
54:5,23
**tractor (5)**
11:3,8;107:12,13,15
**tracts (1)**
48:22
**traditional (4)**
16:7,10;21:14,24
**traffic (13)**
4:17;6:12,12;7:20;
22:1;25:24;26:1,9,20,
20;28:13,25;29:3
**trailer (4)**
11:4,8;107:13,15
**trailers (1)**
107:12
**training (1)**
58:1
**transcript (1)**
47:4
**trash (3)**
8:9,25;9:1
**treated (3)**
17:7,8,10
**tree (2)**
10:5,7
**trees (3)**
10:4,8;20:16
**tried (1)**
92:24
**truck (14)**
8:25;10:25,25;11:3,
4,7,8,8;24:10,13;25:5,
7,11;26:16
**trucks (5)**
24:16;107:10,10,11;
110:13
**true (5)**
49:14;50:25;56:18;
93:14;94:3
**truly (1)**
103:24
**trunk (1)**
10:6
**trust (1)**
59:14
**truth (1)**
102:21
**try (4)**
89:5;92:17;102:9;
103:3
**trying (26)**
38:1,5,12,16,17,21,
23;39:1;40:20;47:21,
21;53:7;70:25;79:4;
80:6;81:5,6,8,13,15;
84:22;85:11;98:11;

103:5,6;106:6
**turn (1)**
108:17
**turned (1)**
7:25
**two (86)**
3:15,25;4:4;5:21,21;
6:11;10:17;11:6;12:12;
15:17,18,21;17:11,15,
17;21:23;22:16;23:19,
24;24:5,14;25:24;26:1,
9,19,23;28:13,17;29:3;
30:1;33:21;34:19,21;
37:7;38:25;39:5;40:17;
45:17,23;46:3;48:5,19,
22;58:10;62:8;64:17,
19;66:1,4,6,7,8,14;
67:2;70:15;73:18;74:9,
12;75:2,9,12,13,15;
79:16,20;80:17,19,24;
81:1;90:19;91:23,24;
94:3;95:18;96:17;
97:20;98:15;99:14,23;
100:12,18;102:1;
104:12;107:2;109:24;
110:11
**twofold (1)**
97:12
**type (6)**
9:8,15;10:5;31:16;
58:2;83:13
**types (1)**
33:17
**typically (1)**
40:6
**typing (1)**
88:7

**U**

**ulcers (1)**
70:22
**Umm-hum (1)**
54:11
**undecided (1)**
21:16
**under (11)**
5:4;17:12,13;68:14;
73:2;76:16;92:9;100:1,
22;102:5;103:15
**undercurrent (1)**
51:6
**underneath (6)**
8:3;15:24;17:1,2;
18:20;43:15
**understands (1)**
23:12
**understood (1)**
71:18
**unfortunately (4)**
22:3;79:2;86:21;
87:2
**uniform (1)**

75:8
**union (1)**
79:1
**unique (5)**
38:25;39:5;40:6;
42:21;82:3
**unit (12)**
3:18,23;8:20;15:15;
17:14;54:9;55:8,9;
63:8;93:8,19,23
**units (47)**
15:21,21;17:3;43:5;
54:20,22,24;55:8,15,
17,19,25;56:3,4,8,9,10;
60:5,15,16;63:16,19;
65:12;70:7,12;72:15;
73:14,15,16,18;90:22;
93:18;94:1,4,5;95:12;
97:16;98:18,19;
101:10,11,17,21;102:8;
103:11,21;108:6
**University (2)**
36:6,7
**unless (1)**
52:18
**up (52)**
6:8;7:3;8:25;9:1;
10:11,15;15:14;16:14,
16,18;17:14;18:12;
19:3;20:24;21:24;23:9;
25:11;27:2;28:23;
29:11;31:21;36:10;
37:24;40:9;44:10;45:7;
46:2;53:20;61:15;
62:21;68:1;76:2;80:14;
88:11,25;89:12,16,18;
91:4;97:2;99:19;
102:12;104:10;107:2,
10,13;108:6;109:6;
110:22;111:11,11,14
**updated (1)**
12:5
**upon (13)**
30:25;42:11,17;51:1;
74:6,21;75:18,18,22;
78:4;83:24;85:15;
92:23
**upper (4)**
15:16;16:25;19:3;
65:20
**upwards (3)**
96:16,16,18
**urban (3)**
23:14;31:10;32:6
**usage (1)**
60:17
**use (34)**
9:12;13:19;29:11;
34:23;42:11;43:8,10;
52:11;58:11,12,13;
59:17;60:6;69:18;76:7,
19,21,24;77:15;78:18,
19;79:12;83:19,20;

