# EXHIBIT L

# In The Matter Of:

*In RE: Wallington*

---

*Transcript fo Proceedings*

*September 19, 2017*

---



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ  07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

## Page 1

```
 1              TOWNSHIP OF WALLINGTON
 2                 PLANNING BOARD
 3  X-------------------------------X
 4  In the matter of:
                                    TRANSCRIPT
 5  MORNINGSIDE AT WALLINGTON, LLC       OF
    551 Main Avenue                 PROCEEDINGS
 6  Block 71, Lot 35.01
                 -AND-
 7  NEW WALLINGTON HOME, LLC
    551 Main Avenue
 8  Block 71, Lot 35.02
    X-------------------------------X
 9
                    Tuesday, September 19, 2017
10                  54 Union Boulevard
                    Wallington, New Jersey 07057
11                  Commencing at 7:47 p.m.
12
    BOARD MEMBERS PRESENT:
13
    STANLEY BAGINSKI, Chairman
14  NICK MELFI
    DARIUSZ PAWLUCZUK
15  TOMASZ BAZEL
    KATHY POLTEN
16  THERESA WYGONIK
    EUGENE RACHELSKI
17  ROBERT KASPEREK
    MARK TOMKO, Mayor
18
19  EVAN JACOBS, PP, Board Planner
20  DOROTHY SIEK, Board Secretary
21  A P P E A R A N C E S :
22  MARTIN S. CEDZIDLO, ESQUIRE
    Attorney for the board
23
    SILLS, CUMMIS & GROSS, P.A.
24  BY:  KEVIN J. MOORE, ESQUIRE
         VICTOR J. HERLINSKY, JUNIOR, ESQUIRE
25  Attorneys for the applicant
```

## Page 2

```
 1
 2
 3
 4              I N D E X
 5
 6
 7  WITNESS                    EXAMINATION
 8  CALISTO BERTIN                  5
    BRIGETTE BOGART                 7
 9  JACK RAKER                     42
10
11
12
13
14
15       EXHIBITS MARKED FOR IDENTIFICATION
16
    NUMBER        DESCRIPTION          PAGE NO
17
    A-9           Proposed parking        5
18                restrictions
19  A-10          Conditional County approval  57
                  dated 9/13/17
20
21
22
23
24
25
```

## Page 3

1     MR. BAGINSKI: Moving on to the old
2 business before the board, that will be the site
3 plan for Morningside at Wallington, LLC and from
4 New Wallington Home, LLC.
5     MR. MOORE: It doesn't work.  I'm
6 loud, I'm loud.
7     MR. BAGINSKI: I think we'll be able
8 to hear you.
9     MR. MOORE: Yup.  Good evening,
10 Mr. Chairman, members of the board.
11 Just for the record, my name is Kevin Moore.
12 I'm with the firm of Sills, Cummis and Gross
13 representing New Wallington Home, LLC and
14 Morningside at Wallington Home, LLC on two related
15 applications.
16 Just to refresh the board's memory, the
17 application for Block 71, Lot 35.02, the New
18 Wallington Home, LLC project, is for amended
19 preliminary and final site plan approval for an
20 approved 134-unit multifamily project, and the
21 applicant -- application for adjacent -- adjacent
22 Block 71, Lot 35.01, the Morningside at Wallington
23 Home, LLC project, is for preliminary and final
24 site plan approval and C bulk variances for a
25 73-unit multifamily project.  Both properties have

## Page 4

1 a street address of 551 Main Avenue here in
2 Wallington.
3 The hearings this evening on the two related
4 applications are continued from the board's July
5 18th hearing.  Due to the cancellation of the
6 August 15th meeting, we re-noticed for this hearing
7 so I'd request the board just acknowledge the
8 re-notice and -- and jurisdiction.
9     MR. CEDZIDLO: Yes.
10     MR. MOORE: Thank you.
11     MR. CEDZIDLO: And I -- I -- I spoke
12 with your office earlier on time. --
13     MR. MOORE: Yes.  Before we -- when
14 -- when the July 18th hearing concluded, as you may
15 recall, we were in the middle of the direct
16 testimony of the applicant's planner for the
17 Morningside at Wallington Home project.
18 Before we continue our planner's testimony on
19 the Morningside at Wallington Home project,
20 however, I would like to briefly recall
21 Mr. Calisto Bertin, the applicant's engineer, to
22 discuss the changes made to the filings for the
23 project that were a concern to the board.
24 Mr. Bertin has been previously sworn and previously
25 qualified.

Page 5

1    MR. BAGINSKI: Correct.
2    MR. BERTIN: Thank you.
3    MR. MOORE: And the exhibits that
4  Mr. Bertin will be speaking from is Exhibit A- --
5  will be Exhibit A-9 which he is marking, and if
6  it's helpful -- Adam, do you have them?
7    MR. FAIELLA: Yes.
8    MR. MOORE: -- these are also A-9 we
9  can hand out for the board so they can follow along
10  11 by 17's of what Mr. Bertin is testifying from on
11  the -- on the -- on the easel.  Mr. Bertin?
12    MR. BERTIN: Thank you.
13    (Whereupon A-9, Proposed parking
14  restrictions, is marked for identification.)
15    MR. BAGINSKI: Just real quick, if
16  anybody does have a cell phone on if you can just
17  turn them off.  Thank you.
18    MR. MOORE: Gee, I wonder if someone
19  has a cell phone on.  Okay.
20    MR. BERTIN: Great.  We -- we just
21  prepared an exhibit rather than submitting new
22  plans because this change is minor to show proposed
23  parking restrictions.
24  There was concern about fire lanes and so
25  forth.  So we -- we have two colors here.  The pink

Page 6

1  color is -- we put, "No Parking, Fire Lane," that
2  would be all the curb lines against the buildings.
3  Then we had another in yellow.  It's shown
4  "No Parking Any Time" would be the remainder of the
5  curbs and we could modify that, this is just what
6  we wanted to put in.
7    MR. BAGINSKI: Okay.
8    MR. BERTIN: But anyway, so this way
9  -- because we -- we had previously shown you the --
10  the fire truck routes and the delivery truck
11  routes.
12    MR. MOORE: Is there any questions
13  for Mr. Bertin?
14    MR. MELFI: I have a question.
15  Has -- has this been submitted to the fire official
16  or the fire chief in regards to the fire lane
17  markings of where they would want to mark, and do
18  we have a report or did we ever get a report or did
19  you ever get a report from either the fire chief or
20  the fire official stating where they would like to
21  have the yellow striping and their --
22    MR. MOORE: Yeah, we -- we did not,
23  but we would certainly if the board found it
24  suitable to grant us an approval accept any
25  approval of that as a condition.

Page 7

1    MR. MELFI: Okay, because I think
2  that's important --
3    MR. MOORE: That would be fine.
4    MR. MELFI: -- just to have it.
5    MR. MOORE: We would accept approval
6  from the -- the fire department as a condition of
7  any approval the board sought to -- to grant.
8  Any further questions for Mr. Bertin?
9    MR. BAGINSKI: Board members?  Any
10  board members have any kind of questions for him?
11    MS. POLTEN: Not at this time.
12    MR. BAGINSKI: Not at this time,
13  okay.  Thank you.
14    MR. MOORE: All right, thank you.
15  Then I'd like to recall Miss Bogart who is also
16  previously sworn and qualified.  She's our planner
17  and we broke off in the middle of her testimony --
18    MR. BAGINSKI: That is correct.
19    MR. MOORE: -- last month.
20    MR. BAGINSKI: Okay.  Good evening.
21    MS. BOGART: Good evening.  How are
22  you?
23    MR. BAGINSKI: All right.
24    MS. BOGART: We're missing our
25  table --

Page 8

1    MR. BAGINSKI: Okay.  So --
2    MS. BOGART: -- and a chair.
3    MR. BAGINSKI: Chair's are -- you got
4  one there?
5    A VOICE: There is one back there.
6    MS. BOGART: I don't mind standing,
7  that's fine.
8    A VOICE: We do have one for you.
9  There you go.
10    MR. MOORE: That's a heavy chair.
11  It's not heavy, it's my chair.
12  And, Ms. Bogart, you had concluded your
13  testimony at the last meeting with the variance
14  from 3 -- Section 365-25G1 and 2 which dealt with
15  the separation of buildings.  So I guess now you
16  would start with your testimony regarding building
17  height.
18    MS. BOGART: Sure.  As I don't know
19  if this board recalls or not because it was kind of
20  a lengthy evening, I did go through all the -- a
21  number of variances that we are requesting, and
22  most of them are due to the fact that we are
23  combining two lots and keeping an existing building
24  on-site, two unique conditions which create the
25  need for rear yard variances and coverage

Page 9

1 variances, mostly because we have to accommodate
2 that existing building and make the most
3 appropriate circulation patterns as designed by the
4 engineer.
5 I did go through, as I mentioned, a number of
6 variances, and I probably have about four or five
7 more to address.
8    MR. MOORE: Ms. Bogart, just to
9 clarify it for the record, you didn't mean we're
10 combining the two lots that are the subject of this
11 application, right, because they're two separate
12 lots?
13    MS. BOGART: No, what I actually
14 meant was that because we have two lots the
15 variances' condition -- the variance conditions for
16 the setbacks have been created because we
17 technically have lot lines even though it's being
18 developed as one site.
19    MR. MOORE: Thank you.
20    MS. BOGART: So the next variances I
21 had indicated is -- or as the attorney had
22 indicated was to address maximum building height.
23 Right now we're permitted four stories and 45
24 feet.  We are at 48.5 feet, and this is due to the
25 slope of not only the roofs, but also the actual

Page 10

1 topography of the site itself.
2
3 Variance is needed for the roof design, but
4 we're trying to keep it to match the surrounding
5 buildings in the New Wallington Homes project.  We
6 believe that this design for the roof slope is more
7 appropriate because it resembles the properties
8 surrounding it, and it was more consistent with the
9 surrounding area.
10 We can comply by re-modifying the roof design,
11 but we don't think that it's an appropriate
12 architectural design or would promote any desirable
13 visual environment compared to the surrounding
14 area.
15 I believe that by requesting this variance we
16 further a couple purposes of the Municipal Land Use
17 Law.  Purpose A, to guide municipal action for
18 appropriate use and development of all lands in a
19 manner that will promote the public health, safety,
20 and moreover, general welfare.  Again, this is
21 because I believe it matches the surrounding
22 development pattern.
23 And also Purpose I, to promote desirable
24 visual environment through creative development
25 techniques, and again, we could comply, but the

Page 11

1 reality is the sloped roof it matches the
2 surrounding development pattern and is more
3 appropriate architectural style -- styled for the
4 neighborhood.
5 The benefits of granting the build -- the
6 minor building height variances is that the size is
7 consistent with the surrounding development
8 patterns, the roof design is more attractive and
9 matches the surrounding properties.
10 I don't believe that there's really any
11 negative detriment to granting those variances
12 because it's for Building 6 which is located to the
13 rear of the site and it's minimized by its
14 location.
15 It provides ground-level parking which, as I
16 think I testified to at the last time, the need for
17 the extra height on the ground-level parking
18 creates -- also lends itself to this variance
19 situation.
20 Conforming with the zoning ordinance would
21 require a parapet which -- a parapet roof which I
22 think is inconsistent with the surrounding
23 development pattern.
24 So from a planning perspective being
25 consistent with the neighborhood is not only one of

Page 12

1 the major goals of the Municipal Land Use Law, but
2 zoning ordinances and planning goals in general.
3 So I think for all those reasons granting this
4 minor deviation in building height is more
5 appropriate than requiring this applicant --
6 applicant to comply with the building height
7 requirements.
8    MR. MOORE: And, Ms. Bogart, just for
9 some clarification, the -- for Building Number 6 I
10 guess the variance amount is 49.42 feet?
11    MS. BOGART: Yes.
12    MR. MOORE: And then 48.5 feet for --
13    MS. BOGART: Is for the building.
14    MR. MOORE: -- for the building
15 itself.
16    MS. BOGART: Yes.
17    MR. MOORE: And then do you think
18 this constitutes an improvement over the existing
19 zoning for the reasons that you just testified to
20 with respect to the architectural match and not
21 requiring the parapet?
22    MS. BOGART: Yes, I believe so.
23    MR. MOORE: Thank you.
24    MS. BOGART: The next variance talks
25 about the on-street parking is not permitted within

Page 13

1 50 feet of Main Avenue boundary, and 25-foot buffer
2 along Main Avenue has to be planted with grass and
3 shrubs.
4 Right now the applicant is proposing parking
5 within .04 feet of Main Avenue and obviously a
6 variance is needed.  Currently the existing parking
7 actually encroaches within the public right-of-way
8 so we're improving the situation.
9 So that alone is a benefit.  So not only we're
10 pulling back the parking and putting it onto our
11 property, but we're also creating a grass buffer
12 area along Main Avenue.  So there are a number of
13 benefits to that -- this proposal.
14 I believe that we further a couple purposes of the
15 Municipal Land Use Law.  Obviously, again, to
16 encourage municipal action to guide appropriate use
17 on developmentable [sic] lands.
18 Yes, we do need a variance, but this proposal
19 provides for safe circulation on-site allowing us
20 to maintain that existing building for recreational
21 purposes and also allowing for us to improve it
22 slightly and pull back the parking onto our
23 property.  So I believe for all those reasons we
24 further Purpose A.
25 I believe that this furthers Purpose G,

Page 14

1 provides sufficient space in an appropriate
2 location for a variety of uses.
3 As you heard from my testimony at the prior
4 hearing, we further a number of the goals of the
5 master plan.  We are consistent with your zoning
6 ordinance, we are doing what is contemplated by
7 your master plan and zoning ordinance for this
8 property, we are maintaining that existing
9 building, and in order to accomplish all this we do
10 need some minor deviations and that includes the
11 modification to this setback for the parking
12 because we are maintaining that building.
13 And as I mentioned to you, there are a number
14 of benefits for lessening this existing
15 nonconformity.  We're making more efficient use of
16 the existing layout, we're providing efficient
17 traffic layout, we're providing sufficient parking
18 for the residents at the same time, and the
19 proposed lawn area along Main Avenue is more
20 consistent with the surrounding development pattern
21 and an improvement upon existing conditions.
22 I don't believe that there's any negative
23 impact to this because we are improving the
24 existing conditions.
25 The engineers have testified to the safety of

Page 15

1 this area and this design and there are no issues.
2 They've testified that it is an improvement, and
3 this property has existed with the parking
4 encroaching upon the right-of-way since at least
5 2002 and there have been no issues, and so
6 improvement can only help the site and the
7 surrounding area.
8 So from all those perspectives I believe that
9 this board has a right to grant the variances for
10 that encroachment into the front yard setback.
11     MR. MOORE: And, Ms. Bogart, it was
12 also for Section 36 -- 365-25M3 for the 25-foot
13 buffer as well, right?
14     MS. BOGART: Yes.
15     MR. MOORE: Plus the surface parking.
16     MS. BOGART: It's --
17     MR. MOORE: Thank you.
18     MS. BOGART: Yes.  There are two
19 additional variances that I need to address.
20 One -- the last one will be for signage, but
21 this -- this last area in bulk regulation variance
22 is for building coverage and lot coverage.
23 Your ordinance permits 25 percent building
24 coverage and 75 percent lot coverage.  We are
25 proposing 30 percent building coverage so

Page 16

1 approximately 5 percent over and 83 percent lot
2 coverage, again, approximately 8 percent over.
3 This site increases due to the fact that we
4 need to accommodate that existing building.  We're
5 trying to provide for appropriate fire truck
6 circulation and fire and appropriate parking for
7 the site so that increases the coverage
8 requirements.
9 As you heard from my testimony at the prior
10 hearing two months ago, this density and this
11 proposal is basically complying with your master
12 plan goals and this density is permitted on-site.
13 We are providing sufficient parking and the
14 only deviations with regard to the coverage have to
15 do with the site design, and the site design is
16 laid out as such because of those unique conditions
17 that I had testified to with regard to
18 accommodating existing building and providing
19 appropriate circulation.
20 By granting these two coverage variances I
21 believe that we further Purpose A, again, municipal
22 -- to guide municipal action for appropriate use in
23 development of all lands, and this goes back to the
24 heart of the fact that your master plan and zoning
25 ordinance call for this type of development on this

1 site.
2 Purpose G, to provide for sufficient space and
3 appropriate locations for a variety of uses both
4 public and private and to meet the -- all the needs
5 of New Jersey citizens.
6 Again, this density is permitted. We're
7 providing affordable housing on-site which is an
8 important component to our application and a
9 substantial benefit to New Jersey citizens and also
10 goes to the heart of furthering the goals of your
11 master plan.
12 Purpose J, to promote the conservation of open
13 space and energy and prevent the degradation of the
14 environment through improper land uses.
15 We are maintaining those buffers around the
16 site and maintaining the environmentally
17 constrained land, and we are developing the site in
18 accordance with your zoning ordinance so I believe
19 that we further Purpose J.
20 Purpose M, encourage coordination of various
21 public and private procedures and activities
22 shaping land development in view of lessening the
23 cost of development and more efficient use of the
24 land, and this goes to the whole concept of
25 redeveloping the site and maintaining that existing

1 building while also doing what your master plan and
2 zoning ordinance calls for.
3 And lastly, Purpose O, to encourage
4 development of balanced housing supply, and this is
5 also identified in your master plan, and as I had
6 mentioned to you just previously, we are providing
7 affordable housing which is a need in the borough
8 and called out in your master plan documents.
9 There are a number of benefits to granting the
10 coverage variances. We're lessening the existing
11 nonconformities. We're reusing the existing
12 building, albeit in order to reuse it we have to
13 increase the -- the coverage slightly.
14 We're providing a family recreation facility
15 for residents, we're providing affordable housing
16 choices with appropriate parking as called out by
17 your ordinance and we are meeting your active
18 recreation requirements of 25 percent open space.
19 As you heard from our engineer, the proposed
20 storm water management and water quality controls
21 are adequate and provide additional improvements to
22 the site, and those are really only the negatives
23 that are associated with increasing the coverage
24 slightly, and in this case they've been taken care
25 of.

1 So for all those reasons I believe that
2 there's really no negatives to the coverage, and I
3 believe that the benefits outweigh any negatives
4 that could possibly be associated with it, and I
5 believe this board has a right to grant the
6 coverage variances as requested.
7     MR. MOORE: And would you also offer
8 the same benefits and reasons that you set forth,
9 Ms. Bogart, that it represents an improvement over
10 the existing zoning?
11     MS. BOGART: Yes. So the last
12 variance pertains, as I mentioned to you, the
13 monument sign. They're prohibited, but I think to
14 provide for --
15     MR. MOORE: We have the active
16 recreation.
17     MS. BOGART: We comply with that.
18     MR. MOORE: We comply now?
19     MS. BOGART: Yes.
20     MR. MOORE: Excellent.
21     MS. BOGART: So with regard to the
22 monument sign I think it's very important from a
23 planning perspective to create a sense of place and
24 provide for that monument sign which it not only
25 identifies the development, but also gives a nice

1 entrance and sort of creates a nice environment for
2 the residents that live there.
3 I believe that by granting this monument sign
4 we further Purpose I which promotes desirable
5 visual environment for the property.
6 It will identify the property not only for
7 emergency services purposes, but also for residents
8 and guests alike which actually increases traffic
9 safety and allows the visitors to identify it
10 quickly without having to make several U-turns
11 along the street.
12 The sign design as proposed today was revised
13 based upon board comments, and we believe that at
14 this point in time we have a design that is most
15 appropriate for the site and takes into
16 accommodate -- into consideration your comments.
17 I believe it's appropriate for the
18 neighborhood, and for all those perspectives I
19 think that the benefits of granting the sign
20 variance as requested outweigh any detriments.
21 There is a monument sign located across the
22 street so I don't think it's out of character with
23 the neighborhood, and I think overall it would
24 create an aesthetic benefit to the property.
25     MR. MOORE: And for that reason you

Page 21

1 think it's a better zoning alternative as well?
2 　　MS. BOGART: Yes, I do.
3 　　MR. MOORE: That concludes -- unless
4 I'm wrong, Ms. Bogart, that concludes Ms. Bogart's
5 direct testimony.
6 　　MS. BOGART: Yes.
7 　　MR. BAGINSKI: Now in regards to -- I
8 have a question for you in regards to the open
9 space versus active recreation area, and you say
10 you meet now the standard of what we're supposed
11 to?
12 　　MS. BOGART: The 25 percent, yes.
13 　　MR. BAGINSKI: And is the enclosed
14 building considered open space?
15 　　MS. BOGART: It's considered active
16 recreation.
17 　　MR. MELFI: It's not considered open
18 space.
19 　　MR. BAGINSKI: But it's not
20 considered open space?
21 　　MR. MOORE: No, we still need then --
22 we need and testified in support of the variance
23 for the open space, but it is active recreation so
24 we meet the active recreation requirement. It's
25 two separate provisions of the ordinance, two

Page 22

1 separate ordinance provisions.
2 　　MR. BAGINSKI: Okay.  So I just want
3 to clarify that so everybody's understanding the
4 difference between the two and what we have here.
5 　　MS. BOGART: The -- the zoning
6 ordinance does state that the open space can be in
7 the form of active recreation.
8 　　MR. BAGINSKI: Okay.
9 　　MR. MOORE: But out of an abundance
10 of caution we have requested that variance, but we
11 do believe we conform, but we -- you know, that's
12 up to the board for their interpretation, but we
13 did seek that variance notwithstanding that fact.
14 　　MR. BAGINSKI: Okay.  I just --
15 again, I just wanted clarification for the board
16 members this way if they do have any questions they
17 can ask them, and now's the time to ask Ms. Bogart
18 any questions that you or anyone might have as far
19 as the board members go right now.
20 　　MR. KASPEREK: I do have a question.
21 　　MR. BAGINSKI: Go on.
22 　　MR. KASPEREK: Can you please bring
23 the previous screen that you had with the -- you
24 know, with the lines, the red and the yellow,
25 please?

