# EXHIBIT Q

Jessica C. Caldwell, P.P. Volume 1
October 30, 2025

```
              UNITED STATE DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
              CIVIL ACTION NO. 2:20-cv-08178
                         - - -
```

NEW WALLINGTON HOME, LLC, a New Jersey
limited liability company; and MORNINGSIDE
AT WALLINGTON, LLC, a New Jersey limited
liability company,

       Plaintiffs,

  vs.

BOROUGH OF WALLINGTON; BOROUGH OF
WALLINGTON PLANNING BOARD; MARK W. TOMKO,
in his official capacity as former Mayor of
the Borough of Wallington; DOROTHY B. SIEK,
in her official capacity as former Tax
Collector for the Borough of Wallington;
and CHRISTOPHER ASSENHEIMER, in his
official capacity as Certified Tax
Collector of the Borough of Wallington,

       Defendants.

    — — —

```
                         - - -
                   October 30, 2025
                       Volume I
                         - - -
```

     Oral DEPOSITION of JESSICA C. CALDWELL, P.P., Non-Party Expert Witness taken pursuant to notice, held at the Law Offices of O'Toole Scrivo, LLC, 14 Village Park Road, Cedar Grove, New Jersey, commencing at 10:07 a.m., before Caren Sheehan, Certified Court Reporter - Notary Public.  There being present:

U.S. Legal Support | www.uslegalsupport.com

Page 2

```
 1   A P P E A R A N C E S:
 2   O'TOOLE SCRIVO
     BY: JAMES DiGIULIO, ESQUIRE.
 3   14 Village Park Road
     Cedar Grove, New Jersey 07009
 4   973-239-5700
     Representing the Plaintiffs
 5
 6
 7   PFUND McDONNELL, P.C.
     BY: GERALD A. SHEPHARD, ESQUIRE.
 8   139 Prospect Street
     Ridgewood, New Jersey 07450
 9   Gshephard@pfundmcdonnell.com
     Representing the Defendants
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    INDEX
 2
 3   WITNESS                         PAGE
 4   JESSICA C. CALDWELL, P.P.
 5     BY MR. DiGIULIO                 6
 6
 7
 8              E X H I B I T S
 9
10   NO.        DESCRIPTION          PAGE
11   Exhibit    Caldwell Report        6
12   Caldwell-1
13   Exhibit    notice                 6
14   Caldwell-2
15   Exhibit    Dr. Steil's report,   40
16   Caldwell-3
17   Exhibit    March 18, 2008 decision in  45
18   Caldwell-4 the Bergen County Superior
19              Court, 800P04 through P010
20   Exhibit    April 22, 2015 decision by  58
21   Caldwell-5 Judge Meehan
22   Exhibit    March 2, 2016 order of  72
23   Caldwell-6 Judge Meehan
24
25
```

Page 4

```
 1              E X H I B I T S
 2
 3   NO.        DESCRIPTION          PAGE
 4   Exhibit    final judgment against the  79
 5   Caldwell-7 Borough dated January 17,
 6              2019
 7   Exhibit    transcript from the July  85
 8   Caldell-8  18, 2017, planning board
 9              hearing for the Morningside
10              and New Wallington joint
11              application
12   Exhibit    public hearing Borough  90
13   Caldwell-9 Planning Board dated
14              September 19, 2017
15   Exhibit    Borough of Wallington  127
16   Caldwell-10 Resolution Number 2019-167
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                  - - -
 2         DEPOSITION SUPPORT INDEX
 3                  - - -
 4
 5   Direction to Witness Not to Answer
 6      Page     Line
 7        NONE
 8
 9   Request for Production of Documents
10      Page     Line
11        NONE
12
13   Information to be Inserted
14      Page     Line
15        NONE
16
17   Questions Marked
18      Page     Line
19        NONE
20
21
22
23
24
25
```

Jessica C. Caldwell, P.P. Volume 1
October 30, 2025

## Page 6

1  (Whereupon, Exhibit Caldwell-1,
2  Caldwell Report, was marked for
3  identification.)
4  (Whereupon, Exhibit Caldwell-2,
5  notice, was marked for identification.)
6  THE COURT REPORTER: Mr. Shephard, do
7  you want a copy.
8  MR. SHEPHARD: Yes.
9  - - -
10  JESSICA C. CALDWELL, P.P., after having been
11  duly sworn, was examined and testified as follows:
12  - - -
13  EXAMINATION BY
14  MR. DiGIULIO:
15  Q. All right. Good morning,
16  Ms. Caldwell, how are you?
17  A. Good morning.
18  Q. We met briefly before off the
19  record. My name is James DiGIULIO, I
20  represent the plaintiffs in the case filed
21  in the Borough of Wallington defending the
22  District Court of New Jersey. We're here
23  today for your deposition.
24  Do you understand that?
25  A. Yes.

## Page 7

1  Q. Okay. You have a few things in
2  front of you.
3  A. Yeah.
4  Q. It looks like your report,
5  Mr. Steil's report. And what else do you
6  have there?
7  A. Just some notes.
8  Q. Okay. Why don't you put those
9  aside.
10  A. Okay.
11  Q. If you need to refer to anything
12  as we go along, that's fine, but I'll be
13  providing you --
14  A. Okay.
15  Q. -- marked exhibits.
16  A. All right.
17  Q. Let me show you what we marked as
18  Caldwell-1.
19  A. Okay.
20  Q. And that -- it has your report
21  date of September 11, 2025; is that right?
22  A. Yes.
23  Q. Okay. And do you know how long
24  you were -- how long before the date of
25  that report you were obtained?

## Page 8

1  A. About a month.
2  Q. About a month okay.
3  A. Six weeks. Sometime in August, I
4  think. Early August.
5  MR. SHEPHARD: I can't help you with
6  this.
7  BY MR. DiGIULIO:
8  Q. I'll give you instructions in a
9  minute, but we'll do that?
10  A. Okay.
11  Q. Yeah, whatever you can answer
12  just say about a month, you think before
13  the date of the report. So sometime maybe
14  in August of 2025?
15  A. Yes.
16  Q. Okay. And can you turn to Page
17  30 of your report, please?
18  A. Which one?
19  Q. 30. The last sentence of the
20  report provides, in conclusion, the Borough
21  is actively supporting affordable housing
22  and remains compliant with state affordable
23  housing guideline obligations with language
24  decisions driven by legitimate concerns
25  aligned with the goals of its master plan

## Page 9

1  and ordinances.
2  Do you see that?
3  A. Yes.
4  Q. Okay. And that is your expert
5  opinion in this case, that the Borough is
6  compliant with its state affordable housing
7  obligations; is that right?
8  A. Yes.
9  Q. Okay. And you've all -- you've
10  offered that opinion to a reasonable degree
11  of certainty, right?
12  A. Yes.
13  Q. Okay. Have you offered any other
14  expert opinions in the report, that you're
15  aware of?
16  A. Any other expert opinions, you
17  mean -- what do you mean by that?
18  Q. Conclusions of opinion like that.
19  Are you aware of any others that you've
20  offered? I mean --
21  MR. SHEPHARD: Note my objection. The
22  report speaks for itself and whatever
23  conclusion.
24  THE WITNESS: Yeah, I think there are
25  various conclusions throughout the report

