## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW WALLINGTON HOME, LLC, a New Jersey limited liability company; MORNINGSIDE at WALLINGTON, LLC, a New Jersey limited liability company, <br><br> *Plaintiff(s)* <br><br> vs. <br><br> BOROUGH OF WALLINGTON, and BOROUGH OF WALLINGTON PLANNING BOARD; MARK W. TOMKO in his official capacity as former Mayor of the Borough of Wallington; DOROTHY B. SIEK, in her official capacity as former Tax Collector for the Borough of Wallington; and CHRISTOPHER ASSENHEIMER, in his official capacity as Certified Tax Collector of the Borough of Wallington, <br><br> *Defendant(s)* | CIVIL ACTION NO. <br> 2:20-cv-08178 (CCC – ESK) |

## DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF FACTS

Of Counsel
*Mary C. McDonnell*

On the Brief
*Mary C. McDonnell*
*Gerald A. Shepard*

## <u>DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS</u>

Defendants, Borough of Wallington, Borough of Wallington Planning Board, Mark Tomko, Dorothy Siek and Chris Assenheimer (hereinafter, collectively referred to as "Defendants") submit this response to Plaintiff's Statement of Facts in accordance with F.R.C.P 56(c) and Local Civil Rule 56.1(a) in opposition to Plaintiffs' motion for summary judgment.

A. **<u>General Background and the Proposed Development</u>**

1.      Plaintiffs are owners of two adjoining and substantially vacant parcels located at 551 Main Avenue, Wallington, New Jersey (the "Property"). (January 27, 2025 Deposition of James Nuckel ("Nuckel Dep.") at T18:1-9; 22:17 to 23:10, attached as Exhibit A to Certification of James DiGiulio, Esq. ("DiGiulio Cert."))

**Response: Denied.**  The property is occupied by an existing roller rink (see, Exhibit "G").

2.      The Property consists of two lots: Block 71, Lot 35.01 and Lot 35.02 consisting of approximately 10.23 acres of land which Plaintiffs planned to develop as a multifamily residential complex with 207 total residential units, of which 42 are affordable housing units reserved for low- and moderate-income households ("Project").

**Response: Admit**

3.      The Project became a part of Wallington's state-mandated affordable housing compliance and was intended to serve families with children and other residents in need of housing. (September 2019 Fair Share Housing Settlement Agreement at 4, attached as Exhibit C to the DiGiulio Cert.)

**Response: Admit.**

4.      The Plaintiffs' claims arise from Defendants' on-going policy of racial and familial discrimination through efforts to thwart the development of affordable housing and increased access to public transportation. (Plaintiffs' December 7, 2020 Amended Complaint attached as Exhibit D to the DiGiulio Cert.)

**Response: Denied.**  Plaintiffs' state is argumentative and not a statement of fact.  The Defendants of a history of compliance with Affordable Housing and adopted Housing Element & Fair Share Plans (see, Exhibit "L" Caldwell Report and Exhibit "P").  Additionally, Defendants approved Plaintiff New Wallington Home site plane application in Apri 2016 (see, Exhibit "E" attached hereto, a copy of Resolution 16-300).

**B. <u>History of Exclusionary Practices</u>**

5.      For over 15 years the Borough engaged in a systemic scheme to prevent multi-family and affordable housing units from being developed within the Borough.(April 22, 2015 Opinion of Hon. William C. Meehan, J.S.C. (Ret.)("2015 Meehan Opinion") (finding Defendants actions were arbitrary, capricious, and unreasonable)

attached as Exhibit E to DiGiulio Cert.; see also 2019 Farrington Opinion at 9 (finding the Borough to be recalcitrant in its affordable housing obligations)).

**Response: Denied.** This statement is argumentative and not statement of undisputed fact. The record reflects Defendants' affirmative efforts to facilitate the development of affordable housing units in the Borough (see, Exhibit "L" expert report of Jessica Caldwell at pg. 4-9). Additionally, Defendants approved Plaintiff New Wallington Home site plane application in Apri 2016 (see, Exhibit "E" attached hereto, a copy of Resolution 16-300).

6.    Defendant's discrimination has led to a municipality that is predominantly white, by a margin far greater than its neighbors. (June 30, 2025 Expert Report prepared by Justin Steil, Ph.D. pf MIT ("Steil Report"), dated attached as Exhibit F to DiGiulio Cert.)

**Response: Denied.**    While Plaintiff's expert finds statistical disparity, Defendants' actions were non-discriminatory (see, Exhibit "L" Caldwell Report). Dr. Steil failed to include the fact that several affordable housing applications have been approved by the Borough and in some cases constructed." (see, Exhibit "L" attached hereto).

7.    In 2006, The Wallington Group, the predecessor in interest to plaintiff, New Wallington Home, LLC, commenced affordable housing litigation against the Borough, in the matter captioned The Wallington Group, LLC and Morningside at

Wallington, LLC v. Borough of Wallington, et al., Superior Court of New Jersey, Bergen County, Law Division, Docket No. BER–L–373–06, (the "Builder's Remedy Litigation") after the Borough failed to meet its affordable housing obligations. (February 5, 2007 Opinion of Hon. Jonathan N. Harris, J.S.C. ("2007 Harris Opinion") attached as Exhibit G to DiGiulio Cert.)

