**NAGEL RICE, LLP**
Bruce H. Nagel
Robert H. Solomon
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400

**O'TOOLE SCRIVO, LLC**
Thomas P. Scrivo
James DiGiulio
Andrew Gimigliano
14 Village Park Road
Cedar Grove, New Jersey 07009
(973) 239-5700
*Attorneys for Plaintiffs, New Wallington*
*Home, LLC and Morningside at Wallington, LLC*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW WALLINGTON HOME, LLC, a New Jersey limited liability company; and MORNINGSIDE AT WALLINGTON, LLC, a New Jersey limited liability company, | Civil Action No. 2:20-cv-08178 |
| Plaintiffs, | **AMENDED COMPLAINT AND JURY DEMAND** |
| vs. | |
| BOROUGH OF WALLINGTON; BOROUGH OF WALLINGTON PLANNING BOARD; MARK W. TOMKO, in his official capacity as former Mayor of the Borough of Wallington; DOROTHY B. SIEK, in her official capacity as former Tax Collector for the Borough of Wallington; and CHRISTOPHER ASSENHEIMER, in his official capacity as Certified Tax Collector of the Borough of Wallington, | |
| Defendants. | |

Plaintiffs, New Wallington Home, LLC ("New Wallington Home") and Morningside at

Wallington, LLC ("Morningside") (to... y and through their counsel, Nagel

**EXHIBIT**

**A**

Rice, LLP and O'Toole Scrivo, LLC, by way of amended complaint against defendants, the Borough of Wallington (the "Borough"), the Borough of Wallington Planning Board (the "Planning Board"), Mark W. Tomko, in his official capacity, Dorothy B. Siek, in her official capacity, and Christopher Assenheimer, in his official capacity (collectively, "Defendants"), allege:

**PRELIMINARY STATEMENT**

1.      This is a complaint about how a New Jersey town has surreptitiously maintained an illegal policy of discrimination in housing and demonstrated an unmatched effort to further its discriminatory policy and preserve its racially homogenous demographics.

2.      In this action, Plaintiffs seek monetary, declaratory, injunctive and other relief against Defendants for violations of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, 42 U.S.C. § 1983, 42 U.S.C. § 1988, and state law arising out of Defendants' pattern of unlawful discriminatory conduct aimed at thwarting Plaintiffs' efforts to develop and attract residents to a planned inclusionary development.

3.      For years, Defendants have gone to extraordinary lengths and employed unscrupulous tactics to deny Plaintiffs their vested and court-awarded right to construct 135 apartments, more than dozens of which will be restricted to low- and moderate-income inhabitants, in a predominantly white municipality that, through its historic and continuous disregard for affordable housing obligations and arbitrary, prejudice-fueled policy making, has unveiled its desire to maintain racial homogeneity within its borders and prevent poor and otherwise protected classes of individuals from moving into the Borough.

4. Despite repeated court rulings memorializing their discriminatory actions, Defendants have continued in their efforts to thwart inclusionary development and a more representative residency in their borders.

5. Defendants' scheme is not speculative or implied; it has been outwardly stated. For instance, Defendants openly attempted to block development and deny site plan applications on the pretext that affordable housing would attract an inordinate number of school-aged children to the Borough and further hamper its purportedly overburdened schools. Ironically, this pretext is itself discriminatory against families with children and violates federal housing law. Moreover, testimony from site plan application hearings, together with other evidence, reveal that Defendants' additional motivation was to prevent non-white racial minorities from occupying the development.

6. Indeed, believing that the construction of a transit-oriented development leads to racial diversity of a municipality's overall population and decreases the percentage of the white-only population, Defendants turned their sights on blocking walking access from planned inclusionary developments to the nearby, newly constructed Wesmont Train Station. This despite the Borough having a right-of-way that would provide direct access to the public from the development to the train station.

7. Despite possessing the ability to make this train station accessible to its residents, Defendants have discriminatorily, arbitrarily and maliciously declined to do so. Indeed, due to the Borough's unlawful conduct, on one side of the Wesmont Train Station there is enviable access and facilities that benefit the residents of an adjacent town. While, on the Borough's side of the station, there is nothing but a barren field of weeds and no access to the station.

8.      This failure to provide access to the train station is not an accident; it is by design and part of the Borough's policy, implemented by Borough officials, to discriminate against racial minorities and families in making housing decisions.

9.      Perhaps worse, Defendants have retaliated against Plaintiffs for their desire to construct an inclusionary development within the Borough through tactics that are both illegal and violate the United States Constitution.  The Borough intentionally withheld tax notices to New Wallington Home for its property and then attempted to seize New Wallington Home's property by holding a secret tax sale and redeeming the tax sale certificate itself without proper and lawful notice and opportunity to be heard.  Eventually, New Wallington Home discovered the Borough's unconstitutional scheme and, in order to obtain clear title, was forced to pay the Borough tens of thousands of dollars in improper penalties, interest, and other monies.

10.      Defendants' ongoing crusade, which started over a decade ago, to do "whatever it takes" to maintain itself as a predominantly white community and thwart planned inclusionary development and an influx of minorities and working families is motivated by discriminatory reasoning and obvious pretext.  Put simply, this case presents "the familiar conflict between the legal principle of non-discrimination and the political principle of not-in-my-backyard." *New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 296 (3d Cir. 2007).

11.      As a result of Defendants' wrongdoing, Plaintiffs seek the monetary, declaratory, injunctive and/or other legal relief that is mandated by the United States Constitution and statutory and common law designed to end the sort of discrimination that Defendants continue to engage in, hold Defendants accountable for their unlawful conduct, and clear the path to providing the citizens of Wallington much needed and long overdue inclusionary development.

**JURISDICTION AND VENUE**

12.     This action is brought pursuant to the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601-3619 ("FHA"), 42 U.S.C. §§ 1983 and 1988, and the United States Constitution.  This Court has jurisdiction over the federal claims alleged in this complaint pursuant to 28 U.S.C. §§ 1331 and 1343 and over the state law claims alleged in this complaint under 28 U.S.C. § 1367.

13.     Venue is proper pursuant to 28 U.S.C. § 1391 because Defendants are residents of the District of New Jersey, the events or omissions giving rise to the claims set forth herein occurred in the District of New Jersey, and the property that is the subject of the action is located in the District of New Jersey.

**PARTIES AND OTHERS INVOLVED**

14.     The Wallington Group, LLC, is a New Jersey limited liability company (the "Wallington Group"), with a principal place of business at 27 Horseneck Road, Suite 301, Fairfield, New Jersey.  The Wallington Group was once the fee simple owner of a substantially vacant parcel, containing only the remnants of prior commercial or industrial uses, located in the Borough of Wallington and designated on the Borough's Municipal Tax Map as Lot 35.02, Block 71 (the "New Wallington Home Property").

15.     The New Wallington Home Property is approximately 6.736 acres in size.  It is bounded on the north and west by the Saddle River, to the north and east by the tracks of the New Jersey Transit/Erie-Lackawanna Railroad, and to the south and east by a parcel owned by Morningside, described more fully below.  The Wallington Group no longer owns the New Wallington Home Property and is not a plaintiff in this case.  That property is now owned by New Wallington Home.  As the prior owner, the Wallington Group is included here for background

5

purposes and because it was involved in certain of the lawsuits against Defendants explained herein.

