IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - -x

NEW WALLINGTON HOME, LLC, a New
Jersey limited liability company;
MORNINGSIDE at WALLINGTON, LLC,
a New Jersey limited liability
company,

                        Plaintiffs,

            -vs-

BOROUGH OF WALLINGTON, and BOROUGH
OF WALLINGTON PLANNING BOARD,

                        Defendants.

- - - - - - - - - - - - - - - - - -x


                    - - -

                DEPOSITION OF

                JAMES NUCKEL

            APPEARING REMOTELY FROM

            CEDAR GROVE, NEW JERSEY
                    - - -


Monday, January 27, 2025
Commencing at 10:00 a.m.


REPORTED BY:

GAIL R. BRENNAN, CSR NO. XIO1776
APPEARING REMOTELY FROM MONROE TOWNSHIP, NEW JERSEY

EXHIBIT

C

800-227-8440                                           973-410-4040

Page 2

T R A N S C R I P T of the stenographic notes of the remote proceeding in the above-entitled matter as taken by and before GAIL R. BRENNAN, a Certified Court Reporter, License No. XIO1776, in and for the State of New Jersey, held on Monday, January 27, 2025, commencing at 10:00 a.m.

Page 4

- - -
INDEX OF EXAMINATION
- - -
WITNESS: JAMES NUCKEL
EXAMINATION                          PAGE
  By Mr. Shepard                        7

- - -
INDEX OF EXHIBITS
- - -
NUMBER          DESCRIPTION
JN-1     Final judgment and decision from Judge Christine Farrington dated January 17, 2019 consisting of 13 pages

JN-2     Amended Complaint and Jury Demand

JN-3     New Wallington Home, LLC's Answers to Interrogatories
JN-4     Morningside at Wallington's Answers to Interrogatories

JN-5     Delinquency notices
JN-6     Collection of documents regarding the tax sale of the property

JN-7     Copy of TD Bank check

JN-8     Correspondence from VAP International dated July 19, 2018
JN-9     Documents bates stamped P-305 through P-429

**Exhibits retained

Page 3

R E M O T E   A P P E A R A N C E S:

O'TOOLE SCRIVO, LLC
BY: JAMES DiGIULIO, ESQ.
14 Village Park Road
Cedar Grove, New Jersey  07009
jdigiulio@oslaw.com
Attorneys for the Plaintiff

PFUND McDONNELL, P.C.
BY: GERALD A. SHEPARD, ESQ.
139 Prospect Street, 2nd Floor
Ridgewood, New Jersey  07450
gshepard@pfundmcdonnell.com
Attorneys for the Defendant

Page 5

- - -
DEPOSITION SUPPORT INDEX
- - -

Request for Production of Documents/Information

Page  Line      Page  Line      Page  Line

Direction to Witness Not to Answer

Page  Line      Page  Line      Page  Line

Stipulations

Page  Line      Page  Line      Page  Line

Question Marked

Page  Line      Page  Line      Page  Line

2 (Pages 2 - 5)

Page 6

REPORTED REMOTELY FROM MONROE TOWNSHIP, NEW JERSEY

MONDAY, JANUARY 27, 2025, 10:00 A.M.

THE REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his/her testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

MR. SHEPARD: Good morning, Gerald Shepard from Pfund McDonnell on behalf of the defendants; I agree.

MR. DiGIULIO: James DiGiulio on behalf of the plaintiffs and the party being deposed; I agree.

Page 7

J A M E S  N U C K E L, business address being c/o 1 Stevens Road, Suite 1, Wallington, New Jersey, 07057, is duly sworn and testified under oath as follows:

EXAMINATION BY MR. SHEPARD:

Q    Good morning, Mr. Nuckel. My name is Gerald Shepard. I'm an attorney at the law firm of Pfund McDonnell. How are you doing today?

A    Very good, sir. Good morning.

Q    Thank you for appearing here today for your deposition. Have you ever been involved in a deposition before?

A    I have.

Q    Okay. How many times?

A    A lot.

Q    A lot? Okay. So, when was the last time you were deposed?

A    Oh, I think it was in '23.

Q    Okay. I'm sure not much has changed in terms of ground rules for depositions in that time but I'll just go over some ground rules for my own benefit.

This is a question-and-answer session between you and I. Although we're in this informal

Page 8

proceeding in your attorney's office your testimony today has the same force and effect as if we were in court before a judge and jury. Do you understand that?

A    I do.

Q    And do you understand the oath to tell the truth you just took that's the same oath you would take in court before a judge and jury?

A    I do.

Q    Okay.

We have a court reporter with us who's appearing by Zoom. She's taking down the questions that I ask and the answers that you give, really everything that's said in the room during the course of the proceeding, so it's important that you verbalize all your responses to my questions, you can't nod your head, shrug your shoulders, say uh-huh or uh-uh, things that you would do in every-day conversation. Okay?

A    Okay.

Q    Please wait until I finish asking the question before you answer. I know you might anticipate the question I'm going to ask you and in every-day conversation it's kind of okay if we cut each other off and answer before the question's

Page 9

fully asked, however for the purpose of this proceeding I might ask something completely different than what you're anticipating, and more importantly if you and I are speaking at the same time, it makes the court reporter's job a lot more difficult to get down an accurate transcript. Okay?

A    Okay.

Q    I'm going to ask you some general background questions and obviously questions about the lawsuit that we're here for today. I don't want you to guess at anything. If you don't know an answer to a question or can't remember it's perfectly fine to say I don't know or I don't remember, just don't guess. Okay?

A    Yes.

Q    With that being said if you can give us an estimate or an approximation, feel free to do so, just let us know that you're estimating or approximating. Okay?

A    Okay.

Q    If at any time you don't understand a question that I ask, please let me know, say I didn't hear that question or I didn't understand that question, and I'll gladly rephrase it or

3 (Pages 6 - 9)

Page 10

clarify it for you so that you can answer it. Okay?

A    Okay.

Q    This proceeding is being typed up and put into a booklet called a deposition transcript, so it's important that you understand my question before you answer, because that transcript can be used against you in a later proceeding if this case goes to arbitration or trial or some other proceeding. Okay?

A    Okay.

Q    Okay. Do you understand all the instructions I gave you?

A    There was a lot there but I think -- I think I'll be okay with them.

Q    I think so too. Are you taking any medication today that would affect your ability to testify truthfully or to remember anything?

A    No.

Q    Okay. Excellent.

A    Although I am getting old and not as -- not as clear as I used to be.

Q    Well, you fooled me.

Page 11

You said you were deposed back in 2023. What was that in relationship with?

A    That was in a trial with an architect in Florida, which was a jury trial.

Q    Were you a party to that lawsuit?

A    I was.

Q    Have you ever given a deposition in New Jersey?

A    Yes.

Q    When was --

A    When you say given a deposition --

Q    When was the last time you were deposed?

A    In New Jersey?

Q    Yes.

A    So the question is when was the last time I was deposed in New Jersey?

Q    Correct.

A    Probably in '22 I think, I don't remember exactly, that's off the top of my head.

Q    That's fair. And what was that in relationship with?

A    It was a situation with a contractor.

Q    Okay. Anything to do with New Wallington Home or Morningside at Wallington?

Page 12

A    No.

Q    Did that case go to trial?

A    It did not, no.

Q    And do you live in Wallington?

A    I lived in Wallington back sometime ago, and my office is -- or some of our offices are in Wallington, but I now live in Florida.

Q    Okay. How long have you lived in Florida?

A    Since 2010.

Q    Okay. And when did you live in Wallington?

A    I lived in Wallington back, at least 20 years ago.

Q    What is your highest level of education?

A    I have a bachelor of science degree in finance, and I have a certificate in construction technology, and a certificate in investment banking, all from New York University.

Q    When did you get your degree in finance?

A    That was back in 1986.

Q    Any further education after that?

A    Those certificates which were courses of

Page 13

study in those subjects.

Q    Okay. And I'm sorry, it was a certificate in construction --

A    Technology.

Q    -- technology and the one --

A    And project management, and a certificate in investment banking.

Q    Investment banking. Are you presently employed?

A    I am.

Q    What is your employment?

A    I am the president if you will, not really titled I guess but the president of JN Management, VAP International, is what we trade as.

Q    Where is JN Management located?

A    We have an office at 1 Stevens Road in Wallington, and we also operate out of Fairfield.

Q    And what is JN Management?

A    We are property managers, JN Management is kind of entity that pays the employees, but we don't trade as JN Management in the open market if you will.

Q    Okay.

A    We trade as VAP, and we've actually rebranded to Frontline.

4 (Pages 10 - 13)

Page 14

Q    Okay.

A    Frontline Management Services.

Q    When did you do that rebranding?

A    We're working on that now.

Q    Okay.  Nothing's finalized yet though.

A    No -- well, yeah, people are grabbing and making business cards and things like that.

Q    And what are your duties and responsibilities as the president of JN Management?

A    I oversee the property management operation of our company, and the construction, and, just our real estate operations.

Q    Are you involved in the trading at all, on the trading side?

A    I'm not sure what you mean.

Q    Well, you said trading as and I got the impression that maybe with VAP International there was some type of investment banking or investment arm to JN Management.

A    Oh, I suppose that is a -- maybe a fair interpretation, I don't know, but no, no, we're not trading --

Q    Okay.

A    -- on Wall Street or anything like that.

Page 15

Q    Okay.  I just didn't know if it was some type of private equity.  I apologize for the confusion, I thought you were maybe referring to some type of private equity firm, but we've cleared that up and it is not.

A    Yeah, I was clarifying that trading just meant we trade as, as far as, you know, we hold ourself out as, in business.

Q    Okay.  Does JN Management own any property in Wallington?

A    JN Management does not own any property.

Q    Where does JN Management own property?

A    JN Management does not own property.

Q    Okay.  It just manages property.

A    Yes.

Q    Okay.

A    It does have leases.

Q    Okay.  Does it manage property in Wallington?

A    It does.

Q    Okay.  What properties does it manage in Wallington?

A    It manages the Jasontown Apartment Complex, it manages Morningside, it manages New Wallington

Page 16

Home, and it manages the Wallington Square Shopping Center.

Q    1 Stevens Road in Wallington, is that located at Jasontown?

A    It is.

Q    Okay.  And that Suite 1, is that an apartment or is that an office there?

A    That's an apartment which we converted.

Q    Okay.  Are there employees working there?

A    There are.

Q    How many employees?

A    We have four in that office.

Q    What is your relationship with New Wallington Home?

A    I am the owner of that LLC.

Q    Are you the sole owner?

A    Yes.

Q    Okay.  Are there any officers or other members of that LLC?

A    There are not.

Q    Are there any employees for New Wallington Home?

A    Not at present, no.

Q    When was the last time New Wallington

Page 17

Home had employees?

A    It has not had employees.

Q    Okay.

How long has New Wallington Home, LLC been in existence?

A    Since I think 2014.  That's a guess off the top of my head.

Q    A guess or an estimate?

A    I don't know the difference.  Can you tell me the difference?

Q    Well, I think an estimate would be a reasonable assumption of a certain date or time, based on knowledge you may have, a guess would be you have no idea and you're just guessing.

A    Oh.  Well then it's an estimate it's 2014.

Q    Okay.

A    Yes.  That's going to be difficult to remember through the deposition.

Q    Well, like I said if you ever need me to remind you of something or if you have a question just let me know.

A    I'm going to have to adjust my usual discussion to take guessing out of everything and turn it into estimating.

Q    All right.

5 (Pages 14 - 17)

Page 18

What is New Wallington Home, what do they do?

A    New Wallington Home owns the property at 521 Main Avenue in Wallington, it's lot 35.2, I estimate.

Q    Okay.  Well, that's what I have in my notes, lot 35.02, block 71?

A    Well I would say that was a good guess but I can't say that.  That was a good estimate.

Q    Okay.  And how long has New Wallington Home owned the property located at 521 Main Avenue?

A    It has owned that property since I think -- excuse me -- I estimate it was 2015.

Q    Okay.  Who did New Wallington Home buy this from?

A    The Wallington Group.

Q    Did you own The Wallington Group?

A    I owned it 50 percent with my brother.

Q    Okay.  Donald?

A    Yes.

Q    Does New Wallington Home, does that generate any income?

A    Not at present.

Q    Okay.  And have you been the sole

Page 19

owner and the president since its inception since, what you estimate is 2014?

A    Yes.

Q    And you were the sole owner at the time you purchased it?

A    I think the -- yes.

Q    Okay.

Does New Wallington Home own any other real property?

A    It does not.

Q    Is New Wallington Home, LLC currently involved in any other litigation, other than the lawsuit that we're here for today, and any pending tax appeals, other than that?

A    No.

Q    Have you ever given a deposition in your capacity as the president or sole owner of New Wallington Home, LLC?

A    I don't recall, I don't think -- I -- I don't think so.

Q    Okay.

A    I was going to say I don't estimate.

Q    Okay.

Has New Wallington Home, LLC ever filed for bankruptcy?

Page 20

A    It has not.

Q    Is there road access?

A    There is.  New Wallington Home has an easement long-standing over the property that's in front of it out to Main Avenue.

Q    And has that easement been developed into a road?

A    Recently there have been improvements on the property that is in front to help create access to New Wallington Home, and there's been some road creation on New Wallington Home.

Q    Okay.  When did you start the road creation on New Wallington Home?

A    In the end of '22/beginning of '23.

Q    And did you have to get any permits to begin that construction on the road?

A    From what I understand the approval by the court is the permit for -- as it stands with respect to site improvements.

Q    Okay.  So did you go to the Town at Wallington at all and say I'm going to build the road now?

A    There -- what I recollect there was -- because we were not building the collective entire development that was approved by the court at that

Page 21

time, there was phasing and we were building what the engineer conceived as the first phase, and there had to be some discussion with the Town with respect to that because the whole development was not being created.

Q    Okay.  And when was that?

A    That was roughly I believe in '22 or '23.

Q    Okay.  Is phase 1 of that project completed?

A    It's completed, although there have to be some signoffs from the DEP from what I remember.

Q    Okay.  And where are you with getting the signoffs from the DEP to move forward with the project?

A    We are in the process.

Q    Okay.  When did you begin that process with the DEP?

A    Oh, that's hard to say because the DEP has been involved in that property for a long time, so I'm not sure exactly how to answer that.

Q    Okay.  What is the nature of the signoff that you need from the DEP?

A    The DEP at present the way I understand it has oversight of the site work on the site, and this site work is in some ways touching on New

6 (Pages 18 - 21)

Veritext Legal Solutions

800-227-8440                                                                973-410-4040

Page 22

Wallington Home, and New Wallington Home has a different, say history with the DEP than say the property in front of it, and therefore required some oversight by the DEP, and we are processing through that, but certainly the DEP has known about this work that we're doing since at least '22.

Q    Okay.  And you say -- you testified that New Wallington Home, LLC has a different history with the DEP than the property in front of it, is that accurate?

A    Yes.

Q    Okay.  And the property in front of it, that is now the Devli property, D-E-V-L-I?

A    No.

Q    So it's not the Devli property?

A    It is not.

Q    What is the property in front of it?

A    It is Morningside.

Q    And when you said that there was -- earlier when you were testifying that there was an easement for the property in front of New Wallington were you also talking about Morningside at that time?

A    I was talking about Morningside.  Morningside, there was an easement that benefited

Page 23

what was the New Wallington Home property or what was previously other property, across the Morningside property that had been long-standing easements there that were in place.  Those were formalized in a different way during the term of our applications in the Town of Wallington.

Q    Okay.  What was -- well let me just ask you this, what is your relationship with Morningside at Wallington, LLC?

A    I am the owner.

Q    Okay.  Are you still the owner?

A    I am.

Q    And when did Morningside at Wallington, LLC come into existence?

A    I'm going to estimate, but it's a good estimation, 2005.

Q    Okay.  Do you have any members, partners, officers in that LLC?

A    No.

Q    Have you ever had any members, partners, officers in that LLC?

A    No.

Q    Has Morningside at Wallington ever had any employees?

A    No.

Page 24

Q    And do Morningside at Wallington, does that generate any income?

A    It did, it does not right now.

Q    Okay.  When did it generate income?

A    It generated income from a warehouse building that existed when I purchased the property, and a facility that was a recreation facility that had a roller -- in-line roller hockey operation in it --

Q    Okay.  It was --

A    -- when we bought it.

Q    It was a closed-in rink?

A    Yes, it was, but it did not start as a rink.

Q    Okay.  What did it start as?

A    I think it was originally built as a tennis facility.

Q    Okay.  And did you transform it into a rink or did someone --

A    No, it had been transformed into a rink long before we had bought the property.

Q    Is the rink still standing?

A    I'm not sure what you mean.

Q    Is the physical structure still there?

A    The building, yes.

Page 25

Q    All right.  Can people still play in-line hockey there?

A    You could.  And there was a family recreation facility there that had some roller-skating as part of their program.

Q    Okay.

A    It wasn't in-line hockey though.

Q    Okay.  Is the recreational aspect, is it still open, do people still go there and skate?

A    Not at present.

Q    Okay.  When was the last time it was open for people to go and skate?

A    In 2016.

Q    Why did it close?

A    Because the lease was at an end, we had some difficulty getting the tenant out but we were thinking we were going forward towards development of the Morningside property.

Q    Okay.  So someone was leasing the rink from Morningside at Wallington and operating a rink there.

A    Operating a family entertainment business.

Q    Okay.  How else had Morningside at Wallington generated income other than the rink?

A    There were tenants in the warehouse for some

7 (Pages 22 - 25)

Page 26

time.

Q    Is the warehouse still standing?

A    The warehouse is not.

Q    Okay.  When was that torn down?

A    That was taken down I think in the beginning of '23, end of '22.

Q    When did you stop having tenants there?

A    Well, the last user of that building was the rink -- excuse me, the family entertainment business which was storing a good amount of stuff in the warehouse.

Q    Okay.

A    But the last other warehouse tenant was out in 2015.  From what I remember, that's an estimate but --

Q    Sure.

Has there been any development on the Morningside at Wallington property?

A    There has.

Q    Okay.  And what has taken place?

A    Just the site work that we spoke about that was phase I.

Q    And what is Morningside at Wallington's history the DEP?

Page 27

A    Morningside did not have an environmental history, I'm not sure how exactly to refer to it, but it was not a site of concern let's say to the DEP as I understand it, and perhaps, to make a long story short, it just was not a -- I'll just sum it up to say it was not a site of concern to the DEP and was not a -- a site that had any history that the DEP was concerned about.

Q    What about at New Wallington Home, does the DEP have any concerns about that site?

A    Well, that -- let me say this, and this will take some time to answer that.

Q    Okay.  That's fine.

A    As I understand it, the DEP was in a long dispute with the Curtis Wright entity or corporation, which owned the Curtis Wright site in Wood Ridge, and that site is higher in elevation and adjacent to our site, the New Wallington Home site, in Wallington, and other sites, in Garfield, and that has, how would I say, ground flow through Wallington, and into other parts of southern Bergen.  That dispute with the DEP as I understand it arose from the fact that Curtis Wright had been manufacturing airplane engines and other equipment in the 1940s.

Page 28

Q    Okay.

A    And the -- as part of the operations of the Curtis Wright site, they were using solids to clean their airplane engines and things like that, and they were dumping what turns out to be probably millions of gallons of solvents into the ground, and as far as I understand, those solvents go quickly down through the ground and the dirt, but they ride on top of the groundwater, and they spread on top of the groundwater and they'll go for many miles if not hundreds of miles, but in any event, as part of the DEP's dispute with Curtis Wright, DEP wanted Curtis Wright to clean up the entire region and, as I understand it, Curtis Wright came back and said, at some point after a very long protracted dispute with Curtis Wright, came back and said -- Curtis Wright came back and said, hey, you haven't investigated other sites around this area that could have contributed to the contamination in the groundwater throughout the region, you have to do that, and the DEP from what I understand ended up having to do those investigations, and in that process they investigated a lot of properties around the area, and they came in and grid-boarded and tested a lot

Page 29

of the properties and -- how would I say -- did a full examination of all of these properties, extensive, and one of the properties that the DEP needed to go and investigate was the New Walling -- what is now the New Wallington Home property, because it had had a sand pit on it that the DEP did not have information on as to how it was filled up through the 40s or the 50s, and it turned out from what I recall, that New Wallington -- or excuse -- yeah, the property that was New Wallington and is now New Wallington Home was filled in the 50s, and was owned by a construction company, and what the DEP found was they went in and they grid-boarded the entire property, and they found that the property had been -- the sand pit that was there, had been filled with construction debris, it had a lot of the fill, it had a lot of -- some concrete, some macadam, some wood, and some coal cinders and things like that, but the DEP determined that site that is now the New Wallington Home site, was not a contributor at all to any of the region's groundwater problems or anything like that, and they classified it as historic fill, historic fill being a classification that the DEP uses for sites all over New Jersey, that have been

8 (Pages 26 - 29)

Page 30

either leveled or filled for construction, because, as I understand it the DEP's definition of what is contaminated includes a piece of concrete, a piece of macadam, a petal of macadam, some, say dust from a cigarette, anything, that is what they -- under the original rules of DEP, it is considered contaminated, but they realized that they had to create this different class of property and different class of contamination, which is called historic fill apparently, and that is treated in, from what I understand in DEP operations in a totally different way, because it's not really a complex situation at all, it's completely innocuous in a lot of ways, and still though, they have to go through their process.

Q    Right.

A    And New Wallington Home was that type of site, and still for instance needs a cap, and as I understand DEP has to go through its process with respect to any work that goes on on that site, and as we were speaking about earlier, the site that is Morningside was not subject to that kind of history, or that kind of process by the DEP or oversight.

Q    Okay.  So New Wallington Home had a

Page 31

little more investigation by the DEP than Morningside, right?

A    Yes.

Q    Okay.  And that's just because of the historic nature of the property from going back to the 40s or 50s.

A    Yes.

Q    Okay.

Was there any finding by the DEP that the contaminants from the Curtis Wright site had leached into the property at New Wallington Home?

A    Well, that is a -- how could I say this -- that depends on your definition of leach.  They found that the contamination from the Curtis Wright site had spread through the entire region on the groundwater, so the groundwater level at New Wallington Home for instance is 60 feet down into the ground, start down there, that's where the contaminants are riding apparently through the entire region at that level, but as far as leaching goes no there's no -- from what I understand no contaminants that would just soak through the ground --

Q    Okay.

A    -- coming from Curtis Wright.

Page 32

Q    Did the DEP require any type of cleanup of the New Wallington Home site?

A    No, they just require a cap.

Q    A cap?

A    Yeah.

Q    And has the cap been put in?

A    The cap has not been put in, we're not developing really most of New Wallington Home yet.

Q    Okay.  And what type of development is contemplated for New Wallington Home?

A    A residential apartment complex.

Q    How many units?

A    Sorry, I didn't hear that.

Q    How many units?

A    It is 134 units.

Q    And are any of those designated as affordable housing units?

A    Yes.

Q    How many?

A    I believe it's 20, it might be 21.

Q    And what about Morningside at Wallington, what type of development is contemplated there?

A    A residential apartment complex.

Q    How many units are contemplated

Page 33

there?

A    73 I think it is.

Q    And how many are affordable housing units?

A    From what I recall 15.

Q    Does either New Wallington Home or Morningside at Wallington, do they have any investors involved in the development?

A    Can you ask me that question again?

Q    Sure.  Does either New Wallington Home or Morningside at Wallington have any investors to help finance the project?

A    If there was any investment, any other entity that has given money to those entities it would be an entity controlled by me.

Q    Right.  Okay.

Have you tried to sell New Wallington Home in the past five years?

A    No.

Q    Have you tried to sell Morningside at Wallington at all in the past five years?

A    No.

Q    Do you have any idea how long the project would take to build the apartments at New Wallington Home?

9 (Pages 30 - 33)

Page 34

A   At New Wallington Home?

Q   Yeah.

A   Probably about a year.

Q   What about at Morningside at Wallington?

A   Probably about a year.

Q   Have you --

A   That's construction.

Q   Sure. Sure. Have you retained any builders or architects for this project?

A   We've interviewed builders in the past, we've interviewed architects and worked with architects in the past as far as making some of the parts of the exhibits for applications in front of the Town of Wallington.

Q   Okay.

A   Yeah, and we've used architects to do construction drawings on Morningside.

Q   Okay. And have you retained them or were they just -- outside of -- or, strike that. Since you have the approvals, I think when the court said you had the approvals back in 20 --

A   19.

Q   -- 19, have you retained any architects or builders?

Page 35

A   We did retain Minno Wasko Architects, M-I-N-N-O  W-A-S-K-O.

Q   When did you retain them?

A   I think it was in 2019.

Q   Are there --

A   That's for that work.

Q   For New Wallington Home or --

A   Morningside.

Q   Morningside. What about for New Wallington Home?

A   We have not engaged them on New Wallington Home yet for construction drawings.

Q   Have you engaged any architect on New Wallington Home for construction drawings since you've had the approval from 2019?

A   No.

Q   Any reason why not?

A   Because of the delays through time caused by Wallington, because of the fact that the job is kind of stalled because of previous delays because of COVID, and, that's what I'm thinking off the top of my head.

Q   Okay.

A   I could supplement for you perhaps later.

Q   Okay. Have you retained any builders

Page 36

for the Morningside at Wallington property?

A   Well, we retained a general contractor for the site work at Morningside, which did affect some part of New Wallington Home.

Q   And who was that general contractor?

A   That was March Construction.

Q   And did March Construction also do the site work at New Wallington Home?

A   Well, they did some site work that did touch on New Wallington Home, yes.

Q   Okay. Did anyone else do the site work at New Wallington Home?

A   I'm not sure I understand the question.

Q   Okay. Well I believe earlier, I thought you indicated that there was some site work that had been done at New Wallington Home, is that correct?

A   Yes.

Q   Okay.

A   And that was part of this phase I.

Q   Okay.

A   There was -- part of phase I touched some on New Wallington Home.

Q   Okay. Did any other contractors do any work at New Wallington Home?

Page 37

A   Well, we have done some of the site work through our company.

Q   All right.

A   Yeah.

Q   New Wallington Home, or --

A   I apologize, we're really JN Management.

Q   Okay. JN Management, okay. Did JN Management do the work itself or did they hire someone to do the work?

A   No, we -- we did it ourselves.

Q   Okay.

A   We do a lot of construction on other sites and we do a lot of other types of construction, all the time.

Q   Did -- going back to Morningside at Wallington, did Minno Wasko Architects, did they complete their drawings?

A   They have not -- it's not exactly 100 percent complete but they're, for the most part yes, as I recall complete. I would have to go back and check, but my recollection is they're complete, there may be some things to supplement.

Q   I'm going to show you what I guess we'll mark as JN-1.

Okay. Mr. Nuckel, I'm showing you what has

10 (Pages 34 - 37)

Page 38

been marked as JN-1. You can just take a brief look at it, and then I'm going to ask you some questions on it.

A   I can read the document?

Q   Sure. Absolutely. Take your time.

(Witness reviews document.)

A   All right, I've perused the document. I can't -- I'm certainly not going to sit here and read the whole thing.

Q   Yeah, I'm not going to test you on it, I just have some questions on it, and I'll certainly allow you to refer to it with any question I do ask.

Are you familiar with this document?

A   I am.

Q   Have you seen it before?

A   I have.

Q   When was the first time you saw it?

A   I believe back in 2019.

Q   Okay. And McCarter & English, that was your attorney that handled this lawsuit?

A   Yes.

Q   Okay. Do you remember what the causes of action were for that lawsuit?

A   I'm not sure I understand the question.

Page 39

Q   Okay. Do you know what -- the reasons why that lawsuit was filed?

A   Yes.

Q   What were the reasons why that lawsuit was filed?

A   Because Morningside and New Wallington Home brought an application for site plan approval, and the board went through a process of review that was problematic and ultimately denied those applications, and we felt that the board's reasons for denial and what they were doing was wrong, and we brought a complaint to the court regarding our positions, and the judge found that in fact that Wallington was acting in an arbitrary and capricious manner and had unreasonably delayed and denied the application and should have approved it.

Q   Okay. And this order that you have in front of you which we've marked as JN-1, this is an order by the court giving you the approvals, correct? If you -- actually if you go to the second page this is what I'm referring to. Okay? If you look at paragraphs 1 through 5.

A   Yes, it says that the Borough shall issue all necessary permits and approvals within 15 days of this order. As I recall, the Town appealed this

Page 40

decision.

Q   Okay.

A   Which put it in limbo right away.

Q   And what happened with that appeal?

A   That appeal was not withdrawn by the Town until I think late November of 2019.

Q   But if you look at paragraph 2 it says New Wallington Home --

A   I'm sorry, paragraph 2 where?

Q   The page right in front of you.

A   So the second page of the final judgment.

Q   Yes.

A   All right.

Q   It says, New Wallington Home's application for amended site plan approval is hereby approved in its entirety.

A   Approved in its entirety, yes, I see that.

Q   So that's a court ruling that the site plan is approved, correct?

A   Well, it says that, but as I understand it, the circumstances of a ruling by the court can be subject to question by another side, and in fact Wallington appealed this decision, which puts you from what I understand in limbo until that appeal is -- I don't know what the words are -- processed,

Page 41

or maybe it's adjudicated.

Q   And it's your understanding that the appeal was withdrawn, correct?

A   Eventually at the end of 2019 it was withdrawn by the Town, and the Town went through a process at the end of 2019 to withdraw the appeal, after the -- I want to say proceedings with us.

