# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW WALLINGTON HOME, LLC, a New Jersey limited liability company; and MORNINGSIDE AT WALLINGTON, LLC, a New Jersey limited liability company,<br><br>          Plaintiffs,<br><br>    v.<br><br>BOROUGH OF WALLINGTON; BOROUGH OF WALLINGTON PLANNING BOARD; MARK W. TOMKO, in his official capacity as former Mayor of the Borough of Wallington; DOROTHY B. SIEK, in her official capacity as former Tax Collector for the Borough of Wallington; and CHRISTOPHER ASSENHEIMER, in his official capacity as Certified Tax Collector of the Borough of Wallington,<br><br>          Defendants. | Civil Action No. 20-08178<br><br>Hon. Evelyn Padin, U.S.D.J.<br>Hon. Andre M. Espinosa, U.S.M.J.<br><br><br><br>        <u>Civil Action</u> |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Of Counsel:
    James DiGiulio

On the Brief:
    Amy Sachs
    Michael A. Botti

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF FACTS .............................................................................. 5

STANDARD OF REVIEW .............................................................................. 15

LEGAL ARGUMENT ................................................................................... 16

POINT I:     DEFENDANTS ARE LIABLE FOR DISPARATE
             TREATMENT IN VIOLATION OF THE
             FAIR HOUSING ACT…………………………………………... 18

POINT II:    THE UNDISPUTED MATERIAL FACTS
             DEMONSTRATE DEFENDANTS ARE ALSO
             LIABLE FOR DISPARATE IMPACT IN
             VIOLATION OF THE FHA     ………………………………… 30

POINT III:   DEFENDANTS VIOLATED PLAINTIFFS' RIGHTS
             UNDER THE EQUAL PROTECTION CLAUSE
             OF THE FOURTEENTH AMENDMENT
             (42 U.S.C. § 1983) …………………..……………………….. 39

POINT IV:    PLAINTIFF'S EQUITABLE RELIEF, REQUEST
             FOR HEARING ON NON-MONETARY RELIEF,
             AND DAMAGES………………………………………………….. 44

CONCLUSION ............................................................................................ 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*431 E. Palisades Ave. Real Est., LLC v. City of Englewood*,
  977 F.3d 277 (3d Cir. 2020) ....................................................................16

*Adarand Constructors, Inc. v. Peña*,
  515 U.S. 200 (1995)..................................................................................40

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................15

*Antonelli v. New Jersey*,
  419 F.3d 267 (3d Cir. 2005) ....................................................................40

*Carey v. Piphus*,
  435 U.S. 247 (1978)..................................................................................44

*City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*,
  538 U.S. 188 (2003)..................................................................................39

*Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*,
  421 F.3d 170 (3d Cir. 2005) .......................................................17, 19, 21

*Eastampton Ctr., LLC v. Twp. of Eastampton*,
  155 F. Supp. 2d 102 (D.N.J. 2001).......................................18, 20, 33

*Fuentes v. Perskie*,
  32 F.3d 759 (3d Cir. 1994) .......................................................................16

*Gomillion v. Lightfoot*,
  364 U.S. 339 (1960)..................................................................................42

*Groome Res. Ltd. v. Parish of Jefferson*,
  234 F.3d 192 (5th Cir. 2000) ...................................................................28

*Horizon House Developmental Servs., Inc. v. Upper Southampton*,
  804 F. Supp. 683 (E.D. Pa. 1992).............................................................19

*Hovsons, Inc. v. Twp. of Brick*,
  89 F.3d 1096 (3d Cir. 1996) ....................................................................25

*Johnson v. California*,
543 U.S. 499 (2005)............................................................................39

*Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*,
284 F.3d 442 (3d Cir. 2002) ...............................................................17

*Larkin v. Mich. Dep't of Soc. Servs.*,
89 F.3d 285 (6th Cir. 1996) ................................................................23

*Mhany Mgmt., Inc. v. County of Nassau*,
819 F.3d 581 (2d Cir. 2016) ..........................................................25, 43

*Mount Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*,
658 F.3d 375 (3d Cir. 2011) .........................................................*passim*

*Orson, Inc. v. Miramax Film Corp.*,
79 F.3d 1358 (3d Cir. 1996) ...............................................................16

*Resident Advisory Bd. v. Rizzo*,
564 F.2d 126 (3d Cir. 1977) ........................................................*passim*

*Stradford v. Sec'y Pa. Dep't of Corr.*,
53 F.4th 67 (3d Cir. 2022) ..................................................................41

*Tex. Dep't of Hous. &Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015).......................................................................31, 39

*Torres v. Franklin Twp.*,
Civil Action No. 09-6282, 2011 U.S. Dist. LEXIS 148296 (D.N.J. Dec. 22, 2011)....................................................................................23

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973).......................................................................41, 42

*United States v. Audubon*,
797 F. Supp. 353 (D.N.J. 1991)......................................................23, 33

*United States v. City of Black Jack*,
508 F.2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975) .................25

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
429 U.S. 252 (1977)........................................................................21, 43

iii

*Washington v. Davis*,
  426 U.S. 229 (1976)........................................................................................39

**Statutes**

42 U.S.C. § 1983 ........................................................................................1, 43

42 U.S.C. § 1988(b) ........................................................................................44

42 U.S.C. § 3602(k) ........................................................................................18

42 U.S.C. § 3604 ................................................................................19, 32, 34

42 U.S.C. § 3604(a) ........................................................................................17

42 U.S.C. § 3613(c)(1)................................................................................44, 45

42 U.S.C. §§ 3613(c)(2)................................................................................45

Fair Housing Act, 42 U.S.C. § 3601 et seq.............................................................1

**Other Authorities**

Fed. R. Civ. P. 56 ........................................................................................15

Plaintiffs, New Wallington Home, LLC and Morningside at Wallington, LLC (together, "Plaintiffs"), respectfully submit this memorandum of law in support of their motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Counts I, II, and III of the First Amended Complaint ("FAC"). These claims arise under the Fair Housing Act, 42 U.S.C. § 3601 et seq., and the Equal Protection Clause of the Fourteenth Amendment, as enforced through 42 U.S.C. § 1983.

## PRELIMINARY STATEMENT

Over at least the past decade and a half, Wallington's officials have waged a persistent campaign to block inclusionary developments within their borders, deterring racial minorities and families with children from moving into the Borough. These practices have had a clear and indisputable disparate impact – Wallington is a white island wedged between its very diverse neighbors. Plaintiffs' expert, Dr. Justin Steil of MIT, has offered a robust statistical analysis demonstrating that Defendants' conduct had a disproportionate adverse effect on racial minorities and families with children. Dr. Steil has concluded the "Borough of Wallington's actions perpetuate[d] residential segregation on the basis of race and den[ied] residents the benefits of living in an integrated community." It cannot be disputed that the Borough's actions have made housing disproportionately unavailable to Black, Latino, and Asian families – a quintessential FHA disparate impact violation.

1

This did not happen by accident, but instead through blatant violations of law. As it relates to Plaintiffs, the Borough engaged in continuous attempts to delay and deprive Plaintiffs from the opportunity to build a proposed mixed-income 207-unit multifamily development (known as "Morningside at Wallington" or the "Project"), which includes 42 affordable housing units designated for lower-income households. Dr. Steil has concluded, with greater than 99.99% certainty, that the expected composition of Plaintiffs' inclusionary development will be substantially more diverse compared to the current population of Wallington. Indeed, Plaintiffs' development will have residents over 55% non-white, in a Borough that is roughly 70% white. Accordingly, Plaintiffs have clearly established a disparate impact that is unrefuted by Defendants or their experts.

In response, Defendants attempt to argue that their decade long delays and denials of Plaintiffs' land use applications were based on "legitimate land use concerns." However, no less than four different court rulings have determined each delay and denial was "arbitrary, capricious and unreasonable" – meaning no legitimate, legally valid reason existed for the Borough's actions. As early as 2006, the Borough was deemed to have engaged in exclusionary practices, and as recently as 2019, the Borough was found to be "recalcitrant" in carrying out its legal obligations. When asked to offer any non-discriminatory basis for the Borough's actions, the Borough's designee offered nothing. The Borough's expert similarly had

2

nothing new to add - simply contending that the four prior court rulings were wrong.

