# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW WALLINGTON HOME, LLC, a New Jersey limited liability company; and MORNINGSIDE AT WALLINGTON, LLC, a New Jersey limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> BOROUGH OF WALLINGTON; BOROUGH OF WALLINGTON PLANNING BOARD; MARK W. TOMKO, in his official capacity as former Mayor of the Borough of Wallington; DOROTHY B. SIEK, in her official capacity as former Tax Collector for the Borough of Wallington; and CHRISTOPHER ASSENHEIMER, in his official capacity as Certified Tax Collector of the Borough of Wallington, <br><br> Defendants. | Civil Action No. 20-08178 <br><br> Hon. Evelyn Padin, U.S.D.J. <br><br> Hon. Andre M. Espinosa, U.S.M.J. <br><br><br> <u>Civil Action</u> |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Of Counsel:
 James DiGiulio

On the Brief:
 Amy Sachs
 Michael A. Botti

## MATERIAL FACTS NOT IN DISPUTE

Plaintiffs, New Wallington Home, LLC, and Morningside at Wallington, LLC, submit this statement of material facts not in dispute in accordance with Federal Rule of Civil Procedure 56(c) and Local Civil Rule 56.1(a) in support of their motion for summary judgment.

### A.  General Background and the Proposed Development

1.  Plaintiffs are owners of two adjoining and substantially vacant parcels located at 551 Main Avenue, Wallington, New Jersey (the "Property"). (January 27, 2025 Deposition of James Nuckel ("Nuckel Dep.") at T18:1-9; 22:17 to 23:10, attached as **Exhibit A** to Certification of James DiGiulio, Esq. ("DiGiulio Cert.")).



2

2.      The Property consists of two lots: Block 71, Lot 35.01 and Lot 35.02

consisting of approximately 10.23 acres of land which Plaintiffs planned to develop

as a multifamily residential complex with 207 total residential units, of which 42 are

affordable housing units reserved for low- and moderate-income households

("Project").



(January 16, 2019 Opinion of Hon. Christine Farrington, J.S.C. (Ret.) ("2019

Farrington Opinion") at 1-2, attached as **Exhibit B** to the DiGiulio Cert.)

3

3.      The Project became a part of Wallington's state-mandated affordable housing compliance and was intended to serve families with children and other residents in need of housing. (September 2019 Fair Share Housing Settlement Agreement at 4, attached as **Exhibit C** to the DiGiulio Cert.)

4.      The Plaintiffs' claims arise from Defendants' on-going policy of racial and familial discrimination through efforts to thwart the development of affordable housing and increased access to public transportation. (Plaintiffs' December 7, 2020 Amended Complaint attached as **Exhibit D** to the DiGiulio Cert.)

**B.      History of Exclusionary Practices**

5.      For over 15 years the Borough engaged in a systemic scheme to prevent multi-family and affordable housing units from being developed within the Borough. (April 22, 2015 Opinion of Hon. William C. Meehan, J.S.C. (Ret.)("2015 Meehan Opinion") (finding Defendants actions were arbitrary, capricious, and unreasonable) attached as **Exhibit E** to DiGiulio Cert.; see also 2019 Farrington Opinion at 9 (finding the Borough to be recalcitrant in its affordable housing obligations)).

6.      Defendant's discrimination has led to a municipality that is predominantly white, by a margin far greater than its neighbors. (June 30, 2025 Expert Report prepared by Justin Steil, Ph.D. pf MIT ("Steil Report"), dated attached as **Exhibit F** to DiGiulio Cert.)

4

7.      In 2006, The Wallington Group, the predecessor in interest to plaintiff, New Wallington Home, LLC, commenced affordable housing litigation against the Borough, in the matter captioned The Wallington Group, LLC and Morningside at Wallington, LLC v. Borough of Wallington, et al., Superior Court of New Jersey, Bergen County, Law Division, Docket No. BER–L–373–06, (the "Builder's Remedy Litigation") after the Borough failed to meet its affordable housing obligations. (February 5, 2007 Opinion of Hon. Jonathan N. Harris, J.S.C. ("2007 Harris Opinion") attached as **Exhibit G** to DiGiulio Cert.)

8.      In the Builder's Remedy Litigation, the Wallington Group sought: (a) a declaration that the Borough had not met its affordable housing obligations; (b) a builder's remedy requiring the Borough to rezone the Property to permit multi-family residential use; and (c) an order directing that the Wallington Group's inclusionary development application be "fast tracked." (Id.)

