# EXHIBIT K

# In The Matter Of:

## *In RE: Morningside at Wallington*

---

## *Transcript of Proceedings*
## *July 18, 2017*

---



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ  07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

Page 1

BOROUGH OF WALLINGTON
PLANNING BOARD

IN THE MATTER OF:                    :

MORNINGSIDE AT WALLINGTON, LLC       :
551 Main Avenue, Block 71, Lot       :
35.01, Zone LI-C                     :
        and                          :
NEW WALLINGTON HOME, LLC             :
Main Avenue Rear                     :
Block 71, Lot 35.02, Zone LI-C.      :

- - - - - - - - - - - - - - - - -    :

                    BOROUGH OF WALLINGTON
                    54 Union Boulevard
                    Wallington, New Jersey
                    Tuesday, July 18, 2017
                    7:58 p.m.

B E F O R E:

STANLEY BAGINSKI, CHAIRMAN
THERESA WYGONIK
NICHOLAS MELFI
MAYOR MARK TOMKO
KATHY POLTON
DARIUS PAWLUCZUK

A L S O   P R E S E N T:

MARTIN CEDZIDLO, ESQ., BOARD ATTORNEY
DOROTHY SIEK, BOARD SECRETARY
EVAN JACOBS NEGLIA, PE, BOARD ENGINEER

KEVIN MOORE, ESQ., FOR THE APPLICANT

Page 2

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
| --- | --- | --- |
| CALISTO J. BERTIN, PE | MR. MOORE | 5 |
| JACK RAKER | MR. MOORE | 13 |
| BRIGETTE BOGART, PP | MR. MOORE | 35 |
| ^ | ^ | ^ |
| ^ | ^ | ^ |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| ^ | ^ | ^ |
| ^ | ^ | ^ |
| ^ | ^ | ^ |
| ^ | ^ | ^ |
| ^ | ^ | ^ |

Page 3

CHAIRMAN BAGINSKI: The application for Morningside at Wallington, LLC and New Wallington Homes.

MR. MOORE: Good evening, Mr. Chairman. Is this working?

CHAIRMAN BAGINSKI: It might be on.

MR. MELFI: No. It's not going to be on.

CHAIRMAN BAGINSKI: No. It's off. We can hear you. I think everybody can hear you.

MR. MOORE: I'm a loud mouth. Most people can hear me. I just wanted to make sure.

Mr. Chair, members of the board, good evening. For the record, my name is Kevin Moore with the firm of Sills, Cummis & Gross representing New Wallington Home, LLC and Morningside at Wallington Home, LLC, two related applications. To refresh the board's memory, the application for Block 71, Lot 35.02, the New Wallington Home, LLC project is for amended preliminary and final site plan approval for an approved 134 unit multi-family project and the application for the adjacent block, Block 71, Lot 35.01, the Morningside at Wallington Home, LLC project is for preliminary and final site plan approval and (c) bulk variances for a 73 unit multi-family project. Both properties have the same street address of 551 Main Avenue. The hearings this evening on the two related applications are

Page 4

continued from the board's May 16th hearing. Because of the cancellation of the board's June meeting, the applicants have re-noticed for the hearings this evening. My office noticed for the two hearings by certified mail, return receipt requested to all property owners within 200 feet and for all others required by law to receive notice, and we published in the Bergen Record on July 7th. I would request that the board take jurisdiction over the applications.

MR. CEDZIDLO: That's fine.

MR. MOORE: Everything's in order?

MR. CEDZIDLO: Everything is in order.

MR. MOORE: Great. Thank you, very much.

When the previous May 16th hearing concluded the applicant completed the application for the New Wallington project and completed the direct testimony of the applicant's engineer and traffic engineer on the Morningside at Wallington Home project. Before we move on to our architect's testimony on the Morningside at Wallington home project, I would like to briefly recall Mr. Calisto Bertin, the applicant's engineer, to discuss the changes made to the site plan for the Morningside at Wallington Home project based on the comments of the board members and the board's engineer.

Now, Mr. Bertin's been previously sworn and

Page 5

qualified.

CHAIRMAN BAGINSKI: Right.

MR. CEDZIDLO: Mr. Bertin, you're still under oath.  Good to go.

MR. MOORE: Is that new, Calisto?

MR. BERTIN: No.  That's the same one.

MR. MOORE: That's the original A-1?

CHAIRMAN BAGINSKI: The microphones aren't working, anyway, so speak loud.

MR. BERTIN: Hello.

CHAIRMAN BAGINSKI: Oh, they are.  Well, you need this for the recording, don't you?

MR. BERTIN: All right.  I'm using here exhibit A-1 that we presented at the last meeting.  I didn't change it but we did make some minor site plan changes based on the hearing and the comments from Neglia Engineer's office and also the comments from Bergen County.  The application is active before Bergen County.  So the first change we made, I'm going to point to the main driveway on Main Avenue.  We had it presented with four lanes, two in and two out with a divider.  That's what's shown here.  We have changed that to one lane in and one lane out with a divider.  So we've just narrowed the driveway, made it smaller.  That was a requirement of Bergen County.  There's a parking

Page 6

lot between building number eight and Main Avenue.  We made some minor changes to that.  We removed three parking spaces and rotated it so it's parallel to the building seven.  On this exhibit it's askew, so now it's parallel and seven feet off.  We've lost a few parking spaces but we've pulled it just a couple feet away from Main Avenue, so it is a little change, and the driveways line up a little bit better.  There's a driveway along the southerly property line, right next to Al Ventura Road.  We changed that.  I think we probably created a little bit of confusion because part of it is two way traffic and part of it is one way traffic and so we elected to make the road one way.  This way there's no confusion.  So anyone that parks in the parking lot between building seven and eight would just have to go around the site, but it's one way.  Now, by doing that we were able to accomplish a few other things.  The driveway doesn't have to be 20 feet or 24 feet wide.  We made the driveway 18 feet wide, so we've enlarged a little landscaped area that we had alongside of building number eight, but we had no landscaping alongside of building number seven.  You can see on the exhibit that we had the pavement and a striped area and that really wasn't attractive.  We're coming into a nice apartment complex so we've now added a five foot wide landscaped

Page 7

strip along that building to soften the look, because that's a block building.  It will be painted and fixed up but the landscaping will add to it.

I mentioned at the last meeting that we have a detention basin.

MR. MOORE: Didn't we add a privacy fence, as well, Mr. Bertin?

MR. BERTIN: Yeah.  I was gonna get --

MR. MOORE: Okay.

MR. BERTIN: Okay.  You're right.  Along this driveway, along the southerly driveway we added a privacy fence, a six foot high privacy fence to remove a variance.  Because originally we didn't put a fence along that side and now we have it, so we've eliminated one variance.

MR. MOORE: And also, just to keep interrupting you and throwing you off your game, with respect to the parking lot in front of building eight, did we also add a stop bar?

MR. BERTIN: Yes.  We improved traffic control on that driveway, that parking lot.

MR. MOORE: Thank you.

MR. BERTIN: Okay.

MR. CEDZIDLO: Mr. Bertin, that's why he turned the mic off.

Page 8

MR. MOORE: But it doesn't do any good.

MR. BERTIN: Okay.  I mentioned there's a drainage basin.  The drainage underneath the bridge, the railroad bridge, comes on to the site and dumps into a deep pit which has got a sand bottom and it's all sand down there, below the pit.  We just changed the shape of it because we wanted to make it more accessible for maintenance.  If you were to look in there now, it's loaded with trash and bottles and that sort of thing, so there's a new shape and it's a more gradual slope coming in from either the street side or the site side for maintenance, and I think I mentioned that it would be the responsibility of the applicant to maintain that drainage basin.

MR. MOORE: Did we add retaining walls, as well?

MR. BERTIN: Yes.  Yes.  There's -- there were walls around it but we modified those walls and we've added those details to the detail sheet.  We made some adjustments to the plans to correct the unit numbers in buildings eight and six.  They did not -- they were in conflict with the architect's plan so we've corrected that.  There's a dumpster on the west side of building five.  We just modified, rotated a little bit to make it easier for trash, for a truck to pick it up,

Page 9

pick up the trash, so just, again, rotated it.  All right.  And the doors to all the dumpsters, we changed the detail.  We had a chain-link fence and I think it had slats in it.  We were asked to make it a more solid fence.  We were asked, suggested that it be board on board fence.  Those are heavy, it's wood and they usually don't last long in that kind of an application, so we used the same type of privacy fence.  It's a little -- it's lighter but it's a little bit more durable as a gate, so that detail has been changed and that's on the plan.  The New Wallington Home site was designed a couple years ago and since then the use of LED light is much more prominent, so we redesigned the entire site, both New Wallington and Morningside, with LED lights.  The same type of fixture but just LED so they're -- so you can control them.  You can dim them at night and that sort of thing.  We added lighting between building seven and eight.  We didn't have the soffit lights there because we figured that would be the architect's realm, but we've added it.  We've added soffit lights and building lights to provide lighting in that area.  We made some changes to the landscaping, part in response to your engineer's comments but also, we did not have any landscaping between that front parking lot and Main Avenue so -- and it's not shown

Page 10

here but it's on the plans, that we've added a hedge row across the front of the -- that parking lot, to shield at least the bottom of the cars.  This rendering shows several street trees and they're just little dots, but if you've been by this site there's a type of maple tree but they probably have a six inch diameter trunk.  They're a nice looking tree, so they do provide a buffer and we will add three more trees along the frontage of, of -- to help shield that parking lot.  I think we'll skip the Welcome to Wallington sign.  The architect came up with a plan.  There was discussion about the location of the Welcome to Wallington sign and it was correct that you wouldn't see it in the place that we picked, so it would be better further away from the bridge but also closer to the road.  I guess it's up to you, but we have a detail on sheet C3.5, which is a smaller Welcome to Wallington sign on a post with a two foot wide by three foot high post mounted sign and there's a detail of that.  I live in Haworth and that's the sign that's right outside my house on the Welcome to Haworth sign, so that's why I used it, but we have an alternate, more of a monument sign that we'll discuss and you can choose, and the architect will discuss the monument sign.  All right.  On drawings C2.5, that's where we have our truck paths, we only provided the truck paths

Page 11

for the Morningside site because the prior application had it for the New Wallington Home, so we've shown them throughout the site.  Both the fire truck and tractor trailer truck going around the site.  That's on drawing 2.8.
MR. MELFI: On two what?
MR. BERTIN: C2.8 has all the truck paths, fire truck and tractor trailer truck.
MR. CEDZIDLO: C2.8 or 2.5?
MR. MOORE: C2.8.
MR. BERTIN: I thought --
MR. CEDZIDLO: Because you said C2.5 and then you said C2.8.
MR. BERTIN: I said 2.5?  Okay.  I meant 2.8.  I wrote 2.8.
MR. CEDZIDLO: That's fine.  I'm just making notes.
MR. BERTIN: If you look at the plans I bet you it is 2.8.
MR. CEDZIDLO: I'm making notes and you said C2 --
MR. BERTIN: Okay.  That's fine.  Maybe I should put my glasses on because right above the 2.8 is the 3.5, where the Welcome to Wallington sign is, so I'll put my glasses on.

Page 12

MR. CEDZIDLO: No problem.
MR. BERTIN: Oh, that's so much better.
We did a little regrading of the parking lots.  Not a big deal.  It's really an engineering issue.  And then we updated the zoning chart.  One of the changes we made before we had the variance for the length of the building, because we have building seven and eight connected, so the variance was changed from the length of the building to having no buffer or no setback between the buildings.  So that's -- the planner and the attorney will take over that.  I just did what I was told.  So anyway, we have the two buildings.  Together they're more than 200 feet but they are separate buildings.
And that, in sum, is the bulk of the changes that we made to the plans.
CHAIRMAN BAGINSKI: Okay.
MR. MOORE: Questions for Mr. Bertin on his supplemental testimony?
CHAIRMAN BAGINSKI: Board members, any questions for Mr. Bertin with regard to this?
MS. POLTON: Not at this time.
CHAIRMAN BAGINSKI: Okay.
MR. MOORE: Do you do the public after everybody?

Page 13

CHAIRMAN BAGINSKI: Yes.

MR. MOORE: Okay.  Then I'd like to call my next witness, Mr. Jack Raker, the project architect.

JACK RAKER, RA, having been first duly sworn according to law, testified as follows:

MS. BAUMANN: Please state your name and spell your last name.

MR. RAKER: My name is Jack Raker, R-A-K-E-R, and business address is 80 Lambert Lane in Lambertville, New Jersey.

MS. BAUMANN: Thank you.

MR. MOORE: Mr. Raker, could you briefly give your education, licenses and professional experience for the board?

MR. RAKER: Yes.  I'm a -- I have a Bachelor's Degree in Architecture from New Jersey Institute of Technology.  I've been a practicing architect for 20 years with Minno & Wasko in the field of residential and multi-use architecture, mixed use architecture for 20 years.

MR. MOORE: Are you licensed as a licensed architect in the State of New Jersey?

MR. RAKER: I am a licensed architect in the State of New Jersey.

MR. MOORE: And have you testified before

Page 14

planning boards and zoning boards in the State of New Jersey?

MR. RAKER: Many planning boards, including this one.  Many planning boards and zoning boards. Jersey City, Hoboken, East Rutherford, many in the area.

MR. MOORE: I would offer Mr. Raker as an expert in the field of architecture.

CHAIRMAN BAGINSKI: Okay.  We'd accept him as an expert witness.

MR. MOORE: Thank you, very much.

Mr. Raker, could you describe the architecture for the Morningside at Wallington Home project?

MR. RAKER: Sure.

I'm going to start with building six and go through the plans and then I'll go right into the architecture.

MR. MOORE: Now, this is --

MR. RAKER: This is a copy.  This set is a copy of the submitted set.

MR. MOORE: Okay.  So right now you're just doing from the submitted set.  You want to mark --

MR. RAKER: I have it on the board so everybody can see it.

MR. MOORE: We don't need to, right?

Page 15

They're part of the submitted set.

MR. RAKER: I can mark it.

MR. MOORE: If it's not part of the set then we have to mark it.

MR. RAKER: This is sheet A1.  This is the floor plan of building six.  Building six has parking at the ground floor and at the entry lobby.  You can see here, there's entrances at one end of the building and parking spaces on either side of the drive aisle. There's a lobby.  They have access to the lobby from the parking garage and access from the front of the building into that same lobby, so you can pull into this building, park your car in a pouring rainstorm, get out, get into an elevator, go up into a hallway and right into your unit without ever having to go outside.  At the upper floors there's a number of bedrooms, one bedrooms and two bedrooms.  The one bedrooms are in a range of about 750 to 800 square feet and the two bedrooms are in the range of 1,170 to 1,225 square feet. In this particular building there are 15 one bedroom units and 15 two bedroom units.  They're all market rate.

MR. MELFI: What are the size of the parking stalls underneath that garage?

MR. RAKER: They're 9 by 18 and the drive

Page 16

aisle's 24 feet.

MR. MOORE: This is a colored rendering. This would be exhibit A-2.  If you could just describe it for the board and mark it.

MR. RAKER: Sure.

Okay.  This is the front elevation of building six.  You can see it's a very traditional style pitched roof.  We've gone with a character that we believe fits well with the surrounding buildings in Wallington, very traditional.  There's a large amount of brick.  I would say this elevation's probably in the neighborhood of 60 to 70 percent brick on the elevation. We do have some horizontal siding, cementitious horizontal siding, and we've broken that building up, base, middle, top.  We've created some feature elements to allow your eye to go up and down along the building so it's not one long repeat, repeat of window, window, window.  We've been able to break it up with a series of different elements using base and a number of architectural features.

Now, I'm going to move to the next building. This is going to be sheet A3.  Sheet A3, you'll see, this is building eight plan.  Building eight, you'll see there's a slight difference from the ground floor and the upper floor.  There's an area, you can park

| Page 17 | Page 19 |
|---|---|

Page 17

underneath this building, so you can see this area here is actually underneath the building. Along the front we'll have a leasing area for leasing the units on this project. In the back there will be Yoga and fitness for an amenity, about 3,500 square feet, and utility rooms, as well. Along this edge there's tenant storage. We've treated this facade -- I'll show you a perspective shortly. You'll see this facade doesn't get treated any differently. You would never know that that's tenant storage. It gets treated with windows just like anything else, and this is building two. You can park under. Although it is open on this side, you can park under, walk into the lobby and to the elevator and then up to your unit. This building has 25 one bedrooms, 15 two bedrooms and three three bedrooms. Of that, 22 of the 25 one bedrooms are market rate and then three affordable, and of the two bedrooms, 15 are market rate, I'm sorry, six are market rate and nine are affordable, and the three bedrooms are affordable. All the three bedrooms are affordable.

MR. MELFI: You said there was 23 one bedrooms or 25?

MR. RAKER: There are 25 one bedrooms and 22 are market rate. Three are affordable.

MR. MELFI: Well, we have 23 market rate and

Page 19

street frontage and felt to have a little more of a downtown flare. Lots of glass on the ground floor in the amenity and balconettes up on the upper level along the street. This building along the street frontage will be all brick, brick and cast stone. The height of this building -- we already know we are asking for a variance. The height of this building is 48 feet, one-quarter inch. I didn't make the quarter inch. The way the ordinance is written, it's average grade to the roof, so average grade, you know, became a decimal point and that's what gave us the quarter inch. I'm going to quickly jump back. I did not mention the height of the first building, building six. Building six height is 49 feet, three-and-an-eighth inches and that roof, that is measured to the mid point of the pitched roof. We could potentially lower this building if we wanted to and go with a flat roof but this building matches all the other buildings in the project with a pitched roof so we felt it would look kind of awkward being that one off building, all residential building. It was just, it was sort of set back with the other buildings. We felt it should blend in with those and that's why we did that. Jumping back to building eight, I'm going to mark this as A-4, this is a color elevation of building eight. It's a side elevation. It's on the Al Ventura Road

Page 18

one -- well, three market -- three low and moderate and --

MR. RAKER: Oh, I apologize. That's correct. You're right. 23, 23 one bedrooms, plus three is 26 total.

MR. MELFI: Thank you.

MR. RAKER: That's correct. Sorry. And I have my glasses on.

MR. CEDZIDLO: 23 one bedrooms?

MR. MELFI: 23 one bedroom market rate and three one bedroom low, moderate. Total of 26.

MR. RAKER: I'm going to bring up the elevation of this building. I have to show you --

MR. MOORE: This would be exhibit A-3. If you can just describe that for the board. I bet it's front elevation building eight.

MR. RAKER: Correct. It's the front elevation of building eight. Again, this building, because it has amenity on the ground floor, the ground floor, we have open parking structures underneath. The first floor gets a little bit taller. It's about 14 feet for the first floor, so in this case we did not go with a pitched roof. We went with a flat roof. Right in the downtown we felt this building was close to the street, it has a nice aesthetic for buildings at the

Page 20

side. This elevation shows you -- I thought it was important to show you what this garage would look like. It's an open parking garage. There will be columns there but we are continuing those materials around the side, continuing with brick. It's not just gonna change to some other material. They're doing brick. There is some siding at the top to break it down a little bit and cast stone at the base.

Next item I'm going to show you is the perspective view of the project. This is a new --

MR. MOORE: That will be A-5.

MR. RAKER: A-5, this is a perspective view. It includes buildings from both sides of the project. This is the building eight, here, the existing warehouse building's right behind you. You can see a little of it right there, behind the trees. This is the building from the previous project. A little bit of our building six is popping out in the background there and the green landscaped plaza. If you want, I could pass this around so you could all get a better look at it. I know you're looking at it from a distance.

MR. MELFI: You might want to show the residents.

MR. RAKER: I did invite them up earlier to look at it.

Page 21

And the next exhibit I want to touch on is --

MR. MOORE: Did everyone on the board see the exhibit? Okay.

MR. RAKER: So this will be A-6. This will be A-6. We did mention we wanted to do a --

MR. MOORE: Let's just describe for the record what A-6 is.

MR. RAKER: -- monument sign.

Yeah. A-6 is what we would like to do for a monument sign. So this is what we're proposing for our project sign. It's got a nice brick base. We've kept some of the detailing similar to the buildings, very traditional. We'll have stand off letters on the sign. I would have put the name of the project but I think we're undecided yet so right now it's just project name.

MR. MELFI: I assume Welcome to Wallington.

MR. RAKER: Hum?

MR. MELFI: That would be a nice monument sign, Welcome to Wallington.

MR. RAKER: Well, I have one here that I'm very excited to show you.

So we have a two foot base here with the brick, some pedestals up, a nice traditional top that -- where we can put the project signage. We feel it's

Page 22

important with cars and traffic nowadays to have a nice, very visible project sign. It's just -- you know, unfortunately people are using their phones, they're not quite paying attention and we would like to, we would like to, you know, have a nice, well lit, nice attractive signage, which brings me to my last exhibit. I worked today with the client --

MR. MOORE: This is A-7.

MR. BERTIN: -- to develop something that was not the same as our project sign but something that had a much more substantial feel. It's a pilaster. The material would be, it would do a masonry or stucco finish and then do stand off letters just like that, Wallington. I did not write Welcome to Wallington. We can obviously work with you on exactly what we want the sign to say, but we have just done two different colors to accent some of the banding in the sign.

MR. MOORE: We'll call that Wallington sign A-7.

MR. RAKER: Yup, and that's the last of my exhibits.

If anybody has any questions -- I can talk a little bit about the dimensions if you'd like. This one's about, it's about 4 feet, 10 in height. The pier is about 2 by 2 and the overall length of the sign is

Page 23

about eight feet. Again, you know, we have to site it. It might be -- the proportions my adjust but, you know, we feel very comfortable with this, this design.

MR. MOORE: Mr. Raker, could you just discuss the adequacy of the fire -- of the space around the building and the access to the buildings, particularly building six for fire access, fire code?

MR. RAKER: Sure. I'm just going to bring up the site plan here.

I'm going to talk a little technical talk about buildings and how they're constructed before I get into just the area. The building code understands that access, full vehicular access around every building is not possible. It's not possible in any urban environment, so the building code is written so that you adjust your fire areas, your protected areas within your building, and you can separate those areas to create areas where you can't -- essentially, you're creating two buildings within one building, so if there's a fire in one, you can run to another section and, and be entirely safe. Once you get over a certain fire area, and all of this relates to how much perimeter access you have. So the building code takes into account all of that information. When we have access on two sides with a vehicle and then we have 20 foot access around the

Page 24

rest of the perimeter for manned access or whatever it be, for hoses, for any of that stuff, so we feel very confident that if I were to take this, my open area would be -- if I were to do a code calculation on this I would take my open area on these two sides and knowing that this side I have about the distance that I need for access for -- while it's not vehicular access, I would do a calculation based on that.

MAYOR TOMKO: How far do you get in there with a truck?

MR. RAKER: Into here?

MAYOR TOMKO: Yeah.

MR. RAKER: You wouldn't take a truck between these two buildings. You just wouldn't do it.

MAYOR TOMKO: Matter of opinion.

MR. RAKER: I mean, these fire trucks are, you know, they're --

MAYOR TOMKO: Well, but I'm, you know, I'm talking about -- what's the furthest access that you can get?

MR. RAKER: Well, I can access this side over here. Here, I can access all the way around, I'd say all the way around, almost three, yeah, three-quarters of the building.

MAYOR TOMKO: Okay.

Page 25

MR. RAKER: And I can access all along here, as well.  This is all open.

MR. MELFI: On the bottom of that where you're saying you can access, you're saying with a truck?

MR. RAKER: Oh, yeah.  All this is with the truck.

MR. MELFI: What's the width right down below?

MR. RAKER: This is 24 feet of pavement.

MR. MELFI: So a fire truck opens up to about 16 feet, 14, 16 feet.  That's leaving you eight feet to a building to fight a fire with flames coming out from me to that wall.

MR. RAKER: No.  No.  That's wrong.  24 feet of pavement but I have another eight feet of distance to the --

MAYOR TOMKO: Right.

MR. RAKER: And then I have space on the other side, as well.  Looks like a couple of feet there.

CHAIRMAN BAGINSKI: That back section wasn't affected like in the front, where it went from 24 feet to 18, that was going to maintain 24 feet because that was going to maintain two way traffic in the back section of that parking area, correct?

Page 26

MR. RAKER: I can do two way traffic here.

CHAIRMAN BAGINSKI: Mr. Bertin reported he was making that road 18 feet now, not 24 feet, one way coming in on the south side of Al Ventura Road.

MR. RAKER: Oh, we're talking about this building here?

CHAIRMAN BAGINSKI: That's what I'm asking. Does the back section get affected also or that's going to maintain two way traffic in the back section for that parking lot?

MR. RAKER: I was talking about building six.  This is painted.

CHAIRMAN BAGINSKI: I was talking about building six.

MR. RAKER: This is  -- okay.  I mean, you can definitely get a fire truck down to building six.

CHAIRMAN BAGINSKI: What I'm asking and what Mr. Melfi asked and Mr. Tomko had asked, the space between building six, right, and the fence, is that two way traffic or one way traffic?

MR. RAKER: You would have to let Calisto answer that question.

MR. BERTIN: That's two way.

CHAIRMAN BAGINSKI: That's going to maintain the 24 feet there?

Page 27

MR. BERTIN: Actually, it's 22 feet of pavement right through here because there's no back up aisle, but all around -- that driveway on the south side of building five is -- that's five or six?

CHAIRMAN BAGINSKI: I'm asking now because earlier you said that that was going to be a one way, from Al Ventura side, and the about 18 feet wide.

MR. BERTIN: I'm sorry.

CHAIRMAN BAGINSKI: I'm just clarifying. That's all I'm doing.

MR. BERTIN: No.  The one way was just along building seven and eight.

CHAIRMAN BAGINSKI: Okay.

MR. RAKER: Well, it looks like building seven.  Eight you can circulate around.

MR. BERTIN: No.  This is the old rendering in the plan, because we created a landscaped strip along building seven.

MR. RAKER: Oh, okay.

CHAIRMAN BAGINSKI: You understand what I'm saying now?

MR. BERTIN: Yeah.

CHAIRMAN BAGINSKI: Now you're saying it's 22 feet?

MR. BERTIN: Well, further in the site,

Page 28

absolutely.  Sorry for the confusion.

MR. RAKER: I was talking down in this, down in this section.

CHAIRMAN BAGINSKI: So --

MR. RAKER: I shouldn't be testifying to any of this.

MR. BERTIN: I don't do windows, you don't do driveways.

CHAIRMAN BAGINSKI: So coming from the back side, which would be the west side of the property, correct?

MR. RAKER: Coming from here.

CHAIRMAN BAGINSKI: It's two way traffic to get to the parking lot between building seven and building six, to get to that parking area?

MR. BERTIN: Yeah.  Yeah.  Yeah.  This is all two way.

MR. RAKER: Correct.

CHAIRMAN BAGINSKI: But you can only, and then it's one way coming in from the east?

MR. RAKER: That's correct.

CHAIRMAN BAGINSKI: What's going to stop people from going up that one way to exit?

MR. BERTIN: All right.  When it comes to traffic, okay, we have do not enter signs along the side

Page 29

of the building.  That's the way the site exists now. That's the way it was designed, but I thought we created some confusion with two way traffic near building eight so we just made it one way, but we'll have do not enter signs so people do not head down that driveway along building seven.

MR. MELFI: You're saying 22 feet you're going to have between the property line and the other building down there?

MR. BERTIN: Well, the driveway alongside of building number six is 22 feet.  We use 24 for a back up aisle, but if it's -- I mean, I could make it longer.  I just, we have a little landscaping on either side of the driveway and I thought that might have been more important.

MR. MELFI: I'm just worried about when they plow for snow.  Where is the snow gonna --

MR. BERTIN: That's why we have a little bit of landscaping on either side of the driveway or they just move it into the larger parking lot.  On the southerly side of building number six there's not a lot of room for snow piling.  They most likely have to move out to Saddle River and put it in the lawn area there.

CHAIRMAN BAGINSKI: Okay.

MR. MOORE: Any further questions of these

Page 30

two witnesses?

MR. MELFI: Regarding the architect, yes, because going back to page A5 you talked about a flat roof on a building.  At the last hearing the other buildings, the pre-approved ones that were done on the first set, you guys were very adamant about not putting a flat roof, period, and we granted you a variance because we thought it would be aesthetically pleasing to have the ridge roof and we granted a variance to put the ridge roof because it looks nicer.  You guys testified that the flat roof always leak, this and that, and now why are we going back to a flat roof?

MR. RAKER: We think along the main street --

MR. MELFI: Because of the height is basically what it is, you can't meet the height requirements if you put the ridge roof on.

MR. RAKER: Yeah.  We think along the front edge of the build -- front edge of the main street we'd like to put a flat roof building.  This building has a slightly different aesthetic than the other building.

MR. MELFI: I understand that, but my question is, the last time you were totally against any flat building on that property because of future roof leaks.  We agreed upon it.  We said we'll do a ridge

Page 31

roof, we'll give you the variance for the pitch roof, not to put and flat roofs on, you guys were happy as a pig in poop and now you're coming back and asking for a flat roof.

