# EXHIBIT L

# In The Matter Of:

*In RE: Wallington*

*Transcript fo Proceedings*

*September 19, 2017*



**RIZMANRAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ  07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

Page 1

TOWNSHIP OF WALLINGTON
PLANNING BOARD

X-----------------------------------X
In the matter of:
                                    TRANSCRIPT
MORNINGSIDE AT WALLINGTON, LLC          OF
551 Main Avenue                     PROCEEDINGS
Block 71, Lot 35.01
        -AND-
NEW WALLINGTON HOME, LLC
551 Main Avenue
Block 71, Lot 35.02
X-----------------------------------X

                    Tuesday, September 19, 2017
                    54 Union Boulevard
                    Wallington, New Jersey 07057
                    Commencing at 7:47 p.m.

BOARD MEMBERS PRESENT:

STANLEY BAGINSKI, Chairman
NICK MELFI
DARIUSZ PAWLUCZUK
TOMASZ BAZEL
KATHY POLTEN
THERESA WYGONIK
EUGENE RACHELSKI
ROBERT KASPEREK
MARK TOMKO, Mayor

EVAN JACOBS, PP, Board Planner
DOROTHY SIEK, Board Secretary

A P P E A R A N C E S:

MARTIN S. CEDZIDLO, ESQUIRE
Attorney for the board

SILLS, CUMMIS & GROSS, P.A.
BY:  KEVIN J. MOORE, ESQUIRE
     VICTOR J. HERLINSKY, JUNIOR, ESQUIRE
Attorneys for the applicant

Page 2

                I N D E X

WITNESS                         EXAMINATION
CALISTO BERTIN                       5
BRIGETTE BOGART                      7
JACK RAKER                          42

        EXHIBITS MARKED FOR IDENTIFICATION

NUMBER        DESCRIPTION              PAGE NO

A-9           Proposed parking              5
              restrictions

A-10          Conditional County approval  57
              dated 9/13/17

Page 3

MR. BAGINSKI: Moving on to the old business before the board, that will be the site plan for Morningside at Wallington, LLC and from New Wallington Home, LLC.

MR. MOORE: It doesn't work.  I'm loud, I'm loud.

MR. BAGINSKI: I think we'll be able to hear you.

MR. MOORE: Yup.  Good evening, Mr. Chairman, members of the board. Just for the record, my name is Kevin Moore. I'm with the firm of Sills, Cummis and Gross representing New Wallington Home, LLC and Morningside at Wallington Home, LLC on two related applications. Just to refresh the board's memory, the application for Block 71, Lot 35.02, the New Wallington Home, LLC project, is for amended preliminary and final site plan approval for an approved 134-unit multifamily project, and the applicant -- application for adjacent -- adjacent Block 71, Lot 35.01, the Morningside at Wallington Home, LLC project, is for preliminary and final site plan approval and C bulk variances for a 73-unit multifamily project.  Both properties have

Page 4

a street address of 551 Main Avenue here in Wallington. The hearings this evening on the two related applications are continued from the board's July 18th hearing.  Due to the cancellation of the August 15th meeting, we re-noticed for this hearing so I'd request the board just acknowledge the re-notice and -- and jurisdiction.

MR. CEDZIDLO: Yes.

MR. MOORE: Thank you.

MR. CEDZIDLO: And I -- I -- I spoke with your office earlier on time.

MR. MOORE: Yes.  Before we -- when -- when the July 18th hearing concluded, as you may recall, we were in the middle of the direct testimony of the applicant's planner for the Morningside at Wallington Home project. Before we continue our planner's testimony on the Morningside at Wallington Home project, however, I would like to briefly recall Mr. Calisto Bertin, the applicant's engineer, to discuss the changes made to the filings for the project that were a concern to the board. Mr. Bertin has been previously sworn and previously qualified.

Page 5

MR. BAGINSKI: Correct.

MR. BERTIN: Thank you.

MR. MOORE: And the exhibits that Mr. Bertin will be speaking from is Exhibit A- -- will be Exhibit A-9 which he is marking, and if it's helpful -- Adam, do you have them?

MR. FAIELLA: Yes.

MR. MOORE: -- these are also A-9 we can hand out for the board so they can follow along 11 by 17's of what Mr. Bertin is testifying from on the -- on the -- on the easel.  Mr. Bertin?

MR. BERTIN: Thank you.

(Whereupon A-9, Proposed parking restrictions, is marked for identification.)

MR. BAGINSKI: Just real quick, if anybody does have a cell phone on if you can just turn them off.  Thank you.

MR. MOORE: Gee, I wonder if someone has a cell phone on.  Okay.

MR. BERTIN: Great.  We -- we just prepared an exhibit rather than submitting new plans because this change is minor to show proposed parking restrictions.

There was concern about fire lanes and so forth.  So we -- we have two colors here.  The pink

Page 6

color is -- we put, "No Parking, Fire Lane," that would be all the curb lines against the buildings.  Then we had another in yellow.  It's shown "No Parking Any Time" would be the remainder of the curbs and we could modify that, this is just what we wanted to put in.

MR. BAGINSKI: Okay.

MR. BERTIN: But anyway, so this way -- because we -- we had previously shown you the -- the fire truck routes and the delivery truck routes.

MR. MOORE: Is there any questions for Mr. Bertin?

MR. MELFI: I have a question.  Has -- has this been submitted to the fire official or the fire chief in regards to the fire lane markings of where they would want to mark, and do we have a report or did we ever get a report or did you ever get a report from either the fire chief or the fire official stating where they would like to have the yellow striping and their --

MR. MOORE: Yeah, we -- we did not, but we would certainly if the board found it suitable to grant us an approval accept any approval of that as a condition.

Page 7

MR. MELFI: Okay, because I think that's important --

MR. MOORE: That would be fine.

MR. MELFI: -- just to have it.

MR. MOORE: We would accept approval from the -- the fire department as a condition of any approval the board sought to -- to grant.  Any further questions for Mr. Bertin?

MR. BAGINSKI: Board members?  Any board members have any kind of questions for him?

MS. POLTEN: Not at this time.

MR. BAGINSKI: Not at this time, okay.  Thank you.

MR. MOORE: All right, thank you.  Then I'd like to recall Miss Bogart who is also previously sworn and qualified.  She's our planner and we broke off in the middle of her testimony --

MR. BAGINSKI: That is correct.

MR. MOORE: -- last month.

MR. BAGINSKI: Okay.  Good evening.

MS. BOGART: Good evening.  How are you?

MR. BAGINSKI: All right.

MS. BOGART: We're missing our table --

Page 8

MR. BAGINSKI: Okay.  So --

MS. BOGART: -- and a chair.

MR. BAGINSKI: Chair's are -- you got one there?

A VOICE: There is one back there.

MS. BOGART: I don't mind standing, that's fine.

A VOICE: We do have one for you.  There you go.

MR. MOORE: That's a heavy chair.  It's not heavy, it's my chair.  And, Ms. Bogart, you had concluded your testimony at the last meeting with the variance from 3 -- Section 365-25G1 and 2 which dealt with the separation of buildings.  So I guess now you would start with your testimony regarding building height.

MS. BOGART: Sure.  As I don't know if this board recalls or not because it was kind of a lengthy evening, I did go through all the -- a number of variances that we are requesting, and most of them are due to the fact that we are combining two lots and keeping an existing building on-site, two unique conditions which create the need for rear yard variances and coverage

Page 9

variances, mostly because we have to accommodate that existing building and make the most appropriate circulation patterns as designed by the engineer.

I did go through, as I mentioned, a number of variances, and I probably have about four or five more to address.

MR. MOORE: Ms. Bogart, just to clarify it for the record, you didn't mean we're combining the two lots that are the subject of this application, right, because they're two separate lots?

MS. BOGART: No, what I actually meant was that because we have two lots the variances' condition -- the variance conditions for the setbacks have been created because we technically have lot lines even though it's being developed as one site.

MR. MOORE: Thank you.

MS. BOGART: So the next variances I had indicated is -- or as the attorney had indicated was to address maximum building height. Right now we're permitted four stories and 45 feet.  We are at 48.5 feet, and this is due to the slope of not only the roofs, but also the actual

Page 10

topography of the site itself.

Variance is needed for the roof design, but we're trying to keep it to match the surrounding buildings in the New Wallington Homes project.  We believe that this design for the roof slope is more appropriate because it resembles the properties surrounding it, and it was more consistent with the surrounding area.

We can comply by re-modifying the roof design, but we don't think that it's an appropriate architectural design or would promote any desirable visual environment compared to the surrounding area.

I believe that by requesting this variance we further a couple purposes of the Municipal Land Use Law.  Purpose A, to guide municipal action for appropriate use and development of all lands in a manner that will promote the public health, safety, and moreover, general welfare.  Again, this is because I believe it matches the surrounding development pattern.

And also Purpose I, to promote desirable visual environment through creative development techniques, and again, we could comply, but the

Page 11

reality is the sloped roof it matches the surrounding development pattern and is more appropriate architectural style -- styled for the neighborhood.

The benefits of granting the build -- the minor building height variances is that the size is consistent with the surrounding development patterns, the roof design is more attractive and matches the surrounding properties.

I don't believe that there's really any negative detriment to granting those variances because it's for Building 6 which is located to the rear of the site and it's minimized by its location.

It provides ground-level parking which, as I think I testified to at the last time, the need for the extra height on the ground-level parking creates -- also lends itself to this variance situation.

Conforming with the zoning ordinance would require a parapet which -- a parapet roof which I think is inconsistent with the surrounding development pattern.

So from a planning perspective being consistent with the neighborhood is not only one of

Page 12

the major goals of the Municipal Land Use Law, but zoning ordinances and planning goals in general. So I think for all those reasons granting this minor deviation in building height is more appropriate than requiring this applicant -- applicant to comply with the building height requirements.

MR. MOORE: And, Ms. Bogart, just for some clarification, the -- for Building Number 6 I guess the variance amount is 49.42 feet?

MS. BOGART: Yes.

MR. MOORE: And then 48.5 feet for --

MS. BOGART: Is for the building.

MR. MOORE: -- for the building itself.

MS. BOGART: Yes.

MR. MOORE: And then do you think this constitutes an improvement over the existing zoning for the reasons that you just testified to with respect to the architectural match and not requiring the parapet?

MS. BOGART: Yes, I believe so.

MR. MOORE: Thank you.

MS. BOGART: The next variance talks about the on-street parking is not permitted within

Page 13

50 feet of Main Avenue boundary, and 25-foot buffer along Main Avenue has to be planted with grass and shrubs.

Right now the applicant is proposing parking within .04 feet of Main Avenue and obviously a variance is needed. Currently the existing parking actually encroaches within the public right-of-way so we're improving the situation.

So that alone is a benefit. So not only we're pulling back the parking and putting it onto our property, but we're also creating a grass buffer area along Main Avenue. So there are a number of benefits to that -- this proposal.

I believe we further a couple purposes of the Municipal Land Use Law. Obviously, again, to encourage municipal action to guide appropriate use on developmentable [sic] lands.

Yes, we do need a variance, but this proposal provides for safe circulation on-site allowing us to maintain that existing building for recreational purposes and also allowing for us to improve it slightly and pull back the parking onto our property. So I believe for all those reasons we further Purpose A.

I believe that this furthers Purpose G,

Page 14

provides sufficient space in an appropriate location for a variety of uses.

As you heard from my testimony at the prior hearing, we further a number of the goals of the master plan. We are consistent with your zoning ordinance, we are doing what is contemplated by your master plan and zoning ordinance for this property, we are maintaining that existing building, and in order to accomplish all this we do need some minor deviations and that includes the modification to this setback for the parking because we are maintaining that building.

And as I mentioned to you, there are a number of benefits for lessening this existing nonconformity. We're making more efficient use of the existing layout, we're providing efficient traffic layout, we're providing sufficient parking for the residents at the same time, and the proposed lawn area along Main Avenue is more consistent with the surrounding development pattern and an improvement upon existing conditions.

I don't believe that there's any negative impact to this because we are improving the existing conditions.

The engineers have testified to the safety of

Page 15

this area and this design and there are no issues. They've testified that it is an improvement, and this property has existed with the parking encroaching upon the right-of-way since at least 2002 and there have been no issues, and so improvement can only help the site and the surrounding area.

So from all those perspectives I believe that this board has a right to grant the variances for that encroachment into the front yard setback.

MR. MOORE: And, Ms. Bogart, it was also for Section 36 -- 365-25M3 for the 25-foot buffer as well, right?

MS. BOGART: Yes.

MR. MOORE: Plus the surface parking.

MS. BOGART: It's --

MR. MOORE: Thank you.

MS. BOGART: Yes. There are two additional variances that I need to address. One -- the last one will be for signage, but this -- this last area in bulk regulation variance is for building coverage and lot coverage. Your ordinance permits 25 percent building coverage and 75 percent lot coverage. We are proposing 30 percent building coverage so

Page 16

approximately 5 percent over and 83 percent lot coverage, again, approximately 8 percent over.

This site increases due to the fact that we need to accommodate that existing building. We're trying to provide for appropriate fire truck circulation and fire and appropriate parking for the site so that increases the coverage requirements.

As you heard from my testimony at the prior hearing two months ago, this density and this proposal is basically complying with your master plan goals and this density is permitted on-site. We are providing sufficient parking and the only deviations with regard to the coverage have to do with the site design, and the site design is laid out as such because of those unique conditions that I had testified to with regard to accommodating existing building and providing appropriate circulation.

By granting these two coverage variances I believe that we further Purpose A, again, municipal -- to guide municipal action for appropriate use in development of all lands, and this goes back to the heart of the fact that your master plan and zoning ordinance call for this type of development on this

Page 17

site. Purpose G, to provide for sufficient space and appropriate locations for a variety of uses both public and private and to meet the -- all the needs of New Jersey citizens.

Again, this density is permitted. We're providing affordable housing on-site which is an important component to our application and a substantial benefit to New Jersey citizens and also goes to the heart of furthering the goals of your master plan.

Purpose J, to promote the conservation of open space and energy and prevent the degradation of the environment through improper land uses.

We are maintaining those buffers around the site and maintaining the environmentally constrained land, and we are developing the site in accordance with your zoning ordinance so I believe that we further Purpose J.

Purpose M, encourage coordination of various public and private procedures and activities shaping land development in view of lessening the cost of development and more efficient use of the land, and this goes to the whole concept of redeveloping the site and maintaining that existing

Page 18

building while also doing what your master plan and zoning ordinance calls for.

And lastly, Purpose O, to encourage development of balanced housing supply, and this is also identified in your master plan, and as I had mentioned to you just previously, we are providing affordable housing which is a need in the borough and called out in your master plan documents.

There are a number of benefits to granting the coverage variances. We're lessening the existing nonconformities. We're reusing the existing building, albeit in order to reuse it we have to increase the -- the coverage slightly.

We're providing a family recreation facility for residents, we're providing affordable housing choices with appropriate parking as called out by your ordinance and we are meeting your active recreation requirements of 25 percent open space.

As you heard from our engineer, the proposed storm water management and water quality controls are adequate and provide additional improvements to the site, and those are really only the negatives that are associated with increasing the coverage slightly, and in this case they've been taken care of.

Page 19

So for all those reasons I believe that there's really no negatives to the coverage, and I believe that the benefits outweigh any negatives that could possibly be associated with it, and I believe this board has a right to grant the coverage variances as requested.

MR. MOORE: And would you also offer the same benefits and reasons that you set forth, Ms. Bogart, that it represents an improvement over the existing zoning?

MS. BOGART: Yes. So the last variance pertains, as I mentioned to you, the monument sign. They're prohibited, but I think to provide for --

MR. MOORE: We have the active recreation.

MS. BOGART: We comply with that.

MR. MOORE: We comply now?

MS. BOGART: Yes.

MR. MOORE: Excellent.

MS. BOGART: So with regard to the monument sign I think it's very important from a planning perspective to create a sense of place and provide for that monument sign which it not only identifies the development, but also gives a nice

Page 20

entrance and sort of creates a nice environment for the residents that live there.

I believe that by granting this monument sign we further Purpose I which promotes desirable visual environment for the property.

It will identify the property not only for emergency services purposes, but also for residents and guests alike which actually increases traffic safety and allows the visitors to identify it quickly without having to make several U-turns along the street.

The sign design as proposed today was revised based upon board comments, and we believe that at this point in time we have a design that is most appropriate for the site and takes into accommodate -- into consideration your comments. I believe it's appropriate for the neighborhood, and for all those perspectives I think that the benefits of granting the sign variance as requested outweigh any detriments.

There is a monument sign located across the street so I don't think it's out of character with the neighborhood, and I think overall it would create an aesthetic benefit to the property.

MR. MOORE: And for that reason you

Page 21

think it's a better zoning alternative as well?

MS. BOGART: Yes, I do.

MR. MOORE: That concludes -- unless I'm wrong, Ms. Bogart, that concludes Ms. Bogart's direct testimony.

MS. BOGART: Yes.

MR. BAGINSKI: Now in regards to -- I have a question for you in regards to the open space versus active recreation area, and you say you meet now the standard of what we're supposed to?

MS. BOGART: The 25 percent, yes.

MR. BAGINSKI: And is the enclosed building considered open space?

MS. BOGART: It's considered active recreation.

MR. MELFI: It's not considered open space.

MR. BAGINSKI: But it's not considered open space?

MR. MOORE: No, we still need then -- we need and testified in support of the variance for the open space, but it is active recreation so we meet the active recreation requirement.  It's two separate provisions of the ordinance, two

Page 22

separate ordinance provisions.

MR. BAGINSKI: Okay.  So I just want to clarify that so everybody's understanding the difference between the two and what we have here.

MS. BOGART: The -- the zoning ordinance does state that the open space can be in the form of active recreation.

MR. BAGINSKI: Okay.

MR. MOORE: But out of an abundance of caution we have requested that variance, but we do believe we conform, but we -- you know, that's up to the board for their interpretation, but we did seek that variance notwithstanding that fact.

MR. BAGINSKI: Okay.  I just -- again, I just wanted clarification for the board members this way if they do have any questions they can ask them, and now's the time to ask Ms. Bogart any questions that you or anyone might have as far as the board members go right now.

MR. KASPEREK: I do have a question.

MR. BAGINSKI: Go on.

MR. KASPEREK: Can you please bring the previous screen that you had with the -- you know, with the lines, the red and the yellow, please?

Page 23

MR. BAGINSKI: And is this question for Ms. Bogart or Mr. Bertin?

MR. KASPEREK: I'm sorry, for Mr. Bertin.

MR. BAGINSKI: Okay, go ahead.

MR. KASPEREK: The project itself seems very congested to me. On the one side on the top you have the railroads, on the left-hand side you got a river. You only have one entrance, right, for the -- for the whole complex? And then, you know, for the other variances that we're hearing you're trying to, you know, fit another building, and what happen is the -- in case of emergency of any kind of fire trucks, police, you know, any ambulances how the one entrance, one exit going to fit all the -- you know, you -- did you -- and also, Mr. Mayor, you're kind of an expert on this.

MR. TOMKO: Well, we were -- we were going over it the last -- the last meeting.

