Jessica C. Caldwell, P.P. Volume I
October 30, 2025

UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 2:20-cv-08178
- - -

NEW WALLINGTON HOME, LLC, a New Jersey
limited liability company; and MORNINGSIDE
AT WALLINGTON, LLC, a New Jersey limited
liability company,

      Plaintiffs,

    vs.

BOROUGH OF WALLINGTON; BOROUGH OF
WALLINGTON PLANNING BOARD; MARK W. TOMKO,
in his official capacity as former Mayor of
the Borough of Wallington; DOROTHY B. SIEK,
in her official capacity as former Tax
Collector for the Borough of Wallington;
and CHRISTOPHER ASSENHEIMER, in his
official capacity as Certified Tax
Collector of the Borough of Wallington,

      Defendants.
    — — —

- - -
October 30, 2025
Volume I
- - -

Oral DEPOSITION of JESSICA C. CALDWELL, P.P., Non-Party Expert Witness taken pursuant to notice, held at the Law Offices of O'Toole Scrivo, LLC, 14 Village Park Road, Cedar Grove, New Jersey, commencing at 10:07 a.m., before Caren Sheehan, Certified Court Reporter - Notary Public.  There being present:

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A P P E A R A N C E S:

O'TOOLE SCRIVO
BY: JAMES DiGIULIO, ESQUIRE.
14 Village Park Road
Cedar Grove, New Jersey 07009
973-239-5700
Representing the Plaintiffs

PFUND McDONNELL, P.C.
BY: GERALD A. SHEPHARD, ESQUIRE.
139 Prospect Street
Ridgewood, New Jersey 07450
Gshephard@pfundmcdonnell.com
Representing the Defendants

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

                              INDEX


 WITNESS                                      PAGE

 JESSICA C. CALDWELL, P.P.

   BY MR. DiGIULIO                      6




                      E X H I B I T S



  NO.              DESCRIPTION                 PAGE

Exhibit          Caldwell Report              6

Caldwell-1

Exhibit          notice                       6

Caldwell-2

Exhibit          Dr. Steil's report,          40

Caldwell-3

Exhibit          March 18, 2008 decision in   45

Caldwell-4        the Bergen County Superior

                  Court, 800P04 through P010

Exhibit          April 22, 2015 decision by   58

Caldwell-5       Judge Meehan

Exhibit          March 2, 2016 order of       72

Caldwell-6       Judge Meehan

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

E X H I B I T S

 NO.                DESCRIPTION                    PAGE

Exhibit            final judgment against the    79
Caldwell-7         Borough dated January 17,
                   2019

Exhibit            transcript from the July       85
Caldell-8          18, 2017, planning board
                   hearing for the Morningside
                   and New Wallington joint
                   application

Exhibit            public hearing Borough         90
Caldwell-9         Planning Board dated
                   September 19, 2017

Exhibit            Borough of Wallington          127
Caldwell-10        Resolution Number 2019-167

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

Page       Line

NONE

Request for Production of Documents

Page       Line

NONE

Information to be Inserted

Page       Line

NONE

Questions Marked

Page       Line

NONE

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

(Whereupon, Exhibit Caldwell-1,

Caldwell Report, was marked for

identification.)

(Whereupon, Exhibit Caldwell-2,

notice, was marked for identification.)

THE COURT REPORTER:  Mr. Shephard, do

you want a copy.

MR. SHEPHARD:  Yes.

- - -

JESSICA C. CALDWELL, P.P., after having been

duly sworn, was examined and testified as follows:

- - -

EXAMINATION BY

MR. DiGIULIO:

Q.   All right.  Good morning,

Ms. Caldwell, how are you?

A.   Good morning.

Q.   We met briefly before off the

record.  My name is James DiGIULIO, I

represent the plaintiffs in the case filed

in the Borough of Wallington defending the

District Court of New Jersey.  We're here

today for your deposition.

Do you understand that?

A.   Yes.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.    Okay.  You have a few things in front of you.

A.    Yeah.

Q.    It looks like your report, Mr. Steil's report.  And what else do you have there?

A.    Just some notes.

Q.    Okay.  Why don't you put those aside.

A.    Okay.

Q.    If you need to refer to anything as we go along, that's fine, but I'll be providing you --

A.    Okay.

Q.    -- marked exhibits.

A.    All right.

Q.    Let me show you what we marked as Caldwell-1.

A.    Okay.

Q.    And that -- it has your report date of September 11, 2025; is that right?

A.    Yes.

Q.    Okay.  And do you know how long you were -- how long before the date of that report you were obtained?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.    About a month.

Q.    About a month okay.

A.    Six weeks.  Sometime in August, I think.  Early August.

MR. SHEPHARD:  I can't help you with this.

BY MR. DiGIULIO:

Q.    I'll give you instructions in a minute, but we'll do that?

A.    Okay.

Q.    Yeah, whatever you can answer just say about a month, you think before the date of the report.  So sometime maybe in August of 2025?

A.    Yes.

Q.    Okay.  And can you turn to Page 30 of your report, please?

A.    Which one?

Q.    30.  The last sentence of the report provides, in conclusion, the Borough is actively supporting affordable housing and remains compliant with state affordable housing guideline obligations with language decisions driven by legitimate concerns aligned with the goals of its master plan

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

and ordinances.

Do you see that?

A.   Yes.

Q.   Okay.  And that is your expert opinion in this case, that the Borough is compliant with its state affordable housing obligations; is that right?

A.   Yes.

Q.   Okay.  And you've all -- you've offered that opinion to a reasonable degree of certainty, right?

A.   Yes.

Q.   Okay.  Have you offered any other expert opinions in the report, that you're aware of?

A.   Any other expert opinions, you mean -- what do you mean by that?

Q.   Conclusions of opinion like that. Are you aware of any others that you've offered?  I mean --

MR. SHEPHARD:  Note my objection.  The report speaks for itself and whatever conclusion.

THE WITNESS:  Yeah, I think there are various conclusions throughout the report

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

about different sections.  You know, each section has some type of conclusion or statement in it.

BY MR. DiGIULIO:

Q.   Okay.  We'll go through those. Any other -- any other opinions you -- you've offered outside of the report?

A.   Outside of the report in this case?

Q.   Yeah.  Do you have any intention to amend your report in any way?

A.   Not currently.

Q.   Okay.  Great.  Let me take that from you for now.  We'll get it back, leave that there.

All right.  Now, you were served with a deposition notice we marked it as Caldwell-2.

Have you seen that before?

A.   Yes.

Q.   Okay.  And as part of that, you were asked to bring with you your file materials.

Did you see that in the notice?

A.   Yeah.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   Okay.  And prior to us going on the record, you did in fact come with a redwell of materials, correct?

A.   Yes.

Q.   Okay.  And I've taken that, and it's being reviewed by my office currently.

Do you understand that?

A.   Yes.

Q.   Okay.  We'll return that afterwards.

A.   Thank you.

Q.   Okay.  Thank you for bringing that in.

A.   Sure.

Q.   In anticipation of today's deposition, what did you do to prepare?

A.   I re-reviewed the documents from the file, reviewed my report, reviewed Dr. Steil's report, and then I met with Mr. Shephard yesterday and discussed the case in general and the report.

Q.   Okay.  Between the time that you issued your report and today, are you aware of any new facts or circumstances that would alter your opinions?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   No.

Q.   The documents you reviewed, you said Dr. Steil's report and your report. Do you recall anything else in particular that you reviewed to prepare for today?

A.   Some of the resolutions and then some of the court decisions.

Q.   Okay.  And those are all documents that you referenced in your report?

A.   Yes.

Q.   Did you review any documents that you didn't previously review to prepare your report?

A.   No.

Q.   Have you been -- have you been deposed before?

A.   No.

Q.   Okay.  I'll give you a couple instructions and if you have any questions, feel free to ask.

A.   Okay.

Q.   As you can see, we have a court reporter to my right and your left, she will be taking down everything you say.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

This is supposed to be a factfinding question and answer by me.  We're here today to understand what you can answer today sitting here based on your personal knowledge and your expert experience.

Do you understand that?

A.   Yes.

Q.   And at the end of your deposition, we'll receive a transcript that will have word for word transcription of everything done today.

Do you understand that?

A.   Mm-hmm.

Q.   And you've been sworn under oath, so while this is an informal conference room, this is as if you were in court testifying.

Do you understand that?

A.   Yes.

Q.   And throughout the case as it moves forward, Mr. Shephard and/or I may use the transcript of your deposition for various reasons.

Do you understand that?

A.   Yeah.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   Because we have a stenographer, we have to be mindful and I speak very quickly, so I already apologized to her, but trying not to speak over each other. You will probably know where I'm going for some questions, but let me get it out, and I will do my very best to let you complete your answer, understood?

A.   Yes.

Q.   Okay.  If I do happen to cut you off and you're not done, please feel free to let me know and I'll let you continue with your answer.  Okay?

A.   Okay.

Q.   This is not a memory test, so if you need to reference your report for any facts, feel free to let me know and we can get the report back in front of you.  Okay?

A.   Okay.

Q.   If you need to use the restroom, get a water break, just need a break, just let me know.  I'm not here to torture you or anything like that.  Okay?

A.   Okay.

Q.   From time to time, Mr. Shephard

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

may object to my questions, let the lawyers deal with the back and forth on the objection, and then -- in most cases, Mr. Shephard will direct you to then answer.  In some instances, he may not.  So wait for that direction before actually answering.  Okay?

A.   Okay.

Q.   And because of that, you might want to give a little pause before answering, just so he can inject his objection if necessary.

A.   Okay.

Q.   All right.  One other very important instruction, if you don't understand my question, please be sure to ask me to restate it, because otherwise everyone that reads your transcript, we will all assume that you understood my question.  Okay?

A.   Okay.

Q.   Okay.  And if I asked you for time, dates, and you can't give me a specific date, but you have an idea of a range, feel free to offer that, but just

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

let me know that you're guessing or you're

estimating.  Okay?

        A.    Okay.

        Q.    Have you ever served as an expert

witness before?

        A.    Yes.

        Q.    In what capacity?

        A.    I served as an expert witness in

planning cases, applications before Land

Use Boards, and I've also served as an

expert witness in Superior Court for

affordable housing cases.

        Q.    Okay.  Let's start with the last

one, you said, the affordable housing

cases.  You were never deposed in those?

        A.    No.

        Q.    Okay.  What was your -- what --

for what purpose did you offer expert

opinion?

        A.    As the municipal planner for

housing elements at Fair Share plans.

        Q.    Okay.  And in all those instances

were done with the affordable housing

Superior Court matters, in all those

instances, was your client a municipality?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.    Yes.

Q.    Okay.  Walk me briefly through what would that expert assignment, you gave us a general understanding, but just a little more detail about that.

A.    All right.  So in the third round, all the cases were moved to Superior Court for certification instead of being at the counsel for affordable housing as an administrative procedure.  So we would eventually get to a fairness hearing.  And as a municipal planner, I would testify to the housing element and my opinion that it basically met the obligations and regulations and that it was unfair to low and moderate income people.

Q.    In all those instances that you testified -- and you said, did you actually testify or offer a written opinion?

A.    I would testify.  In most cases.  In some cases it would be a written opinion and they would have -- they also have what's called special adjudicators, which are the planners hired by the courts.  Sometimes those are the only planners that

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

gave testimony, but in many cases, I also gave testimony as a municipal planner.

Q.   And as you gave -- in either instance where you either gave oral or written opinions about this, in each instance, your testimony was the particular municipality had met the standard as you saw it; is that right?

A.   Yeah.

Q.   Okay.  And you mentioned round three, just so the record's clear, can you just explain what you're referring to when you say round three?

A.   So round three is the third round of affordable housing.  Basically went from 1999 to 2025.  And so that's a period of time that municipalities end up in New Jersey Fair Housing Act has to comply with obligations for affordable housing.

Q.   And just so we're all clear, with references, and that arose not only out of the Fair Housing Act, but also out of some Supreme Court decisions; is that right?

A.   Yeah, not all decisions.  Municipal and law.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   Very good.  And while we're on that topic, the state legal obligations that you reference that you believe the Borough of Wallington, is compliant with, that includes their Fair Housing Act in New Jersey?

A.   Yes.

Q.   The Mount Laurel 1 and 2 documents from the Supreme Court?

A.   Yes.

Q.   New Jersey Constitution and municipal land use law, generally?

A.   Yes.

Q.   Any other New Jersey state obligations that -- you generally reference state obligations, is there anything else that you think of that I didn't include in that list?

A.   Just with the state in some capacity depending, it seems to be a different organization every time, but comes up with the actual number that the municipality needs to comply with.

Q.   Sure.  And those -- and that would be a reference to most recently,

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

round four?

A.   Round four, the obligation that came from EPA.  You know, round three, it was -- kind of came through settlement.  So it kind of -- it used to be COAH, so it's sort of an obligation, but it's come from different places over time.

Q.   They're all emanating out of the Mount Laurel doctrines in the and the Fair Housing?

A.   Correct.

Q.   You also mentioned that you testified before land use boards, correct?

A.   Yes.

Q.   And is that typically -- is there an instance that you know where you testified on behalf of an applicant as opposed to for the municipality?

A.   Yes.

Q.   So you do both?

A.   Yes.

Q.   Okay.  And if you look at the last page of your report, Caldwell-1, there's two -- there's two listings on the last page.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   The last page of my CV?

Q.   The entire -- yeah.  Yeah.  At the top it says, municipal clients and the -- and then there's another bucket, expert witness in the following municipality client.

Do you see that?

A.   Yeah.

Q.   Municipal client, I assume is fairly self explanatory.  Those were all municipalities that you actually testified on behalf of?

A.   Yes.  Well, I was contracted by those municipalities to do some work.

Q.   Okay.  Great.  And I was going to ask you that.  So you actually acted as the town planner in some capacity?

A.   In some capacity.  Sometimes I was a special consultant for some reason, sometimes affordable housing, sometimes just to do a specific report or something like that.  But as a planner, I was contracted with all those municipalities in that way.

Q.   Got it.  Now the second was, were

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

those actually your clients or those are

the municipalities or counties in which the

matters were pending?

A.   That's where I testified on

behalf of private clients in those

municipalities or for some county entities,

like county app boards.  So it's all sorts

of -- some type of land use process.

Q.   And of your private clients, did

any of those applications include a

development that included affordable

housing?

A.   Yes.

Q.   Would that be a majority of them,

most of them?

A.   No, I would say it was a

minority.  I represented primarily some --

100 percent affordable housing project for

low income housing tax credit projects.

Q.   You said that would be the

majority of your private clients?

A.   No, that was just -- those are

the ones that involved affordable housing.

Q.   Okay.

A.   The majority of my private

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

clients are variances for a variety of

reasons.  Use variances, bulk variances,

all types of applications.

Q.   And let's focus on the category

you mentioned for affordable housing.  Can

you just clarify what you said, what did

those applications typically consist of?

A.   100 percent affordable housing is

low income housing tax credit projects

where a developer like RPM is proposing a

project that's all affordable housing.

Q.   And do you recall how many of

those you've done in the last five years?

A.   I think I've done three.

Q.   Prior to this engagement, had you

ever done -- have you ever been retained by

the Borough of Wallington?

A.   No.

Q.   Have you ever testified before

any of the land use boards of the Borough

of Wallington?

A.   No.

Q.   Have you ever acted as an expert

in any litigation pending in the Federal

District Court of New Jersey?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   No.

Q.   Any federal courts at all?

A.   No.

Q.   So Superior Court and land use boards?

A.   Yes.

Q.   Have you ever been an expert in any arbitrations?

A.   Any?

Q.   Arbitration.

A.   Arbitrations, no.

Q.   Can you give me your best estimate of how much of your work is comprised of Superior Court expert work versus municipal work?

A.   When you say Superior Court, expert work, do you mean everything leading up to the Superior Court appearance?

Q.   Yeah, an engagement that is going to be before the Superior Court for approval.

A.   And do you mean over my entire career or?

Q.   Currently, let's say currently.

A.   Currently, right now.

Q.   Right now, a lot easier.

A.   Yeah, I was going to say that's a tough call.  Right now -- so I'm representing 20 municipalities in the dispute resolution program, which is essentially Superior Court at the end of the day.  And I'd say currently that's about 40 percent of our work.

Q.   And obviously your work is not just testifying, right, but you -- what else do you do day-to-day?  Does your -- well, let me ask you this, actually:  You work for J. Caldwell and Associates, LLC, correct?

A.   Yes.

Q.   Okay.  And how many employees work at J. Caldwell?

A.   I have four employees.

Q.   And what are their -- are they -- are any of them -- just give me the titles of each of them since there's only four.

A.   I have three planners, two associate planners, and one senior planner, and an administrative assistant.

Q.   All right.  Let's talk about the

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

current engagement for a moment with the Borough.  Is your fee arrangement hourly or flat rate?

A.    Hourly.

Q.    Do you recall what the rate is?

A.    Not exactly, no.

Q.    Okay.  I don't believe I saw it.

A.    I didn't list it in the report. I noticed that your expert did.

Q.    But any --

A.    It's less than $200 an hour.

Q.    And that would have been -- and was that engagement approved through the council, through a resolution, or directly through Mr. Shephard's office?

A.    To my knowledge, it was through Mr. Shephard's office.  I didn't engage in any council approvals or anything like that personally.

Q.    And in the preparation of your report, did any of the -- put aside the administrative assistant, did any of the three planners assist in preparing the report?

A.    Yes.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   Who did that?

A.   The senior planner, Alison Kopsco.

Q.   Can you spell that for me and the reporter?

A.   A-L-I-S-O-N.  Kopsco is K-O-P-S-C-O.

Q.   Anyone else other than Ms. Kopsco?

A.   Yeah.

Q.   Anyone else help with the report or the preparation?

A.   Aside from my administrative assistant helping with typos, things like that.

Q.   No, just Ms. Kopsco?

A.   Yeah.

Q.   Okay.  And Ms. Kopsco, what did she do to assist you in preparing the report?

A.   She helped with just researching, drafting the overall report.  And then I went through and finalized everything.

MR. DiGIULIO:  Off the record for one second.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

(Whereupon, at this time a discussion was held off the record.)

BY MR. DiGIULIO:

Q.   Ms. Caldwell, just know for the record, my colleague dropped off your file back to you, so that's back in Mr. Shephard's possession.

A.   Thank you.

Q.   Thank you for bringing it.

A.   Sure.

Q.   Do you have any sort of success bonus related to this case as it relates to your engagement?

A.   No.

Q.   Okay.  Let's go to your CV.  Can you turn to -- I believe it's amended to your list 4, the next page after Page 31.

Ms. Caldwell, it says that you're a licensed professional planner in New Jersey since 2005; is that right?

A.   Yes.

Q.   Okay.  Can you just briefly describe, what does a planner do?

A.   What does a planner do?

Q.   Yep.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   So professional planners are land use planners.  So in my case, I suppose there's a whole variety of things that we do, but in my case in particular, it's mostly working on land use cases.  I represent municipalities, work with zoning master plans, land use applications, environmental compliance regulations like Highlands Regional Master Plan.  I work on state planning issues that affect municipalities, and then work on private applications before the boards.

Q.   And you have a bunch of letters after your name at the top there.  Can you walk us through each one.  PP?

A.   Sure.  So PP is a professional planner for New Jersey.  The AICP is American Institute of Certified Planners, so that's a national certification for planners.  And then Leadership in Energy and Environmental Design is a LEED certification.  Green Associate, so that's essentially a green environmental certification for green building.

Q.   And did you -- are you the

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

founder of J. Caldwell and Associates?

A.   Yes.

Q.   And when did you start that?

A.   2012.

Q.   And prior to 2012, where did you work?

A.   I worked at Harold Pellow and Associates, it's an engineering firm in Sussex County.

Q.   Can you spell the last name, please?

A.   P-E-L-L-O-W, Harold Pellow and Associates.

Q.   And you said that was an engineering firm?

A.   It's a planning engineering firm, but a little more heavy on engineering.

Q.   And when did you start at Harold Pellow?

A.   So 2012, seven years, so I guess 2005.

Q.   Did you have the same title during those seven years?

A.   No.  I mean, I think I started as the regular planner and then a senior

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

planner by the end of it.

Q.   And that coincides with the date you -- the year that you became professional planner; is that right?

A.   Yes, when I started there in 2005, yeah, I got my PP.

Q.   Was that your first job that you had where you were a licensed professional planner?

A.   Yes.

Q.   And you went right from Harold Pellow to J. Caldwell and Associates?

A.   Yes.

Q.   Okay.  Prior to your time at Harold Pellow, did you -- what did you do, where did you work?

A.   I was a planner, I worked in New York State for two years as a consulting planner.  At that time, I was certified by the American Institute Certified Planner, so still a planner.  I just wasn't working in New Jersey, so I didn't have the professional planning license.

Q.   And you worked in New York, did you need a -- did you have any New York

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

licensure at that time?

A.   No, there isn't any New York license.

Q.   And you said you were a consulting planner.  Did you work at one place or take on projects as they came?

A.   I worked at two different places. One in Westchester County and one in New York City.

Q.   Just give us the names of those, please?

A.   Serrandino and Associates, S-E-R-R-A-N-D-I-N-O, that was in Westchester.  And then in New York City it was -- now I'm drawing a blank.  Sector Planning.

Q.   Have you ever rendered an expert opinion regarding purported violations of the New Jersey Fair Housing Act?

A.   Regarding what?

Q.   Violation -- purported violations of the New Jersey Fair Housing Act?

A.   Violations by -- who would give a violation?

Q.   So let's do it this way:  Have

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

you ever rendered an opinion where the municipality was brought into a lawsuit for alleged violations of the Federal Fair Housing Act?

A.   No.

Q.   Okay.  How about the New Jersey Fair Housing Act?

A.   No.  Like I said, all of my testimony in Superior Court has been when municipalities are complying.  I've never been brought in for, like, a builder's remedy lawsuit or something like that.

Q.   Very good.  That was my next question, so thank you.  No builders remedy expert experience?

A.   No.

Q.   No.  Okay.  And you're -- you're not an attorney, right?

A.   No.

Q.   Okay.  And you -- and all of your opinions in your report and that you intend to provide in this case, are based on your experience as a planner, correct?

A.   Yes.

Q.   Do you have any experience

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

related to data analysis?

A.   Data analysis?

Q.   Yeah.

A.   I would do census data, that sort of thing.

Q.   Okay.

A.   But I wouldn't say it's an expertise in data analysis where I would do some kind of analysis, like basically look at census data from a planning lens.

Q.   Okay.  Have you ever rendered an opinion that provides statistical analyses like those set forth in Dr. Steil's report?

A.   No.

Q.   Okay.  And you're not offering an expert opinion as it relates to those statistical analyses, are you?

A.   No.

Q.   Okay.  And in this case, you're not offering opinion as to whether there was a disparate impact, unprotected classes of people based on the Borough's acts or omissions, are you?

MR. SHEPHARD:  Objection to form.

You can answer.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

BY MR. DiGIULIO:

Q.   You can answer.

A.   Okay.  Well, I think I am.  I mean, as far as, I don't believe there's a disparate impact by their actions, and I believe that was in my report.

