Meeting of Wallington Planning board of 5/16/17

EXHIBIT

H

exhibitsticker.com

P000063

(Meeting starts 7:51 p.m.)

CHAIRMAN BAGINSKI: I call the meeting to order. Opening of the meeting by chairman Baginski stating the rules and regulations of the Sunshine Law. Adequate notice was serviced to Bergen record and community news, posted on bulletin board of the civic center and on file in the office of borough clerk. I need a roll call.

(Roll call by Mr. Cedzidlo)

Pawluczuk, here, Bazel, here, Baginski, here, Wygonik, here, Rachelski, here, Kasperek here, Melfi here, Tomko, here.

CHAIRMAN BAGINSKI: At this time I like everyone to stand for the flag salute.

(Pledge of Allegiance.)

CHAIRMAN BAGINSKI: Still we have a new member of the planning board. Theresa Wygonik. She's returning member of the board. She was a member in the past. But, we need to have her sworn in. So mayor Tomko, will have you sworn in. I will hold the Bible for you.

(Theresa Wygonik sworn in.) _

CHAIRMAN BAGINSKI: Congratulations. At this time the March 21, 2017 and April 18, 2017 minutes of the planning board having been sent out via mail, motion to be made for passing of same if no additions, corrections or omissions.

Bazel: I make a motion to pass.

CHAIRMAN BAGINSKI: I need a second on that.

Rachelski: Second.

Pawluczuk, aye. Bazel, aye. Baginski, aye, Wygonik, aye, Rachelski aye, Kasperek aye, Melfi aye, Tomko aye.

CHAIRMAN BAGINSKI: Correspondence list having been sent out via mail, anything to be discussed should be discussed at this time. If not then need a motion and second to mark and file the same.

Pawluczuk, motion. Bazel, second.

Roll call: Pawluczuk aye, Bazel aye, Baginski aye, Wygonik aye, Rachelski aye, Kasperek aye, Melfi aye, Tomko aye.

CHAIRMAN BAGINSKI: At this time the board attorney presentation of resolutions to be adopted.

MR. CEDZIDLO: Thank you,, Mr. Chairman. I have two resolutions for waivers of site plan. I will just read the relevant parts and move this along. First one concerning Nuno Lemos. Whereas Nuno Lemos seeks waiver of site plan approval for the property at located 457 Paterson Avenue. Known as block 56, lot 7.01 on the Borough tax map. Applicant seeks an approval on operating a barbecue take out restaurant at the site business zone. Mr. Lemos testified on behalf of the application. Site is currently vacant. It was a restaurant in the past. He's going to open a barbecue take out restaurant. Expectations is the business will be 60 percent take out and 40 percent of his customers will eat at the restaurant. He will renovate the interiors of the premises. Hours of operation ten am to ten p.m. daily. Nine employees. Currently eight parking spaces, already owns the adjacent car wash. Car wash parking spaces will be available in the evening for the restaurant customers. Expect a large volume of diners after the car wash closing. The board approved the application subject to the following conditions. Applicant must install knox box for the fire department, re stripe the parking lot spaces and provided a fence and dumpster space in the rear of the property. The vote at that time in favor of the application was Polton, Baginski, Kasperek, Bazel, Melfi and Rachelski.

CHAIRMAN BAGINSKI: I need a motion and second. Rachelski, motion. Kasperek, second.

Roll call: Pawluczuk aye, Bazel aye, Baginski aye. Wygonik recuse. Rachelski, aye, Kasperek, aye, Melfi aye. Tomko, aye.

MR. CEDZIDLO: The second is for Aneta Volgelgesang seeking a waiver of site plan approval for property located at 46-52 Wallington Avenue, block 15, lot 25. Applicant sought approval to operate a skin care business at the site. She testified that she was going to open a skin care business at the location, facials, skin treatment, and electrolysis. No employees. Closed on Sundays and Monday. Hours of operation from 9:30 a.m. to seven p.m. Proposed uses is a permitted one. The board granted the approval on the condition that Miss Vogelgesang will install a knox box for fire department. The vote was Polton, Pawluczuk, Baginski, Kasperek, Bazel and Melfi and Rachelski.

CHAIRMAN BAGINSKI: I need a motiion. Kasperek, motion. Bazel, second.

roll call: Pawluczuk, aye. Baginski aye. Wygonik, recused. Rachelski, aye. Kasperek aye, Melfi aye. Tomko aye.

**P000064**

CHAIRMAN BAGINSKI: There being no old business before the board we're going to move on to new business. Applicant Morningside at Wallington LLC, 551 Main Avenue, and new Wallington Home, LLC, Main Avenue rear.

MR. MOORE: Good evening, members of the board. For the record my name is Kevin Moore with the firm of Sills Cummis & Gross and I represent both new Wallington home, LLC, and Morningside at Wallington, LLC which have common control. Tonight we we have two applications for an adjacent properties both with the address of 551 Main Avenue, block 71, lots 35.01 and 35.02. The application for lot 35.02, the New Wallington project is for amended preliminary and site plan for approved 134 unit multifamily project. The application for lot 35.01, the Morningside project is for a preliminary and final site plan approval and C bulk variances for a 73 unit multifamily project. Although the two applications are for separate projects, some of the testimony overlaps, and the amended site plan application for the New Wallington project is the result of the construction of the Morningside project. So I believe the easiest procedure would for us to present both projects before the board votes on either one.

MR. CEDZIDLO: Quick procedural question, Mr. Moore.

MR. MOORE: Yes.

MR. CEDZIDLO: You said there is separate applications and separate projects.

MR. MOORE: Yes.

MR. CEDZIDLO: The prior approval that was granted to the New Wallington Homes for lot 35.02 contained easements from 35.02, over 35.01, and the traffic pattern required industrial trucks from 35.01 to exit.

MR. MOORE: Right.

MR. CEDZIDLO: Through 35.02. So just as a preliminary statement, these are still going to be separate projects and they're still going to require.

MR. MOORE: Cross easements and actually there is an easement plan that was submitted as part of the application set with both applications, the plans that was submitted as part of the application before you this evening. So, some of the cross easements are in existence and already been filed. Others will have to be modified and additional will be added. We don't have a use problem because it is for residential on both sides.

MR. CEDZIDLO: So I just wanted preliminarily for the record to go over that. Issues like easement traffic, there is going to be testimony concerning that.

MR. MOORE: Mr. Bertin will be testifying to that this evening.

MR. CEDZIDLO: Thank you very much.

MR. MOORE: Also my office gave notice of both applications by certified mail to all parties entitled to receive notice under all the law, all parties within 200 feet on may fifth. It was also published in the record on May 5th and I would request that the board take jurisdiction on both applications.

MR. CEDZIDLO: I didn't get it delivered and I saw it for the first time about 20 minutes ago. But the certified mailings were all provided to the board. That was provided by your office.

MR. MOORE: Yes, It was.

MR. CEDZIDLO: Thank you, Mr. Moore.

MR. MOORE: On May 11th.

MR. CEDZIDLO: Okay. It's got a cover letter May 11. This is discussing that you provided it to the board.

MR. MOORE: Right.

MR. CEDZIDLO: Gotcha.

MR. MOORE: Is the board taking jurisdiction.

MR. CEDZIDLO: Yes, we're good to go.

MR. MOORE: Good. So just to briefly summarize before Mr. Bertin testifies, with respect to the application for the amended preliminary and final application for lot 35.02, the application and owner is New Wallington Home, LLC. It's on Main Avenue, Wallington New Jersey in the rear. It's an approximately 6.735 acres in area. It is in the PR-ML planned residential Mount Laurel zone of the borough. The application is seeking amended and final site plan approval, which is very minor in nature. The current preliminary and final site plan approval is for 134 apartment units, 27 of which will be affordable housing units and related parking and accessory uses, and that's not going to change. The original approval as you all know is memorialized by this board in resolution No. 16-300, findings of fact and **P000065** of the

Wallington planning board. That was adopted on May 17, 2016. The proposed amendment to the current preliminary and final site plan approval are minor to implement changes relating to driveways, parking spaces and trash enclosures which Mr. Bertin will explain in a moment.

The second application is for lot 35.01. The applicant and owner and I said they are affiliated. This is Morningside at Wallington Home LLC. The same street address because there is only frontage on this lot, 551 Main Avenue, Wallington, New Jersey it is 3.65 acres in area and also in the PR-ML planned residential Mount Laurel zone. The applicant is seeking preliminary and final site plan approval and C bulk variances for 73 apartment units, 15 of which will be affordable units, 205 parking spaces and an accessory uses for on site use of apartment residents. The proposed accessory uses include a gym, yoga studio and family recreational center and are exclusively for the on site use of residents only and customarily incidental to the permitted principal apartment use. The accessory use also includes a leasing office for only the apartments, which are part of the projects. There is three proposed buildings

that we're seeking preliminary and site plan, the new preliminary and site plan approval for on lot 35.01, two of which are residential buildings and one is a family recreation center. Family recreation center is a conversion of the existing roller rink building and will be exclusively for the use of the residents of the complex. Access to the family recreation center will be by key cards and it will not be open to the public. We also sought two partial submission waivers, which are going to become moot. I will explain in a moment. We requested a partial submission waiver 330-35B11 of your code and checklist from the required inclusion of elevations on the site plan. And we requested a partial waiver from 330-35B17 of your ordinance and chechlist for the inclusion of floor space of all buildings on the site plan. We did that so we could get to this point. However, these submissions waivers are needed because in our initial submission we not submit architectural plans. However we will be submitting architectural plans at least 14 days before the June hearing curing the need for the submission waivers at that time. I also would request the planned application and reports that the applicant has submitted as

part of its application to the board be made a part of the record before the board this evening. We have four witnesses. Though only two will be testifying this evening. My first witness will be Calisto Bertin with Bertin Engineering. He's our site civil engineer for both the New Wallington project and Morningside project. Dawson Bloom, who is also with Bertin Engineering, is the project traffic engineer for both projects. Jack Raker, with Minno & Wasko architects and planners, he's the architect for the Morningside project, And Brigette Bogart, our professional planner, who is the planner for the Morningside project. However, tonight only Mr. Bertin and Mr. Bloom will be testifying. Mr. Raker and Miss Bogart will testify at the June hearing after the architectural plans are submitted. With that after my long winded introduction I would like to call Mr. Bertin.

CALISTO BERTIN, sworn.

Q. Mr. Bertin, can you give your education license and professional experience for the board?

A. Yes. I have a degree in civil engineering from Villanova university, masters Degree in engineering from Rensselaer Polytechnic institute, licensed in New Jersey as a professional engineer and, five other states. I'm a principal of Bertin Engineering which is located at 66 s Glen Avenue, in Glen Rock.

