# In The Matter Of:

*In RE: Morningside at Wallington*

*Transcript of Proceedings*

*July 18, 2017*



RIZMANRAPPAPORT
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ  07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

EXHIBIT

I

Page 1

BOROUGH OF WALLINGTON
PLANNING BOARD

IN THE MATTER OF:                    :

MORNINGSIDE AT WALLINGTON, LLC       :
551 Main Avenue, Block 71, Lot       :
35.01, Zone LI-C                     :
        and                          :
NEW WALLINGTON HOME, LLC             :
Main Avenue Rear                     :
Block 71, Lot 35.02, Zone LI-C.      :

- - - - - - - - - - - - - - - - -    :

BOROUGH OF WALLINGTON
54 Union Boulevard
Wallington, New Jersey
Tuesday, July 18, 2017
7:58 p.m.

B E F O R E:

STANLEY BAGINSKI, CHAIRMAN
THERESA WYGONIK
NICHOLAS MELFI
MAYOR MARK TOMKO
KATHY POLTON
DARIUS PAWLUCZUK

A L S O   P R E S E N T:

MARTIN CEDZIDLO, ESQ., BOARD ATTORNEY
DOROTHY SIEK, BOARD SECRETARY
EVAN JACOBS NEGLIA, PE, BOARD ENGINEER

KEVIN MOORE, ESQ., FOR THE APPLICANT

Page 2

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
| --- | --- | --- |
| CALISTO J. BERTIN, PE | MR. MOORE | 5 |
| JACK RAKER | MR. MOORE | 13 |
| BRIGETTE BOGART, PP | MR. MOORE | 35 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |

Page 3

CHAIRMAN BAGINSKI: The application for Morningside at Wallington, LLC and New Wallington Homes.

MR. MOORE: Good evening, Mr. Chairman.  Is this working?

CHAIRMAN BAGINSKI: It might be on.

MR. MELFI: No.  It's not going to be on.

CHAIRMAN BAGINSKI: No.  It's off.  We can hear you.  I think everybody can hear you.

MR. MOORE: I'm a loud mouth.  Most people can hear me.  I just wanted to make sure.

Mr. Chair, members of the board, good evening.  For the record, my name is Kevin Moore with the firm of Sills, Cummis & Gross representing New Wallington Home, LLC and Morningside at Wallington Home, LLC, two related applications.  To refresh the board's memory, the application for Block 71, Lot 35.02, the New Wallington Home, LLC project is for amended preliminary and final site plan approval for an approved 134 unit multi-family project and the application for the adjacent block, Block 71, Lot 35.01, the Morningside at Wallington Home, LLC project is for preliminary and final site plan approval and (c) bulk variances for a 73 unit multi-family project.  Both properties have the same street address of 551 Main Avenue.  The hearings this evening on the two related applications are

Page 4

continued from the board's May 16th hearing.  Because of the cancellation of the board's June meeting, the applicants have re-noticed for the hearings this evening.  My office noticed for the two hearings by certified mail, return receipt requested to all property owners within 200 feet and for all others required by law to receive notice, and we published in the Bergen Record on July 7th.  I would request that the board take jurisdiction over the applications.

MR. CEDZIDLO: That's fine.

MR. MOORE: Everything's in order?

MR. CEDZIDLO: Everything is in order.

MR. MOORE: Great.  Thank you, very much.

When the previous May 16th hearing concluded the applicant completed the application for the New Wallington project and completed the direct testimony of the applicant's engineer and traffic engineer on the Morningside at Wallington Home project.  Before we move on to our architect's testimony on the Morningside at Wallington home project, I would like to briefly recall Mr. Calisto Bertin, the applicant's engineer, to discuss the changes made to the site plan for the Morningside at Wallington Home project based on the comments of the board members and the board's engineer.

Now, Mr. Bertin's been previously sworn and

**Page 5**

qualified.

CHAIRMAN BAGINSKI: Right.

MR. CEDZIDLO: Mr. Bertin, you're still under oath.  Good to go.

MR. MOORE: Is that new, Calisto?

MR. BERTIN: No.  That's the same one.

MR. MOORE: That's the original A-1?

CHAIRMAN BAGINSKI: The microphones aren't working, anyway, so speak loud.

MR. BERTIN: Hello.

CHAIRMAN BAGINSKI: Oh, they are.  Well, you need this for the recording, don't you?

MR. BERTIN: All right.  I'm using here exhibit A-1 that we presented at the last meeting.  I didn't change it but we did make some minor site plan changes based on the hearing and the comments from Neglia Engineer's office and also the comments from Bergen County.  The application is active before Bergen County.  So the first change we made, I'm going to point to the main driveway on Main Avenue.  We had it presented with four lanes, two in and two out with a divider.  That's what's shown here.  We have changed that to one lane in and one lane out with a divider.  So we've just narrowed the driveway, made it smaller.  That was a requirement of Bergen County.  There's a parking

**Page 6**

lot between building number eight and Main Avenue.  We made some minor changes to that.  We removed three parking spaces and rotated it so it's parallel to the building seven.  On this exhibit it's askew, so now it's parallel and seven feet off.  We've lost a few parking spaces but we've pulled it just a couple feet away from Main Avenue, so it is a little change, and the driveways line up a little bit better.  There's a driveway along the southerly property line, right next to Al Ventura Road.  We changed that.  I think we probably created a little bit of confusion because part of it is two way traffic and part of it is one way traffic and so we elected to make the road one way.  This way there's no confusion.  So anyone that parks in the parking lot between building seven and eight would just have to go around the site, but it's one way.  Now, by doing that we were able to accomplish a few other things.  The driveway doesn't have to be 20 feet or 24 feet wide.  We made the driveway 18 feet wide, so we've enlarged a little landscaped area that we had alongside of building number eight, but we had no landscaping alongside of building number seven.  You can see on the exhibit that we had the pavement and a striped area and that really wasn't attractive.  We're coming into a nice apartment complex so we've now added a five foot wide landscaped

**Page 7**

strip along that building to soften the look, because that's a block building.  It will be painted and fixed up but the landscaping will add to it.

I mentioned at the last meeting that we have a detention basin.

MR. MOORE: Didn't we add a privacy fence, as well, Mr. Bertin?

MR. BERTIN: Yeah.  I was gonna get --

MR. MOORE: Okay.

MR. BERTIN: Okay.  You're right.  Along this driveway, along the southerly driveway we added a privacy fence, a six foot high privacy fence to remove a variance.  Because originally we didn't put a fence along that side and now we have it, so we've eliminated one variance.

MR. MOORE: And also, just to keep interrupting you and throwing you off your game, with respect to the parking lot in front of building eight, did we also add a stop bar?

MR. BERTIN: Yes.  We improved traffic control on that driveway, that parking lot.

MR. MOORE: Thank you.

MR. BERTIN: Okay.

