BER-L-001670-18   08/30/2018 7:37:18 PM   Pg 16 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08187-EP-AME   Document 142-14   Filed 05/02/26   Page 2 of 13 PageID: 3811
In RE: Morningside at Wallington
Case 2:20-cv-08187-EP-AME Document 142-14 Filed 05/02/26 Page 1 of 13 PageID: Page 3060

| Page 57 | Page 59 |
|---|---|

approval, you're gonna' walk away from town and say, hey, we hit a grand slam, not a home-run, a grand slam in Wallington, you know. Sometimes you can't have your cake and eat it, too.

MR. HERLINSKY: Look --

MR. MOORE: But they're very -- I mean, I think they were very attractive buildings.

MR. MELFI: They're beautiful, and so is Westmount Country, if you saw the original plans for that, gorgeous. What are they? You got a box with brown aluminum siding around the whole thing.

MR. MOORE: Down the line they did Town Center in Robinsville, New Jersey, which is, you know, Central New Jersey.

CHAIRMAN BAGINSKI: Sore subject.

MR. MELFI: Very sore subject.

CHAIRMAN BAGINSKI: Sore subject in this town right now. Robinsville is a sore subject in this town.

MR. MOORE: What, did they beat you in a sport?

CHAIRMAN BAGINSKI: In softball last night.

MR. MELFI: In state finals.

MR. MOORE: Anyway, maybe they --

MR. HERLINSKY: There is a state-of-the-art

you would like us to do something, we've already extended the offer to do that. That's something we can certainly work out and we're committed to doing that.

MR. CEDZIDLO: The important thing is for Miss Bogart, Mr. Moore, Mr. Herlinsky, is that, and it's exactly the discussion, this is an open discussion saying how we do this, should we do that, should we not do this, is it better to do it this way, is it better to do it that way, let's discuss what options there are, you know, what assurances there are that it will be built this way. This is just, you know, questions so we can figure out, is it best to keep the building, is it not best to keep the building, is it best to keep that, because I think the testimony, and trust me, I'm sure I got this wrong, but you're talking about how the people, if it does get developed jointly, both capital and everything else, the adjoining property is going to use that building, as well, correct?

MR. HERLINSKY: No.

MR. MOORE: No. Not at this -- at this moment that's not the plan.

MR. HERLINSKY: To reiterate my point, we cannot --

MR. CEDZIDLO: I thought this was a rec center.

| Page 58 | Page 60 |
|---|---|

indoor softball training facility in there.

MR. MOORE: The type of elevations of our front building, you know, on the main street there, with this kind of quality architecture, which we agree to be bound to conditions of any approval the board should see fit to grant, and it looks great. It looks awesome.

CHAIRMAN BAGINSKI: I don't think anybody is denying that it looks great and awesome, you're right, but now let's also face reality here. Mr. Melfi says oh, two months ago at the meeting, maybe we'll be able to use that facility. Well, what's it gonna take for Wallington to use that facility? What kind of money is it going to cost Wallington to use that facility? Because there's insurances that need to be bought, because your client isn't gonna take liability if somebody gets hurt on that property. Wallington is going to be responsible to pay that insurance. Correct? Obviously you got to protect your clients. He's going to have to have that piece of paper in front of him.

MR. HERLINSKY: I understand, but look --

CHAIRMAN BAGINSKI: Now, and the next thing --

MR. HERLINSKY: But let me, let me, if I can just cut for a second.

You hold the cards, so if you decide that

MR. MOORE: The way your zoning works, it can only be an amenity for this lot.

MR. MELFI: If I'm not mistaken, at the last meeting you testified that the people, if they want to drive in they can drive from the other side of the units and drive around the park to use this as a whole complex.

MR. MOORE: No. He was talking, he was talking about driving from the buildings to the Yoga center on this lot.

MR. HERLINSKY: They cannot, because as far as what we have decided what we're going to do, we're going to have card key access and it's only going to be for the residents of this property.

MR. MELFI: Of the 73 units.

MR. HERLINSKY: 73 units, that's it. As far as any other usage, this board has complete control over that. We cannot extend it for anything else or we'd be violating any approvals we get and violating your ordinance, so the fact of the matter is it's for 73 people, 73 people are going to have one of the best amenities they can possibly have.

MR. MELFI: You forgot the wives and the kids.

MR. HERLINSKY: Excuse me.

Page 61

MR. MELFI: You forgot the wives and kids. You said 73 people. You forgot the wives, the boyfriends, family, kids.

I would like to let her finish her testimony here.

CHAIRMAN BAGINSKI: Yeah. I was --

MR. HERLINSKY: I hear you, but look, if this is going to be an issue I think it's important that we engage the town and decide if this is something that you would engage with us as far as what would be best for everyone.

CHAIRMAN BAGINSKI: We'll let Miss Bogart finish her testimony and we'll revisit this issue, because I'm sure there will be some questions from the public out there that will come up and maybe she'll have an answer, be able to answer, and for the architect and engineers and everybody, so let's let her finish. I believe she's your last expert witness, right, for tonight?

MR. MOORE: Then we'll address the Neglia report.

CHAIRMAN BAGINSKI: Miss Bogart, sorry to cut you off like that. I apologize. We'll let you finish your report.

MS. BOGART: No worries. I got to take a

Page 62

deep breath.

So as our attorney had indicated, there are four variances that would be removed if we remove that building. One is open space, which is a technical variance because we're providing recreational space. Second is the building length, and that's also a technical variance because we have that building attached to the new multi-family building. The two important variances that would be removed are building coverage and lot coverage, and really, we're talking about five percent of the entire lot that would be the variance that would be removed. I think from a planning perspective, this board needs to review the benefits of providing a public recreation amenity versus a five percent coverage variance, which is minimal, and the only reason it's five percent is because we did it with an existing facility, so I think from all those perspectives, the board needs to look at keeping that building and the benefits of keeping that building versus any detriments.

So before all this came up I was about to get into the expected school children. So Rutgers has a study, which is a little bit outdated, but has a study that provides for a ratio for school children per multi-family development. If you look at the Rutgers

Page 63

School Hupa Study, it indicates that approximately 13.8 school children would come out of this facility, this project. Of that, 11.7 would be public school children. As I mentioned, this study is outdated and I've done a number of studies throughout Bergen County on my own, OPRA a number of Board of Educations throughout the municipalities in Bergen County and what it seems to be is in northern Bergen County, it's .07 children per unit is the average in Bergen County. If you applied that to this project, you're looking at about five school children. So if you look at my studies, and I can give you the municipalities and the studies I did and the data I did, I believe that the project itself will probably generate between five to 11 school children.

