# In The Matter Of:

## *In RE: Wallington*

---

## *Transcript fo Proceedings*

## *September 19, 2017*



RIZMANRAPPAPORT
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ  07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

EXHIBIT

J

**Page 1**

TOWNSHIP OF WALLINGTON
PLANNING BOARD

X----------------------------------X
In the matter of:

MORNINGSIDE AT WALLINGTON, LLC          TRANSCRIPT
551 Main Avenue                            OF
Block 71, Lot 35.01                     PROCEEDINGS
                -AND-
NEW WALLINGTON HOME, LLC
551 Main Avenue
Block 71, Lot 35.02
X----------------------------------X

Tuesday, September 19, 2017
54 Union Boulevard
Wallington, New Jersey 07057
Commencing at 7:47 p.m.


BOARD MEMBERS PRESENT:

STANLEY BAGINSKI, Chairman
NICK MELFI
DARIUSZ PAWLUCZUK
TOMASZ BAZEL
KATHY POLTEN
THERESA WYGONIK
EUGENE RACHELSKI
ROBERT KASPEREK
MARK TOMKO, Mayor


EVAN JACOBS, PP, Board Planner
DOROTHY SIEK, Board Secretary

A P P E A R A N C E S:

MARTIN S. CEDZIDLO, ESQUIRE
Attorney for the board

SILLS, CUMMIS & GROSS, P.A.
BY:  KEVIN J. MOORE, ESQUIRE
     VICTOR J. HERLINSKY, JUNIOR, ESQUIRE
Attorneys for the applicant

**Page 2**

I N D E X


WITNESS                          EXAMINATION
CALISTO BERTIN                        5
BRIGETTE BOGART                       7
JACK RAKER                           42


EXHIBITS MARKED FOR IDENTIFICATION


| NUMBER | DESCRIPTION | PAGE NO |
|--------|-------------|---------|
| A-9 | Proposed parking restrictions | 5 |
| A-10 | Conditional County approval dated 9/13/17 | 57 |

**Page 3**

MR. BAGINSKI: Moving on to the old business before the board, that will be the site plan for Morningside at Wallington, LLC and from New Wallington Home, LLC.

MR. MOORE: It doesn't work.  I'm loud, I'm loud.

MR. BAGINSKI: I think we'll be able to hear you.

MR. MOORE: Yup.  Good evening, Mr. Chairman, members of the board. Just for the record, my name is Kevin Moore. I'm with the firm of Sills, Cummis and Gross representing New Wallington Home, LLC and Morningside at Wallington Home, LLC on two related applications.

Just to refresh the board's memory, the application for Block 71, Lot 35.02, the New Wallington Home, LLC project, is for amended preliminary and final site plan approval for an approved 134-unit multifamily project, and the applicant -- application for adjacent -- adjacent Block 71, Lot 35.01, the Morningside at Wallington Home, LLC project, is for preliminary and final site plan approval and C bulk variances for a 73-unit multifamily project.  Both properties have

**Page 4**

a street address of 551 Main Avenue here in Wallington.

The hearings this evening on the two related applications are continued from the board's July 18th hearing.  Due to the cancellation of the August 15th meeting, we re-noticed for this hearing so I'd request the board just acknowledge the re-notice and -- and jurisdiction.

MR. CEDZIDLO: Yes.

MR. MOORE: Thank you.

MR. CEDZIDLO: And I -- I -- I spoke with your office earlier on time.

MR. MOORE: Yes.  Before we -- when -- when the July 18th hearing concluded, as you may recall, we were in the middle of the direct testimony of the applicant's planner for the Morningside at Wallington Home project. Before we continue our planner's testimony on the Morningside at Wallington Home project, however, I would like to briefly recall Mr. Calisto Bertin, the applicant's engineer, to discuss the changes made to the filings for the project that were a concern to the board. Mr. Bertin has been previously sworn and previously qualified.

In RE: Wallington

---

**Page 5**

MR. BAGINSKI: Correct.

MR. BERTIN: Thank you.

MR. MOORE: And the exhibits that Mr. Bertin will be speaking from is Exhibit A- -- will be Exhibit A-9 which he is marking, and if it's helpful -- Adam, do you have them?

MR. FAIELLA: Yes.

MR. MOORE: -- these are also A-9 we can hand out for the board so they can follow along 11 by 17's of what Mr. Bertin is testifying from on the -- on the -- on the easel. Mr. Bertin?

MR. BERTIN: Thank you.

(Whereupon A-9, Proposed parking restrictions, is marked for identification.)

MR. BAGINSKI: Just real quick, if anybody does have a cell phone on if you can just turn them off. Thank you.

MR. MOORE: Gee, I wonder if someone has a cell phone on. Okay.

