Page 45

throw some yoga mats in the underground parking --

MS. BAUMANN: I'm sorry, I just didn't understand. Repeat again.

MR. BAZEL: So by your definition of "open spaces" if you throw some yoga mats in the underground parking, could you then -- could you consider it as -- as open space as well?

MS. BOGART: We have to go by your -- the zoning code for Wallington, their definition, and it says that open space includes active recreation facilities, but it doesn't define "active recreation" so --

MR. BAZEL: Okay.

MS. BOGART: -- maybe it could be yoga mats, I don't know.

MR. MOORE: We're going to have more active recreation than yoga mats.

MR. MELFI: The way you're interpreting it is what is -- the building is counting as being counted because --

MS. BOGART: Because it's a recreation center, yes.

MR. MELFI: -- because it's recreation, but it doesn't specifically say in the ordinance that it has to be enclosed or open.

Page 46

MS. BOGART: No, it just says active.

MR. MELFI: Active open space.

MS. BOGART: Active recreation.

MR. MOORE: And then it says open space can include active recreation.

MR. BAGINSKI: Okay. Anything else? Okay.

At this time then I'd like to open it to the hearing of citizens. IF there's anybody in the audience that would like to be heard or have any questions for the professionals that testified in regards to this now is the time to come up here, and you can ask whatever questions you need to about this application. If you can just step forward.

MR. ALBRO: Good evening, I'm James Albro. I'm the --

MS. BAUMANN: I just need to swear you in, please.

MR. ALBRO: I'm sorry?

MS. BAUMANN: I'm going to swear you in, please.

(Whereupon James Albro is duly sworn.)

MS. BAUMANN: And your name again,

Page 47

sir?

MR. ALBRO: James Albro, A-l-b-r-o.

MS. BAUMANN: Go ahead.

MR. ALBRO: Evening. I'm the superintendent of schools in the -- the Borough of Wallington.

Just as a point of clarification, it came to my attention I believe in the July meeting that you were referring to that there was communication with my school district about the impact of -- of -- possible impact of high-density housing in our district in comparison to some other high-density housing projects. I never received any request for any information whether formal or informal. The only other place that I think it could have gone would be my business administrator's office who's also the board secretary, and I spoke with him and he received no such request formal or informal.

MR. MOORE: Ms. Bogart, do you know who you spoke to?

MS. BOGART: I don't. I can look that up, but I don't have that with me.

MR. MOORE: Okay.

MS. WYGONIK: Would you be able to

Page 48

provide information?

MR. ALBRO: I can provide whatever information I'm allowed to provide without revealing student identities and things like that, but --

MS. WYGONIK: Well, we're not asking for student identities, just the number of students maybe attending from either the Jasontown or the, you know, Mount Pleasant Apartments.

MR. ALBRO: Okay, and I would prefer it coming in the form of a formal request so I know exactly what it is that I'm answering. I'm protecting my student data, but we can share any information that we're allowed to share.

MS. WYGONIK: Okay.

MR. BAGINSKI: Okay. Thank you very much, Mr. Albro.

MR. ALBRO: Thank you.

MR. BAGINSKI: Okay. Anyone else at this time wish to be heard?

MR. SMITH: Yes. Mr. Chairman, my name is Joe Smith. I'm a 44-year member of the Board of Education in Wallington.

MR. BAGINSKI: Hold on, you need to be sworn.

Page 49

MS. BAUMANN: I need to swear you in.
(Whereupon Joe Smith is duly sworn.)
MS. BAUMANN: Thank you, sir.  Go ahead.
MR. SMITH: The Borough of Wallington, the mayor and council, has been presented with a -- with which I assume that you are and you have a copy of -- of the Whitehall Association's evaluation of our school district where it -- it's pretty much right on the money with the increase of students.
As you are well aware, we've had a -- when we had the closing of Sacred Heart School we had an increase of 60 students, but we really had an increase of 130 students, and since that enclosure [sic] we have maintained at least that and have been equally around that number since then.
So that's public information that the -- that I believe you should have for future reference, but that was submitted to them, and I'm -- I'm -- I'm very aware if I get all the information here and we were never approached about that.
So I -- I don't know.  There's nobody else other than the superintendent of schools, the highest official in the Borough of Wallington, who

Page 50

has all that information did not receive that from anybody.
MR. MOORE: I -- I would just like to point -- like to say to defend my planner, she's not a liar, she talked to someone, and, A, as I said, it's not relevant to your basis of decision, but she can certainly get that information to you.
MR. SMITH: I never said she was a liar, Coach.  I never said she was a liar.  I said that nobody is aware --
MR. MOORE: Well, you said you don't know where she got it.
MR. SMITH: Well, that's what I said, and I'll stand by that.
MR. MOORE: So then you called her a liar.
MR. SMITH: I didn't call her a liar.  She maybe called the wrong municipality.  There's Wellington, maybe it was the wrong municipality.
MR. BAGINSKI: Listen, we're not here to argue about this.  Mr. Smith had a question, he spoke it and we'll leave it at that.
Now, Ms. Bogart, if -- if you need to put the request in for the information that's fine, now you know what avenue to take, correct?

Page 51

MS. BOGART: Yes, I do, thank you.
MR. BAGINSKI: Thank you.  Okay, anyone else wishing to be heard at this time?  You can just step forward or -- or you want to do it right there?
MS. DABAL: Yeah.
MR. BAGINSKI: Just need to swear you in.
(Whereupon Melissa Dabal is duly sworn.)
MS. BAUMANN: Can I have your name again, please?
MS. DABAL: Melissa Dabal, "D" as in David, a-b-a-l.
MS. BAUMANN: Okay.
MS. DABAL: I was at that meeting I think you recall when you were talking about how many children were coming out of the school, and you did distinctively say that you put in an OPRA request, and I just want that to go on record.  It was not a verbal request, you did say OPRA, and for me it defies logic that if you have "X" number of three-bedrooms, "X" number of two-bedrooms that there are going to be more than five children coming out of that complex.

