# In The Matter Of:

*In Re: Morningside at Wallington*

*Transcript of Proceedings*

*December 19, 2017*



RIZMAN RAPPAPORT
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ  07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

EXHIBIT

K

*Min_____Word Index*

Page 1

TOWNSHIP OF WALLINGTON
PLANNING BOARD

X------------------------------------X
In the matter of:

MORNINGSIDE AT WALLINGTON, LLC
551 Main Avenue
Block 71, Lot 35.01
            -AND-
NEW WALLINGTON HOME, LLC
551 Main Avenue
Block 71, Lot 35.02
X------------------------------------X

TRANSCRIPT
OF
PROCEEDINGS

Tuesday, December 19, 2017
54 Union Boulevard
Wallington, New Jersey 07057
Commencing at 7:55 p.m.

BOARD MEMBERS PRESENT:

TOMASZ BAZEL, Chairman
DARIUSZ PAWLUCZUK
KATHY POLTEN
THERESA WYGONIK
MARK TOMKO, Mayor

BRIAN A. INTINDOLA, PE, Board Engineer
DOROTHY SIEK, Board Secretary

A P P E A R A N C E S:

MARTIN S. CEDZIDLO, ESQUIRE
Attorney for the board

SILLS, CUMMIS & GROSS, P.A.
BY:  KEVIN J. MOORE, ESQUIRE
Attorneys for the applicant

Page 2

I N D E X

WITNESS                          EXAMINATION
BRIGETTE BOGART, PP                   4

EXHIBITS MARKED FOR IDENTIFICATION

NUMBER        DESCRIPTION            PAGE NO

A-11          Spreadsheet of school-age      5
              children

Page 3

MR. BAZEL: At this point I would like to move on to old business.  Applicants for Morningside and New Wallington Home, please step forward.

MR. MOORE: Good evening, Mr. Chairman.  Just for the record, my name is Kevin Moore with the firm of Sills, Cummis and Gross.  I represent New Wallington Home, LLC and Morningside at Wallington, LLC on two related applications.  Just to quickly refresh the board's memory, the application for Block 71, Lot 35.02, the New Wallington Home, LLC project, is for amended preliminary and final site plan approval for an approved 134-unit multifamily project, and the application for the adjacent Block 71, Lot 35.01, the Morningside at Wallington Home, LLC project, is for preliminary and final site plan approval and C bulk variances for a 73-unit multifamily project.  Both properties have a street address of 551 Main Avenue here in Wallington.  As the board knows, this is the fourth hearing on these two related applications.  The previous hearings were before the board on May 16th, July 6th, July 18th and September 19th.  The board cancelled its October 17th meeting

Page 4

so the applicants re-noticed to the board's November 21st meeting, and at your November 21st meeting you did take jurisdiction over the applications and continued them to this evening without any further notice but took no other actions and received no testimony on the applications that evening.  When the September 19th hearing concluded which was the last full hearing the applicants had completed their case but continued the application to submit an Open Public Records Act request for information relating to schoolchildren which our planner, Miss Bogart, will present this evening.  With that, I'd like to just briefly recall Miss Bogart to go over her findings.  She's been previously sworn and qualified.

MR. BAZEL: Okay, Mr. Moore.

MR. MOORE: Miss Bogart.

MS. BOGART: Good evening.

MR. BAZEL: Hello.  Good evening.

MS. BOGART: How are you all?

MR. BAZEL: Okay.

MS. BOGART: So the last time I was here there was a lot of questions with regard to how the school impacts would be to -- specifically

Page 5

to Wallington, and from that point on what I did was do an OPRA request to the Board of Education's superintendent, and I've been working with the superintendent very closely to make sure that we had the most accurate information.

So what I did -- actually, the superintendent prepared a spreadsheet and I modified it slightly, but I'd like to pass that out to you.  I believe that's A --

MR. MOORE: A-11, that will be Exhibit A-11.

MR. BAZEL: Thank you.

MR. CEDZIDLO: Thank you.

MR. PAWLUCZUK: Thank you.

MS. POLTEN: Thank you.

MS. BOGART: You're welcome.

(Whereupon A-11, Spreadsheet of school-age children, is marked for identification.)

MS. BOGART: So since the previous meeting I went through your tax records and gathered all the block and lots that had multifamily apartment designations, and I forwarded that list of apartment addresses to the Board of Education.

They came back and provided me with a number

Page 6

of students for each of the addresses, and so you'll see here the first number of lines between the first gray line and the second gray line you have a total of 163 students and a total of 1,206 apartments, that equates to a ratio of .135 students per unit.

Right below the gray line you'll notice that there's two other apartment complexes, the Showhank Realty Homes, one at 13 Reservoir and Brook and the other at 69 Reservoir Avenue.

Unfortunately, we were unable to identify exactly the street addresses that were associated with those units and the number of students.  So what we did was actually take that out of the equation for now.

There are 24 units associated with those two addresses, but it was difficult to cross-reference those with the Board of Education's -- the Board of Education's database.

So with regard to the number of units and the addresses that we have above the gray line, as I mentioned to you, we have 1,206 units and we have 163 schoolchildren, that equates to a ratio of .135.

So if you applied that to the Morningside

Page 7

project that is being proposed for 73 units that would approximate 9.8 schoolchildren or ten, and I had previously testified it would be between five and thirteen.  So that's very similar or consistent with my previous testimony.

If you just look at the Jason Town II Apartment Complex which is the last line before the gray line at 11 to 21 Midland Avenue and 421 Main Avenue there's 674 units, and the reason I just looked at that is because it has a substantial amount of units, and there's 105 schoolchildren and that equates to a ratio of .156 and that would result in 11.372 schoolchildren for Morningside, again, consistent with my testimony of five to thirteen schoolchildren.

If you look at Mount Pleasant Village Apartments where the address is 211 Alden Street there's 396 units with 33 schoolchildren at a ratio of .08 schoolchildren per apartment and that's half of what Jason Town is.