85:4,16;86:19;91:5,7,
8;94:19;106:9;108:7,
23
**used (8)**
9:8;10:21;53:20;
107:17,20;108:2,14,16
**useless (1)**
108:9
**uses (8)**
41:20,22;43:22,23;
73:22,23;84:9;108:25
**using (3)**
5:13;16:19;22:3
**usually (4)**
9:7;64:17,19;96:5
**utility (1)**
17:5
**utilize (1)**
43:23
**utmost (1)**
97:25

**V**

**vacant (1)**
108:3
**valid (2)**
88:14;102:5
**valuable (4)**
51:13,16;84:14;
89:18
**variance (41)**
7:13,15;12:6,8;19:7;
30:7,9;31:1;42:23;
44:16;45:11,16,18;
47:8;49:8,12,13;52:16;
55:22;62:5,7,12,15;
69:11;75:4,17;76:6,16,
19;78:21;79:10;80:10,
17;81:3,3,5,13,23,25;
82:16;86:10
**variances (38)**
3:22;31:11;38:4,11,
22;39:8,20,22;40:3,10,
15;44:9;46:5,6;49:19;
50:8,14;55:24;62:3,9;
75:15;78:20;79:3;80:5,
18,24;81:17,20;82:1,
24;83:18;84:17,21;
85:18;86:22;87:3,23;
108:23
**variety (6)**
33:17;72:7,20;78:22;
84:8;87:14
**various (2)**
72:8;85:1
**vehicle (4)**
23:25;39:2;84:24;
85:21
**vehicular (2)**
23:13;24:7
**Ventura (4)**
6:9;19:25;26:4;27:7

85:4,16;86:19;91:5,7,
23
**versus (2)**
62:14,20
**Victor (1)**
51:4
**view (2)**
20:10,12
**village (5)**
31:7,8,16;65:10;
95:19
**violating (3)**
60:19,19;74:6
**Violation (1)**
91:12
**violet (1)**
41:25
**visible (1)**
22:2
**vision (1)**
106:7
**visual (3)**
78:1,11;84:19
**voice (2)**
88:13;89:22
**vote (1)**
101:22
**voted (1)**
101:22
**voting (1)**
88:17

**W**

**waiting (1)**
34:6
**walk (3)**
17:13;57:1;67:14
**walkers (2)**
67:22;68:1
**walking (1)**
47:19
**walkway (1)**
82:20
**walkways (1)**
84:22
**wall (1)**
25:14
**Wallington (52)**
3:2,2,14,14,17,21;
4:16,18,20,23;9:11,14;
10:10,12,17;11:2,24;
14:12;16:10;21:17,20;
22:14,14,18;36:10;
42:14;45:20,20;46:1;
48:19,20,23;57:3;
58:12,13,16;90:8,13,
22;91:5,7,21,25;92:4,6,
25;93:10;100:16,19;
101:10,16;105:20
**Wallington's (1)**
72:3
**walls (3)**
8:15,18,18
**wants (2)**

BER-L-001670-18  08/30/2018 7:37:18 PM  Pg 47 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-14    Filed 02/26/26    Page 48 of 49
PageID: 1091

In RE: Morningside at Wallington                              Transcript of Proceedings