Page 23

1 　　MR. BAGINSKI: And is this question
2 for Ms. Bogart or Mr. Bertin?
3 　　MR. KASPEREK: I'm sorry, for
4 Mr. Bertin.
5 　　MR. BAGINSKI: Okay, go ahead.
6 　　MR. KASPEREK: The project itself
7 seems very congested to me.
8 On the one side on the top you have the
9 railroads, on the left-hand side you got a river.
10 You only have one entrance, right, for the -- for
11 the whole complex?
12 And then, you know, for the other variances
13 that we're hearing you're trying to, you know, fit
14 another building, and what happen is the -- in case
15 of emergency of any kind of fire trucks, police,
16 you know, any ambulances how the one entrance, one
17 exit going to fit all the -- you know, you -- did
18 you -- and also, Mr. Mayor, you're kind of an
19 expert on this.
20 　　MR. TOMKO: Well, we were -- we were
21 going over it the last -- the last meeting.
22 　　MR. KASPEREK: In the last meeting I
23 know, but only with one entrance, one exit, would
24 that be sufficient for --
25 　　MR. TOMKO: Well, I mean, that's

Page 24

1 normal in a lot of --
2 　　MR. KASPEREK: It is normal in a lot
3 of them, okay.
4 　　MR. BERTIN: And we actually have a
5 second driveway that we have, it's an existing
6 driveway.
7 We kept it as an entrance only because it's
8 next door to -- it's very close to another
9 driveway.  So in the case of an emergency, you
10 know, fire trucks will go wherever they can fit.
11 　　MR. KASPEREK: Okay, just in case.
12 All right.
13 　　MR. BAGINSKI: Do any other board
14 members have any questions for Ms. Bogart or
15 Mr. Bertin?
16 　　MR. MELFI: Ms. Bogart, if we were to
17 eliminate that building, how many variances would
18 we save?
19 　　MS. BOGART: Which one?
20 　　MR. MELFI: It would be the
21 recreation building.
22 　　MR. MOORE: I believe it was four.
23 　　MS. BOGART: It's four.
24 　　MR. BERTIN: It's 17 percent of the
25 site.

Page 25

1     MS. BOGART: So we would eliminate
2  the coverage variances.
3     MR. PAWLUCZUK: Setback variances.
4     MS. BOGART: Probably the -- the
5  parking setback variances.
6  I don't believe we would -- well, we could
7  possibly eliminate the building separation
8  variances.  The maximum building height obviously
9  would still remain.  So probably 95 percent of the
10 variances across the --
11    MR. BAZEL: Open space?
12    MS. BOGART: Well, like I said, the
13 ordinance says that active recreation will count as
14 open space.
15 So if you want it as active recreation that's
16 as proposed, but if you take away the building then
17 you could provide additional open space.
18    MR. PAWLUCZUK: Okay.
19    MR. BAGINSKI: Okay.  Anyone else
20 have any questions for the witnesses?
21    MR. RACHELSKI: Just a quick
22 question.  As far as the height variances these are
23 for which buildings?
24    MS. BOGART: Building 6 in the rear
25 is at 49.5 feet I believe.

Page 26

1     MR. RACHELSKI: Okay.
2     MS. BOGART: And Building 7 and 8 and
3  as the engineer had testified to, depending upon
4  whether they're considered one building or not.
5  If they are two separate buildings then they'd
6  require a height variance.  If they're one building
7  they don't.
8     MR. RACHELSKI: Yeah, okay.  It's --
9  it's just a matter of -- of an appearance while
10 someone is looking from the main entrance.
11    MS. BOGART: From the main entrance?
12    MR. RACHELSKI: It's a little bit
13 taller I guess.  Would -- would that be visually
14 the same?  The building's set -- Building A, right,
15 is that the one --
16    MS. BOGART: That --
17    MR. RACHELSKI: -- closest to the
18 main, right?
19    MS. BOGART: Yes, but that's the one
20 with only the 3-foot deviation --
21    MR. RACHELSKI: Okay.
22    MS. BOGART: -- and that's based upon
23 the slope, and from a planning perspective I think
24 you would -- it would make more sense and be more
25 aesthetically pleasing to have that slope in the

Page 27

1  roof with a slightly higher roof setback.
2     MR. RACHELSKI: I'm thinking about
3  maintaining the same slope.
4     MS. BOGART: That's what I think
5  though.
6     MR. RACHELSKI: Well, that's --
7  that's -- but I mean, the major purpose of the --
8  of the -- the height variations is to stick those
9  additional parking spaces there.
10    MS. BOGART: But you do have to
11 understand that the applicant could provide a
12 parapet roof and completely comply with the zoning
13 ordinance, wouldn't require a variance --
14    MR. RACHELSKI: That's definitely an
15 option.
16    MS. BOGART: -- and it wouldn't be
17 appropriate for that streetscape.  So I think this
18 is the most appropriate design.
19    MR. RACHELSKI: Thank you.
20    MS. BOGART: Thank you.
21    MR. MELFI: So getting back to the
22 buildings they're all going to have a ridged roof.
23 None of these buildings are going to the flat,
24 correct?
25    MS. BOGART: Correct, right?

Page 28

1     MR. BERTIN: No.
2     MS. BOGART: No?
3     MR. BERTIN: No.
4     MS. BOGART: Sorry.
5     MR. BERTIN: Building 8 has a flat
6  roof.
7     MS. BOGART: Okay.
8     MR. RACHELSKI: Building 8 has a flat
9  roof.  Are you going to tell me that?  You just
10 told me it's a slope.
11    MS. BOGART: I though it was a slope
12 roof.
13    MR. RACHELSKI: Let's get it
14 straight, guys.
15    MR. MELFI: I mean, my -- my issue
16 with the flat roof on the building is at the last
17 hearing at the -- and I know I brought it up the
18 last time too -- your witnesses swore they didn't
19 want a flat roof because of issues of leaks and we
20 granted the variances.
21    MR. MOORE: Actually, with no
22 disrespect intended, we checked the transcripts
23 from those hearings and there was no mention of
24 leaks.  It was strictly aesthetic.
25    MR. MELFI: Okay.  Anyway, they

Page 29

1 wanted it that way.  So wait a minute.
2 We granted them the variance because they
3 wanted to put the pitch roof -- the ridge roof
4 because it would --
5     MR. MOORE: Right.
6     MR. MELFI: -- aesthetically look
7 nicer and it's symmetrical, and now you're coming
8 back and saying you want a flat roof because it's
9 going to be aesthetically nicer.
10     MR. RACHELSKI: And they want the
11 variance too.
12     MR. MELFI: And -- yeah.
13     MR. RACHELSKI: Mr. Melfi, if I can
14 ask you.  So the actual height of the building is
15 measured from what point?
16     MR. MELFI: Going midway to midway at
17 peak.
18     MR. RACHELSKI: I know, but I'm just
19 saying from the ground?
20     MR. MELFI: Right.
21     MR. RACHELSKI: Okay.  So when we do
22 the flat roof, why -- why such a --
23     MR. MOORE: Ms. Bogart has I think
24 something she'd like to respond to.
25     MS. BOGART: No, I just wanted to

Page 30

1 show them the building elevations and my mistake.
2 Building 6 is the one with the -- the sloped
3 roof and that's the one in the rear, and this is
4 Building 8 and it has a larger first floor due to
5 the recreation facility in the -- in the front.
6     MR. MOORE: And as the architect had
7 testified to the board -- I can recall him -- it's
8 the recreational area that creates the -- and
9 higher first floor that creates the need for the
10 height variance.
11     MR. RACHELSKI: So aesthetic aspect
12 is not really a factor in that?
13     MR. MOORE: Not on this one though I
14 think it's --
15     MR. RACHELSKI: It should not be
16 considered.
17     MR. MOORE: -- attractive.
18     MR. RACHELSKI: Yes.
19     MR. MOORE: For the second one it
20 should be.
21     MR. RACHELSKI: No, but I'm just
22 saying for the one, the first building in this
23 spot, you know, then that argument that you want a
24 pitched roof because --
25     MR. MOORE: Well, this one's right on

Page 31

1 the streetscape --
2     MR. RACHELSKI: Yes.
3     MR. MOORE: -- and the other one it
4 blends with the rest of the development.
5     MR. MELFI: You said the reason for
6 the -- for the variance and the flat roof is
7 because of the recreation on the first floor?
8     MR. MOORE: Yes.
9     MS. BOGART: It requires a -- a
10 greater ceiling-to -- floor-to-ceiling height.
11     MR. MELFI: I understand that, but I
12 thought that's why we're keeping this building for
13 recreation.
14     MR. MOORE: Well, we're providing a
15 lot of recreation.
16     MR. MELFI: That building is pretty
17 big considering that the testimony from your
18 applicant is it's just going to be for the 73 units
19 that were going to be put on this property.
20     MR. MOORE: Right, plus the town,
21 plus -- and -- and that is the case and we would,
22 you know, accept if the board chose to grant an
23 approval a condition to that effect, but we're also
24 providing for the large building at the board's
25 request that the town residents can utilize that

Page 32

1 building.
2     MR. RACHELSKI: But before that
3 approval, can we sign a -- sign a lease for usage?
4     MR. MOORE: We can make it a
5 condition of the approval, that's --
6     MS. BOGART: You can say --
7     MR. MOORE: -- just as binding as a
8 lease.
9     MS. BOGART: That would mean that
10 basically we can't build the --
11     MR. MOORE: Can't build the
12 building --
13     MS. BOGART: -- the project without
14 it.
15     MR. MOORE: -- without meeting that
16 condition and can't continue to occupy the premises
17 without meeting that condition.
18     MS. POLTEN: I have a question.  If
19 the recreational use is going to be there for the
20 town, who is responsible for the insurance and
21 everything?
22     MR. MOORE: That's something that I
23 think we can resolve through conditions.  My
24 client, unfortunately, is not here.  So we'll have
25 to address those insurance issues.

Page 33

1    MS. POLTEN: And liability and all
2 that stuff as well as the money.
3    MR. MOORE: We would have to address
4 that I think as part of the condition.
5    MS. BOGART: I -- I think that would
6 be worked out with the governing body, and this
7 board can make it a condition of approval that you
8 -- that we have to work that out.
9    MS. POLTEN: If we were to deem that
10 we didn't want this -- this is just a
11 hypothetical -- how would that building -- how
12 would you --
13    MR. MOORE: We would still utilize it
14 for recreation for the residents of the community
15 and we're not sure yet. I know we -- Mr. Nuckel
16 discussed like putting a basketball court in there.
17    MS. POLTEN: Okay. So then -- then
18 the -- the building would stay the same. You
19 wouldn't change it to -- to have the -- the
20 required -- the -- not a flat roof, but the pitched
21 roof?
22    MR. MOORE: No.
23    MS. POLTEN: Okay.
24    MR. MOORE: Yeah, talk about a height
25 variance.

Page 34

1    MS. BOGART: That would actually just
2 increase the -- the height requirement or the
3 required height that we would need.
4    MR. BAGINSKI: Okay. Any other
5 questions for the --
6    MS. WYGONIK: Yeah, I have a
7 question, something that you testified last time we
8 were here, and it was the fact how many children
9 would attend school from the Morningside and you
10 said about 13, but what I'm mainly concerned about
11 is you said you went to the school official and he
12 said he doesn't have that information so you didn't
13 get any information.
14 Did you do anything like an OPRA request where
15 he would be required to provide some kind of
16 information for you or did you just go and ask him
17 and he said, I don't have that information?
18    MS. BOGART: It was a verbal request
19 and I was told that that information isn't compiled
20 based upon addresses or apartments versus
21 non-apartments.
22    MS. WYGONIK: Because I'm sure if you
23 go and redo a -- an OPRA request you can get better
24 information.
25    MR. MOORE: Well, no, because they

Page 35

1 would -- don't have it.
2    MS. BOGART: They didn't have it.
3    MR. MOORE: So you can't OPRA what
4 you don't have.
5    MS. WYGONIK: What -- what do you
6 mean you don't have? I mean, they must know.
7    MR. MOORE: They didn't -- they
8 didn't compile --
9    MS. WYGONIK: They have -- they have
10 access.
11    MR. MOORE: They said -- they told
12 Ms. Bogart they didn't --
13    MS. BAUMANN: Wait.
14    MR. BAGINSKI: Hold on, we can only
15 have one person talking at a time.
16    MS. WYGONIK: I don't understand how
17 they could not have it when they have addresses
18 where the children attend the school from like the
19 Jasontown Apartments or the Mount Pleasant
20 Apartments that they must have that information.
21 I'm sure it would take time for them to gather
22 it, but through an OPRA request you may get better
23 information than just a verbal, We don't have it.
24    MS. BOGART: That may be --
25    MS. WYGONIK: Okay.

Page 36

1    MS. BOGART: -- but it -- it --
2    MS. WYGONIK: But you didn't do an
3 OPRA request, that was my main question, okay.
4    MS. BOGART: I didn't do a written
5 OPRA request. It was just a conversation on the
6 phone.
7    MR. BAGINSKI: We can actually
8 possibly have that question answered.
9 We can have our superintendent speak on that
10 matter over here, but I'm going to do that during
11 the open meeting for the public and then we'll
12 have --
13    MR. MOORE: Great.
14    MR. BAGINSKI: -- Mr. Albro speak
15 about that some more.
16    MR. MOORE: And I would just caution
17 the board without being unduly argumentative, and
18 we've designed this complex to minimize, you know,
19 the type of units and the statistics, and all the
20 studies that Ms. Bogart testified to last time
21 showed that, you know, this will not generate a lot
22 of schoolchildren, but that's also not a valid
23 basis for a decision on an application as I'm sure
24 you all know and as your attorney will tell you.
25    MS. BOGART: So if I could just

Page 37

1 follow up because I know that was a concern last
2 time, and I did testify that the Rutgers' numbers
3 showed in Northern New Jersey there would be
4 approximately 13 schoolchildren coming from this
5 development.
6 I also testified that I had done studies
7 myself and that that resulted in approximately five
8 schoolchildren based upon Northern Jersey towns,
9 and I was also asked if I could look at towns that
10 are similar to Wallington and try to get that
11 information.
12 Unfortunately, I was unable to do that.  A lot
13 of towns don't like to give that information.  They
14 feel that that's private as far as the addresses of
15 the -- the children.
16 I did pull up some additional Rutgers'
17 numbers, and there is a study that shows public
18 schoolchildren generated from transit-oriented
19 development and a number of these -- there's about
20 ten projects that are listed, and most of them are
21 from West New York.
22 So I tried to pull up census data to try to
23 consider how West New York relates to Wallington,
24 and obviously it's a much bigger town, but it does
25 have a lot of similarities with regard to number of

Page 38

1 people per household, number of people in the labor
2 force, median income is similar.
3 Obviously Wallington is a little bit greater.
4 Median income of Wallington from the census is
5 $55,000, in West New York it's $45,000.  The per
6 capita income in the past 12 months -- this goes
7 back to 2015 -- was about $5,000 off.  So I believe
8 there are some similarities when it comes to
9 looking at affordable -- how housing is affordable
10 and how the households are utilized.
11 So this study with regard to the ten
12 properties in -- in the Rutgers' analysis had 1,132
13 units in West New York and of that had -- it -- it
14 resulted in a .02 public schoolchild being created
15 for each unit.
16 So that's even lower than my five that I had
17 estimated last time.  It's actually less than half.
18 It's probably about two public schoolchildren
19 coming out of this development.
20 So I can assure you that based upon the
21 Northern New Jersey Rutgers' data, my own studies
22 and this DOT data that I don't believe it's going
23 to be more than 13 schoolchildren.  In fact, I
24 think it's going to be a lot lower, between five
25 and maybe seven children coming out of that.

Page 39

1      MR. MELFI: You're talking for the
2 full 207 units or just for this building?
3      MR. BAGINSKI: 73.
4      MS. BOGART: For the 73.
5      MR. RACHELSKI: I have just a quick
6 question, I'm sorry, because you -- you refer to
7 this one as a transit village.
8      MS. BOGART: Transit-oriented
9 development.
10      MR. RACHELSKI: A transit-oriented,
11 right.  I mean, a little bit of a distance to the
12 -- driving -- there's a driving distance, it's not
13 a walking distance, for the --
14      MS. BOGART: You are, and the only
15 reason I took this into consideration is because,
16 as I mentioned to you, I couldn't get data from the
17 surrounding area that you had asked for, and I
18 thought that this might be another analysis that
19 you could pinpoint to and kind of consider that it
20 would be similar.
21      MR. RACHELSKI: Now the transit
22 villages or transit-oriented villages are slightly
23 different though.
24 You have the walking distance and -- and a --
25 and a -- the residence is usually different than --

Page 40

1 than -- you know, isolated from the quick
2 connection to New York City.
3      MS. BOGART: Not necessarily because
4 of the bedroom mix.
5 Once you have one or two children in a one- or
6 two-bedroom apartment you're going to want that
7 house.  Once the child starts to walk and wants to
8 go to school and wants to play outside you're going
9 to want that yard.
10 You're not going to want to have -- to have
11 your child play in a -- in a parking lot as we
12 have.  We don't really have the outdoor recreation,
13 we don't have the playground.
14 You're going to want to move to someplace
15 where -- that they could play.  So from that
16 perspective it's -- it's very similar.
17      MR. RACHELSKI: I think -- I don't
18 remember the stance, but how many two-bedrooms, and
19 you had some three-bedroom apartments too if I
20 could recall?
21      MR. MOORE: Yeah, the three-bedrooms
22 are required for the affordable housing.
23      MR. RACHELSKI: Yes, it's just --
24 just because, you know, a three-bedroom apartment
25 is definitely going to generate "X" number of

Page 41

1 students so --
2    MS. BOGART: The three-bedrooms will,
3 but that will be balanced by the one- and
4 two-bedrooms.
5    MR. RACHELSKI: So how many
6 two-bedrooms do we have?
7    MS. BOGART: Bear with me a second.
8    MR. BERTIN: I'm sorry, three.
9    MS. BOGART: Three?
10    MR. BERTIN: Three.
11    MR. RAKER: Three three-bedrooms.
12    MS. BOGART: Three three-bedrooms.
13    MR. RAKER: The affordable units.
14    MR. RACHELSKI: For the whole
15 premises?
16    MR. MOORE: Yes.
17    MR. RACHELSKI: And two-bedrooms?
18    MR. RAKER: Are we talking affordable
19 or market rate?
20    MS. BAUMANN: I'm sorry, sir, what is
21 your name?
22    MR. RAKER: My name's Jack Raker.  I
23 was the architect who testified.
24    MR. MOORE: He's previously sworn and
25 qualified, yeah.

Page 42

1    MR. RAKER: Yes.
2    MS. WYGONIK: You're talking about
3 just Morningside, not the whole complex, right?
4    MS. BOGART: Yes.
5    MS. WYGONIK: Right.  You're not
6 talking about Morningside, that's not the whole
7 complex.  It's just a little part, you know, 72
8 apartments.  Well, no, he said the whole -- the
9 whole development and that's not -- not it.
10    MR. RAKER: So the total is 40
11 one-bedroom, 30 two-bedroom and then the three
12 three-bedroom, that's total, that is inclusive of
13 the low and moderate income.
14    MR. BAGINSKI: And, again, just to
15 clarify, this is strictly for the 73 units that
16 they're --
17    MS. BOGART: Right, the 73 units.
18    MR. MOORE: Right, because the others
19 are already approved.
20    MR. BAGINSKI: Correct.
21    MR. MOORE: We're just seeking
22 certain minor amendments.
23    MR. BAGINSKI: Okay.  Anyone else
24 with any questions?  Okay.
25    MR. KASPEREK: You have no --

Page 43

1    MR. BAZEL: So we have two lots
2 developed as one.  Was there an attempt to combine
3 both lots at some point?
4    MR. MOORE: There's separate
5 ownership.  They're -- they're related, but it's
6 not entirely unified.  It's similar principals, but
7 it's not exactly the same ownership.
8 So we did present a series of cross-easements
9 so that they both work together, but it's not
10 viable to consolidate the two lots.
11    MR. BAZEL: And this was -- yeah.  I
12 mean, we have some setback variances that --
13    MR. MOORE: Right, because of that,
14 but they're what we call "technical variances."
15 It's on paper, but, you know, we've got all the
16 cross-easements there.
17 You can't see the lot line, and we have
18 cross-easements so that the development functions
19 so that, you know, there's access and utilities and
20 everything between the two.
21    MR. BAZEL: So there will be two
22 separate ownerships?
23    MR. MOORE: There are two separate
24 ownerships, there's two applicants.
25    MR. BAZEL: Okay.