Page 10

```
 1        about different sections.  You know, each
 2        section has some type of conclusion or
 3        statement in it.
 4   BY MR. DiGIULIO:
 5        Q.   Okay.  We'll go through those.
 6   Any other -- any other opinions you --
 7   you've offered outside of the report?
 8        A.   Outside of the report in this
 9   case?
10        Q.   Yeah.  Do you have any intention
11   to amend your report in any way?
12        A.   Not currently.
13        Q.   Okay.  Great.  Let me take that
14   from you for now.  We'll get it back, leave
15   that there.
16             All right.  Now, you were served with
17   a deposition notice we marked it as
18   Caldwell-2.
19             Have you seen that before?
20        A.   Yes.
21        Q.   Okay.  And as part of that, you
22   were asked to bring with you your file
23   materials.
24             Did you see that in the notice?
25        A.   Yeah.
```

Page 11

```
 1        Q.   Okay.  And prior to us going on
 2   the record, you did in fact come with a
 3   redwell of materials, correct?
 4        A.   Yes.
 5        Q.   Okay.  And I've taken that, and
 6   it's being reviewed by my office currently.
 7             Do you understand that?
 8        A.   Yes.
 9        Q.   Okay.  We'll return that
10   afterwards.
11        A.   Thank you.
12        Q.   Okay.  Thank you for bringing
13   that in.
14        A.   Sure.
15        Q.   In anticipation of today's
16   deposition, what did you do to prepare?
17        A.   I re-reviewed the documents from
18   the file, reviewed my report, reviewed
19   Dr. Steil's report, and then I met with
20   Mr. Shephard yesterday and discussed the
21   case in general and the report.
22        Q.   Okay.  Between the time that you
23   issued your report and today, are you aware
24   of any new facts or circumstances that
25   would alter your opinions?
```

Page 12

```
 1        A.   No.
 2        Q.   The documents you reviewed, you
 3   said Dr. Steil's report and your report.
 4   Do you recall anything else in particular
 5   that you reviewed to prepare for today?
 6        A.   Some of the resolutions and then
 7   some of the court decisions.
 8        Q.   Okay.  And those are all
 9   documents that you referenced in your
10   report?
11        A.   Yes.
12        Q.   Did you review any documents that
13   you didn't previously review to prepare
14   your report?
15        A.   No.
16        Q.   Have you been -- have you been
17   deposed before?
18        A.   No.
19        Q.   Okay.  I'll give you a couple
20   instructions and if you have any questions,
21   feel free to ask.
22        A.   Okay.
23        Q.   As you can see, we have a court
24   reporter to my right and your left, she
25   will be taking down everything you say.
```

Page 13

```
 1   This is supposed to be a factfinding
 2   question and answer by me.  We're here
 3   today to understand what you can answer
 4   today sitting here based on your personal
 5   knowledge and your expert experience.
 6             Do you understand that?
 7        A.   Yes.
 8        Q.   And at the end of your
 9   deposition, we'll receive a transcript that
10   will have word for word transcription of
11   everything done today.
12             Do you understand that?
13        A.   Mm-hmm.
14        Q.   And you've been sworn under oath,
15   so while this is an informal conference
16   room, this is as if you were in court
17   testifying.
18             Do you understand that?
19        A.   Yes.
20        Q.   And throughout the case as it
21   moves forward, Mr. Shephard and/or I may
22   use the transcript of your deposition for
23   various reasons.
24             Do you understand that?
25        A.   Yeah.
```

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

Page 14

1  Q. Because we have a stenographer,
2  we have to be mindful and I speak very
3  quickly, so I already apologized to her,
4  but trying not to speak over each other.
5  You will probably know where I'm going for
6  some questions, but let me get it out, and
7  I will do my very best to let you complete
8  your answer, understood?
9  A. Yes.
10  Q. Okay. If I do happen to cut you
11  off and you're not done, please feel free
12  to let me know and I'll let you continue
13  with your answer. Okay?
14  A. Okay.
15  Q. This is not a memory test, so if
16  you need to reference your report for any
17  facts, feel free to let me know and we can
18  get the report back in front of you. Okay?
19  A. Okay.
20  Q. If you need to use the restroom,
21  get a water break, just need a break, just
22  let me know. I'm not here to torture you
23  or anything like that. Okay?
24  A. Okay.
25  Q. From time to time, Mr. Shephard

Page 15

1  may object to my questions, let the lawyers
2  deal with the back and forth on the
3  objection, and then -- in most cases,
4  Mr. Shephard will direct you to then
5  answer. In some instances, he may not. So
6  wait for that direction before actually
7  answering. Okay?
8  A. Okay.
9  Q. And because of that, you might
10  want to give a little pause before
11  answering, just so he can inject his
12  objection if necessary.
13  A. Okay.
14  Q. All right. One other very
15  important instruction, if you don't
16  understand my question, please be sure to
17  ask me to restate it, because otherwise
18  everyone that reads your transcript, we
19  will all assume that you understood my
20  question. Okay?
21  A. Okay.
22  Q. Okay. And if I asked you for
23  time, dates, and you can't give me a
24  specific date, but you have an idea of a
25  range, feel free to offer that, but just

Page 16

1  let me know that you're guessing or you're
2  estimating. Okay?
3  A. Okay.
4  Q. Have you ever served as an expert
5  witness before?
6  A. Yes.
7  Q. In what capacity?
8  A. I served as an expert witness in
9  planning cases, applications before Land
10  Use Boards, and I've also served as an
11  expert witness in Superior Court for
12  affordable housing cases.
13  Q. Okay. Let's start with the last
14  one, you said, the affordable housing
15  cases. You were never deposed in those?
16  A. No.
17  Q. Okay. What was your -- what --
18  for what purpose did you offer expert
19  opinion?
20  A. As the municipal planner for
21  housing elements at Fair Share plans.
22  Q. Okay. And in all those instances
23  were done with the affordable housing
24  Superior Court matters, in all those
25  instances, was your client a municipality?

Page 17

1  A. Yes.
2  Q. Okay. Walk me briefly through
3  what would that expert assignment, you gave
4  us a general understanding, but just a
5  little more detail about that.
6  A. All right. So in the third
7  round, all the cases were moved to Superior
8  Court for certification instead of being at
9  the counsel for affordable housing as an
10  administrative procedure. So we would
11  eventually get to a fairness hearing. And
12  as a municipal planner, I would testify to
13  the housing element and my opinion that it
14  basically met the obligations and
15  regulations and that it was unfair to low
16  and moderate income people.
17  Q. In all those instances that you
18  testified -- and you said, did you actually
19  testify or offer a written opinion?
20  A. I would testify. In most cases.
21  In some cases it would be a written opinion
22  and they would have -- they also have
23  what's called special adjudicators, which
24  are the planners hired by the courts.
25  Sometimes those are the only planners that

Jessica C. Caldwell, P.P. Volume 1
October 30, 2025

Page 18

1  gave testimony, but in many cases, I also
2  gave testimony as a municipal planner.
3      Q.   And as you gave -- in either
4  instance where you either gave oral or
5  written opinions about this, in each
6  instance, your testimony was the particular
7  municipality had met the standard as you
8  saw it; is that right?
9      A.   Yeah.
10     Q.   Okay.  And you mentioned round
11 three, just so the record's clear, can you
12 just explain what you're referring to when
13 you say round three?
14     A.   So round three is the third round
15 of affordable housing.  Basically went from
16 1999 to 2025.  And so that's a period of
17 time that municipalities end up in New
18 Jersey Fair Housing Act has to comply with
19 obligations for affordable housing.
20     Q.   And just so we're all clear, with
21 references, and that arose not only out of
22 the Fair Housing Act, but also out of some
23 Supreme Court decisions; is that right?
24     A.   Yeah, not all decisions.
25 Municipal and law.