**Response: Admit.**

8.     In the Builder's Remedy Litigation, the Wallington Group sought: (a) a declaration that the Borough had not met its affordable housing obligations; (b) a builder's remedy requiring the Borough to rezone the Property to permit multifamily residential use; and (c) an order directing that the Wallington Group's inclusionary development application be "fast tracked." (Id.)

**Response: Admit.**

9.     Morningside intervened and sought the same relief with respect to its property. (Id.)

**Response: Admit.**

10.     The Court held that the Borough failed to comply with its affordable housing obligations, declaring Wallington's zoning controls unconstitutional for excluding affordable housing, and entered a judgment granting Plaintiffs a builder's remedy (rezoning the site for the inclusionary project). (Id. at 15-16).

**Response: Admit.**

11.    The Order held, in part, that the Borough had engaged in "exclusionary practices," "not in compliance with the requirements of the New Jersey State Constitution, the Mount Laurel Doctrine, the [New Jersey] Fair Housing Act and the New Jersey Council on Affordable Housing." (Id.)

**Response: Admit.**

12.    Through a subsequent Order, the Superior Court required the Borough to zone the Property for residential, multi-family use, and also required that certain of the multi-family units be restricted to low- and moderate-income families. (March 18, 2008 Builder's Remedy Order entered by Hon. Jonathan N. Harris, J.S.C., attached as Exhibit H to DiGiulio Cert.)

**Response: Admit.**

13.    Eventually, the Property was rezoned in accordance with the Court's Order, however, the Borough then delayed the development of Plaintiffs' inclusionary development for almost a decade. (March 2, 2016, Opinion of Hon. William C. Meehan, J.S.C. (Ret.) ("2016 Meehan Opinion") attached as Exhibit I to DiGiulio Cert.).

**Response: Denied** that the Borough delayed the development of Plaintiffs' inclusionary development for almost a decade.  Plaintiff New Wallington Home submitted waited until December 2013 to submit a site plan approval (see, Exhibit "D", Judge Meehan Opinion at 2). Additionally, Defendants approved Plaintiff New

5

Wallington Home site plane application in Apri 2016 (see, Exhibit "E" attached hereto, a copy of Resolution 16-300).

C. **First Improper Denial of Plaintiffs' Inclusionary Development**

14.     In December 2013, New Wallington Home submitted an application to the Wallington Planning Board for approval of a development at the Property consisting of 134 multi-family residential dwelling units, including 27 affordable housing units. (2015 Meehan Opinion at 2).

**Response: Admit.**

15.     From the outset the Borough revealed its true intentions, refusing to conduct a public hearing on the application, improperly claiming that the application was incomplete and required the granting of a variance. (Id.)

**Response: Denied.**  Judge Meehan concluded that the Borough had legitimate traffic safety concerns, but the site plan application should not have been denied. Nonetheless, the Court remanded two issues for Defendant Planning Board to decide; whether the driveway connecting the housing complex easement and the traffic to the skating rink should be a one way road.  Judge Meehan also found that the Defendant Planning Board could decide if the driveway could be handled in another safe manner (see, Exhibit "D" attached hereto Judge Meehan Opinion).

16.     Only after the Board was faced with the threat of more litigation (which it would surely have lost) did the Board concede the application was complete. (Id.)

**Response: Denied.** Plaintiffs' statement not supported by the record. Plaintiffs filed a verified complaint and order to show cause on February 4, 2014. On April 24, 2014, the parties entered into a consent order, permitting the lots to be developed separately. Plaintiff filed a declaratory judgment action on September 11, 2014 and Defendant Planning Board denied Plaintiff NWH application on October 21, 2014 (see, Exhibit "D" attached hereto, Judge Meehan Opinion).

17.    The Board then improperly decided that a use variance would be required if Plaintiffs proceeded to develop their lots separately. (Id. at 2-3).

**Response: Admit.** Judge Meehan concluded that the Borough had legitimate traffic safety concerns, but the site plan application should not have been denied. Nonetheless, the Court remanded two issues for Defendant Planning Board to decide; whether the driveway connecting the housing complex easement and the traffic to the skating rink should be a one way road. Judge Meehan also found that the Defendant Planning Board could decide if the driveway could be handled in another safe manner (see, Exhibit "D" Judge Meehan Opinion).

18.    The Board did this solely to self-divest itself of jurisdiction to consider the application and resulted in the application's denial. (Id.)

**Response: Denied.** Plaintiffs' statement not support by the record cited.

19.    This forced Plaintiffs to return to court yet again. (Id.)

**Response: Denied.** Plaintiffs' statement not support by the record cited. No evidence that anyone compelled Plaintiffs to return to Court.

20.     On April 22, 2015, the New Jersey Superior Court reversed the Board's latest denial of site plan approval, finding the Board's decision "arbitrary, capricious, and unreasonable." (Id. at 10.)

**Response: Admit.** Judge Meehan found that Defendant Planning Board's decision was arbitrary, capricious and unreasonable, but the Court remanded issues of building height, sewage and the driveway and easement from the skating rink to the Defendant Planning Board (see, Exhibit "D" attached hereto, Judge Meehan Opinion).

### D. The Borough's Continued Recalcitrance

21.     On remand, the Board again undermined the application and failed to promptly comply with the Court's directives. (See 2016 Meehan Opinion at 2).