16.    Plaintiff, Morningside, is a New Jersey limited liability company with its principal place of business at 27 Horseneck Road, Suite 301, Fairfield, New Jersey.  Morningside is the fee simple owner of a 3.687-acre parcel designated on the Borough's Municipal Tax Map as Lot 35.01, Block 71 (the "Morningside Property").  The Morningside Property is situated along Main Avenue in Wallington and is contiguous to the New Wallington Home Property.

17.    Plaintiff, New Wallington Home, is a New Jersey limited liability company with its principal place of business located at 27 Horseneck Road, Suite 301, Fairfield, New Jersey.  New Wallington Home is the successor in interest to the Wallington Group.  New Wallington Home is the present owner of the New Wallington Home Property.

18.    Defendant, Borough of Wallington Planning Board, is a quasi-judicial body having an address at 24 Union Boulevard, Wallington, New Jersey.  The Board was created by the Borough and is vested with authority under the New Jersey Municipal Land Use Law, N.J.S.A. 40:55D-1, *et seq.* ("MLUL") to, among other things, conduct site plan review and approval.

19.    Defendant, Borough of Wallington, is a municipal corporation having an address at 24 Union Boulevard, Wallington, New Jersey.  The Borough is responsible for the conduct, customs, and policies of the Board and other local officials and officers who, at all relevant times, acted in their official capacity under the color of state law.

20.    Defendant, Mark W. Tomko, is the former Mayor of the Borough and is being sued in his official capacity.

21.    Defendant, Dorothy B. Siek, is the former Certified Tax Collector of the Borough and is being sued in her official capacity.

22.     Defendant, Christopher Assenheimer, is the current Certified Tax Collector of the Borough, having immediately succeeded Siek, and is being sued in his official capacity as Certified Tax Collector of the Borough of Wallington.

## ALLEGATIONS OF FACTS COMMON TO ALL COUNTS

**A.**     **The Unmistakable Goal of Federal and New Jersey Law to Provide Inclusionary Housing on a Non-Discriminatory Basis**

23.     Congress enacted the FHA to provide "fair housing throughout the United States." 42 U.S.C. § 3601.  The FHA "was designed to provide nationwide fair housing to minorities who had previously been victims of invidious racial discrimination." *Mitchell v. Cellone*, 389 F.3d 86, 87 (3d Cir. 2004).  In fact, the FHA "makes it the policy of the United States to eliminate all instances of racial discrimination in housing." *Id.*

24.     Because "Congress was aware of the proof problems inherent in establishing racial intent," *Resident Advisory Bd. v. Rizzo*, 425 F.Supp. 987, 1022 (E.D. Pa. 1976), Congress drafted the FHA to provide violations for "either intentional discrimination or if a practice has a disparate impact on a protected class." *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 381 (3d Cir. 2011).

25.     Congress amended the FHA in 1988 to include "familial status" within its protected classes.  42 U.S.C. § 3604.  "This expansion of coverage was supported by a Congressional finding that 'in many parts of the country families with children are refused housing despite their ability to pay for it.'" *Eastampton Ctr. v. Twp. of Eastampton*, 155 F.Supp.2d 102, 116 (D.N.J. 2001) (quoting H.R. Rep. No. 100-711, at 19 (1988) *reprinted in* U.S.C.C.A.N. 2173, 2180).

26.     Accordingly, Section 3604(a) of the FHA prohibits not only the refusal to sell or rent a dwelling, but also any practices that "otherwise make unavailable or deny" housing to any person on the basis of race or familial status. 42 U.S.C. § 3604 (a).

7

27. "The phrase 'otherwise make unavailable or deny' has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory [land use] restrictions." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 424 (2d Cir. 1995) (citations omitted). Indeed, "[a]lthough a municipality has a legitimate governmental interest in regulating land use, [federal courts] have a duty under the [Fair Housing] Act to ensure that that interest is effectuated in a non-discriminatory manner." *United States v. Borough of Audubon, New Jersey*, 797 F. Supp. 353, 360 (D.N.J. 1991).

28. New Jersey law similarly promotes inclusionary housing. New Jersey's *Mount Laurel* decisions recognize a constitutional obligation that municipalities, in the exercise of their delegated power to zone, "afford [] a realistic opportunity for the construction of [their] fair share of the present and prospective regional need for low and moderate income housing." *S. Burlington Cnty. NAACP v. Twp. of Mount Laurel*, 92 N.J. 158, 205 (1983) ["Mount Laurel II"] (citing *S. Burlington Cnty. NAACP v. Twp. of Mount Laurel*, 67 N.J. 151, 174, *appeal dismissed and cert. denied*, 423 U.S. 808 (1975) ["Mount Laurel I"]).

29. Thereafter, the New Jersey Legislature enacted the New Jersey Fair Housing Act ("NJFHA"), N.J.S.A. 52:27D-302, which codified the core constitutional holding undergirding the *Mount Laurel* obligation, *see In re Petition for Substantive Certification Filed by Twp. of Warren*, 132 N.J. 1, 12 (1993) (citing to *Mount Laurel* obligation found in *N.J.S.A.* 52:27D-302(a), (d), (e), -311(a), -314(a), (b)), and included particularized means by which municipalities could satisfy their obligation, mirroring the judicially crafted remedy. Further, the NJFHA created the Council on Affordable Housing ("COAH"), N.J.S.A. 52:27D-305, and provided it with the power to make rules related to affordable housing and determine whether municipalities complied with their affordable housing obligations. *Hills Dev. Co v. Twp. of Bernards*, 103 N.J. 1, 19-20

(1986). In particular, COAH adopted guidelines requiring regional planning entities to "create a variety and choice of housing near public transportation," and to, more specifically, create "affordable housing opportunities . . . in areas with convenient access to . . . public transportation." N.J.S.A. 52:27D-329.9(c).

30.     As the foregoing statutes and regulations indicate, it is the unmistakable goal of our federal and State law to provide inclusionary development on a non-discriminatory basis.

**B.      The Homogenous Racial Makeup of the Borough**

31.     The Borough's unfortunately historic success at abusing its official powers to discriminate against racial minorities and otherwise protected classes of individuals is clearly demonstrated by the racial homogeneity of its populous.

32.     According to the United States Census Bureau ("Census Bureau"), the population of the Borough in 2010 was 11,335. Among these 11,335 residents, approximately 8,546, or 75.4%, identified as being "White alone, not Hispanic or Latino."

33.     This 75.4% is in stark contrast to Census Bureau data providing the percentage of residents in 2010 who identified as "White alone, not Hispanic or Latino" in the municipalities immediately adjacent to the Borough's borders:

|  | Garfield | East Rutherford | Lodi | Passaic |
|---|---|---|---|---|
| Percent of Population "White alone, not Hispanic or Latino" | 55.4% | 51.9% | 46.9% | 16.2% |
| Difference with Wallington | - 20% | - 23.5% | - 28.5% | - 59.2% |

9

34.     Even looking beyond the Borough's immediately adjacent municipalities, the other municipalities surrounding the Borough likewise have significantly lower "White alone, not Hispanic or Latino" populations than the Borough.