Q   Okay. So the appeal was withdrawn, correct?

A   In the end of 2019, the very end of 2019.

Q   Okay. All right. End of 2019 the appeal was withdrawn, so you still have the approvals, correct?

MR. DiGIULIO: Objection to --

A   When you say still have the approvals, I'm not sure. You don't really, as I understand it, have the approvals until that appeal goes away.

Q   Well they withdrew that appeal, correct?

A   They withdrew it, as I was explaining, in the end of 2019, in the very end of 2019, in November.

Q   Okay. Is there still an appeal pending?

A   Not to my knowledge, no.

11 (Pages 38 - 41)

Page 42

Q    Has anyone reinstated that appeal?

A    Not to my knowledge, no.

Q    Okay.  You believe that you do not have the approvals to proceed with the site plan application -- with the site plan?

A    Well, we do not have all building permits of course, we submitted building permits with the construction drawings that I was speaking about on Morningside, but the Town has not acted on those building permits, not processed them, they're not processed through.

Q    Okay.  When were they submitted to Wallington?

A    I believe it was '22 or '23.

Q    Why didn't you submit them in 2019 after the appeal was withdrawn?

A    Well, you're talking -- as I described, the Town doesn't go through the -- how would I say -- go through the required processes to actually withdraw the appeal and formalize it until November of 2019, and then it takes time after you get your site plan approval to do construction drawings and do all kinds of things to get ready for construction, but, you know, what happened in the beginning of 2020, I think the entire world knows

Page 43

that COVID hit and caused all kinds of problems in business everywhere and in society, and the -- how would I say -- construction costs have gone up since that time, but there was a lot of difficulty with respect to development after COVID, but we started to go forward with trying to develop -- getting ready to develop the site, in context with other things.

Q    But COVID was the contributor to the delay in the development of the project?

A    I wouldn't say that it --

    MR. DiGIULIO:  Object to form.  Go ahead.

A    I wouldn't say that it was -- I think it was just a condition that happened to cause problems for the construction, but certainly the Town had delayed us for so long and for so many years, the Town really put us into that unfortunate time of COVID, we could have -- if the Town had processed the -- if the Town had processed the application, which really should have been dealt with we think administratively very quickly, we think we would have been developing earlier than that.

Q    When do you think you would have been developing?

Page 44

A    Okay, so we submitted plans for approval in the end I believe of -- or maybe it was the fall -- it was the fall I think of 2016, and we -- if -- it is my view or our view, that if the Town had expeditiously considered those plans and -- yeah, I should say -- I'll stick with expeditiously considered those plans and processed them, we should have been approved by the beginning of 2017 and we would have been developing probably at the end of 2017 or beginning -- the very beginning of 2018.

Q    You indicated that building permits were requested for Morningside, and I think you said you estimate around '22 or '23 you made that request, who did you make that request with at the Borough, do you remember?

A    I'm not sure I understand the question. With?

Q    Yeah, did you --

A    With my firm, asked or --

Q    Who did you ask at the Borough?

A    Well you had to go to the building inspector and that would be Nick Malfi.

Q    Okay.  Did you go to Nick Malfi or did someone else?

Page 45

A    No, it was a representative.

Q    A representative from JN --

A    Somebody from our firm.

Q    JN Management --

A    Yes.

Q    -- or New Wallington --

A    JN Management.

Q    Do you recall who that was?

A    I believe it was Jim Cornwell -- I apologize, it may have been -- it may have -- it definitely would have been on the oversight of Monica Puerta.

Q    P-U-E-R-T-A?

A    P-U-E-R-T-A.  But it may have been -- I apologize, I forget, we had a construction manager at the time and I can't remember her last name off the top of my head, first name was Kim.

Q    Okay.  And was there a written application you had to fill out or how did -- how do you go about requesting the building permits from Mr. Malfi?

A    I did not go and have the formal interaction with Mr. Malfi.

Q    Okay.

A    But there may have been some applications

12 (Pages 42 - 45)

Page 46

that had to be filled out.

Q   Okay.  And did you get a copy of those applications?

A   We may have them around.

Q   But there were no building applications for New Wallington, correct?

A   There was no permit requested for New Wallington Home -- for the buildings that would be on New Wallington Home.

Q   Okay.  And is that because you're still dealing with the DEP?

A   No.

Q   Okay.

A   It's because we are, at the time, probably getting ready to file, and we are now in a process where -- or shall I say at that time, we were in a process where we've got issues with this suit that we're talking about, or that we're in that you're deposing me on today, and there were issues that needed to be from what I recall considered and worked out, as we went through that process of making those -- filing any -- or going through any work to create plans for that development.

Q   Okay.  What issues?

A   Well, we are in a complaint, as I think I

Page 47

may have described -- actually I didn't -- but we're in a complaint right now, complaining that the Town of Wallington delayed us for many years, which cost us economic damage, economic harm, and it's part of the complaint that relates to save New Wallington Home, and has hurt the financial -- that has hurt New Wallington Home financially, and Morningside.

Q   In the complaint that was filed and ultimately ruled on by Judge Farrington, JN-1, were there any allegations of --

A   When you say JN-1 what do you mean?

Q   The exhibit you have in front of you right now.

A   Oh.

Q   We marked it as Exhibit JN-1.

A   I apologize.

Q   That's okay.  In that lawsuit were there any allegations of delay by the Borough of Wallington in approving the site plan application?

A   From what I recall we did complain about years of delay in that -- in that motion, and from what I remember -- I think I even saw it here -- the judge acknowledged that there was significant delay, and made that observation, caused by

Page 48

Wallington.

Q   I'm going to show you now what we'll mark as JN-2.

(Witness reviews document.)

Q   You don't have to read the whole thing, if you want to, let me know, and you could take --

A   I'd like to peruse it if I could.

Q   Yeah.  Absolutely.  Go for it.

(Witness continues to review document.)

A   Well, I'm perusing this and I think -- in the interest of time, I think I would ask you if I could just refer back to the document when you're asking me questions about it?

Q   Of course.  And just going forward if I show you any other documents and I'm going to ask you questions about them, certainly you can refer to the document.  Okay?

A   Okay.

Q   Just so we're clear, I don't want you to feel like I'm, you know, quizzing you or, you know, putting you on the spot.  Certainly you can refer to the document.  That's why I'm showing it to you.  Okay?

Page 49

A   Okay.

Q   Do you recognize that document that we've marked as JN-2 and that's in front of you?

A   Yes, I do.

Q   Have you ever seen it before?

A   I -- yes, I have.

Q   When was the last time you saw it?

A   I think I did take a look at this, back about a week ago or so.

Q   Okay.  And this is your complaint in federal court against the Borough of Wallington and other borough entities, correct?

A   I think it is, yes.

Q   Okay.  And why are you suing the Borough?

A   Well, because Wallington, over more than a decade, has tried to frustrate and harass this application for housing on New Wallington Home and Morningside, through various different actions that the Town has taken, and that has caused Morningside and New Wallington Home to be fiscally damaged, and they have cost us return on development, a development that could be there, construction costs have gone up a lot during their delays, we've had to engage attorneys to protest their unreasonable

13 (Pages 46 - 49)

Page 50

denials of our applications, and there are other things that are going on in the town, there is a new train station that is developed on the very border of Wallington on a train line that runs into Hoboken, and that is just a -- from what I understand, just a wonderful benefit as seen by most municipalities, and the town, by miracle, happens to have an easement that leads right to where this train station goes to, and this train station -- well, that easement that I said goes directly to where this train station is has existed for many many decades, and I know it to be the Town's policy that they don't want this access to be created, and that is just, I believe and I think others believe, crazy, and the consequence is that this new train station, one of the first train stations in a very long time as I understand it, that has been developed in New Jersey, is well developed on the Wood Ridge side of the train station, and has a parking lot, and has access, and has nice improvements for the residents in Wood Ridge and elsewhere in that side of the region of the train station, it gives them nice access to the trains that run right into Hoboken and therefore right into New York, and if you stand on that

Page 51

platform and look at the Wallington side it's just a field of weeds, and Wallington has the ability to create access to that station, but -- and that station's been I think there almost now, almost 20 years, and Wallington's done nothing to develop and make use of that easement, and from what I understand does not want to.

Q   What makes you -- what makes you say they don't want to?

A   Because of comments that I've heard from the ex-mayor, because of things that I've heard from my brother, who was in negotiations with the Town and processes with the Town in getting an approval on an apartment complex that he has that is -- or had -- that is contiguous to the train station, and just in general, the Town's behavior with respect to this access over 20 years just -- just looking back without even hearing anything, you would expect that a town, especially with an easement directly to this station, would want to in some way immediately effectuate that access. And I also say -- or come to that conclusion because of my experience with the Town since I brought this complaint, the Town has done really nothing much to create that access and has delayed this court case

Page 52

for a long time now, and I'm not aware of any energetic effort on the Town's part to see to it that that access is created.

Q   Does the Town have a legal obligation to develop that easement to create a roadway to that train station?

MR. DiGIULIO:  Object to the form.
Go ahead.

A   Yeah, and I'm not an attorney, but I believe that the Town does have federal and probably state -- I'm going to say obligations, to create access to public transportation for its residents and for residents in the region, and the Town, by its behavior, has shown it doesn't want to create that access.

Q   Is there any other means of public transportation in Wallington?

A   I'm not sure what you're -- I don't understand the question.

Q   Well, are there -- are there busses in Wallington?

A   I do know that there are bus lines that go along Main Avenue.

Q   And the -- where this easement is located what is the terrain like?

Page 53

A   The easement is over flat ground almost all the way to the area of the train station, there is one spot where the easement runs into a steep slope area, for about 150 feet or so from what I remember, that would require some additional construction, if you were going to go according to the exact layout of the easement you would have to do some work on that steep slope and create a wall from what I remember.  However, I was in a meeting with the Town and the owner of the property that the easement crosses, and as I remember the owner of the -- the now owner of the property had shared at that time in that meeting that they'd be happy to move the easement over so that it would not create a hardship on anybody trying to use the easement.  And the easement from what I recall it needed to be moved over say 30 feet or something for a short run, but the rest of that easement runs over flat ground.

Q   Okay.

A   From what I remember.

Q   And you were talking about, in that meeting with the property owner where the easement runs through that was -- is that the Devli property or your brother's property?

14 (Pages 50 - 53)

Page 54

A    That is the Devli property.

Q    Okay. And when was that meeting?

A    I think it was two years ago or so from what I remember.

Q    So it was after this complaint was filed.

A    No. Oh, I'm sorry, it was. Yes, it was.

Q    Okay.

A    I'm sorry, yes.

Q    Do you know if the prior owner of the Devli property was aware of the easement?

A    Definitely, yes.

Q    Okay. And did they have any discussions with the Town about the development of that easement to create road access to the train station?

A    As far as I know, yes.

Q    Okay. And that was the Umdash Property?

A    Well I know it -- I think Umdash is one of their entities but I know it as DOKA, D-O-K-A, all capitals.

Q    Okay. And when did DOKA discuss any development of the easement for road access to the train station, that you're aware?

Page 55

A    Well, I attended a meeting, a planning board meeting, that DOKA was having with Wallington, I think it was in 2019, and I -- when I attended that meeting, I at a break introduced myself to the representatives of DOKA, and I think they thought I might be there to object to their application so they initially weren't happy when I introduced myself from what I remember, but told them immediately that I was in full support of their application but I wanted to make sure there was access to the train station, and they told me -- they were immediately at ease, and they told me that they were -- had proposed to the Town that they'd create an expanded access to the train station, that was part of what they wanted to do, and assured me that they would work on that, and that's what I remember happened at that meeting.

Q    Okay. And you said that was approximately 2019?

A    I think it was 2019.

Q    Okay. Do you know of any other --

A    That's an estimate.

Q    A good estimate.

A    Yes.

Q    And do you know of -- are you aware

Page 56

of any other discussions about developing that easement or access to the train station before 2019?

A    Yes.

Q    When?

A    I remember that there was -- my brother got involved -- the context of this is my brother got involved with the property that is contiguous to the train station back in -- a couple of years ago, I -- I don't know exactly when it was, but I know that he was involved in an application to the court to -- how would I say -- have the court acknowledge and rule that the easement that the Town had for many many years was still good, and still existed, and I think my brother was having some disputes with the then owners of what we usually call in town the Farmland Dairy property, it wasn't owned by Farmland anymore, but it was a group that had taken over the Farmland property that my brother was having disputes with, in any event, I talked with my brother briefly about that back then, and, I think that that was eventually ruled on by the court, and I -- it's my estimate that it was 2016 that the court found that that easement was -- did in fact exist, it was totally usable, so to speak,

Page 57

and I don't know all the legal nomenclature to describe it but, it was a good easement and could be used.

Q    Okay. But was there a discussion or any type of ruling about the development of a road or access to the train station?

A    I'm not sure I understand the question.

Q    All right. Well, when your brother got involved in 2016 and he applied to the court to have a ruling that the easement was valid and enforceable, was there any request or any application to have that easement developed into road access to the train station?

A    I don't know the proceedings in the court.

Q    Okay.

A    I don't know what happened exactly, but I -- as I understand it, the easement was found to be valid and could be used.

Q    Okay. Has there been any development on the easement to date?

A    Well, there's significant -- from my recollection and I've been on the site, there's a significant amount or there was a significant amount of paving on that property in the area of almost the total easement.

15 (Pages 54 - 57)

Page 58

Q     When was that done?

A     Oh, that was done many years ago.

Q     Including that steep slope spot?

A     No.

Q     Okay.

A     No, but a good amount of the flat area of what again we call in town the Farmland site, it was paved in that area.

Q     Do you know who paved it?

A     It was Farmland.

Q     Okay.  Do you know why they paved it?

A     They were using it from what I remember, and even seeing, for truck parking, and things like that.

Q     All right.

Getting back to JN-2, the complaint, and I had asked you why you were suing the Borough, there are some allegations in the complaint about the Fair Housing Act, do you know what the Fair Housing Act is?

A     It is a federal -- a federal act, that deals with issues of housing and the administration of housing in the United States.  There is also, I think a New Jersey Fair Housing Act, and there is the Mount Laurel law as well.

Page 59

Q     Do you believe the Borough of Wallington has discriminated against certain individuals or people?

A     Oh yes.

Q     You believe they are intentionally discriminating against certain individuals or people?

A     Oh yes.

Q     Okay.  What individuals or people do you believe they're discriminating against?

A     What I would understand to be racial minorities, Latin and Hispanic people and Black people, and generally anyone, specifically comments that I've heard is more about, those people in Passaic, as -- I should put in that in quotes, those are not my words, but those are the words that I've heard, and I understand Passaic and some surrounding communities to have Latin and Hispanic populations, and Black populations, and also other minorities.

Q     Okay.  When have you heard that comment, those people?

A     That was a -- more of a summation of some things that I've heard from the former mayor, from a former police chief back a while ago, and those

Page 60

are -- also I've seen or heard some things in this application even that would seem to go along with that mindset or that attitude on the part of people at the Town, even people that were on the planning board.

Q     Okay.  Do you know what the racial makeup of Wallington is?

A     Well, as part of this preparation for this complaint and part of the -- well, part of the preparation of this complaint, and I just saw it in the complaint, it identified a percentage of the amount of White people who identify just as White, in Wallington as, I think it was something close to 70-some -- 75 percent or something like that.

Q     Okay.  I'm looking at page 9, is that -- you want to turn to page 9, maybe that's where --

A     Yeah, I wasn't looking at the document just now.

Q     Okay.

A     You want me to go to --

Q     Sure.  Yeah.

A     Okay.

(Witness reviews requested portion of document.)

Page 61

Q     If you're talking about it I just want to make sure that that's what you're referring to, or --

A     That's what I think I saw.

Q     Okay.

It says in paragraph 32, according to the U.S. Census Bureau the population of the Borough in 2010 was 11,335?

A     I see that.

Q     Okay.  Do you know if the population has changed in the past 15 years?

A     I am not completely sure, although from what I remember I think I saw something that the population has gone up in Wallington.

Q     Okay.  Did you review the Census Bureau from 2010 or would someone else do that?

A     I have looked at some documents that have been circulated, but I don't want to get into things between my attorneys.

Q     Sure.  And I don't want you to.  But I'm just asking if you had looked at the 2010 Census Bureau.

A     I think I saw some information with regard to that.

Q     Okay.  Do you know if any later data

16 (Pages 58 - 61)

Page 62

from the U.S. Census Bureau was used, either from 2020 --

A    I -- I am not sure of all the methods that experts and our attorneys have looked at.

Q    Okay.

A    So -- and I don't want to get into discussions with my attorneys.

Q    Okay.

In paragraph 35 on page 10, it says, The Borough has a disproportionate number of White residents as compared to its neighbors.  What neighbors is that referring to?

A    Here in this document it's referring to Garfield, which is adjacent to Wallington, it's referring to East Rutherford, which is adjacent to Wallington, Lodi, and Passaic, yeah, I agree those all are adjacent to Wallington.

Q    Okay.

A    But there are other -- and I think it even says here -- there are other towns in the general area around all those towns that have a much different demographic makeup.

Q    All right.

Where it says in paragraph 35, The Borough has a disproportionate number of White residents,

Page 63

what would be the appropriate proportion of White residents?

MR. DiGIULIO:  Objection to form.  Go ahead.

A    Yeah, I'm not an attorney, and I'm not an expert, but I do see even in these numbers a significant contrast between the different minorities and White people that are in these other towns, than Wallington, Wallington does stand out as very, very -- very, very homogenous White population, and a high percentage thereof.

Q    And paragraph 36, states, That alone is sufficient to support plaintiff's claims, however, this did not occur by accident but was part of a series of knowing decisions by the Borough.  What decisions is that referring to?

A    Certainly these -- for instance, these proceedings are complaining about the Town delaying and frustrating the creation of affordable housing in the developments that are on Morningside and New Wallington Home, judges have so found that the Town has unreasonably delayed those applications a few times, and just -- hold on, let me just read it again.

(Witness reviews portion of

Page 64

document.)

A    Oh, yes, and I do know that the Town sees access to that train station as partly creating more density, and the access of adjacent towns that would use it, and the Town sees it as bringing in other minorities into the town, and for that reason we are still dealing with a train station that a town has an easement to that has not been developed or even been considered for development, and has literally kind of been worked against for a very long time and certainly through this case.

Q    Do you believe that the development of the New Wallington Home site and Morningside site would affect the racial makeup of Wallington?

A    Well, as I understand it, Mount Laurel was originally the -- the original Mount Laurel case -- and again I'm not an attorney, but I've had to look at these things over time because I'm dealing with affordable housing applications in other towns, and as I understand it in 1975 when the original Mount Laurel case was brought it was brought partly by the NAACP, and Mount Laurel has a lot of -- how would I say -- considerations, or, considerations for diversity, sort of built into its DNA, and it is a requirement from what I understand in the

Page 65

assessment of properties for being candidates for affordable housing, that judges look and consider these things, and as a matter of fact, one of the issues as well is access to -- how could I say -- access for families with children to have opportunities to access affordable housing, and long story short that's tied in by the way, to the nomenclature as I understand it, fiscal concerns, the towns can't deny applications or can't look to fiscal concerns in judging applications, and fiscal concerns is -- under Mount Laurel is directly related to children, and to try to answer your question, those -- the ability as I understand it, or the creation of affordable housing, is seen to increase diversity in towns, it's meant to increase diversity in towns, that is one of the main intents of Mount Laurel.  And so in that way, to answer your question, the creation of housing and affordable housing on Morningside and New Wallington Home does affect diversity in the town, and is seen to positively -- I want to say -- create diversity, greater diversity in the population.

Q    So you believe that developing New Wallington Home and Morningside, it will help

17 (Pages 62 - 65)

Page 66

create more diversity in Wallington.

A   I think that is the definite intent of the law, is to create diversity, and I have seen that it -- I believe it does help diversity.

Q   Okay.  And do you know what percentage -- I know you gave me a number earlier before but do you know what percentage of those units would be affordable housing units?

A   Can you -- can you ask me that question again?  I'm not sure I understood it.

Q   Sure.  So, for New Wallington Home you said you had, I don't know how many units, and then you said a certain number were for affordable housing, and I was just asking if you knew what percentage of the units were for affordable housing.

A   By the court's order it's 20 percent.

Q   Okay.

A   But certainly the creation of apartments would also help access to housing, even beyond the affordable units, for families with children, I would think, to some extent, and certainly access to housing for minorities.

Q   In paragraph 37 on page 10, it refers to the --

Page 67

A   I'm sorry, we're on what page, 37?

Q   We're on page 10, paragraph 37.

A   Oh, I'm sorry.

Q   You're right there.  No, you're okay.  It refers to the Borough's policy of allowing racial animus to influence its official housing decisions leading to a discriminatory affect on the Borough.

A   Can I just read this?

Q   Yeah.  Of course.

(Witness reviews portion of document.)

A   Okay, I've read it.

Q   What policy are you referring to?

A   Well, certainly one that stands out is the Town's behavior through this entire process of trying to get New Wallington Home and Morningside approved, and all of the delay tactics they've used, and even things they've even stated, and things I've heard, so, I think that's what that refers to.

Q   Okay.

A   And also just in general the fact that the Town has also, through not allowing access to the train station, and perhaps other things, has

Page 68

resulted in the town having an amazingly disproportionate White population compared to any of the towns in the surrounding region.

I have to take a bathroom break.

Q   Oh, of course.  Yes.  Absolutely.

MR. SHEPARD:  Let's all take a break, five minutes.

(A short recess is taken.)

BY MR. SHEPARD:

Q   So, you were talking before we took a short break about -- I asked you about the policy, the Borough's policies of allowing racial animus to influence its decision and you said there's long delay tactics, not allowing train access --

A   Could you -- I'm sorry, we were looking at a page that you were directing me to, could we go back to that?

Q   Yeah, page 10, paragraph 37.

(Witness reviews portion of document.)

A   Okay.  And I'm sorry, what was the question again?

Q   So, before the break, you were talking about the delay tactics and the not allowing access to the train station, and a

Page 69

disproportionate number of White people I guess living in Wallington supports your belief that the Borough has a policy of allowing racial animus to influence its decision.

A   Those are amongst the examples, yes.

Q   Okay, amongst the examples.  So, what I want to know is are you aware of any written policies?

A   Well I suppose there would be in writing, not necessarily exactly stating that this is our town policy, but certainly some of the things that the Town does are official documents that do kind of, in ways kind of promote that condition of that disparity in race, or lack of disparity in race maybe, that are kind of documents, or decisions or things like that.

Q   All right.  What documents, decisions, reports, are you referring to?

A   I'm sorry, I can't think of anything off the top of my head but I certainly could supplement that for you.

Q   Okay.  All right, that's fair.  Any correspondences with anyone at the Borough that would support that?

A   Again, I would have to supplement that for

18 (Pages 66 - 69)

Page 70

you because that is -- requires a little bit of thinking and a little bit of investigation. There's -- that's a good question -- that's certainly something that should be investigated, yeah. There may very well though be things that I've come across in the past that would be candidates that would help me answer your -- paperwork that is -- would be candidates for helping me answer that question, but I can't think of anything off the top of my head right here at this moment, I could supplement it for you though.

Q    Sure.

Before the filing of this complaint did you do any investigation as to whether there were any written policies with the Borough or have you had any communications with anyone that would show this racial animus?

A    Well, there was preparation for this case, this case was brought originally in 2020, and I have looked at things like -- briefly like we were speaking about before, the documents showing the different racial makeup of the town, but that's not necessarily something produced by the Town, I understand. Again I'd have to go back and I'll have to supplement for you.

Page 71

Q    All right.

A    I'm sure there were things -- definitely things that we would look at that we could say oh, yeah, this incident had occurred.

Q    Okay.

So any -- aside from anything that was any written documents, you were also talking about the delay tactics and the not allowing the road as support for showing some racial animus. Where did that delay and when did that not allowing access to the road, when did that all start?

A    That's -- that's -- I think I'm going to need you to break that question down.

Q    Okay.

So the delay tactics, when did they begin?

A    Okay, well the delay tactics, if you're speaking about the application of New Wallington Home, that started right away in the end of 2013.

Q    Okay.

A    And you could probably say even before that because the Town was fighting against the Mount Laurel application itself, well before that.

Q    And what about the not allowing access to the train station?

A    The not allowing access to the train station

Page 72

started when the train station was being conceived to be built, and from what I know representatives from Somerset Development had proposed to the mayor of Wallington to create access to the train station and the mayor rejected any idea of access to the train station.

Q    Were these allegations --

A    When you say these allegations, which allegations are you referring to?

Q    Well let me finish my question.

A    Okay. Sorry. I apologize.

Q    It's all right. We're going good here.

With respect to the allegations regarding the Fair Housing Act of discrimination and racial discrimination, were those allegations brought up in the prior lawsuit that I referred you to earlier, where you received the final judgment that setting forth the approvals were good?

A    Was that it? Was that the question?

Q    Yeah.

A    Okay. That was a little bit still, for me, a little bit hazy --

Q    Okay.

A    -- as far as trying to figure that one out.

Page 73

Are you asking -- you know what, I don't know what you were asking.

Q    Okay. That's all right.

In the complaint that we're here for today, you allege violations of the Fair Housing Act and racial discrimination and disparate impact based on race, were those allegations brought in the complaint that was filed in 2018?

A    Oh. In part yes.

Q    Was there any ruling on any allegations or alleged violations of the Fair Housing Act in the prior lawsuit?

A    To my knowledge, and I'm not an attorney, but yes.

Q    Did you -- in that prior lawsuit did you receive any monetary damages?

A    I -- I'm not sure, I'm not an attorney, but I'm not sure, I don't know what we were asking for.

Q    Okay.

A    We were asking for our -- we were complaining about our denial, or the denial of our application. But I think we may have reserved our rights on questions like that.

Q    On questions like what?

A    Like the one you just asked.

19 (Pages 70 - 73)

Page 74

Q    About monetary damages or --

A    Yeah, monetary damages.

Q    Okay.

All right, if you could turn to page 15. And I'll direct your attention to paragraph 71.

A    Okay.

Q    Where it says, The planning board's initial hearing held on May 16, 2017 revealed their discriminatory animus towards families with children.

A    I see that.

Q    Okay. So in 2017 you believed that the Town had a discriminatory animus towards families with children?

MR. DiGIULIO:  Object to the form. Go ahead.

A    Yes.

Q    And how did the planning board reveal its discriminatory animus in May of 2017?

A    From my recollection there were certain comments made by board members complaining about children coming into town, and I think -- at that meeting I think it was even the mayor who stated that that is their main concern and problem with our application, that it's going to bring more

Page 75

children into the town.

Q    Okay. Was it a concern of bringing more children in town or the impact it may have -- bringing more children into town may have on the school?

A    Well, as I understand it under Mount Laurel and under Fair Housing, you can't use those concerns and the impact in schools or on schools, as anything you would consider, in zoning decisions or application decisions, that's part of what Mount Laurel deals with, and therefore what was -- what was driving them, and really underlying other things with respect to them not wanting families with children in town, which seemed to have -- create a greater diversity in the population, the Town was pushing against this and they were making comments about not wanting that -- families with children in the town, they didn't want kids in the schools.

Q    Whether or not you're allowed to use the impact of children in schools as a reason -- let me rephrase that.

You were referencing earlier the Mount Laurel decision and how the Mount Laurel decision you can't use the impact children may have on the

Page 76

schools as a reason to deny any site plan application. Whether or not that that's true, if the Town is concerned about the impact children may have on schools does that necessarily mean it's discriminatory?

A    It's discriminatory, as I understand it, again I'm not an attorney but, it is discriminatory under the laws of the State and the United States, and certainly I think those underlying motivations that the Town -- that the board members have and previous board members and mayors have had, has led to and definitely had an effect on, for instance, that -- that disparity and diversity numbers, those percentages we were looking at earlier, and -- I don't know if I've completely answered the question.

Q    Okay.

A    Can you repeat it?

Q    All right. I think my question was just as complicated as your answer. What I was getting at was, regardless of whether or not Mount Laurel allows you to use the impact children may have as a reason to deny an application or a site plan application, do you believe that the Borough, their concern about the impact of the schools with

Page 77

more children coming in, is that discriminatory?

A    It's discriminatory against families with children but I believe that the Town also had -- I know that the Town also has an intent and has actually succeeded in maintaining a majority White population in the town, through its decision and through its motivations.

Q    Which decisions?

A    Decisions denying our application, decisions denying access to the train station, just with respect to other things in town, the past mayor fought against allowing a traffic light at the access to Wallington on the Eighth Street Bridge, which would create orderly flow between Passaic into Wallington, and he fought against having that, I want to say traffic organizing -- how would I say -- device, or whatever, installed for a long time, he -- or shall I say the Town has -- and I'm not an expert on its activities in other developments exactly but I do know that there's a lot of things in Wallington that have led to this high percentage of White-only residents as compared to all of the surrounding towns around it.

Q    Okay.

Are you aware of any decisions with respect

20 (Pages 74 - 77)

Page 78

to any other properties, other than New Wallington Home, Morningside, that suggest discriminatory --

A   Yes.

Q   What other properties?

A   There's an apartment complex that was approved on -- over by Paterson Avenue, from what I know was forced to be only one-bedrooms, and the Town saw that, from what I understand as a way of -- having only one-bedrooms, as a way of limiting the amount of children, and therefore really minorities, into the town.

Q   What apartment complex was that?