The unrefuted evidence demonstrates clear ill-motives in delaying and denying Plaintiffs' land use applications. In public meetings the Borough's officials openly referred to the "Mason-Dixon line" – a racially charged term - when describing Wallington as different from neighboring Bergen County municipalities. Moreover, Borough officials openly decried Plaintiffs' inclusionary development because it would have families with children moving in – a protected class that the Borough clearly does not want to move into its borders.

Even more anecdotal evidence supports this conclusion. For instance, the Borough has an unrefuted right-of-way to provide pedestrian and vehicular traffic access to the Westmont train station. The Borough has refused to develop that right-of-way out of fear it could become a transit-oriented town like West New York – a diverse community that the Borough has openly stated it does not want to become.

After years of discovery, the Borough has failed to rebut the clear evidence presented that it has violated the law and as a result protected classes of persons have been disparately impacted and discriminated against. While Plaintiffs do not need to prove malicious purpose to prevail on its claims, it has done so. As a result of the Borough's wayward delays and baseless denials, Plaintiffs have been significantly harmed - building the inclusionary development has become financially unworkable as compared to the costs that existed when Plaintiffs should have received their

3

approvals. In order to rectify the harm caused by the Borough and to ensure that this disparate impact and discrimination is addressed, Plaintiffs are entitled to various relief, including but not limited to damages to allow the inclusionary development to be built.[1] Plaintiffs' damages expert, Arthur Linfante of Integra Realty Resources, has determined that Plaintiffs' compensatory damages total $23,672,000 – a damages calculation that has gone unrebutted by Defendants.

Accordingly, Plaintiffs respectfully submit that they are entitled to summary judgment on Counts I through III of the First Amended Complaint. The Court should hold, as a matter of law, that Defendants have violated the Federal Fair Housing Act and the Equal Protection Clause, clearing the path for this long-delayed inclusionary development to finally move forward.

---

[1] Plaintiffs also seek non-monetary relief to address the impacts caused by the Borough. Such relief is not the subject of this motion, but instead, Plaintiffs request herein further proceedings on these limited issues.

## STATEMENT OF FACTS[2]

### A.    The Proposed Development and Its Residents

Plaintiffs own approximately 10.23 acres of land in Wallington on which they planned to develop "Morningside at Wallington," a multifamily residential complex with 207 units, of which 42 are affordable housing units reserved for low- and moderate-income households. (SUMF ¶ 2.) The project was conceived as part of Wallington's state-mandated affordable housing compliance and was intended to serve families with children and other residents in need of housing. (SUMF ¶ 3.) Indeed, the proposed development includes a substantial number of two- and three-bedroom units (both market-rate and affordable) to accommodate families. (Id.)

By design, the anticipated tenant population of the completed project would be significantly more diverse than Wallington's current population, in terms of both race/ethnicity and family status. (SUMF ¶ 59.) Plaintiffs' expert demographer, Dr. Justin Steil of MIT, has calculated that more than 55% of the development's residents would likely be non-white, in contrast to a Borough population that is less than 30% non-white. (SUMF ¶ 60.) Likewise, many residents would be families with minor children, a class of residents Wallington currently underrepresents. (SUMF ¶

---

[2]    This Statement of Facts is derived from the Statement of Undisputed Material Facts (the "SUMF") submitted simultaneously herewith. For the sake of brevity, the SUMF will not be reproduced at-length herein, but will instead be incorporated by reference throughout this Memorandum of Law.

61.) In short, the project squarely advances the FHA's goals of providing inclusionary housing on a non-discriminatory basis and promoting integration. (SUMF ¶ 62.)

## B.    Defendants' History of Resistance to Affordable Housing[3]

The record shows that Wallington's officials have a long-running pattern of obstructing affordable and multi-family housing on Plaintiffs' properties. (SUMF ¶ 5.) For nearly 20 years, Defendants have used every tool at their disposal to foreclose development that would introduce affordable units and more diverse residents into the Borough. Key events in this pattern include:

2006–2009 – Builder's Remedy Litigation: In 2006, Plaintiffs filed a state "Mount Laurel" lawsuit seeking a builder's remedy, after the Borough failed to meet its affordable housing obligations (the "Builder's Remedy Litigation"). (SUMF ¶ 8.) The litigation concluded with an Order declaring Wallington's zoning controls unconstitutional for excluding affordable housing, and a judgment granting Plaintiffs a builder's remedy (rezoning the site for the inclusionary project). (*Id*. ¶¶ 11-13.) The Court specifically noted Wallington's history of exclusionary practices.

2009–2015 – Obstruction of Development Applications: Borough officials continued to hinder and delay Plaintiffs' attempts to develop the rezoned property. (SUMF ¶¶ 14-15.)  Over the next several years, the Planning Board repeatedly refused to grant site plan approval, employing shifting excuses to stall the project. (SUMF ¶¶16-19.)  This forced Plaintiffs to return to court, yet again. On April 22, 2015, the New Jersey Superior Court reversed the Board's latest denial of site plan approval, finding the Board's decision "arbitrary, capricious, and unreasonable." (SUMF ¶ 20.) Even after that judicial rebuke,

---

[3] The tortured history of Court rulings has been set forth in detail in Plaintiffs' Statement of Undisputed Facts.

Wallington's obstruction persisted. (SUMF ¶ 21.)

2015–2016 – Further Delays and Court Intervention: In the ensuing year, the Planning Board still failed to promptly comply with the Court's directives. Ultimately, on March 2, 2016, the court found that "[t]he Planning Board has unreasonably delayed action" on the remanded application and ordered the Board to act. (SUMF ¶ 22.) By 2016 the state courts had twice intervened to compel Wallington to stop stonewalling Plaintiffs' development.

2016 – Imposition of Improper Procedural Barriers: Rather than accede to the Project, Wallington officials invented new hurdles. The Borough's Zoning Officer (who was also a Planning Board member), Nick Melfi, insisted in 2016 that Morningside could not even file its site plan application until Melfi first reviewed and approved a "development plan" – a purported requirement found nowhere in the New Jersey Municipal Land Use Law (MLUL). (SUMF ¶ 25.) Morningside nevertheless complied, only to have Melfi reject the plans, incorrectly asserting that the project needed a use variance (which, if true, would have moved jurisdiction to a different board and caused further delay). (SUMF ¶ 26.) After legal challenges, the Planning Board was forced to concede Melfi was wrong and that it did have jurisdiction to hear Morningside's application. (SUMF ¶ 27.)

2017 – Discriminatory Hearings and Pretextual Concerns: Once the site plan application was finally accepted, the Planning Board held hearings on May 16, July 18, September 19, and December 19, 2017. (SUMF ¶ 28.) Rather than focus on legitimate land-use issues, Board members and other officials used these hearings as a platform to attack the project for who might live there. (SUMF ¶ 31-33.) As detailed below, Defendants fixated on the possibility of children in the development and the demographic changes the project might bring, making numerous statements that revealed a discriminatory motive to thwart the inclusion of families with children and racial minorities in Wallington. ((SUMF ¶¶ 34-35.) The Board never granted final approval for Plaintiffs' inclusionary development. (SUMF ¶ 45.)

2018–2019 – Superior Court[4] Reverses Application Denials; Finding of

---

[4] Morningside at Wallington, LLC v. Borough of Wallington, No. BER-L-1670-18

"Recalcitrant" Mount Laurel Non-Compliance: On January 16, 2018, the Planning Board adopted Resolution 18-326 denying Plaintiffs' applications; its oral vote occurred on December 17, 2017. (SUMF ¶ 45.) The Board grounded denial largely on the supposed "burden" of "additional" schoolchildren. (SUMF ¶ 31.) On January 16, 2019, the Superior Court (Judge Farrington, J.S.C.) reversed, holding the Board's decision "palpably unreasonable, and ipso facto arbitrary, unreasonable and capricious" because it focused on improper fiscal concerns, failed to ground the denial in land-use criteria, ignored that no expert opposed Plaintiffs' proofs, and overlooked the PR-ML zone created by judicial mandate to implement the prior Builder's Remedy order. (SUMF ¶¶ 47-48.) The court emphasized the "tortured history" of the application and the Borough's "recalcitrant stance toward satisfying its Mount Laurel obligation," ordered "[t]he amended application of New Wallington Homes Inc., and the application for final development approval of Morningside at Wallington LLC are approved in their entirety." (*Id.*)

## C.   **Discriminatory Intent Made Explicit at 2017 Planning Board Hearings**

Defendants' actions were not only rebuked by the Courts, but the clear discriminatory intent of their delays and denials was borne out in the public record. During public Planning Board hearings in 2017, Wallington officials and residents openly voiced their desire to exclude families with children and minority groups from the Borough. (SUMF ¶¶ 31-39.) These public statements provide direct evidence of Defendants' discriminatory intent.