9.      Morningside intervened and sought the same relief with respect to its property. (Id.)

10.      The Court held that the Borough failed to comply with its affordable housing obligations, declaring Wallington's zoning controls unconstitutional for excluding affordable housing, and entered a judgment granting Plaintiffs a builder's remedy (rezoning the site for the inclusionary project).  (Id. at 15-16)

5

11.     The Order held, in part, that the Borough had engaged in "exclusionary practices," "not in compliance with the requirements of the New Jersey State Constitution, the Mount Laurel Doctrine, the [New Jersey] Fair Housing Act and the New Jersey Council on Affordable Housing." (Id.)

12.     Through a subsequent Order, the Superior Court required the Borough to zone the Property for residential, multi-family use, and also required that certain of the multi-family units be restricted to low- and moderate-income families. (March 18, 2008 Builder's Remedy Order entered by Hon. Jonathan N. Harris, J.S.C., attached as **Exhibit H** to DiGiulio Cert.)

13.     Eventually, the Property was rezoned in accordance with the Court's Order, however, the Borough then delayed the development of Plaintiffs' inclusionary development for almost a decade. (March 2, 2016, Opinion of Hon. William C. Meehan, J.S.C. (Ret.) ("2016 Meehan Opinion") attached as **Exhibit I** to DiGiulio Cert.).

**C.     First Improper Denial of Plaintiffs' Inclusionary Development**

14.     In December 2013, New Wallington Home submitted an application to the Wallington Planning Board for approval of a development at the Property consisting of 134 multi-family residential dwelling units, including 27 affordable housing units. (2015 Meehan Opinion at 2).

15. From the outset the Borough revealed its true intentions, refusing to conduct a public hearing on the application, improperly claiming that the application was incomplete and required the granting of a variance. (Id.)

16. Only after the Board was faced with the threat of more litigation (which it would surely have lost) did the Board concede the application was complete. (Id.)

17. The Board then improperly decided that a use variance would be required if Plaintiffs proceeded to develop their lots separately. (Id. at 2-3).

18. The Board did this solely to self-divest itself of jurisdiction to consider the application and resulted in the application's denial. (Id.)

19. This forced Plaintiffs to return to court yet again. (Id.)

20. On April 22, 2015, the New Jersey Superior Court reversed the Board's latest denial of site plan approval, finding the Board's decision "arbitrary, capricious, and unreasonable." (Id. at 10.)

## D. The Borough's Continued Recalcitrance

21. On remand, the Board again undermined the application and failed to promptly comply with the Court's directives. (See 2016 Meehan Opinion at 2).

22. After almost a year since the Court's initial ruling, the Court found that "[t]he Planning Board has unreasonably delayed action" on the remanded application and ordered the Board to act. (Id.)

23. By 2016, the Superior Court of New Jersey was twice asked to intervene and compel the Borough to cease stonewalling Plaintiffs' inclusionary development. (See 2015 and 2016 Meehan Opinions.)

### E.      Improper Delays and Denials Continue

24. Rather than comply with their obligations, the Borough and its officials invented new procedural hurdles.

25. The Borough's Zoning Officer (who was also a Planning Board member), Nick Melfi, insisted that despite the Court's prior directive that a site plan application could not even be submitted until he first reviewed and approved a "development plan" – a purported requirement found nowhere in the New Jersey Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-1, et seq. (See 2019 Farrington Opinion at 7).

26. Plaintiffs nevertheless complied, only to have Melfi reject the plans, incorrectly asserting that the inclusionary development needed a use variance (which, if true, would have moved jurisdiction to a different board and caused further delay). (Id.)

27. After legal challenges, the Planning Board was forced to concede Melfi had created the fictional requirement, and that it did have jurisdiction to hear the application. (Id.)

28. A revised site plan was submitted and the Board held hearings on the

8

application on May 16, July 18, September 19, and December 19, 2017. (Id., see also Hearing Transcripts attached as **Exhibit J** (May 16, 2017); **Exhibit K** (July 18, 2017); **Exhibit L** (September 19, 2017); and **Exhibit M** (December 19, 2017)).

29.    At the hearings, the Borough and the Board expressly unveiled the ugly truth of what had driven them to prevent Plaintiffs' inclusionary development: racial and familial discrimination. (Id.)

30.    First, the Board, which is required to make decisions based on land use principles—revealed that their decisions were driven by the perceived familial status of the development's likely residents. (2019 Farrington Opinion at 9.)

31.    At the very first hearing on May 16, 2017, Mayor Tomko expressed concern about "the estimation of children coming out of [Plaintiffs'] development for [Wallington's] schools" because the Borough's public schools were purportedly "burdened" and could not handle "added enrollment." (May 16, 2017 Hearing Transcript at T64:6-12.)