MR. RAKER: Well, I'm not -- I don't recall talking about roof leaks but I do recall talking about the village look we were going for.  We definitely achieved the village look with a pitched roof and I think along the main street we definitely want a more urban or more downtown feel.

MR. MELFI: Then you're asking for variances for the ridge roof for other buildings?

MR. RAKER: Correct.

MR. MELFI: Okay.  I got ya.

MR. RAKER: We think that that building has a, has a very village type feel on the interior.

MR. MELFI: No other questions.

MR. RAKER: You can take a look at the perspective if you'd like.  I think it's, I think that downtown, in and around the green, I think it looks great with the pitched roof and up along the street edge.

CHAIRMAN BAGINSKI: Excuse me.  Keep it down.

MR. MOORE: Mr. Raker, just to go back with

Page 32

the aesthetics of the building number six, that's within the development and that's the same arguments that were made last time, why we need the ridge roof, correct?

MR. RAKER: Correct.  Correct.

MR. MOORE: And this flat roof, is this more in keeping with the urban street structure?

MR. RAKER: Correct.  We're much closer to the street in this building than we were in the other buildings.

MR. MELFI: That wasn't the reason that was given, but you can continue.  I have another couple of questions.  The reason was because the flat roofs tend to leak and aesthetically we figured and you thought it would be nicer to have ridge roofs than flat roofs.

MR. MOORE: Well, we still think -- to clarify, within the development and for building six --

MR. MELFI: You didn't say within the development.

MR. MOORE: We still think it would look better.

MR. MELFI: Those colors, the colors you're proposing, is that the colors that are gonna stay or are the colors subject to change?  The brick facade is -- I want to make sure that's put in the resolution.  They have to put the brick facade and whatever colors you

Page 33

decide, because I've seen a lot of towns when they approve a project and all of a sudden they start changing the facades to the building.  They say well, the brick is $3 million, we can do the siding and the whole building for one million, so if you want to be approved, I want to make sure it's in the resolution, it has to be brick and whatever facade you have to chose.

MR. RAKER: I have not selected a particular brick color yet.

MR. MELFI: I'm not talking about colors. I'm talking about brick in general.

MR. RAKER: We are committed to this look.

MR. MELFI: So brick siding, not a stucco? There's not going to be stucco changed from brick?

MR. RAKER: There are cementitious materials all over this building of composite materials.  They're listed on the elevations.  There are a variety of types of cementitious materials.  Materials nowadays are composites.  They're composites of paper and cement, concrete made to look like stone.

MR. MELFI: You said the first two stories of those other buildings are going to be brick?

MR. RAKER: Brick, correct.

MR. MELFI: That's what I want to make sure, that it stays brick, not stucco, not tile, not whatever.

Page 34

MR. RAKER: Absolutely.  Absolutely.

MR. MELFI: Okay.  I have no questions.

CHAIRMAN BAGINSKI: Okay.  Any other board members have questions for the architect?

MAYOR TOMKO: No, I don't.  I don't know. I'm waiting for someone that will answer the question I had last month.  What is -- I don't know.  I don't think you're capable of doing that, but what is the expected number of children to come out of --

MR. MOORE: That's our next witness.

MAYOR TOMKO: Okay.  Very good.  I'll hold it for the next witness.

CHAIRMAN BAGINSKI: Any other questions?

MAYOR TOMKO: I'm going to keep asking till I hit the right one.

MR. RAKER: Thank you.

CHAIRMAN BAGINSKI: All right.  Thank you.

MR. MOORE: Chairman, I'd like to call my final witness, Miss Brigette Bogart.  Can we take a two minute break?

CHAIRMAN BAGINSKI: Okay.  Take a two minute recess and we'll return and continue with this application.  If anybody needs to use the restroom or get a drink of water, you're more than welcome to do so at this time.

Page 35

(A brief recess was taken.)

CHAIRMAN BAGINSKI: If everybody could take their seats, we'll resume the meeting.

MR. MOORE: Okay.  Before Miss Bogart starts her testimony, I just want to clarify, I think Mr. Bertin did say, but if you guys want it wider than the 22 feet there in the back, you want the 24 feet, we'll be happy to provide that.

MR. BERTIN: Yeah.

CHAIRMAN BAGINSKI: We'll discuss that with our engineer.

MR. MOORE: Whatever you guys think is best, we can accommodate it.

MS. BAUMANN: Could you identify yourself?

CHAIRMAN BAGINSKI: Let's get your expert in.

MR. MOORE: She needs to be sworn first.

BRIGETTE BOGART, PP, having been first duly sworn according to law, testified as follows:

MS. BAUMANN: State your name and address.

MS. BOGART: Brigette Bogart and my office address is 648 Godwin Avenue in Midland Park, New Jersey.

MR. CEDZIDLO: Spell your last name.

MS. BOGART: B-O-G-A-R-T.

Page 36

MR. MOORE: Miss Bogart, did you -- could you give your education, licenses and professional experience for the record.

MS. BOGART: Sure.

I have a Bachelors in Architecture degree from North Carolina State University.  I have a Masters in City Regional Planning from the University of Pennsylvania.  I have been working as a Professional Planner in the State of New Jersey since 1999.  I grew up in Bergen County and my family is from Wallington.

MR. MOORE: Are you a licensed Professional Planner in the State of New Jersey?

MS. BOGART: I am.

MR. MOORE: Thank you.

I offer Miss Bogart as an expert in the field of planning.

CHAIRMAN BAGINSKI: We will accept her as an expert witness.

MR. MOORE: Thank you.

MS. BOGART: Thank you.

MR. MOORE: Miss Bogart, if you can begin your testimony, that would be great.

MS. BOGART: Sure.  May I sit?

So I apologize if my testimony seems extremely long this evening.  It's a complicated case

Page 37

and I want to make sure that I have all the proofs on the record. And feel free to ask any questions as I go through my testimony.

As this board is aware, the site is identified as Block 71, Lot 35.01. It's located at 551 Main Street. It is a large site, at 3.65 acres. It currently is improved with two large masonry structures that are in poor condition. The proposal is to take down one of them and maintain one as a recreation space. The building fronting on Main Street that we're looking to remove is a commercial industrial building. It was previously occupied by a bar and warehouse with loading facilities. The building to the rear was previously occupied as a roller rink facility, I'm sure this board is all aware. There is a smaller paved parking area located in the front of the bar/warehouse facility and we're looking to improve that by moving that back, because that existing parking area is located within the right-of-way, so we're looking to move that back, add additional landscaping and actually create an improved and current parking area. The site is also currently improved with the gravel asphalt area between both the buildings. We're looking to improve that, as well, and bring that up to present standards. The existing rink, as it stands today, obviously creates some issues with

Page 38

trying to improve the site itself. What we're looking to do, obviously, is to create a public amenity, but that creates some issues with regard to the site layout and that leads directly to the variances that are going to be requested this evening. What we're trying to do is make sure that that existing rink becomes an improvement on site that not only fits into the site but fits into the site engineering wise and circulation wise. What that does is create some issues with regard to the planning and zoning on site, so there are a number of variances that we're requesting and most of them are directly related to the fact that we are trying to incorporate this existing rink facility into our building design. I believe that the key factors when this board is reviewing this application is the fact that we are trying to include this existing rink on site, but also, most importantly is that we're trying to develop this site with the adjacent Lot 13. -- 35.02, so the Master Plan, the goals and objectives of this township calls for developing this site in conjunction with the adjacent lot and that's what we're trying to do. All the variances that we are requesting this evening relate to the fact that we are trying to develop not only with the adjacent lot, but also because of this existing building, so we have two unique circumstances

Page 39

here. We are trying to make sure that the circulation on site, and not only pedestrian wise but also vehicle circulation works with the adjacent lot, but also that it works with that adjacent -- the existing building, so we have two unique things on this property that warrant, I believe from a planning perspective, warrant this board's attention when reviewing this application and the variances we are considering. So from just a pure property description perspective, I think those are important things for this board to consider.

Keep going?

MR. MOORE: Keep going.

MS. BOGART: Okay. So --

MR. MELFI: Mr. Chair, I'm sorry. You said we could ask questions as you go.

MS. BOGART: Of course. I don't like to just keep talking.

MR. MELFI: You could talk all night. If you say -- if that building were to be taken down, because we're creating a lot of variances by leaving that building, if that building were to be taken down how many variances would we lose and would we be able to conform, or you be able to conform with a lot of the setbacks with the other buildings?

MS. BOGART: I don't believe that analysis

Page 40

has been completed, however, I think from a planning perspective, the most important thing is to consider not the number of variances that are being proposed but how the site lays out, because I work for a number of municipalities and when you're creating zoning ordinances you don't typically understand the unique circumstances of this situation, so it may not be an analysis of this particular situation where you didn't realize that this building is going to stay up and it may not technically be a negative that the variances should be granted. It's -- and that's, I guess, what this board should weigh. I think that --

MR. MOORE: I'm sorry.

MS. BOGART: That's okay.

MR. MOORE: Aren't the variances also a lot due to the fact that the irregular lot line between the two sites?

MS. BOGART: Yes. So it's not only the building but also the irregular lot line and that we're trying to be consistent with the development to the adjacent lot.

MR. MELFI: But if the building were to be taken down and everything got pushed back, you wouldn't need the front yard setbacks. You may not need the side yard setbacks in some of these buildings. The roller

Page 41

rink is probably as close to as big or near close to one of the sizes of the apartments --

MS. BOGART: Right.

MR. MELFI: -- or buildings.

MS. BOGART: It is a large building and at the May hearing the applicant had agreed to provide that building for public amenities, public recreation facilities, so I think that's also a benefit that this board needs to consider, and with regard to all the front yard setbacks, which I'll get into through my testimony, we're actually improving the front yard area --

MR. MELFI: Yeah, I know.

MS. BOGART: -- substantially.

MR. MELFI: You can continue.

MS. BOGART: Thank you.

MR. MELFI: Sorry.

MS. BOGART: No.

I had prepared an exhibit just quickly discussing the surrounding land uses.

MR. MOORE: That would be A-8. We'll call it surrounding land uses.

MS. BOGART: Yes.

MR. MELFI: If you don't mind me asking, what's the purple or violet on here? It cut out on the

Page 42

bottom.

MS. BOGART: Let me see.

MR. MELFI: You have the chart here, the legend?

MS. BOGART: You got a bad copy.

MR. MELFI: I think everybody has the same thing. Not sure what we're showing.

MS. WYGONIK: What's that?

MR. MELFI: Industrial commercial.

MS. BOGART: So I prepared the exhibit regarding the surrounding land use based upon the New Jersey DEP GIS data. Just identifying the subject site outlined in red, the adjacent parcel to the west, the New Wallington Home site, and then you'll see the railroad further west of that and then Saddle River to the left outlined in blue. You'll see the great big orange area, which is multi-family homes. Based upon this exhibit, from a planning perspective this site, and also reinforced in your Master Plan documents, is appropriate for multi-family development. You'll see from this exhibit that the site itself has a very unique lot shape, which lends itself to the fact that we need the rear yard variance, which I'll get into in a second in my testimony. As I mentioned to you, the site, the subject site outlined in red is going to be developed in

Page 43

conjunction with the adjacent site striped in red.

So as you heard from the previous witnesses, the proposal is to develop this site in conjunction with the PRML zone district, which is what this site is zoned for, with 73 dwelling units, 15 which will be affordable as a 20 percent set aside which is in conjunction and consistent with your Housing Plan. The existing roller rink is to be converted to recreational use, as agreed at the May 16th hearing. We agreed that the borough would be allowed to use the roller rink for recreational purposes. The existing masonry building along Main Street is going to be demolished and we're going to build building six and building eight to provide for affordable housing and multi-family housing. We're going to have parking underneath both buildings and we're going to provide, in building eight along Main Street, a first floor leasing office, a Yoga studio and a gym. The reason that, from a planning perspective, this is important with building eight is because it provides an active storefront. It's not retail, building eight along Main Street, but it's going to provide for active uses and so that residents on site can actually utilize the uses, the Yoga studio and the gym within that building itself.

MR. MELFI: I do have a question.

Page 44

MS. BOGART: Go ahead.

MR. MELFI: You're saying you're building this in conjunction with the other lot, Lot 35.02, whatever. Are we consolidating both of these lots? Are these lots going to be consolidated?

MR. MOORE: No, they are not.

MS. BOGART: They're not going to be consolidated and that's part of the reason for the variances being requested.

Can I pull up the site plan? You have one with dimensions? All right. I'll take the rendered one.

MR. BERTIN: I'll give you the site plan if you'd like.

MS. BOGART: Perfect. That's good.

So the one setback variance that we were requesting is the rear yard setback and it's, from our lot line -- can I draw on your plan or you're gonna' kill me?

MR. BERTIN: Have at it.

MS. BOGART: Yeah?

MR. BERTIN: Go ahead, if you want.

MS. BOGART: Give me a marker.

So our lot line is here.

MR. BERTIN: Straight lines. I'm joking.

Page 45

MS. BOGART: This is not helping. Our site is right here.

CHAIRMAN BAGINSKI: Hours of work, Mr. Bertin.

MS. BOGART: I know, and I just destroyed it all.

MR. BERTIN: I was going to hang it up in my office.

MS. BOGART: Well, now it's even better. It's got the marker.

So the rear yard setback variance that we are requesting is actually from this building to the rear lot line of that lot, so it's actually internal to our site. It's not to an adjacent site. If we were to remove that lot line we would not be requesting that variance. We are not looking to consolidate the lots. They're two separate facilities, but technically we need the variance because that lot line still exists.

CHAIRMAN BAGINSKI: Morningside at Wallington and New Wallington Home, the principal owner of that is the same?

MR. MOORE: Yes, but there's slightly different ownership structures between the two buildings so we really can't consolidate them.

CHAIRMAN BAGINSKI: So because he don't want

Page 46

to consolidate the residents of Wallington need to step down, back up and say, oh, we'll just let him do whatever he wants, leave the two lots separate? If he was to consolidate them he wouldn't need all these variances, correct?

MR. MOORE: He'd still need variances.

CHAIRMAN BAGINSKI: Not as many.

MR. MOORE: Not as many.

MS. BOGART: Not as many.

MR. MOORE: But it's different ownership structures.

CHAIRMAN BAGINSKI: I'm just clarifying, but the principal there is the same, between both LLC's.

MR. MOORE: But it's not the same --

CHAIRMAN BAGINSKI: Okay.

MR. MOORE: -- exact owners in each so they really can't be consolidated.

MS. BOGART: And I guess from a pure planning perspective, the reality is the outcome and the design is going to be the same regardless of who owns what or where the lot line is.

CHAIRMAN BAGINSKI: Well, you say that now, but when Mr. Melfi asked the question about the flat roofs you went from the -- or it went from we need the pitched roofs to now flat roofs are better, so there's a

Page 47

balance. Isn't there? From everything you're saying now to what was said earlier is different and I will have to agree with Mr. Melfi in regards to that. If you were to go back in the minutes of the transcript you would see that you folks made the comment that, oh, no, flat roofs are no good, we need to maintain the pitched roofs and that's why there was -- the agreement was made for the pitched roofs, for the height variance.

MR. MOORE: And we have the pitched --

CHAIRMAN BAGINSKI: Now we have a whole different story today.

MR. MOORE: We have the pitched roof for building six.

CHAIRMAN BAGINSKI: Now it would be okay for this part, like Mr. Melfi said.

MS. BOGART: My comment from a planning perspective was purely from the setbacks and lot lines, because the reality is you don't see the lot lines when you're walking down the street. All you're going to see is the development and the development, what we're trying to improve and trying to propose is a development that's consistent with one another, so I will get into the building height in a second, and I understand your concern completely, but my comment was purely from a setback perspective.

Page 48

MR. CEDZIDLO: Let me ask you a procedural question, though, Miss Bogart. Because you have separate owners, once you get approval, wouldn't you be able to say we're not going to develop it like the approval, we're going to sell it? Two years from now a new owner could come in and say we're scrapping those plans and building something else.

MR. MOORE: Well, no, because it's all subject to this approval. The approval runs with the land.

MR. CEDZIDLO: Correct, the approval runs with the land, but you can decide, you know what, we don't want to build it this way.

MR. MOORE: Well, then someone would have to come back to this board.

MR. CEDZIDLO: Right. That's what I'm saying. Here's the point that the chairman's making that I just want to address. Because you're not combining the two lots, Morningside at Wallington and New Wallington Homes don't have an obligation to build this. Like right now the presentation is we want to jointly develop these two side by side tracts and we have cooperating interests from New Wallington Homes and cooperating interests from Morningside. Eight months from now they can decide not to be cooperating with each

Page 49

other and now you've got approvals for one lot and approvals for the other lot with ingress and egress and --

MR. MOORE: You've got cross easements that are recorded and are conditions of both approvals.

MR. CEDZIDLO: I agree, but people can change their minds and decide we don't want to do it that way and what happens is that the variance granted for this, that you're asking for for this roller rink to remain there, it might never get built this way or the adjoining property owner may not build it this way and now you've got a variance for something that may never get built, right, and that variance --

MR. MOORE: Well, that's true of any approval.

MR. CEDZIDLO: Well, it is, but it goes to the points raised by Mr. Melfi and Mr. Baginski. This is not a joint development. Okay. So you're asking for things that is requesting variances because, well, we're going to do it this way because we're going to cooperate with the other side but you don't really have an obligation to cooperate because it's not a joint development. Okay. There's no requirement that they, these adjoining property owners cooperate with each other down the road because you are not combining it

Page 50

into one development.

MR. MOORE: We could make that a condition of the approval with both developments.

MR. CEDZIDLO: Well, again, I think the record should be clear, because Mr. Melfi and Mr. Baginski both asked, can't you eliminate, just if you eliminate this building, can't you eliminate some of the variances so that the property doesn't require, you know, as many deviations from the current zoning code as it is. Miss Bogart very honestly answered, saying well, yeah, but since we're developing it in conjunction with that, we think from a planning perspective --

MR. MOORE: We checked it while you were, you know, it would eliminate four variances.

MR. CEDZIDLO: Okay. And from a planning perspective --

MR. MOORE: That's all.

MR. CEDZIDLO: Her testimony is purely from a planning perspective, from a planning perspective we think it's best to have something that's, when you look at the site in total, it's best to do it this way because the Master Plan and zoning code doesn't take into, for every single piece of property, every little single thing that may develop, all of which is 100 percent true and I don't have a problem with her

Page 51

testimony, but it's all based upon the fact that this is going to be a joint development. Right?

MR. MOORE: Well, it's -- give your name.

MR. HERLINSKY: Victor Herlinsky. I'm co-counsel with Mr. Moore.

Look, there's a undercurrent that, you know, when I'm talking to the board, we're hearing this, well, you have this building --

MS. BAUMANN: I need you to not speak.

PUBLIC MEMBER: Sorry.

CHAIRMAN BAGINSKI: Thank you.

MR. HERLINSKY: There's a structurally sound very valuable building at that site and one of the amenities that we thought we would provide -- like, you know, the idea of going through the expense to rip down a very nice, valuable building that's there and not have that amenity, just to our, you know, our mind doesn't make any sense. I know Mr. Melfi, last time when we were here at the meeting, suggested, well, maybe that's something we can include the town with, which we thought was a great idea. The fact of the matter is, I cannot understand a business idea or even a planning idea of why that building would come down. To us it doesn't really make, it doesn't make business sense and it doesn't make, in our minds, planning sense, so the idea

Page 52

of what we're doing as far as putting these pieces together, so to speak, and I understand your point, but the point is, if you have something that can be for definitely the betterment of our, our -- the people that are going to live there, on the site, and we've already offered it as an amenity that the town could take advantage of, there isn't that kind of recreation space in the immediate area that we could take advantage of. Are we going to have another roller rink? No, we're not. Everything is in control of this board. Right now you've got a very specific use, you know. The number of people that are going to be there are going to have -- you know, think this is great. We have an indoor gym that, you know, bar none, but the idea of why we would just take it down, I don't understand the reason. If it's only for, you know, whether it's a height variance or something like this, I mean, there is an advantage to keeping it there in our perspective, unless somebody has a differing point. The one thing I'll just say to Mr. Cedzidlo as far as, you know, we've been fighting this for a long time. This was originally an application that we had, it went to Judge Mian, it's now Judge Mian, he's put these residence, the number of apartments on both sites really set in stone, so we're kind of, you know, talking about the different things. We will

Page 53

address Mayor Tomko's issues as far as, you know, expanding the pavement area, we can certainly do that, but we're really, you know, working on the edges. The idea of what's going there is what we have but, you know, the one thing as far as, you know, to have a real conversation with the board, which I'd hope we have, is, you know, we've been trying to get something built there for six years. It's not like we're going to all of a sudden get our application and, okay, you know, we, you know, we had our first kiss, now we're going to go on to somebody else. That's not how we're working.

MR. CEDZIDLO: Mr. Herlinsky, you're absolutely 100 percent right. This whole track that's been the subject of a builder's remedy suit, you know, and Mount Laurel, going to back to -- when? Geez.

MR. HERLINSKY: We both had more hair.

MR. CEDZIDLO: I don't even know how --

MR. MELFI: I want to say 2008.

MR. CEDZIDLO: I did somehow in the barber shop bring up the prior application that I used to get my hair cut in, that barber shop, because I had hair at that point, but --

MR. HERLINSKY: I don't think I called you Mr. Cedzidlo when this application was still --

MR. CEDZIDLO: I was much, much younger, but

Page 54

we did have a builder's remedy suit, and again, that was, the builder's remedy suit was contentious. The rest, not so much, okay, but if we go back even to the builder's remedy suit, we had an agreement worked out where the tract owners and the owners all said -- we came to an agreement, we said let's settle this with the town, let's get this worked out, let's put a new zone, get everything done. Judge Harris did a great job and I think there was a 20 -- the compromise was 20 unit per acre density. Correct?

MR. MELFI: Umm-hum.

MR. CEDZIDLO: I think that's what it was. Now, this subject site that we're just here for, you know, Morningside, this is a three acre site, I believe.

MR. MOORE: We're actually less than, like at --

MS. BOGART: 3.65 acres.

CHAIRMAN BAGINSKI: 3.650 acres, yes.

MR. CEDZIDLO: 3.65, so we're within the 20 units per acre as part of the zone, correct?

MR. BERTIN: Correct.

MR. CEDZIDLO: But the 20 units per acre on the tract are all against the road, all -- what is it? 60? How many units? I keep getting --

CHAIRMAN BAGINSKI: Well, there's 30 at

Page 55

building six.

MR. MELFI: 73 total.

CHAIRMAN BAGINSKI: Yeah, 73 total. There's 43 in building eight.

MR. HERLINSKY: I will make one point. Mr. Melfi was very correct to point this out. In order to be before this board and to separate the lots, we lost this unit, so if the idea is making it less units, we are coming in here with one less unit than we were approved for --

MR. CEDZIDLO: Right, and I'm not --

MR. HERLINSKY: -- by the judge.

MR. CEDZIDLO: I'm not suggesting that. You are absolutely complying with the density as far as the total property and staying at 20 units or less and everything else, you're actually doing that, but basically, those 73 units are being built on half of the property and the other half of the property is this other building, so the units that are being built are being built, you know, in a very dense space in the front of the property here. Now, again, you don't need a variance because overall, but it's just as far as we're going to build the buildings higher, we're going to go above the -- so now you need variances for height because you're building the, you know, 73 units in a

Page 56

contained area. Right?

MR. HERLINSKY: Yeah, but --

MR. MELFI: If you built these 20 units per acre right now, you're building 40 units on one acre.

MR. HERLINSKY: But we're preserving an open rec space that we will basically offer to the town.

MR. MELFI: Judge Harris' decision back in the day, we all agreed, 20 units per acre, so every acre you have you put 20 units. You got another acre, 20 units.

MR. MOORE: It's overall. When you got -- it's not how it works.

MS. BOGART: Yeah. That's not -- even if, even if --

MR. MELFI: I understand that, but now you want to cram the 73 in, leave the building -- you want to raise the building to get them.

MR. MOORE: But the building is a true amenity to both the development and the township and it would seem to me --

MR. MELFI: Because you don't live here. We have to live here. We have to see this and deal with it every day. You're there representing him, he's representing the owners, she's the planner and he's the architect and everything. You're all gonna get your

Page 57

approval, you're gonna' walk away from town and say, hey, we hit a grand slam, not a home-run, a grand slam in Wallington, you know. Sometimes you can't have your cake and eat it, too.

MR. HERLINSKY: Look --

MR. MOORE: But they're very -- I mean, I think they were very attractive buildings.

MR. MELFI: They're beautiful, and so is Westmount Country, if you saw the original plans for that, gorgeous. What are they? You got a box with brown aluminum siding around the whole thing.

MR. MOORE: Down the line they did Town Center in Robinsville, New Jersey, which is, you know, Central New Jersey.

CHAIRMAN BAGINSKI: Sore subject.

MR. MELFI: Very sore subject.

CHAIRMAN BAGINSKI: Sore subject in this town right now. Robinsville is a sore subject in this town.

MR. MOORE: What, did they beat you in a sport?

CHAIRMAN BAGINSKI: In softball last night.

MR. MELFI: In state finals.

MR. MOORE: Anyway, maybe they --

MR. HERLINSKY: There is a state-of-the-art

Page 58

indoor softball training facility in there.

MR. MOORE: The type of elevations of our front building, you know, on the main street there, with this kind of quality architecture, which we agree to be bound to conditions of any approval the board should see fit to grant, and it looks great. It looks awesome.

CHAIRMAN BAGINSKI: I don't think anybody is denying that it looks great and awesome, you're right, but now let's also face reality here. Mr. Melfi says oh, two months ago at the meeting, maybe we'll be able to use that facility. Well, what's it gonna take for Wallington to use that facility? What kind of money is it going to cost Wallington to use that facility? Because there's insurances that need to be bought, because your client isn't gonna take liability if somebody gets hurt on that property. Wallington is going to be responsible to pay that insurance. Correct? Obviously you got to protect your clients. He's going to have to have that piece of paper in front of him.

MR. HERLINSKY: I understand, but look --

CHAIRMAN BAGINSKI: Now, and the next thing --

MR. HERLINSKY: But let me, let me, if I can just cut for a second.

You hold the cards, so if you decide that

Page 59

you would like us to do something, we've already extended the offer to do that. That's something we can certainly work out and we're committed to doing that.

MR. CEDZIDLO: The important thing is for Miss Bogart, Mr. Moore, Mr. Herlinsky, is that, and it's exactly the discussion, this is an open discussion saying how we do this, should we do that, should we not do this, is it better to do it this way, is it better to do it that way, let's discuss what options there are, you know, what assurances there are that it will be built this way. This is just, you know, questions so we can figure out, is it best to keep the building, is it not best to keep the building, is it best to keep that, because I think the testimony, and trust me, I'm sure I got this wrong, but you're talking about how the people, if it does get developed jointly, both capital and everything else, the adjoining property is going to use that building, as well, correct?

MR. HERLINSKY: No.

MR. MOORE: No. Not at this -- at this moment that's not the plan.

MR. HERLINSKY: To reiterate my point, we cannot --

MR. CEDZIDLO: I thought this was a rec center.

Page 60

MR. MOORE: The way your zoning works, it can only be an amenity for this lot.

MR. MELFI: If I'm not mistaken, at the last meeting you testified that the people, if they want to drive in they can drive from the other side of the units and drive around the park to use this as a whole complex.

MR. MOORE: No. He was talking, he was talking about driving from the buildings to the Yoga center on this lot.

MR. HERLINSKY: They cannot, because as far as what we have decided what we're going to do, we're going to have card key access and it's only going to be for the residents of this property.

MR. MELFI: Of the 73 units.

MR. HERLINSKY: 73 units, that's it. As far as any other usage, this board has complete control over that. We cannot extend it for anything else or we'd be violating any approvals we get and violating your ordinance, so the fact of the matter is it's for 73 people, 73 people are going to have one of the best amenities they can possibly have.

MR. MELFI: You forgot the wives and the kids.

MR. HERLINSKY: Excuse me.

Page 61

MR. MELFI: You forgot the wives and kids. You said 73 people. You forgot the wives, the boyfriends, family, kids.

I would like to let her finish her testimony here.

CHAIRMAN BAGINSKI: Yeah. I was --

MR. HERLINSKY: I hear you, but look, if this is going to be an issue I think it's important that we engage the town and decide if this is something that you would engage with us as far as what would be best for everyone.

CHAIRMAN BAGINSKI: We'll let Miss Bogart finish her testimony and we'll revisit this issue, because I'm sure there will be some questions from the public out there that will come up and maybe she'll have an answer, be able to answer, and for the architect and engineers and everybody, so let's let her finish. I believe she's your last expert witness, right, for tonight?

MR. MOORE: Then we'll address the Neglia report.