MR. KASPEREK: In the last meeting I know, but only with one entrance, one exit, would that be sufficient for --

MR. TOMKO: Well, I mean, that's

Page 24

normal in a lot of --

MR. KASPEREK: It is normal in a lot of them, okay.

MR. BERTIN: And we actually have a second driveway that we have, it's an existing driveway. We kept it as an entrance only because it's next door to -- it's very close to another driveway.  So in the case of an emergency, you know, fire trucks will go wherever they can fit.

MR. KASPEREK: Okay, just in case. All right.

MR. BAGINSKI: Do any other board members have any questions for Ms. Bogart or Mr. Bertin?

MR. MELFI: Ms. Bogart, if we were to eliminate that building, how many variances would we save?

MS. BOGART: Which one?

MR. MELFI: It would be the recreation building.

MR. MOORE: I believe it was four.

MS. BOGART: It's four.

MR. BERTIN: It's 17 percent of the site.

Page 25

MS. BOGART: So we would eliminate the coverage variances.

MR. PAWLUCZUK: Setback variances.

MS. BOGART: Probably the -- the parking setback variances. I don't believe we would -- well, we could possibly eliminate the building separation variances. The maximum building height obviously would still remain. So probably 95 percent of the variances across the --

MR. BAZEL: Open space?

MS. BOGART: Well, like I said, the ordinance says that active recreation will count as open space. So if you want it as active recreation that's as proposed, but if you take away the building then you could provide additional open space.

MR. PAWLUCZUK: Okay.

MR. BAGINSKI: Okay. Anyone else have any questions for the witnesses?

MR. RACHELSKI: Just a quick question. As far as the height variances these are for which buildings?

MS. BOGART: Building 6 in the rear is at 49.5 feet I believe.

Page 26

MR. RACHELSKI: Okay.

MS. BOGART: And Building 7 and 8 and as the engineer had testified to, depending upon whether they're considered one building or not. If they are two separate buildings then they'd require a height variance. If they're one building they don't.

MR. RACHELSKI: Yeah, okay. It's -- it's just a matter of -- of an appearance while someone is looking from the main entrance.

MS. BOGART: From the main entrance?

MR. RACHELSKI: It's a little bit taller I guess. Would -- would that be visually the same? The building's set -- Building A, right, is that the one --

MS. BOGART: That --

MR. RACHELSKI: -- closest to the main, right?

MS. BOGART: Yes, but that's the one with only the 3-foot deviation --

MR. RACHELSKI: Okay.

MS. BOGART: -- and that's based upon the slope, and from a planning perspective I think you would -- it would make more sense and be more aesthetically pleasing to have that slope in the

Page 27

roof with a slightly higher roof setback.

MR. RACHELSKI: I'm thinking about maintaining the same slope.

MS. BOGART: That's what I think though.

MR. RACHELSKI: Well, that's -- that's -- but I mean, the major purpose of the -- of the -- the height variations is to stick those additional parking spaces there.

MS. BOGART: But you do have to understand that the applicant could provide a parapet roof and completely comply with the zoning ordinance, wouldn't require a variance --

MR. RACHELSKI: That's definitely an option.

MS. BOGART: -- and it wouldn't be appropriate for that streetscape. So I think this is the most appropriate design.

MR. RACHELSKI: Thank you.

MS. BOGART: Thank you.

MR. MELFI: So getting back to the buildings they're all going to have a ridged roof. None of these buildings are going to the flat, correct?

MS. BOGART: Correct, right?

Page 28

MR. BERTIN: No.

MS. BOGART: No?

MR. BERTIN: No.

MS. BOGART: Sorry.

MR. BERTIN: Building 8 has a flat roof.

MS. BOGART: Okay.

MR. RACHELSKI: Building 8 has a flat roof. Are you going to tell me that? You just told me it's a slope.

MS. BOGART: I though it was a slope roof.

MR. RACHELSKI: Let's get it straight, guys.

MR. MELFI: I mean, my -- my issue with the flat roof on the building is at the last hearing at the -- and I know I brought it up the last time too -- your witnesses swore they didn't want a flat roof because of issues of leaks and we granted the variances.

MR. MOORE: Actually, with no disrespect intended, we checked the transcripts from those hearings and there was no mention of leaks. It was strictly aesthetic.

MR. MELFI: Okay. Anyway, they

Page 29

wanted it that way.  So wait a minute. We granted them the variance because they wanted to put the pitch roof -- the ridge roof because it would --

MR. MOORE: Right.

MR. MELFI: -- aesthetically look nicer and it's symmetrical, and now you're coming back and saying you want a flat roof because it's going to be aesthetically nicer.

MR. RACHELSKI: And they want the variance too.

MR. MELFI: And -- yeah.

MR. RACHELSKI: Mr. Melfi, if I can ask you.  So the actual height of the building is measured from what point?

MR. MELFI: Going midway to midway at peak.

MR. RACHELSKI: I know, but I'm just saying from the ground?

MR. MELFI: Right.

MR. RACHELSKI: Okay.  So when we do the flat roof, why -- why such a --

MR. MOORE: Ms. Bogart has I think something she'd like to respond to.

MS. BOGART: No, I just wanted to

Page 30

show them the building elevations and my mistake. Building 6 is the one with the -- the sloped roof and that's the one in the rear, and this is Building 8 and it has a larger first floor due to the recreation facility in the -- in the front.

MR. MOORE: And as the architect had testified to the board -- I can recall him -- it's the recreational area that creates the -- and higher first floor that creates the need for the height variance.

MR. RACHELSKI: So aesthetic aspect is not really a factor in that?

MR. MOORE: Not on this one though I think it's --

MR. RACHELSKI: It should not be considered.

MR. MOORE: -- attractive.

MR. RACHELSKI: Yes.

MR. MOORE: For the second one it should be.

MR. RACHELSKI: No, but I'm just saying for the one, the first building in this spot, you know, then that argument that you want a pitched roof because --

MR. MOORE: Well, this one's right on

Page 31

the streetscape --

MR. RACHELSKI: Yes.

MR. MOORE: -- and the other one it blends with the rest of the development.

MR. MELFI: You said the reason for the -- for the variance and the flat roof is because of the recreation on the first floor?

MR. MOORE: Yes.

MS. BOGART: It requires a -- a greater ceiling-to -- floor-to-ceiling height.

MR. MELFI: I understand that, but I thought that's why we're keeping this building for recreation.

MR. MOORE: Well, we're providing a lot of recreation.

MR. MELFI: That building is pretty big considering that the testimony from your applicant is it's just going to be for the 73 units that were going to be put on this property.

MR. MOORE: Right, plus the town, plus -- and -- and that is the case and we would, you know, accept if the board chose to grant an approval a condition to that effect, but we're also providing for the large building at the board's request that the town residents can utilize that

Page 32

building.

MR. RACHELSKI: But before that approval, can we sign a -- sign a lease for usage?

MR. MOORE: We can make it a condition of the approval, that's --

MS. BOGART: You can say --

MR. MOORE: -- just as binding as a lease.

MS. BOGART: That would mean that basically we can't build the --

MR. MOORE: Can't build the building --

MS. BOGART: -- the project without it.

MR. MOORE: -- without meeting that condition and can't continue to occupy the premises without meeting that condition.

MS. POLTEN: I have a question.  If the recreational use is going to be there for the town, who is responsible for the insurance and everything?

MR. MOORE: That's something that I think we can resolve through conditions.  My client, unfortunately, is not here.  So we'll have to address those insurance issues.

Page 33

MS. POLTEN: And liability and all that stuff as well as the money.

MR. MOORE: We would have to address that I think as part of the condition.

MS. BOGART: I -- I think that would be worked out with the governing body, and this board can make it a condition of approval that you -- that we have to work that out.

MS. POLTEN: If we were to deem that we didn't want this -- this is just a hypothetical -- how would that building -- how would you --

MR. MOORE: We would still utilize it for recreation for the residents of the community and we're not sure yet. I know we -- Mr. Nuckel discussed like putting a basketball court in there.

MS. POLTEN: Okay. So then -- then the -- the building would stay the same. You wouldn't change it to -- to have the -- the required -- the -- not a flat roof, but the pitched roof?

MR. MOORE: No.

MS. POLTEN: Okay.

MR. MOORE: Yeah, talk about a height variance.

Page 34

MS. BOGART: That would actually just increase the -- the height requirement or the required height that we would need.

MR. BAGINSKI: Okay. Any other questions for the --

MS. WYGONIK: Yeah, I have a question, something that you testified last time we were here, and it was the fact how many children would attend school from the Morningside and you said about 13, but what I'm mainly concerned about is you said you went to the school official and he said he doesn't have that information so you didn't get any information. Did you do anything like an OPRA request where he would be required to provide some kind of information for you or did you just go and ask him and he said, I don't have that information?

MS. BOGART: It was a verbal request and I was told that that information isn't compiled based upon addresses or apartments versus non-apartments.

MS. WYGONIK: Because I'm sure if you go and redo a -- an OPRA request you can get better information.

MR. MOORE: Well, no, because they

Page 35

would -- don't have it.

MS. BOGART: They didn't have it.

MR. MOORE: So you can't OPRA what you don't have.

MS. WYGONIK: What -- what do you mean you don't have? I mean, they must know.

MR. MOORE: They didn't -- they didn't compile --

MS. WYGONIK: They have -- they have access.

MR. MOORE: They said -- they told Ms. Bogart they didn't --

MS. BAUMANN: Wait.

MR. BAGINSKI: Hold on, we can only have one person talking at a time.

MS. WYGONIK: I don't understand how they could not have it when they have addresses where the children attend the school from like the Jasontown Apartments or the Mount Pleasant Apartments that they must have that information. I'm sure it would take time for them to gather it, but through an OPRA request you may get better information than just a verbal, We don't have it.

MS. BOGART: That may be --

MS. WYGONIK: Okay.

Page 36

MS. BOGART: -- but it -- it --

MS. WYGONIK: But you didn't do an OPRA request, that was my main question, okay.

MS. BOGART: I didn't do a written OPRA request. It was just a conversation on the phone.

MR. BAGINSKI: We can actually possibly have that question answered. We can have our superintendent speak on that matter over here, but I'm going to do that during the open meeting for the public and then we'll have --

MR. MOORE: Great.

MR. BAGINSKI: -- Mr. Albro speak about that some more.

MR. MOORE: And I would just caution the board without being unduly argumentative, and we've designed this complex to minimize, you know, the type of units and the statistics, and all the studies that Ms. Bogart testified to last time showed that, you know, this will not generate a lot of schoolchildren, but that's also not a valid basis for a decision on an application as I'm sure you all know and as your attorney will tell you.

MS. BOGART: So if I could just

In RE: Wallington

Page 37

follow up because I know that was a concern last time, and I did testify that the Rutgers' numbers showed in Northern New Jersey there would be approximately 13 schoolchildren coming from this development.

I also testified that I had done studies myself and that that resulted in approximately five schoolchildren based upon Northern Jersey towns, and I was also asked if I could look at towns that are similar to Wallington and try to get that information.

Unfortunately, I was unable to do that. A lot of towns don't like to give that information. They feel that that's private as far as the addresses of the -- the children.

I did pull up some additional Rutgers' numbers, and there is a study that shows public schoolchildren generated from transit-oriented development and a number of these -- there's about ten projects that are listed, and most of them are from West New York.

So I tried to pull up census data to try to consider how West New York relates to Wallington, and obviously it's a much bigger town, but it does have a lot of similarities with regard to number of

Page 38

people per household, number of people in the labor force, median income is similar.

Obviously Wallington is a little bit greater. Median income of Wallington from the census is $55,000, in West New York it's $45,000. The per capita income in the past 12 months -- this goes back to 2015 -- was about $5,000 off. So I believe there are some similarities when it comes to looking at affordable -- how housing is affordable and how the households are utilized.

So this study with regard to the ten properties in -- in the Rutgers' analysis had 1,132 units in West New York and of that had -- it -- it resulted in a .02 public schoolchild being created for each unit.

So that's even lower than my five that I had estimated last time. It's actually less than half. It's probably about two public schoolchildren coming out of this development.

So I can assure you that based upon the Northern New Jersey Rutgers' data, my own studies and this DOT data that I don't believe it's going to be more than 13 schoolchildren. In fact, I think it's going to be a lot lower, between five and maybe seven children coming out of that.

Page 39

MR. MELFI: You're talking for the full 207 units or just for this building?

MR. BAGINSKI: 73.

MS. BOGART: For the 73.

MR. RACHELSKI: I have just a quick question, I'm sorry, because you -- you refer to this one as a transit village.

MS. BOGART: Transit-oriented development.

MR. RACHELSKI: A transit-oriented, right. I mean, a little bit of a distance to the -- driving -- there's a driving distance, it's not a walking distance, for the --

MS. BOGART: You are, and the only reason I took this into consideration is because, as I mentioned to you, I couldn't get data from the surrounding area that you had asked for, and I thought that this might be another analysis that you could pinpoint to and kind of consider that it would be similar.

MR. RACHELSKI: Now the transit villages or transit-oriented villages are slightly different though.

You have the walking distance and -- and a -- and a -- the residence is usually different than --

Page 40

than -- you know, isolated from the quick connection to New York City.

MS. BOGART: Not necessarily because of the bedroom mix.

Once you have one or two children in a one- or two-bedroom apartment you're going to want that house. Once the child starts to walk and wants to go to school and wants to play outside you're going to want that yard.

You're not going to want to have -- to have your child play in a -- in a parking lot as we have. We don't really have the outdoor recreation, we don't have the playground.

You're going to want to move to someplace where -- that they could play. So from that perspective it's -- it's very similar.

MR. RACHELSKI: I think -- I don't remember the stance, but how many two-bedrooms, and you had some three-bedroom apartments too if I could recall?

MR. MOORE: Yeah, the three-bedrooms are required for the affordable housing.

MR. RACHELSKI: Yes, it's just -- just because, you know, a three-bedroom apartment is definitely going to generate "X" number of

Page 41

students so --

MS. BOGART: The three-bedrooms will, but that will be balanced by the one- and two-bedrooms.

MR. RACHELSKI: So how many two-bedrooms do we have?

MS. BOGART: Bear with me a second.

MR. BERTIN: I'm sorry, three.

MS. BOGART: Three?

MR. BERTIN: Three.

MR. RAKER: Three three-bedrooms.

MS. BOGART: Three three-bedrooms.

MR. RAKER: The affordable units.

MR. RACHELSKI: For the whole premises?

MR. MOORE: Yes.

MR. RACHELSKI: And two-bedrooms?

MR. RAKER: Are we talking affordable or market rate?

MS. BAUMANN: I'm sorry, sir, what is your name?

MR. RAKER: My name's Jack Raker.  I was the architect who testified.

MR. MOORE: He's previously sworn and qualified, yeah.

Page 42

MR. RAKER: Yes.

MS. WYGONIK: You're talking about just Morningside, not the whole complex, right?

MS. BOGART: Yes.

MS. WYGONIK: Right.  You're not talking about Morningside, that's not the whole complex.  It's just a little part, you know, 72 apartments.  Well, no, he said the whole -- the whole development and that's not -- not it.

MR. RAKER: So the total is 40 one-bedroom, 30 two-bedroom and then the three three-bedroom, that's total, that is inclusive of the low and moderate income.

MR. BAGINSKI: And, again, just to clarify, this is strictly for the 73 units that they're --

MS. BOGART: Right, the 73 units.

MR. MOORE: Right, because the others are already approved.

MR. BAGINSKI: Correct.

MR. MOORE: We're just seeking certain minor amendments.

MR. BAGINSKI: Okay.  Anyone else with any questions?  Okay.

MR. KASPEREK: You have no --

Page 43

MR. BAZEL: So we have two lots developed as one.  Was there an attempt to combine both lots at some point?

MR. MOORE: There's separate ownership.  They're -- they're related, but it's not entirely unified.  It's similar principals, but it's not exactly the same ownership.  So we did present a series of cross-easements so that they both work together, but it's not viable to consolidate the two lots.

MR. BAZEL: And this was -- yeah.  I mean, we have some setback variances that --

MR. MOORE: Right, because of that, but they're what we call "technical variances." It's on paper, but, you know, we've got all the cross-easements there.  You can't see the lot line, and we have cross-easements so that the development functions so that, you know, there's access and utilities and everything between the two.

MR. BAZEL: So there will be two separate ownerships?

MR. MOORE: There are two separate ownerships, there's two applicants.

MR. BAZEL: Okay.

Page 44

MR. MOORE: And as I said, they share common or they share the common principal of Mr. Nuckel, but I -- the -- the exact mix of ownership is not the same so you can't really consolidate them.

MR. BAGINSKI: Okay.  Anyone else with any questions?  Do you have any more testimony, Mr. Moore?

MR. MOORE: I have no more direct testimony.  I'd reserve a summation, but I do have -- I would like --

MR. BAGINSKI: Before you do that --

MR. MOORE: -- to just give our responses to the May 11, 2017 Neglia Engineering Associates report revised July 14th.

MR. BAGINSKI: I would just like to see if any of the residents that are here have any questions for the -- your professionals that have testified today, this way I'll open it to hear the citizens and then we can go through that.

MR. MOORE: Okay, fine.

MR. BAGINSKI: All right.  Board members, at this time --

MR. BAZEL: Just one more thing about the open space.  So by your definition you could

Page 45

throw some yoga mats in the underground parking --

MS. BAUMANN: I'm sorry, I just didn't understand.  Repeat again.

MR. BAZEL: So by your definition of "open spaces" if you throw some yoga mats in the underground parking, could you then -- could you consider it as -- as open space as well?

MS. BOGART: We have to go by your -- the zoning code for Wallington, their definition, and it says that open space includes active recreation facilities, but it doesn't define "active recreation" so --

MR. BAZEL: Okay.

MS. BOGART: -- maybe it could be yoga mats, I don't know.

MR. MOORE: We're going to have more active recreation than yoga mats.

MR. MELFI: The way you're interpreting it is what is -- the building is counting as being counted because --

MS. BOGART: Because it's a recreation center, yes.

MR. MELFI: -- because it's recreation, but it doesn't specifically say in the ordinance that it has to be enclosed or open.

Page 46

MS. BOGART: No, it just says active.

MR. MELFI: Active open space.

MS. BOGART: Active recreation.

MR. MOORE: And then it says open space can include active recreation.

MR. BAGINSKI: Okay.  Anything else? Okay.

At this time then I'd like to open it to the hearing of citizens.  IF there's anybody in the audience that would like to be heard or have any questions for the professionals that testified in regards to this now is the time to come up here, and you can ask whatever questions you need to about this application.  If you can just step forward.

MR. ALBRO: Good evening, I'm James Albro.  I'm the --

MS. BAUMANN: I just need to swear you in, please.

MR. ALBRO: I'm sorry?

MS. BAUMANN: I'm going to swear you in, please.

(Whereupon James Albro is duly sworn.)

MS. BAUMANN: And your name again,

Page 47

sir?

MR. ALBRO: James Albro, A-l-b-r-o.

MS. BAUMANN: Go ahead.

MR. ALBRO: Evening.  I'm the superintendent of schools in the -- the Borough of Wallington.