Q.   Okay.  Well, you -- yeah.  Your report says that they've complied with their state law obligations, is your belief, correct?

A.   Right.

Q.   Okay.  That's different than, do you dispute the fact that there is a disproportionate impact on protected classes of minorities and families with children in Wallington, based on the acts and omissions of the Borough?

A.   Yes.

Q.   You do.  Okay.

Do you have any opinion as to plaintiffs' damage claims in this case?

A.   No.

Q.   Do you have an opinion on what date the Borough became compliant with their state obligations as it relates to

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

affordable housing?

A.   Yes.

Q.   When do you believe that occurred?

A.   Well, what I looked back on was 2020, the certification by Superior Court.

Q.   When the settlement with Fair Share Housing was -- so you're referring to the date in which the settlement with Fair Share Housing was ultimately approved by the Superior Court?

A.   Yes.

Q.   And that was, I believe, January 2020?

A.   Okay.

Q.   I'll refer you --

A.   I don't have it in front of me.

Q.   No, no problem.  I think you have a handy timeline in here.

If you turn to Page 8 of your report, Caldwell-1, I think the fourth entry from the bottom says, January 6, 2020, the Superior Court issues a settlement order memorializing the fairness hearing on Wallington Borough's third round of EGFSP?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   Yes.

Q.   That's the date you're referring to?

A.   Yes.

Q.   So you believe at that point, the Borough of Wallington was compliant with its state obligations, including, but not limited to, the third round?

A.   Yes.

Q.   Okay.  At that point, the fourth round did not exist; is that right?

A.   Correct.

Q.   So as of that time, everything that did exist, you believe that they were complying with?

A.   Yes.

Q.   Prior to that, they were not compliant, correct?

A.   I would say they were in the process.  So there wasn't really a way to be compliant until you -- for the third round, until you got through the Superior Court process.  They had various housing elements in fair share plans throughout that they were working towards compliance,

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

but they couldn't be certified by any entity.

Q.   And at that point, they were the subject of at least one lawsuit related to their affordable housing noncompliance; is that right?

A.   From -- are you referring to the 2015 Wallington Borough matter, the application, Borough of Wallington and that's the declaratory judgment.  The Mount Laurel?

Q.   If you don't know -- yeah, just call the --

A.   I'm not sure what you're --

Q.   -- if you don't -- yeah, if you don't -- again, if you're not sure of an answer, I don't need you to scour the report.  I'll point to where I need you to.

A.   Okay.

Q.   If you're not aware of the answer, just don't worry about it then.

And do you know, as of today, how many affordable housing units have been built to satisfy the Borough's third round obligation?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   I have it in my report.

Q.   Sure.  Take a look if you want.

A.   It's actually -- well, yeah, let's see if I can find it.  Compliance. So my understanding is the Wallington Homes project is constructed which included eight affordable units.

Q.   And that's in the middle of Page 6, Block 70-05, Lot 8.01?

A.   Yes.

Q.   Okay.  And do you know what the third round obligation was for the Borough?

A.   125 units.

Q.   So 8 out of 125 are built?

A.   Correct.

Q.   And do you know if -- do you know what types of units -- what type of affordable housing units were built at Wallington Homes?

A.   Multifamily units.

Q.   Okay.  Any restrictions, anything?  Are they age restricted?

A.   Not to my knowledge.

Q.   All right.  In preparation for -- let me just ask you this:  I think you

believe you are -- I believe you already

testified, you reviewed Dr. Steil's report;

is that right?

         A.    Yeah.

         Q.    Okay.  And let's just mark it to

make sure it's the same one you looked at.

         (Whereupon, Exhibit Caldwell-3, Dr.

Steil's report, was marked for

identification.)

         Ms. Caldwell, I'm going to hand you

what we've marked as Caldwell-3.  It's a

June 30, 2025 report prepared by Dr. Justin

Steil of MIT.

         A.    Okay.

         Q.    Is this the report that you're

referring to that you reviewed?

         A.    Yes.

         Q.    And have you reviewed the other

expert report provided in this case from

IRR, it's a damage report?

         A.    No.

         Q.    You have not reviewed that report

at all?

         A.    No.

         Q.    In preparing your report, did you

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

conduct any physical inspections of the

subject properties?

        A.    No.

        Q.    Okay.  Did you conduct any

interviews with anyone?

        A.    Any what?

        Q.    Interviews with anyone?

        A.    No.

        Q.    Okay.  Did you speak to any of

the planning board members?

        A.    No.

        Q.    Did you speak to any council

members?

        A.    No.

        Q.    Did you speak to any other

property owners in the Borough?

        A.    No.

        Q.    You didn't go see Wallington

Homes, the build units, did you?

        A.    No.

        Q.    Have you ever been in the Borough

of Wallington before?

        A.    Yes.

        Q.    Okay.  In reviewing and preparing

your report, did you review any of the

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

deficit transcripts from this case?

A.   Yes.

Q.   Do you recall who?

A.   Mr. Knuckle.

Q.   Mr. Knuckle.  Did you review the deposition of the Borough's corporate representative, Ms. Appice?

A.   No.

Q.   That's A-P-P-I-C-E.

Did you review the deposition transcript of Mayor Dabal?

A.   No.

Q.   Councilman Rachelski?

A.   No.

Q.   The only deposition you recall reviewing is that of Mr. Knuckle?

A.   Yes.

Q.   Okay.  Now, the subject properties, just so we can orient ourselves when we're referring to them, you understand there's two lots, correct?

A.   Yes.

Q.   Okay.  And in the front, there's an -- Lot 35.01 is owned by an entity called Morningside.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

         Do you understand that?

         A.   Yes.

         Q.   And the second lot, 35.02, is owned by the other plaintiff, New Wallington Homes.

         Do you understand that?

         Okay.  Yeah.  And do you understand that the properties that the 35.01 property owned by Morningside faces Main Street?

         A.   Yes.

         Q.   Okay.  And 35.02, which is owned by New Wallington Home, is behind the Morningside property?

         A.   Yes.

         Q.   And you also understand that the New Wallington Home property, 35.102, requires access through the Morningside property to access it?

         A.   Yes.

         Q.   Okay.  And do you currently know what is on those properties?

         A.   Only from the record.

         Q.   And what's your understanding from the record?

         A.   That the roller skating rink

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

remain there and that the industrial

buildings have been removed.

Q.   Now, from your review of the

record, you understand that New Wallington

Homes' predecessor filed a builder's remedy

lawsuit dating back to 2006, correct?

A.   Yes.

Q.   And quickly, what is your

understanding of a builder's remedy

lawsuit?

A.   It's essentially a developer

challenging a municipality's zoning based

on the fact that they're not providing for

their obligation of affordable housing,

which means that their zoning gets deemed

invalid.

Q.   And do you understand that the

other plaintiff in this case, Morningside,

intervened in that case?

A.   No.

Q.   Did you understand that both

parcels were the subject of that builder's

remedy suit?

A.   Yes.

Q.   Okay.  And as a result of that

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

lawsuit, did you understand that the court declared the Borough's land use controls and zoning ordinances invalid?

A.   Yes.

Q.   Okay.  And so at that time, the Borough's land use controls and zoning ordinances were not in compliance with New Jersey state law, correct?

A.   Yes.

(Whereupon, Exhibit Caldwell-4, March 18, 2008 decision in the Bergen County Superior Court, 800P04 through P010, was marked for identification.)

Q.   And I want to show you -- have you reviewed -- I'm gonna hand you what is a marked Caldwell-4.  It's a March 18, 2008 decision in the Bergen County Superior Court, Bates number P04 through P010.

And have you seen this decision before?

A.   Yes.

Q.   And as we turn to Page 2, I guess we discussed but maybe a little more detail, plaintiffs alleged that the Borough was out of compliance with the New Jersey

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Constitution, the New Jersey Fair Housing

Act, and Mount Laurel wanted two doctrines.

Do you see that?

MR. SHEPHARD:  Where are you, Jim?

MR. DiGIULIO:  On Page 2.

THE WITNESS:  They allege that is what

you're saying?

BY MR. DiGIULIO:

Q.   It actually says, following the

successful prosecution of a motion for

partial summary judgment, it was declared

that Wallington was out of compliance of

those legal obligations.

Do you see that?

A.   Yes.

Q.   Okay.  And it's your position

that between that time and in January of

2020, they got in compliance with those

state legal obligations, correct?

A.   Yes.

Q.   Now, if you turn to Page 7, and

then at the bottom, there's a -- there's a

subsection 3, determinations of law.

Do you see that?

A.   Yes.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   Okay.  And the judge says that, the principal question in the case is whether, quote, Wallington has created a realistic opportunity for the construction of its fair share of the region's needs for affordable housing, end quote.

Do you see that?

A.   Yes.

Q.   Okay.  Have you heard that language before, that a borough has an obligation -- a municipality has an obligation to create a reasonable opportunity for the construction of affordable housing?

A.   Yes.

Q.   Okay.  And in your experience as a planner, is simply the rezoning of properties to allow for the building of affordable housing sufficient to meet that obligation?

A.   It depends.

Q.   So sometimes no?

A.   Sometimes no.

Q.   Okay.  Have you ever seen instances where a borough has taken actions

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

after rezoning that have made it difficult, if not impossible, to build affordable housing?

A.   Difficult, if not impossible? No, not personally.

Q.   Okay.  Have you ever seen any instances where a borough has denied land use applications improperly for the building affordable housing units?

A.   When you say borough, do you mean municipality?

Q.   Yeah, municipality.

A.   Yes.

Q.   You have, okay.

And in those instances, do you recall if there was a lawsuit that followed?

A.   Yes.

Q.   And was there a ruling in those instances?  Is it more than one or just one that you're aware of?

A.   I'm thinking of one in particular.

Q.   And was there ultimately a decision by the court that the -- the municipalities land use determinations were

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

arbitrary, capricious, and unreasonable?

A.    For that case, yes.

Q.    In that case, okay.

A.    That wasn't a -- they weren't deemed to be out of compliance with affordable housing, just with that case was remanded back to the board.

Q.    Okay.  And typically from what you've seen, when a land use determination is deemed improper by a court is remanded back to the -- to the board?

A.    Yes.

Q.    Have you ever seen an instance where the court didn't remand and simply granted approvals without a remand?

A.    Yes.

Q.    And how many of those instances do you know of?

A.    One or two.

Q.    In this case as well?

A.    Yes, this case.

Q.    Any others beyond this case?

A.    No.

Q.    Let's get back to, the judge said a realistic opportunity for construction.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

And I think we've -- I don't want to put words in your mouth, but I think you've agreed, there are instances where a borough could comply with a builder's remedy and rezone a property, but still not provide a reasonable opportunity for development of affordable housing, correct?

A.   I think what I meant by that statement was more that, sometimes there's more they have to do than just rezoning. So there might be other programs, other processes that have to be undertaken.

Q.   And is it typical that after there's rezoning, there are then subsequent land use applications that need to be approved?

A.   Yes.

Q.   Okay.  And what would those typically entail?

A.   Usually site plan, possibly subdivision applications.  Sometimes it's redevelopment.  So you have to do a study, declare it an area in need, and then do a redevelopment plan and then do the site plan.  But typically it's site plan.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   Sure.  Have you testified or been involved in redevelopment applications?

A.   Yes.

Q.   And in those instances, were you representing municipality, a private client, or both?

A.   Both.

Q.   In those instances, did they result in a redevelopment agreement being entered into?

A.   Yes.

Q.   In any of those instances, was a pilot also granted to the redeveloper?

A.   Yes.

Q.   In all of them or most of them?

A.   Some of them.

Q.   And what does pilot -- what does the PILOT stand for?

A.   Payment in lieu of taxes.

Q.   Okay.

A.   The long term tax abatement program.

Q.   And you understand that a municipality -- actually, in your time, dealing with approvals for affordable

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

housing developments, are you aware of

instances where PILOTS were granted?

A.   Yes.

Q.   And you understand that

municipalities are permitted to provide

PILOTS as part of an affordable housing

development, correct?

A.   Yes.

Q.   Would you say that is more often

than not part of an affordable housing --

let me withdraw the question.  Let me give

you a timeframe.

In recent two or three years, would

you say that PILOTS are more often than not

granted with affordable housing

developments?

MR. SHEPHARD:  Note my objection.  Are

you asking for her expert opinion?  I mean,

she's here as an expert.

MR. DiGIULIO:  In her experience.

MR. SHEPHARD:  Okay.  Well --

THE WITNESS:  In my experience, I'd say

probably 75 percent get PILOTS.

BY MR. DiGIULIO:

Q.   And in those instances, do you

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

understand that one of the obligations --

one of the -- let me withdraw the question,

let me do it this way.

In order to obtain a PILOT, is it

your understanding, in your experience,

that the developer needs to demonstrate a

financial need for that PILOT?

A. Yes.

Q. All right. Now just turn to Page

15. And again, we're at the bottom

paragraph, first sentence. Judge Harris

finds, the order shall further declare that

Wallington's land use regulations remain

invalid and unconstitutional insofar as

they continue past exclusionary practices,

close quotes.

Do you see that?

A. At the bottom?

Q. Yes.

A. Yes.

Q. Okay. Do you have -- in your

review of the record, are you aware of the

exclusionary practices that the Borough was

undertaking at that time?

A. No. I reviewed the 2006 Housing

Element Fair Share plan.  I believe they thought they were stunned because they were built out, some providing additional zoning at the time.

Q.   Okay.  So they weren't permitting the building of affordable housing units; is that a fair?

A.   I think they thought they were able to claim a vacant land adjustment, which means that their community was built out.  And you don't necessarily have to zone.  The rules have kind of changed, so it's more clear now that you do some overlay zoning.  But I think at the time, and because it was round three, there was confusion on the part of the Borough as to whether or not they needed to do zoning for affordable housing.

Q.   Okay.  So the exclusionary past practices that the judge would be referring to then would be, not building the appropriate number of affordable housing units?

A.   Not for them -- I mean, their main requirement, as the Borough is to or

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

municipality is to zone for them.  They don't actually build them.

Q.   Yeah, but they have to create the reasonable opportunity to build, correct?

A.   Right.

Q.   Okay.  Which may include further approvals after the zoning, right?

A.   I guess building permits and whatnot.

Q.   Yeah, or the land use approvals we spoke about before.

A.   Yes.

Q.   And if a borough -- if a municipality improperly denies those subsequent land use applications, it's fair to say, they're not providing the developer an opportunity to build for a PILOT, right?

A.   I suppose so.

Q.   And do you know -- exclusionary practices, do you know who the New Jersey Fair Housing Act is meant to protect?  Do you understand --

A.   Low and moderate income people.

Q.   Do you also understand there's several other groups of protected classes

included in that?

A.   That's not -- no.  Not particularly.  It's just low and moderate income.  That's the way that I interpret it and apply it.

Q.   Got it.  Okay.

And have you ever read the -- I'll take this back from you -- have you ever read the Federal Fair Housing Act before?

A.   Yes.

Q.   Have you ever offered an expert opinion -- I think you testified, you've never offered an expert opinion as it relates to that, correct?

A.   No.

Q.   And then it's your understanding that after Judge Harris's 2008 ruling, the Borough -- Wallington undertook rezoning to comply with his order, correct?

A.   Yes.

Q.   Okay.  And thereafter, New Wallington submitted an application for a 134 multifamily housing development with 27 affordable housing units.

A.   Correct.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   And that New Wallington Home

prop -- sorry.

In that initial application by New

Wallington Home was for the property in the

back, closer to the -- to the river,

correct?

A.   Yeah, that was the second

application.  The New Wallington.

Q.   New Wallington Homes filed an

application for 134 units, that's for the

back parcel?

A.   Right.

Q.   And after that was submitted, the

Borough initially didn't deem their -- the

New Wallington Home application complete,

correct?

A.   Yes.

Q.   And are you aware of the reasons

why that happened?

A.   The only thing I saw in the

record was that there was a question about

the use.  Whether there was some use

variance question, whether it should be

before the planning board or the zoning

board.

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

Q.   Do you believe that was this initial application or maybe a later one?

A.    It might be a later one.

Q.    Any specific recollection as to the alleged basis for not deeming this 2015 application complete by the Borough?

A.   No.

Q.   Okay.  You understand that New Wallington Home ultimately filed a second lawsuit against the Borough in February of 2014 related to this application?

A.   Yes.

Q.   Okay.

(Whereupon, Exhibit Caldwell-5, April 22, 2015 decision by Judge Meehan, was marked for identification.)

Showing you what has been marked Caldwell-5.  It's an April 22, 2015 decision by Judge Meehan in that second lawsuit we just talked about, filed by New Wallington Home and Morningside, the plaintiffs in this case.

See that?

A.    Mm-hmm.

Q.    Have you seen that before?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   Yes.

Q.   And turn to Page 2, Judge Meehan does a bit of a summary of what happened that we just talked about with Judge Harris.  And then in the second full paragraph, he knows that this suit was filed on February 4, 2014, asking where New Wallington asked for a determination on its development application.

Do you see that in the middle of the second full paragraph?

A.   Yes.

Q.   Okay.  And then he says ultimately, a couple months later, in April of 2014, they entered -- the parties entered into a consent order.

Do you see that?

A.   Yes.

Q.   And then a easement was recorded on July 8, 2014.

Do you see that?

A.   Yeah.

Q.   Okay.  So after all that occurred, in your review of the record, and as said by Meehan here, there were several

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

public hearings on New Wallington Homes'
initial applicant development application,
correct?

A.   Right.

Q.   Okay.  And it looks like that
first hearing was held on July 15, 2014; is
that right?

A.   July 15?

Q.   Yes.

A.   Is that somewhere in here?

Q.   Yeah, yeah.  You can -- on that
second page.

A.   Oh, on this last paragraph, on
July 15, September 16, and October, the
board held.  Yes.

Q.   Okay.  And then it said, after
those three hearings, on October 21, 2014,
the board, the Borough board, unanimously
voted to deny New Wallington's application.

Do you see that?

A.   Yes.

Q.   Okay.  So New Wallington Home got
a denial of its application which was filed
a little less than a year prior; is that
right, in December?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   Yes.

Q.   Okay.  And then as a result of that denial, an amended complaint was filed in December of 2019 challenging that denial.

Do you recall that from your review of the record?

A.   Yes.

Q.   So now we're in our -- we're talking about the third application by New Wallington to challenge the Borough action, correct?

A.   Yes.

Q.   Okay.  Now on Page 4, at the bottom, the judge explains defendant's arguments, the Borough's position as to why it denied the application.

Do you see that?

A.   Yes.

Q.   Okay.  Now there's three -- it looks like to me in that second sentence there's three basis for the denial as set forth by the Borough.  One is, plaintiff was required to obtain a use variance because the proposed construction enlarged

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

the nonconforming use in two respects.

Do you see that?

A.   Yes.

Q.   Okay.  Do you have an understanding of what that means and what those purported enlargements were?

A.   You're asking me for what the use variance was required for?

Q.   What the Borough is -- so most of this deposition is going to be about why did the Borough, over the course of more than a decade, deny plaintiff's applications and what were the reasons.  And I think you've opined that, there were legitimate land use concerns --

A.   Right.

Q.   -- for the various denials.  I think the courts have disagreed and overturned it many times.  But I want to get an understanding of, no one -- I'm trying to get an understanding, maybe you can explain, why you believe, and maybe you don't, that this -- there were legitimate concerns in this denial of the subject of this lawsuit and what were they?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   Well, just from, you know, what they're saying is, they thought it was creating a commercial use on the property and expansion because of -- of a driveway connection to a commercial property.  So they thought there was a use variance.

Q.   Okay.  And we saw on the record that just months before they agreed to the properties being developed separately and agreed to an easement, right?

A.   Right.  Connecting those two properties.

Q.   Correct.  So probably not a surprise that there was going to be a driveway between the two properties?

A.   Right.

Q.   Okay.  And you've seen a lot of land use decisions regarding applications, right.  You've probably seen maybe hundreds?

A.   Yes.

Q.   Okay.  Have you ever seen a municipality outwardly state that they were denying an application for improper purposes?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   No, I think it's someone else makes the decision that's improper purposes once they do the denial.

Q.   So it's never -- they don't put in a public resolution that we're going to deny this because and name some bad reason, right, they never do that?

A.   No.  But, you know, I think from a case perspective, you have to look at the record and what the resolution says and what the reasons for denial were.

Q.   Sure.  But ultimately -- well, we'll keep going.  We'll go through those.

The next was -- so that addresses -- so that was their concern, as they stated here, and that you understand it, right?

A.   Right.

Q.   And ultimately -- and if you go to the next page, Page 5, the Borough also contended that plaintiff did not provide adequate evidence to support the grant of a C2 variance.

Do you see that?

A.   Yes.

Q.   Okay.  And very briefly, what is

the C2 variance for the record?

A.   A C2 variance is also known as a flexible C benefits detriments variance, where under municipal land use law, an applicant can show that meeting the positive criteria by promoting a purpose of municipality land use law.  They're not negatively impacting the public good or the municipal master plan and zoning ordinances.  And then on balance, the granting of the variance benefits outweigh the detriment.

Q.   And is there a concept of an inherently beneficial use in New Jersey law?

A.   Yes, but not under the C2 variance criteria.

Q.   Understood.  But what does that generally mean?

A.   Inherently beneficial uses are uses that are seen to be so beneficial to the public that they automatically meet purpose.  A municipal land use law which is serving the general welfare.

Q.   And as you said, that doesn't

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

apply to a C2 variance, what does that apply to?

A.   Applies to primarily D1 use variances.

Q.   And do you know what -- I just want to go back on Page 4, we were talking about the Borough's thought that it required a use variance.  Do you know what type of variance that would be that they were alleging was needed?

A.   Well, they're saying expansion of a nonconforming use, so that's a D2 variance.

Q.   Okay.  Now going back to the C2 that they said, in the last sentence the judge said that the Borough's position was that the development of the property, this is the New Wallington property, solely benefit the property owner and not the community.

Do you see that?

A.   Yes.

Q.   Okay.  So the Borough -- the Borough's decision was that a redevelopment with 27 affordable housing units did not

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

benefit the community; is that right?

A.   I think what they were saying is that the granting of that variance.  So what I saw throughout the record was an applicant requesting several variances, they didn't submit completely conforming applications.  So they felt the granting of the variance was benefiting the applicant, but not the general public.

Q.   Okay.  And Judge Meehan agreed -- disagreed with that, right?

A.   Yes.

Q.   Yes.  And he determined that the denial of the New Wallington Home 2015 application was arbitrary, capricious, and unreasonable, correct?

A.   Yes.

Q.   Okay.  And that term, arbitrary, capricious, and unreasonable, you've heard that before?

A.   Yes.

Q.   What's your -- in your experience, your understanding of that term?

A.   Basically saying that it's not

just what it kind of says, arbitrary, that it's not based on municipal land use law or something in the ordinances that can be substantiated to the extent that the variance should have been denied or the application should have been denied.

Q.   The municipality decision didn't have any legitimate concerns that supported the denial; is that a fair -- a fair summary?