Q. And you have testified before many boards throughout the state including this one, correct?

A. Probably every town in Bergen County.

Q. I offer Mr. Bertin as an expert in the field of civil engineering.

CHAIRMAN BAGINSKI: We'll accept him as an expert witness. Thank you.

A. Thank you.

Q. Mr. Bertin, what documents were prepared for the two applications?

A. We have a set of site plans that was submitted. They have an original date of December 7, 2016, last revised March 24, 2017. Storm water drainage calculations were submitted dated March 24, 2017. And we have a survey that's part of the set. It was originally dated September of 2013, but it was updated December 7, 2016.

Q. I believe you have an exhibit that you will be testifying from which I guess we would

**P000066**

mark as exhibit A-1, and if you can just describe for the board so we have it in the record what the name of that exhibit is?

A.    Exhibit A-1 is called a landscape rendering. It's a colored version of the site plan without all the notes and showing the landscaping.

Q.    What's the date?

A.    It has a revision date of today, 5/16/17. So we'll mark it as A-1.

Q.    A-1.

A.    With today's date, 5/16/17

Q.    Mr. Bertin if you describe the site and the surrounding area?

A.    Yes, as you mentioned, we have two sites. I don't know if you can see the property line that runs through the property. The top site, or I am going to use up as north, is the New Wallington Home site. That already has site plan approval. That site is 6.73 acres in size. It's called lot 35.02 and block 71. It is already approved for 134 dwelling units with 305 parking spaces. The second site is on the bottom of the page which we're calling Morningside. That is lot 35.01. It is 3.65 acres. It's approximately 890 feet deep and about 300 feet wide. There is currently two

buildings on the site. This rendering shows what we're proposing but there is two buildings. The roller rink building and in front of it is a combination warehouse and once used as a bar sometime ago but there is a building in front between the roller rink and Main Avenue. There is a parking lot behind the roller rink with 97 parking spaces in it.

So we have Main Avenue on the east side of the property. Conrail tracks on the north side of the property. Saddle River is on the west and Jasontown II apartments are below us to the south.

Q.    Can you describe the current preliminary and final site plan approval for the New Wallington project?

A.    Again the New Wallington project is the top. And we did obtain site plan approval a few years ago and I mentioned it was 6.73 acres. It has as 134 units. 27 of those units are affordable housing to comply with the zoning requirements. I said 27.

Q.    27.

A.    27 units, and there is a total of 305 parking spaces as approved. There are some accessory uses as you mentioned. There is a club

room, a fitness room, leasing offices, maintenance garages and storage. There is also outdoor recreation indicated around the property. This all part of the original approval. And then we also have open space along the Saddle River. There is a thing in the DEP called a riparian buffer. So we have a 50 foot setback from the stream which we're not proposing to do any activities.

There is five buildings on this site, and we numbered them one through five. Building one is that community center that I mentioned has the accessory uses. That's the one closest to Main Avenue. And buildings two, three, four and five are the four buildings that create a square. Those are residential buildings. It's three stories of residential above a level of parking. So open parking garage. Well, semi open. It has windows cut into it or openings. So there is again a total of 134 dwelling units.

The site had two access points. One main driveway from Main Avenue. And we talked earlier about easements and there was an easement granted through the Morningside property to the New Wallington Home property for this access driveway to pass through the site. Because really New

Wallington Home doesn't have any street frontage. For whatever reason, that's how the lots were created. There was also a second access point. There is another driveway on the south side of the site on Main Avenue, which is an entrance only. And there is a connection driveway between the existing, I'm going to call it the roller rink site, between an existing roller rink site and the New Wallington Home site. There was an access driveway right behind the roller rink. That driveway is there now. There is an established travel way around the property. I guess when the property was in use the driveway on Main Avenue was an entrance only. And you would then exit through what is now New Wallington Home. We propose just some minor changes to the New Wallington Home site. And obviously a new site plan for the site below.

Q.    Can you describe the proposed amendments to the current preliminary and final site plan approval for the New Wallington Home site?

A.    Yes. In developing the Morningside site, the lower site, we had to make some adjustments to the New Wallington Home site. The first is the main driveway on Main Avenue, the entrance

P000067

**18**

driveway. That was re configured and the driveway that comes into the site was also re configured. We're trying to establish traffic control here. So that entrance configuration was changed. We have this center green area. It's not an oval. A long green area that runs between, well, just south of the building one. That stays the same. But on the south side of that green we also had ten parking spaces. The parking spaces stayed within the New Wallington Home site. They didn't encroach on to the Morningside site. Now that we're doing the Morningside site, we modified those ten parking spaces and created a longer full parking lot along the proposed buildings on Morningside. So we went from ten spaces to 54 spaces here. And those additional 44 spaces we're going to count towards the Morningside parking lot. I mentioned the connection driveway between the two sites, which is south of building No. 2. That driveway was widened from 20 feet to 24 feet. In the prior application we only had one way traffic flow. Now we have two way traffic flow. Plus we widened the driveway. So to widen this driveway, we had to make a few changes. There's a driveway that wraps around the south end of building two. Curbs move just a

**19**

little bit. But it's a change to the site plan. And there is a trash enclosure between buildings two and three that we had to shift. So we had to make a couple changes when we made that driveway a little bit wider. Moving between buildings two and, I mean, sorry, between building three and five, we had the trash enclosure located at the end of the parking aisle between those two buildings heading south. It's going to be clear why we moved that dumpster. We took the dumpster out of the New Wallington site and moved it on to the Morningside site. And then there is, because we added the building on the Morningside side and moved the trash enclosure, we are kind of rearranged the sidewalks just around building number one. There's a driveway that wrapped around the back of the property along the Saddle River. It ended on the New Wallington Home site. It just was a dead-end. That's why we the cul-de-sac we created on the northwest corner of the property. Now, it was time to connect that driveway to Morningside and it was always planned that we would connect this driveway when this application came in. When we originally designed it, we weren't exactly sure how the New Wallington Home site would be developed. So as it

**20**

turns out, the driveways are a slightly different location than we originally planned. So that's a modification to the plan. And in lengthening that driveway we had the opportunity to add a couple more parking spaces. So there is four more parking spaces behind building five. So the total number of parking spaces spaces on New Wallington Home site went from 305 to 309 parking spaces. It was a previously -- it only, it only requires 268 parking spaces. So we have an excess parking of 41 parking spaces.

There is an open space requirement in the ordinance. I mentioned that there is open recreation areas, lawns. There is a requirement for that. It has to be 25 percent of the site. In making some of the changes that we did, one site got a little smaller, part of it got a little bigger. But the net result is we have an additional 193 square feet of open space on the New Wallington Home site. Only again because to make, to accommodate the changes.

Now, a comment about the truck traffic. We have a plan and it was a plan for the New Wallington Home site and it's also part of this set for the two sites to show all the easements. But

**21**

there was an easement alongside the industrial building that is between the roller rink and Main Avenue because we had loading docks there. And so trucks would back up across the property line from Morningside onto New Wallington. That's been eliminated. So we don't need that truck turnaround anymore.

So now explaining the Morningside application. This application has 73 dwelling units on 3.65 acres which is exactly 20 units to the acre, which is the limit for this site. Of those 73 dwelling units, 15 are affordable. And on the site between the buildings and the parking lots we have 205 parking spaces. And there are some accessory uses. It was described earlier that we're going to keep the roller rink as an amenity for the residents of the complex. And then there would be some other ancillary uses that I will, that I will get into. With New Wallington site we numbered the buildings one through five. We kept the numbering system and going from the river towards Main Avenue we have building six, seven, and eight.

Q.    That's for new Morningside?

A.    For New Morningside -- **P000068** orningside.

Not new Morningside, for Morningside.

Q. Morningside?

A. Building No. 6 is almost identical to building No. 2. There is consistency in the architecture. The architect will get into it. It's just a few feet longer than building number two but it is basically the same. It has three floors of residential over parking, and there are 30 dwelling units. I have to comment that the site plan says 29 dwelling units. The architectural plans were done after the site plan were finished. I mean there were changes. While the site plan says 29 units, there is 30 units. We'll coordinate that with the next submission. And there is 25 parking spaces inside the building.

I mentioned that we move the trash enclosure from between buildings three and five. The front door for building six faces the courtyard between buildings three and five. So it would have been looking out on the dumpster. Obviously, it made sense to move the dumpster. Building seven is the existing rink building. I don't know two years ago, three years ago, all the floors were replaced before this application. There was a tenant in there, and that building is in pretty good shape.

there is an affordable set aside for the Morningside tract. Again it's 20 percent of 73 units, which is 14 and a half units. Can't have a half a unit so it is 15 units. So just over 20 percent set aside is provided on the Morningside site. So in total between the two projects we have 207 dwelling units, 514 parking spaces.

I will go into how we calculated the parking for Morningside. There is total 11 units. 40 of them are one-bedroom units. And that requires 1.8 spaces per unit. This is on the front page, the cover page. You don't have to write it down. I am testifying. There are 30 two-bedroom units that requires two spaces per unit and there is three three-bedroom units which requires 2.1 spaces per unit. So multiply that all out, you get 138 spaces required. I mention we have 205 parking spaces in various locations on the Morningside site. So we have 67 extra parking spaces.

Now one of the reasons why we have additional parking spaces is because we have a yoga studio up front. We have a roller rink on the side or the gym. I don't want to call a roller rink. Most likely the gym and we want to provide some additional parking around that facility. Because

Rather than demolish the building, our client said we have an asset there. We might as well use it. And so that building will remain. It's a roller rink. It could be used as basketball courts and anything else that you can do on a gym floor, and that will remain. Again strictly for the use of the residents. It's got a footprint, I want to tell you this of 1,900 -- 19,950 square feet. So building eight will replace the current industrial building, bar building that was in the front of the site. That building was bigger than the footprint shown and it came much closer to Main Avenue. We're going to put an L shaped building. The buildings are shown in brown. But you will see a lighter mustard color that indicates where the building is over top of the parking. Because we do have some parking that extends underneath the building. So that building will contain 43 units again.

The architects plans changed at the end. So we say 44 units and now it's really 43. So the total comes up to 73 units. On the ground floor of building eight will be a yoga studio, again another Pilates place for exercise. In addition to offices for the landlord. I think I mentioned this before

if someone -- it doesn't make sense. But if someone wants to drive to the gym from their apartment, they have a place to drive and park. You figure they are going to exercise but maybe they are coming home from work and want to go right to the gym and park by the gym, do their exercise and then move to their apartment.