MR. CEDZIDLO: Mr. Bertin, that's why he turned the mic off.

**Page 8**

MR. MOORE: But it doesn't do any good.

MR. BERTIN: Okay.  I mentioned there's a drainage basin.  The drainage underneath the bridge, the railroad bridge, comes on to the site and dumps into a deep pit which has got a sand bottom and it's all sand down there, below the pit.  We just changed the shape of it because we wanted to make it more accessible for maintenance.  If you were to look in there now, it's loaded with trash and bottles and that sort of thing, so there's a new shape and it's a more gradual slope coming in from either the street side or the site side for maintenance, and I think I mentioned that it would be the responsibility of the applicant to maintain that drainage basin.

MR. MOORE: Did we add retaining walls, as well?

MR. BERTIN: Yes.  Yes.  There's -- there were walls around it but we modified those walls and we've added those details to the detail sheet.  We made some adjustments to the plans to correct the unit numbers in buildings eight and six.  They did not -- they were in conflict with the architect's plan so we've corrected that.  There's a dumpster on the west side of building five.  We just modified, rotated a little bit to make it easier for trash, for a truck to pick it up,

**Page 9**

pick up the trash, so just, again, rotated it. All right. And the doors to all the dumpsters, we changed the detail. We had a chain-link fence and I think it had slats in it. We were asked to make it a more solid fence. We were asked, suggested that it be board on board fence. Those are heavy, it's wood and they usually don't last long in that kind of an application, so we used the same type of privacy fence. It's a little -- it's lighter but it's a little bit more durable as a gate, so that detail has been changed and that's on the plan. The New Wallington Home site was designed a couple years ago and since then the use of LED light is much more prominent, so we redesigned the entire site, both New Wallington and Morningside, with LED lights. The same type of fixture but just LED so they're -- so you can control them. You can dim them at night and that sort of thing. We added lighting between building seven and eight. We didn't have the soffit lights there because we figured that would be the architect's realm, but we've added it. We've added soffit lights and building lights to provide lighting in that area. We made some changes to the landscaping, part in response to your engineer's comments but also, we did not have any landscaping between that front parking lot and Main Avenue so -- and it's not shown

**Page 10**

here but it's on the plans, that we've added a hedge row across the front of the -- that parking lot, to shield at least the bottom of the cars. This rendering shows several street trees and they're just little dots, but if you've been by this site there's a type of maple tree but they probably have a six inch diameter trunk. They're a nice looking tree, so they do provide a buffer and we will add three more trees along the frontage of, of -- to help shield that parking lot. I think we'll skip the Welcome to Wallington sign. The architect came up with a plan. There was discussion about the location of the Welcome to Wallington sign and it was correct that you wouldn't see it in the place that we picked, so it would be better further away from the bridge but also closer to the road. I guess it's up to you, but we have a detail on sheet C3.5, which is a smaller Welcome to Wallington sign on a post with a two foot wide by three foot high post mounted sign and there's a detail of that. I live in Haworth and that's the sign that's right outside my house on the Welcome to Haworth sign, so that's why I used it, but we have an alternate, more of a monument sign that we'll discuss and you can choose, and the architect will discuss the monument sign. All right. On drawings C2.5, that's where we have our truck paths, we only provided the truck paths

**Page 11**

for the Morningside site because the prior application had it for the New Wallington Home, so we've shown them throughout the site. Both the fire truck and tractor trailer truck going around the site. That's on drawing 2.8.

MR. MELFI: On two what?

MR. BERTIN: C2.8 has all the truck paths, fire truck and tractor trailer truck.

MR. CEDZIDLO: C2.8 or 2.5?

MR. MOORE: C2.8.

MR. BERTIN: I thought --

MR. CEDZIDLO: Because you said C2.5 and then you said C2.8.

MR. BERTIN: I said 2.5? Okay. I meant 2.8. I wrote 2.8.

MR. CEDZIDLO: That's fine. I'm just making notes.

MR. BERTIN: If you look at the plans I bet you it is 2.8.

MR. CEDZIDLO: I'm making notes and you said C2 --

MR. BERTIN: Okay. That's fine. Maybe I should put my glasses on because right above the 2.8 is the 3.5, where the Welcome to Wallington sign is, so I'll put my glasses on.

**Page 12**

MR. CEDZIDLO: No problem.

MR. BERTIN: Oh, that's so much better. We did a little regrading of the parking lots. Not a big deal. It's really an engineering issue. And then we updated the zoning chart. One of the changes we made before we had the variance for the length of the building, because we have building seven and eight connected, so the variance was changed from the length of the building to having no buffer or no setback between the buildings. So that's -- the planner and the attorney will take over that. I just did what I was told. So anyway, we have the two buildings. Together they're more than 200 feet but they are separate buildings.

And that, in sum, is the bulk of the changes that we made to the plans.

CHAIRMAN BAGINSKI: Okay.

MR. MOORE: Questions for Mr. Bertin on his supplemental testimony?

CHAIRMAN BAGINSKI: Board members, any questions for Mr. Bertin with regard to this?

MS. POLTON: Not at this time.

CHAIRMAN BAGINSKI: Okay.

MR. MOORE: Do you do the public after everybody?

Page 13

CHAIRMAN BAGINSKI: Yes.

MR. MOORE: Okay.  Then I'd like to call my next witness, Mr. Jack Raker, the project architect.

JACK RAKER, RA, having been first duly sworn according to law, testified as follows:

MS. BAUMANN: Please state your name and spell your last name.

MR. RAKER: My name is Jack Raker, R-A-K-E-R, and business address is 80 Lambert Lane in Lambertville, New Jersey.

MS. BAUMANN: Thank you.

MR. MOORE: Mr. Raker, could you briefly give your education, licenses and professional experience for the board?

MR. RAKER: Yes.  I'm a -- I have a Bachelor's Degree in Architecture from New Jersey Institute of Technology.  I've been a practicing architect for 20 years with Minno & Wasko in the field of residential and multi-use architecture, mixed use architecture for 20 years.

MR. MOORE: Are you licensed as a licensed architect in the State of New Jersey?

MR. RAKER: I am a licensed architect in the State of New Jersey.

MR. MOORE: And have you testified before

Page 14

planning boards and zoning boards in the State of New Jersey?

MR. RAKER: Many planning boards, including this one.  Many planning boards and zoning boards.  Jersey City, Hoboken, East Rutherford, many in the area.

MR. MOORE: I would offer Mr. Raker as an expert in the field of architecture.

CHAIRMAN BAGINSKI: Okay.  We'd accept him as an expert witness.

MR. MOORE: Thank you, very much.

Mr. Raker, could you describe the architecture for the Morningside at Wallington Home project?

MR. RAKER: Sure.

I'm going to start with building six and go through the plans and then I'll go right into the architecture.