MS. WYGONIK: I have a question. So out of the 200-something units that would be -- are you just talking about this one?

MS. BOGART: Just the 73.

MS. WYGONIK: Okay. So even out of 73 units there will only be 13 children, school children?

MS. BOGART: 13 school aged children, of which approximately 11 would be public school children, and if you look at actual data that I've compiled it's probably going to be a little less than that.

MS. WYGONIK: To be -- I don't know. Just

Page 64

thinking about it, 73 families are going to come and live there but there's only going to be 11 children or 13 children?

MS. BOGART: Yeah.

MS. WYGONIK: That seems very low.

MS. BOGART: Like I said, I could provide you the data that I have. I've done, I've done it personally. I've done OPRA requests to municipalities throughout Bergen County. I have the data, the actual data from existing multi-family developments throughout northern Bergen County and I can provide that to you.

MS. WYGONIK: Okay. I mean, you must have your facts and data. I don't -- I'm sure you did your research, but just thinking logically, to me, it doesn't make sense.

MS. BOGART: Well, I --

MS. WYGONIK: 73 families, usually two children, I'm not saying every family has children, but usually two, three children per family, out of 73 --

MS. BOGART: No. I understand that and that's why I've done so much research, because it doesn't make sense, and when you start to look at the -- and everybody questions it. No matter where I am, everybody questions it. Whether I'm on your side of the dais or on this side, everyone wants to know what the

In RE: Morningside at Wallington

---

Page 65

real facts are and that's why I've done so much research and I have the data and I said I could provide that to you.

MR. MELFI: I have a question on that.  You said you OPRA'd many towns and municipalities regarding this?

MS. BOGART: Yes.

MR. MELFI: Have you OPRA'd to see what our ratio is in the three major complexes, as far as Mount Pleasant Village and then --

MS. BOGART: I have.

MR. MELFI: How many units -- maybe you can explain that to the public.

MS. BOGART: I have, and the board of ed said they don't keep that data and they didn't get back to me.

MAYOR TOMKO: What towns in this south Bergen area have you OPRA'd, because, you know, historically Route 4 is the Mason-Dixon line and we cannot compare with upper Bergen County.  Things are different.

MS. BOGART: You're talking to a girl that went to North Carolina.  It's not the Mason-Dixon line.  Let's see.

MR. CEDZIDLO: Miss Bogart, let me just --

---

Page 66

building six has 15 two bedrooms?

MS. BOGART: Yes.

MR. CEDZIDLO: And building eight has how many two bedrooms, and then three three bedrooms?

MS. BOGART: I have, in total, 40 one bedrooms, 30 two bedrooms and 30 three bedrooms.

MS. WYGONIK: 30 two bedrooms?

MR. CEDZIDLO: So there's 30 two bedrooms and three three bedrooms?

MS. BOGART: Yes.

MR. CEDZIDLO: And your -- see, the one bedrooms I can understand, you know, the argument that there's not going to be any school age children in a one bedroom apartment, but you're talking about a lot of two bedrooms and several three bedrooms, which has the potential for 30 bedrooms, you know, over 30 bedrooms, 35 bedrooms where somebody other than the person paying the rent can have a child.  Could be as much as 30, right?

MS. BOGART: I agree with --

MR. CEDZIDLO: Statistically it may come out to five and 11 but you've got over 30 second bedrooms in this complex, right?

MS. BOGART: I understand completely, and like I said, that's why I've done so much research in

---

Page 67

this area.  The record numbers show it's .09 for every one bedroom and .30 for two to three bedrooms, which equates to 13.8 for school age children.  The difference here is elevators serve buildings.  Once kids hit school age, the families don't want to live in elevator service buildings, they don't want the kids to run down the elevator to play outside by themselves.  They want garden apartments, they want to be able to, to see them outside, so it changes.  The amount of school children you see for elevator shared buildings is substantially less.  You don't want kids in, you know, in apartments where you can't see them play, and I'm a mom of three, I get it.  Like, you don't -- you want to be able to see them go out and walk out the front door or in the backyard, so if you live in a building that doesn't provide that, the number of children generated drops substantially.

MR. CEDZIDLO: My office is one block from the George Washington Bridge in Fort Lee and I live in Edge Water, along the waterfront, and every building with an elevator in it is more occupied by people in walkers than people with kids.

MS. BOGART: Yes.

MR. CEDZIDLO: Buildings with elevators are dominated by people 60 and older who need the elevator

---

Page 68

to get up and downstairs.  Walkers, wheelchairs, everything else.

MS. BOGART: So you agree with me?

MR. CEDZIDLO: There's credence to exactly what you're saying.

MS. BOGART: Yes.

MR. CEDZIDLO: Like I said, I understand that from personal experience, but where my office is in Fort Lee, everybody knows all the housing, that's all the glass towers that are being built, you know, next to the George Washington Bridge, they're 47 stories high.

MS. BOGART: And I've worked on many of those projects.

MR. CEDZIDLO: All of Edge Water is under construction and all the buildings with elevators are the more expen -- not only that, they're more expensive buildings and the rent is high so they're, you know, people 45 or 50 and older who are occupying those buildings.

MS. BOGART: They're not moms and dads.

MR. CEDZIDLO: They're not 25 and 30-year-olds.

MR. MOORE: We're marketing this more towards professionals, aren't we, really?

MS. BOGART: That's what it is.  Like I

---

**Rizman Rappaport (973)992-7650**
**Let Our Fingers Do Your Talking**

Page 69

said, moms don't want kids running out, I want to go out and play, go take the elevator downstairs and see what happens. That doesn't happen, so the numbers seem low but it's a different market, it's a different project.

MS. WYGONIK: I have a question. What do you define as school age children? Kindergarten through eight or kindergarten through high school?

MS. BOGART: Through high school.

MS. WYGONIK: Through high school, okay.

MR. MOORE: Can I move Miss Bogart to her variance testimony so we can get through this tonight?

CHAIRMAN BAGINSKI: Yes, please.

MS. BOGART: The school aged children would be an issue but I hope you understand where I'm coming from and all the data.

MAYOR TOMKO: I would just like to say I hope you understand where we're coming from, because we are, and I don't want to use the term gun-shy, in a sense, but we're so apprehensive because we see what other complexes have produced. We have a very problematic school situation right now and, you know, we don't know what's in sight for the future. Everything, everything we're going through and planning is like the domino affect, it's hinged on everything we do and, you know, we're worried about this. This is a big problem.