MR. BERTIN: Great. We -- we just prepared an exhibit rather than submitting new plans because this change is minor to show proposed parking restrictions. There was concern about fire lanes and so forth. So we -- we have two colors here. The pink

---

**Page 6**

color is -- we put, "No Parking, Fire Lane," that would be all the curb lines against the buildings. Then we had another in yellow. It's shown "No Parking Any Time" would be the remainder of the curbs and we could modify that, this is just what we wanted to put in.

MR. BAGINSKI: Okay.

MR. BERTIN: But anyway, so this way -- because we -- we had previously shown you the -- the fire truck routes and the delivery truck routes.

MR. MOORE: Is there any questions for Mr. Bertin?

MR. MELFI: I have a question. Has -- has this been submitted to the fire official or the fire chief in regards to the fire lane markings of where they would want to mark, and do we have a report or did we ever get a report or did you ever get a report from either the fire chief or the fire official stating where they would like to have the yellow striping and their --

MR. MOORE: Yeah, we -- we did not, but we would certainly if the board found it suitable to grant us an approval accept any approval of that as a condition.

---

**Page 7**

MR. MELFI: Okay, because I think that's important --

MR. MOORE: That would be fine.

MR. MELFI: -- just to have it.

MR. MOORE: We would accept approval from the -- the fire department as a condition of any approval the board sought to -- to grant. Any further questions for Mr. Bertin?

MR. BAGINSKI: Board members? Any board members have any kind of questions for him?

MS. POLTEN: Not at this time.

MR. BAGINSKI: Not at this time, okay. Thank you.

MR. MOORE: All right, thank you. Then I'd like to recall Miss Bogart who is also previously sworn and qualified. She's our planner and we broke off in the middle of her testimony --

MR. BAGINSKI: That is correct.

MR. MOORE: -- last month.

MR. BAGINSKI: Okay. Good evening.

MS. BOGART: Good evening. How are you?

MR. BAGINSKI: All right.

MS. BOGART: We're missing our table --

---

**Page 8**

MR. BAGINSKI: Okay. So --

MS. BOGART: -- and a chair.

MR. BAGINSKI: Chair's are -- you got one there?

A VOICE: There is one back there.

MS. BOGART: I don't mind standing, that's fine.

A VOICE: We do have one for you. There you go.

MR. MOORE: That's a heavy chair. It's not heavy, it's my chair. And, Ms. Bogart, you had concluded your testimony at the last meeting with the variance from 3 -- Section 365-25G1 and 2 which dealt with the separation of buildings. So I guess now you would start with your testimony regarding building height.

MS. BOGART: Sure. As I don't know if this board recalls or not because it was kind of a lengthy evening, I did go through all the -- a number of variances that we are requesting, and most of them are due to the fact that we are combining two lots and keeping an existing building on-site, two unique conditions which create the need for rear yard variances and coverage

---

Page 9

variances, mostly because we have to accommodate that existing building and make the most appropriate circulation patterns as designed by the engineer.

I did go through, as I mentioned, a number of variances, and I probably have about four or five more to address.

MR. MOORE: Ms. Bogart, just to clarify it for the record, you didn't mean we're combining the two lots that are the subject of this application, right, because they're two separate lots?

MS. BOGART: No, what I actually meant was that because we have two lots the variances' condition -- the variance conditions for the setbacks have been created because we technically have lot lines even though it's being developed as one site.

MR. MOORE: Thank you.

MS. BOGART: So the next variances I had indicated is -- or as the attorney had indicated was to address maximum building height. Right now we're permitted four stories and 45 feet.  We are at 48.5 feet, and this is due to the slope of not only the roofs, but also the actual

Page 10

topography of the site itself.

Variance is needed for the roof design, but we're trying to keep it to match the surrounding buildings in the New Wallington Homes project.  We believe that this design for the roof slope is more appropriate because it resembles the properties surrounding it, and it was more consistent with the surrounding area. We can comply by re-modifying the roof design, but we don't think that it's an appropriate architectural design or would promote any desirable visual environment compared to the surrounding area. I believe that by requesting this variance we further a couple purposes of the Municipal Land Use Law.  Purpose A, to guide municipal action for appropriate use and development of all lands in a manner that will promote the public health, safety, and moreover, general welfare.  Again, this is because I believe it matches the surrounding development pattern. And also Purpose I, to promote desirable visual environment through creative development techniques, and again, we could comply, but the

Page 11

reality is the sloped roof it matches the surrounding development pattern and is more appropriate architectural style -- styled for the neighborhood. The benefits of granting the build -- the minor building height variances is that the size is consistent with the surrounding development patterns, the roof design is more attractive and matches the surrounding properties. I don't believe that there's really any negative detriment to granting those variances because it's for Building 6 which is located to the rear of the site and it's minimized by its location. It provides ground-level parking which, as I think I testified to at the last time, the need for the extra height on the ground-level parking creates -- also lends itself to this variance situation. Conforming with the zoning ordinance would require a parapet which -- a parapet roof which I think is inconsistent with the surrounding development pattern. So from a planning perspective being consistent with the neighborhood is not only one of

Page 12

the major goals of the Municipal Land Use Law, but zoning ordinances and planning goals in general. So I think for all those reasons granting this minor deviation in building height is more appropriate than requiring this applicant -- applicant to comply with the building height requirements.