Page 52

I'm sure people are not renting these units that are three- and two-bedroom to put a sauna in the additional bedroom or maybe a wine room.  They're definitely going to have children there.
So I'd like to know what is Morningside going to do to ensure that only five children come out of that complex moving forward.
MR. MOORE: Well, first of all, those three-bedrooms there are only three, and they're required by the affordable housing regulations, and it's illegal to ban children and it's illegal to deny applications for children.  The only way you can limit children is through age-restricted communities which this is not.
MS. DABAL: So -- so you're -- so basically what you're saying is there will be more than five children.
MR. MOORE: No, I'm not.
MS. DABAL: Well, you're saying that we can't restrict the number of children going there so I would assume that that means that there will be more than five.
MR. MOORE: No, Ms. Bogart has testified to why she thinks there will be five children, made it very clear on the record.

Page 53

MS. DABAL: Okay, thank you.

MR. BAGINSKI: Okay. Anyone else in the audience wishing to be heard in this matter? Okay, at this time then I'd like to close it to the hearing of citizens. Okay, Mr. Moore, you can --

MR. MOORE: Thank you. Just for the record and I'm --

MS. BOGART: Thank you.

MR. MOORE: -- referring to --

MR. BAGINSKI: Thank you, Ms. Bogart.

MR. MOORE: -- the report of Neglia Engineering Associates originally dated May 11, 2017, revised July 14, 2017, and most of these items in the report are largely informational or have been deemed satisfied so there's just a couple to point out where some explanation is required. Originally on the report in Item 5, "Application Completeness," it had been because we submitted the "location of all locations of proposed buildings and other structures having been shown and the uses on the buildings," that was rectified in a subsequent application -- a subsequent resubmission so there was no waiver request and that was withdrawn. And now I'm only bringing up, as I said, items

Page 54

that -- that aren't informational or that we do not agree to or require further explanation and that first one will be 6.12 which provides, "The applicant shall provide details for all proposed signage. Furthermore, the applicant shall indicate the dimensions of all signage on the site plan." The site monument sign is on the architect's plan, and we've submitted as part of testimony the "Welcome to Wallington" sign. To the extent anything more needs to be dimensioned on the plan that can be done through condition compliance if the board saw fit to grant approval, and again, that's Item 6.12. With respect to Item 7.11 it states, "The applicant does not indicate a sanitary sewer lateral for Buildings Number 7 and 8. "If the applicant intends to utilize the existing lateral the applicant shall provide capacity calculations and shall televise the existing lateral to confirm quality. A compact disc copy of the lateral shall be forwarded to our office." The sewer line for Buildings 7 and 8 is on the south side of the driveway so I also have Mr. Bertin here.

Page 55

MR. BERTIN: The last set of plans that were submitted show a sewer line coming along the southerly driveway and connecting in through the site to go to the sewer pump that's by the railroad tracks. We show a lateral coming out of Building 8. I missed the lateral coming out of Building 9, just a typo, but it is on there and it is intended to not utilize the existing sewer because I'm -- I'm pretty sure there's an ejector pump now for the -- the rink building. So anyway, we'll -- we'll tie into the sewer pump that's provided for the rest of the project.

MR. MOORE: And then with respect to Item 8.4 which says, "We note the intersection of Main Avenue and Midland Avenue will operate at an untenable level of Service F under the build condition with vehicle delay increasing to 736.3 seconds. "We recommend the applicant perform a traffic signal alarm study for the intersection for signalization consideration by the Borough of Wallington and Bergen County," and Mr. Bertin.

MR. BERTIN: We'll -- we'll do the Warren analysis because we've done the traffic

Page 56

counts. We did talk to Bergen County about the status of a -- of a traffic light there, and our response was that it's -- if the municipality would want them to consider a traffic light -- the people we talked to, and I don't know who we talked to so don't -- it was at the planning department -- that the borough would have to initiate the -- the process, and I guess that process hasn't been initiated for that. I just should mention to you that we did receive Bergen County conditional approval this week. So the county has approved it, but it -- we'll do the Warren study for you, and then if you want the light you got to go to the county.

MR. MOORE: And then that would be A-10 --

MR. BERTIN: Yes, okay.

MR. MOORE: -- which is the conditional county approval.

MR. BERTIN: Dated September 13, 2017.

MR. MOORE: And who should I provide the exhibit to?

MR. BERTIN: You're -- you're copied,

---

Page 57

but --

MR. MOORE: Yeah, the town's copied, but the planning board's copy.

MR. BAGINSKI: You can give that to Martie, thank you.

(Whereupon A-10, Conditional County approval dated 9/13/17, is marked for identification.)

MR. MOORE: Then with respect to Item 9.1 in accordance with Section 330-39B, "Any parking area located between the principal building and the minimum front line shall be landscaped or screened.

"No off-street parking area shall be located closer than 5 feet from any side or rear lot line. The applicant shall provide additional landscaping between the front lot line and proposed front yard parking spaces.

"Furthermore, the applicant requires a waiver for the proposed parking with a variance," and we've testified to it. "Parking improvements located within 5 feet of any side or rear lot line."

MR. BERTIN: The -- the --

MR. MOORE: Mr. Bertin.

---

Page 58

MR. BERTIN: The most recent set of plans we do have a hedgerow along the parking spaces on Main Avenue.