So that would approximately be about six schoolchildren generated from the proposed Morningside, again, consistent with my previous testimony with regard to the estimates of schoolchildren.

Page 8

So I understand that this board is very concerned about how the Wallington school capacity and the estimated schoolchildren locally ranked up to what my testimony was statewide and locally.

I think you can see from the numbers provided by your own Board of Education it's very consistent with my testimony previously provided at the last couple hearings and that's basically all I have to say.

I know I testified at length with regard to all the variances that we're seeking for this proposal, and I think that my testimony stands on its own for the variances, and I think that this finalizes the last question that the board had with regard to the school impacts and the local impacts for the proposal, and again, I think it's all consistent with my previous testimony.

MR. MOORE: Are there any questions for Miss Bogart?

MS. WYGONIK: I just have a question just to clarify.

So other than those two bigger like Mount Pleasant Village Apartments and the Jason Town the other addresses that you listed are like multifamily units, correct, more than two-family?

Page 9

MS. BOGART: There were --

MS. WYGONIK: I see some have like five units, some have six units, some have sixteen units.

MS. BOGART: Yes, they were all identified as multifamily housing, yes.

MS. WYGONIK: Okay.

MS. BOGART: And like I said, I specifically called out the ones with the larger number of units just so you can get an idea.

MS. WYGONIK: Okay.

MR. BAZEL: Okay. Thank you, Ms. Bogart.

MS. BOGART: Thank you.

MR. BAZEL: Anybody else have any questions for Ms. Bogart?

MS. WYGONIK: I'm still surprised that the ratio is so low.

MS. BOGART: I know, everyone always is.

MS. WYGONIK: I thought it would be higher, but I guess --

MS. BOGART: No, the facts are the facts.

MS. WYGONIK: Okay, thank you. I

Page 10

know I was the one pursuing this so thank you for the information.

MS. BOGART: No problem, thank you. Thank you.

MR. MOORE: That concludes our direct presentation.

After public comment -- I know I did make a summation back in September, but I would just like to make a brief summation after public comment given it's been so long since the board last considered the matter.

MR. BAZEL: Thank you, Mr. Moore. At this point I would like to open the meeting to hearing of the citizens. Is anybody here that would like to raise any issues with regard to this application? I don't see anybody so I will close the hearing of the citizens.

MR. MOORE: Mr. Chairman, members of the board, I'd just like to recap. What we're here for are two distinct applications. The application for Block 71, Lot 35.02, the New Wallington Home, LLC project, is just for amended preliminary and final site plan approval for an already approved 134-unit multifamily

Page 11

project. The proposed amendments to that preliminary and final site plan approval are to implement changes relating to just functional changes relating to driveways, parking spaces and trash enclosures and to make it more compatible with the proposed Morningside project.

The application for Block 71, Lot 35.01 which is the Morningside at Wallington Home project is for preliminary and final site plan approval and C bulk variances for a 73-unit multifamily project. I'd like to emphasize our testimony has demonstrated that the project is a permitted use, that it complies with the affordable housing set-aside required by the court orders and your ordinances, that the project complies with all stormwater requirements and will not have a substantial negative impact on area traffic.

The converted roller rink will be a unique amenity to the residents of the project. It will be for use of residents of the Morningside Complex and will require a keycard access. However, at the board's request the applicant has agreed -- or at least some board members' request the applicant has agreed to allow the

Page 12

township to utilize the building as well for recreational purposes providing a public benefit. Candidly, we would not build a new building that size, but there's no benefit in demolishing an existing building which has been recently renovated and can be a great amenity to the residents and to the community.

Our planner, as she noted, has accurately testified and testified at length regarding the requested variances and that they meet the positive criteria for granting them because the purposes of the zoning set forth in the Municipal Land Use Law will be furthered by the requested variances. The requested variances represent an improvement over the existing zoning, and the benefits of granting those variances outweigh any detriments to granting the variances.

Likewise, she demonstrated that there's -- the negative criteria of no substantial impairment to the zone plan and zoning ordinance were met, and then we asked for a variance for the open space requirement, but we do not believe under your ordinance that it's required because we believe that the -- the roller rink building being used for active open space which is actually a requirement

Page 13

of the ordinance meets that requirement. Therefore, I believe that the requested variances should be granted and the preliminary and final site plan approval should be granted, and I think Miss Bogart has also demonstrated this evening and in her testimony last evening that even though it's not a real legal basis for a decision, the impact by this development on the generation of the number of schoolchildren will be minimal. I also thank the board for various improvements with respect to access that we made at your suggestion, and I would urge that the board grant this approval. Thank you for all the time you've put into this and your consideration.

MR. BAZEL: Thank you, Mr. Moore. From our last meeting a number of board members raised issues with regard to variances required, and as I recall, most of those variances would not be even seeked(sic) if it wasn't for the building that's actually sitting on the property. As I recall, about 90 percent of variances would be --

MR. MOORE: It wasn't 90 percent. I would say it was about four or five variances that are required because of the building because, don't forget, you got the two separate lots.

Page 14

Let me just pull something out here, and I'll let Miss Bogart correct me if I'm wrong. She's still under oath and qualified, and she can kick me or just tell me to shut up if I get this wrong, but the only two variances the first one was for building height and that was not required due to the roller rink. The second one was for parking setback on Main Avenue which, again, is not required because of the roller rink. The buffer to Main Avenue which is related exactly to the parking is, again, not due to the roller rink. The building coverage I -- I think the roller rink does contribute to the building coverage variance.

MS. BOGART: That's correct.

MR. MOORE: I'm not looking at you, I'm looking at her because she's nodding whether I get it wrong or right. With respect to Item 5 which is lot coverage, again, that would be -- that was from, you know, but to give a perspective on building coverage it's 30.02 versus 25, and on lot coverage it's 83.02 versus 75 percent that would be due to the roller rink. Open space 17.1 versus 30 percent required.