46:3;64:25
**warehouse (6)**
  20:14;37:12;107:9,9,
  11;108:4
**warrant (2)**
  39:5,6
**Washington (2)**
  67:19;68:11
**Wasko (1)**
  13:18
**water (6)**
  34:24;67:20;68:14;
  88:22;103:10,16
**waterfront (1)**
  67:20
**way (39)**
  6:11,12,13,13,16;
  19:9;24:22,23;25:24;
  26:1,3,9,20,20,23;27:6,
  11;28:13,17,20,23;
  29:1,2,3,4;48:13;49:8,
  10,11,20;50:21;59:8,9,
  11;60:1;88:25;94:25;
  104:1;107:20
**weigh (1)**
  40:12
**weighing (1)**
  79:10
**Welcome (9)**
  10:10,12,16,20;
  11:24;21:17,20;22:14;
  34:24
**welfare (2)**
  77:1;83:23
**well-being (1)**
  77:18
**west (4)**
  8:23;28:10;42:13,15
**Westmount (3)**
  57:9;101:6,19
**what's (13)**
  5:22;24:19;25:8;
  28:22;41:25;42:8;53:4;
  58:11;69:22;83:7;
  103:3;104:12;110:5
**wheelchairs (1)**
  68:1
**whole (10)**
  33:5;47:10;53:13;
  57:11;60:6;75:11;
  81:12;85:25;90:24;
  108:1
**wide (5)**
  6:18,19,25;10:17;
  27:7
**widening (1)**
  110:13
**wider (1)**
  35:6
**width (1)**
  25:8
**window (3)**
  16:17,18

**windows (2)**
  17:10;28:7
**wise (3)**
  38:8,9;39:2
**wishes (1)**
  109:14
**wishing (2)**
  94:11;109:5
**within (13)**
  4:6;23:16,19;32:1,
  16,17;37:18;43:24;
  54:19;72:6;92:25;
  93:15;103:12
**without (2)**
  15:15;84:2
**witness (7)**
  13:3;14:9;34:10,12,
  19;36:18;61:18
**witnesses (3)**
  30:1;43:2;109:20
**wives (3)**
  60:23;61:1,2
**woman (1)**
  88:7
**wood (1)**
  9:6
**Woodbridge (1)**
  100:19
**work (12)**
  22:15;40:4;45:3;
  59:3;80:7;81:12;85:25;
  96:2;110:16,25;111:4,
  5
**worked (5)**
  22:7;54:4,7;68:12;
  101:4
**working (5)**
  3:4;5:9;36:8;53:3,11
**works (9)**
  39:3,4;56:12;60:1;
  75:13;77:23;91:18,20;
  95:1
**worried (2)**
  29:16;69:25
**worries (1)**
  61:25
**worst (1)**
  70:4
**write (1)**
  22:14
**written (2)**
  19:9;23:15
**wrong (7)**
  25:15;59:15;102:6;
  105:20,23;106:2;
  107:25
**wrote (1)**
  11:15
**WYGONIK (11)**
  42:8;63:15,19,25;
  64:5,12,17;66:7;69:5,
  9;99:2

**Y**

**ya (1)**
  31:14
**yard (14)**
  40:24,25;41:10,11;
  42:23;44:17;45:11;
  73:4;74:4,24;75:6,17;
  81:3,11
**yards (1)**
  103:12
**year (4)**
  91:6;96:13,13,15
**year-and-a-half (1)**
  101:25
**years (23)**
  9:12;13:18,20;48:5;
  53:8;71:2;73:8;86:17;
  93:15;96:17;99:23;
  100:4;101:1;102:1,2;
  104:1,3,4,8;105:18;
  107:8;108:1,3
**Yoga (5)**
  17:4;43:17,23;60:9;
  77:12
**young (1)**
  96:6
**younger (1)**
  53:25
**Yup (1)**
  22:20

**Z**

**zero (3)**
  74:9,25;75:6
**zone (12)**
  43:4;54:7,20;73:1,6,
  13,20;75:5,6;80:2;
  82:3;108:9
**zoned (3)**
  43:4;107:8,20
**zones (5)**
  107:2,2,3,3,4
**zoning (31)**
  12:5;14:1,4;38:10;
  40:5;50:9,22;60:1;
  71:20;73:12,25;74:2,8,
  24;82:8,8,15;83:3,5,12,
  17;84:6;87:12;97:12,
  14;100:15,25;106:24;
  107:5,6;108:14