Page 44

1    MR. MOORE: And as I said, they share
2 common or they share the common principal of
3 Mr. Nuckel, but I -- the -- the exact mix of
4 ownership is not the same so you can't really
5 consolidate them.
6    MR. BAGINSKI: Okay.  Anyone else
7 with any questions?  Do you have any more
8 testimony, Mr. Moore?
9    MR. MOORE: I have no more direct
10 testimony.  I'd reserve a summation, but I do have
11 -- I would like --
12    MR. BAGINSKI: Before you do that --
13    MR. MOORE: -- to just give our
14 responses to the May 11, 2017 Neglia Engineering
15 Associates report revised July 14th.
16    MR. BAGINSKI: I would just like to
17 see if any of the residents that are here have any
18 questions for the -- your professionals that have
19 testified today, this way I'll open it to hear the
20 citizens and then we can go through that.
21    MR. MOORE: Okay, fine.
22    MR. BAGINSKI: All right.  Board
23 members, at this time --
24    MR. BAZEL: Just one more thing about
25 the open space.  So by your definition you could

Page 45

1 throw some yoga mats in the underground parking --
2     MS. BAUMANN: I'm sorry, I just
3 didn't understand.  Repeat again.
4     MR. BAZEL: So by your definition of
5 "open spaces" if you throw some yoga mats in the
6 underground parking, could you then -- could you
7 consider it as -- as open space as well?
8     MS. BOGART: We have to go by your --
9 the zoning code for Wallington, their definition,
10 and it says that open space includes active
11 recreation facilities, but it doesn't define
12 "active recreation" so --
13     MR. BAZEL: Okay.
14     MS. BOGART: -- maybe it could be
15 yoga mats, I don't know.
16     MR. MOORE: We're going to have more
17 active recreation than yoga mats.
18     MR. MELFI: The way you're
19 interpreting it is what is -- the building is
20 counting as being counted because --
21     MS. BOGART: Because it's a
22 recreation center, yes.
23     MR. MELFI: -- because it's
24 recreation, but it doesn't specifically say in the
25 ordinance that it has to be enclosed or open.

Page 46

1     MS. BOGART: No, it just says active.
2     MR. MELFI: Active open space.
3     MS. BOGART: Active recreation.
4     MR. MOORE: And then it says open
5 space can include active recreation.
6     MR. BAGINSKI: Okay.  Anything else?
7 Okay.
8 At this time then I'd like to open it to the
9 hearing of citizens.  IF there's anybody in the
10 audience that would like to be heard or have any
11 questions for the professionals that testified in
12 regards to this now is the time to come up here,
13 and you can ask whatever questions you need to
14 about this application.  If you can just step
15 forward.
16     MR. ALBRO: Good evening, I'm
17 James Albro.  I'm the --
18     MS. BAUMANN: I just need to swear
19 you in, please.
20     MR. ALBRO: I'm sorry?
21     MS. BAUMANN: I'm going to swear you
22 in, please.
23     (Whereupon James Albro is duly
24 sworn.)
25     MS. BAUMANN: And your name again,

Page 47

1 sir?
2     MR. ALBRO: James Albro, A-l-b-r-o.
3     MS. BAUMANN: Go ahead.
4     MR. ALBRO: Evening.  I'm the
5 superintendent of schools in the -- the Borough of
6 Wallington.
7 Just as a point of clarification, it came to
8 my attention I believe in the July meeting that you
9 were referring to that there was communication with
10 my school district about the impact of -- of --
11 possible impact of high-density housing in our
12 district in comparison to some other high-density
13 housing projects.  I never received any request for
14 any information whether formal or informal.
15 The only other place that I think it could
16 have gone would be my business administrator's
17 office who's also the board secretary, and I spoke
18 with him and he received no such request formal or
19 informal.
20     MR. MOORE: Ms. Bogart, do you know
21 who you spoke to?
22     MS. BOGART: I don't.  I can look
23 that up, but I don't have that with me.
24     MR. MOORE: Okay.
25     MS. WYGONIK: Would you be able to

Page 48

1 provide information?
2     MR. ALBRO: I can provide whatever
3 information I'm allowed to provide without
4 revealing student identities and things like that,
5 but --
6     MS. WYGONIK: Well, we're not asking
7 for student identities, just the number of students
8 maybe attending from either the Jasontown or the,
9 you know, Mount Pleasant Apartments.
10     MR. ALBRO: Okay, and I would prefer
11 it coming in the form of a formal request so I know
12 exactly what it is that I'm answering.  I'm
13 protecting my student data, but we can share any
14 information that we're allowed to share.
15     MS. WYGONIK: Okay.
16     MR. BAGINSKI: Okay.  Thank you very
17 much, Mr. Albro.
18     MR. ALBRO: Thank you.
19     MR. BAGINSKI: Okay.  Anyone else at
20 this time wish to be heard?
21     MR. SMITH: Yes.  Mr. Chairman, my
22 name is Joe Smith.  I'm a 44-year member of the
23 Board of Education in Wallington.
24     MR. BAGINSKI: Hold on, you need to
25 be sworn.

Page 49

1    MS. BAUMANN: I need to swear you in.
2    (Whereupon Joe Smith is duly sworn.)
3    MS. BAUMANN: Thank you, sir.  Go
4  ahead.
5    MR. SMITH: The Borough of
6  Wallington, the mayor and council, has been
7  presented with a -- with which I assume that you
8  are and you have a copy of -- of the Whitehall
9  Association's evaluation of our school district
10  where it -- it's pretty much right on the money
11  with the increase of students.
12  As you are well aware, we've had a -- when we
13  had the closing of Sacred Heart School we had an
14  increase of 60 students, but we really had an
15  increase of 130 students, and since that enclosure
16  [sic] we have maintained at least that and have
17  been equally around that number since then.
18  So that's public information that the -- that
19  I believe you should have for future reference, but
20  that was submitted to them, and I'm -- I'm -- I'm
21  very aware if I get all the information here and we
22  were never approached about that.
23  So I -- I don't know.  There's nobody else
24  other than the superintendent of schools, the
25  highest official in the Borough of Wallington, who

Page 50

1  has all that information did not receive that from
2  anybody.
3    MR. MOORE: I -- I would just like to
4  point -- like to say to defend my planner, she's
5  not a liar, she talked to someone, and, A, as I
6  said, it's not relevant to your basis of decision,
7  but she can certainly get that information to you.
8    MR. SMITH: I never said she was a
9  liar, Coach.  I never said she was a liar.  I said
10  that nobody is aware --
11    MR. MOORE: Well, you said you don't
12  know where she got it.
13    MR. SMITH: Well, that's what I said,
14  and I'll stand by that.
15    MR. MOORE: So then you called her a
16  liar.
17    MR. SMITH: I didn't call her a liar.
18  She maybe called the wrong municipality.  There's
19  Wellington, maybe it was the wrong municipality.
20    MR. BAGINSKI: Listen, we're not here
21  to argue about this.  Mr. Smith had a question, he
22  spoke it and we'll leave it at that.
23  Now, Ms. Bogart, if -- if you need to put the
24  request in for the information that's fine, now you
25  know what avenue to take, correct?

Page 51

1    MS. BOGART: Yes, I do, thank you.
2    MR. BAGINSKI: Thank you.  Okay,
3  anyone else wishing to be heard at this time?  You
4  can just step forward or -- or you want to do it
5  right there?
6    MS. DABAL: Yeah.
7    MR. BAGINSKI: Just need to swear you
8  in.
9    (Whereupon Melissa Dabal is duly
10  sworn.)
11    MS. BAUMANN: Can I have your name
12  again, please?
13    MS. DABAL: Melissa Dabal, "D" as in
14  David, a-b-a-l.
15    MS. BAUMANN: Okay.
16    MS. DABAL: I was at that meeting I
17  think you recall when you were talking about how
18  many children were coming out of the school, and
19  you did distinctively say that you put in an OPRA
20  request, and I just want that to go on record.
21  It was not a verbal request, you did say OPRA,
22  and for me it defies logic that if you have "X"
23  number of three-bedrooms, "X" number of
24  two-bedrooms that there are going to be more than
25  five children coming out of that complex.

Page 52

1  I'm sure people are not renting these units
2  that are three- and two-bedroom to put a sauna in
3  the additional bedroom or maybe a wine room.
4  They're definitely going to have children there.
5  So I'd like to know what is Morningside going
6  to do to ensure that only five children come out of
7  that complex moving forward.
8    MR. MOORE: Well, first of all, those
9  three-bedrooms there are only three, and they're
10  required by the affordable housing regulations, and
11  it's illegal to ban children and it's illegal to
12  deny applications for children.  The only way you
13  can limit children is through age-restricted
14  communities which this is not.
15    MS. DABAL: So -- so you're -- so
16  basically what you're saying is there will be more
17  than five children.
18    MR. MOORE: No, I'm not.
19    MS. DABAL: Well, you're saying that
20  we can't restrict the number of children going
21  there so I would assume that that means that there
22  will be more than five.
23    MR. MOORE: No, Ms. Bogart has
24  testified to why she thinks there will be five
25  children, made it very clear on the record.

Page 53

1      MS. DABAL: Okay, thank you.
2      MR. BAGINSKI: Okay.  Anyone else in
3  the audience wishing to be heard in this matter?
4  Okay, at this time then I'd like to close it to the
5  hearing of citizens.  Okay, Mr. Moore, you can --
6      MR. MOORE: Thank you.  Just for the
7  record and I'm --
8      MS. BOGART: Thank you.
9      MR. MOORE: -- referring to --
10      MR. BAGINSKI: Thank you, Ms. Bogart.
11      MR. MOORE: -- the report of Neglia
12  Engineering Associates originally dated May 11,
13  2017, revised July 14, 2017, and most of these
14  items in the report are largely informational or
15  have been deemed satisfied so there's just a couple
16  to point out where some explanation is required.
17  Originally on the report in Item 5,
18  "Application Completeness," it had been because we
19  submitted the "location of all locations of
20  proposed buildings and other structures having been
21  shown and the uses on the buildings," that was
22  rectified in a subsequent application -- a
23  subsequent resubmission so there was no waiver
24  request and that was withdrawn.
25  And now I'm only bringing up, as I said, items

Page 54

1  that -- that aren't informational or that we do not
2  agree to or require further explanation and that
3  first one will be 6.12 which provides, "The
4  applicant shall provide details for all proposed
5  signage.  Furthermore, the applicant shall indicate
6  the dimensions of all signage on the site plan."
7  The site monument sign is on the architect's
8  plan, and we've submitted as part of testimony the
9  "Welcome to Wallington" sign.
10  To the extent anything more needs to be
11  dimensioned on the plan that can be done through
12  condition compliance if the board saw fit to grant
13  approval, and again, that's Item 6.12.
14  With respect to Item 7.11 it states, "The
15  applicant does not indicate a sanitary sewer
16  lateral for Buildings Number 7 and 8.
17  "If the applicant intends to utilize the
18  existing lateral the applicant shall provide
19  capacity calculations and shall televise the
20  existing lateral to confirm quality.  A compact
21  disc copy of the lateral shall be forwarded to our
22  office."
23  The sewer line for Buildings 7 and 8 is on the
24  south side of the driveway so I also have
25  Mr. Bertin here.

Page 55

1      MR. BERTIN: The last set of plans
2  that were submitted show a sewer line coming along
3  the southerly driveway and connecting in through
4  the site to go to the sewer pump that's by the
5  railroad tracks.
6  We show a lateral coming out of Building 8.  I
7  missed the lateral coming out of Building 9, just a
8  typo, but it is on there and it is intended to not
9  utilize the existing sewer because I'm -- I'm
10  pretty sure there's an ejector pump now for the --
11  the rink building.  So anyway, we'll -- we'll tie
12  into the sewer pump that's provided for the rest of
13  the project.
14      MR. MOORE: And then with respect to
15  Item 8.4 which says, "We note the intersection of
16  Main Avenue and Midland Avenue will operate at an
17  untenable level of Service F under the build
18  condition with vehicle delay increasing to 736.3
19  seconds.
20  "We recommend the applicant perform a traffic
21  signal alarm study for the intersection for
22  signalization consideration by the Borough of
23  Wallington and Bergen County," and Mr. Bertin.
24      MR. BERTIN: We'll -- we'll do the
25  Warren analysis because we've done the traffic

Page 56

1  counts.
2  We did talk to Bergen County about the status
3  of a -- of a traffic light there, and our response
4  was that it's -- if the municipality would want
5  them to consider a traffic light -- the people we
6  talked to, and I don't know who we talked to so
7  don't -- it was at the planning department -- that
8  the borough would have to initiate the -- the
9  process, and I guess that process hasn't been
10  initiated for that.
11  I just should mention to you that we did
12  receive Bergen County conditional approval this
13  week.  So the county has approved it, but it --
14  we'll do the Warren study for you, and then if you
15  want the light you got to go to the county.
16      MR. MOORE: And then that would be
17  A-10 --
18      MR. BERTIN: Yes, okay.
19      MR. MOORE: -- which is the
20  conditional county approval.
21      MR. BERTIN: Dated September 13,
22  2017.
23      MR. MOORE: And who should I provide
24  the exhibit to?
25      MR. BERTIN: You're -- you're copied,

Page 57

1 but --
2     MR. MOORE: Yeah, the town's copied,
3 but the planning board's copy.
4     MR. BAGINSKI: You can give that to
5 Martie, thank you.
6     (Whereupon A-10, Conditional County
7 approval dated 9/13/17, is marked for
8 identification.)
9     MR. MOORE: Then with respect to
10 Item 9.1 in accordance with Section 330-39B, "Any
11 parking area located between the principal building
12 and the minimum front line shall be landscaped or
13 screened.
14 "No off-street parking area shall be located
15 closer than 5 feet from any side or rear lot line.
16 The applicant shall provide additional landscaping
17 between the front lot line and proposed front yard
18 parking spaces.
19 "Furthermore, the applicant requires a waiver
20 for the proposed parking with a variance," and
21 we've testified to it.  "Parking improvements
22 located within 5 feet of any side or rear lot
23 line."
24     MR. BERTIN: The -- the --
25     MR. MOORE: Mr. Bertin.

Page 58

1     MR. BERTIN: The most recent set of
2 plans we do have a hedgerow along the parking
3 spaces on Main Avenue.
4 We show a couple of small dots to indicate
5 existing trees, but if you've been by the site the
6 trees that are along the right-of-way are pretty
7 massive.  I mean, they're not tall, but they're --
8 they've been there a long time and they've got
9 probably a 20-foot drip line, but we can increase
10 the -- the -- the shrubs, whatever your engineer
11 wants, to help shield the parking spaces along Main
12 Avenue.
13 With respect to parking within 5 feet of a lot
14 line side or rear, the only -- that would only
15 occur where the lot line separates the two parcels
16 that are part of this application.
17 We have no parking within 5 feet of the
18 exterior side or rear lot lines, just in this one
19 parking lot on the north side of Buildings 7 and 8.
20     MR. MOORE: Thank you, Mr. Bertin.
21 You might as well stay standing on it.
22 Section 9.2 it said they -- "We recommend that
23 the applicant revise the chain-link fence door
24 enclosure for the dumpster areas to a
25 board-on-board fence with steel posts."

Page 59

1     MR. BERTIN: Yes, we had done a -- a
2 vinyl fence.  I think you saw that and commented
3 you wanted a -- a more -- a rigid -- rigid
4 structure and we'll do that.
5 I might not make it a board-on-board fence, we
6 might make it a solid fence, but I know you want a
7 more rigid structure than a vinyl fence and we'll
8 do that.
9     MR. MOORE: And then with respect to
10 Comment 9.14, "The applicant shall revise the
11 proposed lighting plan to include foot-candle
12 intensities which extend beyond the property line.
13 The applicant shall provide additional shielding to
14 prevent spillage onto adjacent properties."
15     MR. BERTIN: And -- and the -- there
16 were two lighting exhibits, plans.
17 One had just the lighting on the property, and
18 then there was a second one that showed lighting 30
19 feet beyond the property which would be along Main
20 Avenue, the railroad tracks and the Saddle River
21 and --
22     MR. MOORE: And that was Sheet C2.7,
23 right?
24     MR. BERTIN: Correct, Sheet 2.7, and
25 on the south side of Building 6 we did not show the

Page 60

1 parking -- that the lighting extends into the
2 Jasontown lot by Buildings 7 and 8 because we have
3 a -- a -- a solid fence there so it never would
4 have traversed that point, but if you look at the
5 -- Sheet 2.7 we've got it for the other areas.
6     MR. MOORE: And then with respect to
7 the last comment, 9.15, "The engineer recommends
8 the applicant install the Borough of Wallington
9 standard streetscape with light fixtures along the
10 property line."
11     MR. BERTIN: And I'm sorry I missed
12 that the last time we submitted the plans, but yes,
13 we'll put the -- the lanterns along the property
14 line, and you'll probably want the brick pavers
15 between the sidewalk and the curb, just like
16 the -- the -- the municipal standard, which I think
17 occurs a little bit further south across Main
18 Avenue and we'll do that.
19     MR. MOORE: That concludes our -- all
20 of our responses to the Neglia report.
21 I'd just like to say in summation with respect
22 to the first application it's just amended
23 preliminary and final.  It doesn't really affect
24 the application.
25 It just makes it work a little better and

Page 61

1 makes it coordinate with the New Wallington
2 application which is meeting affordable housing
3 requirements, you know, set forth by the court, and
4 while there are variances they are primarily, One,
5 because of the two buildings so they're really --
6 two lots so they're really just technical
7 variances, and then the others preserve the
8 building which we think is a nice building.
9 It's a building in good condition.  It seems a
10 shame to tear it down, and we believe we can find
11 really meaningful, you know, recreational uses for
12 it that we would make open to the borough residents
13 working on any insurance requirements or such, that
14 could be a condition of the approval with the
15 borough council.  So I thank you for your time in
16 listening to this application.
17    MR. BAGINSKI: Okay.  Thank you,
18 Mr. Moore.
19    MR. JACOBS: I have a few items on
20 the -- on our letter that were not addressed.
21    MR. BAGINSKI: Okay.
22    MS. BAUMANN: Could you just identify
23 yourself, please?
24    MR. JACOBS: Sorry, Evan Jacobs with
25 Neglia Engineering.

Page 62

1    MR. MOORE: And where we didn't
2 address it it's because we agree.
3    MR. BAGINSKI: Okay.  So you just
4 want to put it on the record --
5    MR. JACOBS: Yeah --
6    MR. BAGINSKI: -- in order to just --
7    MR. JACOBS: -- sure.  The -- the
8 main concern I have is about Number 7.14, 7.14,
9 with regard to the flow to the Saddle River.
10 Some water analysis indicates that a lot of
11 the site sheet flows into the river today and that
12 it will be piped into the existing pipe in the
13 future.
14 We have no information on the capacity of that
15 pipe, the condition of that pipe, any information
16 as far as can that pipe handle the site, is it --
17 is it in good working condition, does it need a --
18    MR. MOORE: We agree to provide that
19 information with -- to you as a condition of
20 approval, but obviously if the pipe was
21 insufficient we'd have to come back or satisfy you
22 with the installation of a pipe that was
23 sufficient.
24    MR. JACOBS: That's acceptable.
25    MR. BERTIN: Which -- which -- which

Page 63

1 item was that again?
2    MR. JACOBS: 7.14.
3    MR. BERTIN: Okay.
4    MR. BAGINSKI: Okay.
5    MR. JACOBS: I would -- I would
6 submit that any outstanding comments, minor or
7 whatever they are, just be approved as a condition
8 of approval instead of going through all those
9 little technical --
10    MR. BAGINSKI: Okay.
11    MR. MOORE: Right, and all -- as I
12 said, the one -- your other comments that weren't
13 satisfied or informational that I didn't mention it
14 was because we agreed to comply with them.
15    MR. JACOBS: Okay.
16    MR. BAGINSKI: Did you want to -- are
17 there any other open ones that you know of?
18    MR. JACOBS: They're minor
19 technical --
20    MR. BAGINSKI: Okay.
21    MR. JACOBS: -- things I don't think
22 we need to hear now, but if they're willing to
23 address all of them as a condition of approval then
24 I'm satisfied.
25    MR. BAGINSKI: Okay.  Thank you.