Page 19

1      Q.   Very good.  And while we're on
2  that topic, the state legal obligations
3  that you reference that you believe the
4  Borough of Wallington, is compliant with,
5  that includes their Fair Housing Act in New
6  Jersey?
7      A.   Yes.
8      Q.   The Mount Laurel 1 and 2
9  documents from the Supreme Court?
10     A.   Yes.
11     Q.   New Jersey Constitution and
12 municipal land use law, generally?
13     A.   Yes.
14     Q.   Any other New Jersey state
15 obligations that -- you generally reference
16 state obligations, is there anything else
17 that you think of that I didn't include in
18 that list?
19     A.   Just with the state in some
20 capacity depending, it seems to be a
21 different organization every time, but
22 comes up with the actual number that the
23 municipality needs to comply with.
24     Q.   Sure.  And those -- and that
25 would be a reference to most recently,

Page 20

1  round four?
2      A.   Round four, the obligation that
3  came from EPA.  You know, round three, it
4  was -- kind of came through settlement.  So
5  it kind of -- it used to be COAH, so it's
6  sort of an obligation, but it's come from
7  different places over time.
8      Q.   They're all emanating out of the
9  Mount Laurel doctrines in the and the Fair
10 Housing?
11     A.   Correct.
12     Q.   You also mentioned that you
13 testified before land use boards, correct?
14     A.   Yes.
15     Q.   And is that typically -- is there
16 an instance that you know where you
17 testified on behalf of an applicant as
18 opposed to for the municipality?
19     A.   Yes.
20     Q.   So you do both?
21     A.   Yes.
22     Q.   Okay.  And if you look at the
23 last page of your report, Caldwell-1,
24 there's two -- there's two listings on the
25 last page.

Page 21

1      A.   The last page of my CV?
2      Q.   The entire -- yeah.  Yeah.  At
3  the top it says, municipal clients and
4  the -- and then there's another bucket,
5  expert witness in the following
6  municipality client.
7       Do you see that?
8      A.   Yeah.
9      Q.   Municipal client, I assume is
10 fairly self explanatory.  Those were all
11 municipalities that you actually testified
12 on behalf of?
13     A.   Yes.  Well, I was contracted by
14 those municipalities to do some work.
15     Q.   Okay.  Great.  And I was going to
16 ask you that.  So you actually acted as the
17 town planner in some capacity?
18     A.   In some capacity.  Sometimes I
19 was a special consultant for some reason,
20 sometimes affordable housing, sometimes
21 just to do a specific report or something
22 like that.  But as a planner, I was
23 contracted with all those municipalities in
24 that way.
25     Q.   Got it.  Now the second was, were

Page 22

1  those actually your clients or those are
2  the municipalities or counties in which the
3  matters were pending?
4      A.   That's where I testified on
5  behalf of private clients in those
6  municipalities or for some county entities,
7  like county app boards.  So it's all sorts
8  of -- some type of land use process.
9      Q.   And of your private clients, did
10 any of those applications include a
11 development that included affordable
12 housing?
13     A.   Yes.
14     Q.   Would that be a majority of them,
15 most of them?
16     A.   No, I would say it was a
17 minority.  I represented primarily some --
18 100 percent affordable housing project for
19 low income housing tax credit projects.
20     Q.   You said that would be the
21 majority of your private clients?
22     A.   No, that was just -- those are
23 the ones that involved affordable housing.
24     Q.   Okay.
25     A.   The majority of my private

Page 23

1  clients are variances for a variety of
2  reasons.  Use variances, bulk variances,
3  all types of applications.
4      Q.   And let's focus on the category
5  you mentioned for affordable housing.  Can
6  you just clarify what you said, what did
7  those applications typically consist of?
8      A.   100 percent affordable housing is
9  low income housing tax credit projects
10 where a developer like RPM is proposing a
11 project that's all affordable housing.
12     Q.   And do you recall how many of
13 those you've done in the last five years?
14     A.   I think I've done three.
15     Q.   Prior to this engagement, had you
16 ever done -- have you ever been retained by
17 the Borough of Wallington?
18     A.   No.
19     Q.   Have you ever testified before
20 any of the land use boards of the Borough
21 of Wallington?
22     A.   No.
23     Q.   Have you ever acted as an expert
24 in any litigation pending in the Federal
25 District Court of New Jersey?

Page 24

1      A.   No.
2      Q.   Any federal courts at all?
3      A.   No.
4      Q.   So Superior Court and land use
5  boards?
6      A.   Yes.
7      Q.   Have you ever been an expert in
8  any arbitrations?
9      A.   Any?
10     Q.   Arbitration.
11     A.   Arbitrations, no.
12     Q.   Can you give me your best
13 estimate of how much of your work is
14 comprised of Superior Court expert work
15 versus municipal work?
16     A.   When you say Superior Court,
17 expert work, do you mean everything leading
18 up to the Superior Court appearance?
19     Q.   Yeah, an engagement that is going
20 to be before the Superior Court for
21 approval.
22     A.   And do you mean over my entire
23 career or?
24     Q.   Currently, let's say currently.
25     A.   Currently, right now.

Page 25

1      Q.   Right now, a lot easier.
2      A.   Yeah, I was going to say that's a
3  tough call.  Right now -- so I'm
4  representing 20 municipalities in the
5  dispute resolution program, which is
6  essentially Superior Court at the end of
7  the day.  And I'd say currently that's
8  about 40 percent of our work.
9      Q.   And obviously your work is not
10 just testifying, right, but you -- what
11 else do you do day-to-day?  Does your --
12 well, let me ask you this, actually:  You
13 work for J. Caldwell and Associates, LLC,
14 correct?
15     A.   Yes.
16     Q.   Okay.  And how many employees
17 work at J. Caldwell?
18     A.   I have four employees.
19     Q.   And what are their -- are they --
20 are any of them -- just give me the titles
21 of each of them since there's only four.
22     A.   I have three planners, two
23 associate planners, and one senior planner,
24 and an administrative assistant.
25     Q.   All right.  Let's talk about the

Page 26

1  current engagement for a moment with the
2  Borough.  Is your fee arrangement hourly or
3  flat rate?
4      A.   Hourly.
5      Q.   Do you recall what the rate is?
6      A.   Not exactly, no.
7      Q.   Okay.  I don't believe I saw it.
8      A.   I didn't list it in the report.
9  I noticed that your expert did.
10     Q.   But any --
11     A.   It's less than $200 an hour.
12     Q.   And that would have been -- and
13 was that engagement approved through the
14 council, through a resolution, or directly
15 through Mr. Shephard's office?
16     A.   To my knowledge, it was through
17 Mr. Shephard's office.  I didn't engage in
18 any council approvals or anything like that
19 personally.
20     Q.   And in the preparation of your
21 report, did any of the -- put aside the
22 administrative assistant, did any of the
23 three planners assist in preparing the
24 report?
25     A.   Yes.