**Response: Denied.** Judge Meehan noted that Defendant Planning Board had delayed action, but noted that the purpose of his 2016 Order was to clarify the three limited issues remanded to  Planning Board, *i.e.* sewer study, traffic study, and building height (see, Exhibit "D" attached hereto, Judge Meehan Opinion).

22.     After almost a year since the Court's initial ruling, the Court found that "[t]he Planning Board has unreasonably delayed action" on the remanded application and ordered the Board to act. (Id.)

8

**Response: Admit.** The Court's order speaks for itself.

23.    By 2016, the Superior Court of New Jersey was twice asked to intervene and compel the Borough to cease stonewalling Plaintiffs' inclusionary development. (See 2015 and 2016 Meehan Opinions.)

**Response: Denied.**  Denied to Plaintiffs' allegation that the Borough was stonewalling.  Even with the entry of Judge Meehan's 2016 Order, the Court remanded Plaintiffs' application for review of sewer, traffic and building height issues (see, Exhibit "D" attached hereto, Judge Meehan Opinion).

### E. Improper Delays and Denials Continue

24.    Rather than comply with their obligations, the Borough and its officials invented new procedural hurdles.

**Response: Denied.** This statement is argumentative and does not refer to any evidentiary support in the record. Instead, the record is clear that Defendant complied with Judge Meehan's 2016 Order.  Following Judge Meehan's Order on March 2, 2016, the Planning Board discussed Plaintiff NWH's application on March 15, 2016.  At the March 15, 2016, the Planning Board voted to: approve Plaintiff NWH's variance for the roof height and waive the requirement of traffic study (see, Exhibit "Q" attached hereto, March 16, 2016 Planning Board meeting minutes).  As per Judge Meehan's March 2, 2016, at the April 19, 2016, Planning Board meeting, Bertin Engineering presented a sewer study.  On May 17, 2016, Defendant Planning

9

Board approved Plaintiff New Wallington Home's site plan application (see, Exhibit "E" attached hereto, Resolution 16-300).

25.    The Borough's Zoning Officer (who was also a Planning Board member), Nick Melfi, insisted that despite the Court's prior directive that a site plan application could not even be submitted until he first reviewed and approved a "development plan" – a purported requirement found nowhere in the New Jersey Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-1, et seq. (See 2019 Farrington Opinion at 7).

**Response: Denied.** Denied with respect to Plaintiff's statement that Mr. Melfi insisted at that the application could not even be submitted until he review and approved the "development plan."  Judge Farrington found that Mr. Melfi required the submission of a development plan (see, Exhibit "F" attached hereto, Judge Farrington decision).

26.    Plaintiffs nevertheless complied, only to have Melfi reject the plans, incorrectly asserting that the inclusionary development needed a use variance (which, if true, would have moved jurisdiction to a different board and caused further delay). (Id.)

**Response: Admit.**

27. After legal challenges, the Planning Board was forced to concede Melfi had created the fictional requirement, and that it did have jurisdiction to hear the application. (Id.)

Denied in that Judge Farrington found that Defendant Planning Board was forced to concede Mr. Melfi had created a fictional requirement.  As per Judge Farrington's decision, Defendant Planning Board conceded that it had jurisdiction to hear the application (see, Exhibit "F", attached hereto, Judge Farrington decision at pg. 5).

28.    A revised site plan was submitted and the Board held hearings on the application on May 16, July 18, September 19, and December 19, 2017. (Id., see also Hearing Transcripts attached as Exhibit J (May 16, 2017); Exhibit K (July 18, 2017); Exhibit L (September 19, 2017); and Exhibit M (December 19, 2017)).

**Response: Admit.**

29. At the hearings, the Borough and the Board expressly unveiled the ugly truth of what had driven them to prevent Plaintiffs' inclusionary development: racial and familial discrimination. (Id.).

**Response: Denied.**    The denial of Plaintiff Morningside's site plan application and Plaintiff NWH's request for an amendment to its existing site plan approval was necessitated by Plaintiffs' insistence on maintaining the existing roller rink building and building the proposed housing units and parking structures around that accessory use (see, Exhibit "G" attached hereto, Resolution 18-326).  Despite the applicants' experts no valid reason was provided as to why the roller rink was necessary and why Plaintiffs could not demolish the roller rink along with the other

11

warehouse buildings on the site. The Board noted that Plaintiffs' failure to provide a valid reason for maintaining the roller rink was especially egregious as the variances sought were for important planning goals such as open space, impervious ground coverage and building height that may encroach visibility and light (see, Exhibit "G" attached hereto, Resolution 18-326). Moreover, members of the Defendant Planning Board even sought to approve the application on the condition that the recreation building be eliminated but were advised that the procedurally the board would have to vote to deny the application (see, Exhibit "K", attached hereto at 20:14 – 21:18).

30. First, the Board, which is required to make decisions based on land use principles—revealed that their decisions were driven by the perceived familial status of the development's likely residents. (2019 Farrington Opinion at 9.).

**Response: Denied.** As set forth above, Defendant's Resolution denying Plaintiffs' applications shows the denial was based on land use reasons not perceived familial status. (see, Exhibit "G" , attached hereto, Resolution 18-326) (see, Exhibit "K" attached hereto at 20:14 – 21:18).