35.     Put simply, the Borough has a disproportionate number of white residents as compared to its neighbors.  Indeed, it is a racially homogenous community surrounded by communities with significantly greater diversity.

36.     This data alone is sufficient to support Plaintiffs' claims.  However, this did *not* occur by accident, but was part of a series of knowing decisions made by the Borough.

37.     The disparity in the Borough's non-white minority population as compared to its neighbors was caused by the Borough's policy of allowing racial animus to influence its official housing decisions leading to a discriminatory effect on the Borough, including the exclusion of non-white racial minorities within the overall region from residing in the Borough.

38.     The Borough's numerous acts of pervasive, intentional discrimination are violations of federal housing law.

**C.      Defendants' Vigorous Campaign of Exclusionary Tactics Aimed at Thwarting Inclusionary Development and Preserving the Borough's Demographics**

39.     In an effort to promote and maintain its racial homogeneity, the Borough has for years engaged in a campaign, which continues to this day, to thwart planned inclusionary development, including Plaintiffs' proposed development, which would provide housing opportunities for 135 racially and culturally diverse, lower income families.

**i.      The Builder's Remedy Litigation to Force the Borough to Comply with Its Affordable Housing Obligations**

40.     The Borough's historic disregard for inclusionary development within its borders spans decades.

41.     In 2006, New Wallington Home's predecessor, the Wallington Group, commenced affordable housing litigation against the Borough in the matter entitled *The Wallington Group, LLC, and Morningside at Wallington, LLC v. Borough of Wallington, et al.*, in the Superior Court of New Jersey, Bergen County, Law Division, Docket No. BER-L-373-06 (the "Builder's Remedy Litigation").

42.     In the Builder's Remedy Litigation, the Wallington Group sought: (a) a declaration that the Borough had not met its affordable housing obligations under the NJFHA and COAH; (b) a builder's remedy requiring the Borough to rezone the New Wallington Home Property to permit multi-family residential use; and (c) an order directing that the Wallington Group's inclusionary development application be "fast tracked."

43.     Morningside intervened in the action and participated with the Wallington Group in seeking the same relief for its property, which is contiguous to the New Wallington Home Property.

44.     Ultimately, the court, in the Builder's Remedy Litigation, entered an Order declaring the land use controls and zoning ordinances of the Borough of Wallington as being "invalid," and "not in compliance with the requirements of the New Jersey State Constitution, the Mount Laurel Doctrine, the [New Jersey] Fair Housing Act and the New Jersey Council on Affordable Housing." (the "Invalidation Order").

45.     Through a subsequent Order, the Superior Court required the Borough to zone the lands in question for residential, multi-family use, and also required that certain of the multi-family units be restricted to low- and moderate-income families (the "Builder's Remedy Order").

46.     In the opinion accompanying the Builder's Remedy Order, the court specifically noted that the planned development would "make substantial contributions to the [Borough's]

stock of low- and moderate-income housing units" and rejected the Borough's argument that the planned "high-density residential use of the land is clearly contrary to sound land use principles."

47. The award of the builder's remedies to the Wallington Group and Morningside was then codified by a Final Order approving the rezoning of the lots in question by creation of the Planned Residential – Mt. Laurel Zone ("PR-ML Zone") applicable to these lots.

### ii. Defendants' Post-Builder's Remedy Order Efforts to Thwart Inclusionary Development

48. Following entry of the Builder's Remedy Order, and despite the Superior Court finding that the Borough failed to comply with its constitutional obligations to provide a realistic opportunity for the creation of low- and moderate-income housing, the Borough remained recalcitrant and determined to thwart any inclusionary development.

49. In 2015, New Wallington Home became the successor to the Wallington Group and purchased its property.

50. Shortly thereafter, New Wallington Home submitted an application to the Planning Board for approval of the development of 134 multi-family residential dwelling units, including 27 affordable housing units.

51. Rather than accept New Wallington Home's application and process it in accordance with the Builder's Remedy Order, the Planning Board refused to deem the application "complete" as that term is defined by the MLUL.

52. In further contradiction to the Builder's Remedy Order, the Planning Board determined that New Wallington Home's application would not be complete until a simultaneous filing of Morningside's site plan application.

53.     Despite repeated attempts by New Wallington Home to appeal to the Planning Board for a determination of completeness, the Planning Board refused to deem New Wallington Home's application complete.

54.     In response to the Planning Board's deliberate and willful refusal to conduct a public hearing on New Wallington Home's site plan application, New Wallington Home filed a verified complaint and order to show cause seeking to require the Planning Board to deem New Wallington Home's application complete.

55.     After it was faced with litigation, the Planning Board entered into a consent order with New Wallington Home acknowledging that the New Wallington Home and Morningside properties could be developed separately.

56.     The initial public hearing on New Wallington Home's application was held on July 15, 2014.  However, the Planning Board concocted a new delay tactic.

57.     Specifically, the Planning Board, through the Borough's Planner, erroneously determined that if the applicants were to proceed to develop the lots separately, a use variance was required pursuant to N.J.S.A. 40:55D-70(d).  The practical effect of this determination was that the Planning Board now lacked jurisdiction to consider the application.

58.     The Planning Board conducted additional hearings on September 16, 2014, and October 21, 2014, culminating in a resolution entered on October 21, 2014, denying the New Wallington Home application.

### iii.     Litigation to Reverse the Borough's Wrongful Denial of New Wallington Home's Application for Inclusionary Development

59.     Subsequently, New Wallington Home appealed the Planning Board's denial of its site plan application.  This resulted in the Superior Court reversing the Planning Board's denial in a decision entered on April 22, 2015, which found "plaintiffs' claims that the Board's decision was

arbitrary, capricious, and unreasonable are merited[.]" The Superior Court ordered a limited remand to permit the Planning Board to consider three narrow issues.

60. On remand, the Planning Board continued to impede and hinder New Wallington Home's application to construct inclusionary development. In fact, New Wallington Home was forced to return to Court on multiple occasions.

61. The Superior Court ultimately ruled on March 2, 2016, that "[t]he Planning Board has unreasonably delayed action in connection with the limited remand directed in the Court's May 11, 2015 Order reversing the Planning Board's denial of site plan approval."

62. It was not until April 19, 2016, following the Superior Court's ruling of March 2, 2016, that New Wallington Home's development application was fully approved by the Planning Board.

63. Despite failing to prevail on a singular issue at Superior Court, the Planning Board continued its pattern of noncompliance and obstinacy.

### iv. Litigation to Reverse the Borough's Denial of Morningside's Application for Inclusionary Development

64. In 2016, following the Planning Board's reluctant approval of New Wallington Home's application, Morningside prepared a site plan to implement its affordable housing builder's remedy.

65. To further hinder inclusionary development, the Borough advised Morningside that it could not file its development application unless it submitted a development plan for review by Zoning Officer Nick Melfi, who also is a member of the Planning Board. Importantly, this purported requirement is not found anywhere in the MLUL.

66. Nevertheless, Morningside complied with the Borough's improper request.

14

67. Purportedly in his capacity as Zoning Officer, and not as a Planning Board member, Melfi rejected the plans and issued a "Refusal of Permit" incorrectly and improperly stating that Morningside's site plan application required a use variance – relief that could only be granted by the Board of Adjustment and not the Planning Board.