A   I don't know the name, off the top of my head.  I did but I can't remember it right now.

Q   When was that decision made?

A   That decision was made back -- I think it was in -- it was -- I think it was in 2009, 2010, I'm guessing.

Q   Okay.  Is that a property that JN Management manages?

A   No.

Q   Is that a property you own?

A   No.

Q   All right.  Is it owned by your brother?

Page 79

A   No.

Q   Is it owned by your sister Jill?

A   No.

Q   Is it owned by any family?

A   Is it owned by any family -- in my family?

Q   In your family.

A   In my family?

Q   Yeah.

A   No.

Q   Other than that decision about the apartment complex are you aware of any other decisions by the Town for any other properties that show discriminatory animus?

A   Discriminatory animus towards, what group, or what issue?

Q   Families, racial animus?

A   Yes.

Q   Okay.  What other decisions are you familiar with?

A   There is a development that my brother brought -- application that my brother brought for approval of multi-family units on that site we were speaking before that is contiguous to the train station.

Q   Has that been developed?

Page 80

A   No, it has not.

Q   Is it being developed now?

A   I don't know.

Q   Okay.  Any other instances regarding any other properties that you believe show some type of racial animus or discriminatory -- discrimination towards families or children?

A   Can you ask me that question again?

Q   Sure.  Any other instances of decisions by the Borough that show discriminatory animus towards families, or children, or racial animus?

A   In the context of approval of apartment complexes or -- I'm not sure what your question is.

Q   Anything.  Anything.  Any decision by the Town, that you're aware of.

A   Okay.  I'm not privy to all of the decisions that the Town makes.

Q   Certainly.  I just want to know, you know, what you know or --

A   We've gone over a couple here.

Q   Right.  And I was just asking --

A   Yeah.

Q   -- if there were any others that -- you know, so you don't -- you know, later on you

Page 81

don't --

A   I suppose if I was an attorney investigating Wallington and asking for, I guess discovery and investigating everything going on I'm sure I'd find a lot more that would answer your question.

Q   Certainly.  But I'm just asking what you know.  So if there's anything else as we sit here today that you can think of or know of --

A   I probably know some other things, I -- off the top of my head right now --

Q   That's fine.

A   -- I can't think of anything right off the top of my head, but I know I've rattled off a couple of issues that I can definitely point to.

Q   Okay.  All right.  Fair enough.

A   I'll be happy to supplement though.

Q   In the planning board application around the time of 2017, Morningside and New Wallington, they had a planning expert testify, is that correct?

A   Yes.

Q   And do you recall who that was?

A   I think it was Bridget Bogart.

Q   And did she offer any testimony on the impact or the number of families and/or

21 (Pages 78 - 81)

Page 82

children that this site plan would bring?

A    She did speak about that from what I recall, yes.

Q    Okay.  And do you recall what she said?

A    Not -- not exactly, I would have to go back and look at the transcript I guess, what is it specifically that you were driving at again?

Q    I was just asking what you knew of her testimony, so, I wasn't driving at anything in particular --

A    Well she said a lot.

Q    Okay.

A    She said a lot about a lot of things.

Q    All right.  That's fine.

A    She spoke a lot about the -- the good sense of maintaining a recreation facility for residents, she spoke about how -- what I remember, the proximity of a train station could be a great thing for development and that development in this area was a good thing, she spoke about, as you I think were starting to ask me, she did speak about the expected amount of children that would take up residence in a development like this, she had done some studies from what I remember on those type of

Page 83

issues, she spoke about open space, she spoke about recreation, she spoke about the fact that she actually had -- I think she had actually lived in Wallington for a while.

Q    Okay.  Do you recall her saying --

A    And other things she spoke about.

Q    Yeah.  Sure.

A    I mean, you know, those are the things off the top of my head.

Q    Do you recall her saying at any point that she would submit OPRA requests to nearby municipalities to compile data regarding the existing multi-family developments throughout Northern Bergen County?

A    I remember that she had spoken about the fact that, I think she had done OPRA requests and gotten information on certain towns, and I think there was some discussion on the board's part about perhaps getting more investigation into some other towns' circumstances that she might look into, and, I know that OPRA, Open Public Records Act, issues were being discussed at the board, in those meetings.

Q    What OPRA issues were being discussed?

Page 84

A    With regard to children -- whatchamacallit -- with regard to children existing in multi-family developments, with regard to other things, I think also with respect to open space, and things like that.

Q    Okay.

A    There were probably some other things too.

Q    Do you know if she actually did the OPRA requests?

A    I think she had done some which had led to some of her testimony, and I think that she had been discussing possibly doing more, and I think that she had actually issued requests from what I remember, but I don't think that the board turned their back to those things, I don't remember exactly, I'd have to look through the transcripts.

Q    Do you recall any issue between the board -- or the board having with respect to Ms. Bogart about her not doing the OPRA requests as she had testified?

A    I don't remember that, I remember something about the board accepting Ms. Bogart's representations, and -- at the end I don't remember that there was much controversy against Ms. Bogart.

Q    All right.

Page 85

I'm going to --

A    I would have to read at some point --

Q    Of course.

I'm going to draw your attention to page 17 on JN-2 that's in front of you.

A    Of course.

Q    I'm going to draw your attention to paragraph 83.  Before I do that I'm just going to ask you some questions about Mayor Tomko, T-O-M-K-O.

A    Okay.

Q    How long was Mayor Tomko the mayor there?

A    From what I remember not that long.

Q    Okay.  Like one term, four years or --

A    I think it was one term.

Q    Okay.  And do you recall when that was?

A    I'm sorry, I don't remember exactly, it would have been 2016, it could have been earlier, I don't remember, I'd have to check.

Q    Was he the mayor at the time of this site plan application in 2017?

A    I believe he was, yes.

22 (Pages 82 - 85)

Page 86

Q    Okay.  Did you know him?

A    I didn't know him that well, I certainly knew Walter Wargacki, W-A-R-G-A-C-K-I, that is an approximation, but I think there's an S in there.

Q    Did you have any discussions with Mayor Tomko outside of the planning board meetings regarding your site plan application?

A    We did have a discussion with Mayor Tomko to my recollection, and I'd have to think about it, but we certainly had a settlement discussion with him at some point, which I suppose I shouldn't be getting into, but I think there was a discussion with him before these meetings, I'd have to check.

Q    Before what meetings?

A    These applications.

Q    The application meetings, okay.  And do you recall the nature of those meetings or what was discussed?

A    I don't remember, I'd have to go back through records.

Q    Okay.  Was it something that was recorded?

A    I don't recall that.

Q    Okay.  Were you with counsel, do you have a --

Page 87

A    I don't recall that, no.

Q    Okay.  Was it before this lawsuit was filed?

A    Yes, it was.

Q    All right.

I'm going to draw your attention to paragraph 83, and it refers to a quote by -- or it's quoted to Mayor Tomko, saying, Mayor Tomko responded using a phrase that is commonly seen as racially charged, what town -- quote, what towns in this South Bergen area have you OPRA'd because, you know, historically Route 4 is the Mason-Dixon line and you cannot compare Wallington with Upper Bergen County, things are different.

Do you believe that that statement if accurate is racially charged?

A    Oh yeah.

Q    Yeah?  What race is he referring to in there?

A    Well, I -- I recognize the Mason-Dixon line as the dividing line so to speak between the northern states and the southern states in the Civil War, and those southern states of course famously, having a policy of slavery and those were issues that were fought out in the Civil War, and

Page 88

certainly we can go through a whole history, an examination of history with regard to that, but that is usually, from what I understand, Mason-Dixon is a Civil War, kind of -- how would I say -- reference to that line, between the northern and southern states, and of course, you know, we know what Civil War was fought about.

Q    Sure.  And -- and do you think that that's what he meant?

A    Well, I think that the context of what he was talking about, and what was being talked about, and I do remember reading this in the transcript at one time a long time ago, they were talking about the fact that -- they were talking about families with children, and a lot of things had been said about Wallington being in a different, environment so to speak, than Northern Bergen County, and the -- how could I say this -- if you see and look at on its face the percentage, for instance, of White people in Wallington, and then look at the rest of the towns around Wallington, and what is going on there, when he says things are different down here in Southern Bergen, he's talking about that, he's talking about greater diversity, and different problems as they see it, that are created

Page 89

by that and by the housing and kids that are coming in.  So, he's definitely referring to that in different ways, definitely.

Q    Did you ever talk to him about that comment?

A    After that?

Q    Yes.

A    No.

Q    Okay.  Do you know if --

A    I wasn't there.

Q    Okay, you weren't even there for that?

A    Yeah.

Q    Okay.  Do you know if someone spoke to him about that comment?

A    I don't know.

Q    Okay.

A    Oh, we -- no, I actually remember reading on the transcripts -- again this was a while ago -- but I think our attorney at one point in a later hearing said what you guys have been talking about is not right, is not -- is not -- I don't remember his exact words.

Q    Okay.

A    It's -- it's not proper.

23 (Pages 86 - 89)

Page 90

Q    Who was that attorney?

A    That's Victor Herlinsky, H-E-R-L-I-N-K-S-Y I believe.

Q    Okay.  Do you believe he could have been re -- when he said we cannot compare Wallington with Upper Bergen County do you think he could have been referring to population density, available Green Space, as opposed to racial diversity?

MR. DiGIULIO:  Objection to form.  Go ahead.

A    I -- from what I remember of the context of the conversation, what I remember looking at in transcripts, that he wasn't talking about open space or anything like that.

Q    But you weren't at the --

A    He was talking about the demographics of South Bergen being different than the demographics of Northern Bergen County.

Q    Did he make any other comments that you believe were racially charged?

A    Well, I think that as we've been discussing here, he -- well, as we've been discussing here, the underpinnings of Mount Laurel are to create opportunities for affordable housing and for

Page 91

families with children as part of that, and that is seen in part in Mount Laurel as creating greater diversity, and I think, for instance when you asked me did Mayor Tomko make other statements with regard to that -- those issues, he certainly laid out at one point -- and I think this was at the application that I was at -- where he said that this is the main concern of the people on the town, this density and the children that are brought in by this development and the issues that that creates for the town is their main concern.

Q    All right.  Did he explicitly say race or refer to racial diversity or anything like that?

A    In my experience people who do think like that don't necessarily say those things right out.

Q    Sure, but my question was did he say it right out.

A    He certainly said a lot of things that definitely you can see is what they were thinking.

Q    Okay.  Okay, but did he expressly say anything that was racially charged other than what you just talked about?

A    I would have to look at the transcripts and give you more insight on that, I know there were

Page 92

more things.

Q    More comments?

A    Yeah.

Q    Okay.  All right.  Did anyone else from the Town make any racially-charged comments at any of those hearings?

A    From my recollection there were statements made about not wanting to look like certain towns, and that is -- I think certainly has a reference in it to, those towns, and their demographics are different.

Q    Okay.  And who was that?

A    I remember there was a -- what I remember from a while ago I read the transcripts, there were off the top of my head -- oh God, what's the guy's name -- Rachelski.

Q    Jean Rachelski?

A    Yes.

Q    Okay.  R-A-C-H-E-L-S-K-I.  What did Mr. Rachelski say?

A    He was comparing and saying that Wallington doesn't want to be like West New York, I think there was some comments about that, I think there was some comments, not necessarily by Rachelski, about the density and the look of other towns, and

Page 93

that Wallington didn't want to look like that, again I'd have to look through the transcripts. Are you speaking only about the environment of the hearings or other things?

Q    Well, if you have other examples, certainly if there's anything outside of the hearings that you're aware of, please, let me know.

A    Well, I did say earlier that I've heard the mayor make comments -- the ex-mayor, the former mayor made comments, about not wanting to let certain people into the town, and things like that.

Q    Okay.

A    The former police chief, back a while ago, used to make comments like that.

Q    Okay.  And any specific instances you recall?

A    Well, I think it was around -- I'm not sure exactly when, I think it was around -- around -- I remember becoming aware that my brother was fighting out the issue with access to the train station with the former owners of the Farmland property, and I know that the Town got involved in that, or was somehow related to it, but I also do work with the former mayor's company, they're an alarm company, and we use their alarm company in a

24 (Pages 90 - 93)

Page 94

lot of other properties that we manage, and I would occasionally talk to Walter and I asked him about -- at one point I remember asking about what's going on with this train station access, and he made -- at some point the conversation got to the point that, you know, we're never allowing that access to that train station, that's crazy, we're not doing this, that is consistent with some things I've heard from other people, including -- how would I say it -- about what happened in a meeting with Somerset Development and the mayor of Wallington when they were originally proposing access to the train station to the mayor.

Q    What's Somerset Development?

A    They're the ones that own and built the -- I don't know what it's called, the Westmont property I guess it's called, they have different developments that are doing different things in that land, but it's like 150 acres on the other side of the train station.

Q    Have you had any written communications with Jean Rachelski?

A    Other than the applications and things like that, no, there's no personal correspondence between Rachelski and I.

Page 95

Q    Were these instances that you've just gone through, were they brought up in the prior complaint?

A    Which particular instances, and what prior complaint, what do you mean?

Q    Well, we talked about it earlier, your prior complaint where you retained McCarter & English to file the complaint?

A    Okay, so the land use applications complaint.

Q    Yes.  Were any of these instances of what you call discrimination, either comments by Rachelski or comments by Tomko, were they brought up in that complaint?

A    They were referenced in that complaint from what I remember.  I don't remember exactly all of the scientific detail of it.

Q    Do you recall any --

A    And when I say they were referenced I mean -- how could I say this -- from my recollection, it was complained that the board was bringing improper concerns into its judgment of the planning board application and its eventual denial.

Q    Okay.

A    And it was referencing those kind of things.

Page 96

That was the intent, from what I recall.

Q    Okay.  Any other planning board member or member of the mayor and council who made any racially-charged comments, either at that planning board application hearings or any other time?

A    Well, there was a lot of statements by other members of the board and by members of the public about not wanting kids and families in the town.

Q    Okay.

A    And the de facto -- how would I say -- behind the curtains kind of concerns which are related to those are about diversity and bringing, you know, families into the town.

Q    Okay.

A    As I understand.

Q    I'm going to direct your attention to page 22 of this document, and I'm going to refer you to paragraph 110.  It says, For instance, the Borough determined that the inclusionary development would result in an influx of non-White residents and that these new residents would rely on public transportation more than the current residents of the Borough.  Thus hindrance of access to public transportation could invert the influx of

Page 97

the demographics the defendants did not desire reside in their borders.

When -- specifically with respect to this paragraph, when did the Borough make this determination that the inclusionary development would result in an influx of White residents (sic)?

A    Can I read the paragraph?  I know you just read it but I want to read it.

Q    Sure.  Absolutely.

(Witness reviews portion of document.)

A    This is in regard to -- this whole section is in regard to Westmont train station and denying access to the public transportation, so let me -- let me just think about your question in that context.

Q    Mm-hmm.

A    Okay, so your question is therefore -- I'm sorry, I lost the question.

Q    It was when did the Borough make this determination that the inclusionary development would result in an influx of non-White residents?

A    Okay.  So when --

Q    Yes.

A    -- did they make that conclusion?

25 (Pages 94 - 97)

Page 98

Q   Yes.

A   Oh.  As I was just speaking about I heard comments from the former mayor, I heard that the former mayor had made those same representations when the access to the train station was offered to them by -- or to the mayor and to the Town of Wallington by Somerset Development, I don't know if that's exactly what you're driving at in your question --

Q   No, I was just asking when, like did --

A   Oh, when were those comments?

Q   No, when was was the determination that the inclusionary development would result in an influx of White residents (sic)?

A   Oh, I think the mayor has -- the former mayor had concluded that, that's why he would say those things back then, and that attitude has probably been shared by other people in the town because, that train station was developed, and to this day, the Town has not really done anything to try to facilitate the access to that train station, it's pretty easy, it's right there.

Q   Okay.

A   And there's paved -- as we were speaking

Page 99

about earlier, there's paved ground leading to it, for the most part it's flat ground, the now property owner has offered to move the easement a little bit to accommodate some access to the train station, and there -- I'm not aware of any effort on the part of the Town to seriously take advantage of any of that or to promote access to that train station, which is just crazy, in the context of what I understand and the context of modern planning, and good planning, and good operations of any public body, everyone should have access to public transportation.  And here you've got this amazing asset in a train station right there that's been developed on the town's border, and it has access to it, it has an easement to it, and the Town's done nothing about that, for many years.  Hasn't done anything about it in the context of this complaint.

Q   Okay.  All right.

So, just in the context -- I want to go back to this paragraph 110, and again I'm going to ask you, when was this determination made?  Was it when -- during the site plan application, or was it before that?

A   Oh, I'm not sure exactly what was going on

Page 100

in the attorney's mind when this was conceptualized, I don't know exactly what's going on in the attorney's mind.

Q   Okay.

A   But I -- to answer your question from before, I told you that the mayor had made comments back years before, it certainly was his determination, back then, but, you know, the fact that the easement existed for decades and nobody did anything about it is more evidence I would think.

Q   Now, since your prior lawsuit --

A   Which lawsuit?

Q   Sure.  The one we were just talking about before with Judge Farrington's decision.

A   Okay.

Q   All right?  Since that lawsuit, are there any instances of comments, racially-charged comments or decisions by the Town?

A   Well -- I have to think about it, hold on -- so I know that the Town continues to frustrate the development on New Wallington, and Morningside.  In addition I know that the Town, now, engaged in some activity to try to limit the amount of children, and therefore families that would reside in the

Page 101

development that Donald is -- or Donald was, Donald's passed, that's why I say Donald.

Q   I'm sorry to hear that.

A   That Donald was attempting to build that is contiguous to the train station.

Q   And when were any decisions with respect to Donald's property, when were they made?

A   I believe -- I'm not sure what you mean by decisions but -- in that context, but certain things were worked out with the Town as I understand it, and ended up becoming as part of a settlement with fair share housing that the units that would be affordable in that development could be addressed and could have people other than families with children in them.

Q   Okay.  Other than that are you aware of any decisions by the Town since your prior lawsuit that we were just referencing that were either racially charged or discriminatory?

A   I would point to the continued delay of addressing and seriously administrating an opportunity for people to access the train station in Wallington, despite the fact that the Town once again as I've mentioned, has an easement to that train station, across the -- directly to it from

26 (Pages 98 - 101)

Page 102

Main Avenue, and in the past, from what I know, that was seen as a -- by the former mayor as something that would attract people from Passaic and other towns into Wallington, and they didn't want to create a -- and the Town seems to be continuing that understanding and that lack of desire or to -- shall we say it another way, a desire not to facilitate that access, that is one way you can look at it, I can think of some others if --

Q    Sure. The easement, it extends to the train station, correct?

A    Yes.

Q    Does that run through Donald's property?

A    The easement ends at -- there's a small sliver of Donald's property that is -- how would I say -- about 20 feet, where the easement ends and the railroad tracks starts, it might be a little further, but once again with regard to that, Donald's representative was at that meeting that we were speaking about earlier, and Donald's representative stated with the Town mayor that they'd be happy to allow access across that land, and also -- let's see -- Donald himself has often

Page 103

spoken about wanting that easement to be effectuated and was eager to see it created, or a road created.

Q    Do you know if Donald's estate has had any ongoing conversations with the Town about either development of his property or the development of that easement?

A    I know that they are -- the kids, my niece and my nephews -- I know that they are in favor of doing something there.

Q    Okay.

A    There are some internal issues as you might imagine in any estate that are slowing things down, on that end.

Q    Okay.

A    I don't know what the ultimate outcome was.

Q    Okay.

I'm going to show you what we will mark as JN-3. If you'd like to peruse, please peruse.

(Witness reviews document.)

A    Do you want me to read this whole thing or --

Q    Well, if you wanted to peruse it, I mean certainly, I mean --

A    No, you could --

Page 104

Q    I'll ask you questions if you want me to, I'll just go start asking questions now and then you can --

A    And then let me review it?

Q    Yeah.

A    Okay, let's do that.

Q    Okay. So let's do that and move things along a little bit here.

A    Yeah, it looks like I -- it looks like I can read through this thing for an hour and a half.

Q    Yeah. So first I'll just ask you to go to the last page, page 16.

A    Yes.

Q    And is that your signature there?

A    That is.

Q    And do you recall signing this document?

A    I apologize, not exactly, but that's certainly my signature.

Q    Okay. Excellent, all right. Do you recall responding to written questions called Interrogatories?

A    I recall speaking to my attorneys.

Q    Okay. I don't want to know anything, you know, you spoke with your attorney about, do

Page 105

you recall generally these Interrogatories?

A    Not very well.

Q    Okay. All right. Well they have a lot of general objections, but let's go to number 1 here, page 5. Okay? It says James Nuckel, 27 Horse Neck Road, Suite 3001, Fairfield, New Jersey. What address is that?

A    By the way I don't know why it says Suite 3001, it should be Suite 1.

Q    Okay. Earlier you gave the address of Stevens Road.

A    Oh. Yes.

Q    So I'm just asking, you know, why you have 27 Horse Neck Road.

A    Because this is our other office.

Q    All right. Is that for JN Management?

A    I'm sorry, yeah, that is for another office of JN Management, yes, we have people there in Fairfield as well.

Q    Does New Wallington Home have an office at 27 Horse Neck Road?

A    Some of its business is administered there, yes.

Q    But it's primarily an office for JN

27 (Pages 102 - 105)

Page 106

Management?

A    You mean at Fairfield?

Q    Yes.

A    No, it's an office for a lot of different properties in a sense that there's, for instance there's accounting there, things like that.  Over in Wallington there's still property managers, there's people that would, for instance oversee Morningside and things like that that are at Wallington at 1 Stevens Road.

Q    Okay.  But is the 27 Horse Neck Road, Suite 1 address, is that primarily for JN Management?

A    And other entities we operate.

Q    All right.

Going to question number 3, this is a question that asks about loss of income, profit or earnings, and there's a general objection, if you go maybe two-thirds of the way down, it says, Notwithstanding the foregoing, NWH is seeking monetary damages for the loss of income and additional costs and expenses including attorneys fees incurred in all prior proceedings caused by the plaintiff's delays in bad-faith actions, which will be provided in more detail as discovery

Page 107

progresses including through expert reports.  NWH reserves the right to supplement this response.  Do you see that?

A    I see that.

Q    Okay.  Do you need to read it on your own or --

A    I'll accept your reading of it, on this one I've been reading along --

Q    All right.

A    -- as you were reading it so I'm more familiar with it.

Q    Okay.  So it says, New Wallington is seeking monetary damages for the loss of income.  Do you know how much they're seeking?

A    Again I will defer to, what it even says here, that this will be supplemented by expert reports, with that said, I'm not sure how I should answer this question, why don't you maybe further define.

Q    Well, do you have a certain amount that you're seeking at this time?

A    Okay, I know that we incurred hundreds of thousands of dollars in legal fees, fighting these arbitrary and capricious denials of our applications.

Page 108

Q    Okay.

A    I know that the Town tripled the taxes on the property back in 2008 after Judge Harris ruled that the property was -- should be zoned as multi-family, and I do know that we've -- I know that the cost of construction has gone up by millions and millions of dollars, and even looking at it in another way, the net of income that would have come from this property was more than a million dollars a year.

Q    Okay.

A    So, in a way, or in a lot of ways, the Town has frustrated the achievement of all of that, so, again I'm going to defer to an expert report --

Q    That's fine.

A    -- but I gave you some considerations to think about.

Q    No, that's fair.  Thank you.  Do you know how much it would have cost to go through with the development of New Wallington Home?

A    It depends on how you build it but in total New Wallington Home is roughly 160,000 feet in total, and I think -- it's -- it's more familiar to me to just think of the whole development, but I could do the -- kind of try to do the math in my

Page 109

head for you, but it depends on the time you're asking what the cost would be --

Q    All right.

A    -- because this thing has been delayed for so long.

Q    Well let me ask you this, because I don't want you to guess.  Okay?

A    Go ahead.

Q    Have you gotten an estimate from anyone?

A    We made estimates back in time, as you might imagine.

Q    Okay.

A    And through time we've analyzed those things, I don't have those -- any spreadsheet that we would have done or anything available, and I would have to supplement, but -- and again we have an expert that's going to issue a report as I understand it, but, the cost of creating, let's say -- let's say it's 160,000 feet, back in -- and by the way, at what time are you asking?

Q    Okay.  That's good.  Let's -- let's do in 2018.

A    Okay, 2018.  Let's see.  Can I use my phone, just to do a calculation for you?

28 (Pages 106 - 109)

Page 110

Q   Oh for a -- yeah, for a calculation, as long as you're not phoning a friend or something.

A   No, I'm not phoning a friend.

Q   Yeah.

A   Okay.

(Witness uses phone calculator.)

A   Okay, so what I'm going to do is -- this is an estimate -- you're asking me about New Wallington Home.

Q   Correct.

A   I'm figuring it's 160,000 feet total, with 134 apartments, I'm going to average about 1,000 square feet, I may be wrong with that average, then you've got creation of the parking structure underneath, and you have some extra considerations, that might bring it up to say 160,000 feet. That is complete, just, you know, thumb-in-the-air guess at this point, I could have sounded much more scientific for you if I was just looking at the plans --

Q   Sure.

A   -- working it out, but, so I'm going to figure it at that.

Q   Okay.

Page 111

(Witness uses phone calculator.)

A   Okay, I figure -- and this is another recollection of my knowledge of the state of the construction industry in 2018, but I'm figuring total hard costs, about 160 bucks a foot, for the type of building we would be building. I may be off on that, but off the top of my head right now that's what I'm thinking.

Q   Okay.

A   So that is about 25 million bucks.

Q   Okay. Is that now or in 2018?

A   2018.

Q   Okay. And did anyone ever give you an estimate for that, or -- not -- not just for the $25 million, I'm saying like an estimate for building?

A   We had some estimates from construction companies, I think on the development of the buildings on Morningside, and that is more recent than 2018.

Q   Okay. Did you have any construction estimates for New Wallington Home?

A   I think we may have.

Q   Okay.

A   I would have to go back and check my

Page 112

records.

Q   If you could turn to page 8.

A   Of JN-3?

Q   JN-3, correct. This again goes back to your damages. I understand you want to defer to an expert --

A   I'm sorry, where are we on page --

Q   I'm sorry, number 12, the last question there, let me just go to the last -- second-to-last sentence where it starts, Further?

A   I'm on page 8, and you said number 12, there's only one sentence -- question, Set forth the amount of damages --

Q   I was looking at the response.

A   Okay. So you want me to go to the next page?

Q   No, no, no, page 8, it starts Further --

A   Oh, okay. I apologize.

(Witness reviews requested portion.)

A   Well it's referring to such damages in the question and I -- I'm having -- it's so difficult to backtrack through what particular thing --

Q   Well I just have a question about --

A   Because this seems to be talking about

Page 113

rights related to a right-of-way.

Q   Right, and that's what I wanted to ask you about, you know, how does that -- it says, Further NWH will seek the appointment of a third party to ensure compliance. My first question is has New Wallington Homes appointed a third party to ensure compliance?

A   I'm not -- I -- I would have to read a lot of this document to get the context of what that might be referring to.

Q   Okay.

A   And I'm happy to do that, for some time, go through a couple of pages of the document and build up --

Q   Well, you know, they really don't -- the questions don't necessarily build on each other, so, certainly if you want to read the full response, you know, it if makes any more sense for you.

(Witness reviews portion of document.)

A   Okay, so you're asking about that particular sentence.

Q   Correct.

A   And I don't know what's in the attorney's

29 (Pages 110 - 113)

Page 114

mind with respect to how that relates to losses.

Q    Okay.

A    It may very well be very clear when explained to me again.

Q    Okay.

If want to turn to the next page, number 14. And we talked about this earlier, but the question asks, Set forth with detail and specificity any and all facts that support plaintiff's allegation that the Borough of Wallington planning board had discriminatory animus towards family and children, as alleged in paragraph 71 of plaintiff's Amended Complaint.

We talked about this earlier in your deposition, there are, it looks like form objections here, and then it says, Subject to and without waiving its objections, NWH refers to all statements referenced in its first Amended Complaint but not limited to all statements made by Mayor Tomko and other planning board members, all other employees, agents, representatives of defendants at the planning board hearings held on May 16th, July 18th, September 19th and December 19, 2017. And then it says, NWH reserves the right to supplement this response.

Page 115

So my question is, since you signed these Interrogatories on September 3, 2024 are you aware of any other facts --

A    September 3, 2024.

Q    Yeah. Well that's when you signed these.

A    Oh. Okay.

Q    So, I'm just asking, are you aware of any other facts that would support the allegation that the planning board had discriminatory animus towards people in Passaic --

MR. DiGIULIO:  Beyond what was already testified to.

MR. SHEPARD:  Yeah, beyond what was already --

A    Yeah, I was just going to say we've talked about a lot. I'll just say that we've talked about a lot, that in my eyes kind of supplement this answer here today, but I can also tell you that I'd be happy to go back and think more about some other issues for you and look at some other documents and maybe I could supplement more, but those are my thoughts with respect to that.

Q    Okay.

Let me show you what we're going to mark as

Page 116

JN-4. If you want to flip to the last page, and again I'll confirm, is that your signature there on the last page of JN-4?

A    Yes.

Q    If you go to page 5?

A    Okay.

Q    And again, going to that question number 3, I think these are similar questions as to the ones for New Wallington Home, but question 3 again asks about loss of income, profit, earnings, my question is, are the monetary damages different, or equal to or less than, those for New Wallington Home?