### 1.    **Fear and Bias Against Families with Children**

At the very first hearing (May 16, 2017), then-Mayor Mark Tomko pressed "the estimation of children" for the Borough's schools, calling it "the $65,000

_____

(N.J. Super. Ct. Law Div. Jan. 16, 2019).

8

question on the minds of a lot of people" and adding "we're burdened right now." (SUMF ¶ 31.) He went on: "we know a one-bedroom could fill up a few people too" – a remark implying that even small affordable units would be packed with large, unconventional families. (*Id.*)

At a subsequent hearing on July 18, 2017, Zoning Officer Nick Melfi echoed the trope, telling Plaintiffs' expert: "You forgot about the wives and kids… You said 73 people. You forgot the wives, the boyfriends, family, kids." (SUMF ¶ 32.) A member of the public, Brenda Kapusta, was blunter still, stating: "We all know what goes on [in affordable housing units in Wallington]…a one bedroom doesn't just have one family in it. It has multiple kids." (*Id.*) These comments leave no doubt that familial status (specifically, the presence of children) was viewed as an unwanted outcome of the project. The clear message: Wallington did not want any influx of children, especially those that need affordable housing.

The Law Division later held that the Board's denial "improperly focused on fiscal concerns, i.e. the costs for anticipated school age children," and that the Board cited testimony that additional students would be a "burden," even though its own resolution "acknowledged the applicants' testimony that between 5 and 11 additional students would be added by the project was correct and verified." (SUMF ¶¶ 31-39). See Morningside at Wallington, LLC v. Borough of Wallington Planning Bd., No. BER-L-1670-18 *7 (N.J. Super. Ct. Law Div. Jan. 16, 2019) (Farrington, J.S.C.)

9

(holding the decision "palpably unreasonable, and ipso facto arbitrary, unreasonable and capricious").

Putting aside that consideration of such concerns is completely improper and illegal, the factual premise that Wallington's schools would be overwhelmed was also false. Wallington's public-school enrollment during all relevant years was steadily decreasing. Data presented at the hearings showed that the number of K-12 students in the Borough dropped from 1,635 (in 2012) to 1,283 (in 2018). (SUMF ¶ 36.) Thus, the fear that the development would overwhelm the schools was entirely unfounded – a pretext with no basis in reality. Even accepting Plaintiffs' expert's projection of roughly 13 school-aged children from the development's affordable units, that would amount to around 1% of the district's enrollment – a trivial increase. Defendants' own planning expert from Rutgers confirmed that transit-oriented developments typically generate very few schoolchildren, citing studies (many from West New York) that corroborated the low estimate. (SUMF ¶ 36.)

In short, the record refutes any legitimate concern about school capacity, and Judge Farrington specifically found the Board's resolution "devoid of any factors which would support the denial," and condemned the Board's "unfortunate focus on the project's impact to the public fiscal, rather than land use concerns." (SUMF ¶ 47.) Unfortunately, Defendants' focus on children was a sham rationale used to disguise their intent to keep certain families out of Wallington.

10

### 2.    Opposition to "Transit-Oriented" Development to Exclude Minorities

As the hearings progressed, Defendants' racially biased motivations also surfaced. A defining feature of Plaintiffs' project is its proximity to a New Jersey Transit train station (Wesmont Station in neighboring Wood-Ridge). (SUMF ¶¶ 38-40.) The site is separated from the station by one parcel (the "Doka property") over which the Borough holds a right-of-way that could be improved to provide a direct pedestrian connection. (SUMF ¶ 71.)

Rather than embrace improved transit access, Wallington's officials saw it as a threat – specifically, an attraction for undesirable residents to live in Wallington. During the September 19, 2017, hearing, Planning Board member Eugeniusz Rachelski articulated this strategy openly. He noted that while the development was near public transportation, "you don't have walking access…it's quite a distance" and opined that this might deter some people from living there. (SUMF ¶ 38.) Rachelski explicitly contrasted Plaintiffs' project with "transit villages or transit-oriented villages [like West New York]," observing that those communities are within walking distance of train stations. (SUMF ¶¶ 41-43.)

Rachelski did not hide what was motivating this stance. He stated that Plaintiffs' project "was compared to West New York…and it really is…it is a West New York, and this is not the stuff that we want in our town." (emphasis added). (SUMF ¶¶ 41-42.) The reference was telling. West New York is a dense, transit-

11

oriented community with a predominantly Hispanic and non-white population (only ~13.9% white non-Hispanic in 2010, versus Wallington's 75.4% white). (SUMF ¶¶ 40, 60.) In case there were any doubt, the Borough's own attorney, Martin Cedzidlo, underscored the point on the record: "Mr. Rachelski made a comment about we don't want it to look like West New York. I think it's clear that is the overriding issue the Board has raised." (*Id*. ¶ 42.) This admission by the Borough's counsel is extraordinarily compelling. The "overriding issue" for the Board was not traffic, not environmental impact, not compliance with zoning – it was preventing the town from becoming more racially diverse. (*Id*.)

### 3.    The "Mason-Dixon Line" Remark as Direct Evidence of Racialized Intent

In another shocking moment during the 2017 hearings, Mayor Tomko referenced the "Mason–Dixon line" – a racially charged phrase leaving little ambiguity. (*Id*.) In context, the remark functioned as a racial boundary metaphor, aligning with the Board's stated desire to avoid becoming "like West New York" and with its refusal to open the right-of-way to the nearby train station—measures aimed at deterring the racially diverse, family households that would have resided at Morningside. (SUMF ¶¶ 39, 67.)

Together, these statements portray a governing body fixed on keeping Wallington as it is: a largely white and older community, even at the cost of flouting housing laws. Defendants' own words reveal that their true concern was that the

12

project would introduce undesirable families into Wallington and upset the status quo. In furtherance of that discriminatory goal, Defendants were willing to forego the obvious benefits of the development (including helping satisfy affordable housing need, improving an unused right-of-way, and adding new housing stock) and to invent any pretext (school overcrowding, density concerns, etc.) to justify their opposition. The record leaves no genuine issue of fact that Defendants' campaign against Plaintiffs' project was driven by discriminatory intent and had a discriminatory effect, as detailed below.

    **4.**       **Expert Evidence of Disparate Impact and Discrimination**

The results of Defendants' actions are reflected in Wallington's demographics. Wallington is a racially homogenous enclave compared to its neighbors. According to the U.S. Census Bureau's 2019-2023 5-Year American Community Survey,[5] approximately 70% of Wallington's population identified as white, a percentage far higher than in the surrounding municipalities. (SUMF ¶ 56.) In fact, every town bordering Wallington had a significantly lower white (non-Hispanic) population share; some with less than half the proportion of white residents than Wallington. (SUMF ¶ 57.)

Dr. Justin Steil, from MIT and an expert in urban planning and fair housing, conducted an analysis of the demographic impact of Defendants' actions. (SUMF ¶¶

---

[5] U.S. Census Bureau, Data, census.gov, https://www.census.gov/data.html.