32.    At the July hearing, Mr. Melfi questioned the number of people who would occupy the development's affordable housing units, stating: "You forgot about the wives and kids. You said 73 people. You forgot about the wives, the boyfriends, family, kids." (July 18, 2017 Hearing Transcript at T60:23 to 61:5.)

33.    In a transparent attempt to disguise their prejudice, Defendants attempted to couch their concern as one regarding "over-crowding" in Wallington's public schools. (September 19, 2017 Hearing Transcript at T51:16 to 52:22.)

34.    The Board's open desire to preclude the FHA-protected class of families with children from entering the Borough was more than sufficient to reveal Defendants' discriminatory intent. (Id.)

35.    As the hearings on Plaintiffs' application continued, it became clear that the Board's discrimination against families with children may in fact have been code for more subtle discrimination against the additional FHA-protected class of racial minorities. (Id.)

36.    Indeed, when Plaintiffs' expert estimated the number of school-aged children that would occupy Plaintiffs' planned development based on data received from other Bergen County municipalities, Mayor Tomko responded, in a racially charged fashion: "What towns in this south Bergen area have you OPRA'd, because, you know, **historically Route 4 is the Mason-Dixon line** and we cannot compare [Wallington] with upper Bergen County. Things are different." (See July 18, 2017 Hearing Transcript at T65:17-21.)

37.     Mayor Tomko's comments were seconded by then member of the public and now current Mayor Melissa Dabal. (Id.)

38.    At another hearing, Board members keyed in on how they might prevent non-white racial minorities from entering the Borough—by blocking walking access from Plaintiffs' development to any nearby transit station, such as the Wesmont train station. (September 19, 2017 Hearing Transcript at T39:8 to 40:1.)

39.    This became a focus because, pursuant to a respected Rutgers University study that Plaintiffs' expert presented to the Board during the hearings, the construction of transit-oriented developments routinely results in an increased school-aged children and non-white racial minority population. (Id.)

40.    Indeed, census data confirms that the white-only population percentage in West New York—one of the Bergen County transit-oriented developments examined in the Rutgers study—is only 13.9%, which is 61.5% lower than that of Wallington. (September 19, 2017 Hearing Transcript at T37:12 to 28:25.)

41.    Aware of this reality, Mayor Tomko, Board members, the Borough's attorney, and members of the public, each made comments further evidencing discriminatory motivations.

42.    Board member Eugeniusz Rachelski stated, "It was mentioned that this project was compared to West New York. It really is because you look at the [population] density [contemplated by the development] and it is a West New York, and this is not the – the – the stuff that we want in our town." (September 19, 2017 Hearing Transcript at T71:11-18.)

11

43.     Borough Attorney, Martin S. Cedzidlo, Esq., stated: "Mr. Rachelski made a comment about we don't want it to look like West New York. I think it's clear that is the overriding issue the board has raised." (September 19, 2017 Hearing Transcript at T80:16-19.)

44.     After Plaintiffs' counsel suggested that the affordable housing and their occupying families would constitute a true amenity to the Borough, Melfi interrupted him and said, "Because you don't live here. We have to live here. We have to see this and deal with it everyday." (July 18, 2017 Hearing Transcript at T56:15-57:4.)

45.     After making these statements, the Board denied Plaintiffs' application. (See Planning Board Resolution #18-236 attached as **Exhibit N** to DiGiulio Cert.)

46.     Plaintiffs filed yet another action in lieu of prerogative writs against the Board in the Superior Court of New Jersey captioned *Morningside at Wallington, et al. v. Borough of Wallington Planning Board*, BER–L–1670-18, arguing that the Board's denial was arbitrary, capricious, and unreasonable. (2019 Farrington Opinion at 1.)

47.     In rendering a final judgment in favor of Plaintiffs, Judge Farrington held not only that the Board's decision was arbitrary and capricious, but also that Defendants had been recalcitrant in satisfying their Mount Laurel obligations. Judge Farrington rejected the Borough's artifice and found the denial was improper and

12

discriminatory, based on fiscal concerns to keep families with children out of their town. (2019 Farrington Opinion at 8-9).

48.    As a result, Judge Farrington took the extraordinary step of granting Plaintiffs' approvals without further remand to the Board. (Id.)