CHAIRMAN BAGINSKI: Miss Bogart, sorry to cut you off like that. I apologize. We'll let you finish your report.

MS. BOGART: No worries. I got to take a

Page 62

deep breath.

So as our attorney had indicated, there are four variances that would be removed if we remove that building. One is open space, which is a technical variance because we're providing recreational space. Second is the building length, and that's also a technical variance because we have that building attached to the new multi-family building. The two important variances that would be removed are building coverage and lot coverage, and really, we're talking about five percent of the entire lot that would be the variance that would be removed. I think from a planning perspective, this board needs to review the benefits of providing a public recreation amenity versus a five percent coverage variance, which is minimal, and the only reason it's five percent is because we did it with an existing facility, so I think from all those perspectives, the board needs to look at keeping that building and the benefits of keeping that building versus any detriments.

So before all this came up I was about to get into the expected school children. So Rutgers has a study, which is a little bit outdated, but has a study that provides for a ratio for school children per multi-family development. If you look at the Rutgers

Page 63

School Hupa Study, it indicates that approximately 13.8 school children would come out of this facility, this project. Of that, 11.7 would be public school children. As I mentioned, this study is outdated and I've done a number of studies throughout Bergen County on my own, OPRA a number of Board of Educations throughout the municipalities in Bergen County and what it seems to be is in northern Bergen County, it's .07 children per unit is the average in Bergen County. If you applied that to this project, you're looking at about five school children. So if you look at my studies, and I can give you the municipalities and the studies I did and the data I did, I believe that the project itself will probably generate between five to 11 school children.

MS. WYGONIK: I have a question. So out of the 200-something units that would be -- are you just talking about this one?

MS. BOGART: Just the 73.

MS. WYGONIK: Okay. So even out of 73 units there will only be 13 children, school children?

MS. BOGART: 13 school aged children, of which approximately 11 would be public school children, and if you look at actual data that I've compiled it's probably going to be a little less than that.

MS. WYGONIK: To be -- I don't know. Just

Page 64

thinking about it, 73 families are going to come and live there but there's only going to be 11 children or 13 children?

MS. BOGART: Yeah.

MS. WYGONIK: That seems very low.

MS. BOGART: Like I said, I could provide you the data that I have. I've done, I've done it personally. I've done OPRA requests to municipalities throughout Bergen County. I have the data, the actual data from existing multi-family developments throughout northern Bergen County and I can provide that to you.

MS. WYGONIK: Okay. I mean, you must have your facts and data. I don't -- I'm sure you did your research, but just thinking logically, to me, it doesn't make sense.

MS. BOGART: Well, I --

MS. WYGONIK: 73 families, usually two children, I'm not saying every family has children, but usually two, three children per family, out of 73 --

MS. BOGART: No. I understand that and that's why I've done so much research, because it doesn't make sense, and when you start to look at the -- and everybody questions it. No matter where I am, everybody questions it. Whether I'm on your side of the dais or on this side, everyone wants to know what the

Page 65

real facts are and that's why I've done so much research and I have the data and I said I could provide that to you.

MR. MELFI: I have a question on that.  You said you OPRA'd many towns and municipalities regarding this?

MS. BOGART: Yes.

MR. MELFI: Have you OPRA'd to see what our ratio is in the three major complexes, as far as Mount Pleasant Village and then --

MS. BOGART: I have.

MR. MELFI: How many units -- maybe you can explain that to the public.

MS. BOGART: I have, and the board of ed said they don't keep that data and they didn't get back to me.

MAYOR TOMKO: What towns in this south Bergen area have you OPRA'd, because, you know, historically Route 4 is the Mason-Dixon line and we cannot compare with upper Bergen County.  Things are different.

MS. BOGART: You're talking to a girl that went to North Carolina.  It's not the Mason-Dixon line.  Let's see.

MR. CEDZIDLO: Miss Bogart, let me just --

Page 66

building six has 15 two bedrooms?

MS. BOGART: Yes.

MR. CEDZIDLO: And building eight has how many two bedrooms, and then three three bedrooms?

MS. BOGART: I have, in total, 40 one bedrooms, 30 two bedrooms and 30 three bedrooms.

MS. WYGONIK: 30 two bedrooms?

MR. CEDZIDLO: So there's 30 two bedrooms and three three bedrooms?

MS. BOGART: Yes.

MR. CEDZIDLO: And your -- see, the one bedrooms I can understand, you know, the argument that there's not going to be any school age children in a one bedroom apartment, but you're talking about a lot of two bedrooms and several three bedrooms, which has the potential for 30 bedrooms, you know, over 30 bedrooms, 35 bedrooms where somebody other than the person paying the rent can have a child.  Could be as much as 30, right?

MS. BOGART: I agree with --

MR. CEDZIDLO: Statistically it may come out to five and 11 but you've got over 30 second bedrooms in this complex, right?

MS. BOGART: I understand completely, and like I said, that's why I've done so much research in

Page 67

this area.  The record numbers show it's .09 for every one bedroom and .30 for two to three bedrooms, which equates to 13.8 for school age children.  The difference here is elevators serve buildings.  Once kids hit school age, the families don't want to live in elevator service buildings, they don't want the kids to run down the elevator to play outside by themselves.  They want garden apartments, they want to be able to, to see them outside, so it changes.  The amount of school children you see for elevator shared buildings is substantially less.  You don't want kids in, you know, in apartments where you can't see them play, and I'm a mom of three, I get it.  Like, you don't -- you want to be able to see them go out and walk out the front door or in the backyard, so if you live in a building that doesn't provide that, the number of children generated drops substantially.

MR. CEDZIDLO: My office is one block from the George Washington Bridge in Fort Lee and I live in Edge Water, along the waterfront, and every building with an elevator in it is more occupied by people in walkers than people with kids.

MS. BOGART: Yes.

MR. CEDZIDLO: Buildings with elevators are dominated by people 60 and older who need the elevator

Page 68

to get up and downstairs.  Walkers, wheelchairs, everything else.

MS. BOGART: So you agree with me?

MR. CEDZIDLO: There's credence to exactly what you're saying.

MS. BOGART: Yes.

MR. CEDZIDLO: Like I said, I understand that from personal experience, but where my office is in Fort Lee, everybody knows all the housing, that's all the glass towers that are being built, you know, next to the George Washington Bridge, they're 47 stories high.

MS. BOGART: And I've worked on many of those projects.

MR. CEDZIDLO: All of Edge Water is under construction and all the buildings with elevators are the more expen -- not only that, they're more expensive buildings and the rent is high so they're, you know, people 45 or 50 and older who are occupying those buildings.

MS. BOGART: They're not moms and dads.

MR. CEDZIDLO: They're not 25 and 30-year-olds.

MR. MOORE: We're marketing this more towards professionals, aren't we, really?

MS. BOGART: That's what it is.  Like I

Page 69

said, moms don't want kids running out, I want to go out and play, go take the elevator downstairs and see what happens. That doesn't happen, so the numbers seem low but it's a different market, it's a different project.

MS. WYGONIK: I have a question. What do you define as school age children? Kindergarten through eight or kindergarten through high school?

MS. BOGART: Through high school.

MS. WYGONIK: Through high school, okay.

MR. MOORE: Can I move Miss Bogart to her variance testimony so we can get through this tonight?

CHAIRMAN BAGINSKI: Yes, please.

MS. BOGART: The school aged children would be an issue but I hope you understand where I'm coming from and all the data.

MAYOR TOMKO: I would just like to say I hope you understand where we're coming from, because we are, and I don't want to use the term gun-shy, in a sense, but we're so apprehensive because we see what other complexes have produced. We have a very problematic school situation right now and, you know, we don't know what's in sight for the future. Everything, everything we're going through and planning is like the domino affect, it's hinged on everything we do and, you know, we're worried about this. This is a big problem.

Page 70

I respect your research. I question it, but I respect your research and all and, you know, it makes us very apprehensive on a lot of these things because, you know, we just picture the worst scenario. Three bedrooms, five, six kids coming out of there, packing them in. Like, you're saying you're looking for --

MR. MOORE: There's only three units, though, and that's because the affordable housing requires you to do that.

MAYOR TOMKO: Right.

MS. BOGART: And those three affordable units will have the most kids out of this entire complex, that's known, and I completely appreciate your apprehension and your questioning, because I represent two municipalities that have their own school districts that have the same concern. Borough of Park Ridge and Borough of Emerson, they have very tight facilities with regard to education and they go through the same painstaking issues every time they have a development application, so I get that.

MAYOR TOMKO: Well, whatever pains they have, we have ulcers.

MS. BOGART: Exactly. I get it. I understand completely and that's why I've done all the research and I'm trying to provide you the most current

Page 71

and accurate data I can, because I don't want to be the planner that three years from now you say that planner came in and supported that project and all of a sudden we've got 100 school children and she's awful.

MAYOR TOMKO: And we have your name.

MS. BOGART: Yes. Exactly. Everyone's got my name. I don't want to be that girl.

CHAIRMAN BAGINSKI: I don't want to cut off the conversation.

MAYOR TOMKO: I know. I'm sorry.

CHAIRMAN BAGINSKI: Let Miss Bogart finish her testimony so we can continue moving on.

MS. BOGART: But you understand what I'm saying?

MAYOR TOMKO: Yes.

MS. BOGART: Okay. So the next portion of my testimony, I wanted to talk a little bit about your local Master Plan, because I think you've all understood that I really take into consideration your local concerns, your local impacts, your local zoning regulations, but I think most important is your local Master Plan goals. I reviewed your 2006 Master Plan, your 2008 Housing Plan and your 2013 Master Plan and I think that a lot of the goals and objectives in those documents pertain to what we're proposing this evening.

Page 72

So first and foremost, the 2006 Master Plan talks about channeling developments for maximized benefits of Wallington's present and future needs, to preserve the tax base of the community by fostering the diversity of rateables. Obviously this proposal will increase rateables within the township. To preserve the tax based community -- excuse me. To provide a variety of community facilities that will meet the needs of various borough age groups, and that's what we're proposing to provide through the existing facility that we're proposing as a borough recreation facility. To provide adequate housing to meet the needs of the existing population, and obviously not only we're proposing a diversity of housing with multi-family, but also because we're providing affordable units, I believe that we're providing adequate housing to meet the needs of the existing population. And then lastly, to provide diversity of housing to meet the needs of all age groups, income levels, sexes, minorities, handicap and variety of size housing, size facilities -- families. Excuse me. For all those reasons I think our project meets all the goals and objectives in your 2006 Master Plan. Again, as the chairman had indicated and a number of board members indicated, we are providing a project that is completely compliant with your 2008 Housing

Page 73

Plan.  The Housing Plan suggested that the PRML zone be adopted, which is what we are applying under, and we're complying with that, minus some minor modifications with regard to coverage and the rear yard setback.  The 2013 Master Plan talked a little bit about modifying the plan's commercial zone but it really didn't have anything to do with our site.  So a review of those plans for the last 11 years and the goals and objectives that the planning board had indicated, I believe that our proposal is completely on point to the planning objectives of this municipality.  With regard to the zoning ordinance, as I mentioned, we are, and as this board knows, we are in the PRML zone district.  It was rezoned to create multi-family density at 20 units per acre.  We are at 20 units per acre.  The ordinance permits the construction of not more than 208 units.  We are at 207.  We are providing a 20 percent set aside, 15 were the two bedroom units, which will help in the completion of the borough's Housing Plan, so we meet all those objectives of the Housing Plan and the PRML zone district.  Not only that, we meet the fact that we comply with the permitted uses, we comply with the accessory uses, we comply with the minimum lot size and we comply with the maximum density requirements, all set forth in 365-25 (a), (b), (d) and (e) of your zoning

Page 74

ordinance, so we are completely consistent with your Master Plan documents and your zoning documents.  Where we deviate is, as I mentioned to you, with regard to the rear yard setback.  As I indicated on the plan, it's actually a technical deviation because we are really just violating the setback based upon an internal lot line.  We are 22 feet.  We're over 25 feet required.  However, your zoning ordinance suggests that it could be reduced to zero if our planned development with the two lots, 35.01 and the 35.02, which is what we're suggesting here tonight, and there started to be a dialogue with why can't we be developed as two lots, and I think we can and I think this board has a right to require that we develop in accordance with the plans submitted.  I know that there was some apprehension or questions with regard to, well, how does this happen, how do we acquire it, how do we maintain that, but you have a right to do that.  You can say that the plan needs to be developed in accordance with what was submitted and you can make our conditions, our approval conditioned upon those approvals, like what we submitted.  So I think from those perspectives, the board's concerns could be answered.  Like I said, the zoning ordinance says that a rear yard setback can be reduced to zero and we're at 22 and it's an internal lot

Page 75

line.  Not only is it an internal lot line but we also have the river and the natural grading between the two lots that add additional buffer.  I believe that the granting of the variance doesn't substantially impair the intent and purposes of the zone plan, because the zone plan suggests that zero, but rear yard setback is appropriate, particularly when we're looking at a uniform site plan.  Additionally, if you're looking at the two lots together, there's really minimal impact.  What we suggested was a buffer to the south to the adjacent multi-family, but really, the whole key here is to coordinate the development between the two lots to make sure that the circulation works between the two lots, and the engineering, the circulation between the two lots is what creates the need for the variances that we are requesting this evening.  Technically, we could request the variance for the rear yard setback based upon a (c)1, based upon the criteria, that exceptional narrowness, shallowness and shape of property, or by reason of exceptional topography conditions of physical features thereon.  I believe that this is appropriate for this site based upon not only the lot lines, but also the shape of the property and the existing conditions, not only the existing building but also the buildings that were approved on the adjacent lot.  We

Page 76

are meeting the density requirements and if the ordinance allowed we could go up, add a story and reduce the setback requirements, however, that's not the case here.  What we're doing is looking to provide for the permitted density on site and just modify the setback slightly.  I believe that for a (c) variance we have to talk about the purposes of the Municipal Land Use Law.  With regard --

MR. MOORE: On the (c)1, did you want to talk about the negative criteria on the (c)1 for this one or are you going to do (c)1 and (c)2 for the same --

MS. BOGART: Yes.  I'll do the negative criteria together.

MR. MOORE: Okay.  Great.

MS. BOGART: So if we were suggesting that the setback variance could be granted under a (c)2, we have to talk about the positive and negative criteria, and the positive criteria is what purposes the Municipal Land Use Law are, and I believe for the setback variance there are four purposes, further purposes, (a), municipal action to guide appropriate use in the development of all land in a manner --

MS. BAUMANN: I'm sorry.  Appropriate?

MS. BOGART: Appropriate use in the development of all land in a manner that will promote

Page 77

the public health, safety, morals and general welfare. I believe that the proposal that we've identified and laid out for you is the most functional layout for the property, given the existing development or the approved development on the adjacent lot and the adjacent building. I believe it allows for the most functional layout of the entire site. It allows for building six to move and be centered on site so that when you drive down the aisle you're actually looking at the center of the building. It allows for a sidewalk along building six to connect to all the other buildings, as well as the recreation facility, as well as the gym and Yoga facility to the center, so with all those perspectives I think that the layout itself of the entire site meets and furthers purpose (a) of the Municipal Land Use Law. The next purpose is to promote the establishment of appropriate population densities and concentrations that will contributes to the well-being of persons, neighborhoods, communities, regions and preserve the environment. As you heard from my testimony, the density being proposed is permitted by ordinance and also permitted by your Master Plan. All we're looking to do is make sure that the site layout works, not only with the adjacent facility but also the existing building, so I think it serves that purpose. The next

Page 78

purpose is to promote desirable, visual environment through creative development techniques and good civic design and arrangement. As this board has heard and seen and can sort of attest to, based upon the existing conditions, the proposal rehabs the existing facility, tears down the existing building in the front that needs rehabilitation, rehabs the existing rink and creates a great new facility for recreation and not only that, creates brand new housing facilities and affordable housing, so I think from those perspectives it meets the purpose of promoting a desirable visual environment. Lastly, purpose (o), to provide for development of balance housing supply, and that was identified in your municipal Master Plan and this project provides for the much needed affordable housing in your community, so I think from all those perspectives we advance the purpose of the Municipal Housing Law by --

MR. MOORE: Land Use Law.

MS. BOGART: -- Municipal Land Use Law by granting the variances that are requested. There are a number of benefits to granting the setback variance. Not only are we providing housing, providing a variety of housing choices for the residents, we're providing affordable housing for moderate income residents. We are buffering 3. -- Lot 35.02 in Saddle River. The

Page 79

proposal is part of a union required site plan application and, unfortunately, because we need a number of variances, it's all due to the fact that we are trying to create the most appropriate engineering plan for this site. The subject parcel is consistent and the proposal's consistent with the development pattern, as you can see from the exhibit that I had submitted to you this evening. I don't believe there are any detriments to this application. From this board's perspective in weighing the setback variance, you need to look at the benefits and all the benefits of furthering the Municipal Land Use Law purposes, furthering your Master Plan purposes. Again, any detriments, I don't believe there are any detriments. I believe the benefits completely outweigh all the detriments. With regard to the negative criteria, two things that as a Professional Planner I need to discuss is how the project has a detriment to the public good, and I dont believe it does, because all the impacts, if any, are internal and they're internal because of the fact that the two sites are being developed together. There's really no public impact. I believe the size of the property can support the current design and the multi-family development really fits into this site and fits into your Master Plan. The second portion of the negative criteria, I

Page 80

have to prove there's no substantial detriment to your Master Plan or Zone Plan and I don't believe that is so, because that is exactly what your Master Plan or Housing Plan calls for, is this development, this density on this site. Yes, we need certain minor variances, but they're all due to the fact that we're trying to make this site work better from an engineering perspective, so from all those perspectives I believe that the benefits outweigh the detriments and we meet the negative criteria for the setback variance.

I told you this was going to be boring. My attorney is not even listening to me.

MR. MOORE: Yes, I am. I'm going through this. I'm right up with you.

MS. BOGART: He's boring, too.

MR. MOORE: I am boring.

MS. BOGART: The next variance or two variances pertain to minimum building setback and there's two sections of the code that indicate that. One, Section 365-25 (g)1, minimum building separation, no less than 20 feet separation side by side or side to front or side to rear, and Section 365-25(g)2, no less than 40 feet front to front, front to back or back to back, so we need two variances from your section, one with regard to building six and one with regard to

Page 81

building seven and eight.  Two separate issues here. Building six, which is this building, which requires the rear yard setback variance, needs a setback variance from building five and building three and the reason it needs the variance is because we're trying to propose the drive aisle to the rear and we're trying to provide buffering and landscaping on the property line.  Not only that, we're also trying to propose a sidewalk that would connect the building to the rest of the site.  So again, as I started to mention to you, with regard to the rear yard setback, it's all about engineering and how to make this site work as a whole, and yes, we need a setback variance, but we're trying to move building six so that the entry is in the middle of the driveway aisle.  We're trying to make sure it has appropriate pedestrian access and it has appropriate driveway access, so technically we need minor variances from that, from the regulations, but I think this is the most appropriate engineering design.  We also need building setback variances for building seven and eight. Building seven being the existing recreation facility and building eight being the new residential facility. This is a technical variance because they're really not connected, but because they are side by side we need a separation variance for those.  I don't believe that the

Page 82

granting of the variances for either building six, seven or eight substantially impair the intent and purposes of the Zone Plan or Master Plan, because this is a unique situation for this site and because we are preserving that existing building.  I believe that the deviation can be granted because the proposed building location and the reuse of the existing roller facility is a better zoning alternative than the existing zoning requirement of the ordinance.  If we were to take down that building you would probably still need some separation regulations and this part would not have the benefit of a new recreation facility as we're proposing this evening.

MR. MOORE: Miss Bogart, that, that better zoning alternative analysis also applies to the prior variance you were talking about, as well, with the building setback, too, doesn't it?

MS. BOGART: That's correct.

MR. MOORE: Thank you.

MS. BOGART: I believe that the walkway and the additional landscaping that we're proposing, the less impervious coverage, the more open space, the better circulation for the ring road around the property, they're all benefits to the variances that we're requesting this evening with regard to building

Page 83

setbacks, and from a planning perspective and being a planner on one side where you create a Master Plan, you create the zoning regulations for a property, you can't determine how it's all going to lay out in the end.  The zoning regulations are first and foremost, but when you actually start to lay out a property and determine what's best, I'm sorry, for the development of the property, things change, and so that's what this board is here for, to look at why things change and is it a benefit to the development and how that benefits the development, is it more appropriate than what was originally contemplated, because when you create zoning regulations you don't have a full engineered type plan. So from all those perspectives, I think that the benefits of this actually engineered site plan are much better than what was originally contemplated when you create the zoning regulations.  So with regard to the building setback variances, again, there are a number of Municipal Land Use Law purposes that are furthered. Purpose (a), municipal action to guide appropriate use and development of all lands in the manner that will promote the public health, safety and morals and general welfare.  I believe that this development is more appropriate than originally contemplated based upon the fact that it's fully engineered and it has more

Page 84

appropriate circulation than could be contemplated without a fully engineered site plan.  Purpose (e), to promote established -- promote establishment of appropriate population densities.  Again, we are promoting a development that has a population density that is consistent with your zoning ordinance and your Master Plan, Housing Plan.  Purpose (g), to provide sufficient space and appropriate locations for a variety of uses, including residential.  Your Master Plan indicated this is the most appropriate place for a residential, not only residential but multi-family residential and affordable housing.  Purpose (j), to promote concentration of Historic District sites, open space and valuable and natural resources in the state, and I think that the preservation of this existing recreation facility is important, and of course creates variances for us, but obviously it's important to provide for a couple reasons.  Purpose (i), to promote a desirable visual environment with the development techniques, civic design.  Yes, we need setback variances, but they're all due to the fact that we're trying to create appropriate walkways throughout the site, appropriate landscaping and appropriate buffers and an appropriate vehicle of design, so I believe from those perspectives it meets and furthers purpose (i).

Page 85

Purpose (m), encourages development of various public and private procedures and activities shaping land development, basically lessening the cost of such development and more efficient use of the land. I believe that this municipality identified that this is the most appropriate site for multi-family housing and it's the least, or the most cost-effective to provide it here, and that's what we're doing, so the coordination of both the public and the private developer to make sure that we have appropriate development is what we're trying to achieve here, and from those perspectives I believe we meet purpose (m). And lastly, purpose (o) is to provide development bonds housing supply, and again, as I mentioned to you previously, I believe we're addressing that based upon your Housing Plan. Those are the purposes of the Municipal Land Use Law we further. Lastly, I just want to get into the benefits of granting the variances for the separation of buildings. First of all, I believe that the proposed separation distance allows for, as I mentioned to you, the appropriate internal circulation not only from the vehicle perspective but also pedestrians. It allows for that internal ring road, it allows for buffering, it allows for the internal sidewalk that goes to the adjacent buildings and it allows for the site to work as a whole,

Page 86

and I think from an engineering perspective, as you heard, that this is the most appropriate layout for the site. Also, the benefit is to provide for additional recreation opportunities for the residents. It allows for the existing recreation facility to be on site and to be rehabbed, but also, it allows for a pedestrian connection to that recreational facility. It reduces impervious coverage and provides for open space, so from all those perspectives I believe the benefits of granting the variance for this building separation outweighs any negatives. Lastly, addressing the negative criteria, I believe that converting the roller rink and reusing it will have no negative impact to the surrounding community. In fact, I think it will have a benefit. By removing it, you're really taking part of the character of the community away. It allows for a rink that has existed for a number of years to remain and to be incorporated into a new environment and be a public use, so I think that by allowing that to remain is a huge benefit from a historic perspective. Unfortunately, as I mentioned to you, we need a number of variances based on the fact that we're keeping it, however, we also have benefits. We are providing appropriate circulation. We're providing appropriate parking areas. We are making sure that there is

Page 87

additional parking in and around the new recreational facility, and unfortunately, we do need distance variances, but the reality is from an engineering perspective it all lays out really well, so from all those perspectives I don't believe there's any public impact. In fact, I think there's a public benefit because we are providing a public facility. We don't believe there's any impact on the Master Plan perspective because it calls for open space, recreation and multi-family on this site. I believe that, lastly, what we are proposing from a building separation perspective is a better zoning alternative than the existing requirements because it allows for the recreation opportunities and it allows for a variety of housing choices, and also provides for appropriate internal circulation and sufficient parking on site. It also allows for appropriate pedestrian circulation on site and improves, actually, on site circulation which is a requirement.

So that's all my testimony with regard to building setbacks. I've got --

MR. MOORE: Building height?

MS. BOGART: -- building height variances to address. I know it's --

CHAIRMAN BAGINSKI: Your testimony for

Page 88

building height is going to be just as long as it was for setback?

MR. MOORE: Pretty much, and we've got a lot of others, too.

MS. BOGART: I've got --

MR. HERLINSKY: If I can make a suggestion, I see these poor woman that are typing away. Give them a five minute break?

CHAIRMAN BAGINSKI: Well, what I was going to suggest is we'll continue her report next month, open it up and hear the citizens for now on any testimony that was heard, for a little while, so we can -- at least they can speak and voice their opinion. Maybe there will be some questions that will be valid, and then we'll come back next month and continue, and we have some reports for Mr. Neglia yet. It's not like we're going to be voting on this application today.

MR. HERLINSKY: I would say the chairman always knows best.

CHAIRMAN BAGINSKI: I definitely agree, let's take a five minute recess, let the ladies get a drink of water, rest their fingers. When we come back we'll hold your report until next month. At that point in time we'll open the hearing to the citizens, whatever questions come up. This way maybe for next month we can

Page 89

address them and then do what we need to do about that. We'll take a five minute recess. We'll come back here at five after.

(A brief recess was taken.)

CHAIRMAN BAGINSKI: All right. We'll try to get restarted now.

All right. As I said before recess, we'll continue with testimony afterwards, next month, at the next meeting. Our Neglia Engineering representative has some testimony, also, but we'll hold that over till next month.

At this time I'd like to open it up to hearing the citizens. If anybody has any questions about anything that was discussed to this point, we'll take some time, we'll discuss some of it, bring out the questions and it will be opened up again next month for the citizens. It's not just a quick little brief thing. Everybody's opinion is valuable here. Let's open it up to hearing the citizens at this point in time. What I'll have you do is step forward.

MS. KAPUSTA: I got a big enough mouth. I was a cheerleader. I know how to project my voice. Believe me, I still know how to do that.

MR. MOORE: Can you do a cartwheel for us? It was a boring night.

Page 90

MS. KAPUSTA: I'm not dressed for a cartwheel.

BRENDA KAPUSTA, having been first duly sworn according to law, testified as follows:

MS. BAUMANN: May I have your name and your street address?

MS. KAPUSTA: Brenda Kapusta, 90 Allwood Street, Wallington, New Jersey. K-A-P-U-S-T-A. It's Polish, Polish as you can get.

You're talking to us about, that only 13 kids are going to come out of all of those affordable housing. Okay. Affordable housing, have you done any studies in just Wallington itself to see what our affordable housing that's already here has in it? And I'll take an example. The nice little complex that's next to where you're building there -- can you guarantee us that they're gonna have a one bedroom house, one kid in a one bedroom? Can you guarantee us they're not gonna have more than four kids in a one bedroom with two adults? Cuz it's happening in the complex next door. What guarantees are you gonna give the residents of Wallington that 208 units aren't gonna produce 500 kids in our school system? And when you say affordable housing, you're saying 13 kids in that whole thing, it's not gonna happen. What guarantee can you give us

Page 91

residents that are going to have to deal with all the extra children in the schools and everything else? On a second side, you're talking about the roller rink and only opening up to the one side, not letting the other side, but yet allowing the Wallington residents to use it. What guarantee are you gonna say that in a year you're not going to let any Wallington residents use it and that the other side isn't gonna get in there and use it?

MR. MOORE: That will be a condition of the approval, so that we would lose our Certificate of Occupancy or be able to have Notices of Violation, so that part is easy.

MS. KAPUSTA: But if nobody is monitoring it how do we know?

MR. MOORE: Somebody can just drop a dime.

MS. KAPUSTA: We know how well dropping a dime works with illegal homes and too many people and families and overcrowding in one bedroom apartments, we know how that works. So what kind of guarantees can you give the residents of Wallington that you're building all these nice new buildings and you got all these affordable housings that a two bedroom is only going to have one or two kids and then an adult? Again, did you go and look at the housing in Wallington or in the

Page 92

neighboring towns? We all know what goes on. We know a one bedroom just doesn't have one family in it. It has multiple kids. What guarantee can you give the residents of Wallington that only 13 kids are gonna come out of that thing? And I'm not saying your study. Did you check around just in Wallington how many houses are one bedroom and have four kids coming out of them? What guarantee can you give to us that your study is going to actually only keep out 13, under 20 kids in there?

CHAIRMAN BAGINSKI: Okay. Miss Kapusta, is there any other questions that you have?

MS. KAPUSTA: No.

CHAIRMAN BAGINSKI: Okay. Because you asked the same question 10 times, so let her answer it now.

MS. KAPUSTA: I know, because we've all been talking about it.