Just as a point of clarification, it came to my attention I believe in the July meeting that you were referring to that there was communication with my school district about the impact of -- of -- possible impact of high-density housing in our district in comparison to some other high-density housing projects.  I never received any request for any information whether formal or informal. The only other place that I think it could have gone would be my business administrator's office who's also the board secretary, and I spoke with him and he received no such request formal or informal.

MR. MOORE: Ms. Bogart, do you know who you spoke to?

MS. BOGART: I don't.  I can look that up, but I don't have that with me.

MR. MOORE: Okay.

MS. WYGONIK: Would you be able to

Page 48

provide information?

MR. ALBRO: I can provide whatever information I'm allowed to provide without revealing student identities and things like that, but --

MS. WYGONIK: Well, we're not asking for student identities, just the number of students maybe attending from either the Jasontown or the, you know, Mount Pleasant Apartments.

MR. ALBRO: Okay, and I would prefer it coming in the form of a formal request so I know exactly what it is that I'm answering.  I'm protecting my student data, but we can share any information that we're allowed to share.

MS. WYGONIK: Okay.

MR. BAGINSKI: Okay.  Thank you very much, Mr. Albro.

MR. ALBRO: Thank you.

MR. BAGINSKI: Okay.  Anyone else at this time wish to be heard?

MR. SMITH: Yes.  Mr. Chairman, my name is Joe Smith.  I'm a 44-year member of the Board of Education in Wallington.

MR. BAGINSKI: Hold on, you need to be sworn.

Page 49

MS. BAUMANN: I need to swear you in.

(Whereupon Joe Smith is duly sworn.)

MS. BAUMANN: Thank you, sir.  Go ahead.

MR. SMITH: The Borough of Wallington, the mayor and council, has been presented with a -- with which I assume that you are and you have a copy of -- of the Whitehall Association's evaluation of our school district where it -- it's pretty much right on the money with the increase of students. As you are well aware, we've had a -- when we had the closing of Sacred Heart School we had an increase of 60 students, but we really had an increase of 130 students, and since that enclosure [sic] we have maintained at least that and have been equally around that number since then. So that's public information that the -- that I believe you should have for future reference, but that was submitted to them, and I'm -- I'm -- I'm very aware if I get all the information here and we were never approached about that. So I -- I don't know.  There's nobody else other than the superintendent of schools, the highest official in the Borough of Wallington, who

Page 50

has all that information did not receive that from anybody.

MR. MOORE: I -- I would just like to point -- like to say to defend my planner, she's not a liar, she talked to someone, and, A, as I said, it's not relevant to your basis of decision, but she can certainly get that information to you.

MR. SMITH: I never said she was a liar, Coach.  I never said she was a liar.  I said that nobody is aware --

MR. MOORE: Well, you said you don't know where she got it.

MR. SMITH: Well, that's what I said, and I'll stand by that.

MR. MOORE: So then you called her a liar.

MR. SMITH: I didn't call her a liar. She maybe called the wrong municipality.  There's Wellington, maybe it was the wrong municipality.

MR. BAGINSKI: Listen, we're not here to argue about this.  Mr. Smith had a question, he spoke it and we'll leave it at that. Now, Ms. Bogart, if -- if you need to put the request in for the information that's fine, now you know what avenue to take, correct?

Page 51

MS. BOGART: Yes, I do, thank you.

MR. BAGINSKI: Thank you.  Okay, anyone else wishing to be heard at this time?  You can just step forward or -- or you want to do it right there?

MS. DABAL: Yeah.

MR. BAGINSKI: Just need to swear you in.

(Whereupon Melissa Dabal is duly sworn.)

MS. BAUMANN: Can I have your name again, please?

MS. DABAL: Melissa Dabal, "D" as in David, a-b-a-l.

MS. BAUMANN: Okay.

MS. DABAL: I was at that meeting I think you recall when you were talking about how many children were coming out of the school, and you did distinctively say that you put in an OPRA request, and I just want that to go on record. It was not a verbal request, you did say OPRA, and for me it defies logic that if you have "X" number of three-bedrooms, "X" number of two-bedrooms that there are going to be more than five children coming out of that complex.

Page 52

I'm sure people are not renting these units that are three- and two-bedroom to put a sauna in the additional bedroom or maybe a wine room. They're definitely going to have children there. So I'd like to know what is Morningside going to do to ensure that only five children come out of that complex moving forward.

MR. MOORE: Well, first of all, those three-bedrooms there are only three, and they're required by the affordable housing regulations, and it's illegal to ban children and it's illegal to deny applications for children.  The only way you can limit children is through age-restricted communities which this is not.

MS. DABAL: So -- so you're -- so basically what you're saying is there will be more than five children.

MR. MOORE: No, I'm not.

MS. DABAL: Well, you're saying that we can't restrict the number of children going there so I would assume that that means that there will be more than five.

MR. MOORE: No, Ms. Bogart has testified to why she thinks there will be five children, made it very clear on the record.

Page 53

MS. DABAL: Okay, thank you.

MR. BAGINSKI: Okay. Anyone else in the audience wishing to be heard in this matter? Okay, at this time then I'd like to close it to the hearing of citizens. Okay, Mr. Moore, you can --

MR. MOORE: Thank you. Just for the record and I'm --

MS. BOGART: Thank you.

MR. MOORE: -- referring to --

MR. BAGINSKI: Thank you, Ms. Bogart.

MR. MOORE: -- the report of Neglia Engineering Associates originally dated May 11, 2017, revised July 14, 2017, and most of these items in the report are largely informational or have been deemed satisfied so there's just a couple to point out where some explanation is required. Originally on the report in Item 5, "Application Completeness," it had been because we submitted the "location of all locations of proposed buildings and other structures having been shown and the uses on the buildings," that was rectified in a subsequent application -- a subsequent resubmission so there was no waiver request and that was withdrawn. And now I'm only bringing up, as I said, items

Page 54

that -- that aren't informational or that we do not agree to or require further explanation and that first one will be 6.12 which provides, "The applicant shall provide details for all proposed signage. Furthermore, the applicant shall indicate the dimensions of all signage on the site plan." The site monument sign is on the architect's plan, and we've submitted as part of testimony the "Welcome to Wallington" sign. To the extent anything more needs to be dimensioned on the plan that can be done through condition compliance if the board saw fit to grant approval, and again, that's Item 6.12. With respect to Item 7.11 it states, "The applicant does not indicate a sanitary sewer lateral for Buildings Number 7 and 8. "If the applicant intends to utilize the existing lateral the applicant shall provide capacity calculations and shall televise the existing lateral to confirm quality. A compact disc copy of the lateral shall be forwarded to our office." The sewer line for Buildings 7 and 8 is on the south side of the driveway so I also have Mr. Bertin here.

Page 55

MR. BERTIN: The last set of plans that were submitted show a sewer line coming along the southerly driveway and connecting in through the site to go to the sewer pump that's by the railroad tracks. We show a lateral coming out of Building 8. I missed the lateral coming out of Building 9, just a typo, but it is on there and it is intended to not utilize the existing sewer because I'm -- I'm pretty sure there's an ejector pump now for the -- the rink building. So anyway, we'll -- we'll tie into the sewer pump that's provided for the rest of the project.

MR. MOORE: And then with respect to Item 8.4 which says, "We note the intersection of Main Avenue and Midland Avenue will operate at an untenable level of Service F under the build condition with vehicle delay increasing to 736.3 seconds. "We recommend the applicant perform a traffic signal alarm study for the intersection for signalization consideration by the Borough of Wallington and Bergen County," and Mr. Bertin.

MR. BERTIN: We'll -- we'll do the Warren analysis because we've done the traffic

Page 56

counts. We did talk to Bergen County about the status of a -- of a traffic light there, and our response was that it's -- if the municipality would want them to consider a traffic light -- the people we talked to, and I don't know who we talked to so don't -- it was at the planning department -- that the borough would have to initiate the -- the process, and I guess that process hasn't been initiated for that. I just should mention to you that we did receive Bergen County conditional approval this week. So the county has approved it, but it -- we'll do the Warren study for you, and then if you want the light you got to go to the county.

MR. MOORE: And then that would be A-10 --

MR. BERTIN: Yes, okay.

MR. MOORE: -- which is the conditional county approval.

MR. BERTIN: Dated September 13, 2017.

MR. MOORE: And who should I provide the exhibit to?

MR. BERTIN: You're -- you're copied,

Page 57

but --
MR. MOORE: Yeah, the town's copied, but the planning board's copy.
MR. BAGINSKI: You can give that to Martie, thank you.
(Whereupon A-10, Conditional County approval dated 9/13/17, is marked for identification.)
MR. MOORE: Then with respect to Item 9.1 in accordance with Section 330-39B, "Any parking area located between the principal building and the minimum front line shall be landscaped or screened.
"No off-street parking area shall be located closer than 5 feet from any side or rear lot line. The applicant shall provide additional landscaping between the front lot line and proposed front yard parking spaces.
"Furthermore, the applicant requires a waiver for the proposed parking with a variance," and we've testified to it.  "Parking improvements located within 5 feet of any side or rear lot line."
MR. BERTIN: The -- the --
MR. MOORE: Mr. Bertin.

Page 58

MR. BERTIN: The most recent set of plans we do have a hedgerow along the parking spaces on Main Avenue.
We show a couple of small dots to indicate existing trees, but if you've been by the site the trees that are along the right-of-way are pretty massive.  I mean, they're not tall, but they're -- they've been there a long time and they've got probably a 20-foot drip line, but we can increase the -- the -- the shrubs, whatever your engineer wants, to help shield the parking spaces along Main Avenue.
With respect to parking within 5 feet of a lot line side or rear, the only -- that would only occur where the lot line separates the two parcels that are part of this application.
We have no parking within 5 feet of the exterior side or rear lot lines, just in this one parking lot on the north side of Buildings 7 and 8.
MR. MOORE: Thank you, Mr. Bertin. You might as well stay standing up.
Section 9.2 it said they -- "We recommend that the applicant revise the chain-link fence door enclosure for the dumpster areas to a board-on-board fence with steel posts."

Page 59

MR. BERTIN: Yes, we had done a -- a vinyl fence.  I think you saw that and commented you wanted a -- a more -- a rigid -- rigid structure and we'll do that.
I might not make it a board-on-board fence, we might make it a solid fence, but I know you want a more rigid structure than a vinyl fence and we'll do that.
MR. MOORE: And then with respect to Comment 9.14, "The applicant shall revise the proposed lighting plan to include foot-candle intensities which extend beyond the property line. The applicant shall provide additional shielding to prevent spillage onto adjacent properties."
MR. BERTIN: And -- and the -- there were two lighting exhibits, plans. One had just the lighting on the property, and then there was a second one that showed lighting 30 feet beyond the property which would be along Main Avenue, the railroad tracks and the Saddle River and --
MR. MOORE: And that was Sheet C2.7, right?
MR. BERTIN: Correct, Sheet 2.7, and on the south side of Building 6 we did not show the

Page 60

parking -- that the lighting extends into the Jasontown lot by Buildings 7 and 8 because we have a -- a -- a solid fence there so it never would have traversed that point, but if you look at the -- Sheet 2.7 we've got it for the other areas.
MR. MOORE: And then with respect to the last comment, 9.15, "The engineer recommends the applicant install the Borough of Wallington standard streetscape with light fixtures along the property line."
MR. BERTIN: And I'm sorry I missed that the last time we submitted the plans, but yes, we'll put the -- the lanterns along the property line, and you'll probably want the brick pavers between the sidewalk and the curb, just like the -- the -- the municipal standard, which I think occurs a little bit further south across Main Avenue and we'll do that.
MR. MOORE: That concludes our -- all of our responses to the Neglia report. I'd just like to say in summation with respect to the first application it's just amended preliminary and final.  It doesn't really affect the application.
It just makes it work a little better and

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 17 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-15   Filed 04/30/26   Page 18 of 37 PageID: 2644

In RE: Wallington

Page 61

makes it coordinate with the New Wallington application which is meeting affordable housing requirements, you know, set forth by the court, and while there are variances they are primarily, One, because of the two buildings so they're really -- two lots so they're really just technical variances, and then the others preserve the building which we think is a nice building. It's a building in good condition. It seems a shame to tear it down, and we believe we can find really meaningful, you know, recreational uses for it that we would make open to the borough residents working on any insurance requirements or such, that could be a condition of the approval with the borough council. So I thank you for your time in listening to this application.

MR. BAGINSKI: Okay. Thank you, Mr. Moore.

MR. JACOBS: I have a few items on the -- on our letter that were not addressed.

MR. BAGINSKI: Okay.

MS. BAUMANN: Could you just identify yourself, please?

MR. JACOBS: Sorry, Evan Jacobs with Neglia Engineering.

Page 62

MR. MOORE: And where we didn't address it it's because we agree.

MR. BAGINSKI: Okay. So you just want to put it on the record --

MR. JACOBS: Yeah --

MR. BAGINSKI: -- in order to just --

MR. JACOBS: -- sure. The -- the main concern I have is about Number 7.14, 7.14, with regard to the flow to the Saddle River. Some water analysis indicates that a lot of the site sheet flows into the river today and that it will be piped into the existing pipe in the future.

We have no information on the capacity of that pipe, the condition of that pipe, any information as far as can that pipe handle the site, is it -- is it in good working condition, does it need a --

MR. MOORE: We agree to provide that information with -- to you as a condition of approval, but obviously if the pipe was insufficient we'd have to come back or satisfy you with the installation of a pipe that was sufficient.

MR. JACOBS: That's acceptable.

MR. BERTIN: Which -- which -- which

Page 63

item was that again?

MR. JACOBS: 7.14.

MR. BERTIN: Okay.

MR. BAGINSKI: Okay.

MR. JACOBS: I would -- I would submit that any outstanding comments, minor or whatever they are, just be approved as a condition of approval instead of going through all those little technical --

MR. BAGINSKI: Okay.

MR. MOORE: Right, and all -- as I said, the one -- your other comments that weren't satisfied or informational that I didn't mention it was because we agreed to comply with them.

MR. JACOBS: Okay.

MR. BAGINSKI: Did you want to -- are there any other open ones that you know of?

MR. JACOBS: They're minor technical --

MR. BAGINSKI: Okay.

MR. JACOBS: -- things I don't think we need to hear now, but if they're willing to address all of them as a condition of approval then I'm satisfied.

MR. BAGINSKI: Okay. Thank you.

Page 64

All right. At this time, any other -- any other questions for -- for the applicant from the board members or --

MR. MELFI: I understand. I have one question and I don't know if it can go to the architect, the engineer or the attorney.

MR. MOORE: I'm sorry?

MR. MELFI: I don't recall if we discussed an emergency generator for the pumping station over there and if we did --

MR. BERTIN: It's shown on the plan. There's an emergency, there has to be for residential.

MR. MELFI: Absolutely, I understand.

MR. BERTIN: It's required by DEP.

MR. MELFI: I asked at the last meeting and you didn't recall.

MR. BERTIN: Okay, I didn't recall.

MR. MELFI: There's a generator.

MR. JACOBS: Is that the "G" on the plan next to the pump station?

MR. BERTIN: Yes.

MR. JACOBS: Okay.

MR. BAGINSKI: And Ms. Bogart testified today about the revision in the monument

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 18 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-15   Filed 04/30/26   Page 19 of 37
PageID: 2645

In RE: Wallington

Page 65

sign.  Is there something new or is it different than what you originally proposed?

MR. BERTIN: No.

MR. MOORE: No.

MR. BAGINSKI: Then was there any clarification to where you were going to put the "Welcome to Wallington" sign because during your testimony we did talk about the fact where you put it you're not even going to see it?

MR. RAKER: Location.

MR. BAGINSKI: It's -- it would be like a waste to put a "Welcome to Wallington" sign there because --

MR. MOORE: I think it was that we --

MR. BAGINSKI: -- it's blocked by the trestle.

MR. MOORE: -- we'd locate it wherever you guys wanted us to locate it I believe was our response.

MR. RAKER: Yeah.

MR. BERTIN: If the -- as I mentioned, the trees that -- as -- as you're heading south on Main Avenue those first trees are pretty dense, although the -- the -- the canopy isn't that high, but you could have a sign

Page 66

underneath it, but the position I put it in which is shown here on the -- on the -- Exhibit A-1 is the wrong spot. The other monument sign we have next to the -- the entrance driveway.  So wherever you want the "Welcome to Wallington" sign we'll try to figure that out.  We can make that a condition.  We could settle it now or make it a condition we work with --

MR. MOORE: Your engineer and --

MR. BERTIN: -- the construction official and the engineer.

MR. BAGINSKI: And also with the monument sign, how would that affect the field of view from that exit or entrance driveway when you're going to pull out of the place?

MR. BERTIN: Well, that's part of the county's review, and the monument sign is -- is set back from the right-of-way so it doesn't block a vision and that -- that is part of the county -- county review process.

MR. BAGINSKI: Okay.

MR. MELFI: And is -- have you put that sign on a plan for the county for their review?

Page 67

You're saying you got a conditional approval from the county, but are those signs for the "Welcome to Wallington" and the other sign, the monument sign, was that on the application to the county?

MR. BERTIN: The monument sign that's part of this application, yes.  The "Welcome to Wallington" has not. Well, we -- we -- we showed it back closer to the bridge, the railroad bridge, but we have to submit final plans back to the county, and if it's on there and if it's in the sight triangle they're going to comment on it.  Well, we'll make sure it's not in the sight triangle.  The other monument sign is on it.

MR. BAGINSKI: Okay.  All right. Then if there's no other questions or testimony in regard to this we need a motion and a second.

MR. CEDZIDLO: Could we have a discussion?

MR. BAGINSKI: Well, we could if you would like.  Any objection to that?

(Whereupon an off-the-record discussion is held.)

MR. BAGINSKI: Our attorney would

Page 68

like us to have a -- a -- we should be having a little bit of a discussion in regards to what we like about the application, what we dislike about the application. So if we could do that as a board right now then we'll -- I mean, we can start on one side of the room, and -- and if anybody's got any positive or negative comments we can make them before we bring it to a motion.

MR. MELFI: Okay.  I gave my do's and my don'ts.

MR. BAGINSKI: Okay.

MR. MELFI: I notice there's a lawsuit that was granted, and there's no denying the amount of units because that was part of a -- a settlement with -- with the town going back a few years to put 208 units.  I know this project in total I believe is 207 units. My personal opinion is I don't really like the recreation building to stay being that there's recreation underneath the apartments that you're going to be building, and if you're asking for a height variance for that to keep recreational purposes there and testimony was made for just the 73 units that are being built as who's going to be

Page 69

using those facilities, I don't feel there's a need to leave a big building there.

MR. MOORE: Just -- just the -- correct, and I -- except that the height variance isn't for the -- the building that's staying. It's for the building in -- in the front, the new building.

MR. MELFI: That's what I'm saying, that's what I said, excuse me.

MR. MOORE: Okay, I'm sorry.

MR. MELFI: And I feel that if we were to take the other building down and move the other buildings back we cut out a lot of the variances. Then I think I would give approval to the site plan amendment.

MS. WYGONIK: I agree with Mr. Melfi. I think the way -- keeping that recreation building right now the way it is it's too congested in there, the buildings are too closely tight together and I feel also that if that building was removed you could spread out the buildings. We'd have a little bit more open space. The way I understand "open space" is actually open space. I know she said that active recreation is considered open space or a part of open space, but

Page 70

that's enclosed active recreation.