A.   I guess they're saying, that they didn't feel that it rose to the level of denial.

Q.   Because there was not a sufficient basis for the denial, right?

A.   That's what he was saying.

Q.   Okay.  Okay.  And then at the end, the judge, after he entered in the -- I'm on Page 10, if that helps.

After he made that finding, he determined that the issues of one, building height; two, sewage; and three, the driveway and easement from the skating rink would be remanded to the planning board.

Do you see that?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   Yeah.

Q.   Now, would those at that point be site plan approvals, do you know, or would they require some other approvals?  Those three issues, do you know?

A.   They would be done through site plan.

Q.   Okay.

A.   But also, I think there were variances associated with those.  So the judge was finding that those were issues that did need to be discussed with the board and were legitimate issues.  So he remanded those back for decisions under the site plan.

Q.   But the judge found specifically there is no requirement for a D or a C2 variance in this case, right?

A.   The D variance.  I'm not so sure about the C2 variances.  I think they remanded those back in the core variance situation.

Q.   Why don't you turn to Page 8.

A.   Okay.

Q.   In the middle, it starts within

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

the present matter.

Do you see that paragraph in the present matter?

A.   Page 3?

Q.   Page 8.  See the -- in the present matter?

A.   He said the C2 variance should have been granted.

Q.   Yeah.  So he said no D variance was required, but the C2 should have been granted, right?

A.   Yes.

Q.   Okay.  And he said -- Judge Harris found in 2008, affordable housing units unquestionably are inherently beneficial and serve the public good.

Do you see that?

A.   Yes.

Q.   Okay.  And he says, this use benefits the community at large.  Thus, plaintiffs did not have to apply for D variance because the issue was resolved by Judge Harris.

Do you see that?

A.   Yes.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   Okay.  So are you aware of any variance issues that remained open based off of this decision on remand?

A.   I'm not 100 percent clear which C2 variance he was referring to because then it goes on to discuss another variance for building length.  So I think they kept separate variances -- the variance is separate in this case.  And he remanded back the issues of the building height, which was a variance, sewage, and driveway, and the driveway easement for discussion and settlement with the board.

Q.   Okay.  So let's go through those.

So you said that he discusses the variance of the building length, but he said that should have been approved on Page 8, right?

A.   The building length.

Q.   Yeah, he said that should have also been approved?

A.   Yes.

Q.   Okay.  Now you mentioned -- okay.

So the issues that were remanded then were height, sewage, and the easement

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

issue -- the access issue to the skating

rink, right?

A.    Right.

Q.    Okay.

A.    Because he said the board has

legitimate safety concerns.

Q.    Got it.

A.    Yeah.

Q.    So that was remanded on

April 22, 2015, right?

A.    Yeah.

Q.    Do you recall, sitting here

today, what occurred after the remand --

the limited remand to the Borough planning

board?  Do you remember what happened next?

A.    I believe they entered into

settlement, it was approved in 2016.

(Whereupon, Exhibit Caldwell-6, March

2, 2016 order of Judge Meehan, was marked

for identification.)

Q.    This is -- I put in front of you

Miss Caldwell what we have marked as

Caldwell-6.  It's a March 2, 2016 order of

Judge Meehan in a lawsuit that's filed by

the plaintiffs in this case and the Borough

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

of Wallington.

So this is dated March 2, 2016.
We're now almost a year from the partial
remand by Judge Meehan dated
April 22, 2013.

A.   Mm-hmm.

Q.   Did that orient you, right, you
got that?

A.   Yep.

Q.   Okay.  And in Paragraph 1, Judge
Meehan finds that the planning board has
unreasonably delayed action in connection
with the limited remand directed in the
court's May 11, 2015, order reversing the
planning board's denial of site plan
approval.

Do you see that?

A.   Yes.

Q.   Okay.  Do you have any
understanding of what, if anything,
occurred between April 22, 2015, and this
March 2, 2016, as it relates to site plan
approvals?

A.   What I saw from the resolution is
they were requesting funds from the

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

applicant, and they weren't granting it to

do the study.  So they basically denied the

application due to lack of information.

Q.   Okay.  And then it looks like

here that Judge Meehan disagreed with that

and said that the Borough had unreasonably

delayed action, correct?

A.   Yes.

Q.   So we have now -- it's been

another year since there's been an approval

from the application of New Wallington Home

that was filed?

A.   Yes.

Q.   Okay.  Now, as of this date,

March 2, 2016, do you believe that the

Borough was yet in full compliance with its

obligations under the New Jersey

Constitution, the Mount Laurel doctrines,

and the Fair Housing Act?

A.   2016, I'm trying to think of when

they started.  I mean, I wouldn't say

they're not in compliance, they're working

towards compliance in terms of approving

this application of the property.

Q.   Do you think that the Borough

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

gave plaintiffs a reasonable opportunity to develop after they -- by decision of the court, not my decision, not yours, three different judges have ruled that they had acted arbitrary, capricious, and unreasonable in their delays?

A.   I still think the Borough was going through the process, and they had legitimate concerns on their side.  So I see kind of both sides that the applicant also caused delays.  And why wasn't escrow provided?  Why wasn't the sewer study done?  I mean, I think I'd see contention on both sides.

I mean, also in the initial builders remedy lawsuit, the judge stated that the sort of first thing that the plaintiff did was file the builders remedy, that they didn't exhaust any municipal remedies.  So I see a lot of litigation from the plaintiff with the Borough as well.  So I think it really came from both sides.

Q.   Are you aware of any court decisions that rendered a judgment or finding that the plaintiffs unreasonably

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

delayed in anyway?

A.   I don't think that was before the courts.  The plaintiffs were filing for, you know, remedies at that time, but I think the fact that they remanded in cases with concerns still remaining, that it showed that there were issues that needed to be fully fleshed out.  And I think sometimes that shows potentially that the applicant is being recalcitrant and providing the information that the board's asking for.

Q.   Well, we know that the Borough has been deemed recalcitrant by at least one judge in this case, but are you aware of anyone ever finding that plaintiffs were recalcitrant, any judge?

A.   By the judge, no.

Q.   Okay.

A.   But I do reference that 2006 decision where they granted the density that the Borough asked for rather than the developer, because that was their first remedy with the file of builder's remedy lawsuit rather than work with the

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

municipality.

Q.   You mean the '08 decision where Judge Harris found that the Borough engaged in exclusionary practices?

A.   Yeah.

Q.   Okay.  Okay.  So now Judge Meehan has entered another order finding unreasonable delay by the board, and he then orders both parties to take action to get the application finalized, right?

A.   Yes.

Q.   And there's a bunch of paragraphs dealing with the same issues, I think.  You mentioned the sewer, correct?

A.   Mm-hmm.

Q.   Traffic circulation was also a topic related to the rink, correct?

A.   Mm-hmm.

Q.   And building height?

A.   Mm-hmm.

MR. SHEPHARD:  You have to say yes.

THE WITNESS:  Yeah, sorry.  Yes.

BY MR. DiGIULIO:

Q.   And in Paragraph 5, the judge ordered the planning board to vote on all

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

those issues at or before its April 2000 --

April 19, 2016 meeting.

Do you see that?

A.   Yes.

Q.   Okay.  So we're moving along the table of 2016, correct?

A.   Yes.

Q.   All right.  I'll take that from you.  Got it.  And in -- all right.

And then in -- and then you recall what happened at that April 2016 planning board meeting?  Was the -- was the New Wallington Home lot 35.02 application approved?

A.   I think I need to see something regarding that.  I don't have all the --

Q.   Okay.

A.   -- in my head.

Q.   Got it.

A.   You've referred to my reporter?

Q.   It's not in your timeline.  Okay.

Do you recall if that New Wallington Home application was eventually approved by the Borough?

A.   It was approved sometime in 2016.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   Okay.  That's fair.

And that was just about 10 years from the initial filing of the building remedy lawsuit, right?

A.   Yes.

Q.   All right.  And then in 2000 -- also in 2016, Morningside submitted a development plan to the Borough, correct?

A.   Yes.

Q.   Okay.  And the Morningside property is the property in the front of the two properties --

A.   Yes.

Q.   -- abutting the street, correct?

A.   Yeah.

Q.   Okay.  And do you know a gentleman by the name of Mr. Melfi, have you seen that name before in the record?

A.   Mr. Melfi?

Q.   Melfi, yeah.

A.   No.

Q.   Okay.  Do you know who the zoning officer was in 2016?

A.   No.

(Whereupon, Exhibit Caldwell-7, final

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

judgment against the Borough dated January 17, 2019, was marked for identification.)

Q. Okay. Do you recall -- I'm going to show you what is marked Caldwell-7. The front cover page is a final judgment against the Borough dated January 17, 2019, in another lawsuit that is filed by plaintiffs and entered by Judge Barrington.

Have you seen this order and/or the enclosed court decision?

A. Yes.

Q. You have seen that? Okay.

Just to help us orient the timeline a little bit, I don't want you to have to struggle with your memory. If you turn to -- at the bottom, you'll see Bates numbers, and there's a P110. If you go to that page of the decision. Okay. It should say at the top, abide by the order.

A. Yes.

Q. Okay. Now, in the first full sentence, it says on April 19, 2016, New Wallington's application was fully approved.

Do you see that?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   Yes.

Q.   And that was the date of the meeting that the court ordered them to do it by, correct?  Do you recall the judge ordered them to do it by --

A.   Yes, by April 2015.  Yeah.

Q.   Got it.  Okay.  And then thereafter, it said the court found that Morningside and Wallington filed a joint application seeking approval for a development plan based upon the zoning adopted to implement their affordable housing builders remedies.

Do you see that?

A.   Yes.

Q.   Okay.  And Morningside, from your understanding, is at the smaller of the developments, correct?

A.   Right.

Q.   Okay.  And I believe they're set aside was 15 units?

A.   Mm-hmm.

Q.   Okay.

A.   Yes.

Q.   So between the two properties,

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

there were 15 plus 27 affordable units?

    A.   Yes.

    Q.   Whatever that math is.

    A.   Around 40, 41.  42.

    Q.   42 units, I believe is the number, right?

    A.   Yes.

    Q.   And in that application, there were some issues sought by both plaintiffs, including a realignment of the driveway into the backside, correct?

        Do you recall that?

    A.   Yes.

    Q.   Now, when they filed in 2016, there's reference here to the court of zoning officer, Nick Melfi, that was who I was referring to.

        Does that refresh your recollection?

    A.   Yes.

    Q.   Okay.  All right.  And they were told -- they were told they couldn't file their application until they submitted development plan to the zoning officer.

        Do you recall that?

    A.   Yes.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   And that was submitted, according
to the court here, on December 12, 2016.

Do you see that?

A.   Yes.

Q.   Okay.  And the Borough zoning
officer once again -- oh, refused to review
the application and insisted that yet
again, another use variance was required.

Do you see that?

A.   Yes.

Q.   Okay.  Ultimately, the Borough
backed down and they heard the application
in front of the planning board without a
use variance, correct?

A.   Yes.  It was determined a use
variance was not needed.

Q.   Very good.  So in that -- and
those hearings didn't start until May of
2017, right?

A.   Yes.

Q.   Okay.  So we now have another
five months passing between the time the
application was filed and when the hearings
actually began, correct?

A.   Yes.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   And those hearings stretched out through the end of 2017.  I think December 19, 2017, was the last one; is that right?

A.   Yes.

Q.   So over a year from when the application was submitted, correct?

A.   Yes.

Q.   Okay.  Did you review the transcripts of any of those public hearings?

A.   Yes.

Q.   Okay.  Do you recall if you reviewed all of them or just some of them?

A.   Some of them, didn't have all the transcripts.

Q.   Got it.

A.   I had minutes.

Q.   Got it.  Do you happen to remember offhand -- I'll show you, though, but do you remember offhand which of the -- so let's just -- for the record so we know, there was a May 16, a July 18, September 19, and December 19?

A.   I had one of those, I don't

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

recall which one.

Q.   Okay.

A.   And the transcript.

(Whereupon, Exhibit Caldell-8, transcript from the July 18, 2017, planning board hearing for the Morningside and New Wallington joint application, was marked for identification.)

Q.   Got it.  Here you go, Miss Caldwell.  I'm putting in front of you what has been marked Caldwell-8.  It is the transcript from the July 18, 2017, planning board hearing for the Morningside and New Wallington joint application.  And I believe it was the second hearing.

Do you recall that?

Do you recall that being the second date?

A.   Yes, I recall it being the second date.

Q.   And I don't know if from looking at it alone you can tell if that's the one you reviewed or not?

A.   If I can just look through it for a second.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   Yeah.  Take your time.  Take a look at it.  Yeah.

A.   The subject of this meeting in general, this is the one that I reviewed recently.  That was a different one.

Q.   Okay.  Before we dive into that one, then, let me just ask you:  Do you recall from your review of the minutes in that and the one transcript you did review, do you recall the primary issue that took up the greatest deal -- testimony and conversation with the board?

A.   The roller rink, from what I saw, was -- and then the applicant proposing to keep that triggered several variances.  Building coverage, impervious coverage.  And then there's a question as to whether it created the open space and recreation that the board required from what the zoning required.

Q.   And you say it triggered the need for use variance, that was the planning board's position, right?

A.   I think it's a matter of fact.  They have building coverage and impervious

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

coverage for variances.

Q.   Do you recall a decent amount of testimony about concerns regarding anticipated school children moving into the buildings?

A.   Yes.

Q.   Now, a portion of your report discusses the concept that statements by planning board members during a hearing essentially shouldn't be binding on the entire board as a reason for a denial; is that --

A.   That's correct.

Q.   Okay.  All right.  And the reason for that decision -- the reason for that portion of your report, do you know why it wasn't included?

A.   Yes, that's referring to a court case, New York -- I'm looking at Page 23 of my report, the Board of Adjustment.

Q.   Mm-hmm.

A.   And the court found in that case that remarks of members of the board represent informal verbalizations of the speaker's transitory thoughts and they

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

cannot be equated to deliberative findings of fact.  It is the resolution and not board members deliberations that provides the statutorily required findings of fact.

So that was the finding in that case. And because of the expert report that I reviewed that highlighted individual statements from individual board members as reasons that they felt the board was being discriminatory, I highlighted that section.

Q.   And one of those -- can you -- let's go back to Caldwell-8.  I think one of the quotes that you're probably referring to, can you turn to Page 65 of the transcript, not the actual -- you see how there's page numbers, smaller ones?

A.   Right -- on the right?

Q.   No, see how it says there's four different pages, it's a manuscript?

A.   Yeah.  I think it says it at the bottom, too.  Page what, 65.

Q.   65, yep.  And we're at Line 17, do you see that, Mayor Tomko?

Do you see that?

A.   Yes.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   Okay.  And Mayor Tomko, during this July 2017 hearing says, what town in the South Bergen area have you OPRA'd, because, you know, historically, Route 4 is the Mason Dixon Line, and we cannot compare with Upper Bergen County.  Things are different.

And Ms. Bogart says in response, you're talking to a girl that went to North Carolina, it's not the Mason Dixon line.

Do you see that?

A.   Yes.

Q.   Is that one of the statements by an individual board member that you were addressing in your citation to this case?

A.   Yes.

Q.   Okay.  And it's your belief that if indeed that was that passing statement from Mayor Tomko was deemed discriminatory, it shouldn't be held against the entire board; is that your position?

A.   Yes.

Q.   Okay.  You're not providing any opinion at all as to whether that was discriminatory or what Mayor Tomko meant by

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

that?

A.   I don't know what Mayor Tomko meant by that.

Q.   So you're not providing any opinion as to that?

A.   No.

Q.   Your only opinion related to this is if it is indeed deemed discriminatory, it shouldn't be held against the entire board as an official action.

A.   Correct.

Q.   Okay.

(Court reporter interruption.)

(Whereupon, at this time, a recess was taken.)

BY MR. DiGIULIO:

Q.   All right.  I'm going to show you what's called, what's been marked Caldwell-9.

(Whereupon, Exhibit Caldwell-9, public hearing Borough Planning Board dated September 19, 2017, was marked for identification.)

It's the second to last public hearing in the New Wallington and

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Morningside joint application before the Borough Planning Board dated September 19, 2017.

Do you want to take a look at that and see if that was maybe the one you reviewed?

A.   Yes.  It wasn't this one either.

Q.   Okay.  So the September 2017 transcript, you're not sure if that was the one you reviewed either?

A.   Right.

Q.   Okay.  I'll take you to a few of the specific portions of it and we'll -- we'll see.

A.   Okay.

Q.   Oh, before we do that, you said you didn't review the prior transcript, but you -- you were aware of the Mason Dixon line comment from Mayor Tomko.

Do you recall how you became aware of that?

A.   It's in the expert report, Dr. Steil's.

Q.   Dr. Steil's report.  Okay.

A.   Yes.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   And you didn't -- you didn't have to see that transcript after seeing that to see the actual quote?

A.   No, I asked for all the transcripts.

Q.   Can turn to Page 52 and go to Line 4.  And at the top, the speaker at the top and Page 51, it says, Ms. Dabal, at this time she was not mayor, she was a member of the public.

A.   Yes.

Q.   And at the end -- on Page 52, Line 4.

A.   Who was a member of the public, I'm sorry?

Q.   Ms. Dabal.

A.   Ms. Dabal.  Okay.

Q.   Yes.  Do you have that?  I'm going to go to Page 52, Line 4, she says, they're definitely going to have children there.  So I'd like to know what is Morningside going to do to ensure that only five children come out of that complex moving forward.

Do you see that?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   Yes.

Q.   Okay.  And then Mr. Moore, who's an attorney, says, well, first of all, those three bedrooms, there are only three, and they're required by the affordable housing regulations.  And it's illegal to ban children and it's illegal to deny applications for children.  The only way you can limit children is through age restricted communities, which this is not.

Do you see that?

A.   Yes.

Q.   Okay.  And is your understanding from your experience that in certain circumstances age restricted units can count towards affordable housing obligations?

A.   Yes.

Q.   Do you know if there's a restriction -- can a town do 100 percent affordable housing by putting in age restricted?

A.   No.

Q.   Okay.  Do you know generally what the parameters are?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   25 percent for the third round

and 30 percent for the fourth round, less

bonus credit.

Q.   Fair.  And for all purposes, just

to be clear, this suit and the approvals

we're talking about were all predated round

four, correct?

A.   Yes.  So we would have been

looking at the round three, 25 percent

maximum for senior.

Q.   And your -- actually, let's touch

on that real quick.

Your report touches on what the

Borough has done with regard to round four,

correct?

A.   Yes.

Q.   Okay.  And temporally not

relevant to the case, right, as you

understand it?

A.   I think it's relevant to the case

in that they're continuing to comply with

affordable housing regulation.

Q.   So you believe that their --

their compliance with round four in 2025 is

somehow relevant to whether they comply

with round three dating back to 2006 to 2020?

A.   I think it shows that the policy of the Borough is to comply with the affordable housing regulations.

Q.   Okay.  Do you believe that -- and that's despite four different judges finding that they acted unreasonably in denying this application.  You believe that they were still compliant in around January 2020?

A.   Yes.  Yes, they were compliant. They approved several other applications, several other developments.  Several other zones.  So, yes.

Q.   And do you know if any of those applications were approved before the Fair Share settlement was signed?

A.   I'm not sure.  There are a couple board of adjustment approvals in the fourth round that may have been approved earlier.

Q.   For the fourth round?

A.   Yes.

Q.   So the Fair Share agreement I'm referring to is the one for the third round

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

of '20.

A.   Oh, okay.  Any approved before that?

Q.   Yes.

A.   I don't believe so.  I think the --  the only other application was a 4H, which I think received approval after.

Q.   And we'll get to that in a little bit.  So I just want to go back to this.

So Mr. Moore, in addition to talking about the age restricted, talks about it's improper to deny land use applications, he says, for children.

Do you understand that under the Federal Fair Housing Act, families with children are a protected class?

A.   Yes, I guess so.

Q.   And do you have a general understanding that land use applications shouldn't be denied simply because of the existence of -- potential existence of children inhabiting units?

A.   Yes.  Yes.

Q.   And do these -- in your experience, do these issues typically come

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

up either for members of the public or members of planning boards about the number of children that may be in affordable units?

A.   Yes.  Not just affordable units, but almost -- all units.  Any development really that's residential.

Q.   And regardless of whether it's legal or not legal to actually make that part of your final determination, it is certainly pretty common for members of the public, at a minimum, to raise it as a concern, right?

A.   Yes, I think it's common and I think it's within the board's privy to ask and to have a discussion.

Q.   Sure.  And why would it be okay for them to ask about that if ultimately they're final decision cannot be based off of the impact or the number of children that may be?

A.   I think you do look at negative impacts.  I mean, if you think that they're too many -- if there was impact on the schools, they might request a different,

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

you know, bedroom makeup.  And

municipalities often do that.  Look for

different bedroom counts within units.  And

I don't think that's illegal.  You know,

you don't have to zone for all three

bedrooms.  You know, uniform housing

affordability controls, determines the

number of bedrooms that have to be applied

for the affordable units.  But for the

market rate units, that's something that

the municipality often negotiates.

Q.   And I guess you didn't read the

transcripts, so you -- do know -- do you

have any understanding of how much time in

these four hearings was spent on this

topic?

A.   I do understand that it was

raised.

Q.   Do you have any understanding of

how long compared to the other issues that

was discussed in those four hearings?

A.   No.

Q.   And then on -- there was also

another topic that was discussed.  Can you

turn to Page 37.  Do you understand that

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

this was -- there was reference throughout this process to a transit-oriented development?

Do you recall that being raised?

A.    Because of the train station?

Q.    Yeah.  What is -- well, briefly for the record, what is your understanding of a transit-oriented development?

A.    Developments that are proposed near train stations essentially to provide access to transit.  Typically higher density developments.

Q.    Sure.  And did you -- do you recall reference to -- let me see if I have it here.  I'm sorry, you can turn to Page 71, that's good.

On Page 71, Councilman Rachelski, then a member of the planning board says, if I could say something -- this is at Line 11.  It was mentioned this project was compared to West New York.  It really is, because you kind of look at density, it is a West New York.  And this is not the stuff that we want in our town.  It is parking lots and buildings, that's what it

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

basically is.  Thank you.

Do you see that?

A.   Yes.

Q.   Is that accurate, that a transit-oriented development is mostly parking lots and buildings?

A.   I don't know that there's a general makeup of a transit-oriented development.

Q.   Yeah.  And are you aware of -- have you ever been to West New York?

A.   Yeah, I think I've been there once or twice.

Q.   Let me ask you this:  So you understand in the Borough of Wallington, the New Jersey Transit line that runs to New York City runs basically through the edges of the Borough of Wallington and somewhat through it.

Do you understand that orientation?

A.   Yes.

Q.   Okay.  And do you understand that there is a stop that is accessible from one side of the train tracks in Glen Ridge.

Do you know that?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.    Yes.

Q.    Okay.  And there's no direct accessibility from the Borough side, correct?

A.    Right.

Q.    Okay.  And do you also understand that the property that is adjacent to the train tracks, that curve in the borough, is all industrial property?