Q. Or if it is a cold of winter, correct?

A. Or the cold of winter. Take longer to warm up their car and drive over but, yes, people do that. That's something that's common we do in developments when we have community centers.

Q. Can you describe the overall site circulation Mr. Bertin. You have alluded to it a bit already.

A. I will go through it again. We have the in and out driveways is Main Avenue. So sort of center of the site. There is circulation around the perimeter of the entire project between the two sites. And there is a connecting driveway between the two sites. It was always there. That's a two way driveway. The driveway by, Al Ventura driveway by Jasontown II is a one way entrance driveway. And so the drive aisle along the south side of

P000069

building seven is one way. So anybody coming around the back from the river and heading easterly towards Main Avenue along the southern property line or coming from building six, you are going to confront a do not enter sign. So they will all exit towards building No. 2 and come out the site. So the only really exit for the site is the main driveway. But of course in the case of an emergency, you know, they can use the entrance only driveway but that would be only in an emergency.

All the garage doors are gated. So that people are not going to be to drive in underneath the buildings if they don't belong there. They will have access control. We do have sidewalks throughout the site for pedestrians access. We have provided a loading zone along building seven because we had the room for it. Primarily the only loading that will come in would be moving vans. And we have sufficient parking for management to say, okay, we're going to rope off an area, the moving truck comes in, they can park there. Because all moves in and out have to be scheduled with management. So we really anticipate the trucks will park in the drive aisle or in parking spaces. Another reason for having extra parking.

We have two dumpster locations. Again Morningside we're talking about one on the extreme west end by the river and one by building seven. Your board engineer brought up a comment about the orientation of that dumpster might be difficult for a truck to pull in and he's correct. We'll modify, make it easier for a trust to get in.

There is a slight grade change. I am going to move to grading now.

Q.    Before you move to grading, is operationally with the garbage versus the recycling and how that is going to be handled?

A.    Thank you. Each trash enclosure is a double enclosure. So we can have recycling in one and garbage in the other. It changes with towns but now they are doing sole source recycling, so bottles and cardboard are together. At least they changed it in my town. I don't know if they changed it here. But we have the ability to separate them or combine them. That's the idea. So we wanted to have a trash enclosure that could do that.

Q.    I will let you go to grading, sorry about that.

A.    No, that's all right. That's why we have

breaks. The site is not a floodplain. We are located along the Saddle River but we're not a floodplain. We have a letter of determination from the DEP for the New Wallington Home site, and the Morningside site does not front on the Saddle River. There is about 130 feet between the river and the site. The highest point of site is at that entrance only driveway on Main Avenue. I will give you the elevation. It's 34. And when we finally get to the far end, the northwest corner of site, it goes down to 21. So you can see there is a grade change across the site but it's long site so it is hard to notice.

We're going to -- obviously building seven exists. We can't change the grade around it. But we are going to adjust the grades in the property to get proper drainage. That's the whole point about the grading. And so we have a collection system for the storm water. We have a series of inlets in the parking lots, and we have roof drains. And we have an underground storm water detention system in the parking lot between buildings six and seven. That's for Morningside. Haven't changed the one on New Wallington, which is between buildings four and three, the underground

detention system. Rainwater is collected. The building roof water is clean water. That can go right to the underground detention system. The parking lot water has to be treated. So we have what is called a water treatment unit. That's the a thing that -- it helps to remove the silt and other debris that might be on the pavement. The state requires that we remove 80 percent of what we call total suspended solids. That's the silt, when you see the street sweeper sweeping the roads in the springtime. This is also to help do that because you get that silt and sand that might get into the drainage system. It goes into the detention system which is underground, and that detention system is open to the ground below. So water will recharge and go into the groundwater, which is always a good thing. Then we have what call an outlet control structure because we're required not only to maintain the rate at which water leaves the site but to actually reduce the rate at which water leaves the site. And that's supposed to overcome bad practices in the past where we had too much water flowing in the rivers and caused flooding. This is a way to help counteract that. Our drainage system, the

P000070

underground detention system goes to an outlet control structure, and then discharges into a pipe that runs along the driveway on the south side of the property. The county has a drain pipe and easement that goes from Main Avenue out to Saddle River. So drainage from Main Avenue is discharged directly out to the Saddle River. We're going to tie into that pipe. Because we're tying into the pipe and it's the county's pipe, the county will be reviewing our drainage design and in addition to your board engineer reviewing it. So we have two people reviewing the drainage calculations.

Q. Do we meet -- you already alluded to the fact we meet the water quality standards of the regulations but do we meet the rate reduction requirements?

A. Yes, yes. Actually we exceed the rate reductions. It's all in the report. Your engineer has it but we're supposed to reduce the two storm by 50 percent and we reduced it by 53 percent. We're supposed to reduce the ten years storm, the 100 year storm, and we have done all those reduction. Just so you understand the 100 year storm is a storm that has a probability of it happening once in a hundred years. So it could happen more often but that's the probability.

Q. We're not required to provide recharge, correct?

A. No, we're not required because of the area we're in but we do provide recharge anyway. And if we were to required to provide it, we would need it. One thing that I'd like to mention here is that it is not on the plan but we will add it is that we're going to use rainwater harvesting. What happens is you take the roof leaders, you put them into a tank. If that tanks should overflow, it goes into the drainage system just like we would. But then rather than using clean potable water to irrigate your landscaping, we're going to use rainwater with a pump and we would landscape -- I mean irrigate the plants with rainwater as opposed to drinking water.

Q. And the system meets RSIS requirements?

A. Yes, it meets all the Residential Site Improvement Standards requirements.

Q. Is there a proposal to modify the way the street drainage is handled?

A. Yes. I mentioned that street drainage from Main Avenue, actually south of the site, comes through a pipe along the southerly property line out to the Saddle River. From that point the road drops to go underneath the train trestle. And then there is inlets at the bottom of that train trestle. And like many places in Bergen and Passaic county, that's lower than the rest of the area. Some places they pump it. But in this case the county has an easement to take the inlets underneath that train trestle and bring a pipe on to the site and discharge onto the site. Now, fortunately, this is a very sandy site. We did soil borings across the site, and the water discharges into what I am going to call is a sand basin, a sand trap, and it percolates into the ground. If you were to go to the site, you will see this pit that you can't walk down. It's very steep. There is a guardrail around it, loaded with bottles and other debris that just come from the street drainage. So we propose to renew, recondition that sand filter, and put retaining walls around it, make it more accessible. So that you can walk in there and maintain it. Right now you can't maintain it. Also it will be a little little bit more attractive. We did a wetlands investigation earlier, several years ago on this project, and we did find that there is isolated ordinary resource value wetlands around that basin. So anything we do to the basin will require DEP approval because we're going to putz with their wetlands. It's also going to require county approval because it is the county's system that's dumping into it. I don't even know if the county has to approve it but we already made the application to the county for the Morningside site with those changes. So they will have their input on that because I want to make sure it takes the drainage from the site.

Q. Can you describe the proposed utilities?

A. Yes.

Q. To Morningside?

A. Right. We proposed a new water main to com into the site for the New Wallington Home. We also would have a water main coming into the site for Morningside. Those mains will be looped together to promote better water flow through the site. And then for Morningside all the electrical will come underground, and we will connect the sanitary sewe for the proposed three buildings into the sewer system for New Wallington. Because the site is

P000071    06/04/2017 10:14:40

lower than the street, we have to pump the sewage from the site up to the street, and the last manhole in Wallington is just south of the driveway, the entrance-only driveway. And that's at a higher elevation on the site. So we're really collecting all the sewage from the site into the sewer pump and going to pump up to that manhole so it goes into the municipal system. The sewer system has already been reviewed by the board's engineer for the New Wallington site. It's been reviewed and approved. We knew that this other site was coming along. We designed the pump so it could take the additional flow. We'll have to modify our calculations and give them to the municipal engineer or the board's engineer for them to review the drainage -- I mean the sewer calculations again. From the municipal engineer, it goes to Passaic Valley sewerage commission for their review, and then we make an application to the DEP. We did not go to Passaic valley sewerage commission yet and did not go to the DEP yet for the New Wallington Home site because we knew eventually we were going to modify it. The utilities will cross between the two sites. So we will add easements on the New Wallington Home site

for those utilities that are needed to connect to the Morningside site. I just mention that the buildings in the front already are connected to the street, but we're going to rearrange that and send the sewage to the new pump rather than use pipes that are maybe 80 years old.

Q. Can you describe the site lighting?

A. Our intent was to match the lighting that we did for the New Wallington Home site, and that would be 12 foot high acorn lanterns, high pressure sodium. Any lantern that was near a building would have what we call a house shield so that it doesn't, the light doesn't shine against the building. The board engineer made some comments about the level of illumination being a little low. Normally they don't complain about the lighting being too low. We usually get complaints about the lighting is too high. In talking with the client, rather than using high pressure sodium, which is what we originally designed on the other site, we're going to redesign the lighting and use LED. It's a lot more control with LED. You can dim them. You can make them brighter. You don't have that kind of control with high pressure sodium. Also they are much more economical to operate. So

we will change the lighting for the entire site and comply with any comments that the board's engineer may have made.

We are providing landscaping for the site. We show now, again just the Morningside site we have 20 major deciduous trees, nine ornamental trees. The board engineer made a comment about not using flowering pear trees. We'll have talk about that. Our client really likes the callery pear. We'll talk with his landscape architect and come to a solution. Then there is 159 shrubs. The engineer also made another comment, which is correct, it's kind of light in the shrubbery along Main Avenue. He's absolutely right so we'll increase the landscaping along Main Avenue when we make revised plans.

Q. And when we come back next month we'll also be proposing a monument sign, correct?

A. Yes. There are two signs shown on the plan. The first is the welcome to Wallington sign that exists and is sorts of in the middle of the site. I forgot if it was for the county or for the site plan approval, I think it was for the county, we were going relocate that sign, the welcome to Wallington sign, slide it back because it

interfered with the sight distance from the driveway. Now that the site has been redesigned, rather than having a sign in the middle of the property near the parking we jammed in there, we're proposing the sign closer to the railroad trestle and creating an easement for that sign to be located. So we have the welcome to Wallington sign closer to the train tracks along the frontage on Main Avenue and an easement for it. Along the south side of our entrance driveway would be a good place for a monument sign for these two projects. We show the sign. We call it out but we didn't provide a detail, which we will. Signs aren't permitted. Monument signs aren't permitted even though this is a multifamily zone. We looked at the industrial zone. Monument signs are permitted no higher than six feet, no wider than six feet, which this sign will comply with. We have some sketches already made and we'll submit that next time. We propose a monument sign by the driveway to identify the property and put a street address on.