MR. MOORE: Now, this is --

MR. RAKER: This is a copy.  This set is a copy of the submitted set.

MR. MOORE: Okay.  So right now you're just doing from the submitted set.  You want to mark --

MR. RAKER: I have it on the board so everybody can see it.

MR. MOORE: We don't need to, right?

Page 15

They're part of the submitted set.

MR. RAKER: I can mark it.

MR. MOORE: If it's not part of the set then we have to mark it.

MR. RAKER: This is sheet A1.  This is the floor plan of building six.  Building six has parking at the ground floor and at the entry lobby.  You can see here, there's entrances at one end of the building and parking spaces on either side of the drive aisle.  There's a lobby.  They have access to the lobby from the parking garage and access from the front of the building into that same lobby, so you can pull into this building, park your car in a pouring rainstorm, get out, get into an elevator, go up into a hallway and right into your unit without ever having to go outside.  At the upper floors there's a number of bedrooms, one bedrooms and two bedrooms.  The one bedrooms are in a range of about 750 to 800 square feet and the two bedrooms are in the range of 1,170 to 1,225 square feet.  In this particular building there are 15 one bedroom units and 15 two bedroom units.  They're all market rate.

MR. MELFI: What are the size of the parking stalls underneath that garage?

MR. RAKER: They're 9 by 18 and the drive

Page 16

aisle's 24 feet.

MR. MOORE: This is a colored rendering.  This would be exhibit A-2.  If you could just describe it for the board and mark it.

MR. RAKER: Sure.

Okay.  This is the front elevation of building six.  You can see it's a very traditional style pitched roof.  We've gone with a character that we believe fits well with the surrounding buildings in Wallington, very traditional.  There's a large amount of brick.  I would say this elevation's probably in the neighborhood of 60 to 70 percent brick on the elevation.  We do have some horizontal siding, cementitious horizontal siding, and we've broken that building up, base, middle, top.  We've created some feature elements to allow your eye to go up and down along the building so it's not one long repeat, repeat of window, window, window.  We've been able to break it up with a series of different elements using base and a number of architectural features.

Now, I'm going to move to the next building.  This is going to be sheet A3.  Sheet A3, you'll see, this is building eight plan.  Building eight, you'll see there's a slight difference from the ground floor and the upper floor.  There's an area, you can park

| Page 17 | Page 19 |
|---|---|

**Page 17**

underneath this building, so you can see this area here is actually underneath the building. Along the front we'll have a leasing area for leasing the units on this project. In the back there will be Yoga and fitness for an amenity, about 3,500 square feet, and utility rooms, as well. Along this edge there's tenant storage. We've treated this facade -- I'll show you a perspective shortly. You'll see this facade doesn't get treated any differently. You would never know that that's tenant storage. It gets treated with windows just like anything else, and this is building two. You can park under. Although it is open on this side, you can park under, walk into the lobby and to the elevator and then up to your unit. This building has 25 one bedrooms, 15 two bedrooms and three three bedrooms. Of that, 22 of the 25 one bedrooms are market rate and then three affordable, and of the two bedrooms, 15 are market rate, I'm sorry, six are market rate and nine are affordable, and the three bedrooms are affordable. All the three bedrooms are affordable.

MR. MELFI: You said there was 23 one bedrooms or 25?

MR. RAKER: There are 25 one bedrooms and 22 are market rate. Three are affordable.

MR. MELFI: Well, we have 23 market rate and

**Page 18**

one -- well, three market -- three low and moderate and --

MR. RAKER: Oh, I apologize. That's correct. You're right. 23, 23 one bedrooms, plus three is 26 total.

MR. MELFI: Thank you.

MR. RAKER: That's correct. Sorry. And I have my glasses on.

MR. CEDZIDLO: 23 one bedrooms?

MR. MELFI: 23 one bedroom market rate and three one bedroom low, moderate. Total of 26.

MR. RAKER: I'm going to bring up the elevation of this building. I have to show you --

MR. MOORE: This would be exhibit A-3. If you can just describe that for the board. I bet it's front elevation building eight.

MR. RAKER: Correct. It's the front elevation of building eight. Again, this building, because it has amenity on the ground floor, the ground floor, we have open parking structures underneath. The first floor gets a little bit taller. It's about 14 feet for the first floor, so in this case we did not go with a pitched roof. We went with a flat roof. Right in the downtown we felt this building was close to the street, it has a nice aesthetic for buildings at the

**Page 19**

street frontage and felt to have a little more of a downtown flare. Lots of glass on the ground floor in the amenity and balconettes up on the upper level along the street. This building along the street frontage will be all brick, brick and cast stone. The height of this building -- we already know we are asking for a variance. The height of this building is 48 feet, one-quarter inch. I didn't make the quarter inch. The way the ordinance is written, it's average grade to the roof, so average grade, you know, became a decimal point and that's what gave us the quarter inch. I'm going to quickly jump back. I did not mention the height of the first building, building six. Building six height is 49 feet, three-and-an-eighth inches and that roof, that is measured to the mid point of the pitched roof. We could potentially lower this building if we wanted to and go with a flat roof but this building matches all the other buildings in the project with a pitched roof so we felt it would look kind of awkward being that one off building, all residential building. It was just, it was sort of set back with the other buildings. We felt it should blend in with those and that's why we did that. Jumping back to building eight, I'm going to mark this as A-4, this is a color elevation of building eight. It's a side elevation. It's on the Al Ventura Road

**Page 20**

side. This elevation shows you -- I thought it was important to show you what this garage would look like. It's an open parking garage. There will be columns there but we are continuing those materials around the side, continuing with brick. It's not just gonna change to some other material. They're doing brick. There is some siding at the top to break it down a little bit and cast stone at the base.

Next item I'm going to show you is the perspective view of the project. This is a new --

MR. MOORE: That will be A-5.

MR. RAKER: A-5, this is a perspective view. It includes buildings from both sides of the project. This is the building eight, here, the existing warehouse building's right behind you. You can see a little of it right there, behind the trees. This is the building from the previous project. A little bit of our building six is popping out in the background there and the green landscaped plaza. If you want, I could pass this around so you could all get a better look at it. I know you're looking at it from a distance.

MR. MELFI: You might want to show the residents.

MR. RAKER: I did invite them up earlier to look at it.

---

Page 21

And the next exhibit I want to touch on is --

MR. MOORE: Did everyone on the board see the exhibit?  Okay.

MR. RAKER: So this will be A-6.  This will be A-6.  We did mention we wanted to do a --

MR. MOORE: Let's just describe for the record what A-6 is.

MR. RAKER: -- monument sign.

Yeah.  A-6 is what we would like to do for a monument sign.  So this is what we're proposing for our project sign.  It's got a nice brick base.  We've kept some of the detailing similar to the buildings, very traditional.  We'll have stand off letters on the sign.  I would have put the name of the project but I think we're undecided yet so right now it's just project name.