Page 70

I respect your research. I question it, but I respect your research and all and, you know, it makes us very apprehensive on a lot of these things because, you know, we just picture the worst scenario. Three bedrooms, five, six kids coming out of there, packing them in. Like, you're saying you're looking for --

MR. MOORE: There's only three units, though, and that's because the affordable housing requires you to do that.

MAYOR TOMKO: Right.

MS. BOGART: And those three affordable units will have the most kids out of this entire complex, that's known, and I completely appreciate your apprehension and your questioning, because I represent two municipalities that have their own school districts that have the same concern. Borough of Park Ridge and Borough of Emerson, they have very tight facilities with regard to education and they go through the same painstaking issues every time they have a development application, so I get that.

MAYOR TOMKO: Well, whatever pains they have, we have ulcers.

MS. BOGART: Exactly. I get it. I understand completely and that's why I've done all the research and I'm trying to provide you the most current

Page 71

and accurate data I can, because I don't want to be the planner that three years from now you say that planner came in and supported that project and all of a sudden we've got 100 school children and she's awful.

MAYOR TOMKO: And we have your name.

MS. BOGART: Yes. Exactly. Everyone's got my name. I don't want to be that girl.

CHAIRMAN BAGINSKI: I don't want to cut off the conversation.

MAYOR TOMKO: I know. I'm sorry.

CHAIRMAN BAGINSKI: Let Miss Bogart finish her testimony so we can continue moving on.

MS. BOGART: But you understand what I'm saying?

MAYOR TOMKO: Yes.

MS. BOGART: Okay. So the next portion of my testimony, I wanted to talk a little bit about your local Master Plan, because I think you've all understood that I really take into consideration your local concerns, your local impacts, your local zoning regulations, but I think most important is your local Master Plan goals. I reviewed your 2006 Master Plan, your 2008 Housing Plan and your 2013 Master Plan and I think that a lot of the goals and objectives in those documents pertain to what we're proposing this evening.

Page 72

So first and foremost, the 2006 Master Plan talks about channeling developments for maximized benefits of Wallington's present and future needs, to preserve the tax base of the community by fostering the diversity of rateables. Obviously this proposal will increase rateables within the township. To preserve the tax based community -- excuse me. To provide a variety of community facilities that will meet the needs of various borough age groups, and that's what we're proposing to provide through the existing facility that we're proposing as a borough recreation facility. To provide adequate housing to meet the needs of the existing population, and obviously not only we're proposing a diversity of housing with multi-family, but also because we're providing affordable units, I believe that we're providing adequate housing to meet the needs of the existing population. And then lastly, to provide diversity of housing to meet the needs of all age groups, income levels, sexes, minorities, handicap and variety of size housing, size facilities -- families. Excuse me. For all those reasons I think our project meets all the goals and objectives in your 2006 Master Plan. Again, as the chairman had indicated and a number of board members indicated, we are providing a project that is completely compliant with your 2008 Housing

In RE: Morningside at Wallington

---

Page 73

Plan. The Housing Plan suggested that the PRML zone be adopted, which is what we are applying under, and we're complying with that, minus some minor modifications with regard to coverage and the rear yard setback. The 2013 Master Plan talked a little bit about modifying the plan's commercial zone but it really didn't have anything to do with our site. So a review of those plans for the last 11 years and the goals and objectives that the planning board had indicated, I believe that our proposal is completely on point to the planning objectives of this municipality. With regard to the zoning ordinance, as I mentioned, we are, and as this board knows, we are in the PRML zone district. It was rezoned to create multi-family density at 20 units per acre. We are at 20 units per acre. The ordinance permits the construction of not more than 208 units. We are at 207. We are providing a 20 percent set aside, 15 were the two bedroom units, which will help in the completion of the borough's Housing Plan, so we meet all those objectives of the Housing Plan and the PRML zone district. Not only that, we meet the fact that we comply with the permitted uses, we comply with the accessory uses, we comply with the minimum lot size and we comply with the maximum density requirements, all set forth in 365-25 (a), (b), (d) and (e) of your zoning

Page 74

ordinance, so we are completely consistent with your Master Plan documents and your zoning documents. Where we deviate is, as I mentioned to you, with regard to the rear yard setback. As I indicated on the plan, it's actually a technical deviation because we are really just violating the setback based upon an internal lot line. We are 22 feet. We're over 25 feet required. However, your zoning ordinance suggests that it could be reduced to zero if our planned development with the two lots, 35.01 and the 35.02, which is what we're suggesting here tonight, and there started to be a dialogue with why can't we be developed as two lots, and I think we can and I think this board has a right to require that we develop in accordance with the plans submitted. I know that there was some apprehension or questions with regard to, well, how does this happen, how do we acquire it, how do we maintain that, but you have a right to do that. You can say that the plan needs to be developed in accordance with what was submitted and you can make our conditions, our approval conditioned upon those approvals, like what we submitted. So I think from those perspectives, the board's concerns could be answered. Like I said, the zoning ordinance says that a rear yard setback can be reduced to zero and we're at 22 and it's an internal lot

Page 75

line. Not only is it an internal lot line but we also have the river and the natural grading between the two lots that add additional buffer. I believe that the granting of the variance doesn't substantially impair the intent and purposes of the zone plan, because the zone plan suggests that zero, but rear yard setback is appropriate, particularly when we're looking at a uniform site plan. Additionally, if you're looking at the two lots together, there's really minimal impact. What we suggested was a buffer to the south to the adjacent multi-family, but really, the whole key here is to coordinate the development between the two lots to make sure that the circulation works between the two lots, and the engineering, the circulation between the two lots is what creates the need for the variances that we are requesting this evening. Technically, we could request the variance for the rear yard setback based upon a (c)1, based upon the criteria, that exceptional narrowness, shallowness and shape of property, or by reason of exceptional topography conditions of physical features thereon. I believe that this is appropriate for this site based upon not only the lot lines, but also the shape of the property and the existing conditions, not only the existing building but also the buildings that were approved on the adjacent lot. We

Page 76

are meeting the density requirements and if the ordinance allowed we could go up, add a story and reduce the setback requirements, however, that's not the case here. What we're doing is looking to provide for the permitted density on site and just modify the setback slightly. I believe that for a (c) variance we have to talk about the purposes of the Municipal Land Use Law. With regard --

MR. MOORE: On the (c)1, did you want to talk about the negative criteria on the (c)1 for this one or are you going to do (c)1 and (c)2 for the same --

MS. BOGART: Yes. I'll do the negative criteria together.