MR. MOORE: And, Ms. Bogart, just for some clarification, the -- for Building Number 6 I guess the variance amount is 49.42 feet?

MS. BOGART: Yes.

MR. MOORE: And then 48.5 feet for --

MS. BOGART: Is for the building.

MR. MOORE: -- for the building itself.

MS. BOGART: Yes.

MR. MOORE: And then do you think this constitutes an improvement over the existing zoning for the reasons that you just testified to with respect to the architectural match and not requiring the parapet?

MS. BOGART: Yes, I believe so.

MR. MOORE: Thank you.

MS. BOGART: The next variance talks about the on-street parking is not permitted within

In RE: Wallington

Page 13

50 feet of Main Avenue boundary, and 25-foot buffer along Main Avenue has to be planted with grass and shrubs.

Right now the applicant is proposing parking within .04 feet of Main Avenue and obviously a variance is needed. Currently the existing parking actually encroaches within the public right-of-way so we're improving the situation.

So that alone is a benefit. So not only we're pulling back the parking and putting it onto our property, but we're also creating a grass buffer area along Main Avenue. So there are a number of benefits to that -- this proposal.

I believe we further a couple purposes of the Municipal Land Use Law. Obviously, again, to encourage municipal action to guide appropriate use on developmentable [sic] lands.

Yes, we do need a variance, but this proposal provides for safe circulation on-site allowing us to maintain that existing building for recreational purposes and also allowing for us to improve it slightly and pull back the parking onto our property. So I believe for all those reasons we further Purpose A.

I believe that this furthers Purpose G,

Page 14

provides sufficient space in an appropriate location for a variety of uses.

As you heard from my testimony at the prior hearing, we further a number of the goals of the master plan. We are consistent with your zoning ordinance, we are doing what is contemplated by your master plan and zoning ordinance for this property, we are maintaining that existing building, and in order to accomplish all this we do need some minor deviations and that includes the modification to this setback for the parking because we are maintaining that building.

And as I mentioned to you, there are a number of benefits for lessening this existing nonconformity. We're making more efficient use of the existing layout, we're providing efficient traffic layout, we're providing sufficient parking for the residents at the same time, and the proposed lawn area along Main Avenue is more consistent with the surrounding development pattern and an improvement upon existing conditions. I don't believe that there's any negative impact to this because we are improving the existing conditions.

The engineers have testified to the safety of

Page 15

this area and this design and there are no issues. They've testified that it is an improvement, and this property has existed with the parking encroaching upon the right-of-way since at least 2002 and there have been no issues, and so improvement can only help the site and the surrounding area.

So from all those perspectives I believe that this board has a right to grant the variances for that encroachment into the front yard setback.

MR. MOORE: And, Ms. Bogart, it was also for Section 36 -- 365-25M3 for the 25-foot buffer as well, right?

MS. BOGART: Yes.

MR. MOORE: Plus the surface parking.

MS. BOGART: It's --

MR. MOORE: Thank you.

MS. BOGART: Yes. There are two additional variances that I need to address. One -- the last one will be for signage, but this -- this last area in bulk regulation variance is for building coverage and lot coverage. Your ordinance permits 25 percent building coverage and 75 percent lot coverage. We are proposing 30 percent building coverage so

Page 16

approximately 5 percent over and 83 percent lot coverage, again, approximately 8 percent over. This site increases due to the fact that we need to accommodate that existing building. We're trying to provide for appropriate fire truck circulation and fire and appropriate parking for the site so that increases the coverage requirements.

As you heard from my testimony at the prior hearing two months ago, this density and this proposal is basically complying with your master plan goals and this density is permitted on-site. We are providing sufficient parking and the only deviations with regard to the coverage have to do with the site design, and the site design is laid out as such because of those unique conditions that I had testified to with regard to accommodating existing building and providing appropriate circulation.

By granting these two coverage variances I believe that we further Purpose A, again, municipal -- to guide municipal action for appropriate use in development of all lands, and this goes back to the heart of the fact that your master plan and zoning ordinance call for this type of development on this

Page 17

site.

Purpose G, to provide for sufficient space and appropriate locations for a variety of uses both public and private and to meet the -- all the needs of New Jersey citizens.