We show a couple of small dots to indicate existing trees, but if you've been by the site the trees that are along the right-of-way are pretty massive. I mean, they're not tall, but they're -- they've been there a long time and they've got probably a 20-foot drip line, but we can increase the -- the -- the shrubs, whatever your engineer wants, to help shield the parking spaces along Main Avenue.

With respect to parking within 5 feet of a lot line side or rear, the only -- that would only occur where the lot line separates the two parcels that are part of this application.

We have no parking within 5 feet of the exterior side or rear lot lines, just in this one parking lot on the north side of Buildings 7 and 8.

MR. MOORE: Thank you, Mr. Bertin. You might as well stay standing up.

Section 9.2 it said they -- "We recommend that the applicant revise the chain-link fence door enclosure for the dumpster areas to a board-on-board fence with steel posts."

---

Page 59

MR. BERTIN: Yes, we had done a -- a vinyl fence. I think you saw that and commented you wanted a -- a more -- a rigid -- rigid structure and we'll do that.

I might not make it a board-on-board fence, we might make it a solid fence, but I know you want a more rigid structure than a vinyl fence and we'll do that.

MR. MOORE: And then with respect to Comment 9.14, "The applicant shall revise the proposed lighting plan to include foot-candle intensities which extend beyond the property line. The applicant shall provide additional shielding to prevent spillage onto adjacent properties."

MR. BERTIN: And -- and the -- there were two lighting exhibits, plans. One had just the lighting on the property, and then there was a second one that showed lighting 30 feet beyond the property which would be along Main Avenue, the railroad tracks and the Saddle River and --

MR. MOORE: And that was Sheet C2.7, right?

MR. BERTIN: Correct, Sheet 2.7, and on the south side of Building 6 we did not show the

---

Page 60

parking -- that the lighting extends into the Jasontown lot by Buildings 7 and 8 because we have a -- a -- a solid fence there so it never would have traversed that point, but if you look at the -- Sheet 2.7 we've got it for the other areas.

MR. MOORE: And then with respect to the last comment, 9.15, "The engineer recommends the applicant install the Borough of Wallington standard streetscape with light fixtures along the property line."

MR. BERTIN: And I'm sorry I missed that the last time we submitted the plans, but yes, we'll put the -- the lanterns along the property line, and you'll probably want the brick pavers between the sidewalk and the curb, just like the -- the -- the municipal standard, which I think occurs a little bit further south across Main Avenue and we'll do that.

MR. MOORE: That concludes our -- all of our responses to the Neglia report. I'd just like to say in summation with respect to the first application it's just amended preliminary and final. It doesn't really affect the application.

It just makes it work a little better and

---

**Page 61**

makes it coordinate with the New Wallington application which is meeting affordable housing requirements, you know, set forth by the court, and while there are variances they are primarily, One, because of the two buildings so they're really -- two lots so they're really just technical variances, and then the others preserve the building which we think is a nice building. It's a building in good condition.  It seems a shame to tear it down, and we believe we can find really meaningful, you know, recreational uses for it that we would make open to the borough residents working on any insurance requirements or such, that could be a condition of the approval with the borough council.  So I thank you for your time in listening to this application.

MR. BAGINSKI: Okay.  Thank you, Mr. Moore.

MR. JACOBS: I have a few items on the -- on our letter that were not addressed.

MR. BAGINSKI: Okay.

MS. BAUMANN: Could you just identify yourself, please?

MR. JACOBS: Sorry, Evan Jacobs with Neglia Engineering.

**Page 62**

MR. MOORE: And where we didn't address it it's because we agree.

MR. BAGINSKI: Okay.  So you just want to put it on the record --

MR. JACOBS: Yeah --

MR. BAGINSKI: -- in order to just --

MR. JACOBS: -- sure.  The -- the main concern I have is about Number 7.14, 7.14, with regard to the flow to the Saddle River. Some water analysis indicates that a lot of the site sheet flows into the river today and that it will be piped into the existing pipe in the future.

We have no information on the capacity of that pipe, the condition of that pipe, any information as far as can that pipe handle the site, is it -- is it in good working condition, does it need a --

MR. MOORE: We agree to provide that information with -- to you as a condition of approval, but obviously if the pipe was insufficient we'd have to come back or satisfy you with the installation of a pipe that was sufficient.

MR. JACOBS: That's acceptable.

MR. BERTIN: Which -- which -- which

**Page 63**

item was that again?

MR. JACOBS: 7.14.

MR. BERTIN: Okay.

MR. BAGINSKI: Okay.

MR. JACOBS: I would -- I would submit that any outstanding comments, minor or whatever they are, just be approved as a condition of approval instead of going through all those little technical --

MR. BAGINSKI: Okay.

MR. MOORE: Right, and all -- as I said, the one -- your other comments that weren't satisfied or informational that I didn't mention it was because we agreed to comply with them.

MR. JACOBS: Okay.

MR. BAGINSKI: Did you want to -- are there any other open ones that you know of?

MR. JACOBS: They're minor technical --

MR. BAGINSKI: Okay.

MR. JACOBS: -- things I don't think we need to hear now, but if they're willing to address all of them as a condition of approval then I'm satisfied.

MR. BAGINSKI: Okay.  Thank you.

**Page 64**

All right.  At this time, any other -- any other questions for -- for the applicant from the board members or --

MR. MELFI: I understand.  I have one question and I don't know if it can go to the architect, the engineer or the attorney.

MR. MOORE: I'm sorry?

MR. MELFI: I don't recall if we discussed an emergency generator for the pumping station over there and if we did --

MR. BERTIN: It's shown on the plan. There's an emergency, there has to be for residential.

MR. MELFI: Absolutely, I understand.