Page 15

Again, we believe that the roller rink actually meets that and we put the variance proofs in, but we don't actually believe that it's a required variance, and those are the -- and then the other variance for the monument sign is, likewise, not required due to the fact of the roller rink. It would be required anyway. Am I missing any other variances?

MS. BOGART: No. The only other two were the building separation which --

MR. MOORE: Right, building separation which --

MS. BOGART: -- depends on how it's designed.

MR. MOORE: Yeah.

MS. WYGONIK: So how many variances total?

MR. MOORE: I would say three if you were giving the benefit of the two. The building coverage, the lot coverage and --

MS. WYGONIK: We had a lot more than that, three.

MR. MOORE: And then I was going to say and then the building separation could be argued to be due to that.

Page 16

MS. WYGONIK: I thought we had like eight variances.

MR. MOORE: I have -- I have seven.

MS. WYGONIK: Well, seven.

MR. MOORE: Right.

MS. WYGONIK: Oh, I thought you said three?

MR. MOORE: No, you said how many were due to the building coverage.

MS. WYGONIK: No, no, no, no. How many variances total?

MR. MOORE: I mean, not the building coverage, to the roller rink. Of those seven I'm saying three.

MS. WYGONIK: Okay, but there's total seven variances --

MR. MOORE: Yes.

MS. WYGONIK: -- that you're seeking, okay, with this application?

MR. MOORE: Yes.

MS. WYGONIK: All right, fine. Well, I still have the same concerns because to approve an application that requires seven variances I'm not comfortable voting on that application and approving that application.

Page 17

We have an obligation to the citizens of this town. I mean, those apartments will look nice. There's going to be plenty of space around. However, with that recreation building it's limiting the space around those apartments. They're becoming very compact and very tight, and citizens aren't going to like that. They're going to come back and say, Why did you approve this application when everything is so tight and compact? So I still have major concerns with those seven variances, that's -- that's my opinion.

MR. MOORE: And --

MS. WYGONIK: Any other board members have any other, you know --

MS. POLTEN: At the last meeting that you were here in September I had brought up about insurance, who's going to monitor the facility if you were to have this recreation center, and also two, the amount of people that would be allowed and where would you park -- have them park?

MR. MOORE: Well, there's -- there's plenty of parking in the vicinity on this development. I mean, we're meeting your ordinance

Page 18

requirements, but it's actually as a practical matter over-parked by, you know, industry standards, and insurance and handling that could be worked out in condition compliance in the developer's agreement.

MS. POLTEN: And also, two, the flow of traffic on the one side of the building. It can only be a one way because it's too narrow for a two way up until a certain point which your drawings had shown.

MR. MOORE: But we've widened -- we've -- we've widened the road as part of the --

MS. POLTEN: How do you widen that part because I'm very familiar with that area? How would you widen it because right next door is the driveway that goes into --

MR. MOORE: We have 6 --

MS. POLTEN: -- Jason Town.

MR. MOORE: Just to give you the exact number, we have 66 extra parking spaces from the parking requirements of the municipality.

MS. POLTEN: Well, I know the facility of Retro Fitness alone over there there's cars you wouldn't believe are all over the parking lot and there's more than 66, I guarantee it.

Page 19

MR. MOORE: Yeah, but Retro Fitness is a business. This would be something if there was like a town, you know, soccer game or something that had to do with indoor soccer or basketball.

MS. POLTEN: That's it. How would you accommodate all these people?

MR. MOORE: Like I said, we got 66 extra parking spaces, and I think we could accommodate them.

MS. POLTEN: And with the tenants who rent from you, would they like it if the town people joined in in a facility that should really be for them? I know I would be upset.

MR. MOORE: Well, they would have it the majority of the time, and as I said, that was something that the board requested. If the board doesn't want us to do that then we don't have to do that either.

MS. POLTEN: I just -- I just can't see where it would be conducive to have this facility at all.

MR. MOORE: But, I mean, it's a -- you know, it's a facility, it's in good shape, it provides, you know, remarkable recreational

Page 20

opportunities, and it just seems a shame to tear it down.

MR. BAZEL: Well, the other option is to limit number of units for development to be compliant with all the requirements.

MR. MOORE: Well, that's -- I mean, you know, that's part of the affordable housing, you know, requirements, and you guys should want that to make sure you're compliant with, you know, your affordable housing requirements as well.

MR. BAZEL: Any other member would like to voice their opinion on this? Well, if not, then we need a motion on the application.

MS. WYGONIK: I would like to make a motion to approve the application on the condition that the recreation building is eliminated because I don't feel comfortable voting for it. I will not vote for the recreation building. So that's -- that's my --

MS. POLTEN: I'll second that.

MR. BAZEL: Can we do that?

MR. CEDZIDLO: That's the problem, you can't do that.

MS. POLTEN: You can't do that?

MS. WYGONIK: Why not?

Page 21

MR. BAZEL: Because you're voting on the application.

MR. CEDZIDLO: If you just remove the building everything else -- you still need variances for everything else. You have to reconfigure the entire -- because right now the roads, the setbacks, everything is conditioned upon this building being there.

MS. WYGONIK: I understand that, yeah, but it's making everything tight and everything compact.

MR. CEDZIDLO: Yeah, but procedurally what you have to do is you have to vote to deny the application as submitted.

MS. WYGONIK: Okay.

MR. CEDZIDLO: That would allow the applicant to come back with a new application that doesn't have the recreation in it.

MS. WYGONIK: All right. Then I withdraw my motion.

MS. POLTEN: Wasn't the original -- the judge's orders that that building was not included?

MR. CEDZIDLO: No, no, no.

MS. POLTEN: How was --

Page 22

MR. CEDZIDLO: The original settlement of the Mount Laurel litigation was for density of units.

MS. POLTEN: Yeah.