**0**

**07 (2)**
  63:8;93:8
**09 (1)**
  67:1

**1**

**1,170 (1)**
  15:19
**1,225 (1)**
  15:19
**1,800 (1)**
  103:17
**10 (8)**
  22:24;92:14,24;
  93:14,15;99:23;101:1;
  105:18
**10:40 (1)**
  112:1
**100 (7)**
  50:25;53:13;71:4;
  104:14,20;105:1,1
**11 (5)**
  63:14,22;64:2;66:22;
  73:8
**11.7 (1)**
  63:3
**110 (1)**
  104:21
**115 (1)**
  104:22
**118 (1)**
  104:23
**120 (1)**
  104:23
**13 (8)**
  38:18;63:20,21;64:3;
  90:10,24;92:4,9
**13.8 (2)**
  63:1;67:3
**134 (1)**
  3:18
**14 (2)**
  18:22;25:12
**15 (8)**
  15:20,21;17:14,17;
  43:5;66:1;73:17;104:8
**15th (2)**
  110:8;111:25
**16 (2)**
  25:12,12
**16th (3)**
  4:1,14;43:9
**18 (5)**
  6:19;15:25;25:23;
  26:3;27:7
**1999 (1)**
  36:9

**2**

**2 (2)**
  22:25,25
**2.5 (2)**
  11:9,14
**2.8 (5)**
  11:5,15,15,19,23
**20 (24)**
  6:18;13:18,20;23:25;
  43:6;54:9,9,19,22;

55:15;56:3,8,9,10;
73:14,15,17;80:21;
92:9;101:10,14,16,21;
107:10
**200 (3)**
  4:6;12:13;98:23
**2006 (3)**
  71:22;72:1,22
**2008 (4)**
  53:18;71:23;72:25;
  106:21
**200-something (1)**
  63:16
**2013 (2)**
  71:23;73:4
**207 (5)**
  73:17;98:24,25;99:2,
  3
**208 (3)**
  73:16;90:22;98:19
**22 (9)**
  17:15,23;27:1,24;
  29:7,11;35:7;74:7,25
**23 (6)**
  17:21,25;18:4,4,9,10
**24 (10)**
  6:18;16:1;25:10,15,
  22,23;26:3,25;29:11;
  35:7
**25 (6)**
  17:14,16,22,23;
  68:21;74:7
**26 (2)**
  18:5,11
**28 (1)**
  96:18

**3**

**3 (1)**
  78:25
**3,500 (1)**
  17:5
**3.5 (1)**
  11:24
**3.65 (3)**
  37:6;54:17,19
**3.650 (1)**
  54:18
**30 (13)**
  54:25;66:6,6,7,8,16,
  16,18,22;67:2;96:17;
  99:14;106:24
**30-year-olds (1)**
  68:22
**33 (1)**
  99:12
**35 (3)**
  66:17;100:4;104:1
**35.01 (3)**
  3:20;37:5;74:10
**35.02 (5)**
  3:16;38:18;44:3;

In RE: Morningside at Wallington

Transcript of Proceedings

74:10;78:25
**365-25 (2)**
73:25;80:20
**365-25g2 (1)**
80:22

### 4

**4 (2)**
22:24;65:19
**40 (7)**
56:4;66:5;80:23;
99:12,14;101:11,14
**41 (1)**
99:9
**43 (1)**
55:4
**45 (1)**
68:18
**47 (1)**
68:11
**48 (1)**
19:7
**49 (1)**
19:13

### 5

**5,000 (1)**
107:9
**50 (3)**
68:18;103:15;107:8
**500 (1)**
90:22
**551 (2)**
3:24;37:5

### 6

**60 (4)**
16:12;54:24;67:25;
107:8
**648 (1)**
35:22
**66 (1)**
94:21

### 7

**70 (3)**
16:12;101:14,15
**700 (2)**
98:7,12
**71 (3)**
3:16,20;37:5
**73 (20)**
3:22;43:5;55:2,3,17,
25;56:16;60:15,16,20,
21;61:2;63:18,19;64:1,
17,19;98:18;99:5;
104:14
**74 (1)**
99:1

**750 (1)**
15:18
**7th (1)**
4:8

### 8

**80 (1)**
13:9
**800 (1)**
15:18
**8-15 (1)**
110:7
**850 (1)**
98:13

### 9

**9 (1)**
15:25
**90 (1)**
90:7