Page 64

1 All right.  At this time, any other -- any other
2 questions for -- for the applicant from the board
3 members or --
4    MR. MELFI: I understand.  I have one
5 question and I don't know if it can go to the
6 architect, the engineer or the attorney.
7    MR. MOORE: I'm sorry?
8    MR. MELFI: I don't recall if we
9 discussed an emergency generator for the pumping
10 station over there and if we did --
11    MR. BERTIN: It's shown on the plan.
12 There's an emergency, there has to be for
13 residential.
14    MR. MELFI: Absolutely, I understand.
15    MR. BERTIN: It's required by DEP.
16    MR. MELFI: I asked at the last
17 meeting and you didn't recall.
18    MR. BERTIN: Yeah, I didn't recall.
19    MR. MELFI: There's a generator.
20    MR. JACOBS: Is that the "G" on the
21 plan next to the pump station?
22    MR. BERTIN: Yes.
23    MR. JACOBS: Okay.
24    MR. BAGINSKI: And Ms. Bogart
25 testified today about the revision in the monument

Page 65

1 sign. Is there something new or is it different
2 than what you originally proposed?
3      MR. BERTIN: No.
4      MR. MOORE: No.
5      MR. BAGINSKI: Then was there any
6 clarification to where you were going to put the
7 "Welcome to Wallington" sign because during your
8 testimony we did talk about the fact where you put
9 it you're not even going to see it?
10      MR. RAKER: Location.
11      MR. BAGINSKI: It's -- it would be
12 like a waste to put a "Welcome to Wallington" sign
13 there because --
14      MR. MOORE: I think it was that we --
15      MR. BAGINSKI: -- it's blocked by the
16 trestle.
17      MR. MOORE: -- we'd locate it
18 wherever you guys wanted us to locate it I believe
19 was our response.
20      MR. RAKER: Yeah.
21      MR. BERTIN: If the -- as I
22 mentioned, the trees that -- as -- as you're
23 heading south on Main Avenue those first trees are
24 pretty dense, although the -- the -- the canopy
25 isn't that high, but you could have a sign

Page 66

1 underneath it, but the position I put it in which
2 is shown here on the -- on the -- Exhibit A-1 is
3 the wrong spot.
4 The other monument sign we have next to the --
5 the entrance driveway. So wherever you want the
6 "Welcome to Wallington" sign we'll try to figure
7 that out. We can make that a condition. We could
8 settle it now or make it a condition we work
9 with --
10      MR. MOORE: Your engineer and --
11      MR. BERTIN: -- the construction
12 official and the engineer.
13      MR. BAGINSKI: And also with the
14 monument sign, how would that affect the field of
15 view from that exit or entrance driveway when
16 you're going to pull out of the place?
17      MR. BERTIN: Well, that's part of the
18 county's review, and the monument sign is -- is set
19 back from the right-of-way so it doesn't block a
20 vision and that -- that is part of the county --
21 county review process.
22      MR. BAGINSKI: Okay.
23      MR. MELFI: And is -- have you put
24 that sign on a plan for the county for their
25 review?

Page 67

1 You're saying you got a conditional approval
2 from the county, but are those signs for the
3 "Welcome to Wallington" and the other sign, the
4 monument sign, was that on the application to the
5 county?
6      MR. BERTIN: The monument sign that's
7 part of this application, yes. The "Welcome to
8 Wallington" has not.
9 Well, we -- we -- we showed it back closer to
10 the bridge, the railroad bridge, but we have to
11 submit final plans back to the county, and if it's
12 on there and if it's in the sight triangle they're
13 going to comment on it. Well, we'll make sure it's
14 not in the sight triangle. The other monument sign
15 is on it.
16      MR. BAGINSKI: Okay. All right.
17 Then if there's no other questions or testimony in
18 regard to this we need a motion and a second.
19      MR. CEDZIDLO: Could we have a
20 discussion?
21      MR. BAGINSKI: Well, we could if you
22 would like. Any objection to that?
23      (Whereupon an off-the-record
24 discussion is held.)
25      MR. BAGINSKI: Our attorney would

Page 68

1 like us to have a -- a -- we should be having a
2 little bit of a discussion in regards to what we
3 like about the application, what we dislike about
4 the application.
5 So if we could do that as a board right now
6 then we'll -- I mean, we can start on one side of
7 the room, and -- and if anybody's got any positive
8 or negative comments we can make them before we
9 bring it to a motion.
10      MR. MELFI: Okay. I gave my do's and
11 my don'ts.
12      MR. BAGINSKI: Okay.
13      MR. MELFI: I notice there's a
14 lawsuit that was granted, and there's no denying
15 the amount of units because that was part of a -- a
16 settlement with -- with the town going back a few
17 years to put 208 units. I know this project in
18 total I believe is 207 units.
19 My personal opinion is I don't really like the
20 recreation building to stay being that there's
21 recreation underneath the apartments that you're
22 going to be building, and if you're asking for a
23 height variance for that to keep recreational
24 purposes there and testimony was made for just the
25 73 units that are being built as who's going to be

Page 69

1 using those facilities, I don't feel there's a need
2 to leave a big building there.
3     MR. MOORE: Just -- just the --
4 correct, and I -- except that the height variance
5 isn't for the -- the building that's staying.  It's
6 for the building in -- in the front, the new
7 building.
8     MR. MELFI: That's what I'm saying,
9 that's what I said, excuse me.
10     MR. MOORE: Okay, I'm sorry.
11     MR. MELFI: And I feel that if we
12 were to take the other building down and move the
13 other buildings back we cut out a lot of the
14 variances.  Then I think I would give approval to
15 the site plan amendment.
16     MS. WYGONIK: I agree with Mr. Melfi.
17 I think the way -- keeping that recreation building
18 right now the way it is it's too congested in
19 there, the buildings are too closely tight together
20 and I feel also that if that building was removed
21 you could spread out the buildings.
22 We'd have a little bit more open space.  The
23 way I understand "open space" is actually open
24 space.  I know she said that active recreation is
25 considered open space or a part of open space, but

Page 70

1 that's enclosed active recreation.
2 So I don't know, maybe I'm thinking something
3 different, but anyway, I would also like to see
4 that building being demolished and spread out.
5 Also, I would just like to do an OPRA request just
6 to find out how many children we can expect to come
7 from the whole -- from that whole development
8 because we're still not sure.
9 We heard testimony maybe it's going to be 13,
10 today she's revising it to five, and somehow I just
11 can't see that.
12 If you're going to have 208 units -- I know
13 she testified based on 72 units or 73 units, but
14 still, out of 208 units I'm sure that we can expect
15 a lot more children in school than what she was
16 testifying to and that's a big concern for us
17 citizens.
18 I mean, you know, our schools are -- our
19 schools are already tight as it is now.  We'd like
20 to know what we can expect from all those -- that
21 whole development.  So that's -- that's my opinion.
22     MR. BAGINSKI: Thank you.
23     MS. DABAL: Thank you.
24     MS. POLTEN: I agree with Mr. Melfi
25 and with Mrs. Wygonik.

Page 71

1 I too am concerned about the recreational
2 facility and the amount of children that will be
3 generated from this -- this project in itself
4 because our -- I know our schools are -- are -- are
5 overflowing now and we need a new school and -- you
6 know, but that's not at hand right at this moment.
7 So I do happen to agree with them.
8     MR. PAWLUCZUK: I agree with these
9 two about the OPRA request for the children, yes,
10 totally.
11     MR. RACHELSKI: If I could say
12 something.
13 It was mentioned that this project was
14 compared to West New York.  It really is because
15 you kind of look at density it is a West New York,
16 and this is not the -- the -- the stuff that we
17 want in our town.  It is parking lots and
18 buildings, that's what it basically is.  Thank you.
19     MR. BAGINSKI: Anyone else?
20     MR. KASPEREK: Yeah, my biggest
21 concern would be the -- there's not really a study
22 done on the traffic, like real study, between
23 Midland and Locust Avenue because when I used to,
24 you know, work, you know, coming from work this way
25 I used to spend 25 hours on this.

Page 72

1 Right now considering adding, you know, 207
2 apartments right now you will actually increase the
3 traffic in that area a lot.
4     MR. BAGINSKI: Anyone else at this
5 time?
6     MR. BAZEL: I'd like to echo
7 Mr. Melfi's sentiment about the recreational --
8 recreation center.
9 Also, I feel kind of uneasy that we are being
10 asked to consider this as one project involving two
11 -- two separate entities and that would it be --
12 would it be possible to redevelop each one of those
13 lots in the future separately when we create right
14 now variances?
15     MR. MOORE: No, but you'll have the
16 approvals and the cross-easements and it would be
17 impossible really.
18     MR. BAGINSKI: Okay.
19     MS. POLTEN: Another concern I have
20 too is with the fire lane.
21 As it is -- as it stands right now if that
22 building was to stay there, recreation and the
23 other building, it's very narrow to get a truck
24 through there, that would be -- you know, you'd
25 have to speak with the fire official and have a

In RE: Wallington

---

Page 73

1 report from him.
2    MR. MOORE: What I would like to do
3 if it is at all possible with the board's leave
4 because my client is not here because he's dealing
5 with disasters from hurricanes down in the south is
6 continue this application because I'm certainly
7 hearing loud and clear what you folks are saying
8 about the recreation building and about getting the
9 OPRA request for the school.
10    MR. BAGINSKI: Okay.
11    MR. HERLINSKY: If I can interrupt
12 you.
13    MR. BAGINSKI: Okay.
14    MR. HERLINSKY: Victor Herlinsky,
15 Junior of the law firm of Sills, Cummis. I'm
16 cocounsel with Kevin Moore.
17 I -- I have spoken to the client about a
18 number of the issues. The -- I mean, look, the
19 real issue right here that we're talking about is,
20 you know, I'm sure -- I'm sure the board doesn't
21 like the court's decision as far as, you know, the
22 number of units and what's going on in there.
23 You don't like the fact that we have to put
24 three-bedrooms in there, we don't like that either,
25 but the -- the idea and what I'm going to ask for

---

Page 74

1 is that -- and I'm glad the superintendent's here
2 because the -- and let me just stand up.
3 I know Brigette Bogart for years. It was on
4 me to hire her for this firm. I know her. If she
5 said she called this board she called your office.
6 I know she called this office, and anything saying
7 that she didn't you don't know her, I do. She's
8 been trusted by a number of communities.
9 Her bond is -- I would like to make the OPRA
10 request. You'll get it by the end of the week,
11 you'll have the statutory time, and then we can
12 come to the next -- the next meeting because, you
13 know, I don't want this board to -- to talk in a --
14 in a -- in a vacuum and nobody knows how many.
15 You know, we had somebody come up here and
16 say, You know, I know a one-bedroom apartment that
17 is, you know, eight kids living. I mean, that's
18 BS, that -- that -- you know, that's when they call
19 DYFS.
20 Maybe they're a thing, but that's -- that's --
21 the county should -- there's no apartment I think
22 in -- in -- in a -- in a -- a community like
23 Wallington where there's eight people living there,
24 that's -- that's BS.
25 Excuse my French, but the fact of the matter

---

Page 75

1 is in this -- you know, I feel like she's been
2 under attack in this case, you know, and it's like,
3 look, I have roots in Wallington, she has roots in
4 Wallington, and the fact of the matter is we're not
5 coming here, you know, trying to do something.
6 We're coming here with -- with units that have
7 already been approved by the -- by the court, and
8 if we go back to the court the court's going to
9 say, Look, I already told you what we're putting in
10 here.
11 So like in the end of the day what I'm asking
12 for is let me come back. We're going to get you
13 the report. You know, I -- I -- I trust we're
14 going to get a -- a prompt answer, and then you
15 won't have to guess as far as how many kids are
16 coming in.
17 And -- and I know West New York's not -- you
18 know, just Wallington's not West New York. We're
19 not trying to say that it is, but we're trying to
20 get some information.
21 She called somebody in Wallington. Somebody
22 in Wallington says, Oh, we can't get that
23 information, and you know what, I don't think
24 you're going to have this information hand -- you
25 know, sitting in some drawer.

---

Page 76

1 You're going to have to actually work for it,
2 but if you came here tonight and you said, Look, we
3 want to get you this information. We're going to
4 get you a request that's going to be able to give
5 her the information that she can come and tell you
6 what's going on in Wallington, so that you don't
7 have to guess. So if I can, I would like to be
8 able to answer your question.
9    MS. WYGONIK: I would appreciate
10 that, yes.
11    MR. BAGINSKI: Okay.
12    MS. WYGONIK: That's -- that's one
13 part, that's a small part of this -- all these
14 discussions, but that's one part.
15    MR. HERLINSKY: Yeah, but the -- we
16 -- I've heard everything that the board has said
17 and -- and it --
18    MR. MOORE: We got it, I think.
19    MR. HERLINSKY: Yeah.
20    MR. MELFI: Mr. Herlinsky, it's not
21 the question of an approval for the 207 units
22 because that's court ordered. It's a question --
23    MS. WYGONIK: Right.
24    MR. MELFI: -- of the variances that
25 we have to grant for you -- for you to meet those

---

Page 77

1 207 units.
2 So I don't think it's a child issue that's
3 informational, and for what we want here is to --
4 if you did an OPRA request to say how many children
5 are going to our school system from Mount Pleasant,
6 Jasontown 1 and 2.
7 We're not looking for names and if they have
8 the amount they have the amount. I don't think the
9 amounts are going to really make a difference here,
10 personally, because it's court ordered as far as
11 how many one-bedrooms, how many two-bedrooms, how
12 many three-bedrooms that you had to put in
13 according to the courts, that was the lawsuit that
14 was won by your people.
15     MR. HERLINSKY: Yeah, but if -- if --
16 I did hear every single person that came up here
17 say, We can't have any more kids, and if I didn't
18 hear so much from the board.
19 It's an over -- in my mind it's an overriding
20 consideration and whether or not it's, you know,
21 something that you should or should not according
22 to the law, and Mr. Cedzidlo will advise you on the
23 law, whether it's -- it's -- it's there, and the
24 fact of the matter is right now it's a question
25 mark and it's a question mark, and I will say

Page 78

1 because my planner called your office and got an
2 answer saying, We don't really have that
3 information.
4     MR. MOORE: Basically we've made the
5 point.
6     MS. DABAL: Yeah, really.
7     MR. HERLINSKY: I understand, but I
8 want --
9     MR. SMITH: Yeah, and it's insulting
10 to my superintendent of schools.
11     MS. DABAL: That's right.
12     MR. SMITH: There's two people in
13 that office, his secretary and him.
14     MR. BAGINSKI: Excuse me, excuse me.
15 He has the floor right now. You'll have an
16 opportunity to speak again, sorry.
17     MR. HERLINSKY: Well, we're going to
18 put it all to rest because we're going to get the
19 information, and we're going to come back and we're
20 going to present it to the board so you don't have
21 to guess.
22     MR. BAGINSKI: Okay.
23     MS. WYGONIK: And the reason I kept
24 pursuing the -- you know, how many children we can
25 expect is not that we're going to vote against it

Page 79

1 because we're going to get so many children, but
2 just what can we expect so we can plan for the
3 future because this development may not be complete
4 for a couple years.
5 I don't know how long it's going to take it.
6 We just want to know what we can expect so we can
7 prepare for the future, that's all, and I think
8 that we should know what it would be.
9     MR. CEDZIDLO: Let's be clear about
10 something, okay?
11 We heard from Mr. Melfi, Bazel, Pawluczuk,
12 Polten, we've got Mr. Kasperek. The thing that I
13 heard most clearly were complaints about keeping
14 the existing recreational structure, that was
15 voiced by almost everyone.
16 And Ms. Bogart gave honest testimony that said
17 if we remove that building 95 percent of the
18 variances that we've requested would be eliminated.
19 And name-calling, accusations, side issues, of
20 course people have those issues and of course the
21 public is going to worry, of course those things
22 will get discussed, but the simple fact of the
23 matter is is that the testimony presented by the
24 applicant that -- is that we're asking for a lot of
25 variances on this project in this configuration

Page 80

1 because we're going to keep a building that's only
2 going to be limited to the 73 units on this parcel
3 and will not be shared with all the -- the other
4 units on the other parcel because we can't do that
5 by -- by agreement or by law because it's on a
6 different property.
7 So let's focus on, okay, let's -- let's be
8 civil, let's discuss things properly and let's
9 address what everybody discussed is the granting of
10 variances that all surround a recreational building
11 which is going to impede open space.
12 Ms. Bogart told us very clearly that's an
13 interpretive issue, one the board has interpreted
14 -- clearly stated that they interpret that it's not
15 open space.
16 Mr. Rachelski made a comment about we don't
17 want it to look like West New York. I think it's
18 clear that that is the overriding issue that the
19 board has raised.
20 Certainly Counsel; Mr. Moore, Mr. Herlinsky,
21 said, Can we have a continuance on this? I don't
22 think anybody has expressed any concern because, as
23 the board has also said, the amount of units are
24 already decided.
25 It's how do we present that, build these units

Page 81

1 in the best possible manner for the residents and
2 for the Borough of Wallington and the residents of
3 this project, okay?
4 So from that point -- from this point on let's
5 -- let's be civil and let's address things in the
6 proper way, okay?
7    MR. HERLINSKY: Thank you.
8    MR. BAGINSKI: Okay.  And now just so
9 everybody understands, we as the board here have an
10 obligation to the residents of Wallington and
11 that's what we're here for.
12 So we need to try and make sure that what's
13 being done is done the right way, and we need to
14 balance out -- you're telling me you got a
15 perfectly good building that you don't want to
16 knock down and you see no sense in knocking down,
17 but yet if you do 95 percent of the variances are
18 gone.
19 So we as the board need to sit and discuss
20 this which we've been doing, and we need to come up
21 with a plan or an idea of what's going to work best
22 for us by saying, No, we can't have that building
23 because of whatever, but again, I'm just voicing my
24 opinion now, but we as the board will vote on it.
25 So it -- it's a big project, we all know that

Page 82

1 it is, and the court mandated the number of units,
2 but now we need to do what's best for the residents
3 of our town.
4    MR. MOORE: Well, I'd like to --
5    MR. HERLINSKY: Can I -- can I just
6 ask --
7    MR. MOORE: Before Mr. Herlinsky got
8 up with --
9    MR. HERLINSKY: Can I just ask a -- a
10 simple question, and it's just while I'm sitting
11 here?
12 I'm going on and I see my fellow alumni.  When
13 I -- when I played soccer at Don Bosco I played a
14 lot of guys.  You had a lot of guys from Wallington
15 coming up to Don Bosco at the time, and the fact of
16 the matter is there is -- you know, if you're
17 talking about overcrowding, if you're talking lack
18 of facilities like why wouldn't you want to have
19 like an indoor soccer which we've offered to the
20 town?
21 So like if -- you don't have enough fields in
22 Wallington for all the kids that want to play.
23 Like why -- why wouldn't you want -- why would you
24 want to tear down this building?  It'd be -- make a
25 fantastic indoor soccer, that's what I think.

Page 83

1 You know, somebody said basketball.  I didn't
2 -- I sucked at basketball so I never played that,
3 but I was decent at soccer, but the idea is like
4 why wouldn't you want it?
5 If you -- it's already there, it's built.
6 It's a -- it's a building that was built for
7 several million dollars.  So like to tear it seems
8 like a waste, but if we're offering and say, Look,
9 every Saturday you want to have game after game
10 after game, you know, nine o'clock to two o'clock
11 you got it.  Like if -- if Wallington has this
12 overcrowding problem, why wouldn't you want to have
13 that?
14 I don't know if there's another indoor soccer
15 facility, but you got a high school that -- I don't
16 think that has an indoor soccer facility.  Why
17 wouldn't you want to have that?  I don't
18 understand.
19 I mean, that's a rhetorical question and I'm
20 not asking the board to answer it, but it seems to
21 me that if -- if the issue is the strain on all the
22 resources here in Wallington and we're offering
23 something that's already there, man, I -- I -- I
24 think that'd be a very popular thing because you
25 can do that all year-round, and I assume soccer's

Page 84

1 pretty popular in Wallington, used to be, and the
2 fact of the matter is that -- that's what I would
3 say, but we're going to do the OPRA request.
4 We're going to come in, we'll assess -- again,
5 I've -- I've offered to Mr. Melfi, I've offered to
6 other people to say, Look, if there's something
7 that the town wants to do.
8 If you want us to look in the insurance issues
9 we'll look at them, but the fact of the matter is
10 it's -- it's something that could be for the good
11 of the town, and I -- and I would ask you again
12 it's like why would you want to tear it down if --
13 if it's something we're offering?  So that's all I
14 have to say.
15 I would ask for a continuance so we can
16 provide the information so the board doesn't have
17 to guess.
18    MR. BAGINSKI: Okay.  Thank you,
19 Mr. Herlinsky.  All right, at this point then we'll
20 need a motion to hold it in abeyance until next
21 month.
22    MS. WYGONIK: I'll make the motion.
23    MS. POLTEN: I'll second it.
24    MR. MELFI: Do we -- on -- on that
25 second before we make the motion I just have a

Page 85

1  comment on that or do we have to wait until after
2  we vote because I think a lot of the conditions --
3  okay, let's wait.  We'll wait.
4      MR. BAGINSKI: Okay.  So
5  Mr. Herlinsky comitted to hold it in abeyance.
6  You're going to do the OPRA request for those
7  students, and at this point in time there is a
8  motion.
9  Can we make the request of Mr. Herlinsky to
10  look into insurance and things like that for this
11  -- this type of building or is it feasible at this
12  time to do or do you want to hold off on that?
13      MR. TOMKO: I think you're putting
14  the cart before the horse right now.
15      MS. POLTEN: Yeah.
16      MR. BAGINSKI: Okay.
17      MR. TOMKO: Let -- let -- let's get
18  these other things straightened out before you even
19  talk about what we're going to do out there.
20      MS. POLTEN: Right.
21      MR. BAGINSKI: Okay.
22      MR. TOMKO: I mean, between that and
23  -- and just a quick answer to the traffic study
24  with that traffic light.
25  We have met with Bergen County about that,

Page 86

1  that's been an ongoing thing, and just recently we
2  met and -- and there's a sizable cost involved in
3  it on the municipal part that has to be looked into
4  also.  So we are looking at that avenue, it's not
5  dormant, and the town has been working on it.
6      MR. BAGINSKI: Yes, okay.  Mr. Melfi,
7  good?
8      MR. MELFI: Good.
9      MR. BAGINSKI: We need a motion to
10  the second?
11      MS. POLTEN: We have it.
12      MR. BAGINSKI: Okay.  I need a roll
13  call.
14      MS. SIEK: Melfi?
15      MR. MELFI: Aye.
16      MS. SIEK: Pawluczuk?
17      MR. PAWLUCZUK: Aye.
18      MS. SIEK: Bazel?
19      MR. BAZEL: Aye.
20      MS. SIEK: Polten?
21      MS. POLTEN: Aye.
22      MS. SIEK: Baginski?
23      MR. BAGINSKI: Aye.
24      MS. SIEK: Wygonik?
25      MS. WYGONIK: Aye.