Page 27

1      Q.   Who did that?
2      A.   The senior planner, Alison
3  Kopsco.
4      Q.   Can you spell that for me and the
5  reporter?
6      A.   A-L-I-S-O-N.  Kopsco is
7  K-O-P-S-C-O.
8      Q.   Anyone else other than
9  Ms. Kopsco?
10     A.   Yeah.
11     Q.   Anyone else help with the report
12 or the preparation?
13     A.   Aside from my administrative
14 assistant helping with typos, things like
15 that.
16     Q.   No, just Ms. Kopsco?
17     A.   Yeah.
18     Q.   Okay.  And Ms. Kopsco, what did
19 she do to assist you in preparing the
20 report?
21     A.   She helped with just researching,
22 drafting the overall report.  And then I
23 went through and finalized everything.
24          MR. DiGIULIO:  Off the record for one
25     second.

Page 28

1          (Whereupon, at this time a discussion
2      was held off the record.)
3  BY MR. DiGIULIO:
4      Q.   Ms. Caldwell, just know for the
5  record, my colleague dropped off your file
6  back to you, so that's back in
7  Mr. Shephard's possession.
8      A.   Thank you.
9      Q.   Thank you for bringing it.
10     A.   Sure.
11     Q.   Do you have any sort of success
12 bonus related to this case as it relates to
13 your engagement?
14     A.   No.
15     Q.   Okay.  Let's go to your CV.  Can
16 you turn to -- I believe it's amended to
17 your list 4, the next page after Page 31.
18      Ms. Caldwell, it says that you're a
19 licensed professional planner in New Jersey
20 since 2005; is that right?
21     A.   Yes.
22     Q.   Okay.  Can you just briefly
23 describe, what does a planner do?
24     A.   What does a planner do?
25     Q.   Yep.

Page 29

1      A.   So professional planners are land
2  use planners.  So in my case, I suppose
3  there's a whole variety of things that we
4  do, but in my case in particular, it's
5  mostly working on land use cases.  I
6  represent municipalities, work with zoning
7  master plans, land use applications,
8  environmental compliance regulations like
9  Highlands Regional Master Plan.  I work on
10 state planning issues that affect
11 municipalities, and then work on private
12 applications before the boards.
13     Q.   And you have a bunch of letters
14 after your name at the top there.  Can you
15 walk us through each one.  PP?
16     A.   Sure.  So PP is a professional
17 planner for New Jersey.  The AICP is
18 American Institute of Certified Planners,
19 so that's a national certification for
20 planners.  And then Leadership in Energy
21 and Environmental Design is a LEED
22 certification.  Green Associate, so that's
23 essentially a green environmental
24 certification for green building.
25     Q.   And did you -- are you the

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Page 30
1  founder of J. Caldwell and Associates?
2      A.  Yes.
3      Q.  And when did you start that?
4      A.  2012.
5      Q.  And prior to 2012, where did you
6  work?
7      A.  I worked at Harold Pellow and
8  Associates, it's an engineering firm in
9  Sussex County.
10     Q.  Can you spell the last name,
11 please?
12     A.  P-E-L-L-O-W, Harold Pellow and
13 Associates.
14     Q.  And you said that was an
15 engineering firm?
16     A.  It's a planning engineering firm,
17 but a little more heavy on engineering.
18     Q.  And when did you start at Harold
19 Pellow?
20     A.  So 2012, seven years, so I guess
21 2005.
22     Q.  Did you have the same title
23 during those seven years?
24     A.  No.  I mean, I think I started as
25 the regular planner and then a senior

Page 31
1  planner by the end of it.
2      Q.  And that coincides with the date
3  you -- the year that you became
4  professional planner; is that right?
5      A.  Yes, when I started there in
6  2005, yeah, I got my PP.
7      Q.  Was that your first job that you
8  had where you were a licensed professional
9  planner?
10     A.  Yes.
11     Q.  And you went right from Harold
12 Pellow to J. Caldwell and Associates?
13     A.  Yes.
14     Q.  Okay.  Prior to your time at
15 Harold Pellow, did you -- what did you do,
16 where did you work?
17     A.  I was a planner, I worked in New
18 York State for two years as a consulting
19 planner.  At that time, I was certified by
20 the American Institute Certified Planner,
21 so still a planner.  I just wasn't working
22 in New Jersey, so I didn't have the
23 professional planning license.
24     Q.  And you worked in New York, did
25 you need a -- did you have any New York

Page 32
1  licensure at that time?
2      A.  No, there isn't any New York
3  license.
4      Q.  And you said you were a
5  consulting planner.  Did you work at one
6  place or take on projects as they came?
7      A.  I worked at two different places.
8  One in Westchester County and one in New
9  York City.
10     Q.  Just give us the names of those,
11 please?
12     A.  Serrandino and Associates,
13 S-E-R-R-A-N-D-I-N-O, that was in
14 Westchester.  And then in New York City it
15 was -- now I'm drawing a blank.  Sector
16 Planning.
17     Q.  Have you ever rendered an expert
18 opinion regarding purported violations of
19 the New Jersey Fair Housing Act?
20     A.  Regarding what?
21     Q.  Violation -- purported violations
22 of the New Jersey Fair Housing Act?
23     A.  Violations by -- who would give a
24 violation?
25     Q.  So let's do it this way:  Have

Page 33
1  you ever rendered an opinion where the
2  municipality was brought into a lawsuit for
3  alleged violations of the Federal Fair
4  Housing Act?
5      A.  No.
6      Q.  Okay.  How about the New Jersey
7  Fair Housing Act?
8      A.  No.  Like I said, all of my
9  testimony in Superior Court has been when
10 municipalities are complying.  I've never
11 been brought in for, like, a builder's
12 remedy lawsuit or something like that.
13     Q.  Very good.  That was my next
14 question, so thank you.  No builders remedy
15 expert experience?
16     A.  No.
17     Q.  No.  Okay.  And you're -- you're
18 not an attorney, right?
19     A.  No.
20     Q.  Okay.  And you -- and all of your
21 opinions in your report and that you intend
22 to provide in this case, are based on your
23 experience as a planner, correct?
24     A.  Yes.
25     Q.  Do you have any experience

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Page 34

1  related to data analysis?
2      A.  Data analysis?
3      Q.  Yeah.
4      A.  I would do census data, that sort
5  of thing.
6      Q.  Okay.
7      A.  But I wouldn't say it's an
8  expertise in data analysis where I would do
9  some kind of analysis, like basically look
10 at census data from a planning lens.
11     Q.  Okay.  Have you ever rendered an
12 opinion that provides statistical analyses
13 like those set forth in Dr. Steil's report?
14     A.  No.
15     Q.  Okay.  And you're not offering an
16 expert opinion as it relates to those
17 statistical analyses, are you?
18     A.  No.
19     Q.  Okay.  And in this case, you're
20 not offering opinion as to whether there
21 was a disparate impact, unprotected classes
22 of people based on the Borough's acts or
23 omissions, are you?
24         MR. SHEPHARD:  Objection to form.
25         You can answer.