31. At the very first hearing on May 16, 2017, Mayor Tomko expressed concern about "the estimation of children coming out of [Plaintiffs'] development for [Wallington's] schools" because the Borough's public schools were purportedly

"burdened" and could not handle "added enrollment." (May 16, 2017 Hearing Transcript at T64:6-12.).

**Response: Admit** that the transcript reflects comments by Defendant Tomko during the course of the hearing. Mayor Tomko also expressed concerns regarding fire safety with the proposed project (see, Exhibit "H", attached hereto at 49:23 – 50:13). Additionally, during the course of the May 16, 2017 hearing, Eugenius Rahcleski and Mr. Melfi asked questions regarding the use of the roller rink (see, Exhibit "H" at 43 –47). Others raised questions regarding Plaintiff NWH's site being listed on the DEP website as a known contaminated site and Plaintiff Morningside's property having contaminants(see, Exhibit "H" 54:12- 57:12).

32.    At the July hearing, Mr. Melfi questioned the number of people who would occupy the development's affordable housing units, stating: "You forgot about the wives and kids. You said 73 people. You forgot about the wives, the boyfriends, family, kids." (July 18, 2017 Hearing Transcript at T60:23 to 61:5.).

**Response:** Admit that Mr. Melfi raised questions regarding the number people for Plaintiff Morningside 73 unit, did not specify affordable housing units (see, Exhibit "I" attached hereto, 60:16 - 61:3). At the same hearing, Mr. Melfi engaged in discussions regarding the existing roller rink (see, Exhibit "I" attached hereto at 39:18-41:13).

13

33.     In a transparent attempt to disguise their prejudice, Defendants attempted to couch their concern as one regarding "over-crowding" in Wallington's public schools. (September 19, 2017 Hearing Transcript at T51:16 to 52:22.).

**Response: Denied.** These comments were merely discourse during the hearings and not part of the Defendant Planning Board's deliberative process (see, Exhibit "L" attached hereto, Expert report of Jessica Caldwell)(see, Exhibit "G", attached hereto, Resolution 18-326).

34.     The Board's open desire to preclude the FHA-protected class of families with children from entering the Borough was more than sufficient to reveal Defendants' discriminatory intent. (Id.)

**Response: Denied.** None of the members of the Defendant Planning Board made comments referred to by Plaintiff in this paragraph.  Melissa Dabal, a member of the Town Council questioned the number of children the project would  bring and ask no further questions on the topic after the applicants' attorney advised Ms. Dabal that the expert testified as to why she believed there would be only five (5) children (see, Exhibit  "J" attached hereto at 51:16 – T53:1).

35.     As the hearings on Plaintiffs' application continued, it became clear that the Board's discrimination against families with children may in fact have been code for more subtle discrimination against the additional FHA-protected class of racial minorities. (Id.)

**Response: Denied.** While Plaintiffs have alleged discrimination, the same has not been proven. As set forth above, Defendant's Resolution denying Plaintiffs' applications shows the denial was based on land use reasons not perceived familial status. (see, Exhibit "G" attached hereto, Resolution 18-326). Members of the board even moved to approve the application with the condition that the building be removed (see, Exhibit "K", attached hereto at 20:14 – 21:18).

36.     Indeed, when Plaintiffs' expert estimated the number of school-aged children that would occupy Plaintiffs' planned development based on data received from other Bergen County municipalities, Mayor Tomko responded, in a racially charged fashion: "What towns in this south Bergen area have you OPRA'd, because, you know, historically Route 4 is the Mason-Dixon line and we cannot compare [Wallington] with upper Bergen County. Things are different." (See July 18, 2017 Hearing Transcript at T65:17-21.)

**Response: Denied.** Defendant Tomko's statement was not racially charged and was made in the context of Plaintiffs' expert's finding on the ratio of school age children per multi-family development (see Exhibit "I" attached hereto at 62:21 – 67:17). Unfortunately, Mayor Tomko passed away, but Eugeniusz Rachelski, a member of Town Council, was present at the July 18, 2017 planning board meeting and clarified that Mayor Tomko's comment referred to the fact that northern Bergen

15

County towns are less densely populated, more affluent and less diversified (see, Exhibit "O" attached hereto at 41:6 –45:13)

37.    Mayor Tomko's comments were seconded by then member of the public and now current Mayor Melissa Dabal. (Id.)

**Response: Denied.**  The citation to the record does not reflect current Mayor Dabal allegedly seconding Mayor Tomko's comments (see, Exhibit "I" attached hereto at 65:17-21).

38.    At another hearing, Board members keyed in on how they might prevent non-white racial minorities from entering the Borough—by blocking walking access from Plaintiffs' development to any nearby transit station, such as the Wesmont train station. (September 19, 2017 Hearing Transcript at T39:8 to 40:1.).

**Response: Denied.**  The citation to the record does not reflect any comments on blocking walking access from the proposed developments to any nearby train station (see, attached hereto Exhibit "J" attached hereto, at  39:8 –40:1).

39.    This became a focus because, pursuant to a respected Rutgers University study that Plaintiffs' expert presented to the Board during the hearings, the construction of transit-oriented developments routinely results in an increased school-aged children and non-white racial minority population. (Id.).

**Response: Denied.** This ambiguous statement is not supported by the record. Instead, Plaintiffs' expert presented findings of school children being created that were lower than her original estimate (see, Exhibit "J" attached hereto 38:7-19).