68. After further legal wrangling, the Planning Board was forced to concede that Melfi was incorrect and that the Planning Board did, indeed, have jurisdiction to consider Morningside's site plan application.

69. Morningside submitted its revised site plans on February 21, 2017.

**D.** **Defendants Reveal That Their Arbitrary Land Use Decisions Aimed at Thwarting Inclusionary Development are Motived by Discrimination**

70. The Planning Board held hearings on May 16, July 18, September 19, and December 19, 2017, to consider Morningside's site plan application. During these hearings, the Planning Board arbitrarily and discriminatorily focused its attention on matters unrelated to land use.

**i.** **The Planning Board's Discriminatory Attack on the Families with Children**

71. The Planning Board's initial hearing held on May 16, 2017, revealed their discriminatory animus towards families with children.

72. For example, rather than inquire about legitimate land use considerations, then-Mayor Tomko expressed concern about "the estimation of children coming out of this development for our schools," indicating, "that's a $65,000 question that is on the minds of a lot of people, what it is, we're burdened right now and where are we going to go from here with the added, added enrollment."

73. Suggesting that the influx of unwanted children would stem from non-traditional family structure in the affordable housing units within the development, Mayor Tomko added, "I

15

know you got some one-bedroom but we know a one-bedroom could fill up a few people too. Okay."

74.     Melfi furthered this sentiment at the subsequent hearing held on July 18, 2017, when he questioned the number of people who would occupy the development's affordable housing units, stating: "You forgot about the wives and kids.  You said 73 people.  You forgot the wives, the boyfriends, family, kids."

75.     At this same meeting, a member of the public, Brenda Kapusta, stated, "We all know what goes on [in affordable housing units in Wallington].  We know a one bedroom doesn't just have one family in it.  It has multiple kids."

76.     These comments, each of which express a desire to preclude families with children from entering the Borough, indicate discriminatory intent.

77.     In fact, according to National Center for Education Statistics data, the number of school aged children has been steadily decreasing in the Borough since 2012:

| Estimated Number of Students in Grades K through 12 in Wallington Public Schools | |
|---|---|
| 2012-2016 | 1,635 students |
| 2013-2017 | 1,490 students |
| 2014-2018 | 1,440 students |
| Present Date | 1,283 students |

78.     In other words, the concern of overburdened schools was a pretext:  Not only was the Planning Board's fear of child residents adding to the student population of the Borough's purportedly overburdened schools facially discriminatory against families with children, but it was also unfounded.

16

ii.      **The Board's Attack on Families Is Motivated by Racial Discrimination**

79.      Despite the concern about over-crowding in schools being a baseless pretext, in an effort to alleviate the Planning Board's purported concern, Morningside's planning expert testified during the hearing held on July 18, 2017, that, according to a trusted Rutgers University "study that provides for a ratio for children per multi-family development," it is estimated that the seventy-three affordable housing units at the development would produce only approximately thirteen school-aged children – approximately 1% of the K-12 student population.

80.      Morningside's expert's estimation was immediately met with baseless skepticism by the Board, with Wygonik commenting, "I don't know.  Just thinking about it.  73 families are going to come and live there but there's only going to be 11 children or 13 children?"

81.      Kapusta was equally skeptical, stating, "And when you say affordable housing, you're saying 13 kids in that whole thing, it's not gonna happen."

82.      In response, Morningside's expert indicated that she could further confirm the accuracy of her estimation by submitting OPRA requests to nearby municipalities in order to compile "the actual data from existing multi-family developments throughout northern Bergen County" and provide that data to the Board.  Indeed, Morningside's expert confirmed that she routinely forwards such OPRA requests throughout Bergen County.

83.      Mayor Tomko responded using a phrase that is commonly seen as racially charged, "What towns in this south Bergen area have you OPRA'd, because, you know, historically Route 4 is the Mason-Dixon line and we cannot compare [Wallington] with upper Bergen County. Things are different."

84.      Current Mayor and Board member, Dabal, who was then a member of the public, seconded Mayor Tomko's notion, stating: "And those municipalities [in the Rutgers study] were

17

in northern Bergen County and even though technically [Wallington is] in north Bergen County, like the mayor's comment, so to speak, can you just give me [further information on] the two municipalities that maybe you did studies on?"

85.     These racially motivated comments confirm that the Planning Board's unfounded concern over an increased children population was a mere pretext for discriminatory concerns about non-white racial minorities occupying inclusionary developments in the Borough.

86.     Indeed, the repeated comments from the Borough and its officials reveal a policy of racial discrimination in housing decisions, which manifested in other ways.

### iii.     The Planning Board's Disdain for Becoming Akin to More Racially Diverse, Transit-Oriented Communities

87.     At the following hearing on September 19, 2017, Morningside's expert followed up on the issue of the estimated number of children that the development would produce, stating that she "pull[ed] up some additional Rutgers numbers, and there is a study that shows public schoolchildren generated from transit-oriented development and a number of these – there's about ten projects that are listed, and most of them are from West New York."

88.     Morningside's expert then indicated that the statistics from these ten studies of transit-oriented developments confirmed her initial estimation that no more than thirteen children would occupy the seventy-three affordable housing units within the development.

89.     Morningside made clear that it contemplated the development would be transit-oriented. At prior hearings, Morningside's traffic expert testified that given the "mass transportation systems in the nearby vicinity" of the development – such as Wesmont Station – "[i]t's very likely that a percentage of residents will use that public transportation."

18

90. Mayor Tomko expressed his disdain for a transit-oriented development: "I only foresee things getting worse with, with more development and more people coming in. That's just my opinion."

91. Rachelski then keyed in on how Defendants might be able to preserve the Borough's demographic makeup and prevent racial minorities and families with children from moving in: *by blocking walking access from Plaintiffs' development to any nearby transit station.*

92. Rachelski further observed that, from Plaintiffs' development, although access to public "transportation is nearby . . . you don't have [walking access] . . . [i]t's quite a distance [and] I don't know if this is going to be a factor for anybody to walk a couple miles" to the nearest train station.

93. Indeed, Rachelski stated: "Now the transit villages or transit-oriented villages [like West New York] are slightly different" because they, unlike the development, are within "walking distance" of a public transit station. Thus, Rachelski reasoned, if Defendants could block walking access from the development to any nearby transit stations, they could prevent the Borough from becoming akin to a diverse, transit-oriented village.

94. In fact, Rachelski confirmed the Board's discriminatory goal to avoid becoming a transit-oriented development, stating: "It was mentioned that this project was compared to West New York. It really is because you look at the [population] density [contemplated by the development] and it is a West New York, and this is not the – the – the stuff that we want in our town."

95. The Defendants' opposition to transit-oriented development can be found in the data. According to the Census Bureau, the transit-oriented villages identified in the Rutgers

19

University study that Morningside's expert referenced each possessed a significantly lower "White only, not Hispanic or Latino" population percentage than Wallington in 2010:

|  | Metuchen | South Orange | Morristown | New Brunswick | West New York |
|---|---|---|---|---|---|
| Percentage of Population "White alone, not Hispanic or Latino" | 68.4% | 58.3% | 53.9% | 24.7% | 13.9% |
| Difference with Wallington | - 7% | - 17.1% | - 21.5% | - 50.7% | - 61.5% |

96.     In fact, the transit-oriented village of West New York – which the Board specifically expressed its desire to avoid becoming – had a "White alone, not Hispanic or Latino" population percentage that was 61.5% lower than that of Wallington in 2010.