A    Well, you were asking me before about my estimate of losses on New Wallington Home specifically, solely.

Q    Correct.

A    And so to answer a question saying -- or asking, were Morningside's losses different, I would say yes, it's a different entity, different kind of situation.

Q    Okay.

In the instances of discrimination that we talked about --

A    Did you say in the instances?

Page 117

Q    In the instances of discrimination that we've been talking about, those would apply for Morningside as they do to New Wallington Home.

A    That's a good question. I would think yes, but I think I actually have to think about that, there may have been contexts in Morningside that -- where more things were said and certain things, at certain times.

MR. SHEPARD:  I'm about to pivot on topics, so I don't know if you want to break now, before we start unpacking the tax issues.

MR. DiGIULIO:  Okay.

(A short recess is taken.)

MR. SHEPARD:  We're back on the record for Mr. Nuckel's deposition.

BY MR. SHEPARD:

Q    Mr. Nuckel, I want to bring you back to document JN-2, which is the complaint.

A    Which complaint?

Q    The Amended Complaint.

A    Okay.

Q    You got it?

A    I do.

Q    Okay. And this portion of the

30 (Pages 114 - 117)

Page 118

deposition we'll be talking about tax-related claims that were brought under the Amended Complaint.

With respect to these -- the tax-related complaints are they only for New Wallington Home, LLC or are they -- or is it for Morningside as well?

A   In some instances as I recall they are for New Wallington Home, but overall, some of our complaints about taxes relate to Morningside as well.

Q   How do they relate to Morningside?

A   As -- let me say that, as I understand it, there are certain issues that we complained about that the Town did with respect to New Wallington Home in their tax activities, however, in general, the Town tripled the taxes, starting in around 2008, and that as I see is also -- it may not be exactly triple on Morningside but they've taxed Morningside at a higher rate as well, and I would bring those concerns, and say that, those concepts are what we're complaining about here in this complaint.

Q   Okay.  And they're relevant to Morningside as well.

Page 119

A   In some ways.

Q   In some ways, okay.

For New Wallington Home are there any pending property tax appeals?

A   Yes.

Q   How many?

A   I'm not sure what you mean.

Q   Well how many -- is there more than one --

A   There's multiple years.

Q   Yes, that's -- that is what I mean.

A   Okay.

Q   What years did the property tax appeals cover for New Wallington Home?

A   I think they go back to -- oh God, back -- they go back quite a long way, I think at least 2014, probably before.

Q   And is there an attorney handling that for New Wallington Home?

A   Well, when you say handling that what do you mean?

Q   Did they file the appeal and --

A   Well there's an attorney that filed tax appeals, yes, but there are other issues that we're complaining about with taxes that maybe a tax

Page 120

appeal attorney doesn't necessarily handle.  This is all legal interpretation that, in some ways I'd defer to an attorney.

Q   Okay.  That's fair.  But with respect to the filing of the property tax appeals that are currently pending there is an attorney representing New Wallington Home.

A   There is.

Q   Who is that?

A   Bruce Stavitsky, S-T-A-V-I-T-S-K-Y.

Q   And what about for Morningside, are there any pending property tax appeals?

A   I -- off the top of my head I don't recall.

Q   Okay.

Are there any trial dates for the property tax appeals?

A   I think those trial dates have been, in the past delayed, I don't remember all the legalese of it.

Q   Okay.

A   You have to go to the attorneys.

Q   All right.

A   Yeah.

Q   But as you sit here today you're not aware of any trial date for those property tax

Page 121

appeals.

A   I -- I'm not an expert on the legalese with respect to in the court and how --

Q   Yeah.

A   -- tax appeals necessarily are adjudicated in the court.

Q   I'm not -- I'm not trying to make it complicated though, I'm just asking if you knew of a date for the trial for those appeals, and if you say no, there's no date there's no date, if you're not aware of it that's fine.

A   Well, I -- I defer to my attorneys.

Q   All right.

So, if you turn to page 27 of JN-2, which is the Amended Complaint, and if you go to paragraph 136, and if you read that there, if you want me to read it or you want to read it, any way that's fine.

(Witness reviews requested portion.)

A   Okay.

Q   All right.  So, in there it says, New Wallington Home was actively involved with litigation with defendants.  What litigation is that referring to?

A   Actions to try to establish affordable

31 (Pages 118 - 121)

Page 122

housing in -- on the site, in Wallington.

Q     Was it litigation regarding the site plan applications that were denied?

A     Well, no, not only that, this also says and for other reasons.  There was prior litigation in 2008, where we were seeking for these properties to be -- how would I say -- zoned --

Q     Okay.

A     -- for multi-family housing.  I don't know all the things that the attorney's necessarily referring to here but, in any event, those are the things that come to mind.

Q     Okay.  All right.  And it says here, New Wallington Home withheld property tax payments that were assessed against the New Wallington Home property by the Borough in 2016 through 2018.

A     I see that.

Q     Okay.  Did you withhold payment of property taxes in the earlier litigation, like in 2008?

A     I do know that some payments weren't made on taxes, but at that time my brother was in control of the -- how would I say -- the checkbook on that property in certain respects --

Q     Okay.

Page 123

A     -- and I don't know all of his reasons for the actions or inactions that he took.

Q     So in that time period --

A     In which time period, I'm sorry?

Q     2016 through 2018 --

A     Okay.

Q     -- in paragraph 136 there, New Wallington Home knew it was withholding taxes.  They were withholding them on purpose.

A     Well, I remember the context of what was going on there somewhat, not completely off the top of my head, but I do know that we were concerned that the Town was taxing at a higher rate and that they weren't allowing us to develop the property because they were denying us all the time yet they were taxing us as if we could develop it, and I remember there being questions as to, what's the proper venue for a complaint like that, and I remember there being some conjecture but that it's not exactly tax court -- not traditional tax court, because at -- and I don't remember this completely, but I remember that one of the issues or concerns was that -- and I may be talking about --

MR. DiGIULIO:  Gerry, I'm just going to say, it sounds like we're veering into

Page 124

attorney/client communications, I don't think that was the intention of the question so --

MR. SHEPARD:  No.

MR. DiGIULIO:  -- I'd ask the witness not to go into that topic, and maybe Mr. Shepard can ask that question again so we can focus on --

MR. SHEPARD:  Yeah.

BY MR. SHEPARD:

Q     I was just talking about that time period in between 2016 and 2018, property taxes were withheld by New Wallington Home, is it fair to say that they withheld those property taxes intentionally?

A     As I recall there were questions as to how these concerns should be adjudicated, and how they should be worked out.

Q     Okay.  But you didn't pay taxes.  New Wallington Home did not pay taxes in that time --

A     New Wallington Home it appears did not pay taxes.

Q     Okay.  Before that time period 2016 through 2018 was New Wallington Home paying taxes on that property?

A     There were times where taxes were paid, and

Page 125

there were times when -- a significant amount of time when it was controlled by my brother when taxes were not paid.

Q     Okay.  And you're unsure of the reasoning or rationale why he may or may not have paid the taxes.

A     I'm unsure.

Q     Okay.

In the next paragraph, 137, it says, The Borough however changed its taxing behavior in response to New Wallington Home's actions against unfair taxes.

A     This is 137?

Q     This is 137, yes, the next paragraph.

(Witness reviews requested portion.)

A     Okay.  Yes.

Q     During that period of time when New Wallington Home was not paying taxes, was there anything sent to the Town saying --

A     Anything sent to the Town?

Q     Either correspondence, or some kind of document or report or request, to the Borough, disputing the taxes that were assessed against them?

A     I don't recall.  I'd have to go back and

32 (Pages 122 - 125)

Page 126

check the records.

Q    Okay.

A    That's a -- I don't recall, I'd have to go back and check the records.

Q    Okay.

How did the Borough's taxing behavior change?

A    I can answer that off the top of my head with respect to one idea I have with respect to that, is, as I shared earlier even after my brother had not paid taxes for a significant amount of time, and the Town made no action, there would be occasionally times, my recollection, when we would be late on taxes, when I was controlling the property, and from what I remember, the Town would get in touch with our accounting department and say, hey, what's going on, you're delinquent, and also send notices, and, we would immediately process the taxes with regard to whatever was not paid, there was times when -- back then there would be hiccups in the accounting department with respect to certain things, but the usual demeanor of the Town from my recollection was they were often in contact with the accounting department, they know each other, and that would be cleared

Page 127

up --

Q    Okay.

A    -- quickly.

Q    Who was with the accounting department?

A    Beth Arici, A-R-I-C-I.

Q    And is she, or was she with New Wallington Home or JN Management?

A    She's with JN Management.

Q    Is she still there?

A    She is.

Q    Do you know who Beth Arici would speak with at the Borough or receive communications from at the Borough regarding any delinquent taxes?

A    From what I remember, it was Ms. Siek, S-I-E-K, and other people -- I think she communicated with someone else, if it comes to me I'll let you know.

Q    Okay. Did you ever communicate with Ms. Siek?

A    No.

Q    Do you know what time period Ms. Siek worked at the Borough?

A    I think she had been working there for quite some time, during the -- certainly as I remember

Page 128

during the time that we owned this property, I think she quit in 2019.

Q    Do you know what her position was?

A    I think she was the clerk.

Q    The Borough clerk, or --

A    I -- I just remember seeing it somewhere, I don't know if it's necessarily the Borough clerk, but yeah, I think it's Borough clerk.

Q    Well she's a named defendant in this lawsuit. Okay? What did she do --

A    She --

Q    -- or did not do?

A    Again, she changed her behavior, that I was just describing, with respect to these particular tax-related administrative procedures, and she was I guess part of a situation where tax -- the property was put to tax sale, as I understand it, and we were not noticed, and then the Town redeemed that tax certificate, and from what I understand didn't pay any money for it or anything like that, I don't know everything about all what's required with respect to tax procedures, however -- and I don't want to get into discussions with the attorneys that I've had, but, some of this is laid out in the complaint, and -- but again I don't want

Page 129

to get into all of the discussions with attorneys.

Q    Okay. No, that -- that's good. What do you feel like she should have done?

A    Well, from my part, I do know that she changed her behavior, with respect to this, and, there's seemingly no reason for that other than some of the other things that were going on in the Town, where I ask the question, why would you usually call somebody up that you usually talk to and get taxes paid and then suddenly you don't do it anymore and you're doing things seemingly in secret, and -- again though I don't want to get into too much discussion that I had with attorneys.

Q    Do you know if Beth Arici had any conversations or communications with Dorothy Siek about not paying taxes, withholding taxes because of some of the issues -- because they were in active litigation with the Borough?

A    Can you ask me that again?

Q    Sure. Do you know if Beth Arici ever discussed, communicated or corresponded with Dorothy Siek indicating that New Wallington Home was withholding tax payments because of ongoing litigation with the Borough?

A    I don't know all the conversations that Beth

33 (Pages 126 - 129)

Page 130

had with Dorothy Siek, but I do know they would talk often.

Q    Okay.  Did you speak with Beth Arici before this deposition?

A    I speak to Beth Arici all the time.

Q    Okay.  Did you ever discuss Dorothy Siek with her?

A    From my recollection yes.

Q    When was the last time you spoke with Beth about Dorothy Siek?

A    Some time ago, I don't know exactly when.

Q    Okay.  What was the nature of that conversation?

A    Relative to the issues of Dorothy not sending notice as she usually did, not speaking to Beth about some of these procedures that suddenly -- or activities that suddenly the Town engaged in with respect to the taxes, and, I don't remember all the details of that conversation but I certainly understood from Beth that a lot of things changed and a lot of things weren't done how they usually were done, with regard to that.

Q    Do you know if Ms. Siek was doing anything illegal?

MR. DiGIULIO:  Object to form.  Go

Page 131

ahead.

A    I'm sorry, could you ask me that question again?

Q    Sure.  Well do you know if Dorothy Siek was doing anything illegal or if she wasn't following procedure or protocol?

A    I do --

MR. DiGIULIO:  Same objection.  Go ahead.

A    Okay.  Well, I do know that -- you know what, I believe Ms. Siek ended up being under investigation with Victor Beginsky with regard to tax -- things they were doing with taxes in the Town of Wallington.

Q    And do you know what happened with that investigation?

A    I don't know everything that happened with that investigation, no.

Q    Okay.

A    However I do know that there were supposedly some similar situations to this, and in some ways perhaps related to this, but I have not spoken with the prosecutor's office.

Q    Do you believe that the Borough intentionally withheld tax delinquency notices to

Page 132

New Wallington Home?

A    I believe they did, yes.

Q    Why?

A    Are you asking me why I think that or why I think that the board did that -- or the Town did that I should say?

Q    Why do you think the Town did that?

A    Because they wanted to in some way harass the property and perhaps -- well, you know what, I don't want to get into conversations with my attorneys because, I think someone who knows the ins and outs of tax law would be better at explaining all the nuances of the ramifications of that behavior --

Q    Okay.

A    -- and then how it relates to some of the other things that the Town was engaged in.

Q    Did anyone tell you that the Borough was intentionally withholding tax notices to New Wallington Home?

A    I don't want to get into conversations with my attorney.

Q    Sure.  Okay.

Do you have any documents or records that you believe confirm that the Borough was

Page 133

intentionally withholding tax notices to New Wallington Home?

A    I don't want to get into conversations with my attorney.

Q    I'm not talking about conversations, I'm talking about documents or records.

A    I mean I have to kind of -- well, so then ask the question again please.

Q    Okay.  Aside from any documents or communications with your attorney, do you have any documents or records confirming that the Borough intentionally withheld tax notices to New Wallington Home?

A    And that would require in my eyes some knowledge of tax law because some things that have been produced in this proceeding may very well be -- be candidates for being evidence for what you just asked about, and that would also, I think require me to know a little bit about taxes and how they relate to this particular situation, to answer that completely.

Q    Do you know who Chris Assenheimer is, A-S-S-E-N-H-E-I-M-E-R?

A    Do I know who he is?

Q    Yes.

34 (Pages 130 - 133)

Page 134

A    I think he was the tax officer of Wallington at the time that this complaint was brought.

Q    At the time that this complaint was brought in 2020 or at the time that New Wallington Home was withholding taxes?

A    It might very well have been that, I -- I'd have to defer to my attorneys once again.

Q    But as -- you in your own personal knowledge, you're not a hundred percent sure of when he was -- or when he worked for the Borough of Wallington.

A    I'm not exactly sure but again, that is an issue that the attorneys would have investigated.

Q    Did you ever discuss Chris Assenheimer with Beth Arici?

A    I don't recall, I recall more Dorothy Siek.

Q    Okay.  Did Beth ever mention to you Christopher Assenheimer?

A    I don't remember.  May have, yes.

Q    Did you ever speak with Chris Assenheimer?

A    No.

Q    Did you ever meet him?

A    Not that I recall.

Q    Do you know if he's still with the

Page 135

Borough of Wallington?

A    I don't believe he is.

Q    Did you ever communicate with Mr. Assenheimer, either email, letters, correspondences, anything like that?

A    I'd have to check.

Q    Okay.  Do you know if anyone from New Wallington Home or Morningside or JN Management had any written communications with Mr. Assenheimer?

A    I would have to check.

Q    What do you believe that Chris Assenheimer did wrong or didn't do?

A    My understanding, and again, I'm not a tax lawyer, is that Mr. Assenheimer was the tax officer of the Town and is in that way related to these tax issues.

Q    Do you know if he was responsible for sending any delinquency notices?

A    I don't know.

Q    Mr. Nuckel, I'm going to show you what we've marked as JN-5, and I'll just represent to you these are delinquent notices that we received in discovery from your attorney.

(Witness reviews documents.)

A    Any particular one you would like me to look

Page 136

at?

Q    No particular one, I just have some general questions about them.

First, are you familiar with these documents?

A    I am not.

Q    Okay.  Do you know if you've ever seen them before?

A    I don't recall.

Q    Okay.  And it looks like these are --

A    I don't think I did.

Q    Okay.  And it looks like these are tax delinquent notices that were issued to New Wallington Group, LLC, correct?

A    They are, yes.

Q    Okay.  But the property, if we look on the tax delinquent notices on the right underneath the date there's block 71, lot 35.02.

A    Okay, I see that.

Q    Okay.

A    By the way, The Wallington Group address was not 1 Stevens Road, The Wallington Group address, business address, was on Liberty Street in Little Ferry, New Jersey, my brother's office.

Q    Okay.  So Mr. Nuckel, you would agree

Page 137

though that it says block 71, lot 35.02, that is the property -- that is the New Wallington Home property, correct?

A    I'm not going to say that it is but it appears to be.

Q    Okay.  And The Wallington Group, you said it owns the property, correct?

A    That is correct.

Q    And New Wallington Home purchased it from The Wallington Group, or acquired it?

A    It purchased it from The Wallington Group.

Q    Okay.  And you don't recall ever seeing these tax delinquent notices.

A    I do not.

Q    Okay.  And do you know who they would have gone to?

A    They would have gone to my -- as far as I understood, the business office for The Wallington Group was my brother's office in Little Ferry, and they would have -- I don't know if the Town was just sending a copy to The Wallington Group at 1 Stevens Road, I don't know, I don't know what -- it was -- it may very well be the idea of sending a copy, but, again, my observation is the business office for The Wallington Group was in Little

35 (Pages 134 - 137)

Veritext Legal Solutions

800-227-8440                                    973-410-4040

Page 138

Ferry.

Q    Okay.  And in the complaint where it said they've changed their practices, are you saying that they used to send out these tax delinquent notices and then you stopped getting them?

A    No, no, I spoke before about the fact that the Town had -- or my brother had not paid the taxes for some time, and I wasn't aware of his reasons for not paying the taxes, he and I were in a dispute, by the way, with regard to the property, and, in any case, it's after this time, I think the last one here is 2011 -- no, it's 2012 -- yeah, it was after that time that, from my recollection, the Town and Mrs. Siek would send notices to New Wallington Home at this address, but also speak to Beth often, if there was ever a -- whenever taxes were late, if they were late.

Q    All right.

A    But in a lot of cases they were -- pretty much the taxes were kept up with.

Q    Okay.

Prior to 2016 were there ever any tax liens on the property?

A    Not that I recall, no.

Page 139

Q    Were there any tax sales on the property, prior to 2016?

A    Well, from then to the beginning of time or during the time that either The Wallington Group or New Wallington Home moved in?

Q    From the time that Wallington Group or New Wallington Home moved in.

A    Not that I'm aware of, no.

Q    I'm showing you what we're marking as JN-6.

    (Witness reviews documents.)

A    Did you want me to look at any one of these or --

Q    Well, so we'll -- we'll start at the beginning.

A    Okay.

Q    On that first two pages there, on the top it says tax settlement notice, do you see that?

A    I do.

Q    Okay.  Have you ever seen this document before?

A    I don't recall that, no.

Q    Okay.  And on the second page at the bottom, it says, New Wallington Home, Main Ave., rear, and it says the amount is for $217,637.74.

Page 140

A    I see that.

Q    Okay.  And you never saw this public tax notice before?

A    I don't recall seeing this and it looks like it purports to be December 20, 2017.

Q    Okay.  And that was during the time that New Wallington Home was not paying their taxes, correct?

A    You mean 2017.

Q    Yes.

A    End of 2017.  Let me think.  That may have been in that time when those issues were being investigated by attorneys, and things like that.

Q    Are you saying that there was no public notice of the tax sale?

A    I don't know about public notice.

Q    Okay.

A    I'm -- again, I don't know all -- I'm not an attorney, I don't know all tax procedure, but I do know that in the past, owed taxes weren't paid, the -- for instance, Dorothy Siek would get in touch with Beth, and talk about it, and we'd bring the taxes current, but also we'd get notices, and as I've said, I don't -- as far as I understand, we didn't get those notices and those communications

Page 141

between Dorothy and Beth stopped at some point.

Q    Okay.

Also attached with this document are some tax lien redemption spreadsheets --

A    Well I see certificate of sale.

Q    Right, but in this packet of documents here, there's a certificate of sale, if you go after that, there's a tax lien redemption spreadsheet, and then there's one from December 2, 2013, do you see that?

A    Okay, let's see --

Q    December 2, 2013.

A    Is that this one or is that this one?

Q    Bates number 51.

    MR. DiGIULIO:  What's the question?

    MR. SHEPARD:  No, I was asking him to go through it, I just want to make sure that --

A    So you want me to stick with this one, because these other ones look like they might be the same, I don't know.

Q    Yes, well, that's what I was going to ask you.

A    They're all on the same date.

Q    Right.  So --

36 (Pages 138 - 141)

Page 142

A      Or appears to be.  Yeah.

Q      So, at the top of this document, it says tax lien redemption spreadsheet, is through meeting date December 2, 2013, total due to lienholder was $669,714.16.  Do you remember what the outcome was of that lien?

MR. DiGIULIO:  I just want to -- I'm going to object.  I just want to make sure we're clear.  The tax certificate to seller -- the certificate to seller that underlie these redemptions, none were signed, and they're all dated the same date of 2021, so I just -- I'm just a little concerned we're going down a path where we're -- we're going to ask questions of whether this happened or not, I don't know.  So maybe just check with him on that maybe --

MR. SHEPARD:  All right.  Well, I want to ask him if there's -- you know, if these are accurate, inaccurate, you know, that's kind of what I wanted to ask him about.

BY MR. SHEPARD:

Q      So going back to where we were on the document bates stamped 51, do you recall there

Page 143

being a tax lien in the amount of $669,714.16?

A      I don't remember a tax lien being in place, no.

Q      Okay.

A      But I did have to pay taxes when I was taking over the property, and I did pay a significant amount of taxes.  I noticed in this pile of documents here that there's some Nuckel Reit, R-E-I-T, which is not me, that's my brother, and I don't know what he was doing.

Q      Okay.  So when you purchased the property, New Wallington Home purchased the property, they had to take on some tax liabilities?

A      I don't know if you'd say we had to take on tax liabilities, I don't think that was part of the agreement, but at some point I do remember I had to pay a significant amount of taxes when I took over the property.

Q      If you can turn to the document bates stamped D-54.

A      Yeah, I think I have it.

Q      Okay.  That is the tax lien redemption spreadsheet, it looks like it's dated July 26, 2018.  Do you recall ever seeing this document?

Page 144

A      No.

Q      And then if you go over to D-56, is the certificate of sale?

A      Okay.

Q      And there you see, total amount of sale, in the middle there, is $217,637.74?

A      Well I don't know if this is related to those documents because I think these are different dates so I -- it would be -- it would take some time to do the cross-referencing.

Q      Well that's what I'm -- that's what I want to do here.  Okay?

A      Okay.

Q      So in this certificate of sale, it says the total amount of sale is $217,637.74.  If we go back to the tax lien redemption spreadsheet, okay --

A      Which one?

Q      The one you were just at, D-54.  Okay?  It says the date of sale, December 20, 2017, do you see that where it says original certificate?

A      On the tax lien redemption spreadsheet?

Q      Yes.

A      Okay.  So where do you want me to look?

Q      Well it says total amount of sale in

Page 145

that first block there or the second -- in the middle of the page.  Where it says original certificate, 17-06, date of sale, December 20, 2017.

A      I see here where you pointed to total amount of sale $217,637.74.

Q      Okay.  Do you recall owing that much in taxes?

A      On 2018?

Q      Yes.

A      I don't recall that.

Q      Okay.  And if you go over to the next block it says redemption information.  The original certificate, $217,637.74 at the top there --

A      Where are you?

Q      The next block over, where it says redemption information.

A      Okay.

Q      Do you know what that means, redemption information?

A      No, I'm not a tax attorney and no, I don't -- no, I don't know what redemption information in this context exactly means.

Q      Well there are a bunch of numbers there, it says original certificate, and there's a

37 (Pages 142 - 145)

Page 146

redemption penalty, there's an interest -- interest on certificate, search fee, recording fee, other fee, and subsequent taxes and interest on subsequent taxes, below that it says total to redeem, $449,659.87, and that is through July 26, 2018. Do you see that?

A    I see some of that, yes.

Q    Okay. Do you recall having to pay $449,659.87?

A    No, I don't recall exactly, no.

Q    Did you pay that amount?

A    I know we paid some amount to pay off taxes, I know -- I don't recall exactly this $449,000, no.

Q    I'm going to show you what we've marked as JN-7.

(Witness reviews document.)

Q    Mr. Nuckel, have you ever seen this document before?

A    It's bringing back my memory, I think I have.

Q    All right. And what is this document?

A    This seems to be a payment for taxes under protest.

Q    Okay. Is that your signature?

Page 147

A    That is not.

Q    Whose signature is that?

A    I believe that's Beth Arici.

Q    Were you aware that Beth was writing this check?

A    I probably was.

Q    Okay. Does this refresh your recollection of this check at all?

A    It does and it reflexes my recollection, when it says under protest I think we issued letters protesting how this had come about to the Town.

Q    How what had come about?

A    This amount, and this issue of paying taxes.

Q    And disagreeing with the amount?

A    I believe that we issued a letter with respect to that.

Q    Okay.
Let me show you JN-8. It's a correspondence from VAP International dated July 19, 2018.
Mr. Nuckel, I'm showing you what we have marked as JN-8, the correspondence dated July 19th of 2018, and if you go to the --

A    Can I read it?

Q    Of course.

Page 148

(Witness reviews document.)

A    Okay, I perused it.

Q    Perused it, okay. Do you recognize this document?

A    I recall this document.

Q    Okay. What do you recall about this document?

A    I recall it being -- how would I say -- drafted and eventually produced by us, as far as I remember and it certainly says in this document that it's sent with the tax payment.

Q    Did you help draft this document?

A    I believe I did, yes.

Q    Did anyone else help draft this document?

A    Probably some advice from attorneys.

Q    Okay. When you spoke earlier about sending notices or sending correspondence to the Town, is this what you were referring to?

A    I'm not sure what you're referring to.

Q    Well, I think when we were looking at that check before, and the --

A    You mean the check paying the tax?

Q    Yes.

A    So what's the question?

Page 149

Q    Sure. You had indicated that there was some correspondences with the Town with respect to that check. Is this what you were referring to?

A    Oh, I probably was referring to this. I think there may be another one.

Q    Okay. All right. Did you ever receive any type of response from Dorothy Siek?

A    I don't recall.

Q    Okay. Was this letter also sent to Chris Assenheimer?

A    I don't recall.

Q    Who hand-wrote Dorothy Siek on that?

A    Not us.

Q    Okay. Do you know if this letter was sent to anyone else at the Borough other than Dorothy Siek?

A    I -- I don't know.

Q    Okay.

A    The attorneys were corresponding with the Town as well so, something might have been sent to other people.

MR. SHEPARD: Could we just go off the record for a second?

(Discussion held off the record.)

MR. SHEPARD: We can go back on the

38 (Pages 146 - 149)

Page 150

record.

BY MR. SHEPARD:

Q    Mr. Nuckel, I'm going to show you what we are marking as JN-9. Okay? I will submit to you that this set of documents was submitted as a supplemental discovery production and it looks like it's the attorneys's fees, invoices.

A    Okay.

Q    Take a look at them, I don't think you need to --

MR. DiGIULIO: For the record I just want to make sure, I believe it's P-305 through P-429.

(Witness reviews documents.)

A    Certainly you don't want me to review all these documents.

Q    I don't.

A    Okay.

Q    I really only have a couple of questions on them.

A    Okay.

Q    Those invoices and that -- the spreadsheet on the top there of JN-9, those are invoices for attorneys fees incurred by New Wallington Home, and Morningside or --

Page 151

A    They would be for New Wallington Home and they go up to -- so it would have been New Wallington Home and Morningside.

Q    And Morningside, okay.

A    They would be for the invoices for both New Wallington Home and Morningside.

Q    And were those -- those are attorneys fees from before the start of this lawsuit, correct?

A    That for the most part is correct, I think, I don't recall.

Q    Okay.

A    I'd have to look it up.

Q    Did they encompass the prior lawsuit that we were talking about with Judge Farrington's decision?

A    When you say did they encompass I don't know what you mean in this context. Did some of them relate to that prior one, some of them did.

Q    Were they for services rendered in connection with that lawsuit?

A    Not all.

Q    But some of them.

A    Some of them are I believe, yes.

Q    Okay. Was there any claim for

Page 152

attorneys fees in that prior lawsuit?

A    I don't recall.

Q    Okay. Do you know if there was any reimbursement of attorneys fees from that prior lawsuit?

A    I don't recall.

MR. DiGIULIO: Just note my objection to the form. Thank you.

Q    Okay.

The roller rink, you talked about it earlier, in terms of the development, was that part of the site plan application?

A    Yes.

Q    Okay. And what was contemplated with the roller rink with the site plan application?

A    That it be used as a recreation center for the residents.

Q    Was that ever -- was the roller rink, was that ever considered a reason for the denial of the site plan application?

A    Can you ask me that question again?

Q    Sure. Was the roller rink ever used as a reason to deny the site plan application?

A    As I recall there were some comments made about the roller rink giving rise -- in the

Page 153

application giving rise to some of the variances, and I remember there being an argument with respect to whether that actually was the case or not, but I guess -- well, there were questions about the roller rink --

Q    Okay.

A    -- in the application.

Q    Do you recall what the questions were?

A    It was basically about -- see, when the zoning was actually written from what I recall, I vaguely recall this but the zoning required active recreation space as part of any development that would be proposed on the property, and active recreation space was, what we looked at as this roller -- well, the building was a recreation center, and it was certainly something that you would call active recreation. As a matter of fact, there was as -- as I remember, some conjecture that when the zone was written, that it actually was referring to that building requirement.