13

58-59.) His unrebutted findings demonstrate stark disparate impacts. Using census and housing data, Dr. Steil determined that the Borough's obstruction of the development "had a significant adverse impact in making housing unavailable on the basis of race and family status." (*Id.*) He applied two complementary statistical tests consistent with HUD regulations and case law. (*Id.*)

First, he compared the proportion of protected-class members affected by the challenged actions to the proportion of others affected. This showed that Wallington's blocking of the mixed-income development adversely affected potential non-white residents at 1.2 times the rate of white residents, and affected households with minor children at 1.3 times the rate of households without children. (*Id.* ¶¶ 62-63.)   In other words, the pool of people denied housing includes a 20% higher share of minorities (Black, Latino, Asian) than the pool of those not adversely affected, and a 30% higher share of families with kids than of childless households. (Id. ¶ 64.)

Second, Dr. Steil performed a chi-square statistical test to evaluate the likelihood that Wallington's current racial makeup would occur by chance if the proposed development (with its expected diverse residents) were allowed. (Id. ¶ 65.) This test found with greater than 99.99% certainty that the racial disparity between the "substantially more diverse" population expected in the development and the existing population of Wallington is not random. (Id. ¶ 66.) In practical terms,

Wallington's actions have demonstrably caused housing opportunities to be disproportionately unavailable to Black, Latino, and Asian residents, and have also disproportionately denied housing to families with children. (Id. ¶ 67.) By preventing a development in which a majority of residents would likely have been non-white, Defendants ensured that Wallington remains far less diverse than the surrounding region, thereby perpetuating racial segregation. (Id.)

Taken together, the undisputed factual record paints a compelling picture: Defendants' actions had an outsized adverse impact on protected groups.

## STANDARD OF REVIEW

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To withstand summary judgment, an issue of fact in dispute must be both genuine and material; that is, a fact on which a reasonable fact finder could base a verdict for the nonmoving party, and which is essential to the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, the court may not weigh the evidence or make credibility determinations but rather is limited to deciding whether there are any disputed issues that are both genuine and material. *Id.* at 249.

A court considers the facts drawn from materials in the record, such as "affidavits or declarations, stipulations (including those made for purposes of the

15

motion only), [and] admissions[.]" Fed. R. Civ. P. 56(c)(1)(A). If the moving party carries its burden under Fed. R. Civ. P. 56, the non-movant must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The non-movant must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994) (citation omitted).

Summary judgment in Plaintiffs' favor as to their First Amended Complaint is appropriate. The record makes clear there are no genuine disputes of material fact, and the Court may grant relief in Plaintiffs' favor as a matter of law.

## **LEGAL ARGUMENT**[6]

"'The Fair Housing Act . . . passed by Congress as Title VIII of the Civil Rights Act of 1968, prohibits housing discrimination on the basis of, *inter alia,* race, gender, and national origin. *431 E. Palisades Ave. Real Est., LLC v. City of Englewood*, 977 F.3d 277, 283 (3d Cir. 2020) (citing *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005)). Specifically, the Fair Housing Act

---

[6]     All exhibits referenced in Plaintiffs' Memorandum of Law in Support of Summary Judgment are attached to the Certification of James DiGiulio, Esq. filed contemporaneously herewith.

("FHA") makes it unlawful to "refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). A dwelling can be made otherwise unavailable by, among other things, action that limits the availability of affordable housing. *Mount Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 381 (3d Cir. 2011).

A plaintiff may bring a claim under the FHA for unlawful discriminatory housing practices under three legal theories: disparate treatment, disparate impact and failure to reasonably accommodate. *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains,* 284 F.3d 442, 448 (3d Cir. 2002). "[C]ourts have specifically allowed claims under this section to be brought against municipalities and land use authorities." *Cmty. Servs.*, 421 F.3d at 176.

Here, Plaintiffs move for summary judgment on two types of claims pursuant to the FHA: (1) intentional discrimination claims (also called disparate treatment claims) and (2) disparate impact claims. Plaintiffs further move for summary judgment on Equal Protection claims under the Fourteenth Amendment of the United States Constitution.

17

## POINT I

### DEFENDANTS ARE LIABLE FOR DISPARATE TREATMENT IN VIOLATION OF THE FAIR HOUSING ACT

The FHA's protections extend to the very non-white racial minorities and families with children that Defendants have excluded from the Borough. Congress enacted the FHA "to prohibit housing discrimination on the basis of race, color, religion or national origin." *Eastampton Ctr., LLC v. Twp. of Eastampton*, 155 F. Supp. 2d 102, 110 (D.N.J. 2001). Congress subsequently "extended the protected classes to include 'familial status.'" *Id.* (quoting *United States v. Branella*, 972 F. Supp. 294, 297-98 (D.N.J. 1997). "Familial status" is defined as one or more persons under the age of eighteen domiciled with a parent or legal custodian. 42 U.S.C. § 3602(k). Congress included familial status as a protected class to recognize that "[i]n many parts of the country families with children [were being] refused housing despite their ability to pay for it." *Eastampton Ctr., LLC*, 155 F. Supp. 2d at 116 (citing H.R. Rep. No. 100-711, at 19 (1988) reprinted in U.S.C.C.A.N. 2173, 2180). Congress intended to prevent discriminatory practices which resulted in "families with children" being forced to live in substandard or overcrowded conditions. *See id.* at n.16 (citing H.R. Rep. No. 100-711, at 19).

A violation of the FHA may thus be established by showing that the challenged actions were either intentionally discriminatory (disparate treatment) **or**

18

had a discriminatory effect (disparate impact). § 3604 requires only that a protected characteristic was a motivating factor in the housing decision; plaintiffs need not show that the decision rested "solely, primarily, or even predominantly" into the motivation behind the challenged action. *See Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005); *see also Horizon House Developmental Servs., Inc. v. Upper Southampton*, 804 F. Supp. 683, 696 (E.D. Pa. 1992) ("In order to prove intentional discrimination it is not necessary to show an evil or hostile motive. It is a violation of the FHAA to discriminate even if the motive was benign or paternalistic."). The plaintiff is only required to "show that a protected characteristic played a role in the defendant's decision to treat her differently." *Id*. (internal citations omitted).

Courts assess such claims under the burden-shifting framework analogous to employment discrimination: the plaintiff bears the initial burden to produce evidence of discriminatory intent; the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason; finally, the plaintiff may show that the proffered reason is pretextual and that discrimination was the real reason. *Id.* at 176-77.

### A.    The Undisputed Evidence Establishes Defendants' Discriminatory Intent

A disparate treatment claim requires evidence of discriminatory purpose motivating the housing decision. *Id*. A plaintiff can establish a prima facie disparate

treatment claim "by showing that discriminatory intent against a protected group was a motivating factor for the challenged action." *Eastampton Ctr., LLC*, 155 F. Supp. 2d at 111 (internal citation omitted).

Plaintiffs have amassed overwhelming (indeed, largely uncontroverted) evidence that Defendants acted because of race and familial status, not for any legitimate purpose. Most damning are the *explicit statements* made by Defendants' officials during the 2017 hearings. There is no need to infer animus or interpret coded language – the decision-makers plainly stated their bias. They worried aloud that the inclusionary development would bring an inordinate number of school children and *"multiple kids"* in affordable units, which they viewed negatively. They spoke of not wanting the project to turn Wallington into a dense, transit-accessible community like West New York – a place associated with racial diversity – and flatly said *"this is not the stuff that we want in our town."* (SUMF ¶ 42.) And perhaps most blatant and offensive of all the remarks from Mayor Tomko referencing the "Mason–Dixon line" - a direct expression of race-based opposition to the project's anticipated residents. (*Id.* ¶ 36.) The Borough's attorney also confirmed that avoiding an influx of undesirable inhabitants, akin to West New York, was *"the overriding issue"* for the Board. (*Id.* ¶ 43.) These statements alone constitute direct evidence of discriminatory intent as they are overt expressions of bias against protected groups (families with children and diverse residents) and admissions that such bias was

20

driving the Board's actions.

Even absent such direct evidence, Plaintiffs may establish intent through circumstantial evidence under the framework of *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977). Indeed, the "discriminatory purpose need not be malicious or invidious, nor need it figure in 'solely, primarily, or even predominantly' into the motivation behind the challenged action." *Cmty. Servs., Inc.*, 421 F.3d at 177. Rather, the burden is much lighter: "the plaintiff is only required to 'show that a protected characteristic *played a role* in the defendant's decision.'" *Id.* (emphasis added).