49.    This was the fourth time between 2007 and 2019 that Defendants' actions were deemed either unconstitutional or arbitrary, capricious and unreasonable:

| Date | Judge | Ruling |
|---|---|---|
| February 5, 2007 | Hon. Jonathan N. Harris, J.S.C. (Ret.) | Granting partial summary judgment to Plaintiffs declaring the land use controls and zoning ordinances of Defendants as invalid and not in compliance with the NJ Constitution, the Mount Laurel Doctrine, the Fair Housing Act and the New Jersey Council on Affordable Housing. |
| March 18, 2008 | Hon. Jonathan N. Harris, J.S.C (Ret.) | Finding that the Borough failed to satisfy any of its affordable housing obligations and entering a Builder's Remedy Order granting Plaintiffs' application for its land in Wallington to be developed for high density residential use. |
| April 22, 2015 and May 11, 2015 | Hon. William C. Meehan, J.S.C. (Ret.) | Finding the Defendants actions in denying Plaintiff's site plan approval on its land were arbitrary, capricious, and unreasonable. |
| March 2, 2016 | Hon. William C. Meehan, J.S.C. (Ret.) | Finding Defendants had unreasonably delayed action in connection with the limited remand and ordering the Planning Board to Vote on all outstanding issues at or before the April 19, 2016 Planning Board Meeting. |
| June 17, 2019 | Hon. Christine A. Farrington, J.S.C. (Ret.) | Final Judgment in favor of Plaintiffs, finding (1) the Defendants actions in denying Plaintiffs' site plan approval were arbitrary, |

| | | capricious, and unreasonable, (2) that the Borough's denials were based on improper discriminatory concerns, and (3) approving Plaintiffs' application for site plan approval and variances in their entirety. |
|---|---|---|

50. As a result of these repeated violations of law, Plaintiffs' ability to build the inclusionary development was delayed for years, increasing costs and making the development significantly more costly. (June 25, 2025 Expert Report of Arthur Linfante of Integra Realty Resources ("Linfante Report") at 8 attached as **Exhibit O** to the DiGiulio Cert.)

## F. Lack of Legitimate, Non-Discriminatory Bases for The Continued Delays and Denials.

51. After four different court rulings finding that the Borough offered no legitimate, legal basis for its denials of Plaintiffs' land use applications, the Borough has failed to provide any other legitimate, non-discriminatory basis to support its actions.

52. When asked to offer any alternative reason, not based on discrimination, for the repeated improper denials of Plaintiffs' land use applications, the Borough's corporate representative had no response:

> Q:    Okay. So plaintiff's position -- and I know you haven't read the complaint, so I'm just going to make a representation. Plaintiff's position in this case is that the Borough improperly denied numerous land use applications delaying the development of the property for many years, and three courts found that those decisions

14

were arbitrary, capricious and unreasonable, and I'm trying to determine if the Borough has any other bases for their denials that are not set forth in resolutions.

And, so, as here as the corporate designee, are you aware of any other bases for the denial of those applications?

A:     Not that I'm aware of.

(December 3, 2025 Deposition of Jennifer Appice, Borough Corporate Designee ("Appice Dep.") at 46:1-12 attached as **Exhibit P** to the DiGiulio Cert.)

53.     The Borough's expert, Jessica Caldwell, a planner, testified that she disagreed with the prior Court rulings and said that some of the offered reasons for the denials were legitimate, notwithstanding the Court's repeated and consistent rulings to the contrary on numerous occassions:

Q:     Okay. So [Judge Farrington] says she is not aware of any legitimate land use concerns that were addressed by the planning board in their denial, right?

A:     Yes, she says that.

Q:     Okay. But you disagree with [Judge Farrington] and you believe that the Borough did have legitimate land use concerns that they were addressing in their denial?

A:     Yes.

(October 30, 2025 Deposition of Jessica Caldwell, P.P. ("Caldwell Dep.") at T106:1–10 attached as **Exhibit Q** to the DiGiulio Cert.).

54.     When pressed for a reason, the only viable alternative offered by the Borough's expert was also illegal – speculating that the Borough denied Plaintiff's

15

development because it did not like it. (Caldwell Dep. at 109:1-3 ("I mean, it may be they just don't like this development, but its not an overall policy.") This despite the Borough's affordable housing obligation to have the development built to comply with applicable law.

**G.      The Impact of Wallington's Discriminatory and Unsupported Actions**

55.     Wallington is a racially homogenous enclave compared to its neighboring towns. (Steil Report at 2.)

56.     According to U.S. Census data from 2019 to 2023, approximately 70% of Wallington's population identified as "White alone, not Hispanic or Latino." (Steil Report at 4.)

57.     Every town bordering Wallington had a significantly lower white population share, some with less than half the proportion of white residents. (Id. at 4.)