CHAIRMAN BAGINSKI: Let's let them try and answer it now.

MS. BOGART: So as I mentioned to you, I did the study with regard to the Rutgers numbers and the standards and I also did my own study with regard to existing developments in Bergen County and I am sure, based upon those studies, that it's probably between five to 10 kids. That being said, I also tried to do a study within Wallington itself, because as you heard

Page 93

from my testimony, I'm very concerned about the local impact, and I did do an OPRA request to the local Board of Ed and they said they didn't maintain those records, so I was not able to identify that from a local perspective.  But from a Bergen County perspective and other municipalities, I can tell you that these six or seven municipalities have an average school child per unit ratio of .07, particularly when you look at elevator serviced buildings, so I understand.  I can't guarantee my numbers are exactly correct in Wallington because they won't give me that information.  What I can tell you is all the information that I have gathered throughout Bergen County is completely accurate, between five to 10 kids, and that has been true for new developments within the last 10 years.  All I can do is give you the best information that I gathered.

MS. KAPUSTA: When they go into this housing units will there be somebody monitoring the number of people in each unit or the number of kids, not to overload them?

MR. MOORE: Well, there's legal per -- I mean, there's legal things about how many people you can, you know, have occupy a unit.  Again, that's code enforcement.

MS. BOGART: The good news with regard to

Page 94

the affordable units is that they have to be monitored. It is -- there are a specific number of occupants per one bedroom, per two bedroom, and that's not true for all the other units in town, so the state requires that all affordable units be monitored, that you can't have more than a certain number of occupants per bedroom, so that actually is a benefit to this with regard to the issues you're talking about.

MS. KAPUSTA: Okay.

CHAIRMAN BAGINSKI: Thank you, Miss Kapusta. Anyone else wishing to be heard?  You can step forward.

MELISSA DABAL, having been first duly sworn according to law, testified as follows:

MS. BAUMANN: State your name and your address.

MS. DABAL: Melissa Dabal.

MR. MOORE: You know what, why don't you sit here and use the mic.

MS. DABAL: Okay.  Melissa Dabal, D-A-B-A-L, 66 Mount, M-O-U-N-T, Cedar Avenue.

My questions are mainly for Mrs. Bogart, Ms. Bogart.

CHAIRMAN BAGINSKI: Melissa, could you pull the microphone closer so this way we don't have --

Page 95

MR. CEDZIDLO: I don't think that works.

MS. DABAL: How's that?  Better?

CHAIRMAN BAGINSKI: That might be the one that's shut off.

MS. BOGART: Here, we can share.

MS. DABAL: So do you have any studies post-development build that could corroborate or substantiate anything that you had predicted in terms of number of children coming out of those developments?

MS. BOGART: So all my studies that I mentioned are post-development.  They're all actual developed units and all actual information provided by the Board of Ed of those municipalities.

MS. DABAL: And those municipalities were in northern Bergen County and even though technically we're in northern Bergen County, like the mayor's comment, so to speak, can you just give me a quick example of the two municipalities that maybe you did studies on?

MS. BOGART: The Village of Ridgewood and the Borough of Park Ridge.

MS. DABAL: Okay.  So those are highly affluent towns.

MS. BOGART: Ridgewood, yes.  Park Ridge --

MS. DABAL: Yes.  Well, I mean, much more affluent than we are.

Page 96

MS. BOGART: I don't know that.

MS. DABAL: Well, I do.  I work there and my sister lives in Ridgewood, so I do know.

MS. BOGART: Okay.

MS. DABAL: Usually apartments in more affluent areas, young, let's say millennials will move in with children and I don't think that they stay there for a very long time.  I think they tend to want to buy a home because they don't want to keep children in an apartment.  Here it's very different.  We have a lot of people in apartment complexes that have a lot of children and for a very long time, I'm very involved in the school system, year over year we have larger amounts of children incoming into the school systems.  For instance, this year there was a high school class that had upwards of -- I'm sorry.  Middle school upwards of 30 children.  There was a grammar school class two years ago upwards of 28 children.  Again, you know, I know you can't give guarantees but this is a massive impact on this town.  It's massive for us.  We all own homes or we rent.  We live here.  I'm very, very concerned and highly disappointed that -- and I'm not pointing the finger at anyone.  Please don't misunderstand me, but that there was not greater planning for the number of children that could come out of this development.  We

Page 97

have three very large apartment complexes in town. We also have one going up on Paterson Plank Road. I don't know where we're going to put these children. I go to Board of Education meetings and the officials at the Board of Education level don't know where we're going to put these children. My heart is breaking. Are we going to put them in the hallway? I don't know what anybody could do and I don't have the answer.

MS. BOGART: May I?

MS. DABAL: Absolutely.

MS. BOGART: So my response is sort of twofold. One, your Master Plan and zoning ordinance allows for this. It's not like we're looking for any -- your Master Plan and zoning ordinance allow for it. We're not allowing or requesting any increase in density or any more units than what the governing body has already decided is appropriate for this site. We're not looking to provide anything more, any additional families than what was planned by this municipality. That's number one. Number two, I understand your comments with regard to school children completely, but the other side of that is if you look at Ridgewood, people are looking to rent there and pull in school children because they think the school system is the utmost be all of school systems ever, so while you say

Page 98

that people come in and rent and pull all school kids in there and stay there for a while, it's the same scenario in any town regardless of the income level.

MS. DABAL: But the number of apartments here far exceed anything in Park Ridge, anything in Ridgewood.

MS. BOGART: Ridgewood has about 700 apartments.

MS. DABAL: I'm gonna guess -- Nick?

MR. MELFI: Off the top of my head -- we were just trying to figure that out.

MS. BOGART: Over 700 apartments. I think there was about 850, so it's very similar.

MR. MOORE: I'd just like to clarify one point and -- two points. One is that, one of these projects was already approved, regardless of whether or not this project gets approved or the amendments get approved, so we're talking here about 73 units, not about 208 units.

MS. DABAL: I wasn't -- I know that was -- you know, part B is to your point. I don't really understand the full scope of the project. I mean, I understand the redevelopment part but there's 200 -- what did you say -- 207 apartments?

CHAIRMAN BAGINSKI: 207.

Page 99

MS. DABAL: And 74 are affordable?

MS. WYGONIK: Total, 207.

MS. DABAL: Total, 207.

MS. BOGART: The proposal today is just talking about 73.

MS. DABAL: And what is the breakdown in terms of bedrooms? Anybody know a high level off the top of their head?

MS. BOGART: 41 one bedrooms.

MR. MOORE: Mr. Raker testified to that earlier. He can reiterate that.

MR. CEDZIDLO: 40, 33.

MS. DABAL: Yeah.

MR. CEDZIDLO: 40 one bedroom, 30 two bedroom, three three bedroom.

MR. MOORE: Correct.

CHAIRMAN BAGINSKI: Now, again, to clarify, this project, this was a project that, the original one, when it came up, was denied by the planning board and it went to the Courts of Hackensack and at that point in time it was the -- Judge Harris was the judge?

MR. CEDZIDLO: This goes back, this goes back 10 years, where the owners of these two pieces of land sued the town, saying that the town had failed to adopt low to moderate income housing requirements and

Page 100

meet their housing requirements under the Mount Laurel decision, so they're called Mount Laurel lawsuits. Now, if you want to go really far back, the person who was the borough attorney 35 years ago told the town, we don't need Mount Laurel housing because we have apartments so we have cheap housing in town, which is not the law. The borough attorney who supplanted him didn't tell the mayor and council that we need the requirements. I happen to know this because I happen to know the current borough attorney.

MS. DABAL: He's awesome. He's awesome.

MR. CEDZIDLO: But the two borough attorneys prior to him had told the town, you don't need to comply with Mount Laurel, so when the builder's remedy came, I represented the planning and zoning board during those hearings and Judge Harris ruled that Wallington has absolutely failed to plant anything and is not complying with phase one, phase two, now we're in phase three of Mount Laurel housing. Wallington was alone. Woodbridge went through the same thing. Okay. So several towns down here in south Bergen didn't do what they were supposed to do under the law, so when the developers sued, the judge granted them a right to build housing and low income housing here. Okay. And nothing to do with this planning board or the zoning board. I've been

Page 101

the board attorney for 10 years for both, had nothing to do with anything the board did. Judge Harris said you have a right to do it. As part of that litigation a compromise was worked out, because some of the plans that were suggested for the sites were five and six stories with -- if you look at Westmount Station, where there's Panera Bread and six stories above it, that's what was proposed for these sites. The borough, as part of a negotiation, settled that lawsuit in the best interest of Wallington to limit it to 20 units per acre, okay, when I think something like 40 units or more was proposed at the time.

MR. MELFI: I think their proposal was almost 70. We negotiated for 40 and we settled for 20. It was almost 70 an acre.

MR. CEDZIDLO: So Wallington settled for 20 units an acre and the developers said we'll live with that, that's okay. Okay. Because that's why we don't have Westmount Station being built here. Okay. Now, when the adjoining property owner came here in compliance with the 20 units per acre, the board at that time vote -- this board voted it down, saying we don't like the plan, we don't like the roadway house, there's certain things we don't like on this, and a judge in Hackensack, that was Judge Mian, about a year-and-a-half

Page 102

or two years ago said you can't deny the builders. The builders sued the town a couple years ago, they have a right to build houses. The reasons you're giving for not allowing this development to go forward are not valid, in my opinion, under the law. I happen to think the judge was wrong but he's the judge. He has final say so. So it's not like the board has done anything, and you mentioned the units over by the bowling alley, I believe they're almost all one bedrooms to try and limit the effect on the school system, by making them small commuter apartments that aren't going to attract families. Again, I grew up in town. I know the town. I love the town. My brother decided to move back into town, built a big house in town, probably pays as much in taxes as anybody in town. He probably has the big --

MS. DABAL: He's actually the third highest. He tells me quite often.

MR. CEDZIDLO: Again, my brother pays the third highest taxes of anybody in this town. I get it and I understand it. I still have the connection to the town and I understand it, but the truth is that there's very little -- okay, as long as the builder says I'm going to build according to the settlement we have and I only need, you know, a three or five foot setback from the property line and I'm going to be a quarter inch

Page 103

above the building height, you know, these are rather technical things, and you heard the discussion earlier, this is a discussion to try and do what's best for the town with the board and the developer acting to let's do what we think is best. They're not trying to shove anything down our throats. We're not trying to shove anything down their throat, but these are real serious, you know, issues that the town faces and it's, you know, it's hard, it's hard to do. That's why, you know, like I said, my office is in Fort Lee. I live in Edge Water. Now, nobody has more development -- there's more units being built within a thousand yards of my home than you can imagine right now and there's more coming. I will tell you, every building with an elevator, there's nobody under age 50 because they can't afford it in Edge Water. You just can't. There's a complex across from the golf range which is, if you want 1,800 square feet, it's $6,000 a month. There's no families with little kids moving into those. It's different here, but again, it's kind of what the planner was saying, these are nice units with, you know -- these are not slapped together little -- you know, the nicer development we can have, more likely is you're going to attract higher rents and less kids. It's difficult. It truly is.

CHAIRMAN BAGINSKI: Just in regards to what

Page 104

you're saying, you go all the way back to 35 years, the town fathers in our town here were battling with the state going back years ago, because if I'm not mistaken, the Mount Laurel rulings have changed over the years. It's not something that was set in stone, so everybody kind of pushed it to the side and said they don't know what they want yet so we don't have to do it. Am I correct in what I'm saying? This is 15 years ago I heard this.

MR. CEDZIDLO: I haven't brushed up on my Mount Laurel law lately but it was Mount Laurel One, Mount Laurel Two. Nick, you probably know this. What's our requirement now? What do we have to have in town? 73 or 100? I forget what the latest requirement --

MR. MELFI: Now, what we're required now to have?

MR. CEDZIDLO: Yeah.

MR. MELFI: I'm not sure off the top of my head.

MS. BOGART: It's over 100.

MR. CEDZIDLO: It might be, like, 110 or 115.

MR. MELFI: I want to say 118, 120, something like that.

MR. CEDZIDLO: We're required to maintain

Page 105

100, over 100 low income affordable housing in town, designated as such.

CHAIRMAN BAGINSKI: Okay.

MR. CEDZIDLO: And this project is going to allow us to meet our obligations so we're not subject to another lawsuit.

MS. DABAL: Right.  Sure.

CHAIRMAN BAGINSKI: Okay.  Thank you.

Any other questions?

MS. DABAL: Just one more, just really for my own edification.  The property owners now, or the group -- I'm not sure.  I mean, I know Mr. Nuckels owns, I guess both or a part.  Were they the original owners of the land or has that changed hands since the dawn of time?  I mean, I'm just curious.

MR. CEDZIDLO: I don't know how far back.  I know part of these were the builders and from that the builder's remedy suit, going back more than 10 years ago, when the lawsuit was done, and I think, and I'm sure I'll get it wrong, but as you heard, Wallington -- one of them was a joint partnership, I think, between possibly all three of the Nuckel children.  It was another that was -- I'm sure I'm wrong, but again, it was different ownership interest.  It wasn't the same people.  All part of the same -- it was different

Page 106

ownership percentages with different parcels for some reason, and again, I'm sure I got it wrong, but it was an interplay, so I do know when Counsel Moore told us, I know he was being honest with us.

MS. DABAL: Just one more.  I know you're trying to get through it.  When this was in the planning stage or the conceptual stage or a vision, however you want to call it, did anyone meet together as a group to say, geez, maybe there's a better use for this land?  I know that our hands are tied to some degree, we're not the owners, obviously, but could we have found greater rateables?

MR. MOORE: You were bound by court, so what happened, what the attorney had been explaining to you is my clients brought a builder's remedy lawsuit and an affordable housing lawsuit and this land is court ordered to be done as residential with an affordable housing set aside and there's -- the towns hands are totally tied.

MR. CEDZIDLO: The town actually had changed and adopted in its Master Plan, what was it, 2008, and designated this as a residential site in connection with the settlement of that lawsuit.  Now, bigger picture, 30 seconds, the planning board and zoning board's hands are very tied and very limited.  What needs to happen is

Page 107

the mayor and council can have the town's Professional Planner redraft up the zones, you know, two family zones and the business zones and the commercial zones and light industrial zones.  You got to redraw the map, because right now what the zoning board, I'm the attorney for the zoning board, we see it all the time, they say we have an industrial piece of property that was zoned industrial 50, 60 years ago and when it was a warehouse it was, you know, 5,000 square foot warehouse and the trucks would back up and the trucks were 20 feet long, like the box trucks.  Now you can't warehouse in there.  Now you have tractor trailers.  When we did Liberty Plaza, a tractor trailer backing up to, you know, the Liberty Plaza or the site next to it or the site next to it, a tractor trailer would actually block off the roadway, so you have loading docks that can't be used, you have -- so you have what you would say rateables, you know, people that would be paying taxes that wouldn't put money into the school system, but it's zoned in a way that it can't possibly be used.  We just had a lawsuit, a developer in town wanted to build housing near the Passaic Avenue bridge, over by --

CHAIRMAN BAGINSKI: Market Street.

MR. CEDZIDLO: Market Street bridge.  I'm getting my bridges wrong.  I'm out of town too long, but

Page 108

it was because that whole neighborhood flooded years ago, across from where the toy factory used to be and everything, that building sat vacant for three years because of flooding and nobody would warehouse or put anything in there so they said let me change it to residential, put up eight units and I'll put it on stilts, because we can't use it as -- there's no loading dock, no anything, no access, there was no access, it was in a flood zone, so it was rendered useless, and then that, when it got -- when the board said okay, build residential, that got challenged in court and the court said no, there's no good reason to make it residential but it's a piece of property that can't be used, so the mayor and council -- zoning and planning boards can only do what the town tells us, this is what it's supposed to be used for and here's the requirements.  The mayor and council has to turn around at some point and say we have to address this on a major planning scale, how do we get rateables and how do we get property to produce income, where it's just not, you know, lot by lot by lot.  Because Judge Harris, who is no longer in Hackensack, he basically said there shouldn't be any use variances ever granted but, you know, they still exist in the law, but he said the standards of changing uses by a board can't be met.

In RE: Morningside at Wallington

Page 109

MS. DABAL: Thank you, very much, Mr. Cedzidlo, for that thorough explanation. Thank you, everyone.

CHAIRMAN BAGINSKI: Okay. Anyone else wishing to be heard at this time? Again, don't forget, I opened it up to the citizens for questions. It will be open again the hearing next month, so if you forgot to ask something, it can be asked later. If there's any other -- anybody else at this point in time need to be heard? Is this in regards to anything with the citizens?

MR. HERLINSKY: No.

CHAIRMAN BAGINSKI: At this time, if nobody wishes to be heard tonight, what I'll do is close it to the citizens.

MR. CEDZIDLO: Just one thing. Does anyone have questions for Mr. Bertin, the engineer, or the architect, not just Miss Bogart, but any of the other experts who testified? Just to be clear, this would be the time to ask any of the witnesses.

CHAIRMAN BAGINSKI: Okay. At this time, then, I'd like to close it to the citizens and then we can address Mr. Herlinsky's question.

MR. HERLINSKY: There's two issues I have, since we're obviously coming back. The first is if you

Page 110

want us --

CHAIRMAN BAGINSKI: One second. Anybody leaving, just understand that you're not going to get re-noticed next month. If anybody was noticed for this meeting it's going to be here next month. What's the date?

MS. SIEK: 8-15.

CHAIRMAN BAGINSKI: August 15th, same time, same location, but you won't get any notices in the mail. You're being noticed right now. Thank you.

MR. HERLINSKY: The two issues that I would want to address. One, there was an issue as far as perhaps widening the pavement for fire trucks.

MR. MOORE: We agreed to that on the record.

MR. HERLINSKY: If the engineer has any, if you want to work through the engineering and give us any more feedback on that to make sure that we addressed any of those issues and finalize it and we'll have those amendments, and then the other thing is, this is the second time we've had a meeting and they've discussed possible, and again, I guess the issues that have come up, the overcrowding in the schools, I would imagine the overcrowding of whatever rec facilities you might have. If I can suggest, if there's anyone that we can meet with so we can work out some of the details. People

Page 111

mentioned things about insurance and other things, prior to the next meeting it might be fruitful, at least if you thought to adopt this, this would be something you could work into a resolution, but we would be able to work it out. If there's any -- I don't know if there's going to be any board members that are on the rec committee or any members of the public that we could meet with, that would be something I would suggest.

CHAIRMAN BAGINSKI: Maybe what I could do, suggest to the mayor over here, I know he's got a council meeting coming up, maybe he can bring it up during the council meeting and see if there's something possibly the council or rec committee might want to set up and reach out for you and see what we can do.

MR. HERLINSKY: That would be great.

CHAIRMAN BAGINSKI: All right.

MR. HERLINSKY: Thank you.

CHAIRMAN BAGINSKI: At this time, then, I'd like to have a motion to hold this in abeyance till next month.

MR. MELFI: Motion.

CHAIRMAN BAGINSKI: Second?

MS. POLTON: I'll second.

CHAIRMAN BAGINSKI: Like I said earlier, August 15th, same location.

Page 112

(At 10:40 p.m. proceedings were concluded.)

Page 113

CERTIFICATE

I, MICHELLE GRUENDEL, a Certified Court Reporter and Notary Public of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically and digitally at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

MICHELLE GRUENDEL, C.C.R.
C.C.R. License No. 30X100190500
Notary Public of the
State of New Jersey

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 31 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 141-14    Filed 04/30/26    Page 32 of 49
PageID: 2609

In RE: Morningside at Wallington                                    Transcript of Proceedings

## $

**$3 (1)**
33:4
**$6,000 (1)**
103:18

## A

**A1 (1)**
15:5
**A-1 (2)**
5:7,14
**A-2 (1)**
16:3
**A3 (2)**
16:22,22
**A-3 (1)**
18:14
**A-4 (1)**
19:24
**A5 (1)**
30:3
**A-5 (2)**
20:11,12
**A-6 (4)**
21:5,6,8,10
**A-7 (2)**
22:8,19
**A-8 (1)**
41:21
**abeyance (1)**
111:19
**able (12)**
6:17;16:18;39:22,23;
48:4;58:10;61:16;67:8,
13;91:12;93:4;111:4
**above (4)**
11:23;55:24;101:7;
103:1
**absolutely (7)**
28:1;34:1,1;53:13;
55:14;97:10;100:17
**accent (1)**
22:17
**accept (2)**
14:8;36:17
**access (22)**
15:10,11;23:6,7,13,
13,22,24,25;24:1,7,7,
19,21,22;25:1,4;60:13;
81:16,17;108:8,8
**accessible (1)**
8:7
**accessory (1)**
73:23
**accommodate (1)**
35:13
**accomplish (1)**
6:17
**accordance (2)**
74:14,19

**according (5)**
13:4;35:19;90:3;
94:13;102:23
**account (1)**
23:23
**accurate (2)**
71:1;93:13
**achieve (1)**
85:11
**achieved (1)**
31:8
**acquire (1)**
74:17
**acre (15)**
54:10,14,20,22;56:4,
4,8,8,9;73:15,15;
101:10,15,17,21
**acres (3)**
37:6;54:17,18
**across (3)**
10:2;103:16;108:2
**acting (1)**
103:4
**action (2)**
76:21;83:20
**active (3)**
5:18;43:20,22
**activities (1)**
85:2
**actual (4)**
63:23;64:9;95:11,12
**actually (19)**
17:2;27:1;37:20;
41:11;43:23;45:12,13;
54:15;55:16;74:5;77:9;
83:6,15;87:18;92:9;
94:7;102:16;106:20;
107:15
**adamant (1)**
30:6
**add (8)**
7:3,6,19;8:15;10:8;
37:19;75:3;76:2
**added (7)**
6:25;7:11;8:19;9:17,
20,20;10:1
**additional (6)**
37:20;75:3;82:21;
86:3;87:1;97:18
**Additionally (1)**
75:8
**address (14)**
3:24;13:9;35:20,22;
48:18;53:1;61:20;
87:24;89:1;90:6;94:16;
108:18;109:23;110:12
**addressed (1)**
110:17
**addressing (2)**
85:15;86:11
**adequacy (1)**
23:5
**adequate (2)**

72:12,16
**adjacent (16)**
3:20;38:18,21,24;
39:3,4;40:21;42:13;
43:1;45:14;75:11,25;
77:5,5,24;85:24
**adjoining (4)**
49:11,24;59:17;
101:20
**adjust (2)**
23:2,16
**adjustments (1)**
8:20
**adopt (2)**
99:25;111:3
**adopted (2)**
73:2;106:21
**adult (1)**
91:24
**adults (1)**
90:20
**advance (1)**
78:16
**advantage (3)**
52:7,8,17
**aesthetic (2)**
18:25;30:21
**aesthetically (2)**
30:8;32:13
**aesthetics (1)**
32:1
**affect (1)**
69:24
**affected (2)**
25:22;26:8
**affluent (3)**
95:22,25;96:6
**afford (1)**
103:15
**affordable (25)**
17:17,18,19,20,24;
43:5,14;70:8,11;72:15;
78:9,15,24;84:12;
90:11,12,14,23;91:23;
94:1,5;99:1;105:1;
106:16,17
**afterwards (1)**
89:8
**again (25)**
9:1;18:18;23:1;50:4;
54:1;55:21;72:23;
79:13;81:10;83:18;
84:4;85:13;89:16;
91:24;93:23;96:18;
99:17;102:12,18;
103:19;105:23;106:2;
109:5,7;110:21
**against (2)**
30:23;54:23
**age (7)**
66:13;67:3,5;69:6;
72:9,18;103:15
**aged (2)**

63:21;69:13
**ago (11)**
9:12;58:10;96:18;
100:4;102:1,2;104:3,8;
105:19;107:8;108:2
**agree (6)**
47:3;49:6;58:4;
66:20;68:3;88:20
**agreed (6)**
30:25;41:6;43:8,9;
56:8;110:14
**agreement (3)**
47:7;54:4,6
**ahead (2)**
44:1,22
**aisle (6)**
15:9;27:3;29:12;
77:9;81:6,15
**aisle's (1)**
16:1
**Al (4)**
6:9;19:25;26:4;27:7
**alley (1)**
102:8
**allow (3)**
16:16;97:14;105:5
**allowed (2)**
43:10;76:2
**allowing (4)**
86:19;91:5;97:15;
102:4
**allows (15)**
77:6,7,10;85:20,22,
23,23,25;86:4,6,16;
87:13,14,17;97:13
**Allwood (1)**
90:7
**almost (4)**
24:23;101:14,15;
102:9
**alone (1)**
100:19
**along (25)**
6:8;7:1,10,11,14;
10:8;16:16;17:2,6;
19:3,4;25:1;27:11,17;
28:25;29:5;30:13,18;
31:9,21;43:11,16,21;
67:20;77:10
**alongside (3)**
6:20,21;29:10
**alternate (1)**
10:21
**alternative (3)**
82:8,15;87:12
**Although (1)**
17:12
**aluminum (1)**
57:11
**always (2)**
30:11;88:19
**amended (1)**
3:17

**amendments (2)**
98:17;110:19
**amenities (3)**
41:7;51:14;60:22
**amenity (9)**
17:5;18:19;19:3;
38:2;51:17;52:6;56:19;
60:2;62:14
**amount (2)**
16:10;67:9
**amounts (1)**
96:13
**analysis (3)**
39:25;40:8;82:15
**answered (2)**
50:10;74:23
**apartment (5)**
6:24;66:14;96:10,11;
97:1
**apartments (12)**
41:2;52:23;67:8,11;
91:19;96:5;98:4,8,12,
24;100:6;102:11
**apologize (3)**
18:3;36:24;61:23
**applicant (3)**
4:15;8:13;41:6
**applicants (1)**
4:3
**applicant's (2)**
4:17,21
**application (18)**
3:1,16,19;4:15;5:18;
9:7;11:1;34:23;38:15;
39:7;52:21;53:9,20,24;
70:20;79:2,9;88:17
**applications (3)**
3:15,25;4:9
**applied (1)**
63:9
**applies (1)**
82:15
**applying (1)**
73:2
**appreciate (1)**
70:13
**apprehension (2)**
70:14;74:15
**apprehensive (2)**
69:19;70:3
**appropriate (31)**
42:20;75:7,21;76:21,
23,24;77:17;79:4;
81:15,16,19;83:11,20,
24;84:1,4,8,10,22,23,
23,24;85:6,10,20;86:2,
24,24;87:15,17;97:17
**approval (13)**
3:18,22;48:3,5,9,9,
11;49:15;50:3;57:1;
58:5;74:20;91:11
**approvals (5)**
49:1,2,5;60:19;74:21

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 32 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-14   Filed 04/30/26   Page 33 of 49
PageID: 2610
In RE: Morningside at Wallington                                      Transcript of Proceedings

**approve (1)**
33:2
**approved (8)**
3:18;33:6;55:10;
75:25;77:4;98:16,17,
18
**approximately (2)**
63:1,22
**architect (11)**
10:10,23;13:3,18,22,
23;30:2;34:4;56:25;
61:16;109:18
**architect's (3)**
4:19;8:22;9:20
**architectural (1)**
16:20
**Architecture (8)**
13:16,19,20;14:7,12,
17;36:5;58:4
**area (25)**
6:20,23;9:22;14:5;
16:25;17:1,3;23:12,21;
24:3,5;25:25;28:15;
29:23;37:15,18,21,22;
41:12;42:17;52:8;53:2;
56:1;65:18;67:1
**areas (6)**
23:16,16,17,18;
86:25;96:6
**argument (1)**
66:12
**arguments (1)**
32:2
**around (19)**
6:16;8:18;11:4;20:4,
19;23:5,13,25;24:22,
23;27:3,15;31:20;
57:11;60:6;82:23;87:1;
92:6;108:17
**arrangement (1)**
78:3
**aside (3)**
43:6;73:17;106:18
**askew (1)**
6:4
**asphalt (1)**
37:22
**assume (1)**
21:17
**assurances (1)**
59:10
**attached (1)**
62:8
**attention (2)**
22:4;39:7
**attest (1)**
78:4
**attorney (9)**
12:11;62:2;80:12;
100:4,7,10;101:1;
106:14;107:6
**attorneys (1)**
100:12

**attract (2)**
102:11;103:23
**attractive (3)**
6:24;22:6;57:7
**August (2)**
110:8;111:25
**Avenue (8)**
3:24;5:20;6:1,7;
9:25;35:22;94:21;
107:22
**average (4)**
19:9,10;63:9;93:7
**aware (2)**
37:4,15
**away (5)**
6:6;10:14;57:1;
86:16;88:7
**awesome (4)**
58:6,8;100:11,11
**awful (1)**
71:4
**awkward (1)**
19:19