So I don't know, maybe I'm thinking something different, but anyway, I would also like to see that building being demolished and spread out. Also, I would like to do an OPRA request just to find out how many children we can expect to come from the whole -- from that whole development because we're still not sure. We heard testimony maybe it's going to be 13, today she's revising it to five, and somehow I just can't see that.

If you're going to have 208 units -- I know she testified based on 72 units or 73 units, but still, out of 208 units I'm sure that we can expect a lot more children in school than what she was testifying to and that's a big concern for us citizens.

I mean, you know, our schools are -- our schools are already tight as it is now. We'd like to know what we can expect from all those -- that whole development. So that's -- that's my opinion.

MR. BAGINSKI: Thank you.

MS. DABAL: Thank you.

MS. POLTEN: I agree with Mr. Melfi and with Mrs. Wygonik.

Page 71

I too am concerned about the recreational facility and the amount of children that will be generated from this -- this project in itself because our -- I know our schools are -- are -- are overflowing now and we need a new school and -- you know, but that's not at hand right at this moment. So I do happen to agree with them.

MR. PAWLUCZUK: I agree with these two about the OPRA request for the children, yes, totally.

MR. RACHELSKI: If I could say something.

It was mentioned that this project was compared to West New York. It really is because you kind of look at density it is a West New York, and this is not the -- the -- the stuff that we want in our town. It is parking lots and buildings, that's what it basically is. Thank you.

MR. BAGINSKI: Anyone else?

MR. KASPEREK: Yeah, my biggest concern would be the -- there's not really a study done on the traffic, like real study, between Midland and Locust Avenue because when I used to, you know, work, you know, coming from work this way I used to spend 25 hours on this.

Page 72

Right now considering adding, you know, 207 apartments right now you will actually increase the traffic in that area a lot.

MR. BAGINSKI: Anyone else at this time?

MR. BAZEL: I'd like to echo Mr. Melfi's sentiment about the recreational -- recreation center.

Also, I feel kind of uneasy that we are being asked to consider this as one project involving two -- two separate entities and that would it be -- would it be possible to redevelop each one of those lots in the future separately when we create right now variances?

MR. MOORE: No, but you'll have the approvals and the cross-easements and it would be impossible really.

MR. BAGINSKI: Okay.

MS. POLTEN: Another concern I have too is with the fire lane.

As it is -- as it stands right now if that building was to stay there, recreation and the other building, it's very narrow to get a truck through there, that would be -- you know, you'd have to speak with the fire official and have a

Page 73

report from him.

MR. MOORE: What I would like to do if it is at all possible with the board's leave because my client is not here because he's dealing with disasters from hurricanes down in the south is continue this application because I'm certainly hearing loud and clear what you folks are saying about the recreation building and about getting the OPRA request for the school.

MR. BAGINSKI: Okay.

MR. HERLINSKY: If I can interrupt you.

MR. BAGINSKI: Okay.

MR. HERLINSKY: Victor Herlinsky, Junior of the law firm of Sills, Cummis. I'm cocounsel with Kevin Moore. I -- I have spoken to the client about a number of the issues. The -- I mean, look, the real issue right here that we're talking about is, you know, I'm sure -- I'm sure the board doesn't like the court's decision as far as, you know, the number of units and what's going on in there. You don't like the fact that we have to put three-bedrooms in there, we don't like that either, but the -- the idea and what I'm going to ask for

Page 74

is that -- and I'm glad the superintendent's here because the -- and let me just stand up. I know Brigette Bogart for years. It was on me to hire her for this firm. I know her. If she said she called this board she called your office. I know she called this office, and anything saying that she didn't you don't know her, I do. She's been trusted by a number of communities. Her bond is -- I would like to make the OPRA request. You'll get it by the end of the week, you'll have the statutory time, and then we can come to the next -- the next meeting because, you know, I don't want this board to -- to talk in a -- in a -- in a vacuum and nobody knows how many. You know, we had somebody come up here and say, You know, I know a one-bedroom apartment that is, you know, eight kids living. I mean, that's BS, that -- that -- you know, that's when they call DYFS. Maybe they're a thing, but that's -- that's -- the county should -- there's no apartment I think in -- in -- in a -- in a -- a community like Wallington where there's eight people living there, that's -- that's BS. Excuse my French, but the fact of the matter

Page 75

is in this -- you know, I feel like she's been under attack in this case, you know, and it's like, look, I have roots in Wallington, she has roots in Wallington, and the fact of the matter is we're not coming here, you know, trying to do something. We're coming here with -- with units that have already been approved by the -- by the court, and if we go back to the court the court's going to say, Look, I already told you what we're putting in here. So like in the end of the day what I'm asking for is let me come back. We're going to get you the report. You know, I -- I -- I trust we're going to get a -- a prompt answer, and then you won't have to guess as far as how many kids are coming in. And -- and I know West New York's not -- you know, just Wallington's not West New York. We're not trying to say that it is, but we're trying to get some information. She called somebody in Wallington. Somebody in Wallington says, Oh, we can't get that information, and you know what, I don't think you're going to have this information hand -- you know, sitting in some drawer.

Page 76

You're going to have to actually work for it, but if you came here tonight and you said, Look, we want to get you this information. We're going to get you a request that's going to be able to give her the information that she can come and tell you what's going on in Wallington, so that you don't have to guess. So if I can, I would like to be able to answer your question.

MS. WYGONIK: I would appreciate that, yes.

MR. BAGINSKI: Okay.

MS. WYGONIK: That's -- that's one part, that's a small part of this -- all these discussions, but that's one part.

MR. HERLINSKY: Yeah, but the -- we -- I've heard everything that the board has said and -- and it --

MR. MOORE: We got it, I think.

MR. HERLINSKY: Yeah.

MR. MELFI: Mr. Herlinsky, it's not the question of an approval for the 207 units because that's court ordered. It's a question --

MS. WYGONIK: Right.

MR. MELFI: -- of the variances that we have to grant for you -- for you to meet those

Page 77

207 units.

So I don't think it's a child issue that's informational, and for what we want here is to -- if you did an OPRA request to say how many children are going to our school system from Mount Pleasant, Jasontown 1 and 2.

We're not looking for names and if they have the amount they have the amount.  I don't think the amounts are going to really make a difference here, personally, because it's court ordered as far as how many one-bedrooms, how many two-bedrooms, how many three-bedrooms that you had to put in according to the courts, that was the lawsuit that was won by your people.

MR. HERLINSKY: Yeah, but if -- if -- I did hear every single person that came up here say, We can't have any more kids, and if I didn't hear so much from the board.

It's an over -- in my mind it's an overriding consideration and whether or not it's, you know, something that you should or should not according to the law, and Mr. Cedzidlo will advise you on the law, whether it's -- it's -- it's there, and the fact of the matter is right now it's a question mark and it's a question mark, and I will say

Page 78

because my planner called your office and got an answer saying, We don't really have that information.

MR. MOORE: Basically we've made the point.

MS. DABAL: Yeah, really.

MR. HERLINSKY: I understand, but I want --

MR. SMITH: Yeah, and it's insulting to my superintendent of schools.

MS. DABAL: That's right.

MR. SMITH: There's two people in that office, his secretary and him.

MR. BAGINSKI: Excuse me, excuse me.  He has the floor right now.  You'll have an opportunity to speak again, sorry.

MR. HERLINSKY: Well, we're going to put it all to rest because we're going to get the information, and we're going to come back and we're going to present it to the board so you don't have to guess.

MR. BAGINSKI: Okay.

MS. WYGONIK: And the reason I kept pursuing the -- you know, how many children we can expect is not that we're going to vote against it

Page 79

because we're going to get so many children, but just what can we expect so we can plan for the future because this development may not be complete for a couple years.

I don't know how long it's going to take it.  We just want to know what we can expect so we can prepare for the future, that's all, and I think that we should know what it would be.

MR. CEDZIDLO: Let's be clear about something, okay?

We heard from Mr. Melfi, Bazel, Pawluczuk, Polten, we've got Mr. Kasperek.  The thing that I heard most clearly were complaints about keeping the existing recreational structure, that was voiced by almost everyone.

And Ms. Bogart gave honest testimony that said if we remove that building 95 percent of the variances that we've requested would be eliminated.  And name-calling, accusations, side issues, of course people have those issues and of course the public is going to worry, of course those things will get discussed, but the simple fact of the matter is is that the testimony presented by the applicant that -- is that we're asking for a lot of variances on this project in this configuration

Page 80

because we're going to keep a building that's only going to be limited to the 73 units on this parcel and will not be shared with all the -- the other units on the other parcel because we can't do that by -- by agreement or by law because it's on a different property.

So let's focus on, okay, let's -- let's be civil, let's discuss things properly and let's address what everybody discussed is the granting of variances that all surround a recreational building which is going to impede open space.  Ms. Bogart told us very clearly that's an interpretive issue, one the board has interpreted -- clearly stated that they interpret that it's not open space.

Mr. Rachelski made a comment about we don't want it to look like West New York.  I think it's clear that that is the overriding issue that the board has raised.

Certainly Counsel; Mr. Moore, Mr. Herlinsky, said, Can we have a continuance on this?  I don't think anybody has expressed any concern because, as the board has also said, the amount of units are already decided.

It's how do we present that, build these units

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 22 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-15   Filed 04/30/26   Page 23 of 37
PageID: 2649

In RE: Wallington

Page 81

in the best possible manner for the residents and for the Borough of Wallington and the residents of this project, okay?
So from that point -- from this point on let's -- let's be civil and let's address things in the proper way, okay?
    MR. HERLINSKY: Thank you.
    MR. BAGINSKI: Okay.  And now just so everybody understands, we as the board here have an obligation to the residents of Wallington and that's what we're here for.
So we need to try and make sure that what's being done is done the right way, and we need to balance out -- you're telling me you got a perfectly good building that you don't want to knock down and you see no sense in knocking down, but yet if you do 95 percent of the variances are gone.
So we as the board need to sit and discuss this which we've been doing, and we need to come up with a plan or an idea of what's going to work best for us by saying, No, we can't have that building because of whatever, but again, I'm just voicing my opinion now, but we as the board will vote on it.
So it -- it's a big project, we all know that

Page 82

it is, and the court mandated the number of units, but now we need to do what's best for the residents of our town.
    MR. MOORE: Well, I'd like to --
    MR. HERLINSKY: Can I -- can I just ask --
    MR. MOORE: Before Mr. Herlinsky got up with --
    MR. HERLINSKY: Can I just ask a -- a simple question, and it's just while I'm sitting here?
I'm going on and I see my fellow alumni.  When I -- when I played soccer at Don Bosco I played a lot of guys.  You had a lot of guys from Wallington coming up to Don Bosco at the time, and the fact of the matter is there is -- you know, if you're talking about overcrowding, if you're talking lack of facilities like why wouldn't you want to have like an indoor soccer which we've offered to the town?
So like if -- you don't have enough fields in Wallington for all the kids that want to play.
Like why -- why wouldn't you want -- why would you want to tear down this building?  It'd be -- make a fantastic indoor soccer, that's what I think.

Page 83

You know, somebody said basketball.  I didn't -- I sucked at basketball so I never played that, but I was decent at soccer, but the idea is like why wouldn't you want it?
If you -- it's already there, it's built.
It's a -- it's a building that was built for several million dollars.  So like to tear it seems like a waste, but if we're offering and say, Look, every Saturday you want to have game after game after game, you know, nine o'clock to two o'clock you got it.  Like if -- if Wallington has this overcrowding problem, why wouldn't you want to have that?
I don't know if there's another indoor soccer facility, but you got a high school that -- I don't think that has an indoor soccer facility.  Why wouldn't you want to have that?  I don't understand.
I mean, that's a rhetorical question and I'm not asking the board to answer it, but it seems to me that if -- if the issue is the strain on all the resources here in Wallington and we're offering something that's already there, man, I -- I -- I think that'd be a very popular thing because you can do that all year-round, and I assume soccer's

Page 84

pretty popular in Wallington, used to be, and the fact of the matter is that -- that's what I would say, but we're going to do the OPRA request.
We're going to come in, we'll assess -- again, I've -- I've offered to Mr. Melfi, I've offered to other people to say, Look, if there's something that the town wants to do.
If you want us to look in the insurance issues we'll look at them, but the fact of the matter is it's -- it's something that could be for the good of the town, and I -- and I would ask you again it's like why would you want to tear it down if -- if it's something we're offering?  So that's all I have to say.
I would ask for a continuance so we can provide the information so the board doesn't have to guess.
    MR. BAGINSKI: Okay.  Thank you, Mr. Herlinsky.  All right, at this point then we'll need a motion to hold it in abeyance until next month.
    MS. WYGONIK: I'll make the motion.
    MS. POLTEN: I'll second it.
    MR. MELFI: Do we -- on -- on that second before we make the motion I just have a

Page 85

comment on that or do we have to wait until after we vote because I think a lot of the conditions -- okay, let's wait.  We'll wait.

MR. BAGINSKI: Okay.  So Mr. Herlinsky comitted to hold it in abeyance. You're going to do the OPRA request for those students, and at this point in time there is a motion.

Can we make the request of Mr. Herlinsky to look into insurance and things like that for this -- this type of building or is it feasible at this time to do or do you want to hold off on that?

MR. TOMKO: I think you're putting the cart before the horse right now.

MS. POLTEN: Yeah.

MR. BAGINSKI: Okay.

MR. TOMKO: Let -- let -- let's get these other things straightened out before you even talk about what we're going to do out there.

MS. POLTEN: Right.

MR. BAGINSKI: Okay.

MR. TOMKO: I mean, between that and -- and just a quick answer to the traffic study with that traffic light.

We have met with Bergen County about that,

Page 86

that's been an ongoing thing, and just recently we met and -- and there's a sizable cost involved in it on the municipal part that has to be looked into also.  So we are looking at that avenue, it's not dormant, and the town has been working on it.

MR. BAGINSKI: Yes, okay.  Mr. Melfi, good?

MR. MELFI: Good.

MR. BAGINSKI: We need a motion to the second?

MS. POLTEN: We have it.

MR. BAGINSKI: Okay.  I need a roll call.

MS. SIEK: Melfi?

MR. MELFI: Aye.

MS. SIEK: Pawluczuk?

MR. PAWLUCZUK: Aye.

MS. SIEK: Bazel?

MR. BAZEL: Aye.

MS. SIEK: Polten?

MS. POLTEN: Aye.

MS. SIEK: Baginski?

MER. BAGINSKI: Aye.

MS. SIEK: Wygonik?

MS. WYGONIK: Aye.

Page 87

MS. SIEK: Rachelski?

MR. RACHELSKI: Aye.

MS. SIEK: Kasperek?

MR. KASPEREK: Aye.

MS. SIEK: And Tomko?

MR. TOMKO: Aye.

MR. BAGINSKI: Thank you.

MR. MOORE: Oh, we need to get the date for the continuance.

MS. SIEK: October 17th.

MR. BAGINSKI: Okay.  So anybody in the audience wishing to come back it'll be October 17th at the meeting here, same time, same place. Thank you.

(Whereupon all witnesses are excused and the matter is adjourned for the evening at 9:08 p.m.)

Page 88

CERTIFICATE

I, DENISE C. CLARK, a Certified Court Reporter and Notary Public of the State of New Jersey, hereby certify the foregoing to be a true and accurate transcript of the proceedings as taken stenographically by me on the date and place hereinbefore set forth.

DENISE C. CLARK, CCR
License No. 30XI00213800

My Commission expires November 14, 2017.

In RE: Wallington

Transcript fo Proceedings

---

**$**

**$45,000 (1)**
38:5
**$5,000 (1)**
38:7
**$55,000 (1)**
38:5

---

**[**

**[sic] (2)**
13:17;49:16

---

**A**

**A- (1)**
5:4
**A-1 (1)**
66:2
**A-10 (2)**
56:17;57:6
**A-9 (3)**
5:5,8,13
**a-b-a-l (1)**
51:14
**abeyance (2)**
84:20;85:5
**able (4)**
3:7;47:25;76:4,8
**Absolutely (1)**
64:14
**abundance (1)**
22:9
**accept (3)**
6:24;7:5;31:22
**acceptable (1)**
62:24
**access (2)**
35:10;43:19
**accommodate (3)**
9:1;16:4;20:16
**accommodating (1)**
16:18
**accomplish (1)**
14:9
**accordance (2)**
17:18;57:10
**according (2)**
77:13,21
**accusations (1)**
79:19
**acknowledge (1)**
4:7
**across (3)**
20:21;25:10;60:17
**action (3)**
10:17;13:16;16:22
**active (18)**
18:17;19:15;21:9,15,
23,24;22:7;25:13,15;
45:10,12,17;46:1,2,3,5;

69:24;70:1
**activities (1)**
17:21
**actual (2)**
9:25;29:14
**actually (11)**
9:13;13:7;20:8;24:4;
28:21;34:1;36:7;38:17;
69:23;72:2;76:1
**Adam (1)**
5:6
**adding (1)**
72:1
**additional (8)**
15:19;18:21;25:17;
27:9;37:16;52:3;57:16;
59:13
**address (10)**
4:1;9:7,22;15:19;
32:25;33:3;62:2;63:23;
80:9;81:5
**addressed (1)**
61:20
**addresses (3)**
34:20;35:17;37:14
**adequate (1)**
18:21
**adjacent (3)**
3:21,21;59:14
**adjourned (1)**
87:16
**administrator's (1)**
47:16
**advise (1)**
77:22
**aesthetic (3)**
20:24;28:24;30:11
**aesthetically (3)**
26:25;29:6,9
**affect (2)**
60:23;66:14
**affordable (10)**
17:7;18:7,15;38:9,9;
40:22;41:13,18;52:10;
61:2
**Again (17)**
10:20,25;13:15;16:2,
21;17:6;22:15;42:14;
45:3;46:25;51:12;
54:13;63:1;78:16;
81:23;84:4,11
**against (2)**
6:2;78:25
**age-restricted (1)**
52:13
**ago (1)**
16:10
**agree (7)**
54:2;62:2,18;69:16;
70:24;71:7,8
**agreed (1)**
63:14
**agreement (1)**

80:5
**ahead (3)**
23:5;47:3;49:4
**alarm (1)**
55:21
**albeit (1)**
18:12
**Albro (12)**
36:14;46:16,17,20,
23;47:2,2,4;48:2,10,17,
18
**A-l-b-r-o (1)**
47:2
**alike (1)**
20:8
**allowed (2)**
48:3,14
**allowing (2)**
13:19,21
**allows (1)**
20:9
**almost (1)**
79:15
**alone (1)**
13:9
**along (12)**
5:9;13:2,12;14:19;
20:11;55:2;58:2,6,11;
59:19;60:9,13
**alternative (1)**
21:1
**although (1)**
65:24
**alumni (1)**
82:12
**ambulances (1)**
23:16
**amended (2)**
3:18;60:22
**amendment (1)**
69:15
**amendments (1)**
42:22
**amount (6)**
12:10;68:15;71:2;
77:8,8;80:23
**amounts (1)**
77:9
**analysis (4)**
38:12;39:18;55:25;
62:10
**answered (1)**
36:8
**apartment (4)**
40:6,24;74:16,21
**apartments (8)**
34:20;35:19,20;
40:19;42:8;48:9;68:21;
72:2
**appearance (1)**
26:9
**applicant (20)**
3:21;12:5,6;13:4;