A.    Yes.

Q.    Okay.  And have you -- in your review of the record at all, have you seen reference to the Borough's, right to an access easement from Main Street down towards the train, are you aware of that?

A.    I've seen that issue discussed. I haven't seen the easement.

Q.    Okay.  And from a planning perspective, are you -- actually, are you aware that the Borough has approved that industrial area to remain nonresidential in recent months?

A.    To remain nonresidential?

Q.    Yeah.

A.    No, I'm not aware of any

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

approvals related to that.

Q.   Okay.  Okay.  Now you didn't review this transcript, so I'm not going to belabor that if you haven't looked at it.

And you still probably -- and so there's two remaining hearings, the first and the last.  Any idea which one you might have reviewed?  Do you know if they voted at the end or there was discussion at the end about the application and the one you reviewed?

A.   It might have been the last one.

Q.   Okay.  And do you recall ultimately what the Borough decided related to this application?

A.   Yes, they denied the application.

Q.   Do you recall the reasons why?

A.   Yes.

Q.   Just off the top of your head, we'll go into your report in a little bit about it.

A.   The concern was over keeping the roller rink and having additional impervious coverage because of that additional building coverage.  There are

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

traffic concerns and lack of open space

concerns.

Q.   And do you recall an oral

resolution on that last hearing date of

December 2017?

A.   Oral resolution?

Q.   Yeah, oral discussions and/or

resolutions being adopted in 2018?

A.   I don't recall.

Q.   Okay.  So if you look at Judge

Barrington's decision, if you go to Page 7,

this is again Caldwell-7, Page 7 of her

decision.  At the top she says, by oral

resolution on December 17, 2017 and then

written resolution 18326, adopted on

January 16, 2018.  The board denied the

application, citing in three paragraphs the

testimony of the superintendent of the

school, a member of the Wallington Board of

Education, and a member of the town council

for the proposition that a number of

children would, quote, emanate from the

multiunit apartment buildings.

And then it goes on to say, reference

additional demand on the schools and that

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

the additional students would be, quote, burdened.

Do you see that?

A.   Yes.

Q.   Okay.  The judge then notes that despite that testimony and the statements at the December 17 hearing, the resolution that was ultimately passed acknowledged that the applicant's testimony of only 5 to 11 additional students being added to the project was correct and verified.  And then the court goes on to talk about the skating rink.

Do you see that?

A.   Yes.

Q.   Okay.  And also the recreational facility obligations.

Do you see that?

A.   Right.

Q.   Okay.  Now ultimately, the judge determined the denial was improper, correct, and that's on Page 8?

A.   Yes.

Q.   Okay.  And she goes on and she says, specifically the board's denial does

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

not articulate any rationale for denial and the petition improperly focused on fiscal concerns, i.e., the cost for anticipated school age children.

Do you see that?

A.   Yes.

Q.   So at least in Judge Barrington's mind, she thought that the planning board improperly considered the impact that school children coming into those units would have, correct?

A.   Yes.

Q.   Okay.  And the next paragraph -- the next paragraph after the case cite on Page 9 says, the board's resolution is devoid of any factors which would support the denial other than the improper consideration of fiscal reasons.  The board's unfortunate focus on the project's impact to the public fiscal rather than land use concerns, renders it decision palpably unreasonable and ipso facto arbitrary, unreasonable, and capricious.

Do you see that?

A.   Yes.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.   Okay.  So the judge says she is not aware of any legitimate land use concerns that were addressed by the planning board in their denial, right?

A.   Yes, she says that.

Q.   Okay.  But you disagree with her and you believe that the Borough did have legitimate land use concerns that they were addressing in their denial?

A.   Yes.

Q.   And what were those specifically?

A.   So the ones I just mentioned that -- there's a focus on the other transcript that I reviewed was primarily about those.  It was the retention of the roller rink on the property that created additional impervious coverage, building coverage, and reduced open space on the property.  It was the subject of almost that entire meeting application, and the board had several concerns, and all those essentially triggered most of the eight variances that were requested by that application.  So what I saw was that they had legitimate land use concerns that were

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

based in the resolution of their denial.

Q.   So I mean -- I mean, are you -- are you just -- are you saying the judge got it wrong?  Because, I mean, she specifically says the opposite of what you're saying?

A.   Yeah, I see that.  I mean, I'm not -- I'm not an attorney.  I think from a land use perspective, there are legitimate land use concerns raised, and the judge found differently.

Q.   And then if you go at the bottom of 9, she says, based on the tortured history of this application and the township's recalcitrant stance towards satisfying its notorious obligation, which these developments will in part address, the court determined there would be no purpose in demanding the applications to the board and that such a remand would result in further delay and expense to the applicant without further elucidation to support denial.

Are you aware of any situation where a judge has simply approved an application

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

without a remand?

A.   Yeah.

Q.   You've seen one before, other than this?

A.   Yeah.

Q.   Okay.  Less than five, probably?

A.   Yeah.

Q.   Not --

A.   Yes.

Q.   Not common?

A.   Not entirely common, no.

Q.   Okay.  So at that point, January 17, 2019, in spite of what the judge says there, I mean, is it your opinion that as of that date, the Borough was in compliance with the New Jersey Constitution, the New Jersey Fair Housing Act, and/or Mount Laurel doctrine?

A.   I think they are because it gets approved and then in the same year they get certified by the court with the settlement agreement with Fair Share Housing Centers. So somehow they are compliant.

Q.   So it took --

A.   They adopted a housing element

and Fair Share plan.  I mean, it may be

they just don't like this development, but

it's not an overall policy.

Q.   Well, I mean, that's where I want

to go.  That's where -- I'm like, we've

seen now -- I mean, I've read you all the

words of judges, not me.  I mean, they say

they were calcitrant.  They say they

exercise exclusionary practices.  And every

denial that we look at is unreasonable,

arbitrary, and capricious, right?  Every

single one we look at, correct?

A.   Yeah, that's what the case has

said, yeah.

Q.   So, you know, and I asked -- I

asked the Borough's corporate

representative if she was aware of any

legitimate explanations as to these denials

other than those that were rejected by the

court, and she didn't have any.  I don't

know if you reviewed -- I don't think you

reviewed her transcript, did you?

A.   No, I did not.

Q.   Now you said -- so either they

didn't like -- they don't like affordable

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

housing or they don't like this project,
seems to be where we're headed on this.
And I just don't -- do you have any reason
to understand why it is that they wouldn't
like this project from what you saw on the
record and your experience?

A.   Well, based on what I saw, the
zoning really wanted the removal of that
roller ink and wanted more open space.  And
I think some of the comments, like the
comments about West New York is they don't
like the density and lack of open space.
So they were looking for that balance, the
removal of that building.  And that's how
the zoning was written.

And the application was submitted
directly contradicting that.  They had
their reasons, but I think that it seemed
like the board was really leaning towards
wanting it to have more open space and not
wanting that additional building.

And to me, those are legitimate
concerns of the board raising with respect
to creating open space and trying to retain
some of their character of their

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

municipality as they see it.  And their master plan -- implementing their master plan as well.

Q.   And standing alone could be legitimate.  But if you look at the history of this, as the judge said, and the repeated denials for different reasons, the repeated delays, it's hard -- can you imagine why it's difficult, why there are questions about the motivations of the Borough?  Because of -- have you ever seen a history this tortured with regard to approval of one application?

A.   I haven't reviewed -- I mean, I've seen tortured histories all throughout New Jersey of affordable housing cases.  So I think there definitely are other tortured history.

Q.   Are you aware of any where there were four different reversals of the planning board by court?

A.   Not specifically, no.

Q.   And other than the reasons -- your opinion is that the reasons that the Borough put in their resolutions, in your

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

mind, were legitimate land use concerns, correct?

A.   Yes.

Q.   You're not aware of any other legitimate land use concerns outside of those resolutions that the Borough relied upon, are you?

A.   No.  I mean, except to the extent, you know, that they're implementing master plan goals and objectives, which we put into our report, which I think stem into how they created the zoning.  But when you're doing the site plan, it's about the zoning, really.  So you go back to what the variances are, what the concerns are, and I think they have some legitimate concerns that they raised.

Q.   Now, somewhere in your report, you make a point to reference the fact that the approval for the back property was approved in 2017.

Do you recall that part of your report?

A.   Yes.  At what page are you?

Q.   I'm going to find it.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

I can't find it.  But you do make a point to say that the back lot was -- did have some approval?

A.   Yes.

Q.   And then there was a joint application tweaking it made by both.

A.   Yes.

Q.   And is it your -- are you making -- are you providing an expert opinion that construction could have commenced on the back lot before that front lot ultimately had its approvals?

A.   Yes.

Q.   Okay.  And did you review the site plans that were provided?

A.   No.

Q.   Okay.  Do you have any understanding if site work was needed on the front lot in order for access to be provided to the back lot for construction?

A.   I would assume so, since there's some easements going back to the property.

Q.   And are you aware if the 35.01 line, the front, if they were permitted to undertake that preliminary site work to

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

create appropriate access to the back lot

approvals?

        A.    I'm not aware.

        Q.    Okay.  So if they ultimately did

need approvals to even have some

preliminary site plan work done, we can

agree that the construction couldn't have

started without access, correct?

        A.    Correct.

        Q.    Okay.  And I want to talk briefly

about -- you should have it here.  Steil's

report.  You did review this report, right,

that's Caldwell-3.

        A.    Okay.

        Q.    Okay.  So we have in front of

you, what's been marked Caldwell-3.  It's a

June 30, 2025 expert report of Dr. Justin

Steil.  Now, if you turn to page -- the

first page of the narrative of his report,

Executive Summary.

         Do you see that?

        A.    Yeah.

        Q.    And he states in the second full

paragraph -- well, the first paragraph

provides the scope of his expert

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

assignment.  And he says it contains his

expert opinion regarding the effect of the

Borough of Wallington's delay and denial of

permits for the construction of the

proposed mixed income development owned by

New Wallington Home, LLC and Morningside at

Wallington on; one, access to housing by

protected classes under the Fair Housing

Act; and two, the perpetuation of

segregation.

Do you see that?

A.   Yes.

Q.   Okay.  And then he discusses what

he did to do so in the next paragraph.  And

he says that, my review of the data

available to me indicates that the

inability to develop the proposed mixed

income multifamily housing development in

Wallington had a significant adverse impact

in making housing unavailable on the basis

of race and family status.

Do you see that?

A.   Yes.

Q.   Okay.  And he also says his

review indicated the inability to develop

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

perpetuated segregation on the basis of race.

Do you see that?

A.   Yes.

Q.   Okay.  So Dr. Steil, through an analysis of data, determined that because plaintiffs were unable to build their development, there was a disparate impact under the Fair Housing Act.

Do you understand that as his opinion?

A.   Because -- can you say that again?

Q.   Sure.  Because of plaintiffs inability to build the proposed development, there was a disparate impact on certain protected classes based on race and family status?

A.   Yes.

Q.   And that's under the Federal Fair Housing Act.

Do you understand that?

A.   Yes.

Q.   Okay.  And on Page 4, Mister -- Dr. Steil states -- he has a chart and it

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

shows that the Borough of Wallington at the

applicable time through 2023 was 69.6

percent white in population.

Do you see that?

A.    Yes.

Q.    Okay.  Do you dispute that fact?

A.    No.

Q.    Okay.  Do you dispute his

conclusion that the Borough of Wallington

is substantially less diverse than

neighboring municipalities?

A.    I really have no information on

that.  I didn't do a study, I didn't look

at adjacent municipalities.

Q.    That's the majority of these

questions.  I want to make sure -- I'm just

trying to -- I need to understand the scope

of your opinion --

A.    Aside from looking at his chart,

it wasn't part of my purview to determine

whether or not they were more or less

racially integrated.

Q.    Are you offering any opinion that

refutes his conclusion that there is a

disparity in ethnic composition between

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Wallington and its neighboring

municipalities?

A.   No.

Q.   Okay.  And you don't offer an

opinion as to the causes of that disparity

that he opines on, do you?

A.   No.  As it relates to -- I guess,

aside from discussing the disparate impact

which I had in my report about these exact

cases, I don't dispute any other reason he

might have stated there may be historic

segregation in the community.

Q.   And it's your opinion that you

don't believe that the disparate impact, if

it exists, was the result of intentional

discrimination by the Borough?

A.   Correct.

Q.   Do you have an opinion that if --

do you have an opinion that their policies

and practices may have ultimately resulted

in that impact?

Do you have an opinion as to that?

A.   I believe it did not.

Q.   Okay.  So you do not believe that

the fact that they weren't compliant until

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

January 2020 with their state land use obligations for affordable housing had no impact -- no resulting impact on the disparity in the demographics in the town?

MR. SHEPHARD:  Objection or form.

You can answer.  Go ahead.

THE WITNESS:  No, I don't believe that it -- I don't believe that it did.  Because I believe that they are zoning for affordable housing, they are -- and I don't see any causality there as a planner.

BY MR. DiGIULIO:

Q.   Are you providing an opinion as to causality?

A.   No.

Q.   Okay.  And you don't know -- and you have no -- do you have any opinion whatsoever as to how Wallington is so more predominantly white than its neighboring municipalities?

A.   I don't know that they are, but no.

Q.   Okay.  And -- and since 2006, the Borough has built -- has -- within the Borough, eight affordable housing units

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

have been built so far, correct?

A.   Correct.

Q.   And it's your belief that -- and you don't believe that that has had any impact on the ability of either minorities or families to move into the Borough?

A.   I don't think there's anything stopping minorities and families from moving into the Borough.

Q.   Well, the purpose of affordable housing is to allow -- I think you said --

A.   Low to moderate income people.

Q.   Okay.  And Dr. Steil has opined that based off of his data analysis, that is predominantly minorities.

Do you understand that?

A.   Yeah, I understand that.

Q.   Okay.  And you don't believe that the fact that they've only built eight affordable housing units in the last 20 years has any impact on the ability of minorities to move into the Borough of Wallington?

A.   I don't believe it meets the Fair Housing Act accusations.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.    Okay.

A.    That it's counter to the Fair Housing Act, because I did put in my report a reference to another case regarding the Fair Housing Act, that municipalities have the right to zone for a variety of reasons. And there's -- in that case where a developer sued a municipality based on the Fair Housing Act for essentially rezoning their single family residential properties to large lot zoning. The court found that it didn't stop families with children from moving into that community. It didn't stop people of other races from moving into that community, into the existing housing. And my opinion is under the Fair Housing Act doesn't require that municipalities build affordable housing.

Q.    They need to provide a reasonable opportunity for them to be building, correct?

A.    Under the New Jersey Fair Housing Act.

Q.    Now, your opinion does not in any way opine on the Borough's compliance with

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

the Federal Fair Housing Act, correct?

A.   It does to that disparate impact.

Q.   Your conclusion in your report references only state legal obligation?

A.   Yes.

Q.   Okay.  And you don't provide any analysis under the Federal Fair Housing Act, you provided one case you cited.  Are you -- is it your opinion -- are you saying that your expert opinion is that, the Borough has complied with the Federal Fair Housing Act?

A.   Yes.

Q.   Okay.  And what expertise do you have in the Fair Housing -- Federal Fair Housing Act to provide that opinion?

A.   Basically, from my experience as a planner, I think that just as that case said that there's -- you don't have to comply with the Federal Fair Housing Act. If you had to zone for affordable housing under the Federal Fair Housing Act, every state in the country would have to provide for affordable housing, that's not the case.  New Jersey State Fair Housing Act

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

requires that affordable housing

obligation.  So it's like you're mixing two

things together, in my opinion.  The

affordable housing is under the State Fair

Housing Act.  Under the Federal Fair

Housing Act, it's access to existing

housing.

Q.   Correct.  And that's why I'm

asking, how is it that you are providing an

opinion on the Federal Fair Housing Act if

your opinion is focused on the affordable

housing obligations of New Jersey?

A.   Well, my opinion is that what

they did with this case is not a violation

of the Federal Fair Housing Act.  That's

what my opinion is.

Q.   So you're saying that there is no

disparate impact to the two protected

classes that have been alleged in the

Borough of Wallington?

A.   Correct.  Based on a policy,

based on what happened with it.

Q.   You're not denying there's

disparate impact, you're just saying you

don't believe there's a causal connection

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

between what the Borough has done or hasn't

done and that disparity impact.

MR. SHEPHARD:  Objection or form.

You can answer.

THE WITNESS:  I don't know if there's a

disparate impact.

BY MR. DiGIULIO:

Q.   Well, that's my question --

A.   What I'm saying is, based on this

case and what I'm seeing, no.  And then the

obligation under the Fair Housing Act isn't

to provide for affordable housing for

minorities and families.

Q.   Correct.  The purpose is to allow

access for those protected classes to move

into certain municipalities, right?

A.   When housing is built.  So the

housing that exists and the housing that

gets built.

Q.   Okay.  And do you dispute that if

there is an unreasonable delay in allowing

for the building of housing that could be a

basis for a violation of the Federal Fair

Housing Act?

A.   Yes.  I do dispute that.

Q.    You do dispute that?

A.    Yes.

Q.    Okay.  So if a municipality unreasonably delays the building of housing that would be predominantly lived in by protected classes, you don't believe that that could be a violation of the Federal Fair Housing Act?

A.    No.  Because there's not an obligation under the Fair Housing Act to provide that housing.

Q.    You don't believe there's an obligation on municipalities to not interfere improperly with the building of housing that minorities could live in?

A.    I don't believe they interfered improperly.

Q.    Okay.

A.    That's what I'm saying.

Q.    I know that's what you're saying, and I didn't ask you to --

A.    I'd rather not make it a general statement on all cases.

Q.    Okay.  That's what you say, but four courts said that they either

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

unreasonably delayed or acted improperly.

So that's your belief, but you disagree

with --

A.    I see delays on both sides.

Q.    And you did not conduct any data

analysis akin to what Dr. Steil did,

correct?

A.    No.

Q.    Okay.  Let's go back to your

report.  You can put this little report

away.  Go back to your report, Caldwell-1.

A.    Okay.

Q.    Page 6.  The three bullets in the

middle of the page are the three properties

that were included in the Borough's third

round obligation, correct?

A.    Yes.

Q.    Okay.  We looked at that earlier.

And the first one are the two properties

owned by the plaintiffs in this case,

correct?

A.    Yes.

Q.    The second one is the one that we

said would build for Wallington Homes,

correct?

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

A.   Yes.

Q.   And the third one is 4H.

Do you see that?

A.   Yes.

Q.   By the way, anecdotally, do you know that all three of these properties are owned by one of the Knuckle siblings?

A.   No.

Q.   Okay.  And as far as you know 4H, those 48 units have not been built yet, correct?

A.   As far as I know, yes.

Q.   Have you reviewed that site plan or approval at all?

A.   No.

Q.   Okay.  And these were all included in the Fair Share --

A.   Settlement --

Q.   -- settlement agreement?

A.   Yes.

(Whereupon, Exhibit Caldwell-10, Borough of Wallington Resolution Number 2019-167, was marked for identification.)

Q.   Okay.  Miss Caldwell, you have

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

what has been marked, Caldwell-10 in front of you.  The top says Borough of Wallington Resolution Number 2019-167?

A.   Yes.

Q.   Bates stamp D453, 461.

Have you seen this before?

A.   Yes.

Q.   Okay.  And that was the settlement agreement we talked about, which was ultimately approved by the court sometime in January of 2020, correct?

A.   Yes.

Q.   And if you go to Paragraph 7, and that sets forth the -- Paragraph 7 goes from Page 2 onto Page 3, and that sets forth the -- how the obligation for the third round will be satisfied, correct?

A.   Yes.

Q.   Okay.  And for -- and that includes the three -- the three properties we just discussed from your report, correct?

A.   Yes.

Q.   Okay.  And 4H is on the third -- it's a carryover onto the third page, the

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

top.

A.   Yeah.

Q.   They were -- from my understanding, were only required to have two units that would be used for affordable housing and the remainder age restricted; is that right?

A.   It says, the 48 units may be achieved by including up to 31 units of age restricted.

Q.   Oh, correct.  And then there's 15 alternative living arrangement beds.  What does that mean, do you know?

A.   That it's a group home.

Q.   Okay.  And if you do that math, 31 to 15 is what, 46, right?  That leaves two remaining for --

A.   31 age restricted, 15 alternative living, and 48 total.  So there'd be two. One -- yeah, it says one family very low. And I guess one other moderate.  Seven very low, moderate income units.  Okay.

Q.   Make sure, if you're reading, just either do it in your head or do it louder so she can hear you.  If you're

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

reading from the document.

A.   I'm reading from the document.

Q.   Yeah.  If you are, just either do it in your head or do it louder.

A.   Oh, okay.  Sorry.

Q.   So it doesn't trail off.

A.   Okay.

Q.   No, that's okay.

And as we discussed -- I believe we discussed this before and we saw this in the statement of Mr. Moore in that transcript.  The age restricted affordable housing obviously would not have school age children live in them, correct?

A.   Correct.

Q.   Okay.  The alternative living arrangements, do you know if there's needs requirement on that or is that there won't be children in those 15 alternative living arrangement beds.

Do you know?

A.   Typically those are not -- they're group homes for developmentally disabled people who are typically adults.

Q.   Sure.  And there's somewhere

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

maybe between four to five adults that will live there together?

A.   Yeah, they're group homes.

Q.   Do you have -- do you have any opinion or based on your experience on whether -- what the likely demographic is that would live in age restricted housing units from an ethnic perspective?

A.   No.

Q.   Now we go to page -- if ultimately either the units on plaintiff's property or the units on 4H are unable to be built, does that impose on the Borough an obligation to find more affordable units to be developed?

A.   Yes.

Q.   Okay.

A.   They need to replace those sites.

Q.   And they're currently figuring out sites for their fourth round obligation, correct?

A.   Well, they have proposed sites.

Q.   They have proposed sites.

A.   Yes.

Q.   And they're going through that

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

process?

A.   Yes.

Q.   Okay.  Have you reviewed plaintiff's complaint in this case?

A.   Yes.

Q.   And do you understand that every claim, five of the six claims, are based on violations with Federal Fair Housing Act?

A.   Yes.

Q.   Okay.  And is it your -- I just want to make sure I understand the scope of your opinion.

Is it your opinion that because the Borough has complied with its state and land use affordable housing obligations, it therefore cannot be in violation of the Federal Fair Housing Act?

A.   I guess it's -- it's connected, I guess.

Q.   Is it more that, because you believe they comply with their state law obligations, there isn't an intentional violation of the Federal Fair Housing Act?

A.   Their policy is to comply.  So the disparate impact was about a policy of

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

delaying and not providing for affordable housing.  So the policy to comply connects to not being in violation of the Federal Fair Housing Act because, again, I believe that units aren't required by Federal Fair Housing Act.  They're required by the State Fair Housing Act.

Q.   The building of the affordable unit?

A.   Yes.

Q.   Yes.  And that's what I'm trying -- so I'm trying to connect here.  So your -- let's break it down.

A.   According to the Federal Fair Housing Act, they could never build those units.  They wouldn't have to build these units.  And they wouldn't be in violation of the Federal Fair Housing Act.