Q. And Mr. Bertin, to sort of finish up your testimony, did you want to just go over the zoning requirements and oth... ed variances

P000072

and the fact there is two or not we're not going to need that we applied for?

A.    Yes. We are in the planned residential Mount Laurel zone. Multifamily is permitted use. Accessory uses to the multifamily is a permitted use. So we comply with the use. And we comply with the density of 20 units per acre. Actually if you combine the sites, we are allowed to have one more unit but the sites aren't combined. So there is one unit less than what we could do.

We eliminated one bulk variance of the existing variance. I said the existing warehouse, former bar building that's on the front is only set back 25 and a half feet. The required setback is 50 feet. So that building comes down, and the new building is setback over 62 feet. So we move the building further back from the street and we eliminated a variance and complied with the ordinance. Rather than going through all 30 or 40 requirements, I am just going to outline the variances, and they are all enumerated on the cover sheet of the plan.

We have one setback violation from the rear of the building, rear of the site. So building six is setback to the rear property line. We have 15

---

39

feet where 25 is required. I can remedy that by asking for a subdivision and moving the line. So I don't think that's an onerous variance to grant because no one knows where the property line is except us, and we could easily move the property line. It doesn't affect a neighboring property, like a house or something else.

Q.    Also it helps with respect to centering the center building No. 6 on the courtyard, doesn't it?

A.    Yes, because we want to line up the front door of the building with the drive aisle between buildings three and five, yes. We have a front-to-rear setback variance between buildings three and six. The required spacing is supposed to be 40 feet. We have just over 35 feet. We really can't move building six any further south because we're trying to provide a little bit of a landscape buffer as required. We're supposed to have a buffer with a fence along Jasontown, and we could move building three up northward but we wanted to maintain the large buffers we had along the front of that building. So that's why we're asking for the 35 foot buffer. We rather keep buffers along Morningside -- I mean along Jasontown and buffers

---

40

along the parking in the front of building No. 3.

The architect will talk about the maximum building height. We do have a variance for that. For those that were here last time, we went to a sloped roof as opposed to a mansard or a flat roof for the buildings that required a variance, which you granted and he will discuss that.

The next variance is the parking along Main Avenue. No parking is permitted within 50 feet, and our parking is about half a foot, closest point is half a foot from Main Avenue. The existing parking there, by the way, is in the right-of-way. So we're moving it back but we did violate the 50 foot setback and again we want to create parking where the fitness area is for in building No. 8. But as I mentioned earlier, we'll add landscaping which we should have done from the beginning. We'll add landscaping along Main Avenue to help buffer the parking. The building coverage limit on the site is 25 percent. Currently it's 31 and a half percent, and we brought it down a little bit to 30 percent. And the reason why our building coverage is over is because we're maintaining building No. 7. We thought it was -- we have an asset. Rather than tear it down, we wanted to keep

---

41

that asset, which is the current roller rink building. The lot coverage again is a little bit over. Lot coverage being the total impervious coverage. Again it's a little over and that's part because we kept that building. We got all the units that we need in the two buildings. So the building No. 7 is an extra building and we wanted to keep. There's an open space requirement. New Wallington Home meets the open space requirement. It is 25 percent has been to be active open space, 30 percent open space. Right now we have 17, just over 17 percent open space on the New Wallington site. But the roller rink occupies about 17 and a half percent. So if we look at active usable space, we're well over 34 percent. And then we have a yoga studio, which is another two percent, but the reason we don't meet the active open space is we have indoor active space.

Q.    It could be interpreted, we think the interpretation, again how the board chooses to interpret --

A.    Correct.

Q.    -- is, that is actually the definition of open space and we would not need that variance but that would be up to the board's

P000073

06/04/2017 10:14:40

interpretation, obviously.

A.    It's a potential we don't need that variance but we're conservative and leave it up to you. There is another requirement for a buffer along the southerly property line which is Jasontown II apartments. It is either a buffer of a certain width or a fence, a privacy fence, and we'll put a privacy fence so we're going to eliminate that. I mentioned the parking setback to Main Avenue, the 50 foot setback. It's also supposed to be a buffer. So it's both a setback and buffer so I guess they are two variances.

MR. MOORE: That concludes Mr. Bertin's direct testimony.

CHAIRMAN BAGINSKI: Any board members have any questions for Mr. Bertin.

Bazel: I am sure Mr. Bertin or maybe Mr. Moore but can you clarify for us what is the relationship between New Home and Morningside.

MR. MOORE: They're separate limited liability companies but they are controlled by the same ownership. But the way we created the easements and crossings, they are to be controlled by separate nonaffiliated ownership. The project would still function.

Bazel: Okay thank you. I think I missed, did you cover the impervious coverage on the variance.

A.    Yes, I think I did. Yes I did. I talked about the impervious. Yes, I did. Because I mentioned we only have 17 percent impervious coverage. We're supposed to have 30 and the building number seven is over 17 percent of the site. And the reason why we don't have the impervious coverage, well, we exceed the impervious coverage because we're keeping that existing building. If we were to eliminate, it would all be lawn and we would exceed the --

Q.    You would meet it?

A.    We would exceed it, the impervious requirements.

CHAIRMAN BAGINSKI: Anyone else have any questions.

Rachelski: I have a question. As far as the roller skating rink, the definition is vague. It basically states it's recreation is this. Really are you going to leave it as open space? Do you have a plan for it? Is this going to be covered by the architect in the future?

Q.    It will be covered by the architect

but it is going to be I think -- I am looking to my client. It's going to be a basketball court in there. Is that correct.

Nuckel: There is a requirement for an active recreation to the site. We thought this would be --

CHAIRMAN BAGINSKI: Hold on one second.

MR. MOORE: We have to bring you up.

CHAIRMAN BAGINSKI: Excuse me. We need to have your applicant sworn in if he's going to tive testimony.

MR. MOORE: Okay. Do you want to describe it. You have to come up.

CHAIRMAN BAGINSKI: Just step forward.

JAMES NUCKEL, sworn.

Q.    Mr. Nuckel are you the principal of both applications this evening?

A.    I am.

Q.    Thank you. Mr. Nuckel could you describe the recreational activities that you have planned, recreational uses for the roller rink once it is converted to a community center?

A.    Can I just talk about the building first?

Q.    Sure.

A.    Okay. It was originally built as I think a tennis facility and then converted into a roller rink. There is a requirement for active recreation as I understand it in the zone. And as Mr. Bertin explained, we have an existing building here. It's a perfect recreation facility.

Q.    Look at them. I don't count.

A.    There is a perfect recreation facility and it would be wonderful as far as using it to show in websites in marketing the site to be able to have recreation in that building. Whether it is training for adults, active adults, basketball, perhaps indoor soccer training or even we can create a tennis court. Just I think if it is there and we can use it, I believe it's a great idea and we want to preserve it rather than just get rid of it. And yes, it is not a necessarily open but it is definitely active. And also we can use it through the winter when you couldn't use other open space. So that's kind of the idea for this.

CHAIRMAN BAGINSKI: Does that answer your question.

Mr. Rachelski: Thank you.

CHAIRMAN BAGI**P000074**one have any

other questions for any questions for Mr. Nuckel.

MR. MELFI:  I have a couple of questions for the engineer.

CHAIRMAN BAGINSKI:  Do we have any other questions.

Melfi:  In regard to that, you call it a recreation center.  And I can probably direct this to the engineer.  If that were to be taken down, you would need a lot less variances as far as the parking in the front, shift the building back and side yard location.  I think it's a great idea having it there.  It's a beautiful building.  I know I have been in there a millions times.  It's been redone.  My question is to you what would the chances be, if it was to be kept, that the town would be able to use it maybe a couple hours a week or a couple hours a night as a rec center for the kids in the community, I think have basketball.  Just throwing it out to you, what would the options be for the community, to be able to, possibly use that.

MR. NUCKEL:  I think it's a great idea. Fantastic idea.

MR. MELFI:  And that's something, that sitting on the recreation board also, we're

always limited to school space as far as basketball or soccer or training of any sort of thing.   And I'm not asking 24/7.  If at all possible, set amount of days or set amount of hours per day, or if it is two days a week, just this time and this time, between this time and this time.  I think it would be beneficial to the children of our community.

MR. NUCKEL:  I agree and I would be open to working all kinds of things like that out with the town.  I love it.  I have young kids in recreation down in Florida right now.  We have a greatly facilities but up here in the north things are challenged, and again I can say this is a great facility.  So I thought we should keep it.

MR. MELFI:  Now I have no more questions for you.  You can go sit.  A couple questions I had as far as the sewage.  I know we have to pump station and everything.  Are we going to be doing or is a location set for a backup generator on the site.

A.    Yes.

Melfi:  You didn't discuss that.

A.    Sorry.

COURT3:  I didn't take full note of

it.

A.    Part of New Wallington Home application was the sewer pump and a generator.  So they're located -- I am going to point to the plan.  I mentioned the welcome to Wallington sign.  The county's detention basin or seepage basin.  Beyond that along the river tracks there is three gray things, one is the sewer pump and one is the backup generator.

MR. MELFI:  Now being it is two separate entities, this is a little confusing to people, to board members, possibly, maybe not.  If this is ever -- it is subdivided already.  If one part is sold off to whoever, Johnny buys A and Peter owns B, A doesn't want put the pumping of sewage on his property.

MR. MOORE:  It will be easements.

A.    There is going to be an easement and then beforehand before anything is sold, if it was to be sold, there will be an allocation as to which property has what percentage of the sewer pump maintenance, which is going to happen anyway, because we have two corporate entities.  One will be paying 70 percent, another will be paying 30 percent or something like that.  Unless the town

uses the roller rink a lot more, then the sewage changes but we'll get to that.

Melfi:  Obviously the buildings will all be sprinklered.

A.    Yes, yes.  Multifamily, they have to be sprinklered.

Melfi:  They will be separate and garages and everything.  And you haven't done any kind of testing as far as pressure whether any kind of pumps would be needed for the sprinkler system.

A.    I don't recall.  I know we investigated this before but I don't remember.  But one of the things we're going to do is to submit the plans to the water company and get their feedback.  I think we addressed it but I don't recall.

MR. MOORE:  I think that was one of the requests, that we would supply all that information in your engineer's report.  And it is something, when we get to his report, a request that we would be agreeing with.

Melfi:  Okay.  I have no more questions at this time.