MR. MELFI: I assume Welcome to Wallington.

MR. RAKER: Hum?

MR. MELFI: That would be a nice monument sign, Welcome to Wallington.

MR. RAKER: Well, I have one here that I'm very excited to show you.

So we have a two foot base here with the brick, some pedestals up, a nice traditional top that -- where we can put the project signage.  We feel it's

---

Page 22

important with cars and traffic nowadays to have a nice, very visible project sign.  It's just -- you know, unfortunately people are using their phones, they're not quite paying attention and we would like to, we would like to, you know, have a nice, well lit, nice attractive signage, which brings me to my last exhibit.  I worked today with the client --

MR. MOORE: This is A-7.

MR. BERTIN: -- to develop something that was not the same as our project sign but something that had a much more substantial feel.  It's a pilaster.  The material would be, it would do a masonry or stucco finish and then do stand off letters just like that, Wallington.  I did not write Welcome to Wallington.  We can obviously work with you on exactly what we want the sign to say, but we have just done two different colors to accent some of the banding in the sign.

MR. MOORE: We'll call that Wallington sign A-7.

MR. RAKER: Yup, and that's the last of my exhibits.

If anybody has any questions -- I can talk a little bit about the dimensions if you'd like.  This one's about, it's about 4 feet, 10 in height.  The pier is about 2 by 2 and the overall length of the sign is

---

Page 23

about eight feet.  Again, you know, we have to site it.  It might be -- the proportions my adjust but, you know, we feel very comfortable with this, this design.

MR. MOORE: Mr. Raker, could you just discuss the adequacy of the fire -- of the space around the building and the access to the buildings, particularly building six for fire access, fire code?

MR. RAKER: Sure.  I'm just going to bring up the site plan here.

I'm going to talk a little technical talk about buildings and how they're constructed before I get into just the area.  The building code understands that access, full vehicular access around every building is not possible.  It's not possible in any urban environment, so the building code is written so that you adjust your fire areas, your protected areas within your building, and you can separate those areas to create areas where you can't -- essentially, you're creating two buildings within one building, so if there's a fire in one, you can run to another section and, and be entirely safe.  Once you get over a certain fire area, and all of this relates to how much perimeter access you have.  So the building code takes into account all of that information.  When we have access on two sides with a vehicle and then we have 20 foot access around the

---

Page 24

rest of the perimeter for manned access or whatever it be, for hoses, for any of that stuff, so we feel very confident that if I were to take this, my open area would be -- if I were to do a code calculation on this I would take my open area on these two sides and knowing that this side I have about the distance that I need for access for -- while it's not vehicular access, I would do a calculation based on that.

MAYOR TOMKO: How far do you get in there with a truck?

MR. RAKER: Into here?

MAYOR TOMKO: Yeah.

MR. RAKER: You wouldn't take a truck between these two buildings.  You just wouldn't do it.

MAYOR TOMKO: Matter of opinion.

MR. RAKER: I mean, these fire trucks are, you know, they're --

MAYOR TOMKO: Well, but I'm, you know, I'm talking about -- what's the furthest access that you can get?

MR. RAKER: Well, I can access this side over here.  Here, I can access all the way around, I'd say all the way around, almost three, yeah, three-quarters of the building.

MAYOR TOMKO: Okay.

---

In RE: Morningside at Wallington

Page 25

MR. RAKER: And I can access all along here, as well. This is all open.

MR. MELFI: On the bottom of that where you're saying you can access, you're saying with a truck?

MR. RAKER: Oh, yeah. All this is with the truck.

MR. MELFI: What's the width right down below?

MR. RAKER: This is 24 feet of pavement.

MR. MELFI: So a fire truck opens up to about 16 feet, 14, 16 feet. That's leaving you eight feet to a building to fight a fire with flames coming out from me to that wall.

MR. RAKER: No. No. That's wrong. 24 feet of pavement but I have another eight feet of distance to the --

MAYOR TOMKO: Right.

MR. RAKER: And then I have space on the other side, as well. Looks like a couple of feet there.

CHAIRMAN BAGINSKI: That back section wasn't affected like in the front, where it went from 24 feet to 18, that was going to maintain 24 feet because that was going to maintain two way traffic in the back section of that parking area, correct?

Page 26

MR. RAKER: I can do two way traffic here.

CHAIRMAN BAGINSKI: Mr. Bertin reported he was making that road 18 feet now, not 24 feet, one way coming in on the south side of Al Ventura Road.

MR. RAKER: Oh, we're talking about this building here?

CHAIRMAN BAGINSKI: That's what I'm asking. Does the back section get affected also or that's going to maintain two way traffic in the back section for that parking lot?

MR. RAKER: I was talking about building six. This is painted.

CHAIRMAN BAGINSKI: I was talking about building six.

MR. RAKER: This is -- okay. I mean, you can definitely get a fire truck down to building six.

CHAIRMAN BAGINSKI: What I'm asking and what Mr. Melfi asked and Mr. Tomko had asked, the space between building six, right, and the fence, is that two way traffic or one way traffic?

MR. RAKER: You would have to let Calisto answer that question.

MR. BERTIN: That's two way.

CHAIRMAN BAGINSKI: That's going to maintain the 24 feet there?

Page 27

MR. BERTIN: Actually, it's 22 feet of pavement right through here because there's no back up aisle, but all around -- that driveway on the south side of building five is -- that's five or six?

CHAIRMAN BAGINSKI: I'm asking now because earlier you said that that was going to be a one way, from Al Ventura side, and the about 18 feet wide.

MR. BERTIN: I'm sorry.

CHAIRMAN BAGINSKI: I'm just clarifying. That's all I'm doing.

MR. BERTIN: No. The one way was just along building seven and eight.

CHAIRMAN BAGINSKI: Okay.

MR. RAKER: Well, it looks like building seven. Eight you can circulate around.

MR. BERTIN: No. This is the old rendering in the plan, because we created a landscaped strip along building seven.

MR. RAKER: Oh, okay.

CHAIRMAN BAGINSKI: You understand what I'm saying now?

MR. BERTIN: Yeah.

CHAIRMAN BAGINSKI: Now you're saying it's 22 feet?

MR. BERTIN: Well, further in the site,

Page 28

absolutely. Sorry for the confusion.

MR. RAKER: I was talking down in this, down in this section.

CHAIRMAN BAGINSKI: So --

MR. RAKER: I shouldn't be testifying to any of this.

MR. BERTIN: I don't do windows, you don't do driveways.

CHAIRMAN BAGINSKI: So coming from the back side, which would be the west side of the property, correct?

MR. RAKER: Coming from here.

CHAIRMAN BAGINSKI: It's two way traffic to get to the parking lot between building seven and building six, to get to that parking area?

MR. BERTIN: Yeah. Yeah. Yeah. This is all two way.

MR. RAKER: Correct.