MR. MOORE: Okay. Great.

MS. BOGART: So if we were suggesting that the setback variance could be granted under a (c)2, we have to talk about the positive and negative criteria, and the positive criteria is what purposes the Municipal Land Use Law are, and I believe for the setback variance there are four purposes, further purposes, (a), municipal action to guide appropriate use in the development of all land in a manner --

MS. BAUMANN: I'm sorry. Appropriate?

MS. BOGART: Appropriate use in the development of all land in a manner that will promote

---

Case 2:20-cv-08178-EP-MAH Document 142-14 Filed 05/02/26 Page 6 of 23 PageID: 33861065

In RE: Morningside at Wallington

Page 77

the public health, safety, morals and general welfare. I believe that the proposal that we've identified and laid out for you is the most functional layout for the property, given the existing development or the approved development on the adjacent lot and the adjacent building. I believe it allows for the most functional layout of the entire site. It allows for building six to move and be centered on site so that when you drive down the aisle you're actually looking at the center of the building. It allows for a sidewalk along building six to connect to all the other buildings, as well as the recreation facility, as well as the gym and Yoga facility to the center, so with all those perspectives I think that the layout itself of the entire site meets and furthers purpose (a) of the Municipal Land Use Law. The next purpose is to promote the establishment of appropriate population densities and concentrations that will contributes to the well-being of persons, neighborhoods, communities, regions and preserve the environment. As you heard from my testimony, the density being proposed is permitted by ordinance and also permitted by your Master Plan. All we're looking to do is make sure that the site layout works, not only with the adjacent facility but also the existing building, so I think it serves that purpose. The next

Page 78

purpose is to promote desirable, visual environment through creative development techniques and good civic design and arrangement. As this board has heard and seen and can sort of attest to, based upon the existing conditions, the proposal rehabs the existing facility, tears down the existing building in the front that needs rehabilitation, rehabs the existing rink and creates a great new facility for recreation and not only that, creates brand new housing facilities and affordable housing, so I think from those perspectives it meets the purpose of promoting a desirable visual environment. Lastly, purpose (o), to provide for development of balance housing supply, and that was identified in your municipal Master Plan and this project provides for the much needed affordable housing in your community, so I think from all those perspectives we advance the purpose of the Municipal Housing Law by --
    MR. MOORE: Land Use Law.
    MS. BOGART: -- Municipal Land Use Law by granting the variances that are requested. There are a number of benefits to granting the setback variance. Not only are we providing housing, providing a variety of housing choices for the residents, we're providing affordable housing for moderate income residents. We are buffering 3. -- Lot 35.02 in Saddle River. The

Page 79

proposal is part of a union required site plan application and, unfortunately, because we need a number of variances, it's all due to the fact that we are trying to create the most appropriate engineering plan for this site. The subject parcel is consistent and the proposal's consistent with the development pattern, as you can see from the exhibit that I had submitted to you this evening. I don't believe there are any detriments to this application. From this board's perspective in weighing the setback variance, you need to look at the benefits and all the benefits of furthering the Municipal Land Use Law purposes, furthering your Master Plan purposes. Again, any detriments, I don't believe there are any detriments. I believe the benefits completely outweigh all the detriments. With regard to the negative criteria, two things that as a Professional Planner I need to discuss is how the project has a detriment to the public good, and I dont believe it does, because all the impacts, if any, are internal and they're internal because of the fact that the two sites are being developed together. There's really no public impact. I believe the size of the property can support the current design and the multi-family development really fits into this site and fits into your Master Plan. The second portion of the negative criteria, I

Page 80

have to prove there's no substantial detriment to your Master Plan or Zone Plan and I don't believe that is so, because that is exactly what your Master Plan or Housing Plan calls for, is this development, this density on this site. Yes, we need certain minor variances, but they're all due to the fact that we're trying to make this site work better from an engineering perspective, so from all those perspectives I believe that the benefits outweigh the detriments and we meet the negative criteria for the setback variance.
    I told you this was going to be boring. My attorney is not even listening to me.
    MR. MOORE: Yes, I am. I'm going through this. I'm right up with you.
    MS. BOGART: He's boring, too.
    MR. MOORE: I am boring.
    MS. BOGART: The next variance or two variances pertain to minimum building setback and there's two sections of the code that indicate that. One, Section 365-25 (g)1, minimum building separation, no less than 20 feet separation side by side or side to front or side to rear, and Section 365-25(g)2, no less than 40 feet front to front, front to back or back to back, so we need two variances from your section, one with regard to building six and one with regard to

Page 81

building seven and eight. Two separate issues here. Building six, which is this building, which requires the rear yard setback variance, needs a setback variance from building five and building three and the reason it needs the variance is because we're trying to propose the drive aisle to the rear and we're trying to provide buffering and landscaping on the property line. Not only that, we're also trying to propose a sidewalk that would connect the building to the rest of the site. So again, as I started to mention to you, with regard to the rear yard setback, it's all about engineering and how to make this site work as a whole, and yes, we need a setback variance, but we're trying to move building six so that the entry is in the middle of the driveway aisle. We're trying to make sure it has appropriate pedestrian access and it has appropriate driveway access, so technically we need minor variances from that, from the regulations, but I think this is the most appropriate engineering design. We also need building setback variances for building seven and eight. Building seven being the existing recreation facility and building eight being the new residential facility. This is a technical variance because they're really not connected, but because they are side by side we need a separation variance for those. I don't believe that the

Page 82

granting of the variances for either building six, seven or eight substantially impair the intent and purposes of the Zone Plan or Master Plan, because this is a unique situation for this site and because we are preserving that existing building. I believe that the deviation can be granted because the proposed building location and the reuse of the existing roller facility is a better zoning alternative than the existing zoning requirement of the ordinance. If we were to take down that building you would probably still need some separation regulations and this part would not have the benefit of a new recreation facility as we're proposing this evening.

    MR. MOORE: Miss Bogart, that, that better zoning alternative analysis also applies to the prior variance you were talking about, as well, with the building setback, too, doesn't it?

    MS. BOGART: That's correct.

    MR. MOORE: Thank you.