Again, this density is permitted. We're providing affordable housing on-site which is an important component to our application and a substantial benefit to New Jersey citizens and also goes to the heart of furthering the goals of your master plan.

Purpose J, to promote the conservation of open space and energy and prevent the degradation of the environment through improper land uses.

We are maintaining those buffers around the site and maintaining the environmentally constrained land, and we are developing the site in accordance with your zoning ordinance so I believe that we further Purpose J.

Purpose M, encourage coordination of various public and private procedures and activities shaping land development in view of lessening the cost of development and more efficient use of the land, and this goes to the whole concept of redeveloping the site and maintaining that existing

Page 18

building while also doing what your master plan and zoning ordinance calls for.

And lastly, Purpose O, to encourage development of balanced housing supply, and this is also identified in your master plan, and as I had mentioned to you just previously, we are providing affordable housing which is a need in the borough and called out in your master plan documents.

There are a number of benefits to granting the coverage variances. We're lessening the existing nonconformities. We're reusing the existing building, albeit in order to reuse it we have to increase the -- the coverage slightly.

We're providing a family recreation facility for residents, we're providing affordable housing choices with appropriate parking as called out by your ordinance and we are meeting your active recreation requirements of 25 percent open space.

As you heard from our engineer, the proposed storm water management and water quality controls are adequate and provide additional improvements to the site, and those are really only the negatives that are associated with increasing the coverage slightly, and in this case they've been taken care of.

Page 19

So for all those reasons I believe that there's really no negatives to the coverage, and I believe that the benefits outweigh any negatives that could possibly be associated with it, and I believe this board has a right to grant the coverage variances as requested.

MR. MOORE: And would you also offer the same benefits and reasons that you set forth, Ms. Bogart, that it represents an improvement over the existing zoning?

MS. BOGART: Yes. So the last variance pertains, as I mentioned to you, the monument sign. They're prohibited, but I think to provide for --

MR. MOORE: We have the active recreation.

MS. BOGART: We comply with that.

MR. MOORE: We comply now?

MS. BOGART: Yes.

MR. MOORE: Excellent.

MS. BOGART: So with regard to the monument sign I think it's very important from a planning perspective to create a sense of place and provide for that monument sign which it not only identifies the development, but also gives a nice

Page 20

entrance and sort of creates a nice environment for the residents that live there.

I believe that by granting this monument sign we further Purpose I which promotes desirable visual environment for the property.

It will identify the property not only for emergency services purposes, but also for residents and guests alike which actually increases traffic safety and allows the visitors to identify it quickly without having to make several U-turns along the street.

The sign design as proposed today was revised based upon board comments, and we believe that at this point in time we have a design that is most appropriate for the site and takes into accommodate -- into consideration your comments.

I believe it's appropriate for the neighborhood, and for all those perspectives I think that the benefits of granting the sign variance as requested outweigh any detriments.

There is a monument sign located across the street so I don't think it's out of character with the neighborhood, and I think overall it would create an aesthetic benefit to the property.

MR. MOORE: And for that reason you

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 7 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 132-15    Filed 03/06/26    Page 7 of 12 PageID: 3400

In RE: Wallington

Page 21

think it's a better zoning alternative as well?

MS. BOGART: Yes, I do.

MR. MOORE: That concludes -- unless I'm wrong, Ms. Bogart, that concludes Ms. Bogart's direct testimony.

MS. BOGART: Yes.

MR. BAGINSKI: Now in regards to -- I have a question for you in regards to the open space versus active recreation area, and you say you meet now the standard of what we're supposed to?

MS. BOGART: The 25 percent, yes.

MR. BAGINSKI: And is the enclosed building considered open space?

MS. BOGART: It's considered active recreation.

MR. MELFI: It's not considered open space.

MR. BAGINSKI: But it's not considered open space?

MR. MOORE: No, we still need then -- we need and testified in support of the variance for the open space, but it is active recreation so we meet the active recreation requirement.  It's two separate provisions of the ordinance, two

Page 22

separate ordinance provisions.

MR. BAGINSKI: Okay.  So I just want to clarify that so everybody's understanding the difference between the two and what we have here.

MS. BOGART: The -- the zoning ordinance does state that the open space can be in the form of active recreation.

MR. BAGINSKI: Okay.

MR. MOORE: But out of an abundance of caution we have requested that variance, but we do believe we conform, but we -- you know, that's up to the board for their interpretation, but we did seek that variance notwithstanding that fact.

MR. BAGINSKI: Okay.  I just -- again, I just wanted clarification for the board members this way if they do have any questions they can ask them, and now's the time to ask Ms. Bogart any questions that you or anyone might have as far as the board members go right now.

MR. KASPEREK: I do have a question.

MR. BAGINSKI: Go on.