MR. BERTIN: It's required by DEP.

MR. MELFI: I asked at the last meeting and you didn't recall.

MR. BERTIN: Okay, I didn't recall.

MR. MELFI: There's a generator.

MR. JACOBS: Is that the "G" on the plan next to the pump station?

MR. BERTIN: Yes.

MR. JACOBS: Okay.

MR. BAGINSKI: And Ms. Bogart testified today about the revision in the monument

In RE: Wallington

---

Page 65

sign.  Is there something new or is it different than what you originally proposed?

MR. BERTIN: No.

MR. MOORE: No.

MR. BAGINSKI: Then was there any clarification to where you were going to put the "Welcome to Wallington" sign because during your testimony we did talk about the fact where you put it you're not even going to see it?

MR. RAKER: Location.

MR. BAGINSKI: It's -- it would be like a waste to put a "Welcome to Wallington" sign there because --

MR. MOORE: I think it was that we --

MR. BAGINSKI: -- it's blocked by the trestle.

MR. MOORE: -- we'd locate it wherever you guys wanted us to locate it I believe was our response.

MR. RAKER: Yeah.

MR. BERTIN: If the -- as I mentioned, the trees that -- as -- as you're heading south on Main Avenue those first trees are pretty dense, although the -- the -- the canopy isn't that high, but you could have a sign

---

Page 66

underneath it, but the position I put it in which is shown here on the -- on the -- Exhibit A-1 is the wrong spot.

The other monument sign we have next to the -- the entrance driveway.  So wherever you want the "Welcome to Wallington" sign we'll try to figure that out.  We can make that a condition.  We could settle it now or make it a condition we work with --

MR. MOORE: Your engineer and --

MR. BERTIN: -- the construction official and the engineer.

MR. BAGINSKI: And also with the monument sign, how would that affect the field of view from that exit or entrance driveway when you're going to pull out of the place?

MR. BERTIN: Well, that's part of the county's review, and the monument sign is -- is set back from the right-of-way so it doesn't block a vision and that -- that is part of the county -- county review process.

MR. BAGINSKI: Okay.

MR. MELFI: And is -- have you put that sign on a plan for the county for their review?

---

Page 67

You're saying you got a conditional approval from the county, but are those signs for the "Welcome to Wallington" and the other sign, the monument sign, was that on the application to the county?

MR. BERTIN: The monument sign that's part of this application, yes.  The "Welcome to Wallington" has not.

Well, we -- we -- we showed it back closer to the bridge, the railroad bridge, but we have to submit final plans back to the county, and if it's on there and if it's in the sight triangle they're going to comment on it.  Well, we'll make sure it's not in the sight triangle.  The other monument sign is on it.

MR. BAGINSKI: Okay.  All right.  Then if there's no other questions or testimony in regard to this we need a motion and a second.

MR. CEDZIDLO: Could we have a discussion?

MR. BAGINSKI: Well, we could if you would like.  Any objection to that?

(Whereupon an off-the-record discussion is held.)

MR. BAGINSKI: Our attorney would

---

Page 68

like us to have a -- a -- we should be having a little bit of a discussion in regards to what we like about the application, what we dislike about the application.

So if we could do that as a board right now then we'll -- I mean, we can start on one side of the room, and -- and if anybody's got any positive or negative comments we can make them before we bring it to a motion.

MR. MELFI: Okay.  I gave my do's and my don'ts.

MR. BAGINSKI: Okay.

MR. MELFI: I notice there's a lawsuit that was granted, and there's no denying the amount of units because that was part of a -- a settlement with -- with the town going back a few years to put 208 units.  I know this project in total I believe is 207 units.

My personal opinion is I don't really like the recreation building to stay being that there's recreation underneath the apartments that you're going to be building, and if you're asking for a height variance for that to keep recreational purposes there and testimony was made for just the 73 units that are being built as who's going to be

---

Rizman Rappaport (973)992-7650
Let Our Fingers Do Your Talking

## Page 69

using those facilities, I don't feel there's a need to leave a big building there.

MR. MOORE: Just -- just the --

correct, and I -- except that the height variance isn't for the -- the building that's staying.  It's for the building in -- in the front, the new building.

MR. MELFI: That's what I'm saying, that's what I said, excuse me.

MR. MOORE: Okay, I'm sorry.

MR. MELFI: And I feel that if we were to take the other building down and move the other buildings back we cut out a lot of the variances.  Then I think I would give approval to the site plan amendment.

MS. WYGONIK: I agree with Mr. Melfi. I think the way -- keeping that recreation building right now the way it is it's too congested in there, the buildings are too closely tight together and I feel also that if that building was removed you could spread out the buildings. We'd have a little bit more open space.  The way I understand "open space" is actually open space.  I know she said that active recreation is considered open space or a part of open space, but

## Page 70

that's enclosed active recreation.

So I don't know, maybe I'm thinking something different, but anyway, I would also like to see that building being demolished and spread out. Also, I would like to do an OPRA request just to find out how many children we can expect to come from the whole -- from that whole development because we're still not sure.

We heard testimony maybe it's going to be 13, today she's revising it to five, and somehow I just can't see that.

If you're going to have 208 units -- I know she testified based on 72 units or 73 units, but still, out of 208 units I'm sure that we can expect a lot more children in school than what she was testifying to and that's a big concern for us citizens.

I mean, you know, our schools are -- our schools are already tight as it is now.  We'd like to know what we can expect from all those -- that whole development.  So that's -- that's my opinion.

MR. BAGINSKI: Thank you.

MS. DABAL: Thank you.

MS. POLTEN: I agree with Mr. Melfi and with Mrs. Wygonik.