MR. CEDZIDLO: And the -- that the --

MS. POLTEN: Refresh my memory.

MR. CEDZIDLO: See, that was a commercial site. If it was going to be developed it can be developed for residential purposes with certain density, and here, they're compliant with the density requirements --

MS. POLTEN: Right.

MR. CEDZIDLO: -- but they -- they wanted to keep this recreation building as part of it. So the application as submitted would -- would be -- what Theresa is suggesting is that, I won't vote for it, which would be actually to deny the application as submitted, not that, I'll approve it if you make changes, because we don't know what the changes are.

MS. POLTEN: Right.

MR. CEDZIDLO: So it would be a denial, and -- and we -- we have this all the time. We -- I'm trying to think if it's the planning

Page 23

board or zoning board since I do both. I think it was the zoning board where we had a property that submitted an application, it was denied. They submitted an application, it was denied. They submitted an application, it was approved. They made the changes that the board said, This is what we would -- what we would like to see there and remove certain variances. So it doesn't mean that the property can't be developed. It just means it can't be developed under this plan.

MR. PAWLUCZUK: So they have to do a new plan first.

MR. CEDZIDLO: Which they would have to draw a new plan, and they can still build the amount of units. They just have to reconfigure the -- the units and -- and its location on the property and what variances they may or may not need.

MS. WYGONIK: Okay. So I make a motion to deny the application, reject the application as is.

MR. BAZEL: Second?

MR. PAWLUCZUK: Second.

Page 24

MS. SIEK: Pawluczuk.

MR. PAWLUCZUK: Aye.

MS. SIEK: Polten.

MS. POLTEN: Aye.

MS. SIEK: Bazel.

MR. BAZEL: Aye.

MS. SIEK: Wygonik.

MS. WYGONIK: Aye.

MS. SIEK: Tomko.

MR. TOMKO: Aye.

MR. BAZEL: Thank you, Mr. Moore.

MR. MOORE: Thank you, understood.

MR. BAZEL: Merry Christmas.

MR. MOORE: Merry Christmas and Happy New Year.

(Whereupon the witness is excused and the matter is adjourned at 8:22 p.m.)

Page 25

CERTIFICATE

I, DENISE C. CLARK, a Certified Court
Reporter and Notary Public of the State of New
Jersey, hereby certify the foregoing to be a true
and accurate transcript of the proceedings as taken
stenographically by me on the date and place
hereinbefore set forth.

DENISE C. CLARK, CCR
License No. 30XI00213800

My Commission expires
November 14, 2022.

Case 2:20-cv-08176-AME  Document 42-16  Filed 01/26/26  Page 9 of 13 PageID: 459

**In Re: Morningside at Wallington**                                    **Transcript of Proceedings**

## A

**A-11 (3)**
  5:10,11,17
**above (1)**
  6:21
**access (2)**
  11:22;13:11
**accommodate (2)**
  19:7,10
**accurate (1)**
  5:5
**accurately (1)**
  12:8
**Act (1)**
  4:11
**actions (1)**
  4:6
**active (1)**
  12:25
**actually (8)**
  5:6;6:14;12:25;
  13:20;15:2,3;18:1;
  22:18
**address (2)**
  3:19;7:17
**addresses (6)**
  5:23;6:1,12,17,21;
  8:24
**adjacent (1)**
  3:15
**adjourned (1)**
  24:17
**affordable (3)**
  11:14;20:7,10
**again (7)**
  7:14,23;8:16;14:9,
  11,21;15:1
**agreed (2)**
  11:24,25
**agreement (1)**
  18:5
**Alden (1)**
  7:17
**allow (2)**
  11:25;21:16
**allowed (1)**
  17:20
**alone (1)**
  18:23
**always (1)**
  9:19
**amended (2)**
  3:12;10:24
**amendments (1)**
  11:2
**amenity (2)**
  11:20;12:6
**amount (3)**
  7:11;17:20;23:17
**apartment (5)**
  5:22,23;6:8;7:7,19

**apartments (5)**
  6:5;7:17;8:23;17:2,5
**applicant (3)**
  11:23,25;21:17
**Applicants (3)**
  3:2;4:1,9
**application (23)**
  3:11,15;4:10;10:16,
  22;11:8;16:19,23,24,
  25;17:9;20:13,15;21:2,
  14,17;22:16,19;23:3,4,
  5,22,23
**applications (5)**
  3:9,22;4:4,7;10:21
**applied (1)**
  6:25
**approval (7)**
  3:13,17;10:24;11:3,
  10;13:4,13
**approve (4)**
  16:22;17:9;20:15;
  22:19
**approved (3)**
  3:14;10:25;23:6
**approving (1)**
  16:25
**approximate (1)**
  7:2
**approximately (1)**
  7:21
**area (2)**
  11:18;18:14
**argued (1)**
  15:25
**around (2)**
  17:3,5
**associated (2)**
  6:12,16
**Avenue (6)**
  3:20;6:10;7:8,9;14:9,
  10
**Aye (5)**
  24:2,4,6,8,10

## B

**back (4)**
  5:25;10:8;17:8;
  21:17
**basically (1)**
  8:8
**basis (1)**
  13:7
**basketball (1)**
  19:5
**BAZEL (18)**
  3:1;4:17,20,22;5:12;
  9:12,15;10:12;13:15;
  20:3,11,21;21:1;23:24;
  24:5,6,11,13
**becoming (1)**
  17:6
**below (1)**