Page 87

1      MS. SIEK: Rachelski?
2      MR. RACHELSKI: Aye.
3      MS. SIEK: Kasperek?
4      MR. KASPEREK: Aye.
5      MS. SIEK: And Tomko?
6      MR. TOMKO: Aye.
7      MR. BAGINSKI: Thank you.
8      MR. MOORE: Oh, we need to get the
9  date for the continuance.
10      MS. SIEK: October 17th.
11      MR. BAGINSKI: Okay.  So anybody in
12  the audience wishing to come back it'll be October
13  17th at the meeting here, same time, same place.
14  Thank you.
15      (Whereupon all witnesses are excused
16  and the matter is adjourned for the evening at 9:08
17  p.m.)
18
19
20
21
22
23
24
25

Page 88

1
2
3          CERTIFICATE
4
5
6
7
8          I, DENISE C. CLARK, a Certified Court
9  Reporter and Notary Public of the State of New
10  Jersey, hereby certify the foregoing to be a true
11  and accurate transcript of the proceedings as taken
12  stenographically by me on the date and place
13  hereinbefore set forth.
14
15
16
17
18          DENISE C. CLARK, CCR
19          License No. 30XI00213800
20
21
22
23
24  My Commission expires
25  November 14, 2017.

BER-L-001670-18  08/30/2018 7:37:18 PM  Pg 24 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME  Document 133-15  Filed 02/26/26  Page 25 of 37
PageID: 1117

In RE: Wallington

Transcript fo Proceedings

**$**

**$45,000 (1)**
38:5
**$5,000 (1)**
38:7
**$55,000 (1)**
38:5

**[**

**[sic] (2)**
13:17;49:16

**A**

**A- (1)**
5:4
**A-1 (1)**
66:2
**A-10 (2)**
56:17;57:6
**A-9 (3)**
5:5,8,13
**a-b-a-l (1)**
51:14
**abeyance (2)**
84:20;85:5
**able (4)**
3:7;47:25;76:4,8
**Absolutely (1)**
64:14
**abundance (1)**
22:9
**accept (3)**
6:24;7:5;31:22
**acceptable (1)**
62:24
**access (2)**
35:10;43:19
**accommodate (3)**
9:1;16:4;20:16
**accommodating (1)**
16:18
**accomplish (1)**
14:9
**accordance (2)**
17:18;57:10
**according (1)**
77:13,21
**accusations (1)**
79:19
**acknowledge (1)**
4:7
**across (3)**
20:21;25:10;60:17
**action (3)**
10:17;13:16;16:22
**active (18)**
18:17;19:15;21:9,15,
23,24;22:7;25:13,15;
45:10,12,17;46:1,2,3,5;

69:24;70:1
**activities (1)**
17:21
**actual (2)**
9:25;29:14
**actually (11)**
9:13;13:7;20:8;24:4;
28:21;34:1;36:7;38:17;
69:23;72:2;76:1
**Adam (1)**
5:6
**adding (1)**
72:1
**additional (8)**
15:19;18:21;25:17;
27:9;37:16;52:3;57:16;
59:13
**address (10)**
4:1;9:7;22;15:19;
32:25;33:3;62:2;63:23;
80:9;81:5
**addressed (1)**
61:20
**addresses (3)**
34:20;35:17;37:14
**adequate (1)**
18:21
**adjacent (3)**
3:21,21;59:14
**adjourned (1)**
87:16
**administrator's (1)**
47:16
**advise (1)**
77:22
**aesthetic (3)**
20:24;28:24;30:11
**aesthetically (3)**
26:25;29:6,9
**affect (2)**
60:23;66:14
**affordable (10)**
17:7;18:7,15;38:9,9;
40:22;41:13,18;52:10;
61:2
**Again (17)**
10:20,25;13:15;16:2,
21;17:6;22:15;42:14;
45:3;46:25;51:12;
54:13;63:1;78:16;
81:23;84:4,11
**against (2)**
6:2;78:25
**age-restricted (1)**
52:13
**ago (1)**
16:10
**agree (7)**
54:2;62:2,18;69:16;
70:24;71:7,8
**agreed (1)**
63:14
**agreement (1)**

80:5
**ahead (3)**
23:5;47:3;49:4
**alarm (1)**
55:21
**albeit (1)**
18:12
**Albro (12)**
36:14;46:16,17,20,
23;47:2,2,4;48:2,10,17,
18
**A-l-b-r-o (1)**
47:2
**alike (1)**
20:8
**allowed (2)**
48:3,14
**allowing (2)**
13:19,21
**allows (1)**
20:9
**almost (1)**
79:15
**alone (1)**
13:9
**along (12)**
5:9;13:2,12;14:19;
20:11;55:2;58:2,6,11;
59:19;60:9,13
**alternative (1)**
21:1
**although (1)**
65:24
**alumni (1)**
82:12
**ambulances (1)**
23:16
**amended (1)**
3:18;60:22
**amendment (1)**
69:15
**amendments (1)**
42:22
**amount (6)**
12:10;68:15;71:2;
77:8,8;80:23
**amounts (1)**
77:9
**analysis (4)**
38:12;39:18;55:25;
62:10
**answered (1)**
36:8
**apartment (4)**
40:6,24;74:16,21
**apartments (8)**
34:20;35:19,20;
40:19;42:8;48:9;68:21;
72:2
**appearance (1)**
26:9
**applicant (20)**
3:21;12:5,6;13:4;

27:11;31:18;54:4,5,15,
17,18;55:20;57:16,19;
58:23;59:10,13;60:8;
64:2;79:24
**applicants (1)**
43:24
**applicant's (2)**
4:16,21
**application (18)**
3:17,21;9:11;17:8;
36:23;46:14;53:18,22;
58:16;60:22,24;61:2,
16;67:4,7;68:3,4;73:6
**applications (3)**
3:15;4:4;52:12
**appreciate (1)**
76:9
**approached (1)**
49:22
**appropriate (18)**
9:3;10:7,11,18;11:3;
12:5;13:16;14:1;16:5,
6,19,22;17:3;18:16;
20:15,17;27:17,18
**approval (21)**
3:19,24;6:24,25;7:5,
7;31:23;32:3,5;33:7;
54:13;56:12,20;57:7;
61:14;62:20;63:3,23;
67:1;69:14;76:21
**approvals (1)**
72:16
**approved (5)**
3:20;42:19;56:13;
63:7;75:7
**approximately (4)**
16:1,2;37:4,7
**architect (3)**
30:6;41:23;64:6
**architect's (1)**
54:7
**architectural (3)**
10:12;11:3;12:20
**area (13)**
10:9,14;13:12;14:19;
15:1,7,21;21:9;30:8;
39:17;57:11,14;72:3
**areas (2)**
58:24;60:5
**argue (1)**
50:21
**argument (1)**
30:23
**argumentative (1)**
36:17
**around (2)**
17:15;49:17
**aspect (1)**
30:11
**assess (1)**
84:4
**associated (2)**
18:23;19:4

**Associates (2)**
44:15;53:12
**Association's (1)**
49:9
**assume (3)**
49:7;52:21;83:25
**assure (1)**
38:20
**attack (1)**
75:2
**attempt (1)**
43:2
**attend (2)**
34:9;35:18
**attending (1)**
48:8
**attention (1)**
47:8
**attorney (4)**
9:21;36:24;64:6;
67:25
**attractive (2)**
11:8;30:17
**audience (3)**
46:10;53:3;87:12
**August (1)**
4:6
**Avenue (16)**
4:1;13:1,2,5,12;
14:19;50:25;55:16,16;
58:3,12;59:20;60:18;
65:23;71:23;86:4
**aware (3)**
49:12,21;50:10
**away (1)**
25:16
**Aye (9)**
86:15,17,19,21,23,
25;87:2,4,6

**B**

**back (17)**
8:5;13:10,22;16:23;
27:21;29:8;38:7;62:21;
66:19;67:9,11;68:16;
69:13;75:8,12;78:19;
87:12
**BAGINSKI (85)**
3:1,7;5:1,15;6:7;7:9,
12,18,20,23;8:1,3;21:7,
13,19;22:2,8,14,21;
23:1,5;24:13;25:19;
34:4;35:14;36:7,14;
39:3;42:14,20,23;44:6,
12,16,22;46:6;48:16,
19,24;50:20;51:2,7;
53:2,10;57:4;61:17,21;
62:3,6;63:4,10,16,20,
25;64:24;65:5,11,15;
66:13,22;67:16,21,25;
68:12;70:22;71:19;
72:4,18;73:10,13;

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 25 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 133-15   Filed 02/26/26   Page 26 of 37
PageID: 1118

In RE: Wallington                                                    Transcript fo Proceedings

76:11;78:14,22;81:8;
84:18;85:4,16,21;86:6,
9,12,22,23;87:7,11
**balance (1)**
   81:14
**balanced (2)**
   18:4;41:3
**ban (1)**
   52:11
**based (6)**
   20:13;26:22;34:20;
   37:8;38:20;70:13
**basically (5)**
   16:11;32:10;52:16;
   71:18;78:4
**basis (2)**
   36:23;50:6
**basketball (3)**
   33:16;83:1,2
**BAUMANN (12)**
   35:13;41:20;45:2;
   46:18,21,25;47:3;49:1,
   3;51:11,15;61:22
**BAZEL (12)**
   25:11;43:1,11,21,25;
   44:24;45:4,13;72:6;
   79:11;86:18,19
**Bear (1)**
   41:7
**bedroom (2)**
   40:4;52:3
**benefit (3)**
   13:9;17:9;20:24
**benefits (7)**
   11:5;13:13;14:14;
   18:9;19:3,8;20:19
**Bergen (4)**
   55:23;56:2,12;85:25
**Bertin (47)**
   4:21,24;5:2,4,10,11,
   12,20;6:8,13;7:8;23:2,
   4;24:4,15,24;28:1,3,5;
   41:8,10;54:25;55:1,23,
   24;56:18,21,25;57:24,
   25;58:1,20;59:1,15,24;
   60:11;62:25;63:3;
   64:11,15,18,22;65:3,
   21;66:11,17;67:6
**best (3)**
   81:1,21;82:2
**better (4)**
   21:1;34:23;35:22;
   60:25
**beyond (2)**
   59:12,19
**big (4)**
   31:17;69:2;70:16;
   81:25
**bigger (1)**
   37:24
**biggest (1)**
   71:20
**binding (1)**

32:7
**bit (6)**
   26:12;38:3;39:11;
   60:17;68:2;69:22
**blends (1)**
   31:4
**Block (3)**
   3:17,22;66:19
**blocked (1)**
   65:15
**board (41)**
   3:2,10;4:7,23;5:9;
   6:23;7:7,9,10;8:19;
   15:9;19:5;20:13;22:12,
   15,19;24:13;30:7;
   31:22;33:7;36:17;
   44:22;47:17;48:23;
   54:12;64:2;68:5;73:20;
   74:5,13;76:16;77:18;
   78:20;80:13,19,23;
   81:9,19,24;83:20;
   84:16
**board-on-board (2)**
   58:25;59:5
**board's (5)**
   3:16;4:4;31:24;57:3;
   73:3
**body (1)**
   33:6
**Bogart (97)**
   7:15,21,24;8:2,6,12,
   18;9:8,13,20;12:8,11,
   13,16,22,24;15:11,14,
   16,18;19:9,11,17,19,
   21;21:2,4,6,12,15;22:5,
   17;23:2;24:14,16,19,
   23;25:1,4,12,24;26:2,
   11,16,19,22;27:4,10,
   16,20,25;28:2,4,7,11;
   29:23,25;31:9;32:6,9,
   13;33:5;34:1,18;35:2,
   12,24;36:1,4,20,25;
   39:4,8,14;40:3;41:2,7,
   9,12;42:4,17;45:8,14,
   21;46:1,3;47:20,22;
   50:23;51:1;52:23;53:8,
   10;64:24;74:3;79:16;
   80:12
**Bogart's (1)**
   21:4
**bond (1)**
   74:9
**borough (10)**
   18:7;47:5;49:5,25;
   55:22;56:8;60:8;61:12,
   15;81:2
**Bosco (2)**
   82:13,15
**Both (4)**
   3:25;17:3;43:3,9
**boundary (1)**
   13:1
**brick (1)**

60:14
**bridge (2)**
   67:10,10
**briefly (1)**
   4:20
**Brigette (1)**
   74:3
**bring (2)**
   22:22;68:9
**bringing (1)**
   53:25
**broke (1)**
   7:17
**brought (1)**
   28:17
**BS (2)**
   74:18,24
**buffer (3)**
   13:1,11;15:13
**buffers (1)**
   17:15
**build (5)**
   11:5;32:10,11;55:17;
   80:25
**building (79)**
   8:16,23;9:2,22;11:6,
   12;12:4,6,9,13,14;
   13:20;14:9,12;15:22,
   23,25;16:4,18;18:1,12;
   21:14;23:14;24:17,21;
   25:7,8,16,24;26:2,4,6,
   14;28:5,8,16;29:14;
   30:1,2,4,22;31:12,16,
   24;32:1,12;33:11,18;
   39:2;45:19;55:6,7,11;
   57:11;59:25;61:8,8,9;
   68:20,22;69:2,5,6,7,12,
   17,20;70:4;72:22,23;
   73:8;79:17;80:1,10;
   81:15,22;82:24;83:6;
   85:11
**buildings (18)**
   6:2;8:15;10:5;25:23;
   26:5;27:22,23;53:20,
   21;54:16,23;58:19;
   60:2;61:5;69:13,19,21;
   71:18
**building's (1)**
   26:14
**built (3)**
   68:25;83:5,6
**bulk (2)**
   3:24;15:21
**business (2)**
   3:2;47:16

___

**C**

**C2.7 (1)**
   59:22
**calculations (1)**
   54:19
**Calisto (1)**

4:21
**call (5)**
   16:25;43:14;50:17;
   74:18;86:13
**called (9)**
   18:8;16;50:15,18;
   74:5,5,6;75:21;78:1
**calls (2)**
   18:2
**came (3)**
   47:7;76:2;77:16
**can (62)**
   5:9,9,16;10:10;15:6;
   22:6,17,22;24:10;
   29:13;30:7;31:25;32:3,
   4,6,23;33:7;34:23;
   35:14;36:7,9;38:20;
   44:20;46:5,13,14;
   47:22;48:2,13;50:7;
   51:4,11;52:13;53:5;
   54:11;57:4;58:9;61:10;
   62:16;64:5;66:7;68:6,
   8;70:6,14,20;73:11;
   74:11;76:5,7;78:24;
   79:2,2,6,6;80:21;82:5,
   5,9;83:25;84:15;85:9
**cancellation (1)**
   4:5
**canopy (1)**
   65:24
**capacity (2)**
   54:19;62:14
**capita (1)**
   38:6
**care (1)**
   18:24
**cart (1)**
   85:14
**case (6)**
   18:24;23:14;24:9,11;
   31:21;75:2
**caution (2)**
   22:10;36:16
**CEDZIDLO (5)**
   4:9,11;67:19;77:22;
   79:9
**ceiling-to (1)**
   31:10
**cell (2)**
   5:16,19
**census (2)**
   37:22;38:4
**center (2)**
   45:22;72:8
**certain (1)**
   42:22
**certainly (4)**
   6:23;50:7;73:6;
   80:20
**chain-link (1)**
   58:23
**chair (3)**
   8:2,10,11

**Chairman (2)**
   3:10;48:21
**Chair's (1)**
   8:3
**change (2)**
   5:22;33:19
**changes (1)**
   4:22
**character (1)**
   20:22
**checked (1)**
   28:22
**chief (2)**
   6:16,19
**child (3)**
   40:7,11;77:2
**children (22)**
   34:8;35:18;37:15;
   38:25;40:5;51:18,25;
   52:4,6,11,12,13,17,20,
   25;70:6,15;71:2,9;
   77:4;78:24;79:1
**choices (1)**
   18:16
**chose (1)**
   31:22
**circulation (4)**
   9:3;13:19;16:6,19
**citizens (6)**
   17:5;9;44:20;46:9;
   53:5;70:17
**City (1)**
   40:2
**civil (2)**
   80:8;81:5
**clarification (4)**
   12:9;22:15;47:7;
   65:6
**clarify (3)**
   9:9;22:3;42:15
**clear (4)**
   52:25;73:7;79:9;
   80:18
**clearly (3)**
   79:13;80:12,14
**client (3)**
   32:24;73:4,17
**close (2)**
   24:8;53:4
**closely (1)**
   69:19
**closer (2)**
   57:15;67:9
**closest (1)**
   26:17
**closing (1)**
   49:13
**Coach (1)**
   50:9
**cocounsel (1)**
   73:16
**code (1)**
   45:9

color (1)
  6:1
colors (1)
  5:25
combine (1)
  43:2
combining (2)
  8:23;9:10
coming (15)
  29:7;37:4;38:19,25;
  48:11;51:18,25;55:2,6,
  7;71:24;75:5,6,16;
  82:15
comitted (1)
  85:5
Comment (5)
  59:10;60:7;67:13;
  80:16;85:1
commented (1)
  59:2
comments (5)
  20:13,16;63:6,12;
  68:8
common (2)
  44:2,2
communication (1)
  47:9
communities (2)
  52:14;74:8
community (2)
  33:14;74:22
compact (1)
  54:20
compared (2)
  10:13;71:14
comparison (1)
  47:12
compile (1)
  35:8
compiled (1)
  34:19
complaints (1)
  79:13
complete (1)
  79:3
completely (1)
  27:12
Completeness (1)
  53:18
complex (6)
  23:11;36:18;42:3,7;
  51:25;52:7
compliance (1)
  54:12
comply (7)
  10:10,25;12:6;19:17,
  18;27:12;63:14
complying (1)
  16:11
component (1)
  17:8
concept (1)
  17:24

concern (8)
  4:23;5:24;37:1;62:8;
  70:16;71:21;72:19;
  80:22
concerned (2)
  34:10;71:1
concluded (1)
  4:14;8:12
concludes (3)
  21:3,4;60:19
condition (20)
  6:25;7:6;9:15;31:23;
  32:5,16,17;33:4,7;
  54:12;55:18;61:9,14;
  62:15,17,19;63:7,23;
  66:7,8
conditional (4)
  56:12,20;57:6;67:1
conditions (7)
  8:24;9:15;14:21,24;
  16:16;32:23;85:2
configuration (1)
  79:25
confirm (1)
  54:20
conform (1)
  22:11
Conforming (1)
  11:20
congested (2)
  23:7;69:18
connecting (1)
  55:3
connection (1)
  40:2
conservation (1)
  17:12
consider (3)
  37:23;39:19;45:7;
  56:5;72:10
consideration (4)
  20:16;39:15;55:22;
  77:20
considered (7)
  21:14,15,17,20;26:4;
  30:16;69:25
considering (2)
  31:17;72:1
consistent (5)
  10:8;11:7,25;14:5,20
consolidate (2)
  43:10;44:5
constitutes (1)
  12:18
constrained (1)
  17:17
construction (1)
  66:11
contemplated (1)
  14:6
continuance (3)
  80:21;84:15;87:9
continue (3)

4:18;32:16;73:6
continued (1)
  4:4
controls (1)
  18:20
conversation (1)
  36:5
coordinate (1)
  61:1
coordination (1)
  17:20
copied (2)
  56:25;57:2
copy (3)
  49:8;54:21;57:3
cost (2)
  17:23;86:2
council (2)
  49:6;61:15
Counsel (1)
  80:20
count (1)
  25:13
counted (1)
  45:20
counting (1)
  45:20
counts (1)
  56:1
County (15)
  55:23;56:2,12,13,15,
  20;57:6;66:20,21,24;
  67:2,5,11;74:21;85:25
county's (1)
  66:18
couple (5)
  10:16;13:14;53:15;
  58:4;79:4
course (3)
  79:20,20,21
court (7)
  33:16;61:3;75:7,8;
  76:22;77:10;82:1
courts (1)
  77:13
court's (2)
  73:21;75:8
coverage (16)
  8:25;15:22,22,24,24,
  25;16:2,7,14,20;18:10,
  13,23;19:2,6;25:2
create (4)
  8:24;19:23;20:24;
  72:13
created (2)
  9:16;38:14
creates (4)
  11:18;20:1;30:8,9
creating (1)
  13:11
creative (1)
  10:24
cross-easements (4)