Page 35

1  BY MR. DiGIULIO:
2      Q.  You can answer.
3      A.  Okay.  Well, I think I am.  I
4  mean, as far as, I don't believe there's a
5  disparate impact by their actions, and I
6  believe that was in my report.
7      Q.  Okay.  Well, you -- yeah.  Your
8  report says that they've complied with
9  their state law obligations, is your
10 belief, correct?
11     A.  Right.
12     Q.  Okay.  That's different than, do
13 you dispute the fact that there is a
14 disproportionate impact on protected
15 classes of minorities and families with
16 children in Wallington, based on the acts
17 and omissions of the Borough?
18     A.  Yes.
19     Q.  You do.  Okay.
20        Do you have any opinion as to
21 plaintiffs' damage claims in this case?
22     A.  No.
23     Q.  Do you have an opinion on what
24 date the Borough became compliant with
25 their state obligations as it relates to

Page 36

1  affordable housing?
2      A.  Yes.
3      Q.  When do you believe that
4  occurred?
5      A.  Well, what I looked back on was
6  2020, the certification by Superior Court.
7      Q.  When the settlement with Fair
8  Share Housing was -- so you're referring to
9  the date in which the settlement with Fair
10 Share Housing was ultimately approved by
11 the Superior Court?
12     A.  Yes.
13     Q.  And that was, I believe, January
14 2020?
15     A.  Okay.
16     Q.  I'll refer you --
17     A.  I don't have it in front of me.
18     Q.  No, no problem.  I think you have
19 a handy timeline in here.
20        If you turn to Page 8 of your report,
21 Caldwell-1, I think the fourth entry from
22 the bottom says, January 6, 2020, the
23 Superior Court issues a settlement order
24 memorializing the fairness hearing on
25 Wallington Borough's third round of EGFSP?

Page 37

1      A.  Yes.
2      Q.  That's the date you're referring
3  to?
4      A.  Yes.
5      Q.  So you believe at that point, the
6  Borough of Wallington was compliant with
7  its state obligations, including, but not
8  limited to, the third round?
9      A.  Yes.
10     Q.  Okay.  At that point, the fourth
11 round did not exist; is that right?
12     A.  Correct.
13     Q.  So as of that time, everything
14 that did exist, you believe that they were
15 complying with?
16     A.  Yes.
17     Q.  Prior to that, they were not
18 compliant, correct?
19     A.  I would say they were in the
20 process.  So there wasn't really a way to
21 be compliant until you -- for the third
22 round, until you got through the Superior
23 Court process.  They had various housing
24 elements in fair share plans throughout
25 that they were working towards compliance,

Page 38

```
 1  but they couldn't be certified by any
 2  entity.
 3     Q.   And at that point, they were the
 4  subject of at least one lawsuit related to
 5  their affordable housing noncompliance; is
 6  that right?
 7     A.   From -- are you referring to the
 8  2015 Wallington Borough matter, the
 9  application, Borough of Wallington and
10  that's the declaratory judgment.  The Mount
11  Laurel?
12     Q.   If you don't know -- yeah, just
13  call the --
14     A.   I'm not sure what you're --
15     Q.   -- if you don't -- yeah, if you
16  don't -- again, if you're not sure of an
17  answer, I don't need you to scour the
18  report.  I'll point to where I need you to.
19     A.   Okay.
20     Q.   If you're not aware of the
21  answer, just don't worry about it then.
22          And do you know, as of today, how
23  many affordable housing units have been
24  built to satisfy the Borough's third round
25  obligation?
```

Page 39

```
 1     A.   I have it in my report.
 2     Q.   Sure.  Take a look if you want.
 3     A.   It's actually -- well, yeah,
 4  let's see if I can find it.  Compliance.
 5  So my understanding is the Wallington Homes
 6  project is constructed which included eight
 7  affordable units.
 8     Q.   And that's in the middle of Page
 9  6, Block 70-05, Lot 8.01?
10     A.   Yes.
11     Q.   Okay.  And do you know what the
12  third round obligation was for the Borough?
13     A.   125 units.
14     Q.   So 8 out of 125 are built?
15     A.   Correct.
16     Q.   And do you know if -- do you know
17  what types of units -- what type of
18  affordable housing units were built at
19  Wallington Homes?
20     A.   Multifamily units.
21     Q.   Okay.  Any restrictions,
22  anything?  Are they age restricted?
23     A.   Not to my knowledge.
24     Q.   All right.  In preparation for --
25  let me just ask you this: I think you
```

Page 40

```
 1  believe you are -- I believe you already
 2  testified, you reviewed Dr. Steil's report;
 3  is that right?
 4     A.   Yeah.
 5     Q.   Okay.  And let's just mark it to
 6  make sure it's the same one you looked at.
 7          (Whereupon, Exhibit Caldwell-3, Dr.
 8  Steil's report, was marked for
 9  identification.)
10          Ms. Caldwell, I'm going to hand you
11  what we've marked as Caldwell-3.  It's a
12  June 30, 2025 report prepared by Dr. Justin
13  Steil of MIT.
14     A.   Okay.
15     Q.   Is this the report that you're
16  referring to that you reviewed?
17     A.   Yes.
18     Q.   And have you reviewed the other
19  expert report provided in this case from
20  IRR, it's a damage report?
21     A.   No.
22     Q.   You have not reviewed that report
23  at all?
24     A.   No.
25     Q.   In preparing your report, did you
```

Page 41

```
 1  conduct any physical inspections of the
 2  subject properties?
 3     A.   No.
 4     Q.   Okay.  Did you conduct any
 5  interviews with anyone?
 6     A.   Any what?
 7     Q.   Interviews with anyone?
 8     A.   No.
 9     Q.   Okay.  Did you speak to any of
10  the planning board members?
11     A.   No.
12     Q.   Did you speak to any council
13  members?
14     A.   No.
15     Q.   Did you speak to any other
16  property owners in the Borough?
17     A.   No.
18     Q.   You didn't go see Wallington
19  Homes, the build units, did you?
20     A.   No.
21     Q.   Have you ever been in the Borough
22  of Wallington before?
23     A.   Yes.
24     Q.   Okay.  In reviewing and preparing
25  your report, did you review any of the
```

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

```
                                               Page 42
 1   deficit transcripts from this case?
 2       A.   Yes.
 3       Q.   Do you recall who?
 4       A.   Mr. Knuckle.
 5       Q.   Mr. Knuckle.  Did you review the
 6   deposition of the Borough's corporate
 7   representative, Ms. Appice?
 8       A.   No.
 9       Q.   That's A-P-P-I-C-E.
10            Did you review the deposition
11   transcript of Mayor Dabal?
12       A.   No.
13       Q.   Councilman Rachelski?
14       A.   No.
15       Q.   The only deposition you recall
16   reviewing is that of Mr. Knuckle?
17       A.   Yes.
18       Q.   Okay.  Now, the subject
19   properties, just so we can orient ourselves
20   when we're referring to them, you
21   understand there's two lots, correct?
22       A.   Yes.
23       Q.   Okay.  And in the front, there's
24   an -- Lot 35.01 is owned by an entity
25   called Morningside.
```

```
                                               Page 43
 1       Do you understand that?
 2       A.   Yes.
 3       Q.   And the second lot, 35.02, is
 4   owned by the other plaintiff, New
 5   Wallington Homes.
 6            Do you understand that?
 7            Okay.  Yeah.  And do you understand
 8   that the properties that the 35.01 property
 9   owned by Morningside faces Main Street?
10       A.   Yes.
11       Q.   Okay.  And 35.02, which is owned
12   by New Wallington Home, is behind the
13   Morningside property?
14       A.   Yes.
15       Q.   And you also understand that the
16   New Wallington Home property, 35.102,
17   requires access through the Morningside
18   property to access it?
19       A.   Yes.
20       Q.   Okay.  And do you currently know
21   what is on those properties?
22       A.   Only from the record.
23       Q.   And what's your understanding
24   from the record?
25       A.   That the roller skating rink
```

```
                                               Page 44
 1   remain there and that the industrial
 2   buildings have been removed.
 3       Q.   Now, from your review of the
 4   record, you understand that New Wallington
 5   Homes' predecessor filed a builder's remedy
 6   lawsuit dating back to 2006, correct?
 7       A.   Yes.
 8       Q.   And quickly, what is your
 9   understanding of a builder's remedy
10   lawsuit?
11       A.   It's essentially a developer
12   challenging a municipality's zoning based
13   on the fact that they're not providing for
14   their obligation of affordable housing,
15   which means that their zoning gets deemed
16   invalid.
17       Q.   And do you understand that the
18   other plaintiff in this case, Morningside,
19   intervened in that case?
20       A.   No.
21       Q.   Did you understand that both
22   parcels were the subject of that builder's
23   remedy suit?
24       A.   Yes.
25       Q.   Okay.  And as a result of that
```

```
                                               Page 45
 1   lawsuit, did you understand that the court
 2   declared the Borough's land use controls
 3   and zoning ordinances invalid?
 4       A.   Yes.
 5       Q.   Okay.  And so at that time, the
 6   Borough's land use controls and zoning
 7   ordinances were not in compliance with New
 8   Jersey state law, correct?
 9       A.   Yes.
10            (Whereupon, Exhibit Caldwell-4, March
11   18, 2008 decision in the Bergen County
12   Superior Court, 800P04 through P010, was
13   marked for identification.)
14       Q.   And I want to show you -- have
15   you reviewed -- I'm gonna hand you what is
16   a marked Caldwell-4.  It's a March 18, 2008
17   decision in the Bergen County Superior
18   Court, Bates number P04 through P010.
19            And have you seen this decision
20   before?
21       A.   Yes.
22       Q.   And as we turn to Page 2, I guess
23   we discussed but maybe a little more
24   detail, plaintiffs alleged that the Borough
25   was out of compliance with the New Jersey
```