40. Indeed, census data confirms that the white-only population percentage in West New York—one of the Bergen County transit-oriented developments examined in the Rutgers study—is only 13.9%, which is 61.5% lower than that of Wallington. (September 19, 2017 Hearing Transcript at T37:12 to 28:25.)

**Response: Denied.** This statement is not supported by the record cited by Plaintiffs (see, Exhibit "J" attached hereto at 37:12 to 28(sic):25).

41. Aware of this reality, Mayor Tomko, Board members, the Borough's attorney, and members of the public, each made comments further evidencing discriminatory motivations.

**Response: Denied.** This statement is not supported by any citation to the record.

42. Board member Eugeniusz Rachelski stated, "It was mentioned that this project was compared to West New York. It really is because you look at the [population] density [contemplated by the development] and it is a West New York, and this is not the – the – the stuff that we want in our town." (September 19, 2017 Hearing Transcript at T71:11-18.)

17

**Response: Denied.** Plaintiffs' recitation to the record erroneously states that Mr. Rachelski was referring to population density and omitted the rest of Mr. Rachelski's statement Mr. Rachelski stated when comparing the project to West New York "It is parking lots and buildings, that's what it basically is. Thank you." (see, Exhibit "J" attached hereto at 71:17-18).

43.    Borough Attorney, Martin S. Cedzidlo, Esq., stated: "Mr. Rachelski made a comment about we don't want it to look like West New York. I think it's clear that is the overriding issue the board has raised." (September 19, 2017 Hearing Transcript at T80:16-19.)

**Response: Admit.** The Borough Attorney's statement concerned "…the granting of variances that all surround a recreational building, which is going to impede open space." (see, Exhibit "J" attached hereto at 79:11 – 80:11).

44.    After Plaintiffs' counsel suggested that the affordable housing and their occupying families would constitute a true amenity to the Borough, Melfi interrupted him and said, "Because you don't live here. We have to live here. We have to see this and deal with it everyday." (July 18, 2017 Hearing Transcript at T56:15-57:4.)

**Response: Denied.** Plaintiff's counsel stated referring to the existing building on the property not that the affordable housing and occupying families constitute an amenity (see, Exhibit "I" attached hereto, at 55:13 – 57:4).

18

45.     After making these statements, the Board denied Plaintiffs' application. (See Planning Board Resolution #18-236 attached as Exhibit N to DiGiulio Cert.)

**Response: Denied.**  After the July 18, 2017 hearing, additional hearings were conducted on September 19, 2017 and December 19, 2017(see, Exhibit "J" and "K"). On January 16, 2018, the Planning Board passed Resolution 18-326 denying Plaintiffs applications, wherein Defendant Planning Board accepted much of the testimony of the applicants' experts, but noted the Plaintiffs provided no valid reason to keep the existing roller skating rink necessitating at least four variances.  The Board noted that "[t]his was especially egregious in light of the fact that the variances were for such important planning goals such as open space, impervious ground coverage and height of building that might encroach on visibility and light." (see, Exhibit "G" attached hereto, Resolution 18-326).

46.     Plaintiffs filed yet another action in lieu of prerogative writs against the Board in the Superior Court of New Jersey captioned *Morningside at Wallington, etal. v. Borough of Wallington Planning Board*, BER–L–1670-18, arguing that the Board's denial was arbitrary, capricious, and unreasonable. (2019 Farrington Opinion at 1.)

**Response: Admit.**

47.     In rendering a final judgment in favor of Plaintiffs, Judge Farrington held not only that the Board's decision was arbitrary and capricious, but also that Defendants had been recalcitrant in satisfying their Mount Laurel obligations. Judge Farrington

19

rejected the Borough's artifice and found the denial was improper and discriminatory, based on fiscal concerns to keep families with children out of their town. (2019 Farrington Opinion at 8-9).

**Response: Denied** in that Judge Farrington did not make any finding of discrimination.    Judge Farrington found that the Planning Board "…improperly focused on fiscal concerns, *i.e.* the costs for anticipated school age children" (see, Exhibit "F" at pg. 9).

48.    As a result, Judge Farrington took the extraordinary step of granting Plaintiffs' approvals without further remand to the Board. (Id.)

**Response:** Admit that Judge Farrington approved the amended application of Plaintiff NWH and the application for final development approval for Plaintiff Morningside in their entirety, including all variances (see, Exhibit "F" attached hereto, Judge Farrington decision at pg. 10).

49.    This was the fourth time between 2007 and 2019 that Defendants' actions were deemed either unconstitutional or arbitrary, capricious and unreasonable:

**Response: Admit** that the Courts have deemed Defendant Planning Board's denials as arbitrary, capricious and/or unreasonable.  Denied that they were deemed unconstitutional.

50.    As a result of these repeated violations of law, Plaintiffs' ability to build the inclusionary development was delayed for years, increasing costs and making the

20

development significantly more costly. (June 25, 2025 Expert Report of Arthur Linfante of Integra Realty Resources ("Linfante Report") at 8 attached as Exhibit O to the DiGiulio Cert.).