97.     Confirming that point, Borough Attorney, Martin S. Cedzidlo, Esq., stated: "Mr. Rachelski made a comment about we don't want it to look like West New York. I think it's clear that is the overriding issue the board has raised."

98.     On the other hand, Morningside's counsel, Kevin J. Moore, Esq., indicated his belief that the affordable housing units and their occupying families would constitute "a true amenity to both the development and the township."

99.     Melfi interrupted him and said: "Because you don't live here. We have to live here. We have to see this and deal with it every day."

20

100.    In fact, Melfi suggested, "[y]ou want to cram the 73 in, leave the building . . . and walk away from town and say, hey, we hit a grand slam, not a home-run, a grand slam in Wallington," concerning the implementation of affordable housing.

101.    True to its comments and blatant disregard for its obligations, the Board tried to ensure the development would not happen, denying Morningside's site plan application by relying on inappropriate and unrelated issues to the site plan application that were raised throughout the hearings.

102.    The Planning Board's denial was memorialized by written resolution at a meeting on January 16, 2018.

103.    On its face, the resolution setting forth the Planning Board's reasons for denial of the site plan application were improper and unsupported.  Thus, the Morningside application represents another example of the discriminatory motivations underlying Defendants' improper land use decisions.

**E.    Defendants Turn Their Sights on Thwarting the Inclusionary Development by Restricting Access from the Development to the Wesmont Train Station**

**i.    The Action in Lieu of Prerogative Writs**

104.    Following their application denials, Morningside and New Wallington Home filed a renewed action in lieu of prerogative writs against the Planning Board in the Superior Court of New Jersey alleging that the Planning Board's decision was arbitrary, capricious, and unreasonable.

105.    The court held a hearing and determined that not only was the Planning Board's decision arbitrary and capricious, but that "the applicant has satisfied all of the criteria necessary for approval of both applications.  The Court finds the negative and positive criteria have been met and the application advances the purposes of the MLUL."

106. The court specifically acknowledged that a remand would only result in further delay and expense to the application. It was now clear that Defendants were recalcitrant in every way and would not change their practices.

107. The court, therefore, granted all approvals requested in the site plan applications of New Wallington Home and Morningside completely bypassing Defendants.

108. Despite being roundly rebuked at every level, the Borough remained committed to discrimination by thwarting inclusionary development.

109. Given the court's ruling, the Planning Board was effectively sidelined, making it far more difficult to directly delay Plaintiffs' development. However, it did not stop their efforts. The Borough's conspiracy evolved to include more covert discriminatory tactics in an effort to circumvent the judicial orders and continue moving downfield their plot to discriminate against racial minorities.

110. For instance, the Borough determined that the inclusionary development would result in an influx of non-white residents and that these new residents would rely on public transportation more than the current residents of the Borough. Thus, hindrance of access to public transportation could avert the influx of the demographics the Defendants did not desire reside in their borders.

111. This stems from the Planning Board's consideration, during the Morningside application hearings, of data from Rutgers University studies on transit villages that was presented to the Planning Board by Morningside's expert.

112. According to one Rutgers University study, entitled "Evaluation of the New Jersey Transit Village Initiative," the characteristics of the "transit village," which is defined as the half-

mile area around the transit station, shift from the overall municipal profile with remarkable consistency across New Jersey.

113. In particular, the study finds that "School-age population percentage goes up in the Transit Village," and "White non-Hispanic population level goes down."

114. In the event that Defendants do not prevail in their ongoing crusade to thwart Plaintiffs' planned inclusionary development, the development would, by definition, become a transit village.

115. Indeed, the Borough's Master Plan Land Use Element Amendment to Implement the 2020 Housing Element and Fair Share Plan ("Land Use amendment") finds that both the New Wallington Home and Morningside properties "are within 0.25 miles, considered walking distance, to the Wesmont Rail station" and that there is vacant property "directly adjacent to the Wesmont Rail station, presenting an opportunity to create a transit oriented development."

116. In fact, the Land Use amendment declares that "[c]oncentrating residential development with convenient access to multiple transit options by both rail and bus for future residents promotes the efficient use of land and creates the benefit of reducing traffic congestion, parking demand and reducing the release of vehicle-generated pollutants into the environment."

117. Under New Jersey law, a master plan, such as the Borough's master plan in which the Land Use amendment was incorporated, carries much more weight than a mere Board member's personal animus.

118. Instead, a master plan is an official document prepared "to guide the use of lands within the municipality in a manner which protects public health and safety and promotes the general welfare." N.J.S.A. 40:55D-28.

119. Put simply, the master plan is the blueprint for a municipality that is to guide decisions for both growth and conservation in a community.

120. Despite the pro-transit-oriented development findings included in the Borough's master plan, Defendants, cognizant of statistics regarding transit-oriented villages and possessing an unwarranted concern that allowing Plaintiffs to construct their inclusionary development and potentially create a transit oriented village may attract residents who Defendants deem as undesirable – namely, non-whites and families with children – disregarded the master plan and turned their sights on thwarting the development and continuing to carry out their discriminatory animus by alternative means.

121. Specifically, upon information and belief, the Borough and the Planning Board concluded that if they could not stop New Wallington Home and Morningside from securing approvals for the inclusionary developments, they could attempt to negatively affect the viability of the development, including by restricting access to the Wesmont train station.

### ii. Defendants' Arbitrary Refusal to Accept a Right-of-Way Permitting Access to the Wesmont Train Station

122. The New Wallington Home Property and the Morningside Property are located along Main Avenue in Wallington and the nearest full-service train station is the newly developed Wesmont Train Station located at the end of Highland Avenue and Johnson Drive in Wood-Ridge, New Jersey. This new station sits right on the border of Wallington in the north.

123. The Borough has a right of way for the benefit of the town across commercial property that leads directly to the Wesmont Train Station.

124. In fact, in original proposals for the Wesmont Train Station, there was access contemplated through that right-of-way directly to the station from the Wallington side of the railroad tracks:

24



125. Despite having the ability to create additional avenues of egress and ingress from the Borough to the Wesmont Train Station, the Borough has refused to do so because it believes that increasing access would benefit the inclusionary developments and result in additional non-white residents moving to the Borough.

126. Umdasch Real Estate USA LTD and Doka USA, LTD. (together, "Doka"), are the owners of real property northwest of and adjacent to the Wesmont train station. Doka purchased this property in 2017. This property is designated as Block 70.01, Lots 1.01, 1.02, 4.02, 4.03, and 4.04 (collectively, the "Doka Property") on the tax map of the Borough with a street address of 520 Main Avenue, Wallington, New Jersey.

127. Surveys submitted by Doka in their own land use applications clearly reference the existence of a right-of-way over the Doka Property held in favor of the Borough that provides access to the Wesmont Train Station property.

128. To date, Defendants have not taken any action to use this right-of-way for train station access.

129. However, this right-of-way would provide the residents of Wallington, including those in the inclusionary developments, with walking, biking, and driving access to the Wesmont train station.