Q    Okay. After the appeal was withdrawn --

A    Are you -- what are we talking about?

Q    Okay. So, we talked earlier about

39 (Pages 150 - 153)

Page 154

Judge Farrington's decision in the prior lawsuit granting approvals, and then you indicated that at some point the Borough had appealed that, correct?

A    The Borough appealed Judge Farrington's decision, yes.

Q    And at some point that appeal was withdrawn?

A    Yes, later on in 2019, the end of -- the very end of -- well, November of 2019.

Q    After the appeal was withdrawn, did the Borough of Wallington or the planning board take any action with respect to your application, either further denying it or --

A    Oh, the Town recently, when we were trying to work out the circumstances in settlement of this lawsuit the Town has dragged its feet, but also, we were, in the middle of starting that phase I construction, really tied to, in a sense what the indications we were getting from the Town, and then the Town came in and changed its directions with respect to some of the things that were already in the site plan and made us put in new things that were very expensive, and cost us like, you know, almost $300,000.

Q    What was that that they required you

Page 155

to put in?

A    They came in and made us put in an additional water line and change the water line on the site, when that was not called for in the original plans that were approved.

Q    Why did you have to change the water line?

A    They just -- some official from the Town came in and said they wanted a different water line, and size it up, and you got to put this in.

Q    Do you recall who that official was?

A    I'll get it for you.

Q    Okay.  Was there any documentation along with that?

A    Yes, there was.

Q    Okay.  Do you have that documentation?

A    I can get it for you.

Q    Okay.  That would be great.

MR. SHEPARD:  All right, I don't have any further questions for you, Mr. Nuckel, I appreciate your time.

(Whereupon the Reporter advises if any attorney wishes to order a copy of the transcript to state so on the record at this

Page 156

time.)

MR. DiGIULIO:  I would like a copy, please; James DiGiulio.

(Witness excused.)

(Deposition concluded at 3:30 p.m.)

Page 157

ACKNOWLEDGEMENT

I, JAMES NUCKEL, certify that I have read the transcript of my testimony taken under oath on January 27, 2025, and that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

_____

JAMES NUCKEL

Signed and subscribed to before me, this      day of            , 20 .

_____

Notary Public

40 (Pages 154 - 157)

Page 158

C E R T I F I C A T E

I, GAIL R. BRENNAN, a Certified Court Reporter and Notary Public of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the remote deposition of said witness(es) who were first duly sworn by me, on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this remote deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

GAIL R. BRENNAN, C.C.R.
License No. XI01776

Page 159

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: New Wallington Home, Llc v. Borough Of Wallington, Et Al
DATE OF DEPOSITION: 1/27/2025
WITNESSES' NAME: James Nuckel

PAGE   LINE (S)      CHANGE       REASON

James Nuckel
SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20__.

_____
(NOTARY PUBLIC)        MY COMMISSION EXPIRES:

41 (Pages 158 - 159)

Veritext Legal Solutions

800-227-8440                                973-410-4040

**[& - 23]**

| & |
| --- |
| **&**  38:20 95:7 |

| 0 |
| --- |
| **07009**  3:3 |
| **07057**  7:3 |
| **07450**  3:7 |

| 1 |
| --- |

**1**  4:10 7:2,2 13:16 16:3,6 21:8 37:24 38:1 39:18,22 47:10,12,16 105:4,9 106:10 106:12 136:22 137:21

**1,000**  110:13

**1/27/2025** 159:3

**10**  62:9 66:24 67:2 68:18

**100**  37:19

**10:00**  1:20 2:6 6:2

**11,335**  61:8

**110**  96:19 99:21

**12**  112:8,11

**13**  4:11

**134**  32:15 110:13

**136**  121:16 123:7

**137**  125:9,13,14

**139**  3:6

**14**  3:3 114:6

**15**  33:5 39:24 61:11 74:4

**150**  53:4 94:19

**16**  74:8 104:12

**160**  111:5

**160,000**  108:22 109:20 110:12 110:17

**16th**  114:23

**17**  4:11 85:4

**17-06**  145:3

**18th**  114:23

**19**  4:21 34:23 34:24 114:24 147:20

**1940s**  27:25

**1975**  64:20

**1986**  12:23

**19th**  114:23 147:22

| 2 |
| --- |

**2**  4:12 40:7,9 48:3 49:3 58:16 85:5 117:19 121:14 141:9,12 142:4

**20**  12:14 32:20 34:22 51:5,17 66:17 102:18 140:5 144:20

145:3 157:20 159:22

**2005**  23:16

**2008**  108:3 118:18 122:6 122:20

**2009**  78:17

**2010**  12:10 61:8,16,21 78:17

**2011**  138:13

**2012**  138:13

**2013**  71:18 141:10,12 142:4

**2014**  17:6,15 19:2 119:17

**2015**  18:14 26:15

**2016**  25:13 44:3 56:23 57:9 85:21 122:16 123:5 124:11,22 138:23 139:2

**2017**  44:8,10 74:8,12,19 81:18 85:24 114:24 140:5,9 140:11 144:20 145:4

**2018**  4:21 44:11 73:8 109:23,24

111:4,11,12,20 122:16 123:5 124:11,23 143:24 145:9 146:6 147:20 147:23

**2019**  4:11 35:4 35:15 38:19 40:6 41:4,6,10 41:10,11,21,21 42:15,21 55:3 55:19,20 56:3 128:2 154:8,9

**2020**  42:25 62:2 70:19 134:4

**2021**  142:12

**2023**  11:1

**2024**  115:2,4

**2025**  1:19 2:5 6:2 157:8

**21**  32:20

**217,637.74** 144:6 145:14

**217,637.74.** 139:25 144:15 145:6

**22**  11:19 20:14 21:7 22:6 26:6 42:14 44:14 96:18

**23**  7:19 20:14 21:7 26:6 42:14 44:14

**25**  111:10,15
**26**  143:24 146:5
**27**  1:19 2:5 6:2 105:5,14,22 106:11 121:14 157:7
**2nd**  3:6

**3**

**3**  4:13 103:19 106:16 112:3,4 115:2,4 116:8 116:9
**30**  53:17
**300,000**  154:24
**3001**  105:6,9
**305**  4:22 150:12
**32**  61:6
**35**  62:9,24
**35.02**  18:7 137:1
**35.02.**  136:18
**35.2**  18:4
**36**  63:12
**37**  66:24 67:1,2 68:18
**3:30**  156:5

**4**

**4**  4:15 87:12 116:1,3
**40s**  29:8 31:6

**429**  4:22 150:13
**449,000**  146:13
**449,659.87** 146:5,9

**5**

**5**  4:17 39:22 105:5 116:5 135:21
**50**  18:19
**50s**  29:8,12 31:6
**51**  141:14 142:25
**521**  18:3,11
**54**  143:20 144:19
**56**  144:2

**6**

**6**  4:18 139:10
**60**  31:17
**669,714.16** 143:1
**669,714.16.** 142:5

**7**

**7**  4:5,19 146:15
**70**  60:14
**71**  18:7 74:5 114:12 136:18 137:1

**73**  33:2
**75**  60:14

**8**

**8**  4:20 112:2,11 112:17 147:19 147:22
**83**  85:8 87:7

**9**

**9**  4:22 60:15,16 150:4,23
**9606**  158:17

**a**

**a.m.**  1:20 2:6 6:2
**ability**  10:19 51:2 65:13
**above**  2:2
**absolutely**  38:5 48:9 68:5 97:9
**accept**  107:7
**accepting** 84:22
**access**  20:2,9 50:13,20,23 51:3,17,21,25 52:3,12,15 54:15,24 55:11 55:14 56:2 57:6,13 64:3,4 65:4,5,6 66:20 66:22 67:24 68:14,25 71:10

71:24,25 72:4 72:5 77:10,13 93:20 94:4,7 94:13 96:24 97:14 98:5,22 99:4,7,11,15 101:22 102:8 102:24
**accident**  63:14
**accommodate** 99:4
**accounting** 106:6 126:16 126:21,24 127:4
**accurate**  9:6 22:10 87:16 142:20 158:6
**achievement** 108:13
**acknowledge** 6:5,9 56:12
**acknowledged** 47:24
**acquired** 137:10
**acres**  94:19
**act**  58:19,20,21 58:24 72:15 73:5,12 83:21
**acted**  42:9
**acting**  39:14
**action**  38:24 126:12 154:12

158:11,14
**actions** 49:19 106:24 121:25 123:2 125:11
**active** 129:18 153:12,14,18
**actively** 121:22
**activities** 77:19 118:16 130:17
**activity** 100:24
**actually** 13:24 39:20 42:19 47:1 77:5 83:3 83:3 84:8,13 89:18 117:5 153:3,11,20
**addition** 100:23
**additional** 53:5 106:22 155:3
**address** 7:1 105:7,10 106:12 136:21 136:22,23 138:16
**addressed** 101:14
**addressing** 101:21
**adjacent** 27:18 62:14,15,17 64:4
**adjudicated** 41:1 121:5

124:16
**adjust** 17:22
**administered** 6:10 105:23
**administrating** 101:21
**administration** 58:22
**administrative** 128:15
**administrativ...** 43:22
**advantage** 99:6
**advice** 148:16
**advises** 155:23
**affect** 10:19 36:3 64:14 65:20 67:7
**affordable** 32:17 33:3 63:19 64:19 65:2,6,14,19 66:8,13,15,21 90:25 101:13 121:25
**agents** 114:21
**ago** 12:5,14 49:9 54:3 56:9 58:2 59:25 88:13 89:19 92:14 93:13 130:11
**agree** 6:22,25 62:16 136:25

**agreement** 6:17 6:18 143:16
**ahead** 43:13 52:8 63:4 74:16 90:11 109:8 131:1,9
**air** 110:18
**airplane** 27:24 28:4
**al** 159:2
**alarm** 93:25,25
**allegation** 114:9 115:9
**allegations** 47:11,19 58:18 72:7,8,9,14,16 73:7,11
**allege** 73:5
**alleged** 73:11 114:12
**allow** 38:12 102:24
**allowed** 75:20
**allowing** 67:5 67:24 68:12,14 68:25 69:3 71:8,10,23,25 77:12 94:6 123:14
**allows** 76:22
**amazing** 99:13
**amazingly** 68:1
**amended** 4:12 40:15 114:12

114:18 117:21 118:2 121:15
**amount** 26:11 57:23,24 58:6 60:12 78:10 82:23 100:24 107:20 112:13 125:1 126:11 139:25 143:1,7 143:17 144:5 144:15,25 145:5 146:11 146:12 147:14 147:15
**analyzed** 109:14
**animus** 67:6 68:12 69:3 70:17 71:9 74:9,13,19 79:13,14,16 80:6,11,12 114:11 115:10
**answer** 5:8 7:24 8:22,25 9:13 10:1,7 21:20 27:12 65:12,17 70:7 70:9 76:20 81:5 100:5 107:18 115:19 116:18 126:8 133:20

[answered - asking]

**answered** 76:15 157:10

**answers** 4:13 4:15 8:13 157:12

**anticipate** 8:23

**anticipating** 9:3

**anybody** 53:15

**anymore** 56:18 129:11

**apartment** 15:24 16:7,8 32:11,24 51:14 78:5,12 79:11 80:13

**apartments** 33:24 66:19 110:13

**apologize** 15:2 37:6 45:10,15 47:17 72:11 104:18 112:19

**apparently** 30:10 31:19

**appeal** 40:4,5 40:24 41:3,6,8 41:12,17,18,23 42:1,16,20 119:22 120:1 153:22 154:6 154:10

**appealed** 39:25 40:23 154:3,4

**appeals** 19:14 119:4,14,24 120:5,12,16 121:1,5,9

**appearing** 1:15 1:25 7:11 8:12

**appears** 124:20 137:5 142:1

**application** 39:7,16 40:15 42:5 43:20 45:19 47:20 49:18 55:6,10 56:11 57:12 60:2 71:17,22 73:22 74:25 75:10 76:2,23 76:24 77:9 79:21 81:17 85:24 86:7,16 91:7 95:23 96:5 99:23 152:12,15,20 152:23 153:1,7 154:12

**applications** 23:6 34:14 39:10 45:25 46:3,6 50:1 63:22 64:19 65:9,10 86:15 94:23 95:9 107:25 122:3

**applied** 57:9

**apply** 117:2

**appointed** 113:6

**appointment** 113:4

**appreciate** 155:22

**appropriate** 63:1

**approval** 20:17 35:15 39:7 40:15 42:22 44:1 51:13 79:22 80:13

**approvals** 34:21,22 39:19 39:24 41:13,15 41:17 42:4 72:19 154:2

**approved** 20:25 39:16 40:16,17,19 44:8 67:18 78:6 155:5

**approving** 47:20

**approximately** 55:19

**approximating** 9:20

**approximation** 9:18 86:4

**arbitrary** 39:14 107:24

**arbitration** 10:9

**architect** 11:3 35:13

**architects** 34:10,12,13,17 34:25 35:1 37:16

**area** 28:19,24 53:2,4 57:24 58:6,8 62:21 82:20 87:11

**argument** 153:2

**arici** 127:6,12 129:14,20 130:3,5 134:15 147:3

**arm** 14:20

**arose** 27:23

**arrangement** 6:15

**aside** 71:6 133:9

**asked** 9:1 44:20 58:17 68:11 73:25 91:3 94:2 133:18 157:10

**asking** 8:21 48:15 61:21 66:14 73:1,2

Page 5

73:18,20 80:22 81:3,6 82:9 94:3 98:10 104:2 105:13 109:2,21 110:9 113:22 115:8 116:14,19 121:8 132:4 141:16

**asks** 106:17 114:8 116:10

**aspect** 25:8

**assenheimer** 133:22 134:15 134:18,21 135:4,9,12,14 149:10

**assessed** 122:15 125:23

**assessment** 65:1

**asset** 99:13

**assumption** 17:12

**assured** 55:16

**attached** 141:3

**attempting** 101:4

**attended** 55:1,3

**attention** 74:5 85:4,7 87:6 96:17

**attitude** 60:3 98:18

**attorney** 7:8 38:21 52:9 63:5 64:17 73:13,17 76:7 81:2 89:20 90:1 104:25 119:18,23 120:1,3,6 124:1 132:22 133:4,10 135:23 140:19 145:21 155:24 158:9,13

**attorney's** 8:1 100:1,3 113:25 122:10

**attorneys** 3:4,8 6:4 49:25 61:19 62:4,7 104:23 106:22 120:21 121:12 128:24 129:1 129:13 132:11 134:7,13 140:13 148:16 149:19 150:24 151:7 152:1,4

**attorneys's** 150:7

**attract** 102:3

**available** 90:8 109:16

**ave** 139:24

**avenue** 18:4,12 20:5 52:23 78:6 102:1

**average** 110:13 110:14

**aware** 52:1 54:11,25 55:25 69:7 77:25 79:11 80:16 93:7,19 99:5 101:16 115:2,8 120:25 121:11 138:9 139:8 147:4

**b**

**bachelor** 12:17

**back** 11:1 12:5 12:13,23 28:15 28:17,17 31:5 34:22 37:15,20 38:19 48:14 49:8 51:18 56:9,21 58:16 59:25 68:17 70:24 78:16 82:6 84:15 86:19 93:13 98:18 99:20 100:7,8 108:3 109:11,20 111:25 112:4 115:20 117:15 117:18 119:15

119:15,16 125:25 126:4 126:20 142:24 144:16 146:19 149:25

**background** 9:10

**backtrack** 112:23

**bad** 106:24

**bank** 4:19

**banking** 12:20 13:7,8 14:19

**bankruptcy** 19:25

**based** 17:13 73:6

**basically** 153:10

**bates** 4:22 141:14 142:25 143:19

**bathroom** 68:4

**becoming** 93:19 101:11

**bedrooms** 78:7 78:9

**beginning** 20:14 26:5 42:25 44:8,10 44:10 139:3,15

**beginsky** 131:12

**[behalf - bucks]** Page 6

**behalf** 6:21,24
**behavior** 51:16
  52:14 67:16
  125:10 126:6
  128:13 129:5
  132:14
**belief** 69:2
**believe** 21:7
  32:20 36:14
  38:19 42:3,14
  44:2 45:9
  50:14,15 52:9
  59:1,5,10
  64:12 65:24
  66:4 76:24
  77:3 80:5
  85:25 87:15
  90:3,4,21
  101:8 131:11
  131:24 132:2
  132:25 135:2
  135:11 147:3
  147:16 148:13
  150:12 151:24
**believed** 74:12
**benefit** 7:23
  50:6
**benefited** 22:25
**bergen** 27:22
  83:14 87:11,13
  88:17,23 90:6
  90:18,19
**beth** 127:6,12
  129:14,20,25

130:3,5,10,16
130:20 134:15
134:17 138:17
140:22 141:1
147:3,4
**better** 132:12
**beyond** 66:20
  115:12,14
**bit** 70:1,2 72:22
  72:23 99:4
  104:8 133:19
**black** 59:12,19
**block** 18:7
  136:18 137:1
  145:1,13,16
**board** 1:8 39:8
  55:1 60:5
  74:18,21 76:10
  76:11 81:17
  83:22 84:14,18
  84:18,22 86:6
  95:21,23 96:2
  96:5,8 114:10
  114:20,22
  115:10 132:5
  154:11
**board's** 39:10
  74:7 83:18
**boarded** 28:25
  29:14
**body** 99:11
**bogart** 81:23
  84:19,24

**bogart's** 84:22
**booklet** 10:5
**border** 50:4
  99:14
**borders** 97:2
**borough** 1:8,8
  39:23 44:16,21
  47:19 49:11,12
  49:15 58:17
  59:1 61:7
  62:10,24 63:16
  67:8 69:3,23
  70:15 76:24
  80:10 96:20,24
  97:4,20 114:10
  122:16 125:10
  125:22 127:13
  127:14,23
  128:5,7,8
  129:18,24
  131:24 132:18
  132:25 133:11
  134:10 135:1
  149:15 154:3,4
  154:11 159:2
**borough's** 67:5
  68:12 126:6
**bottom** 139:24
**bought** 24:11
  24:20
**break** 55:4 68:4
  68:6,11,23
  71:13 117:10

**brennan** 1:24
  2:3 158:3,18
**bridge** 77:13
**bridget** 81:23
**brief** 38:1
**briefly** 56:21
  70:20
**bring** 74:25
  82:1 110:17
  117:18 118:21
  140:22
**bringing** 64:5
  75:2,4 95:22
  96:13 146:19
**brother** 18:19
  51:12 56:6,7
  56:15,19,21
  57:8 78:25
  79:20,21 93:19
  122:22 125:2
  126:10 138:8
  143:9
**brother's** 53:25
  136:24 137:19
**brought** 39:7
  39:12 51:23
  64:21,21 70:19
  72:16 73:7
  79:21,21 91:9
  95:2,13 118:2
  134:2,4
**bruce** 120:10
**bucks** 111:5,10

**[build - children]**                                                    Page 7

**build**  20:21 33:24 101:4 108:21 113:13 113:16
**builders**  34:10 34:11,25 35:25
**building**  20:24 21:1 24:6,25 26:9 42:6,7,10 44:12,22 45:20 46:5 111:6,6 111:16 153:16 153:21
**buildings**  46:8 111:19
**built**  24:15 64:24 72:2 94:15
**bunch**  145:24
**bureau**  61:7,16 61:22 62:1
**bus**  52:22
**business**  7:1 14:8 15:8 25:22 26:11 43:2 105:23 136:23 137:18 137:24
**busses**  52:20
**buy**  18:16

**c**

**c**  2:1 3:1 7:1,1 86:3 92:19

127:6 157:2 158:1,1
**c.c.r.**  158:18
**calculation** 109:25 110:1
**calculator** 110:7 111:1
**call**  56:16 58:7 95:12 129:9 153:18
**called**  10:5 30:9 94:16,17 104:21 155:4
**candidates** 65:1 70:7,8 133:17
**cap**  30:18 32:3 32:4,6,7
**capacity**  19:17
**capitals**  54:22
**capricious** 39:15 107:24
**cards**  14:8
**case**  10:8 12:2 51:25 64:11,16 64:21 70:18,19 138:12 153:3 158:15 159:2
**cases**  138:20
**cause**  43:15
**caused**  35:18 43:1 47:25 49:20 106:23

**causes**  38:24
**cedar**  1:16 3:3
**census**  61:7,15 61:22 62:1
**center**  16:2 152:16 153:17
**certain**  17:12 59:2,6 66:13 74:20 83:17 92:8 93:11 101:9 107:20 117:7,8 118:14 122:24 126:22
**certainly**  22:5 38:8,12 43:16 48:18,23 63:17 64:11 66:19,22 67:15 69:11,20 70:4 76:9 80:19 81:6 86:2,10 88:1 91:5,19 92:9 93:6 100:7 103:24 104:19 113:17 127:25 130:20 148:10 150:15 153:17
**certificate** 12:18,19 13:3 13:6 128:19 141:5,7 142:9 142:10 144:3 144:14,21 145:3,14,25

146:2
**certificates** 12:25
**certified**  2:3 158:3
**certify**  157:5 158:5,9
**change**  126:7 155:3,6 159:5
**changed**  7:20 61:11 125:10 128:13 129:5 130:21 138:3 154:20
**charged**  87:10 87:16 90:21 91:22 92:5 96:4 100:18 101:19
**check**  4:19 37:21 85:22 86:13 111:25 126:1,4 135:6 135:10 142:17 147:5,8 148:22 148:23 149:3
**checkbook** 122:23
**chief**  59:25 93:13
**children**  65:5 65:12 66:21 74:10,14,22 75:1,3,4,14,18

75:21,25 76:3 76:22 77:1,3 78:10 80:7,11 82:1,23 84:1,2 88:15 91:1,9 100:24 101:15 114:11

chris  133:22 134:14,20 135:11 149:10

christine  4:10

christopher 134:18

cigarette  30:5

cinders  29:19

circulated 61:18

circumstances 40:21 83:20 154:15

civil  87:23,25 88:4,7

claim  151:25

claims  63:13 118:2

clarify  10:1

clarifying  15:6

class  30:8,9

classification 29:24

classified  29:23

clean  28:3,13

cleanup  32:2

clear  10:24 48:21 114:3 142:9

cleared  15:4 126:25

clerk  128:4,5,7 128:8

client  124:1

close  25:14 60:13

closed  24:12

coal  29:19

collection  4:18

collective  20:24

come  23:14 51:22 70:6 108:9 122:12 147:11,13

comes  127:17

coming  31:25 74:22 77:1 89:1

commencing 1:20 2:6

comment  59:22 89:5,15

comments 51:10 59:13 74:21 75:17 90:20 92:2,5 92:23,24 93:9 93:10,14 95:12 95:13 96:4 98:3,12 100:6

100:18,19 152:24

commission 159:25

commonly  87:9

communicate 127:19 135:3

communicated 127:17 129:21

communicati... 70:16 94:22 124:1 127:13 129:15 133:10 135:9 140:25

communities 59:18

companies 111:18

company  1:3,5 14:12 29:13 37:2 93:24,25 93:25

compare  87:13 90:5

compared 62:11 68:2 77:22

comparing 92:21

compile  83:12

complain  47:21

complained 95:21 118:14

complaining 47:2 63:18 73:21 74:21 118:22 119:25

complaint  4:12 39:12 46:25 47:2,5,9 49:10 51:24 54:5 58:16,18 60:9 60:10,11 70:13 73:4,8 95:3,5,7 95:8,10,14,15 99:18 114:13 114:19 117:19 117:20,21 118:3,23 121:15 123:18 128:25 134:2,3 138:2

complaints 118:5,10

complete  37:17 37:19,20,21 110:18 157:9

completed  21:9 21:10

completely  9:2 30:13 61:12 76:15 123:11 123:21 133:21

complex  15:24 30:13 32:11,24 51:14 78:5,12 79:11

**[complexes - correct]** Page 9

complexes
80:14
compliance
113:5,7
complicated
76:20 121:8
conceived 21:2
72:1
concepts
118:21
conceptualized
100:2
concern 27:3,6
74:24 75:2
76:25 91:8,11
concerned 27:8
76:3 123:12
142:13
concerns 27:10
65:8,10,11
75:8 95:22
96:12 118:21
123:22 124:16
concluded
98:17 156:5
conclusion
51:22 97:25
concrete 29:18
30:3
condition 43:15
69:13
confirm 116:2
132:25

confirming
133:11
confusion 15:3
conjecture
123:19 153:19
connection
151:21
consent 6:14
consequence
50:15
consider 65:2
75:9
considerations
64:23,23
108:16 110:16
considered
30:6 44:5,7
46:20 64:9
152:19
consistent 94:8
consisting 4:11
construction
12:18 13:3
14:12 20:16
29:12,16 30:1
34:8,18 35:12
35:14 36:6,7
37:12,13 42:8
42:22,24 43:3
43:16 45:15
49:23 53:6
108:6 111:4,17
111:21 154:18

contact 126:24
contaminants
31:10,19,22
contaminated
30:3,7
contamination
28:20 30:9
31:14
contemplated
32:10,23,25
152:14
context 43:7
56:7 80:13
88:10 90:12
97:16 99:8,9
99:17,20 101:9
113:9 123:10
145:23 151:18
contexts 117:6
contiguous
51:15 56:8
79:23 101:5
continued
101:20
continues
48:10 100:21
continuing
102:6
contractor
11:23 36:2,5
contractors
36:24
contrast 63:7

contributed
28:19
contributor
29:21 43:9
control 122:22
controlled
33:15 125:2
controlling
126:14
controversy
84:24
conversation
8:19,24 90:13
94:5 130:13,19
conversations
103:5 129:15
129:25 132:10
132:21 133:3,5
converted 16:8
copy 4:19 46:2
137:21,24
155:24 156:2
cornwell 45:9
corporation
27:16
correct 11:18
36:17 39:20
40:19 41:3,9
41:13,19 46:6
49:12 81:20
102:12 110:11
112:4 113:24
116:17 136:14
137:3,7,8

[correct - decision]

140:8 151:9,10 154:3 157:9,13

**corresponded** 129:21

**corresponden...** 4:20 94:24 125:21 147:19 147:22 148:18

**corresponden...** 69:23 135:5 149:2

**corresponding** 149:19

**cost** 47:4 49:22 108:6,19 109:2 109:19 154:23

**costs** 43:3 49:23 106:22 111:5

**council** 96:3

**counsel** 6:14 86:24 158:10 158:13

**county** 83:14 87:14 88:17 90:6,19

**couple** 56:9 80:21 81:14 113:13 150:19

**course** 8:15 42:7 48:16 67:10 68:5 85:3,6 87:23 88:6 147:25

**courses** 12:25

**court** 1:1 2:4 8:3,8,11 9:5 20:18,25 34:22 39:12,19 40:18 40:21 49:11 51:25 56:11,12 56:23,24 57:9 57:14 121:3,6 123:20,20 158:3

**court's** 66:17

**cover** 119:14

**covid** 35:21 43:1,5,9,19

**crazy** 50:15 94:7 99:8

**create** 20:9 30:8 46:23 51:3,25 52:5 52:11,14 53:8 53:15 54:15 55:14 65:22 66:1,3 72:4 75:15 77:14 90:24 102:5

**created** 21:5 50:14 52:3 88:25 103:2,3

**creates** 91:11

**creating** 64:3 91:2 109:19

**creation** 20:11 20:13 63:19

65:14,18 66:19 110:15

**cross** 144:10

**crosses** 53:11

**csr** 1:24

**current** 96:23 140:23

**currently** 19:11 120:6

**curtains** 96:12

**curtis** 27:15,16 27:23 28:3,12 28:13,14,16,17 31:10,14,25

**cut** 8:24

**d**

**d** 22:13 54:21 143:20 144:2 144:19 157:2

**dairy** 56:17

**damage** 47:4

**damaged** 49:21

**damages** 73:16 74:1,2 106:21 107:13 112:5 112:13,21 116:11

**data** 61:25 83:12

**date** 17:12 57:20 120:25 121:9,10,10 136:18 141:24

142:4,12 144:20 145:3 158:8 159:3

**dated** 4:10,21 142:12 143:23 147:20,22

**dates** 120:15,17 144:9

**day** 8:19,24 98:21 157:19 159:22

**days** 39:24

**de** 96:11

**dealing** 46:11 64:7,18

**deals** 58:21 75:11

**dealt** 43:21

**debris** 29:17

**decade** 49:17

**decades** 50:12 100:9

**december** 114:24 140:5 141:9,12 142:4 144:20 145:3

**decision** 4:10 40:1,23 68:13 69:4 75:24,24 77:6 78:15,16 79:10 80:15 100:15 151:16 154:1,5

**decisions** 63:15 63:16 67:7 69:15,18 75:9 75:10 77:8,9,9 77:25 79:12,18 80:10,17 100:19 101:6,9 101:17

**declare** 6:11

**defendant** 3:8 128:9

**defendants** 1:9 6:22 97:1 114:22 121:23

**defer** 107:15 108:14 112:5 120:3 121:12 134:7

**define** 107:19

**definite** 66:2

**definitely** 45:11 54:12 71:2 76:12 81:14 89:2,3 91:20

**definition** 30:2 31:13

**degree** 12:17 12:21

**delay** 43:10 47:19,22,25 67:18 68:14,24 71:8,10,15,16 101:20

**delayed** 39:15 43:17 47:3 51:25 63:22 109:4 120:18

**delaying** 63:18

**delays** 35:18,20 49:24 106:24

**delinquency** 4:17 131:25 135:18

**delinquent** 126:17 127:14 135:22 136:13 136:17 137:13 138:5

**demand** 4:12

**demeanor** 126:22

**demographic** 62:22

**demographics** 90:17,18 92:10 97:1

**denial** 39:11 73:21,21 95:23 152:19

**denials** 50:1 107:24

**denied** 39:9,16 122:3

**density** 64:4 90:7 91:9 92:25

**deny** 65:9 76:1 76:23 152:23

**denying** 77:9 77:10 97:13 123:15 154:13

**dep** 21:11,13 21:17,18,22,23 22:2,4,5,9 26:25 27:4,6,8 27:10,14,22 28:13,21 29:3 29:6,13,19,24 30:6,11,19,23 31:1,9 32:1 46:11