A motivating "'invidious discriminatory purpose' can be gleaned through an inquiry which weighs a number of factors." *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 142-43 (3d Cir. 1977) (quoting *Arlington Heights*, 429 U.S. at 266). Indeed, some of the relevant factors that can show an invidious discriminatory purpose, include: (1) a disparate impact on a protected class; (2) the historical background of the decision; (3) departures from normal procedure or substantive criteria; and (4) contemporaneous statements by members of the decision-making body. *Id*. at 266-68.  All of those factors are present here.

First, the effect of Defendants' actions was to disproportionately deny housing to non-whites and families (see Point II *infra* on disparate impact). Second, the *historical background* reveals a long campaign of resistance to affordable housing,

21

in particular this Project, often in open defiance of legal orders/mandates. Indeed, Judge Farrington determined that the Borough improperly considered the impact of families with children in its denial. Third, there were blatant *procedural and substantive departures*: e.g., inventing extra-statutory processes to stall approval, issuing a baseless variance denial, and refusing to use an existing right-of-way for the illogical reason of *preventing improved access to transit*. (SUMF ¶¶ 71-74.) Such irregularities make sense only as part of a plan to thwart this particular development. Indeed, it was only after four different court rulings, including a final ruling that deemed it futile to remand again to the Planning Board, that the Project finally received its approvals. Fourth, as discussed, the *contemporaneous statements* of the decision-makers including references to "West New York" and the "Mason–Dixon line" explicitly linking opposition to the race and family status of expected occupants, leave no doubt as to their mindset. (SUMF ¶¶ 36-42.) In combination, this evidence overwhelmingly demonstrates that a discriminatory intent permeated Defendants' conduct. At a minimum, discriminatory purpose was a significant motivating factor behind the Borough's actions regarding Plaintiffs' project.

Notably, courts in this District and around the country have specifically recognized that hostility toward new developments and residents because of race or familial status (or animus towards a protected group) is exactly the kind of intentional discrimination the FHA forbids and is a "significant factor" in showing

22

a violation of the FHA. *Torres v. Franklin Twp.*, Civil Action No. 09-6282, 2011 U.S. Dist. LEXIS 148296 *19 (D.N.J. Dec. 22, 2011)("in establishing a violation of the FHA, a plaintiff need not show that racial animus was the sole reason for denial of housing, only that it was 'one significant factor'"); *United States v. Audubon*, 797 F. Supp. 353, 361-62, (D.N.J. 1991)("[d]iscriminatory intent may be established where animus towards a protected group is a significant factor in the community opposition to which the commissioners are responding"); *Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996) ("facially discriminatory actions are just a type of intentional discrimination or disparate treatment, and should be treated as such.").

Here, no such proof is necessary as Wallington's officials explicitly stated they did not want certain families with children and other residents in their backyard, analogized the area using a reference to the "Mason-Dixon line," and acted on that bias by blocking the development. (SUMF ¶ 36.) Accordingly, Plaintiffs have satisfied their burden of showing that discriminatory motives played some role in the decisions and actions of the Borough.  As a result, the burden shifts to Defendants to proffer a legitimate reason for their conduct.

**B.    Defendants' Purported Justifications Are Pretextual and Legally Insufficient**

Defendants cannot meet their burden to produce a legitimate, non-discriminatory justification for their actions. During this litigation (and previously,

in their motion to dismiss), Defendants have suggested that their opposition to the project was based on neutral concerns like school overcrowding, traffic, and preserving community character. (SUMF ¶¶ 31-43.) But the record fatally undermines these excuses.

In reversing the Planning Board's denial, the Law Division found the Board's resolution "devoid of any factors which would support the denial, other than the improper consideration of fiscal reasons," and criticized the Board's "unfortunate focus on the project's impact to the public fiscal, rather than land use concerns," i.e., "the costs for anticipated school age children," rendering the decision "palpably unreasonable, and ipso facto arbitrary, unreasonable and capricious." *Morningside at Wallington, LLC v. Borough of Wallington Planning Bd.*, No. BER-L-1670-18, *9 (N.J. Super. Ct. Law Div. Jan. 16, 2019). Ultimately, the record is clear from four different Court rulings that the Borough's actions were not based on any legitimate land use concerns, but instead arbitrary, capricious, and unreasonable.

Moreover, many of the purported reasons for the delays and denials were completely pretextual. The school overcrowding rationale was not only inherently discriminatory (targeting families with children) but also factually baseless – school enrollments in the borough have been in decline since 2012, and the project would have had a de minimis impact on the schools. (*See* Ex. B, Farrington Opinion, at pg. 7.) Judge Farrington underscored that even the Board's own resolution

24

"acknowledged the applicants' testimony that between 5 and 11 additional students would be added by the project was correct and verified," while the Board simultaneously labeled such students a "burden." (*Id.*) In other words, the supposed problem was *manufactured*. See *Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1105 (3d Cir. 1996) (recognizing that supposed "incompatibli[ty]" concerns does not override equal opportunity to housing and are not legitimate bases for land-use decisions under the FHA); *United States v. City of Black Jack*, 508 F.2d 1179, 1186–88 (8th Cir. 1974) (rejecting a municipality's asserted concerns about school overcrowding and other neutral-sounding factors where the record showed the zoning denial did not actually advance those interests), cert. denied, 422 U.S. 1042 (1975); *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 606–10 (2d Cir. 2016) (upholding finding that asserted traffic and school-impact concerns were insufficient to negate discriminatory intent in rezoning for affordable housing).

Likewise, Defendants' invocations of "density" concerns do not withstand scrutiny. (SUMF ¶ 42.) The property was rezoned by court order specifically to permit this 207-unit development - any impact from that density were assessed and accepted in the builder's remedy judgment. Judge Farrington noted the Board "makes no mention" that the site lies in the PR-ML zone "created by judicial mandate" to implement the builder's remedy; that zone permits reduced rear setbacks where, as here, a coordinated uniform plan was submitted across both lots.

(Ex. B, Farrington Opinion at pg. 8.) Plaintiffs' traffic expert even testified that, given the nearby transit options, a significant number of residents would use public transportation – mitigating traffic concerns. (Ex. R, Seckler Report at pg. 11). Tellingly, Defendants did not dwell on traffic at the hearings; instead, they fixated on who might be riding that public transit. (Ex. B, Farrington Opinion at. pg. 7).

Even when given the chance to conjure an after-the-fact legitimate, non-discriminatory basis for a decade of delays and denials, the Defendants have fallen woefully short. In the only deposition testimony offered to bind the Borough, its corporate designee, Jennifer Appice ("Ms. Appice"), was unable to offer even one alternative basis for the repeated denials and delays. (Ex. P, Appice Dep. at 29:12-22). Therefore, as corporate designee, Ms. Appice confirmed that the Borough had: (1) no legitimate basis for denying Plaintiffs' development projects for over a decade; and (2) no defense to Plaintiffs' claims. (*See generally id*).

Realizing that the Borough failed to carry its burden with either contemporaneous proofs or post-hoc testimony from its corporate designee, the Borough served the expert report of planner Jessica C. Caldwell. Ms. Caldwell has worked as a planner and testified for municipalities in New Jersey Fair Share Housing matters regarding municipal compliance with New Jersey state affordable housing obligations. However, Ms. Caldwell has never appeared as an expert before a Federal District Court or rendered an opinion regarding alleged violations of the

26

Federal Fair Housing Act – the basis for Plaintiffs' claims.

Ms. Caldwell acknowledged that the Courts found no legitimate land use concerns when determining the Borough acted arbitrary, capriciously, and unreasonably. Indeed, Ms. Caldwell conceded that Judge Farrington did not reference "any legitimate land use concerns that were addressed by the planning board in their denial." With no alternative theories of her own, Ms. Caldwell took the only position she could – she "disagree[d]" with the judicial findings of the Courts, and opined that the Borough actually had "legitimate land use concerns." (Ex. Q, Caldwell Dep. 106:1–107:11). Surely, a planner lacks the expertise and experience to overrule the final judgments entered by no less than four judges.