58.     Dr. Justin Steil, an urban planning and fair housing expert from MIT has made unrebutted findings of disparate impact in the Borough of Wallington. (Id. at 2.)

59.     Using census and housing data, Dr. Steil determined that the Borough's obstruction of Plaintiffs' inclusionary development "had a significant adverse impact in making housing unavailable on the basis of race and family status." (Id. at 7-8.)

16

60.    Dr. Steil calculated that more than 55% of Plaintiffs' development's residents would likely be non-white, in contrast to a Borough population that is roughly 70-75% white. (Id. at 1-2.)

61.    Likewise, many residents would be families with minor children, a class of residents Wallington currently underrepresents. (Id.)

62.    Dr. Steil's data showed that Wallington's blocking of the mixed-income development adversely affected potential non-white residents at 1.2 times the rate of white residents. (Id. at 14.)

63.    Further, potential residents with minor children were affected at 1.3 times the rate of households without children. (Id. at 20.)

64.    Dr. Steil demonstrates that the pool of people denied housing includes a 20% higher share of minorities (Black, Latino, Asian) and a 30% high share of families with children than the pool of those not adversely affected. (Id. at 20-21.)

65.    Dr. Steil also conducted a chi-square statistical test to evaluate the likelihood Wallington's current racial makeup would occur by chance if the proposed development were allowed. (Id. at 15.)

66.    This test found with greater than 99.99% certainty that the racial disparity between the "substantially more diverse" population expected in the development and the existing population of Wallington is not random. (Id.)

17

67.    By preventing a development in which a majority of residents would likely have been non-white, Defendants ensured that Wallington remains less diverse than the surrounding region, thereby perpetuating racial segregation. (Id.)

68.    The Borough's actions are not limited to Plaintiffs' development.  To date, for its Third Round Obligations agreed to with Fair Share Housing in a 2019, settlement agreement, only 8 out of 125 affordable units have been built. (Fair Share Housing Agreement at 3 attached as **Ex. C** to DiGiulio Cert.)

69.    Moreover, a majority of the remaining affordable units approved for other sites are not for low or middle income residents, but instead age-restricted housing. (Id. at 3.)

## H.    <u>Other Actions to Thwart Diverse Residents Coming to Wallington</u>

70.    The Property is adjacent to the Wesmont train station in neighboring Wood-Ridge operated by New Jersey Transit. (June 24, 2025 Expert Report of Matthew J. Seckler, PE ("Seckler Report") at 1, attached as **Exhibit R** to the DiGiulio Cert.)

71.    The Property is separated from the station by one parcel (the "Doka Property") over which the Borough holds a court affirmed right-of-way that could be improved to provide a direct pedestrian connection. (March 18, 2016 Order Granting Summary Judgment to Plaintiffs' declaring existence of the Right of Way attached as **Exhibit S** to the DiGiulio Cert.)

18

72.    Despite the right-of-way in favor of the Borough, the Borough refuses to improve or utilize the right-of-way to avoid becoming a transit-oriented village, as reflected in this picture of the Wallington side of the tracks:



[Seckler Report, Figure 2 at 2.]

73.    As opined by Plaintiffs' traffic expert, without this right-of-way, Wallington residents must drive or bus a circuitous route into neighboring Wood-Ridge to find parking and access the train station – another effort to keep minorities from moving to Wallington.  (Id. at pg. 7.)

74.    The Borough has made numerous admissions that it was "cognizant of statistics regarding transit-oriented villages" and had "an unwarranted concern" that allowing Plaintiff's project to create a transit-oriented community would attract

19

undesirable residents namely non-whites and families with children. (September 19, 2017 Hearing Transcript, **Ex. L**, at T37:12 to 28:25.)

75.    In fact, in Wood-Ridge, where transit-oriented developments were permitted, the area adjacent to the train station has seen a considerable boon, including an increased ratio of residents commuting and decreased roadway volume and traffic congestion:



[Seckler Report at 1, Figure 4.]

I.    **Resulting Monetary Damages**

76.    Due to the Defendants' illegal actions, in violation of, inter alia, the Federal Fair Housing Act and the Equal Protection Clause, Plaintiffs were improperly and unreasonably delayed in developing the Project. As a result, Plaintiffs incurred significant compensatory damages that are required to ensure Plaintiffs can build the Project and be placed in the same place they would have been but for the Defendants' actions and omissions. (Amended Complaint.)

77.     Plaintiffs' expert, Arthur Linfante, determined that Plaintiffs suffered compensatory damages in the amount of $23,672,000. (Linfante Report at 2.)

78.     Defendants did not serve an expert report rebutting Mr. Linfante's expert opinion regarding damages.