---

**B**

---

**Bachelors (1)**
36:5
**Bachelor's (1)**
13:16
**back (42)**
17:4;19:12,21,23;
25:21,24;26:8,9;27:2;
28:9;29:11;30:3,12;
31:3,25;35:7;37:17,19;
40:23;46:2;47:4;48:15;
53:15;54:3;56:7;65:15;
80:23,23,24;88:15,22;
89:2;99:22,23;100:3;
102:13;104:1,3;
105:16,18;107:10;
109:25
**background (1)**
20:18
**backing (1)**
107:13
**backyard (1)**
67:15
**bad (1)**
42:5
**BAGINSKI (89)**
3:1,5,7;5:2,8,11;
12:17,20,23;13:1;14:8;
25:21;26:2,7,13,17,24;
27:5,9,13,20,23;28:4,9,
13,19,22;29:24;31:23;
34:3,13,17,21;35:2,10,
15;36:17;45:3,19,25;
46:7,12,15,22;47:10,
14;49:17;50:6;51:11;
54:18,25;55:3;57:15,
17,22;58:7,21;61:6,12,
22;69:12;71:8,11;

87:25;88:9,20;89:5;
92:10,13,17;94:10,24;
95:3;98:25;99:17;
103:25;105:3,8;
107:23;109:4,13,21;
110:2,8;111:9,16,18,
22,24
**balance (2)**
47:1;78:13
**balconettes (1)**
19:3
**banding (1)**
22:17
**bar (3)**
7:19;37:12;52:14
**bar/warehouse (1)**
37:16
**barber (2)**
53:19,21
**base (6)**
16:15,19;20:8;21:12,
23;72:4
**based (16)**
4:23;5:16;24:8;
42:11,17;51:1;72:7;
74:6;75:17,18,22;78:4;
83:24;85:15;86:22;
92:23
**basically (5)**
30:16;55:17;56:6;
85:3;108:22
**basin (3)**
7:5;8:3,14
**battling (1)**
104:2
**BAUMANN (8)**
13:6,11;35:14,20;
51:9;76:23;90:5;94:15
**beat (1)**
57:20
**beautiful (1)**
57:8
**became (1)**
19:10
**becomes (1)**
38:6
**bedroom (20)**
15:20,21;18:10,11;
66:14;67:2;73:18;
90:17,18,19;91:19,23;
92:2,7;94:3,3,6;99:14,
15,15
**bedrooms (37)**
15:16,17,17,17,19;
17:14,15,15,16,17,19,
20,22,23;18:4,9;66:1,4,
4,6,6,6,7,8,9,9,12,15,15,
16,16,17,22;67:2;70:4;
99:7,9;102:9
**begin (1)**
36:21
**behind (2)**
20:15,16

**below (2)**
8:6;25:9
**benefit (8)**
41:8;82:12;83:10;
86:3,15,20;87:6;94:7
**benefits (14)**
62:13,19;72:2;78:21;
79:11,11,14;80:9;
82:24;83:10,15;85:17;
86:9,23
**Bergen (19)**
4:7;5:18,18,25;
36:10;63:5,7,8,9;64:9,
11;65:18,20;92:22;
93:5,13;95:15,16;
100:21
**Bertin (45)**
4:21;5:3,6,10,13;7:7,
8,10,20,23,24;8:2,17;
11:7,11,14,18,22;12:2,
18,21;22:9;26:2,23;
27:1,8,11,16,22,25;
28:7,16,24;29:10,18;
35:6,9;44:13,20,22,25;
45:4,7;54:21;109:17
**Bertin's (1)**
4:25
**best (14)**
35:12;50:20,21;
59:12,13,13;60:21;
61:10;83:7;88:19;
93:16;101:9;103:3,5
**bet (2)**
11:18;18:15
**better (17)**
6:8;10:14;12:2;
20:20;32:20;45:9;
46:25;59:8,8;80:7;
82:8,14,23;83:16;
87:12;95:2;106:9
**betterment (1)**
52:4
**big (7)**
12:4;41:1;42:16;
69:25;89:21;102:14,15
**bigger (1)**
106:23
**bit (12)**
6:8,11;8:24;9:9;
18:21;20:7,17;22:23;
29:18;62:23;71:17;
73:5
**blend (1)**
19:22
**Block (7)**
3:16,20,20;7:2;37:5;
67:18;107:15
**blue (1)**
42:16
**board (55)**
3:11;4:8,24;9:5,6;
12:20;13:14;14:23;
16:4;18:15;21:3;34:3;

37:4,14;38:15;39:10;
40:12;41:9;48:15;51:7;
52:10;53:6;55:7;58:5;
60:17;62:13,18;63:6;
65:14;72:24;73:9,13;
74:13;78:3;83:8;93:2;
95:13;97:4,5;99:19;
100:15,25,25;101:1,2,
21,22;102:7;103:4;
106:24;107:5,6;
108:10,25;111:6
**boards (6)**
14:1,1,3,4,4;108:15
**board's (8)**
3:15;4:1,2,24;39:7;
74:23;79:9;106:24
**body (1)**
97:16
**Bogart (106)**
34:19;35:4,18,21,21,
25;36:1,4,13,15,20,21,
23;39:13,16,25;40:14,
18;41:3,5,14,16,18,23;
42:2,5,10;44:1,7,15,21,
23;45:1,5,9;46:9,18;
47:16;48:2;50:10;
54:17;56:13;59:5;
61:12,22,25;63:18,21;
64:4,6,16,20;65:7,11,
14,22,25;66:2,5,10,20,
24;67:23;68:3,6,12,20,
25;69:8,10,13;70:11,
23;71:6,11,13,16;
76:12,15,24;78:19;
80:15,17;82:14,18,20;
87:23;88:5;92:19;
93:25;94:22,23;95:5,
10,19,23;96:1,4;97:9,
11;98:7,12;99:4,9;
104:20;109:18
**B-O-G-A-R-T (1)**
35:25
**bonds (1)**
85:13
**boring (4)**
80:11,15,16;89:25
**borough (11)**
43:9;70:16,17;72:9,
11;95:20;100:4,7,10,
12;101:8
**borough's (1)**
73:19
**Both (18)**
3:23;9:14;11:3;
20:13;37:22;43:15;
44:4;46:13;49:5;50:3,
6;52:24;53:16;56:19;
59:16;85:9;101:1;
105:13
**bottles (1)**
8:9
**bottom (4)**
8:5;10:3;25:3;42:1

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 33 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME     Document 141-14     Filed 04/30/26     Page 34 of 49
PageID: 2611
In RE: Morningside at Wallington                                         Transcript of Proceedings

**bought (1)**
58:14
**bound (2)**
58:5;106:13
**bowling (1)**
102:8
**box (2)**
57:10;107:11
**boyfriends (1)**
61:3
**brand (1)**
78:9
**Bread (1)**
101:7
**break (4)**
16:18;20:7;34:20;
88:8
**breakdown (1)**
99:6
**breaking (1)**
97:6
**breath (1)**
62:1
**BRENDA (2)**
90:3,7
**brick (19)**
16:11,12;19:5,5;
20:5,6;21:12,24;32:23,
25;33:4,7,9,11,13,14,
22,23,25
**bridge (7)**
8:3,4;10:14;67:19;
68:11;107:22,24
**bridges (1)**
107:25
**brief (3)**
35:1;89:4,17
**briefly (2)**
4:20;13:12
**Brigette (3)**
34:19;35:18,21
**bring (6)**
18:12;23:8;37:24;
53:20;89:15;111:11
**brings (1)**
22:6
**broken (1)**
16:14
**brother (2)**
102:13,18
**brought (1)**
106:15
**brown (1)**
57:11
**brushed (1)**
104:10
**buffer (4)**
10:7;12:9;75:3,10
**buffering (3)**
78:25;81:7;85:23
**buffers (1)**
84:23
**build (12)**

30:19;43:13;48:13,
20;49:11;55:23;95:7;
100:23;102:3,23;
107:21;108:11
**builder (1)**
102:22
**builders (3)**
102:1,2;105:17
**builder's (7)**
53:14;54:1,2,4;
100:14;105:18;106:15
**building (183)**
6:1,4,15,20,22;7:1,2,
18;8:24;9:18,21;12:7,
7,9;14:15;15:6,6,8,11,
13,20;16:7,14,16,21,
23,23;17:1,2,11,14;
18:13,16,18,18,24;
19:4,6,7,13,13,13,16,
17,20,20,23,24;20:14,
16,17;23:6,7,12,13,15,
17,19,23;24:24;25:13;
26:6,11,14,16,19;27:4,
12,14,18;28:14,15;
29:1,3,6,9,11,21;30:4,
20,20,21,24;31:15;
32:1,8,16;33:3,5,16;
37:10,11,13;38:14,25;
39:4,19,21,21;40:9,19,
22;41:5,7;43:11,13,13,
16,19,21,24;44:2;
45:12;47:13,23;48:7;
50:7;51:8,13,16,23;
55:1,4,19,25;56:4,16,
17,18;58:3;59:12,13,
18;62:4,6,7,8,9,19,19;
66:1,3;67:15,20;75:24;
77:6,7,10,10,25;78:6;
80:18,20,25;81:1,2,2,4,
4,9,13,19,20,21,22;
82:1,5,6,10,17,25;
83:18;86:10;87:11,21,
22,23;88:1;90:16;
91:21;103:1,14;108:3
**buildings (40)**
8:21;12:10,12,14;
16:9;18:25;19:18,21;
20:13;21:13;23:6,11,
19,24;14;30:5;31:12;
32:9;33:22;37:23;
39:24;40:25;41:4;
43:15;45:23;55:23;
57:7;60:9;67:4,6,10,
24;68:15,17,19;75:25;
77:11;85:18,25;91:22;
93:9
**building's (1)**
20:15
**built (12)**
49:10,13;53:7;55:17,
19,20;56:3;59:11;
68:10;101:19;102:14;
103:12

**bulk (2)**
3:22;12:15
**business (4)**
13:9;51:22,24;107:3
**buy (1)**
96:8

---

## C

**c1 (4)**
75:18;76:9,10,11
**C2 (3)**
11:21;76:11,16
**C2.5 (2)**
10:24;11:12
**C2.8 (4)**
11:7,9,10,13
**C3.5 (1)**
10:16
**cake (1)**
57:4
**calculation (2)**
24:4,8
**Calisto (3)**
4:21;5:5;26:21
**call (5)**
13:2;22:18;34:18;
41:21;106:8
**called (2)**
53:23;100:2
**calls (3)**
38:20;80:4;87:9
**came (7)**
10:10;54:6;62:21;
71:3;99:19;100:14;
101:20
**can (103)**
3:7,8,10;6:22;9:16,
16;10:22;14:24;15:2,7,
12;16:7,25;17:1,11,12;
18:15;20:15;21:25;
22:15,22;23:17,20;
24:19,21,22;25:1,4;
26:1,16;27:15;28:19;
31:18;32:11;33:4;
34:19;35:13;36:21;
41:15;43:23;44:10,18;
48:12,25;49:6;51:20;
52:3;53:2;58:23;59:2,
12;60:2,5,22;63:11;
64:11;65:12;66:12,18;
69:10,11;71:1,12;
74:13,18,20,24;78:4;
79:7,22;82:6;88:6,12,
13,25;89:24;90:9,16,
18,25;91:16,20;92:3,8;
93:6,11,15,23;94:11;
95:5,17;99:11;103:13,
22;107:1;108:15;
109:8,23;110:24,24,25;
111:11,14
**cancellation (1)**
4:2

**capable (1)**
34:8
**capital (1)**
59:16
**car (1)**
15:13
**card (1)**
60:13
**cards (1)**
58:25
**Carolina (2)**
36:6;65:23
**cars (2)**
10:3;22:1
**cartwheel (2)**
89:24;90:2
**case (3)**
18:22;36:25;76:3
**cast (2)**
19:5;20:8
**Cedar (1)**
94:21
**CEDZIDLO (60)**
4:10,12;5:3;7:24;
11:9,12,16,20;12:1;
18:9;35:24;48:1,11,16;
49:6,16;50:4,15,18;
52:20;53:12,17,19,24,
25;54:12,19,22;55:11,
13;59:4,24;65:25;66:3,
8,11,21;67:18,24;68:4,
7,14,21;95:1;99:12,14,
22;100:12;101:16;
102:18;104:10,17,21,
25;105:4,16;106:20;
107:24;109:2,16
**cement (1)**
33:19
**cementitious (3)**
16:13;33:15,18
**Center (5)**
57:13;59:25;60:10;
77:9,13
**centered (1)**
77:8
**Central (1)**
57:14
**certain (4)**
23:21;80:5;94:6;
101:24
**certainly (2)**
53:2;59:3
**Certificate (1)**
91:11
**certified (1)**
4:5
**chain-link (1)**
9:3
**Chair (2)**
3:11;39:14
**CHAIRMAN (91)**
3:1,3,5,7;5:2,8,11;
12:17,20,23;13:1;14:8;

25:21;26:2,7,13,17,24;
27:5,9,13,20,23;28:4,9,
13,19,22;29:24;31:23;
34:3,13,17,18,21;35:2,
10,15;36:17;45:3,19,
25;46:7,12,15,22;
47:10,14;51:11;54:18,
25;55:3;57:15,17,22;
58:7,21;61:6,12,22;
69:12;71:8,11;72:23;
87:25;88:9,18,20;89:5;
92:10,13,17;94:10,24;
95:3;98:25;99:17;
103:25;105:3,8;
107:23;109:4,13,21;
110:2,8;111:9,16,18,
22,24
**chairman's (1)**
48:17
**challenged (1)**
108:11
**change (9)**
5:15,19;6:7;20:5;
32:23;49:7;83:8,9;
108:5
**changed (10)**
5:22;6:10;8:6;9:2,
10;12:8;33:14;104:4;
105:14;106:20
**changes (7)**
4:22;5:16;6:2;9:22;
12:6,15;67:9
**changing (2)**
33:3;108:25
**channeling (1)**
72:2
**character (2)**
16:8;86:16
**chart (2)**
12:5;42:3
**cheap (1)**
100:6
**check (1)**
92:6
**checked (1)**
50:13
**cheerleader (1)**
89:22
**child (2)**
66:18;93:7
**children (38)**
34:9;62:22,24;63:2,
3,8,11,14,20,20,21,22;
64:2,3,18,18,19;66:13;
67:3,9,16;69:6,13;
71:4;91:2;95:9;96:7,9,
12,14,17,18,25;97:3,6,
21,24;105:22
**choices (2)**
78:23;87:15
**choose (1)**
10:23
**chose (1)**

In RE: Morningside at Wallington

Transcript of Proceedings

33:7
**circulate (1)**
  27:15
**circulation (12)**
  38:8;39:1,3;75:13,
  14;82:23;84:1;85:21;
  86:24;87:16,17,18
**circumstances (2)**
  38:25;40:7
**citizens (9)**
  88:11,24;89:13,17,
  19;109:6,11,15,22
**City (2)**
  14:5;36:7
**civic (2)**
  78:2;84:20
**clarify (4)**
  32:16;35:5;98:14;
  99:17
**clarifying (2)**
  27:9;46:12
**class (2)**
  96:15,17
**clear (2)**
  50:5;109:19
**client (2)**
  22:7;58:15
**clients (2)**
  58:18;106:15
**close (5)**
  18:24;41:1,1;109:14,
  22
**closer (3)**
  10:15;32:7;94:25
**co-counsel (1)**
  51:5
**code (9)**
  23:7,12,15,23;24:4;
  50:9,22;80:19;93:23
**color (2)**
  19:24;33:9
**colored (1)**
  16:2
**colors (7)**
  22:16;32:21,21,22,
  23,25;33:10
**columns (1)**
  20:3
**combining (2)**
  48:19;49:25
**comfortable (1)**
  23:3
**coming (17)**
  6:24;8:10;25:13;
  26:4;28:9,12,20;31:3;
  55:9;69:14,17;70:5;
  92:7;95:9;103:13;
  109:25;111:11
**comment (4)**
  47:5,16,24;95:16
**comments (5)**
  4:23;5:16,17;9:23;
  97:21

**commercial (4)**
  37:11;42:9;73:6;
  107:3
**committed (2)**
  33:12;59:3
**committee (2)**
  111:7,13
**communities (1)**
  77:19
**community (6)**
  72:4,7,8;78:15;
  86:14,16
**commuter (1)**
  102:11
**compare (1)**
  65:20
**compiled (1)**
  63:23
**complete (1)**
  60:17
**completed (3)**
  4:15,16;40:1
**completely (10)**
  47:24;66:24;70:13,
  24;72:25;73:10;74:1;
  79:15;93:13;97:21
**completion (1)**
  73:19
**complex (7)**
  6:25;60:7;66:23;
  70:13;90:15,20;103:16
**complexes (4)**
  65:9;69:20;96:11;
  97:1
**compliance (1)**
  101:21
**compliant (1)**
  72:25
**complicated (1)**
  36:25
**comply (5)**
  73:22,22,23,24;
  100:13
**complying (3)**
  55:14;73:3;100:17
**composite (1)**
  33:16
**composites (2)**
  33:19,19
**compromise (2)**
  54:9;101:4
**concentration (1)**
  84:13
**concentrations (1)**
  77:17
**conceptual (1)**
  106:7
**concern (2)**
  47:24;70:16
**concerned (2)**
  93:1;96:21
**concerns (2)**
  71:20;74:23

**concluded (2)**
  4:14;112:1
**concrete (1)**
  33:20
**condition (3)**
  37:8;50:2;91:10
**conditioned (1)**
  74:21
**conditions (6)**
  49:5;58:5;74:20;
  75:20,24;78:5
**confident (1)**
  24:3
**conflict (1)**
  8:22
**conform (2)**
  39:23,23
**confusion (4)**
  6:11,14;28:1;29:3
**conjunction (6)**
  38:20;43:1,3,6;44:3;
  50:11
**connect (2)**
  77:11;81:9
**connected (2)**
  12:8;81:24
**connection (3)**
  86:7;102:20;106:22
**consider (3)**
  39:10;40:2;41:9
**consideration (1)**
  71:19
**considering (1)**
  39:8
**consistent (7)**
  40:20;43:7;47:22;
  74:1;79:5,6;84:6
**consolidate (4)**
  45:16,24;46:1,4
**consolidated (3)**
  44:5,8;46:17
**consolidating (1)**
  44:4
**constructed (1)**
  23:11
**construction (2)**
  68:15;73:16
**contained (1)**
  56:1
**contemplated (4)**
  83:12,16,24;84:1
**contentious (1)**
  54:2
**continue (7)**
  32:11;34:22;41:15;
  71:12;88:10,15;89:8
**continued (1)**
  4:1
**continuing (2)**
  20:4,5
**contributes (1)**
  77:18
**control (4)**

  7:21;9:16;52:10;
  60:17
**conversation (2)**
  53:6;71:9
**converted (1)**
  43:8
**converting (1)**
  86:12
**cooperate (3)**
  49:20,22,24
**cooperating (3)**
  48:23,24,25
**coordinate (1)**
  75:12
**coordination (1)**
  85:8
**copy (3)**
  14:19,20;42:5
**corrected (1)**
  8:23
**corroborate (1)**
  95:7
**cost (2)**
  58:13;85:3
**cost-effective (1)**
  85:7
**council (7)**
  100:8;107:1;108:14,
  17;111:11,12,13
**Counsel (1)**
  106:3
**Country (1)**
  57:9
**County (16)**
  5:18,19,25;36:10;
  63:5,7,8,9;64:9,11;
  65:20;92:22;93:5,13;
  95:15,16
**couple (6)**
  6:6;9:12;25:20;
  32:11;84:18;102:2
**course (2)**
  39:16;84:16
**court (4)**
  106:13,16;108:11,12
**Courts (1)**
  99:20
**coverage (6)**
  62:10,10,15;73:4;
  82:22;86:8
**cram (1)**
  56:16
**create (11)**
  23:17;37:20;38:2,9;
  73:14;79:4;83:2,3,12,
  17;84:22
**created (4)**
  6:10;16:15;27:17;
  29:2
**creates (6)**
  37:25;38:3;75:15;
  78:7,9;84:16
**creating (3)**

  23:18;39:20;40:5
**creative (1)**
  78:2
**credence (1)**
  68:4
**criteria (9)**
  75:18;76:10,13,17,
  18;79:16,25;80:10;
  86:12
**cross (1)**
  49:4
**Cummis (1)**
  3:13
**curious (1)**
  105:15
**current (5)**
  37:21;50:9;70:25;
  79:23;100:10
**currently (2)**
  37:7,21
**cut (5)**
  41:25;53:21;58:24;
  61:23;71:8
**Cuz (1)**
  90:20

### D

**DABAL (26)**
  94:13,17,17,20,20;
  95:2,6,14,21,24;96:2,5;
  97:10;98:4,9,20;99:1,3,
  6,13;100:11;102:16;
  105:7,10;106:5;109:1
**D-A-B-A-L (1)**
  94:20
**dads (1)**
  68:20
**dais (1)**
  64:25
**data (11)**
  42:12;63:13,23;64:7,
  9,10,13;65:2,15;69:15;
  71:1
**date (1)**
  110:6
**dawn (1)**
  105:14
**day (2)**
  56:8,23
**deal (3)**
  12:4;56:22;91:1
**decide (6)**
  33:1;48:12,25;49:7;
  58:25;61:9
**decided (3)**
  60:12;97:17;102:13
**decimal (1)**
  19:10
**decision (2)**
  56:7;100:2
**deep (2)**
  8:5;62:1

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 35 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-14   Filed 04/30/26   Page 36 of 49
PageID: 2613

In RE: Morningside at Wallington                                    Transcript of Proceedings

**define (1)**
69:6
**definitely (5)**
26:16;31:7,9;52:4;
88:20
**Degree (3)**
13:16;36:5;106:10
**demolished (1)**
43:12
**denied (1)**
99:19
**dense (1)**
55:20
**densities (2)**
77:17;84:4
**density (10)**
54:10;55:14;73:14,
24;76:1,5;77:21;80:4;
84:5;97:15
**deny (1)**
102:1
**denying (1)**
58:8
**DEP (1)**
42:12
**describe (4)**
14:11;16:3;18:15;
21:7
**description (1)**
39:9
**design (8)**
23:3;38:14;46:20;
78:3;79:23;81:19;
84:20,24
**designated (2)**
105:2;106:22
**designed (2)**
9:12;29:2
**desirable (3)**
78:1,11;84:19
**destroyed (1)**
45:5
**detail (5)**
8:19;9:3,10;10:16,18
**detailing (1)**
21:13
**details (2)**
8:19;110:25
**detention (1)**
7:5
**determine (2)**
83:4,6
**detriment (2)**
79:18;80:1
**detriments (6)**
62:20;79:8,13,14,15;
80:9
**develop (8)**
22:9;38:18,23;43:3;
48:4,22;50:24;74:14
**developed (6)**
42:25;59:16;74:12,
19;79:21;95:12

**developer (3)**
85:9;103:4;107:21
**developers (2)**
100:22;101:17
**developing (2)**
38:20;50:11
**development (42)**
32:2,16,18;40:20;
42:20;47:20,20,21;
49:18,23;50:1;51:2;
56:19;62:25;70:19;
74:9;75:12;76:22,25;
77:4,5;78:2,12;79:6,
23;80:4;83:7,10,11,21,
23;84:5,19;85:1,3,4,10,
13;96:25;102:4;
103:11,22
**developments (6)**
50:3;64:10;72:2;
92:22;93:15;95:9
**deviate (1)**
74:3
**deviation (2)**
74:5;82:5
**deviations (1)**
50:9
**dialogue (1)**
74:12
**diameter (1)**
10:6
**difference (2)**
16:24;67:3
**different (16)**
16:19;22:16;30:21;
45:23;46:10;47:2,11;
52:25;65:21;69:4,4;
96:10;103:19;105:24,
25;106:1
**differently (1)**
17:9
**differing (1)**
52:19
**difficult (1)**
103:24
**dim (1)**
9:16
**dime (2)**
91:16,18
**dimensions (2)**
22:23;44:11
**direct (1)**
4:16
**directly (2)**
38:4,12
**disappointed (1)**
96:22
**discuss (8)**
4:21;10:22,23;23:5;
35:10;59:9;79:17;
89:15
**discussed (2)**
89:14;110:20
**discussing (1)**

41:20
**discussion (5)**
10:11;59:6,6;103:2,3
**distance (5)**
20:21;24:6;25:16;
85:19;87:2
**district (4)**
43:4;73:13,21;84:13
**districts (1)**
70:15
**diversity (3)**
72:4,14,18
**divider (2)**
5:22,23
**dock (1)**
108:8
**docks (1)**
107:16
**documents (4)**
42:19;71:25;74:2,2
**dominated (1)**
67:25
**domino (1)**
69:24
**done (15)**
22:16;30:5;54:8;
63:4;64:7,7,8,21;65:1;
66:25;70:24;90:12;
102:7;105:19;106:17
**dont (1)**
79:18
**door (2)**
67:14;90:20
**doors (1)**
9:2
**dots (1)**
10:4
**down (29)**
8:6;16:16;20:7;25:8;
26:16;28:2,2;29:5,9;
31:24;37:9;39:19,21;
40:23;46:2;47:19;
49:25;51:15,23;52:15;
57:12;67:6;77:9;78:6;
82:9;100:21;101:22;
103:6,7
**downstairs (2)**
68:1;69:2
**downtown (4)**
18:24;19:2;31:10,20
**drainage (3)**
8:3,3,14
**draw (1)**
44:18
**drawing (1)**
11:4
**drawings (1)**
10:24
**dressed (1)**
90:1
**drink (2)**
34:24;88:22
**drive (7)**

15:9,25;60:5,5,6;
77:8;81:6
**driveway (15)**
5:20,24;6:8,18,19;
7:11,11,21;27:3;29:5,
10,14,19;81:14,16
**driveways (2)**
6:7;28:8
**driving (1)**
60:9
**drop (1)**
91:16
**dropping (1)**
91:17
**drops (1)**
67:16
**due (4)**
40:16;79:3;80:6;
84:21
**duly (4)**
13:4;35:18;90:3;
94:13
**dumps (1)**
8:4
**dumpster (1)**
8:23
**dumpsters (1)**
9:2
**durable (1)**
9:10
**during (2)**
100:15;111:12
**dwelling (1)**
43:5

## E

**earlier (6)**
20:24;27:6;47:2;
99:11;103:2;111:24
**easements (1)**
49:4
**easier (1)**
8:25
**East (2)**
14:5;28:20
**easy (1)**
91:13
**eat (1)**
57:4
**ed (3)**
65:14;93:3;95:13
**edge (8)**
17:6;30:19,19;31:22;
67:20;68:14;103:10,15
**edges (1)**
53:3
**edification (1)**
105:11
**education (5)**
13:13;36:2;70:18;
97:4,5
**Educations (1)**

63:6
**effect (1)**
102:10
**efficient (1)**
85:4
**egress (1)**
49:2
**eight (33)**
6:1,15,21;7:18;8:21;
9:18;12:8;16:23,23;
18:16,18;19:23,24;
20:14;23:1;25:12,16;
27:12,15;29:3;43:13,
16,19,21;48:24;55:4;
66:3;69:7;81:1,20,22;
82:2;108:6
**either (5)**
8:11;15:9;29:13,19;
82:1
**elected (1)**
6:13
**elements (2)**
16:15,19
**elevation (8)**
16:6,12;18:13,16,18;
19:24,25;20:1
**elevations (2)**
33:17;58:2
**elevation's (1)**
16:11
**elevator (10)**
15:14;17:13;67:5,7,
10,21,25;69:2;93:9;
103:14
**elevators (3)**
67:4,24;68:15
**eliminate (4)**
50:6,7,7,14
**eliminated (1)**
7:14
**else (11)**
17:11;48:7;53:11;
55:16;59:17;60:18;
68:2;91:2;94:11;109:4,
9
**Emerson (1)**
70:17
**encourages (1)**
85:1
**end (2)**
15:8;83:4
**enforcement (1)**
93:24
**engage (2)**
61:9,10
**engineer (7)**
4:17,17,21,24;35:11;
109:17;110:15
**engineered (4)**
83:13,15,25;84:2
**engineering (11)**
12:4;38:8;75:14;
79:4;80:7;81:11,19;

BER-L-001670-18   08/30/2018 7:37:18 PM   Pg 36 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-14   Filed 04/30/26   Page 37 of 49
PageID: 2614
In RE: Morningside at Wallington                                        Transcript of Proceedings

86:1;87:3;89:9;110:16
**engineers (1)**
  61:17
**Engineer's (2)**
  5:17;9:23
**enlarged (1)**
  6:19
**enough (1)**
  89:21
**enter (2)**
  28:25;29:4
**entire (5)**
  9:14;62:11;70:12;
  77:7,14
**entirely (1)**
  23:21
**entrances (1)**
  15:8
**entry (2)**
  15:7;81:14
**environment (6)**
  23:15;77:20;78:1,11;
  84:19;86:18
**equates (1)**
  67:3
**essentially (1)**
  23:18
**established (1)**
  84:3
**establishment (2)**
  77:16;84:3
**even (9)**
  45:9;51:22;53:17;
  54:3;56:13,14;63:19;
  80:12;95:15
**evening (12)**
  3:3,12,25;4:4;36:25;
  38:5,23;71:25;75:16;
  79:8;82:13,25
**everybody (10)**
  3:8;12:25;14:24;
  35:2;42:6;61:17;64:23,
  24;68:9;104:5
**Everybody's (1)**
  89:18
**everyone (4)**
  21:3;61:11;64:25;
  109:3
**Everyone's (1)**
  71:6
**Everything's (1)**
  4:11
**exact (1)**
  46:16
**exactly (7)**
  22:15;59:6;68:4;
  70:23;71:6;80:3;93:10
**example (2)**
  90:15;95:17
**exceed (1)**
  98:5
**exceptional (2)**
  75:18,20