27:11;31:18;54:4,5,15,
17,18;55:20;57:16,19;
58:23;59:10,13;60:8;
64:2;79:24
**applicants (1)**
43:24
**applicant's (2)**
4:16,21
**application (18)**
3:17,21;9:11;17:8;
36:23;46:14;53:18,22;
58:16;60:22,24;61:2,
16;67:4,7;68:3,4;73:6
**applications (3)**
3:15;4:4;52:12
**appreciate (1)**
76:9
**approached (1)**
49:22
**appropriate (18)**
9:3;10:7,11,18;11:3;
12:5;13:16;14:1;16:5,
6,19,22;17:3;18:16;
20:15,17;27:17,18
**approval (21)**
3:19,24;6:24,25;7:5,
7;31:23;32:3,5;33:7;
54:13;56:12,20;57:7;
61:14;62:20;63:8,23;
67:1;69:14;76:21
**approvals (1)**
72:16
**approved (5)**
3:20;42:19;56:13;
63:7;75:7
**approximately (4)**
16:1,2;37:4,7
**architect (3)**
30:6;41:23;64:6
**architect's (1)**
54:7
**architectural (3)**
10:12;11:3;12:20
**area (13)**
10:9,14;13:12;14:19;
15:1,7,21;21:9;30:8;
39:17;57:11,14;72:3
**areas (2)**
58:24;60:5
**argue (1)**
50:21
**argument (1)**
30:23
**argumentative (1)**
36:17
**around (2)**
17:15;49:17
**aspect (1)**
30:11
**assess (1)**
84:4
**associated (2)**
18:23;19:4

**Associates (2)**
44:15;53:12
**Association's (1)**
49:9
**assume (3)**
49:7;52:21;83:25
**assure (1)**
38:20
**attack (1)**
75:2
**attempt (1)**
43:2
**attend (2)**
34:9;35:18
**attending (1)**
48:8
**attention (1)**
47:8
**attorney (4)**
9:21;36:24;64:6;
67:25
**attractive (2)**
11:8;30:17
**audience (3)**
46:10;53:3;87:12
**August (1)**
4:6
**Avenue (16)**
4:1;13:1,2,5,12;
14:19;50:25;55:16,16;
58:3,12;59:20;60:18;
65:23;71:23;86:4
**aware (3)**
49:12,21;50:10
**away (1)**
25:16
**Aye (9)**
86:15,17,19,21,23,
25;87:2,4,6

---

**B**

**back (17)**
8:5;13:10,22;16:23;
27:21;29:8;38:7;62:21;
66:19;67:9,11;68:16;
69:13;75:8,12;78:19;
87:12
**BAGINSKI (85)**
3:1,7;5:1,15;6:7;7:9,
12,18,20,23;8:1,3;21:7,
13,19;22:2,8,14,21;
23:1,5;24:13;25:19;
34:4;35:14;36:7,14;
39:3;42:14,20,23;44:6,
12,16,22;46:6;48:16,
19,24;50:20;51:2,7;
53:2,10;57:4;61:17,21;
62:3,6;63:4,10,16,20,
25;64:24;65:5,11,15;
66:13,22;67:16,21,25;
68:12;70:22;71:19;
72:4,18;73:10,13;

---

Rizman Rappaport (973)992-7650
Let Our Fingers Do Your Talking

76:11;78:14,22;81:8;
84:18;85:4,16,21;86:6,
9,12,22,23;87:7,11
**balance (1)**
81:14
**balanced (2)**
18:4;41:3
**ban (1)**
52:11
**based (6)**
20:13;26:22;34:20;
37:8;38:20;70:13
**basically (5)**
16:11;32:10;52:16;
71:18;78:4
**basis (2)**
36:23;50:6
**basketball (3)**
33:16;83:1,2
**BAUMANN (12)**
35:13;41:20;45:2;
46:18,21,25;47:3;49:1,
3;51:11,15;61:22
**BAZEL (12)**
25:11;43:1,11,21,25;
44:24;45:4,13;72:6;
79:11;86:18,19
**Bear (1)**
41:7
**bedroom (2)**
40:4;52:3
**benefit (3)**
13:9;17:9;20:24
**benefits (7)**
11:5;13:13;14:14;
18:9;19:3,8;20:19
**Bergen (4)**
55:23;56:2,12;85:25
**Bertin (47)**
4:21,24;5:2,4,10,11,
12,20;6:8,13;7:8;23:2,
4;24:4,15,24;28:1,3,5;
41:8,10;54:25;55:1,23,
24;56:18,21,25;57:24,
25;58:1,20;59:1,15,24;
60:11;62:25;63:3;
64:11,15,18,22;65:3,
21;66:11,17;67:6
**best (3)**
81:1,21;82:2
**better (4)**
21:1;34:23;35:22;
60:25
**beyond (2)**
59:12,19
**big (4)**
31:17;69:2;70:16;
81:25
**bigger (1)**
37:24
**biggest (1)**
71:20
**binding (1)**

32:7
**bit (6)**
26:12;38:3;39:11;
60:17;68:2;69:22
**blends (1)**
31:4
**Block (3)**
3:17,22;66:19
**blocked (1)**
65:15
**board (41)**
3:2,10;4:7,23;5:9;
6:23;7:7,9,10;8:19;
15:9;19:5;20:13;22:12,
15,19;24:13;30:7;
31:22;33:7;36:17;
44:22;47:17;48:23;
54:12;64:2;68:5;73:20;
74:5,13;76:16;77:18;
78:20;80:13,19,23;
81:9,19,24;83:20;
84:16
**board-on-board (2)**
58:25;59:5
**board's (5)**
3:16;4:4;31:24;57:3;
73:3
**body (1)**
33:6
**Bogart (97)**
7:15,21,24;8:2,6,12,
18;9:8,13,20;12:8,11,
13,16,22,24;15:11,14,
16,18;19:9,11,17,19,
21;21:2,4,6,12,15;22:5,
17;23:2;24:14,16,19,
23;25:1,4,12,24;26:2,
11,16,19,22;27:4,10,
16,20,25;28:2,4,7,11;
29:23,25;31:9;32:6,9,
13;33:5;34:1,18;35:2,
12,24;36:1,4,20,25;
39:4,8,14;40:3;41:2,7,
9,12;42:4,17;45:8,14,
21;46:1,3;47:20,22;
50:23;51:1;52:23;53:8,
10;64:24;74:3;79:16;
80:12
**Bogart's (1)**
21:4
**bond (1)**
74:9
**borough (10)**
18:7;47:5;49:5,25;
55:22;56:8;60:8;61:12,
15;81:2
**Bosco (2)**
82:13,15
**Both (4)**
3:25;17:3;43:3,9
**boundary (1)**
13:1
**brick (1)**

60:14
**bridge (2)**
67:10,10
**briefly (1)**
4:20
**Brigette (1)**
74:3
**bring (2)**
22:22;68:9
**bringing (1)**
53:25
**broke (1)**
7:17
**brought (1)**
28:17
**BS (2)**
74:18,24
**buffer (3)**
13:1,11;15:13
**buffers (1)**
17:15
**build (5)**
11:5;32:10,11;55:17;
80:25
**building (79)**
8:16,23;9:2,22;11:6,
12;12:4,6,9,13,14;
13:20;14:9,12;15:22,
23,25;16:4,18;18:1,12;
21:14;23:14;24:17,21;
25:7,8,16,24;26:2,4,6,
14;28:5,8,16;29:14;
30:1,2,4,22;31:12,16,
24;32:1,12;33:11,18;
39:2;45:19;55:6,7,11;
57:11;59:25;61:8,8,9;
68:20,22;69:2,5,6,7,12,
17,20;70:4;72:22,23;
73:8;79:17;80:1,10;
81:15,22;82:24;83:6;
85:11
**buildings (18)**
6:2;8:15;10:5;25:23;
26:5;27:22,23;53:20,
21;54:16,23;58:19;
60:2;61:5;69:13,19,21;
71:18
**building's (1)**
26:14
**built (3)**
68:25;83:5,6
**bulk (2)**
3:24;15:21
**business (2)**
3:2;47:16

---

**C**

---

**C2.7 (1)**
59:22
**calculations (1)**
54:19
**Calisto (1)**

4:21
**call (5)**
16:25;43:14;50:17;
74:18;86:13
**called (9)**
18:8,16;50:15,18;
74:5,5,6;75:21;78:1
**calls (1)**
18:2
**came (3)**
47:7;76:2;77:16
**can (62)**
5:9,9,16;10:10;15:6;
22:6,17,22;24:10;
29:13;30:7;31:25;32:3,
4,6,23;33:7;34:23;
35:14;36:7,9;38:20;
44:20;46:5,13,14;
47:22;48:2,13;50:7;
51:4,11;52:13;53:5;
54:11;57:4;58:9;61:10;
62:16;64:5;66:7;68:6,
8;70:6,14,20;73:11;
74:11;76:5,7;78:24;
79:2,2,6,6;80:21;82:5,
5,9;83:25;84:15;85:9
**cancellation (1)**
4:5
**canopy (1)**
65:24
**capacity (2)**
54:19;62:14
**capita (1)**
38:6
**care (1)**
18:24
**cart (1)**
85:14
**case (6)**
18:24;23:14;24:9,11;
31:21;75:2
**caution (2)**
22:10;36:16
**CEDZIDLO (5)**
4:9,11;67:19;77:22;
79:9
**ceiling-to (1)**
31:10
**cell (2)**
5:16,19
**census (2)**
37:22;38:4
**center (2)**
45:22;72:8
**certain (1)**
42:22
**certainly (4)**
6:23;50:7;73:6;
80:20
**chain-link (1)**
58:23
**chair (3)**
8:2,10,11

**Chairman (2)**
3:10;48:21
**Chair's (1)**
8:3
**change (2)**
5:22;33:19
**changes (1)**
4:22
**character (1)**
20:22
**checked (1)**
28:22
**chief (2)**
6:16,19
**child (3)**
40:7,11;77:2
**children (22)**
34:8;35:18;37:15;
38:25;40:5;51:18,25;
52:4,6,11,12,13,17,20,
25;70:6,15;71:2,9;
77:4;78:24;79:1
**choices (1)**
18:16
**chose (1)**
31:22
**circulation (4)**
9:3;13:19;16:6,19
**citizens (6)**
17:5,9;44:20;46:9;
53:5;70:17
**City (1)**
40:2
**civil (2)**
80:8;81:5
**clarification (4)**
12:9;22:15;47:7;
65:6
**clarify (3)**
9:9;22:3;42:15
**clear (4)**
52:25;73:7;79:9;
80:18
**clearly (3)**
79:13;80:12,14
**client (3)**
32:24;73:4,17
**close (2)**
24:8;53:4
**closely (1)**
69:19
**closer (2)**
57:15;67:9
**closest (1)**
26:17
**closing (1)**
49:13
**Coach (1)**
50:9
**cocounsel (1)**
73:16
**code (1)**
45:9

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 26 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 141-15   Filed 04/30/26   Page 27 of 37
PageID: 2653

In RE: Wallington

Transcript fo Proceedings

color (1)
6:1
colors (1)
5:25
combine (1)
43:2
combining (2)
8:23;9:10
coming (15)
29:7;37:4;38:19,25;
48:11;51:18,25;55:2,6,
7;71:24;75:5,6,16;
82:15
comitted (1)
85:5
Comment (5)
59:10;60:7;67:13;
80:16;85:1
commented (1)
59:2
comments (5)
20:13,16;63:6,12;
68:8
common (2)
44:2,2
communication (1)
47:9
communities (2)
52:14;74:8
community (2)
33:14;74:22
compact (1)
54:20
compared (2)
10:13;71:14
comparison (1)
47:12
compile (1)
35:8
compiled (1)
34:19
complaints (1)
79:13
complete (1)
79:3
completely (1)
27:12
Completeness (1)
53:18
complex (6)
23:11;36:18;42:3,7;
51:25;52:7
compliance (1)
54:12
comply (7)
10:10,25;12:6;19:17,
18;27:12;63:14
complying (1)
16:11
component (1)
17:8
concept (1)
17:24

concern (8)
4:23;5:24;37:1;62:8;
70:16;71:21;72:19;
80:22
concerned (2)
34:10;71:1
concluded (2)
4:14;8:12
concludes (3)
21:3,4;60:19
condition (20)
6:25;7:6;9:15;31:23;
32:5,16,17;33:4,7;
54:12;55:18;61:9,14;
62:15,17,19;63:7,23;
66:7,8
conditional (4)
56:12,20;57:6;67:1
conditions (7)
8:24;9:15;14:21,24;
16:16;32:23;85:2
configuration (1)
79:25
confirm (1)
54:20
conform (1)
22:11
Conforming (1)
11:20
congested (2)
23:7;69:18
connecting (1)
55:3
connection (1)
40:2
conservation (1)
17:12
consider (5)
37:23;39:19;45:7;
56:5;72:10
consideration (4)
20:16;39:15;55:22;
77:20
considered (7)
21:14,15,17,20;26:4;
30:16;69:25
considering (2)
31:17;72:1
consistent (5)
10:8;11:7,25;14:5,20
consolidate (2)
43:10;44:5
constitutes (1)
12:18
constrained (1)
17:17
construction (1)
66:11
contemplated (1)
14:6
continuance (3)
80:21;84:15;87:9
continue (3)

4:18;32:16;73:6
continued (1)
4:4
controls (1)
18:20
conversation (1)
36:5
coordinate (1)
61:1
coordination (1)
17:20
copied (2)
56:25;57:2
copy (3)
49:8;54:21;57:3
cost (2)
17:23;86:2
council (2)
49:6;61:15
Counsel (1)
80:20
count (1)
25:13
counted (1)
45:20
counting (1)
45:20
counts (1)
56:1
County (15)
55:23;56:2,12,13,15,
20;57:6;66:20,21,24;
67:2,5,11;74:21;85:25
county's (1)
66:18
couple (5)
10:16;13:14;53:15;
58:4;79:4
course (3)
79:20,20,21
court (7)
33:16;61:3;75:7,8;
76:22;77:10;82:1
courts (1)
77:13
court's (2)
73:21;75:8
coverage (16)
8:25;15:22,22,24,24,
25;16:2,7,14,20;18:10,
13,23;19:2,6;25:2
create (4)
8:24;19:23;20:24;
72:13
created (2)
9:16;38:14
creates (4)
11:18;20:1;30:8,9
creating (1)
13:11
creative (1)
10:24
cross-easements (4)

43:8,16,18;72:16
Cummis (2)
3:12;73:15
curb (2)
6:2;60:15
curbs (1)
6:5
Currently (1)
13:6
cut (1)
69:13

**D**

DABAL (11)
51:6,9,13,13,16;
52:15,19;53:1;70:23;
78:6,11
data (5)
37:22;38:21,22;
39:16;48:13
date (1)
87:9
dated (3)
53:12;56:21;57:7
David (1)
51:14
day (1)
75:11
dealing (1)
73:4
dealt (1)
8:14
decent (1)
83:3
decided (1)
80:24
decision (3)
36:23;50:6;73:21
deem (1)
33:9
deemed (1)
53:15
defend (1)
50:4
defies (1)
51:22
define (1)
45:11
definitely (3)
27:14;40:25;52:4
definition (3)
44:25;45:4,9
degradation (1)
17:13
delay (1)
55:18
delivery (1)
6:10
demolished (1)
70:4
dense (1)
65:24

density (4)
16:10,12;17:6;71:15
deny (1)
52:12
denying (1)
68:14
DEP (1)
64:15
department (2)
7:6;56:7
depending (1)
26:3
design (11)
10:3,6,10,12;11:8;
15:1;16:15,15;20:12,
14;27:18
designed (2)
9:3;36:18
desirable (3)
10:12,23;20:4
details (1)
54:4
detriment (1)
11:11
detriments (1)
20:20
developed (2)
9:18;43:2
developing (1)
17:17
development (23)
10:18,22,24;11:2,7,
23;14:20;16:23,25;
17:22,23;18:4;19:25;
31:4;37:5,19;38:19;
39:9;42:9;43:18;70:7,
21;79:3
developmentable (1)
13:17
deviation (2)
12:4;26:20
deviations (2)
14:10;16:14
difference (2)
22:4;77:9
different (5)
39:23,25;65:1;70:3;
80:6
dimensioned (1)
54:11
dimensions (1)
54:6
direct (3)
4:15;21:5;44:9
disasters (1)
73:5
disc (1)
54:21
discuss (3)
4:22;80:8;81:19
discussed (4)
33:16;64:9;79:22;
80:9

discussion (3)
67:20,24;68:2
discussions (1)
76:14
dislike (1)
68:3
disrespect (1)
28:22
distance (4)
39:11,12,13,24
distinctively (1)
51:19
district (3)
47:10,12;49:9
documents (1)
18:8
dollars (1)
83:7
Don (2)
82:13,15
done (7)
37:6;54:11;55:25;
59:1;71:22;81:13,13
don'ts (1)
68:11
door (2)
24:8;58:23
dormant (1)
86:5
do's (1)
68:10
DOT (1)
38:22
dots (1)
58:4
down (7)
61:10;69:12;73:5;
81:16,16;82:24;84:12
drawer (1)
75:25
drip (1)
58:9
driveway (7)
24:5,6,9;54:24;55:3;
66:5,15
driving (2)
39:12,12
Due (5)
4:5;8:22;9:24;16:3;
30:4
duly (3)
46:23;49:2;51:9
dumpster (1)
58:24
during (2)
36:10;65:7
DYFS (1)
74:19

**E**

earlier (1)
4:12

easel (1)
5:11
echo (1)
72:6
Education (1)
48:23
effect (1)
31:23
efficient (3)
14:15,16;17:23
eight (2)
74:17,23
either (3)
6:19;48:8;73:24
ejector (1)
55:10
elevations (1)
30:1
eliminate (3)
24:17;25:1,7
eliminated (1)
79:18
else (10)
25:19;42:23;44:6;
46:6;48:19;49:23;51:3;
53:2;71:19;72:4
emergency (5)
20:7;23:15;24:9;
64:9,12
enclosed (3)
21:13;45:25;70:1
enclosure (2)
49:15;58:24
encourage (3)
13:16;17:20;18:3
encroaches (1)
13:7
encroaching (1)
15:4
encroachment (1)
15:10
end (2)
74:10;75:11
energy (1)
17:13
engineer (9)
4:21;9:4;18:19;26:3;
58:10;60:7;64:6;66:10,
12
Engineering (3)
44:14;53:12;61:25
engineers (1)
14:25
enough (1)
82:21
ensure (1)
52:6
entirely (1)
43:6
entities (1)
72:11
entrance (9)
20:1;23:10,16,23;