Q.   Your opinion on the Federal Fair Housing Act, they don't have an obligation to build affordable housing units, correct?

A.   Correct.

Q.   Under the Fair Housing -- Federal Fair Housing Act, they have an obligation to provide access to housing to protect the

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

classes, correct?

A.   I don't see a policy that's not allowing that.

Q.   I didn't say they were and weren't.  I'm saying that's their obligation?

A.   I suppose so, yeah.  They can't bar people from moving in.

Q.   They can't take action that would otherwise cause a disproportionate impact, not allowing those protected classes to move into, correct?

A.   Correct.

Q.   Okay.  I understand the basis for your opinions as to the state laws on fair housing because you're involved in those applications.  What experience do you have in the Federal Fair Housing Act that gives you the expertise to testify on that issue?

A.   Just my experience as a planner, you know, dealing with -- I mean, we deal with the Federal Fair Housing Act honestly rarely.  But from my opinion, if you have that obligation from the Federal Fair Housing Act, then every municipality in the

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

country would have, like, a Mount Laurel obligation, which they do not.  So I don't think you can transfer that in that way. To me that's not how the Fair Housing Act works.  And the case I cited, substantiates that.

Q.   Yeah.  And I think you're flipping it on a tad bit.  So have you been in -- you haven't been involved in any planning applications for which the Federal Fair Housing Act has been implicated?

A.   I wouldn't say that.

Q.   Okay.  Give me an example of one.

A.   We do these, like, homes for drug abuse, things like that.  I mean, there are protected classes, and that gets raised during the course of applications that it's a protected class.  And oftentimes I think the applicants think that that gives them a certain ability to be approved.  But in my opinion, they still have to meet municipal land response.  That would be ordinances for the municipality.

Q.   And I just -- I want to make sure we understand this correctly.  It's your

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

position that as long as they comply with their state law and land use obligations to the Borough, they can't be in violation of the Federal Fair Housing Act?

A.   Not as it relates to applications like this.

Q.   So they undertook other actions to prevent a builder from building, that would ultimately result in more protective people moving in, that would be a violation of Federal Fair Housing Act?

A.   I don't know that that is a violation.

Q.   Okay.  Doesn't sound -- okay. What would you consider a violation of the Federal Fair Housing Act, and you're providing an opinion on it I want to -- what do you think would actually be?

A.   Barring people from moving in somehow, you know, keeping people from renting or buying a house, keeping people -- I don't know that municipalities have a lot of impact on that, but I guess there was redlining, zoning, and things like that were determined to be

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

segregationists.  But I just don't see how you can say that the Fair Housing Act, all of a sudden, requires a municipality to approve affordable housing cases.  Because then there's tons of municipalities that deny affordable housing cases and these things go on in court and they're not found to be in violation of the Fair Housing Act.  Federal Fair Housing Act.

Q.   Sure.  And have you ever seen -- and I think you said -- have you ever seen any that have resulted in -- I don't think you -- I think you said you hadn't, four courts finding arbitrary depreciation actions on the same development.

You have not?

A.   Courts finding what?

Q.   That there were four denials for the same application, you've never seen that?

A.   Not specifically.

Q.   Have you ever seen in -- in a public hearing a reference to the Mason Dixon Line?

A.   Mason Dixon Line, no.

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

Q.    Have you ever -- have you ever been involved in an application where the court specifically found that the Borough improperly considered the impact by children from a project?

A.    The municipality?

Q.    Yeah.  The court found the municipality improperly considered the impact by children?

A.    I haven't seen that specifically, no.

MR. DiGIULIO:  Take a five minute break.

(Whereupon, at this time, a recess was taken.)

MR. DiGIULIO:  All right.

Miss Caldwell, no further questions. Thank you.  Appreciate it.

MR. SHEPHARD:  I have no questions. You're done.

(Deposition concluded at 12:51 p.m.)

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

C E R T I F I C A T I O N.


        I, Caren Sheehan, hereby certify that

the proceedings and evidence noted are

contained fully and accurately in the

stenographic notes taken by me in the

foregoing matter, and that this is a correct

transcript of the same.

        ------------------------------

        Caren Sheehan, Certified

        Court Reporter - Notary Public


        (The foregoing certification of this

transcript does not apply to any

reproduction of the same by any means,

unless under the direct control and/or

supervision of the certifying reporter.)

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

**Exhibits**

**EX 0001 Jessica C. Caldwell, P.P. 103025**
3:11,12
**EX 0002 Jessica C. Caldwell, P.P. 103025**
3:13,14
**EX 0003 Jessica C. Caldwell, P.P. 103025**
3:16,17
**EX 0004 Jessica C. Caldwell, P.P. 103025**
3:18,19
**EX 0005 Jessica C. Caldwell, P.P. 103025**
3:20,21
**EX 0006 Jessica C. Caldwell, P.P. 103025**
3:22,23
**EX 0007 Jessica C. Caldwell, P.P. 103025**
4:4,5
**EX 0008 Jessica C. Caldwell, P.P. 103025**
4:7,8
**EX 0009 Jessica C. Caldwell, P.P. 103025**

4:12,13
**EX 0010 Jessica C. Caldwell, P.P. 103025**
4:15,16

**$**

**$200**
26:11

**0**

**08**
77:2

**1**

**1**
19:8 73:10
**10**
68:19 79:2
**100**
22:18 23:8
71:4 93:20
**11**
7:21 73:14
99:20 104:10
**12**
83:2
**125**
39:13,14
**12:51**
138:21
**134**
56:23 57:10
**15**
53:10 60:6,
8,14 81:21
82:1 129:11,
16,18 130:19
**16**
60:14 84:23
103:16

**17**
80:2,6 88:22
103:14 104:7
108:13
**18**
45:11,16
84:23 85:5,
12
**18326**
103:15
**19**
78:2 80:22
84:3,24
90:22 91:3
**1999**
18:16

**2**

**2**
19:8 45:22
46:5 59:2
72:19,23
73:2,22
74:15 128:15
**20**
25:4 96:1
120:20
**2000**
78:1 79:6
**2005**
28:20 30:21
31:6
**2006**
44:6 53:25
76:20 95:1
119:23
**2008**
45:11,16
56:17 70:14
**2012**
30:4,5,20
**2013**
73:5
**2014**
58:11 59:7,
15,20 60:6,

17
**2015**
38:8 58:5,
15,18 67:14
72:10 73:14,
21 81:6
**2016**
72:17,19,23
73:2,22
74:15,20
78:2,6,11,25
79:7,23
80:22 82:14
83:2
**2017**
83:19 84:2,3
85:5,12 89:2
90:22 91:3,8
103:5,14
112:21
**2018**
103:8,16
**2019**
61:4 80:2,6
108:13
**2019-167**
127:23 128:3
**2020**
36:6,14,22
46:18 95:2,
11 119:1
128:11
**2023**
117:2
**2025**
7:21 8:14
18:16 40:12
94:24 114:17
**21**
60:17
**22**
58:15,18
72:10 73:5,
21
**23**
87:19

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

**25**
94:1,9
**27**
56:23 66:25
82:1

**3**

**3**
46:23 70:4
128:15
**30**
8:17,19
40:12 94:2
114:17
**31**
28:17 129:9,
16,18
**35.01**
42:24 43:8
113:23
**35.02**
43:3,11
78:13
**35.102**
43:16
**37**
98:25

**4**

**4**
28:17 59:7
61:14 66:6
89:4 92:7,
13,19 116:24
**40**
25:8 82:4
**41**
82:4
**42**
82:4,5
**46**
129:16
**461**
128:5

**48**
127:10
129:8,19
**4H**
96:7 127:2,9
128:24
131:12

**5**

**5**
64:19 77:24
104:9
**51**
92:8
**52**
92:6,12,19

**6**

**6**
36:22 39:9
126:13
**65**
88:14,21,22
**69.6**
117:2

**7**

**7**
46:21
103:11,12
128:13,14
**70-05**
39:9
**71**
99:16,17
**75**
52:23

**8**

**8**
36:20 39:14
59:20 69:23

70:5 71:18
104:22
**8.01**
39:9
**800P04**
45:12

**9**

**9**
105:15
107:13

**A**

**A-L-I-S-O-N**
27:6
**A-P-P-I-C-E**
42:9
**abatement**
51:21
**abide**
80:19
**ability**
120:5,21
135:20
**able**
54:9
**abuse**
135:15
**abutting**
79:14
**access**
43:17,18
72:1 99:11
101:14
113:19
114:1,8
115:7 123:6
124:15
133:25
**accessibility**
101:3
**accessible**
100:23
**accurate**

100:4
**accusations**
120:25
**achieved**
129:9
**acknowledged**
104:8
**Act**
18:18,22
19:5 32:19,
22 33:4,7
46:2 55:21
56:9 74:19
96:15 108:18
115:9 116:9,
21 120:25
121:3,5,9,
16,23 122:1,
8,12,16,20,
22,25 123:5,
6,10,15
124:11,24
125:8,10
132:8,17,23
133:4,6,7,
15,18,20,24
134:18,22,25
135:4,11
136:4,11,16
137:2,8,9
**acted**
21:16 23:23
75:5 95:8
126:1
**action**
61:11 73:12
74:7 77:9
90:10 134:9
**actions**
35:5 47:25
136:7 137:15
**actively**
8:21
**acts**
34:22 35:16
**actual**
19:22 88:15
92:3

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

**added**
  104:10
**addition**
  96:10
**additional**
  54:3 102:23,
  25 103:25
  104:1,10
  106:17
  110:21
**address**
  107:17
**addressed**
  106:3
**addresses**
  64:14
**addressing**
  89:15 106:9
**adequate**
  64:21
**adjacent**
  101:7 117:14
**adjudicators**
  17:23
**adjustment**
  54:9 87:20
  95:20
**administrativ
e**
  17:10 25:24
  26:22 27:13
**adopted**
  81:12 103:8,
  15 108:25
**adults**
  130:24 131:1
**adverse**
  115:19
**affect**
  29:10
**affordability**
  98:7
**affordable**
  8:21,22 9:6
  16:12,14,23
  17:9 18:15,
  19 21:20

22:11,18,23
23:5,8,11
36:1 38:5,23
39:7,18
44:14 47:6,
14,19 48:2,9
49:6 50:7
51:25 52:6,
10,15 54:6,
18,22 56:24
66:25 70:14
81:12 82:1
93:5,16,21
94:22 95:5
97:3,5 98:9
109:25
111:16
119:2,10,25
120:10,20
121:18
122:21,24
123:1,4,11
124:12 129:5
130:12
131:14
132:15
133:1,8,21
137:4,6
**afterwards**
  11:10
**age**
  39:22 93:9,
  15,21 96:11
  105:4 129:6,
  9,18 130:12,
  13 131:7
**agree**
  114:7
**agreed**
  50:3 63:8,10
  67:10
**agreement**
  51:9 95:24
  108:22
  127:19 128:9
**ahead**
  119:6

**AICP**
  29:17
**akin**
  126:6
**aligned**
  8:25
**Alison**
  27:2
**allege**
  46:6
**alleged**
  33:3 45:24
  58:5 123:19
**alleging**
  66:10
**allow**
  47:18 120:11
  124:14
**allowing**
  124:21
  134:3,11
**alter**
  11:25
**alternative**
  129:12,18
  130:16,19
**amend**
  10:11
**amended**
  28:16 61:3
**American**
  29:18 31:20
**amount**
  87:2
**analyses**
  34:12,17
**analysis**
  34:1,2,8,9
  116:6 120:14
  122:7 126:6
**and/or**
  13:21 80:9
  103:7 108:18
**anecdotally**
  127:5
**answer**
  8:11 13:2,3

14:8,13 15:5
34:25 35:2
38:17,21
119:6 124:4
**answering**
  15:7,11
**anticipated**
  87:4 105:3
**anticipation**
  11:15
**anyone**
  27:8,11
  41:5,7 76:16
**apartment**
  103:23
**apologized**
  14:3
**app**
  22:7
**appearance**
  24:18
**Appice**
  42:7
**applicable**
  117:2
**applicant**
  20:17 60:2
  65:5 67:5,8
  74:1 75:10
  76:10 86:14
  107:22
**applicant's**
  104:9
**applicants**
  135:19
**application**
  38:9 56:22
  57:3,8,10,15
  58:2,6,11
  59:9 60:2,
  19,23 61:10,
  17 63:24
  67:15 68:6
  74:3,11,24
  77:10 78:13,
  23 80:23
  81:10 82:8,

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

22 83:7,12,
23 84:7
85:7,14 91:1
95:9 96:6
102:10,15,16
103:17
106:20,24
107:14,25
110:16
111:13 113:6
137:19 138:2
**applications**
16:9 22:10
23:3,7 29:7,
12 48:8
50:15,21
51:2 55:15
62:13 63:18
67:7 93:8
95:13,17
96:12,19
107:19
134:17
135:10,17
136:5
**applied**
98:8
**Applies**
66:3
**apply**
56:5 66:1,2
70:21
**Appreciate**
138:18
**appropriate**
54:22 114:1
**approval**
24:21 73:16
74:10 81:10
96:7 111:13
112:20 113:3
127:14
**approvals**
26:18 49:15
51:25 55:7,
10 69:3,4
73:23 94:5
95:20 102:1

113:12
114:2,5
**approve**
137:4
**approved**
26:13 36:10
50:16 71:17,
21 72:17
78:14,23,25
80:24 95:13,
17,21 96:2
101:20
107:25
108:20
112:21
128:10
135:20
**approving**
74:23
**April**
58:15,18
59:14 72:10
73:5,21
78:1,2,11
80:22 81:6
**arbitrary**
49:1 67:15,
18 68:1 75:5
105:23
109:11
137:14
**Arbitration**
24:10
**arbitrations**
24:8,11
**area**
50:23 89:3
101:21
**arguments**
61:16
**arose**
18:21
**around**
82:4 95:10
**arrangement**
26:2 129:12
130:20

**arrangements**
130:17
**articulate**
105:1
**asked**
10:22 15:22
59:8 76:22
92:4 109:15,
16
**asking**
52:18 59:7
62:7 76:12
123:9
**assignment**
17:3 115:1
**assist**
26:23 27:19
**assistant**
25:24 26:22
27:14
**associate**
25:23 29:22
**associated**
69:10
**Associates**
25:13 30:1,
8,13 31:12
32:12
**assume**
15:19 21:9
113:21
**attorney**
33:18 93:3
107:8
**August**
8:3,4,14
**automatically**
65:22
**available**
115:16
**aware**
9:15,19
11:23 38:20
48:20 52:1
53:22 57:18
71:1 75:23
76:15 91:18,

20 100:10
101:15,20,25
106:2 107:24
109:17
111:19 112:4
113:23 114:3

---

**B**

---

**back**
10:14 14:18
15:2 28:6
36:5 44:6
49:7,11,24
56:8 57:5,11
66:6,14
69:14,21
71:10 88:12
95:1 96:9
112:14,20
113:2,11,20,
22 114:1
126:9,11
**backed**
83:12
**backside**
82:11
**bad**
64:6
**balance**
65:10 110:13
**ban**
93:7
**bar**
134:8
**Barring**
136:19
**Barrington**
80:8
**Barrington's**
103:11 105:7
**based**
13:4 33:22
34:22 35:16
44:12 68:2
71:2 81:11
97:19 107:1,

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

13 110:7
116:17
120:14 121:8
123:21,22
124:9 131:5
132:7

**basically**
17:14 18:15
34:9 67:25
74:2 100:1,
17 122:17

**basis**
58:5 61:22
68:15 115:20
116:1 124:23
134:14

**Bates**
45:18 80:16
128:5

**bedroom**
98:1,3

**bedrooms**
93:4 98:6,8

**beds**
129:12
130:20

**began**
83:24

**behalf**
20:17 21:12
22:5

**behind**
43:12

**belabor**
102:4

**belief**
35:10 89:17
120:3 126:2

**believe**
19:3 26:7
28:16 35:4,6
36:3,13
37:5,14 40:1
54:1 58:1
62:22 72:16
74:15 81:20
82:5 85:15

94:23 95:6,9
96:5 106:7
118:14,23,24
119:7,8,9
120:4,18,24
123:25
125:6,12,16
130:9 132:21
133:4

**beneficial**
65:14,20,21
70:16

**benefit**
66:19 67:1

**benefiting**
67:8

**benefits**
65:3,11
70:20

**Bergen**
45:11,17
89:3,6

**best**
14:7 24:12

**binding**
87:10

**bit**
59:3 80:14
96:9 102:20
135:8

**blank**
32:15

**Block**
39:9

**board**
41:10 49:7,
11 57:24,25
60:15,18
68:24 69:13
71:13 72:5,
15 73:11
77:8,25
78:12 83:13
85:6,13
86:12,19
87:9,11,20,
23 88:3,8,9

89:14,21
90:10,21
91:2 95:20
99:18
103:16,19
105:8 106:4,
21 107:20
110:19,23
111:21

**board's**
73:15 76:11
86:23 97:15
104:25
105:15,19

**boards**
16:10 20:13
22:7 23:20
24:5 29:12
97:2

**Bogart**
89:8

**bonus**
28:12 94:3

**borough**
6:21 8:20
9:5 19:4
23:17,20
26:2 35:17,
24 37:6
38:8,9 39:12
41:16,21
45:24 47:10,
25 48:7,10
50:3 53:23
54:16,25
55:13 56:18
57:14 58:6,
10 60:18
61:11,23
62:9,11
64:19 66:23
72:14,25
74:6,16,25
75:7,21
76:13,22
77:3 78:24
79:8 80:1,6
83:5,11

90:21 91:2
94:14 95:4
100:15,18
101:3,8,20
102:14 106:7
108:15
111:11,25
112:6 115:3
117:1,9
118:16
119:24,25
120:6,9,22
122:11
123:20 124:1
127:22 128:2
131:13
132:14 136:3
138:3

**Borough's**
34:22 36:25
38:24 42:6
45:2,6 61:16
66:7,16,24
101:13
109:16
121:25
126:15

**bottom**
36:22 46:22
53:10,18
61:15 80:16
88:21 107:12

**break**
14:21 133:13
138:13

**briefly**
6:18 17:2
28:22 64:25
99:6 114:10

**bring**
10:22

**bringing**
11:12 28:9

**brought**
33:2,11

**bucket**
21:4

**build**
  41:19 48:2
  55:2,4,17
  116:7,15
  121:17
  126:24
  133:15,16,21
**builder**
  136:8
**builder's**
  33:11 44:5,
  9,22 50:4
  76:24
**builders**
  33:14 75:15,
  18 81:13
**building**
  29:24 47:18
  48:9 54:6,21
  55:8 68:21
  71:7,10,16,
  19 77:19
  79:3 86:16,
  25 102:25
  106:17
  110:14,21
  121:20
  124:22
  125:4,14
  133:8 136:8
**buildings**
  44:2 87:5
  99:25 100:6
  103:23
**built**
  38:24 39:14,
  18 54:3,10
  119:24
  120:1,19
  124:17,19
  127:10
  131:13
**bulk**
  23:2
**bullets**
  126:13
**bunch**
  29:13 77:12

**burdened**
  104:2
**buying**
  136:21

———————

**C**

———————

**C2**
  64:22 65:1,
  2,16 66:1,14
  69:17,20
  70:7,10 71:5
**calcitrant**
  109:8
**Caldell-8**
  85:4
**Caldwell**
  6:2,10,16
  25:13,17
  28:4,18 30:1
  31:12 40:10
  72:22 85:10
  127:25
  138:17
**Caldwell-1**
  6:1 7:18
  20:23 36:21
  126:11
**Caldwell-10**
  127:21 128:1
**Caldwell-2**
  6:4 10:18
**Caldwell-3**
  40:7,11
  114:13,16
**Caldwell-4**
  45:10,16
**Caldwell-5**
  58:14,18
**Caldwell-6**
  72:18,23
**Caldwell-7**
  79:25 80:4
  103:12
**Caldwell-8**
  85:11 88:12

**Caldwell-9**
  90:19,20
**call**
  25:3 38:13
**called**
  17:23 42:25
  90:18
**capacity**
  16:7 19:20
  21:17,18
**capricious**
  49:1 67:15,
  19 75:5
  105:23
  109:11
**career**
  24:23
**Carolina**
  89:10
**carryover**
  128:25
**case**
  6:20 9:5
  10:9 11:21
  13:20 28:12
  29:2,4 33:22
  34:19 35:21
  40:19 42:1
  44:18,19
  47:2 49:2,3,
  6,20,21,22
  58:22 64:9
  69:18 71:9
  72:25 76:15
  87:19,22
  88:5 89:15
  94:18,20
  105:14
  109:13
  121:4,7
  122:8,18,25
  123:14
  124:10
  126:20 132:4
  135:5
**cases**
  15:3 16:9,
  12,15 17:7,

  20,21 18:1
  29:5 76:5
  111:16
  118:10
  125:23
  137:4,6
**category**
  23:4
**causal**
  123:25
**causality**
  119:11,14
**caused**
  75:11
**census**
  34:4,10
**Centers**
  108:22
**certain**
  93:14 116:17
  124:16
  135:20
**certainly**
  97:11
**certainty**
  9:11
**certification**
  17:8 29:19,
  22,24 36:6
**certified**
  29:18 31:19,
  20 38:1
  108:21
**challenge**
  61:11
**challenging**
  44:12 61:4
**changed**
  54:12
**character**
  110:25
**chart**
  116:25
  117:19
**children**
  35:16 87:4
  92:20,23

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

93:7,8,9
96:13,16,22
97:3,20
103:22
105:4,10
121:12
130:14,19
138:5,9
**circulation**
77:16
**circumstances**
11:24 93:15
**citation**
89:15
**cite**
105:14
**cited**
122:8 135:5
**citing**
103:17
**City**
32:9,14
100:17
**claim**
54:9 132:7
**claims**
35:21 132:7
**clarify**
23:6
**class**
96:16 135:18
**classes**
34:21 35:15
55:25 115:8
116:17
123:19
124:15 125:6
134:1,11
135:16
**clear**
18:11,20
54:13 71:4
94:5
**client**
16:25 21:6,9
51:6

**clients**
21:3 22:1,5,
9,21 23:1
**close**
53:16
**closer**
57:5
**COAH**
20:5
**coincides**
31:2
**colleague**
28:5
**come**
11:2 20:6
92:23 96:25
**comes**
19:22
**commenced**
113:11
**comment**
91:19
**comments**
110:10,11
**commercial**
63:3,5
**common**
97:11,14
108:10,11
**communities**
93:10
**community**
54:10 66:20
67:1 70:20
118:12
121:13,15
**compare**
89:5
**compared**
98:20 99:21
**complaint**
61:3 132:4
**complete**
14:7 57:15
58:6
**completely**
67:6