Kasperek:  I have a concern.  The space between those two buildings, there is not enough space.  Would that be saved for the

P000075

50

residents in case of fire emergency.

A.    It's 35 feet and we have a lawn area. So, a ladder can get to there. 35 feet is --

Kasperek:  Want to make sure.

A.    Going to add it up, that's probably 35 feet. I will count. This is 36. So it's this far.

Kasperek:  Should be enough.

A.    Should be enough.

Rachelski:  Mr. Mayor is the fireman expert.

Mayor Tomko:  I think that what we're concerned about, too. To getting in there with a ladder truck, you know.

A.    The architect can talk better about the fire code. We are not required to have -- the code doesn't require 360 degrees access to every building but you can see all these buildings have access on a lot of sides. So, the only place that we have this 35 foot wide corridor between these two buildings here, but we still have open space. We have lawn area where a truck could pull in and if someone had to erect a ladder we could. And there is just little space here.

MR. MELFI:  They are aall sprinklered.

51

A.    The buildings are all sprinklered, yeah.

CHAIRMAN BAGINSKI:  Anyone else have any questions for Mr. Bertin. Borough engineer.

MR. JUZMESKI:  Just going through some of the comments in our letter. I don't know if you are going to get to that or not.

MR. MOORE:  Actually we were going to do that after, after our traffic engineer's testimony. Then we are going to.

MR. JUZMESKI:  Some of them, since the required testimony is going to hit on some of them now, and then you can address the rest of them with respect to the details. You mentioned you have a jurisdictional determination from the DEP. The DEP permit for flood hazard.

A.    Correct. We are not in a floodplain.

MR. JUZMESKI:  You will provide that to our office.

A.    Yeah, I even have a copy here. I will give it to you. We normally wouldn't have gotten it but we just got it for the sake of it.

MR. JUZMESKI:  Have you submitted to county and have you gotten county approval yet?

A.    We do not have county approval but, yes, we have submitted to the county. So the application

52

is active.

MR. JUZMESKI:  Can you provide, we want you to provide fire apparatus maneuverability around the perimeter of the site and to each building. That's in our letter. Details of the signage you will provide.

The easement plan needs to be obviously revised to included a lot more easements than are shown.

A.    We don't have the utility easements on here. But the easement plan has all the access easements.

MR. CEDZIDLO:  Can I just interrupt. Mr. Bertin, you discussed earlier that New Wallington Home plan, the road that wrapped around, came along the back of the Saddle River just dead-ends. There was a lot of testimony about a fire truck having to back out and how it would move and everything. Now it's going to be a road that continues all the way around and links back up. Has there been easements filed between the two property owners for that.

A.    I mentioned that the easement was anticipated coming into the middle of the rear lot line for Morningside and we're going to move it. So that has to be modified. The easement that's

53

shown on drawing 2.8, how that easement is going to be modified.

MR. CEDZIDLO:  So there is no filed easement currently but one will be filed if the plans --

MR. MOORE:  Right, it will be a condition of approval.

A.    Yes.

MR. CEDZIDLO:  I want to make sure the record was clear what has been agreed upon, what hasn't been agreed to because there was a filed easement for the front. Now we're changing the back. So there has to be easements for the rear.

MR. MOORE:  Absolutely.

MR. CEDZIDLO:  And just want to know where we stood as far as that.

A.    We have to redo --

MR. MOORE:  Obviously we want to wait until we had the site plan approval because that would determine the configuration of the easements or whether we would be doing the easements or not.

A.    One thing, that turnaround, that cul-de-sac that we used for the fire truck to maneuver is still there. We thought it was a vital part of the

06/04/2017 10:14:40 PM                    Page 50 to 53 of 99                    **P000076**    14 of 26 she

project because the way the parking runs along the north side of building four.

MR. CEDZIDLO: Okay.

MR. JUZMESKI: The roller rink, will be used from for the residents of both sites or just the lower site, how will that be used.

A. Right now it's just for the one site.

MR. JUZMESKI: Okay.

A. Because it only limits -- it's limited to onsite. So we can discuss if you want to modify that.

MR. JUZMESKI: On the DEP website the site is notified as a known contaminated site. Do you have, it shows there is an LSRP. I guess you are in the process of addressing those. I know the owners responsible for --

A. Yes.

MR. JUZMESKI: To get those orders for residential use. I am sure he knows all the requirements.

A. Right, we already met with the DEP and we're working on that. The site will be capped.

MR. JUZMESKI: Do you have the documentation?

A. We have an LSRP.

---

55

MR. JUZMESKI: You will provide the documentation that is capped or whatever other means you are using to make it to residential standards.

A. Yes, we are in the process of doing the preliminary assessment. The lot has been done. We just met with the DEP to finalize that. That will be submitted and then we will do a combination of remedial action work plan and our actual capping plan. So that will happen next. It's coming.

MR. JUZMESKI: Getting into the rest of the letter, I guess after whatever time you are ready for it.

Rachelski: Do you have any timeline set for this project. I know it's kind of premature to ask.

A. I would think with the things that we have to do, it will be next year. I mean obviously we're not going to start construction this year but it is possible to start construction next year.

MR. CEDZIDLO: Mr. Bertin, when the New Wallington Home project was originally before the board, there was testimony before this board that a no further action letter was issued by the DEP and we asked for copies of that letter and it

---

was never given to us. Hold on. You are responding. Hold on. You are responding before I ask a question. So was the testimony given to the board last time that there was a no further action letter required, that the site met DEP standards truthful or not.

A. I don't know who made that statement. I don't know if it was one of my engineers. I didn't because I testified on traffic last time. There may have been for like the removal of old heating oil tanks there may have been a no further action for that. But for the whole site, because it is got historic fill, they don't issue a no further action. We have to cap the site. So.

MR. CEDZIDLO: This board denied Wallington Home's application last time and the court overturned it. One of the things the board asked was for information about the contamination at the site. And what is not clear from what we've heard so far is whether or not truthful testimony was given to the board last time for lot 35.02. Now you are telling us about lot 35.01 as being a contaminated site as 35.02.

A. The historic fill is more on lot 35.02, the New Wallington Home site.

---

57

MR. CEDZIDLO: Okay, hold on. I want to be precise here. Is 35 -- because you have two separate applications. You are here to amend 35.02. Is 35.02 a contaminated site as best you know.

A. Yes.

MR. CEDZIDLO: Okay. Is 35.01 a contaminated site as best you know.

A. Minor pieces of it as best I know.

MR. CEDZIDLO: Which is yes.

A. Oh, yes, there's some contaminants, some historic fill on 35.01.

MR. CEDZIDLO: So if I pull out the transcripts with the testimony for 35.02 at the next meeting and tell you who testified falsely, you are going to refute that testimony was truthful before the board last time.

A. I guess I have to see the context.

MR. CEDZIDLO: I have all the transcripts and I will bring them. But the board was told it was not a contaminated site when we denied the application the first go around. So your testimony is that you know that. And again our engineer looked this up for us because it was a concern last time, no one told -- no one ever

P000077

06/04/2017 10:14:40

58

provided the letter. We denied it. And what we were told is, well, that's a DEP issue. You don't have to worry about that. So, my concern is.

MR. MOORE: I don't want to be overly argumentative here, we will be happy to supply.

MR. CEDZIDLO: Hold on, counsel, I am just asking questions, because, I sat here through that application in 2014. The board kept asking New Wallington Home for documentation and it was never provided. We denied the application. The court approved it and what we were told is don't ask these questions because it is not your jurisdiction.

MR. MOORE: That's true. I was about to just say --

MR. CEDZIDLO: Now it's a different issue if it is a jurisdictional requirement but it is also, it's now an issue because you are back before the board, and the board has a right to know is the testimony that we're being given by applicants truthful or someone is lying to us. Because credibility plays a huge role into whether or not we are going to accept applications and, I will tell you I have the transcripts, and there was testimony that this was not a contaminated site in

59

the first application. I am just letting you know.

MR. MOORE: We'll be happy to provide you all the information, we don't have to, with respect to our LSRP in going through this. If it is historic fill, historic fill is governed by the DEP regulations, but I can see how someone would think that historic fill is not contamination.

CHAIRMAN BAGINSKI: Anyone have any other questions for Mr. Bertin. Mr. Bertin I do have a question for you in regard to the sewer study. I know there was some issues originally during the original application, and there was not in agreement to do a sewer study on the project. Has there been a sewer study completed now.

A. We worked with I I think it was Neglia engineering at the time to do a sewer study. And we did the sewer study down Main Avenue. I think we presented maps or we presented drawings.

MR. JUZMESKI: I can answer that. Mr. Bertin has submitted flow tests map profiles. We reviewed them, confirmed there is capacity for the development.

CHAIRMAN BAGINSKI: Okay.

A. There is plenty of capacity.

CHAIRMAN BAGINSKI: I know it was an

60

issue in the beginning. You are talking about relocating this welcome to Wallington sign to the Northeast corner of the property. So when you are driving into Wallington, you see this trestle and now you are going to see this sign as you come out of the trestle. You are never going to see welcome to Wallington. You are going to welcome to Wallington as you are leaving. I don't think it's a good idea to put it where you are talking about putting it, number one.

A. We'll take your recommendations.

CHAIRMAN BAGINSKI: The other issue is the driveway configuration, the egress and ingress. Originally you testified during the first application about the sight limitations for the driveway at the middle of the property. Would it not be more sensible and for safety reasons to move it all the way to the south end of the property. So this way there wasn't that limited view of sight at the trestle and everything else. We would provide a safer turning out and in and everything else at that point, would it not.

A. It could. But it is not unsafe here because we actually provided photographs of what this view is from the driveway and it was in

61

generally the same location. Because you can actually see underneath the bridge to the road on the other side. So this is not an unsafe location. And the county is going to review this again as well.

CHAIRMAN BAGINSKI: Now you are also now going to limit the sight view from the middle driveway because you are putting a parking space or a vehicle in the parking spot six inches off the property line is what you are testified to earlier. So now that's line of sight from that middle driveway looking to your south will be now limited by the parking spaces.

A. I don't think it's in the sight triangle but I will confirm that to you.

CHAIRMAN BAGINSKI: Okay. Now, the water retention or drainage basin, I know we had issues in regard to under that trestle in the Borough of Wallington where when we had heavy flooding or heavy rains it floods.

A. Okay.

CHAIRMAN BAGINSKI: Now the county came in and I know it was a county retention drainage basin. They had to come in and dig it out. You guys are going reconfigure it. You are

going to update it to what it is supposed to be as far as the sand pit. Who is going maintain that.