CHAIRMAN BAGINSKI: But you can only, and then it's one way coming in from the east?

MR. RAKER: That's correct.

CHAIRMAN BAGINSKI: What's going to stop people from going up that one way to exit?

MR. BERTIN: All right. When it comes to traffic, okay, we have do not enter signs along the side

Page 29

of the building. That's the way the site exists now. That's the way it was designed, but I thought we created some confusion with two way traffic near building eight so we just made it one way, but we'll have do not enter signs so people do not head down that driveway along building seven.

MR. MELFI: You're saying 22 feet you're going to have between the property line and the other building down there?

MR. BERTIN: Well, the driveway alongside of building number six is 22 feet. We use 24 for a back up aisle, but if it's -- I mean, I could make it longer. I just, we have a little landscaping on either side of the driveway and I thought that might have been more important.

MR. MELFI: I'm just worried about when they plow for snow. Where is the snow gonna --

MR. BERTIN: That's why we have a little bit of landscaping on either side of the driveway or they just move it into the larger parking lot. On the southerly side of building number six there's not a lot of room for snow piling. They most likely have to move out to Saddle River and put it in the lawn area there.

CHAIRMAN BAGINSKI: Okay.

MR. MOORE: Any further questions of these

Page 30

two witnesses?

MR. MELFI: Regarding the architect, yes, because going back to page A5 you talked about a flat roof on a building. At the last hearing the other buildings, the pre-approved ones that were done on the first set, you guys were very adamant about not putting a flat roof, period, and we granted you a variance because we thought it would be aesthetically pleasing to have the ridge roof and we granted a variance to put the ridge roof because it looks nicer. You guys testified that the flat roof always leak, this and that, and now why are we going back to a flat roof?

MR. RAKER: We think along the main street --

MR. MELFI: Because of the height is basically what it is, you can't meet the height requirements if you put the ridge roof on.

MR. RAKER: Yeah. We think along the front edge of the build -- front edge of the main street we'd like to put a flat roof building. This building has a slightly different aesthetic than the other building.

MR. MELFI: I understand that, but my question is, the last time you were totally against any flat building on that property because of future roof leaks. We agreed upon it. We said we'll do a ridge

Page 31

roof, we'll give you the variance for the pitch roof, not to put and flat roofs on, you guys were happy as a pig in poop and now you're coming back and asking for a flat roof.

MR. RAKER: Well, I'm not -- I don't recall talking about roof leaks but I do recall talking about the village look we were going for. We definitely achieved the village look with a pitched roof and I think along the main street we definitely want a more urban or more downtown feel.

MR. MELFI: Then you're asking for variances for the ridge roof for other buildings?

MR. RAKER: Correct.

MR. MELFI: Okay. I got ya.

MR. RAKER: We think that that building has a, has a very village type feel on the interior.

MR. MELFI: No other questions.

MR. RAKER: You can take a look at the perspective if you'd like. I think it's, I think that downtown, in and around the green, I think it looks great with the pitched roof and up along the street edge.

CHAIRMAN BAGINSKI: Excuse me. Keep it down.

MR. MOORE: Mr. Raker, just to go back with

Page 32

the aesthetics of the building number six, that's within the development and that's the same arguments that were made last time, why we need the ridge roof, correct?

MR. RAKER: Correct. Correct.

MR. MOORE: And this flat roof, is this more in keeping with the urban street structure?

MR. RAKER: Correct. We're much closer to the street in this building than we were in the other buildings.

MR. MELFI: That wasn't the reason that was given, but you can continue. I have another couple of questions. The reason was because the flat roofs tend to leak and aesthetically we figured and you thought it would be nicer to have ridge roofs than flat roofs.

MR. MOORE: Well, we still think -- to clarify, within the development and for building six --

MR. MELFI: You didn't say within the development.

MR. MOORE: We still think it would look better.

MR. MELFI: Those colors, the colors you're proposing, is that the colors that are gonna stay or are the colors subject to change? The brick facade is -- I want to make sure that's put in the resolution. They have to put the brick facade and whatever colors you

Page 33

decide, because I've seen a lot of towns when they approve a project and all of a sudden they start changing the facades to the building.  They say well, the brick is $3 million, we can do the siding and the whole building for one million, so if you want to be approved, I want to make sure it's in the resolution, it has to be brick and whatever facade you have to chose.

MR. RAKER: I have not selected a particular brick color yet.

MR. MELFI: I'm not talking about colors. I'm talking about brick in general.

MR. RAKER: We are committed to this look.

MR. MELFI: So brick siding, not a stucco? There's not going to be stucco changed from brick?

MR. RAKER: There are cementitious materials all over this building of composite materials.  They're listed on the elevations.  There are a variety of types of cementitious materials.  Materials nowadays are composites.  They're composites of paper and cement, concrete made to look like stone.

MR. MELFI: You said the first two stories of those other buildings are going to be brick?

MR. RAKER: Brick, correct.

MR. MELFI: That's what I want to make sure, that it stays brick, not stucco, not tile, not whatever.

Page 34

MR. RAKER: Absolutely.  Absolutely.

MR. MELFI: Okay.  I have no questions.

CHAIRMAN BAGINSKI: Okay.  Any other board members have questions for the architect?

MAYOR TOMKO: No, I don't.  I don't know. I'm waiting for someone that will answer the question I had last month.  What is -- I don't know.  I don't think you're capable of doing that, but what is the expected number of children to come out of --

MR. MOORE: That's our next witness.

MAYOR TOMKO: Okay.  Very good.  I'll hold it for the next witness.

CHAIRMAN BAGINSKI: Any other questions?

MAYOR TOMKO: I'm going to keep asking till I hit the right one.

MR. RAKER: Thank you.

CHAIRMAN BAGINSKI: All right.  Thank you.

MR. MOORE: Chairman, I'd like to call my final witness, Miss Brigette Bogart.  Can we take a two minute break?

CHAIRMAN BAGINSKI: Okay.  Take a two minute recess and we'll return and continue with this application.  If anybody needs to use the restroom or get a drink of water, you're more than welcome to do so at this time.

Page 35

(A brief recess was taken.)

CHAIRMAN BAGINSKI: If everybody could take their seats, we'll resume the meeting.

MR. MOORE: Okay.  Before Miss Bogart starts her testimony, I just want to clarify, I think Mr. Bertin did say, but if you guys want it wider than the 22 feet there in the back, you want the 24 feet, we'll be happy to provide that.

MR. BERTIN: Yeah.

CHAIRMAN BAGINSKI: We'll discuss that with our engineer.

MR. MOORE: Whatever you guys think is best, we can accommodate it.

MS. BAUMANN: Could you identify yourself?

CHAIRMAN BAGINSKI: Let's get your expert in.

MR. MOORE: She needs to be sworn first.