    MS. BOGART: I believe that the walkway and the additional landscaping that we're proposing, the less impervious coverage, the more open space, the better circulation for the ring road around the property, they're all benefits to the variances that we're requesting this evening with regard to building

Page 83

setbacks, and from a planning perspective and being a planner on one side where you create a Master Plan, you create the zoning regulations for a property, you can't determine how it's all going to lay out in the end. The zoning regulations are first and foremost, but when you actually start to lay out a property and determine what's best, I'm sorry, for the development of the property, things change, and so that's what this board is here for, to look at why things change and is it a benefit to the development and how that benefits the development, is it more appropriate than what was originally contemplated, because when you create zoning regulations you don't have a full engineered type plan. So from all those perspectives, I think that the benefits of this actually engineered site plan are much better than what was originally contemplated when you create the zoning regulations. So with regard to the building setback variances, again, there are a number of Municipal Land Use Law purposes that are furthered. Purpose (a), municipal action to guide appropriate use and development of all lands in the manner that will promote the public health, safety and morals and general welfare. I believe that this development is more appropriate than originally contemplated based upon the fact that it's fully engineered and it has more

Page 84

appropriate circulation than could be contemplated without a fully engineered site plan. Purpose (e), to promote established -- promote establishment of appropriate population densities. Again, we are promoting a development that has a population density that is consistent with your zoning ordinance and your Master Plan, Housing Plan. Purpose (g), to provide sufficient space and appropriate locations for a variety of uses, including residential. Your Master Plan indicated this is the most appropriate place for a residential, not only residential but multi-family residential and affordable housing. Purpose (j), to promote concentration of Historic District sites, open space and valuable and natural resources in the state, and I think that the preservation of this existing recreation facility is important, and of course creates variances for us, but obviously it's important to provide for a couple reasons. Purpose (i), to promote a desirable visual environment with the development techniques, civic design. Yes, we need setback variances, but they're all due to the fact that we're trying to create appropriate walkways throughout the site, appropriate landscaping and appropriate buffers and an appropriate vehicle of design, so I believe from those perspectives it meets and furthers purpose (i).

In RE: Morningside at Wallington

Page 85

Purpose (m), encourages development of various public and private procedures and activities shaping land development, basically lessening the cost of such development and more efficient use of the land.  I believe that this municipality identified that this is the most appropriate site for multi-family housing and it's the least, or the most cost-effective to provide it here, and that's what we're doing, so the coordination of both the public and the private developer to make sure that we have appropriate development is what we're trying to achieve here, and from those perspectives I believe we meet purpose (m).  And lastly, purpose (o) is to provide development bonds housing supply, and again, as I mentioned to you previously, I believe we're addressing that based upon your Housing Plan.  Those are the purposes of the Municipal Land Use Law we further.  Lastly, I just want to get into the benefits of granting the variances for the separation of buildings.  First of all, I believe that the proposed separation distance allows for, as I mentioned to you, the appropriate internal circulation not only from the vehicle perspective but also pedestrians.  It allows for that internal ring road, it allows for buffering, it allows for the internal sidewalk that goes to the adjacent buildings and it allows for the site to work as a whole,

Page 86

and I think from an engineering perspective, as you heard, that this is the most appropriate layout for the site.  Also, the benefit is to provide for additional recreation opportunities for the residents.  It allows for the existing recreation facility to be on site and to be rehabbed, but also, it allows for a pedestrian connection to that recreational facility.  It reduces impervious coverage and provides for open space, so from all those perspectives I believe the benefits of granting the variance for this building separation outweighs any negatives.  Lastly, addressing the negative criteria, I believe that converting the roller rink and reusing it will have no negative impact to the surrounding community.  In fact, I think it will have a benefit.  By removing it, you're really taking part of the character of the community away.  It allows for a rink that has existed for a number of years to remain and to be incorporated into a new environment and be a public use, so I think that by allowing that to remain is a huge benefit from a historic perspective.  Unfortunately, as I mentioned to you, we need a number of variances based on the fact that we're keeping it, however, we also have benefits.  We are providing appropriate circulation.  We're providing appropriate parking areas.  We are making sure that there is

Page 87

additional parking in and around the new recreational facility, and unfortunately, we do need distance variances, but the reality is from an engineering perspective it all lays out really well, so from all those perspectives I don't believe there's any public impact.  In fact, I think there's a public benefit because we are providing a public facility.  We don't believe there's any impact on the Master Plan perspective because it calls for open space, recreation and multi-family on this site.  I believe that, lastly, what we are proposing from a building separation perspective is a better zoning alternative than the existing requirements because it allows for the recreation opportunities and it allows for a variety of housing choices, and also provides for appropriate internal circulation and sufficient parking on site.  It also allows for appropriate pedestrian circulation on site and improves, actually, on site circulation which is a requirement.

So that's all my testimony with regard to building setbacks.  I've got --

MR. MOORE: Building height?

MS. BOGART: -- building height variances to address.  I know it's --

CHAIRMAN BAGINSKI: Your testimony for

Page 88

building height is going to be just as long as it was for setback?

MR. MOORE: Pretty much, and we've got a lot of others, too.

MS. BOGART: I've got --

MR. HERLINSKY: If I can make a suggestion, I see these poor woman that are typing away.  Give them a five minute break?

CHAIRMAN BAGINSKI: Well, what I was going to suggest is we'll continue her report next month, open it up and hear the citizens for now on any testimony that was heard, for a little while, so we can -- at least they can speak and voice their opinion.  Maybe there will be some questions that will be valid, and then we'll come back next month and continue, and we have some reports for Mr. Neglia yet.  It's not like we're going to be voting on this application today.

MR. HERLINSKY: I would say the chairman always knows best.

CHAIRMAN BAGINSKI: I definitely agree, let's take a five minute recess, let the ladies get a drink of water, rest their fingers.  When we come back we'll hold your report until next month.  At that point in time we'll open the hearing to the citizens, whatever questions come up.  This way maybe for next month we can

BER-L-001670-18   08/30/2018 7:37:18 PM   Pg 24 of 48 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME   Document 142-14   Filed 05/02/22   Page 9 of 13 PageID: 3891

In RE: Morningside at Wallington

Page 89

address them and then do what we need to do about that. We'll take a five minute recess. We'll come back here at five after.

(A brief recess was taken.)

CHAIRMAN BAGINSKI: All right. We'll try to get restarted now.

All right. As I said before recess, we'll continue with testimony afterwards, next month, at the next meeting. Our Neglia Engineering representative has some testimony, also, but we'll hold that over till next month.

At this time I'd like to open it up to hearing the citizens. If anybody has any questions about anything that was discussed to this point, we'll take some time, we'll discuss some of it, bring out the questions and it will be opened up again next month for the citizens. It's not just a quick little brief thing. Everybody's opinion is valuable here. Let's open it up to hearing the citizens at this point in time. What I'll have you do is step forward.