MR. KASPEREK: Can you please bring the previous screen that you had with the -- you know, with the lines, the red and the yellow, please?

Page 23

MR. BAGINSKI: And is this question for Ms. Bogart or Mr. Bertin?

MR. KASPEREK: I'm sorry, for Mr. Bertin.

MR. BAGINSKI: Okay, go ahead.

MR. KASPEREK: The project itself seems very congested to me.  On the one side on the top you have the railroads, on the left-hand side you got a river.  You only have one entrance, right, for the -- for the whole complex?  And then, you know, for the other variances that we're hearing you're trying to, you know, fit another building, and what happen is the -- in case of emergency of any kind of fire trucks, police, you know, any ambulances how the one entrance, one exit going to fit all the -- you know, you -- did you -- and also, Mr. Mayor, you're kind of an expert on this.

MR. TOMKO: Well, we were -- we were going over it the last -- the last meeting.

MR. KASPEREK: In the last meeting I know, but only with one entrance, one exit, would that be sufficient for --

MR. TOMKO: Well, I mean, that's

Page 24

normal in a lot of --

MR. KASPEREK: It is normal in a lot of them, okay.

MR. BERTIN: And we actually have a second driveway that we have, it's an existing driveway.  We kept it as an entrance only because it's next door to -- it's very close to another driveway.  So in the case of an emergency, you know, fire trucks will go wherever they can fit.

MR. KASPEREK: Okay, just in case.  All right.

MR. BAGINSKI: Do any other board members have any questions for Ms. Bogart or Mr. Bertin?

MR. MELFI: Ms. Bogart, if we were to eliminate that building, how many variances would we save?

MS. BOGART: Which one?

MR. MELFI: It would be the recreation building.

MR. MOORE: I believe it was four.

MS. BOGART: It's four.

MR. BERTIN: It's 17 percent of the site.

Page 25

MS. BOGART: So we would eliminate the coverage variances.

MR. PAWLUCZUK: Setback variances.

MS. BOGART: Probably the -- the parking setback variances. I don't believe we would -- well, we could possibly eliminate the building separation variances. The maximum building height obviously would still remain. So probably 95 percent of the variances across the --

MR. BAZEL: Open space?

MS. BOGART: Well, like I said, the ordinance says that active recreation will count as open space. So if you want it as active recreation that's as proposed, but if you take away the building then you could provide additional open space.

MR. PAWLUCZUK: Okay.

MR. BAGINSKI: Okay. Anyone else have any questions for the witnesses?

MR. RACHELSKI: Just a quick question. As far as the height variances these are for which buildings?

MS. BOGART: Building 6 in the rear is at 49.5 feet I believe.

Page 26

MR. RACHELSKI: Okay.

MS. BOGART: And Building 7 and 8 and as the engineer had testified to, depending upon whether they're considered one building or not. If they are two separate buildings then they'd require a height variance. If they're one building they don't.

MR. RACHELSKI: Yeah, okay. It's -- it's just a matter of -- of an appearance while someone is looking from the main entrance.

MS. BOGART: From the main entrance?

MR. RACHELSKI: It's a little bit taller I guess. Would -- would that be visually the same? The building's set -- Building A, right, is that the one --

MS. BOGART: That --

MR. RACHELSKI: -- closest to the main, right?

MS. BOGART: Yes, but that's the one with only the 3-foot deviation --

MR. RACHELSKI: Okay.

MS. BOGART: -- and that's based upon the slope, and from a planning perspective I think you would -- it would make more sense and be more aesthetically pleasing to have that slope in the

Page 27

roof with a slightly higher roof setback.

MR. RACHELSKI: I'm thinking about maintaining the same slope.

MS. BOGART: That's what I think though.

MR. RACHELSKI: Well, that's -- that's -- but I mean, the major purpose of the -- of the -- the height variations is to stick those additional parking spaces there.

MS. BOGART: But you do have to understand that the applicant could provide a parapet roof and completely comply with the zoning ordinance, wouldn't require a variance --

MR. RACHELSKI: That's definitely an option.

MS. BOGART: -- and it wouldn't be appropriate for that streetscape. So I think this is the most appropriate design.

MR. RACHELSKI: Thank you.

MS. BOGART: Thank you.

MR. MELFI: So getting back to the buildings they're all going to have a ridged roof. None of these buildings are going to the flat, correct?

MS. BOGART: Correct, right?

Page 28

MR. BERTIN: No.

MS. BOGART: No?

MR. BERTIN: No.

MS. BOGART: Sorry.

MR. BERTIN: Building 8 has a flat roof.

MS. BOGART: Okay.

MR. RACHELSKI: Building 8 has a flat roof. Are you going to tell me that? You just told me it's a slope.

MS. BOGART: I though it was a slope roof.