## Page 71

I too am concerned about the recreational facility and the amount of children that will be generated from this -- this project in itself because our -- I know our schools are -- are -- are overflowing now and we need a new school and -- you know, but that's not at hand right at this moment. So I do happen to agree with them.

MR. PAWLUCZUK: I agree with these two about the OPRA request for the children, yes, totally.

MR. RACHELSKI: If I could say something.

It was mentioned that this project was compared to West New York.  It really is because you kind of look at density it is a West New York, and this is not the -- the -- the stuff that we want in our town.  It is parking lots and buildings, that's what it basically is.  Thank you.

MR. BAGINSKI: Anyone else?

MR. KASPEREK: Yeah, my biggest concern would be the -- there's not really a study done on the traffic, like real study, between Midland and Locust Avenue because when I used to, you know, work, you know, coming from work this way I used to spend 25 hours on this.

## Page 72

Right now considering adding, you know, 207 apartments right now you will actually increase the traffic in that area a lot.

MR. BAGINSKI: Anyone else at this time?

MR. BAZEL: I'd like to echo Mr. Melfi's sentiment about the recreational -- recreation center.

Also, I feel kind of uneasy that we are being asked to consider this as one project involving two -- two separate entities and that would it be -- would it be possible to redevelop each one of those lots in the future separately when we create right now variances?

MR. MOORE: No, but you'll have the approvals and the cross-easements and it would be impossible really.

MR. BAGINSKI: Okay.

MS. POLTEN: Another concern I have too is with the fire lane.

As it is -- as it stands right now if that building was to stay there, recreation and the other building, it's very narrow to get a truck through there, that would be -- you know, you'd have to speak with the fire official and have a

Page 73

report from him.

MR. MOORE: What I would like to do if it is at all possible with the board's leave because my client is not here because he's dealing with disasters from hurricanes down in the south is continue this application because I'm certainly hearing loud and clear what you folks are saying about the recreation building and about getting the OPRA request for the school.

MR. BAGINSKI: Okay.

MR. HERLINSKY: If I can interrupt you.

MR. BAGINSKI: Okay.

MR. HERLINSKY: Victor Herlinsky, Junior of the law firm of Sills, Cummis. I'm cocounsel with Kevin Moore. I -- I have spoken to the client about a number of the issues. The -- I mean, look, the real issue right here that we're talking about is, you know, I'm sure -- I'm sure the board doesn't like the court's decision as far as, you know, the number of units and what's going on in there. You don't like the fact that we have to put three-bedrooms in there, we don't like that either, but the -- the idea and what I'm going to ask for

Page 74

is that -- and I'm glad the superintendent's here because the -- and let me just stand up. I know Brigette Bogart for years. It was on me to hire her for this firm. I know her. If she said she called this board she called your office. I know she called this office, and anything saying that she didn't you don't know her, I do. She's been trusted by a number of communities. Her bond is -- I would like to make the OPRA request. You'll get it by the end of the week, you'll have the statutory time, and then we can come to the next -- the next meeting because, you know, I don't want this board to -- to talk in a -- in a -- in a vacuum and nobody knows how many. You know, we had somebody come up here and say, You know, I know a one-bedroom apartment that is, you know, eight kids living. I mean, that's BS, that -- that -- you know, that's when they call DYFS. Maybe they're a thing, but that's -- that's -- the county should -- there's no apartment I think in -- in -- in a -- in a -- a community like Wallington where there's eight people living there, that's -- that's BS. Excuse my French, but the fact of the matter

Page 75

is in this -- you know, I feel like she's been under attack in this case, you know, and it's like, look, I have roots in Wallington, she has roots in Wallington, and the fact of the matter is we're not coming here, you know, trying to do something. We're coming here with -- with units that have already been approved by the -- by the court, and if we go back to the court the court's going to say, Look, I already told you what we're putting in here.

So like in the end of the day what I'm asking for is let me come back. We're going to get you the report. You know, I -- I -- I trust we're going to get a -- a prompt answer, and then you won't have to guess as far as how many kids are coming in.

And -- and I know West New York's not -- you know, just Wallington's not West New York. We're not trying to say that it is, but we're trying to get some information.

She called somebody in Wallington. Somebody in Wallington says, Oh, we can't get that information, and you know what, I don't think you're going to have this information hand -- you know, sitting in some drawer.

Page 76

You're going to have to actually work for it, but if you came here tonight and you said, Look, we want to get you this information. We're going to get you a request that's going to be able to give her the information that she can come and tell you what's going on in Wallington, so that you don't have to guess. So if I can, I would like to be able to answer your question.

MS. WYGONIK: I would appreciate that, yes.

MR. BAGINSKI: Okay.

MS. WYGONIK: That's -- that's one part, that's a small part of this -- all these discussions, but that's one part.

MR. HERLINSKY: Yeah, but the -- we -- I've heard everything that the board has said and -- and it --

MR. MOORE: We got it, I think.

MR. HERLINSKY: Yeah.

MR. MELFI: Mr. Herlinsky, it's not the question of an approval for the 207 units because that's court ordered. It's a question --

MS. WYGONIK: Right.

MR. MELFI: -- of the variances that we have to grant for you -- for you to meet those

BER-L-001670-18   08/30/2018 7:37:18 PM   Pg 21 of 36   Trans ID: LCV20181512307
Case 2:20-cv-08187-EP-AME   Document 142-15   Filed 05/02/26   Page 9 of 22 PageID: 3485

In RE: Wallington

Page 77

207 units. So I don't think it's a child issue that's informational, and for what we want here is to -- if you did an OPRA request to say how many children are going to our school system from Mount Pleasant, Jasontown 1 and 2. We're not looking for names and if they have the amount they have the amount. I don't think the amounts are going to really make a difference here, personally, because it's court ordered as far as how many one-bedrooms, how many two-bedrooms, how many three-bedrooms that you had to put in according to the courts, that was the lawsuit that was won by your people.