  6:7
**benefit (3)**
  12:2,4;15:19
**benefits (1)**
  12:16
**bigger (1)**
  8:22
**Block (5)**
  3:11,15;5:21;10:22;
  11:8
**board (23)**
  3:21,23,25;5:2,23;
  6:18,18;8:1,6,14;10:10,
  20;11:24;13:10,12,16;
  17:14;19:17,17;23:1,1,
  2,7
**board's (3)**
  3:10;4:1;11:23
**Bogart (23)**
  4:13,15,18,19,21,23;
  5:16,19;8:19;9:1,5,8,
  13,14,16,19,23;10:3;
  13:5;14:2,16;15:9,13
**Both (2)**
  3:19;23:1
**brief (1)**
  10:9
**briefly (1)**
  4:14
**Brook (1)**
  6:9
**brought (1)**
  17:17
**buffer (1)**
  14:10
**build (2)**
  12:3;23:16
**building (24)**
  12:1,3,5,24;13:19,
  24;14:6,13,14,22;
  15:10,11,19,24;16:9,
  12;17:4;18:7;20:16,18;
  21:4,8,22;22:14
**bulk (2)**
  3:18;11:11
**business (2)**
  3:2;19:2

## C

**called (1)**
  9:9
**came (1)**
  5:25
**can (8)**
  8:5;9:10;12:6;14:3;
  18:8;20:21;22:9;23:16
**cancelled (1)**
  3:25
**Candidly (1)**
  12:3
**capacity (1)**
  8:2

**cars (1)**
  18:24
**case (1)**
  4:10
**CEDZIDLO (12)**
  5:13;20:22;21:3,12,
  16,24;22:1,5,7,13,23;
  23:15
**center (1)**
  17:19
**certain (3)**
  18:9;22:10;23:9
**Chairman (2)**
  3:6;10:19
**changes (5)**
  11:4,4;22:20,21;23:7
**children (1)**
  5:18
**Christmas (2)**
  24:13,14
**citizens (4)**
  10:14,18;17:1,7
**clarify (1)**
  8:21
**close (1)**
  10:17
**closely (1)**
  5:4
**comfortable (2)**
  16:24;20:17
**comment (2)**
  10:7,9
**commercial (1)**
  22:8
**community (1)**
  12:7
**compact (3)**
  17:6,10;21:11
**compatible (1)**
  11:6
**completed (1)**
  4:10
**Complex (2)**
  7:7;11:21
**complexes (1)**
  6:8
**compliance (1)**
  18:4
**compliant (3)**
  20:5,9;22:10
**complies (2)**
  11:14,16
**concerned (1)**
  8:2
**concerns (2)**
  16:22;17:10
**concluded (1)**
  4:8
**concludes (1)**
  10:5
**condition (2)**
  18:4;20:15
**conditioned (1)**

  21:8
**conducive (1)**
  19:21
**consideration (1)**
  13:14
**considered (1)**
  10:11
**consistent (5)**
  7:4,14,23;8:6,17
**continued (2)**
  4:4,10
**contribute (1)**
  14:14
**converted (1)**
  11:19
**couple (1)**
  8:8
**court (1)**
  11:15
**coverage (9)**
  14:13,14,20,22,23;
  15:20,20;16:9,13
**criteria (2)**
  12:11,19
**cross-reference (1)**
  6:17
**Cummis (1)**
  3:7

## D

**database (1)**
  6:19
**decision (1)**
  13:7
**demolishing (1)**
  12:4
**demonstrated (3)**
  11:13;12:18;13:5
**denial (1)**
  22:24
**denied (2)**
  23:4,5
**density (3)**
  22:3,10,11
**deny (3)**
  21:13;22:18;23:22
**depends (1)**
  15:13
**designations (1)**
  5:22
**designed (1)**
  15:14
**detriments (1)**
  12:17
**developed (4)**
  22:8,9;23:11,11
**developer's (1)**
  18:5
**development (3)**
  13:8;17:24;20:4
**difficult (1)**
  6:17

**direct (1)**
10:5
**distinct (1)**
10:21
**door (1)**
18:15
**down (1)**
20:2
**draw (1)**
23:16
**drawings (1)**
18:10
**driveway (1)**
18:16
**driveways (1)**
11:5
**due (6)**
14:6,11,24;15:6,25;
16:9

## E

**Education (2)**
5:24;8:6
**Education's (3)**
5:2;6:18,19
**eight (1)**
16:2
**either (1)**
19:19
**eliminated (1)**
20:16
**else (3)**
9:15;21:4,5
**emphasize (1)**
11:12
**enclosures (1)**
11:6
**entire (1)**
21:6
**equates (3)**
6:5,23;7:12
**equation (1)**
6:15
**estimated (1)**
8:3
**estimates (1)**
7:24
**even (2)**
13:6,19
**evening (8)**
3:5;4:4,7,13,19,20;
13:6,6
**everyone (1)**
9:19
**exact (1)**
18:20
**exactly (2)**
6:12;14:11
**excused (1)**
24:16
**Exhibit (1)**
5:11

**existing (2)**
12:5,15
**extra (2)**
18:20;19:9

## F

**facility (5)**
17:18;18:23;19:13,
22,24
**fact (1)**
15:6
**facts (2)**
9:23,24
**familiar (1)**
18:14
**feel (1)**
20:17
**final (6)**
3:13,17;10:24;11:3,
10;13:4
**finalizes (1)**
8:14
**findings (1)**
4:15
**fine (1)**
16:21
**firm (1)**
3:7
**first (4)**
6:2,3;14:5;23:14
**Fitness (2)**
18:23;19:1
**five (4)**
7:3,14;9:3;13:23
**flow (1)**
18:6
**forget (1)**
13:25
**forth (1)**
12:12
**forward (1)**
3:4
**forwarded (1)**
5:22
**four (1)**
13:23
**fourth (1)**
3:21
**full (1)**
4:9
**functional (1)**
11:4
**further (1)**
4:5
**furthered (1)**
12:13

## G

**game (1)**
19:4
**gathered (1)**

5:21
**generated (1)**
7:22
**generation (1)**
13:8
**given (1)**
10:10
**giving (1)**
15:19
**goes (1)**
18:16
**Good (4)**
3:5;4:19,20;19:24
**grant (1)**
13:13
**granted (2)**
13:3,4
**granting (3)**
12:11,16,17
**gray (5)**
6:3,3,7,21;7:8
**great (1)**
12:6
**Gross (1)**
3:7
**guarantee (1)**
18:25
**guess (1)**
9:22
**guys (1)**
20:8