43:8,16,18;72:16
Cummis (2)
  3:12;73:15
curb (2)
  6:2;60:15
curbs (1)
  6:5
Currently (1)
  13:6
cut (1)
  69:13

**D**

DABAL (11)
  51:6,9,13,13,16;
  52:15,19;53:1;70:23;
  78:6,11
data (5)
  37:22;38:21,22;
  39:16;48:13
date (1)
  87:9
dated (3)
  53:12;56:21;57:7
David (1)
  51:14
day (1)
  75:11
dealing (1)
  73:4
dealt (1)
  8:14
decent (1)
  83:3
decided (1)
  80:24
decision (3)
  36:23;50:6;73:21
deem (1)
  33:9
deemed (1)
  53:15
defend (1)
  50:4
defies (1)
  51:22
define (1)
  45:11
definitely (3)
  27:14;40:25;52:4
definition (3)
  44:25;45:4,9
degradation (1)
  17:13
delay (1)
  55:18
delivery (1)
  6:10
demolished (1)
  70:4
dense (1)
  65:24

density (4)
  16:10,12;17:6;71:15
deny (1)
  52:12
denying (1)
  68:14
DEP (1)
  64:15
department (2)
  7:6;56:7
depending (1)
  26:3
design (7)
  10:3,6,10,12;11:8;
  15:1;16:15,15;20:12,
  14;27:18
designed (2)
  9:3;36:18
desirable (3)
  10:12,23;20:4
details (1)
  54:4
detriment (1)
  11:11
detriments (1)
  20:20
developed (2)
  9:18;43:2
developing (1)
  17:17
development (23)
  10:18,22,24;11:2,7,
  23;14:20;16:23,25;
  17:22,23;18:4;19:25;
  31:4;37:5,19;38:19;
  39:9;42:9;43:18;70:7,
  21;79:3
developmentable (1)
  13:17
deviation (2)
  12:4;26:20
deviations (2)
  14:10;16:14
difference (2)
  22:4;77:9
different (5)
  39:23,25;65:1;70:3;
  80:6
dimensioned (1)
  54:11
dimensions (1)
  54:6
direct (3)
  4:15;21:5;44:9
disasters (1)
  73:5
disc (1)
  54:21
discuss (3)
  4:22;80:8;81:19
discussed (4)
  33:16;64:9;79:22;
  80:9

BER-L-001670-18    08/30/2018 7:37:18 PM  Pg 27 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-15    Filed 02/26/26    Page 28 of 37
PageID: 1120

In RE: Wallington                                                    Transcript fo Proceedings

**discussion (3)**
67:20,24;68:2
**discussions (1)**
76:14
**dislike (1)**
68:3
**disrespect (1)**
28:22
**distance (4)**
39:11,12,13,24
**distinctively (1)**
51:19
**district (3)**
47:10,12;49:9
**documents (1)**
18:8
**dollars (1)**
83:7
**Don (2)**
82:13,15
**done (7)**
37:6;54:11;55:25;
59:1;71:22;81:13,13
**don'ts (1)**
68:11
**door (2)**
24:8;58:23
**dormant (1)**
86:5
**do's (1)**
68:10
**DOT (1)**
38:22
**dots (1)**
58:4
**down (7)**
61:10;69:12;73:5;
81:16,16;82:24;84:12
**drawer (1)**
75:25
**drip (1)**
58:9
**driveway (7)**
24:5,6,9;54:24;55:3;
66:5,15
**driving (2)**
39:12,12
**Due (5)**
4:5;8:22;9:24;16:3;
30:4
**duly (3)**
46:23;49:2;51:9
**dumpster (1)**
58:24
**during (2)**
36:10;65:7
**DYFS (1)**
74:19

**E**

**earlier (1)**
4:12

**easel (1)**
5:11
**echo (1)**
72:6
**Education (1)**
48:23
**effect (1)**
31:23
**efficient (3)**
14:15,16;17:23
**eight (2)**
74:17,23
**either (3)**
6:19;48:8;73:24
**ejector (1)**
55:10
**elevations (1)**
30:1
**eliminate (3)**
24:17;25:1,7
**eliminated (1)**
79:18
**else (10)**
25:19;42:23;44:6;
46:6;48:19;49:23;51:3;
53:2;71:19;72:4
**emergency (5)**
20:7;23:15;24:9;
64:9,12
**enclosed (3)**
21:13;45:25;70:1
**enclosure (2)**
49:15;58:24
**encourage (3)**
13:16;17:20;18:3
**encroaches (1)**
13:7
**encroaching (1)**
15:4
**encroachment (1)**
15:10
**end (2)**
74:10;75:11
**energy (1)**
17:13
**engineer (9)**
4:21;9:4;18:19;26:3;
58:10;60:7;64:6;66:10,
12
**Engineering (3)**
44:14;53:12;61:25
**engineers (1)**
14:25
**enough (1)**
82:21
**ensure (1)**
52:6
**entirely (1)**
43:6
**entities (1)**
72:11
**entrance (9)**
20:1;23:10,16,23;

24:7;26:10,11;66:5,15
**environment (5)**
10:13,24;17:14;20:1,
5
**environmentally (1)**
17:16
**equally (1)**
49:17
**estimated (1)**
38:17
**evaluation (1)**
49:9
**Evan (1)**
61:24
**even (4)**
9:17;38:16;65:9;
85:18
**evening (8)**
3:9;4:3;7:20,21;
8:20;46:16;47:4;87:16
**everybody (2)**
80:9;81:9
**everybody's (1)**
22:3
**everyone (1)**
79:15
**exact (1)**
44:3
**exactly (2)**
43:7;48:12
**Excellent (1)**
19:20
**except (1)**
69:4
**excuse (4)**
69:9;74:25;78:14,14
**excused (1)**
87:15
**Exhibit (5)**
5:4,5,21;56:24;66:2
**exhibits (2)**
5:3;59:16
**existed (1)**
15:3
**existing (23)**
8:23;9:2;12:18;13:6,
20;14:8,14,16,21,24;
16:4,18;17:25;18:10,
11;19:10;24:5;54:18,
20;55:9;58:5;62:12;
79:14
**exit (3)**
23:17,23;66:15
**expect (6)**
70:6,14,20;78:25;
79:2,6
**expert (1)**
23:19
**explanation (2)**
53:16;54:2
**expressed (1)**
80:22
**extend (1)**

59:12
**extends (1)**
60:1
**extent (1)**
54:10
**exterior (1)**
58:18
**extra (1)**
11:17

**F**

**facilities (3)**
45:11;69:1;82:18
**facility (5)**
18:14;30:5;71:2;
83:15,16
**fact (15)**
8:22;16:3,24;22:13;
34:8;38:23;65:8;73:23;
74:25;75:4;77:24;
79:22;82:15;84:2,9
**factor (1)**
30:12
**FAIELLA (1)**
5:7
**family (1)**
18:14
**fantastic (1)**
82:25
**far (7)**
22:18;25:22;37:14;
62:16;73:21;75:15;
77:10
**feasible (1)**
85:11
**feel (6)**
37:14;69:1,11,20;
72:9;75:1
**feet (12)**
9:24,24;12:10,12;
13:1,5;25:25;57:15,22;
58:13,17;59:19
**fellow (1)**
82:12
**fence (7)**
58:23,25;59:2,5,6,7;
60:3
**few (2)**
61:19;68:16
**field (1)**
66:14
**fields (1)**
82:21
**figure (1)**
66:6
**filings (1)**
4:22
**final (4)**
3:19,23;60:23;67:11
**find (2)**
61:10;70:6
**fine (4)**

7:3;8:7;44:21;50:24
**fire (15)**
5:24;6:1,10,15,16,16,
19,20;7:6;16:5,6;
23:15;24:10;72:20,25
**firm (3)**
3:12;73:15;74:4
**first (8)**
30:4,9,22;31:7;52:8;
54:3;60:22;65:23
**fit (4)**
23:13,17;24:10;
54:12
**five (10)**
9:6;37:7;38:16,24;
51:25;52:6,17,22,24;
70:10
**fixtures (1)**
60:9
**flat (9)**
27:23;28:5,8,16,19;
29:8,22;31:6;33:20
**floor (4)**
30:4,9;31:7;78:15
**floor-to-ceiling (1)**
31:10
**flow (1)**
62:9
**flows (1)**
62:11
**focus (1)**
80:7
**folks (1)**
73:7
**follow (2)**
5:9;37:1
**foot-candle (1)**
59:11
**force (1)**
38:2
**form (2)**
22:7;48:11
**formal (3)**
47:14,18;48:11
**forth (3)**
5:25;19:8;61:3
**forward (3)**
46:15;51:4;52:7
**forwarded (1)**
54:21
**found (1)**
6:23
**four (4)**
9:6,23;24:22,23
**French (1)**
74:25
**front (6)**
15:10;30:5;57:12,17,
17;69:6
**full (1)**
39:2
**functions (1)**
43:18

**further (10)**
7:8;10:16;13:14,24;
14:4;16:21;17:19;20:4;
54:2;60:17
**furthering (1)**
17:10
**Furthermore (2)**
54:5;57:19
**furthers (1)**
13:25
**future (5)**
49:19;62:13;72:13;
79:3,7

**G**

**game (3)**
83:9,9,10
**gather (1)**
35:21
**gave (2)**
68:10;79:16
**Gee (1)**
5:18
**general (2)**
10:20;12:2
**generate (2)**
36:21;40:25
**generated (2)**
37:18;71:3
**generator (2)**
64:9,19
**gives (1)**
19:25
**glad (1)**
74:1
**goals (5)**
12:1,2;14:4;16:12;
17:10
**goes (4)**
16:23;17:10,24;38:6
**Good (10)**
3:9;7:20,21;46:16;
61:9;62:17;81:15;
84:10;86:7,8
**governing (1)**
33:6
**grant (7)**
6:24;7:7;15:9;19:5;
31:22;54:12;76:25
**granted (3)**
28:20;29:2;68:14
**granting (8)**
11:5,11;12:3;16:20;
18:9;20:3,19;80:9
**grass (2)**
13:2,11
**Great (2)**
5:20;36:13
**greater (2)**
31:10;38:3
**Gross (1)**
3:12

**ground (1)**
29:19
**ground-level (2)**
11:15,17
**guess (8)**
8:15;12:10;26:13;
56:9;75:15;76:7;78:21;
84:17
**guests (1)**
20:8
**guide (3)**
10:17;13:16;16:22
**guys (4)**
28:14;65:18;82:14,
14

**H**

**half (1)**
38:17
**hand (3)**
5:9;71:6;75:24
**handle (1)**
62:16
**happen (2)**
23:14;71:7
**heading (1)**
65:23
**health (1)**
10:19
**hear (5)**
3:8;44:19;63:22;
77:16,18
**heard (11)**
14:3;16:9;18:19;
46:10;48:20;51:3;53:3;
70:9;76:16;79:11,13
**hearing (10)**
4:5,6,14;14:4;16:10;
23:13;28:17;46:9;53:5;
73:7
**hearings (2)**
4:3;28:23
**heart (3)**
16:24;17:10;49:13
**heavy (2)**
8:10,11
**hedgerow (1)**
58:2
**height (18)**
8:17;9:22;11:6,17;
12:4,6;25:8,22;26:6;
27:8;29:14;30:10;
31:10;33:24;34:2,3;
68:23;69:4
**held (1)**
67:24
**help (2)**
15:6;58:11
**helpful (1)**
5:6
**HERLINSKY (17)**
73:11,14,14;76:15,

19,20;77:15;78:7,17;
80:20;81:7;82:5,7,9;
84:19;85:5,9
**high (2)**
65:25;83:15
**high-density (2)**
47:11,12
**higher (2)**
27:1;30:9
**highest (1)**
49:25
**hire (1)**
74:4
**Hold (5)**
35:14;48:24;84:20;
85:5,12
**Home (7)**
3:4,13,14,18,23;4:17,
19
**Homes (1)**
10:5
**honest (1)**
79:16
**horse (1)**
85:14
**hours (1)**
71:25
**house (1)**
40:7
**household (1)**
38:1
**households (1)**
38:10
**housing (10)**
17:7;18:4,7,15;38:9;
40:22;47:11,13;52:10;
61:2
**hurricanes (1)**
73:5
**hypothetical (1)**
33:11

**I**

**idea (3)**
73:25;81:21;83:3
**identification (2)**
5:14;57:8
**identified (1)**
18:5
**identifies (1)**
19:25
**identify (3)**
20:6,9;61:22
**identities (1)**
48:4,7
**illegal (2)**
52:11,11
**impact (3)**
14:23;47:10,11
**impede (1)**
80:11
**important (3)**

7:2;17:8;19:22
**impossible (1)**
72:17
**improper (1)**
17:14
**improve (1)**
13:21
**improvement (5)**
12:18;14:21;15:2,6;
19:9
**improvements (2)**
18:21;57:21
**improving (2)**
13:8;14:23
**include (2)**
46:5;59:11
**includes (2)**
14:10;45:10
**inclusive (1)**
42:12
**income (4)**
38:2,4,6;42:13
**inconsistent (1)**
11:22
**increase (7)**
18:13;34:2;49:11,14,
15;58:9;72:2
**increases (3)**
16:3,7;20:8
**increasing (2)**
18:23;55:18
**indicate (3)**
54:5,15;58:4
**indicated (2)**
9:21,22
**indicates (1)**
62:10
**indoor (1)**
82:19,25;83:14,16
**informal (2)**
47:14,19
**information (30)**
34:12,13,16,17,19,
24;35:20,23;37:11,13;
47:14;48:1,3,14;49:18,
21;50:1,7,24;62:14,15,
19;75:20,23,24;76:3,5;
78:3,19;84:16
**informational (1)**
53:14;54:1;63:13;
77:3
**initiate (1)**
56:8
**initiated (1)**
56:10
**install (1)**
60:8
**installation (1)**
62:22
**instead (1)**
63:8
**insufficient (1)**
62:21

**insulting (1)**
78:9
**insurance (5)**
32:20,25;61:13;84:8;
85:10
**intended (2)**
28:22;55:8
**intends (1)**
54:17
**intensities (1)**
59:12
**interpret (1)**
80:14
**interpretation (1)**
22:12
**interpreted (1)**
80:13
**interpreting (1)**
45:19
**interpretive (1)**
80:13
**interrupt (1)**
73:11
**intersection (2)**
55:15,21
**into (10)**
15:10;20:15,16;
39:15;55:12;60:1;
62:11,12;85:10;86:3
**involved (1)**
86:2
**involving (1)**
72:10
**isolated (1)**
40:1
**issue (6)**
28:15;73:19;77:2;
80:13,18;83:21
**issues (8)**
15:1,5;28:19;32:25;
73:18;79:19,20;84:8
**Item (6)**
53:17;54:13,14;
55:15;57:10;63:1
**items (3)**
53:14,25;61:19

**J**

**Jack (1)**
41:22
**JACOBS (13)**
61:19,24,24;62:5,7,
24;63:2,5,15,18,21;
64:20,23
**James (3)**
46:17,23;47:2
**Jasontown (4)**
35:19;48:8;60:2;
77:6
**Jersey (5)**
17:5,9;37:3,8;38:21
**Joe (2)**

BER-L-001670-18    08/30/2018 7:37:18 PM  Pg 29 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-15    Filed 02/26/26    Page 30 of 37
PageID: 1122

In RE: Wallington                                                                    Transcript fo Proceedings

48:22;49:2
**July (5)**
  4:4,14;44:15;47:8;
  53:13
**Junior (1)**
  73:15
**jurisdiction (1)**
  4:8

## K

**KASPEREK (12)**
  22:20,22;23:3,6,22;
  24:2,11;42:25;71:20;
  79:12;87:3,4
**keep (3)**
  10:4;68:23;80:1
**keeping (4)**
  8:23;31:12;69:17;
  79:13
**kept (2)**
  24:7;78:23
**Kevin (2)**
  3:11;73:16
**kids (4)**
  74:17;75:15;77:17;
  82:22
**kind (8)**
  7:10;8:19;23:15,18;
  34:15;39:19;71:15;
  72:9
**knock (1)**
  81:16
**knocking (1)**
  81:16
**knows (1)**
  74:14

## L

**labor (1)**
  38:1
**lack (1)**
  82:17
**laid (1)**
  16:16
**Land (7)**
  10:16;12:1;13:15;
  17:14,17,22,24
**lands (3)**
  10:18;13:17;16:23
**landscaped (1)**
  57:12
**landscaping (1)**
  57:16
**Lane (3)**
  6:1,16;72:20
**lanes (1)**
  5:24
**lanterns (1)**
  60:13
**large (1)**
  31:24

**largely (1)**
  53:14
**larger (1)**
  30:4
**last (19)**
  7:19;8:13;11:16;
  15:20,21;19:11;23:21,
  21,22;28:16,18;34:7;
  36:20;37:1;38:17;55:1;
  60:7,12;64:16
**lastly (1)**
  18:3
**lateral (5)**
  54:16,18,20,21;55:6,
  7
**Law (7)**
  10:17;12:1;13:15;
  73:15;77:22,23;80:5
**lawn (1)**
  14:19
**lawsuit (2)**
  68:14;77:13
**layout (2)**
  14:16,17
**leaks (2)**
  28:19,24
**lease (2)**
  32:3,8
**least (2)**
  15:4;49:16
**leave (3)**
  50:22;69:2;73:3
**left-hand (1)**
  23:9
**lends (1)**
  11:18
**lengthy (1)**
  8:20
**less (1)**
  38:17
**lessening (3)**
  14:14;17:22;18:10
**letter (1)**
  61:20
**level (1)**
  55:17
**liability (1)**
  33:1
**liar (5)**
  50:5,9,9,16,17
**light (5)**
  56:3,5,15;60:9;85:24
**lighting (5)**
  59:11,16,17,18;60:1
**limit (1)**
  52:13
**limited (1)**
  80:2
**line (13)**
  43:17;54:23;55:2;
  57:12,15,17,23;58:9,
  14,15;59:12;60:10,14
**lines (4)**

6:2;9:17;22:24;
  58:18
**listed (1)**
  37:20
**Listen (1)**
  50:20
**listening (1)**
  61:16
**little (9)**
  26:12;38:3;39:11;
  42:7;60:17,25;63:9;
  68:2;69:22
**live (1)**
  20:2
**living (2)**
  74:17,23
**LLC (6)**
  3:3,4,13,14,18,23
**locate (2)**
  65:17,18
**located (5)**
  11:12;20:21;57:11,
  14,22
**location (4)**
  11:14;14:2;53:19;
  65:10
**locations (2)**
  17:3;53:19
**Locust (1)**
  71:23
**logic (1)**
  51:22
**long (2)**
  58:8;79:5
**look (15)**
  29:6;37:9;47:22;
  60:4;71:15;73:18;75:3,
  9;76:2;80:17;83:8;
  84:6,8,9;85:10
**looked (1)**
  86:3
**looking (4)**
  26:10;38:9;77:7;
  86:4
**Lot (31)**
  3:17,22;9:17;15:22,
  24;16:1;24:1,2;31:15;
  36:21;37:12,25;38:24;
  40:11;43:17;57:15,17,
  22;58:13,15,18,19;
  60:2;62:10;69:13;
  70:15;72:3;79:24;
  82:14,14;85:2
**lots (10)**
  8:23;9:10,12,14;
  43:1,3,10;61:6;71:17;
  72:13
**loud (3)**
  3:6,6;73:7
**low (1)**
  42:13
**lower (2)**
  38:16,24

## M

**Main (17)**
  4:1;13:1,2,5,12;
  14:19;26:10,11,18;
  36:3;55:16;58:3,11;
  59:19;60:17;62:8;
  65:23
**mainly (1)**
  34:10
**maintain (1)**
  13:20
**maintained (1)**
  49:16
**maintaining (6)**
  14:8,12;17:15,16,25;
  27:3
**major (2)**
  12:1;27:7
**makes (2)**
  60:25;61:1
**making (1)**
  14:15
**man (1)**
  83:23
**management (1)**
  18:20
**mandated (1)**
  82:1
**manner (2)**
  10:19;81:1
**many (14)**
  24:17;34:8;40:18;
  41:5;51:18;70:6;74:14;
  75:15;77:4,11,11,12;
  78:24;79:1
**mark (3)**
  6:17;77:25,25
**marked (2)**
  5:14;57:7
**market (1)**
  41:19
**marking (1)**
  5:5
**markings (1)**
  6:17
**Martie (1)**
  57:5
**massive (1)**
  58:7
**master (8)**
  14:5,7;16:11,24;
  17:11;18:1,5,8
**match (2)**
  10:4;12:20
**matches (1)**
  10:21;11:1,9
**mats (4)**
  45:1,5,15,17
**matter (11)**
  26:9;36:10;53:3;
  74:25;75:4;77:24;