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Page 46
1  Constitution, the New Jersey Fair Housing
2  Act, and Mount Laurel wanted two doctrines.
3      Do you see that?
4          MR. SHEPHARD:  Where are you, Jim?
5          MR. DiGIULIO:  On Page 2.
6          THE WITNESS:  They allege that is what
7      you're saying?
8  BY MR. DiGIULIO:
9      Q.   It actually says, following the
10 successful prosecution of a motion for
11 partial summary judgment, it was declared
12 that Wallington was out of compliance of
13 those legal obligations.
14     Do you see that?
15     A.   Yes.
16     Q.   Okay.  And it's your position
17 that between that time and in January of
18 2020, they got in compliance with those
19 state legal obligations, correct?
20     A.   Yes.
21     Q.   Now, if you turn to Page 7, and
22 then at the bottom, there's a -- there's a
23 subsection 3, determinations of law.
24     Do you see that?
25     A.   Yes.

Page 47
1      Q.   Okay.  And the judge says that,
2  the principal question in the case is
3  whether, quote, Wallington has created a
4  realistic opportunity for the construction
5  of its fair share of the region's needs for
6  affordable housing, end quote.
7      Do you see that?
8      A.   Yes.
9      Q.   Okay.  Have you heard that
10 language before, that a borough has an
11 obligation -- a municipality has an
12 obligation to create a reasonable
13 opportunity for the construction of
14 affordable housing?
15     A.   Yes.
16     Q.   Okay.  And in your experience as
17 a planner, is simply the rezoning of
18 properties to allow for the building of
19 affordable housing sufficient to meet that
20 obligation?
21     A.   It depends.
22     Q.   So sometimes no?
23     A.   Sometimes no.
24     Q.   Okay.  Have you ever seen
25 instances where a borough has taken actions

Page 48
1  after rezoning that have made it difficult,
2  if not impossible, to build affordable
3  housing?
4      A.   Difficult, if not impossible?
5  No, not personally.
6      Q.   Okay.  Have you ever seen any
7  instances where a borough has denied land
8  use applications improperly for the
9  building affordable housing units?
10     A.   When you say borough, do you mean
11 municipality?
12     Q.   Yeah, municipality.
13     A.   Yes.
14     Q.   You have, okay.
15     And in those instances, do you recall
16 if there was a lawsuit that followed?
17     A.   Yes.
18     Q.   And was there a ruling in those
19 instances?  Is it more than one or just one
20 that you're aware of?
21     A.   I'm thinking of one in
22 particular.
23     Q.   And was there ultimately a
24 decision by the court that the -- the
25 municipalities land use determinations were

Page 49
1  arbitrary, capricious, and unreasonable?
2      A.   For that case, yes.
3      Q.   In that case, okay.
4      A.   That wasn't a -- they weren't
5  deemed to be out of compliance with
6  affordable housing, just with that case was
7  remanded back to the board.
8      Q.   Okay.  And typically from what
9  you've seen, when a land use determination
10 is deemed improper by a court is remanded
11 back to the -- to the board?
12     A.   Yes.
13     Q.   Have you ever seen an instance
14 where the court didn't remand and simply
15 granted approvals without a remand?
16     A.   Yes.
17     Q.   And how many of those instances
18 do you know of?
19     A.   One or two.
20     Q.   In this case as well?
21     A.   Yes, this case.
22     Q.   Any others beyond this case?
23     A.   No.
24     Q.   Let's get back to, the judge said
25 a realistic opportunity for construction.

Page 50

1  And I think we've -- I don't want to put
2  words in your mouth, but I think you've
3  agreed, there are instances where a borough
4  could comply with a builder's remedy and
5  rezone a property, but still not provide a
6  reasonable opportunity for development of
7  affordable housing, correct?
8      A.   I think what I meant by that
9  statement was more that, sometimes there's
10 more they have to do than just rezoning.
11 So there might be other programs, other
12 processes that have to be undertaken.
13     Q.   And is it typical that after
14 there's rezoning, there are then subsequent
15 land use applications that need to be
16 approved?
17     A.   Yes.
18     Q.   Okay.  And what would those
19 typically entail?
20     A.   Usually site plan, possibly
21 subdivision applications.  Sometimes it's
22 redevelopment.  So you have to do a study,
23 declare it an area in need, and then do a
24 redevelopment plan and then do the site
25 plan.  But typically it's site plan.

Page 51

1      Q.   Sure.  Have you testified or been
2  involved in redevelopment applications?
3      A.   Yes.
4      Q.   And in those instances, were you
5  representing municipality, a private
6  client, or both?
7      A.   Both.
8      Q.   In those instances, did they
9  result in a redevelopment agreement being
10 entered into?
11     A.   Yes.
12     Q.   In any of those instances, was a
13 pilot also granted to the redeveloper?
14     A.   Yes.
15     Q.   In all of them or most of them?
16     A.   Some of them.
17     Q.   And what does pilot -- what does
18 the PILOT stand for?
19     A.   Payment in lieu of taxes.
20     Q.   Okay.
21     A.   The long term tax abatement
22 program.
23     Q.   And you understand that a
24 municipality -- actually, in your time,
25 dealing with approvals for affordable

Page 52

1  housing developments, are you aware of
2  instances where PILOTS were granted?
3      A.   Yes.
4      Q.   And you understand that
5  municipalities are permitted to provide
6  PILOTS as part of an affordable housing
7  development, correct?
8      A.   Yes.
9      Q.   Would you say that is more often
10 than not part of an affordable housing --
11 let me withdraw the question.  Let me give
12 you a timeframe.
13      In recent two or three years, would
14 you say that PILOTS are more often than not
15 granted with affordable housing
16 developments?
17          MR. SHEPHARD:  Note my objection.  Are
18      you asking for her expert opinion?  I mean,
19      she's here as an expert.
20          MR. DiGIULIO:  In her experience.
21          MR. SHEPHARD:  Okay.  Well --
22          THE WITNESS:  In my experience, I'd say
23      probably 75 percent get PILOTS.
24 BY MR. DiGIULIO:
25     Q.   And in those instances, do you