**Response: Denied.** Plaintiffs' ability to build was delayed only by Plaintiffs resting on their laurels following the Judge Harris decision on March 18, 2008. Plaintiff NWH did not submit a development application to the Defendant Planning Board until December 10, 2013 more than five (5) years after Judge Harris's Builder's Remedy Order (see, Exhibit "D" at pg. 2). Although Plaintiff NWH received final approval May 17, 2016 (see, Exhibit "E" attached hereto, Resolution 16-300), on December 12, 2016, Plaintiff NWH sought to amend its site plan approval at the same time Plaintiff Morningside submitted an application for a development plan (see, Exhibit "F" attached hereto, Judge Farrington Decision pg. 5). Plaintiffs have had approval to develop their projects since January 17, 2019 (see, Exhibit "F" attached hereto, Judge Farrington Decision at pg. 10).

## F. Lack of Legitimate, Non-Discriminatory Bases for The Continued Delays and Denials.

51. After four different court rulings finding that the Borough offered no legitimate, legal basis for its denials of Plaintiffs' land use applications, the Borough has failed to provide any other legitimate, non-discriminatory basis to support its actions.

**Response: Denied.** There are no continued delays or denials as Plaintiffs have had approval for their projects since January 17, 2019 (see, Exhibit "F" at pg. 10). In his decisions on April 22, 2015 and May 11, 2015, Judge Meehan remanded the matter to the Planning Board for further hearing on issues regarding building height, sewage, and the driveway and easement from the skating rink (see, Exhibit "D" attached hereto, Judge Meehan Order). As such, Plaintiff's application was not ripe for approval (see, Exhibit "D" attached hereto, Judge Meehan Order). Further, Following Judge Meehan's decision on March 2, 2016, Plaintiff NWH's application was approved on April 19, 2016 (see, Exhibit "E" attached hereto, Resolution 16-300 ; and Exhibit "F" attached hereto, Judge Meehan Order at pg. 5).

52. When asked to offer any alternative reason, not based on discrimination, for the repeated improper denials of Plaintiffs' land use applications, Borough's corporate representative had no response:

> Q:    Okay. So plaintiff's position -- and I know you haven't read the complaint, so I'm just going to make a representation. Plaintiff's position in this case is that the Borough improperly denied numerous land use applications delaying the development of the property for many years, and three courts found that those decisions were arbitrary, capricious and unreasonable, and I'm trying to determine if the Borough has any other bases for their denials that are not set forth in resolutions.
>
> And, so, as here as the corporate designee, are you aware of any other bases for the denial of those applications?
>
> A: Not that I'm aware of.

(December 3, 2025 Deposition of Jennifer Appice,
Borough Corporate Designee ("Appice Dep.") at 46:1-12
attached as **Exhibit P** to the DiGiulio Cert.).

**Response: Denied.** No evidence supports a finding of discrimination. Defendant Planning Board's rationale for its decisions approving Plaintiff NWH's site plan approval is set forth in Resolution 16-300  and their decision for denying Plaintiff NWH's site plan amendment and Plaintiff Morningside's site plan development application is set forth in Resolution 18-326 (see, Exhibit "E" Resolution 16-300 and Exhibit "G" Resolution 18-326).

53.    The Borough's expert, Jessica Caldwell, a planner, testified that she disagreed with the prior Court rulings and said that some of the offered reasons for the denials were legitimate, notwithstanding the Court's repeated and consistent rulings to the contrary on numerous occasions:

> Q: Okay. So [Judge Farrington] says she is not aware
> of any legitimate land use concerns that were addressed by
> the planning board in their denial, right?
>
> A: Yes, she says that.
>
> Q: Okay. But you disagree with [Judge Farrington] and
> you believe that the Borough did have legitimate land use
> concerns that they were addressing in their denial?
> A: Yes.
>
> (October 30, 2025 Deposition of Jessica Caldwell, P.P.
> ("Caldwell Dep.") at T106:1–10 attached as **Exhibit Q** to
> the DiGiulio Cert.).

23

**Response:   Denied.**    Defendants' expert, Jessica Caldwell a licensed professional planner in New Jersey cited Defendant Planning Board's legitimate concern with Plaintiffs' insistence on keeping the existing roller rink building (see, Exhibit "L" attached hereto, Caldwell report at pg. 18).   The Defendant Planning Board's concern over the roller skating rink was consistent with Judge Meehan's prior ruling remanding the issue of the roller skating rink to the Planning Board (see, Exhibit ""D" attached hereto, Judge Meehan decision)

54.    When pressed for a reason, the only viable alternative offered by the Borough's expert was also illegal – speculating that the Borough denied Plaintiff's development because it did not like it. (Caldwell Dep. at 109:1-3 ("I mean, it maybe they just don't like this development, but its not an overall policy.") This despite the Borough's affordable housing obligation to have the development built to comply with applicable law.

**Response: Denied.**   Ms. Caldwell's report  specified other legitimate concerns, *i.e.* sewer capacity, traffic and known contaminated site history (see, Exhibit "L" Caldwell report at pg. 18-20).  Ms. Caldwell noted that the number of students likely to be generated from the project was not cited as a reason for the Defendant Planning Board's denial (see, Exhibit "L" Caldwell Report at pg. 20)

**G. The Impact of Wallington's Discriminatory and Unsupported Actions**

24

55.     Wallington is a racially homogenous enclave compared to its neighboring towns. (Steil Report at 2.)

**Response: Denied.** As per the US Census Bureau: the population of Wallington is 11,868 and the number of White alone, non-Hispanic or Latino is 8,286 (see, Exhibit "N" attached hereto, Defendants' answers to interrogatories).