130. Without this right-of-way, Wallington residents are forced to drive down a circuitous route outside of the Borough and into neighboring Wood-Ridge's transit-oriented village to find parking and access public transportation – the exact scenario discussed in Planning Board meetings.

131. Cognizant of this fact, Defendants have, on information and belief, arbitrarily refused to improve the right-of-way on the Doka Property to provide access to the Wesmont Train Station.

132. Indeed, Defendants continue, to this day, to delay any decision on Doka's Application, which was has been pending for some fifteen months and has itself been the subject of litigation.

133. Given the fourteen yearlong battle fought by the Borough and the Planning Board against affordable housing, it is clear that Defendants' actions are just the latest front in its continuing war to maintain racial homogeneity in the Borough through a policy of racial discrimination.

134.     The Borough's actions have led to a clear disparity in its population, to the detriment of protected classes of persons in violation of federal and State law.

**F.     The Borough Retaliates by Acting Unlawfully, Egregiously, Deliberately and Maliciously Regarding New Wallington Home's Property Taxes**

135.     In addition, Defendants continue to take direct action against Plaintiffs to interfere in development.

136.     Because New Wallington Home was actively involved in litigation with Defendants trying to overcome their improper denials of Plaintiffs' rights to develop the New Wallington Home Property and the Morningside Property according to court rulings and for other reasons, New Wallington Home withheld property tax payments that were assessed against the New Wallington Home Property by the Borough in 2016 through 2018.

137.     The Borough, however, changed its taxing behavior in response to New Wallington Home's actions against unfair taxes.

138.     Prior to 2016, when the Wallington Group – New Wallington Home's predecessor – did not pay property taxes, the Borough would repeatedly issue tax delinquency notices.  The Wallington Group did not pay real estate taxes for many years prior to 2015.  Despite this fact, the Borough chose to regularly notice it on taxes owing in the normal course.

139.     Delinquent taxes were eventually paid when New Wallington Home bought the New Wallington Home Property from the Wallington Group.  Over 20 tax delinquency notices were mailed by the Borough and received over the years.  As such, the Borough's longstanding practice was to adhere to the law and provided delinquency notices when taxes were overdue.

140.     The Borough was required to provide notice to New Wallington Home regarding its delinquent taxes.

141. However, with regard to the 2016-2018 taxes, the Borough and its then-Certified Tax Collector, Defendant, Dorothy Siek ("Siek"), failed to provide any notice to New Wallington Home that the taxes were delinquent.

142. Further, despite demand, Siek was unable or unwilling to provide proof that any of the notices of delinquency or the notice of tax sale were mailed to, delivered to, or received by New Wallington Home. In fact, they were not.

143. Then, the Borough issued tax certificate #17-016 regarding New Wallington Home's unpaid property taxes. This lien was improperly assessed upon the property by the Borough and constitutes a cloud on title.

144. The Borough must adhere to the requirements and procedures set forth in N.J.S.A. 54:5-1, *et seq.*, for the sale of tax certificates, but the Borough failed to adhere to these requirements with regard to New Wallington Home's tax sale.

145. The Borough's current Certified Tax Collector, Defendant, Christopher Assenheimer ("Assenheimer"), has not supplied any evidence that the notice of the tax sale was mailed to New Wallington Home or posted in public places, despite repeated request for same.

146. Instead of providing notice to New Wallington Home and the public regarding the sale of New Wallington Home's tax certificate, and putting the tax sale certificate up for sale, the Borough unlawfully, deliberately, maliciously and egregiously took the unpaid tax sale certificate for itself.

147. The intention of the Borough was to surreptitiously take the property from New Wallington Home in order to thwart the construction of affordable housing and punish Plaintiffs for attempting to bring affordable housing to the Borough.

28

148. By failing to provide New Wallington Home notice of the tax delinquency, improperly and unlawfully taking the tax sale certificate without providing notice of the sale to New Wallington Home and publicly and unlawfully taking the tax sale certificate without first providing New Wallington Home the opportunity to pay off the taxes, the Borough wrongfully, maliciously and deliberately took New Wallington Home's Property.

149. In addition, the Borough wrongfully, maliciously and deliberately placed a lien and cloud on the title to New Wallington Home's property.

150. In order to obtain clear title, the Borough improperly demanded that New Wallington Home pay certain interest and penalties. The Borough assessed over $13,000 of interest at the rate of 18% charged on the "interest on certificate."

151. The assessment was unlawful. Assessment of any interest on the certificate is inconsistent with the tax sale certificate itself, which on its face states that the interest will accrue at 0%.

152. If the tax sale certificate is deemed valid, it is binding on the Borough as it would be on any other tax sale certificate holder, and as a result the Borough was not permitted to charge interest in excess of 0%.

153. There was no basis in law or fact for the Borough to charge anything other than 0%, and requiring New Wallington Home to pay interest at 18% was illegal and deliberately and maliciously discriminatory.

154. The Borough also assessed New Wallington Home over $23,000 as a 6% redemption penalty.

155. N.J.S.A. 54:4-67, however, requires that the governing body take affirmative action to authorize such a charge/penalty before it can do so as a matter of law.

156. Upon information and belief, the Borough failed to take the necessary action to authorize the 6% redemption penalty.

157. Despite requests to the Borough for proof of the authorization of the penalty, none has been provided, and there was no basis in law or fact for the Borough to charge the 6% redemption penalty and require New Wallington Home to pay the penalty.

158. Even if the penalty was authorized and fixed by the Borough, according to N.J.S.A. 54:4-67, the holder of the tax sale certificate is only entitled to recover the penalty to the extent it pays the outstanding delinquency by the end of the tax year in which it arose.

159. Upon information and belief, the Borough did not pay the outstanding delinquency.

160. As a result, the Borough was not entitled to collect the 6% penalty, and the Borough's requirement that New Wallington Home pay the 6% penalty was unlawful, egregious and improper.

161. New Wallington Home paid the improper and unlawful penalties, interest and other monies to the Borough under protest as the Borough refused to release the lien on the property unless all the monies, including those that the Borough knew or should have known were in fact not owed, were paid in full.

162. All the above actions of the Borough, Siek, and Assenheimer regarding New Wallington Home's taxes were in retaliation to Plaintiffs' actions regarding development of its inclusionary development and steadfast and longstanding commitment to providing affordable housing in the Borough.

163. Indeed, this maneuver was just another in a long line, which continues to this day, to stop inclusionary developments in the Borough, disparately treating protected classes of people.

## FIRST COUNT

### (Violation of the Fair Housing Act – Disparate Treatment)

164. Plaintiffs incorporate by reference the allegations contained in this complaint as if fully stated herein.

165. Pursuant to the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, (the "FHA") it is unlawful to "make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status or national origin." 42 U.S.C. § 3604(a).

166. Plaintiffs' planned development qualifies as a dwelling pursuant to the FHA as it will be the residence of its contemplated inhabitants, including families with children and non-white racial minorities.

167. Plaintiffs are entitled to act on behalf of the individuals that would reside in the development that Plaintiffs plan to construct.

168. The Defendants have violated, and are continuing to violate the FHA, by, among other things: (i) refusing to comply with their affordable housing obligations; (ii) discriminating against families with children; and (iii) allowing prejudice against families with children and non-white racial minorities to dictate the outcome of Plaintiffs' official actions.