**dep's** 28:12 30:2

**department** 126:16,21,24 127:5

**depends** 31:13 108:21 109:1

**deposed** 6:25 7:18 11:1,13 11:17

**deposing** 46:19

**deposition** 1:13 5:1 6:5,7,8 7:12,13 10:5 11:7,11 17:18 19:16 114:15 117:16 118:1 130:4 156:5 157:11 158:6

158:12 159:3

**depositions** 7:21

**describe** 57:2

**described** 42:17 47:1

**describing** 128:14

**description** 4:9

**designated** 32:16

**desire** 97:1 102:7,8

**despite** 101:23

**detail** 95:17 106:25 114:8

**details** 130:19

**determination** 97:5,21 98:13 99:22 100:8

**determined** 29:20 96:20

**develop** 43:6,7 51:5 52:5 123:14,16

**developed** 20:6 50:3,18,19 57:12 64:8 79:25 80:2 98:20 99:14

**developing** 32:8 43:23,25 44:9 56:1 65:24

**[development - document]**

**development**
20:25 21:4
25:17 26:18
32:9,22 33:8
43:5,10 46:23
49:22,23 54:14
54:24 57:5,19
64:9,12 72:3
79:20 82:20,20
82:24 91:10
94:11,14 96:21
97:5,21 98:7
98:14 100:22
101:1,13 103:6
103:7 108:20
108:24 111:18
152:11 153:13
**developments**
63:20 77:20
83:13 84:3
94:18
**device** 77:17
**devli** 22:13,15
53:24 54:1,11
**difference** 17:9
17:10
**different** 9:3
22:2,8 23:5
30:8,9,12
49:19 62:22
63:7 70:22
87:14 88:16,22
88:25 89:3
90:18 92:11

94:17,18 106:4
116:11,19,20
116:20 144:8
155:9
**difficult** 9:6
17:17 112:22
**difficulty** 25:16
43:4
**digiulio** 3:2
6:23,23 41:14
43:12 52:7
63:3 74:15
90:10 115:12
117:13 123:24
124:4 130:25
131:8 141:15
142:7 150:11
152:7 156:2,3
**direct** 74:5
96:17
**directing** 68:16
**direction** 5:8
**directions**
154:20
**directly** 50:11
51:20 65:11
101:25
**dirt** 28:8
**disagreeing**
147:15
**discovery** 81:3
106:25 135:23
150:6

**discriminated**
59:2
**discriminating**
59:6,10
**discrimination**
72:15,16 73:6
80:7 95:12
116:23 117:1
**discriminatory**
67:7 74:9,13
74:19 76:5,6,7
77:1,2 78:2
79:13,14 80:6
80:10 101:19
114:11 115:10
**discuss** 54:23
130:6 134:14
**discussed** 83:22
83:25 86:18
129:21
**discussing**
84:12 90:22,23
**discussion**
17:23 21:3
57:4 83:18
86:8,10,12
129:13 149:24
**discussions**
54:14 56:1
62:7 86:5
128:23 129:1
**disparate** 73:6
**disparity** 69:14
69:14 76:13

**disproportion...**
62:10,25 68:2
69:1
**dispute** 27:15
27:22 28:12,16
138:11
**disputes** 56:15
56:20
**disputing**
125:23
**district** 1:1,1
**diversity** 64:24
65:15,16,20,22
65:22 66:1,3,4
75:15 76:13
88:24 90:9
91:3,13 96:13
**dividing** 87:21
**dixon** 87:12,20
88:4
**dna** 64:24
**document** 38:4
38:6,7,14 48:4
48:11,14,19,24
49:2 60:18,25
62:13 64:1
67:12 68:20
96:18 97:11
103:20 104:17
113:9,13,21
117:19 125:22
139:21 141:3
142:2,25
143:19,25

**[document - engage]** Page 13

146:16,18,22 148:1,4,5,7,10 148:12,15

**documentation** 155:13,17

**documents** 4:18,22 5:4 48:17 61:17 69:12,15,17 70:21 71:7 115:21 132:24 133:6,9,11 135:24 136:5 139:11 141:7 143:8 144:8 150:5,14,16

**doing** 7:9 22:6 39:11 84:12,19 94:8,18 103:10 129:11 130:23 131:5,13 143:10

**doka** 54:21,23 55:2,5

**dollars** 107:23 108:7,10

**donald** 18:20 101:1,1,2,4 102:25

**donald's** 101:2 101:7 102:14 102:17,21,22 103:4

**dorothy** 129:15 129:22 130:1,6 130:10,14 131:4 134:16 140:21 141:1 149:7,12,16

**draft** 148:12,14

**drafted** 148:9

**dragged** 154:16

**draw** 85:4,7 87:6

**drawings** 34:18 35:12,14 37:17 42:8,22

**driving** 75:12 82:8,10 98:8

**due** 142:4

**duly** 7:3 158:7

**dumping** 28:5

**dust** 30:4

**duties** 14:9

**e**

**e** 3:1,1,1,1 7:1,1 22:13 45:13,14 90:2 92:19 127:16 133:23 133:23,23 143:9 157:2,2 157:2 158:1,1

**eager** 103:2

**earlier** 22:20 30:21 36:14 43:23 66:6

72:18 75:23 76:14 85:21 93:8 95:6 99:1 102:22 105:10 114:7,14 122:19 126:10 148:17 152:11 153:25

**earnings** 106:18 116:10

**ease** 55:12

**easement** 20:4 20:6 22:21,25 50:8,10 51:6 51:19 52:5,24 53:1,3,7,11,14 53:16,16,18,23 54:11,15,24 56:2,13,24 57:2,10,12,17 57:20,25 64:8 99:3,15 100:9 101:24 102:11 102:16,18 103:1,7

**easements** 23:4

**east** 62:15

**easy** 98:23

**economic** 47:4 47:4

**education** 12:16,24

**effect** 8:2 76:12

**effectuate** 51:21

**effectuated** 103:2

**effort** 52:2 99:5

**eighth** 77:13

**either** 30:1 33:6 33:10 62:1 95:12 96:4 101:19 103:6 125:21 135:4 139:4 154:13

**elevation** 27:17

**email** 135:4

**employed** 13:9 158:10,14

**employee** 158:13

**employees** 13:20 16:9,12 16:22 17:1,2 23:24 114:21

**employment** 13:11

**encompass** 151:14,17

**ended** 28:22 101:11 131:11

**ends** 102:16,18

**energetic** 52:2

**enforceable** 57:11

**engage** 49:25

**[engaged - extra]** Page 14

engaged  35:11 35:13 100:23 130:18 132:17
engineer  21:2
engines  27:24 28:4
english  38:20 95:8
ensure  113:5,7
entertainment  25:22 26:10
entire  20:24 28:14 29:14 31:15,20 42:25 67:16
entirety  40:16 40:17
entities  33:14 49:12 54:21 106:14
entitled  2:2
entity  13:20 27:15 33:14,15 116:20
environment  88:16 93:3
environmental  27:1
equal  116:12
equipment  27:24
equity  15:2,4
errata  159:1

es  158:7
especially  51:19
esq  3:2,6
establish  121:25
estate  14:13 103:4,13
estimate  9:18 17:8,11,15 18:5,9,14 19:2 19:22 23:15 26:15 44:14 55:22,23 56:23 109:9 110:9 111:14,15 116:15
estimates  109:11 111:17 111:22
estimating  9:19 17:24
estimation  23:16
et  159:2
event  28:12 56:20 122:11
eventual  95:23
eventually  41:4 56:22 148:9
evidence  100:10 133:17
ex  51:11 93:9

exact  53:7 89:23
exactly  11:20 21:20 27:2 37:18 56:10 57:16 69:10 77:20 82:6 84:16 85:20 93:18 95:16 98:8 99:25 100:2 104:18 118:19 123:20 130:11 134:12 145:23 146:10 146:13
examination  4:1,4 7:6 29:2 88:2
examples  69:5 69:6 93:5
excellent  10:22 104:20
excuse  18:14 26:10 29:10
excused  156:4
exhibit  47:13 47:16
exhibits  4:7,23 34:14
exist  56:25
existed  24:6 50:11 56:14 100:9

existence  17:5 23:14
existing  83:13 84:2
expanded  55:14
expect  51:19
expected  82:23
expeditiously  44:5,6
expenses  106:22
expensive  154:23
experience  51:23 91:15
expert  63:6 77:19 81:19 107:1,16 108:14 109:18 112:6 121:2
experts  62:4
expires  159:25
explained  114:4
explaining  41:20 132:13
explicitly  91:12
expressly  91:21
extends  102:11
extensive  29:3
extent  66:22
extra  110:16

**[eyes - florida]** Page 15

**eyes** 115:18 133:14

**f**

**f** 158:1
**face** 88:19
**facilitate** 98:22 102:8
**facility** 24:7,8 24:16 25:4 82:17
**fact** 27:23 35:19 39:13 40:22 56:25 65:3 67:23 83:2,16 88:14 100:8 101:23 138:7 153:18
**facto** 96:11
**facts** 114:9 115:3,9
**fair** 11:21 14:21 58:19,19 58:24 69:22 72:15 73:5,11 75:7 81:15 101:12 108:18 120:4 124:12
**fairfield** 13:17 105:6,20 106:2
**faith** 106:24
**fall** 44:2,3
**familiar** 38:14 79:19 107:11

108:23 136:4
**families** 65:5 66:21 74:9,14 75:13,17 77:2 79:16 80:7,11 81:25 88:14 91:1 96:9,14 100:25 101:15
**family** 25:3,22 26:10 79:4,5,5 79:6,7,22 83:13 84:3 108:5 114:11 122:9
**famously** 87:24
**far** 15:7 28:7 31:20 34:13 54:17 72:25 137:17 140:24 148:9
**farmland** 56:17 56:18,19 58:7 58:10 93:21
**farrington** 4:10 47:10
**farrington's** 100:15 151:15 154:1,4
**favor** 103:9
**federal** 49:11 52:10 58:21,21
**fee** 146:2,2,3
**feel** 9:18 48:22 129:3

**fees** 106:23 107:23 150:7 150:24 151:8 152:1,4
**feet** 31:17 53:4 53:17 102:18 108:22 109:20 110:12,14,17 154:16
**felt** 39:10
**ferry** 136:24 137:19 138:1
**field** 51:2
**fighting** 71:21 93:20 107:23
**figure** 72:25 110:24 111:2
**figuring** 110:12 111:4
**file** 46:15 95:8 119:22
**filed** 19:24 39:2 39:5 47:9 54:6 73:8 87:3 119:23
**filing** 46:22 70:13 120:5
**fill** 29:17,23,24 30:10 45:19
**filled** 29:7,12 29:16 30:1 46:1
**final** 4:10 40:11 72:18

**finalized** 14:5
**finance** 12:18 12:22 33:12
**financial** 47:6
**financially** 47:7 158:14
**find** 81:4
**finding** 31:9
**fine** 9:14 27:13 81:11 82:15 108:15 121:11 121:18
**finish** 8:21 72:10
**firm** 7:8 15:4 44:20 45:3
**first** 21:2 38:18 45:17 50:16 104:11 113:5 114:18 136:4 139:17 145:1 158:7
**fiscal** 65:8,10 65:10
**fiscally** 49:21
**five** 33:18,21 68:7
**flat** 53:1,19 58:6 99:2
**flip** 116:1
**floor** 3:6
**florida** 11:4 12:7,9

**[flow - god]**

**flow** 27:20 77:14

**focus** 124:7

**following** 131:6

**follows** 7:4

**fooled** 10:25

**foot** 111:5

**force** 8:2

**forced** 78:7

**foregoing** 106:20 158:5

**forget** 45:15

**form** 43:12 52:7 63:3 74:15 90:10 114:15 130:25 152:8

**formal** 45:22

**formalize** 42:20

**formalized** 23:5

**former** 59:24 59:25 93:9,13 93:21,24 98:3 98:4,16 102:2

**forth** 72:19 112:12 114:8 158:8

**forward** 21:13 25:17 43:6 48:16

**fought** 77:12 77:15 87:25

88:7

**found** 29:13,15 31:14 39:13 56:24 57:17 63:21

**four** 16:13 85:15

**free** 9:18

**friend** 110:2,4

**front** 20:5,9 22:3,9,12,17,21 34:14 39:18 40:10 47:13 49:3 85:5

**frontline** 13:25 14:2

**frustrate** 49:17 100:21

**frustrated** 108:13

**frustrating** 63:19

**full** 29:2 55:9 113:17

**fully** 9:1

**further** 6:9 12:24 102:20 107:18 112:10 112:18 113:4 154:13 155:21 158:9,12

**g**

**g** 86:3 157:2

**gail** 1:24 2:3 158:3,18

**gallons** 28:6

**garfield** 27:19 62:14

**general** 9:9 36:2,5 51:16 62:20 67:23 105:4 106:18 118:16 136:3

**generally** 59:13 105:1

**generate** 18:23 24:2,4

**generated** 24:5 25:24

**gerald** 3:6 6:20 7:8

**gerry** 123:24

**getting** 10:23 21:12 25:16 43:7 46:15 51:13 58:16 76:21 83:19 86:12 138:5 154:19

**give** 8:13 9:17 91:25 111:13

**given** 11:7,11 19:16 33:14 157:12

**gives** 50:23

**giving** 39:19 152:25 153:1

**gladly** 9:25

**go** 7:22 12:2 20:20 25:9,12 28:7,10 29:4 30:14,19 37:20 39:20 42:18,19 43:6,12 44:22 44:24 45:20,22 48:9 52:8,22 53:6 60:2,21 63:3 68:16 70:24 74:16 82:6 86:19 88:1 90:10 99:20 104:2,12 105:4 106:19 108:19 109:8 111:25 112:9 112:15 113:12 115:20 116:5 119:15,16 120:21 121:15 124:5 125:25 126:3 130:25 131:8 141:8,17 144:2,16 145:12 147:23 149:22,25 151:2

**god** 92:15 119:15

**[goes - hey]**

**goes** 10:9 30:20 31:21 41:17 50:9,10 112:4
**going** 8:23 9:9 17:17,22 19:22 20:21 23:15 25:17 31:5 37:15,23 38:2 38:8,10 46:22 48:2,16,17 50:2 52:11 53:6 71:12 72:12 74:25 81:4 85:1,4,7,8 87:6 88:22 94:4 96:17,18 99:21,25 100:2 103:18 106:16 108:14 109:18 110:8,13,23 115:16,25 116:7 123:11 123:24 126:17 129:7 135:20 137:4 141:22 142:8,14,15,24 146:14 150:3
**good** 6:20 7:7 7:10,10 18:8,9 23:15 26:11 55:23 56:14 57:2 58:6 70:3 72:12,19 82:16 82:21 99:10,10 109:22 117:4 129:2
**gotten** 83:17 109:9
**grabbing** 14:7
**granting** 154:2
**great** 82:19 155:19
**greater** 65:22 75:15 88:24 91:2
**green** 90:8
**grid** 28:25 29:14
**ground** 7:21,22 27:20 28:6,8 31:18,23 53:1 53:19 99:1,2
**groundwater** 28:9,10,20 29:22 31:16,16
**group** 18:17,18 56:18 79:14 136:14,21,22 137:6,10,11,19 137:21,25 139:4,6
**grove** 1:16 3:3
**gshepard** 3:7
**guess** 9:12,15 13:13 17:6,8 17:13 18:8 37:23 69:1 81:3 82:7

94:17 109:7 110:18 128:16 153:4
**guessing** 17:14 17:23 78:18
**guy's** 92:15
**guys** 89:21

**h**

**h** 90:2 92:19 133:23
**half** 104:10
**hand** 149:12
**handle** 120:1
**handled** 38:21
**handling** 119:18,20
**happened** 40:4 42:24 43:15 55:17 57:16 94:10 131:15 131:17 142:16
**happens** 50:8
**happy** 53:13 55:7 81:16 102:24 113:12 115:20
**harass** 49:17 132:8
**hard** 21:18 111:5
**hardship** 53:15
**harm** 47:4

**harris** 108:3
**hazy** 72:23
**head** 8:17 11:20 17:7 35:22 45:17 69:20 70:10 78:14 81:10,13 83:9 92:15 109:1 111:7 120:13 123:12 126:8
**hear** 9:24 32:13 101:3
**heard** 51:10,11 59:14,17,21,24 60:1 67:20 93:8 94:9 98:2 98:3
**hearing** 51:18 74:8 89:21
**hearings** 92:6 93:4,7 96:5 114:22
**held** 2:5 74:8 114:22 149:24
**help** 20:9 33:12 65:25 66:4,20 70:7 148:12,14
**helping** 70:9
**hereinbefore** 158:8
**herlinsky** 90:2
**hey** 28:18 126:17

**[hiccups - inclusionary]**

| | | | |
|---|---|---|---|
| **hiccups** 126:21 | 27:9,18 29:5 | 151:1,3,6 | **identify** 60:12 |
| **high** 63:11 | 29:11,21 30:17 | 159:2 | **illegal** 130:24 |
| 77:22 | 30:25 31:11,17 | **home's** 40:14 | 131:5 |
| **higher** 27:17 | 32:2,8,10 33:6 | 125:11 | **imagine** 103:13 |
| 118:20 123:13 | 33:11,17,25 | **homes** 113:6 | 109:12 |
| **highest** 12:15 | 34:1 35:7,10 | **homogenous** | **immediately** |
| **hindrance** | 35:12,14 36:4 | 63:10 | 51:21 55:9,12 |
| 96:24 | 36:8,10,12,16 | **horse** 105:6,14 | 126:18 |
| **hire** 37:8 | 36:23,25 37:5 | 105:22 106:11 | **impact** 73:6 |
| **hispanic** 59:12 | 39:6 40:8 46:8 | **hour** 104:10 | 75:3,8,21,25 |
| 59:18 | 46:9 47:6,7 | **housing** 32:17 | 76:3,22,25 |
| **historic** 29:23 | 49:18,21 63:21 | 33:3 49:18 | 81:25 |
| 29:24 30:10 | 64:13 65:20,25 | 58:19,19,22,23 | **important** 8:15 |
| 31:5 | 66:11 67:17 | 58:24 63:19 | 10:6 |
| **historically** | 71:18 78:2 | 64:19 65:2,6 | **importantly** |
| 87:12 | 105:21 108:20 | 65:14,18,19 | 9:4 |
| **history** 22:2,9 | 108:22 110:10 | 66:8,14,16,20 | **impression** |
| 26:25 27:2,7 | 111:22 116:9 | 66:23 67:6 | 14:18 |
| 30:23 88:1,2 | 116:13,15 | 72:15 73:5,12 | **improper** 95:22 |
| **hit** 43:1 | 117:3 118:5,9 | 75:7 89:1 | **improvements** |
| **hmm** 97:17 | 118:16 119:3 | 90:25 101:12 | 20:8,19 50:21 |
| **hoboken** 50:5 | 119:14,19 | 122:1,9 | **inaccurate** |
| 50:24 | 120:7 121:22 | **huh** 8:18 | 142:20 |
| **hockey** 24:8 | 122:14,15 | **hundred** 134:9 | **inactions** 123:2 |
| 25:2,7 | 123:8 124:12 | **hundreds** | **inception** 19:1 |
| **hold** 15:7 63:23 | 124:19,20,23 | 28:11 107:22 | **incident** 71:4 |
| 100:20 | 125:18 127:8 | **hurt** 47:6,7 | **includes** 30:3 |
| **home** 1:3 4:13 | 129:22 132:1 | **i** | **including** 58:3 |
| 11:25 16:1,15 | 132:20 133:2 | **idea** 17:14 | 94:9 106:22 |
| 16:23 17:1,4 | 133:13 134:5 | 33:23 72:5 | 107:1 |
| 18:1,3,11,15,22 | 135:8 137:2,9 | 126:9 137:23 | **inclusionary** |
| 19:8,11,18,24 | 138:16 139:5,7 | **identified** | 96:20 97:5,21 |
| 20:3,10,11,13 | 139:24 140:7 | 60:11 | 98:14 |
| 22:1,1,8 23:1 | 143:12 150:25 | | |

**income** 18:23 24:2,4,5 25:24 106:17,21 107:13 108:8 116:10
**increase** 65:15 65:15
**incurred** 106:23 107:22 150:24
**index** 4:1,7 5:1
**indicate** 6:17
**indicated** 36:15 44:12 149:1 154:2
**indicating** 129:22
**indications** 154:19
**individuals** 59:3,6,9
**industry** 111:4
**influence** 67:6 68:13 69:4
**influx** 96:21,25 97:6,22 98:15
**informal** 7:25
**information** 5:4 29:7 61:23 83:17 145:13 145:17,20,23
**initial** 74:8
**initially** 55:7

**innocuous** 30:13
**ins** 132:12
**insight** 91:25
**inspector** 44:22
**installed** 77:17
**instance** 30:18 31:17 63:17 76:12 88:19 91:3 96:19 106:5,8 140:21
**instances** 80:4 80:9 93:15 95:1,4,11 100:18 116:23 116:25 117:1 118:8
**instructions** 10:13
**intent** 66:2 77:4 96:1
**intention** 124:2
**intentionally** 59:5 124:14 131:25 132:19 133:1,12
**intents** 65:16
**interaction** 45:22
**interest** 48:13 146:1,1,3
**interested** 158:15

**internal** 103:12
**international** 4:20 13:14 14:18 147:20
**interpretation** 14:22 120:2
**interrogatories** 4:14,15 104:22 105:1 115:2
**interviewed** 34:11,12
**introduced** 55:4,7
**invert** 96:25
**investigate** 29:4
**investigated** 28:18,24 70:4 134:13 140:13
**investigating** 81:2,4
**investigation** 31:1 70:2,14 83:19 131:12 131:16,18
**investigations** 28:23
**investment** 12:19 13:7,8 14:19,20 33:13
**investors** 33:8 33:12
**invoices** 150:7 150:22,24

151:5
**involved** 7:12 14:14 19:12 21:19 33:8 56:7,8,11 57:9 93:22 121:22
**issue** 39:23 79:15 84:17 93:20 109:18 134:13 147:14
**issued** 84:13 136:13 147:10 147:16
**issues** 46:17,19 46:24 58:22 65:4 81:14 83:1,21,24 87:25 91:5,10 103:12 115:21 117:12 118:14 119:24 123:22 129:17 130:14 135:16 140:12

**j**

**j** 7:1
**james** 1:14 3:2 4:3 6:23 105:5 156:3 157:5,16 159:3,21
**january** 1:19 2:5 4:11 6:2 157:7

**[jasontown - know]**

**jasontown** 15:24 16:4

**jdigiulio** 3:4

**jean** 92:17 94:22

**jersey** 1:1,3,4 1:16,25 2:5 3:3 3:7 6:1 7:2 11:8,14,17 29:25 50:18 58:24 105:6 136:24 158:4

**jill** 79:2

**jim** 45:9

**jn** 4:10,12,13 4:15,17,18,19 4:20,22 13:13 13:15,18,19,21 14:10,20 15:9 15:11,12,14 37:6,7,7,24 38:1 39:18 45:2,4,7 47:10 47:12,16 48:3 49:3 58:16 78:19 85:5 103:19 105:16 105:19,25 106:12 112:3,4 116:1,3 117:19 121:14 127:8,9 135:8,21 139:10 146:15 147:19,22

150:4,23

**job** 9:5 35:19

**judge** 4:10 8:3 8:8 39:13 47:10,24 100:15 108:3 151:15 154:1,4

**judges** 63:21 65:2

**judging** 65:10

**judgment** 4:10 40:11 72:18 95:22

**july** 4:21 114:23 143:24 146:5 147:20 147:22

**jury** 4:12 8:3,8 11:4

**k**

**k** 7:1 35:2 54:21 85:10 86:3 90:2 92:19 120:10 127:16 157:2

**kept** 138:21

**kids** 75:18 89:1 96:9 103:8

**kim** 45:17

**kind** 8:24 13:20 30:22,23 35:20 64:10 69:12,13 69:15 88:4

95:25 96:12 108:25 115:18 116:21 125:21 133:7 142:21

**kinds** 42:23 43:1

**knew** 66:14 82:9 86:3 121:8 123:8

**know** 8:22 9:12 9:14,19,23 14:22 15:1,7 17:9,21 39:1 40:25 42:24 48:6,22,23 50:12 52:22 54:10,17,20,21 55:21,25 56:10 56:10 57:1,14 57:16 58:9,11 58:19 60:6 61:10,25 64:2 66:5,6,7,12 69:7 72:2 73:1 73:1,18 76:15 77:4,20 78:7 78:13 80:3,19 80:20,20,25,25 81:7,8,9,13 83:8,21 84:8 86:1,2 87:12 88:6,7 89:9,14 89:16 91:25 93:7,22 94:6

94:16 96:14 97:7 98:7 100:2,8,21,23 102:1 103:4,8 103:9,16 104:24,25 105:8,13 107:14,22 108:2,5,5,19 110:18 113:3 113:15,18,25 117:10 122:9 122:21 123:1 123:12 126:25 127:12,18,22 128:3,7,21 129:4,14,20,25 130:1,11,23 131:4,10,10,15 131:17,20 132:9 133:19 133:22,24 134:25 135:7 135:17,19 136:7 137:15 137:20,22,22 140:16,18,19 140:20 141:21 142:16,19,20 143:10,14 144:7 145:19 145:22 146:12 146:13 149:14 149:17 151:17

152:3 154:23
**knowing** 63:15
**knowledge**
 17:13 41:25
 42:2 73:13
 111:3 133:15
 134:9
**known** 22:5
**knows** 42:25
 132:11

**l**

**l** 7:1 22:13 90:2
 92:19 157:2
**lack** 69:14
 102:6
**laid** 91:5
 128:24
**land** 94:19 95:9
 102:24
**late** 40:6
 126:14 138:18
 138:18
**latin** 59:12,18
**laurel** 58:25
 64:15,16,21,22
 65:11,17 71:22
 75:6,11,24,24
 76:22 90:24
 91:2
**law** 7:8 58:25
 66:3 132:12
 133:15

**laws** 76:8
**lawsuit** 9:11
 11:5 19:13
 38:21,24 39:2
 39:5 47:18
 72:17 73:12,15
 87:2 100:12,13
 100:17 101:18
 128:10 151:8
 151:14,21
 152:1,5 154:1
 154:16
**lawyer** 135:14
**layout** 53:7
**leach** 31:13
**leached** 31:11
**leaching** 31:20
**leading** 67:7
 99:1
**leads** 50:8
**lease** 25:15
**leases** 15:18
**leasing** 25:19
**led** 76:11 77:21
 84:10
**legal** 52:4 57:1
 107:23 120:2
**legalese** 120:18
 121:2
**letter** 147:16
 149:9,14
**letters** 135:4
 147:11

**level** 12:15
 31:16,20
**leveled** 30:1
**liabilities**
 143:13,15
**liability** 1:3,4
**liberty** 136:23
**license** 2:4
 158:19
**lien** 141:4,8
 142:3,6 143:1
 143:2,22
 144:16,22
**lienholder**
 142:5
**liens** 138:23
**lieu** 6:10
**light** 77:12
**limbo** 40:3,24
**limit** 100:24
**limited** 1:3,4
 114:19
**limiting** 78:10
**line** 5:5,5,5,9,9
 5:9,13,13,13,17
 5:17,17 24:8
 25:2,7 50:4
 87:12,20,21
 88:5 155:3,3,7
 155:10 159:5
**lines** 52:22
**literally** 64:10
**litigation** 19:12
 121:23,23

122:2,5,19
 129:18,24
**little** 31:1 70:1
 70:2 72:22,23
 99:4 102:19
 104:8 133:19
 136:23 137:19
 137:25 142:13
**live** 12:4,7,11
**lived** 12:5,8,13
 83:3
**living** 69:2
**llc** 1:3,4 3:2
 16:16,20 17:4
 19:11,18,24
 22:8 23:9,14
 23:18,21 118:6
 136:14 159:1,2
**llc's** 4:13
**located** 13:15
 16:4 18:11
 52:25
**lodi** 62:16
**long** 12:8 17:4
 18:10 20:4
 21:19 23:3
 24:19 27:4,14
 28:16 33:23
 43:17 50:17
 52:1 64:11
 65:7 68:13
 77:17 85:12,14
 88:13 109:5
 110:2 119:16