Ms. Caldwell further conceded that the Board's hearings featured concerns about "anticipated school children," and admitted that, under the Fair Housing Act, families with children are a protected class and land use applications may not be denied simply because of the presence of children, precisely what the Law Division criticized here. (*Id.* 87:2–7; 96:8–97:7; 104:24–105:25). In addition, when asked to explain repeated reliance on rhetoric about "West New York" and the "Mason–Dixon Line," Ms. Caldwell did not offer any alternative non-discriminatory explanation. (*Id.* 89:1–90:11; 109:24–111:22).

Ms. Caldwell's opinions are particularly speculative and unsupported because she conducted less diligence than the very Judges she disagrees with. Ms. Caldwell

27

did not visit the site, conducted no interviews of Board or Council members, did not review the depositions of the Borough's corporate representative, the Mayor, or Council members, and reviewed only some of the hearing transcripts. She also performed no statistical or data analysis of her own and offered no expertise regarding the FHA. (*Id.* 40:25–42:17; 84:6–85:3; 34:11–35:6; 134:14–135:6). She has never served as an expert in a builder's-remedy action and was unaware of any matter, with facts comparable to this one, featuring "four" judicial reversals or an on-the-record "Mason–Dixon Line" remark. (*Id.* 33:11–24; 137:18–25).

Finally, although she purports to offer opinions about the Borough's compliance with the Federal Fair Housing Act, Ms. Caldwell testified that her firm rarely deals with the federal statute, she has not previously offered opinions for an FHA causation analysis, and she believes that unreasonable delays in permitting housing for protected classes cannot violate the FHA – opinions squarely odds with the statute's core purpose of ensuring access to housing and pertinent case law. (*Id.* 119:13-15; 124:20–125:11; 134:14–136:13); *see also Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 198-99 (5th Cir. 2000) (holding that a municipality's unjustified failure to act on a zoning request for a group home in the disability context could constitute a refusal to make a reasonable accommodation under the FHA because an "indeterminate delay has the same effect as an outright denial").

Even if Defendants could articulate some facially neutral interest, which they

have not, Plaintiffs have offered unrebutted evidence that Defendants could have achieved legitimate objectives through less discriminatory means. For instance, if the Borough truly worried about school capacity or infrastructure, it could have negotiated developer contributions (e.g. payments in lieu of taxes ("PILOT"), which Plaintiffs were willing to discuss) or made targeted improvements – rather than categorically obstructing the project. Ms. Caldwell further testified that, in her experience, "probably 75 percent" of affordable-housing developments receive PILOTs and that municipalities routinely grant them, confirming that pragmatic, less-restrictive tools were readily available. (Ex. Q, *Caldwell Dep.* 52:9-23). If pedestrian safety near the train station was a concern, the solution would be to improve the right-of-way with appropriate safeguards, not to leave it barren to intentionally discourage use. There was no necessity to adopt the extreme course of blocking the development outright. Under FHA disparate treatment analysis (and even more so under disparate impact analysis), the availability of less discriminatory alternatives eviscerates Defendants' proffered defenses. (*See generally* Steil Report. Ex. F). The truth is that Defendants' only real "interest" was in keeping Wallington's demographic makeup unchanged, which is not a legally cognizable interest. (*Id.*)

Because Plaintiffs have shown direct and circumstantial evidence of discriminatory intent, and because Defendants' offer no supported non-discriminatory reasons, and any unsupported reasons offered are pretextual or

29

legally insufficient, Plaintiffs are entitled to summary judgment on their FHA disparate treatment claim. In similar circumstances, courts have not hesitated to find liability. *See, e.g., Borough of Audubon*, 797 F. Supp. at 361–63 (imposing a permanent injunction against the Borough in FHA case where the record was "replete with evidence" exposing the town's discriminatory purpose).

Here, the record, including Defendants' own words, offers no benign interpretation. The FHA was enacted precisely to halt the kind of intentional exclusionary conduct that Defendants engaged in. The Court should so hold and grant Plaintiff's motion for summary judgment with respect to disparate treatment.

## POINT II

### THE UNDISPUTED MATERIAL FACTS DEMONSTRATE DEFENDANTS ARE ALSO LIABLE FOR DISPARATE IMPACT IN VIOLATION OF THE FHA

"For a claim of 'disparate impact under the FHAA, the plaintiff must show that the [municipality's] action had a greater adverse impact on the protected group . . . than on others.'" *901 Ernston Rd., LLC*, 2018 U.S. Dist. LEXIS 79845, 2018 WL 2176175 at *7 (quoting *Lapid-Laurel LLC v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 466-67 (3d Cir. 2002)). "'[N]o single test controls in measuring disparate impact,' but the Residents must offer proof of disproportionate impact, measured in a plausible way." *Mount Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011)

30

(quoting *Hallmark Developers, Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1286 (11th Cir. 2006)). "Typically, 'a disparate impact is demonstrated by statistics,' and a prima facie case may be established where 'gross statistical disparities can be shown.'" *Id.* (quoting *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977)).

Once the plaintiff makes this showing, the burden shifts to the defendant to prove that its actions were necessary to achieve a legitimate, nondiscriminatory interest. *Tex. Dep't of Hous. &Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 527 (2015). Even if a valid interest is shown, the defendant must also demonstrate that "no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Mount Holly*, 658 F.3d at 382 (quoting *Rizzo*, 564 F.2d at 149). If the defendant meets that burden, the plaintiff may still prevail by showing a less discriminatory alternative was available. *Id.* at 382–83.

## A.    Plaintiffs Have Established a Prima Facie Case of Disparate Impact

Plaintiffs have indisputably made the threshold showing that Defendants' conduct had a disproportionate adverse impact on protected classes – specifically, on (1) racial and ethnic minorities, and (2) families with children. The "policy" or practice at issue can be viewed as Defendants' series of actions obstructing the Morningside development (refusing approvals, declining to open the right-of-way, etc.), which effectively kept 207 units of housing, including 42 affordable units, out

31

of the Borough's housing stock. Those units would have been available to renters and by preventing their existence, Defendants "otherwise made unavailable or denied" dwellings to persons because of their race and familial status, in violation of §3604. Statistical evidence quantifies the impact of that denial. Dr. Justin Steil's expert report (dated June 30, 2025) provides unrefuted statistical analysis demonstrating that Wallington's blockage of the project fell more harshly on protected groups than others:

### 1.    **Disparate Impact on Racial Minorities**

Dr. Steil compared the racial composition of the expected residents of the 207-unit development to the composition of those who would remain housed elsewhere because the project was not built. He concluded that the Borough's actions "adversely affected potential non-white residents at 1.2 times the rate" of potential white residents. (Ex. F, Steil Report at 1.) This is unsurprising: as noted, between 55 and 63 percent of the development's occupants were projected to be non-white, far above the Borough's existing proportion of non-whites. (*Id.* at 14.) By halting the project, Defendants disproportionately hurt minority households looking for housing. Dr. Steil further performed a chi-square statistical test, finding with greater than *99.99% confidence* that the racial composition of the lost housing opportunity (more diverse) versus the status quo in Wallington (much whiter) was not due to chance but to the Borough's policy. (*Id.* at 16.) In short, Wallington's actions

32

removed a housing opportunity that would have benefited hundreds of non-white individuals, thereby continuing the exclusion of such individuals. The result is exactly the kind of "disproportionate adverse effect on minorities" that the FHA's disparate-impact theory addresses.

### 2.    Disparate Impact on Families with Children

The evidence similarly shows that Defendants' obstruction had a disparate impact on households with minor children. The proposed inclusionary development included a substantial number of two- and three-bedroom units ideal for families. Dr. Steil found that by blocking the 42 affordable units, which were predominantly larger units, Defendants adversely affected *eligible residents with children* at 1.3 times the rate of eligible residents without children. (*Id*. at 20.)  In other words, families were 30% more impacted than childless households. Indeed, the entire premise of Defendants' hostility was to keep out children; a point that ironically confirms the disparate impact on families. Under the FHA, "familial status" (having children under 18) is a protected class, and statistical disparities in housing opportunities that disfavor families can establish a prima facie impact case. *See Eastampton Ctr., L.L.C. v. Twp. of Eastampton*, 155 F. Supp. 2d 102, 113–15 (D.N.J. 2001); *Borough of Audubon*, 797 F. Supp. at 360 (legitimate interests in land use regulation must be pursued in a nondiscriminatory manner under the FHA).