**excited (1)**
  21:22
**Excuse (4)**
  31:23;60:25;72:7,21
**exhibit (13)**
  5:14;6:4,22;16:3;
  18:14;21:1,4;22:6;
  41:19;42:10,18,21;
  79:7
**exhibits (1)**
  22:21
**exist (1)**
  108:24
**existed (1)**
  86:17
**existing (31)**
  20:14;37:18,24;38:6,
  13,16,25;39:4;43:7,11;
  62:17;64:10;72:10,12,
  17;75:23,24;77:4,24;
  78:4,5,6,7;81:21;82:5,
  7,8;84:15;86:5;87:13;
  92:22
**exists (2)**
  29:1;45:18
**exit (1)**
  28:23
**expanding (1)**
  53:2
**expected (2)**
  34:8;62:22
**expen (1)**
  68:16
**expense (1)**
  51:15
**expensive (1)**
  68:16
**experience (3)**
  13:14;36:3;68:8
**expert (6)**
  14:7,9;35:15;36:15,
  18;61:18
**experts (1)**
  109:19
**explain (1)**
  65:13
**explaining (1)**
  106:14
**explanation (1)**
  109:2
**extend (1)**
  60:18
**extended (1)**
  59:2
**extra (1)**
  91:2
**extremely (1)**
  36:25
**eye (1)**
  16:16

**F**

**facade (5)**
  17:7,8;32:23,25;33:7
**facades (1)**
  33:3
**face (1)**
  58:9
**faces (1)**
  103:8
**facilities (8)**
  37:13;41:8;45:17;
  70:17;72:8,20;78:9;
  110:23
**facility (25)**
  37:14,16;38:13;58:1,
  11,12,13;62:17;63:2;
  72:10,11;77:12,13,24;
  78:5,8;81:21,22;82:7,
  12;84:16;86:5,7;87:2,7
**fact (17)**
  38:12,15,23;40:16;
  42:22;51:1,21;60:20;
  73:21;79:3,20;80:6;
  83:25;84:21;86:14,22;
  87:6
**factors (1)**
  38:14
**factory (1)**
  108:2
**facts (2)**
  64:13;65:1
**failed (2)**
  99:24;100:17
**families (8)**
  64:1,17;67:5;72:20;
  91:19;97:19;102:12;
  103:18
**family (6)**
  36:10;61:3;64:18,19;
  92:2;107:2
**far (15)**
  24:9;52:1,20;53:1,5;
  55:14,22;60:11,16;
  61:10;65:9;98:5;100:3;
  105:16;110:12
**fathers (1)**
  104:2
**feature (1)**
  16:15
**features (2)**
  16:20;75:21
**feedback (1)**
  110:17
**feel (7)**
  21:25;22:11;23:3;
  24:2;31:10,16;37:2
**feet (41)**
  4:6;6:5,6,18,18,19;
  12:13;15:18,19;16:1;
  17:5;18:22;19:7,14;
  22:24;23:1;25:10,12,
  12,13,15,16,20,22,23;
  26:3,3,25;27:1,7,24;
  29:7,11;35:7,7;74:7,7;

80:21,23;103:17;
  107:10
**felt (4)**
  18:24;19:1,18,21
**fence (9)**
  7:6,12,12,13;9:3,5,6,
  8;26:19
**few (2)**
  6:5,17
**field (3)**
  13:18;14:7;36:16
**fight (1)**
  25:13
**fighting (1)**
  52:20
**figure (2)**
  59:12;98:11
**figured (2)**
  9:19;32:13
**final (4)**
  3:18,22;34:19;102:6
**finalize (1)**
  110:18
**finals (1)**
  57:23
**fine (3)**
  4:10;11:16,22
**finger (1)**
  96:23
**fingers (1)**
  88:22
**finish (6)**
  22:13;61:4,13,17,24;
  71:11
**fire (13)**
  11:3,8;23:5,7,7,16,
  19,21;24:16;25:11,13;
  26:16;110:13
**firm (1)**
  3:13
**first (17)**
  5:19;13:4;18:21,22;
  19:13;30:6;33:21;
  35:17,18;43:17;53:10;
  72:1;83:5;85:18;90:3;
  94:13;109:25
**fit (1)**
  58:6
**fitness (1)**
  17:4
**fits (5)**
  16:9;38:7,8;79:24,24
**five (20)**
  6:25;8:24;27:4,4;
  62:11,14,16;63:10,14;
  66:22;70:5;81:4;88:8,
  21;89:2,3;92:24;93:14;
  101:5;102:24
**fixed (1)**
  7:2
**fixture (1)**
  9:15
**flames (1)**

25:13
**flare (1)**
  19:2
**flat (16)**
  18:23;19:17;30:3,7,
  11,12,20,24;31:2,4;
  32:5,12,14;46:23,25;
  47:6
**flood (1)**
  108:9
**flooded (1)**
  108:1
**flooding (1)**
  108:4
**floor (10)**
  15:6,7;16:24,25;
  18:19,20,21,22;19:2;
  43:17
**floors (1)**
  15:16
**folks (1)**
  47:5
**follows (4)**
  13:5;35:19;90:4;
  94:14
**foot (8)**
  6:25;7:12;10:17,18;
  21:23;23:25;102:24;
  107:9
**foremost (2)**
  72:1;83:5
**forget (2)**
  104:14;109:5
**forgot (4)**
  60:23;61:1,2;109:7
**Fort (3)**
  67:19;68:9;103:10
**forth (1)**
  73:25
**forward (3)**
  89:20;94:12;102:4
**fostering (1)**
  72:4
**found (1)**
  106:11
**four (6)**
  5:21;50:14;62:3;
  76:20;90:19;92:7
**free (1)**
  37:2
**front (24)**
  7:18;9:24;10:2;
  15:11;16:6;17:2;18:16,
  17;25:22;30:18,19;
  37:16;40:24;41:10,11;
  55:21;58:3,19;67:14;
  78:6;80:22,23,23,23
**frontage (3)**
  10:8;19:1,4
**fronting (1)**
  37:10
**fruitful (1)**
  111:2

**full (3)**
23:13;83:13;98:22
**fully (2)**
83:25;84:2
**functional (2)**
77:3,6
**further (6)**
10:14;27:25;29:25;
42:15;76:20;85:16
**furthered (1)**
83:19
**furthering (2)**
79:11,12
**furthers (2)**
77:15;84:25
**furthest (1)**
24:19
**future (3)**
30:24;69:22;72:3

### G

**g1 (1)**
80:20
**game (1)**
7:17
**garage (4)**
15:11,24;20:2,3
**garden (1)**
67:8
**gate (1)**
9:10
**gathered (2)**
93:12,16
**gave (1)**
19:11
**Geez (2)**
53:15;106:9
**general (3)**
33:11;77:1;83:22
**generate (1)**
63:14
**generated (1)**
67:16
**George (2)**
67:19;68:11
**gets (4)**
17:10;18:21;58:16;
98:17
**girl (2)**
65:22;71:7
**GIS (1)**
42:12
**given (2)**
32:11;77:4
**giving (1)**
102:3
**glass (2)**
19:2;68:10
**glasses (3)**
11:23,25;18:8
**goals (5)**
38:19;71:22,24;

72:22;73:8
**Godwin (1)**
35:22
**goes (5)**
49:16;85:24;92:1;
99:22,22
**golf (1)**
103:17
**gonna (16)**
7:8;20:5;29:17;
32:22;56:25;58:11,15;
90:17,19,21,22,25;
91:6,8;92:4;98:9
**gonna' (2)**
44:18;57:1
**Good (11)**
3:3,11;5:4;8:1;
34:11;44:15;47:6;78:2;
79:18;93:25;108:12
**gorgeous (1)**
57:10
**governing (1)**
97:16
**grade (2)**
19:9,10
**grading (1)**
75:2
**gradual (1)**
8:10
**grammar (1)**
96:17
**grand (2)**
57:2,2
**grant (1)**
58:6
**granted (8)**
30:7,9;40:11;49:8;
76:16;82:6;100:23;
108:23
**granting (6)**
75:4;78:20,21;82:1;
85:17;86:10
**gravel (1)**
37:22
**Great (12)**
4:13;31:21;36:22;
42:16;51:21;52:13;
54:8;58:6,8;76:14;
78:8;111:15
**greater (2)**
96:24;106:11
**green (2)**
20:18;31:20
**grew (2)**
36:9;102:12
**Gross (1)**
3:13
**ground (5)**
15:7;16:24;18:19,19;
19:2
**group (2)**
105:12;106:8
**groups (2)**

72:9,19
**guarantee (7)**
90:16,18,25;91:6;
92:3,8;93:10
**guarantees (3)**
90:21;91:20;96:19
**guess (6)**
10:15;40:11;46:18;
98:9;105:13;110:21
**guide (2)**
76:21;83:20
**gun-shy (1)**
69:18
**guys (5)**
30:6,10;31:2;35:6,12
**gym (4)**
43:18,24;52:13;
77:12

### H

**Hackensack (3)**
99:20;101:25;108:22
**hair (3)**
53:16,21,21
**half (2)**
55:17,18
**hallway (2)**
15:14;97:7
**handicap (1)**
72:19
**hands (4)**
105:14;106:10,18,24
**hang (1)**
45:7
**happen (7)**
69:3;74:16;90:25;
100:9,9;102:5;106:25
**happened (1)**
106:14
**happening (1)**
90:20
**happens (2)**
49:8;69:3
**happy (2)**
31:2;35:8
**hard (2)**
103:9,9
**Harris (5)**
54:8;99:21;100:16;
101:2;108:21
**Harris' (1)**
56:7
**Haworth (2)**
10:19,20
**head (4)**
29:5;98:10;99:8;
104:19
**health (2)**
77:1;83:22
**hear (5)**
3:8,8,10;61:7;88:11
**heard (13)**

43:2;77:20;78:3;
86:2;88:12;92:25;
94:11;103:2;104:9;
105:20;109:5,10,14
**hearing (11)**
4:1,14;5:16;30:4;
41:6;43:9;51:7;88:24;
89:13,19;109:7
**hearings (4)**
3:24;4:3,4;100:16
**heart (1)**
97:6
**heavy (1)**
9:6
**hedge (1)**
10:1
**height (15)**
19:5,7,12,13;22:24;
30:15,16;47:8,23;
52:16;55:24;87:22,23;
88:1;103:1
**Hello (1)**
5:10
**help (2)**
10:9;73:18
**helping (1)**
45:1
**Here's (2)**
48:17;108:16
**Herlinsky (29)**
51:4,4,12;53:12,16,
23;55:5,12;56:2,5;
57:5,25;58:20,23;59:5,
19,22;60:11,16,25;
61:7;88:6,18;109:12,
24;110:11,15;111:15,
17
**Herlinsky's (1)**
109:23
**hey (1)**
57:2
**high (9)**
7:12;10:18;68:11,17;
69:7,8,9;96:15;99:7
**higher (2)**
55:23;103:23
**highest (2)**
102:16,19
**highly (2)**
95:21;96:22
**hinged (1)**
69:24
**Historic (2)**
84:13;86:20
**historically (1)**
65:19
**hit (3)**
34:15;57:2;67:4
**Hoboken (1)**
14:5
**hold (5)**
34:11;58:25;88:23;
89:10;111:19

**Home (14)**
3:14,14,17,21;4:18,
20,23;9:11;11:2;14:12;
42:14;45:20;96:9;
103:12
**home-run (1)**
57:2
**Homes (6)**
3:2;42:17;48:20,23;
91:18;96:20
**honest (1)**
106:4
**honestly (1)**
50:10
**hope (3)**
53:6;69:14,17
**horizontal (2)**
16:13,14
**hoses (1)**
24:2
**Hours (1)**
45:3
**house (4)**
10:20;90:17;101:23;
102:14
**houses (2)**
92:6;102:3
**Housing (47)**
43:7,14,14;68:9;
70:8;71:23;72:12,14,
16,18,20,25;73:1,19,
20;78:9,10,13,15,17,
22,23,24;80:3;84:7,12;
85:6,13,15;87:15;
90:12,12,14,24;91:25;
93:17;99:25;100:1,5,6,
19,23,24;105:1;106:16,
18;107:22
**housings (1)**
91:23
**How's (1)**
95:2
**huge (1)**
86:20
**Hum (1)**
21:18
**Hupa (1)**
63:1
**hurt (1)**
58:16

### I

**idea (8)**
51:15,21,22,22,25;
52:14;53:4;55:8
**identified (4)**
37:5;77:2;78:13;
85:5
**identify (2)**
35:14;93:4
**identifying (1)**
42:12

**illegal (1)**
91:18
**imagine (2)**
103:13;110:22
**immediate (1)**
52:8
**impact (7)**
75:9;79:22;86:13;
87:6,8;93:2;96:19
**impacts (2)**
71:20;79:19
**impair (2)**
75:4;82:2
**impervious (2)**
82:22;86:8
**important (12)**
20:2;22:1;29:15;
39:10;40:2;43:19;59:4;
61:8;62:9;71:21;84:16,
17
**importantly (1)**
38:17
**improve (4)**
37:17,23;38:1;47:21
**improved (4)**
7:20;37:7,20,22
**improvement (1)**
38:7
**improves (1)**
87:18
**improving (1)**
41:11
**inch (5)**
10:6;19:8,8,11;
102:25
**inches (1)**
19:14
**include (2)**
38:16;51:20
**includes (1)**
20:13
**including (2)**
14:3;84:9
**income (7)**
72:19;78:24;98:3;
99:25;100:24;105:1;
108:20
**incoming (1)**
96:14
**incorporate (1)**
38:13
**incorporated (1)**
86:18
**increase (2)**
72:5;97:15
**indicate (1)**
80:19
**indicated (6)**
62:2;72:23,24;73:9;
74:4;84:10
**indicates (1)**
63:1
**indoor (2)**

52:13;58:1
**industrial (5)**
37:11;42:9;107:4,7,8
**information (5)**
23:24;93:11,12,16;
95:12
**ingress (1)**
49:2
**instance (1)**
96:15
**Institute (1)**
13:17
**insurance (2)**
58:17;111:1
**insurances (1)**
58:14
**intent (2)**
75:5;82:2
**interest (2)**
101:10;105:24
**interests (2)**
48:23,24
**interior (1)**
31:16
**internal (10)**
45:13;74:6,25;75:1;
79:19,20;85:21,23,24;
87:16
**interplay (1)**
106:3
**interrupting (1)**
7:17
**into (33)**
6:24;8:4;14:16;
15:12,12,14,14,15;
17:13;23:12,23;24:11;
29:20;38:7,8,13;41:10;
42:23;47:22;50:1,23;
62:22;71:19;79:24,24;
85:17;86:18;93:17;
96:14;102:13;103:19;
107:19;111:4
**invite (1)**
20:24
**involved (1)**
96:12
**irregular (2)**
40:16,19
**issue (5)**
12:5;61:8,13;69:14;
110:12
**issues (12)**
37:25;38:3,9;53:1;
70:19;81:1;94:8;103:8;
109:24;110:11,18,21
**item (1)**
20:9

**J**

**Jack (3)**
13:3,4,8
**Jersey (13)**

13:10,16,22,24;14:2,
5;35:23;36:9,12;42:12;
57:13,14;90:8
**job (1)**
54:8
**joint (4)**
49:18,22;51:2;
105:21
**jointly (2)**
48:22;59:16
**joking (1)**
44:25
**Judge (15)**
52:22,22;54:8;55:12;
56:7;99:21,21;100:16,
23;101:2,24,25;102:6,
6;108:21
**July (1)**
4:8
**jump (1)**
19:12
**Jumping (1)**
19:23
**June (1)**
4:2
**jurisdiction (1)**
4:9

**K**

**KAPUSTA (13)**
89:21;90:1,3,7,7;
91:14,17;92:10,12,15;
93:17;94:9,10
**K-A-P-U-S-T-A (1)**
90:8
**keep (13)**
7:16;31:23;34:14;
39:11,12,17;54:24;
59:12,13,13;65:15;
92:9;96:9
**keeping (5)**
32:6;52:18;62:18,19;
86:22
**kept (1)**
21:12
**Kevin (1)**
3:12
**key (3)**
38:14;60:13;75:11
**kid (1)**
90:17
**kids (25)**
60:24;61:1,3;67:4,6,
11,22;69:1;70:5,12;
90:11,19,22,24;91:24;
92:3,4,7,9,24;93:14,19;
98:1;103:19,24
**kill (1)**
44:19
**kind (9)**
9:7;19:19;52:7,24;
58:4,12;91:20;103:20;

104:6
**Kindergarten (2)**
69:6,7
**kiss (1)**
53:10
**knowing (1)**
24:5
**known (1)**
70:13
**knows (3)**
68:9;73:13;88:19

**L**

**ladies (1)**
88:21
**laid (1)**
77:3
**Lambert (1)**
13:9
**Lambertville (1)**
13:10
**land (21)**
41:20,22;42:11;
48:10,12;76:7,19,22,
25;77:15;78:18,19;
79:12;83:19;85:2,4,16;
99:24;105:14;106:9,16
**lands (1)**
83:21
**landscaped (4)**
6:20,25;20:19;27:17
**landscaping (10)**
6:21;7:3;9:22,24;
29:13,19;37:20;81:7;
82:21;84:23
**lane (3)**
5:23,23;13:9
**lanes (1)**
5:21
**large (5)**
16:10;37:6,7;41:5;
97:1
**larger (2)**
29:20;96:13
**last (17)**
5:14;7:4;9:7;13:7;
22:6,20;30:4,23;32:3;
34:7;35:24;51:18;
57:22;60:3;61:18;73:8;
93:15
**lastly (6)**
72:17;78:12;85:12,
17;86:11;87:10
**lately (1)**
104:11
**later (1)**
109:8
**latest (1)**
104:14
**Laurel (10)**
53:15;100:1,2,5,14,
19;104:4,11,11,12

**law (19)**
4:7;13:5;35:19;76:7,
19;77:15;78:17,18,19;
79:12;83:19;85:16;
90:4;94:14;100:7,22;
102:5;104:11;108:24
**lawn (1)**
29:23
**lawsuit (7)**
101:9;105:6,19;
106:15,16,23;107:21
**lawsuits (1)**
100:2
**lay (2)**
83:4,6
**layout (6)**
38:3;77:3,7,14,23;
86:2
**lays (2)**
40:4;87:4
**leads (1)**
38:4
**leak (2)**
30:11;32:13
**leaks (2)**
30:25;31:6
**leasing (3)**
17:3,3;43:17
**least (4)**
10:3;85:7;88:13;
111:2
**leave (2)**
46:3;56:16
**leaving (3)**
25:12;39:20;110:3
**LED (3)**
9:13,15,15
**Lee (3)**
67:19;68:9;103:10
**left (1)**
42:16
**legal (2)**
93:21,22
**legend (1)**
42:4
**lends (1)**
42:22
**length (4)**
12:7,9;22:25;62:6
**less (10)**
54:15;55:8,9,15;
63:24;67:11;80:21,22;
82:22;103:24
**lessening (1)**
85:3
**letters (2)**
21:14;22:13
**letting (1)**
91:4
**level (4)**
19:3;97:5;98:3;99:7
**levels (1)**
72:19

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 39 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-14   Filed 04/30/26   Page 40 of 49
PageID: 2617

In RE: Morningside at Wallington                                      Transcript of Proceedings

**liability (1)**
58:15
**Liberty (2)**
107:13,14
**licensed (4)**
13:21,21,23;36:11
**licenses (2)**
13:13;36:2
**light (2)**
9:13;107:4
**lighter (1)**
9:9
**lighting (2)**
9:17,21
**lights (4)**
9:15,19,21,21
**likely (2)**
29:22;103:23
**limit (2)**
101:10;102:9
**limited (1)**
106:25
**line (19)**
6:8,9;29:8;40:16,19;
44:18,24;45:13,15,18;
46:21;57:12;65:19,23;
74:7;75:1,1;81:7;
102:25
**lines (4)**
44:25;47:17,18;
75:22
**listed (1)**
33:17
**listening (1)**
80:12
**lit (1)**
22:5
**litigation (1)**
101:3
**little (29)**
6:7,8,11,20;8:24;9:9,
9;10:4;12:3;18:21;
19:1;20:7,15,17;22:23;
23:10;29:13,18;50:23;
62:23;63:24;71:17;
73:5;88:12;89:17;
90:15;102:22;103:18,
22
**live (11)**
10:19;52:5;56:21,22;
64:2;67:5,15,19;96:21;
101:17;103:10
**lives (1)**
96:3
**LLC (5)**
3:2,14,15,17,21
**LLC's (1)**
46:13
**loaded (1)**
8:9
**loading (3)**
37:12;107:16;108:7
**lobby (5)**

15:7,10,10,12;17:13
**local (8)**
71:18,19,20,20,21;
93:1,2,4
**located (3)**
37:5,16,18
**location (4)**
10:11;82:6;110:9;
111:25
**locations (1)**
84:8
**logically (1)**
64:14
**long (10)**
9:7;16:17;36:25;
52:21;88:1;96:8,12;
102:22;107:11,25
**longer (2)**
29:12;108:22
**look (29)**
7:1;8:8;11:18;19:19;
20:2,20,25;31:7,8,18;
32:19;33:12,20;50:20;
51:6;57:5;58:20;61:7;
62:18,25;63:11,23;
64:22;79:10;83:9;
91:25;93:8;97:22;
101:6
**looking (18)**
10:7;20:21;37:10,17,
19,23;38:1;45:16;
63:10;70:6;75:7,8;
76:4;77:9,22;97:13,18,
23
**Looks (7)**
25:20;27:14;30:10;
31:20;58:6,6,8
**lose (2)**
39:22;91:11
**lost (2)**
6:5;55:7
**Lot (60)**
3:16,20;6:1,14;7:18,
21;9:25;10:2,9;26:10;
28:14;29:20,21;33:1;
37:5;38:18,21,24;39:3,
20,23;40:15,16,19,21;
42:22;44:3,3,18,24;
45:13,13,15,18;46:21;
47:17,18;49:1,2;60:2,
10;62:10,11;66:14;
70:3;71:24;73:23;74:6,
25;75:1,22,25;77:5;
78:25;88:3;96:10,11;
108:21,21,21
**lots (15)**
12:4;19:2;44:4,5;
45:16;46:3;48:19;55:7;
74:10,12;75:3,9,12,14,
15
**loud (2)**
3:9;5:9
**love (1)**

102:13
**low (7)**
18:1,11;64:5;69:3;
99:25;100:24;105:1
**lower (1)**
19:16

---

**M**

---

**mail (2)**
4:5;110:10
**Main (15)**
3:24;5:20,20;6:1,7;
9:25;30:13,19;31:9;
37:6,10;43:11,16,21;
58:3
**mainly (1)**
94:22
**maintain (10)**
8:13;25:23,24;26:9,
24;37:9;47:6;74:17;
93:3;104:25
**maintenance (2)**
8:8,12
**major (2)**
65:9;108:18
**makes (1)**
70:2
**making (7)**
11:16,20;26:3;48:17;
55:8;86:25;102:10
**manned (1)**
24:1
**manner (3)**
76:22,25;83:21
**Many (16)**
14:3,4,5;39:22;46:7,
8,9;50:9;54:24;65:5,
12;66:4;68:12;91:18;
92:6;93:22
**map (1)**
107:4
**maple (1)**
10:5
**mark (5)**
14:22;15:2,4;16:4;
19:23
**marker (2)**
44:23;45:10
**market (11)**
15:21;17:16,17,18,
24,25;18:1,10;69:4;
107:23,24
**marketing (1)**
68:23
**Mason-Dixon (2)**
65:19,23
**masonry (3)**
22:12;37:7;43:11
**massive (2)**
96:19,20
**Master (25)**
38:19;42:19;50:22;

71:18,22,22,23;72:1,
22;73:5;74:2;77:22;
78:14;79:12,24;80:2,3;
82:3;83:2;84:7,9;87:8;
97:12,14;106:21
**Masters (1)**
36:6
**matches (1)**
19:17
**material (2)**
20:6;22:12
**materials (5)**
20:4;33:15,16,18,18
**Matter (4)**
24:15;51:21;60:20;
64:23
**maximized (1)**
72:2
**maximum (1)**
73:24
**May (14)**
4:1,14;36:23;40:7,
10,24;41:6;43:9;49:11,
12;50:24;66:21;90:5;
97:9
**Maybe (12)**
11:22;51:19;57:24;
58:10;61:15;65:12;
88:13,25;95:18;106:9;
111:9,11
**MAYOR (22)**
24:9,12,15,18,25;
25:18;34:5,11,14;53:1;
65:17;69:16;70:10,21;
71:5,10,15;100:8;
107:1;108:14,17;
111:10
**mayor's (1)**
95:16
**mean (11)**
24:16;26:15;29:12;
52:17;57:6;64:12;
93:22;95:24;98:22;
105:12,15
**meant (1)**
11:14
**measured (1)**
19:15
**meet (14)**
30:16;72:8,12,16,18;
73:19,21;80:9;85:12;
100:1;105:5;106:8;
110:24;111:8
**meeting (14)**
4:2;5:14;7:4;35:3;
51:19;58:10;60:4;76:1;
89:9;110:5,20;111:2,
11,12
**meetings (1)**
97:4
**meets (4)**
72:22;77:14;78:10;
84:25

**MELFI (74)**
3:6;11:6;15:23;
17:21,25;18:6,10;
20:22;21:17,19;25:3,8,
11;26:18;29:7,16;30:2,
15,22;31:11,14,17;
32:10,17,21;33:10,13,
21,24;34:2;39:14,18;
40:22;41:4,13,15,17,
24;42:3,6,9;43:25;
44:2;46:23;47:3,15;
49:17;50:5;51:18;
53:18;54:11;55:2,6;
56:3,7,15,21;57:8,16,
23;58:9;60:3,15,23;
61:1;65:4,8,12;98:10;
101:13;104:15,18,23;
111:21
**MELISSA (4)**
94:13,17,20,24
**MEMBER (1)**
51:10
**members (7)**
3:11;4:24;12:20;
34:4;72:24;111:6,7
**memory (1)**
3:16
**mention (3)**
19:12;21:6;81:10
**mentioned (14)**
7:4;8:2,12;42:24;
63:4;73:12;74:3;85:14,
20;86:21;92:19;95:11;
102:8;111:1
**met (1)**
108:25
**Mian (3)**
52:22,22;101:25
**mic (2)**
7:25;94:19
**microphone (1)**
94:25
**microphones (1)**
5:8
**mid (1)**
19:15
**middle (3)**
16:15;81:14;96:16
**Midland (1)**
35:22
**might (10)**
3:5;20:22;23:2;
29:14;49:10;95:3;
104:21;110:23;111:2,
13
**millennials (1)**
96:6
**million (2)**
33:4,5
**mind (2)**
41:24;51:17
**minds (2)**
49:7;51:25

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 40 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-14   Filed 04/30/26   Page 41 of 49
PageID: 2618
In RE: Morningside at Wallington                                    Transcript of Proceedings

minimal (2)
62:15;75:9
minimum (3)
73:23;80:18,20
Minno (1)
13:18
minor (5)
5:15;6:2;73:3;80:5;
81:17
minorities (1)
72:19
minus (1)
73:3
minute (5)
34:20,21;88:8,21;
89:2
minutes (1)
47:4
Miss (17)
34:19;35:4;36:1,15,
21;48:2;50:10;59:5;
61:12,22;65:25;69:10;
71:11;82:14;92:10;
94:10;109:18
mistaken (2)
60:3;104:3
misunderstand (1)
96:23
mixed (1)
13:19
moderate (4)
18:1,11;78:24;99:25
modifications (1)
73:3
modified (2)
8:18,24
modify (1)
76:5
modifying (1)
73:5
mom (1)
67:12
moment (1)
59:21
moms (2)
68:20;69:1
money (2)
58:12;107:19
monitored (2)
94:1,5
monitoring (2)
91:14;93:18
month (13)
34:7;88:10,15,23,25;
89:8,11,16;103:18;
109:7;110:4,5;111:20
months (2)
48:24;58:10
monument (5)
10:22,23;21:9,11,19
MOORE (107)
3:3,9,12;4:11,13;5:5,
7;7:6,9,16,22;8:1,15;