24:7;26:10,11;66:5,15
environment (5)
10:13,24;17:14;20:1,
5
environmentally (1)
17:16
equally (1)
49:17
estimated (1)
38:17
evaluation (1)
49:9
Evan (1)
61:24
even (4)
9:17;38:16;65:9;
85:18
evening (8)
3:9;4:3;7:20,21;
8:20;46:16;47:4;87:16
everybody (2)
80:9;81:9
everybody's (1)
22:3
everyone (1)
79:15
exact (1)
44:3
exactly (2)
43:7;48:12
Excellent (1)
19:20
except (1)
69:4
excuse (4)
69:9;74:25;78:14,14
excused (1)
87:15
Exhibit (5)
5:4,5,21;56:24;66:2
exhibits (2)
5:3;59:16
existed (1)
15:3
existing (23)
8:23;9:2;12:18;13:6,
20;14:8,14,16,21,24;
16:4,18;17:25;18:10,
11;19:10;24:5;54:18,
20;55:9;58:5;62:12;
79:14
exit (3)
23:17,23;66:15
expect (6)
70:6,14,20;78:25;
79:2,6
expert (1)
23:19
explanation (2)
53:16;54:2
expressed (1)
80:22
extend (1)

59:12
extends (1)
60:1
extent (1)
54:10
exterior (1)
58:18
extra (1)
11:17

**F**

facilities (3)
45:11;69:1;82:18
facility (5)
18:14;30:5;71:2;
83:15,16
fact (15)
8:22;16:3,24;22:13;
34:8;38:23;65:8;73:23;
74:25;75:4;77:24;
79:22;82:15;84:2,9
factor (1)
30:12
FAIELLA (1)
5:7
family (1)
18:14
fantastic (1)
82:25
far (7)
22:18;25:22;37:14;
62:16;73:21;75:15;
77:10
feasible (1)
85:11
feel (6)
37:14;69:1,11,20;
72:9;75:1
feet (12)
9:24,24;12:10,12;
13:1,5;25:25;57:15,22;
58:13,17;59:19
fellow (1)
82:12
fence (7)
58:23,25;59:2,5,6,7;
60:3
few (2)
61:19;68:16
field (1)
66:14
fields (1)
82:21
figure (1)
66:6
filings (1)
4:22
final (4)
3:19,23;60:23;67:11
find (2)
61:10;70:6
fine (4)

7:3;8:7;44:21;50:24
fire (15)
5:24;6:1,10,15,16,16,
19,20;7:6;16:5,6;
23:15;24:10;72:20,25
firm (3)
3:12;73:15;74:4
first (8)
30:4,9,22;31:7;52:8;
54:3;60:22;65:23
fit (4)
23:13,17;24:10;
54:12
five (10)
9:6;37:7;38:16,24;
51:25;52:6,17,22,24;
70:10
fixtures (1)
60:9
flat (9)
27:23;28:5,8,16,19;
29:8,22;31:6;33:20
floor (4)
30:4,9;31:7;78:15
floor-to-ceiling (1)
31:10
flow (1)
62:9
flows (1)
62:11
focus (1)
80:7
folks (1)
73:7
follow (2)
5:9;37:1
foot-candle (1)
59:11
force (1)
38:2
form (2)
22:7;48:11
formal (3)
47:14,18;48:11
forth (3)
5:25;19:8;61:3
forward (3)
46:15;51:4;52:7
forwarded (1)
54:21
found (1)
6:23
four (4)
9:6,23;24:22,23
French (1)
74:25
front (6)
15:10;30:5;57:12,17,
17;69:6
full (1)
39:2
functions (1)
43:18

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 28 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 141-15    Filed 04/30/26    Page 29 of 37
PageID: 2655

In RE: Wallington

Transcript fo Proceedings

**further (10)**
7:8;10:16;13:14,24;
14:4;16:21;17:19;20:4;
54:2;60:17
**furthering (1)**
17:10
**Furthermore (2)**
54:5;57:19
**furthers (1)**
13:25
**future (5)**
49:19;62:13;72:13;
79:3,7

## G

**game (3)**
83:9,9,10
**gather (1)**
35:21
**gave (2)**
68:10;79:16
**Gee (1)**
5:18
**general (2)**
10:20;12:2
**generate (2)**
36:21;40:25
**generated (2)**
37:18;71:3
**generator (2)**
64:9,19
**gives (1)**
19:25
**glad (1)**
74:1
**goals (5)**
12:1,2;14:4;16:12;
17:10
**goes (4)**
16:23;17:10,24;38:6
**Good (10)**
3:9;7:20,21;46:16;
61:9;62:17;81:15;
84:10;86:7,8
**governing (1)**
33:6
**grant (7)**
6:24;7:7;15:9;19:5;
31:22;54:12;76:25
**granted (3)**
28:20;29:2;68:14
**granting (8)**
11:5,11;12:3;16:20;
18:9;20:3,19;80:9
**grass (2)**
13:2,11
**Great (2)**
5:20;36:13
**greater (2)**
31:10;38:3
**Gross (1)**
3:12

**ground (1)**
29:19
**ground-level (2)**
11:15,17
**guess (8)**
8:15;12:10;26:13;
56:9;75:15;76:7;78:21;
84:17
**guests (1)**
20:8
**guide (3)**
10:17;13:16;16:22
**guys (4)**
28:14;65:18;82:14,
14

## H

**half (1)**
38:17
**hand (3)**
5:9;71:6;75:24
**handle (1)**
62:16
**happen (2)**
23:14;71:7
**heading (1)**
65:23
**health (1)**
10:19
**hear (5)**
3:8;44:19;63:22;
77:16,18
**heard (11)**
14:3;16:9;18:19;
46:10;48:20;51:3;53:3;
70:9;76:16;79:11,13
**hearing (10)**
4:5,6,14;14:4;16:10;
23:13;28:17;46:9;53:5;
73:7
**hearings (2)**
4:3;28:23
**heart (3)**
16:24;17:10;49:13
**heavy (2)**
8:10,11
**hedgerow (1)**
58:2
**height (18)**
8:17;9:22;11:6,17;
12:4,6;25:8,22;26:6;
27:8;29:14;30:10;
31:10;33:24;34:2,3;
68:23;69:4
**held (1)**
67:24
**help (2)**
15:6;58:11
**helpful (1)**
5:6
**HERLINSKY (17)**
73:11,14,14;76:15,

19,20;77:15;78:7,17;
80:20;81:7;82:5,7,9;
84:19;85:5,9
**high (2)**
65:25;83:15
**high-density (2)**
47:11,12
**higher (2)**
27:1;30:9
**highest (1)**
49:25
**hire (1)**
74:4
**Hold (5)**
35:14;48:24;84:20;
85:5,12
**Home (7)**
3:4,13,14,18,23;4:17,
19
**Homes (1)**
10:5
**honest (1)**
79:16
**horse (1)**
85:14
**hours (1)**
71:25
**house (1)**
40:7
**household (1)**
38:1
**households (1)**
38:10
**housing (10)**
17:7;18:4,7,15;38:9;
40:22;47:11,13;52:10;
61:2
**hurricanes (1)**
73:5
**hypothetical (1)**
33:11

## I

**idea (3)**
73:25;81:21;83:3
**identification (2)**
5:14;57:8
**identified (1)**
18:5
**identifies (1)**
19:25
**identify (3)**
20:6,9;61:22
**identities (2)**
48:4,7
**illegal (2)**
52:11,11
**impact (3)**
14:23;47:10,11
**impede (1)**
80:11
**important (3)**

7:2;17:8;19:22
**impossible (1)**
72:17
**improper (1)**
17:14
**improve (1)**
13:21
**improvement (5)**
12:18;14:21;15:2,6;
19:9
**improvements (2)**
18:21;57:21
**improving (2)**
13:8;14:23
**include (2)**
46:5;59:11
**includes (2)**
14:10;45:10
**inclusive (1)**
42:12
**income (4)**
38:2,4,6;42:13
**inconsistent (1)**
11:22
**increase (7)**
18:13;34:2;49:11,14,
15;58:9;72:2
**increases (3)**
16:3,7;20:8
**increasing (2)**
18:23;55:18
**indicate (3)**
54:5,15;58:4
**indicated (2)**
9:21,22
**indicates (1)**
62:10
**indoor (4)**
82:19,25;83:14,16
**informal (2)**
47:14,19
**information (30)**
34:12,13,16,17,19,
24;35:20,23;37:11,13;
47:14;48:1,3,14;49:18,
21;50:1,7,24;62:14,15,
19;75:20,23,24;76:3,5;
78:3,19;84:16
**informational (4)**
53:14;54:1;63:13;
77:3
**initiate (1)**
56:8
**initiated (1)**
56:10
**install (1)**
60:8
**installation (1)**
62:22
**instead (1)**
63:8
**insufficient (1)**
62:21

**insulting (1)**
78:9
**insurance (5)**
32:20,25;61:13;84:8;
85:10
**intended (2)**
28:22;55:8
**intends (1)**
54:17
**intensities (1)**
59:12
**interpret (1)**
80:14
**interpretation (1)**
22:12
**interpreted (1)**
80:13
**interpreting (1)**
45:19
**interpretive (1)**
80:13
**interrupt (1)**
73:11
**intersection (2)**
55:15,21
**into (10)**
15:10;20:15,16;
39:15;55:12;60:1;
62:11,12;85:10;86:3
**involved (1)**
86:2
**involving (1)**
72:10
**isolated (1)**
40:1
**issue (6)**
28:15;73:19;77:2;
80:13,18;83:21
**issues (8)**
15:1,5;28:19;32:25;
73:18;79:19,20;84:8
**Item (6)**
53:17;54:13,14;
55:15;57:10;63:1
**items (3)**
53:14,25;61:19

## J

**Jack (1)**
41:22
**JACOBS (13)**
61:19,24,24;62:5,7,
24;63:2,5,15,18,21;
64:20,23
**James (3)**
46:17,23;47:2
**Jasontown (4)**
35:19;48:8;60:2;
77:6
**Jersey (5)**
17:5,9;37:3,8;38:21
**Joe (2)**

BER-L-001670-18   08/30/2018 7:37:18 PM   Pg 29 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 141-15    Filed 04/30/26    Page 30 of 37
PageID: 2656

In RE: Wallington                                                    Transcript fo Proceedings

48:22;49:2
**July (5)**
4:4,14;44:15;47:8;
53:13
**Junior (1)**
73:15
**jurisdiction (1)**
4:8

## K

**KASPEREK (12)**
22:20,22;23:3,6,22;
24:2,11;42:25;71:20;
79:12;87:3,4
**keep (3)**
10:4;68:23;80:1
**keeping (4)**
8:23;31:12;69:17;
79:13
**kept (2)**
24:7;78:23
**Kevin (2)**
3:11;73:16
**kids (4)**
74:17;75:15;77:17;
82:22
**kind (8)**
7:10;8:19;23:15,18;
34:15;39:19;71:15;
72:9
**knock (1)**
81:16
**knocking (1)**
81:16
**knows (1)**
74:14

## L

**labor (1)**
38:1
**lack (1)**
82:17
**laid (1)**
16:16
**Land (7)**
10:16;12:1;13:15;
17:14,17,22,24
**lands (3)**
10:18;13:17;16:23
**landscaped (1)**
57:12
**landscaping (1)**
57:16
**Lane (3)**
6:1,16;72:20
**lanes (1)**
5:24
**lanterns (1)**
60:13
**large (1)**
31:24

**largely (1)**
53:14
**larger (1)**
30:4
**last (19)**
7:19;8:13;11:16;
15:20,21;19:11;23:21,
21,22;28:16,18;34:7;
36:20;37:1;38:17;55:1;
60:7,12;64:16
**lastly (1)**
18:3
**lateral (6)**
54:16,18,20,21;55:6,
7
**Law (7)**
10:17;12:1;13:15;
73:15;77:22,23;80:5
**lawn (1)**
14:19
**lawsuit (2)**
68:14;77:13
**layout (2)**
14:16,17
**leaks (2)**
28:19,24
**lease (2)**
32:3,8
**least (2)**
15:4;49:16
**leave (3)**
50:22;69:2;73:3
**left-hand (1)**
23:9
**lends (1)**
11:18
**lengthy (1)**
8:20
**less (1)**
38:17
**lessening (3)**
14:14;17:22;18:10
**letter (1)**
61:20
**level (1)**
55:17
**liability (1)**
33:1
**liar (5)**
50:5,9,9,16,17
**light (5)**
56:3,5,15;60:9;85:24
**lighting (5)**
59:11,16,17,18;60:1
**limit (1)**
52:13
**limited (1)**
80:2
**line (13)**
43:17;54:23;55:2;
57:12,15,17,23;58:9,
14,15;59:12;60:10,14
**lines (4)**

6:2;9:17;22:24;
58:18
**listed (1)**
37:20
**Listen (1)**
50:20
**listening (1)**
61:16
**little (9)**
26:12;38:3;39:11;
42:7;60:17,25;63:9;
68:2;69:22
**live (1)**
20:2
**living (2)**
74:17,23
**LLC (6)**
3:3,4,13,14,18,23
**locate (2)**
65:17,18
**located (5)**
11:12;20:21;57:11,
14,22
**location (4)**
11:14;14:2;53:19;
65:10
**locations (2)**
17:3;53:19
**Locust (1)**
71:23
**logic (1)**
51:22
**long (2)**
58:8;79:5
**look (15)**
29:6;37:9;47:22;
60:4;71:15;73:18;75:3,
9;76:2;80:17;83:8;
84:6,8,9;85:10
**looked (1)**
86:3
**looking (4)**
26:10;38:9;77:7;
86:4
**Lot (31)**
3:17,22;9:17;15:22,
24;16:1;24:1,2;31:15;
36:21;37:12,25;38:24;
40:11;43:17;57:15,17,
22;58:13,15,18,19;
60:2;62:10;69:13;
70:15;72:3;79:24;
82:14,14;85:2
**lots (10)**
8:23;9:10,12,14;
43:1,3,10;61:6;71:17;
72:13
**loud (3)**
3:6,6;73:7
**low (1)**
42:13
**lower (2)**
38:16,24

## M

**Main (17)**
4:1;13:1,2,5,12;
14:19;26:10,11,18;
36:3;55:16;58:3,11;
59:19;60:17;62:8;
65:23
**mainly (1)**
34:10
**maintain (1)**
13:20
**maintained (1)**
49:16
**maintaining (6)**
14:8,12;17:15,16,25;
27:3
**major (2)**
12:1;27:7
**makes (2)**
60:25;61:1
**making (1)**
14:15
**man (1)**
83:23
**management (1)**
18:20
**mandated (1)**
82:1
**manner (2)**
10:19;81:1
**many (14)**
24:17;34:8;40:18;
41:5;51:18;70:6;74:14;
75:15;77:4,11,11,12;
78:24;79:1
**mark (3)**
6:17;77:25,25
**marked (2)**
5:14;57:7
**market (1)**
41:19
**marking (1)**
5:5
**markings (1)**
6:17
**Martie (1)**
57:5
**massive (1)**
58:7
**master (8)**
14:5,7;16:11,24;
17:11;18:1,5,8
**match (2)**
10:4;12:20
**matches (3)**
10:21;11:1,9
**mats (4)**
45:1,5,15,17
**matter (11)**
26:9;36:10;53:3;
74:25;75:4;77:24;

79:23;82:16;84:2,9;
87:16
**maximum (2)**
9:22;25:8
**may (6)**
4:14;35:22,24;44:14;
53:12;79:3
**maybe (9)**
38:25;45:14;48:8;
50:18,19;52:3;70:2,9;
74:20
**Mayor (2)**
23:18;49:6
**mean (16)**
9:9;23:25;27:7;
28:15;32:9;35:6,6;
39:11;43:12;58:7;68:6;
70:18;73:18;74:17;
83:19;85:22
**meaningful (1)**
61:11
**means (1)**
52:21
**meant (1)**
9:14
**measured (1)**
29:15
**median (2)**
38:2,4
**meet (4)**
17:4;21:10,24;76:25
**meeting (14)**
4:6;8:13;18:17;
23:21,22;32:15,17;
36:11;47:8;51:16;61:2;
64:17;74:12;87:13
**MELFI (42)**
6:14;7:1,4;21:17;
24:16,20;27:21;28:15,
25;29:6,12,13,16,20;
31:5,11,16;39:1;45:18,
23;46:2;64:4,8,14,16,
19;66:23;68:10,13;
69:8,11,16;70:24;
76:20,24;79:11;84:5,
24;86:6,8,14,15
**Melfi's (1)**
72:7
**Melissa (2)**
51:9,13
**member (1)**
48:22
**members (8)**
3:10;7:9,10;22:16,
19;24:14;44:23;64:3
**memory (1)**
3:16
**mention (3)**
28:23;56:11;63:13
**mentioned (7)**
9:5;14:13;18:6;
19:12;39:16;65:22;
71:13

In RE: Wallington                                                                    Transcript fo Proceedings

**met (2)**
85:25;86:2
**middle (2)**
4:15;7:17
**Midland (2)**
55:16;71:23
**midway (2)**
29:16,16
**might (5)**
22:18;39:18;58:21;
59:5,6
**million (1)**
83:7
**mind (2)**
8:6;77:19
**minimize (1)**
36:18
**minimized (1)**
11:13
**minimum (1)**
57:12
**minor (7)**
5:22;11:6;12:4;
14:10;42:22;63:6,18
**minute (1)**
29:1
**Miss (1)**
7:15
**missed (2)**
55:7;60:11
**missing (1)**
7:24
**mistake (1)**
30:1
**mix (2)**
40:4;44:3
**moderate (1)**
42:13
**modification (1)**
14:11
**modify (1)**
6:5
**moment (1)**
71:6
**money (2)**
33:2;49:10
**month (2)**
7:19;84:21
**months (2)**
16:10;38:6
**monument (13)**
19:13,22,24;20:3,21;
54:7;64:25;66:4,14,18;
67:4,6,14
**MOORE (120)**
3:5,9,11;4:10,13;5:3,
8,18;6:12,22;7:3,5,14,
19;8:10;9:8,19;12:8,
12,14,17,23;15:11,15,
17;19:7,15,18,20;
20:25;21:3,21;22:9;
24:22;28:21;29:5,23;
30:6,13,17,19,25;31:3,

8,14,20;32:4,7,11,15,
22;33:3,13,22,24;
34:25;35:3,7,11;36:13,
16;40:21;41:16,24;
42:18,21;43:4,13,23;
44:1,8,9,13,21;45:16;
46:4;47:20,24;50:3,11,
15;52:8,18,23;53:5,6,9,
11;55:14;56:16,19,23;
57:2,9,25;58:20;59:9,
22;60:6,19;61:18;62:1,
18;63:11;64:7;65:4,14,
17;66:10;69:3,10;
72:15;73:2,16;76:18;
78:4;80:20;82:4,7;87:8
**more (26)**
9:7;10:6,8;11:2,8;
12:4;14:15,19;17:23;
26:24,24;36:15;38:23;
44:7,9,24;45:16;51:24;
52:16,22;54:10;59:3,7;
69:22;70:15;77:17
**moreover (1)**
10:20
**Morningside (9)**
3:3,14,22;4:17,19;
34:9;42:3,6;52:5
**most (8)**
8:22;9:2;20:14;
27:18;37:20;53:13;
58:1;79:13
**mostly (1)**
9:1
**motion (7)**
67:18;68:9;84:20,22,
25;85:8;86:9
**Mount (3)**
35:19;48:9;77:5
**move (2)**
40:14;69:12
**Moving (2)**
3:1;52:7
**Mrs (1)**
70:25
**much (4)**
37:24;48:17;49:10;
77:18
**multifamily (2)**
3:20,25
**Municipal (9)**
10:16,17;12:1;13:15,
16;16:21,22;60:16;
86:3
**municipality (3)**
50:18,19;56:4
**must (2)**
35:6,20
**myself (1)**
37:7