**complex**
92:23
**compliance**
29:8 37:25
39:4 45:7,25
46:12,18
49:5 74:16,
22,23 94:24
108:16
121:25
**compliant**
8:22 9:6
19:4 35:24
37:6,18,21
95:10,12
108:23
118:25
**complied**
35:8 122:11
132:14
**comply**
18:18 19:23
50:4 56:19
94:21,25
95:4 122:20
132:21,24
133:2 136:1
**complying**
33:10 37:15
**composition**
117:25
**comprised**
24:14
**concept**
65:13 87:8
**concern**
64:15 97:13
102:22
**concerns**
8:24 62:15,
24 68:8 72:6
75:9 76:6
87:3 103:1,2
105:3,21
106:3,8,21,
25 107:10
110:23
112:1,5,15,

16
**concluded**
138:21
**conclusion**
8:20 9:23
10:2 117:9,
24 122:3
**conclusions**
9:18,25
**conduct**
41:1,4 126:5
**conference**
13:15
**conforming**
67:6
**confusion**
54:16
**connect**
133:12
**connected**
132:18
**Connecting**
63:11
**connection**
63:5 73:12
123:25
**connects**
133:2
**consent**
59:16
**consider**
136:15
**consideration**
105:18
**considered**
105:9 138:4,
8
**consist**
23:7
**Constitution**
19:11 46:1
74:18 108:17
**constructed**
39:6
**construction**
47:4,13
49:25 61:25

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

113:10,20
114:7 115:4
**consultant**
21:19
**consulting**
31:18 32:5
**contains**
115:1
**contended**
64:20
**contention**
75:13
**continue**
14:12 53:15
**continuing**
94:21
**contracted**
21:13,23
**contradicting**
110:17
**controls**
45:2,6 98:7
**conversation**
86:12
**copy**
6:7
**core**
69:21
**corporate**
42:6 109:16
**correct**
11:3 20:11,
13 25:14
33:23 35:10
37:12,18
39:15 42:21
44:6 45:8
46:19 50:7
52:7 55:4
56:14,19,25
57:6,16 60:3
61:12 63:13
67:16 74:7
77:14,17
78:6 79:8,14
81:4,18
82:11 83:14,

24 84:7
87:13 90:11
94:7,15
101:4
104:11,22
105:11
109:12 112:2
114:8,9
118:17
120:1,2
121:21 122:1
123:8,21
124:14
126:7,16,21,
25 127:11
128:11,17,22
129:11
130:14,15
131:21
133:21,22
134:1,12,13
**correctly**
135:25
**cost**
105:3
**council**
26:14,18
41:12 103:20
**Councilman**
42:13 99:17
**counsel**
17:9
**count**
93:16
**counter**
121:2
**counties**
22:2
**country**
122:23 135:1
**counts**
98:3
**county**
22:6,7 30:9
32:8 45:11,
17 89:6

**couple**
12:19 59:14
95:19
**course**
62:11 135:17
**court**
6:6,22 12:7,
23 13:16
16:11,24
17:8 18:23
19:9 23:25
24:4,14,16,
18,20 25:6
33:9 36:6,
11,23 37:23
45:1,12,18
48:24 49:10,
14 75:3,23
80:10 81:3,8
82:15 83:2
87:18,22
90:13 104:12
107:18
108:21
109:20
111:21
121:11
128:10 137:7
138:3,7
**court's**
73:14
**courts**
17:24 24:2
62:18 76:3
125:25
137:14,17
**cover**
80:5
**coverage**
86:16,25
87:1 102:24,
25 106:17,18
**create**
47:12 55:3
114:1
**created**
47:3 86:18
106:16

112:12
**creating**
63:3 110:24
**credit**
22:19 23:9
94:3
**criteria**
65:6,17
**current**
26:1
**curve**
101:8
**cut**
14:10
**CV**
21:1 28:15

—

**D**

—

**D1**
66:3
**D2**
66:12
**D453**
128:5
**Dabal**
42:11 92:8,
16,17
**damage**
35:21 40:20
**data**
34:1,2,4,8,
10 115:15
116:6 120:14
126:5
**date**
7:21,24 8:13
15:24 31:2
35:24 36:9
37:2 74:14
81:2 85:18,
20 103:4
108:15
**dated**
73:2,4 80:1,
6 90:21 91:2

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

| | | | |
|---|---|---|---|
| **dates** 15:23 | **deem** 57:14 | 64:3,11 67:14 68:9, 13,15 73:15 87:11 104:21,25 105:1,17 106:4,9 107:1,23 109:10 115:3 | **detail** 17:5 45:24 |
| **dating** 44:6 95:1 | **deemed** 44:15 49:5, 10 76:14 89:19 90:8 | | **determination** 49:9 59:8 97:10 |
| **day** 25:7 | **deeming** 58:5 | | **determinations** 46:23 48:25 |
| **day-to-day** 25:11 | **defendant's** 61:15 | | **determine** 117:20 |
| **deal** 15:2 86:11 134:21 | **defending** 6:21 | **denials** 62:17 109:18 111:7 137:18 | **determined** 67:13 68:21 83:15 104:21 107:18 116:6 136:25 |
| **dealing** 51:25 77:13 134:21 | **deficit** 42:1 | **denied** 48:7 61:17 68:5,6 74:2 96:20 102:16 103:16 | **determines** 98:7 |
| **decade** 62:12 | **definitely** 92:20 111:17 | | **detriment** 65:12 |
| **December** 60:25 61:4 83:2 84:3,24 103:5,14 104:7 | **degree** 9:10 | **denies** 55:14 | **detriments** 65:3 |
| | **delay** 77:8 107:21 115:3 124:21 | **density** 76:21 99:12, 22 110:12 | **develop** 75:2 115:17, 25 |
| **decent** 87:2 | **delayed** 73:12 74:7 76:1 126:1 | **deny** 60:19 62:12 64:6 93:7 96:12 137:6 | **developed** 63:9 131:15 |
| **decided** 102:14 | **delaying** 133:1 | **denying** 63:24 95:9 123:23 | **developer** 23:10 44:11 53:6 55:16 76:23 121:8 |
| **decision** 45:11,17,19 48:24 58:15, 19 64:2 66:24 68:7 71:3 75:2,3 76:21 77:2 80:10,18 87:15 97:19 103:11,13 105:21 | **delays** 75:6,11 111:8 125:4 126:4 | **depending** 19:20 | **development** 22:11 50:6 52:7 56:23 59:9 60:2 66:17 79:8 81:11 82:23 97:6 99:3,8 100:5,9 109:2 115:5, 18 116:8,16 137:15 |
| | **deliberations** 88:3 | **depends** 47:21 | |
| | **deliberative** 88:1 | **deposed** 12:17 16:15 | |
| | **demand** 103:25 | **deposition** 6:23 10:17 11:16 13:9, 22 42:6,10, 15 62:10 138:21 | |
| **decisions** 8:24 12:7 18:23,24 63:18 69:14 75:24 | **demanding** 107:19 | | |
| | **demographic** 131:6 | | **developmentally** 130:23 |
| **declaratory** 38:10 | **demographics** 119:4 | **depreciation** 137:14 | |
| **declare** 50:23 53:12 | **demonstrate** 53:6 | **describe** 28:23 | **developments** 52:1,16 81:18 95:14 |
| **declared** 45:2 46:11 | **denial** 60:23 61:3, 5,22 62:24 | **Design** 29:21 | |

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

99:9,12
107:17
**devoid**
105:16
**different**
10:1 19:21
20:7 32:7
35:12 75:4
86:5 88:19
89:7 95:7
97:25 98:3
111:7,20
**differently**
107:11
**difficult**
48:1,4 111:9
**Digiulio**
6:14,19 8:7
10:4 27:24
28:3 35:1
46:5,8
52:20,24
77:23 90:16
119:12 124:7
138:12,16
**direct**
15:4 101:2
**directed**
73:13
**direction**
15:6
**directly**
26:14 110:17
**disabled**
130:24
**disagree**
106:6 126:2
**disagreed**
62:18 67:11
74:5
**discrimination**
118:16
**discriminatory**
88:10 89:19,
25 90:8

**discuss**
71:6
**discussed**
11:20 45:23
69:12 98:21,
24 101:16
128:21
130:9,10
**discusses**
71:15 87:8
115:13
**discussing**
118:8
**discussion**
28:1 71:12
97:16 102:9
**discussions**
103:7
**disparate**
34:21 35:5
116:8,16
118:8,14
122:2
123:18,24
124:6 132:25
**disparity**
117:25 118:5
119:4 124:2
**disproportionate**
35:14 134:10
**dispute**
25:5 35:13
117:6,8
118:10
124:20,25
125:1
**District**
6:22 23:25
**dive**
86:6
**diverse**
117:10
**Dixon**
89:5,10
91:18
137:24,25

**doctrine**
108:18
**doctrines**
20:9 46:2
74:18
**document**
130:1,2
**documents**
11:17 12:2,
9,12 19:9
**doing**
112:13
**drafting**
27:22
**drawing**
32:15
**driven**
8:24
**driveway**
63:4,15
68:23 71:11,
12 82:10
**dropped**
28:5
**drug**
135:14
**due**
74:3
**duly**
6:11

---

**E**

**earlier**
95:21 126:18
**Early**
8:4
**easement**
59:19 63:10
68:23 71:12,
25 101:14,17
**easements**
113:22
**easier**
25:1
**edges**

100:18
**Education**
103:20
**effect**
115:2
**EGFSP**
36:25
**eight**
39:6 106:22
119:25
120:19
**either**
18:3,4 91:7,
10 97:1
109:24 120:5
125:25
129:24 130:3
131:11
**element**
17:13 54:1
108:25
**elements**
16:21 37:24
**elucidation**
107:22
**emanate**
103:22
**emanating**
20:8
**employees**
25:16,18
**enclosed**
80:10
**end**
13:8 18:17
25:6 31:1
47:6 68:18
84:2 92:12
102:9,10
**Energy**
29:20
**engage**
26:17
**engaged**
77:3
**engagement**
23:15 24:19

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

| | | | |
|---|---|---|---|
| 26:1,13 28:13 | **ethnic** 117:25 131:8 | **experience** 13:5 33:15, 23,25 47:16 52:20,22 53:5 67:23 93:14 96:25 110:6 122:17 131:5 134:17,20 | 112:19 117:6 118:25 120:19 |
| **engineering** 30:8,15,16, 17 | **eventually** 17:11 78:23 | | **factfinding** 13:1 |
| **enlarged** 61:25 | **everyone** 15:18 | | **facto** 105:22 |
| **enlargements** 62:6 | **evidence** 64:21 | | **factors** 105:16 |
| **ensure** 92:22 | **exact** 118:9 | **expert** 9:4,14,16 13:5 16:4,8, 11,18 17:3 21:5 23:23 24:7,14,17 26:9 32:17 33:15 34:16 40:19 52:18, 19 56:11,13 88:6 91:22 113:9 114:17,25 115:2 122:10 | **facts** 11:24 14:17 |
| **entail** 50:19 | **exactly** 26:6 | | **fair** 16:21 18:18, 22 19:5 20:9 32:19,22 33:3,7 36:7, 9 37:24 46:1 47:5 54:1,7 55:15,21 56:9 68:9 74:19 79:1 94:4 95:17, 24 96:15 108:17,22 109:1 115:8 116:9,20 120:24 121:2,5,9, 16,22 122:1, 7,11,15,20, 22,25 123:4, 5,10,15 124:11,23 125:8,10 127:17 132:8,17,23 133:4,5,7, 14,18,19,23, 24 134:15, 18,22,24 135:4,11 136:4,11,16 137:2,8,9 |
| **entered** 51:10 59:15, 16 68:18 72:16 77:7 80:8 | **EXAMINATION** 6:13 | | |
| | **examined** 6:11 | | |
| **entire** 21:2 24:22 87:11 89:20 90:9 106:20 | **exclusionary** 53:15,23 54:19 55:19 77:4 109:9 | | |
| **entirely** 108:11 | **Executive** 114:20 | | |
| **entities** 22:6 | **exercise** 109:9 | **expertise** 34:8 122:14 134:19 | |
| **entity** 38:2 42:24 | **exhaust** 75:19 | **explain** 18:12 62:22 | |
| **entry** 36:21 | **Exhibit** 6:1,4 40:7 45:10 58:14 72:18 79:25 85:4 90:20 127:21 | **explains** 61:15 | |
| **environmental** 29:8,21,23 | | **explanations** 109:18 | |
| **EPA** 20:3 | **exhibits** 7:15 | **explanatory** 21:10 | |
| **equated** 88:1 | **exist** 37:11,14 | **extent** 68:4 112:9 | |
| **escrow** 75:11 | **existence** 96:21 | | |
| **essentially** 25:6 29:23 44:11 87:10 99:10 106:22 121:9 | **existing** 121:15 123:6 | **F** | |
| | **exists** 118:15 124:18 | **faces** 43:9 | **fairly** 21:10 |
| **estimate** 24:13 | **expansion** 63:4 66:11 | **facility** 104:17 | **fairness** 17:11 36:24 |
| **estimating** 16:2 | **expense** 107:21 | **fact** 11:2 35:13 44:13 76:5 86:24 88:2,4 | |

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

families
  35:15 96:15
  120:6,8
  121:12
  124:13
family
  115:21
  116:18
  121:10
  129:20
far
  35:4 120:1
  127:9,12
February
  58:10 59:7
federal
  23:24 24:2
  33:3 56:9
  96:15 116:20
  122:1,7,11,
  15,20,22
  123:5,10,15
  124:23 125:7
  132:8,17,23
  133:3,5,14,
  18,19,23
  134:18,22,24
  135:10
  136:4,11,16
  137:9
fee
  26:2
feel
  12:21 14:11,
  17 15:25
  68:12
felt
  67:7 88:9
figuring
  131:19
file
  10:22 11:18
  28:5 75:18
  76:24 82:21
filed
  6:20 44:5
  57:9 58:9,20
  59:7 60:23

61:3 72:24
74:12 80:7
81:9 82:14
83:23
filing
  76:3 79:3
final
  79:25 80:5
  97:10,19
finalized
  27:23 77:10
financial
  53:7
find
  39:4 112:25
  113:1 131:14
finding
  68:20 69:11
  75:25 76:16
  77:7 88:5
  95:8 137:14,
  17
findings
  88:1,4
finds
  53:12 73:11
fine
  7:12
firm
  30:8,15,16
first
  31:7 53:11
  60:6 75:17
  76:23 80:21
  93:3 102:6
  114:19,24
  126:19
fiscal
  105:2,18,20
five
  23:13 83:22
  92:23 108:6
  131:1 132:7
  138:12
flat
  26:3

fleshed
  76:8
flexible
  65:3
flipping
  135:8
focus
  23:4 105:19
  106:13
focused
  105:2 123:11
followed
  48:16
following
  21:5 46:9
follows
  6:11
form
  34:24 119:5
  124:3
forth
  15:2 34:13
  61:23
  128:14,16
forward
  13:21 92:24
found
  69:16 70:14
  77:3 81:8
  87:22 107:11
  121:11 137:7
  138:3,7
founder
  30:1
four
  20:1,2
  25:18,21
  88:18 94:7,
  14,24 95:7
  98:15,21
  111:20
  125:25 131:1
  137:13,18
fourth
  36:21 37:10
  94:2 95:20,
  22 131:20

free
  12:21 14:11,
  17 15:25
front
  7:2 14:18
  36:17 42:23
  72:21 79:11
  80:5 83:13
  85:10
  113:11,19,24
  114:15 128:1
full
  59:5,11
  74:16 80:21
  114:23
fully
  76:8 80:23
funds
  73:25

───────────

G

───────────

gave
  17:3 18:1,2,
  3,4 75:1
general
  11:21 17:4
  65:24 67:9
  86:4 96:18
  100:8 125:22
generally
  19:12,15
  65:19 93:24
gentleman
  79:17
girl
  89:9
give
  8:8 12:19
  15:10,23
  24:12 25:20
  32:10,23
  52:11 135:13
Glen
  100:24
goals
  8:25 112:10

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

**goes**
71:6 103:24
104:12,24
128:14
**going**
11:1 14:5
21:15 24:19
25:2 40:10
62:10 63:14
64:5,13
66:14 75:8
80:3 90:17
92:19,20,22
102:3 112:25
113:22
131:25
**good**
6:15,17 19:1
33:13 65:8
70:16 83:17
99:16
**grant**
64:21
**granted**
49:15 51:13
52:2,15
70:8,11
76:21
**granting**
65:11 67:3,7
74:1
**Great**
10:13 21:15
**greatest**
86:11
**green**
29:22,23,24
**group**
129:14
130:23 131:3
**groups**
55:25
**guess**
30:20 45:22
55:8 68:11
96:17 98:12
118:7 129:21

132:18,19
136:23
**guessing**
16:1
**guideline**
8:23

---

**H**

---

**hand**
40:10 45:15
**handy**
36:19
**happen**
14:10 84:19
**happened**
57:19 59:3
72:15 78:11
123:22
**hard**
111:8
**Harold**
30:7,12,18
31:11,15
**Harris**
53:11 59:5
70:14,23
77:3
**Harris's**
56:17
**head**
78:18 102:19
129:24 130:4
**headed**
110:2
**hear**
129:25
**heard**
47:9 67:19
83:12
**hearing**
17:11 36:24
60:6 85:6,
13,15 87:9
89:2 90:21,
25 103:4
104:7 137:23

**hearings**
60:1,17
83:18,23
84:1,11
98:15,21
102:6
**heavy**
30:17
**height**
68:22 71:10,
25 77:19
**held**
28:2 60:6,15
89:20 90:9
**help**
8:5 27:11
80:13
**helped**
27:21
**helping**
27:14
**helps**
68:19
**higher**
99:11
**Highlands**
29:9
**highlighted**
88:7,10
**hired**
17:24
**historic**
118:11
**historically**
89:4
**histories**
111:15
**history**
107:14
111:5,12,18
**home**
43:12,16
57:1,4,15
58:9,21
60:22 67:14
74:11 78:13,
23 115:6

129:14
**homes**
39:5,19
41:19 43:5
57:9 126:24
130:23 131:3
135:14
**Homes'**
44:5 60:1
**honestly**
134:22
**hour**
26:11
**hourly**
26:2,4
**house**
136:21
**housing**
8:21,23 9:6
16:12,14,21,
23 17:9,13
18:15,18,19,
22 19:5
20:10 21:20
22:12,18,19,
23 23:5,8,9,
11 32:19,22
33:4,7 36:1,
8,10 37:23
38:5,23
39:18 44:14
46:1 47:6,
14,19 48:3,9
49:6 50:7
52:1,6,10,15
53:25 54:6,
18,22 55:21
56:9,23,24
66:25 70:14
74:19 81:13
93:6,16,21
94:22 95:5
96:15 98:6
108:17,22,25
110:1 111:16
115:7,8,18,
20 116:9,21
119:2,10,25

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

120:11,20,25
121:3,5,9,
15,16,18,22
122:1,7,12,
15,16,20,21,
22,24,25
123:1,4,5,6,
7,10,12,15
124:11,12,
17,18,22,24
125:4,8,10,
11,15 129:6
130:13 131:7
132:8,15,17,
23 133:2,4,
6,7,15,18,
20,21,23,24,
25 134:16,
18,22,25
135:4,11
136:4,11,16
137:2,4,6,8,
9

**hundreds**
63:20

---

**I**

**i.e.**
105:3
**idea**
15:24 102:7
**identification**
6:3,5 40:9
45:13 58:16
72:20 80:2
85:8 90:23
127:24
**illegal**
93:6,7 98:4
**imagine**
111:9
**impact**
34:21 35:5,
14 97:20,24
105:9,20
115:19

116:8,16
118:8,14,21
119:3 120:5,
21 122:2
123:18,24
124:2,6
132:25
134:10
136:23
138:4,9
**impacting**
65:8
**impacts**
97:23
**impervious**
86:16,25
102:24
106:17
**implement**
81:12
**implementing**
111:2 112:9
**implicated**
135:11
**important**
15:15
**impose**
131:13
**impossible**
48:2,4
**improper**
49:10 63:24
64:2 96:12
104:21
105:17
**improperly**
48:8 55:14
105:2,9
125:14,17
126:1 138:4,
8
**inability**
115:17,25
116:15
**include**
19:17 22:10
55:6

**included**
22:11 39:6
56:1 87:17
126:15
127:17
**includes**
19:5 128:20
**including**
37:7 82:10
129:9
**income**
17:16 22:19
23:9 55:23
56:4 115:5,
18 120:12
129:22
**indeed**
89:18 90:8
**indicated**
115:25
**indicates**
115:16
**individual**
88:7,8 89:14
**industrial**
44:1 101:9,
21
**informal**
13:15 87:24
**information**
74:3 76:11
117:12
**inhabiting**
96:22
**inherently**
65:14,20
70:15
**initial**
57:3 58:2
60:2 75:15
79:3
**initially**
57:14
**inject**
15:11
**ink**
110:9

**insisted**
83:7
**inspections**
41:1
**instance**
18:4,6 20:16
49:13
**instances**
15:5 16:22,
25 17:17
47:25 48:7,
15,19 49:17
50:3 51:4,8,
12 52:2,25
**Institute**
29:18 31:20
**instruction**
15:15
**instructions**
8:8 12:20
**integrated**
117:22
**intend**
33:21
**intention**
10:10
**intentional**
118:15
132:22
**interfere**
125:14
**interfered**
125:16
**interpret**
56:4
**interruption**
90:13
**intervened**
44:19
**interviews**
41:5,7
**invalid**
44:16 45:3
53:14
**involved**
22:23 51:2
134:16 135:9

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

138:2

**ipso**
105:22

**IRR**
40:20

**issue**
70:22  72:1
86:10  101:16
134:19

**issued**
11:23

**issues**
29:10  36:23
68:21  69:5,
11,13  71:2,
10,24  76:7
77:13  78:1
82:9  96:25
98:20

---

**J**

**James**
6:19

**January**
36:13,22
46:17  80:1,6
95:11  103:16
108:13  119:1
128:11

**Jersey**
6:22  18:18
19:6,11,14
23:25  28:19
29:17  31:22
32:19,22
33:6  45:8,25
46:1  55:20
65:14  74:17
100:16
108:16,17
111:16
121:22
122:25
123:12

**JESSICA**
6:10

**Jim**
46:4

**job**
31:7

**joint**
81:9  85:7,14
91:1  113:5

**judge**
47:1  49:24
53:11  54:20
56:17  58:15,
19  59:2,4
61:15  66:16
67:10  68:18
69:11,16
70:13,23
72:19,24
73:4,10  74:5
75:16  76:15,
17,18  77:3,
6,24  80:8
81:4  103:10
104:5,20
105:7  106:1
107:3,10,25
108:14  111:6

**judges**
75:4  95:7
109:7

**judgment**
38:10  46:11
75:24  80:1,5

**July**
59:20  60:6,
8,14  84:23
85:5,12  89:2

**June**
40:12  114:17

**Justin**
40:12  114:17

---

**K**

**K-O-P-S-C-O**
27:7

**keep**
64:13  86:15

**keeping**
102:22
136:20,21

**kept**
71:7

**kind**
20:4,5  34:9
54:12  68:1
75:10  99:22

**know**
7:23  10:1
14:5,12,17,
22  16:1
20:3,16  28:4
38:12,22
39:11,16
43:20  49:18
55:19,20
63:1  64:8
66:5,8  69:3,
5  76:4,13
79:16,22
84:22  85:21
87:16  89:4
90:2  92:21
93:19,24
95:16  98:1,
4,6,13
100:7,25
102:8
109:15,21
112:9
119:16,21
124:5  125:20
127:6,9,12
129:13
130:17,21
134:21
136:12,20,22