A. We will. The applicant will.

CHAIRMAN BAGINSKI: I am clarifying that.

A. But right now if you look in there, it is a pit. It's loaded with bottles or types of plastic bottles. It is not maintained. You get leaves in there, which there is a trees all around. The leaves fall and they inhibit water from going into the sand. When it is clean and maintained, and, again it's sandy soil, you rake it and you get the leaves and clean the bottles up, you shouldn't have a flooding problem. But again we're depending on the county to give us guidance.

CHAIRMAN BAGINSKI: I was concerned who was going to maintain it after it was being done. Because right now we don't have any equipment, the manpower and everything for the borough of Wallington to go in there and maintain this. So we don't want to burden our residents with having another job to do after you remediated this and reconfigured this drainage area. We're not going to be responsible for it.

A. Correct. It's in our applicant's, in the

applicant's best interest to clean it because it is right in the entrance to his property. And that's the whole purpose of this.

CHAIRMAN BAGINSKI: Now, as far as the sign, the Wallington sign as far as welcome to Wallington, but you are also proposing the other monument sign. We need to worry about where we're going to be putting that so we're not blocking the line of sight for egress and ingress wherever we put it.

A. We'll work with your engineer before we come to the next meeting and see what we can do with that.

CHAIRMAN BAGINSKI: Okay. You did discuss the easement for the roadway that circles the building so it would be the southwest corner. I believe Mr. Cedzidlo had spoken about you are going to perfect the easement where the road ended. Now we're going to continue it.

A. Yes, we always provided an easement from where the dead-end was to the property, but it is now in a different location so we have to refile.

CHAIRMAN BAGINSKI: Okay. Very good thank you. That's all I have.

MAYOR TOMKO: I have one question at

this time right now. What is the estimation of children coming out of this development for our schools.

A. The planner will be the better person to answer that. I will make sure --

Mayor tomko: I think that's a $65,000 question that is on the minds of a lot of people. What is it, we're burdened right now, and where are we going to go from here with the added enrollment. And I know you have some one bedroom but, we know one bedroom could fill up a few people, too.

A. We'll pass that on.

CHAIRMAN BAGINSKI: Any board members have any questions for Mr. Bertin.

Bazel: I'd like to go back to the history list of variances for the Morningside property. Was there any attempt to develop the lot and try to avoid those variances. Such as, no off-street surface parking, maximum building coverage, maximum impervious coverage and, open space. Seems to me if you develop that from what I see as the eastern part of the lot you would probably eliminate all those variances.

A. The lot is allowed to have 73 dwelling units

and we provided that. Again it is because we're maintaining the existing recreation building. If it weren't built -- the thing is I think it's a preengineered building. We can't build on top of it. We can't put units on top of it. We really have to put our own buildings. And that's the reason, keeping that building is the reason for really all those variances. Because we have a great asset that we'd like to keep. And as Mr. Nuckel mentioned, it's all year round. We have a basketball court over by the river but you can only use that during nonwinter months and, when it is not raining. So, that's the reason that causes all those lot coverage and parking setbacks and all that sort of thing.

Bazel: Thank you.

CHAIRMAN BAGINSKI: Okay. Any board members have any other questions.

MR. MELFI: I know you talked about the existing building was going to be used just for this site of the project only. Right.

A. Yes.

Melfi, the basketball court that's in the back on the other side, is that going to be used -- how are you going to stop people from this

P000079

building six or whatever going to use the outdoor basketball court on the other side. You know what I am saying. Are you going to stop building three four, two, one, whatever, from going to seven. Also going to prevent you from stopping six, seven and eight from going over to the basketball courts on the other side.

A.   We'll address that.

CHAIRMAN BAGINSKI:  Anyone else have any questions for Mr. Bertin.

MR. MELFI:  One another.  You are talking about the sign of the monument.  Is there a possibility of putting the welcome to Wallington up higher with the monument underneath it or lower. Put a little pylon, not a big pylon.

A.   Actually, yes, that was one way of doing it. We have done that with other signs where you put the sign with the name of the site and then on the base you put welcome to Wallington.  I will work that out with your -- I will come up with an concept with your engineer but yes, that's possible.  Yes, yes, we'll take photographs and we'll show how it works.  Where you see it as you travel on the road.

CHAIRMAN BAGINSKI:  Any other board

---

67

members. That's it.  We normally open this up to hearing of citizens.  We're to get testimony from the next witness, there is only two, and then we'll entertain the hearing of citizens after the two witnesses and you can ask all the questions that you want at that point in time.  Is that acceptable to everybody that's in the audience.  It will help expedite a process a little bit.  Okay.  So right now Mr. Bertin is done but you will have your opportunity to question Mr. Bertin once the other witness has testified.

MR. MOORE:  I like to call Mr. Dawson Bloom.

DAWSON BLOOM, sworn.

Q.   Mr. Bloom, would you give your educational background, licences and professional, experience for the board?

A.   Certainly.  I am graduate of New Jersey institute of technology.  I have both bachelor's and master's degree in civil engineering from there.  I have 25 years of practical experience, 21 years as a licensed engineer in the State of New Jersey.  My license is currently in good standing. I currently serve as a civil engineering manager at Bertin Engineering.

---

68

Q.   What's your traffic engineering experience?

A.   Again it's part and parcel to 25 years of experience doing traffic engineering studies and reports for roadway/highway design, site engineering and the like.

Q.   I would offer Mr. Bloom as an expert in the field of traffic engineering?

CHAIRMAN BAGINSKI:  We accept as an expert witness.

Q.   Mr. Bloom, did you or someone under your supervision prepare a traffic impact study for this project?

A.   We did.  We prepared a traffic impact study which was dated March 24, 2017.

Q.   And what was done to prepare this study?

A.   We inventoried the existing roads and traffic conditions around the site.  We measured traffic volumes, developed traffic projections, checked the site distances, analyzed the traffic impact for the proposed development, including reviewing the proposed site plan.

Q.   Can you please explain the site and the area?

---

69

A.   Certainly.  The site is located in the planned residential Mount Laurel zoning district, located in block 71, lot 35.01.  Land uses along Main Avenue are predominantly residential in nature with abandoned Farmland Dairies located across the street.  The site is surrounded by railroad tracks to the north.  Saddle River to the west. Multifamily residential to the south.  And Main Avenue, abutting Main Avenue to the east.  The project site is approximately 3.65 acres in size, and it has approximately 320 feet of frontage along Main Avenue.  Subject lot currently contains an out of use roller skating rink and warehouse with two existing driveways along Main Avenue.  Main Avenue is a county road.  It's county road 61.  Travels in a general north-south direction in the vicinity of the site.  The road carries one lane of traffic in each direction.  Opposing lanes are separated by a double yellow stipe.  The speed limit in the vicinity of site is 25 miles per hour.

Al Ventura road which is adjacent to the southern area of the site is a private roadway. That travels generally in an east-west direction and provides access to the Jasontown II apartment complex.  There is no striping separating the two

P000080

way traffic on that roadway. The Main Avenue and Midland Avenue intersection is a stop controlled T-intersection which is approximately .43 miles to the general west of the project site. Main Avenue acts as both northbound and westbound approach to the intersection with Midland Avenue as a southbound approach. There are no turning restrictions from any approach and it has one approach lane in each direction.

Q.    Did you undertake traffic counts?

A.    We did. Traffic counts were taken at the intersections of Main Avenue, Al Ventura road and Midland Avenue respectively on Tuesday December 6, 2016, from four to six p.m. And Wednesday, December 7, 2017 from seven to nine a.m.

Q.    And what is the access for the site and did you review the onsite circulation?

A.    Yes. The site will have two way access driveway at the north end of the Main Avenue frontage. The two way access drive will have an exclusive left turn only and right turn only exiting the site. There is also an entrance only driveway located at the southern end of the Main Avenue frontage adjacent to Al Ventura road.

Q.    And did you check the sight distances

at the Main Avenue driveway?

A.    We did. The sight distances from the northern site driveway location were investigated to access the safety for motorists both entering and exiting the site. The speed limit on Al Ventura -- on Main Avenue is 25 miles an hour. As such, the requirements, the AASHTO requirements require that sight distances are analyzed for speeds of 30 miles an hour, which we did. The requirement is 335 feet for a left turn from stop and 290 feet as for a right turn from stop.

We measured the available site distances at that driveway, proposed driveway location, and they both measured to be approximately 350 feet, which are in accordance and exceed the requirements based on the AASHTO. And I will mention that because this is a county road, this will also be reviewed by the county. And as part of that review we have to show from a sight perspective there is no obstructions within the sight triangle for both of those movements. So the concerns regarding the siting of the parking lots and the signs will be addressed during that review, and we have to be able to show that these obstructions will not impact the required site distances for this

driveway.

Q.    What is the traffic projections for the site?

A.    The amount of traffic that is proposed to be generated by the residential complex was determined from data published in the ninth edition of the trip generation manual published by the Instutite of Transportation Engineers. The mid rise apartment land use was used to determine those generated trips. For the site generated traffic specific to the proposed develop, in the a.m. or morning peak hour we're looking at a generated number of trips of six trips into the site and 11 trips exiting the site. Total combined trips will be 17 trips in the morning peak hour. And in the p.m. peak hour we would have 14 trips into the site. Nine trips leaving the site. With a total of 23 trips in the p.m. peak hour.

We made assumptions that since the southern driveway is an ingress only driveway, that all entering trips would use the southern driveway, while all exiting trips would be utilizing the northern full movement driveway. In addition, we also added, took into account the future development of the adjacent New Wallington Home

development. And based upon that land use, we have a total a.m. peak hour trip generation of 39 trips and a total p.m. peak hour of 51 trips. All of those trips we are assuming will enter the site, access the site via the northern driveway. Additionally, the traffic projections that I just discussed take into account the use of mass transportation systems in nearby vicinity. There is several New Jersey Transit bus stops along Main Avenue. The closest is located at Al Ventura road. As well as the Bergen line train station located less than a mile away in Garfield. It's very likely that a percentage of residents will use that public transportation, and in accordance with the ITE manual there is an implied five percent vehicle reduction for use of mass transit.

Q.    Did you assess the impact this traffic will have on the adjoining streets?

A.    Yes. And just to discuss some of the background in terms of how we developed that projection, we anticipated that the residential development would be completed at the time in 2017 which is considered to be the build, which we considered to be the build year. Using that as the build year, the traffic road rate which would be

**P000081**

74

used by the Department of Transportation, New Jersey Department of Transportation in this area is one percent per year. We performed a capacity analysis at Main Avenue, Al Ventura road intersection during both a.m. and p.m. peak hours using the above-mentioned conditions. And we assessed both the existing, no build and build year conditions for the a.m. and p.m. peak hour.