BRIGETTE BOGART, PP, having been first duly sworn according to law, testified as follows:

MS. BAUMANN: State your name and address.

MS. BOGART: Brigette Bogart and my office address is 648 Godwin Avenue in Midland Park, New Jersey.

MR. CEDZIDLO: Spell your last name.

MS. BOGART: B-O-G-A-R-T.

Page 36

MR. MOORE: Miss Bogart, did you -- could you give your education, licenses and professional experience for the record.

MS. BOGART: Sure. I have a Bachelors in Architecture degree from North Carolina State University.  I have a Masters in City Regional Planning from the University of Pennsylvania.  I have been working as a Professional Planner in the State of New Jersey since 1999.  I grew up in Bergen County and my family is from Wallington.

MR. MOORE: Are you a licensed Professional Planner in the State of New Jersey?

MS. BOGART: I am.

MR. MOORE: Thank you. I offer Miss Bogart as an expert in the field of planning.

CHAIRMAN BAGINSKI: We will accept her as an expert witness.

MR. MOORE: Thank you.

MS. BOGART: Thank you.

MR. MOORE: Miss Bogart, if you can begin your testimony, that would be great.

MS. BOGART: Sure.  May I sit? So I apologize if my testimony seems extremely long this evening.  It's a complicated case

In RE: Morningside at Wallington

Page 37

and I want to make sure that I have all the proofs on the record. And feel free to ask any questions as I go through my testimony.

As this board is aware, the site is identified as Block 71, Lot 35.01. It's located at 551 Main Street. It is a large site, at 3.65 acres. It currently is improved with two large masonry structures that are in poor condition. The proposal is to take down one of them and maintain one as a recreation space. The building fronting on Main Street that we're looking to remove is a commercial industrial building. It was previously occupied by a bar and warehouse with loading facilities. The building to the rear was previously occupied as a roller rink facility, I'm sure this board is all aware. There is a smaller paved parking area located in the front of the bar/warehouse facility and we're looking to improve that by moving that back, because that existing parking area is located within the right-of-way, so we're looking to move that back, add additional landscaping and actually create an improved and current parking area. The site is also currently improved with the gravel asphalt area between both the buildings. We're looking to improve that, as well, and bring that up to present standards. The existing rink, as it stands today, obviously creates some issues with

Page 38

trying to improve the site itself. What we're looking to do, obviously, is to create a public amenity, but that creates some issues with regard to the site layout and that leads directly to the variances that are going to be requested this evening. What we're trying to do is make sure that that existing rink becomes an improvement on site that not only fits into the site but fits into the site engineering wise and circulation wise. What that does is create some issues with regard to the planning and zoning on site, so there are a number of variances that we're requesting and most of them are directly related to the fact that we are trying to incorporate this existing rink facility into our building design. I believe that the key factors when this board is reviewing this application is the fact that we are trying to include this existing rink on site, but also, most importantly is that we're trying to develop this site with the adjacent Lot 13. -- 35.02, so the Master Plan, the goals and objectives of this township calls for developing this site in conjunction with the adjacent lot and that's what we're trying to do. All the variances that we are requesting this evening relate to the fact that we are trying to develop not only with the adjacent lot, but also because of this existing building, so we have two unique circumstances

Page 39

here. We are trying to make sure that the circulation on site, and not only pedestrian wise but also vehicle circulation works with the adjacent lot, but also that it works with that adjacent -- the existing building, so we have two unique things on this property that warrant, I believe from a planning perspective, warrant this board's attention when reviewing this application and the variances we are considering. So from just a pure property description perspective, I think those are important things for this board to consider.

Keep going?

MR. MOORE: Keep going.

MS. BOGART: Okay. So --

MR. MELFI: Mr. Chair, I'm sorry. You said we could ask questions as you go.

MS. BOGART: Of course. I don't like to just keep talking.

MR. MELFI: You could talk all night. If you say -- if that building were to be taken down, because we're creating a lot of variances by leaving that building, if that building were to be taken down how many variances would we lose and would we be able to conform, or you be able to conform with a lot of the setbacks with the other buildings?

MS. BOGART: I don't believe that analysis

Page 40

has been completed, however, I think from a planning perspective, the most important thing is to consider not the number of variances that are being proposed but how the site lays out, because I work for a number of municipalities and when you're creating zoning ordinances you don't typically understand the unique circumstances of this situation, so it may not be an analysis of this particular situation where you didn't realize that this building is going to stay up and it may not technically be a negative that the variances should be granted. It's -- and that's, I guess, what this board should weigh. I think that --

MR. MOORE: I'm sorry.

MS. BOGART: That's okay.

MR. MOORE: Aren't the variances also a lot due to the fact that the irregular lot line between the two sites?

MS. BOGART: Yes. So it's not only the building but also the irregular lot line and that we're trying to be consistent with the development to the adjacent lot.

MR. MELFI: But if the building were to be taken down and everything got pushed back, you wouldn't need the front yard setbacks. You may not need the side yard setbacks in some of these buildings. The roller

Page 41

rink is probably as close to as big or near close to one of the sizes of the apartments --

MS. BOGART: Right.

MR. MELFI: -- or buildings.

MS. BOGART: It is a large building and at the May hearing the applicant had agreed to provide that building for public amenities, public recreation facilities, so I think that's also a benefit that this board needs to consider, and with regard to all the front yard setbacks, which I'll get into through my testimony, we're actually improving the front yard area --

MR. MELFI: Yeah, I know.

MS. BOGART: -- substantially.

MR. MELFI: You can continue.

MS. BOGART: Thank you.

MR. MELFI: Sorry.

MS. BOGART: No.

I had prepared an exhibit just quickly discussing the surrounding land uses.

MR. MOORE: That would be A-8. We'll call it surrounding land uses.

MS. BOGART: Yes.

MR. MELFI: If you don't mind me asking, what's the purple or violet on here? It cut out on the

Page 42

bottom.

MS. BOGART: Let me see.

MR. MELFI: You have the chart here, the legend?

MS. BOGART: You got a bad copy.

MR. MELFI: I think everybody has the same thing. Not sure what we're showing.

MS. WYGONIK: What's that?

MR. MELFI: Industrial commercial.

MS. BOGART: So I prepared the exhibit regarding the surrounding land use based upon the New Jersey DEP GIS data. Just identifying the subject site outlined in red, the adjacent parcel to the west, the New Wallington Home site, and then you'll see the railroad further west of that and then Saddle River to the left outlined in blue. You'll see the great big orange area, which is multi-family homes. Based upon this exhibit, from a planning perspective this site, and also reinforced in your Master Plan documents, is appropriate for multi-family development. You'll see from this exhibit that the site itself has a very unique lot shape, which lends itself to the fact that we need the rear yard variance, which I'll get into in a second in my testimony. As I mentioned to you, the site, the subject site outlined in red is going to be developed in

Page 43

conjunction with the adjacent site striped in red.