MS. KAPUSTA: I got a big enough mouth. I was a cheerleader. I know how to project my voice. Believe me, I still know how to do that.

MR. MOORE: Can you do a cartwheel for us? It was a boring night.

Page 90

MS. KAPUSTA: I'm not dressed for a cartwheel.

BRENDA KAPUSTA, having been first duly sworn according to law, testified as follows:

MS. BAUMANN: May I have your name and your street address?

MS. KAPUSTA: Brenda Kapusta, 90 Allwood Street, Wallington, New Jersey. K-A-P-U-S-T-A. It's Polish, Polish as you can get.

You're talking to us about, that only 13 kids are going to come out of all of those affordable housing. Okay. Affordable housing, have you done any studies in just Wallington itself to see what our affordable housing that's already here has in it? And I'll take an example. The nice little complex that's next to where you're building there -- can you guarantee us that they're gonna have a one bedroom house, one kid in a one bedroom? Can you guarantee us they're not gonna have more than four kids in a one bedroom with two adults? Cuz it's happening in the complex next door. What guarantees are you gonna give the residents of Wallington that 208 units aren't gonna produce 500 kids in our school system? And when you say affordable housing, you're saying 13 kids in that whole thing, it's not gonna happen. What guarantee can you give us

Page 91

residents that are going to have to deal with all the extra children in the schools and everything else? On a second side, you're talking about the roller rink and only opening up to the one side, not letting the other side, but yet allowing the Wallington residents to use it. What guarantee are you gonna say that in a year you're not going to let any Wallington residents use it and that the other side isn't gonna get in there and use it?

MR. MOORE: That will be a condition of the approval, so that we would lose our Certificate of Occupancy or be able to have Notices of Violation, so that part is easy.

MS. KAPUSTA: But if nobody is monitoring it how do we know?

MR. MOORE: Somebody can just drop a dime.

MS. KAPUSTA: We know how well dropping a dime works with illegal homes and too many people and families and overcrowding in one bedroom apartments, we know how that works. So what kind of guarantees can you give the residents of Wallington that you're building all these nice new buildings and you got all these affordable housings that a two bedroom is only going to have one or two kids and then an adult? Again, did you go and look at the housing in Wallington or in the

Page 92

neighboring towns? We all know what goes on. We know a one bedroom just doesn't have one family in it. It has multiple kids. What guarantee can you give the residents of Wallington that only 13 kids are gonna come out of that thing? And I'm not saying your study. Did you check around just in Wallington how many houses are one bedroom and have four kids coming out of them? What guarantee can you give to us that your study is going to actually only keep out 13, under 20 kids in there?

CHAIRMAN BAGINSKI: Okay. Miss Kapusta, is there any other questions that you have?

MS. KAPUSTA: No.

CHAIRMAN BAGINSKI: Okay. Because you asked the same question 10 times, so let her answer it now.

MS. KAPUSTA: I know, because we've all been talking about it.

CHAIRMAN BAGINSKI: Let's let them try and answer it now.

MS. BOGART: So as I mentioned to you, I did the study with regard to the Rutgers numbers and the standards and I also did my own study with regard to existing developments in Bergen County and I am sure, based upon those studies, that it's probably between five to 10 kids. That being said, I also tried to do a study within Wallington itself, because as you heard

Page 93

from my testimony, I'm very concerned about the local impact, and I did do an OPRA request to the local Board of Ed and they said they didn't maintain those records, so I was not able to identify that from a local perspective. But from a Bergen County perspective and other municipalities, I can tell you that these six or seven municipalities have an average school child per unit ratio of .07, particularly when you look at elevator serviced buildings, so I understand. I can't guarantee my numbers are exactly correct in Wallington because they won't give me that information. What I can tell you is all the information that I have gathered throughout Bergen County is completely accurate, between five to 10 kids, and that has been true for new developments within the last 10 years. All I can do is give you the best information that I gathered.

MS. KAPUSTA: When they go into this housing units will there be somebody monitoring the number of people in each unit or the number of kids, not to overload them?

MR. MOORE: Well, there's legal per -- I mean, there's legal things about how many people you can, you know, have occupy a unit. Again, that's code enforcement.

MS. BOGART: The good news with regard to

Page 94

the affordable units is that they have to be monitored. It is -- there are a specific number of occupants per one bedroom, per two bedroom, and that's not true for all the other units in town, so the state requires that all affordable units be monitored, that you can't have more than a certain number of occupants per bedroom, so that actually is a benefit to this with regard to the issues you're talking about.

MS. KAPUSTA: Okay.

CHAIRMAN BAGINSKI: Thank you, Miss Kapusta. Anyone else wishing to be heard? You can step forward.

MELISSA DABAL, having been first duly sworn according to law, testified as follows:

MS. BAUMANN: State your name and your address.

MS. DABAL: Melissa Dabal.

MR. MOORE: You know what, why don't you sit here and use the mic.

MS. DABAL: Okay. Melissa Dabal, D-A-B-A-L, 66 Mount, M-O-U-N-T, Cedar Avenue.

My questions are mainly for Mrs. Bogart, Ms. Bogart.

CHAIRMAN BAGINSKI: Melissa, could you pull the microphone closer so this way we don't have --

Page 95

MR. CEDZIDLO: I don't think that works.

MS. DABAL: How's that? Better?

CHAIRMAN BAGINSKI: That might be the one that's shut off.

MS. BOGART: Here, we can share.

MS. DABAL: So do you have any studies post-development build that could corroborate or substantiate anything that you had predicted in terms of number of children coming out of those developments?

MS. BOGART: So all my studies that I mentioned are post-development. They're all actual developed units and all actual information provided by the Board of Ed of those municipalities.

MS. DABAL: And those municipalities were in northern Bergen County and even though technically we're in northern Bergen County, like the mayor's comment, so to speak, can you just give me a quick example of the two municipalities that maybe you did studies on?

MS. BOGART: The Village of Ridgewood and the Borough of Park Ridge.

MS. DABAL: Okay. So those are highly affluent towns.

MS. BOGART: Ridgewood, yes. Park Ridge --

MS. DABAL: Yes. Well, I mean, much more affluent than we are.

Page 96

MS. BOGART: I don't know that.

MS. DABAL: Well, I do. I work there and my sister lives in Ridgewood, so I do know.

MS. BOGART: Okay.