MR. RACHELSKI: Let's get it straight, guys.

MR. MELFI: I mean, my -- my issue with the flat roof on the building is at the last hearing at the -- and I know I brought it up the last time too -- your witnesses swore they didn't want a flat roof because of issues of leaks and we granted the variances.

MR. MOORE: Actually, with no disrespect intended, we checked the transcripts from those hearings and there was no mention of leaks. It was strictly aesthetic.

MR. MELFI: Okay. Anyway, they

|  |  |
|---|---|
| **Page 29** | **Page 31** |

**Page 29**

wanted it that way.  So wait a minute. We granted them the variance because they wanted to put the pitch roof -- the ridge roof because it would --

MR. MOORE: Right.

MR. MELFI: -- aesthetically look nicer and it's symmetrical, and now you're coming back and saying you want a flat roof because it's going to be aesthetically nicer.

MR. RACHELSKI: And they want the variance too.

MR. MELFI: And -- yeah.

MR. RACHELSKI: Mr. Melfi, if I can ask you.  So the actual height of the building is measured from what point?

MR. MELFI: Going midway to midway at peak.

MR. RACHELSKI: I know, but I'm just saying from the ground?

MR. MELFI: Right.

MR. RACHELSKI: Okay.  So when we do the flat roof, why -- why such a --

MR. MOORE: Ms. Bogart has I think something she'd like to respond to.

MS. BOGART: No, I just wanted to

**Page 30**

show them the building elevations and my mistake. Building 6 is the one with the -- the sloped roof and that's the one in the rear, and this is Building 8 and it has a larger first floor due to the recreation facility in the -- in the front.

MR. MOORE: And as the architect had testified to the board -- I can recall him -- it's the recreational area that creates the -- and higher first floor that creates the need for the height variance.

MR. RACHELSKI: So aesthetic aspect is not really a factor in that?

MR. MOORE: Not on this one though I think it's --

MR. RACHELSKI: It should not be considered.

MR. MOORE: -- attractive.

MR. RACHELSKI: Yes.

MR. MOORE: For the second one it should be.

MR. RACHELSKI: No, but I'm just saying for the one, the first building in this spot, you know, then that argument that you want a pitched roof because --

MR. MOORE: Well, this one's right on

**Page 31**

the streetscape --

MR. RACHELSKI: Yes.

MR. MOORE: -- and the other one it blends with the rest of the development.

MR. MELFI: You said the reason for the -- for the variance and the flat roof is because of the recreation on the first floor?

MR. MOORE: Yes.

MS. BOGART: It requires a -- a greater ceiling-to -- floor-to-ceiling height.

MR. MELFI: I understand that, but I thought that's why we're keeping this building for recreation.

MR. MOORE: Well, we're providing a lot of recreation.

MR. MELFI: That building is pretty big considering that the testimony from your applicant is it's just going to be for the 73 units that were going to be put on this property.

MR. MOORE: Right, plus the town, plus -- and -- and that is the case and we would, you know, accept if the board chose to grant an approval a condition to that effect, but we're also providing for the large building at the board's request that the town residents can utilize that

**Page 32**

building.

MR. RACHELSKI: But before that approval, can we sign a -- sign a lease for usage?

MR. MOORE: We can make it a condition of the approval, that's --

MS. BOGART: You can say --

MR. MOORE: -- just as binding as a lease.

MS. BOGART: That would mean that basically we can't build the --

MR. MOORE: Can't build the building --

MS. BOGART: -- the project without it.

MR. MOORE: -- without meeting that condition and can't continue to occupy the premises without meeting that condition.

MS. POLTEN: I have a question.  If the recreational use is going to be there for the town, who is responsible for the insurance and everything?

MR. MOORE: That's something that I think we can resolve through conditions.  My client, unfortunately, is not here.  So we'll have to address those insurance issues.

Page 33

MS. POLTEN: And liability and all that stuff as well as the money.

MR. MOORE: We would have to address that I think as part of the condition.

MS. BOGART: I -- I think that would be worked out with the governing body, and this board can make it a condition of approval that you -- that we have to work that out.

MS. POLTEN: If we were to deem that we didn't want this -- this is just a hypothetical -- how would that building -- how would you --

MR. MOORE: We would still utilize it for recreation for the residents of the community and we're not sure yet. I know we -- Mr. Nuckel discussed like putting a basketball court in there.

MS. POLTEN: Okay. So then -- then the -- the building would stay the same. You wouldn't change it to -- to have the -- the required -- the -- not a flat roof, but the pitched roof?

MR. MOORE: No.

MS. POLTEN: Okay.

MR. MOORE: Yeah, talk about a height variance.

Page 34

MS. BOGART: That would actually just increase the -- the height requirement or the required height that we would need.