MR. HERLINSKY: Yeah, but if -- if -- I did hear every single person that came up here say, We can't have any more kids, and if I didn't hear so much from the board.

It's an over -- in my mind it's an overriding consideration and whether or not it's, you know, something that you should or should not according to the law, and Mr. Cedzidlo will advise you on the law, whether it's -- it's -- it's there, and the fact of the matter is right now it's a question mark and it's a question mark, and I will say

Page 78

because my planner called your office and got an answer saying, We don't really have that information.

MR. MOORE: Basically we've made the point.

MS. DABAL: Yeah, really.

MR. HERLINSKY: I understand, but I want --

MR. SMITH: Yeah, and it's insulting to my superintendent of schools.

MS. DABAL: That's right.

MR. SMITH: There's two people in that office, his secretary and him.

MR. BAGINSKI: Excuse me, excuse me. He has the floor right now. You'll have an opportunity to speak again, sorry.

MR. HERLINSKY: Well, we're going to put it all to rest because we're going to get the information, and we're going to come back and we're going to present it to the board so you don't have to guess.

MR. BAGINSKI: Okay.

MS. WYGONIK: And the reason I kept pursuing the -- you know, how many children we can expect is not that we're going to vote against it

Page 79

because we're going to get so many children, but just what can we expect so we can plan for the future because this development may not be complete for a couple years. I don't know how long it's going to take it. We just want to know what we can expect so we can prepare for the future, that's all, and I think that we should know what it would be.

MR. CEDZIDLO: Let's be clear about something, okay? We heard from Mr. Melfi, Bazel, Pawluczuk, Polten, we've got Mr. Kasperek. The thing that I heard most clearly were complaints about keeping the existing recreational structure, that was voiced by almost everyone. And Ms. Bogart gave honest testimony that said if we remove that building 95 percent of the variances that we've requested would be eliminated. And name-calling, accusations, side issues, of course people have those issues and of course the public is going to worry, of course those things will get discussed, but the simple fact of the matter is is that the testimony presented by the applicant that -- is that we're asking for a lot of variances on this project in this configuration

Page 80

because we're going to keep a building that's only going to be limited to the 73 units on this parcel and will not be shared with all the -- the other units on the other parcel because we can't do that by -- by agreement or by law because it's on a different property. So let's focus on, okay, let's -- let's be civil, let's discuss things properly and let's address what everybody discussed is the granting of variances that all surround a recreational building which is going to impede open space. Ms. Bogart told us very clearly that's an interpretive issue, one the board has interpreted -- clearly stated that they interpret that it's not open space.

Mr. Rachelski made a comment about we don't want it to look like West New York. I think it's clear that that is the overriding issue that the board has raised.

Certainly Counsel; Mr. Moore, Mr. Herlinsky, said, Can we have a continuance on this? I don't think anybody has expressed any concern because, as the board has also said, the amount of units are already decided. It's how do we present that, build these units

Page 81

in the best possible manner for the residents and for the Borough of Wallington and the residents of this project, okay? So from that point -- from this point on let's -- let's be civil and let's address things in the proper way, okay?

MR. HERLINSKY: Thank you.

MR. BAGINSKI: Okay. And now just so everybody understands, we as the board here have an obligation to the residents of Wallington and that's what we're here for. So we need to try and make sure that what's being done is done the right way, and we need to balance out -- you're telling me you got a perfectly good building that you don't want to knock down and you see no sense in knocking down, but yet if you do 95 percent of the variances are gone. So we as the board need to sit and discuss this which we've been doing, and we need to come up with a plan or an idea of what's going to work best for us by saying, No, we can't have that building because of whatever, but again, I'm just voicing my opinion now, but we as the board will vote on it. So it -- it's a big project, we all know that

Page 82

it is, and the court mandated the number of units, but now we need to do what's best for the residents of our town.

MR. MOORE: Well, I'd like to --

MR. HERLINSKY: Can I -- can I just ask --

MR. MOORE: Before Mr. Herlinsky got up with --

MR. HERLINSKY: Can I just ask a -- a simple question, and it's just while I'm sitting here? I'm going on and I see my fellow alumni. When I -- when I played soccer at Don Bosco I played a lot of guys. You had a lot of guys from Wallington coming up to Don Bosco at the time, and the fact of the matter is there is -- you know, if you're talking about overcrowding, if you're talking lack of facilities like why wouldn't you want to have like an indoor soccer which we've offered to the town? So like if -- you don't have enough fields in Wallington for all the kids that want to play. Like why -- why wouldn't you want -- why would you want to tear down this building? It'd be -- make a fantastic indoor soccer, that's what I think.

Page 83

You know, somebody said basketball. I didn't -- I sucked at basketball so I never played that, but I was decent at soccer, but the idea is like why wouldn't you want it? If you -- it's already there, it's built. It's a -- it's a building that was built for several million dollars. So like to tear it seems like a waste, but if we're offering and say, Look, every Saturday you want to have game after game after game, you know, nine o'clock to two o'clock you got it. Like if -- if Wallington has this overcrowding problem, why wouldn't you want to have that? I don't know if there's another indoor soccer facility, but you got a high school that -- I don't think that has an indoor soccer facility. Why wouldn't you want to have that? I don't understand. I mean, that's a rhetorical question and I'm not asking the board to answer it, but it seems to me that if -- if the issue is the strain on all the resources here in Wallington and we're offering something that's already there, man, I -- I -- I think that'd be a very popular thing because you can do that all year-round, and I assume soccer's

Page 84

pretty popular in Wallington, used to be, and the fact of the matter is that -- that's what I would say, but we're going to do the OPRA request. We're going to come in, we'll assess -- again, I've -- I've offered to Mr. Melfi, I've offered to other people to say, Look, if there's something that the town wants to do. If you want us to look in the insurance issues we'll look at them, but the fact of the matter is it's -- it's something that could be for the good of the town, and I -- and I would ask you again it's like why would you want to tear it down if -- if it's something we're offering? So that's all I have to say. I would ask for a continuance so we can provide the information so the board doesn't have to guess.