## H

**half (1)**
7:19
**handling (1)**
18:3
**Happy (1)**
24:14
**hearing (5)**
3:21;4:8,9;10:14,17
**hearings (2)**
3:23;8:8
**height (1)**
14:6
**Hello (1)**
4:20
**higher (1)**
9:22
**Home (6)**
3:3,8,12,16;10:23;
11:9
**Homes (1)**
6:9
**housing (4)**
9:6;11:14;20:7,10

## I

**idea (1)**
9:10
**identification (1)**

5:18
**identified (1)**
9:6
**identify (1)**
6:11
**II (1)**
7:6
**impact (2)**
11:18;13:8
**impacts (3)**
4:25;8:15,15
**impairment (1)**
12:19
**implement (1)**
11:3
**improvement (1)**
12:15
**improvements (1)**
13:11
**included (1)**
21:23
**indoor (1)**
19:5
**industry (1)**
18:2
**information (3)**
4:12;5:5;10:2
**insurance (2)**
17:18;18:3
**into (2)**
13:14;18:16
**issues (2)**
10:16;13:17
**Item (1)**
14:20

## J

**Jason (4)**
7:6,20;8:23;18:18
**joined (1)**
19:13
**judge's (1)**
21:22
**July (2)**
3:23,24
**jurisdiction (1)**
4:3

## K

**keep (1)**
22:14
**Kevin (1)**
3:6
**keycard (1)**
11:22
**kick (1)**
14:3
**knows (1)**
3:21

## L

**Land (1)**
12:12
**larger (1)**
9:9
**last (9)**
4:9,23;7:7;8:7,14;
10:10;13:6,16;17:16
**Laurel (1)**
22:2
**Law (1)**
12:12
**least (1)**
11:24
**legal (1)**
13:7
**length (2)**
8:10;12:9
**Likewise (2)**
12:18;15:6
**limit (1)**
20:4
**limiting (1)**
17:5
**line (6)**
6:3,3,7,21;7:7,8
**lines (1)**
6:2
**list (1)**
5:23
**listed (1)**
8:24
**litigation (1)**
22:2
**LLC (5)**
3:8,9,12,16;10:23
**local (1)**
8:15
**locally (2)**
8:3,4
**location (1)**
23:19
**long (1)**
10:10
**look (3)**
7:6,16;17:2
**looked (1)**
7:10
**looking (2)**
14:17,18
**Lot (10)**
3:11,15;4:24;10:22;
11:8;14:20,23;15:20,
21;18:25
**lots (2)**
5:21;13:25
**low (1)**
9:18

## M

In Re: Morningside at Wallington

Transcript of Proceedings

**Main (4)**
3:19;7:8;14:8,10
**major (1)**
17:10
**majority (1)**
19:16
**making (1)**
21:10
**many (3)**
15:16;16:8,11
**marked (1)**
5:18
**matter (3)**
10:11;18:2;24:17
**May (3)**
3:23;23:20,20
**mean (6)**
16:12;17:2,25;19:23;
20:6;23:10
**means (1)**
23:11
**meet (1)**
12:10
**meeting (8)**
3:25;4:2,3;5:20;
10:13;13:16;17:16,25
**meets (2)**
13:1;15:2
**member (1)**
20:11
**members (3)**
10:19;13:16;17:14
**members' (1)**
11:24
**memory (2)**
3:10;22:6
**mentioned (1)**
6:22
**Merry (2)**
24:13,14
**met (1)**
12:20
**Midland (1)**
7:8
**minimal (1)**
13:9
**Miss (6)**
4:13,15,18;8:19;
13:5;14:2
**missing (1)**
15:8
**modified (1)**
5:7
**monitor (1)**
17:18
**monument (1)**
15:5
**MOORE (35)**
3:5,7;4:17,18;5:10;
8:18;10:5,12,19;13:15,
22;14:17;15:11,15,18,
23;16:3,5,8,12,17,20;
17:13,22;18:11,17,19;

19:1,8,15,23;20:6;
24:11,12,14
**more (4)**
8:25;11:6;15:21;
18:25
**Morningside (9)**
3:3,8,16;6:25;7:13,
23;11:7,9,21
**most (2)**
5:5;13:18
**motion (4)**
20:13,15;21:20;
23:22
**Mount (3)**
7:16;8:22;22:2
**move (1)**
3:2
**multifamily (7)**
3:14,18;5:22;8:25;
9:6;10:25;11:11
**Municipal (1)**
12:12
**municipality (1)**
18:21

**N**

**name (1)**
3:6
**narrow (1)**
18:9
**need (3)**
20:13;21:4;23:20
**negative (2)**
11:18;12:19
**New (9)**
3:3,8,11;10:23;12:3;
21:17;23:14,16;24:15
**next (1)**
18:15
**nice (1)**
17:2
**nodding (1)**
14:18
**noted (1)**
12:8
**notice (2)**
4:5;6:7
**November (2)**
4:2,2
**number (9)**
5:25;6:2,13,20;9:10;
13:9,16;18:20;20:4
**numbers (1)**
8:5

**O**

**oath (1)**
14:3
**obligation (1)**
17:1
**October (1)**

3:25
**old (1)**
3:2
**one (6)**
6:9;10:1;14:5,8;18:7,
8
**ones (1)**
9:9
**only (3)**
14:5;15:9;18:8
**Open (5)**
4:11;10:13;12:21,25;
14:25
**opinion (2)**
17:12;20:12
**opportunities (1)**
20:1
**OPRA (1)**
5:2
**option (1)**
20:3
**orders (2)**
11:15;21:22
**ordinance (4)**
12:20,23;13:1;17:25
**ordinances (1)**
11:16
**original (2)**
21:21;22:1
**out (5)**
5:8;6:14;9:9;14:1;
18:4
**outweigh (1)**
12:16
**over (5)**
4:3,15;12:15;18:23,
24
**over-parked (1)**
18:2
**own (2)**
8:6,13