79:23;82:16;84:2,9;
  87:16
**maximum (2)**
  9:22;25:8
**may (6)**
  4:14;35:22,24;44:14;
  53:12;79:3
**maybe (9)**
  38:25;45:14;48:8;
  50:18,19;52:3;70:2,9;
  74:20
**Mayor (2)**
  23:18;49:6
**mean (5)**
  9:9;23:25;27:7;
  28:15;32:9;35:6,6;
  39:11;43:12;58:7;68:6;
  70:18;73:18;74:17;
  83:19;85:22
**meaningful (1)**
  61:11
**means (1)**
  52:21
**meant (1)**
  9:14
**measured (1)**
  29:15
**median (2)**
  38:2,4
**meet (4)**
  17:4;21:10,24;76:25
**meeting (14)**
  4:6;8:13;18:17;
  23:21,22;32:15,17;
  36:11;47:8;51:16;61:2;
  64:17;74:12;87:13
**MELFI (42)**
  6:14;7:1,4;21:17;
  24:16,20;27:2;28:15,
  25;29:6,12,13,16,20;
  31:5,11,16;39:1;45:18,
  23;46:2;64:4,8,14,16,
  19;66:23;68:10,13;
  69:8,11,16;70:24;
  76:20,24;79:11;84:5,
  24;86:6,8,14,15
**Melfi's (1)**
  72:7
**Melissa (2)**
  51:9,13
**member (1)**
  48:22
**members (8)**
  3:10;7:9,10;22:16,
  19;24:14;44:23;64:3
**memory (1)**
  3:16
**mention (3)**
  28:23;56:11;63:13
**mentioned (7)**
  9:5;14:13;18:6;
  19:12;39:16;65:22;
  71:13

met (2)
   85:25;86:2
middle (2)
   4:15;7:17
Midland (2)
   55:16;71:23
midway (2)
   29:16,16
might (5)
   22:18;39:18;58:21;
   59:5,6
million (1)
   83:7
mind (2)
   8:6;77:19
minimize (1)
   36:18
minimized (1)
   11:13
minimum (1)
   57:12
minor (7)
   5:22;11:6;12:4;
   14:10;42:22;63:6,18
minute (1)
   29:1
Miss (1)
   7:15
missed (2)
   55:7;60:11
missing (1)
   7:24
mistake (1)
   30:1
mix (2)
   40:4;44:3
moderate (1)
   42:13
modification (1)
   14:11
modify (1)
   6:5
moment (1)
   71:6
money (2)
   33:2;49:10
month (2)
   7:19;84:21
months (2)
   16:10;38:6
monument (13)
   19:13,22,24;20:3,21;
   54:7;64:25;66:4,14,18;
   67:4,6,14
MOORE (120)
   3:5,9,11;4:10,13;5:3,
   8,18;6:12,22;7:3,5,14,
   19;8:10;9:8,19;12:8,
   12,14,17,23;15:11,15,
   17;19:7,15,18,20;
   20:25;21:3,21;22:9;
   24:22;28:21;29:5,23;
   30:6,13,17,19,25;31:3,

8,14,20;32:4,7,11,15,
22;33:3,13,22,24;
34:25;35:3,7,11;36:13,
16;40:21;41:16,24;
42:18,21;43:4,13,23;
44:1,8,9,13,21;45:16;
46:4;47:20,24;50:3,11,
15;52:8,18,23;53:5,6,9,
11;55:14;56:16,19,23;
57:2,9,25;58:20;59:9,
22;60:6,19;61:18;62:1,
18;63:11;64:7;65:4,14,
17;66:10;69:3,10;
72:15;73:2,16;76:18;
78:4;80:20;82:4,7;87:8
more (26)
   9:7;10:6,8;11:2,8;
   12:4;14:15,19;17:23;
   26:24,24;36:15;38:23;
   44:7,9,24;45:16;51:24;
   52:16,22;54:10;59:3,7;
   69:22;70:15;77:17
moreover (1)
   10:20
Morningside (9)
   3:3,14,22;4:17,19;
   34:9;42:3,6;52:5
most (8)
   8:22;9:2;20:14;
   27:18;37:20;53:13;
   58:1;79:13
mostly (1)
   9:1
motion (7)
   67:18;68:9;84:20,22,
   25;85:8;86:9
Mount (3)
   35:19;48:9;77:5
move (2)
   40:14;69:12
Moving (2)
   3:1;52:7
Mrs (1)
   70:25
much (4)
   37:24;48:17;49:10;
   77:18
multifamily (2)
   3:20,25
Municipal (9)
   10:16,17;12:1;13:15,
   16;16:21,22;60:16;
   86:3
municipality (3)
   50:18,19;56:4
must (2)
   35:6,20
myself (1)
   37:7

N

name (5)

3:11;41:21;46:25;
48:22;51:11
name-calling (1)
   79:19
names (1)
   77:7
name's (1)
   41:22
narrow (1)
   72:23
necessarily (1)
   40:3
need (31)
   8:25;11:16;13:18;
   14:10;15:19;16:4;18:7;
   21:21,22;30:9;34:3;
   46:13,18;48:24;49:1;
   50:23;51:7;62:17;
   63:22;67:18;69:1;71:5;
   81:12,13,19,20;82:2;
   84:20;86:9,12;87:8
needed (2)
   10:3;13:6
needs (2)
   17:4;54:10
negative (3)
   11:11;14:22;68:8
negatives (3)
   18:22;19:2,3
Neglia (4)
   44:14;53:11;60:20;
   61:25
neighborhood (4)
   11:4,25;20:18,23
New (23)
   3:4,13,17;5:21;10:5;
   17:5,9;37:3,21,23;38:5,
   13,21;40:2;61:1;65:1;
   69:6;71:5,14,15;75:17,
   18;80:17
next (8)
   9:20;12:24;24:8;
   64:21;66:4;74:12,12;
   84:20
nice (3)
   19:25;20:1;61:8
nicer (2)
   29:7,9
nine (1)
   83:10
nobody (3)
   49:23;50:10;74:14
non-apartments (1)
   34:21
nonconformities (1)
   18:11
nonconformity (1)
   14:15
None (1)
   27:23
normal (2)
   24:1,2
north (1)

58:19
Northern (3)
   37:3,8;38:21
note (1)
   55:15
notice (1)
   68:13
notwithstanding (1)
   22:13
now's (1)
   22:17
Nuckel (2)
   33:15;44:3
number (22)
   8:21;9:5;12:9;13:12;
   14:4,13;18:9;37:19,25;
   38:1;40:25;48:7;49:17;
   51:23,23;52:20;54:16;
   62:8;73:18,22;74:8;
   82:1
numbers (2)
   37:2,17

O

objection (1)
   67:22
obligation (1)
   81:10
obviously (6)
   13:5,15;25:8;37:24;
   38:3;62:20
occupy (1)
   32:16
occur (1)
   58:15
occurs (1)
   60:17
o'clock (2)
   83:10,10
October (2)
   87:10,12
off (4)
   5:17;7:17;38:7;
   85:12
offer (1)
   19:7
offered (3)
   82:19;84:5,5
offering (3)
   83:8,22;84:13
office (7)
   4:12;47:17;54:22;
   74:5,6;78:1,13
official (6)
   6:15,20;34:11;49:25;
   66:12;72:25
off-street (1)
   57:14
off-the-record (1)
   67:23
old (1)
   3:1

Once (2)
   40:5,7
one (42)
   8:4,5,8;9:18;11:25;
   15:20,20;23:8,10,16,
   16,23,23;24:19;26:4,6,
   15,19;30:2,3,13,19,22;
   31:3;35:15;39:7;40:5;
   43:2;44:24;54:3;58:18;
   59:17,18;61:4;63:12;
   64:4;68:6;72:10,12;
   76:12,14;80:13
one- (2)
   40:5;41:3
one-bedroom (2)
   42:11;74:16
one-bedrooms (1)
   77:11
ones (1)
   63:17
one's (1)
   30:25
ongoing (1)
   86:1
only (22)
   9:25;11:25;13:9;
   15:6;16:14;18:22;
   19:24;20:6;23:10,23;
   24:7;26:20;35:14;
   39:14;47:15;52:6,9,12;
   53:25;58:14,14;80:1
on-site (4)
   8:24;13:19;16:12;
   17:7
on-street (1)
   12:25
onto (3)
   13:10,22;59:14
open (30)
   17:12;18:18;21:8,14,
   17,20,23;22:6;25:11,
   14,17;36:11;44:19,25;
   45:5,7,10,25;46:2,4,8;
   61:12;63:17;69:22,23,
   23,25,25;80:11,15
operate (1)
   55:16
opinion (1)
   68:19;70:21;81:24
opportunity (1)
   78:16
OPRA (15)
   34:14,23;35:3,22;
   36:3,5;51:19,21;70:5;
   71:9;73:9;74:9;77:4;
   84:3;85:6
option (1)
   27:15
order (3)
   14:9;18:12;62:6
ordered (2)
   76:22;77:10
ordinance (14)

In RE: Wallington                                                                                    Transcript fo Proceedings

11:20;14:6,7;15:23;
16:25;17:18;18:2,17;
21:25;22:1,6;25:13;
27:13;45:25
**ordinances (1)**
12:2
**originally (3)**
53:12,17;65:2
**others (2)**
42:18;61:7
**out (26)**
5:9;16:16;18:8,16;
20:22;22:9;33:6,8;
38:19,25;51:18,25;
52:6;53:16;55:6,7;
66:7,16;69:13,21;70:4,
6,14;81:14;85:18,19
**outdoor (1)**
40:12
**outside (1)**
40:8
**outstanding (1)**
63:6
**outweigh (2)**
19:3;20:20
**over (8)**
12:18;16:1,2;19:9;
23:21;36:10;64:10;
77:19
**overall (1)**
20:23
**overcrowding (2)**
82:17;83:12
**overflowing (1)**
71:5
**overriding (2)**
77:19;80:18
**own (1)**
38:21
**ownership (3)**
43:5,7;44:4
**ownerships (2)**
43:22,24

**P**

**paper (1)**
43:15
**parapet (4)**
11:21,21;12:21;
27:12
**parcel (2)**
80:2,4
**parcels (1)**
58:15
**parking (35)**
5:13,23;6:1,4;11:15,
17;12:25;13:4,6,10,22;
14:11,17;15:3,15;16:6,
13;18:16;25:5;27:9;
40:11;45:1,6;57:11,14,
18,20,21;58:2,11,13,
17,19;60:1;71:17

**part (13)**
33:4;42:7;54:8;
58:16;66:17,20;67:7;
68:15;69:25;76:13,13,
14;86:3
**past (1)**
38:6
**pattern (4)**
10:22;11:2,23;14:20
**patterns (2)**
9:3;11:8
**pavers (1)**
60:14
**PAWLUCZUK (6)**
25:3,18;71:8;79:11;
86:16,17
**peak (1)**
29:17
**people (9)**
38:1,1;52:1;56:5;
74:23;77:14;78:12;
79:20;84:6
**per (2)**
38:1,5
**percent (12)**
15:23,24,25;16:1,1,
2;18:18;21:12;24:24;
25:9;79:17;81:17
**perfectly (1)**
81:15
**perform (1)**
55:20
**permits (1)**
15:23
**permitted (4)**
9:23;12:25;16:12;
17:6
**person (2)**
35:15;77:16
**personal (1)**
68:19
**personally (1)**
77:10
**perspective (4)**
11:24;19:23;26:23;
40:16
**perspectives (2)**
15:8;20:18
**pertains (1)**
19:12
**phone (3)**
5:16,19;36:6
**pink (1)**
5:25
**pinpoint (1)**
39:19
**pipe (6)**
62:12,15,15,16,20,22
**piped (1)**
62:12
**pitch (1)**
29:3
**pitched (2)**

30:24;33:20
**place (4)**
19:23;47:15;66:16;
87:13
**plan (21)**
3:3,19,24;14:5,7;
16:12,24;17:11;18:1,5,
8;54:6,8,11;59:11;
64:11,21;66:24;69:15;
79:2;81:21
**planner (4)**
4:16;7:16;50:4;78:1
**planner's (1)**
4:18
**planning (6)**
11:24;12:2;19:23;
26:23;56:7;57:3
**plans (6)**
5:22;55:1;58:2;
59:16;60:12;67:11
**planted (1)**
13:2
**play (4)**
40:8,11,15;82:22
**played (3)**
82:13,13;83:2
**playground (1)**
40:13
**Pleasant (3)**
35:19;48:9;77:5
**please (6)**
22:22,25;46:19,22;
51:12;61:23
**pleasing (1)**
26:25
**Plus (3)**
15:15;31:20,21
**pm (1)**
87:17
**point (12)**
20:14;29:15;43:3;
47:7;50:4;53:16;60:4;
78:5;81:4,4;84:19;85:7
**police (1)**
23:15
**POLTEN (15)**
7:11;32:18;33:1,9,
17,23;70:24;72:19;
79:12;84:23;85:15,20;
86:11,20,21
**popular (2)**
83:24;84:1
**position (1)**
66:1
**positive (1)**
68:7
**possible (4)**
47:11;72:12;73:3;
81:1
**possibly (3)**
19:4;25:7;36:8
**posts (1)**
58:25

**prefer (1)**
48:10
**preliminary (3)**
3:19,23;60:23
**premises (2)**
32:16;41:15
**prepare (1)**
79:7
**prepared (1)**
5:21
**present (3)**
43:8;78:20;80:25
**presented (2)**
49:7;79:23
**preserve (1)**
61:7
**pretty (6)**
31:16;49:10;55:10;
58:6;65:24;84:1
**prevent (2)**
17:13;59:14
**previous (1)**
22:23
**previously (6)**
4:24,24;6:9;7:16;
18:6;41:24
**primarily (1)**
61:4
**principal (2)**
44:2;57:11
**principals (1)**
43:6
**prior (2)**
14:3;16:9
**private (3)**
17:4,21;37:14
**probably (6)**
9:6;25:4,9;38:18;
58:9;60:14
**problem (1)**
83:12
**procedures (1)**
17:21
**process (3)**
56:9,9;66:21
**professionals (2)**
44:18;46:11
**prohibited (1)**
19:13
**project (18)**
3:18,20,23,25;4:17,
19,23;10:5;23:6;32:13;
55:13;68:17;71:3,13;
72:10;79:25;81:3,25
**projects (2)**
37:20;47:13
**promote (4)**
10:12,19,23;17:12
**promotes (1)**
20:4
**prompt (1)**
75:14
**proper (1)**

81:6
**properly (1)**
80:8
**properties (5)**
3:25;10:7;11:9;
38:12;59:14
**property (14)**
13:11,23;14:8;15:3;
20:5,6,24;31:19;59:12,
17,19;60:10,13;80:6
**proposal (2)**
13:13,18;16:11
**Proposed (12)**
5:13,22;14:19;18:19;
20:12;25:16;53:20;
54:4;57:17,20;59:11;
65:2
**proposing (2)**
13:4;15:25
**protecting (1)**
48:13
**provide (18)**
16:5;17:2;18:21;
19:14,24;25:17;27:11;
34:15;48:1,2,3;54:4,
18;56:23;57:16;59:13;
62:18;84:16
**provided (1)**
55:12
**provides (4)**
11:15;13:19;14:1;
54:3
**providing (10)**
14:16,17;16:13,18;
17:7;18:6,14,15;31:14,
24
**provisions (2)**
21:25;22:1
**public (10)**
10:19;13:7;17:4,21;
36:11;37:17;38:14,18;
49:18;79:21
**pull (4)**
13:22;37:16,22;
66:16
**pulling (1)**
13:10
**pump (4)**
55:4,10,12;64:21
**pumping (1)**
64:9
**Purpose (12)**
10:17,23;13:24,25;
16:21;17:2,12,19,20;
18:3;20:4;27:7
**purposes (5)**
10:16;13:14,21;20:7;
68:24
**pursuing (1)**
78:24
**put (18)**
6:1,6;29:3;31:19;
50:23;51:19;52:2;

60:13;62:4;65:6,8,12;
66:1,23;68:17;73:23;
77:12;78:18
**putting (4)**
13:10;33:16;75:9;
85:13

## Q

**qualified (3)**
4:25;7:16;41:25
**quality (2)**
18:20;54:20
**quick (5)**
5:15;25:21;39:5;
40:1;85:23
**quickly (1)**
20:10

## R

**RACHELSKI (34)**
25:21;26:1,8,12,17,
21;27:2,6,14,19;28:8,
13;29:10,13,18,21;
30:11,15,18,21;31:2;
32:2;39:5,10,21;40:17,
23;41:5,14,17;71:11;
80:16;87:1,2
**railroad (3)**
55:5;59:20;67:10
**railroads (1)**
23:9
**raised (1)**
80:19
**RAKER (9)**
41:11,13,18,22,22;
42:1,10;65:10,20
**rate (1)**
41:19
**rather (1)**
5:21
**real (3)**
5:15;71:22;73:19
**reality (1)**
11:1
**really (18)**
11:10;18:22;19:2;
30:12;40:12;44:4;
49:14;60:23;61:5,6,11;
68:19;71:14,21;72:17;
77:9;78:2,6
**rear (8)**
8:25;11:13;25:24;
30:3;57:15,22;58:14,
18
**reason (4)**
20:25;31:5;39:15;
78:23
**reasons (5)**
12:3,19;13:23;19:1,8
**recall (9)**
4:15,20;7:15;30:7;

40:20;51:17;64:8,17,
18
**recalls (1)**
8:19
**receive (2)**
50:1;56:12
**received (2)**
47:13,18
**recent (1)**
58:1
**recently (1)**
86:1
**recommend (2)**
55:20;58:22
**recommends (1)**
60:7
**record (6)**
3:11;9:9;51:20;
52:25;53:7;62:4
**recreation (32)**
18:14,18;19:16;21:9,
16,23,24;22:7;24:21;
25:13,15;30:5;31:7,13,
15;33:14;40:12;45:11,
12,17,22,24;46:3,5;
68:20,21;69:17,24;
70:1;72:8,22;73:8
**recreational (9)**
13:20;30:8;32:19;
61:11;68:23;71:1;72:7;
79:14;80:10
**rectified (1)**
53:22
**red (1)**
22:24
**redevelop (1)**
72:12
**redeveloping (1)**
17:25
**redo (1)**
34:23
**refer (1)**
39:6
**reference (1)**
49:19
**referring (2)**
47:9;53:9
**refresh (1)**
3:16
**regard (7)**
16:14,17;19:21;
37:25;38:11;62:9;
67:18
**regarding (1)**
8:16
**regards (5)**
6:16;21:7,8;46:12;
68:2
**regulation (1)**
15:21
**regulations (1)**
52:10
**related (3)**

3:14;4:3;43:5
**relates (1)**
37:23
**relevant (1)**
50:6
**remain (1)**
25:9
**remainder (1)**
6:4
**remember (1)**
40:18
**re-modifying (1)**
10:10
**remove (1)**
79:17
**removed (1)**
69:20
**re-notice (1)**
4:8
**re-noticed (1)**
4:6
**renting (1)**
52:1
**Repeat (1)**
45:3
**report (10)**
6:18,18,19;44:15;
53:11,14,17;60:20;
73:1;75:13
**representing (1)**
3:13
**represents (1)**
19:9
**request (24)**
4:7;31:25;34:14,18,
23;35:22;36:3,5;47:13,
18;48:11;50:24;51:20,
21;53:24;70:5;71:9;
73:9;74:10;76:4;77:4;
84:3;85:6,9
**requested (4)**
19:6;20:20;22:10;
79:18
**requesting (2)**
8:21;10:15
**require (4)**
11:21;26:6;27:13;
54:2
**required (7)**
33:20;34:3,15;40:22;
52:10;53:16;64:15
**requirement (2)**
21:24;34:2
**requirements (5)**
12:7;16:8;18:18;
61:3,13
**requires (2)**
31:9;57:19
**requiring (2)**
12:5,21
**resembles (1)**
10:7
**reserve (1)**

44:10
**residence (1)**
39:25
**residential (1)**
64:13
**residents (12)**
14:18;18:15;20:2,7;
31:25;33:14;44:17;
61:12;81:1,2,10;82:2
**resolve (1)**
32:23
**resources (1)**
83:22
**respect (8)**
12:20;54:14;55:14;
57:9;58:13;59:9;60:6,
21
**respond (1)**
29:24
**response (2)**
56:3;65:19
**responses (2)**
44:14;60:20
**responsible (1)**
32:20
**rest (3)**
31:4;55:12;78:18
**restrict (1)**
52:20
**restrictions (2)**
5:14,23
**resubmission (1)**
53:23
**resulted (2)**
37:7;38:14
**reuse (1)**
18:12
**reusing (1)**
18:11
**revealing (1)**
48:4
**review (3)**
66:18,21,25
**revise (2)**
58:23;59:10
**revised (3)**
20:12;44:15;53:13
**revising (1)**
70:10
**revision (1)**
64:25
**rhetorical (1)**
83:19
**ridge (1)**
29:3
**ridged (1)**
27:22
**right (47)**
7:14,23;9:11,23;
13:4;15:9,13;19:5;
22:19;23:10;24:12;
26:14,18;27:25;29:5,
20;30:25;31:20;39:11;

42:3,5,17,18;43:13;
44:22;49:10;51:5;
59:23;63:11;64:1;
67:16;68:5;69:18;71:6;
72:1,2,13,21;73:19;
76:23;77:24;78:11,15;
81:13;84:19;85:14,20
**right-of-way (4)**
13:7;15:4;58:6;
66:19
**rigid (3)**
59:3,3,7
**rink (1)**
55:11
**river (4)**
23:9;59:20;62:9,11
**roll (1)**
86:12
**roof (24)**
10:3,6,10;11:1,8,21;
27:1,1,12,22;28:6,9,12,
16,19;29:3,3,8,22;30:3,
24;31:6;33:20,21
**roofs (1)**
9:25
**room (2)**
52:3;68:7
**roots (2)**
75:3,3
**routes (2)**
6:10,11
**Rutgers' (4)**
37:2,16;38:12,21