Page 53

1  understand that one of the obligations --
2  one of the -- let me withdraw the question,
3  let me do it this way.
4       In order to obtain a PILOT, is it
5  your understanding, in your experience,
6  that the developer needs to demonstrate a
7  financial need for that PILOT?
8      A.   Yes.
9      Q.   All right.  Now just turn to Page
10 15.  And again, we're at the bottom
11 paragraph, first sentence.  Judge Harris
12 finds, the order shall further declare that
13 Wallington's land use regulations remain
14 invalid and unconstitutional insofar as
15 they continue past exclusionary practices,
16 close quotes.
17      Do you see that?
18     A.   At the bottom?
19     Q.   Yes.
20     A.   Yes.
21     Q.   Okay.  Do you have -- in your
22 review of the record, are you aware of the
23 exclusionary practices that the Borough was
24 undertaking at that time?
25     A.   No.  I reviewed the 2006 Housing

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Page 54

1  Element Fair Share plan. I believe they
2  thought they were stunned because they were
3  built out, some providing additional zoning
4  at the time.
5      Q.  Okay. So they weren't permitting
6  the building of affordable housing units;
7  is that a fair?
8      A.  I think they thought they were
9  able to claim a vacant land adjustment,
10 which means that their community was built
11 out. And you don't necessarily have to
12 zone. The rules have kind of changed, so
13 it's more clear now that you do some
14 overlay zoning. But I think at the time,
15 and because it was round three, there was
16 confusion on the part of the Borough as to
17 whether or not they needed to do zoning for
18 affordable housing.
19     Q.  Okay. So the exclusionary past
20 practices that the judge would be referring
21 to then would be, not building the
22 appropriate number of affordable housing
23 units?
24     A.  Not for them -- I mean, their
25 main requirement, as the Borough is to or

Page 55

1  municipality is to zone for them. They
2  don't actually build them.
3      Q.  Yeah, but they have to create the
4  reasonable opportunity to build, correct?
5      A.  Right.
6      Q.  Okay. Which may include further
7  approvals after the zoning, right?
8      A.  I guess building permits and
9  whatnot.
10     Q.  Yeah, or the land use approvals
11 we spoke about before.
12     A.  Yes.
13     Q.  And if a borough -- if a
14 municipality improperly denies those
15 subsequent land use applications, it's fair
16 to say, they're not providing the developer
17 an opportunity to build for a PILOT, right?
18     A.  I suppose so.
19     Q.  And do you know -- exclusionary
20 practices, do you know who the New Jersey
21 Fair Housing Act is meant to protect? Do
22 you understand --
23     A.  Low and moderate income people.
24     Q.  Do you also understand there's
25 several other groups of protected classes

Page 56

1  included in that?
2      A.  That's not -- no. Not
3  particularly. It's just low and moderate
4  income. That's the way that I interpret it
5  and apply it.
6      Q.  Got it. Okay.
7       And have you ever read the -- I'll
8  take this back from you -- have you ever
9  read the Federal Fair Housing Act before?
10     A.  Yes.
11     Q.  Have you ever offered an expert
12 opinion -- I think you testified, you've
13 never offered an expert opinion as it
14 relates to that, correct?
15     A.  No.
16     Q.  And then it's your understanding
17 that after Judge Harris's 2008 ruling, the
18 Borough -- Wallington undertook rezoning to
19 comply with his order, correct?
20     A.  Yes.
21     Q.  Okay. And thereafter, New
22 Wallington submitted an application for a
23 134 multifamily housing development with 27
24 affordable housing units.
25     A.  Correct.

Page 57

1      Q.  And that New Wallington Home
2  prop -- sorry.
3       In that initial application by New
4  Wallington Home was for the property in the
5  back, closer to the -- to the river,
6  correct?
7      A.  Yeah, that was the second
8  application. The New Wallington.
9      Q.  New Wallington Homes filed an
10 application for 134 units, that's for the
11 back parcel?
12     A.  Right.
13     Q.  And after that was submitted, the
14 Borough initially didn't deem their -- the
15 New Wallington Home application complete,
16 correct?
17     A.  Yes.
18     Q.  And are you aware of the reasons
19 why that happened?
20     A.  The only thing I saw in the
21 record was that there was a question about
22 the use. Whether there was some use
23 variance question, whether it should be
24 before the planning board or the zoning
25 board.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Page 58

1  Q. Do you believe that was this
2  initial application or maybe a later one?
3  A. It might be a later one.
4  Q. Any specific recollection as to
5  the alleged basis for not deeming this 2015
6  application complete by the Borough?
7  A. No.
8  Q. Okay. You understand that New
9  Wallington Home ultimately filed a second
10 lawsuit against the Borough in February of
11 2014 related to this application?
12 A. Yes.
13 Q. Okay.
14    (Whereupon, Exhibit Caldwell-5,
15 April 22, 2015 decision by Judge Meehan,
16 was marked for identification.)
17    Showing you what has been marked
18 Caldwell-5. It's an April 22, 2015
19 decision by Judge Meehan in that second
20 lawsuit we just talked about, filed by New
21 Wallington Home and Morningside, the
22 plaintiffs in this case.
23    See that?
24 A. Mm-hmm.
25 Q. Have you seen that before?

Page 59

1  A. Yes.
2  Q. And turn to Page 2, Judge Meehan
3  does a bit of a summary of what happened
4  that we just talked about with Judge
5  Harris. And then in the second full
6  paragraph, he knows that this suit was
7  filed on February 4, 2014, asking where New
8  Wallington asked for a determination on its
9  development application.
10    Do you see that in the middle of the
11 second full paragraph?
12 A. Yes.
13 Q. Okay. And then he says
14 ultimately, a couple months later, in April
15 of 2014, they entered -- the parties
16 entered into a consent order.
17    Do you see that?
18 A. Yes.
19 Q. And then a easement was recorded
20 on July 8, 2014.
21    Do you see that?
22 A. Yeah.
23 Q. Okay. So after all that
24 occurred, in your review of the record, and
25 as said by Meehan here, there were several

Page 60

1  public hearings on New Wallington Homes'
2  initial applicant development application,
3  correct?
4  A. Right.
5  Q. Okay. And it looks like that
6  first hearing was held on July 15, 2014; is
7  that right?
8  A. July 15?
9  Q. Yes.
10 A. Is that somewhere in here?
11 Q. Yeah, yeah. You can -- on that
12 second page.
13 A. Oh, on this last paragraph, on
14 July 15, September 16, and October, the
15 board held. Yes.
16 Q. Okay. And then it said, after
17 those three hearings, on October 21, 2014,
18 the board, the Borough board, unanimously
19 voted to deny New Wallington's application.
20    Do you see that?
21 A. Yes.
22 Q. Okay. So New Wallington Home got
23 a denial of its application which was filed
24 a little less than a year prior; is that
25 right, in December?