56.     According to U.S. Census data from 2019 to 2023, approximately 70% of Wallington's population identified as "White alone, not Hispanic or Latino." (Steil Report at 4.)

**Response: Admit.**  The U.S. Census data speaks for itself.

57.     Every town bordering Wallington had a significantly lower white population share, some with less than half the proportion of white residents. (Id. at 4.)

**Response: Admit** that the Borough of Wallington had different proportion of white residents as reflected in Dr. Steil's data from 2019 to 2023.  Dr. Steil presented no data prior to 2019.

58.     Dr. Justin Steil, an urban planning and fair housing expert from MIT has made unrebutted findings of disparate impact in the Borough of Wallington. (Id.at 2.)

**Response:** Admit that Dr. Steil relied on data from 2019 to 2023 after Plaintiffs' received approval from the Court.  However, Dr. Steil made no finding of a disparate impact prior to Plaintiffs receiving approval from the Court.  Defendants' expert, Jessica Caldwell noted that Dr. Steil failed to "…consider all the factors that

25

municipal land use boards typically evaluate when review development applications such as safety concerns, aesthetic considerations, and unique site-specific factors. Also, Dr. Steil failed to include the fact that several affordable housing applications have been approved by the Borough and in some cases constructed." (see, Exhibit "L" attached hereto, Caldwell Report).

59.    Using census and housing data, Dr. Steil determined that the Borough's obstruction of Plaintiffs' inclusionary development "had a significant adverse impact in making housing unavailable on the basis of race and family status." (Id. at 7-8.)

   **Response: Denied.** Dr. Steil failed to include the fact that several affordable housing applications have been approved by the Borough and in some cases constructed." (see, Exhibit "L" attached hereto, Caldwell Report).

60.    Dr. Steil calculated that more than 55% of Plaintiffs' development's residents would likely be non-white, in contrast to a Borough population that is  roughly 70-75% white. (Id. at 1-2.)

   **Response: Denied.**  Dr. Steil calculated 55 % of the Plaintiff's development's residents would be non-white; however, Dr. Steil failed to include the fact that several affordable housing applications have been approved by the Borough and in some cases constructed." (see, Exhibit "L" attached hereto, Caldwell Report).

61.    Likewise, many residents would be families with minor children, a class of residents Wallington currently underrepresents. (Id.)

26

**Response: Denied** that the families with minor children are underrepresented in Wallington.  Dr. Steil failed to include the fact that several affordable housing applications have been approved by the Borough and in some cases constructed." (see, Exhibit "L" attached hereto, Caldwell Report).

62. Dr. Steil's data showed that Wallington's blocking of the mixed-income development adversely affected potential non-white residents at 1.2 times the rate of white residents. (Id. at 14.)

**Response:** Admit in that Dr. Steil's data speaks for itself; however, Dr. Steil relied on census data from 2019 to 2023, after Plaintiff's had received site plan approvals.  Dr. Steil failed to include the fact that several affordable housing applications have been approved by the Borough and in some cases constructed." (see, Exhibit "L" attached hereto).

63.    Further, potential residents with minor children were affected at 1.3 times the rate of households without children. (Id. at 20.)

**Response:** Admit in that Dr. Steil's data speaks for itself; however, Dr. Steil relied on census data from 2019 to 2023, after Plaintiff's had received site plan approvals. Dr. Steil failed to include the fact that several affordable housing applications have been approved by the Borough and in some cases constructed." (see, Exhibit "L" attached hereto, Caldwell Report).

27

64.    Dr. Steil demonstrates that the pool of people denied housing includes a 20% higher share of minorities (Black, Latino, Asian) and a 30% high share of families with children than the pool of those not adversely affected. (Id. at 20-21.).

**Response:** Admit in that Dr. Steil's data speaks for itself; however, Dr. Steil relied on census data from 2019 to 2023, after Plaintiff's had received site plan approvals. Dr. Steil failed to include the fact that several affordable housing applications have been approved by the Borough and in some cases constructed." (see, Exhibit "L" attached hereto, Caldwell Report).

65.    Dr. Steil also conducted a chi-square statistical test to evaluate the likelihood Wallington's current racial makeup would occur by chance if the proposed development were allowed. (Id. at 15.)

**Response:** Admit in that Dr. Steil's data speaks for itself; however, Dr. Steil relies on census data from 2019 to 2023, after Plaintiff's had received site plan approvals. Dr. Steil failed to include the fact that several affordable housing applications have been approved by the Borough and in some cases constructed." (see, Exhibit "L" attached hereto, Caldwell Report).

66.    This test found with greater than 99.99% certainty that the racial disparity between the "substantially more diverse" population expected in the development and the existing population of Wallington is not random. (Id.)

**Response:** Admit in that Dr. Steil's data speaks for itself; however, Dr. Steil relies on census data from 2019 to 2023, after Plaintiff's had received site plan approvals. However, Dr. Steil failed to include the fact that several affordable housing applications have been approved by the Borough and in some cases constructed." (see, Exhibit "L" attached hereto, Caldwell Report).

67.     By preventing a development in which a majority of residents would likely have been non-white, Defendants ensured that Wallington remains less diverse than the surrounding region, thereby perpetuating racial segregation. (Id.)