169. Defendants' intentional actions to obstruct, delay and deny inclusionary development are and have been based on discriminatory motives related to the familial status and/or race of individuals who Defendants perceive to be the likely residents of Plaintiffs' development.

170. Defendants injured Plaintiffs by committing and continuing to commit discriminatory housing practices with the purpose of discriminating on the basis of familial status

and/or race, and limiting the availability and viability of inclusionary development in the Borough, in violation of the FHA.

**WHEREFORE,** Plaintiffs respectfully request that the Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, (i) declaring that the unlawful practices of Defendants complained of herein violate the Fair Housing Act and fail to affirmatively further fair housing; (ii) permanently enjoining all of the unlawful practices of Defendants complained of herein and enjoining Defendants from obstructing or interfering with Plaintiffs' planned development and operation thereof; (iii) awarding Plaintiffs actual damages, punitive damages and attorneys' fees and costs; and (iv) granting such other and further relief as the Court may deem equitable and just.

## SECOND COUNT

### (Violation of the Fair Housing Act – Disparate Impact)

171. Plaintiffs incorporate by reference the allegations contained in this complaint as if fully stated herein.

172. Under the FHA, it is unlawful to engage in practices or policies that "have a disproportionately adverse effect on minorities and are otherwise unjustified by legitimate rationale." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S.Ct. 2507, 2513 (2015).

173. Defendants have, and continue to, engage in practices and policies that are unlawful under the FHA, including, without limitation: (i) refusing to comply with their affordable housing obligations; (ii) discriminating against families with children; and (iii) allowing prejudice against families with children and non-white racial minorities to dictate the outcome of Plaintiffs' official actions.

32

174. Defendants' unlawful actions have a disproportionately adverse effect on non-white racial minorities and have served to maintain the racially homogenous composition of the Borough's demographics.

175. Defendants' discriminatory and unlawful practices and policies of thwarting inclusionary development, therefore, have a disparate impact on non-white racial minorities.

176. Defendants never had any justifiable basis to persistently undermine, delay and deny Plaintiffs' efforts to construct inclusionary development in the Borough. As such, there is no legitimate rationale for Defendants' disparate-impact-causing conduct.

177. Defendants injured Plaintiffs by committing and continuing to commit discriminatory housing practices with the effect of discriminating on the basis of familial status and/or race, and limiting the availability and viability of inclusionary development in the Borough, in violation of the FHA.

**WHEREFORE,** Plaintiffs respectfully request that the Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, (i) declaring that the unlawful practices of Defendants complained of herein violate the Fair Housing Act and fail to affirmatively further fair housing; (ii) permanently enjoining all of the unlawful practices of Defendants complained of herein and enjoining Defendants from obstructing or interfering with Plaintiffs' planned development and operation thereof; (iii) awarding Plaintiffs actual damages, punitive damages and attorneys' fees and costs; and (iv) granting such other and further relief as the Court may deem equitable and just.

## COUNT THREE

### (42 U.S.C. § 1983, *et seq.* – Equal Protection)

178.    Plaintiffs incorporate by reference the allegations contained in this complaint as if fully stated herein.

179.    The Fourteenth Amendment of the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the law."

180.    Under the Fourteenth Amendment's Equal Protection Clause, discrimination based on race is presumptively unconstitutional.

181.    At all times relevant to this claim, Mayor Tomko, the members of the Planning Board, Siek, and Assenheimer acted in their official capacities under the color of State law and were decision makers and/or policy makers of Defendants.

182.    Under color of State law, Mayor Tomko, the members of the Planning Board, Siek, and Assenheimer, and Defendants perpetuated a policy of racial and familial discrimination, creating a well-settled or permanent custom of racial and familial discrimination that had the force of law ascribable to municipal decision makers and the municipality.

183.    By allowing prejudice against families with children and/or non-white racial minorities to drive their decision making and policy making, Defendants, through Mayor Tomko, the members of the Planning Board, Siek, and Assenheimer, intentionally and arbitrarily discriminated against individuals on the basis of familial status and/or race and were deliberately indifferent to the ongoing custom of racial and familial discrimination, an existing practice that was likely to lead to a violation of constitutional rights.

184.    Defendants, through Mayor Tomko, the members of the Planning Board, Siek, and Assenheimer, injured Plaintiffs by discriminating against them because of their association with

prospective residents on the basis of familial status or race in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

**WHEREFORE,** Plaintiffs respectfully request that the Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, (i) declaring that the unlawful practices of Defendants complained of herein violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as well as 42 U.S.C. § 1983; (ii) permanently enjoining all of the unlawful practices of Defendants complained of herein and enjoining Defendants from obstructing or interfering with Plaintiffs' planned development and operation thereof; (iii) awarding Plaintiffs actual damages, punitive damages and attorneys' fees and costs; and (iv) granting such other and further relief as the Court may deem equitable and just.

## COUNT FOUR

### (42 U.S.C. § 1983, *et seq.* – Substantive Due Process)

185.    Plaintiffs incorporate by reference the allegations contained in this complaint as if fully stated herein.

186.    The Due Process Clause of the Fourteenth Amendment of the United States Constitution limits state action that deprives life, liberty, or property.

187.    At all times relevant to this claim, Mayor Tomko, the members of the Planning Board, Siek, and Assenheimer acted in their official capacities under the color of State law and were decision makers and/or policy makers of Defendants.

188.    Under color of State law, Mayor Tomko, the members of the Planning Board, Siek, and Assenheimer, and Defendants perpetuated a policy of racial and familial discrimination, creating a well-settled or permanent custom of racial and familial discrimination that had the force of law ascribable to municipal decision makers and the municipality.

189.    At all relevant times, the Borough and the Board were acting in their capacity as the municipal entities responsible for all matters relating to, *inter alia*, (i) review and approval of site plans, and (ii) property taxes and tax sale certificates.

190.    Plaintiffs, as owners of the two respective properties at issue, have the right to use and enjoyment thereof. This right includes the ability to construct an inclusionary development on the properties. In fact, Plaintiffs have distinct and definite investment-backed expectations in their ability to develop, use and enjoy the properties and the contemplated inclusionary development.

191.    Defendants, through Mayor Tomko, the members of the Planning Board, Siek, and Assenheimer acting under color of State law, have deprived Plaintiffs of their Fourteenth Amendment substantive due process rights by, since issuance of the Builder's Remedy, engaging in an unrelenting scheme of arbitrary, capricious, illegal and conscience-shocking decisions to frustrate, delay and deny Plaintiffs' site plan applications and otherwise thwart Plaintiffs' ability to construct a viable inclusionary development within the Borough.

192.    The actions and inaction of Defendants were driven by their bias towards families with children and non-white racial minorities as evidenced by, among other things, the commentary provided during Morningside's site plan application hearings and the arbitrariness of Defendants' several, judicially-overturned land use decisions.

193.    This discriminatory bias stems from the perceived blight that the construction of a transit-oriented village containing affordable housing and the accommodation of the Borough's poor, minority and children-bearing families would have on a predominantly white community.