**[look - mayor]** Page 22

**look** 38:2 39:22 40:7 49:8 51:1 64:17 65:2,9 71:3 82:7 83:20 84:16 88:18,20 91:24 92:8,25 93:1,2 102:9 115:21 135:25 136:16 139:12 141:20 144:24 150:9 151:13
**looked** 61:17 61:21 62:4 70:20 153:15
**looking** 51:17 60:15,18 68:15 76:14 90:13 108:7 110:20 112:14 148:21
**looks** 104:9,9 114:15 136:10 136:12 140:4 143:23 150:6
**loss** 106:17,21 107:13 116:10
**losses** 114:1 116:15,19
**lost** 97:19
**lot** 7:16,17 9:5 10:15 18:4,7 28:24,25 29:17 29:17 30:14 37:12,13 43:4

49:24 50:20 64:22 77:21 81:5 82:12,14 82:14,16 88:15 91:19 94:1 96:7 105:4 106:4 108:12 113:8 115:17 115:18 130:20 130:21 136:18 137:1 138:20

**m**

**m** 3:1 7:1 35:2 85:10 133:23 157:2
**macadam** 29:18 30:4,4
**made** 44:14 47:25 74:21 78:15,16 92:8 93:10 94:5 96:3 98:4 99:22 100:6 101:7 109:11 114:19 122:21 126:12 152:24 154:22 155:2
**main** 18:4,12 20:5 52:23 65:16 74:24 91:8,11 102:1 139:24

**maintaining** 77:5 82:17
**majority** 77:5
**make** 27:4 44:15 51:6 55:10 61:2 90:20 91:4 92:5 93:9,14 97:4,20,25 121:7 141:17 142:8 150:12
**makes** 9:5 51:8 51:8 80:18 113:18
**makeup** 60:7 62:22 64:14 70:22
**making** 14:8 34:13 46:22 75:16
**malfi** 44:23,24 45:21,23
**manage** 15:19 15:22 94:1
**management** 13:6,13,15,18 13:19,21 14:2 14:10,11,20 15:9,11,12,14 37:6,7,8 45:4,7 78:20 105:17 105:19 106:1 106:13 127:8,9 135:8

**manager** 45:15
**managers** 13:19 106:7
**manages** 15:15 15:24,25,25 16:1 78:20
**manner** 6:16 39:15
**manufacturing** 27:24
**march** 36:6,7
**mark** 37:24 48:3 103:18 115:25
**marked** 5:16 38:1 39:18 47:16 49:3 135:21 146:15 147:22
**market** 13:21
**marking** 139:9 150:4
**mason** 87:12,20 88:4
**math** 108:25
**matter** 2:2 6:12 65:3 153:18
**mayor** 51:11 59:24 72:3,5 74:23 77:11 85:9,12,12,23 86:6,8 87:8,8 91:4 93:9,9,10 94:11,13 96:3

**[mayor - name]**

98:3,4,6,16,17 100:6 102:2,23 114:20

**mayor's** 93:24

**mayors** 76:11

**mccarter** 38:20 95:7

**mcdonnell** 3:5 6:21 7:9

**mean** 14:16 24:22 47:12 76:4 83:8 95:5 95:20 101:8 103:24,24 106:2 119:7,11 119:21 133:7 140:9 148:23 151:18

**means** 52:16 145:19,23

**meant** 15:7 65:15 88:9

**medication** 10:18

**meet** 134:23

**meeting** 53:9 53:13,23 54:2 55:1,2,4,17 74:23 94:10 102:21 142:4

**meetings** 83:23 86:6,13,14,16 86:17

**member** 96:3,3

**members** 16:20 23:17,20 74:21 76:10,11 96:8 96:8 114:20

**memory** 146:19

**mention** 134:17

**mentioned** 101:24

**methods** 62:3

**middle** 144:6 145:2 154:17

**miles** 28:11,11

**million** 108:10 111:10,15

**millions** 28:6 108:7,7

**mind** 100:1,3 114:1 122:12

**mindset** 60:3

**minno** 35:1 37:16

**minorities** 59:12,20 63:8 64:6 66:23 78:11

**minutes** 68:7

**miracle** 50:7

**mm** 97:17

**modern** 99:9

**moment** 70:11

**monday** 1:19 2:5 6:2

**monetary** 73:16 74:1,2 106:21 107:13 116:11

**money** 33:14 128:20

**monica** 45:12

**monroe** 1:25 6:1

**morning** 6:20 7:7,10

**morningside** 1:4 4:15 11:25 15:25 22:18,22 22:24,25 23:3 23:9,13,23 24:1 25:18,20 25:23 26:19,24 27:1 30:22 31:2 32:21 33:7,11,20 34:4,18 35:8,9 36:1,3 37:15 39:6 42:9 44:13 47:8 49:19,20 63:20 64:13 65:19,25 67:17 78:2 81:18 100:22 106:9 111:19 117:3,6 118:6 118:10,12,19 118:20,25 120:11 135:8

150:25 151:3,4 151:6

**morningside's** 116:19

**motion** 47:22

**motivations** 76:9 77:7

**mount** 58:25 64:15,16,20,22 65:11,17 71:21 75:6,10,23,24 76:21 90:24 91:2

**move** 21:13 53:14 99:3 104:7

**moved** 53:17 139:5,7

**multi** 79:22 83:13 84:3 108:5 122:9

**multiple** 119:10

**municipalities** 50:7 83:12

**n**

**n** 2:1 3:1 7:1 35:2,2 90:2 133:23 157:2,2

**naacp** 64:22

**name** 6:18 7:7 45:16,17 78:13 92:16 159:2,3

**named**  128:9
**nature**  21:21
  31:5 86:17
  130:12
**nearby**  83:11
**necessarily**
  69:10 70:23
  76:4 91:16
  92:24 113:16
  120:1 121:5
  122:10 128:7
**necessary**
  39:24
**neck**  105:6,14
  105:22 106:11
**need**  17:19
  21:22 71:13
  107:5 150:10
**needed**  29:4
  46:20 53:17
**needs**  30:18
**negotiations**
  51:12
**neighbors**
  62:11,12
**neither**  158:9
**nephews**  103:9
**net**  108:8
**never**  94:6
  140:2
**new**  1:1,3,3,4
  1:16,25 2:5 3:3
  3:7 4:13 6:1
  7:2 11:8,14,17

11:24 12:20
15:25 16:14,22
16:25 17:4
18:1,3,10,15,22
19:8,11,17,24
20:3,10,11,13
21:25 22:1,8
22:21 23:1
27:9,18 29:4,5
29:9,10,11,20
29:25 30:17,25
31:11,16 32:2
32:8,10 33:6
33:10,17,24
34:1 35:7,9,11
35:13 36:4,8
36:10,12,16,23
36:25 37:5
39:6 40:8,14
45:6 46:6,7,9
47:5,7 49:18
49:21 50:3,16
50:18,25 58:24
63:20 64:13
65:19,24 66:11
67:17 71:17
78:1 81:18
92:22 96:22
100:22 105:6
105:21 107:12
108:20,22
110:9 111:22
113:6 116:9,12
116:15 117:3

118:5,9,15
119:3,14,19
120:7 121:21
122:14,15
123:7 124:12
124:18,20,23
125:11,17
127:7 129:22
132:1,19 133:1
133:12 134:4
135:7 136:13
136:24 137:2,9
138:15 139:5,7
139:24 140:7
143:12 150:24
151:1,2,5
154:22 158:4
159:1,2
**nice**  50:21,23
**nick**  44:23,24
**niece**  103:8
**nod**  8:17
**nomenclature**
  57:1 65:8
**non**  96:21
  97:22
**northern**  83:14
  87:22 88:5,17
  90:19
**notary**  157:22
  158:4 159:25
**note**  152:7
**notes**  2:1 18:7

**nothing's**  14:5
**notice**  130:15
  139:18 140:3
  140:15,16
**noticed**  128:18
  143:7
**notices**  4:17
  126:18 131:25
  132:19 133:1
  133:12 135:18
  135:22 136:13
  136:17 137:13
  138:5,15
  140:23,25
  148:18
**notwithstandi...**
  106:20
**november**  40:6
  41:22 42:20
  154:9
**nuances**  132:13
**nuckel**  1:14 4:3
  7:7 37:25
  105:5 117:18
  135:20 136:25
  143:8 146:17
  147:21 150:3
  155:21 157:5
  157:16 159:3
  159:21
**nuckel's**  117:16
**number**  4:9
  62:10,25 66:6
  66:13 69:1

**[number - okay]** Page 25

| | | | |
|---|---|---|---|
| 81:25 105:4 106:16 112:8 112:11 114:6 116:8 141:14 | **obviously** 9:10 **occasionally** 94:2 126:13 | **okay** 7:15,17 7:20 8:10,19 8:20,24 9:7,8 | 47:18 48:19,20 48:25 49:1,10 49:14 53:20 |
| **numbers** 63:6 76:13 145:24 | **occur** 63:14 **occurred** 71:4 | 9:15,20,21 10:2,3,10,11,12 | 54:2,8,13,18,23 55:18,21 57:4 |
| **nwh** 106:20 107:1 113:4 114:17,24 | **offer** 81:24 **offered** 98:5 99:3 | 10:16,22 11:24 12:8,11 13:2 13:23 14:1,5 | 57:15,19 58:5 58:11 59:9,21 60:6,15,20,23 |
| **o** | **office** 8:1 12:6 13:16 16:7,13 | 14:24 15:1,9 15:15,17,19,22 | 61:5,10,15,25 62:5,8,18 66:5 |
| **o** 3:1 7:1 35:2,2 54:21 85:10,10 157:2 | 105:15,18,22 105:25 106:4 131:23 136:24 | 16:6,9,19 17:3 17:16 18:6,10 18:15,20,25 | 66:18 67:4,13 67:22 68:21 69:6,22 71:5 |
| **o'toole** 3:2 | 137:18,19,25 | 19:7,21,23 | 71:14,16,19 |
| **oath** 6:10 7:3 8:6,7 157:7 | **officer** 134:1 135:14 | 20:12,20 21:6 21:8,12,16,21 | 72:11,22,24 73:3,19 74:3,6 |
| **object** 43:12 52:7 55:6 74:15 130:25 142:8 | **officers** 16:19 23:18,21 | 22:7,12 23:7 23:11,17 24:4 24:10,14,17 | 74:12 75:2 76:17 77:24 78:19 79:18 |
| **objection** 41:14 63:3 90:10 106:18 131:8 152:7 | **offices** 12:6 **official** 67:6 69:12 155:8,11 | 25:6,8,11,19,23 26:4,13,21 27:13 28:1 | 80:4,17 81:15 82:4,13 83:5 84:6 85:11,15 |
| **objections** 6:15 105:4 114:16 114:17 | **oh** 7:19 14:21 17:15 21:18 47:15 54:7 | 30:25 31:4,8 31:24 32:9 33:16 34:16,19 | 85:18 86:1,16 86:21,24 87:2 89:9,11,14,17 |
| **obligation** 52:4 **obligations** 52:11 | 58:2 59:4,8 64:2 67:3 68:5 71:3 73:9 | 35:23,25 36:11 36:14,19,21,24 37:7,7,11,25 | 89:24 90:4 91:21,21 92:4 92:12,19 93:12 |
| **observation** 47:25 137:24 | 87:17 89:18 92:15 98:2,12 98:16 99:25 | 38:20,23 39:1 39:17,21 40:2 41:8,11,23 | 93:15 95:9,24 96:2,10,15 97:18,23 98:24 |
| | 105:12 110:1 112:19 115:7 119:15 149:4 154:14 | 42:3,12 44:1 44:24 45:18,24 46:2,10,13,24 | 99:19 100:4,16 101:16 103:11 103:15,17 |

104:6,7,20,24
105:3,5,10
106:11 107:5
107:12,22
108:1,11 109:7
109:13,22,24
110:6,8,25
111:2,9,11,13
111:21,24
112:15,19
113:11,22
114:2,5 115:7
115:24 116:6
116:22 117:13
117:22,25
118:24 119:2
119:12 120:4
120:14,20
121:20 122:8
122:13,18,25
123:6 124:18
124:22 125:4,8
125:16 126:2,5
127:2,19
128:10 129:2
130:3,6,12
131:10,19
132:15,23
133:9 134:17
135:7 136:7,10
136:12,16,19
136:20,25
137:6,12,15
138:2,22

139:16,20,23
140:2,6,17
141:2,11 143:4
143:11,22
144:4,12,13,17
144:20,24
145:7,12,18
146:8,25 147:7
147:18 148:2,3
148:6,17 149:6
149:9,14,18
150:4,8,18,21
151:4,12,25
152:3,9,14
153:6,22,25
155:13,16,19
**old**  10:23
**once**  101:23
  102:20 134:7
**ones**  94:15
  116:9 141:20
**ongoing**  103:5
  129:23
**open**  13:21
  25:9,12 83:1
  83:21 84:4
  90:14
**operate**  13:17
  106:14
**operating**
  25:20,22
**operation**
  14:11 24:9

**operations**
  14:13 28:2
  30:11 99:10
**opportunities**
  65:6 90:25
**opportunity**
  101:22
**opposed**  90:8
**opra**  83:11,16
  83:21,24 84:9
  84:19
**opra'd**  87:11
**order**  39:17,19
  39:25 66:17
  155:24
**orderly**  77:14
**organizing**
  77:16
**original**  30:6
  64:16,20
  144:21 145:2
  145:13,25
  155:5
**originally**
  24:15 64:16
  70:19 94:12
**oslaw.com**  3:4
**ourself**  15:8
**outcome**
  103:16 142:6
**outs**  132:12
**outside**  34:20
  86:6 93:6

**overall**  118:9
**oversee**  14:11
  106:8
**oversight**  21:24
  22:4 30:24
  45:11
**owed**  140:20
**owing**  145:7
**own**  7:23 15:9
  15:11,12,14
  18:18 19:8
  78:22 94:15
  107:6 134:8
**owned**  18:11
  18:13,19 27:16
  29:12 56:17
  78:24 79:2,4,5
  128:1
**owner**  16:16,17
  19:1,4,17
  23:10,11 53:10
  53:11,12,23
  54:10 99:3
**owners**  56:16
  93:21
**owns**  18:3
  137:7

|  p  |
|---|

**p**  2:1 3:1,1 4:22
  4:22 45:13,14
  150:12,13
**p.c.**  3:5

**[p.m. - permit]** Page 27

**p.m.** 156:5
**packet** 141:6
**page** 4:4 5:5,5,5
5:9,9,9,13,13
5:13,17,17,17
39:21 40:10,11
60:15,16 62:9
66:24 67:1,2
68:16,18 74:4
85:4 96:18
104:12,12
105:5 112:2,7
112:11,16,17
114:6 116:1,3
116:5 121:14
139:23 145:2
159:5
**pages** 4:11
113:13 139:17
**paid** 124:25
125:3,6 126:11
126:20 129:10
138:8 140:20
146:12
**paperwork**
70:8
**paragraph**
40:7,9 61:6
62:9,24 63:12
66:24 67:2
68:18 74:5
85:8 87:7
96:19 97:4,7
99:21 114:12

121:15 123:7
125:9,14
**paragraphs**
39:22
**park** 3:3
**parking** 50:20
58:13 110:15
**part** 25:5 28:2
28:12 36:4,20
36:22 37:19
47:5 52:2
55:15 60:3,8,9
60:9 63:15
73:9 75:10
83:18 91:1,2
99:2,6 101:11
128:16 129:4
143:15 151:10
152:11 153:13
**participating**
6:5
**particular**
82:11 95:4
112:23 113:22
128:14 133:20
135:25 136:2
**parties** 6:14
158:11
**partly** 64:3,21
**partners** 23:18
23:21
**parts** 27:21
34:14

**party** 6:24 11:5
113:5,6
**passaic** 59:15
59:17 62:16
77:14 102:3
115:11
**passed** 101:2
**past** 33:18,21
34:11,13 61:11
70:6 77:11
102:1 120:18
140:20
**paterson** 78:6
**path** 142:14
**paved** 58:8,9
58:11 98:25
99:1
**paving** 57:24
**pay** 124:18,19
124:20 128:20
143:5,6,17
146:8,11,12
**paying** 124:23
125:18 129:16
138:10 140:7
147:14 148:23
**payment**
122:18 146:23
148:11
**payments**
122:14,21
129:23
**pays** 13:20

**penalty** 6:12
146:1
**pending** 19:13
41:24 119:4
120:6,12
**people** 14:7
25:1,9,12 59:3
59:7,9,12,13,14
59:22 60:3,4
60:12 63:8
69:1 88:20
91:8,15 93:11
94:9 98:19
101:14,22
102:3 105:19
106:8 115:11
127:16 149:21
**percent** 18:19
37:19 60:14
66:17 134:9
**percentage**
60:11 63:11
66:6,7,15
77:22 88:19
**percentages**
76:14
**perfectly** 9:14
**period** 123:3,4
124:11,22
125:17 127:22
**perjury** 6:13
**permit** 20:18
46:7

**[permits - probably]**

**permits** 20:15 39:24 42:6,7 42:10 44:12 45:20

**person** 6:10

**personal** 94:24 134:8

**peruse** 48:8 103:19,19,23

**perused** 38:7 148:2,3

**perusing** 48:12

**petal** 30:4

**pfund** 3:5 6:21 7:9

**pfundmcdon...** 3:7

**phase** 21:2,8 26:23 36:20,22 154:17

**phasing** 21:1

**phone** 109:24 110:7 111:1

**phoning** 110:2 110:4

**phrase** 87:9

**physical** 24:23

**physically** 6:6

**piece** 30:3,3

**pile** 143:8

**pit** 29:6,15

**pivot** 117:9

**place** 23:4 26:21 143:2

158:8

**plaintiff** 3:4

**plaintiff's** 63:13 106:24 114:9,12

**plaintiffs** 1:6 6:24

**plan** 39:7 40:15 40:19 42:4,5 42:22 47:20 76:1,24 82:1 85:24 86:7 99:23 122:3 152:12,15,20 152:23 154:22

**planning** 1:8 55:1 60:4 74:7 74:18 81:17,19 86:6 95:23 96:2,5 99:10 99:10 114:10 114:20,22 115:10 154:11

**plans** 44:1,5,7 46:23 110:21 155:5

**platform** 51:1

**play** 25:1

**please** 6:17 8:21 9:23 93:7 103:19 133:8 156:3

**point** 28:15 81:14 83:10

85:2 86:11 89:20 91:6 94:3,5,6 101:20 110:19 141:1 143:16 154:3,6

**pointed** 145:5

**police** 59:25 93:13

**policies** 68:12 69:8 70:15

**policy** 50:13 67:5,14 68:11 69:3,11 87:24

**population** 61:7,10,14 63:11 65:23 68:2 75:15 77:6 90:7

**populations** 59:19,19

**portion** 60:24 63:25 67:11 68:19 97:10 112:20 113:20 117:25 121:19 125:15

**position** 128:3

**positions** 39:13

**positively** 65:21

**possibly** 84:12

**practices** 138:3

**preparation** 60:8,10 70:18

**present** 6:6 16:24 18:24 21:23 25:10

**presently** 13:9

**president** 13:12 13:13 14:10 19:1,17

**pretty** 98:23 138:20

**previous** 35:20 76:11

**previously** 23:2

**primarily** 105:25 106:12

**prior** 54:10 72:17 73:12,15 95:2,4,7 100:12 101:17 106:23 122:5 138:23 139:2 151:14,19 152:1,4 154:1

**private** 15:2,4

**privy** 80:17

**probably** 11:19 28:5 34:3,6 44:9 46:14 52:10 71:20 81:9 84:7 98:19 119:17 147:6 148:16 149:4

**problem** 74:24
**problematic** 39:9
**problems** 29:22 43:1,15 88:25
**procedure** 131:6 140:19
**procedures** 128:15,22 130:16
**proceed** 42:4
**proceeding** 2:2 8:1,15 9:2 10:4 10:8,10 133:16
**proceedings** 41:7 57:14 63:18 106:23
**process** 21:15 21:17 28:23 30:15,19,23 39:8 41:6 46:15,17,21 67:16 126:19
**processed** 40:25 42:10,11 43:19,20 44:7
**processes** 42:19 51:13
**processing** 22:4
**produced** 70:23 133:16 148:9
**production** 5:4 150:6

**profit** 106:17 116:10
**program** 25:5
**progresses** 107:1
**project** 13:6 21:8,14 33:12 33:24 34:10 43:10
**promote** 69:13 99:7
**proper** 89:25 123:18
**properties** 15:22 28:24 29:1,2,3 65:1 78:1,4 79:12 80:5 94:1 106:5 122:6
**property** 4:18 13:19 14:11 15:10,11,13,14 15:15,19 18:3 18:11,13 19:9 20:4,9 21:19 22:3,9,12,13,15 22:17,21 23:1 23:2,3 24:7,20 25:18 26:19 29:5,10,14,15 30:8 31:5,11 36:1 53:10,12 53:23,24,25 54:1,11,19

56:8,17,19 57:24 78:19,22 93:22 94:16 99:3 101:7 102:15,17 103:6 106:7 108:3,4,9 119:4,13 120:5 120:12,15,25 122:14,16,19 122:24 123:14 124:11,13,24 126:15 128:1 128:17 132:9 136:16 137:2,3 137:7 138:11 138:24 139:2 143:6,12,13,18 153:14
**proportion** 63:1
**proposed** 55:13 72:3 153:14
**proposing** 94:12
**prosecutor's** 131:23
**prospect** 3:6
**protest** 49:25 146:24 147:10
**protesting** 147:11
**protocol** 131:6

**protracted** 28:16
**provided** 106:25
**proximity** 82:19
**public** 52:12,16 83:21 96:8,23 96:25 97:14 99:11,12 140:2 140:15,16 157:22 158:4 159:25
**puerta** 45:12
**purchased** 19:5 24:6 137:9,11 143:11,12
**purports** 140:5
**purpose** 9:1 123:9
**pushing** 75:16
**put** 10:5 32:6,7 40:3 43:18 59:15 128:17 154:22 155:1,2 155:10
**puts** 40:23
**putting** 48:23

**q**

**question** 5:16 7:24 8:22,23 9:13,23,24,25 10:6 11:16

**[question - recall]**

17:21 33:9 36:13 38:13,25 40:22 44:17 52:19 57:7 65:13,18 66:9 68:21 70:3,9 71:13 72:10,20 76:16,19 80:8 80:14 81:5 91:17 97:15,18 97:19 98:9 100:5 106:16 106:17 107:18 112:9,12,22,24 113:5 114:7 115:1 116:7,9 116:11,18 117:4 124:2,6 129:8 131:2 133:8 141:15 148:25 152:21

**question's** 8:25
**questions** 8:12 8:16 9:10,10 38:3,11 48:15 48:18 73:23,24 85:9 104:1,2 104:21 113:16 116:8 123:17 124:15 136:3 142:15 150:20 153:4,8 155:21
**quickly** 28:8 43:22 127:3

**quit** 128:2
**quite** 119:16 127:24
**quizzing** 48:22
**quote** 87:7,10
**quoted** 87:8
**quotes** 59:15

**r**

**r** 1:24 2:1,1,3 3:1,1 45:13,14 86:3 90:2 92:19 127:6 133:23 143:9 158:1,3,18
**race** 69:14,14 73:7 87:18 91:13
**rachelski** 92:16 92:17,20,24 94:22,25 95:13
**racial** 59:11 60:6 64:14 67:6 68:12 69:3 70:17,22 71:9 72:15 73:6 79:16 80:6,11 90:8 91:13
**racially** 87:10 87:16 90:21 91:22 92:5 96:4 100:18 101:19

**railroad** 102:19
**ramifications** 132:13
**rate** 118:20 123:13
**rationale** 125:5
**rattled** 81:13
**read** 38:4,9 48:5 63:23 67:9,13 85:2 92:14 97:7,8,8 103:21 104:10 107:5 113:8,17 121:16,17,17 147:24 157:6
**reading** 88:12 89:18 107:7,8 107:10
**ready** 42:23 43:7 46:15
**real** 14:13 19:8
**realized** 30:7
**really** 8:13 13:12 30:12 32:8 37:6 41:16 43:18,21 51:24 75:12 78:11 98:21 113:15 150:19 154:18
**rear** 139:25
**reason** 35:17 64:6 75:21 76:1,23 129:6

152:19,23 159:5
**reasonable** 17:12
**reasoning** 125:5
**reasons** 39:2,4 39:10 122:5 123:1 138:10
**rebranded** 13:25
**rebranding** 14:3
**recall** 19:19 29:9 33:5 37:20 39:25 45:8 46:20 47:21 53:16 81:22 82:2,4 83:5,10 84:17 85:18 86:17,23 87:1 93:16 95:18 96:1 104:16,21,23 105:1 118:8 120:13 124:15 125:25 126:3 134:16,16,24 136:9 137:12 138:25 139:22 140:4 142:25 143:24 145:7 145:11 146:8 146:10,13

148:5,6,8
149:8,11
151:11 152:2,6
152:24 153:8
153:11,12
155:11
**receive**  73:16
127:13 149:7
**received**  72:18
135:23
**recent**  111:19
**recently**  20:8
154:14
**recess**  68:8
117:14
**recognize**  49:2
87:20 148:3
**recollect**  20:23
**recollection**
37:21 57:22
74:20 86:9
92:7 95:21
111:3 126:13
126:23 130:8
138:14 147:8,9
**record**  6:19
117:16 149:23
149:24 150:1
150:11 155:25
157:9,12
**recorded**  86:22
**recording**
146:2

**records**  83:21
86:20 112:1
126:1,4 132:24
133:6,11
**recreation**  24:7
25:4 82:17
83:2 152:16
153:13,15,16
153:18
**recreational**
25:8
**redeem**  146:5
**redeemed**
128:18
**redemption**
141:4,8 142:3
143:23 144:16
144:22 145:13
145:17,20,22
146:1
**redemptions**
142:11
**refer**  27:2
38:12 48:14,18
48:24 91:13
96:18
**reference**  88:5
92:9
**referenced**
95:15,19
114:18
**referencing**
75:23 95:25
101:18 144:10

**referred**  72:17
**referring**  15:3
39:21 61:2
62:12,13,15
63:16 67:14
69:18 72:9
87:18 89:2
90:7 112:21
113:10 121:24
122:11 148:19
148:20 149:3,4
153:21
**refers**  66:24
67:5,21 87:7
114:17
**reflexes**  147:9
**refresh**  147:7
**regard**  61:23
84:1,2,3 88:2
91:5 97:12,13
102:20 126:19
130:22 131:12
138:11
**regarding**  4:18
39:12 72:14
80:4 83:12
86:7 122:2
127:14
**regardless**
76:21
**region**  28:14,21
31:15,20 50:22
52:13 68:3

**region's**  29:22
**reimbursement**
152:4
**reinstated**  42:1
**reit**  143:9
**rejected**  72:5
**relate**  118:10
118:12 133:20
151:19
**related**  65:12
93:23 96:13
113:1 118:1,4
128:15 131:22
135:15 144:7
158:10
**relates**  47:5
114:1 132:16
**relationship**
11:2,22 16:14
23:8
**relative**  130:14
158:13
**relevant**  118:24
**rely**  96:22
**remember**  9:13
9:15 10:20
11:19 17:18
21:11 26:15
38:23 44:16
45:16 47:23
53:5,9,11,21
54:4 55:8,17
56:6 58:12
61:13 78:14

82:18,25 83:15
84:14,15,21,21
84:23 85:14,20
85:22 86:19
88:12 89:18,22
90:12,13 92:13
92:13 93:19
94:3 95:16,16
120:18 123:10
123:17,19,21
123:22 126:15
127:15,25
128:6 130:19
134:19 142:5
143:2,16
148:10 153:2
153:19
**remind** 17:20
**remote** 2:2
158:6,11
**remotely** 1:15
1:25 6:1,8
**rendered**
151:20
**repeat** 76:18
**rephrase** 9:25
75:22
**report** 108:14
109:18 125:22
**reported** 1:22
6:1
**reporter** 2:4
6:4 8:11
155:23 158:3

**reporter's** 9:5
**reporting** 6:7
6:16 159:1
**reports** 69:18
107:1,17
**represent**
135:21
**representations**
84:23 98:4
**representative**
45:1,2 102:21
102:23
**representatives**
55:5 72:2
114:21
**representing**
120:6
**request** 5:4
44:15,15 57:11
125:22
**requested**
44:13 46:7
60:24 112:20
121:19 125:15
**requesting**
45:20
**requests** 83:11
83:16 84:9,13
84:19
**require** 32:1,3
53:5 133:14,19
**required** 22:3
42:19 128:21
153:12 154:25

**requirement**
64:25 153:21
**requires** 70:1
**reserved** 73:22
**reserves** 107:2
114:24
**reside** 97:2
100:25
**residence** 82:24
**residential**
32:11,24
**residents** 50:21
52:12,13 62:11
62:25 63:2
77:22 82:17
96:22,22,24
97:6,22 98:15
152:17
**respect** 20:19
21:4 30:20
43:5 51:16
72:14 75:13
77:11,25 84:4
84:18 97:3
101:7 114:1
115:23 118:4
118:15 120:4
121:3 126:9,9
126:22 128:14
128:22 129:5
130:18 147:17
149:2 153:2
154:12,21

**respects** 122:24
**responded** 87:9
**responding**
104:21
**response** 107:2
112:14 113:18
114:25 125:11
149:7
**responses** 8:16
**responsibilities**
14:10
**responsible**
135:17
**rest** 53:18
88:21
**result** 96:21
97:6,22 98:14
**resulted** 68:1
**retain** 35:1,3
**retained** 4:23
34:9,19,24
35:25 36:2
95:7
**return** 49:22
**reveal** 74:18
**revealed** 74:8
**review** 39:8
48:10 61:15
104:4 150:15
**reviews** 38:6
48:4 60:24
63:25 67:11
68:19 97:10
103:20 112:20