33

### 3.    Perpetuation of Segregation

On its face, the Mayor's invocation of the "Mason–Dixon line" during the hearings is consistent with a policy choice that perpetuates segregation rather than mitigates it, and indeed, in FHA jurisprudence, a policy that perpetuates racial segregation is also cognizable as a discriminatory effect. *See Rizzo*, 564 F.2d at 149. Dr. Steil's report and other data make clear that Wallington's conduct had this segregative effect. Wallington is a disproportionately white enclave in its region (approximately 70–75% white, versus markedly lower white percentages in adjacent municipalities). (SUMF ¶ 60.) The Project was specifically aimed at integrating the community as it would have introduced a racially diverse population into Wallington, moving the needle toward the regional norms. By killing the project, Defendants further perpetuated residential segregation of the Borough. As Dr. Steil concluded, the odds that Wallington's extreme homogeneity compared to its surroundings is a natural occurrence are essentially zero (Ex. F at pg. 2) as it is the product of the Borough's course of conduct at issue here. Continuing to fence off the Borough from more integrated development entrenches the segregation, precisely a harm the FHA was meant to redress. 42 U.S.C. § 3604.

### 4.    Defendants Cannot Demonstrate Any Valid, Nondiscriminatory Justification

The burden thus shifts to Defendants to justify their policies. For many of the same reasons discussed under Point I(B) supra, Defendants cannot carry this burden.

34

In evaluating a disparate-impact defense, the question is whether the defendant's interest is bona fide and substantial, and if so, whether it could be served by a less discriminatory alternative. *See Mount Holly*, 658 F.3d at 382.

Here, Defendants' proffered interests (to the extent they have articulated any in discovery or motion practice) are insubstantial and illegitimate. A desire to maintain a town's traditional demographic makeup – to avoid becoming like a more diverse community – is not a legitimate governmental interest under the FHA. To the contrary, it is the kind of intent the FHA targets. *Rizzo*, 564 F.2d at 142-43. Likewise, generalized concerns about more children in town or about multi-family housing being built do not qualify as valid interests that can justify discriminatory effects. Even if couched as protecting "burdened" schools from "over-crowding" which purportedly could not handle "added enrollment," those rationales crumble under scrutiny: the schools did not need protecting, as no evidence was put forth indicating that the development would be overly burdensome to the schools. (See Ex. B, Farrington Opinion, at pg.11). Furthermore, preventing residential density in the abstract is not a compelling goal, especially when affordable housing mandates specifically called for this density on Plaintiffs' Property. In short, no substantial, non-discriminatory objective has been demonstrated here.

Defendants' own expert offers no rebuttal to Plaintiffs' statistical proof or to Dr. Steil's conclusions. Ms. Caldwell admitted she has never rendered an expert

35

opinion employing statistical analyses like those in Dr. Steil's report and is not offering any expert opinion addressing those analyses here; she further conceded she performed no data analysis of her own. (*See* Ex. Q at 34:11–18; 126:5–8). She did not dispute Dr. Steil's baseline demographic facts and had "no information" to contest his conclusion that Wallington is substantially less diverse than neighboring municipalities, and she offers no opinion on the causes of the disparity he identifies. (*Id*. 116:24-118:12). Those concessions alone leave Dr. Steil's analyses unrebutted.

Ms. Caldwell also acknowledged that Dr. Steil concluded the Borough's conduct had a disparate impact on protected classes under the FHA, yet she countered only with a bare assertion that she doesn't "believe" there is disparate impact before admitting she "do[esn't] know if there's a disparate impact", and conceding she is not providing a federal FHA analysis, that she "rarely" deals with the FHA, and that her opinions rest on planning experience rather than FHA expertise. (*Id*. 116:5–23; 122:1–13; 123:23-124:6; 134:14–135:25). Such does not create a genuine dispute on summary judgment and cannot carry Defendants' burden at step two of the FHA framework.

Instead, Ms. Caldwell was hired to try and explain another reason for these impacts since the Borough's own representatives were unable to do so.  However, short of rejecting four judicial rulings, Ms. Caldwell left nothing for the Defendants' to credibly rely upon. In fact, her testimony further confirms the availability of

less-discriminatory alternatives that undermine any asserted fiscal or "school cost" rationale. Based on her experience, municipalities routinely use long-term tax abatements to manage fiscal impacts for affordable developments, "probably 75 percent" of such projects receive PILOTs, yet Wallington chose obstruction rather than standard fiscal tools. (*Id.* 52:9–23.) That admission both undercuts Defendants' purported interests and independently demonstrates that less-discriminatory means were available.

Finally, Ms. Caldwell's understanding of the record aligns with the Law Division's findings that the Board's denial improperly fixated on schoolchildren: she acknowledged the court's conclusion that the Board "improperly focused on fiscal concerns, i.e., the costs for anticipated school age children," and despite her best effort, she could not identify any other legitimate land use basis beyond what the Board recited in its resolutions; rather, Ms. Caldwell believes Judge Farrington was "wrong." (*Id.* 104:24–107:11; 112:1–17.) That testimony reinforces that Defendants' proffered rationales are post hoc and pretextual, not bona fide interests under the FHA.

Assuming arguendo that Defendants had some legitimate objectives, they have made no showing whatsoever that "no alternative" could achieve those objectives with less discriminatory impact. *Rizzo*, 564 F.2d at 149. Indeed, Plaintiffs proved the opposite: there were many alternatives and mitigating measures

37

available. For example, the Borough could have allowed the development to proceed and then addressed any potential traffic issues via infrastructure improvements or traffic studies, rather than prohibit housing altogether. If the concern was the cost of education for additional students, the Borough could have negotiated a PILOT agreement or seek other fiscal offsets (Plaintiffs even indicated willingness to discuss such measures with the Borough). (*see* Ex. Q at 52:9–52:23 (testifying that, in her experience, "probably 75 percent" of affordable developments receive PILOTs)). Defendants explored none of these avenues. They chose the most extreme and restrictive approach, blocking the housing and maximizing discriminatory impact. Under settled FHA law, if a less discriminatory alternative could serve the defendant's needs, the defendant's practice cannot survive step 2 or 3 of the analysis. *See Rizzo*, 564 F.2d at 149. Here, Defendants have not met (and cannot meet) their burden to show the absence of less discriminatory impact.

Because Plaintiffs' evidence of disparate impact is compelling and essentially unrebutted, and because Defendants lack a valid justification that meets the demanding standard, Plaintiffs are entitled to summary judgment on their FHA disparate-impact claim. *See Mt. Holly*, 658 F.3d at 385–87 (reversing dismissal of disparate impact claim where plaintiffs presented statistical evidence of displacement of minorities and defendants had not proven no less discriminatory alternatives). Granting relief here serves the FHA's core purpose: the removal of

38

"artificial, arbitrary, and unnecessary barriers" that operate to discriminate in housing. *Tex. Dep't of Hous. & Cmty. Affairs*, 576 U.S. at 543. Defendants' obstruction of much-needed affordable homes was exactly such a barrier. The Court should declare it unlawful.

## POINT III

### DEFENDANTS VIOLATED PLAINTIFFS' RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT (42 U.S.C. § 1983)

In addition to violating the FHA, Defendants' conduct independently violated the Equal Protection Clause of the U.S. Constitution. The Equal Protection Clause prohibits a state (and its subdivisions) from intentionally discriminating between individuals on the basis of race or other suspect classifications. *See U.S. CONST.* amend. XIV, § 1; *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194-95 (2003). Proof of a racially discriminatory intent or purpose is required to show an Equal Protection violation; disparate impact alone is insufficient. *Washington v. Davis*, 426 U.S. 229, 239–42 (1976). However, once intentional discrimination is shown, the governmental action is subject to strict scrutiny – it can only survive if the government proves that its action was narrowly tailored to serve a compelling governmental interest. *Johnson v. California*, 543 U.S. 499, 507-09 (2005). In practice, intentional race-based discrimination by a municipality is always subject to strict scrutiny, almost never justified, and virtually always

39

unconstitutional. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995) (strict scrutiny applies to all racial classifications by government).