11:10;12:18,24;13:2,
12,21,25;14:6,10,18,
21,25;15:3;16:2;18:14;
20:11;21:3,7;22:8,18;
23:4;29:25;31:25;32:5,
15,19;34:10,18;35:4,
12,17;36:1,11,14,19,
21;39:12;40:13,15;
41:21;44:6;45:22;46:6,
8,10,14,16;47:9,12;
48:8,14;49:4,14;50:2,
13,17;51:3,5;54:15;
56:11,18;57:6,12,20,
24;58:2;59:5,20;60:1,
8;61:20;68:23;69:10;
70:7;76:9,14;78:18;
80:13,16;82:14,19;
87:22;88:3;89:24;
91:10,16;93:21;94:18;
98:14;99:10,16;106:3,
13;110:14
morals (2)
77:1;83:22
more (41)
8:7,10;9:4,9,13;10:8,
21;12:13;19:1;22:11;
29:14;31:9,10;32:5;
34:24;53:16;67:21;
68:16,16,23;73:16;
82:22;83:11,23,25;
85:4;90:19;94:6;95:24;
96:5;97:16,18;101:11;
103:11,11,13,23;
105:10,18;106:5;
110:17
Morningside (13)
3:2,14,20;4:18,19,
22;9:14;11:1;14:12;
45:19;48:19,24;54:14
Most (16)
3:9;29:22;38:11,17;
40:2;70:12,25;71:21;
77:3,6;79:4;81:18;
84:10;85:6,7;86:2
motion (2)
111:19,21
Mount (12)
53:15;65:9;94:21;
100:1,2,5,14,19;104:4,
11,11,12
M-O-U-N-T (1)
94:21
mounted (1)
10:18
mouth (2)
3:9;89:21
move (10)
4:18;16:21;29:20,22;
37:19;69:10;77:8;
81:13;96:6;102:13
moving (3)
37:17;71:12;103:19
Mrs (1)

94:22
much (20)
4:13;9:13;12:2;
14:10;22:11;23:22;
32:7;53:25,25;54:3;
64:21;65:1;66:18,25;
78:15;83:15;88:3;
95:24;102:14;109:1
multi-family (15)
3:19,23;42:17,20;
43:14;62:8,25;64:10;
72:14;73:14;75:11;
79:23;84:11;85:6;
87:10
multiple (1)
92:3
multi-use (1)
13:19
Municipal (11)
76:7,18,21;77:15;
78:14,17,19;79:12;
83:19,20;85:16
municipalities (11)
40:5;63:7,12;64:8;
65:5;70:15;93:6,7;
95:13,14,18
municipality (3)
73:11;85:5;97:19
must (1)
64:12

N

name (13)
3:12;13:6,7,8;21:15,
16;35:20,24;51:3;71:5,
7;90:5;94:15
narrowed (1)
5:24
narrowness (1)
75:19
natural (2)
75:2;84:14
near (3)
29:3;41:1;107:22
need (38)
5:12;14:25;24:6;
32:3;40:24,24;42:22;
45:17;46:1,4,6,24;
47:6;51:9;55:21,24;
58:14;67:25;75:15;
79:2,10,17;80:5,24;
81:12,17,19,24;82:10;
84:20;86:21;87:2;89:1;
100:5,8,13;102:24;
109:9
needed (1)
78:15
needs (15)
34:23;35:17;41:9;
62:13,18;72:3,8,12,16,
18;74:19;78:6;81:3,5;
106:25

negative (9)
40:10;76:10,12,17;
79:16,25;80:10;86:12,
13
negatives (1)
86:11
Neglia (4)
5:17;61:20;88:16;
89:9
negotiated (1)
101:14
negotiation (1)
101:9
neighborhood (2)
16:12;108:1
neighborhoods (1)
77:19
neighboring (1)
92:1
New (37)
3:2,13,16;4:15;5:5;
8:10;9:11,14;11:2;
13:10,16,22,24;14:1;
20:10;35:22;36:9,12;
42:11,14;45:20;48:6,
20,23;54:7;57:13,14;
62:8;78:8,9;81:22;
82:12;86:18;87:1;90:8;
91:22;93:14
news (1)
93:25
next (30)
6:9;13:3;16:21;20:9;
21:1;34:10,12;58:21;
68:10;71:16;77:16,25;
80:17;88:10,15,23,25;
89:8,9,10,16;90:16,20;
107:14,15;109:7;
110:4,5;111:2,19
nice (13)
6:24;10:7;18:25;
21:12,19,24;22:1,5,5;
51:16;90:15;91:22;
103:20
nicer (3)
30:10;32:14;103:22
Nick (2)
98:9;104:12
night (4)
9:17;39:18;57:22;
89:25
nine (1)
17:18
nobody (5)
91:14;103:11,15;
108:4;109:13
none (1)
52:14
North (2)
36:6;65:23
northern (4)
63:8;64:11;95:15,16
notes (2)

11:17,20
notice (1)
4:7
noticed (3)
4:4;110:4,10
Notices (2)
91:12;110:9
nowadays (2)
22:1;33:18
Nuckel (1)
105:22
Nuckels (1)
105:12
number (32)
6:1,21,22;15:16;
16:19;29:11,21;32:1;
34:9;38:11;40:3,4;
52:11,23;63:5,6;67:16;
72:23;78:21;79:2;
83:18;86:17,21;93:18,
19;94:2,6;95:9;96:24;
97:20,20;98:4
numbers (5)
8:21;67:1;69:3;
92:20;93:10

O

oath (1)
5:4
objectives (6)
38:19;71:24;72:22;
73:8,11,20
obligation (2)
48:20;49:22
obligations (1)
105:5
obviously (9)
22:15;37:25;38:2;
58:18;72:5,13;84:17;
106:11;109:25
Occupancy (1)
91:12
occupants (2)
94:2,6
occupied (3)
37:12,14;67:21
occupy (1)
93:23
occupying (1)
68:18
off (14)
3:7;6:5;7:17,25;
19:19;21:14;22:13;
61:23;71:8;95:4;98:10;
99:7;104:18;107:16
offer (4)
14:6;36:15;56:6;
59:2
offered (1)
52:6
office (8)
4:4;5:17;35:21;

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 41 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-14   Filed 04/30/26   Page 42 of 49
PageID: 2619

In RE: Morningside at Wallington                                                    Transcript of Proceedings

43:17;45:8;67:18;68:8;
103:10
**officials (1)**
97:4
**often (1)**
102:17
**old (1)**
27:16
**older (2)**
67:25;68:18
**Once (3)**
23:21;48:3;67:4
**one (94)**
5:6,23,23;6:12,13,
16;7:15;12:5;14:4;
15:8,16,17,20;16:17;
17:14,16,21,23;18:1,4,
9,10,11;19:19;21:21;
23:19,20;26:3,20;27:6,
11;28:20,23;29:4;33:5;
34:15;37:9,9;41:1;
44:10,12,16;47:22;
49:1;50:1;51:13;52:19;
53:5;55:5,9;56:4;
60:21;62:4;63:17;66:5,
11,13;67:2,18;76:11;
80:20,24,25;83:2;
90:17,17,18,19;91:4,
19,24;92:2,2,7;94:3;
95:3;97:2,12,20;98:14,
15,15;99:9,14,18;
100:18;102:9;104:11;
105:10,21;106:5;
109:16;110:2,12
**one-quarter (1)**
19:8
**ones (1)**
30:5
**one's (1)**
22:24
**only (32)**
10:25;28:19;38:7,24;
39:2;40:18;52:16;60:2,
13;62:16;63:20;64:2;
68:16;70:7;72:13;
73:21;75:1,22,24;
77:23;78:8,22;81:8;
84:11;85:21;90:10;
91:4,23;92:4,9;102:24;
108:15
**open (18)**
17:12;18:20;20:3;
24:3,5;25:2;56:5;59:6;
62:4;82:22;84:13;86:8;
87:9;88:10,24;89:12,
18;109:7
**opened (2)**
89:16;109:6
**opening (1)**
91:4
**opens (1)**
25:11
**opinion (4)**

24:15;88:13;89:18;
102:5
**opportunities (2)**
86:4;87:14
**OPRA (3)**
63:6;64:8;93:2
**OPRA'd (3)**
65:5,8,18
**options (1)**
59:9
**orange (1)**
42:17
**order (3)**
4:11,12;55:6
**ordered (1)**
106:17
**ordinance (13)**
19:9;60:20;73:12,15;
74:1,8,24;76:2;77:21;
82:9;84:6;97:12,14
**ordinances (1)**
40:6
**original (4)**
5:7;57:9;99:18;
105:13
**originally (5)**
7:13;52:21;83:12,16,
24
**others (2)**
4:6;88:4
**out (43)**
5:21,23;15:13;20:18;
25:14;29:23;34:9;40:4;
41:25;54:4,7;55:6;
59:3,12;61:15;63:2,15,
19;64:19;66:21;67:14,
14;69:1,1;70:5,12;
77:3;83:4,6;87:4;
89:15;90:11;92:5,7,9;
95:9;96:25;98:11;
101:4;107:25;110:25;
111:5,14
**outcome (1)**
46:19
**outdated (2)**
62:23;63:4
**outlined (3)**
42:13,16,25
**outside (4)**
10:20;15:15;67:7,9
**outweigh (2)**
79:15;80:9
**outweighs (1)**
86:11
**over (18)**
4:9;12:11;23:21;
24:22;33:16;60:17;
66:16,22;74:7;89:10;
96:13;98:12;102:8;
104:4,20;105:1;
107:22;111:10
**overall (3)**
22:25;55:22;56:11

**overcrowding (3)**
91:19;110:22,23
**overload (1)**
93:20
**own (5)**
63:5;70:15;92:21;
96:20;105:11
**owner (4)**
45:20;48:6;49:11;
101:20
**owners (11)**
4:6;46:16;48:3;
49:24;54:5,5;56:24;
99:23;105:11,13;
106:11
**ownership (4)**
45:23;46:10;105:24;
106:1
**owns (2)**
46:20;105:12

# P

**packing (1)**
70:5
**page (1)**
30:3
**pains (1)**
70:21
**painstaking (1)**
70:19
**painted (2)**
7:2;26:12
**Panera (1)**
101:7
**paper (2)**
33:19;58:19
**parallel (2)**
6:3,5
**parcel (2)**
42:13;79:5
**parcels (1)**
106:1
**park (10)**
15:13;16:25;17:11,
12;35:22;60:6;70:16;
95:20,23;98:5
**parking (28)**
5:25;6:3,5,14;7:18,
21;9:25;10:2,9;12:3;
15:6,9,11,23;18:20;
20:3;25:25;26:10;
28:14,15;29:20;37:15,
18,21;43:15;86:25;
87:1,16
**parks (1)**
6:14
**part (19)**
6:11,12;9:23;15:1,3;
44:8;47:15;54:20;79:1;
82:11;86:15;91:13;
98:21,23;101:3,8;
105:13,17,25

**particular (3)**
15:20;33:8;40:8
**particularly (3)**
23:7;75:7;93:8
**partnership (1)**
105:21
**pass (1)**
20:19
**Passaic (1)**
107:22
**Paterson (1)**
97:2
**paths (3)**
10:25,25;11:7
**pattern (1)**
79:6
**paved (1)**
37:15
**pavement (6)**
6:23;25:10,16;27:2;
53:2;110:13
**pay (1)**
58:17
**paying (3)**
22:4;66:17;107:18
**pays (2)**
102:14,18
**pedestals (1)**
21:24
**pedestrian (4)**
39:2;81:16;86:6;
87:17
**pedestrians (1)**
85:22
**Pennsylvania (1)**
36:8
**people (25)**
3:9;22:3;28:23;29:5;
49:6;52:4,12;59:15;
60:4,21,21;61:2;67:21,
22,25;68:18;91:18;
93:19,22;96:11;97:23;
98:1;105:25;107:18;
110:25
**per (17)**
54:9,20,22;56:3,8;
62:24;63:8;64:19;
73:14,15;93:7,21;94:2,
3,6;101:10,21
**percent (8)**
16:12;43:6;50:25;
53:13;62:11,15,16;
73:17
**percentages (1)**
106:1
**Perfect (1)**
44:15
**perhaps (1)**
110:13
**perimeter (2)**
23:22;24:1
**period (1)**
30:7

**permits (1)**
73:16
**permitted (4)**
73:22;76:5;77:21,22
**person (2)**
66:17;100:3
**personal (1)**
68:8
**personally (1)**
64:8
**persons (1)**
77:18
**perspective (29)**
17:7;20:10,12;31:19;
39:6,9;40:2;42:18;
43:18;46:19;47:17,25;
50:12,16,19,19;52:18;
62:13;79:9;80:7;83:1;
85:22;86:1,20;87:4,9,
12;93:5,5
**perspectives (11)**
62:18;74:22;77:13;
78:10,16;80:8;83:14;
84:25;85:11;86:9;87:5
**pertain (2)**
71:25;80:18
**phase (3)**
100:18,18,18
**phones (1)**
22:3
**physical (1)**
75:20
**pick (2)**
8:25;9:1
**picked (1)**
10:13
**picture (2)**
70:4;106:23
**piece (4)**
50:23;58:19;107:7;
108:13
**pieces (2)**
52:1;99:23
**pier (1)**
22:24
**pig (1)**
31:3
**pilaster (1)**
22:11
**piling (1)**
29:22
**pit (2)**
8:5,6
**pitch (1)**
31:1
**pitched (11)**
16:8;18:23;19:15,18;
31:8,21;46:25;47:6,8,9,
12
**place (2)**
10:13;84:10
**plan (62)**
3:18,22;4:22;5:15;

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 42 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-14   Filed 04/30/26   Page 43 of 49
PageID: 2620
In RE: Morningside at Wallington                                    Transcript of Proceedings

8:22;9:11;10:11;15:6;
16:23;23:9;27:17;
38:19;42:19;43:7;
44:10,13,18;50:22;
59:21;71:18,22,22,23,
23;72:1,23;73:1,1,5,19,
20;74:2,4,18;75:5,6,8;
77:22;78:14;79:1,4,13,
25;80:2,2,3,4;82:3,3;
83:2,13,15;84:2,7,7,9;
85:15;87:8;97:12,14;
101:23;106:21
**Plank (1)**
97:2
**planned (2)**
74:9;97:19
**planner (10)**
12:10;36:9,12;56:24;
71:2,2;79:17;83:2;
103:20;107:2
**planning (31)**
14:1,3,4;36:7,16;
38:10;39:6;40:1;42:18;
43:18;46:19;47:16;
50:12,15,19,19;51:22,
25;62:12;69:23;73:9,
10;83:1;96:24;99:19;
100:15,25;106:6,24;
108:14,19
**plans (10)**
8:20;10:1;11:18;
12:16;14:16;48:7;57:9;
73:8;74:14;101:4
**plan's (1)**
73:6
**plant (1)**
100:17
**play (3)**
67:7,12;69:2
**plaza (3)**
20:19;107:13,14
**Pleasant (1)**
65:10
**Please (3)**
13:6;69:12;96:23
**pleasing (1)**
30:8
**plow (1)**
29:17
**plus (1)**
18:4
**pm (1)**
112:1
**point (20)**
5:19;19:10,15;48:17;
52:2,3,19;53:22;55:5,
6;59:22;73:10;88:23;
89:14,19;98:15,21;
99:20;108:18;109:9
**pointing (1)**
96:22
**points (2)**
49:17;98:15

**Polish (2)**
90:9,9
**POLTON (2)**
12:22;111:23
**poop (1)**
31:3
**poor (2)**
37:8;88:7
**popping (1)**
20:18
**population (5)**
72:13,17;77:17;84:4,
5
**portion (2)**
71:16;79:25
**positive (2)**
76:17,18
**possible (3)**
23:14,14;110:21
**possibly (4)**
60:22;105:22;
107:20;111:13
**post (2)**
10:17,18
**post-development (2)**
95:7,11
**potential (1)**
66:16
**potentially (1)**
19:16
**pouring (1)**
15:13
**PP (1)**
35:18
**practicing (1)**
13:17
**pre-approved (1)**
30:5
**predicted (1)**
95:8
**preliminary (2)**
3:17,21
**prepared (2)**
41:19;42:10
**present (2)**
37:24;72:3
**presentation (1)**
48:21
**presented (2)**
5:14,21
**preservation (1)**
84:15
**preserve (3)**
72:3,6;77:19
**preserving (2)**
56:5;82:4
**Pretty (1)**
88:3
**previous (3)**
4:14;20:17;43:2
**previously (4)**
4:25;37:12,13;85:14
**principal (2)**

45:20;46:13
**prior (5)**
11:1;53:20;82:15;
100:13;111:1
**privacy (4)**
7:6,12,12;9:8
**private (2)**
85:2,9
**PRML (4)**
43:4;73:1,13,20
**probably (11)**
6:10;10:6;16:11;
41:1;63:14,24;82:10;
92:23;102:14,15;
104:12
**problem (3)**
12:1;50:25;69:25
**problematic (1)**
69:21
**procedural (1)**
48:1
**procedures (1)**
85:2
**proceedings (1)**
112:1
**produce (2)**
90:22;108:20
**produced (1)**
69:20
**professional (6)**
13:13;36:2,8,11;
79:16;107:1
**professionals (1)**
68:24
**project (37)**
3:17,19,21,23;4:16,
18,20,23;13:3;14:13;
17:4;19:18;20:10,13,
17;21:12,15,16,25;
22:2,10;33:2;63:3,10,
13;69:4;71:3;72:21,24;
78:14;79:17;89:22;
98:17,22;99:18,18;
105:4
**projects (2)**
68:13;98:16
**prominent (1)**
9:13
**promote (8)**
76:25;77:16;78:1;
83:22;84:3,3,13,18
**promoting (2)**
78:11;84:5
**proofs (1)**
37:1
**properties (1)**
3:23
**property (33)**
4:5;6:9;28:10;29:8;
30:24;39:5,9;49:11,24;
50:8,23;55:15,18,18,
21;58:16;59:17;60:14;
75:19,23;77:4;79:22;

81:7;82:24;83:3,6,8;
101:20;102:25;105:11;
107:7;108:13,20
**proportions (1)**
23:2
**proposal (9)**
37:8;43:3;72:5;
73:10;77:2;78:5;79:1;
99:4;101:13
**proposal's (1)**
79:6
**propose (3)**
47:21;81:5,8
**proposed (6)**
40:3;77:21;82:6;
85:19;101:8,12
**proposing (9)**
21:11;32:22;71:25;
72:9,11,13;82:12,21;
87:11
**protect (1)**
58:18
**protected (1)**
23:16
**prove (1)**
80:1
**provide (26)**
9:21;10:7;35:8;41:6;
43:13,16,22;51:14;
64:6,11;65:2;67:16;
70:25;72:7,10,11,17;
76:4;78:12;81:6;84:7,
18;85:7,13;86:3;97:18
**provided (2)**
10:25;95:12
**provides (5)**
43:20;62:24;78:14;
86:8;87:15
**providing (12)**
62:5,14;72:15,16,24;
73:17;78:22,22,23;
86:23,24;87:7
**public (21)**
12:24;38:2;41:7,7;
51:10;61:15;62:14;
63:3,22;65:13;77:1;
79:18,21;83:22;85:1,9;
86:19;87:5,6,7;111:7
**published (1)**
4:7
**pull (5)**
15:12;44:10;94:24;
97:23;98:1
**pulled (1)**
6:6
**pure (2)**
39:8;46:18
**purely (3)**
47:17,24;50:18
**purple (1)**
41:25
**purpose (16)**
77:15,16,25;78:1,11,

12,16;83:20;84:2,7,12,
18,25;85:1,12,12
**purposes (11)**
43:11;75:5;76:7,18,
20,20;79:12,13;82:2;
83:19;85:16
**pushed (2)**
40:23;104:6
**put (22)**
7:13;11:23,25;21:15,
25;29:23;30:9,17,20;
31:2;32:24,25;52:23;
54:7;56:9;97:3,6,7;
107:19;108:4,6,6
**putting (2)**
30:6;52:1

---

## Q

**qualified (1)**
5:1
**quality (1)**
58:4
**quarter (3)**
19:8,11;102:25
**quick (2)**
89:17;95:17
**quickly (2)**
19:12;41:19
**quite (2)**
22:4;102:17

---

## R

**RA (1)**
13:4
**railroad (2)**
8:4;42:15
**rainstorm (1)**
15:13
**raise (1)**
56:17
**raised (1)**
49:17
**Raker (68)**
13:3,4,8,8,12,15,23;
14:3,6,11,14,19,23;
15:2,5,25;16:5;17:23;
18:3,7,12,17;20:12,24;
21:5,9,18,21;22:20;
23:4,8;24:11,13,16,21;
25:1,6,10,15,19;26:1,5,
11,15,21;27:14,19;
28:2,5,12,18,21;30:13,
18;31:5,13,15,18,25;
32:4,7;33:8,12,15,23;
34:1,16;99:10
**R-A-K-E-R (1)**
13:9
**range (3)**
15:18,19;103:17
**rate (7)**
15:22;17:16,17,18,

24,25;18:10
**rateables (5)**
72:5,6;106:12;
107:18;108:19
**rather (1)**
103:1
**ratio (3)**
62:24;65:9;93:8
**reach (1)**
111:14
**real (3)**
53:5;65:1;103:7
**reality (4)**
46:19;47:18;58:9;
87:3
**realize (1)**
40:9
**really (23)**
6:23;12:4;45:24;
46:17;49:21;51:24;
52:24;53:3;62:10;
68:24;71:19;73:6;74:5;
75:9,11;79:21,24;
81:23;86:15;87:4;
98:21;100:3;105:10
**realm (1)**
9:20
**rear (14)**
37:13;42:23;44:17;
45:11,13;73:4;74:4,24;
75:6,17;80:22;81:3,6,
11
**reason (10)**
32:10,12;43:18;44:8;
52:15;62:16;75:20;
81:4;106:2;108:12
**reasons (3)**
72:21;84:18;102:3
**rec (5)**
56:6;59:24;110:23;
111:6,13
**recall (3)**
4:20;31:5,6
**receipt (1)**
4:5
**receive (1)**
4:7
**recess (6)**
34:22;35:1;88:21;
89:2,4,7
**record (8)**
3:12;4:8;21:8;36:3;
37:2;50:5;67:1;110:14
**recorded (1)**
49:5
**recording (1)**
5:12
**records (1)**
93:3
**recreation (14)**
37:9;41:7;52:7;
62:14;72:11;77:12;
78:8;81:21;82:12;

84:16;86:4,5;87:9,14
**recreational (5)**
43:8,10;62:5;86:7;
87:1
**red (3)**
42:13,25;43:1
**redesigned (1)**
9:13
**redevelopment (1)**
98:23
**redraft (1)**
107:2
**redraw (1)**
107:4
**reduce (1)**
76:2
**reduced (2)**
74:9,25
**reduces (1)**
86:7
**refresh (1)**
3:15
**regard (22)**
12:21;38:3,9;41:9;
70:18;73:4,11;74:3,16;
76:8;79:15;80:25,25;
81:10;82:25;83:17;
87:20;92:20,21;93:25;
94:7;97:21
**Regarding (3)**
30:2;42:11;65:5
**regardless (3)**
46:20;98:3,16
**regards (3)**
47:3;103:25;109:10
**Regional (1)**
36:7
**regions (1)**
77:19
**regrading (1)**
12:3
**regulations (7)**
71:21;81:18;82:11;
83:3,5,13,17
**rehabbed (1)**
86:6
**rehabilitation (1)**
78:7
**rehabs (2)**
78:5,7
**reinforced (1)**
42:19
**reiterate (2)**
59:22;99:11
**relate (1)**
38:23
**related (3)**
3:15,25;38:12
**relates (1)**
23:22
**remain (3)**
49:10;86:17,19
**remedy (7)**

53:14;54:1,2,4;
100:14;105:18;106:15
**remove (4)**
7:12;37:11;45:15;
62:3
**removed (4)**
6:2;62:3,9,12
**removing (1)**
86:15
**rendered (2)**
44:11;108:9
**rendering (3)**
10:3;16:2;27:16
**re-noticed (2)**
4:3;110:4
**rent (5)**
66:18;68:17;96:21;
97:23;98:1
**rents (1)**
103:23
**repeat (2)**
16:17,17
**report (4)**
61:21,24;88:10,23
**reported (1)**
26:2
**reports (1)**
88:16
**represent (1)**
70:14
**representative (1)**
89:9
**represented (1)**
100:15
**representing (3)**
3:13;56:23,24
**request (3)**
4:8;75:17;93:2
**requested (4)**
4:5;38:5;44:9;78:20
**requesting (9)**
38:11,22;44:17;
45:12,15;49:19;75:16;
82:25;97:15
**requests (1)**
64:8
**require (2)**
50:8;74:14
**required (5)**
4:6;74:7;79:1;
104:15,25
**requirement (6)**
5:25;49:23;82:9;
87:19;104:13,14
**requirements (9)**
30:17;73:24;76:1,3;
87:13;99:25;100:1,9;
108:17
**requires (3)**
70:9;81:2;94:4
**research (7)**
64:14,21;65:1;66:25;
70:1,2,25

**residence (1)**
52:23
**residential (12)**
13:19;19:20;81:22;
84:9,11,11,12;106:17,
22;108:6,11,13
**residents (13)**
20:23;43:22;46:1;
60:14;78:23,24;86:4;
90:21;91:1,5,7,21;92:4
**resolution (3)**
32:24;33:6;111:4
**resources (1)**
84:14
**respect (3)**
7:18;70:1,1
**response (2)**
9:23;97:11
**responsibility (1)**
8:13
**responsible (1)**
58:17
**rest (4)**
24:1;54:3;81:9;
88:22
**restarted (1)**
89:6
**restroom (1)**
34:23
**resume (1)**
35:3
**retail (1)**
43:20
**retaining (1)**
8:15
**return (2)**
4:5;34:22
**reuse (1)**
82:7
**reusing (1)**
86:13
**review (2)**
62:13;73:7
**reviewed (1)**
71:22
**reviewing (2)**
38:15;39:7
**revisit (1)**
61:13
**rezoned (1)**
73:14
**ridge (11)**
30:9,10,17,25;31:12;
32:3,14;70:16;95:20,
23;98:5
**Ridgewood (6)**
95:19,23;96:3;97:22;
98:6,7
**Right (56)**
5:2,13;6:9;7:10;9:2;
10:20,24;11:23;14:16,
21,25;15:14;18:4,24;
20:15,16;21:16;25:8,

18;26:19;27:2;28:24;
34:15,17;41:3;44:11;
45:2;48:16,21;49:13;
51:2;52:10;53:13;
55:11;56:1,4;57:18;
58:8;61:18;66:19,23;
69:21;70:10;74:13,18;
80:14;89:5,7;100:23;
101:3;102:3;103:13;
105:7;107:5;110:10;
111:16
**right-of-way (1)**
37:19
**ring (2)**
82:23;85:23
**rink (14)**
37:14,24;38:6,13,16;
41:1;43:8,10;49:9;
52:9;78:7;86:13,17;
91:3
**rip (1)**
51:15
**River (4)**
29:23;42:15;75:2;
78:25
**Road (11)**
6:10,13;10:15;19:25;
26:3,4;49:25;54:23;
82:23;85:23;97:2
**roadway (2)**
101:23;107:16
**Robinsville (2)**
57:13,18
**roller (9)**
37:14;40:25;43:7,10;
49:9;52:9;82:7;86:12;
91:3
**roof (27)**
16:8;18:23,23;19:10,
14,15,17,18;30:4,7,9,
10,11,12,17,20,24;
31:1,1,4,6,8,12,21;
32:3,5;47:12
**roofs (10)**
31:2;32:12,14,14;
46:24,25,25;47:6,7,8
**room (1)**
29:22
**rooms (1)**
17:5
**rotated (3)**
6:3;8:24;9:1
**Route (1)**
65:19
**row (1)**
10:1
**ruled (1)**
100:16
**rulings (1)**
104:4
**run (2)**
23:20;67:6
**running (1)**

**Rizman Rappaport (973)992-7650**
**Let Our Fingers Do Your Talking**

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 44 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-14   Filed 04/30/26   Page 45 of 49
PageID: 2622
In RE: Morningside at Wallington

Transcript of Proceedings

69:1
**runs (2)**
48:9,11
**Rutgers (3)**
62:22,25;92:20
**Rutherford (1)**
14:5

## S

**Saddle (3)**
29:23;42:15;78:25
**safe (1)**
23:21
**safety (2)**
77:1;83:22
**same (23)**
3:24;5:6;9:8,15;
15:12;22:10;32:2;42:6;
45:21;46:13,14,20;
70:16,18;76:11;92:14;
98:2;100:20;105:24,
25;110:8,9;111:25
**sand (2)**
8:5,5
**sat (1)**
108:3
**saw (1)**
57:9
**saying (21)**
25:4,4;27:21,23;
29:7;44:2;47:1;48:17;
50:10;59:7;64:18;68:5;
70:6;71:14;90:24;92:5;
99:24;101:22;103:20;
104:1,8
**scale (1)**
108:19
**scenario (2)**
70:4;98:2
**school (36)**
62:22,24;63:1,2,3,10,
14,20,21,22;66:13;
67:3,4,9;69:6,7,8,9,13,
21;70:15;71:4;90:23;
93:7;96:13,14,15,16,
17;97:21,23,24,25;
98:1;102:10;107:19
**schools (2)**
91:2;110:22
**scope (1)**
98:22
**scrapping (1)**
48:6
**seats (1)**
35:3
**second (11)**
42:23;47:23;58:24;
62:6;66:22;79:25;91:3;
110:2,20;111:22,23
**seconds (1)**
106:24
**section (9)**