**N**

**name (5)**

3:11;41:21;46:25;
48:22;51:11
**name-calling (1)**
79:19
**names (1)**
77:7
**name's (1)**
41:22
**narrow (1)**
72:23
**necessarily (1)**
40:3
**need (31)**
8:25;11:16;13:18;
14:10;15:19;16:4;18:7;
21:21,22;30:9;34:3;
46:13,18;48:24;49:1;
50:23;51:7;62:17;
63:22;67:18;69:1;71:5;
81:12,13,19,20;82:2;
84:20;86:9,12;87:8
**needed (2)**
10:3;13:6
**needs (2)**
17:4;54:10
**negative (3)**
11:11;14:22;68:8
**negatives (3)**
18:22;19:2,3
**Neglia (4)**
44:14;53:11;60:20;
61:25
**neighborhood (4)**
11:4,25;20:18,23
**New (23)**
3:4,13,17;5:21;10:5;
17:5,9;37:3,21,23;38:5,
13,21;40:2;61:1;65:1;
69:6;71:5,14,15;75:17,
18;80:17
**next (8)**
9:20;12:24;24:8;
64:21;66:4;74:12,12;
84:20
**nice (3)**
19:25;20:1;61:8
**nicer (2)**
29:7,9
**nine (1)**
83:10
**nobody (3)**
49:23;50:10;74:14
**non-apartments (1)**
34:21
**nonconformities (1)**
18:11
**nonconformity (1)**
14:15
**None (1)**
27:23
**normal (2)**
24:1,2
**north (1)**

58:19
**Northern (3)**
37:3,8;38:21
**note (1)**
55:15
**notice (1)**
68:13
**notwithstanding (1)**
22:13
**now's (1)**
22:17
**Nuckel (2)**
33:15;44:3
**number (22)**
8:21;9:5;12:9;13:12;
14:4,13;18:9;37:19,25;
38:1;40:25;48:7;49:17;
51:23,23;52:20;54:16;
62:8;73:18,22;74:8;
82:1
**numbers (2)**
37:2,17

**O**

**objection (1)**
67:22
**obligation (1)**
81:10
**obviously (6)**
13:5,15;25:8;37:24;
38:3;62:20
**occupy (1)**
32:16
**occur (1)**
58:15
**occurs (1)**
60:17
**o'clock (2)**
83:10,10
**October (2)**
87:10,12
**off (4)**
5:17;7:17;38:7;
85:12
**offer (1)**
19:7
**offered (3)**
82:19;84:5,5
**offering (3)**
83:8,22;84:13
**office (7)**
4:12;47:17;54:22;
74:5,6;78:1,13
**official (6)**
6:15,20;34:11;49:25;
66:12;72:25
**off-street (1)**
57:14
**off-the-record (1)**
67:23
**old (1)**
3:1

**Once (2)**
40:5,7
**one (42)**
8:4,5,8;9:18;11:25;
15:20,20;23:8,10,16,
16,23,23;24:19;26:4,6,
15,19;30:2,3,13,19,22;
31:3;35:15;39:7;40:5;
43:2;44:24;54:3;58:18;
59:17,18;61:4;63:12;
64:4;68:6;72:10,12;
76:12,14;80:13
**one- (2)**
40:5;41:3
**one-bedroom (2)**
42:11;74:16
**one-bedrooms (1)**
77:11
**ones (1)**
63:17
**one's (1)**
30:25
**ongoing (1)**
86:1
**only (22)**
9:25;11:25;13:9;
15:6;16:14;18:22;
19:24;20:6;23:10,23;
24:7;26:20;35:14;
39:14;47:15;52:6,9,12;
53:25;58:14,14;80:1
**on-site (4)**
8:24;13:19;16:12;
17:7
**on-street (1)**
12:25
**onto (3)**
13:10,22;59:14
**open (30)**
17:12;18:18;21:8,14,
17,20,23;22:6;25:11,
14,17;36:11;44:19,25;
45:5,7,10,25;46:2,4,8;
61:12;63:17;69:22,23,
23,25,25;80:11,15
**operate (1)**
55:16
**opinion (3)**
68:19;70:21;81:24
**opportunity (1)**
78:16
**OPRA (15)**
34:14,23;35:3,22;
36:3,5;51:19,21;70:5;
71:9;73:9;74:9;77:4;
84:3;85:6
**option (1)**
27:15
**order (3)**
14:9;18:12;62:6
**ordered (2)**
76:22;77:10
**ordinance (14)**

11:20;14:6,7;15:23;
16:25;17:18;18:2,17;
21:25;22:1,6;25:13;
27:13;45:25
**ordinances (1)**
12:2
**originally (3)**
53:12,17;65:2
**others (2)**
42:18;61:7
**out (26)**
5:9;16:16;18:8,16;
20:22;22:9;33:6,8;
38:19,25;51:18,25;
52:6;53:16;55:6,7;
66:7,16;69:13,21;70:4,
6,14;81:14;85:18,19
**outdoor (1)**
40:12
**outside (1)**
40:8
**outstanding (1)**
63:6
**outweigh (2)**
19:3;20:20
**over (8)**
12:18;16:1,2;19:9;
23:21;36:10;64:10;
77:19
**overall (1)**
20:23
**overcrowding (2)**
82:17;83:12
**overflowing (1)**
71:5
**overriding (2)**
77:19;80:18
**own (1)**
38:21
**ownership (3)**
43:5,7;44:4
**ownerships (2)**
43:22,24

**P**

**paper (1)**
43:15
**parapet (4)**
11:21,21;12:21;
27:12
**parcel (2)**
80:2,4
**parcels (1)**
58:15
**parking (35)**
5:13,23;6:1,4;11:15,
17;12:25;13:4,6,10,22;
14:11,17;15:3,15;16:6,
13;18:16;25:5;27:9;
40:11;45:1,6;57:11,14,
18,20,21;58:2,11,13,
17,19;60:1;71:17

**part (13)**
33:4;42:7;54:8;
58:16;66:17,20;67:7;
68:15;69:25;76:13,13,
14;86:3
**past (1)**
38:6
**pattern (4)**
10:22;11:2,23;14:20
**patterns (2)**
9:3;11:8
**pavers (1)**
60:14
**PAWLUCZUK (6)**
25:3,18;71:8;79:11;
86:16,17
**peak (1)**
29:17
**people (9)**
38:1,1;52:1;56:5;
74:23;77:14;78:12;
79:20;84:6
**per (2)**
38:1,5
**percent (12)**
15:23,24,25;16:1,1,
2;18:18;21:12;24:24;
25:9;79:17;81:17
**perfectly (1)**
81:15
**perform (1)**
55:20
**permits (1)**
15:23
**permitted (4)**
9:23;12:25;16:12;
17:6
**person (2)**
35:15;77:16
**personal (1)**
68:19
**personally (1)**
77:10
**perspective (4)**
11:24;19:23;26:23;
40:16
**perspectives (2)**
15:8;20:18
**pertains (1)**
19:12
**phone (3)**
5:16,19;36:6
**pink (1)**
5:25
**pinpoint (1)**
39:19
**pipe (6)**
62:12,15,15,16,20,22
**piped (1)**
62:12
**pitch (1)**
29:3
**pitched (2)**

30:24;33:20
**place (4)**
19:23;47:15;66:16;
87:13
**plan (21)**
3:3,19,24;14:5,7;
16:12,24;17:11;18:1,5,
8;54:6,8,11;59:11;
64:11,21;66:24;69:15;
79:2;81:21
**planner (4)**
4:16;7:16;50:4;78:1
**planner's (1)**
4:18
**planning (6)**
11:24;12:2;19:23;
26:23;56:7;57:3
**plans (6)**
5:22;55:1;58:2;
59:16;60:12;67:11
**planted (1)**
13:2
**play (4)**
40:8,11,15;82:22
**played (3)**
82:13,13;83:2
**playground (1)**
40:13
**Pleasant (3)**
35:19;48:9;77:5
**please (6)**
22:22,25;46:19,22;
51:12;61:23
**pleasing (1)**
26:25
**Plus (3)**
15:15;31:20,21
**pm (1)**
87:17
**point (12)**
20:14;29:15;43:3;
47:7;50:4;53:16;60:4;
78:5;81:4,4;84:19;85:7
**police (1)**
23:15
**POLTEN (15)**
7:11;32:18;33:1,9,
17,23;70:24;72:19;
79:12;84:23;85:15,20;
86:11,20,21
**popular (2)**
83:24;84:1
**position (1)**
66:1
**positive (1)**
68:7
**possible (4)**
47:11;72:12;73:3;
81:1
**possibly (3)**
19:4;25:7;36:8
**posts (1)**
58:25

**prefer (1)**
48:10
**preliminary (3)**
3:19,23;60:23
**premises (2)**
32:16;41:15
**prepare (1)**
79:7
**prepared (1)**
5:21
**present (3)**
43:8;78:20;80:25
**presented (2)**
49:7;79:23
**preserve (1)**
61:7
**pretty (6)**
31:16;49:10;55:10;
58:6;65:24;84:1
**prevent (2)**
17:13;59:14
**previous (1)**
22:23
**previously (6)**
4:24,24;6:9;7:16;
18:6;41:24
**primarily (1)**
61:4
**principal (2)**
44:2;57:11
**principals (1)**
43:6
**prior (2)**
14:3;16:9
**private (3)**
17:4,21;37:14
**probably (6)**
9:6;25:4,9;38:18;
58:9;60:14
**problem (1)**
83:12
**procedures (1)**
17:21
**process (3)**
56:9,9;66:21
**professionals (2)**
44:18;46:11
**prohibited (1)**
19:13
**project (18)**
3:18,20,23,25;4:17,
19,23;10:5;23:6;32:13;
55:13;68:17;71:3,13;
72:10;79:25;81:3,25
**projects (2)**
37:20;47:13
**promote (4)**
10:12,19,23;17:12
**promotes (1)**
20:4
**prompt (1)**
75:14
**proper (1)**

81:6
**properly (1)**
80:8
**properties (5)**
3:25;10:7;11:9;
38:12;59:14
**property (14)**
13:11,23;14:8;15:3;
20:5,6,24;31:19;59:12,
17,19;60:10,13;80:6
**proposal (3)**
13:13,18;16:11
**Proposed (12)**
5:13,22;14:19;18:19;
20:12;25:16;53:20;
54:4;57:17,20;59:11;
65:2
**proposing (2)**
13:4;15:25
**protecting (1)**
48:13
**provide (18)**
16:5;17:2;18:21;
19:14,24;25:17;27:11;
34:15;48:1,2,3;54:4,
18;56:23;57:16;59:13;
62:18;84:16
**provided (1)**
55:12
**provides (4)**
11:15;13:19;14:1;
54:3
**providing (10)**
14:16,17;16:13,18;
17:7;18:6,14,15;31:14,
24
**provisions (2)**
21:25;22:1
**public (10)**
10:19;13:7;17:4,21;
36:11;37:17;38:14,18;
49:18;79:21
**pull (4)**
13:22;37:16,22;
66:16
**pulling (1)**
13:10
**pump (4)**
55:4,10,12;64:21
**pumping (1)**
64:9
**Purpose (12)**
10:17,23;13:24,25;
16:21;17:2,12,19,20;
18:3;20:4;27:7
**purposes (5)**
10:16;13:14,21;20:7;
68:24
**pursuing (1)**
78:24
**put (18)**
6:1,6;29:3;31:19;
50:23;51:19;52:2;

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 32 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 141-15    Filed 04/30/26    Page 33 of 37
PageID: 2659

In RE: Wallington

Transcript fo Proceedings

60:13;62:4;65:6,8,12;
66:1,23;68:17;73:23;
77:12;78:18
**putting (4)**
13:10;33:16;75:9;
85:13

## Q

**qualified (3)**
4:25;7:16;41:25
**quality (2)**
18:20;54:20
**quick (5)**
5:15;25:21;39:5;
40:1;85:23
**quickly (1)**
20:10

## R

**RACHELSKI (34)**
25:21;26:1,8,12,17,
21;27:2,6,14,19;28:8,
13;29:10,13,18,21;
30:11,15,18,21;31:2;
32:2;39:5,10,21;40:17,
23;41:5,14,17;71:11;
80:16;87:1,2
**railroad (3)**
55:5;59:20;67:10
**railroads (1)**
23:9
**raised (1)**
80:19
**RAKER (9)**
41:11,13,18,22,22;
42:1,10;65:10,20
**rate (1)**
41:19
**rather (1)**
5:21
**real (3)**
5:15;71:22;73:19
**reality (1)**
11:1
**really (18)**
11:10;18:22;19:2;
30:12;40:12;44:4;
49:14;60:23;61:5,6,11;
68:19;71:14,21;72:17;
77:9;78:2,6
**rear (8)**
8:25;11:13;25:24;
30:3;57:15,22;58:14,
18
**reason (4)**
20:25;31:5;39:15;
78:23
**reasons (5)**
12:3,19;13:23;19:1,8
**recall (9)**
4:15,20;7:15;30:7;

40:20;51:17;64:8,17,
18
**recalls (1)**
8:19
**receive (2)**
50:1;56:12
**received (2)**
47:13,18
**recent (1)**
58:1
**recently (1)**
86:1
**recommend (2)**
55:20;58:22
**recommends (1)**
60:7
**record (6)**
3:11;9:9;51:20;
52:25;53:7;62:4
**recreation (32)**
18:14,18;19:16;21:9,
16,23,24;22:7;24:21;
25:13,15;30:5;31:7,13,
15;33:14;40:12;45:11,
12,17,22,24;46:3,5;
68:20,21;69:17,24;
70:1;72:8,22;73:8
**recreational (9)**
13:20;30:8;32:19;
61:11;68:23;71:1;72:7;
79:14;80:10
**rectified (1)**
53:22
**red (1)**
22:24
**redevelop (1)**
72:12
**redeveloping (1)**
17:25
**redo (1)**
34:23
**refer (1)**
39:6
**reference (1)**
49:19
**referring (2)**
47:9;53:9
**refresh (1)**
3:16
**regard (7)**
16:14,17;19:21;
37:25;38:11;62:9;
67:18
**regarding (1)**
8:16
**regards (5)**
6:16;21:7,8;46:12;
68:2
**regulation (1)**
15:21
**regulations (1)**
52:10
**related (3)**

3:14;4:3;43:5
**relates (1)**
37:23
**relevant (1)**
50:6
**remain (1)**
25:9
**remainder (1)**
6:4
**remember (1)**
40:18
**re-modifying (1)**
10:10
**remove (1)**
79:17
**removed (1)**
69:20
**re-notice (1)**
4:8
**re-noticed (1)**
4:6
**renting (1)**
52:1
**Repeat (1)**
45:3
**report (10)**
6:18,18,19;44:15;
53:11,14,17;60:20;
73:1;75:13
**representing (1)**
3:13
**represents (1)**
19:9
**request (24)**
4:7;31:25;34:14,18,
23;35:22;36:3,5;47:13,
18;48:11;50:24;51:20,
21;53:24;70:5;71:9;
73:9;74:10;76:4;77:4;
84:3;85:6,9
**requested (4)**
19:6;20:20;22:10;
79:18
**requesting (2)**
8:21;10:15
**require (4)**
11:21;26:6;27:13;
54:2
**required (7)**
33:20;34:3,15;40:22;
52:10;53:16;64:15
**requirement (2)**
21:24;34:2
**requirements (5)**
12:7;16:8;18:18;
61:3,13
**requires (2)**
31:9;57:19
**requiring (2)**
12:5,21
**resembles (1)**
10:7
**reserve (1)**

44:10
**residence (1)**
39:25
**residential (1)**
64:13
**residents (12)**
14:18;18:15;20:2,7;
31:25;33:14;44:17;
61:12;81:1,2,10;82:2
**resolve (1)**
32:23
**resources (1)**
83:22
**respect (8)**
12:20;54:14;55:14;
57:9;58:13;59:9;60:6,
21
**respond (1)**
29:24
**response (2)**
56:3;65:19
**responses (2)**
44:14;60:20
**responsible (1)**
32:20
**rest (3)**
31:4;55:12;78:18
**restrict (1)**
52:20
**restrictions (2)**
5:14,23
**resubmission (1)**
53:23
**resulted (2)**
37:7;38:14
**reuse (1)**
18:12
**reusing (1)**
18:11
**revealing (1)**
48:4
**review (3)**
66:18,21,25
**revise (2)**
58:23;59:10
**revised (3)**
20:12;44:15;53:13
**revising (1)**
70:10
**revision (1)**
64:25
**rhetorical (1)**
83:19
**ridge (1)**
29:3
**ridged (1)**
27:22
**right (47)**
7:14,23;9:11,23;
13:4;15:9,13;19:5;
22:19;23:10;24:12;
26:14,18;27:25;29:5,
20;30:25;31:20;39:11;

42:3,5,17,18;43:13;
44:22;49:10;51:5;
59:23;63:11;64:1;
67:16;68:5;69:18;71:6;
72:1,2,13,21;73:19;
76:23;77:24;78:11,15;
81:13;84:19;85:14,20
**right-of-way (4)**
13:7;15:4;58:6;
66:19
**rigid (3)**
59:3,3,7
**rink (1)**
55:11
**river (4)**
23:9;59:20;62:9,11
**roll (1)**
86:12
**roof (24)**
10:3,6,10;11:1,8,21;
27:1,1,12,22;28:6,9,12,
16,19;29:3,3,8,22;30:3,
24;31:6;33:20,21
**roofs (1)**
9:25
**room (2)**
52:3;68:7
**roots (2)**
75:3,3
**routes (2)**
6:10,11
**Rutgers' (4)**
37:2,16;38:12,21

## S

**Sacred (1)**
49:13
**Saddle (2)**
59:20;62:9
**safe (1)**
13:19
**safety (3)**
10:19;14:25;20:9
**same (9)**
14:18;19:8;26:14;
27:3;33:18;43:7;44:4;
87:13,13
**sanitary (1)**
54:15
**satisfied (3)**
53:15;63:13,24
**satisfy (1)**
62:21
**Saturday (1)**
83:9
**sauna (1)**
52:2
**save (1)**
24:18
**saw (2)**
54:12;59:2
**saying (11)**