**knowledge**
13:5  26:16
39:23

**known**
65:2

**Knuckle**
42:4,5,16
127:7

**Kopsco**
27:3,6,9,16,
18

---

**L**

**lack**
74:3  103:1
110:12

**land**
16:9  19:12
20:13  22:8
23:20  24:4
29:1,5,7
45:2,6  48:7,
25  49:9
50:15  53:13
54:9  55:10,
15  62:15
63:18  65:4,
7,23  68:2
96:12,19
105:21
106:2,8,25
107:9,10
112:1,5
119:1  132:15
135:22  136:2

**language**
8:23  47:10

**large**
70:20  121:11

**Laurel**
19:8  20:9
38:11  46:2
74:18  108:18
135:1

**law**
18:25  19:12
35:9  45:8
46:23  65:4,
7,15,23  68:2
132:21  136:2

**laws**
134:15

**lawsuit**
33:2,12  38:4

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

44:6,10 45:1 48:16 58:10, 20 62:25 72:24 75:16 76:25 79:4 80:7

**lawyers**
15:1

**Leadership**
29:20

**leading**
24:17

**leaning**
110:19

**leave**
10:14

**leaves**
129:16

**LEED**
29:21

**left**
12:24

**legal**
19:2 46:13, 19 97:9 122:4

**legitimate**
8:24 62:15, 23 68:8 69:13 72:6 75:9 106:2, 8,25 107:9 109:18 110:22 111:5 112:1,5,16

**length**
71:7,16,19

**lens**
34:10

**letters**
29:13

**level**
68:12

**license**
31:23 32:3

**licensed**
28:19 31:8

**licensure**
32:1

**lieu**
51:19

**limit**
93:9

**limited**
37:8 72:14 73:13

**line**
88:22 89:5, 10 91:19 92:7,13,19 99:19 100:16 113:24 137:24,25

**list**
19:18 26:8 28:17

**listings**
20:24

**litigation**
23:24 75:20

**little**
15:10 17:5 30:17 45:23 60:24 80:14 96:8 102:20 126:10

**live**
125:15 130:14 131:2,7

**lived**
125:5

**living**
129:12,19 130:16,19

**LLC**
25:13 115:6

**long**
7:23,24 51:21 98:20 136:1

**look**
20:22 34:9 39:2 64:9

85:24 86:2 91:4 97:22 98:2 99:22 103:10 109:10,12 111:5 117:13

**looked**
36:5 40:6 102:4 126:18

**looking**
85:21 87:19 94:9 110:13 117:19

**looks**
7:4 60:5 61:21 74:4

**lot**
25:1 39:9 42:24 43:3 63:17 75:20 78:13 113:2, 11,12,19,20 114:1 121:11 136:23

**lots**
42:21 99:25 100:6

**louder**
129:25 130:4

**low**
17:15 22:19 23:9 55:23 56:3 120:12 129:20,22

———————

**M**

———————

**made**
48:1 68:20 113:6

**main**
43:9 54:25 101:14

**majority**
22:14,21,25 117:15

**make**
40:6 97:9 112:19 113:1 117:16 125:22 129:23 132:11 135:24

**makes**
64:2

**makeup**
98:1 100:8

**making**
113:9 115:20

**manuscript**
88:19

**March**
45:10,16 72:18,23 73:2,22 74:15

**mark**
40:5

**marked**
6:2,5 7:15, 17 10:17 40:8,11 45:13,16 58:16,17 72:19,22 80:2,4 85:7, 11 90:18,22 114:16 127:23 128:1

**market**
98:10

**Mason**
89:5,10 91:18 137:23,25

**master**
8:25 29:7,9 65:9 111:2 112:10

**materials**
10:23 11:3

math
  82:3 129:15
matter
  38:8 70:1,3,
  6 86:24
matters
  16:24 22:3
maximum
  94:10
mayor
  42:11 88:23
  89:1,19,25
  90:2 91:19
  92:9
mean
  9:17,20
  24:17,22
  30:24 35:4
  48:10 52:18
  54:24 65:19
  74:21 75:13,
  15 77:2
  97:23 107:2,
  4,7 108:14
  109:1,4,6,7
  111:14 112:8
  129:13
  134:21
  135:15
means
  44:15 54:10
  62:5
meant
  50:8 55:21
  89:25 90:3
Meehan
  58:15,19
  59:2,25
  67:10 72:19,
  24 73:4,11
  74:5 77:6
meet
  47:19 65:22
  135:21
meeting
  65:5 78:2,12
  81:3 86:3
  106:20

meets
  120:24
Melfi
  79:17,19,20
  82:16
member
  89:14 92:10,
  14 99:18
  103:19,20
members
  41:10,13
  87:9,23
  88:3,8 97:1,
  2,11
memorializing
  36:24
memory
  14:15 80:15
mentioned
  18:10 20:12
  23:5 71:23
  77:14 99:20
  106:12
met
  6:18 11:19
  17:14 18:7
middle
  39:8 59:10
  69:25 126:14
mind
  105:8 112:1
mindful
  14:2
minimum
  97:12
minorities
  35:15 120:5,
  8,15,22
  124:13
  125:15
minority
  22:17
minute
  8:9 138:12
minutes
  84:18 86:8

Mister
  116:24
MIT
  40:13
mixed
  115:5,17
mixing
  123:2
Mm-hmm
  13:13 58:24
  73:6 77:15,
  18,20 81:22
  87:21
moderate
  17:16 55:23
  56:3 120:12
  129:21,22
moment
  26:1
month
  8:1,2,12
months
  59:14 63:8
  83:22 101:22
Moore
  93:2 96:10
  130:11
morning
  6:15,17
Morningside
  42:25 43:9,
  13,17 44:18
  58:21 79:7,
  10 81:9,16
  85:6,13 91:1
  92:22 115:6
motion
  46:10
motivations
  111:10
Mount
  19:8 20:9
  38:10 46:2
  74:18 108:18
  135:1
mouth
  50:2

move
  120:6,22
  124:15
  134:12
moved
  17:7
moves
  13:21
moving
  78:5 87:4
  92:24 120:9
  121:13,14
  134:8
  136:10,19
multifamily
  39:20 56:23
  115:18
multiunit
  103:23
municipal
  16:20 17:12
  18:2,25
  19:12 21:3,9
  24:15 65:4,
  9,23 68:2
  75:19 135:21
municipalitie
s
  18:17 21:11,
  14,23 22:2,6
  25:4 29:6,11
  33:10 48:25
  52:5 98:2
  117:11,14
  118:2 119:20
  121:5,17
  124:16
  125:13
  136:22 137:5
municipality
  16:25 18:7
  19:23 20:18
  21:6 33:2
  47:11 48:11,
  12 51:5,24
  55:1,14
  63:23 65:7
  68:7 77:1

98:11 111:1
121:8 125:3
134:25
135:23 137:3
138:6,8
**municipality'
s**
  44:12

_____

**N**
_____

**name**
  6:19 29:14
  30:10 64:6
  79:17,18
**names**
  32:10
**narrative**
  114:19
**national**
  29:19
**necessarily**
  54:11
**necessary**
  15:12
**need**
  7:11 14:16,
  20,21 31:25
  38:17,18
  50:15,23
  53:7 69:12
  78:15 86:21
  114:5 117:17
  121:19
  131:18
**needed**
  54:17 66:10
  76:7 83:16
  113:18
**needs**
  19:23 47:5
  53:6 130:17
**negative**
  97:22
**negatively**
  65:8

**negotiates**
  98:11
**neighboring**
  117:11 118:1
  119:19
**never**
  16:15 33:10
  56:13 64:4,7
  133:15
  137:19
**Nick**
  82:16
**noncompliance**
  38:5
**nonconforming**
  62:1 66:12
**nonresidentia
l**
  101:21,23
**North**
  89:9
**Note**
  9:21 52:17
**notes**
  7:7 104:5
**notice**
  6:5 10:17,24
**noticed**
  26:9
**notorious**
  107:16
**number**
  19:22 45:18
  54:22 82:6
  97:2,20 98:8
  103:21
  127:22 128:3
**numbers**
  80:17 88:16

_____

**O**
_____

**oath**
  13:14
**object**
  15:1

**objection**
  9:21 15:3,12
  34:24 52:17
  119:5 124:3
**objectives**
  112:10
**obligation**
  20:2,6 38:25
  39:12 44:14
  47:11,12,20
  107:16 122:4
  123:2 124:11
  125:10,13
  126:16
  128:16
  131:14,21
  133:20,24
  134:6,24
  135:2
**obligations**
  8:23 9:7
  17:14 18:19
  19:2,15,16
  35:9,25 37:7
  46:13,19
  53:1 74:17
  93:17 104:17
  119:2 123:12
  132:15,22
  136:2
**obtain**
  53:4 61:24
**obtained**
  7:25
**obviously**
  25:9 130:13
**occurred**
  36:4 59:24
  72:13 73:21
**October**
  60:14,17
**offer**
  15:25 16:18
  17:19 118:4
**offered**
  9:10,13,20
  10:7 56:11,
  13

**offering**
  34:15,20
  117:23
**offhand**
  84:20,21
**office**
  11:6 26:15,
  17
**officer**
  79:23 82:16,
  23 83:6
**official**
  90:10
**oftentimes**
  135:18
**okay**
  7:1,8,10,14,
  19,23 8:2,
  10,16 9:4,9,
  13 10:5,13,
  21 11:1,5,9,
  12,22 12:8,
  19,22 14:10,
  13,14,18,19,
  23,24 15:7,
  8,13,20,21,
  22 16:2,3,
  13,17,22
  17:2 18:10
  20:22 21:15
  22:24 25:16
  26:7 27:18
  28:15,22
  31:14 33:6,
  17,20 34:6,
  11,15,19
  35:3,7,12,19
  36:15 37:10
  38:19 39:11,
  21 40:5,14
  41:4,9,24
  42:18,23
  43:7,11,20
  44:25 45:5
  46:16 47:1,
  9,16,24
  48:6,14
  49:3,8 50:18

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

51:20 52:21 53:21 54:5, 19 55:6 56:6,21 58:8,13 59:13,23 60:5,16,22 61:2,14,20 62:4 63:7, 17,22 64:25 66:14,23 67:10,18 68:17 69:8, 24 70:13,19 71:1,14,23 72:4 73:10, 19 74:4,14 76:19 77:6 78:5,17,21 79:1,10,16, 22 80:3,12, 18,21 81:7, 16,20,23 82:20 83:5, 11,21 84:9, 13 85:2 86:6 87:14 89:1, 17,23 90:12 91:8,12,15, 24 92:17 93:2,13,24 94:17 95:6 96:2 97:17 100:22 101:2,6,11, 18 102:2,13 103:10 104:5,16,20, 24 105:13 106:1,6 108:6,12 113:14,17 114:4,10,14, 15 115:13,24 116:5,24 117:6,8 118:4,24 119:16,23 120:13,18

121:1 122:6, 14 124:20 125:3,18,24 126:9,12,18 127:9,16,25 128:8,19,24 129:15,22 130:5,7,8,16 131:17 132:3,10 134:14 135:13 136:14

**omissions**
 34:23 35:17

**once**
 64:3 83:6 100:13

**one**
 8:18 15:14 16:14 25:23 27:24 29:15 32:5,8 38:4 40:6 48:19, 21 49:19 53:1,2 58:2, 3 61:23 62:20 68:21 76:15 84:3, 25 85:1,22 86:4,5,7,9 88:11,12 89:13 91:5, 7,10 95:25 100:23 102:7,10,12 108:3 109:12 111:13 115:7 122:8 126:19,23 127:2,7 129:20,21 135:13

**ones**
 22:23 88:16 106:12

**open**
 71:2 86:18

 103:1 106:18 110:9,12,20, 24

**opine**
 121:25

**opined**
 62:14 120:13

**opines**
 118:6

**opinion**
 9:5,10,18 16:19 17:13, 19,21 32:18 33:1 34:12, 16,20 35:20, 23 52:18 56:12,13 89:24 90:5,7 108:15 111:24 113:10 115:2 116:11 117:18,23 118:5,13,18, 19,22 119:13,17 121:16,24 122:9,10,16 123:3,10,11, 13,16 131:5 132:12,13 133:19 134:23 135:21 136:17

**opinions**
 9:14,16 10:6 11:25 18:5 33:21 134:15

**opportunity**
 47:4,13 49:25 50:6 55:4,17 75:1 121:20

**opposed**
 20:18

**opposite**
 107:5

**OPRA'D**
 89:3

**oral**
 18:4 103:3, 6,7,13

**order**
 36:23 53:4, 12 56:19 59:16 72:19, 23 73:14 77:7 80:9,19 113:19

**ordered**
 77:25 81:3,5

**orders**
 77:9

**ordinances**
 9:1 45:3,7 65:10 68:3 135:22

**organization**
 19:21

**orient**
 42:19 73:7 80:13

**orientation**
 100:20

**outside**
 10:7,8 112:5

**outwardly**
 63:23

**outweigh**
 65:11

**overlay**
 54:14

**overturned**
 62:19

**owned**
 42:24 43:4, 9,11 115:5 126:20 127:7

**owner**
 66:19

**owners**
 41:16

|  | P |  |
| --- | --- | --- |

**P-E-L-L-O-W**
  30:12
**p.m.**
  138:21
**P.P.**
  6:10
**P010**
  45:12,18
**P04**
  45:18
**P110**
  80:17
**page**
  8:16 20:23,
  25 21:1
  28:17 36:20
  39:8 45:22
  46:5,21 53:9
  59:2 60:12
  61:14 64:19
  66:6 68:19
  69:23 70:4,5
  71:17 80:5,
  18 87:19
  88:14,16,21
  92:6,8,12,19
  98:25 99:15,
  17 103:11,12
  104:22
  105:15
  112:24
  114:18,19
  116:24
  126:13,14
  128:15,25
  131:10
**pages**
  88:19
**palpably**
  105:22
**paragraph**
  53:11 59:6,
  11 60:13
  70:2 73:10

  77:24
  105:13,14
  114:24
  115:14
  128:13,14
**paragraphs**
  77:12 103:17
**parameters**
  93:25
**parcel**
  57:11
**parcels**
  44:22
**parking**
  99:24 100:6
**part**
  10:21 52:6,
  10 54:16
  97:10 107:17
  112:22
  117:20
**partial**
  46:11 73:3
**particular**
  12:4 18:6
  29:4 48:22
**parties**
  59:15 77:9
**passed**
  104:8
**passing**
  83:22 89:18
**past**
  53:15 54:19
**pause**
  15:10
**Payment**
  51:19
**Pellow**
  30:7,12,19
  31:12,15
**pending**
  22:3 23:24
**people**
  17:16 34:22
  55:23 120:12
  121:14

  130:24 134:8
  136:10,19,
  20,22
**percent**
  22:18 23:8
  25:8 52:23
  71:4 93:20
  94:1,2,9
  117:3
**period**
  18:16
**permits**
  55:8 115:4
**permitted**
  52:5 113:24
**permitting**
  54:5
**perpetuated**
  116:1
**perpetuation**
  115:9
**personal**
  13:4
**personally**
  26:19 48:5
**perspective**
  64:9 101:19
  107:9 131:8
**petition**
  105:2
**physical**
  41:1
**pilot**
  51:13,17,18
  53:4,7 55:17
**PILOTS**
  52:2,6,14,23
**place**
  32:6
**places**
  20:7 32:7
**plaintiff**
  43:4 44:18
  61:23 64:20
  75:17,21
**plaintiff's**
  62:12 131:11

  132:4
**plaintiffs**
  6:20 45:24
  58:22 70:21
  72:25 75:1,
  25 76:3,16
  80:8 82:9
  116:7,14
  126:20
**plaintiffs'**
  35:21
**plan**
  8:25 29:9
  50:20,24,25
  54:1 65:9
  69:3,7,15
  73:15,22
  79:8 81:11
  82:23 109:1
  111:2,3
  112:10,13
  114:6 127:13
**planner**
  16:20 17:12
  18:2 21:17,
  22 25:23
  27:2 28:19,
  23,24 29:17
  30:25 31:1,
  4,9,17,19,
  20,21 32:5
  33:23 47:17
  119:11
  122:18
  134:20
**planners**
  17:24,25
  25:22,23
  26:23 29:1,
  2,18,20
**planning**
  16:9 29:10
  30:16 31:23
  32:16 34:10
  41:10 57:24
  68:24 72:14
  73:11,15
  77:25 78:11

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

83:13 85:5,
12 86:22
87:9 90:21
91:2 97:2
99:18 101:18
105:8 106:4
111:21
135:10

**plans**
16:21 29:7
37:24 113:15

**please**
8:17 14:11
15:16 30:11
32:11

**point**
37:5,10
38:3,18 69:2
108:12
112:19 113:2

**policies**
118:19

**policy**
95:3 109:3
123:21
132:24,25
133:2 134:2

**population**
117:3

**portion**
87:7,16

**portions**
91:13

**position**
46:16 61:16
66:16 86:23
89:21 136:1

**positive**
65:6

**possession**
28:7

**possibly**
50:20

**potential**
96:21

**potentially**
76:9

**PP**
29:15,16
31:6

**practices**
53:15,23
54:20 55:20
77:4 109:9
118:20

**predated**
94:6

**predecessor**
44:5

**predominantly**
119:19
120:15 125:5

**preliminary**
113:25 114:6

**preparation**
26:20 27:12
39:24

**prepare**
11:16 12:5,
13

**prepared**
40:12

**preparing**
26:23 27:19
40:25 41:24

**present**
70:1,3,6

**pretty**
97:11

**prevent**
136:8

**previously**
12:13

**primarily**
22:17 66:3
106:14

**primary**
86:10

**principal**
47:2

**prior**
11:1 23:15
30:5 31:14
37:17 60:24

91:17

**private**
22:5,9,21,25
29:11 51:5

**privy**
97:15

**probably**
14:5 52:23
63:13,19
88:13 102:5
108:6

**problem**
36:18

**procedure**
17:10

**process**
22:8 37:20,
23 75:8 99:2
132:1

**processes**
50:12

**professional**
28:19 29:1,
16 31:4,8,23

**program**
25:5 51:22

**programs**
50:11

**project**
22:18 23:11
39:6 99:20
104:11
110:1,5
138:5

**project's**
105:19

**projects**
22:19 23:9
32:6

**promoting**
65:6

**prop**
57:2

**properties**
41:2 42:19
43:8,21
47:18 63:9,

12,15 79:12
81:25 121:10
126:14,19
127:6 128:20

**property**
41:16 43:8,
13,16,18
50:5 57:4
63:3,5
66:17,18,19
74:24 79:11
101:7,9
106:16,19
112:20
113:22
131:12

**proposed**
61:25 99:9
115:5,17
116:15
131:22,23

**proposing**
23:10 86:14

**proposition**
103:21

**prosecution**
46:10

**protect**
55:21 133:25

**protected**
35:14 55:25
96:16 115:8
116:17
123:18
124:15 125:6
134:11
135:16,18

**protective**
136:9

**provide**
33:22 50:5
52:5 64:20
99:10 121:19
122:6,16,23
124:12
125:11
133:25

**provided**
40:19 75:12
113:15,20
122:8
**provides**
8:20 34:12
88:3 114:25
**providing**
7:13 44:13
54:3 55:16
76:11 89:23
90:4 113:9
119:13 123:9
133:1 136:17
**public**
60:1 64:5
65:8,22 67:9
70:16 84:10
90:21,24
92:10,14
97:1,12
105:20
137:23
**purported**
32:18,21
62:6
**purpose**
16:18 65:6,
23 107:19
120:10
124:14
**purposes**
63:25 64:2
94:4
**purview**
117:20
**put**
7:8 26:21
50:1 64:4
72:21 111:25
112:11 121:3
126:10
**putting**
85:10 93:21

---

**Q**

---

**question**
13:2 15:16,
20 33:14
47:2 52:11
53:2 57:21,
23 86:17
124:8
**questions**
12:20 14:6
15:1 111:10
117:16
138:17,19
**quick**
94:12
**quickly**
14:3 44:8
**quote**
47:3,6 92:3
103:22 104:1
**quotes**
53:16 88:13

---

**R**

---

**race**
115:21
116:2,17
**races**
121:14
**Rachelski**
42:13 99:17
**racially**
117:22
**raise**
97:12
**raised**
98:18 99:4
107:10
112:17
135:16
**raising**
110:23
**range**
15:25

**rarely**
134:23
**rate**
26:3,5 98:10
**rationale**
105:1
**re-reviewed**
11:17
**read**
56:7,9 98:12
109:6
**reading**
129:23
130:1,2
**reads**
15:18
**real**
94:12
**realignment**
82:10
**realistic**
47:4 49:25
**reason**
21:19 64:6
87:11,14,15
110:3 118:10
**reasonable**
9:10 47:12
50:6 55:4
75:1 121:19
**reasons**
13:23 23:2
57:18 62:13
64:11 88:9
102:17
105:18
110:18
111:7,23,24
121:6
**recalcitrant**
76:10,14,17
107:15
**recall**
12:4 23:12
26:5 42:3,15
48:15 61:6
72:12 78:10,

22 80:3 81:4
82:12,24
84:13 85:1,
16,17,19
86:8,10 87:2
91:20 99:4,
14 102:13,17
103:3,9
112:22
**receive**
13:9
**received**
96:7
**recent**
52:13 101:22
**recently**
19:25 86:5
**recess**
90:14 138:14
**recollection**
58:4 82:18
**record**
6:19 11:2
27:24 28:2,5
43:22,24
44:4 53:22
57:21 59:24
61:7 63:7
64:10 65:1
67:4 79:18
84:22 99:7
101:12 110:6
**record's**
18:11
**recorded**
59:19
**recreation**
86:18
**recreational**
104:16
**redeveloper**
51:13
**redevelopment**
50:22,24
51:2,9 66:24
**redlining**
136:24