The conclusion of the capacity analysis at those locations was that there was no further degradation of the traffic. So the levels of service that are currently existing will exist after this proposed development. There is one exception, if I could call it an exception, and that's at the intersection of Main Avenue and Midland Avenue.

Q.    Main Avenue and what?

A.    I'm sorry. Midland Avenue. There is -- the westbound leg of Main Avenue currently operates at level of service F, which is a failure. That level of service doesn't change. But with the proposed development there is a slight increase in the delay at that intersection. The delay from the existing condition in the morning peak hour would increase from roughly 113 seconds to 145 seconds. And again

75

this is a projected algorithm that's really more of exponential increase. And on the evening peak hour, the existing delay is 624 seconds, and that would increase to 736 seconds.

In summary the proposed development adds a total 13 or 14 trips to the westbound approach in the a.m. peak hours. Respectfully, with the majority of those turning left, which is in accordance with the current traffic patterns at that intersection. And again as I said, the overall level of service, which is currently an F, does not change with that proposed development.

Q.    Thank you, Mr. Bloom. That concludes Mr. Blooms direct testimony.

CHAIRMAN BAGINSKI: Any board members have any questions for Mr. Bloom.

Melfi: I have just a couple.

MR. MOORE: I did want to just --

CHAIRMAN BAGINSKI: Sorry. Mr. Melfi.

MR. MOORE: It relates to Mr. Blooms testimony. As part of our application before the county, this is a county road, the county has already asked us for a fair share contribution for improvements to the Midland intersection. So there

76

will be improvements to that intersection donemany and This project will be paying its share of those improvements.

CHAIRMAN BAGINSKI: Okay. Thank you.

MR. MELFI: In another 30 years.

MR. MOORE: They are taking the money from us now.

Melfi: They are taking the money from everybody for 30 years already. On the southeast corner of the single driveway going in only.

A.    Yes.

MR. MELFI: I am looking at an arrow coming in from people making a left hand turn kind of coming in at a quicker pace. You have two lane road coming out with a car that wouldn't be able to go straight. They have to make a left. Danger-wise, as far as someone coming north on Main zooming in to the left there and you have a car that could be coming off from the back end to make a left to go in.

A.    From the parking lot?

CHAIRMAN BAGINSKI: From Main Avenue.

A.    From Main Avenue.

Melfi: You are coming, you are going

77

north on Main.

A.    Yes.

MR. MELFI: You are making a left.

A.    Yes.

MR. MELFI: Then you have another, you have the other arrows where it is a double lane in the back on the south side of those buildings.

A.    Here?

MR. MELFI: You have a double lane there. So you have someone flying in from the left side of Main Avenue, trying to, and then you have a car that's going to be trying to make a left at the same time, what's the safety issue? What's the safety.

A.    Certainly the most positive way to deal with that would be to actually have a stop sign for the car making the left into the parking lot, and that's something that we will take into account. You want all the vehicles, whether it is a traffic or not, to stop there and be certain somebody --

MR. MELFI: At least I think there should be a stop at both sides on the main street side and on the Al Ventura side. I will leave that up to the engineer.

MR. JUZMESKI: I will review that.

P000082

Stop bar on the two way traffic is a good idea.

MR. MELFI: Also I always ask these questions of traffic engineer. When you did those two studies on those two days in December, what was the weather like. I ask weather because a lot of guys do it on certain days and meanwhile you had a foot of snow on the ground and there was no traffic.

A. No, it was --

MR. MELFI: Question I always ask. If you don't have it, you can --

A. Typically when we have it, it will be in the data sheets.

Kasperek: Check the records.

A. We have it. From the 7th it was cloudy, 40 degrees.

MR. MELFI: What date was that?

A. December. I believe that a Wednesday. And the 6th was cloudy, 45 degrees, Tuesday.

MR. MELFI: I always have that curiosity.

A. Certainly.

MR. MELFI: Sometimes sneak in with six, eight inches of snow and nobody on the road.

A. We want to have a valid study what we're trying to show here.

MR. MELFI: That's all the questions I have.

Wygonik: I have a question, when you did the traffic study did you do it based on current conditions meaning across the street the Farmlands Dairy is empty, there is no activity over there. Or did you take into consideration if that someday gets developed or sold or a business comes in there, how that might impact the traffic patterns.

A. When you do the counts, you take into account what the existing conditions are. When we project traffic we have to do a reasonable assumption. But that includes are there any currently planned developments. We can't really generally make over assumptions on potential for down the road. So we do make assumptions based on what information is readily available and possible. Otherwise, we could be really analyzing things that are absolutely not practical. We try to make the most practical judgment.

Wygonik: You realize if someday that gets developed or sold, it could double the traffic in that area?

A. True but also the trip generation tables in the ITE manual does take into account similar certain conditions for growth, and those are factored into the analysis as well.

Wygonik: Okay. Thank you.

MAYOR TOMKO:. You have been told right around that trestle over there, on the other side, they are condemning property that's planned for over 300 units. That it was approved.

A. We have to take a look at that.

MAYOR TOMKO: I mean we're concerned with the traffic. Let me tell you on a normal day it's gridlock and that traffic is backed up all the way to the shopping center from main and Midland. We know that eventually that will traffic light is going to be there. I hope it's within my lifetime. Because it is going on and on and on. But we know that there is some property that has to be taken and things like that. We met with the county and the county engineer over and over and over. But we're concerned the way with the traffic backed up in morning and four o'clock. They are cutting through Jasontown, coming around out on Midland Avenue. I can't tell you how many accidents on Midland Avenue coming out of Stevens road. And then on the other side coming out. Plus down by Al Ventura. And then I am thinking with this turning or going in and out of there, with this added traffic, not knowing what is going to be in South Hackensack, not knowing what is going to be across the street, not knowing what is going to be even further, This isn't going to be called Wallington. It's going to be called gridlock with quotes around it, and we're never going to get anything around, emergency vehicles, nothing. Because let me tell you four o'clock you try and go with a fire truck, an ambulance, a police car down Main Avenue, and, boy, you better have good driving course to get around. And I only foresee things worse with more development, more people coming in. That's just my opinion.

Rachelski: You did mention the transportation. There is, nearby there is a Conrail station in Garfield, and you don't have a direct access to the Saddle River. I guess the only way to get there would be to take Main Avenue and go all the way to the light. It's quite a bit of distance. I don't think this is going to be a factor for anybody to walk probably a couple of miles.

**P000083**

A.    No.  Certainly we would -- you're right. Certainly but it is within a realm of possibility. Exactly how many people would choose to do that, I'm not certain.  They could bike.

MR. MELFI:  Driving, not walking.

A.    Driving.  Certainly there is other modes of transportation, bicycles and other things that are also viable as well.

CHAIRMAN BAGINSKI:  Any other board members have any questions?

MR. JUZMESKI:  Two questions.  You have a fair share improvement with the county.  Is that related to a traffic signal going there at some point?  Have they done a traffic signal warrant at that location do you know?  Are you privy?

A.    I'm not aware.

MR. JUZMESKI:  Can you find out?

A.    We can find out and report back, absolutely.

MR. JUZMESKI:  It's important to know at this point whether a traffic light is in the words at that location.

A.    Sure.

CHAIRMAN BAGINSKI:  Any other board members have any questions.  Okay.  At this point in time what I would like to do is open up to the hearing of citizens.  And these will be questions, directed to the two expert witnesses that testified today.  If anyone has any questions about anything they talked about today, you are more than welcome to step forward, state your name and ask questions that you have.

MR. MOORE:  Mr. Chairman, to clarify, these are questions rather than statements, correct?  That will be later.

CHAIRMAN BAGINSKI:  These are questions from the public.  It's open forum.  If they make a statement, it's out of my control.  I am asking them to ask questions to get the information.  So if anybody wishes to be heard, if you can just step forward and state your name.

ms. Mannuzza:  Rhonda Mannuzza, RHONDA MANNUZZA, 119 Wallington Avenue, Wallington. You said there was 207 units?

MR. BERTIN:  Yes.

MS. MANNUZZA:  That's total in all the buildings?

MR. BERTIN:  Yes.

MS. MANNUZZA:  How many did you say were two bedroom?

MR. MOORE:  You need to pull the plan.

MR. BERTIN:  For the Morningside site.

MS. MANNUZZA:  I want a total because I want to know how many kids possibly could be going to school in Wallington.  Because head law says two children per bedroom are allowed.  So if you have like 23 bedrooms, we're looking at 40 some odd children.

MR. BERTIN:  That's not the case.  The planner will testify but there is studies on what typical occupancy with children.  So the planner, next time when the planner testifying, she will provide that.

MS. MANNUZZA:  This is something that we need to take into consideration.

CHAIRMAN BAGINSKI:  Again we heard from two witnesses today.  I don't want to cut you off.  Every question is very important but we need to direct the questions today to the two expert witnesses.  Next month we will have more testimony, and other witnesses and you can direct questions at them.

MS. MANNUZZA:  He did mention how many two bedrooms there was earlier.

CHAIRMAN BAGINSKI:  He did.

MR. CEDZIDLO:  Just, Miss Mannuzza, there is a difference between questions that you ask and then comments that you want to make about it.  So asking how many two bedrooms there are is a proper question.  For you to say, when you then change this is something the board should take into consideration, that's a statement or an opinion that you have that you are allowed to make, it's just not at this time.

MS. MANNUZZA:  But he can answer the question?

MR. CEDZIDLO:  Of course.

CHAIRMAN BAGINSKI:  He can answer how many two bedrooms units.

MS. MANNUZZA: And three bedroom.

CHAIRMAN BAGINSKI:  And three bedroom units.  If we can get some clarification in regards to that.

MR. MOORE:  Absolutely.  We have to get a bedroom for the prior project.

A.    We'll provide that.  I have to provide that to the planner so the planner is

P000084

MS. MANNUZZA: Okay.

CHAIRMAN BAGINSKI: Thank you for your question. Anybody else wishing to be heard in regard to this or to the two professional witnesses.

WILL.

MR. MENDYK: William, Mendyk, M-E-N-D-Y-K. Six Azalea drive, Wallington I was just wondering, are these all going to be private roads.

MR. BERTIN: Yes, everything on site is private.

MR. MENDYK: Streets maintained by the applicant?

MR. BERTIN: Yes.

MR. MENDYK: Lighting?

MR. BERTIN: Yes.

MR. MENDYK: Garbage removal?

MR. BERTIN: Yes.