So as you heard from the previous witnesses, the proposal is to develop this site in conjunction with the PRML zone district, which is what this site is zoned for, with 73 dwelling units, 15 which will be affordable as a 20 percent set aside which is in conjunction and consistent with your Housing Plan. The existing roller rink is to be converted to recreational use, as agreed at the May 16th hearing. We agreed that the borough would be allowed to use the roller rink for recreational purposes. The existing masonry building along Main Street is going to be demolished and we're going to build building six and building eight to provide for affordable housing and multi-family housing. We're going to have parking underneath both buildings and we're going to provide, in building eight along Main Street, a first floor leasing office, a Yoga studio and a gym. The reason that, from a planning perspective, this is important with building eight is because it provides an active storefront. It's not retail, building eight along Main Street, but it's going to provide for active uses and so that residents on site can actually utilize the uses, the Yoga studio and the gym within that building itself.

MR. MELFI: I do have a question.

Page 44

MS. BOGART: Go ahead.

MR. MELFI: You're saying you're building this in conjunction with the other lot, Lot 35.02, whatever. Are we consolidating both of these lots? Are these lots going to be consolidated?

MR. MOORE: No, they are not.

MS. BOGART: They're not going to be consolidated and that's part of the reason for the variances being requested.

Can I pull up the site plan? You have one with dimensions? All right. I'll take the rendered one.

MR. BERTIN: I'll give you the site plan if you'd like.

MS. BOGART: Perfect. That's good.

So the one setback variance that we were requesting is the rear yard setback and it's, from our lot line -- can I draw on your plan or you're gonna' kill me?

MR. BERTIN: Have at it.

MS. BOGART: Yeah?

MR. BERTIN: Go ahead, if you want.

MS. BOGART: Give me a marker.

So our lot line is here.

MR. BERTIN: Straight lines. I'm joking.

In RE: Morningside at Wallington

---

Page 45

MS. BOGART: This is not helping. Our site is right here.

CHAIRMAN BAGINSKI: Hours of work, Mr. Bertin.

MS. BOGART: I know, and I just destroyed it all.

MR. BERTIN: I was going to hang it up in my office.

MS. BOGART: Well, now it's even better. It's got the marker.

So the rear yard setback variance that we are requesting is actually from this building to the rear lot line of that lot, so it's actually internal to our site. It's not to an adjacent site. If we were to remove that lot line we would not be requesting that variance. We are not looking to consolidate the lots. They're two separate facilities, but technically we need the variance because that lot line still exists.

CHAIRMAN BAGINSKI: Morningside at Wallington and New Wallington Home, the principal owner of that is the same?

MR. MOORE: Yes, but there's slightly different ownership structures between the two buildings so we really can't consolidate them.

CHAIRMAN BAGINSKI: So because he don't want

---

Page 46

to consolidate the residents of Wallington need to step down, back up and say, oh, we'll just let him do whatever he wants, leave the two lots separate? If he was to consolidate them he wouldn't need all these variances, correct?

MR. MOORE: He'd still need variances.

CHAIRMAN BAGINSKI: Not as many.

MR. MOORE: Not as many.

MS. BOGART: Not as many.

MR. MOORE: But it's different ownership structures.

CHAIRMAN BAGINSKI: I'm just clarifying, but the principal there is the same, between both LLC's.

MR. MOORE: But it's not the same --

CHAIRMAN BAGINSKI: Okay.

MR. MOORE: -- exact owners in each so they really can't be consolidated.

MS. BOGART: And I guess from a pure planning perspective, the reality is the outcome and the design is going to be the same regardless of who owns what or where the lot line is.

CHAIRMAN BAGINSKI: Well, you say that now, but when Mr. Melfi asked the question about the flat roofs you went from the -- or it went from we need the pitched roofs to now flat roofs are better, so there's a

---

Page 47

balance. Isn't there? From everything you're saying now to what was said earlier is different and I will have to agree with Mr. Melfi in regards to that. If you were to go back in the minutes of the transcript you would see that you folks made the comment that, oh, no, flat roofs are no good, we need to maintain the pitched roofs and that's why there was -- the agreement was made for the pitched roofs, for the height variance.

MR. MOORE: And we have the pitched --

CHAIRMAN BAGINSKI: Now we have a whole different story today.

MR. MOORE: We have the pitched roof for building six.

CHAIRMAN BAGINSKI: Now it would be okay for this part, like Mr. Melfi said.

MS. BOGART: My comment from a planning perspective was purely from the setbacks and lot lines, because the reality is you don't see the lot lines when you're walking down the street. All you're going to see is the development and the development, what we're trying to improve and trying to propose is a development that's consistent with one another, so I will get into the building height in a second, and I understand your concern completely, but my comment was purely from a setback perspective.

---

Page 48

MR. CEDZIDLO: Let me ask you a procedural question, though, Miss Bogart. Because you have separate owners, once you get approval, wouldn't you be able to say we're not going to develop it like the approval, we're going to sell it? Two years from now a new owner could come in and say we're scrapping those plans and building something else.

MR. MOORE: Well, no, because it's all subject to this approval. The approval runs with the land.

MR. CEDZIDLO: Correct, the approval runs with the land, but you can decide, you know what, we don't want to build it this way.

MR. MOORE: Well, then someone would have to come back to this board.

MR. CEDZIDLO: Right. That's what I'm saying. Here's the point that the chairman's making that I just want to address. Because you're not combining the two lots, Morningside at Wallington and New Wallington Homes don't have an obligation to build this. Like right now the presentation is we want to jointly develop these two side by side tracts and we have cooperating interests from New Wallington Homes and cooperating interests from Morningside. Eight months from now they can decide not to be cooperating with each

---

Page 49

other and now you've got approvals for one lot and approvals for the other lot with ingress and egress and --

MR. MOORE: You've got cross easements that are recorded and are conditions of both approvals.

MR. CEDZIDLO: I agree, but people can change their minds and decide we don't want to do it that way and what happens is that the variance granted for this, that you're asking for for this roller rink to remain there, it might never get built this way or the adjoining property owner may not build it this way and now you've got a variance for something that may never get built, right, and that variance --

MR. MOORE: Well, that's true of any approval.

MR. CEDZIDLO: Well, it is, but it goes to the points raised by Mr. Melfi and Mr. Baginski.  This is not a joint development.  Okay.  So you're asking for things that is requesting variances because, well, we're going to do it this way because we're going to cooperate with the other side but you don't really have an obligation to cooperate because it's not a joint development.  Okay.  There's no requirement that they, these adjoining property owners cooperate with each other down the road because you are not combining it

Page 50

into one development.

MR. MOORE: We could make that a condition of the approval with both developments.