MS. DABAL: Usually apartments in more affluent areas, young, let's say millennials will move in with children and I don't think that they stay there for a very long time. I think they tend to want to buy a home because they don't want to keep children in an apartment. Here it's very different. We have a lot of people in apartment complexes that have a lot of children and for a very long time, I'm very involved in the school system, year over year we have larger amounts of children incoming into the school systems. For instance, this year there was a high school class that had upwards of -- I'm sorry. Middle school upwards of 30 children. There was a grammar school class two years ago upwards of 28 children. Again, you know, I know you can't give guarantees but this is a massive impact on this town. It's massive for us. We all own homes or we rent. We live here. I'm very, very concerned and highly disappointed that -- and I'm not pointing the finger at anyone. Please don't misunderstand me, but that there was not greater planning for the number of children that could come out of this development. We

Page 97

have three very large apartment complexes in town. We also have one going up on Paterson Plank Road. I don't know where we're going to put these children. I go to Board of Education meetings and the officials at the Board of Education level don't know where we're going to put these children. My heart is breaking. Are we going to put them in the hallway? I don't know what anybody could do and I don't have the answer.

MS. BOGART: May I?

MS. DABAL: Absolutely.

MS. BOGART: So my response is sort of twofold. One, your Master Plan and zoning ordinance allows for this. It's not like we're looking for any -- your Master Plan and zoning ordinance allow for it. We're not allowing or requesting any increase in density or any more units than what the governing body has already decided is appropriate for this site. We're not looking to provide anything more, any additional families than what was planned by this municipality. That's number one. Number two, I understand your comments with regard to school children completely, but the other side of that is if you look at Ridgewood, people are looking to rent there and pull in school children because they think the school system is the utmost be all of school systems ever, so while you say

Page 98

that people come in and rent and pull all school kids in there and stay there for a while, it's the same scenario in any town regardless of the income level.

MS. DABAL: But the number of apartments here far exceed anything in Park Ridge, anything in Ridgewood.

MS. BOGART: Ridgewood has about 700 apartments.

MS. DABAL: I'm gonna guess -- Nick?

MR. MELFI: Off the top of my head -- we were just trying to figure that out.

MS. BOGART: Over 700 apartments. I think there was about 850, so it's very similar.

MR. MOORE: I'd just like to clarify one point and -- two points. One is that, one of these projects was already approved, regardless of whether or not this project gets approved or the amendments get approved, so we're talking here about 73 units, not about 208 units.

MS. DABAL: I wasn't -- I know that was -- you know, part B is to your point. I don't really understand the full scope of the project. I mean, I understand the redevelopment part but there's 200 -- what did you say -- 207 apartments?

CHAIRMAN BAGINSKI: 207.

Page 99

MS. DABAL: And 74 are affordable?

MS. WYGONIK: Total, 207.

MS. DABAL: Total, 207.

MS. BOGART: The proposal today is just talking about 73.

MS. DABAL: And what is the breakdown in terms of bedrooms? Anybody know a high level off the top of their head?

MS. BOGART: 41 one bedrooms.

MR. MOORE: Mr. Raker testified to that earlier. He can reiterate that.

MR. CEDZIDLO: 40, 33.

MS. DABAL: Yeah.

MR. CEDZIDLO: 40 one bedroom, 30 two bedroom, three three bedroom.

MR. MOORE: Correct.

CHAIRMAN BAGINSKI: Now, again, to clarify, this project, this was a project that, the original one, when it came up, was denied by the planning board and it went to the Courts of Hackensack and at that point in time it was the -- Judge Harris was the judge?

MR. CEDZIDLO: This goes back, this goes back 10 years, where the owners of these two pieces of land sued the town, saying that the town had failed to adopt low to moderate income housing requirements and

Page 100

meet their housing requirements under the Mount Laurel decision, so they're called Mount Laurel lawsuits. Now, if you want to go really far back, the person who was the borough attorney 35 years ago told the town, we don't need Mount Laurel housing because we have apartments so we have cheap housing in town, which is not the law. The borough attorney who supplanted him didn't tell the mayor and council that we need the requirements. I happen to know this because I happen to know the current borough attorney.

MS. DABAL: He's awesome. He's awesome.

MR. CEDZIDLO: But the two borough attorneys prior to him had told the town, you don't need to comply with Mount Laurel, so when the builder's remedy came, I represented the planning and zoning board during those hearings and Judge Harris ruled that Wallington has absolutely failed to plant anything and is not complying with phase one, phase two, now we're in phase three of Mount Laurel housing. Wallington was alone. Woodbridge went through the same thing. Okay. So several towns down here in south Bergen didn't do what they were supposed to do under the law, so when the developers sued, the judge granted them a right to build housing and low income housing here. Okay. And nothing to do with this planning board or the zoning board. I've been

Page 101

the board attorney for 10 years for both, had nothing to do with anything the board did. Judge Harris said you have a right to do it. As part of that litigation a compromise was worked out, because some of the plans that were suggested for the sites were five and six stories with -- if you look at Westmount Station, where there's Panera Bread and six stories above it, that's what was proposed for these sites. The borough, as part of a negotiation, settled that lawsuit in the best interest of Wallington to limit it to 20 units per acre, okay, when I think something like 40 units or more was proposed at the time.

MR. MELFI: I think their proposal was almost 70. We negotiated for 40 and we settled for 20. It was almost 70 an acre.

MR. CEDZIDLO: So Wallington settled for 20 units an acre and the developers said we'll live with that, that's okay. Okay. Because that's why we don't have Westmount Station being built here. Okay. Now, when the adjoining property owner came here in compliance with the 20 units per acre, the board at that time vote -- this board voted it down, saying we don't like the plan, we don't like the roadway house, there's certain things we don't like on this, and a judge in Hackensack, that was Judge Mian, about a year-and-a-half

Page 102

or two years ago said you can't deny the builders. The builders sued the town a couple years ago, they have a right to build houses. The reasons you're giving for not allowing this development to go forward are not valid, in my opinion, under the law. I happen to think the judge was wrong but he's the judge. He has final say so. So it's not like the board has done anything, and you mentioned the units over by the bowling alley, I believe they're almost all one bedrooms to try and limit the effect on the school system, by making them small commuter apartments that aren't going to attract families. Again, I grew up in town. I know the town. I love the town. My brother decided to move back into town, built a big house in town, probably pays as much in taxes as anybody in town. He probably has the big --

MS. DABAL: He's actually the third highest. He tells me quite often.