MR. BAGINSKI: Okay. Any other questions for the --

MS. WYGONIK: Yeah, I have a question, something that you testified last time we were here, and it was the fact how many children would attend school from the Morningside and you said about 13, but what I'm mainly concerned about is you said you went to the school official and he said he doesn't have that information so you didn't get any information. Did you do anything like an OPRA request where he would be required to provide some kind of information for you or did you just go and ask him and he said, I don't have that information?

MS. BOGART: It was a verbal request and I was told that that information isn't compiled based upon addresses or apartments versus non-apartments.

MS. WYGONIK: Because I'm sure if you go and redo a -- an OPRA request you can get better information.

MR. MOORE: Well, no, because they

Page 35

would -- don't have it.

MS. BOGART: They didn't have it.

MR. MOORE: So you can't OPRA what you don't have.

MS. WYGONIK: What -- what do you mean you don't have? I mean, they must know.

MR. MOORE: They didn't -- they didn't compile --

MS. WYGONIK: They have -- they have access.

MR. MOORE: They said -- they told Ms. Bogart they didn't --

MS. BAUMANN: Wait.

MR. BAGINSKI: Hold on, we can only have one person talking at a time.

MS. WYGONIK: I don't understand how they could not have it when they have addresses where the children attend the school from like the Jasontown Apartments or the Mount Pleasant Apartments that they must have that information. I'm sure it would take time for them to gather it, but through an OPRA request you may get better information than just a verbal, We don't have it.

MS. BOGART: That may be --

MS. WYGONIK: Okay.

Page 36

MS. BOGART: -- but it -- it --

MS. WYGONIK: But you didn't do an OPRA request, that was my main question, okay.

MS. BOGART: I didn't do a written OPRA request. It was just a conversation on the phone.

MR. BAGINSKI: We can actually possibly have that question answered. We can have our superintendent speak on that matter over here, but I'm going to do that during the open meeting for the public and then we'll have --

MR. MOORE: Great.

MR. BAGINSKI: -- Mr. Albro speak about that some more.

MR. MOORE: And I would just caution the board without being unduly argumentative, and we've designed this complex to minimize, you know, the type of units and the statistics, and all the studies that Ms. Bogart testified to last time showed that, you know, this will not generate a lot of schoolchildren, but that's also not a valid basis for a decision on an application as I'm sure you all know and as your attorney will tell you.

MS. BOGART: So if I could just

|  | Page 37 |
| --- | --- |

follow up because I know that was a concern last time, and I did testify that the Rutgers' numbers showed in Northern New Jersey there would be approximately 13 schoolchildren coming from this development.

I also testified that I had done studies myself and that that resulted in approximately five schoolchildren based upon Northern Jersey towns, and I was also asked if I could look at towns that are similar to Wallington and try to get that information.

Unfortunately, I was unable to do that.  A lot of towns don't like to give that information.  They feel that that's private as far as the addresses of the -- the children.

I did pull up some additional Rutgers' numbers, and there is a study that shows public schoolchildren generated from transit-oriented development and a number of these -- there's about ten projects that are listed, and most of them are from West New York.

So I tried to pull up census data to try to consider how West New York relates to Wallington, and obviously it's a much bigger town, but it does have a lot of similarities with regard to number of

|  | Page 38 |
| --- | --- |

people per household, number of people in the labor force, median income is similar.

Obviously Wallington is a little bit greater.  Median income of Wallington from the census is $55,000, in West New York it's $45,000.  The per capita income in the past 12 months -- this goes back to 2015 -- was about $5,000 off.  So I believe there are some similarities when it comes to looking at affordable -- how housing is affordable and how the households are utilized.

So this study with regard to the ten properties in -- in the Rutgers' analysis had 1,132 units in West New York and of that had -- it -- it resulted in a .02 public schoolchild being created for each unit.

So that's even lower than my five that I had estimated last time.  It's actually less than half.  It's probably about two public schoolchildren coming out of this development.

So I can assure you that based upon the Northern New Jersey Rutgers' data, my own studies and this DOT data that I don't believe it's going to be more than 13 schoolchildren.  In fact, I think it's going to be a lot lower, between five and maybe seven children coming out of that.

|  | Page 39 |
| --- | --- |

MR. MELFI: You're talking for the full 207 units or just for this building?

MR. BAGINSKI: 73.

MS. BOGART: For the 73.

MR. RACHELSKI: I have just a quick question, I'm sorry, because you -- you refer to this one as a transit village.

MS. BOGART: Transit-oriented development.

MR. RACHELSKI: A transit-oriented, right.  I mean, a little bit of a distance to the -- driving -- there's a driving distance, it's not a walking distance, for the --

MS. BOGART: You are, and the only reason I took this into consideration is because, as I mentioned to you, I couldn't get data from the surrounding area that you had asked for, and I thought that this might be another analysis that you could pinpoint to and kind of consider that it would be similar.