MR. BAGINSKI: Okay. Thank you, Mr. Herlinsky. All right, at this point then we'll need a motion to hold it in abeyance until next month.

MS. WYGONIK: I'll make the motion.

MS. POLTEN: I'll second it.

MR. MELFI: Do we -- on -- on that second before we make the motion I just have a

BER-L-001670-18   08/30/2018 7:37:18 PM  Pg 23 of 36 Trans ID: LCV20181512307
Case 2:20-cv-08178-EP-AME    Document 132-15    Filed 02/06/26    Page 24 of 32
PageID: 3436

In RE: Wallington

Page 85

comment on that or do we have to wait until after we vote because I think a lot of the conditions -- okay, let's wait.  We'll wait.

MR. BAGINSKI: Okay.  So Mr. Herlinsky comitted to hold it in abeyance.  You're going to do the OPRA request for those students, and at this point in time there is a motion.

Can we make the request of Mr. Herlinsky to look into insurance and things like that for this -- this type of building or is it feasible at this time to do or do you want to hold off on that?

MR. TOMKO: I think you're putting the cart before the horse right now.

MS. POLTEN: Yeah.

MR. BAGINSKI: Okay.

MR. TOMKO: Let -- let -- let's get these other things straightened out before you even talk about what we're going to do out there.

MS. POLTEN: Right.

MR. BAGINSKI: Okay.

MR. TOMKO: I mean, between that and -- and just a quick answer to the traffic study with that traffic light.

We have met with Bergen County about that,

Page 86

that's been an ongoing thing, and just recently we met and -- and there's a sizable cost involved in it on the municipal part that has to be looked into also.  So we are looking at that avenue, it's not dormant, and the town has been working on it.

MR. BAGINSKI: Yes, okay.  Mr. Melfi, good?

MR. MELFI: Good.

MR. BAGINSKI: We need a motion to the second?

MS. POLTEN: We have it.

MR. BAGINSKI: Okay.  I need a roll call.

MS. SIEK: Melfi?

MR. MELFI: Aye.

MS. SIEK: Pawluczuk?

MR. PAWLUCZUK: Aye.

MS. SIEK: Bazel?

MR. BAZEL: Aye.

MS. SIEK: Polten?

MS. POLTEN: Aye.

MS. SIEK: Baginski?

MER. BAGINSKI: Aye.

MS. SIEK: Wygonik?

MS. WYGONIK: Aye.

Page 87

MS. SIEK: Rachelski?

MR. RACHELSKI: Aye.

MS. SIEK: Kasperek?

MR. KASPEREK: Aye.

MS. SIEK: And Tomko?

MR. TOMKO: Aye.

MR. BAGINSKI: Thank you.

MR. MOORE: Oh, we need to get the date for the continuance.

MS. SIEK: October 17th.

MR. BAGINSKI: Okay.  So anybody in the audience wishing to come back it'll be October 17th at the meeting here, same time, same place.  Thank you.

(Whereupon all witnesses are excused and the matter is adjourned for the evening at 9:08 p.m.)

Page 88

CERTIFICATE

I, DENISE C. CLARK, a Certified Court Reporter and Notary Public of the State of New Jersey, hereby certify the foregoing to be a true and accurate transcript of the proceedings as taken stenographically by me on the date and place hereinbefore set forth.

DENISE C. CLARK, CCR
License No. 30XI00213800

My Commission expires November 14, 2017.

In RE: Wallington

Transcript fo Proceedings

---

**$**

**$45,000 (1)**
38:5
**$5,000 (1)**
38:7
**$55,000 (1)**
38:5

**[**

**[sic] (2)**
13:17;49:16

**A**

**A- (1)**
5:4
**A-1 (1)**
66:2
**A-10 (2)**
56:17;57:6
**A-9 (3)**
5:5,8,13
**a-b-a-l (1)**
51:14
**abeyance (2)**
84:20;85:5
**able (4)**
3:7;47:25;76:4,8
**Absolutely (1)**
64:14
**abundance (1)**
22:9
**accept (3)**
6:24;7:5;31:22
**acceptable (1)**
62:24
**access (2)**
35:10;43:19
**accommodate (3)**
9:1;16:4;20:16
**accommodating (1)**
16:18
**accomplish (1)**
14:9
**accordance (2)**
17:18;57:10
**according (2)**
77:13,21
**accusations (1)**
79:19
**acknowledge (1)**
4:7
**across (3)**
20:21;25:10;60:17
**action (3)**
10:17;13:16;16:22
**active (18)**
18:17;19:15;21:9,15,
23,24;22:7;25:13,15;
45:10,12,17;46:1,2,3,5;