**P**

**park (2)**
17:21,21
**parking (8)**
11:5;14:8,11;17:23;
18:20,21,24;19:9
**part (4)**
18:12,14;20:7;22:14
**pass (1)**
5:8
**PAWLUCZUK (5)**
5:14;23:13,25;24:1,2
**people (3)**
17:20;19:7,13
**per (2)**
6:6;7:19
**percent (4)**
13:21,22;14:24,25
**permitted (1)**
11:13

**perspective (1)**
14:22
**plan (10)**
3:13,17;10:24;11:3,
10;12:20;13:4;23:12,
14,16
**planner (2)**
4:13;12:8
**planning (1)**
22:25
**Pleasant (2)**
7:16;8:23
**please (1)**
3:3
**plenty (2)**
17:3,23
**pm (1)**
24:17
**point (4)**
3:1;5:1;10:13;18:9
**POLTEN (19)**
5:15;17:16;18:6,13,
18,22;19:6,11,20;
20:20,24;21:21,25;
22:4,6,12,22;24:3,4
**positive (1)**
12:10
**practical (1)**
18:1
**preliminary (6)**
3:13,17;10:24;11:2,
10;13:3
**prepared (1)**
5:7
**present (1)**
4:13
**presentation (1)**
10:6
**previous (5)**
3:22;5:19;7:5,23;
8:17
**previously (3)**
4:16;7:3;8:7
**problem (2)**
10:3;20:22
**procedurally (1)**
21:12
**project (13)**
3:12,14,16,18;7:1;
10:23;11:1,7,9,11,13,
16,20
**proofs (1)**
15:2
**properties (1)**
3:19
**property (4)**
13:20;23:3,10,19
**proposal (2)**
8:12,16
**proposed (4)**
7:1,22;11:2,7
**provided (3)**
5:25;8:5,7

**provides (1)**
19:25
**providing (1)**
12:2
**Public (4)**
4:11;10:7,9;12:2
**pull (1)**
14:1
**purposes (3)**
12:2,11;22:9
**pursuing (1)**
10:1
**put (2)**
13:14;15:2

**Q**

**qualified (2)**
4:16;14:3
**quickly (1)**
3:10

**R**

**raise (1)**
10:15
**raised (1)**
13:17
**ranked (1)**
8:3
**ratio (5)**
6:5,23;7:12,18;9:18
**real (1)**
13:7
**really (1)**
19:13
**Realty (1)**
6:9
**reason (1)**
7:9
**recall (3)**
4:14;13:18,21
**recap (1)**
10:20
**received (1)**
4:6
**recently (1)**
12:5
**reconfigure (2)**
21:6;23:18
**record (1)**
3:6
**Records (2)**
4:11;5:20
**recreation (6)**
17:4,19;20:16,18;
21:18;22:14
**recreational (2)**
12:2;19:25
**refresh (2)**
3:10;22:6
**regard (7)**
4:24;6:20;7:24;8:10,

Rizman Rappaport (973)992-7650
Let Our Fingers Do Your Talking

15;10:16;13:17
**regarding (1)**
12:9
**reject (1)**
23:22
**related (3)**
3:9,22;14:11
**relating (3)**
4:12;11:4,5
**remarkable (1)**
19:25
**remove (2)**
21:3;23:9
**re-noticed (1)**
4:1
**renovated (1)**
12:5
**rent (1)**
19:12
**represent (2)**
3:8;12:14
**request (4)**
4:11;5:2;11:23,25
**requested (5)**
12:10,13,14;13:2;
19:17
**require (1)**
11:22
**required (10)**
11:15;12:23;13:17,
24;14:6,9,25;15:4,6,7
**requirement (3)**
12:22,25;13:1
**requirements (7)**
11:17;18:1,21;20:5,
8,10;22:11
**requires (1)**
16:23
**Reservoir (2)**
6:9,10
**residential (1)**
22:9
**residents (3)**
11:20,21;12:6
**respect (2)**
13:11;14:20
**result (1)**
7:13
**Retro (2)**
18:23;19:1
**Right (10)**
6:7;14:19;15:11;
16:5,21;18:15;21:7,19;
22:12,22
**rink (10)**
11:19;12:24;14:7,10,
12,14,25;15:1,7;16:13
**road (1)**
18:12
**roads (1)**
21:7
**roller (10)**
11:19;12:24;14:7,10,

12,13,24;15:1,7;16:13

## S

**same (1)**
16:22
**saying (1)**
16:14
**school (3)**
4:25;8:2,15
**school-age (1)**
5:18
**schoolchildren (12)**
4:12;6:23;7:2,11,13,
15,18,19,22,25;8:3;
13:9
**second (5)**
6:3;14:8;20:20;
23:24,25
**seekedsic (1)**
13:19
**seeking (2)**
8:11;16:18
**seems (1)**
20:1
**separate (1)**
13:25
**separation (3)**
15:10,12,24
**September (4)**
3:24;4:8;10:8;17:17
**set (1)**
12:12
**set-aside (1)**
11:15
**setback (1)**
14:8
**setbacks (1)**
21:7
**settlement (1)**
22:2
**seven (6)**
16:3,4,13,16,23;
17:11
**shame (1)**
20:1
**shape (1)**
19:24
**Showhank (1)**
6:8
**shown (1)**
18:10
**shut (1)**
14:4
**side (1)**
18:7
**SIEK (5)**
24:1,3,5,7,9
**sign (1)**
15:5
**Sills (1)**
3:7
**similar (1)**