## S

**Sacred (1)**
49:13
**Saddle (2)**
59:20;62:9
**safe (1)**
13:19
**safety (3)**
10:19;14:25;20:9
**same (9)**
14:18;19:8;26:14;
27:3;33:18;43:7;44:4;
87:13,13
**sanitary (1)**
54:15
**satisfied (3)**
53:15;63:13,24
**satisfy (1)**
62:21
**Saturday (1)**
83:9
**sauna (1)**
52:2
**save (1)**
24:18
**saw (2)**
54:12;59:2
**saying (11)**

29:8,19;30:22;52:16,
19;67:1;69:8;73:7;
74:6;78:2;81:22
**school (13)**
34:9,11;35:18;40:8;
47:10;49:9,13;51:18;
70:15;71:5;73:9;77:5;
83:15
**schoolchild (1)**
38:14
**schoolchildren (6)**
36:22;37:4,8,18;
38:18,23
**schools (6)**
47:5;49:24;70:18,19;
71:4;78:10
**screen (1)**
22:23
**screened (1)**
57:13
**second (8)**
24:5;30:19;41:7;
59:18;67:18;84:23,25;
86:10
**seconds (1)**
55:19
**secretary (2)**
47:17;78:13
**Section (4)**
8:14;15:12;57:10;
58:22
**seek (1)**
22:13
**seeking (1)**
42:21
**seems (4)**
23:7;61:9;83:7,20
**sense (3)**
19:23;26:24;81:16
**sentiment (1)**
72:7
**separate (8)**
9:11;21:25;22:1;
26:5;43:4,22,23;72:11
**separately (1)**
72:13
**separates (1)**
58:15
**separation (2)**
8:15;25:7
**September (1)**
56:21
**series (1)**
43:8
**Service (1)**
55:17
**services (1)**
20:7
**set (6)**
19:8;26:14;55:1;
58:1;61:3;66:18
**setback (6)**
14:11;15:10;25:3,5;

27:1;43:12
**setbacks (1)**
9:16
**settle (1)**
66:8
**settlement (1)**
68:16
**seven (1)**
38:25
**several (2)**
20:10;83:7
**sewer (6)**
54:15,23;55:2,4,9,12
**shall (10)**
54:4,5,18,19,21;
57:12,14,16;59:10,13
**shame (1)**
61:10
**shaping (1)**
17:22
**share (4)**
44:1,2;48:13,14
**shared (1)**
80:3
**Sheet (4)**
59:22,24;60:5;62:11
**shield (1)**
58:11
**shielding (1)**
59:13
**show (6)**
5:22;30:1;55:2,6;
58:4;59:25
**showed (4)**
36:21;37:3;59:18;
67:9
**shown (5)**
6:3,9;53:21;64:11;
66:2
**shows (1)**
37:17
**shrubs (2)**
13:3;58:10
**side (11)**
23:8,9;54:24;57:15,
22;58:14,18,19;59:25;
68:6;79:19
**sidewalk (1)**
60:15
**SIEK (10)**
86:14,16,18,20,22,
24;87:1,3,5,10
**sight (2)**
67:12,14
**sign (24)**
19:13,22,24;20:3,12,
19,21;32:3,3;54:7,9;
65:1,7,12,25;66:4,6,14,
18,24;67:3,4,6,14
**signage (3)**
15:20;54:5,6
**signal (1)**
55:21

**signalization (1)**
55:22
**signs (1)**
67:2
**Sills (2)**
3:12;73:15
**similar (5)**
37:10;38:2;39:20;
40:16;43:6
**similarities (2)**
37:25;38:8
**simple (2)**
79:22;82:10
**single (1)**
77:16
**sit (1)**
81:19
**site (25)**
3:2,19,24;9:18;10:1;
11:13;15:6;16:3,7,15,
15;17:1,16,17,25;
18:22;20:15;24:25;
54:6,7;55:4;58:5;
62:11,16;69:15
**sitting (2)**
75:25;82:10
**situation (2)**
11:19;13:8
**sizable (1)**
86:2
**size (1)**
11:6
**slightly (5)**
13:22;18:13,24;27:1;
39:22
**slope (7)**
9:25;10:6;26:23,25;
27:3;28:10,11
**sloped (2)**
11:1;30:2
**small (2)**
58:4;76:13
**SMITH (10)**
48:21,22;49:2,5;
50:8,13,17,21;78:9,12
**soccer (6)**
82:13,19,25;83:3,14,
16
**soccer's (1)**
83:25
**solid (2)**
59:6;60:3
**somebody (4)**
74:15;75:21,21;83:1
**somehow (1)**
70:10
**someone (3)**
5:18;26:10;50:5
**someplace (1)**
40:14
**sorry (12)**
23:3;28:4;39:6;41:8,
20;45:2;46:20;60:11;

61:24;64:7;69:10;
78:16
**sort (1)**
20:1
**sought (1)**
7:7
**south (5)**
54:24;59:25;60:17;
65:23;73:5
**southerly (1)**
55:3
**space (25)**
14:1;17:2,13;18:18;
21:9,14,18,20,23;22:6;
25:11,14,17;44:25;
45:7,10;46:2,5;69:22,
23,24,25,25;80:11,15
**spaces (5)**
27:9;45:5;57:18;
58:3,11
**speak (4)**
36:9,14;72:25;78:16
**speaking (1)**
5:4
**specifically (1)**
45:24
**spend (1)**
71:25
**spillage (1)**
59:14
**spoke (4)**
4:11;47:17,21;50:22
**spoken (1)**
73:17
**spot (2)**
30:23;66:3
**spread (2)**
69:21;70:4
**stance (1)**
40:18
**stand (2)**
50:14;74:2
**standard (3)**
21:10;60:9,16
**standing (2)**
8:6;58:21
**stands (1)**
72:21
**start (2)**
8:16;68:6
**starts (1)**
40:7
**state (1)**
22:6
**stated (1)**
80:14
**states (1)**
54:14
**stating (1)**
6:20
**station (2)**
64:10,21
**statistics (1)**

36:19
**status (1)**
56:2
**statutory (1)**
74:11
**stay (4)**
33:18;58:21;68:20;
72:22
**staying (1)**
69:5
**steel (1)**
58:25
**step (2)**
46:14;51:4
**stick (1)**
27:8
**still (5)**
21:21;25:9;33:13;
70:8,14
**stories (1)**
9:23
**storm (1)**
18:20
**straight (1)**
28:14
**straightened (1)**
85:18
**strain (1)**
83:21
**street (3)**
4:1;20:11,22
**streetscape (3)**
27:17;31:1;60:9
**strictly (2)**
28:24;42:15
**striping (1)**
6:21
**structure (3)**
59:4,7;79:14
**structures (1)**
53:20
**student (3)**
48:4,7,13
**students (6)**
41:1;48:7;49:11,14,
15;85:7
**studies (3)**
36:20;37:6;38:21
**study (7)**
37:17;38:11;55:21;
56:14;71:21,22;85:23
**stuff (2)**
33:2;71:16
**style (1)**
11:3
**styled (1)**
11:3
**subject (1)**
9:10
**submit (2)**
63:6;67:11
**submitted (1)**
6:15;49:20;53:19;

In RE: Wallington                                                                          Transcript fo Proceedings

54:8;55:2;60:12
**submitting (1)**
  5:21
**subsequent (2)**
  53:22,23
**substantial (1)**
  17:9
**sucked (1)**
  83:2
**sufficient (6)**
  14:1,17;16:13;17:2;
  23:24;62:23
**suitable (1)**
  6:24
**summation (2)**
  44:10;60:21
**superintendent (4)**
  36:9;47:5;49:24;
  78:10
**superintendent's (1)**
  74:1
**supply (1)**
  18:4
**support (1)**
  21:22
**supposed (1)**
  21:10
**Sure (14)**
  8:18;33:15;34:22;
  35:21;36:23;52:1;
  55:10;62:7;67:13;70:8,
  14;73:20,20;81:12
**surface (1)**
  15:15
**surround (1)**
  80:10
**surrounding (12)**
  10:4,8,9,13,21;11:2,
  7,9,22;14:20;15:7;
  39:17
**swear (4)**
  46:18,21;49:1;51:7
**swore (1)**
  28:18
**sworn (7)**
  4:24;7:16;41:24;
  46:24;48:25;49:2;
  51:10
**symmetrical (1)**
  29:7
**system (1)**
  77:5

**T**

**table (1)**
  7:25
**talk (5)**
  33:24;56:2;65:8;
  74:13;85:19
**talked (3)**
  50:5;56:6,6
**talking (9)**

35:15;39:1;41:18;
42:2,6;51:17;73:19;
82:17,17
**talks (1)**
  12:24
**tall (1)**
  58:7
**taller (1)**
  26:13
**tear (4)**
  61:10;82:24;83:7;
  84:12
**technical (1)**
  43:14;61:6;63:9,19
**technically (1)**
  9:17
**techniques (1)**
  10:25
**televise (1)**
  54:19
**telling (1)**
  81:14
**ten (2)**
  37:20;38:11
**testified (18)**
  11:16;12:19;14:25;
  15:2;16:17;21:22;26:3;
  30:7;34:7;36:20;37:6;
  41:23;44:19;46:11;
  52:24;57:21;64:25;
  70:13
**testify (1)**
  37:2
**testifying (2)**
  5:10;70:16
**testimony (18)**
  4:16,18;7:17;8:13,
  16;14:3;16:9;21:5;
  31:17;44:8,10;54:8;
  65:8;67:17;68:24;70:9;
  79:16,23
**that'd (1)**
  83:24
**thinking (2)**
  27:2;70:2
**though (5)**
  9:17;27:5;28:11;
  30:13;39:23
**thought (2)**
  31:12;39:18
**three (7)**
  41:8,9,10,11,12;
  42:11;52:9
**three- (1)**
  52:2
**three-bedroom (3)**
  40:19,24;42:12
**three-bedrooms (8)**
  40:21;41:2,11,12;
  51:23;52:9;73:24;
  77:12
**throw (2)**
  45:1,5

**tie (1)**
  55:11
**tight (2)**
  69:19;70:19
**today (5)**
  20:12;44:19;62:11;
  64:25;70:10
**together (2)**
  43:9;69:19
**told (5)**
  28:10;34:19;35:11;
  75:9;80:12
**TOMKO (7)**
  23:20,25;85:13,17,
  22;87:5,6
**tonight (1)**
  76:2
**took (1)**
  39:15
**top (1)**
  23:8
**topography (1)**
  10:1
**total (3)**
  42:10,12;68:18
**totally (1)**
  71:10
**town (11)**
  31:20,25;32:20;
  37:24;68:16;71:17;
  82:3,20;84:7,11;86:5
**towns (3)**
  37:8,9,13
**town's (1)**
  57:2
**tracks (2)**
  55:5;59:20
**traffic (10)**
  14:17;20:8;55:20,25;
  56:3,5;71:22;72:3;
  85:23,24
**transcripts (1)**
  28:22
**transit (2)**
  39:7,21
**transit-oriented (6)**
  37:18;39:8,10,22
**traversed (1)**
  60:4
**trees (4)**
  58:5,6;65:22,23
**trestle (1)**
  65:16
**triangle (2)**
  67:12,14
**tried (1)**
  37:22
**truck (4)**
  6:10,10;16:5;72:23
**trucks (2)**
  23:15;24:10
**trust (1)**
  75:13

**trusted (1)**
  74:8
**try (4)**
  37:10,22;66:6;81:12
**trying (6)**
  10:4;16:5;23:13;
  75:5,19,19
**turn (1)**
  5:17
**two (32)**
  3:14;4:3;5:25;8:23,
  24;9:10,11,14;15:18;
  16:10,20;21:25,25;
  22:4;26:5;38:18;40:5;
  43:1,10,20,21,23,24;
  58:15;59:16;61:5,6;
  71:9;72:10,11;78:12;
  83:10
**two-bedroom (3)**
  40:6;42:11;52:2
**two-bedrooms (6)**
  40:18;41:4,6,17;
  51:24;77:11
**type (3)**
  16:25;36:19;85:11
**typo (1)**
  55:8

**U**

**unable (1)**
  37:12
**under (2)**
  55:17;75:2
**underground (2)**
  45:1,6
**underneath (2)**
  66:1;68:21
**understands (1)**
  81:9
**unduly (1)**
  36:17
**uneasy (1)**
  72:9
**unfortunately (2)**
  32:24;37:12
**unified (1)**
  43:6
**unique (2)**
  8:24;16:16
**unit (1)**
  38:15
**units (25)**
  31:18;36:19;38:13;
  39:2;41:13;42:15,17;
  52:1;68:15,17,18,25;
  70:12,13,13,14;73:22;
  75:6;76:21;77:1;80:2,
  4,23,25;82:1
**unless (1)**
  21:3
**untenable (1)**
  55:17

**up (15)**
  22:12;28:17;37:1,16,
  22;46:12;47:23;53:25;
  58:21;74:2,15;77:16;
  81:20;82:8,15
**upon (8)**
  14:21;15:4;20:13;
  26:3,22;34:20;37:8;
  38:20
**usage (1)**
  32:3
**Use (9)**
  10:16,18;12:1;13:15,
  16;14:15;16:22;17:23;
  32:19
**used (3)**
  71:23,25;84:1
**uses (5)**
  14:2;17:3,14;53:21;
  61:11
**using (1)**
  69:1
**usually (1)**
  39:25
**utilities (1)**
  43:19
**utilize (4)**
  31:25;33:13;54:17;
  55:9
**utilized (1)**
  38:10
**U-turns (1)**
  20:10

**V**

**vacuum (1)**
  74:14
**valid (1)**
  36:22
**variance (25)**
  8:13;9:15;10:3,15;
  11:18;12:10,24;13:6,
  18;15:21;19:12;20:20;
  21:22;22:10,13;26:6;
  27:13;29:2,11;30:10;
  31:6;33:25;57:20;
  68:23;69:4
**variances (33)**
  3:24;8:21,25;9:1,6,
  20;11:6,11;15:9,19;
  16:20;18:10;19:6;
  23:12;24:17;25:2,3,5,8,
  10,22;28:20;43:12,14;
  61:4,7;69:14;72:14;
  76:24;79:18,25;80:10;
  81:17
**variances' (1)**
  9:15
**variations (1)**
  27:8
**variety (2)**
  14:2;17:3

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 35 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 133-15   Filed 02/26/26   Page 36 of 37
PageID: 1128

In RE: Wallington                                                              Transcript fo Proceedings

**various (1)**
17:20
**vehicle (1)**
55:18
**verbal (3)**
34:18;35:23;51:21
**versus (2)**
21:9;34:20
**viable (1)**
43:10
**Victor (1)**
73:14
**view (2)**
17:22;66:15
**village (1)**
39:7
**villages (2)**
39:22,22
**vinyl (2)**
59:2,7
**vision (1)**
66:20
**visitors (1)**
20:9
**visual (3)**
10:13,24;20:5
**visually (1)**
26:13
**VOICE (2)**
8:5,8
**voiced (1)**
79:15
**voicing (1)**
81:23
**vote (3)**
78:25;81:24;85:2

**W**

**wait (5)**
29:1;35:13;85:1,3,3
**waiver (2)**
53:23;57:19
**walk (1)**
40:7
**walking (2)**
39:13,24
**Wallington (41)**
3:3,4,13,14,18,22;
4:2,17,19;10:5;37:10,
23;38:3,4;45:9;47:6;
48:23;49:6,25;54:9;
55:23;60:8;61:1;65:7,
12;66:6;67:3,8;74:23;
75:3,4,21,22;76:6;81:2,
10;82:14,22;83:11,22;
84:1
**Wallington's (1)**
75:18
**wants (4)**
40:7,8;58:11;84:7
**Warren (2)**
55:25;56:14

**waste (2)**
65:12;83:8
**water (3)**
18:20,20;62:10
**way (12)**
6:8;22:16;29:1;
44:19;45:18;52:12;
69:17,18,23;71:24;
81:6,13
**week (2)**
56:13;74:10
**Welcome (6)**
54:9;65:7,12;66:6;
67:3,7
**welfare (1)**
10:20
**Wellington (1)**
50:19
**weren't (1)**
63:12
**West (9)**
37:21,23;38:5,13;
71:14,15;75:17,18;
80:17
**what's (5)**
73:22;76:6;81:12,21;
82:2
**Whereupon (7)**
5:13;46:23;49:2;
51:9;57:6;67:23;87:15
**wherever (1)**
24:10;65:18;66:5
**Whitehall (1)**
49:8
**whole (10)**
17:24;23:11;41:14;
42:3,6,8,9;70:7,7,21
**who's (2)**
47:17;68:25
**willing (1)**
63:22
**wine (1)**
52:3
**wish (1)**
48:20
**wishing (3)**
51:3;53:3;87:12
**withdrawn (1)**
53:24
**within (6)**
12:25;13:5,7;57:22;
58:13,17
**without (6)**
20:10;32:13,15,17;
36:17;48:3
**witnesses (3)**
25:20;28:18;87:15
**won (1)**
77:14
**wonder (1)**
5:18
**work (9)**
3:5;33:8;43:9;60:25;

66:8;71:24,24;76:1;
81:21
**worked (1)**
33:6
**working (3)**
61:13;62:17;86:5
**worry (1)**
79:21
**written (1)**
36:4
**wrong (4)**
21:4;50:18,19;66:3
**WYGONIK (21)**
34:6,22;35:5,9,16,
25;36:2;42:2,5;47:25;
48:6,15;69:16;70:25;
76:9,12,23;78:23;
84:22;86:24,25

**Y**

**yard (4)**
8:25;15:10;40:9;
57:17
**year-round (1)**
83:25
**years (3)**
68:17;74:3;79:4
**yellow (3)**
6:3,21;22:24
**yoga (4)**
45:1,5,15,17
**York (9)**
37:21,23;38:5,13;
40:2;71:14,15;75:18;
80:17
**York's (1)**
75:17
**Yup (1)**
3:9

**Z**

**zoning (13)**
11:20;12:2,19;14:5,
7;16:24;17:18;18:2;
19:10;21:1;22:5;27:12;
45:9

**0**

**02 (1)**
38:14
**04 (1)**
13:5

**1**

**1 (1)**
77:6
**1,132 (1)**
38:12
**11 (3)**

5:10;44:14;53:12
**12 (1)**
38:6
**13 (5)**
34:10;37:4;38:23;
56:21;70:9
**130 (1)**
49:15
**134-unit (1)**
3:20
**14 (1)**
53:13
**14th (1)**
44:15
**15th (1)**
4:6
**17 (1)**
24:24
**17's (1)**
5:10
**17th (2)**
87:10,13
**18th (2)**
4:5,14

**2**

**2 (2)**
8:14;77:6
**2.7 (2)**
59:24;60:5
**2002 (1)**
15:5
**2015 (1)**
38:7
**2017 (4)**
44:14;53:13,13;
56:22
**207 (5)**
39:2;68:18;72:1;
76:21;77:1
**208 (3)**
68:17;70:12,14
**20-foot (1)**
58:9
**25 (4)**
15:23;18:18;21:12;
71:25
**25-foot (2)**
13:1;15:12

**3**

**3 (1)**
8:14
**30 (3)**
15:25;42:11;59:18
**330-39B (1)**
57:10
**35.01 (1)**
3:22
**35.02 (1)**
3:17

**36 (1)**
15:12
**365-25G1 (1)**
8:14
**365-25M3 (1)**
8:18
**3-foot (1)**
26:20

**4**

**40 (1)**
42:10
**44-year (1)**
48:22
**45 (1)**
9:23
**48.5 (2)**
9:24;12:12
**49.42 (1)**
12:10
**49.5 (1)**
25:25

**5**

**5 (6)**
16:1;53:17;57:15,22;
58:13,17
**50 (1)**
13:1
**551 (1)**
4:1

**6**

**6 (5)**
11:12;12:9;25:24;
30:2;59:25
**6.12 (2)**
54:3,13
**60 (1)**
49:14

**7**

**7 (5)**
26:2;54:16,23;58:19;
60:2
**7.11 (1)**
54:14
**7.14 (3)**
62:8,8;63:2
**71 (2)**
3:17,22
**72 (2)**
42:7;70:13
**73 (8)**
31:18;39:3,4;42:15,
17;68:25;70:13;80:2
**736.3 (1)**
55:18
**73-unit (1)**

BER-L-001670-18    08/30/2018 7:37:18 PM  Pg 36 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 133-15    Filed 02/26/26    Page 37 of 37
PageID: 1129

In RE: Wallington                                                    Transcript fo Proceedings

3:25
**75 (1)**
  15:24

## 8

**8 (10)**
  16:2;26:2;28:5,8;
  30:4;54:16,23;55:6;
  58:19;60:2
**8.4 (1)**
  55:15
**83 (1)**
  16:1

## 9

**9 (1)**
  55:7
**9.1 (1)**
  57:10
**9.14 (1)**
  59:10
**9.15 (1)**
  60:7
**9.2 (1)**
  58:22
**9/13/17 (1)**
  57:7
**9:08 (1)**
  87:16
**95 (3)**
  25:9;79:17;81:17