Page 61

1  A. Yes.
2  Q. Okay. And then as a result of
3  that denial, an amended complaint was filed
4  in December of 2019 challenging that
5  denial.
6     Do you recall that from your review
7  of the record?
8  A. Yes.
9  Q. So now we're in our -- we're
10 talking about the third application by New
11 Wallington to challenge the Borough action,
12 correct?
13 A. Yes.
14 Q. Okay. Now on Page 4, at the
15 bottom, the judge explains defendant's
16 arguments, the Borough's position as to why
17 it denied the application.
18    Do you see that?
19 A. Yes.
20 Q. Okay. Now there's three -- it
21 looks like to me in that second sentence
22 there's three basis for the denial as set
23 forth by the Borough. One is, plaintiff
24 was required to obtain a use variance
25 because the proposed construction enlarged

Page 62

1  the nonconforming use in two respects.
2       Do you see that?
3       A.   Yes.
4       Q.   Okay.  Do you have an
5  understanding of what that means and what
6  those purported enlargements were?
7       A.   You're asking me for what the use
8  variance was required for?
9       Q.   What the Borough is -- so most of
10 this deposition is going to be about why
11 did the Borough, over the course of more
12 than a decade, deny plaintiff's
13 applications and what were the reasons.
14 And I think you've opined that, there were
15 legitimate land use concerns --
16      A.   Right.
17      Q.   -- for the various denials.  I
18 think the courts have disagreed and
19 overturned it many times.  But I want to
20 get an understanding of, no one -- I'm
21 trying to get an understanding, maybe you
22 can explain, why you believe, and maybe you
23 don't, that this -- there were legitimate
24 concerns in this denial of the subject of
25 this lawsuit and what were they?

Page 63

1       A.   Well, just from, you know, what
2  they're saying is, they thought it was
3  creating a commercial use on the property
4  and expansion because of -- of a driveway
5  connection to a commercial property.  So
6  they thought there was a use variance.
7       Q.   Okay.  And we saw on the record
8  that just months before they agreed to the
9  properties being developed separately and
10 agreed to an easement, right?
11      A.   Right.  Connecting those two
12 properties.
13      Q.   Correct.  So probably not a
14 surprise that there was going to be a
15 driveway between the two properties?
16      A.   Right.
17      Q.   Okay.  And you've seen a lot of
18 land use decisions regarding applications,
19 right.  You've probably seen maybe
20 hundreds?
21      A.   Yes.
22      Q.   Okay.  Have you ever seen a
23 municipality outwardly state that they were
24 denying an application for improper
25 purposes?

Page 64

1       A.   No, I think it's someone else
2  makes the decision that's improper purposes
3  once they do the denial.
4       Q.   So it's never -- they don't put
5  in a public resolution that we're going to
6  deny this because and name some bad reason,
7  right, they never do that?
8       A.   No.  But, you know, I think from
9  a case perspective, you have to look at the
10 record and what the resolution says and
11 what the reasons for denial were.
12      Q.   Sure.  But ultimately -- well,
13 we'll keep going.  We'll go through those.
14      The next was -- so that addresses --
15 so that was their concern, as they stated
16 here, and that you understand it, right?
17      A.   Right.
18      Q.   And ultimately -- and if you go
19 to the next page, Page 5, the Borough also
20 contended that plaintiff did not provide
21 adequate evidence to support the grant of a
22 C2 variance.
23      Do you see that?
24      A.   Yes.
25      Q.   Okay.  And very briefly, what is

Page 65

1  the C2 variance for the record?
2       A.   A C2 variance is also known as a
3  flexible C benefits detriments variance,
4  where under municipal land use law, an
5  applicant can show that meeting the
6  positive criteria by promoting a purpose of
7  municipality land use law.  They're not
8  negatively impacting the public good or the
9  municipal master plan and zoning
10 ordinances.  And then on balance, the
11 granting of the variance benefits outweigh
12 the detriment.
13      Q.   And is there a concept of an
14 inherently beneficial use in New Jersey
15 law?
16      A.   Yes, but not under the C2
17 variance criteria.
18      Q.   Understood.  But what does that
19 generally mean?
20      A.   Inherently beneficial uses are
21 uses that are seen to be so beneficial to
22 the public that they automatically meet
23 purpose.  A municipal land use law which is
24 serving the general welfare.
25      Q.   And as you said, that doesn't

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Page 66

1  apply to a C2 variance, what does that
2  apply to?
3      A.   Applies to primarily D1 use
4  variances.
5      Q.   And do you know what -- I just
6  want to go back on Page 4, we were talking
7  about the Borough's thought that it
8  required a use variance.  Do you know what
9  type of variance that would be that they
10 were alleging was needed?
11     A.   Well, they're saying expansion of
12 a nonconforming use, so that's a D2
13 variance.
14     Q.   Okay.  Now going back to the C2
15 that they said, in the last sentence the
16 judge said that the Borough's position was
17 that the development of the property, this
18 is the New Wallington property, solely
19 benefit the property owner and not the
20 community.
21      Do you see that?
22     A.   Yes.
23     Q.   Okay.  So the Borough -- the
24 Borough's decision was that a redevelopment
25 with 27 affordable housing units did not

Page 67

1  benefit the community; is that right?
2      A.   I think what they were saying is
3  that the granting of that variance.  So
4  what I saw throughout the record was an
5  applicant requesting several variances,
6  they didn't submit completely conforming
7  applications.  So they felt the granting of
8  the variance was benefiting the applicant,
9  but not the general public.
10     Q.   Okay.  And Judge Meehan agreed --
11 disagreed with that, right?
12     A.   Yes.
13     Q.   Yes.  And he determined that the
14 denial of the New Wallington Home 2015
15 application was arbitrary, capricious, and
16 unreasonable, correct?
17     A.   Yes.
18     Q.   Okay.  And that term, arbitrary,
19 capricious, and unreasonable, you've heard
20 that before?
21     A.   Yes.
22     Q.   What's your -- in your
23 experience, your understanding of that
24 term?
25     A.   Basically saying that it's not

Page 68

1  just what it kind of says, arbitrary, that
2  it's not based on municipal land use law or
3  something in the ordinances that can be
4  substantiated to the extent that the
5  variance should have been denied or the
6  application should have been denied.
7      Q.   The municipality decision didn't
8  have any legitimate concerns that supported
9  the denial; is that a fair -- a fair
10 summary?
11     A.   I guess they're saying, that they
12 didn't feel that it rose to the level of
13 denial.
14     Q.   Because there was not a
15 sufficient basis for the denial, right?
16     A.   That's what he was saying.
17     Q.   Okay.  Okay.  And then at the
18 end, the judge, after he entered in the --
19 I'm on Page 10, if that helps.
20      After he made that finding, he
21 determined that the issues of one, building
22 height; two, sewage; and three, the
23 driveway and easement from the skating rink
24 would be remanded to the planning board.
25      Do you see that?

Page 69

1      A.   Yeah.
2      Q.   Now, would those at that point be
3  site plan approvals, do you know, or would
4  they require some other approvals?  Those
5  three issues, do you know?
6      A.   They would be done through site
7  plan.
8      Q.   Okay.
9      A.   But also, I think there were
10 variances associated with those.  So the
11 judge was finding that those were issues
12 that did need to be discussed with the
13 board and were legitimate issues.  So he
14 remanded those back for decisions under the
15 site plan.
16     Q.   But the judge found specifically
17 there is no requirement for a D or a C2
18 variance in this case, right?
19     A.   The D variance.  I'm not so sure
20 about the C2 variances.  I think they
21 remanded those back in the core variance
22 situation.
23     Q.   Why don't you turn to Page 8.
24     A.   Okay.
25     Q.   In the middle, it starts within