**Response: Denied.** Plaintiffs have substantially delayed in the development of their sites. Both Plaintiffs have had approval to develop the sites for over seven (7) years. Dr. Steil failed to include the fact that several affordable housing applications have been approved by the Borough and in some cases constructed." (see, Exhibit "L" attached hereto, Caldwell Report).

68.     The Borough's actions are not limited to Plaintiffs' development. To date, for its Third Round Obligations agreed to with Fair Share Housing in a 2019, settlement agreement, only 8 out of 125 affordable units have been built. (Fair Share Housing Agreement at 3 attached as Ex. C to DiGiulio Cert.)

**Response: Denied**.   The Fair Share Housing agreement referenced by Plaintiff arose from a declaratory judgment action filed by Defendant Borough of Wallington, seeking judicial determination of compliance with the Borough's Third

29

Round affordable housing obligation. The Borough settled with the Fair Share Housing Center. Judge Farrington approved the settlement after a Fairness Hearing held on November 20, 2019 (see, Exhibit "L" attached hereto , Caldwell Report at pg. 9).

69.     Moreover, a majority of the remaining affordable units approved for other sites are not for low or middle income residents, but instead age-restricted housing. (Id. at 3.)

**Response: Denied** in that age-restricted units can also affordable units.

## H. Other Actions to Thwart Diverse Residents Coming to Wallington

70.     The Property is adjacent to the Wesmont train station in neighboring Wood-Ridge operated by New Jersey Transit. (June 24, 2025 Expert Report of Matthew J. Seckler, PE ("Seckler Report") at 1, attached as Exhibit R to the DiGiulio Cert.)

**Response: Denied.**    Plaintiff's property is across the street and not even visible on Mr. Seckler's report Figures 1 to 4 (see, Plaintiff's Exhibit "R" Mr. Seckler report).

71.     The Property is separated from the station by one parcel (the "Doka Property") over which the Borough holds a court affirmed right-of-way that could be improved to provide a direct pedestrian connection. (March 18, 2016 Order Granting Summary Judgment to Plaintiffs' declaring existence of the Right of Way attached as Exhibit S to the DiGiulio Cert.)

**Response: Denied.**  Plaintiffs' property is separated from the station by not only the "Doka Property" but also Main Avenue.  Defendants have been advised by its engineering consultants that construction of a roadway on that right of way would be prohibitively expensive due to the irregular shape of the right of way and the slopes an change of grade.  Also, the right of way does not lead to an access to any railroad but rather another private property (see, Exhibit "N" attached hereto, Defendants' answers to interrogatories at no. 19)

72.   Despite the right-of-way in favor of the Borough, the Borough refuses to improve or utilize the right-of-way to avoid becoming a transit-oriented village, as reflected in this picture of the Wallington side of the tracks:

**Response: Denied.**  Plaintiffs' property is separated from the station by not only the "Doka Property" but also Main Avenue.  Defendants have been advised by its engineering consultants that construction of a roadway on that right of way would be prohibitively expensive due to the irregular shape of the right of way and the slopes an change of grade.  Also, the right of way does not lead to an access to any railroad but rather another private property (see, Defendants' answers to interrogatories at no. 19)

73.   As opined by Plaintiffs' traffic expert, without this right-of-way, Wallington residents must drive or bus a circuitous route into neighboring Wood-Ridge to find

parking and access the train station – another effort to keep minorities from moving to Wallington. (Id. at pg. 7.)

**Response: Admit** as to that was Plaintiff's expert's opinion.

74. The Borough has made numerous admissions that it was "cognizant of statistics regarding transit-oriented villages" and had "an unwarranted concern" that allowing Plaintiff's project to create a transit-oriented community would attract undesirable residents namely non-whites and families with children. (September 19, 2017 Hearing Transcript, Ex. L, at T37:12 to 28:25.)

**Response: Denied.** The cited reference does not contain statements regarding undesirable residents, non white families with children (see, Exhibit "J" September 19, 2017 Hearing Transcript at T37:12 to 28(sic):25).

75. In fact, in Wood-Ridge, where transit-oriented developments were permitted, the area adjacent to the train station has seen a considerable boon, including an increased ratio of residents commuting and decreased roadway volume and traffic congestion:

**Response: Admit** as to the extent that was Mr. Seckler's finding.

**I. <u>Resulting Monetary Damages</u>**

76. Due to the Defendants' illegal actions, in violation of, inter alia, the Federal Fair Housing Act and the Equal Protection Clause, Plaintiffs were improperly and unreasonably delayed in developing the Project. As a result, Plaintiffs incurred

significant compensatory damages that are required to ensure Plaintiffs can build the Project and be placed in the same place they would have been but for the Defendants' actions and omissions. (Amended Complaint.)

**Response: Denied.** This statement is an allegation and not an undisputed statement of material fact. Further, Plaintiffs have had approval to develop the property since 2019 (see, Exhibit "F"). Plaintiffs could have developed the property.

77. Plaintiffs' expert, Arthur Linfante, determined that Plaintiffs suffered compensatory damages in the amount of $23,672,000. (Linfante Report at 2.).

**Response: Admit** as that was what Mr. Linfante determined (see, Plaintiff's Exhibit "" Linfante Report at 2). Plaintiffs' damages are inflated as Plaintiffs had approval to develop since 2019 (see, Exhibit "F", attached hereto Judge Farrington decision).

78. Defendants did not serve an expert report rebutting Mr. Linfante's expert opinion regarding damages.

**Response: Admit.**