194.    In addition, the Borough, acting under color of State law, has engaged in acts that have deprived New Wallington Home of its substantive due process rights by, among other things,

deliberately, maliciously, arbitrarily and illegally: (i) failing to provide notice of New Wallington Home's tax delinquency; (ii) failing to provide New Wallington Home and the public notice of the sale of the tax certificate; (iii) taking the tax sale certificate without first providing New Wallington Home and the public the opportunity to purchase the certificate; (iv) placing a cloud on New Wallington Home's title; (v) taking the title to New Wallington Home's property; (vi) demanding that New Wallington Home pay unlawful and improper interest and penalties; (vii) charging New Wallington Home unlawful and improper interest and penalties; (viii) not following the custom and practice of the Borough which was to provide delinquency notices to New Wallington Home and taxpayers; (ix) hiding the fact that it took the property from New Wallington Home in order that New Wallington Home would lose its property and no longer be able to pursue the construction of its inclusionary development; and (x) taking the foregoing actions against New Wallington Home in retaliation to Plaintiffs' efforts to develop inclusionary developing in the Borough.

195.    These tax-related actions of the Borough were motivated by a corrupt and self-dealing desire to seek vengeance against Plaintiffs for their longstanding efforts to construct an inclusionary development in the Borough, as well as by a bias against the families with children and non-white racial minorities that the Borough suspected would reside in the inclusionary development.

196.    For the foregoing reasons, Defendants' conduct is an egregious abuse of authority and shocking to the conscience.

197.    As such, Defendants are liable to Plaintiffs under 28 U.S.C. § 1983 for deprivation of substantive rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**WHEREFORE,** Plaintiffs respectfully request that the Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, (i) declaring that the unlawful practices of Defendants complained of herein violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution as well as 42 U.S.C. § 1983; (ii) permanently enjoining all of the unlawful practices of Defendants complained of herein and enjoining Defendants from obstructing or interfering with Plaintiffs' planned development and operation thereof; (iii) awarding Plaintiffs actual damages, punitive damages and attorneys' fees and costs; and (iv) granting such other and further relief as the Court may deem equitable and just.

## COUNT FIVE

### (42 U.S.C. § 1983, *et seq.* – Procedural Due Process)

198.    Plaintiffs incorporate by reference the allegations contained in this complaint as if fully stated herein.

199.    The Due Process Clause of the Fourteenth Amendment of the United States Constitution limits state action that deprives life, liberty, or property.

200.    At all times relevant to this claim, Mayor Tomko, the members of the Planning Board, Siek, and Assenheimer acted in their official capacities under the color of State law and were decision makers and/or policy makers of Defendants.

201.    Under color of State law, Mayor Tomko, the members of the Planning Board, Siek, and Assenheimer, and Defendants perpetuated a policy of racial and familial discrimination, creating a well-settled or permanent custom of racial and familial discrimination that had the force of law ascribable to municipal decision makers and the municipality.

38

202. At all relevant times, the Borough and the Board were acting in their capacity as the municipal entities responsible for all matters relating to, *inter alia*, property taxes and tax sale certificates.

203. Plaintiffs, as owners of the two respective properties at issue, have the right to use and enjoyment thereof. This right includes the ability to develop their properties.

204. In furtherance of the discriminatory custom or policy set forth above, Defendants, through Mayor Tomko, the members of the Planning Board, Siek, and Assenheimer, engaged in acts designed to deprive New Wallington Home of its procedural due process rights by, among other things, deliberately, maliciously, arbitrarily and illegally: (i) failing to provide notice of New Wallington Home's tax delinquency; (ii) failing to provide New Wallington Home and the public notice of the sale of the tax certificate; (iii) taking the tax sale certificate without first providing New Wallington Home and the public the opportunity to purchase the certificate; (iv) placing a cloud on New Wallington Home's title; (v) taking the title to New Wallington Home's property; (vi) demanding that New Wallington Home pay unlawful and improper interest and penalties; (vii) charging New Wallington Home unlawful and improper interest and penalties; (viii) not following the custom and practice of the Borough which was to provide delinquency notices to New Wallington Home and taxpayers; and (ix) hiding the fact that it took the property from New Wallington Home in order that New Wallington Home would lose its property and no longer be able to pursue the construction of its inclusionary development.

205. The foregoing actions deprived New Wallington Home of the notice and opportunity to be heard that is required pursuant to the Due Process Clause of the Fourteenth Amendment.

206. The foregoing actions taken against New Wallington Home were in retaliation to Plaintiffs' efforts to develop their properties.

207. Defendants therefore are liable to Plaintiffs under 42 U.S.C. Section 1983 for violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**WHEREFORE,** Plaintiffs respectfully request that the Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, (i) declaring that the unlawful practices of Defendants complained of herein violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution as well as 42 U.S.C. § 1983; (ii) permanently enjoining all of the unlawful practices of Defendants complained of herein and enjoining Defendants from obstructing or interfering with Plaintiffs' planned development and operation thereof; (iii) awarding Plaintiffs actual damages, punitive damages and attorneys' fees and costs; and (iv) granting such other and further relief as the Court may deem equitable and just.

## COUNT SIX

### (Unjust Enrichment)

208. Plaintiffs incorporate by reference the allegations contained in this complaint as if fully stated herein.

209. The Borough assessed interest, penalties and other monies on New Wallington Home that were unlawful and improper.

210. The Borough forced New Wallington Home to pay the unlawful and improper interest, penalties and other monies in order to clear the cloud on New Wallington Home's title.

211. Under protest, and to clear title, New Wallington Home paid the unlawful and improper interest, penalties and other monies to the Borough.

212.     As a result, the Borough improperly and unlawfully collected, from 2016 through 2018, tens of thousands of dollars in penalties, interest and other monies from New Wallington Home.

213.     The Borough has been unjustly enriched by the unlawful and improper collection of interest, penalties and other monies from New Wallington Home.

214.     Permitting the Borough to retain these monies would unfairly give the Borough the benefit of New Wallington Home's property.

215.     Equity and good conscience require that the Borough return to New Wallington Home all interest, penalties and other monies that New Wallington Home paid to the Borough with regard to the 2016, 2017 and 2018 taxes.

**WHEREFORE,** Plaintiff, New Wallington Home respectfully requests that the Court enter a judgment in favor of it and against Defendant, Borough of Wallington, for damages, attorneys' fees and costs of suit, and such other and further relief as the Court may deem equitable and just.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury as to all issues in the above matter.

## DESIGNATION OF TRIAL COUNSEL

Bruce H. Nagel, Esq., and Thomas P. Scrivo, Esq., are hereby designated as trial counsel for the within matter.

**NAGEL RICE, LLP**                              **O'TOOLE SCRIVO, LLC**

***/s/ Bruce Nagel***                           ***/s/ Thomas Scrivo***
Bruce H. Nagel                                  Thomas P. Scrivo
Robert H. Solomon                               James DiGiulio
103 Eisenhower Parkway                          Andrew Gimigliano
Roseland, New Jersey 07068                      14 Village Park Road
Tel: (973) 618-0400                             Cedar Grove, New Jersey 07009
                                                Tel: (973) 239-5700

                                                *Attorneys for Plaintiffs,*
                                                *New Wallington Home, LLC, and*
                                                *Morningside at Wallington, LLC*

Dated:  December 7, 2020