**[reviews - second]**                                              Page 33

113:20 121:19
125:15 135:24
139:11 146:16
148:1 150:14
**ride** 28:9
**ridge** 27:17
50:19,22
**ridgewood** 3:7
**riding** 31:19
**right** 17:25
24:3 25:1
30:16 31:2
33:16 37:3
38:7 40:3,10
40:13 41:11
47:2,14 50:8
50:24,25 57:8
58:15 62:23
67:4 69:17,22
70:10 71:1,18
72:12 73:3
74:4 76:19
78:14,24 80:22
81:10,12,15
82:15 84:25
87:5 89:22
91:12,16,18
92:4 98:23
99:13,19
100:17 104:20
105:3,16
106:15 107:2,9
109:3 111:7
113:1,2 114:25

120:22 121:13
121:21 122:13
136:17 138:19
141:6,25
142:18 146:21
149:6 155:20
**rights** 73:23
113:1
**rink** 24:12,13
24:18,19,21
25:20,21,24
26:10 152:10
152:15,18,22
152:25 153:5
**rise** 152:25
153:1
**road** 3:3 7:2
13:16 16:3
20:2,7,10,12,16
20:22 54:15,24
57:5,13 71:8
71:11 103:3
105:6,11,14,22
106:10,11
136:22 137:22
**roadway** 52:5
**roller** 24:8,8
25:5 152:10,15
152:18,22,25
153:5,16
**room** 6:7 8:14
**roughly** 21:7
108:22

**route** 87:12
**rule** 56:13
**ruled** 47:10
56:22 108:3
**rules** 7:21,22
30:6
**ruling** 40:18,21
57:5,10 73:10
**run** 50:24
53:18 102:14
**runs** 50:4 53:3
53:18,24
**rutherford**
62:15

**s**

**s** 2:1 3:1 7:1
35:2 86:4 90:2
92:19 120:10
120:10 127:16
133:23,23
159:5
**sale** 4:18
128:17 140:15
141:5,7 144:3
144:6,14,15,20
144:25 145:3,6
**sales** 139:1
**sand** 29:6,15
**save** 47:5
**saw** 38:18
47:23 49:7
60:10 61:4,13
61:23 78:8

140:2
**saying** 83:5,10
87:8 92:21
111:15 116:18
125:19 138:4
140:14
**says** 39:23 40:8
40:14,20 61:6
62:9,20,24
74:7 88:22
96:19 105:5,8
106:19 107:12
107:15 113:3
114:16,24
121:21 122:4
122:13 125:9
137:1 139:18
139:24,25
142:3 144:15
144:20,21,25
145:2,13,16,25
146:4 147:10
148:10
**school** 75:5
**schools** 75:8,8
75:19,21 76:1
76:4,25
**science** 12:17
**scientific** 95:17
110:20
**scrivo** 3:2
**search** 146:2
**second** 39:21
40:11 112:10

**[second - site]** Page 34

139:23 145:1 149:23

**secret** 129:12

**section** 97:12

**see** 40:17 52:2 61:9 63:6 74:11 88:18,25 91:20 102:25 103:2 107:3,4 109:24 118:18 122:17 136:19 139:18 140:1 141:5,10,11 144:5,21 145:5 146:6,7 153:10

**seeing** 58:13 128:6 137:13 140:4 143:24

**seek** 113:4

**seeking** 106:20 107:13,14,21 122:6

**seem** 60:2

**seemed** 75:14

**seemingly** 129:6,11

**seems** 102:5 112:25 146:23

**seen** 38:16 49:5 50:6 60:1 65:14,21 66:3 87:9 91:2 102:2 136:8 139:20 146:17

**sees** 64:2,5

**sell** 33:17,20

**seller** 142:10,10

**send** 126:18 138:4,15

**sending** 130:15 135:18 137:21 137:23 148:18 148:18

**sense** 82:16 106:5 113:18 154:18

**sent** 125:19,20 148:11 149:9 149:15,20

**sentence** 112:10,12 113:23

**september** 114:23 115:2,4

**series** 63:15

**seriously** 99:6 101:21

**services** 14:2 151:20

**session** 7:24

**set** 112:12 114:8 150:5 158:8

**setting** 72:19

**settlement** 86:10 101:12 139:18 154:15

**share** 101:12

**shared** 53:12 98:19 126:10

**sheet** 159:1

**shepard** 3:6 4:5 6:20,21 7:6,8 68:6,9 115:14 117:9,15,17 124:3,6,8,9 141:16 142:18 142:23 149:22 149:25 150:2 155:20

**shopping** 16:1

**short** 27:5 53:18 65:7 68:8,11 117:14

**shoulders** 8:17

**show** 37:23 48:2,17 70:16 79:13 80:5,10 103:18 115:25 135:20 146:14 147:19 150:3

**showing** 37:25 48:24 70:21 71:9 139:9 147:21

**shown** 52:14

**shrug** 8:17

**sic** 97:6 98:15

**side** 14:15 40:22 50:19,22 51:1 94:20

**siek** 127:15,20 127:22 129:15 129:22 130:1,7 130:10,23 131:5,11 134:16 138:15 140:21 149:7 149:12,16

**signature** 104:14,19 116:2 146:25 147:2 158:17

**signed** 115:1,5 142:11 157:18

**significant** 47:24 57:21,23 57:23 63:7 125:1 126:11 143:7,17

**signing** 104:16

**signoff** 21:22

**signoffs** 21:11 21:13

**similar** 116:8 131:21

**sir** 7:10

**sister** 79:2

**sit** 38:8 81:7 120:24

**site** 20:19 21:24 21:24,25 26:22 27:3,6,7,10,16 27:17,18,19 28:3 29:20,21

**[site - statements]** Page 35

30:18,20,21
31:10,15 32:2
36:3,8,9,11,15
37:1 39:7
40:15,19 42:4
42:5,22 43:7
47:20 57:22
58:7 64:13,14
76:1,23 79:22
82:1 85:24
86:7 99:23
122:1,2 152:12
152:15,20,23
154:22 155:4
**sites** 27:19
  28:18 29:25
  37:12
**situation** 11:23
  30:13 116:21
  128:16 133:20
**situations**
  131:21
**size** 155:10
**skate** 25:9,12
**skating** 25:5
**slavery** 87:24
**sliver** 102:17
**slope** 53:3,8
  58:3
**slowing** 103:13
**small** 102:16
**soak** 31:22
**society** 43:2

**sole** 16:17
  18:25 19:4,17
**solely** 116:16
**solids** 28:3
**solvents** 28:6,7
**somebody** 45:3
  129:9
**somerset** 72:3
  94:11,14 98:7
**somewhat**
  123:11
**sorry** 13:2
  32:13 40:9
  54:7,9 67:1,3
  68:15,21 69:19
  72:11 85:20
  97:19 101:3
  105:18 112:7,8
  123:4 131:2
**sort** 64:24
**sounded**
  110:19
**sounds** 123:25
**south** 87:11
  90:18
**southern** 27:21
  87:22,23 88:6
  88:23
**space** 83:1 84:4
  90:8,15 153:13
  153:15
**speak** 56:25
  82:2,22 87:21
  88:17 127:13

130:3,5 134:20
  138:16
**speaking** 9:4
  30:21 42:8
  70:21 71:17
  79:23 93:3
  98:2,25 102:22
  104:23 130:15
**specific** 93:15
**specifically**
  59:13 82:8
  97:3 116:16
**specificity**
  114:8
**spoke** 26:22
  82:16,18,21
  83:1,1,2,6
  89:14 104:25
  130:9 138:7
  148:17
**spoken** 83:15
  103:1 131:22
**spot** 48:23 53:3
  58:3
**spread** 28:10
  31:15
**spreadsheet**
  109:15 141:9
  142:3 143:23
  144:16,22
  150:23
**spreadsheets**
  141:4

**square** 16:1
  110:14
**stalled** 35:20
**stamped** 4:22
  142:25 143:20
**stand** 50:25
  63:9
**standing** 20:4
  23:3 24:21
  26:2
**stands** 20:18
  67:15
**start** 20:12
  24:13,14 31:18
  71:11 104:2
  117:11 139:14
  151:8
**started** 43:6
  71:18 72:1
**starting** 82:22
  118:17 154:17
**starts** 102:19
  112:10,17
**state** 2:5 52:11
  76:8 111:3
  155:25 158:4
**stated** 67:19
  74:23 102:23
**statement**
  87:15
**statements**
  91:4 92:7 96:7
  114:18,19

**states**  1:1 58:23 63:12 76:8 87:22,22,23 88:6

**stating**  6:18 69:10

**station**  50:3,9 50:10,11,16,20 50:23 51:3,15 51:20 52:6 53:2 54:16,25 55:11,15 56:2 56:9 57:6,13 64:3,7 67:25 68:25 71:24,25 72:1,4,6 77:10 79:24 82:19 93:21 94:4,7 94:13,20 97:13 98:5,20,22 99:5,8,13 101:5,22,25 102:12

**station's**  51:4

**stations**  50:17

**stavitsky** 120:10

**steep**  53:3,8 58:3

**stenographic** 2:1

**stevens**  7:2 13:16 16:3 105:11 106:10

**136:22 137:22**

**stick**  44:6 141:19

**stipulations** 5:12

**stop**  26:7

**stopped**  138:5 141:1

**storing**  26:11

**story**  27:5 65:7

**street**  3:6 14:25 77:13 136:23

**strike**  34:20

**structure**  24:23 110:15

**studies**  82:25

**study**  13:1

**stuff**  26:11

**subject**  30:22 40:22 114:16

**subjects**  13:1

**submit**  42:15 83:11 150:4

**submitted**  42:7 42:12 44:1 150:5

**subscribed** 157:18 159:22

**subsequent** 146:3,4

**succeeded**  77:5

**suddenly** 129:10 130:17 130:17

**sufficient**  63:13

**suggest**  78:2

**suing**  49:14 58:17

**suit**  46:17

**suite**  7:2 16:6 105:6,8,9 106:12

**sum**  27:5

**summation** 59:23

**supplement** 35:24 37:22 69:20,25 70:11 70:25 81:16 107:2 109:17 114:25 115:18 115:22

**supplemental** 150:6

**supplemented** 107:16

**support**  5:1 55:9 63:13 69:24 71:9 114:9 115:9

**supports**  69:2

**suppose**  14:21 69:9 81:2 86:11

**supposedly** 131:20

**sure**  7:20 14:16 21:20 24:22

**26:17 27:2**

**33:10 34:9,9 36:13 38:5,25 41:16 44:17 52:18 55:10 57:7 60:22 61:2,12,20 62:3 66:10,11 70:12 71:2 73:17,18 80:9 80:14 81:4 83:7 88:8 91:17 93:17 97:9 99:25 100:14 101:8 102:11 107:17 110:22 119:7 129:20 131:4 132:23 134:9 134:12 141:17 142:8 148:20 149:1 150:12 152:22**

**surrounding** 59:18 68:3 77:23

**sworn**  7:3 158:7 159:22**

---

t

**t**  2:1,1 3:1 45:13,14 85:10 120:10,10 143:9 157:2

**[t - things]** Page 37

158:1,1
**tactics** 67:18
68:14,24 71:8
71:15,16
**take** 8:8 17:23
27:12 33:24
38:1,5 48:7
49:8 68:4,6
82:23 99:6
143:13,14
144:9 150:9
154:12
**taken** 2:3 26:5
26:21 49:20
56:19 68:8
117:14 157:7
158:12
**takes** 42:21
**talk** 89:4 94:2
129:9 130:2
140:22
**talked** 56:20
88:11 91:23
95:6 114:7,14
115:16,17
116:24 152:10
153:25
**talking** 22:22
22:24 42:17
46:18 53:22
61:1 68:10,24
71:7 88:11,13
88:14,23,24
89:21 90:14,17

100:14 112:25
117:2 118:1
123:23 124:10
133:5,6 151:15
153:24
**tax** 4:18 19:14
117:11 118:1,4
118:16 119:4
119:13,23,25
120:5,12,16,25
121:5 122:14
123:20,20
128:15,16,17
128:19,22
129:23 131:13
131:25 132:12
132:19 133:1
133:12,15
134:1 135:13
135:14,15
136:13,17
137:13 138:4
138:23 139:1
139:18 140:3
140:15,19
141:4,8 142:3
142:9 143:1,2
143:13,15,22
144:16,22
145:21 148:11
148:23
**taxed** 118:19
**taxes** 108:2
118:10,17

119:25 122:19
122:22 123:8
124:11,13,18
124:19,21,23
124:25 125:3,6
125:12,18,23
126:11,14,19
127:14 129:10
129:16,16
130:18 131:13
133:19 134:5
138:9,10,17,21
140:8,20,23
143:5,7,17
145:8 146:3,4
146:12,23
147:14
**taxing** 123:13
123:16 125:10
126:6
**td** 4:19
**technology**
12:19 13:4,5
**tell** 8:7 17:9
115:19 132:18
**tenant** 25:16
26:14
**tenants** 25:25
26:7
**tennis** 24:15
**term** 23:5
85:15,17
**terms** 7:21
152:11

**terrain** 52:25
**test** 38:10
**tested** 28:25
**testified** 7:3
22:7 84:20
115:13
**testify** 10:19
81:19
**testifying** 22:20
**testimony** 6:12
8:1 81:24
82:10 84:11
157:7
**thank** 7:11
108:18 152:8
**thereof** 63:11
**thing** 38:9 48:6
82:19,21
103:21 104:10
109:4 112:23
**things** 8:18
14:8 28:4
29:19 37:22
42:23 43:8
50:2 51:11
58:13 59:24
60:1 61:19
64:18 65:3
67:19,20,25
69:11,16 70:5
70:20 71:2,3
75:13 77:11,21
81:9 82:14
83:6,8 84:4,5,7

**[things - top]** Page 38

84:15 87:14
88:15,22 91:16
91:19 92:1
93:4,11 94:8
94:18,23 95:25
98:18 101:10
103:13 104:8
106:6,9 109:15
117:7,7 122:10
122:12 126:22
129:7,11
130:20,21
131:13 132:17
133:15 140:13
154:21,22
**think** 7:19
10:15,15,17
11:19 17:6,11
18:13 19:6,19
19:20 24:15
26:5 33:2
34:21 35:4
40:6 42:25
43:14,21,22,24
44:3,13 46:25
47:23 48:12,13
49:8,13 50:14
51:4 54:3,20
55:3,5,20
56:15,22 58:24
60:13 61:4,13
61:23 62:19
66:2,22 67:20
69:19 70:9

71:12 73:22
74:22,23 76:9
76:19 78:16,17
81:8,12,23
82:21 83:3,16
83:17 84:4,10
84:11,12,14
85:17 86:4,9
86:12 88:8,10
89:20 90:6,22
91:3,6,15 92:9
92:22,23 93:17
93:18 97:15
98:16 100:11
100:20 102:9
108:17,23,24
111:18,23
115:20 116:8
117:4,5,5
119:15,16
120:17 124:1
127:16,24
128:2,4,8
132:4,5,7,11
133:18 134:1
136:11 138:12
140:11 143:15
143:21 144:8
146:19 147:10
148:21 149:5
150:9 151:10
**thinking** 25:17
35:21 70:2
91:20 111:8

**third** 113:4,6
**thirds** 106:19
**thought** 15:3
36:15 55:5
**thoughts**
115:23
**thousands**
107:23
**thumb** 110:18
**tied** 65:7
154:18
**time** 7:18,22
9:5,22 11:12
11:16 16:25
17:12 19:5
21:1,19 22:23
25:11 26:1
27:12 35:18
37:14 38:5,18
42:21 43:4,18
45:16 46:14,16
48:13 49:7
50:17 52:1
53:13 64:11,18
77:18 81:18
85:23 88:13,13
96:6 107:21
109:1,11,14,21
113:12 122:22
123:3,4,15
124:10,19,22
125:2,17
126:12 127:22
127:25 128:1

130:5,9,11
134:2,3,4
138:9,12,14
139:3,4,6
140:6,12
144:10 155:22
156:1
**times** 7:15
63:23 117:8
124:25 125:1
126:13,20
**titled** 13:13
**today** 7:9,11
8:2 9:11 10:18
19:13 46:19
73:4 81:8
115:19 120:24
**told** 55:8,11,12
100:6
**tomko** 85:9,12
86:6,8 87:8,8
91:4 95:13
114:20
**took** 8:7 68:10
123:2 143:17
**top** 11:20 17:7
28:9,10 35:21
45:17 69:20
70:10 78:13
81:10,13 83:9
92:15 111:7
120:13 123:11
126:8 139:18
142:2 145:14

**[top - truthfully]**

| | | | |
|---|---|---|---|
| 150:23 | 64:2,5,6,8 | **towns** 62:20,21 | 102:12 |
| **topic** 124:5 | 65:20 67:24 | 63:9 64:4,19 | **trains** 50:24 |
| **topics** 117:10 | 68:1 69:11,12 | 65:9,15,16 | **transcript** 9:6 |
| **torn** 26:4 | 70:22,23 71:21 | 68:3 77:23 | 10:5,7 82:7 |
| **total** 57:25 | 74:13,22 75:1 | 83:17,20 87:10 | 88:12 155:25 |
| 108:21,23 | 75:3,4,14,16,18 | 88:21 92:8,10 | 157:6,8 158:6 |
| 110:12 111:5 | 76:3,10 77:3,4 | 92:25 102:4 | **transcripts** |
| 142:4 144:5,15 | 77:6,11,18 | **township** 1:25 | 84:16 89:19 |
| 144:25 145:5 | 78:8,11 79:12 | 6:1 | 90:14 91:24 |
| 146:4 | 80:16,18 87:10 | **tracks** 102:19 | 92:14 93:2 |
| **totally** 30:12 | 91:8,11 92:5 | **trade** 13:14,21 | **transform** |
| 56:25 | 93:11,22 96:9 | 13:24 15:7 | 24:17 |
| **touch** 36:9 | 96:14 98:6,19 | **trading** 14:14 | **transformed** |
| 126:16 140:22 | 98:21 99:6 | 14:15,17,23 | 24:19 |
| **touched** 36:22 | 100:19,21,23 | 15:6 | **transportation** |
| **touching** 21:25 | 101:10,17,23 | **traditional** | 52:12,17 96:23 |
| **towards** 25:17 | 102:5,23 103:5 | 123:20 | 96:25 97:14 |
| 74:9,13 79:14 | 108:2,12 | **traffic** 77:12,16 | 99:12 |
| 80:7,11 114:11 | 118:15,17 | **train** 50:3,4,9,9 | **treated** 30:10 |
| 115:11 | 123:13 125:19 | 50:11,16,16,19 | **trial** 10:9 11:3 |
| **town** 20:20 | 125:20 126:12 | 50:23 51:15 | 11:4 12:2 |
| 21:3 23:6 | 126:15,23 | 52:6 53:2 | 120:15,17,25 |
| 34:15 39:25 | 128:18 129:8 | 54:15,25 55:11 | 121:9 |
| 40:5 41:5,5 | 130:17 131:14 | 55:14 56:2,9 | **tried** 33:17,20 |
| 42:9,18 43:16 | 132:5,7,17 | 57:6,13 64:3,7 | 49:17 |
| 43:18,19,20 | 135:15 137:20 | 67:25 68:14,25 | **triple** 118:19 |
| 44:4 47:3 | 138:8,15 | 71:24,25 72:1 | **tripled** 108:2 |
| 49:20 50:2,7 | 147:12 148:19 | 72:4,6 77:10 | 118:17 |
| 51:12,13,19,23 | 149:2,20 | 79:23 82:19 | **truck** 58:13 |
| 51:24 52:4,10 | 154:14,16,19 | 93:20 94:4,7 | **true** 76:2 157:9 |
| 52:13 53:10 | 154:20 155:8 | 94:13,20 97:13 | 157:13 158:5 |
| 54:14 55:13 | **town's** 50:13 | 98:5,20,22 | **truth** 8:7 |
| 56:13,17 58:7 | 51:16 52:2 | 99:4,7,13 | **truthfully** |
| 60:4 63:18,21 | 67:16 99:14,16 | 101:5,22,25 | 10:19 |

**[try - victor]** Page 40

| | | | |
|---|---|---|---|
| **try** 65:12 98:22 100:24 108:25 121:25 | **under** 6:12 7:3 30:5 65:11 75:6,7 76:8 118:2 131:11 146:23 147:10 157:7 | 140:24 | **used** 10:8,24 34:17 57:3,18 62:1 67:19 93:14 138:4 152:16,22 |
| **trying** 43:6 53:15 67:17 72:25 121:7 154:14 | | **understanding** 41:2 102:6 135:13 | |
| | | **understood** 66:10 130:20 137:18 | **user** 26:9 |
| **turn** 17:24 60:16 74:4 112:2 114:6 121:14 143:19 | **underlie** 142:11 | | **uses** 29:25 110:7 111:1 |
| | **underlying** 75:12 76:9 | **unfair** 125:12 | **using** 28:3 58:12 87:9 |
| | | **unfortunate** 43:18 | |
| **turned** 29:8 84:14 | **underneath** 110:16 136:18 | **united** 1:1 58:23 76:8 | **usual** 17:22 126:22 |
| **turns** 28:5 | **underpinnings** 90:24 | **units** 32:12,14 32:15,17,25 33:4 66:8,8,12 66:15,21 79:22 101:12 | **usually** 56:16 88:3 129:9,9 130:15,22 |
| **two** 54:3 106:19 139:17 | **understand** 8:4 8:6 9:22,24 10:6,13 20:17 21:23 27:4,14 27:22 28:7,14 28:22 30:2,11 30:19 31:21 36:13 38:25 40:20,24 41:16 44:17 50:6,17 51:7 52:19 57:7,17 59:11 59:17 64:15,20 64:25 65:8,13 70:24 75:6 76:6 78:8 88:3 96:16 99:9 101:11 109:19 112:5 118:13 128:17,19 | | |
| **type** 14:19 15:2 15:4 30:17 32:1,9,22 57:5 80:6 82:25 111:6 149:7 | | | **v** |
| | | **university** 12:20 | **v** 22:13 120:10 159:2 |
| | | **unpacking** 117:11 | **vaguely** 153:12 |
| **typed** 10:4 | | **unreasonable** 49:25 | **valid** 57:10,18 |
| **types** 37:13 | | | **vap** 4:20 13:14 13:24 14:18 147:20 |
| **u** | | **unreasonably** 39:15 63:22 | **variances** 153:1 |
| **u** 7:1 45:13,14 | | **unsure** 125:4,7 | |
| **u.s.** 61:7 62:1 | | **upper** 87:13 90:6 | **various** 49:19 |
| **uh** 8:18,18,18 | | | **veering** 123:25 |
| **ultimate** 103:16 | | **usable** 56:25 | **venue** 123:18 |
| | | **use** 51:6 53:15 64:5 75:7,20 75:25 76:22 93:25 95:9 109:24 | **verbalize** 8:16 |
| **ultimately** 39:9 47:10 | | | **verbally** 6:11 |
| | | | **veritext** 159:1 |
| **umdash** 54:18 54:20 | | | **victor** 90:2 131:12 |

**view** 44:4,4
**village** 3:3
**violations** 73:5
 73:11
**vs** 1:7

**w**

**w** 35:2 86:3
 157:2
**wait** 8:21
**waive** 6:15
**waiving** 114:17
**wall** 14:25 53:8
**walling** 29:4
**wallington** 1:3
 1:4,8,8 4:13
 7:2 11:25,25
 12:4,5,7,12,13
 13:17 15:10,20
 15:23,25 16:1
 16:3,15,23,25
 17:4 18:1,3,4
 18:11,15,17,18
 18:22 19:8,11
 19:18,24 20:3
 20:10,11,13,21
 22:1,1,8,22
 23:1,6,9,14,23
 24:1 25:20,24
 26:19 27:9,18
 27:19,21 29:5
 29:9,11,11,20
 30:17,25 31:11
 31:17 32:2,8

32:10,22 33:6
33:7,10,11,17
33:21,25 34:1
34:5,15 35:7
35:10,11,14,19
36:1,4,8,10,12
36:16,23,25
37:5,16 39:6
39:14 40:8,14
40:23 42:13
45:6 46:6,8,9
47:3,6,7,20
48:1 49:11,16
49:18,21 50:4
51:1,2 52:17
52:21 55:2
59:2 60:7,13
61:14 62:14,16
62:17 63:9,9
63:21 64:13,14
65:20,25 66:1
66:11 67:17
69:2 71:17
72:4 77:13,15
77:21 78:1
81:3,19 83:4
87:13 88:16,20
88:21 90:6
92:21 93:1
94:12 98:7
100:22 101:23
102:4 105:21
106:7,10
107:12 108:20

108:22 110:10
111:22 113:6
114:10 116:9
116:12,15
117:3 118:5,9
118:15 119:3
119:14,19
120:7 121:22
122:1,14,15
123:8 124:12
124:19,20,23
125:11,18
127:8 129:22
131:14 132:1
132:20 133:2
133:13 134:1,4
134:11 135:1,8
136:14,21,22
137:2,6,9,10,11
137:18,21,25
138:16 139:4,5
139:6,7,24
140:7 143:12
150:25 151:1,3
151:6 154:11
159:2,2
**wallington's**
 4:15 26:25
 51:5
**walter** 86:3
 94:2
**want** 9:12 41:7
 48:6,21 50:13
 51:7,9,20

52:14 60:16,21
61:2,18,20
62:6 65:21
69:7 75:18
77:16 80:19
92:22 93:1
97:8 99:20
102:5 103:21
104:1,24 109:7
112:5,15
113:17 114:6
116:1 117:10
117:18 121:16
121:17 128:23
128:25 129:12
132:10,21
133:3 139:12
141:17,19
142:7,8,19
144:12,24
150:12,15
**wanted** 28:13
 55:10,15
 103:23 113:2
 132:8 142:21
 155:9
**wanting** 75:13
 75:17 92:8
 93:10 96:9
 103:1
**war** 87:23,25
 88:4,7
**warehouse**
 24:5 25:25

26:2,3,12,14
**wargacki** 86:3
**wasko** 35:1 37:16
**water** 155:3,3,6 155:9
**way** 21:23 23:5 30:12 51:20 53:2 65:7,17 78:8,9 102:7,9 105:8 106:19 108:8,12 109:21 113:1 119:16 121:17 132:8 135:15 136:21 138:11
**ways** 21:25 30:14 69:13 89:3 108:12 119:1,2 120:2 131:21
**we've** 13:24 15:4 34:11,12 34:17 39:18 46:17 49:3,24 80:21 90:22,23 108:5 109:14 115:16,17 117:2 135:21 146:14
**weeds** 51:2
**week** 49:9
**went** 29:13 39:8 41:5

46:21
**west** 92:22
**westmont** 94:16 97:13
**whatchamaca...** 84:2
**white** 60:12,12 62:10,25 63:1 63:8,10 68:2 69:1 77:5,22 88:20 96:21 97:6,22 98:15
**wishes** 155:24
**withdraw** 41:6 42:20
**withdrawn** 40:5 41:3,5,8 41:12 42:16 153:23 154:7 154:10
**withdrew** 41:18,20
**withheld** 122:14 124:12 124:13 131:25 133:12
**withhold** 122:18
**withholding** 123:8,9 129:16 129:23 132:19 133:1 134:5
**witness** 4:3 5:8 6:11 38:6 48:4

48:10 60:24 63:25 67:11 68:19 97:10 103:20 110:7 111:1 112:20 113:20 121:19 124:4 125:15 135:24 139:11 146:16 148:1 150:14 156:4 158:7
**witnesses'** 159:3
**wonderful** 50:6
**wood** 27:17 29:18 50:19,21
**words** 40:25 59:16,16 89:23
**work** 21:24,25 22:6 26:22 30:20 35:6 36:3,8,9,12,15 36:25 37:1,8,9 46:23 53:8 55:16 93:24 154:15
**worked** 34:12 46:21 64:10 101:10 124:17 127:23 134:10
**working** 14:4 16:9 110:23 127:24

**world** 42:25
**wright** 27:15 27:16,23 28:3 28:13,13,15,16 28:17 31:10,14 31:25
**writing** 69:9 147:4
**written** 45:18 69:7 70:15 71:7 94:21 104:21 135:9 153:11,20
**wrong** 39:11 110:14 135:12
**wrote** 149:12

|  x  |
| :---: |

**x** 1:2,10
**xi01776** 158:19
**xio1776** 1:24 2:4

|  y  |
| :---: |

**y** 90:2 120:10
**yeah** 14:7 15:6 29:10 32:5 34:2,17 37:4 38:10 44:5,19 48:9 52:9 60:18,22 62:16 63:5 67:10 68:18 70:5 71:4 72:21 74:2 79:8

**[yeah - zoom]**

80:23 83:7
87:17,18 89:13
92:3 104:5,9
104:11 105:18
110:1,5 115:5
115:14,16
120:23 121:4
124:8 128:8
138:13 142:1
143:21
**year**  34:3,6
  108:10
**years**  12:14
  33:18,21 43:17
  47:3,22 51:5
  51:17 54:3
  56:9,14 58:2
  61:11 85:15
  99:16 100:7
  119:10,13
**york**  12:20
  50:25 92:22
  159:1

**z**

**zone**  153:20
**zoned**  108:4
  122:7
**zoning**  75:9
  153:11,12
**zoom**  8:12

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.