Here, the *same evidence* that establishes Defendants' intentional discrimination under the FHA also establishes a violation of Equal Protection. Indeed, the contemporaneous statements, procedural departures, and prolonged obstruction, reversed by Judge Meehan and again reversed with approvals ordered by Judge Farrington, permit only one inference: Plaintiffs' project was treated adversely because of who would live there. Among the most telling examples is the Mayor's "Mason–Dixon line" remark, an explicit racial boundary metaphor uttered in connection with Plaintiffs' project. (SUMF ¶¶ 36-37.) The case for an Equal Protection violation is straightforward: Wallington's officials targeted Plaintiffs and the Project because of the race (and, arguably, national origin) of the people who would live in the new housing. The record is replete with implicit and explicit admissions that Borough decision-makers did not want more diverse residents and took action to prevent that from happening. This is a textbook denial of equal protection. Government authorities may not make housing decisions because on race any more than they may make employment or contracting decisions on that basis. *See Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005) ("This clause prohibits states from intentionally discriminating between individuals on the basis of race."). Nor may they intentionally discriminate against a class of people due to familial

40

status – while not a *suspect* classification under traditional doctrine, such intentional bias is still unconstitutional if not supported by at least a rational basis. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533–35 (1973) (striking down a family-composition classification that disadvantaged "unrelated" households under the equal protection component of the Fifth Amendment because it was unrelated to the statute's purposes and reflected only a "bare congressional desire to harm a politically unpopular group," which "cannot constitute a legitimate governmental interest").

Here it was plainly *irrational*, rooted in prejudice and stereotype rather than facts (as shown by the lack of any real school overcrowding). In short, Defendants intentionally treated a certain *proposed class of residents* (minority families with children) unfavorably and took official action to block their housing. This triggers Equal Protection scrutiny. *Stradford v. Sec'y Pa. Dep't of Corr.*, 53 F.4th 67 (3d Cir. 2022) (reiterating that, even under rational-basis review, disfavor "based on nothing but mere animus toward a group violates the Equal Protection Clause" (citing *Moreno* and *Romer v. Evans*, 517 U.S. 620 (1996))).

Defendants cannot meet their burden to justify this conduct under any level of scrutiny. Under *strict scrutiny* (appropriate for race or ethnicity discrimination), the Borough's objective essentially amounts to racial segregation or exclusion – which is not a compelling interest; it is patently illegitimate. Under even *rational basis*

41

review (if one looked at the treatment of families with children in isolation), the policy fails because acting on generalized anti-child or anti-outsider bias is not a legitimate government purpose. *See Moreno*, 413 U.S. at 534-35 (1973) (a bare desire to harm an unpopular group cannot constitute a legitimate governmental interest). Defendants' actions were driven by exactly that sort of impermissible desire to keep out a certain group of people. No court would uphold such action if it were candidly presented as an ordinance (for example, an ordinance saying "no housing that would attract families with children or minority commuters"). The fact that here it was done through ad hoc obstruction and subterfuge rather than a facial classification does not save it as the Equal Protection Clause looks beyond the face of the law to prevent state power "used as an instrument for circumventing a federally protected right." *Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960).

To illustrate the Equal Protection violation in concrete terms: The Planning Board's refusal to grant approvals was not based on neutral planning criteria applied equally to all developments. It was based on hostility to the expected occupants of *this* development. Had Plaintiffs proposed 207 units of luxury housing expected to be filled primarily with affluent, childless white tenants, it is evident (from the record of comments) that the project would not have faced the same opposition. Indeed, Wallington's Master Plan and zoning allowed other multifamily developments in town; none drew the fire that Morningside did. The difference was the *affordable*

42

component and the fear of who that would bring. This is a paradigm Equal Protection problem. Government officials changing their behavior and standards to disadvantage a project because of animus toward a protected class. *See Village of Arlington Heights*, 429 U.S. at 266–68 (inquiry looks to impact, historical background, departures from normal procedure, and contemporaneous statements).

The evidence of record would compel a jury to find that Defendants acted with discriminatory intent. In fact, unlike many Equal Protection cases, where intent must be inferred, we have direct proof as discussed at length herein. Therefore, there is no genuine issue to send to a jury on this point – the intent was manifest. Because Defendants cannot justify their actions under the rigorous scrutiny required (and have never suggested a justification that could remotely be considered compelling or necessary), Plaintiffs are entitled to judgment as a matter of law on the Equal Protection claim (Count III, via §1983). *See Mhany Mgmt., Inc.*, 819 F.3d at 606–08 (upholding finding of intentional discrimination where town's decision was substantially motivated by vocal citizen bias against minorities who would occupy proposed affordable housing). The Court should likewise hold Wallington's officials accountable for their discriminatory abuse of government power in this case.

43

## POINT IV

### PLAINTIFF'S EQUITABLE RELIEF, REQUEST FOR HEARING ON NON-MONETARY RELIEF, AND DAMAGES

Upon a finding of liability, what remains is the fashioning of practical relief to effectuate the Court's decision. Plaintiffs are entitled to compensatory damages proximately caused by Defendants' constitutional and statutory violations so as to restore Plaintiffs to the position they would have occupied absent the unlawful obstruction and deprivation of rights. *See Carey v. Piphus*, 435 U.S. 247, 254–55 (1978); 42 U.S.C. § 3613(c)(1)–(2); 42 U.S.C. § 1988(b). There is no genuine dispute that Defendants' conduct proximately caused delay-based damages, including escalation of hard and soft construction costs, increased financing and carrying costs, professional fees, and the costs associated with completing the train-access improvements reflected in the record. Plaintiffs have proven these monetary damages with the expert report of Arthur Linfante, MAI, who has calculated Plaintiffs' compensatory damages to be $23,672,000. (SUMF ¶ 77.) This represents the amount now needed to build a financially viable inclusionary development that will permit those in protected classes to move into the Borough of Wallington. Mr. Linfante's damages calculation is unrefuted, and accordingly, Plaintiffs seek entry of a compensatory damages award against Defendants in this amount.

44

As for non-monetary relief under 42 U.S.C. § 3613(c)(1) to ensure timely redress of the Fair Housing Act violations and the award of reasonable attorneys' fees and any enhanced damages, including under 42 U.S.C. §§ 3613(c)(2), 1988(b), Plaintiffs respectfully request a prompt, focused hearing on the scope and sequencing of such equitable relief.

The Fair Housing Act authorizes "permanent or temporary injunction[s] … or other order[s] (including an order enjoining the defendant or ordering such affirmative action as may be appropriate)," as well as other equitable remedies. 42 U.S.C. § 3613(c)(1). Consistent with Judge Farrington's finding of the Township's "recalcitrant" posture toward its Mount Laurel obligations and her direction that approvals be issued "in their entirety" with permits to follow promptly, see *Morningside at Wallington, LLC v. Borough of Wallington Planning Bd.*, No. BER-L-1670-18 (N.J. Super. Ct. Law Div. Jan. 16, 2019) (Farrington, J.S.C.), appropriate equitable relief here should include a declaratory judgment and a permanent injunction requiring the prompt issuance of all remaining approvals and permits necessary to commence and complete construction, together with tailored, forward-looking restraints on further discriminatory practices (e.g., written non-discrimination procedures for land use reviews, training for officials, and a short period of compliance reporting).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant summary judgment in their favor on Counts I, II, and III of the First Amended Complaint. The undisputed facts establish that Defendants violated the Fair Housing Act, both its prohibition on intentional discrimination and unjustified discriminatory impact, and that Defendants violated the Equal Protection Clause by acting with a racially discriminatory purpose. No reasonable finder of fact could conclude otherwise given the voluminous evidence of Defendants' statements, actions, and the stark disparities shown vis-à-vis robust and unrefuted statistical analysis.

Dated:  April 30, 2026                    Respectfully submitted,

**O'TOOLE SCRIVO, LLC**
*Attorneys for Plaintiffs*

By:    */s/ James DiGiulio*
          James DiGiulio

46