23:20;25:21,25;26:8,
9;28:3;80:20,22,24
**sections (1)**
80:19
**seem (2)**
56:20;69:3
**seems (3)**
36:24;63:7;64:5
**selected (1)**
33:8
**sell (1)**
48:5
**sense (6)**
51:18,24,25;64:15,
22;69:19
**separate (7)**
12:14;23:17;45:17;
46:3;48:3;55:7;81:1
**separation (8)**
80:20,21;81:25;
82:11;85:18,19;86:10;
87:11
**series (1)**
16:18
**serious (1)**
103:7
**serve (1)**
67:4
**serves (1)**
77:25
**service (1)**
67:5
**serviced (1)**
93:9
**set (14)**
14:19,20,22;15:1,3;
19:21;30:6;43:6;52:24;
73:17,24;104:5;
106:18;111:13
**setback (29)**
12:10;44:16,17;
45:11;47:25;73:4;74:4,
6,24;75:6,17;76:3,5,16,
19;78:21;79:10;80:10,
18;81:3,3,11,13,20;
82:17;83:18;84:20;
88:2;102:24
**setbacks (7)**
39:24;40:24,25;
41:10;47:17;83:1;
87:21
**settle (1)**
54:6
**settled (3)**
101:9,14,16
**settlement (2)**
102:23;106:23
**seven (16)**
6:4,5,15,22;9:18;
12:7;27:12,15,18;
28:14;29:6;81:1,20,21;
82:1;93:7
**several (3)**

10:4;66:15;100:20
**sexes (1)**
72:19
**shallowness (1)**
75:19
**shape (5)**
8:6,10;42:22;75:19,
23
**shaping (1)**
85:2
**share (1)**
95:5
**shared (1)**
67:10
**sheet (5)**
8:19;10:16;15:5;
16:22,22
**shield (2)**
10:2,9
**shop (2)**
53:20,21
**shortly (1)**
17:8
**shove (2)**
103:5,6
**show (7)**
17:7;18:13;20:2,9,
22;21:22;67:1
**showing (1)**
42:7
**shown (3)**
5:22;9:25;11:2
**shows (2)**
10:3;20:1
**shut (1)**
95:4
**side (41)**
7:14;8:11,11,23;
15:9;17:12;19:25;20:1,
5;24:6,21;25:20;26:4;
27:3,7;28:10,10,25;
29:13,19,21;40:24;
48:22,22;49:21;60:5;
64:24,25;80:21,21,21,
22;81:24,24;83:2;91:3,
4,5,8;97:22;104:6
**sides (3)**
20:13;23:24;24:5
**sidewalk (3)**
77:10;81:8;85:24
**siding (6)**
16:13,14;20:7;33:4,
13;57:11
**SIEK (1)**
110:7
**sight (1)**
69:22
**sign (20)**
10:10,12,17,18,19,
20,22,24;11:24;21:9,
11,12,14,20;22:2,10,
16,17,18,25
**signage (2)**

21:25;22:6
**signs (2)**
28:25;29:5
**Sills (1)**
3:13
**similar (2)**
21:13;98:13
**single (2)**
50:23,24
**sister (1)**
96:3
**sit (2)**
36:23;94:18
**site (82)**
3:18,22;4:22;5:15;
6:16;8:4,11;9:11,14;
10:5;11:1,3,4;23:1,9;
27:25;29:1;37:4,6,21;
38:1,3,7,7,8,10,17,18,
20;39:2;40:4;42:12,14,
18,21,24,25;43:1,3,4,
22;44:10,13;45:1,14,
14;50:21;51:13;52:5;
54:13,14;73:7;75:8,22;
76:5;77:7,8,14,23;79:1,
5,24;80:5,7;81:9,12;
82:4;83:15;84:2,23;
85:6,25;86:3,5;87:10,
16,18,18;97:17;
106:22;107:14,15
**sites (6)**
40:17;52:24;79:20;
84:13;101:5,8
**situation (4)**
40:7,8;69:21;82:4
**six (37)**
7:12;8:21;10:6;
14:15;15:6,6;16:7;
17:18;19:13,13;20:18;
23:7;26:12,14,16,19;
27:4;28:15;29:11,21;
32:1,16;43:13;47:13;
53:8;55:1;66:1;70:5;
77:7,11;80:25;81:2,14;
82:1;93:6;101:5,7
**size (5)**
15:23;72:20,20;
73:23;79:22
**sizes (1)**
41:2
**skip (1)**
10:10
**slam (2)**
57:2,2
**slapped (1)**
103:21
**slats (1)**
9:4
**slight (1)**
16:24
**slightly (3)**
30:21;45:22;76:6
**slope (1)**

8:10
**small (1)**
102:10
**smaller (3)**
5:24;10:16;37:15
**snow (3)**
29:17,17,22
**soffit (2)**
9:18,21
**softball (2)**
57:22;58:1
**soften (1)**
7:1
**solid (1)**
9:4
**somebody (6)**
52:18;53:11;58:16;
66:17;91:16;93:18
**somehow (1)**
53:19
**someone (2)**
34:6;48:14
**Sometimes (1)**
57:3
**Sore (4)**
57:15,16,17,18
**sorry (13)**
17:18;18:7;27:8;
28:1;39:14;40:13;
41:17;51:10;61:22;
71:10;76:23;83:7;
96:16
**sort (5)**
8:9;9:17;19:21;78:4;
97:11
**sound (1)**
51:12
**south (5)**
26:4;27:3;65:17;
75:10;100:21
**southerly (3)**
6:9;7:11;29:21
**space (14)**
23:5;25:19;26:18;
37:9;52:7;55:20;56:6;
62:4,5;82:22;84:8,14;
86:8;87:9
**spaces (3)**
6:3,6;15:9
**speak (5)**
5:9;51:9;52:2;88:13;
95:17
**specific (2)**
52:11;94:2
**spell (2)**
13:7;35:24
**sport (1)**
57:21
**square (5)**
15:18,19;17:5;
103:17;107:9
**stage (2)**
106:7,7

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 45 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-14   Filed 04/30/26   Page 46 of 49
PageID: 2623
In RE: Morningside at Wallington                                              Transcript of Proceedings

stalls (1)
15:24
stand (2)
21:14;22:13
standards (3)
37:24;92:21;108:25
stands (1)
37:25
start (4)
14:15;33:2;64:22;
83:6
started (2)
74:11;81:10
starts (1)
35:4
state (13)
13:6,22,24;14:1;
35:20;36:6,9,12;57:23;
84:14;94:4,15;104:3
state-of-the-art (1)
57:25
Station (2)
101:6,19
Statistically (1)
66:21
stay (4)
32:22;40:9;96:7;
98:2
staying (1)
55:15
stays (1)
33:25
step (3)
46:1;89:20;94:12
still (10)
5:3;32:15,19;45:18;
46:6;53:24;82:10;
89:23;102:20;108:24
stilts (1)
108:7
stone (5)
19:5;20:8;33:20;
52:24;104:5
stop (2)
7:19;28:22
storage (2)
17:6,10
storefront (1)
43:20
stories (4)
33:21;68:11;101:6,7
story (2)
47:11;76:2
Straight (1)
44:25
street (24)
3:24;8:11;10:4;
18:25;19:1,4,4;30:14,
19;31:9,21;32:6,8;
37:6,10;43:12,17,21;
47:19;58:3;90:6,8;
107:23,24
strip (2)

7:1;27:17
striped (2)
6:23;43:1
structurally (1)
51:12
structure (1)
32:6
structures (4)
18:20;37:7;45:23;
46:11
stucco (4)
22:12;33:13,14,25
studies (8)
63:5,11,12;90:13;
92:23;95:6,10,18
studio (2)
43:17,23
study (9)
62:23,23;63:1,4;
92:5,8,20,21,25
stuff (1)
24:2
style (1)
16:7
subject (12)
32:23;42:12,25;48:9;
53:14;54:13;57:15,16,
17,18;79:5;105:5
submitted (7)
14:20,22;15:1;74:15,
20,22;79:7
substantial (2)
22:11;80:1
substantially (5)
41:14;67:10,17;75:4;
82:2
substantiate (1)
95:8
sudden (3)
33:2;53:9;71:3
sued (3)
99:24;100:23;102:2
sufficient (2)
84:8;87:16
suggest (4)
88:10;110:24;111:8,
10
suggested (5)
9:5;51:19;73:1;
75:10;101:5
suggesting (3)
55:13;74:11;76:15
suggestion (1)
88:6
suggests (2)
74:8;75:6
suit (5)
53:14;54:1,2,4;
105:18
sum (1)
12:15
supplanted (1)
100:7

supplemental (1)
12:19
supply (2)
78:13;85:13
support (1)
79:22
supported (1)
71:3
supposed (2)
100:22;108:16
sure (30)
3:10;14:14;16:5;
23:8;32:24;33:6,24;
36:4,23;37:1,14;38:6;
39:1;42:7;59:14;61:14;
64:13;75:13;77:23;
81:15;85:10;86:25;
92:22;104:18;105:7,
12,20,23;106:2;110:17
surrounding (5)
16:9;41:20,22;42:11;
86:14
sworn (6)
4:25;13:4;35:17,18;
90:3;94:13
system (5)
90:23;96:13;97:24;
102:10;107:19
systems (2)
96:14;97:25

T

talk (8)
22:22;23:10,10;
39:18;71:17;76:7,10,
17
talked (2)
30:3;73:5
talking (26)
24:19;26:5,11,13;
28:2;31:6,6;33:10,11;
39:17;51:7;52:25;
59:15;60:8,9;62:10;
63:17;65:22;66:14;
82:16;90:10;91:3;
92:16;94:8;98:18;99:5
talks (1)
72:1
taller (1)
18:21
tax (2)
72:4,6
taxes (3)
102:15,19;107:18
tears (1)
78:6
technical (6)
23:10;62:4,7;74:5;
81:23;103:2
technically (5)
40:10;45:17;75:16;
81:17;95:15

techniques (2)
78:2;84:20
Technology (1)
13:17
tells (2)
102:17;108:15
tenant (2)
17:6,9
tend (2)
32:12;96:8
term (1)
69:18
terms (2)
95:8;99:7
testified (9)
13:5,25;30:10;35:19;
60:4;90:4;94:14;99:10;
109:19
testifying (1)
28:5
testimony (24)
4:16,19;12:19;35:5;
36:22,24;37:3;41:11;
42:24;50:18;51:1;
59:14;61:4,13;69:11;
71:12,17;77:20;87:20,
25;88:11;89:8,10;93:1
thereon (1)
75:21
thinking (2)
64:1,14
third (2)
102:16,19
thorough (1)
109:2
though (3)
48:2;70:8;95:15
thought (10)
11:11;20:1;29:2,14;
30:8;32:13;51:14,20;
59:24;111:3
thousand (1)
103:12
three (37)
6:2;10:8,17;17:15,
15,16,19,19,24;18:1,1,
4,11;24:23;54:14;
64:19;65:9;66:4,4,6,9,
9,15;67:2,12;70:4,7,11;
71:2;81:4;97:1;99:15,
15;100:18;102:24;
105:22;108:3
three-and-an-eighth (1)
19:14
three-quarters (1)
24:24
throat (1)
103:7
throats (1)
103:6
throughout (7)
11:3;63:5,6;64:9,10;
84:22;93:13

throwing (1)
7:17
tied (3)
106:10,19,25
tight (1)
70:17
tile (1)
33:25
till (3)
34:14;89:10;111:19
times (1)
92:14
today (5)
22:7;37:25;47:11;
88:17;99:4
Together (7)
12:13;52:2;75:9;
76:13;79:21;103:21;
106:8
told (5)
12:12;80:11;100:4,
13;106:3
TOMKO (17)
24:9,12,15,18,25;
25:18;26:18;34:5,11,
14;65:17;69:16;70:10,
21;71:5,10,15
Tomko's (1)
53:1
tonight (4)
61:19;69:11;74:11;
109:14
top (6)
16:15;20:7;21:24;
98:10;99:8;104:18
topography (1)
75:20
total (9)
18:5,11;50:21;55:2,
3,15;66:5;99:2,3
totally (2)
30:23;106:19
touch (1)
21:1
towards (1)
68:24
towers (1)
68:10
town (37)
51:20;52:6;54:7;
56:6;57:1,12,18,19;
61:9;94:4;96:20;97:1;
98:3;99:24,24;100:4,6,
13;102:2,12,12,13,14,
14,15,19,21;103:4,8;
104:2,2,13;105:1;
106:20;107:21,25;
108:15
town's (1)
107:1

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 46 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 141-14    Filed 04/30/26    Page 47 of 49
PageID: 2624
In RE: Morningside at Wallington                                    Transcript of Proceedings

**township (3)**
38:20;56:19;72:6
**toy (1)**
108:2
**track (1)**
53:13
**tract (2)**
54:5,23
**tractor (5)**
11:3,8;107:12,13,15
**tracts (1)**
48:22
**traditional (4)**
16:7,10;21:14,24
**traffic (13)**
4:17;6:12,12;7:20;
22:1;25:24;26:1,9,20,
20;28:13,25;29:3
**trailer (4)**
11:4,8;107:13,15
**trailers (1)**
107:12
**training (1)**
58:1
**transcript (1)**
47:4
**trash (3)**
8:9,25;9:1
**treated (3)**
17:7,8,10
**tree (2)**
10:5,7
**trees (3)**
10:4,8;20:16
**tried (1)**
92:24
**truck (14)**
8:25;10:25,25;11:3,
4,7,8,8;24:10,13;25:5,
7,11;26:16
**trucks (5)**
24:16;107:10,10,11;
110:13
**true (5)**
49:14;50:25;56:18;
93:14;94:3
**truly (1)**
103:24
**trunk (1)**
10:6
**trust (1)**
59:14
**truth (1)**
102:21
**try (4)**
89:5;92:17;102:9;
103:3
**trying (26)**
38:1,5,12,16,17,21,
23;39:1;40:20;47:21,
21;53:7;70:25;79:4;
80:6;81:5,6,8,13,15;
84:22;85:11;98:11;

103:5,6;106:6
**turn (1)**
108:17
**turned (1)**
7:25
**two (86)**
3:15,25;4:4;5:21,21;
6:11;10:17;11:6;12:12;
15:17,18,21;17:11,15,
17;21:23;22:16;23:19,
24;24:5,14;25:24;26:1,
9,19,23;28:13,17;29:3;
30:1;33:21;34:19,21;
37:7;38:25;39:5;40:17;
45:17,23;46:3;48:5,19,
22;58:10;62:8;64:17,
19;66:1,4,6,7,8,14;
67:2;70:15;73:18;74:9,
12;75:2,9,12,13,15;
79:16,20;80:17,19,24;
81:1;90:19;91:23,24;
94:3;95:18;96:17;
97:20;98:15;99:14,23;
100:12,18;102:1;
104:12;107:2;109:24;
110:11
**twofold (1)**
97:12
**type (6)**
9:8,15;10:5;31:16;
58:2;83:13
**types (1)**
33:17
**typically (1)**
40:6
**typing (1)**
88:7

**U**

**ulcers (1)**
70:22
**Umm-hum (1)**
54:11
**undecided (1)**
21:16
**under (11)**
5:4;17:12,13;68:14;
73:2;76:16;92:9;100:1,
22;102:5;103:15
**undercurrent (1)**
51:6
**underneath (6)**
8:3;15:24;17:1,2;
18:20;43:15
**understands (1)**
23:12
**understood (1)**
71:18
**unfortunately (4)**
22:3;79:2;86:21;
87:2
**uniform (1)**

75:8
**union (1)**
79:1
**unique (5)**
38:25;39:5;40:6;
42:21;82:3
**unit (12)**
3:18,23;8:20;15:15;
17:14;54:9;55:8,9;
63:8;93:8,19,23
**units (47)**
15:21,21;17:3;43:5;
54:20,22,24;55:8,15,
17,19,25;56:3,4,8,9,10;
60:5,15,16;63:16,19;
65:12;70:7,12;72:15;
73:14,15,16,18;90:22;
93:18;94:1,4,5;95:12;
97:16;98:18,19;
101:10,11,17,21;102:8;
103:11,21;108:6
**University (2)**
36:6,7
**unless (1)**
52:18
**up (52)**
6:8;7:3;8:25;9:1;
10:11,15;15:14;16:14,
16,18;17:14;18:12;
19:3;20:24;21:24;23:9;
25:11;27:2;28:23;
29:11;31:21;36:10;
37:24;40:9;44:10;45:7;
46:2;53:20;61:15;
62:21;68:1;76:2;80:14;
88:11,25;89:12,16,18;
91:4;97:2;99:19;
102:12;104:10;107:2,
10,13;108:6;109:6;
110:22;111:11,11,14
**updated (1)**
12:5
**upon (13)**
30:25;42:11,17;51:1;
74:6,21;75:18,18,22;
78:4;83:24;85:15;
92:23
**upper (4)**
15:16;16:25;19:3;
65:20
**upwards (3)**
96:16,16,18
**urban (3)**
23:14;31:10;32:6
**usage (1)**
60:17
**use (34)**
9:12;13:19;29:11;
34:23;42:11;43:8,10;
52:11;58:11,12,13;
59:17;60:6;69:18;76:7,
19,21,24;77:15;78:18,
19;79:12;83:19,20;

85:4,16;86:19;91:5,7,
8;94:19;106:9;108:7,
23
**used (8)**
9:8;10:21;53:20;
107:17,20;108:2,14,16
**useless (1)**
108:9
**uses (8)**
41:20,22;43:22,23;
73:22,23;84:9;108:25
**using (3)**
5:13;16:19;22:3
**usually (4)**
9:7;64:17,19;96:5
**utility (1)**
17:5
**utilize (1)**
43:23
**utmost (1)**
97:25

**V**

**vacant (1)**
108:3
**valid (2)**
88:14;102:5
**valuable (4)**
51:13,16;84:14;
89:18
**variance (41)**
7:13,15;12:6,8;19:7;
30:7,9;31:1;42:23;
44:16;45:11,16,18;
47:8;49:8,12,13;52:16;
55:22;62:5,7,12,15;
69:11;75:4,17;76:6,16,
19;78:21;79:10;80:10,
17;81:3,3,5,13,23,25;
82:16;86:10
**variances (38)**
3:22;31:11;38:4,11,
22;39:8,20,22;40:3,10,
15;44:9;46:5,6;49:19;
50:8,14;55:24;62:3,9;
75:15;78:20;79:3;80:5,
18,24;81:17,20;82:1,
24;83:18;84:17,21;
85:18;86:22;87:3,23;
108:23
**variety (6)**
33:17;72:7,20;78:22;
84:8;87:14
**various (2)**
72:8;85:1
**vehicle (4)**
23:25;39:2;84:24;
85:21
**vehicular (2)**
23:13;24:7
**Ventura (4)**
6:9;19:25;26:4;27:7

**versus (2)**
62:14,20
**Victor (1)**
51:4
**view (2)**
20:10,12
**village (5)**
31:7,8,16;65:10;
95:19
**violating (3)**
60:19,19;74:6
**Violation (1)**
91:12
**violet (1)**
41:25
**visible (1)**
22:2
**vision (1)**
106:7
**visual (3)**
78:1,11;84:19
**voice (2)**
88:13;89:22
**vote (1)**
101:22
**voted (1)**
101:22
**voting (1)**
88:17

**W**

**waiting (1)**
34:6
**walk (3)**
17:13;57:1;67:14
**walkers (2)**
67:22;68:1
**walking (1)**
47:19
**walkway (1)**
82:20
**walkways (1)**
84:22
**wall (1)**
25:14
**Wallington (52)**
3:2,2,14,14,17,21;
4:16,18,20,23;9:11,14;
10:10,12,17;11:2,24;
14:12;16:10;21:17,20;
22:14,14,18;36:10;
42:14;45:20,20;46:1;
48:19,20,23;57:3;
58:12,13,16;90:8,13,
22;91:5,7,21,25;92:4,6,
25;93:10;100:16,19;
101:10,16;105:20
**Wallington's (1)**
72:3
**walls (3)**
8:15,18,18
**wants (2)**

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 47 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-14   Filed 04/30/26   Page 48 of 49
PageID: 2625
In RE: Morningside at Wallington                                    Transcript of Proceedings

46:3;64:25
**warehouse (6)**
20:14;37:12;107:9,9,
11;108:4
**warrant (2)**
39:5,6
**Washington (2)**
67:19;68:11
**Wasko (1)**
13:18
**water (6)**
34:24;67:20;68:14;
88:22;103:10,16
**waterfront (1)**
67:20
**way (39)**
6:11,12,13,13,16;
19:9;24:22,23;25:24;
26:1,3,9,20,20,23;27:6,
11;28:13,17,20,23;
29:1,2,3,4;48:13;49:8,
10,11,20;50:21;59:8,9,
11;60:1;88:25;94:25;
104:1;107:20
**weigh (1)**
40:12
**weighing (1)**
79:10
**Welcome (9)**
10:10,12,16,20;
11:24;21:17,20;22:14;
34:24
**welfare (2)**
77:1;83:23
**well-being (1)**
77:18
**west (4)**
8:23;28:10;42:13,15
**Westmount (3)**
57:9;101:6,19
**what's (13)**
5:22;24:19;25:8;
28:22;41:25;42:8;53:4;
58:11;69:22;83:7;
103:3;104:12;110:5
**wheelchairs (1)**
68:1
**whole (10)**
33:5;47:10;53:13;
57:11;60:6;75:11;
81:12;85:25;90:24;
108:1
**wide (5)**
6:18,19,25;10:17;
27:7
**widening (1)**
110:13
**wider (1)**
35:6
**width (1)**
25:8
**window (3)**
16:17,17,18

**windows (2)**
17:10;28:7
**wise (3)**
38:8,9;39:2
**wishes (1)**
109:14
**wishing (2)**
94:11;109:5
**within (13)**
4:6;23:16,19;32:1,
16,17;37:18;43:24;
54:19;72:6;92:25;
93:15;103:12
**without (2)**
15:15;84:2
**witness (7)**
13:3;14:9;34:10,12,
19;36:18;61:18
**witnesses (3)**
30:1;43:2;109:20
**wives (3)**
60:23;61:1,2
**woman (1)**
88:7
**wood (1)**
9:6
**Woodbridge (1)**
100:19
**work (12)**
22:15;40:4;45:3;
59:3;80:7;81:12;85:25;
96:2;110:16,25;111:4,
5
**worked (5)**
22:7;54:4,7;68:12;
101:4
**working (5)**
3:4;5:9;36:8;53:3,11
**works (9)**
39:3,4;56:12;60:1;
75:13;77:23;91:18,20;
95:1
**worried (2)**
29:16;69:25
**worries (1)**
61:25
**worst (1)**
70:4
**write (1)**
22:14
**written (2)**
19:9;23:15
**wrong (7)**
25:15;59:15;102:6;
105:20,23;106:2;
107:25
**wrote (1)**
11:15
**WYGONIK (11)**
42:8;63:15,19,25;
64:5,12,17;66:7;69:5,
9;99:2

## Y

**ya (1)**
31:14
**yard (14)**
40:24,25;41:10,11;
42:23;44:17;45:11;
73:4;74:4,24;75:6,17;
81:3,11
**yards (1)**
103:12
**year (4)**
91:6;96:13,13,15
**year-and-a-half (1)**
101:25
**years (23)**
9:12;13:18,20;48:5;
53:8;71:2;73:8;86:17;
93:15;96:17;99:23;
100:4;101:1;102:1,2;
104:1,3,4,8;105:18;
107:8;108:1,3
**Yoga (5)**
17:4;43:17,23;60:9;
77:12
**young (1)**
96:6
**younger (1)**
53:25
**Yup (1)**
22:20

## Z

**zero (3)**
74:9,25;75:6
**zone (12)**
43:4;54:7,20;73:1,6,
13,20;75:5,6;80:2;
82:3;108:9
**zoned (3)**
43:4;107:8,20
**zones (5)**
107:2,2,3,3,4
**zoning (31)**
12:5;14:1,4;38:10;
40:5;50:9,22;60:1;
71:20;73:12,25;74:2,8,
24;82:8,8,15;83:3,5,12,
17;84:6;87:12;97:12,
14;100:15,25;106:24;
107:5,6;108:14

## 0

**07 (2)**
63:8;93:8
**09 (1)**
67:1

## 1

**1,170 (1)**
15:19
**1,225 (1)**
15:19
**1,800 (1)**
103:17
**10 (8)**
22:24;92:14,24;
93:14,15;99:23;101:1;
105:18
**10:40 (1)**
112:1
**100 (7)**
50:25;53:13;71:4;
104:14,20;105:1,1
**11 (5)**
63:14,22;64:2;66:22;
73:8
**11.7 (1)**
63:3
**110 (1)**
104:21
**115 (1)**
104:22
**118 (1)**
104:23
**120 (1)**
104:23
**13 (8)**
38:18;63:20,21;64:3;
90:10,24;92:4,9
**13.8 (2)**
63:1;67:3
**134 (1)**
3:18
**14 (2)**
18:22;25:12
**15 (8)**
15:20,21;17:14,17;
43:5;66:1;73:17;104:8
**15th (2)**
110:8;111:25
**16 (2)**
25:12,12
**16th (3)**
4:1,14;43:9
**18 (5)**
6:19;15:25;25:23;
26:3;27:7
**1999 (1)**
36:9

## 2

**2 (2)**
22:25,25
**2.5 (2)**
11:9,14
**2.8 (5)**
11:5,15,15,19,23
**20 (24)**
6:18;13:18,20;23:25;
43:6;54:9,9,19,22;

**1,170 (1)**
55:15;56:3,8,9,10;
73:14,15,17;80:21;
92:9;101:10,14,16,21;
107:10
**200 (3)**
4:6;12:13;98:23
**2006 (3)**
71:22;72:1,22
**2008 (4)**
53:18;71:23;72:25;
106:21
**200-something (1)**
63:16
**2013 (2)**
71:23;73:4
**207 (5)**
73:17;98:24,25;99:2,
3
**208 (3)**
73:16;90:22;98:19
**22 (9)**
17:15,23;27:1,24;
29:7,11;35:7;74:7,25
**23 (6)**
17:21,25;18:4,4,9,10
**24 (10)**
6:18;16:1;25:10,15,
22,23;26:3,25;29:11;
35:7
**25 (6)**
17:14,16,22,23;
68:21;74:7
**26 (2)**
18:5,11
**28 (1)**
96:18

## 3

**3 (1)**
78:25
**3,500 (1)**
17:5
**3.5 (1)**
11:24
**3.65 (3)**
37:6;54:17,19
**3.650 (1)**
54:18
**30 (13)**
54:25;66:6,6,7,8,16,
16,18,22;67:2;96:17;
99:14;106:24
**30-year-olds (1)**
68:22
**33 (1)**
99:12
**35 (3)**
66:17;100:4;104:1
**35.01 (3)**
3:20;37:5;74:10
**35.02 (5)**
3:16;38:18;44:3;

74:10;78:25
**365-25 (2)**
   73:25;80:20
**365-25g2 (1)**
   80:22

## 4

**4 (2)**
   22:24;65:19
**40 (7)**
   56:4;66:5;80:23;
   99:12,14;101:11,14
**41 (1)**
   99:9
**43 (1)**
   55:4
**45 (1)**
   68:18
**47 (1)**
   68:11
**48 (1)**
   19:7
**49 (1)**
   19:13

## 5

**5,000 (1)**
   107:9
**50 (3)**
   68:18;103:15;107:8
**500 (1)**
   90:22
**551 (2)**
   3:24;37:5

## 6

**60 (4)**
   16:12;54:24;67:25;
   107:8
**648 (1)**
   35:22
**66 (1)**
   94:21

## 7

**70 (3)**
   16:12;101:14,15
**700 (2)**
   98:7,12
**71 (3)**
   3:16,20;37:5
**73 (20)**
   3:22;43:5;55:2,3,17,
   25;56:16;60:15,16,20,
   21;61:2;63:18,19;64:1,
   17,19;98:18;99:5;
   104:14
**74 (1)**
   99:1

**750 (1)**
   15:18
**7th (1)**
   4:8

## 8

**80 (1)**
   13:9
**800 (1)**
   15:18
**8-15 (1)**
   110:7
**850 (1)**
   98:13

## 9

**9 (1)**
   15:25
**90 (1)**
   90:7