29:8,19;30:22;52:16,
19;67:1;69:8;73:7;
74:6;78:2;81:22
**school (13)**
34:9,11;35:18;40:8;
47:10;49:9,13;51:18;
70:15;71:5;73:9;77:5;
83:15
**schoolchild (1)**
38:14
**schoolchildren (6)**
36:22;37:4,8,18;
38:18,23
**schools (6)**
47:5;49:24;70:18,19;
71:4;78:10
**screen (1)**
22:23
**screened (1)**
57:13
**second (8)**
24:5;30:19;41:7;
59:18;67:18;84:23,25;
86:10
**seconds (1)**
55:19
**secretary (2)**
47:17;78:13
**Section (4)**
8:14;15:12;57:10;
58:22
**seek (1)**
22:13
**seeking (1)**
42:21
**seems (4)**
23:7;61:9;83:7,20
**sense (3)**
19:23;26:24;81:16
**sentiment (1)**
72:7
**separate (8)**
9:11;21:25;22:1;
26:5;43:4,22,23;72:11
**separately (1)**
72:13
**separates (1)**
58:15
**separation (2)**
8:15;25:7
**September (1)**
56:21
**series (1)**
43:8
**Service (1)**
55:17
**services (1)**
20:7
**set (6)**
19:8;26:14;55:1;
58:1;61:3;66:18
**setback (6)**
14:11;15:10;25:3,5;

27:1;43:12
**setbacks (1)**
9:16
**settle (1)**
66:8
**settlement (1)**
68:16
**seven (1)**
38:25
**several (2)**
20:10;83:7
**sewer (6)**
54:15,23;55:2,4,9,12
**shall (10)**
54:4,5,18,19,21;
57:12,14,16;59:10,13
**shame (1)**
61:10
**shaping (1)**
17:22
**share (4)**
44:1,2;48:13,14
**shared (1)**
80:3
**Sheet (4)**
59:22,24;60:5;62:11
**shield (1)**
58:11
**shielding (1)**
59:13
**show (6)**
5:22;30:1;55:2,6;
58:4;59:25
**showed (4)**
36:21;37:3;59:18;
67:9
**shown (5)**
6:3,9;53:21;64:11;
66:2
**shows (1)**
37:17
**shrubs (2)**
13:3;58:10
**side (11)**
23:8,9;54:24;57:15,
22;58:14,18,19;59:25;
68:6;79:19
**sidewalk (1)**
60:15
**SIEK (10)**
86:14,16,18,20,22,
24;87:1,3,5,10
**sight (2)**
67:12,14
**sign (24)**
19:13,22,24;20:3,12,
19,21;32:3,3;54:7,9;
65:1,7,12,25;66:4,6,14,
18,24;67:3,4,6,14
**signage (3)**
15:20;54:5,6
**signal (1)**
55:21

**signalization (1)**
55:22
**signs (1)**
67:2
**Sills (2)**
3:12;73:15
**similar (5)**
37:10;38:2;39:20;
40:16;43:6
**similarities (2)**
37:25;38:8
**simple (2)**
79:22;82:10
**single (1)**
77:16
**sit (1)**
81:19
**site (25)**
3:2,19,24;9:18;10:1;
11:13;15:6;16:3,7,15,
15;17:1,16,17,25;
18:22;20:15;24:25;
54:6,7;55:4;58:5;
62:11,16;69:15
**sitting (2)**
75:25;82:10
**situation (2)**
11:19;13:8
**sizable (1)**
86:2
**size (1)**
11:6
**slightly (5)**
13:22;18:13,24;27:1;
39:22
**slope (7)**
9:25;10:6;26:23,25;
27:3;28:10,11
**sloped (2)**
11:1;30:2
**small (2)**
58:4;76:13
**SMITH (10)**
48:21,22;49:2,5;
50:8,13,17,21;78:9,12
**soccer (6)**
82:13,19,25;83:3,14,
16
**soccer's (1)**
83:25
**solid (2)**
59:6;60:3
**somebody (4)**
74:15;75:21,21;83:1
**somehow (1)**
70:10
**someone (3)**
5:18;26:10;50:5
**someplace (1)**
40:14
**sorry (12)**
23:3;28:4;39:6;41:8,
20;45:2;46:20;60:11;

61:24;64:7;69:10;
78:16
**sort (1)**
20:1
**sought (1)**
7:7
**south (5)**
54:24;59:25;60:17;
65:23;73:5
**southerly (1)**
55:3
**space (25)**
14:1;17:2,13;18:18;
21:9,14,18,20,23;22:6;
25:11,14,17;44:25;
45:7,10;46:2,5;69:22,
23,24,25,25;80:11,15
**spaces (5)**
27:9;45:5;57:18;
58:3,11
**speak (4)**
36:9,14;72:25;78:16
**speaking (1)**
5:4
**specifically (1)**
45:24
**spend (1)**
71:25
**spillage (1)**
59:14
**spoke (4)**
4:11;47:17,21;50:22
**spoken (1)**
73:17
**spot (2)**
30:23;66:3
**spread (2)**
69:21;70:4
**stance (1)**
40:18
**stand (2)**
50:14;74:2
**standard (3)**
21:10;60:9,16
**standing (2)**
8:6;58:21
**stands (1)**
72:21
**start (2)**
8:16;68:6
**starts (1)**
40:7
**state (1)**
22:6
**stated (1)**
80:14
**states (1)**
54:14
**stating (1)**
6:20
**station (2)**
64:10,21
**statistics (1)**

36:19
**status (1)**
56:2
**statutory (1)**
74:11
**stay (4)**
33:18;58:21;68:20;
72:22
**staying (1)**
69:5
**steel (1)**
58:25
**step (2)**
46:14;51:4
**stick (1)**
27:8
**still (5)**
21:21;25:9;33:13;
70:8,14
**stories (1)**
9:23
**storm (1)**
18:20
**straight (1)**
28:14
**straightened (1)**
85:18
**strain (1)**
83:21
**street (3)**
4:1;20:11,22
**streetscape (3)**
27:17;31:1;60:9
**strictly (2)**
28:24;42:15
**striping (1)**
6:21
**structure (3)**
59:4,7;79:14
**structures (1)**
53:20
**student (3)**
48:4,7,13
**students (6)**
41:1;48:7;49:11,14,
15;85:7
**studies (3)**
36:20;37:6;38:21
**study (7)**
37:17;38:11;55:21;
56:14;71:21,22;85:23
**stuff (2)**
33:2;71:16
**style (1)**
11:3
**styled (1)**
11:3
**subject (1)**
9:10
**submit (2)**
63:6;67:11
**submitted (6)**
6:15;49:20;53:19;

54:8;55:2;60:12
**submitting (1)**
5:21
**subsequent (2)**
53:22,23
**substantial (1)**
17:9
**sucked (1)**
83:2
**sufficient (6)**
14:1,17;16:13;17:2;
23:24;62:23
**suitable (1)**
6:24
**summation (2)**
44:10;60:21
**superintendent (4)**
36:9;47:5;49:24;
78:10
**superintendent's (1)**
74:1
**supply (1)**
18:4
**support (1)**
21:22
**supposed (1)**
21:10
**Sure (14)**
8:18;33:15;34:22;
35:21;36:23;52:1;
55:10;62:7;67:13;70:8,
14;73:20,20;81:12
**surface (1)**
15:15
**surround (1)**
80:10
**surrounding (12)**
10:4,8,9,13,21;11:2,
7,9,22;14:20;15:7;
39:17
**swear (4)**
46:18,21;49:1;51:7
**swore (1)**
28:18
**sworn (7)**
4:24;7:16;41:24;
46:24;48:25;49:2;
51:10
**symmetrical (1)**
29:7
**system (1)**
77:5

**T**

**table (1)**
7:25
**talk (5)**
33:24;56:2;65:8;
74:13;85:19
**talked (3)**
50:5;56:6,6
**talking (9)**

35:15;39:1;41:18;
42:2,6;51:17;73:19;
82:17,17
**talks (1)**
12:24
**tall (1)**
58:7
**taller (1)**
26:13
**tear (4)**
61:10;82:24;83:7;
84:12
**technical (4)**
43:14;61:6;63:9,19
**technically (1)**
9:17
**techniques (1)**
10:25
**televise (1)**
54:19
**telling (1)**
81:14
**ten (2)**
37:20;38:11
**testified (18)**
11:16;12:19;14:25;
15:2;16:17;21:22;26:3;
30:7;34:7;36:20;37:6;
41:23;44:19;46:11;
52:24;57:21;64:25;
70:13
**testify (1)**
37:2
**testifying (2)**
5:10;70:16
**testimony (18)**
4:16,18;7:17;8:13,
16;14:3;16:9;21:5;
31:17;44:8,10;54:8;
65:8;67:17;68:24;70:9;
79:16,23
**that'd (1)**
83:24
**thinking (2)**
27:2;70:2
**though (5)**
9:17;27:5;28:11;
30:13;39:23
**thought (2)**
31:12;39:18
**three (7)**
41:8,9,10,11,12;
42:11;52:9
**three- (1)**
52:2
**three-bedroom (3)**
40:19,24;42:12
**three-bedrooms (8)**
40:21;41:2,11,12;
51:23;52:9;73:24;
77:12
**throw (2)**
45:1,5

**tie (1)**
55:11
**tight (2)**
69:19;70:19
**today (5)**
20:12;44:19;62:11;
64:25;70:10
**together (2)**
43:9;69:19
**told (5)**
28:10;34:19;35:11;
75:9;80:12
**TOMKO (7)**
23:20,25;85:13,17,
22;87:5,6
**tonight (1)**
76:2
**took (1)**
39:15
**top (1)**
23:8
**topography (1)**
10:1
**total (3)**
42:10,12;68:18
**totally (1)**
71:10
**town (11)**
31:20,25;32:20;
37:24;68:16;71:17;
82:3,20;84:7,11;86:5
**towns (3)**
37:8,9,13
**town's (1)**
57:2
**tracks (2)**
55:5;59:20
**traffic (10)**
14:17;20:8;55:20,25;
56:3,5;71:22;72:3;
85:23,24
**transcripts (1)**
28:22
**transit (2)**
39:7,21
**transit-oriented (4)**
37:18;39:8,10,22
**traversed (1)**
60:4
**trees (4)**
58:5,6;65:22,23
**trestle (1)**
65:16
**triangle (2)**
67:12,14
**tried (1)**
37:22
**truck (4)**
6:10,10;16:5;72:23
**trucks (2)**
23:15;24:10
**trust (1)**
75:13

**trusted (1)**
74:8
**try (4)**
37:10,22;66:6;81:12
**trying (6)**
10:4;16:5;23:13;
75:5,19,19
**turn (1)**
5:17
**two (32)**
3:14;4:3;5:25;8:23,
24;9:10,11,14;15:18;
16:10,20;21:25,25;
22:4;26:5;38:18;40:5;
43:1,10,20,21,23,24;
58:15;59:16;61:5,6;
71:9;72:10,11;78:12;
83:10
**two-bedroom (3)**
40:6;42:11;52:2
**two-bedrooms (6)**
40:18;41:4,6,17;
51:24;77:11
**type (3)**
16:25;36:19;85:11
**typo (1)**
55:8

**U**

**unable (1)**
37:12
**under (2)**
55:17;75:2
**underground (2)**
45:1,6
**underneath (2)**
66:1;68:21
**understands (1)**
81:9
**unduly (1)**
36:17
**uneasy (1)**
72:9
**unfortunately (2)**
32:24;37:12
**unified (1)**
43:6
**unique (2)**
8:24;16:16
**unit (1)**
38:15
**units (25)**
31:18;36:19;38:13;
39:2;41:13;42:15,17;
52:1;68:15,17,18,25;
70:12,13,13,14;73:22;
75:6;76:21;77:1;80:2,
4,23,25;82:1
**unless (1)**
21:3
**untenable (1)**
55:17

**up (15)**
22:12;28:17;37:1,16,
22;46:12;47:23;53:25;
58:21;74:2,15;77:16;
81:20;82:8,15
**upon (8)**
14:21;15:4;20:13;
26:3,22;34:20;37:8;
38:20
**usage (1)**
32:3
**Use (9)**
10:16,18;12:1;13:15,
16;14:15;16:22;17:23;
32:19
**used (3)**
71:23,25;84:1
**uses (5)**
14:2;17:3,14;53:21;
61:11
**using (1)**
69:1
**usually (1)**
39:25
**utilities (1)**
43:19
**utilize (4)**
31:25;33:13;54:17;
55:9
**utilized (1)**
38:10
**U-turns (1)**
20:10

**V**

**vacuum (1)**
74:14
**valid (1)**
36:22
**variance (25)**
8:13;9:15;10:3,15;
11:18;12:10,24;13:6,
18;15:21;19:12;20:20;
21:22;22:10,13;26:6;
27:13;29:2,11;30:10;
31:6;33:25;57:20;
68:23;69:4
**variances (33)**
3:24;8:21,25;9:1,6,
20;11:6,11;15:9,19;
16:20;18:10;19:6;
23:12;24:17;25:2,3,5,8,
10,22;28:20;43:12,14;
61:4,7;69:14;72:14;
76:24;79:18,25;80:10;
81:17
**variances' (1)**
9:15
**variations (1)**
27:8
**variety (2)**
14:2;17:3

**various (1)**
17:20
**vehicle (1)**
55:18
**verbal (3)**
34:18;35:23;51:21
**versus (2)**
21:9;34:20
**viable (1)**
43:10
**Victor (1)**
73:14
**view (2)**
17:22;66:15
**village (1)**
39:7
**villages (2)**
39:22,22
**vinyl (2)**
59:2,7
**vision (1)**
66:20
**visitors (1)**
20:9
**visual (3)**
10:13,24;20:5
**visually (1)**
26:13
**VOICE (2)**
8:5,8
**voiced (1)**
79:15
**voicing (1)**
81:23
**vote (3)**
78:25;81:24;85:2

## W

**wait (5)**
29:1;35:13;85:1,3,3
**waiver (2)**
53:23;57:19
**walk (1)**
40:7
**walking (2)**
39:13,24
**Wallington (41)**
3:3,4,13,14,18,22;
4:2,17,19;10:5;37:10,
23;38:3,4;45:9;47:6;
48:23;49:6,25;54:9;
55:23;60:8;61:1;65:7,
12;66:6;67:3,8;74:23;
75:3,4,21,22;76:6;81:2,
10;82:14,22;83:11,22;
84:1
**Wallington's (1)**
75:18
**wants (4)**
40:7,8;58:11;84:7
**Warren (2)**
55:25;56:14

**waste (2)**
65:12;83:8
**water (3)**
18:20,20;62:10
**way (12)**
6:8;22:16;29:1;
44:19;45:18;52:12;
69:17,18,23;71:24;
81:6,13
**week (2)**
56:13;74:10
**Welcome (6)**
54:9;65:7,12;66:6;
67:3,7
**welfare (1)**
10:20
**Wellington (1)**
50:19
**weren't (1)**
63:12
**West (9)**
37:21,23;38:5,13;
71:14,15;75:17,18;
80:17
**what's (5)**
73:22;76:6;81:12,21;
82:2
**Whereupon (7)**
5:13;46:23;49:2;
51:9;57:6;67:23;87:15
**wherever (3)**
24:10;65:18;66:5
**Whitehall (1)**
49:8
**whole (10)**
17:24;23:11;41:14;
42:3,6,8,9;70:7,7,21
**who's (2)**
47:17;68:25
**willing (1)**
63:22
**wine (1)**
52:3
**wish (1)**
48:20
**wishing (3)**
51:3;53:3;87:12
**withdrawn (1)**
53:24
**within (6)**
12:25;13:5,7;57:22;
58:13,17
**without (6)**
20:10;32:13,15,17;
36:17;48:3
**witnesses (3)**
25:20;28:18;87:15
**won (1)**
77:14
**wonder (1)**
5:18
**work (9)**
3:5;33:8;43:9;60:25;

66:8;71:24,24;76:1;
81:21
**worked (1)**
33:6
**working (3)**
61:13;62:17;86:5
**worry (1)**
79:21
**written (1)**
36:4
**wrong (4)**
21:4;50:18,19;66:3
**WYGONIK (21)**
34:6,22;35:5,9,16,
25;36:2;42:2,5;47:25;
48:6,15;69:16;70:25;
76:9,12,23;78:23;
84:22;86:24,25

## Y

**yard (4)**
8:25;15:10;40:9;
57:17
**year-round (1)**
83:25
**years (3)**
68:17;74:3;79:4
**yellow (3)**
6:3,21;22:24
**yoga (4)**
45:1,5,15,17
**York (9)**
37:21,23;38:5,13;
40:2;71:14,15;75:18;
80:17
**York's (1)**
75:17
**Yup (1)**
3:9

## Z

**zoning (13)**
11:20;12:2,19;14:5,
7;16:24;17:18;18:2;
19:10;21:1;22:5;27:12;
45:9

## 0

**02 (1)**
38:14
**04 (1)**
13:5

## 1

**1 (1)**
77:6
**1,132 (1)**
38:12
**11 (3)**

5:10;44:14;53:12
**12 (1)**
38:6
**13 (5)**
34:10;37:4;38:23;
56:21;70:9
**130 (1)**
49:15
**134-unit (1)**
3:20
**14 (1)**
53:13
**14th (1)**
44:15
**15th (1)**
4:6
**17 (1)**
24:24
**17's (1)**
5:10
**17th (2)**
87:10,13
**18th (2)**
4:5,14

## 2

**2 (2)**
8:14;77:6
**2.7 (2)**
59:24;60:5
**2002 (1)**
15:5
**2015 (1)**
38:7
**2017 (4)**
44:14;53:13,13;
56:22
**207 (5)**
39:2;68:18;72:1;
76:21;77:1
**208 (3)**
68:17;70:12,14
**20-foot (1)**
58:9
**25 (4)**
15:23;18:18;21:12;
71:25
**25-foot (2)**
13:1;15:12

## 3

**3 (1)**
8:14
**30 (3)**
15:25;42:11;59:18
**330-39B (1)**
57:10
**35.01 (1)**
3:22
**35.02 (1)**
3:17

**36 (1)**
15:12
**365-25G1 (1)**
8:14
**365-25M3 (1)**
15:12
**3-foot (1)**
26:20

## 4

**40 (1)**
42:10
**44-year (1)**
48:22
**45 (1)**
9:23
**48.5 (2)**
9:24;12:12
**49.42 (1)**
12:10
**49.5 (1)**
25:25

## 5

**5 (6)**
16:1;53:17;57:15,22;
58:13,17
**50 (1)**
13:1
**551 (1)**
4:1

## 6

**6 (5)**
11:12;12:9;25:24;
30:2;59:25
**6.12 (2)**
54:3,13
**60 (1)**
49:14

## 7

**7 (5)**
26:2;54:16,23;58:19;
60:2
**7.11 (1)**
54:14
**7.14 (3)**
62:8,8;63:2
**71 (2)**
3:17,22
**72 (2)**
42:7;70:13
**73 (8)**
31:18;39:3,4;42:15,
17;68:25;70:13;80:2
**736.3 (1)**
55:18
**73-unit (1)**

3:25
**75 (1)**
15:24

## 8

**8 (10)**
16:2;26:2;28:5,8;
30:4;54:16,23;55:6;
58:19;60:2
**8.4 (1)**
55:15
**83 (1)**
16:1

## 9

**9 (1)**
55:7
**9.1 (1)**
57:10
**9.14 (1)**
59:10
**9.15 (1)**
60:7
**9.2 (1)**
58:22
**9/13/17 (1)**
57:7
**9:08 (1)**
87:16
**95 (3)**
25:9;79:17;81:17