---

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

reduced
  106:18
redwell
  11:3
refer
  7:11 36:16
reference
  14:16 19:3,
  15,25 76:20
  82:15 99:1,
  14 101:13
  103:24
  112:19 121:4
  137:23
referenced
  12:9
references
  18:21 122:4
referred
  78:20
referring
  18:12 36:8
  37:2 38:7
  40:16 42:20
  54:20 71:5
  82:17 87:18
  88:14 95:25
refresh
  82:18
refused
  83:6
refutes
  117:24
regard
  94:14 111:12
regarding
  32:18,20
  63:18 78:16
  87:3 115:2
  121:4
region's
  47:5
Regional
  29:9
regular
  30:25

regulation
  94:22
regulations
  17:15 29:8
  53:13 93:6
  95:5
rejected
  109:19
related
  28:12 34:1
  38:4 58:11
  77:17 90:7
  102:1,14
relates
  28:12 34:16
  35:25 56:14
  73:22 118:7
  136:5
relevant
  94:18,20,25
relied
  112:6
remain
  44:1 53:13
  101:21,23
remainder
  129:6
remained
  71:2
remaining
  76:6 102:6
  129:17
remains
  8:22
remand
  49:14,15
  71:3 72:13,
  14 73:4,13
  107:20 108:1
remanded
  49:7,10
  68:24 69:14,
  21 71:9,24
  72:9 76:5
remarks
  87:23

remedies
  75:19 76:4
  81:13
remedy
  33:12,14
  44:5,9,23
  50:4 75:16,
  18 76:24
  79:3
remember
  72:15 84:20,
  21
removal
  110:8,14
removed
  44:2
rendered
  32:17 33:1
  34:11 75:24
renders
  105:21
renting
  136:21
repeated
  111:7,8
replace
  131:18
report
  6:2 7:4,5,
  20,25 8:13,
  17,20 9:14,
  22,25 10:7,
  8,11 11:18,
  19,21,23
  12:3,10,14
  14:16,18
  20:23 21:21
  26:8,21,24
  27:11,20,22
  33:21 34:13
  35:6,8 36:20
  38:18 39:1
  40:2,8,12,
  15,19,20,22,
  25 41:25
  87:7,16,20
  88:6 91:22,
  24 94:13

102:20
  112:11,18,23
  114:12,17,19
  118:9 121:3
  122:3
  126:10,11
  128:21
reporter
  6:6 12:24
  27:5 78:20
  90:13
represent
  6:20 29:6
  87:24
representative
  42:7 109:17
represented
  22:17
representing
  25:4 51:5
request
  97:25
requested
  106:23
requesting
  67:5 73:25
require
  69:4 121:17
required
  61:24 62:8
  66:8 70:10
  83:8 86:19,
  20 88:4 93:5
  129:4 133:5,
  6
requirement
  54:25 69:17
  130:18
requires
  43:17 123:1
  137:3
researching
  27:21
residential
  97:7 121:10

**resolution**
  25:5 26:14
  64:5,10
  73:24 88:2
  103:4,6,14,
  15 104:7
  105:15 107:1
  127:22 128:3
**resolutions**
  12:6 103:8
  111:25 112:6
**resolved**
  70:22
**respect**
  110:23
**respects**
  62:1
**response**
  89:8 135:22
**restate**
  15:17
**restricted**
  39:22 93:10,
  15,22 96:11
  129:6,10,18
  130:12 131:7
**restriction**
  93:20
**restrictions**
  39:21
**restroom**
  14:20
**result**
  44:25 51:9
  61:2 107:21
  118:15 136:9
**resulted**
  118:20
  137:12
**resulting**
  119:3
**retain**
  110:24
**retained**
  23:16
**retention**
  106:15

**return**
  11:9
**reversals**
  111:20
**reversing**
  73:14
**review**
  12:12,13
  41:25 42:5,
  10 44:3
  53:22 59:24
  61:6 83:6
  84:9 86:8,9
  91:17 101:12
  102:3 113:14
  114:12
  115:15,25
**reviewed**
  11:6,18
  12:2,5 40:2,
  16,18,22
  45:15 53:25
  84:14 85:23
  86:4 88:7
  91:6,10
  102:8,11
  106:14
  109:21,22
  111:14
  127:13 132:3
**reviewing**
  41:24 42:16
**rezone**
  50:5
**rezoning**
  47:17 48:1
  50:10,14
  56:18 121:9
**Ridge**
  100:24
**right**
  6:15 7:16,21
  9:7,11 10:16
  12:24 15:14
  17:6 18:8,23
  24:25 25:1,
  3,10,25
  28:20 31:4,

  11 33:18
  35:11 37:11
  38:6 39:24
  40:3 53:9
  55:5,7,17
  57:12 60:4,
  7,25 62:16
  63:10,11,16,
  19 64:7,16,
  17 67:1,11
  68:15 69:18
  70:11 71:18
  72:2,3,10
  73:7 77:10
  78:8,9 79:4,
  6 81:19
  82:6,20
  83:19 84:4
  86:23 87:14
  88:17 90:17
  91:11 94:18
  97:13 101:5,
  13 104:19
  106:4 109:11
  114:12 121:6
  124:16
  129:7,16
  138:16
**rink**
  43:25 68:23
  72:2 77:17
  86:13 102:23
  104:13
  106:16
**river**
  57:5
**roller**
  43:25 86:13
  102:23
  106:16 110:9
**room**
  13:16
**rose**
  68:12
**round**
  17:7 18:10,
  13,14 20:1,
  2,3 36:25

  37:8,11,22
  38:24 39:12
  54:15 94:1,
  2,6,9,14,24
  95:1,21,22,
  25 126:16
  128:17
  131:20
**Route**
  89:4
**RPM**
  23:10
**ruled**
  75:4
**rules**
  54:12
**ruling**
  48:18 56:17
**runs**
  100:16,17

---

**S**

---

**S-E-R-A-N-
D-I-N-O**
  32:13
**safety**
  72:6
**satisfied**
  128:17
**satisfy**
  38:24
**satisfying**
  107:16
**saying**
  46:7 63:2
  66:11 67:2,
  25 68:11,16
  107:3,6
  122:9
  123:17,24
  124:9
  125:19,20
  134:5
**says**
  21:3 28:18
  35:8 36:22

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

46:9 47:1
59:13 64:10
68:1 70:19
80:22 88:18,
20 89:2,8
92:8,19 93:3
96:13 99:18
103:13
104:25
105:15
106:1,5
107:5,13
108:14
115:1,15,24
128:2 129:8,
20

**school**
87:4 103:19
105:4,10
130:13

**schools**
97:25 103:25

**scope**
114:25
117:17
132:11

**scour**
38:17

**second**
21:25 27:25
43:3 57:7
58:9,19
59:5,11
60:12 61:21
85:15,17,19,
25 90:24
114:23
126:23

**section**
10:2 88:10

**sections**
10:1

**Sector**
32:15

**see**
9:2 10:24
12:23 21:7
39:4 41:18

46:3,14,24
47:7 53:17
58:23 59:10,
17,21 60:20
61:18 62:2
64:23 66:21
68:25 70:2,
5,17,24
73:17 75:10,
13,20 78:3,
15 80:16,25
81:14 83:3,9
88:15,18,23,
24 89:11
91:5,14
92:2,3,25
93:11 99:14
100:2 104:3,
14,18 105:5,
24 107:7
111:1 114:21
115:11,22
116:3 117:4
119:11 126:4
127:3 134:2
137:1

**seeing**
92:2 124:10

**seeking**
81:10

**segregation**
115:10 116:1
118:12

**segregationis
ts**
137:1

**senior**
25:23 27:2
30:25 94:10

**sentence**
8:19 53:11
61:21 66:15
80:22

**separate**
71:8,9

**separately**
63:9

**September**
7:21 60:14
84:24 90:22
91:3,8

**Serrandino**
32:12

**serve**
70:16

**served**
10:16 16:4,
8,10

**serving**
65:24

**set**
34:13 61:22
81:20

**sets**
128:14,15

**settlement**
20:4 36:7,9,
23 71:13
72:17 95:18
108:21
127:18,19
128:9

**seven**
30:20,23
129:21

**several**
55:25 59:25
67:5 86:15
95:13,14
106:21

**sewage**
68:22 71:11,
25

**sewer**
75:12 77:14

**share**
16:21 36:8,
10 37:24
47:5 54:1
95:18,24
108:22 109:1
127:17

**Shephard**
6:6,8 8:5

9:21 11:20
13:21 14:25
15:4 34:24
46:4 52:17,
21 77:21
119:5 124:3
138:19

**Shephard's**
26:15,17
28:7

**show**
7:17 45:14
65:5 80:4
84:20 90:17

**showed**
76:7

**Showing**
58:17

**shows**
76:9 95:3
117:1

**siblings**
127:7

**side**
75:9 100:24
101:3

**sides**
75:10,14,22
126:4

**signed**
95:18

**significant**
115:19

**simply**
47:17 49:14
96:20 107:25

**single**
109:12
121:10

**site**
50:20,24,25
69:3,6,15
73:15,22
112:13
113:15,18,25
114:6 127:13

| | | | |
|---|---|---|---|
| **sites**<br>  131:18,20,<br>  22,23<br>**sitting**<br>  13:4 72:12<br>**situation**<br>  69:22 107:24<br>**skating**<br>  43:25 68:23<br>  72:1 104:12<br>**smaller**<br>  81:17 88:16<br>**solely**<br>  66:18<br>**sort**<br>  20:6 28:11<br>  34:4 75:17<br>**sorts**<br>  22:7<br>**sought**<br>  82:9<br>**sound**<br>  136:14<br>**South**<br>  89:3<br>**space**<br>  86:18 103:1<br>  106:18<br>  110:9,12,20,<br>  24<br>**speak**<br>  14:2,4 41:9,<br>  12,15<br>**speaker**<br>  92:7<br>**speaker's**<br>  87:25<br>**speaks**<br>  9:22<br>**special**<br>  17:23 21:19<br>**specific**<br>  15:24 21:21<br>  58:4 91:13<br>**specifically**<br>  69:16 104:25<br>  106:11 107:5 | **111:22<br>137:21<br>138:3,10**<br>**spell**<br>  27:4 30:10<br>**spent**<br>  98:15<br>**spite**<br>  108:13<br>**spoke**<br>  55:11<br>**stamp**<br>  128:5<br>**stance**<br>  107:15<br>**stand**<br>  51:18<br>**standard**<br>  18:7<br>**standing**<br>  111:4<br>**start**<br>  16:13 30:3,<br>  18 83:18<br>**started**<br>  30:24 31:5<br>  74:21 114:8<br>**starts**<br>  69:25<br>**state**<br>  8:22 9:6<br>  19:2,14,16,<br>  19 29:10<br>  31:18 35:9,<br>  25 37:7 45:8<br>  46:19 63:23<br>  119:1 122:4,<br>  23,25 123:4<br>  132:14,21<br>  133:6 134:15<br>  136:2<br>**stated**<br>  64:15 75:16<br>  118:11<br>**statement**<br>  10:3 50:9<br>  89:18 125:23 | **130:11**<br>**statements**<br>  87:8 88:8<br>  89:13 104:6<br>**states**<br>  114:23<br>  116:25<br>**station**<br>  99:5<br>**stations**<br>  99:10<br>**statistical**<br>  34:12,17<br>**status**<br>  115:21<br>  116:18<br>**statutorily**<br>  88:4<br>**Steil**<br>  40:13 114:18<br>  116:5,25<br>  120:13 126:6<br>**Steil's**<br>  7:5 11:19<br>  12:3 34:13<br>  40:2,8<br>  91:23,24<br>  114:11<br>**stem**<br>  112:11<br>**stenographer**<br>  14:1<br>**stop**<br>  100:23<br>  121:12,13<br>**stopping**<br>  120:8<br>**street**<br>  43:9 79:14<br>  101:14<br>**stretched**<br>  84:1<br>**struggle**<br>  80:15<br>**students**<br>  104:1,10 | **study**<br>  50:22 74:2<br>  75:12 117:13<br>**stuff**<br>  99:23<br>**stunned**<br>  54:2<br>**subdivision**<br>  50:21<br>**subject**<br>  38:4 41:2<br>  42:18 44:22<br>  62:24 86:3<br>  106:19<br>**submit**<br>  67:6<br>**submitted**<br>  56:22 57:13<br>  79:7 82:22<br>  83:1 84:7<br>  110:16<br>**subsection**<br>  46:23<br>**subsequent**<br>  50:14 55:15<br>**substantially**<br>  117:10<br>**substantiated**<br>  68:4<br>**substantiates**<br>  135:5<br>**success**<br>  28:11<br>**successful**<br>  46:10<br>**sudden**<br>  137:3<br>**sued**<br>  121:8<br>**sufficient**<br>  47:19 68:15<br>**suit**<br>  44:23 59:6<br>  94:5<br>**summary**<br>  46:11 59:3<br>  68:10 114:20 |

Jessica G. Caldwell, P.P. Volume I
October 30, 2025

superintendent
  103:18
Superior
  16:11,24
  17:7 24:4,
  14,16,18,20
  25:6 33:9
  36:6,11,23
  37:22 45:12,
  17
support
  64:21 105:16
  107:23
supported
  68:8
supporting
  8:21
suppose
  29:2 55:18
  134:7
supposed
  13:1
Supreme
  18:23 19:9
sure
  11:14 15:16
  19:24 28:10
  29:16 38:14,
  16 39:2 40:6
  51:1 64:12
  69:19 91:9
  95:19 97:17
  99:13 116:14
  117:16
  129:23
  130:25
  132:11
  135:24
  137:10
surprise
  63:14
Sussex
  30:9
sworn
  6:11 13:14

         T

table
  78:6
tad
  135:8
take
  10:13 32:6
  39:2 56:8
  77:9 78:8
  86:1 91:4,12
  134:9 138:12
taken
  11:5 47:25
  90:15 138:15
taking
  12:25
talk
  25:25 104:12
  114:10
talked
  58:20 59:4
  128:9
talking
  61:10 66:6
  89:9 94:6
  96:10
talks
  96:11
tax
  22:19 23:9
  51:21
taxes
  51:19
tell
  85:22
temporally
  94:17
term
  51:21 67:18,
  24
terms
  74:23
test
  14:15

testified
  6:11 17:18
  20:13,17
  21:11 22:4
  23:19 40:2
  51:1 56:12
testify
  17:12,19,20
  134:19
testifying
  13:17 25:10
testimony
  18:1,2,6
  33:9 86:11
  87:3 103:18
  104:6,9
thank
  11:11,12
  28:8,9 33:14
  100:1 138:18
there'd
  129:19
thing
  34:5 57:20
  75:17
things
  7:1 27:14
  29:3 89:6
  123:3 135:15
  136:24 137:7
think
  8:4,12 9:24
  19:17 23:14
  30:24 35:3
  36:18,21
  39:25 50:1,
  2,8 54:8,14
  56:12 62:14,
  18 64:1,8
  67:2 69:9,20
  71:7 74:20,
  25 75:7,13,
  22 76:2,5,8
  77:13 78:15
  84:2 86:24
  88:12,20
  94:20 95:3
  96:5,7

  97:14,15,22,
  23 98:4
  100:12 107:8
  108:19
  109:21
  110:10,18
  111:17
  112:11,16
  120:7,11
  122:18
  135:3,7,18,
  19 136:18
  137:11,12,13
thinking
  48:21
third
  17:6 18:14
  36:25 37:8,
  21 38:24
  39:12 61:10
  94:1 95:25
  126:15 127:2
  128:17,24,25
thought
  54:2,8 63:2,
  6 66:7 105:8
thoughts
  87:25
three
  18:11,13,14
  20:3 23:14
  25:22 26:23
  52:13 54:15
  60:17 61:20,
  22 68:22
  69:5 75:3
  93:4 94:9
  95:1 98:5
  103:17
  126:13,14
  127:6 128:20
time
  11:22 14:25
  15:23 18:17
  19:21 20:7
  28:1 31:14,
  19 32:1
  37:13 45:5

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

| | | | |
|---|---|---|---|
| 46:17 51:24 53:24 54:4, 14 76:4 83:22 86:1 90:14 92:9 98:14 117:2 138:14 | total 129:19 | transitory 87:25 | typos 27:14 |
| timeframe 52:12 | touch 94:11 | triggered 86:15,21 106:22 | |
| timeline 36:19 78:21 80:13 | touches 94:13 | trying 14:4 62:21 74:20 110:24 117:17 133:12 | **U** |
| times 62:19 | tough 25:3 | | ultimately 36:10 48:23 58:9 59:14 64:12,18 83:11 97:18 102:14 104:8,20 113:12 114:4 118:20 128:10 131:11 136:9 |
| title 30:22 | town 21:17 89:2 93:20 99:24 103:20 119:4 | turn 8:16 28:16 36:20 45:22 46:21 53:9 59:2 69:23 80:15 88:14 92:6 98:25 99:15 114:18 | |
| titles 25:20 | township's 107:15 | | unable 116:7 131:12 |
| today 6:23 11:23 12:5 13:3,4, 11 38:22 72:13 | tracks 100:24 101:8 | | unanimously 60:18 |
| | traffic 77:16 103:1 | | unavailable 115:20 |
| | trail 130:6 | tweaking 113:6 | unconstitutional 53:14 |
| today's 11:15 | train 99:5,10 100:24 101:8,15 | twice 100:13 | |
| told 82:21 | transcript 13:9,22 15:18 42:11 85:3,5,12 86:9 88:15 91:9,17 92:2 102:3 106:14 109:22 130:12 | two 20:24 25:22 31:18 32:7 42:21 46:2 49:19 52:13 62:1 63:11, 15 68:22 79:12 81:25 102:6 115:9 123:2,18 126:19 129:5,17,19 | understand 6:24 11:7 13:3,6,12, 18,24 15:16 42:21 43:1, 6,7,15 44:4, 17,21 45:1 51:23 52:4 53:1 55:22, 24 58:8 64:16 94:19 96:14 98:17, 25 100:15, 20,22 101:6 110:4 116:10,22 117:17 120:16,17 132:6,11 134:14 135:25 |
| Tomko 88:23 89:1, 19,25 90:2 91:19 | | | |
| tons 137:5 | | | |
| top 21:3 29:14 80:19 92:7,8 102:19 103:13 128:2 129:1 | | | |
| | transcription 13:10 | type 10:2 22:8 39:17 66:9 | |
| | transcripts 42:1 84:10, 16 92:5 98:13 | types 23:3 39:17 | |
| topic 19:2 77:17 98:16,24 | transfer 135:3 | typical 50:13 | |
| torture 14:22 | transit 99:11 100:16 | typically 20:15 23:7 49:8 50:19, 25 96:25 99:11 130:22,24 | |
| tortured 107:13 111:12,15,17 | transit-oriented 99:2,8 100:5,8 | | understanding 17:4 39:5 |

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

43:23 44:9
53:5 56:16
62:5,20,21
67:23 73:20
81:17 93:13
96:19 98:14,
19 99:7
113:18 129:4
**understood**
14:8 15:19
65:18
**undertake**
113:25
**undertaken**
50:12
**undertaking**
53:24
**undertook**
56:18 136:7
**unfair**
17:15
**unfortunate**
105:19
**uniform**
98:6
**unit**
133:9
**units**
38:23 39:7,
13,17,18,20
41:19 48:9
54:6,23
56:24 57:10
66:25 70:15
81:21 82:1,5
93:15 96:22
97:4,5,6
98:3,9,10
105:10
119:25
120:20
127:10
129:5,8,9,22
131:8,11,12,
14 133:5,16,
17,21
**unprotected**

34:21
**unquestionabl
y**
70:15
**unreasonable**
49:1 67:16,
19 75:6 77:8
105:22,23
109:10
124:21
**unreasonably**
73:12 74:6
75:25 95:8
125:4 126:1
**Upper**
89:6

---

**V**

---

**vacant**
54:9
**variance**
57:23 61:24
62:8 63:6
64:22 65:1,
2,3,11,17
66:1,8,9,13
67:3,8 68:5
69:18,19,21
70:7,9,22
71:2,5,6,8,
11,16 83:8,
14,16 86:22
**variances**
23:1,2 66:4
67:5 69:10,
20 71:8
86:15 87:1
106:23
112:15
**variety**
23:1 29:3
121:6
**various**
9:25 13:23
37:23 62:17

**verbalization
s**
87:24
**verified**
104:11
**versus**
24:15
**violation**
32:21,24
123:14
124:23 125:7
132:16,23
133:3,17
136:3,10,13,
15 137:8
**violations**
32:18,21,23
33:3 132:8
**vote**
77:25
**voted**
60:19 102:8

---

**W**

---

**wait**
15:6
**walk**
17:2 29:15
**Wallington**
6:21 19:4
23:17,21
35:16 36:25
37:6 38:8,9
39:5,19
41:18,22
43:5,12,16
44:4 46:12
47:3 56:18,
22 57:1,4,8,
9,15 58:9,21
59:8 60:1,22
61:11 66:18
67:14 73:1
74:11 78:13,
22 81:9
85:7,14

90:25
100:15,18
103:19
115:6,7,19
117:1,9
118:1 119:18
120:23
123:20
126:24
127:22 128:2
**Wallington's**
53:13 60:19
80:23 115:3
**want**
6:7 15:10
39:2 45:14
50:1 62:19
66:6 80:14
91:4 96:9
99:24 109:4
114:10
117:16
132:11
135:24
136:17
**wanted**
46:2 110:8,9
**wanting**
110:20,21
**water**
14:21
**way**
10:11 21:24
32:25 37:20
53:3 56:4
93:8 121:25
127:5 135:3
**weeks**
8:3
**welfare**
65:24
**went**
18:15 27:23
31:11 89:9
**West**
99:21,23
100:11
110:11

Jessica C. Caldwell, P.P. Volume I
October 30, 2025

Westchester
  32:8,14
whatnot
  55:9
whatsoever
  119:18
white
  117:3 119:19
withdraw
  52:11 53:2
witness
  9:24 16:5,8,
  11 21:5 46:6
  52:22 77:22
  119:7 124:5
word
  13:10
words
  50:2 109:7
work
  21:14 24:13,
  14,15,17
  25:8,9,13,17
  29:6,9,11
  30:6 31:16
  32:5 76:25
  113:18,25
  114:6
worked
  30:7 31:17,
  24 32:7
working
  29:5 31:21
  37:25 74:22
works
  135:5
worry
  38:21
written
  17:19,21
  18:5 103:15
  110:15
wrong
  107:4

―――――――――――
          Y
―――――――――――
yeah
  7:3 8:11
  9:24 10:10,
  25 13:25
  18:9,24
  21:2,8 24:19
  25:2 27:10,
  17 31:6 34:3
  35:7 38:12,
  15 39:3 40:4
  43:7 48:12
  55:3,10 57:7
  59:22 60:11
  69:1 70:9
  71:20 72:8,
  11 77:5,22
  79:15,20
  81:6 86:1,2
  88:20 99:6
  100:10,12
  101:24 103:7
  107:7 108:2,
  5,7 109:13,
  14 114:22
  120:17
  129:2,20
  130:3 131:3
  134:7 135:7
  138:7
year
  31:3 60:24
  73:3 74:10
  84:6 108:20
years
  23:13 30:20,
  23 31:18
  52:13 79:2
  120:21
yesterday
  11:20
York
  31:18,24,25
  32:2,9,14
  87:19 99:21,
  23 100:11,17

  110:11

―――――――――――
          Z
―――――――――――
zone
  54:12 55:1
  98:5 121:6
  122:21
zones
  95:15
zoning
  29:6 44:12,
  15 45:3,6
  54:3,14,17
  55:7 57:24
  65:9 79:22
  81:11 82:16,
  23 83:5
  86:20 110:8,
  15 112:12,14
  119:9 121:11
  136:24