MR. MENDYK: Snow removal?

MR. BERTIN: Yes.

MR. MENDYK: Everything?

MR. BERTIN: It's private property.

MR. MENDYK: Okay that's it. Thank you.

87

CHAIRMAN BAGINSKI: Thank you. Anyone else wishing to be heard or questions for the two expert witnesses that we have.

MR. OLKOWSKI: In regard to their testimony today -- Bryan Olkowski, 8 Iris Lane, Wallington, O L K O W S Q K I. Just two questions. First one is you talked about the sewer, sewerage going up the hill. There is a pump that's powerful enough to make sure it goes up the hill. Are any concerns that we should be worried about? Because I am worried about driving down there and --

MR. BERTIN: No.

MR. OLKOWSKI: -- something happening?

MR. BERTIN: No, that's why we have a backup generator and the pump is way off the road, and it doesn't have to pump very far. This is not unusual. Municipalities do it. It's a common practice.

MR. OLKOWSKI: I know we were talking about a sewer study. That was a concern.

CHAIRMAN BAGINSKI: Do you have a second question also.

MR. BERTIN: Let me just explain one other thing. From the buildings on the site it's

88

gravity flow to our pump. And there is what we call a wet well where sewerage comes in and there is two sets of pumps with float level alarms and stuff like that. It will pump it up the street. It's not pumping very far.

MR. OLKOWSKI: The second question was about the historic fill. What kind of fill are we talking about?

MR. BERTIN: Construction debris, concrete and other construction debris, that's what's in the site. We have done test pits and borings and DEP records show that's what is in there.

MR. OLKOWSKI: Thank you.

CHAIRMAN BAGINSKI: Any other questions for the two expert witnesses. Any citizens.

MR. ANDROWIS: Khaldown Androwis, KHALDOWN ANDROWIS, 5 Ivy lane, Wallington. The question, we have 207 units. What's the square footage for each unit?

MR. MOORE: The architect will be here to answer that at the next meeting.

MR. ANDROWIS: Okay. And what is going to be the exact use? It going to be for

89

rented?

MR. MOORE: Rental.

MR. ANDROWIS: Okay. I will have my other questions when the architect for the square footage. Thank you.

CHAIRMAN BAGINSKI: Thank you. Any other questions for the two expert witnesses today. At this time I like to close to the hearing of citizens. At this time any board members have any further questions in regard to the testimony we heard today.

I do have one question that was brought up in regard to the sewer pit which is a wet well, or retention wells as we call it, right. Is there going to be a backup pump system or one single pump.

MR. BERTIN: Two pumps.

CHAIRMAN BAGINSKI: Okay.

MR. BERTIN: Actually we've already done near construction drawings and given it to your engineer. Again just the calculations have to be modified for the additional flow.

CHAIRMAN BAGINSKI: Okay. So all the safety requirements are being met with the two pumps system with the backup generator in case

P000085

there is a power failure.

MR. BERTIN: Yes, as a matter of fact. Those plans also go to the DEP. In addition to going to your municipal engineer reviewing them, Passaic valley really doesn't review them that much but the DEP will review them.

CHAIRMAN BAGINSKI: Okay thank you. At this time anybody else have any questions.

MR. MOORE: We can respond to a series of comments in your engineer's report, and, we could address most of them now If that's the boards pleasure.

CHAIRMAN BAGINSKI: Do you want to wait until you have your experts testimony done and then do it at the end.

MR. MOORE: They were mostly engineering really and traffic.

MR. JUZMESKI: Is there anything that you are opposed to doing? Rather do it that way rather than going over --

MR. MOORE: We're not going through -- almost everything we agree with. Going through on C, on your number five, application completeness, which was just addressing the submission waivers and deferring them to the board,

obviously we will the materials at the next meeting.

MR. JUZMESKI: 11 to 17.

MR. MOORE: Pardon.

MR. JUZMESKI: You will have items 11 and 17 you will have at the next meeting.

MR. MOORE: Yes. Then with respect to the easement plan, you noted that it should be noted that additional utility and drain easements will be required for utility and drainage facilities that traverse from one lot to the other. We'll revise the easement plan to address all those. Some of the easements have already been filed, and others we'll have to modify and add new ones. The applicant shall provide additional privacy fencing along the perimeter of the property. Right now the site shows privacy fencing between buildings three and six. We think we don't need privacy fencing along the remainder of the northern perimeter because it is the New Wallington Home project. And then the applicant will also provide additional fencing along the southern perimeter of the Morningside property. We think the western perimeter doesn't require the privacy fence because it is just up against the Saddle

River. I don't know if you are okay with that.

MR. JUZMESKI: Okay. It's up to the board.

MR. MOORE: Then with respect to item 8.1 which talks about the size of the parking stalls. Under the Wallington ordinance, since this is residential, it would be RSIS.

MR. JUZMESKI: Waiver from our ordinance.

MR. MOORE: Your ordinance doesn't apply. So we don't need a waiver from your ordinance because there is no jurisdiction for your ordinance.

MR. JUZMESKI: Okay.

MR. MOORE: That's also true with respect to the aisle width. Then with respect to item 8.5, we'll be getting the additional information. We'll perform a warrant analysis if the county is not doing the signal. But we're hopeful to do a signal. We'll come back with the additional information at the next meeting.

MR. JUZMESKI: Okay.

MR. MOORE: Then with respect to item 9.2, we recommend the applicant revise the chain link fence door and enclosure to the dumpster area

to a board on board fence with steel posts. We like to make -- we'll make the fence enclosure solid. We prefer to do vinyl, because it is easier to maintain and not so heavy. I don't know that.

MR. JUZMESKI: It just shows a chain link.

MR. MOORE: We'll change ir from chain link.

MR. BERTIN: A trash closure.

MR. JUZMESKI: It looks like you are proposing chain link. You have a chain link fence detail next to your dumpster enclosure. It may not be together but, if it is vinyl, that's okay with me.

MR. MOORE: We'll make it solid.

MR. BERTIN: The dumpster enclosure is masonry, and then typically we use a chain link with slats but we can make it a solid fence. You are talking about the gates.

MR. JUZMESKI: Yes.

MR. BERTIN: The gates. And the other privacy fence, we actually have a detail for the vinyl fence rather that a board on board.

MR. JUZMESKI: I was just referencing the trash enclosure area. **P000086**

94

MR. BERTIN: The what?

MR. JUZMESKI: The trash enclosure.

MR. BERTIN: Yeah, they will be solid.

MR. MOORE: Then 9.4, it says the applicant does not provide sufficient illumination between buildings seven and building number eight within a parking area.

B: We can increase it but I mentioned we're going to change high pressure sodium to LED lights. So we'll have a new design.

MR. JUZMESKI: Not increasing, you are providing. There is no lighting at all proposed in that area. Maybe just not depicted.

MR. BERTIN: Between buildings.

MR. JUZMESKI: It's really under the area where the building goes over the parking.

MR. BERTIN: Okay. In the building eight.

MR. JUZMESKI: Recessed lighting.

MR. BERTIN: There will be soffit lighting in there.

MR. JUZMESKI: That's what I meant way. It will be increased, I meant some lighting.

MR. BERTIN: Here, yes, because it

95

will be soffit lights. We didn't show the soffit lights. We will coordinate with the architect.

MR. MOORE: Then with respect to the landscaping we will come back and work with your landscape architect on all of the various landscape comments. And then just one correction on 9.10 where it talks about relocating trees. They haven't actually been planted yet. We are just relocating them on the plans. There is no actual physical relocation of trees.

MR. BERTIN: That was done just to indicate where it was approved. So it was clear how we're modifying the prior approval. I didn't go in my testimony because that was sort of insignificant.

MR. JUZMESKI: Fair enough.

MR. MOORE: We'll be coming back with the revised planning schedule on the trees for your review. We'll discuss, Mr. Bertin's office and your office.

CHAIRMAN BAGINSKI: Do you have anything else, Mr. Moore.

MR. MOORE: No, I do not.

CHAIRMAN BAGINSKI: At this time since you will not be presenting any further, any

96

more expert witnesses this evening, We have no other applications before this board, the application noticed people 200 feet around the said application, and they will not be noticing you again.

MR. MOORE: Right. It's continuing.

CHAIRMAN BAGINSKI: Next meeting will be June 20, 2017, here at these council chambers. So you will not be getting anything in the mail. If anybody got anything in the mail, it's not going to come again. I am informing everyone now that the next meeting is June 20, 2017 At the council chambers. So everybody is well aware of that and they will not be getting noticed again in regard to that. So if anybody is here, wants to hear more testimony from the other experts and has more questions, feel flee to come to our next meeting. At this time I need a motion to carry this application to the next meeting.

Rachelski: Motion.

MR. MELFI: Before we do, take into consideration that the board members know along with the audience that June 20th is high school graduation. Just to put a thought in your head. Usually the mayor is there and some council people.

97

CHAIRMAN BAGINSKI: I am going by our schedule that is posted at the beginning of the year.

MR. MELFI: I want to let everybody know.

CHAIRMAN BAGINSKI: That's the date scheduled right now. Anybody have problems with that in regard to board members. I know you just said the mayor possibly has a problem.

MAYOR TOMKO: I will be late.

CHAIRMAN BAGINSKI: Anyone else have a problem with that. The 20th. As far as the citizens that are here to be heard in this matter, the 20th. It is high school graduation I was just informed. Does anybody have a problem with that. Coming back on that date. Is it possible to come back a little later after the high school graduation or whatever. So we're going to keep it set for June 20th, 2017 here at council chambers. Same time as today. And, I need a motion to carry this to next month.

Rachelski: Motion.

CHAIRMAN BAGINSKI: I need a second.

Bazel: Second.

Wygonik: Second

P000087

Roll call: Pawluczuk aye, Bazel aye, Baginski aye, Wygonik aye, Rachelski aye, Kasperek aye, Melfi aye, Tomko aye.

CHAIRMAN BAGINSKI: If no further business before the board, I need a motion to adjourn.

Bazel: Motion.

CHAIRMAN BAGINSKI: Pawluczuk, aye, Bazel, yes. Baginski aye, Wygonik aye, Rachelski aye, Kasperek, aye, Melfi, aye, Tomko, aye.

(End at 9:57 p.m.)

99

P000088        26 of 26 sh

Case 2:20-cv-08178-EP-AME Document 88-11 Filed 02/06/26 Page 1 of 27 PageID: 10443365

# EXHIBIT K

Case 2:20-cv-08178-EP-AME Document 88-11 Filed 02/06/26 Page 1 of 27 PageID: 10443365