MR. CEDZIDLO: Well, again, I think the record should be clear, because Mr. Melfi and Mr. Baginski both asked, can't you eliminate, just if you eliminate this building, can't you eliminate some of the variances so that the property doesn't require, you know, as many deviations from the current zoning code as it is.  Miss Bogart very honestly answered, saying well, yeah, but since we're developing it in conjunction with that, we think from a planning perspective --

MR. MOORE: We checked it while you were, you know, it would eliminate four variances.

MR. CEDZIDLO: Okay.  And from a planning perspective --

MR. MOORE: That's all.

MR. CEDZIDLO: Her testimony is purely from a planning perspective, from a planning perspective we think it's best to have something that's, when you look at the site in total, it's best to do it this way because the Master Plan and zoning code doesn't take into, for every single piece of property, every little single thing that may develop, all of which is 100 percent true and I don't have a problem with her

Page 51

testimony, but it's all based upon the fact that this is going to be a joint development.  Right?

MR. MOORE: Well, it's -- give your name.

MR. HERLINSKY: Victor Herlinsky.  I'm co-counsel with Mr. Moore.

Look, there's a undercurrent that, you know, when I'm talking to the board, we're hearing this, well, you have this building --

MS. BAUMANN: I need you to not speak.

PUBLIC MEMBER: Sorry.

CHAIRMAN BAGINSKI: Thank you.

MR. HERLINSKY: There's a structurally sound very valuable building at that site and one of the amenities that we thought we would provide -- like, you know, the idea of going through the expense to rip down a very nice, valuable building that's there and not have that amenity, just to our, you know, our mind doesn't make any sense.  I know Mr. Melfi, last time when we were here at the meeting, suggested, well, maybe that's something we can include the town with, which we thought was a great idea.  The fact of the matter is, I cannot understand a business idea or even a planning idea of why that building would come down.  To us it doesn't really make, it doesn't make business sense and it doesn't make, in our minds, planning sense, so the idea

Page 52

of what we're doing as far as putting these pieces together, so to speak, and I understand your point, but the point is, if you have something that can be for definitely the betterment of our, our -- the people that are going to live there, on the site, and we've already offered it as an amenity that the town could take advantage of, there isn't that kind of recreation space in the immediate area that we could take advantage of.  Are we going to have another roller rink?  No, we're not.  Everything is in control of this board.  Right now you've got a very specific use, you know.  The number of people that are going to be there are going to have -- you know, think this is great.  We have an indoor gym that, you know, bar none, but the idea of why we would just take it down, I don't understand the reason.  If it's only for, you know, whether it's a height variance or something like this, I mean, there is an advantage to keeping it there in our perspective, unless somebody has a differing point.  The one thing I'll just say to Mr. Cedzidlo as far as, you know, we've been fighting this for a long time.  This was originally an application that we had, it went to Judge Mian, it's now Judge Mian, he's put these residence, the number of apartments on both sites really set in stone, so we're kind of, you know, talking about the different things.  We will

Page 53

address Mayor Tomko's issues as far as, you know, expanding the pavement area, we can certainly do that, but we're really, you know, working on the edges. The idea of what's going there is what we have but, you know, the one thing as far as, you know, to have a real conversation with the board, which I'd hope we have, is, you know, we've been trying to get something built there for six years. It's not like we're going to all of a sudden get our application and, okay, you know, we, you know, we had our first kiss, now we're going to go on to somebody else. That's not how we're working.

MR. CEDZIDLO: Mr. Herlinsky, you're absolutely 100 percent right. This whole track that's been the subject of a builder's remedy suit, you know, and Mount Laurel, going to back to -- when? Geez.

MR. HERLINSKY: We both had more hair.

MR. CEDZIDLO: I don't even know how --

MR. MELFI: I want to say 2008.

MR. CEDZIDLO: I did somehow in the barber shop bring up the prior application that I used to get my hair cut in, that barber shop, because I had hair at that point, but --

MR. HERLINSKY: I don't think I called you Mr. Cedzidlo when this application was still --

MR. CEDZIDLO: I was much, much younger, but

Page 54

we did have a builder's remedy suit, and again, that was, the builder's remedy suit was contentious. The rest, not so much, okay, but if we go back even to the builder's remedy suit, we had an agreement worked out where the tract owners and the owners all said -- we came to an agreement, we said let's settle this with the town, let's get this worked out, let's put a new zone, get everything done. Judge Harris did a great job and I think there was a 20 -- the compromise was 20 unit per acre density. Correct?

MR. MELFI: Umm-hum.

MR. CEDZIDLO: I think that's what it was. Now, this subject site that we're just here for, you know, Morningside, this is a three acre site, I believe.

MR. MOORE: We're actually less than, like at --

MS. BOGART: 3.65 acres.

CHAIRMAN BAGINSKI: 3.650 acres, yes.

MR. CEDZIDLO: 3.65, so we're within the 20 units per acre as part of the zone, correct?

MR. BERTIN: Correct.

MR. CEDZIDLO: But the 20 units per acre on the tract are all against the road, all -- what is it? 60? How many units? I keep getting --

CHAIRMAN BAGINSKI: Well, there's 30 at

Page 55

building six.

MR. MELFI: 73 total.

CHAIRMAN BAGINSKI: Yeah, 73 total. There's 43 in building eight.

MR. HERLINSKY: I will make one point. Mr. Melfi was very correct to point this out. In order to be before this board and to separate the lots, we lost this unit, so if the idea is making it less units, we are coming in here with one less unit than we were approved for --

MR. CEDZIDLO: Right, and I'm not --

MR. HERLINSKY: -- by the judge.

MR. CEDZIDLO: I'm not suggesting that. You are absolutely complying with the density as far as the total property and staying at 20 units or less and everything else, you're actually doing that, but basically, those 73 units are being built on half of the property and the other half of the property is this other building, so the units that are being built are being built, you know, in a very dense space in the front of the property here. Now, again, you don't need a variance because overall, but it's just as far as we're going to build the buildings higher, we're going to go above the -- so now you need variances for height because you're building the, you know, 73 units in a

Page 56

contained area. Right?

MR. HERLINSKY: Yeah, but --

MR. MELFI: If you built these 20 units per acre right now, you're building 40 units on one acre.

MR. HERLINSKY: But we're preserving an open rec space that we will basically offer to the town.

MR. MELFI: Judge Harris' decision back in the day, we all agreed, 20 units per acre, so every acre you have you put 20 units. You got another acre, 20 units.

MR. MOORE: It's overall. When you got -- it's not how it works.

MS. BOGART: Yeah. That's not -- even if, even if --

MR. MELFI: I understand that, but now you want to cram the 73 in, leave the building -- you want to raise the building to get them.

MR. MOORE: But the building is a true amenity to both the development and the township and it would seem to me --

MR. MELFI: Because you don't live here. We have to live here. We have to see this and deal with it every day. You're there representing him, he's representing the owners, she's the planner and he's the architect and everything. You're all gonna get your