MR. CEDZIDLO: Again, my brother pays the third highest taxes of anybody in this town. I get it and I understand it. I still have the connection to the town and I understand it, but the truth is that there's very little -- okay, as long as the builder says I'm going to build according to the settlement we have and I only need, you know, a three or five foot setback from the property line and I'm going to be a quarter inch

Page 103

above the building height, you know, these are rather technical things, and you heard the discussion earlier, this is a discussion to try and do what's best for the town with the board and the developer acting to let's do what we think is best. They're not trying to shove anything down our throats. We're not trying to shove anything down their throat, but these are real serious, you know, issues that the town faces and it's, you know, it's hard, it's hard to do. That's why, you know, like I said, my office is in Fort Lee. I live in Edge Water. Now, nobody has more development -- there's more units being built within a thousand yards of my home than you can imagine right now and there's more coming. I will tell you, every building with an elevator, there's nobody under age 50 because they can't afford it in Edge Water. You just can't. There's a complex across from the golf range which is, if you want 1,800 square feet, it's $6,000 a month. There's no families with little kids moving into those. It's different here, but again, it's kind of what the planner was saying, these are nice units with, you know -- these are not slapped together little -- you know, the nicer development we can have, more likely is you're going to attract higher rents and less kids. It's difficult. It truly is.

CHAIRMAN BAGINSKI: Just in regards to what

Page 104

you're saying, you go all the way back to 35 years, the town fathers in our town here were battling with the state going back years ago, because if I'm not mistaken, the Mount Laurel rulings have changed over the years. It's not something that was set in stone, so everybody kind of pushed it to the side and said they don't know what they want yet so we don't have to do it. Am I correct in what I'm saying? This is 15 years ago I heard this.

MR. CEDZIDLO: I haven't brushed up on my Mount Laurel law lately but it was Mount Laurel One, Mount Laurel Two. Nick, you probably know this. What's our requirement now? What do we have to have in town? 73 or 100? I forget what the latest requirement --

MR. MELFI: Now, what we're required now to have?

MR. CEDZIDLO: Yeah.

MR. MELFI: I'm not sure off the top of my head.

MS. BOGART: It's over 100.

MR. CEDZIDLO: It might be, like, 110 or 115.

MR. MELFI: I want to say 118, 120, something like that.

MR. CEDZIDLO: We're required to maintain

Page 105

100, over 100 low income affordable housing in town, designated as such.

CHAIRMAN BAGINSKI: Okay.

MR. CEDZIDLO: And this project is going to allow us to meet our obligations so we're not subject to another lawsuit.

MS. DABAL: Right.  Sure.

CHAIRMAN BAGINSKI: Okay.  Thank you.

Any other questions?

MS. DABAL: Just one more, just really for my own edification.  The property owners now, or the group -- I'm not sure.  I mean, I know Mr. Nuckels owns, I guess both or a part.  Were they the original owners of the land or has that changed hands since the dawn of time?  I mean, I'm just curious.

MR. CEDZIDLO: I don't know how far back.  I know part of these were the builders and from that the builder's remedy suit, going back more than 10 years ago, when the lawsuit was done, and I think, and I'm sure I'll get it wrong, but as you heard, Wallington -- one of them was a joint partnership, I think, between possibly all three of the Nuckel children.  It was another that was -- I'm sure I'm wrong, but again, it was different ownership interest.  It wasn't the same people.  All part of the same -- it was different

Page 106

ownership percentages with different parcels for some reason, and again, I'm sure I got it wrong, but it was an interplay, so I do know when Counsel Moore told us, I know he was being honest with us.

MS. DABAL: Just one more.  I know you're trying to get through it.  When this was in the planning stage or the conceptual stage or a vision, however you want to call it, did anyone meet together as a group to say, geez, maybe there's a better use for this land?  I know that our hands are tied to some degree, we're not the owners, obviously, but could we have found greater rateables?

MR. MOORE: You were bound by court, so what happened, what the attorney had been explaining to you is my clients brought a builder's remedy lawsuit and an affordable housing lawsuit and this land is court ordered to be done as residential with an affordable housing set aside and there's -- the towns hands are totally tied.

MR. CEDZIDLO: The town actually had changed and adopted in its Master Plan, what was it, 2008, and designated this as a residential site in connection with the settlement of that lawsuit.  Now, bigger picture, 30 seconds, the planning board and zoning board's hands are very tied and very limited.  What needs to happen is

Page 107

the mayor and council can have the town's Professional Planner redraft up the zones, you know, two family zones and the business zones and the commercial zones and light industrial zones.  You got to redraw the map, because right now what the zoning board, I'm the attorney for the zoning board, we see it all the time, they say we have an industrial piece of property that was zoned industrial 50, 60 years ago and when it was a warehouse it was, you know, 5,000 square foot warehouse and the trucks would back up and the trucks were 20 feet long, like the box trucks.  Now you can't warehouse in there.  Now you have tractor trailers.  When we did Liberty Plaza, a tractor trailer backing up to, you know, the Liberty Plaza or the site next to it or the site next to it, a tractor trailer would actually block off the roadway, so you have loading docks that can't be used, you have -- so you have what you would say rateables, you know, people that would be paying taxes that wouldn't put money into the school system, but it's zoned in a way that it can't possibly be used.  We just had a lawsuit, a developer in town wanted to build housing near the Passaic Avenue bridge, over by --

CHAIRMAN BAGINSKI: Market Street.

MR. CEDZIDLO: Market Street bridge.  I'm getting my bridges wrong.  I'm out of town too long, but

Page 108

it was because that whole neighborhood flooded years ago, across from where the toy factory used to be and everything, that building sat vacant for three years because of flooding and nobody would warehouse or put anything in there so they said let me change it to residential, put up eight units and I'll put it on stilts, because we can't use it as -- there's no loading dock, no anything, no access, there was no access, it was in a flood zone, so it was rendered useless, and then that, when it got -- when the board said okay, build residential, that got challenged in court and the court said no, there's no good reason to make it residential but it's a piece of property that can't be used, so the mayor and council -- zoning and planning boards can only do what the town tells us, this is what it's supposed to be used for and here's the requirements.  The mayor and council has to turn around at some point and say we have to address this on a major planning scale, how do we get rateables and how do we get property to produce income, where it's just not, you know, lot by lot by lot.  Because Judge Harris, who is no longer in Hackensack, he basically said there shouldn't be any use variances ever granted but, you know, they still exist in the law, but he said the standards of changing uses by a board can't be met.