MR. RACHELSKI: Now the transit villages or transit-oriented villages are slightly different though.

You have the walking distance and -- and a -- and a -- the residence is usually different than --

|  | Page 40 |
| --- | --- |

than -- you know, isolated from the quick connection to New York City.

MS. BOGART: Not necessarily because of the bedroom mix.

Once you have one or two children in a one- or two-bedroom apartment you're going to want that house.  Once the child starts to walk and wants to go to school and wants to play outside you're going to want that yard.

You're not going to want to have -- to have your child play in a -- in a parking lot as we have.  We don't really have the outdoor recreation, we don't have the playground.

You're going to want to move to someplace where -- that they could play.  So from that perspective it's -- it's very similar.

MR. RACHELSKI: I think -- I don't remember the stance, but how many two-bedrooms, and you had some three-bedroom apartments too if I could recall?

MR. MOORE: Yeah, the three-bedrooms are required for the affordable housing.

MR. RACHELSKI: Yes, it's just -- just because, you know, a three-bedroom apartment is definitely going to generate "X" number of

In RE: Wallington

---

Page 41

students so --

MS. BOGART: The three-bedrooms will, but that will be balanced by the one- and two-bedrooms.

MR. RACHELSKI: So how many two-bedrooms do we have?

MS. BOGART: Bear with me a second.

MR. BERTIN: I'm sorry, three.

MS. BOGART: Three?

MR. BERTIN: Three.

MR. RAKER: Three three-bedrooms.

MS. BOGART: Three three-bedrooms.

MR. RAKER: The affordable units.

MR. RACHELSKI: For the whole premises?

MR. MOORE: Yes.

MR. RACHELSKI: And two-bedrooms?

MR. RAKER: Are we talking affordable or market rate?

MS. BAUMANN: I'm sorry, sir, what is your name?

MR. RAKER: My name's Jack Raker.  I was the architect who testified.

MR. MOORE: He's previously sworn and qualified, yeah.

---

Page 42

MR. RAKER: Yes.

MS. WYGONIK: You're talking about just Morningside, not the whole complex, right?

MS. BOGART: Yes.

MS. WYGONIK: Right.  You're not talking about Morningside, that's not the whole complex.  It's just a little part, you know, 72 apartments.  Well, no, he said the whole -- the whole development and that's not -- not it.

MR. RAKER: So the total is 40 one-bedroom, 30 two-bedroom and then the three three-bedroom, that's total, that is inclusive of the low and moderate income.

MR. BAGINSKI: And, again, just to clarify, this is strictly for the 73 units that they're --

MS. BOGART: Right, the 73 units.

MR. MOORE: Right, because the others are already approved.

MR. BAGINSKI: Correct.

MR. MOORE: We're just seeking certain minor amendments.

MR. BAGINSKI: Okay.  Anyone else with any questions?  Okay.

MR. KASPEREK: You have no --

---

Page 43

MR. BAZEL: So we have two lots developed as one.  Was there an attempt to combine both lots at some point?

MR. MOORE: There's separate ownership.  They're -- they're related, but it's not entirely unified.  It's similar principals, but it's not exactly the same ownership.  So we did present a series of cross-easements so that they both work together, but it's not viable to consolidate the two lots.

MR. BAZEL: And this was -- yeah.  I mean, we have some setback variances that --

MR. MOORE: Right, because of that, but they're what we call "technical variances."  It's on paper, but, you know, we've got all the cross-easements there.  You can't see the lot line, and we have cross-easements so that the development functions so that, you know, there's access and utilities and everything between the two.

MR. BAZEL: So there will be two separate ownerships?

MR. MOORE: There are two separate ownerships, there's two applicants.

MR. BAZEL: Okay.

---

Page 44

MR. MOORE: And as I said, they share common or they share the common principal of Mr. Nuckel, but I -- the -- the exact mix of ownership is not the same so you can't really consolidate them.

MR. BAGINSKI: Okay.  Anyone else with any questions?  Do you have any more testimony, Mr. Moore?

MR. MOORE: I have no more direct testimony.  I'd reserve a summation, but I do have -- I would like --

MR. BAGINSKI: Before you do that --

MR. MOORE: -- to just give our responses to the May 11, 2017 Neglia Engineering Associates report revised July 14th.

MR. BAGINSKI: I would just like to see if any of the residents that are here have any questions for the -- your professionals that have testified today, this way I'll open it to hear the citizens and then we can go through that.

MR. MOORE: Okay, fine.

MR. BAGINSKI: All right.  Board members, at this time --

MR. BAZEL: Just one more thing about the open space.  So by your definition you could

---