69:24;70:1
**activities (1)**
17:21
**actual (2)**
9:25;29:14
**actually (11)**
9:13;13:7;20:8;24:4;
28:21;34:1;36:7;38:17;
69:23;72:2;76:1
**Adam (1)**
5:6
**adding (1)**
72:1
**additional (8)**
15:19;18:21;25:17;
27:9;37:16;52:3;57:16;
59:13
**address (10)**
4:1;9:7,22;15:19;
32:25;33:3;62:2;63:23;
80:9;81:5
**addressed (1)**
61:20
**addresses (3)**
34:20;35:17;37:14
**adequate (1)**
18:21
**adjacent (3)**
3:21,21;59:14
**adjourned (1)**
87:16
**administrator's (1)**
47:16
**advise (1)**
77:22
**aesthetic (3)**
20:24;28:24;30:11
**aesthetically (3)**
26:25;29:6,9
**affect (2)**
60:23;66:14
**affordable (10)**
17:7;18:7,15;38:9,9;
40:22;41:13,18;52:10;
61:2
**Again (17)**
10:20,25;13:15;16:2,
21;17:6;22:15;42:14;
45:3;46:25;51:12;
54:13;63:1;78:16;
81:23;84:4,11
**against (2)**
6:2;78:25
**age-restricted (1)**
52:13
**ago (1)**
16:10
**agree (7)**
54:2;62:2,18;69:16;
70:24;71:7,8
**agreed (1)**
63:14
**agreement (1)**

80:5
**ahead (3)**
23:5;47:3;49:4
**alarm (1)**
55:21
**albeit (1)**
18:12
**Albro (12)**
36:14;46:16,17,20,
23;47:2,2,4;48:2,10,17,
18
**A-l-b-r-o (1)**
47:2
**alike (1)**
20:8
**allowed (2)**
48:3,14
**allowing (2)**
13:19,21
**allows (1)**
20:9
**almost (1)**
79:15
**alone (1)**
13:9
**along (12)**
5:9;13:2,12;14:19;
20:11;55:2;58:2,6,11;
59:19;60:9,13
**alternative (1)**
21:1
**although (1)**
65:24
**alumni (1)**
82:12
**ambulances (1)**
23:16
**amended (2)**
3:18;60:22
**amendment (1)**
69:15
**amendments (1)**
42:22
**amount (6)**
12:10;68:15;71:2;
77:8,8;80:23
**amounts (1)**
77:9
**analysis (4)**
38:12;39:18;55:25;
62:10
**answered (1)**
36:8
**apartment (4)**
40:6,24;74:16,21
**apartments (8)**
34:20;35:19,20;
40:19;42:8;48:9;68:21;
72:2
**appearance (1)**
26:9
**applicant (20)**
3:21;12:5,6;13:4;

27:11;31:18;54:4,5,15,
17,18;55:20;57:16,19;
58:23;59:10,13;60:8;
64:2;79:24
**applicants (1)**
43:24
**applicant's (2)**
4:16,21
**application (18)**
3:17,21;9:11;17:8;
36:23;46:14;53:18,22;
58:16;60:22,24;61:2,
16;67:4,7;68:3,4;73:6
**applications (3)**
3:15;4:4;52:12
**appreciate (1)**
76:9
**approached (1)**
49:22
**appropriate (18)**
9:3;10:7,11,18;11:3;
12:5;13:16;14:1;16:5,
6,19,22;17:3;18:16;
20:15,17;27:17,18
**approval (21)**
3:19,24;6:24,25;7:5,
7;31:23;32:3,5;33:7;
54:13;56:12,20;57:7;
61:14;62:20;63:8,23;
67:1;69:14;76:21
**approvals (1)**
72:16
**approved (5)**
3:20;42:19;56:13;
63:7;75:7
**approximately (4)**
16:1,2;37:4,7
**architect (3)**
30:6;41:23;64:6
**architect's (1)**
54:7
**architectural (3)**
10:12;11:3;12:20
**area (13)**
10:9,14;13:12;14:19;
15:1,7,21;21:9;30:8;
39:17;57:11,14;72:3
**areas (2)**
58:24;60:5
**argue (1)**
50:21
**argument (1)**
30:23
**argumentative (1)**
36:17
**around (2)**
17:15;49:17
**aspect (1)**
30:11
**assess (1)**
84:4
**associated (2)**
18:23;19:4

**Associates (2)**
44:15;53:12
**Association's (1)**
49:9
**assume (3)**
49:7;52:21;83:25
**assure (1)**
38:20
**attack (1)**
75:2
**attempt (1)**
43:2
**attend (2)**
34:9;35:18
**attending (1)**
48:8
**attention (1)**
47:8
**attorney (4)**
9:21;36:24;64:6;
67:25
**attractive (2)**
11:8;30:17
**audience (3)**
46:10;53:3;87:12
**August (1)**
4:6
**Avenue (16)**
4:1;13:1,2,5,12;
14:19;50:25;55:16,16;
58:3,12;59:20;60:18;
65:23;71:23;86:4
**aware (3)**
49:12,21;50:10
**away (1)**
25:16
**Aye (9)**
86:15,17,19,21,23,
25;87:2,4,6

**B**

**back (17)**
8:5;13:10,22;16:23;
27:21;29:8;38:7;62:21;
66:19;67:9,11;68:16;
69:13;75:8,12;78:19;
87:12
**BAGINSKI (85)**
3:1,7;5:1,15;6:7;7:9,
12,18,20,23;8:1,3;21:7,
13,19;22:2,8,14,21;
23:1,5;24:13;25:19;
34:4;35:14;36:7,14;
39:3;42:14,20,23;44:6,
12,16,22;46:6;48:16,
19,24;50:20;51:2,7;
53:2,10;57:4;61:17,21;
62:3,6;63:4,10,16,20,
25;64:24;65:5,11,15;
66:13,22;67:16,21,25;
68:12;70:22;71:19;
72:4,18;73:10,13;

Rizman Rappaport (973)992-7650
Let Our Fingers Do Your Talking

**(89) $45,000 - BAGINSKI**