7:4
**site (7)**
3:13,17;10:24;11:3,
10;13:4;22:8
**sitting (1)**
13:20
**six (2)**
7:21;9:3
**sixteen (1)**
9:3
**size (1)**
12:4
**slightly (1)**
5:7
**soccer (2)**
19:4,5
**space (5)**
12:21,25;14:25;17:3,
5
**spaces (3)**
11:5;18:20;19:9
**specifically (2)**
4:25;9:9
**spreadsheet (2)**
5:7,17
**standards (1)**
18:3
**stands (1)**
8:12
**statewide (1)**
8:4
**step (1)**
3:3
**still (6)**
9:17;14:3;16:22;
17:10;21:4;23:16
**stormwater (1)**
11:17
**street (3)**
3:19;6:12;7:17
**students (4)**
6:1,4,6,13
**submit (1)**
4:11
**submitted (6)**
21:14;22:16,19;23:3,
4,5
**substantial (3)**
7:10;11:18;12:19
**suggesting (1)**
22:17
**suggestion (1)**
13:12
**summation (2)**
10:8,9
**superintendent (3)**
5:3,4,6
**sure (2)**
5:4;20:9
**surprised (1)**
9:17
**sworn (1)**
4:16

## T

**tax (1)**
5:20
**tear (1)**
20:1
**ten (1)**
7:2
**tenants (1)**
19:11
**testified (4)**
7:3;8:10;12:9,9
**testimony (10)**
4:6;7:5,14,24;8:4,7,
12,17;11:12;13:6
**Therefore (1)**
13:2
**Theresa (1)**
22:17
**thirteen (2)**
7:4,15
**though (1)**
13:7
**thought (3)**
9:21;16:1,6
**three (4)**
15:18,22;16:7,14
**tight (3)**
17:6,10;21:10
**Tomko (2)**
24:9,10
**took (1)**
4:5
**total (5)**
6:4,4;15:17;16:11,15
**Town (7)**
7:6,20;8:23;17:2;
18:18;19:4,12
**township (1)**
12:1
**traffic (2)**
11:18;18:7
**trash (1)**
11:5
**trying (1)**
22:25
**two (13)**
3:9,22;6:8,16;8:22;
10:21;13:25;14:5;15:9,
19;17:20;18:6,9
**two-family (1)**
8:25

## U

**unable (1)**
6:11
**under (3)**
12:22;14:3;23:12
**understood (1)**
24:12
**Unfortunately (1)**

6:11
**unique (1)**
11:19
**unit (1)**
6:6
**units (17)**
6:13,16,20,22;7:1,9,
11,18;8:25;9:3,3,4,10;
20:4;22:3;23:17,18
**up (4)**
8:3;14:4;17:17;18:9
**upon (1)**
21:8
**upset (1)**
19:14
**urge (1)**
13:12
**use (3)**
11:13,21;12:12
**used (1)**
12:24
**utilize (1)**
12:1

## V

**variance (5)**
12:21;14:15;15:2,4,5
**variances (25)**
3:18;8:11,13;11:11;
12:10,13,14,16,17;
13:3,17,18,21,23;14:5;
15:8,16;16:2,11,16,23;
17:11;21:5;23:9,20
**various (1)**
13:10
**versus (3)**
14:23,24,25
**vicinity (1)**
17:23
**Village (2)**
7:16;8:23
**voice (1)**
20:12
**vote (3)**
20:18;21:13;22:18
**voting (3)**
16:24;20:17;21:1

## W

**Wallington (10)**
3:3,8,9,12,16,20;5:1;
8:2;10:23;11:9
**way (2)**
18:8,9
**welcome (1)**
5:16
**Whereupon (2)**
5:17;24:16
**who's (1)**
17:18
**widen (2)**

**In Re: Morningside at Wallington**                                                    **Transcript of Proceedings**

18:13,15
**widened (2)**
18:11,12
**withdraw (1)**
21:20
**without (1)**
4:5
**witness (1)**
24:16
**worked (1)**
18:4
**working (1)**
5:3
**wrong (3)**
14:2,4,19
**WYGONIK (25)**
8:20;9:2,7,11,17,21,
25;15:16,21;16:1,4,6,
10,15,18,21;17:14;
20:14,25;21:9,15,19;
23:21;24:7,8

**Y**

**Year (1)**
24:15

**Z**

**zone (1)**
12:20
**zoning (5)**
12:12,15,20;23:1,2

**0**

**08 (1)**
7:19

**1**

**1,206 (2)**
6:4,22
**105 (1)**
7:11
**11 (1)**
7:8
**11.372 (1)**
7:13
**13 (1)**
6:9
**134-unit (2)**
3:14;10:25
**135 (2)**
6:5,24
**156 (1)**
7:12
**163 (2)**
6:4,23
**16th (1)**
3:23
**17.1 (1)**
14:25

**17th (1)**
3:25
**18th (1)**
3:24
**19th (2)**
3:24;4:8

**2**

**21 (1)**
7:8
**211 (1)**
7:17
**21st (2)**
4:2,2
**24 (1)**
6:16
**25 (1)**
14:23

**3**

**30 (1)**
14:25
**30.02 (1)**
14:23
**33 (1)**
7:18
**35.01 (2)**
3:15;11:8
**35.02 (2)**
3:11;10:22
**396 (1)**
7:18

**4**

**421 (1)**
7:8

**5**

**5 (1)**
14:20
**551 (1)**
3:19

**6**

**6 (1)**
18:17
**66 (3)**
18:20,25;19:8
**674 (1)**
7:9
**69 (1)**
6:10
**6th (1)**
3:24

**7**

**71 (4)**

3:11,15;10:22;11:8
**73 (1)**
7:1
**73-unit (2)**
3:18;11:11
**75 (1)**
14:24

**8**

**8:22 (1)**
24:17
**83.02 (1)**
14:23

**9**

**9.8 (1)**
7:2
**90 (2)**
13:21,22