U.S. LEGAL SUPPORT
(877) 479-2484

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

CIVIL ACTION No. 2:20-cv-08178

-------------------------------
NEW WALLINGTON HOME, LLC, a      :
New Jersey limited liability
company; and MORNINGSIDE AT      :
WALLINGTON, LLC, a New Jersey
limited liability company,       :

            Plaintiffs,          :      DEPOSITION OF:

      v.                         :      EUGENIUSZ RACHELSKI


BOROUGH OF WALLINGTON; BOROUGH   :
OF WALLINGTON PLANNING BOARD;
MARK W. TOMKO, in his official   :
capacity as former mayor of
the Borough of Wallington;       :
DOROTHY B. SIEK, in her
official capacity as former      :
tax collector for the Borough
of Wallington; and CHRISTOPHER   :
ASSENHEMER, in his official
capacity as certified tax        :
collector of the Borough of
Wallington,                      :

            Defendants.          :
-------------------------------

November 1, 2024

10:04 a.m.


      TRANSCRIPT of testimony of EUGENIUSZ RACHELSKI,

Taken by and before LINDA M. SCHAAL, Certified Court

Reporter, and Notary Public of the State of New

Jersey, at the offices of O'TOOLE SCRIVO, 14 Village

Park Road, Cedar Grove

EXHIBIT

O

A P P E A R A N C E S:


         O'TOOLE SCRIVO, LLC
         Attorneys for the Plaintiff
         14 Village Park Road
         Cedar Grove, New Jersey 07009
         BY:  JAMES DiGIULIO, ESQ.
         jdigiulio@oslaw.com


         PFUND McDONNELL, P.C.
         Attorneys for the Defendants
         139 Prospect Street
         Ridgewood, New Jersey
         BY:  GERALD SHEPARD, ESQ.
         gshepard@pfundmcdonnell.com

I N D E X   TO   E X A M I N A T I O N

WITNESS                                                    PAGE

EUGENIUSZ RACHELSKI

   by Mr. DiGiulio                                           5

I N D E X   T O   E X H I B I T S

EUGENIUSZ RACHELSKI

NEW WALLINGTON HOME vs. BOROUGH OF WALLINGTON

FRIDAY, NOVEMBER 1, 2024

LINDA SCHAAL, CCR

| MARKED | DESCRIPTION | PAGE |
|--------|-------------|------|
| ER-1 | Amended Complaint | 18 |
| ER-2 | Opinion of Judge Harris - 3-18-08 | 25 |
| ER-3 | Judge Meehan Decision - 4-22-15 | 30 |
| ER-4 | Judge Meehan Order - 3-2-16 | 33 |
| ER-5 | Transcript - 7-18-17 | 36 |
| ER-6 | Transcript - 9-19-17 | 45 |
| ER-7 | Resolution 18-326 | 49 |
| ER-8 | Civil Case Information Statement | 53 |
| ER-9 | Preliminary and Final Site Plan for Wallington Station | 60 |
| ER-10 | Certificate of Sale for Unpaid Municipal Liens | 68 |
| ER-11 | Check with 7/19/18 letter attached | 70 |
| ER-12 | Resolution No. 2018-197 | 72 |
| ER-13 | Settlement Agreement | 79 |

(Exhibits retained by the Reporter)

E U G E N I U S Z   R A C H E L S K I,

   the witness herein, having been duly sworn by a

   Notary Public of the State of New Jersey, was

   examined and testified as follow:

EXAMINATION BY MR. DiGIULIO:

Q.        Good morning, Councilman Rachelski.
My name is Jim DiGiulio from the law firm of O'Toole
Scrivo where you are today.  It's nice to meet you.
We met off the record right before.  I represent the
plaintiffs, New Wallington Home and Morningside at
Wallington in a federal lawsuit that has been
brought against the borough and several of its
officials.  Have you ever been deposed before?

A.        Yes.

Q.        About how many times?

A.        Probably four, three or four.

Q.        Do you recall when the most recent
one was?

A.        I guess the most recent one was maybe
three years ago.

Q.        Did any of those four times relate to
any roles that you held in the borough?

A.        Yes.

Q.        All of them or how many?

A.        Two of them.

Q.      Can you just describe briefly what each one was about?

A.      This was the wrongful discharge from employment.

Q.      Of Mr. Baginski?

A.      Yes.

Q.      Okay.  That was one of them?

A.      That was one of them.

Q.      And was that the most recent one?

A.      Yeah, I believe it was the most recent one.

Q.      And that was approximately in what year?

A.      That was probably four or five years ago.

Q.      And the one before that?

A.      I believe that was with Donald Nuckel.

Q.      That was his lawsuit related to one of his properties in town?

A.      I believe so.

Q.      In that one you were deposed in an official capacity?

A.      Yes.

Q.      The other two, do you recall what

they were about?

A.    This was some related for my work.

Q.    We'll get into your position.  The other two you think you were related to your actual job?

A.    That's correct.

Q.    You obviously have been through this process, but I'll give you some brief instructions because it's been a few years.

As you can see we are in person here today.  To your left and my right is a court reporter.  She's going to take down everything you say.  Because of that, and it's a lot easier here than usually on Zoom, but please try to let me complete my questions, and I will do my very best, but I will probably fail, to let you answer your question.  If I cut you off at any time, just let me know.

A.    Okay.

Q.    All right, understood?

A.    Sure.

Q.    From time to time Mr. Shepard may have an objection.  Most times he'll direct you to answer.  Other times he may ask you not to answer.  Please let us finish our back and forth before you

do provide an answer and then you'll receive an instruction from counsel.  Okay?

A.      Yes.

Q.      Third instruction, any answer please make them verbal.  Nods of the head or even mm-hmms are not going to get on the record probably, so make sure all your answers are fully verbal.  Okay?

A.      No problem.

Q.      Okay, thank you.

This is not an endurance test.  So if you need coffee, water, restroom, or just to make a phone call, please just let me know at any time.  I will want to finish whatever question is pending, but then we can take a break.  During any breaks please make sure you don't discuss your testimony with counsel.  Okay?

A.      Understood.

Q.      At the end of this deposition we will receive a transcript that can be used for motions, at trial potentially.  You have been sworn in under oath so I would ask that you treat this as if you're in a courtroom.  Okay?

A.      Yes.

Q.      You currently reside in Wallington?

A.      Yes, I do.

Q.    You mentioned your current job.  What is your job?

A.    Do you refer to municipal duties?

Q.    In the private sector.

A.    In the private sector I'm actually right now retired, virtually retired.

Q.    Congratulations.

A.    Thank you.

Q.    When did you start your retirement?

A.    August 1st of this year, 2024.

Q.    What did you do?  Immediately prior to your retirement what was your job?

A.    I was engineering manager for Konica Minolta, a Japanese company.

Q.    How long were you with Konica Minolta?

A.    A total of 15 years.

Q.    In the same or similar capacity?

A.    That's correct.

Q.    We don't need to belabor you're entire work history.  Did you have similar engineering jobs throughout your career?

A.    Yes.

Q.    And that was throughout various companies?

A.    Yes.

Q.    What is your highest level of education?

A.    Bachelor.

Q.    From what school?

A.    NJIT.

Q.    Was that a degree in engineering?

A.    That's correct.

Q.    Any specific area of engineering?

A.    Chemical engineering.

Q.    Did you emigrate to the United States?

A.    That's correct.

Q.    When did you arrive in the United States?

A.    1977.

Q.    Where did you come from?

A.    Poland.

Q.    You've been in the United States continuously since 1997?

A.    Yes, that's correct.

Q.    From 1977 to today did you continuously live in Wallington?

A.    No.  On and off, but basically between Wallington and Clifton.

Q.    Okay.  So in New Jersey pretty much?

A.    Yes.  If I could clarify one thing.
After my retirement I took a position with the
municipality, a nonpaid position, assistant to the
CFO.

Q.    Thank you.  Feel free if you think of
something that --

A.    You know, this may appear that I'm
not disclosing it.

Q.    In an hour from now if you think of
something that might help clarify, feel free to
raise it.

A.    This is a nonpaid position.

Q.    Understood.  We'll go through your
history with Wallington.  So aside from your public
-- your private sector work as an engineer, you've
also had various positions within the Borough of
Wallington?

A.    I was elected councilman nine years
ago and I've been doing this since then.

Q.    Other than as a council person and
now assistant to the CFO as an unpaid job, have you
had any other positions within the borough?

A.    I have not.

Q.    Now, in your position as councilman

you've you also sat on various boards and committees, correct?

A.    That's correct.

Q.    I think you've acted as the council member of the planning board for some time?

A.    Yes, that has been -- that's a statutory position for a council member.

Q.    That's been continuous for the nine years?

A.    It has been probably for the last seven years.

Q.    When did you take office?  January of what year?

A.    So that would be January of 2017 -- '16, I'm sorry.

Q.    January '16?

A.    '16, yes.

Q.    And your current term expires at the end of this year?

A.    That's correct.

Q.    Are you currently running for reelection?

A.    Yes.

Q.    For those first two years as a council person what board or committees did you sit

on?

A.      My primary function was always around the finances.

Q.      Just walk me through the current position of the council.  So we have Mayor Dabal?

A.      That's correct.

Q.      Then there are six councilmen; is that right?

A.      Yes.

Q.      Maybe you can help me pronounce the names so in the future I get them right.

A.      Sure.

Q.      Why don't we go down the list.

A.      Yes.

Q.      Ivanicki.

A.      Yes.

Q.      The first name is Wendysu?

A.      Yes, Wendysu.

Q.      Susanne Preinfalk.

A.      Yes.

Q.      Khaldoun Androwis.

A.      Yes.

Q.      Beata Balik.

A.      Yes.

Q.      The last one is easy, Dennis Graham.

A.    Yes.

Q.    Mayor Dabal, she's a woman?

A.    Yes.

Q.    Is she White?

A.    Yes.

Q.    Wendysu Ivanicki, is she a woman?

A.    Yes.

Q.    White?

A.    Yes.

Q.    You are a man.

A.    Yes.

Q.    You are also White, Polish?

A.    Yes.

Q.    Susanne Preinfalk, female?

A.    Yes.

Q.    White?

A.    Yes.

Q.    Khaldoun Androwis?

A.    He's Jordanian, Arabic.

Q.    Male?

A.    Man.

Q.    Beata, female?

A.    Female.

Q.    Polish?

A.    Polish.

Q.      Dennis Graham?

A.      Dennis is a mix.  So he's half black/ half white.

Q.      And he's a man?

A.      Man.

Q.      Then the planning board.  I just want to make sure we understand the setup of the planning board quickly.  Nick Melfi, is actually a member of the planning board or is he there as a statutory position?

A.      That's a statutory position.  He's a member, voting member, a statutory position.

Q.      Does he have another capacity?

A.      He's the building official.

Q.      He's a white man?

A.      Yes.

Q.      Tomas Bazel.

A.      Yes.

Q.      Is he an elected position on the planning board?

A.      Yes.

Q.      He's elected.

A.      Not elected, appointed.

Q.      Appointed, sorry.  Robert Kasperek.

A.      Yes, male, appointed position.

Q.      White?

A.      White.

Q.      Stanley Baginski, he's the chairman?

A.      Yes.

Q.      Male, White?

A.      Yes.

Q.      That's appointed?

A.      That's correct.

Q.      Is he the brother of the other, Vic Baginski?

A.      Yes, he is.  He's the chairman.

Q.      Then obviously the borough engineer and planner, David Juzmeski, he's in attendance but not voting?

A.      He's not voting.  He's just an adviser.

Q.      Adviser, okay.

You are the council liaison?

A.      Yes.

Q.      And you are voting?

A.      Yes, I'm voting.  I'm one of the members of the -- because the mayor and council are statutory positions.

Q.      Correct, and the next one is Mayor Dabal who is on the planning board voting?

A.     That's correct.

Q.     Brian Giblin, is he still the planning board attorney?

A.     Yes, he is.

Q.     Then we have four more members. Joseph Smith, is he still an appointed member?

A.     Yes.

Q.     White male?

A.     That's correct.

Q.     Paul Szwaczka?

A.     Szwaczka, yes.

Q.     Also still a voting member?

A.     That's correct.

Q.     White male?

A.     Yes.

Q.     Theresa Wygonik.

A.     Yes, she's female.

Q.     Voting member?

A.     Yes.

Q.     White?

A.     White.

Q.     James Furtak, alternate still?

A.     Yes.

Q.     White male?

A.     White male.

Q.      For the last seven years have you continuously been the council liaison?

A.      Yes.

Q.      So you do double duty at nights?

A.      Well, we have only once a month the planning board most of the time.

Q.      The council, they meet twice a month?

A.      Between once or twice a month.  It all depends on the time of the year.

        MR. DiGIULIO:  Please mark this ER-1.

        (Exhibit ER-1 marked for identification.)

Q.      Councilman, I'm going to put in front of you what has been marked as ER-1.  This is a copy of the amended complaint filed by my clients, New Wallington Home and Morningside at Wallington.

        Have you seen this complaint before?

A.      I have not.  It was discussed in a council meeting where our attorney brought it in, but I did not go through the details of this complaint.

Q.      I will just make sure we're clear. Any discussions with counsel or that was an executive session because it was in litigation, I don't need to know the substance of that.

A.      All right.

Q.      Other than communications with either Mr. Shepard or the town attorney, have you had any communications with anyone else about this lawsuit?

A.      No.

Q.      You haven't spoken to the mayor about this lawsuit?

A.      No.

Q.      Do you have a general understanding of what the claims are in this case?

A.      I think I do.

Q.      Why don't you just give me a general idea what you think it is.

A.      I think in a nutshell it's a lawsuit that claims that we are discriminating against future tenants, future development by not providing access to a nonexisting train station.  Would that be correct?

Q.      I'll walk you through it a little bit just to make sure we orient ourselves.

Now, are you aware of the two properties that are owned by New Wallington Home and Morningside?

A.      Yes, sir.

Q.      And you've been in attendance at

planning board meetings where they have submitted --

A.        That's correct.

Q.        Let me finish the question so we don't drive her crazy.

A.        I understand.  You were going so fast.

Q.        I know.  I tend to move quickly.  So can slow down if you need to, but it's a Friday.  I want to make sure you're not here all day.  I want you to enjoy your retirement.

A.        Thank you.

Q.        So you've been in attendance at planning board meetings where either New Wallington Home or Morningside have submitted site plan applications, correct?

A.        Yes.  Can I interject?

Q.        Sure.

A.        Pretty much because that application has been going on with the planning board for multiple years I believe.  It started way before my time.  So this is when you kind of think about it, I was in the later phase of the approval process or I think it was approved.  There was modification and I was pretty much part of the modification on the planning board.

Q.    So your knowledge of their applications would have started in or around 2017 when you started on the planning board?

A.    Yes, 2017.

Q.    Your understanding is the development applications related to these properties predate that by quite some time?

A.    That's correct.

Q.    Do you have a general understanding of the approvals that those properties have received?

A.    Yes, I do.

Q.    Why don't you give me a brief sketch.

A.    I think it received approval to build 220 something units.  Fifteen percent of those I believe is affordable.  There were two lots, combined lots for the development.  We're going back and forth regarding the existing growing skating rink.  There is an existing structure.  That was basically it.  As far as I know this was all preapproved way back through affordable housing.

Q.    Speaking of affordable housing, do you know does the borough have any affordable housing units occupied that you know of?

A.    We have approved -- actually,

approval for all required affordable housing units and that consisted of three properties. Jimmy Nuckel's being one, that one site. The second was his brother's, Donald Nuckel, and Jill Nuckel's combined give us the required number of affordable units.

Q.    Just so the record is clear, my client, Jim Nuckel, is the principal of the plaintiffs in this case. Do you understand that?

A.    Yes.

Q.    He has a brother named -- well, he had a brother named Donald Nuckel?

A.    That's correct.

Q.    And Donald also owns some properties within Wallington, correct?

A.    That's correct.

Q.    They also have a sister named Jill Nuckel, correct?

A.    Yes.

Q.    And she also owns some properties within the borough, correct?

A.    Yes.

Q.    And they all also jointly own some properties together, correct?

A.    Yes.

Q.    The property that you mentioned that Donald Nuckel had some affordable housing approvals for, is that the property that abuts the train station?

A.    Yes.

Q.    The train tracks, I'm sorry.

A.    Yes.

Q.    And that's the property that's adjacent to the Devli property?

A.    Yes.

Q.    On the opposite side of that property the municipality owns?

A.    Yes.

Q.    The Jill Nuckel property, do you recall where that property is located?

A.    That is right next to our property that is commonly named Latex.  You probably have seen it.  This is an acre plus strip of land the apartments are being finished on as we speak.  Probably 80, 90 percent completed.

Q.    Donald Nuckel's property has not started construction, correct?

A.    It has not.

Q.    And Jim Nuckel's to date has not either?

A.        Yes.  Construction has started.

Q.        I should say it's not as far along.
Jill's property is the furthest along; is that
correct?

A.        Yes.

Q.        You said that the town has approved
all required affordable housing; is that correct?

A.        Yes.

Q.        And that would be through round 3?

A.        That would be through -- we are
facing round 5 right now, right or round 4.  So
round 3 we have complied with the requirements.  We
have assigned all required affordable housing units
approved for construction.

Q.        Through round 3?

A.        Round 3, yes.

Q.        I know you did not start on the
council -- let me just preface everything with this
just so we're clear.  This is a fact-finding
deposition.  I want to know what you know and also
importantly what you don't know because that can
resolve you from a lot of questions.  So feel free
to say you don't know or you're not aware if we get
to that because I want to start from the beginning
just so we're clear and I want to understand what

knowledge you have from the start of this saga, which you were not around for potentially.  You were in town, but might not have been on the planning board.  I'll preface it with that to be fair.

MR. DiGIULIO:  Mark this ER-2.

(Exhibit ER-2 marked for identification.)

Q.       This is what has been marked as ER-2. I'll represent for the record it's a March 18, 2008, unpublished opinion written by Judge Harris in a Bergen County Law Division matter filed by The Wallington Group, intervened by Morningside at Wallington and it was against the borough.  The docket number has an '06 docket on the top.

Let's start with this.  Have you seen this opinion from Judge Harris?

A.       I have not.

Q.       Are you aware that at some point before you joined the planning board my clients filed a lawsuit against the borough related to the builder's remedy?

A.       I found out about this very much -- very late when I was on the planning board.  It was never really discussed, this document.  This case was never discussed on the planning board.  We deal

with the current issues.  So this was very much a surprise to me.

Q.        So that was brought up in a planning board meeting you were in attendance for?

A.        That was very much when the new application for modification was brought in.  That's when I found out part of this story, what was going on.

Q.        Okay.  So when they came back in for a modification of their approvals, someone had at least brought this to the attention of you or the board?

A.        That's correct.

Q.        Was that potentially Mr. Nuckel's counsel at the time?

A.        That was a combination of both, Mr. Nuckel's counsel, as well as our attorney.

Q.        Fair.  Did you have an understanding that Mr. Nuckel's entities prevailed in that suit?

A.        I found out about that, you know, during the modification.

Q.        Turn to page 15 of that opinion.  At the bottom there is a sentence that reads:  "The order shall further declare that Wallington's land use regulations remain invalid and unconstitutional

insofar as they continue past exclusionary practices."

Do you see that?

A.      Yes.

Q.      Were you made aware that Judge Harris had found that Wallington's land use practices, at least dating back to 2006, were deemed exclusionary and unconstitutional?

A.      I was not aware.

Q.      This is the first time you're hearing that?

A.      That's correct.

Q.      Do you understand that as a result of this -- let me see if I can find it for you.  Turn to page 3.  The last sentence of that paragraph says, "Thus, I grant a builder's remedy to plaintiff and intervener that will require Wallington to zone the lands in question for residential multifamily use at a density of not less than 20 dwelling units per acre."

Do you see that?

A.      Yes, I do.

Q.      Were you aware of any other builder's remedy lawsuit being granted related to the borough?

A.      Two lawsuits were brought in by

Donald Nuckel and Jill Nuckel.

Q.        Those were the properties you previously discussed?

A.        That's right.

Q.        For the three properties that have been approved by the borough for affordable housing, they were as a result of court orders?

A.        I cannot speculate on that one because there was -- I cannot speculate on that one.

Q.        We know for sure -- well, we've seen the plaintiffs's properties, they were ordered to be rezoned by the court, correct?

A.        That's right.

Q.        You think maybe, but you're not certain about Donald's and Jill's?

A.        We did hire at one point an attorney to handle our obligation for affordable housing and I know that was done through negotiations.

Q.        Okay.  Do you understand what occurs -- you've been on the planning board now for a few years.  Do you have a general understanding of what would occur after a builder's remedy lawsuit is granted by the court?

A.        Yes.

Q.        What would that be generally?

A.        Say in this situation, the final design is being reintroduced to the planning board for final approvals.

Q.        So the developer that prevailed in the lawsuit would then prepare an application for its development and present it to the planning board?

A.        That's correct.

Q.        That's generally a site plan approval --

A.        Yes.

Q.        -- subject to any variance that's needed?

A.        That's correct.

Q.        Do you have any understanding of what happened when New Wallington submitted their application after they prevailed in the lawsuit?

A.        My understanding is that the application has not been submitted, the drawings for site approval had not been submitted for a long time and this case is from 2008 and I think with a modification of the plan for new site approval was presented to us in 2017 or '18.  So that's why I was not really aware that was in existence.

Q.        Are you aware of the fact that New

Wallington submitted a site plan application actually back in 2014?

A.    No.

Q.    Are you aware of a subsequent lawsuit that had to be filed to have their application accepted by the borough?

A.    No.  If you are referring to the one that was in 2014.

Q.    Yes.

A.    No.

(Exhibit ER-3 marked for identification.)

Q.    Councilman, I'm going to show you what was marked ER-3 for the record.  It's another court decision.  This one is by Judge Meehan in a Bergen County lawsuit filed by New Wallington Home and Morningside against the borough and the Court's decision is dated April 22, 2015.  So to be fair that is obviously before you were on the planning board, correct?

A.    That's correct.

Q.    Sir, I'm going to have you turn to page 2.  In the second full paragraph it starts on December 10, 2013.  Do you see that?

A.    Yes.

Q.        It says that New Wallington filed their development application with the borough planning board in December of 2013.  Do you see that?

A.        Yes.

Q.        Then if you read down further -- feel free to read that whole paragraph.  Let me know when you're done.  I'll let you read it.

A.        All right.

Q.        Let's walk through the timeline to make sure we understand.  So Judge Harris grants the builder's remedy lawsuit, we saw that.  As a result the borough adopts a new zoning regulation for these two properties, correct?

A.        I was not a part of it.

Q.        Then, thereafter, after the zoning change New Wallington filed their application according to the court in December of 2013.  Do you see that?

A.        I see that.

Q.        Then in February of 2014 the Court found that New Wallington filed another lawsuit.  Do you see that?

A.        Yes.

Q.        But then in April of 2014 my clients,

New Wallington Home and Morningside, entered into a consent order with the borough.  Do you see that?

A.    Yes.

Q.    Now, based off of that application there were hearings according to the Court in the summer through the fall of 2014.  Do you see that?

A.    Yes.

Q.    You were not on the planning board at that point?

A.    I was not.

Q.    Now, on October 21, 2014, the board voted to deny New Wallington's application.  Do you see that?

A.    Yes.

Q.    Were you aware before today there was a denial of the application back in 2014?

A.    Absolutely not.

Q.    Now, if you could just briefly turn to page 10.  That first sentence under "Conclusion" Judge Meehan man wrote, "In conclusion, the Court finds plaintiffs' claims that the board's decision was arbitrary, capricious and unreasonable are merited, as set forth above."

Do you see that?

A.    Yes.

Q.        Until today you were not aware of that finding of arbitrary, capricious and unreasonable, correct?

A.        I was not.

Q.        So we see Judge Harris has made a finding in favor of plaintiffs and we have Judge Meehan made findings in favor of plaintiffs, correct?

A.        Yes.

          (Exhibit ER-4 marked for identification.)

Q.        Now, we just saw an opinion from Judge Meehan from April 22, 2015.  I want to show you now an order of the Court, which has been marked as ER-4 dated March 2, 2016, so almost a year later. It's a lawsuit that was filed in 2014 in Bergen County by New Wallington and Morningside against the borough.  I want to show you on page 2, paragraph 1, the Court found "The planning board has unreasonably delayed action in connection with the limited remand directed in the Court's May 11, 2015, order reversing the planning board's denial of site plan approval."

          Do you see that in paragraph 1?

A.        Yes.

Q.        Were you aware of this ruling by the Court finding that the planning board had unreasonably delayed approval?

A.        I was not.

Q.        Okay.  So this is dated 2016 and the first builder's remedy lawsuit was filed 2006. Until today you were not aware of the ten year litigations and hearings held by the planning board related to these properties?

A.        I had no details.  I knew there was something going on, but I absolutely had no details of the Court's rulings.

Q.        Now, if you turn to the next page, paragraph 5.  There is a paragraph 5 entitled "Timing" and it says, "The planning board shall vote to determine all issues described in this order at or before the April 19, 2006, planning board meeting."

Do you see that?

A.        Yes.

Q.        In your time on the planning board have you ever seen a court order the planning board to act by a date certain?

A.        No, I have not.

Q.        Just to make sure the record is

clear, you would have no personal knowledge of the reasons for the delays that resulted in these lawsuits?

A.      I don't.

Q.      Okay, very good.

Now, do you understand sometime in 2016 or 2017 my clients came back to the planning board for approvals, site plan approvals, for the properties?

A.      Yes.

Q.      Are those the modifications that we discussed earlier?

A.      That's correct.

Q.      Do you recall that there were several planning board hearings related to that application?

A.      Yes, sir.

Q.      Those were throughout the summer, fall and winter of 2017.  Does that sound right to you?

A.      That's correct.

Q.      Now, do you recall any of the primary issues that were discussed during those hearings?

A.      There was just modifications, no original plan.  That were questionable from the municipality.

Q.      Do you remember what specifically was questionable?

A.      One of those was leaving an old ugly building for no apparent good reason.

Q.      And that would be the skating rink?

A.      That's correct.

Q.      Do you recall a good amount of time being spent with questions and testimony related to how many children would be living in the buildings?

A.      There was a presentation of the possible impact or no impact on schools.

Q.      In that discussion do you recall being present for some of that back and forth with the planning board and the applicant?

A.      Yes.

Q.      Do you recall if you attended all of the planning board hearings related to this application?

A.      The majority.

Q.      Do you recall any specifics about that issue in particular about the amount of residents that would be living in these units?

A.      I cannot speculate on that.

        (Exhibit ER-5 marked for identification.)

Q.        Sir, I'm going to show you what was marked ER-5.  This is the July 18, 2017, transcript in the matter of Morningside at Wallington before the Borough of Wallington Planning Board.  I will note if you go to the second page -- have you seen transcripts of planning board meetings before?

A.        Yes.

Q.        On the second page, it's double-sided, sir, so this page.  I will note it does not appear that you were at this particular meeting.  I just want to point that out to you as being fair.  Do you see that at the top there?

A.        Yes.

Q.        Can I have you turn to page 16 of the big document or page 64 if you look at the little transcript pages.

Now, there is a Ms. Bogart.  Do you see her name in capitals?

A.        Yes.

Q.        Do you recall that being Morningside's -- I believe she's a planner.  Do you recall her?

A.        Yes.

Q.        Was she one of the people that provided testimony about the number of residents or

children that would be in the building, if you recall?

A.    Yes.

Q.    Now, if you look at page 64, if you go down to -- why don't you read to yourself lines 6 through 19 just to orient yourself to the discussion.

A.    Okay.

Q.    I apologize, probably a little bit higher up.  You probably need to go to 63.  Start around line 4 of 63, I apologize.

So Ms. Bogart testified that she believed the project, and here she was talking about just the 73 units on the Morningside property.  We generate between 5 to 11 school children that would attend Wallington public schools.  Do you see that?

A.    Yes.

Q.    Does that help you refresh your recollection about the discussion that was going on throughout these hearings about that?

A.    The only thing I can say --

MR. SHEPARD:  Let me interject.  Are we talking about this particular hearing because we've already established he wasn't there.

MR. DiGIULIO:  Yes, I said across the

hearings. I will get to them, but this permeates a few hearings. I'm trying to get your head back into this time frame.

A.      The only thing that I can recall that was really disturbing was the fact that she claimed she obtained the information from our board of education. She got an OPRA request, but that was not the case. Someone verified so she lied under oath. That was the only one thing that we kind of questioned of Ms. Bogart.

Q.      But ultimately the borough found that her numbers were accurate, right?

A.      We agreed because there was no other substance.

Q.      Do you know why --

A.      If I can?

Q.      Please.

A.      We just followed -- you know, there was no further discussion as far as the numbers were accurate or not.

Q.      You had nothing else other than what she said really to refute what she said; is that right?

A.      That's correct.

Q.      Do you know why this topic was

discussed at the site plan application?

A.      No.  I'm under the impression the number -- the impact of a new development on the municipality has to be reviewed.

MR. SHEPARD:  Don't speculate.  If you don't know, you don't know.

Q.      I definitely don't want you to speculate.

A.      No.

Q.      You're an elected official and you sat on the planning board for a while, so is it fair to say public officials will have a concern about the strain a development may have on the borough?

A.      Yes.

Q.      And additional school-aged children attending the public schools could be seen by at least the residents as a strain?

A.      Yes.

Q.      So this was an issue of public interest?  Is that why it was addressed?

A.      Yes.

Q.      Do you know -- turn to the next page, page 65.  Page 65, line 17 references Mayor Tomko. Mayor Tomko was mayor at that time in 2017?

A.      That's correct.

Q.    When did he cease being mayor, do you recall?  When did he stop being mayor?

A.    So that was 2019.

Q.    Then did Mayor Dabal take over?

A.    That's correct.

Q.    Mayor Tomko says here -- this is page 65 on ER-5, line 17 to 21.  He says, "What towns in the south Bergen area have you OPRA'd because, you know, historically Route 4 is the Mason-Dixon line and we cannot compare with upper Bergen County.  Things are different."

Then Ms. Bogart responds, "You're talking to a girl that went to North Carolina.  It's not the Mason-Dixon line.  Do you see that?

A.    Yes.

Q.    Have you ever heard Mayor Tomko use that term, Mason-Dixon line before?

A.    No.

Q.    I know you were born in Poland, but do you have any understanding what that term refers to?

A.    Yes, I do.

Q.    What's that?

MR. SHEPARD:  Note my objection in terms of this hearing or historically?

MR. DiGIULIO:  What is his general understanding of that term.

A.      You might not be aware, but there is a distinctive difference in Bergen County between upper Bergen County and lower Bergen County.  So what he referred to, and he was a good friend of mine.  We were opposite.  He was a Democrat and I'm a Republican and we never see eye-to-eye as far as political aspects are concerned, but he's a man who really referred to a completely different look of the northern Bergen County.  We're densely populated.  We struggle financially of the municipalities.  That's what he referred to.  That would be a disservice to think in terms it something more than just a local thinking.  It has nothing to do with the south and north of the states.  He was a great guy.

Q.      Sure.  But, you know, what is your general understanding of what the Mason-Dixon line is?

A.      My son went to the Citadel so I'm quite aware of the situation.  It's the difference between the south, a different way of thinking, a different way of living.

Q.      And that was generally the line of

demarcation between the slave states and the north, right?

MR. Shepard:  Objection.

A.      Listen, you're trying to connect Mayor Tomko, this I resent that.  Do you know what I'm saying?

Q.      I'm not trying --

A.      Let me finish.  This is a man who committed his life to the municipality, to all the people in the municipality.  He served as a councilman for, I don't know, 20 something years fireman for 50 years and the whole family.  You're talking about something that you shouldn't talk about a person you don't know.  There is absolutely no racial undertone.  Maybe that was not really clearly stated, but you cannot characterize Mayor Tomko.

Q.      I was referring to the term, that general understanding of the term.  He chose to use that word, right, not me.  He chose it.

A.      I don't think it has anything to do with this case and my situation.  We are not thinking about the Mason-Dixon line in the municipality.

Q.      Mayor Tomko was that day, he said it.

A.      But I can guarantee he didn't mean it the way you think, what you're implying, absolutely not.

Q.      I didn't imply anything.

A.      You brought up slavery.  This has nothing to do with Mayor Tomko.  His family emigrated from Slovakia.

Q.      So you don't believe that term has any relation to the north and south and slave states?

A.      Absolutely not.  Absolutely no connection.

Q.      You don't believe that term has any connection to it?

A.      Absolutely not.

Q.      It was just referring to the density and...

A.      It's a different world.  If you try to drive from Wallington to Ramsey and other towns, you will see the difference.

Q.      Describe for me the difference between the north and south of Route 4?

A.      Density, the different -- we are more diversified.  We have all races of immigrants.  The majority of our town south from Route 4 are

completely different.  Economically, we probably have half the income per household from the north.

Q.        When you said the density and diversity, you meant south of Route 4?

A.        That's correct.

Q.        I just wanted to make sure.

A.        Yes.

Q.        Wallington is predominantly more white than its neighbors, though, correct?

A.        We are probably right now Hispanic 30 percent, 40, 50 percent are Polish and the remaining we have some Asian Indian population.  We are well diversified.

Q.        Do you believe -- my question was asking compared to its neighbors Wallington is certainly more white than its neighbors, right?

A.        No.  If I have to compare us to East Rutherford or Carlstadt we are definitely not.

Q.        That's what you believe?

A.        Yeah, they're probably less diversified than we are.

Q.        Have you recently looked at census numbers or that's just kind of your belief?

A.        Just my belief.

(Exhibit ER-6 marked for

identification.)

Q.       Councilman, I'm going to show you another transcript from the planning board meetings. R-6.  This one is dated September 19, 2017.  It's been marked ER six.  I'll point you to page 2 like we did before.  You were present for this hearing.

A.       Okay.

Q.       Do you recall a discussion about transit villages and transit oriented developments in these hearings?

A.       Yes.

Q.       What do you recall about that?

A.       The idea is that the transit villages will be -- obviously, when you have a train station or access to a train station, the population texture is going to be quite different.  It's going to be mostly people, professionals, no children or minimum children.

Q.       What do you recall specifically -- just so we're clear, these two properties are basically across the street from the train line?

A.       Yes.

Q.       They don't abut -- they don't abut the train tracks like the Devli or Mr. Nuckel's property, correct?

A.        They are right next to the track, but not the train station.

Q.        Correct, that's a good point.  So one side of one of the properties, the tracks run through, but the Westmont Station is actually a little further down closer to Donald Nuckel's property, correct?

A.        That's correct.

Q.        Was your concern that Mr. Nuckel was going to attempt to make this a transit village?

A.        I think all the applications we had was more of Donald Nuckel, who being so close to the train station, made multiple indications that he will provide assistance in getting the train station -- access to the train station.

Q.        Do you know why the transit oriented development was brought up in this application, do you remember?

A.        No, I don't.

Q.        Do you remember during this hearing Mayor Dabal as a citizen asked questions?

A.        No, I don't.

Q.        Do you remember saying you didn't want this development and that area of Wallington to not look like West New York, do you remember that

discussion?

A.       No.

Q.       You don't recall saying that?

A.       No.

Q.       Thinking about it now, would you be adverse to portions of Wallington looking like West New York?

A.       It is -- who made that statement?  I did?  The whole idea was that it's going to comply with our density, our current density.  That's what it was.  Looking back at the approvals that you showed me, the 20 units per acre that was reasonable density.  The idea of having density that cannot support our infrastructure, it cannot support it would be disastrous for the town.

Q.       More recently Donald Nuckel's approvals were approved for 50 units, right, per acre?

A.       Yes, and this was all related to the distance to the future train station.

Q.       So his density was approved at that density because it was closer to the train station?

A.       That's correct.

Q.       And, ultimately, did the planning board vote to deny New Wallington and Morningside's

applications?

A.        Yes.

Q.        Do you recall the reasons why?

A.        I don't.

Q.        Do you recall did you vote against it?

A.        That's correct.

(Exhibit ER-7 marked for identification.)

Q.        Councilman, I'm going to show you what has been marked ER-7.  It's resolution 18-326. It's the findings of fact and conclusions of the Wallington Planning Board related to New Wallington Homes and Morningside at Wallington.  It's dated January 16, 2018.  Do you see that?

A.        Yes.

Q.        This is dated January 16, 2018.  As we saw, Judge Harris granted the builder's remedy back in 2008, right, you saw that?

A.        Yes.

Q.        So it's been a decade since there was a final decision on the applications of both New Wallington and Morningside for the development, correct?

A.        Mm-hmm.

Q.        Do site plan applications in the Borough of Wallington usually take a decade?

A.        They failed to say that each time the application was altered.  So this was not the same application, the number of apartments have changed each time.  So this was different -- there were differences between what we've seen in 2018 and '17 versus what was presented in 2009.

Q.        So it's your belief that the number of units actually changed over that time?

A.        Yes, I believe so.  There were variances that were requested to modify, if you look closer.  The reason for the denial was because of multiple issues with the application.

Q.        Do you recall any applications that required three court rulings to be rendered by the court to favor an applicant?

A.        No, I don't.

Q.        Just so we're clear, on the first page, paragraph 2, there were four separate hearings; May, July, September and December of 2017. Do you see that?

A.        Yes.

Q.        Turn to page -- they are not numbered, but if you look at the top it says pg 6 of

7.  Turn to page 6, the very top there.  The first full paragraph would be 17.  Above that is the carryover from paragraph 16.  We talked about Ms. Bogart already.

You said in the last paragraph the planning board found, "Thus, based on actual Wallington based information, her model," and I'll represent that's Ms. Bogart, "of a range of 5 to 11 students added to the schools is correct."

Do you see that?

A.      Yes.

Q.      So that was based off of information that the Borough of Wallington actually had, right?

MR. SHEPARD:  That Wallington had or that was provided by Ms. Bogart.

MR. DiGIULIO:  I'm just reading the words.  It says, "Based on actual Wallington based information."

MR. SHEPARD:  I'll just object and say the document speaks for itself.  I don't want him speculating as to...

Q.      Does that refresh your recollection at all as to your position that she was wrong?

A.      I just said she lied under oath because she said she got the information from the

board of education, but she never put in any OPRA request to the board of education.

Q.    But you're not contesting if she was right or wrong?

A.    I'm just saying we found that she did not -- she was lying under oath.

Q.    But you're not contesting the findings?

A.    No.

Q.    You're actually challenging whether she made an OPRA request?

A.    Yes.

Q.    At the bottom it says there was a vote to deny the application, correct?

A.    Yes.

Q.    That was unanimous; is that right? You can look at the next page.  With one abstention?

A.    Yes.

Q.    Is that correct?

A.    That's correct.

Q.    It's your belief looking at that resolution that the basis of denial was related to the skating rink?

A.    I think it was -- I cannot recall to be honest.

Q.        Whatever the reasons were, they would be stated in the resolution, correct?

A.        That's correct.

(Exhibit ER-8 marked for identification.)

Q.        Councilman, we are looking at what has been marked as ER-8.  It is a -- the first two pages are a civil case information statement for a lawsuit filed in 2018 by my clients against the borough and starting on the third page is a January 17, 2019, court decision of Judge Farrington.  It's actually entitled "Final Judgment."  Do you see that on the third page?

A.        Yes.

Q.        Do you recall that the planning board's denial in January of 2018 of my client's application was deemed arbitrary, capricious and unreasonable by the courts?

A.        Yes, I do.

Q.        Now, do you recall that the court in this instance did not actually remand the matter back to the planning board?

A.        Yes, I do.

Q.        Typically in your understanding from sitting on the planning board, typically if a

decision is deemed arbitrary, capricious and

unreasonable, it would get remanded back to the

planning board for further hearings?  Is that your

understanding?

A.      Yes.

Q.      But here it was not remanded,

correct?

A.      Yes.

Q.      Instead the court deemed the

applications as submitted by my clients granted and

ordered the borough to issue permits within 15 days.

Do you recall that?

A.      Yes.

Q.      Do you recall that ever happening

before in the borough?

A.      I cannot speculate.

Q.      In your time sitting on the planning

board.

A.      No.

Q.      Pretty extreme relief, correct?

MR. SHEPARD:  Objection.

A.      I don't know.

Q.      It never happened before?

A.      I've been on the planning board for a

few years.

Q.        Were you made aware of this decision when it came out?

A.        Yes.

Q.        Were you surprised by the judge's decision to deem them granted without a remand?

A.        I cannot recall.

Q.        Do you recall any response when you learned of the decision?

A.        No.

Q.        This is the fourth court decision that we've seen that deemed the borough arbitrary capricious and unreasonable; is that right.

A.        During my time it was the first one.

Q.        Yes, during your time.

A.        Be my guest, you can tell me what it is.

Q.        We'll be fair to you.  The ones we've seen today, three were without you on the planning board.  We've seen four total, correct?

A.        Yes.

Q.        Now, if you turn to page 8 of that decision, there is little page numbers at the bottom.  At the bottom, the second full paragraph -- well, the last full paragraph reads:  "The denials have been appealed as arbitrary, capricious and

unreasonable; specifically that the board's denial

does not articulate any rationale for the denial,

and in addition improperly focused on fiscal

concerns, i.e., the costs for anticipated school-age

children."

           Do you see that?

     A.     Yes.

     Q.     Do you now have an understanding that

the consideration of the cost for school-age

children is not an appropriate factor to consider?

           MR. SHEPARD:  Objection to form.  You

can answer.

     A.     I have to check what was our reasons

for denial, but it was multiple reasons.  It was

zoning and variance issues.

     Q.     We briefly discussed before what I

referred to as the Devli property.  Do you remember

that?

     A.     Yes.

     Q.     Is that more commonly referred to as

the Farmland Dairy?

     A.     Yes.

     Q.     Devli is just the name of the current

owner; is that right?

     A.     That's correct.

Q.       That property is currently industrial buildings?

A.       Used to be.  The industrial buildings have been demolished.

Q.       Since Devli took over?

A.       Even before that.

Q.       During your time on the planning board was that property deemed an area in need of redevelopment?

A.       Yes.

Q.       Was also the parcel owned by the municipality deemed an area in need of redevelopment?

A.       No.

Q.       So it's your understanding the only property -- let me ask you this.  Are you aware of any other properties besides the Devli property -- actually let me back up and make sure the record is very clear.

         The Devli property we're talking about actually includes several different lots and blocks, correct?

A.       Yes.

Q.       It's approximately 40 acres?

A.       It's 27 acres.

Q.       Total?

A.       That's correct.

Q.       And that whole 27 acres has been deemed an area in need of redevelopment?

A.       That's correct.

Q.       Are you aware of any other properties within the borough that have been deemed an area in need of redevelopment in your time on the planning board?

A.       No.

MR. SHEPARD:  Note my objection to this line of questioning.  I don't think we're getting into really the allegations and the facts concerning the allegations of the complaint.  We're talking about the Devli property and whether it's an area in need of redevelopment and the allegations in this complaint are really Fair Housing Act violations and disparate impact.

MR. DiGIULIO:  Understood.  Trust me, I'm not here to waste time.  There is some tie to it, but understood.

Q.       Councilman, just to get us back on track.  You're not aware of any other property besides the 27 acres owned by Devli that has been deemed an area in need of redevelopment, correct?

A.      Yes.

Q.      Are you aware that -- I think I have the orientation right -- on the southern border of that property the town has a right to a right-of-way?

A.      Yes.

Q.      In the approvals that Devli has received so far, that property is still zoned for industrial, light industrial; is that right?

A.      Yes.

Q.      There is no current intention of putting housing on that property; is that right?

A.      That's correct.

Q.      Has the Town of Wallington ever entered into a payment in lieu of taxes before also known as a PILOT?

A.      No, we have not.

Q.      Is there a PILOT that is contemplated related to the Devli property?

MR. SHEPARD:  Note my objection.  You can answer, but standing objection regarding PILOTS.

A.      We don't have anything solid.

Q.      There has been discussions, though?

A.      There is always discussion.

Q.      Would deeming that property an area

in need of redevelopment be a necessary step to a PILOT?

A.     Yes.

Q.     Do you know if constructing to the right-of-way owned by the town is a condition to any further development on the Devli property?

A.     It has been strongly indicated to Devli that this is a must.

Q.     Understood.  You sat on the planning board when Donald Nuckel's adjacent property was approved, correct?

A.     Yes.

Q.     Do you recall --

A.     Well, it has not received the final approval.

Q.     Thank you for that.  Let's clean that up now.

MR. DiGIULIO:  Gerry, this was not produced in our production.  I just got it.

(Exhibit ER-9 marked for identification.)

Q.     Councilman, I want to show you what has been marked ER-9.  The top of it is called a "Preliminary and Final Site Plan for Wallington Station, 380 Mount Pleasant Avenue, Lot 78,

Block 70.01.  Do you see that?

A.      Yes.

Q.      I think if you turn to the second page, this shows the site plan application and the property?

A.      Yes.

Q.      Is it your understanding that this property is the one that we have been referring to as Donald Nuckel's property?

A.      Yes.

Q.      If we look at this map, to the right Block 70.01, Lot 4.02, that would be the Devli property or as it's called Dairy?

A.      Yes.

Q.      To the left of that is that the municipal property?

A.      Yes.

Q.      Now, you mentioned Jill Nuckel's property.  Do you know where it would be oriented in here?  Is it shown anywhere or is it off the map?

A.      It's off the top.

Q.      It's a little further to the left?

A.      That's correct.

Q.      On this property on this site plan it shows the road right-of-way to the right of Donald

Nuckel's property basically on the Devli property and then it shows at the top right-of-way shift as proposed.  Do you see that?  Are you on the second page?  Right there.  Do you see there is a right-of-way drawn in there?

A.      Yes.

Q.      So on the right side of the plan there is a right-of-way.  Do you see that?  It says in parentheses "as proposed by others."

Do you see that?

A.      Yes.

Q.      This proposed right-of-way goes right up to what looks like a parking lot that abuts the train station.  Do you see that?

A.      Yes.

Q.      Have you seen this site plan before?

A.      Yes.

Q.      Has Wallington Station received preliminary site plan approval?

A.      So preliminary approvals were done through affordable housing.  So we had multiple hearings on the details and then with the departure of Donald Nuckel the whole process has been delayed.

Q.      So there was an agreement as relates to affordable housing litigation, the process?

A.      Yes.

Q.      There were some hearings related to his application?

A.      Yes.

Q.      Mr. Nuckel sadly passed away somewhat recently?

A.      Yes.

Q.      As a result of that there has been a delay in the hearings?

A.      Yes.

Q.      So final site plan approval has not yet been provided for this site?

A.      No.

Q.      Thank you for that clarification.

Is it your understanding that those hearings will continue once things are straightened out on that side?

A.      We are in the process of providing that at the hearings and just talking to the executor of the will.  He oversees the estate of Donald Nuckel.

Q.      Fair, thank you.

Prior to his passing had you ever spoken to Donald Nuckel about his right-of-way?

A.      We have talked on multiple occasions.

As a matter of fact, more than a year ago there was a meeting attended by all the clients and the client reps and we were talking about the roads.  There were at least 20 people that were organized by me, at least 20 people representing all the parties involved, and there was mutual agreement that the road would be built.  I assigned our affordable income housing attorney to kind of organize things and Rob Simon is his name.

MR. SHEPARD:  I want to caution you not to get into any discussions you had with Mr. Simon.  Is this stuff being discussed in executive sessions or anything -- if it's public that's one thing, but I don't want you discussing anything that's fluid at this time or uncertain.

A.       That hearing was a public hearing. So that was a public hearing and everybody had agreed to build the road including Devli donating the land for the right-of-way.

Q.       I think you said there hasn't been a signed agreement as it relates to the donation of the land, but it's been strongly suggested to Devli that they proceed with the plan?

A.       That's correct.

Q.       Obviously, Mr. Nuckel, and his now

estate, has incorporated this roadway into their site plan, correct?

A.        This roadway is only proposed.  Their final decision about the roadway has not been made because the way it was drawn originally it is cost forbidding because half of the mountain has to be removed.

Q.        Let me make sure I understand what you said.  Under the town's current right-of-way as recorded, it's the town's position that building the roadway in that pathway would be cost prohibitive?

A.        That's correct.

Q.        And the discussions among and between the various property owners and the borough is to reorient that pathway into a more affordable pathway; is that right?

A.        Yes.

Q.        Understood.  But Mr. Nuckel clearly has a site plan that would provide that roadway would continue all the way to the train station, correct?

A.        Yes.

Q.        Well, to the side of the borough's side of the train station?

A.        Right.

Q.        Now, as you understand it, on the other side of those train tracks is the New Jersey Transit Westmont station, correct?

A.        Yes.

(Recess taken.)

BY MR. DiGIULIO:

Q.        Thank you, Councilman, for the quick break.

Shifting issues for a minute.  Do you have any understanding that plaintiff's also have claims related to the property taxes and the imposition of a lien by the borough?  Do you have any knowledge of those claims at all?

A.        Not claims, but I'm fully aware that at one point he was behind with taxes, paying taxes, quite significantly.

Q.        Do you have an understanding that those issues are part of plaintiff's claims in this federal action?

A.        It was just brought to my attention. I don't see the connection.

Q.        I mean you just learned that today?

A.        Yes.

Q.        In your role as a councilman or as a liaison to the planning board, do you have any role

in the issuance of property tax delinquency notices?

A.        It's the sole responsibility of the tax collector.

Q.        Do you have any knowledge related to the issuance of tax certificates related to plaintiff's properties?

A.        Yes, I do.

Q.        And what is your knowledge of that?

A.        We -- during the budgeting process it was noticed that our tax collection rate is extremely low and I asked our CFO to review the reasons for that because it has a tremendous impact on the municipality, our finances.  The taxes not being paid by residents and by the owners, they have to be assessed in the next budgets.  We have to get this money from increased taxes, increase the taxes on other properties.

It was noticed by the CFO that Jim Nuckel did not pay taxes for multiple periods and the amount was quite significant.  The tax collector was instructed by the CFO to proceed with the proper processes and a year later, it was not more than that, the tax lien goes on a tax sale and it becomes a lien.  No one purchased that tax lien and it became a municipal tax lien and the municipality

exercised its rights after X number of days or months to start the proceedings for foreclosing and that's when the money was paid by Jim Nuckel.

Q.      Do you remember when you had those discussions with the CFO, what year?

A.      That was 2020, 2019-2020.

Q.      Do you remember what years there was delinquency?

A.      I can't recall, but it was significant, very significant amount of money that had to be paid.

Q.      Do you recall approximately how much?

A.      The total -- I believe the accumulated interest was in the hundreds of thousands and with the tax, I think it was close to $500,000.

        (Exhibit ER-10 marked for identification.)

Q.      Councilman, I'm going to show you what was marked as ER-10.  It is a certificate of sale for unpaid municipal liens number 17-016 dated December 20, 2017.  Do you see that?

A.      Yes.

Q.      Is this the certificate of sale you were referring to?

A.      Yes, I believe so.

Q.      The total on that was how much total amount due?

A.      217.

Q.      That was ultimately paid by the property owner?

A.      That's correct.

Q.      Do you recall if that was paid under protest?

A.      No.

Q.      You don't recall that.

Do you recall when you said it was significantly more, do you recall if there was additional interest charged to the property owner?

A.      Yes, there is 18 percent interest on the property.

Q.      Could you go to the middle -- I know the font is small.  Underneath where it has the total of 217.

A.      Yes.

Q.      It says, "Said sale is subject to redemption on repayment of the amount of the sale, together with interest at the rate of 0 per centum per annum from the date of sale and the cost incurred by the purchase as defined by statute."

Do you see that?

A.     Yes.

Q.     Ultimately the borough obtained the lien for the property?

A.     Yes.

Q.     Do you know why Ms. Siek would have put a 0 percent interest rate on this certificate of sale?

A.     Where does it say 0 percent?

Q.     Right there.

A.     From the date of sale, yes.

Q.     Correct.  The difference between the 217 and the almost half a million you said was all interest, correct?

A.     No.

Q.     It was not?

A.     I cannot recall that, but there were significant issues with Mr. Nuckel not paying taxes. So if he brought over money, that is probably the money he brought for some of the months or quarters that he did not pay.  There was never a complaint. This is the first time I see somebody is challenging the money that was paid in 2017 or 2018 that was eventually paid.

                (Exhibit ER-11 marked for

identification.)

Q.      Councilman, do you want to add to your answer?

A.      The property that we are talking about are two separate lots.

Q.      Correct.

A.      This sale certificate is only for one lot.  I don't know what's going on with the second lot.  That might be the difference.  It looks like we're not quite prepared for this.

Q.      The property you have there is what lot and block, do you know?

A.      This is Block 71, Lot 35.02.  Let's make sure we are talking about the two properties.

Q.      Sure.  It's your belief that both properties were in arrears?

A.      This is something that I cannot speculate on.

Q.      Sure.

A.      But all this stuff is being calculated automatically by the software.

Q.      The almost $500,000, you believe that was related to both properties or you're not sure?

A.      What I'm trying to say is we have to verify exactly what it is.  If it's the two

properties.

(Exhibit ER-12 marked for

identification.)

Q.        I'm going to go a little out of order

and I'll show you first, Councilman, ER-12.  It's a

Borough of Wallington resolution 2018-197 and it

provides for that the tax certificate we just saw,

17-016 is held by the Borough of Wallington for

Block 71, Lot 35.02.  Do you see that?

A.        Yes.

Q.        That's the same one we just saw?

A.        Correct.

Q.        It has the total amount due

$449,659.87.  Do you see that?

A.        Yes.

Q.        Is that around the number you thought

was owed?

A.        Okay, yes.

Q.        Are you aware -- you said you weren't

sure.  Are you aware of any documentation related to

Lot 35.01?

A.        Let me put it this way.  It's very

unlikely that our finance people, as well as Jim

Nuckel, made a mistake for 200,000.  So there was

more to this story.  The documents that you are

providing, something is missing.  That's my point.

Q.        Are you aware of any other amounts that are owed related to the other, Lot 35.01?

A.        I don't know, but I was aware of the amount being close to $500,000 not $200,000.

Q.        This number 449,000?

A.        Yes.

Q.        And that relates based off this borough resolution only to Lot 35.02, correct?

A.        That would have to be verified. That's just a typo.

Q.        What was a typo?

A.        There is another lot not included or both of them are included in this amount.  I don't know if there is another resolution.

Q.        Are you speculating or do you think this resolution that was passed and signed is wrong?

A.        I cannot -- I really don't know what I can comment where that $449,000 came from.

Q.        Well this resolution we're looking at for $449,000 relates only to Lot 35.02 based off the passed resolution we're looking at correct?

A.        That's what it says right there.

Q.        Do you have any reason to believe that the borough adopted a resolution and made

public one that is incorrect?

A.    I don't know, but I know taxes were not paid on the whole property.

Q.    When you say the whole property, you mean both lots?

A.    Both lots.

Q.    And you're certain of that?

A.    I'm pretty sure it was not, that this is the case.

MR. SHEPARD:  Again, don't speculate.

THE WITNESS:  Let me withdraw that answer.

MR. SHEPARD:  If you don't know --

THE WITNESS:  It needs to be verified.

BY MR. DiGIULIO:

Q.    Sitting here today you believe the total amount between the properties was somewhere in this range of 449,000?

A.    That's correct.

Q.    You're not certain if it related at all to 35.01, but you have your doubts as to whether it was both or not?

A.    Yes.

Q.    Okay.  I referenced previously that

payment was made under protest by the property

owner.  I'll show you what was marked ER-11.  The

cover page is an official check from TD Bank dated

July 18, 2018, and that's for that same amount

449,000.  Do you see that?

        A.      Yes.

        Q.      And that's paid by New Wallington

Home, LLC.  Do you see that?

        A.      Yes.

        Q.      And that is the owner of Lot 35.02,

correct?

        A.      Yes.

        Q.      At the bottom left of that check it

says tax certificate 17-016.  Do you see that?

        A.      Yes.

        Q.      And that's the tax certificate we

reviewed?

        A.      Yes.

        Q.      And that was only limited to 35.02,

correct?

        A.      Yes.

        Q.      And it writes underneath that "Under

Protest," right?

        A.      Yes.

        Q.      And then there is a two-page letter

attached.  Have you ever seen this letter dated July --

A.      I have not.

Q.      Hold on, let me finish.

There is a letter from VAP International dated July 19, 2018, to Ms. Siek, the Wallington tax collector.  Do you see that?

A.      Yes.

Q.      You've never seen this letter before?

A.      No.

Q.      And no one made you aware that the payment was made under protest, right?

A.      That's correct.

Q.      This is the first time you're hearing that New Wallington Home has alleged claims related to the process for the payment of that tax certificate?

A.      That's correct.

Q.      As it relates to the tax collector's job to issue notices -- let me retract that question and start it over.

You have a general understanding that there is a statute that governs the issuance of property tax delinquency notices and property tax liens, correct?

A.      Property tax liens, yes.  A
notification -- you do have a process before the tax
sale and that's advertised in the newspapers so that
case was advertised in the newspapers before the tax
sale.

Q.      Did you have any involvement in that
process from issuing public notices to the tax sale?

A.      Absolutely not.

Q.      So the mechanisms in effectuating the
collection of that property taxes was done by the
tax collector?

A.      That's correct.

Q.      And that was after you had a
discussion with the CFO?

A.      Yes.

Q.      I'm trying to square out your
personal knowledge as opposed to what was done at
the borough and other levels.

You realize that certain property
taxes, not just Mr. Nuckel's, but certain other
property taxes were not being paid timely; is that
right?

A.      That's correct.

Q.      You raised that as a concern to the
CFO; is that right?

A.      That's correct.

Q.      As a result of that the CFO pointed out to the tax collector and basically said do your job; is that right?

A.      Yes.

Q.      From there you understand that at least as to Mr. Nuckel, he paid as far as you knew before today that that amount was paid in full?

A.      Yes.

Q.      Am I missing any other areas of knowledge you have regarding this issue?

A.      You pretty much covered everything.

Q.      Sitting here today you don't know the basis for New Wallington's claim related to this tax lien issue?

A.      No.

Q.      Councilman, in advance of today did you do anything to get ready for your deposition?

A.      I had a discussion with the attorney.

Q.      I don't want to know the substance of your discussion.  Did you review any documents at all?

A.      No.

Q.      So other than a discussion with Mr. Shepard, you had no other preparation?

A.       No.

Q.       Did you speak to anyone else about your deposition other than potentially a spouse or family member that you were going today?

A.       No.

(Exhibit ER-13 marked for identification.)

Q.       Councilman, I'm going to show you what was marked as ER-13.  It's a draft partially executed settlement agreement related to this lawsuit, which was on page 18 executed by James Nuckel on January 30, 2024, not executed by the borough.  Have you ever seen this document before?

A.       No.

Q.       Are you aware of there being discussions between the parties in this case about a potential settlement?

A.       Not really.

Q.       Are you aware of any discussions between borough representatives and representatives for the plaintiffs related to a PILOT for the two properties?

A.       Yes.

Q.       As far as you know was this settlement agreement ever presented to the full

Eugeniusz Rachelski
November 01, 2024

80

council for approval?

A.    Yes, it was.

Q.    In a public meeting or in an executive session?

A.    I don't recall that.

Q.    It's your belief this settlement agreement was placed on a council agenda?

A.    I don't -- I think if it was, it was probably an executive session.

Q.    Outside of the executive session, did you speak to any council members or anyone else at the borough outside of attorneys regarding the provision of a PILOT to the plaintiffs?

A.    I didn't talk to anybody on the council.  I talked to our tax appeal attorney and I talked to our PILOT adviser.

Q.    Property tax being Mr. Elias?

A.    Yes.

Q.    Property tax adviser?

A.    Adviser -- property PILOT adviser.  We gave like...

Q.    A financial consultant?

A.    A financial consultant.

Q.    Did you understand as part of the settlement -- let me ask you this.

Are you aware there are pending several property tax appeals related to these properties?

A.      Yes.

Q.      Did you understand that part of the settlement was going to be resolution of those property tax appeals?

A.      That's correct.

Q.      It's your belief that any council consideration of the settlement agreement as you recall was only done in executive session?

A.      I believe so.  I cannot vouch for that.

Q.      Do you recall any public vote to approve the settlement agreement?

A.      I cannot recall.

Q.      Are you opposed to this settlement agreement?

A.      I did not believe -- I do not believe that this fully benefits the town the way I would like to and I talked to our --

MR. SHEPARD:  Stop right there.

Q.      If you're about to say an attorney --

A.      No.

Q.      If it's not an attorney, go ahead.

A.        Personally, I believe that this does not benefit the town the way it should, so.

Q.        Is that in the actual financial terms or the PILOT --

A.        Financial terms.

Q.        Understood.  Did you discuss with the financial consultant outside of the presence of counsel the financial terms?

A.        Yes, I did.

Q.        I don't know if it's numbered, but after the numbered pages, there should be Exhibit B. It looks like this.

A.        I'm fully aware of that.

Q.        I want to make sure.

MR. SHEPARD:  Bates 287.

Q.        So when you said the financial terms, this is what we're talking about?

A.        Yes.

Q.        And you reviewed this with the financial consultant and you thought these terms should have been more beneficial to the town?

A.        That's correct.

Q.        Are you aware of any other set of financial terms that were presented by the borough to Mr. Nuckel other than this?

A.        One of the -- I advised our financial guy there has to be more for the town and we're asking for some money up front.

MR. SHEPARD:  Hold on.  I think we have to be clear.  Are you talking about things discussed in an executive session or things discussed with the borough attorney, borough tax attorney?

THE WITNESS:  That's our tax attorneys.

MR. SHEPARD:  Then let's not discuss that.

Q.        I don't want to know anything with the attorney.  Ultimately you were -- to approve the settlement you wanted some more money up front from plaintiffs?

A.        And better terms.

Q.        Better terms?

A.        There is -- I calculated myself, there is a discount of nearly 40 percent on taxes. That really does not justify the settlement.

Q.        Do you understand as part of the settlement any amounts that may be required to be paid back to the property owner from the property tax appeals would not be paid back in cash, but

instead would subsumed in the PILOT?  Do you understand that?

A.     Yes.

Q.     That was a benefit to the borough, correct?

A.     Yes.

Q.     The money up front, are we talking about a couple hundred thousand dollars for the fire station?

A.     Yes.

Q.     Outside of an executive session, did you talk to any other council members about these financial terms?

A.     I don't recall.

Q.     Are you aware of any of their positions requiring these financial terms?

A.     I don't.

Q.     Going back to the right-of-way, are you generally in favor of the building of that right-of-way on a path that is not cost prohibitive?

A.     This is the understanding of the whole planning board.  The primary responsibility of ours was to have road access to Main Avenue.  That has to be -- that must be done.

Q.     Because otherwise the only access to

Mr. Nuckel's property would be only through Mount

Pleasant Avenue?

    A.        That's correct.

    Q.        And that road travels through

residential neighborhoods?

    A.        Residential neighborhoods and

difficult access.  Entering the area there are some

blind spots and things like that and there is a

potential new school that would generate more

problems having additional traffic in that area.

    Q.        So the building of that roadway is

critical to traffic in the neighborhood, especially

if there is a new school?

    A.        That's correct.

    Q.        You said the borough never entered

into a PILOT before, right?

    A.        No.

    Q.        Do you know what interrogatories are?

    A.        Yes.

    Q.        What's your --

    A.        What are you referring to?

    Q.        What is your general understanding of

interrogatories?

    A.        What...

    Q.        I can clarify.  I'm trying to save

you from looking at the document.  Interrogatories are written questions that are exchanged by parties in a lawsuit.  Does that help you?

A.    Yes.

Q.    Do you understand -- have you ever seen the interrogatories provided by the borough or the planning board to plaintiff's in this case?

A.    No.

Q.    I'll represent to you the borough's interrogatories were signed by the borough administrator, Jennifer Appice.  The planning board's interrogatories were signed by Mr. Baginski. Have you ever seen those documents before?

A.    I saw not the signed document.  I saw the rough copy that was forwarded, but I have no idea what this thing was all about.

Q.    Do you recall if they were the borough's interrogatories or the planning board's or both?

A.    They were forwarded to my email, but to be honest, I was not in a position to answer any of those questions.

Q.    Without telling me what it was, did you provide any input into those answers?

A.    No.

Q.      Did you respond to that email?

A.      No.

Q.      So you received draft interrogatories for --

A.      Actually blank interrogatory questions and I just simply said okay, this is not...

Q.      So you would have nothing to offer related to those answers that were provided?

A.      That's correct.

Q.      Do you recall how -- you testified that you were previously deposed in Mr. Baginski's lawsuit, do you remember?

A.      Yes.

Q.      He had federal and a state action. Do you recall that?

A.      Yes.

Q.      Which case were you deposed in?

A.      It was the federal case.  Everything ended up in the federal case.

Q.      Everything -- it was basically the same lawsuit, right?

A.      Yes, that's correct.

Q.      And ultimately it was litigated in the federal case, right?

A.    That's correct.

Q.    That ultimately was resolved?

A.    That's correct.

Q.    And we're talking about Mr. Witold, W-i-t-o-l-d Baginski?

A.    Yes.

Q.    Commonly referred to as Vic?

A.    Yes.

Q.    He no longer works at the borough?

A.    That's correct.

Q.    What was his last job at the borough, do you remember?

A.    He was the borough clerk.

Q.    Do you know when he stopped working for the borough?

A.    Sometime in 2020.

Q.    This lawsuit was related to employment matters?

A.    That's correct.

Q.    Have you spoken at all to Jill Nuckel related to this lawsuit?

A.    No.

Q.    When was the last time you talked to her?

A.    I cannot really recall talking to her

at all.  I talked to her son.

Q.      Have you spoken to him about this?

A.      No.  Just a matter of upkeep of the property.

Q.      I understand.  Maintaining the property that's being constructed or --

A.      No.

Q.      -- something else?

A.      An existing property they own.

Q.      Jasontown?

A.      Yes, and Mt. Pleasantville Village.

Q.      They have a lot of different names. I can't keep track of them either.

Prior to his passing had you talked to Donald about this lawsuit in particular?

A.      No.

Q.      As it relates to this lawsuit at all, you did talk about the right-of-way, but that really related to his property, right?

A.      That's correct.

Q.      One other clarification.  Councilman, who is the current tax collector?

A.      We have Sireci -- I forget the first name.  We have an official tax collector and someone who just passed the exam and Carol West is the

acting tax collector.

Q.    Carol West is the acting tax collector?

A.    Yes.

Q.    And this other gentleman --

A.    A lady.  She's the wife of the CFO.

Q.    Is she going to become the tax collector?

A.    She's leaving.  She was part time helping us clean up the place.

Q.    Who was the tax collector after Dorothy Siek?

A.    So Sireci was the tax collector after Dorothy Siek.

Q.    Was that Assenheimer?  Was he ever the tax collector?

A.    No, he was the tax assessor.

Q.    Has he remained the tax assessor?

A.    No.

Q.    Does he have any role in the borough?

A.    No.

Q.    When did he last have a position with the borough?

A.    I think it was maybe 2020.

Q.    His last role was as tax assessor?

A.      That's right.

Q.      Do you recall him having any other roles in the borough?

A.      No.

Q.      Councilman, I thank you for coming in person.  I have no further questions.  I assume Mr. Shepard doesn't.

MR. SHEPARD:  No questions.

THE REPORTER:  Mr. Shepard, would you like to order a copy of the transcript?

MR. SHEPARD:  Yes, I would like a copy of the transcript.

(Deposition concluded at 12:20 p.m.)

REPORTER'S CERTIFICATION

I, LINDA M. SCHAAL, a Certified Court Reporter and Notary Public of the State of New Jersey, do hereby certify that prior to the commencement of the examination EUGENIUSZ RACHELSKI was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any party in this action and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the event nor outcome of this action.

_____
Notary Public of the State of New Jersey
My Commission expires December 5, 2028

DATED:  November 21, 2024

Errata Sheet

NAME OF CASE: NEW WALLINGTON HOME vs BOROUGH OF WALLINGTON

DATE OF DEPOSITION: 11/01/2024

NAME OF WITNESS: Eugeniusz Rachelski

Reason Codes:

    1. To clarify the record.

    2. To conform to the facts.

    3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____

Eugeniusz Rachelski
November 01, 2024

|  |  |  |  |
|---|---|---|---|
| **Exhibits** | **$** | **20** 27:19 43:11 48:12 64:4,5 68:22 | **3-18-08** 4:9 |

**Exhibits**

EX 0001 Eugenius z Rachelski 1101 24 4:8 18:10, 11,14

EX 0002 Eugenius z Rachelski 1101 24 4:9 25:5,6,8

EX 0003 Eugenius z Rachelski 1101 24 4:10 30:11, 14

EX 0004 Eugenius z Rachelski 1101 24 4:11 33:10, 15

EX 0005 Eugenius z Rachelski 1101 24 4:12 36:24 37:2 41:7

EX 0006 Eugenius z Rachelski 1101 24 4:13 45:25 46:4

EX 0007 Eugenius z Rachelski 1101 24 4:14 49:8,11

EX 0008 Eugenius z Rachelski 1101 24 4:15 53:4,7

EX 0009 Eugenius z Rachelski 1101 24 4:16 60:20, 23

EX 0010 Eugenius z Rachelski 1101 24 4:18 68:17, 20

EX 0011 Eugenius z Rachelski 1101 24 4:19 70:25 75:2

EX 0012 Eugenius z Rachelski 1101 24 4:20 72:2,5

EX 0013 Eugenius z Rachelski 1101 24 4:21 79:6,9

**$**

$200,000 73:5
$449,000 73:19, 21
$449,659.87 72:14
$500,000 68:16 71:22 73:5

**0**

0 69:23 70:7,9
06 25:14

**1**

1 4:4 33:18,24
10 30:24 32:19
11 33:21 38:15 51:8
12:20 91:13
15 9:17 26:22 54:11
16 12:15,16,17 37:14 49:15,17 51:3
17 40:23 41:7 50:7 51:2 53:11
17-016 68:21 72:8 75:14
18 4:8 25:9 29:23 37:2 69:15 75:4 79:11
18-326 4:14 49:11
19 34:17 38:6 46:4 76:6
1977 10:16,22
1997 10:20
1st 9:10

**2**

2 30:23 33:15, 18 46:5 50:20

**20** 27:19 43:11 48:12 64:4,5 68:22
**200,000** 72:24
**2006** 27:7 34:6, 17
**2008** 25:9 29:21 49:19
**2009** 50:8
**2013** 30:24 31:3,18
**2014** 30:2,8 31:21,25 32:6, 11,16 33:16
**2015** 30:18 33:13,21
**2016** 33:15 34:5 35:7
**2017** 12:14 21:2,4 29:23 35:7,18 37:2 40:24 46:4 50:21 68:22 70:23
**2018** 49:15,17 50:7 53:9,16 70:23 75:4 76:6
**2018-197** 4:20 72:6
**2019** 41:3 53:11
**2019-2020** 68:6
**2020** 68:6 88:16 90:24
**2024** 4:4 9:10 79:12
**21** 32:11 41:7
**217** 69:4,19 70:13
**22** 30:18 33:13
**220** 21:15
**25** 4:9
**27** 57:25 58:3, 24
**287** 82:15

**3**

3 24:9,12,15,16 27:15

**3-18-08** 4:9
**3-2-16** 4:11
**30** 4:10 45:10 79:12
**33** 4:11
**35.01** 72:21 73:3 74:22
**35.02** 71:13 72:9 73:9,21 75:10,19
**36** 4:12
**380** 60:25

**4**

4 24:11 38:11 41:9 44:22,25 45:4
**4-22-15** 4:10
**4.02** 61:12
**40** 45:11 57:24 83:20
**449,000** 73:6 74:19 75:5
**45** 4:13
**49** 4:14

**5**

5 3:5 24:11 34:14 38:15 51:8
**50** 43:12 45:11 48:17
**53** 4:15

**6**

6 38:5 50:25 51:1
**60** 4:16
**63** 38:10,11
**64** 37:15 38:4
**65** 40:23 41:7
**68** 4:18

**7**

7 51:1

**7-18-17**  4:12
**7/19/18**  4:19
**70**  4:19
**70.01**  61:1,12
**71**  71:13 72:9
**72**  4:20
**73**  38:14
**78**  60:25
**79**  4:21

---

**8**

**8**  55:21
**80**  23:20

---

**9**

**9-19-17**  4:13
**90**  23:20

---

**A**

**above**  32:23
  51:2
**absolutely**
  32:17 34:11
  43:14 44:2,11,
  15 77:8
**abstention**
  52:17
**abut**  46:23
**abuts**  23:3
  62:13
**accepted**  30:6
**access**  19:17
  46:15 47:15
  84:23,25 85:7
**accumulated**
  68:14
**accurate**  39:12,
  20
**acre**  23:18
  27:20 48:12,18
**acres**  57:24,25
  58:3,24
**across**  38:25
  46:21
**act**  34:23 58:17
**acted**  12:4

**acting**  90:1,2
**action**  33:20
  66:19 87:15
**actual**  7:4
  51:6,17 82:3
**add**  71:2
**added**  51:9
**addition**  56:3
**additional**
  40:15 69:14
  85:10
**addressed**  40:20
**adjacent**  23:9
  60:10
**administrator**
  86:11
**adopted**  73:25
**adopts**  31:13
**advance**  78:17
**adverse**  48:6
**advertised**
  77:3,4
**advised**  83:1
**adviser**  16:16,
  17 80:16,19,20
**affordable**
  21:16,21,22,23
  22:1,5 23:2
  24:7,13 28:6,
  17 62:21,25
  64:7 65:15
**agenda**  80:7
**ago**  5:20 6:15
  11:20 64:1
**agreed**  39:13
  64:18
**agreement**  4:21
  62:24 64:6,21
  79:10,25 80:7
  81:10,15,18
**ahead**  81:25
**allegations**
  58:13,14,16
**alleged**  76:15
**altered**  50:4
**alternate**  17:22
**amended**  4:8
  18:15
**amount**  36:7,21
  67:20 68:10
  69:3,22 72:13

73:5,14 74:18
  75:4 78:8
**amounts**  73:2
  83:23
**Androwis**  13:21
  14:18
**annum**  69:24
**answer**  7:16,24
  8:1,4 56:12
  59:21 71:3
  74:12 86:21
**answers**  8:7
  86:24 87:9
**anticipated**
  56:4
**anybody**  80:14
**anyone**  19:4
  79:2 80:11
**apartments**
  23:19 50:5
**apologize**  38:9,
  11
**apparent**  36:4
**appeal**  80:15
**appealed**  55:25
**appeals**  81:2,7
  83:25
**Appice**  86:11
**applicant**  36:14
  50:17
**application**
  20:18 26:6
  29:5,17,19
  30:1,5 31:2,17
  32:4,12,16
  35:15 36:18
  40:1 47:17
  50:4,5,14
  52:14 53:17
  61:4 63:3
**applications**
  20:15 21:2,6
  47:11 49:1,22
  50:1,15 54:10
**appointed**
  15:23,24,25
  16:7 17:6
**appropriate**
  56:10
**approval**  20:22
  21:14 22:1

29:10,20,22
  33:23 34:3
  60:15 62:19
  63:11 80:1
**approvals**  21:10
  23:2 26:10
  29:3 35:8
  48:11,17 59:7
  62:20
**approve**  81:15
  83:14
**approved**  20:23
  21:25 24:6,14
  28:6 48:17,21
  60:11
**approximately**
  6:12 57:24
  68:12
**April**  30:18
  31:25 33:13
  34:17
**Arabic**  14:19
**arbitrary**  32:22
  33:2 53:17
  54:1 55:11,25
**area**  10:9 41:8
  47:24 57:8,12
  58:4,7,16,25
  59:25 85:7,10
**areas**  78:10
**around**  13:2
  21:2 25:2
  38:11 72:16
**arrears**  71:16
**arrive**  10:14
**articulate**  56:2
**Asian**  45:12
**asked**  47:21
  67:11
**asking**  45:15
  83:3
**aspects**  42:9
**Assenheimer**
  90:15
**assessed**  67:15
**assessor**  90:17,
  18,25
**assigned**  24:13
  64:7
**assistance**
  47:14

assistant  11:4, 22
assume  91:6
attached  4:19 76:1
attempt  47:10
attend  38:16
attendance  16:13 19:25 20:12 26:4
attended  36:16 64:2
attending  40:16
attention  26:11 66:20
attorney  17:3 18:19 19:3 26:17 28:16 64:8 78:19 80:15 81:23,25 83:7,8,14
attorneys  80:12 83:10
August  9:10
automatically  71:21
Avenue  60:25 84:23 85:2
aware  19:21 24:23 25:18 27:5,9,23 29:24,25 30:4 32:15 33:1 34:1,7 42:3,22 55:1 57:16 58:6,23 59:2 66:14 72:19,20 73:2,4 76:11 79:15,19 81:1 82:13,23 84:15

---

**B**

Bachelor  10:4
back  7:25 21:17,21 26:9 27:7 30:2 32:16 35:7 36:13 39:2 48:11 49:19 53:22 54:2 57:18 58:22

83:24,25 84:18
Baginski  6:5 16:3,10 86:12 88:5
Baginski's  87:12
Balik  13:23
Bank  75:3
based  32:4 51:6,7,12,17 73:8,21
basically  10:24 21:20 46:21 62:1 78:3 87:21
basis  52:22 78:14
Bates  82:15
Bazel  15:17
Beata  13:23 14:22
beginning  24:24
behind  66:15
belabor  9:20
belief  45:23,24 50:9 52:21 71:15 80:6 81:9
believe  6:10, 17,21 20:20 21:16 37:21 44:8,13 45:14, 19 50:11 68:13 69:1 71:22 73:24 74:17 81:12,19 82:1
believed  38:13
beneficial  82:21
benefit  82:2 84:4
benefits  81:20
Bergen  25:11 30:16 33:16 41:8,10 42:4, 5,11
besides  57:17 58:24
best  7:15
better  83:17,18

big  37:15
bit  19:19 38:9
black  15:2
blank  87:5
blind  85:8
block  61:1,12 71:12,13 72:9
blocks  57:22
board  12:5,25 15:6,8,9,20 16:25 17:3 18:6 20:1,13, 19,25 21:3 25:4,19,23,25 26:4,12 28:20 29:2,7 30:20 31:3 32:8,11 33:19 34:2,8, 15,17,21,22 35:8,15 36:14, 17 37:4,6 39:6 40:11 46:3 48:25 49:13 51:6 52:1,2 53:22,25 54:3, 18,24 55:19 57:8 58:9 60:10 66:25 84:22 86:7
board's  32:21 33:22 53:16 56:1 86:12,18
boards  12:1
Bogart  37:17 38:12 39:10 41:12 51:4,8, 15
border  59:3
born  41:19
borough  4:3 5:12,22 11:17, 23 16:12 21:23 22:21 25:13,20 27:24 28:6 30:6,17 31:2, 13 32:2 33:18 37:4 39:11 40:13 50:2 51:13 53:10 54:11,15 55:11 58:7 65:14 66:12 70:3

72:6,8 73:9,25 77:18 79:13,20 80:12 82:24 83:7 84:4 85:15 86:6,10 88:9,11,13,15 90:20,23 91:3
borough's  65:23 86:9,18
bottom  26:23 52:13 55:23 75:13
break  8:14 66:8
breaks  8:14
Brian  17:2
brief  7:8 21:13
briefly  6:1 32:18 56:16
brother  16:9 22:11,12
brother's  22:4
brought  5:12 18:19 26:3,6, 11 27:25 44:5 47:17 66:20 70:19,20
budgeting  67:9
budgets  67:15
build  21:14 64:18
builder's  25:21 27:16,23 28:22 31:12 34:6 49:18
building  15:14 36:4 38:1 65:10 84:19 85:11
buildings  36:9 57:2,3
built  64:7

---

**C**

calculated  71:21 83:19
call  8:12
called  60:23 61:13
capacity  6:23 9:18 15:13

capitals  37:18
capricious
  32:22 33:2
  53:17 54:1
  55:12,25
career  9:22
Carlstadt  45:18
Carol  89:25
  90:2
Carolina  41:13
carryover  51:3
case  4:15 19:10
  22:9 25:24
  29:21 39:8
  43:22 53:8
  74:9 77:4
  79:16 86:7
  87:18,19,20,25
cash  83:25
caution  64:10
CCR  4:5
cease  41:1
census  45:22
centum  69:23
certain  28:15
  34:23 74:7,21
  77:19,20
certainly  45:16
certificate
  4:18 68:20,24
  70:7 71:7 72:7
  75:14,16 76:17
certificates
  67:5
CFO  11:5,22
  67:11,18,21
  68:5 77:14,25
  78:2 90:6
chairman  16:3,
  11
challenging
  52:10 70:22
change  31:17
changed  50:5,10
characterize
  43:16
charged  69:14
check  4:19
  56:13 75:3,13
Chemical  10:10

children  36:9
  38:1,15 40:15
  46:17,18 56:5,
  10
chose  43:19,20
Citadel  42:21
citizen  47:21
civil  4:15 53:8
claim  78:14
claimed  39:5
claims  19:10,15
  32:21 66:11,
  13,14,18 76:15
clarification
  63:14 89:21
clarify  11:2,11
  85:25
clean  60:16
  90:10
clear  18:22
  22:7 24:19,25
  35:1 46:20
  50:19 57:19
  83:5
clearly  43:16
  65:18
clerk  88:13
client  22:8
  64:2
client's  53:16
clients  18:15
  25:19 31:25
  35:7 53:9
  54:10 64:2
Clifton  10:25
close  47:12
  68:15 73:5
closer  47:6
  48:22 50:13
coffee  8:11
collection
  67:10 77:10
collector  67:3,
  20 76:7 77:11
  78:3 89:22,24
  90:1,3,8,11,
  13,16
collector's
  76:19
combination
  26:16

combined  21:17
  22:5
come  10:17
comment  73:19
committed  43:9
committees
  12:2,25
commonly  23:17
  56:20 88:7
communications
  19:2,4
companies  9:25
company  9:14
compare  41:10
  45:17
compared  45:15
complaint  4:8
  18:15,17,21
  58:14,17 70:21
complete  7:15
completed  23:20
completely
  42:10 45:1
complied  24:12
comply  48:9
concern  40:12
  47:9 77:24
concerned  42:9
concerns  56:4
concluded  91:13
conclusion
  32:19,20
conclusions
  49:12
condition  60:5
Congratulations
  9:7
connect  43:4
connection
  33:20 44:12,14
  66:21
consent  32:2
consider  56:10
consideration
  56:9 81:10
consisted  22:2
constructed
  89:6
constructing
  60:4

construction
  23:22 24:1,14
consultant
  80:22,23 82:7,
  20
contemplated
  59:18
contesting
  52:3,7
continue  27:1
  63:16 65:20
continuous  12:8
continuously
  10:20,23 18:2
copy  18:14
  86:15 91:10,12
correct  7:6
  9:19 10:8,13,
  21 12:2,3,20
  13:6 16:8,24
  17:1,9,13
  19:18 20:2,15
  21:8 22:13,15,
  16,18,21,24
  23:22 24:4,7
  26:13 27:12
  28:12 29:8,14
  30:20,21 31:14
  33:3,8 35:13,
  20 36:6 39:24
  40:25 41:5
  45:5,9 46:25
  47:3,7,8 48:23
  49:7,24 51:9
  52:14,19,20
  53:2,3 54:7,20
  55:19 56:25
  57:22 58:2,5,
  25 59:13 60:11
  61:23 64:24
  65:2,12,21
  66:3 69:7
  70:12,14 71:6
  72:12 73:9,22
  74:20 75:11,20
  76:13,18,25
  77:12,23 78:1
  81:8 82:22
  84:5 85:3,14
  87:10,23 88:1,
  3,10,19 89:20
cost  56:9 65:5,
  11 69:24 84:20

costs  56:4
council  11:21
  12:4,7,25 13:5
  16:18,22 18:2,
  7,19 24:18
  80:1,7,11,15
  81:9 84:12
councilman  5:6
  11:19,25 18:13
  30:13 43:11
  46:2 49:10
  53:6 58:22
  60:22 66:7,24
  68:19 71:2
  72:5 78:17
  79:8 89:21
  91:5
councilmen  13:7
counsel  8:2,16
  18:23 26:15,17
  82:8
County  25:11
  30:16 33:17
  41:10 42:4,5,
  11
couple  84:8
court  7:11
  28:7,12,23
  30:15 31:18,21
  32:5,20 33:14,
  19 34:2,22
  50:16,17
  53:11,20 54:9
  55:10
Court's  30:17
  33:21 34:12
courtroom  8:22
courts  53:18
cover  75:3
covered  78:12
crazy  20:4
critical  85:12
current  9:1
  12:18 13:4
  26:1 48:10
  56:23 59:11
  65:9 89:22
cut  7:17

**D**

Dabal  13:5 14:2
  16:25 41:4
  47:21
Dairy  56:21
  61:13
date  23:24
  34:23 69:24
  70:11
dated  30:18
  33:15 34:5
  46:4 49:14,17
  68:21 75:3
  76:1,6
dating  27:7
David  16:13
day  20:9 43:25
days  54:11 68:1
deal  25:25
decade  49:21
  50:2
December  30:24
  31:3,18 50:21
  68:22
decision  4:10
  30:15,18 32:21
  49:22 53:11
  54:1 55:1,5,8,
  10,22 65:4
declare  26:24
deem  55:5
deemed  27:7
  53:17 54:1,9
  55:11 57:8,12
  58:4,7,25
deeming  59:25
defined  69:25
definitely  40:7
  45:18
degree  10:7
delay  63:9
delayed  33:20
  34:3 62:23
delays  35:2
delinquency
  67:1 68:8
  76:24
demarcation
  43:1

Democrat  42:7
demolished  57:4
denial  32:16
  33:22 50:13
  52:22 53:16
  56:1,2,14
denials  55:24
Dennis  13:25
  15:1,2
densely  42:11
density  27:19
  44:16,23 45:3
  48:10,13,21,22
deny  32:12
  48:25 52:14
departure  62:22
depends  18:9
deposed  5:13
  6:22 87:12,18
deposition  8:18
  24:20 78:18
  79:3 91:13
describe  6:1
  44:21
described  34:16
DESCRIPTION  4:7
design  29:2
details  18:20
  34:10,11 62:22
determine  34:16
developer  29:4
development
  19:16 21:5,17
  29:6 31:2
  40:3,13 47:17,
  24 49:23 60:6
developments
  46:9
Devli  23:9
  46:24 56:17,23
  57:5,17,20
  58:15,24 59:7,
  19 60:6,8
  61:12 62:1
  64:18,22
difference
  42:4,22 44:20,
  21 70:12 71:9
differences
  50:7

different  41:11
  42:10,23,24
  44:18,23 45:1
  46:16 50:6
  57:21 89:12
difficult  85:7
Digiulio  3:5
  5:5,7 18:10
  25:5 38:25
  42:1 51:16
  58:19 60:18
  66:6 74:16
direct  7:23
directed  33:21
disastrous
  48:15
discharge  6:3
disclosing  11:9
discount  83:20
discriminating
  19:15
discuss  8:15
  82:6 83:11
discussed  18:18
  25:24,25 28:3
  35:12,22 40:1
  56:16 64:12
  83:6,7
discussing
  64:14
discussion
  36:12 38:7,19
  39:19 46:8
  48:1 59:24
  77:14 78:19,
  21,24
discussions
  18:23 59:23
  64:11 65:13
  68:5 79:16,19
disparate  58:18
disservice
  42:14
distance  48:20
distinctive
  42:4
disturbing  39:5
diversified
  44:24 45:13,21
diversity  45:4

**Division**  25:11
**docket**  25:14
**document**  25:24
  37:15 51:20
  79:13 86:1,14
**documentation**
  72:20
**documents**  72:25
  78:21 86:13
**doing**  11:20
**dollars**  84:8
**Donald**  6:17
  22:4,12,14
  23:2,21 28:1
  47:6,12 48:16
  60:10 61:9,25
  62:23 63:21,24
  89:15
**Donald's**  28:15
**donating**  64:18
**donation**  64:21
**Dorothy**  90:12,
  14
**double**  18:4
**double-sided**
  37:8
**doubts**  74:22
**draft**  79:9 87:3
**drawings**  29:19
**drawn**  62:5 65:5
**drive**  20:4
  44:19
**due**  69:3 72:13
**duly**  5:2
**duties**  9:3
**duty**  18:4
**dwelling**  27:19

---

**E**

---

**earlier**  35:12
**easier**  7:13
**East**  45:17
**easy**  13:25
**Economically**
  45:1
**education**  10:3
  39:7 52:1,2
**effectuating**
  77:9

**either**  19:2
  20:13 23:25
  89:13
**elected**  11:19
  15:19,22,23
  40:10
**Elias**  80:17
**email**  86:20
  87:1
**emigrate**  10:11
**emigrated**  44:7
**employment**  6:4
  88:18
**end**  8:18 12:19
**ended**  87:20
**endurance**  8:10
**engineer**  11:16
  16:12
**engineering**
  9:13,22 10:7,
  9,10
**enjoy**  20:10
**entered**  32:1
  59:15 85:15
**Entering**  85:7
**entire**  9:21
**entities**  26:19
**entitled**  34:14
  53:12
**ER**  46:5
**ER-1**  4:8 18:10,
  11,14
**ER-10**  4:18
  68:17,20
**ER-11**  4:19
  70:25 75:2
**ER-12**  4:20
  72:2,5
**ER-13**  4:21
  79:6,9
**ER-2**  4:9 25:5,
  6,8
**ER-3**  4:10
  30:11,14
**ER-4**  4:11
  33:10,15
**ER-5**  4:12 36:24
  37:2 41:7
**ER-6**  4:13 45:25
**ER-7**  4:14 49:8,
  11

**ER-8**  4:15 53:4,
  7
**ER-9**  4:16
  60:20,23
**established**
  38:24
**estate**  63:20
  65:1
**EUGENIUSZ**  3:4
  4:2
**eventually**
  70:24
**everybody**  64:17
**exactly**  71:25
**exam**  89:25
**EXAMINATION**  5:5
**examined**  5:4
**exchanged**  86:2
**exclusionary**
  27:1,7
**executed**  79:10,
  11,12
**executive**  18:24
  64:13 80:4,9,
  10 81:11 83:6
  84:11
**executor**  63:20
**exercised**  68:1
**exhibit**  18:11
  25:6 30:11
  33:10 36:24
  45:25 49:8
  53:4 60:20
  68:17 70:25
  72:2 79:6
  82:11
**exhibits**  4:23
**existence**  29:24
**existing**  21:18,
  19 89:9
**expires**  12:18
**extreme**  54:20
**extremely**  67:11
**eye-to-eye**  42:8

---

**F**

---

**facing**  24:11
**fact**  29:25 39:5
  49:12 64:1

**fact-finding**
  24:19
**factor**  56:10
**facts**  58:13
**fail**  7:16
**failed**  50:3
**fair**  25:4 26:18
  30:18 37:11
  40:11 55:17
  58:17 63:22
**fall**  32:6 35:18
**family**  43:12
  44:6 79:4
**far**  21:20 24:2
  39:19 42:8
  59:8 78:7
  79:24
**Farmland**  56:21
**Farrington**
  53:12
**fast**  20:6
**favor**  33:6,7
  50:17 84:19
**February**  31:21
**federal**  5:11
  66:19 87:15,
  19,20,25
**feel**  11:6,11
  24:22 31:6
**female**  14:14,
  22,23 17:17
**Fifteen**  21:15
**filed**  18:15
  25:11,20 30:5,
  16 31:1,17,22
  33:16 34:6
  53:9
**final**  4:16
  29:1,3 49:22
  53:12 60:14,24
  63:11 65:4
**finance**  72:23
**finances**  13:3
  67:13
**financial**
  80:22,23 82:3,
  5,7,8,16,20,24
  83:1 84:13,16
**financially**
  42:12

Case 2:20-cv-08178-EP-AME   Document 142-23   Filed 05/01/26   Page 100 of 109
PageID: 3623
Eugenski Rachel Isel
November 30, 2024

7

find   27:14
finding   33:2,6
  34:2
findings   33:7
  49:12 52:8
finds   32:21
finish   7:25
  8:13 20:3 43:8
  76:4
finished   23:19
fire   84:8
fireman   43:12
firm   5:7
first   12:24
  13:17 27:10
  32:19 34:6
  50:19 51:1
  53:7 55:13
  70:22 72:5
  76:14 89:23
fiscal   56:3
five   6:14
fluid   64:15
focused   56:3
follow   5:4
followed   39:18
font   69:18
forbidding   65:6
foreclosing
  68:2
forget   89:23
form   56:11
forth   7:25
  21:18 32:23
  36:13
forwarded
  86:15,20
found   25:22
  26:7,20 27:6
  31:22 33:19
  39:11 51:6
  52:5
four   5:16,21
  6:14 17:5
  50:20 55:19
fourth   55:10
frame   39:3
free   11:6,11
  24:22 31:7
Friday   4:4 20:8

friend   42:6
front   18:13
  83:3,15 84:7
full   30:23 51:2
  55:23,24 78:8
  79:25
fully   8:7 66:14
  81:20 82:13
function   13:2
Furtak   17:22
furthest   24:3
future   13:11
  19:16 48:20

### G

gave   80:21
general   19:9,12
  21:9 28:21
  42:1,19 43:19
  76:22 85:22
generally   28:25
  29:9 42:25
  84:19
generate   38:15
  85:9
gentleman   90:5
Gerry   60:18
getting   47:14
  58:13
Giblin   17:2
girl   41:13
give   7:8 19:12
  21:13 22:5
goes   62:12
  67:23
going   7:12 8:6
  18:13 20:5,19
  21:17 26:7
  30:13,22 34:11
  37:1 38:19
  46:2,16 47:10
  48:9 49:10
  68:19 71:8
  72:4 79:4,8
  81:6 84:18
  90:7
good   5:6 35:5
  36:4,7 42:6
  47:3

governs   76:23
Graham   13:25
  15:1
grant   27:16
granted   27:24
  28:23 49:18
  54:10 55:5
grants   31:11
great   42:17
Group   25:12
growing   21:18
guarantee   44:1
guess   5:19
guest   55:15
guy   42:17 83:2

### H

half   15:2,3
  45:2 65:6
  70:13
handle   28:17
happened   29:16
  54:23
happening   54:14
Harris   4:9
  25:10,16 27:5
  31:11 33:5
  49:18
he'll   7:23
head   8:5 39:2
heard   41:16
hearing   27:10
  38:23 41:25
  46:6 47:20
  64:16,17 76:14
hearings   32:5
  34:8 35:15,22
  36:17 38:20
  39:1,2 46:10
  50:21 54:3
  62:22 63:2,9,
  16,19
held   5:22 34:8
  72:8
help   11:11
  13:10 38:18
  86:3
helping   90:10
higher   38:10

highest   10:2
hire   28:16
Hispanic   45:10
historically
  41:9,25
history   9:21
  11:15
Hold   76:4 83:4
Home   4:3 5:10
  18:16 19:22
  20:14 30:16
  32:1 75:8
  76:15
Homes   49:14
honest   52:25
  86:21
hour   11:10
household   45:2
housing   21:21,
  22,24 22:1
  23:2 24:7,13
  28:6,17 58:17
  59:12 62:21,25
  64:8
hundred   84:8
hundreds   68:14

### I

i.e.   56:4
idea   19:13
  46:13 48:9,13
  86:16
identification
  18:12 25:7
  30:12 33:11
  36:25 46:1
  49:9 53:5
  60:21 68:18
  71:1 72:3 79:7
Immediately
  9:11
immigrants
  44:24
impact   36:11
  40:3 58:18
  67:12
imply   44:4
implying   44:2
importantly
  24:21

**imposition**
  66:12
**impression**  40:2
**improperly**  56:3
**included**  73:13,
  14
**includes**  57:21
**including**  64:18
**income**  45:2
  64:8
**incorporated**
  65:1
**incorrect**  74:1
**increase**  67:16
**increased**  67:16
**incurred**  69:25
**Indian**  45:12
**indicated**  60:7
**indications**
  47:13
**industrial**
  57:1,3 59:9
**information**
  4:15 39:6
  51:7,12,18,25
  53:8
**infrastructure**
  48:14
**input**  86:24
**instance**  53:21
**instructed**
  67:21
**instruction**
  8:2,4
**instructions**
  7:8
**intention**  59:11
**interest**  40:20
  68:14 69:14,
  15,23 70:7,14
**interject**  20:16
  38:22
**International**
  76:6
**interrogatories**
  85:18,23 86:1,
  6,10,12,18
  87:3
**interrogatory**
  87:5

**intervened**
  25:12
**intervener**
  27:17
**invalid**  26:25
**involved**  64:6
**involvement**
  77:6
**issuance**  67:1,5
  76:23
**issue**  36:21
  40:19 54:11
  76:20 78:11,15
**issues**  26:1
  34:16 35:22
  50:14 56:15
  66:9,18 70:18
**issuing**  77:7
**Ivanicki**  13:15
  14:6

**J**

**James**  17:22
  79:11
**January**  12:12,
  14,16 49:15,17
  53:11,16 79:12
**Japanese**  9:14
**Jasontown**  89:10
**Jennifer**  86:11
**Jersey**  5:3 11:1
  66:2
**Jill**  22:4,17
  23:14 28:1
  61:18 88:20
**Jill's**  24:3
  28:15
**Jim**  5:7 22:8
  23:24 67:18
  68:3 72:23
**Jimmy**  22:2
**job**  7:5 9:1,2,
  12 11:22 76:20
  78:4 88:11
**jobs**  9:22
**joined**  25:19
**jointly**  22:23
**Jordanian**  14:19
**Joseph**  17:6

**Judge**  4:9,10,11
  25:10,16 27:5
  30:15 31:11
  32:20 33:5,6,
  13 49:18 53:11
**judge's**  55:4
**Judgment**  53:13
**July**  37:2 50:21
  75:4 76:2,6
**justify**  83:21
**Juzmeski**  16:13

**K**

**Kasperek**  15:24
**keep**  89:13
**Khaldoun**  13:21
  14:18
**kind**  20:21 39:9
  45:23 64:8
**knew**  34:10 78:7
**know**  7:18 8:12
  11:8 18:25
  20:7 21:20,23,
  24 24:17,20,
  21,23 26:20
  28:10,18 31:7
  39:15,18,25
  40:6,22 41:9,
  19 42:18 43:5,
  11,14 47:16
  54:22 60:4
  61:19 69:17
  70:6 71:8,12
  73:4,15,18
  74:2,13 78:13,
  20 79:24 82:10
  83:13 85:18
  88:14
**knowledge**  21:1
  25:1 35:1
  66:13 67:4,8
  77:17 78:11
**known**  59:16
**Konica**  9:13,15

**L**

**lady**  90:6
**land**  23:18
  26:24 27:6

**64:19,22
lands**  27:18
**late**  25:23
**Latex**  23:17
**law**  5:7 25:11
**lawsuit**  5:11
  6:19 19:4,7,14
  25:20 27:24
  28:22 29:5,17
  30:4,16 31:12,
  22 33:16 34:6
  53:9 79:11
  86:3 87:13,22
  88:17,21
  89:15,17
**lawsuits**  27:25
  35:3
**learned**  55:8
  66:22
**leaving**  36:3
  90:9
**left**  7:11
  61:15,22 75:13
**letter**  4:19
  75:25 76:1,5,9
**level**  10:2
**levels**  77:18
**liaison**  16:18
  18:2 66:25
**lied**  39:8 51:24
**lien**  66:12
  67:23,24,25
  70:4 78:15
**liens**  4:18
  68:21 76:25
  77:1
**lieu**  59:15
**life**  43:9
**light**  59:9
**limited**  33:20
  75:19
**LINDA**  4:5
**line**  38:11
  40:23 41:7,9,
  14,17 42:19,25
  43:23 46:21
  58:12
**lines**  38:5
**list**  13:13
**Listen**  43:4

litigated  87:24
litigation
 18:24 62:25
litigations
 34:8
little  19:19
 37:15 38:9
 47:6 55:22
 61:22 72:4
live  10:23
living  36:9,22
 42:24
LLC  75:8
local  42:15
located  23:15
long  9:15 29:20
longer  88:9
look  37:15 38:4
 42:10 47:25
 50:12,25 52:17
 61:11
looked  45:22
looking  48:6,11
 52:21 53:6
 73:20,22 86:1
looks  62:13
 71:9 82:12
lot  7:13 24:22
 60:25 61:12
 62:13 71:8,9,
 12,13 72:9,21
 73:3,9,13,21
 75:10 89:12
lots  21:16,17
 57:21 71:5
 74:5,6
low  67:11
lower  42:5
lying  52:6

**M**

made  27:5 33:5,
 7 47:13 48:8
 52:11 55:1
 65:4 72:24
 73:25 75:1
 76:11,12
Main  84:23
Maintaining
 89:5

majority  36:19
 44:25
make  8:5,6,11,
 15 15:7 18:22
 19:20 20:9
 31:11 34:25
 45:6 47:10
 57:18 65:8
 71:14 82:14
male  14:20
 15:25 16:5
 17:8,14,24,25
man  14:10,21
 15:4,5,15
 32:20 42:9
 43:8
manager  9:13
map  61:11,20
March  25:9
 33:15
mark  18:10 25:5
marked  4:7
 18:11,14 25:6,
 8 30:11,14
 33:10,14 36:24
 37:2 45:25
 46:5 49:8,11
 53:4,7 60:20,
 23 68:17,20
 70:25 72:2
 75:2 79:6,9
Mason-dixon
 41:9,14,17
 42:19 43:23
matter  25:11
 37:3 53:21
 64:1 89:3
matters  88:18
mayor  13:5 14:2
 16:22,24 19:6
 40:23,24 41:1,
 2,4,6,16 43:5,
 16,25 44:6
 47:21
mean  44:1 66:22
 74:5
meant  45:4
mechanisms  77:9
Meehan  4:10,11
 30:15 32:20
 33:7,13

meet  5:8 18:7
meeting  18:19
 26:4 34:18
 37:10 64:2
 80:3
meetings  20:1,
 13 37:6 46:3
Melfi  15:8
member  12:5,7
 15:8,12 17:6,
 12,18 79:4
members  16:22
 17:5 80:11
 84:12
mentioned  9:1
 23:1 61:18
merited  32:23
met  5:9
middle  69:17
million  70:13
mine  42:7
minimum  46:17
Minolta  9:14,16
minute  66:9
missing  73:1
 78:10
mistake  72:24
mix  15:2
Mm-hmm  49:25
mm-hmms  8:5
model  51:7
modification
 20:23,24 26:6,
 10,21 29:22
modifications
 35:11,23
modify  50:12
money  67:16
 68:3,10 70:19,
 20,23 83:3,15
 84:7
month  18:5,7,8
months  68:2
 70:20
morning  5:6
Morningside
 5:10 18:16
 19:23 20:14
 25:12 30:17
 32:1 33:17
 37:3 38:14

 49:14,23
Morningside's
 37:21 48:25
motions  8:19
Mount  60:25
 85:1
mountain  65:6
move  20:7
Mt  89:11
multifamily
 27:18
multiple  20:20
 47:13 50:14
 56:14 62:21
 63:25 67:19
municipal  4:18
 9:3 61:16
 67:25 68:21
municipalities
 42:13
municipality
 11:4 23:12
 35:25 40:4
 43:9,10,24
 57:12 67:13,25
mutual  64:6

**N**

name  5:7 13:17
 37:18 56:23
 64:9 89:24
named  22:11,12,
 17 23:17
names  13:11
 89:12
necessary  60:1
need  8:11 9:20
 18:25 20:8
 38:10 57:8,12
 58:4,8,16,25
 60:1
needed  29:13
needs  74:14
negotiations
 28:18
neighborhood
 85:12
neighborhoods
 85:5,6

neighbors   45:9,
  15,16
never   25:24,25
  42:8  52:1
  54:23  70:21
  76:9  85:15
newspapers
  77:3,4
nice   5:8
Nick   15:8
nights   18:4
nine   11:19  12:8
NJIT   10:6
Nods   8:5
nonexisting
  19:17
nonpaid   11:4,13
north   41:13
  42:16  43:1
  44:9,22  45:2
northern   42:11
Notary   5:3
note   37:5,9
  41:24  58:11
  59:20
noticed   67:10,
  18
notices   67:1
  76:20,24  77:7
notification
  77:2
NOVEMBER   4:4
Nuckel   6:18
  22:4,8,12,18
  23:2,14  28:1
  47:9,12  62:23
  63:5,21,24
  64:25  65:18
  67:19  68:3
  70:18  72:24
  78:7  79:12
  82:25  88:20
Nuckel's   22:3,4
  23:21,24
  26:14,17,19
  46:24  47:6
  48:16  60:10
  61:9,18  62:1
  77:20  85:1
number   22:5
  25:14  37:25

40:3 50:5,9
  68:1,21 72:16
  73:6
numbered   50:25
  82:10,11
numbers   39:12,
  19 45:23 55:22
nutshell   19:14

---

**O**

---

O'TOOLE   5:7
oath   8:21 39:9
  51:24 52:6
object   51:19
objection   7:23
  41:24 43:3
  54:21 56:11
  58:11 59:20,21
obligation
  28:17
obtained   39:6
  70:3
obviously   7:7
  16:12 30:19
  46:14 64:25
occasions   63:25
occupied   21:24
occur   28:22
occurs   28:19
October   32:11
offer   87:8
office   12:12
official   6:23
  15:14 40:10
  75:3 89:24
officials   5:13
  40:12
okay   6:7 7:19
  8:2,7,9,16,22
  11:1 16:17
  26:9 28:19
  34:5 35:5 38:8
  46:7 72:18
  74:25 87:6
once   18:5,8
  63:16
one   5:18,19
  6:2,7,8,9,11,
  16,19,22 11:2
  13:25 16:21,24

22:3 28:8,9,16
  30:7,15 36:3
  37:24 39:9
  46:4 47:3,4
  52:17 55:13
  61:8 64:14
  66:15 67:24
  71:7 72:11
  74:1 76:11
  83:1 89:21
ones   55:17
opinion   4:9
  25:10,16 26:22
  33:12
opposed   77:17
  81:17
opposite   23:11
  42:7
OPRA   39:7 52:1,
  11
OPRA'D   41:8
order   4:11
  26:24 32:2
  33:14,21
  34:16,22 72:4
  91:10
ordered   28:11
  54:11
orders   28:7
organize   64:8
organized   64:4
orient   19:20
  38:6
orientation
  59:3
oriented   46:9
  47:16 61:19
original   35:24
originally   65:5
outside   80:10,
  12 82:7 84:11
oversees   63:20
owed   72:17 73:3
owned   19:22
  57:11 58:24
  60:5
owner   56:24
  69:6,14 75:2,
  10 83:24
owners   65:14
  67:14

owns   22:14,20
  23:12

---

**P**

---

p.m.   91:13
page   3:3 4:7
  26:22 27:15
  30:23 32:19
  33:18 34:13
  37:5,8,9,14,15
  38:4 40:22,23
  41:6 46:5
  50:20,24 51:1
  52:17 53:10,13
  55:21,22 61:4
  62:4 75:3
  79:11
pages   37:16
  53:8 82:11
paid   67:14
  68:3,11 69:5,8
  70:23,24 74:3
  75:7 77:21
  78:7,8 83:24,
  25
paragraph   27:15
  30:23 31:7
  33:18,24 34:14
  50:20 51:2,3,5
  55:23,24
parcel   57:11
parentheses
  62:9
parking   62:13
part   20:24 26:7
  31:15 66:18
  80:24 81:5
  83:22 90:9
partially   79:9
particular
  36:21 37:10
  38:23 89:15
parties   64:5
  79:16 86:2
passed   63:5
  73:17,22 89:25
passing   63:23
  89:14
past   27:1
path   84:20

pathway 65:11, 15,16
Paul 17:10
pay 67:19 70:21
paying 66:15 70:18
payment 59:15 75:1 76:12,16
pending 8:13 81:1
people 37:24 43:10 46:17 64:4,5 72:23
percent 21:15 23:20 45:11 69:15 70:7,9 83:20
periods 67:19
permeates 39:1
permits 54:11
person 7:10 11:21 12:25 43:14 91:6
personal 35:1 77:17
Personally 82:1
pg 50:25
phase 20:22
phone 8:12
PILOT 59:16,18 60:2 79:21 80:13,16,20 82:4 84:1 85:16
PILOTS 59:21
place 90:10
plaintiff 27:16
plaintiff's 66:10,18 67:6 86:7
plaintiffs 5:10 22:9 33:6,7 79:21 80:13 83:16
plaintiffs' 32:21
plaintiffs's 28:11
plan 4:16 20:14 29:9,22 30:1 33:22 35:8,24

40:1 50:1 60:24 61:4,24 62:7,16,19 63:11 64:23 65:2,19
planner 16:13 37:21
planning 12:5 15:6,7,9,20 16:25 17:3 18:6 20:1,13, 19,25 21:3 25:3,19,23,25 26:3 28:20 29:2,6 30:19 31:3 32:8 33:19,22 34:2, 8,15,17,21,22 35:7,15 36:14, 17 37:4,6 40:11 46:3 48:24 49:13 51:6 53:15,22, 25 54:3,17,24 55:18 57:7 58:8 60:9 66:25 84:22 86:7,11,18
Pleasant 60:25 85:2
Pleasantville 89:11
please 7:14,25 8:4,12,15 18:10 39:17
point 25:18 28:16 32:9 37:11 46:5 47:3 66:15 73:1
pointed 78:2
Poland 10:18 41:19
Polish 14:12, 24,25 45:11
political 42:9
populated 42:12
population 45:12 46:15
portions 48:6
position 7:3 11:3,4,13,25

12:7 13:5 15:10,11,12, 19,25 51:23 65:10 86:21 90:22
positions 11:17,23 16:23 84:16
possible 36:11
potential 79:17 85:9
potentially 8:20 25:2 26:14 79:3
practices 27:2, 6
preapproved 21:21
predate 21:6
predominantly 45:8
preface 24:18 25:4
Preinfalk 13:19 14:14
preliminary 4:16 60:24 62:19,20
preparation 78:25
prepare 29:5
prepared 71:10
presence 82:7
present 29:6 36:13 46:6
presentation 36:10
presented 29:23 50:8 79:25 82:24
pretty 11:1 20:18,24 54:20 74:8 78:12
prevailed 26:19 29:4,17
previously 28:3 74:25 87:12
primary 13:2 35:21 84:22
principal 22:8

prior 9:11 63:23 89:14
private 9:4,5 11:16
probably 5:16 6:14 7:16 8:6 12:10 23:17,20 38:9,10 45:1, 10,20 70:19 80:9
problem 8:8
problems 85:10
proceed 64:23 67:21
proceedings 68:2
process 7:8 20:22 62:23,25 63:18 67:9 76:16 77:2,7
processes 67:22
produced 60:19
production 60:19
professionals 46:17
prohibitive 65:11 84:20
project 38:13
pronounce 13:10
proper 67:21
properties 6:20 19:22 21:6,10 22:2,14,20,24 28:2,5,11 31:14 34:9 35:9 46:20 47:4 57:17 58:6 67:6,17 71:14,16,23 72:1 74:18 79:22 81:3
property 23:1, 3,8,9,11,14, 15,16,21 24:3 38:14 46:25 47:7 56:17 57:1,8,16,17, 20 58:15,23 59:4,8,12,19, 25 60:6,10 61:5,8,9,13,

16,19,24 62:1
65:14 66:11
67:1 69:6,14,
16 70:4 71:4,
11 74:3,4 75:1
76:24 77:1,10,
19,21 80:17,
19,20 81:2,7
83:24 85:1
89:4,6,9,19
**proposed** 62:3,
9,12 65:3
**protest** 69:9
75:1,23 76:12
**provide** 8:1
47:14 65:19
86:24
**provided** 37:25
51:15 63:12
86:6 87:9
**provides** 72:7
**providing** 19:16
63:18 73:1
**provision** 80:13
**public** 5:3
11:15 38:16
40:12,16,19
64:13,16,17
74:1 77:7 80:3
81:14
**purchase** 69:25
**purchased** 67:24
**put** 18:13 52:1
70:7 72:22
**putting** 59:12

**Q**

**quarters** 70:20
**question** 7:17
8:13 20:3
27:18 45:14
76:20
**questionable**
35:24 36:2
**questioned**
39:10
**questioning**
58:12
**questions** 7:15
24:22 36:8

47:21 86:2,22
87:6 91:6,8
**quick** 66:7
**quickly** 15:8
20:7
**quite** 21:7
42:22 46:16
66:16 67:20
71:10

**R**

**R-6** 46:4
**races** 44:24
**Rachelski** 3:4
4:2 5:6
**racial** 43:15
**raise** 11:12
**raised** 77:24
**Ramsey** 44:19
**range** 51:8
74:19
**rate** 67:10
69:23 70:7
**rationale** 56:2
**read** 31:6,7,8
38:5
**reading** 51:16
**reads** 26:23
55:24
**ready** 78:18
**realize** 77:19
**reason** 36:4
50:13 73:24
**reasonable**
48:12
**reasons** 35:2
49:3 53:1
56:13,14 67:12
**recall** 5:17
6:25 23:15
35:14,21 36:7,
12,16,20
37:20,22 38:2
39:4 41:2
46:8,12,19
48:3 49:3,5
50:15 52:24
53:15,20
54:12,14 55:6,
7 60:13 68:9,

12 69:8,11,12,
13 70:17 80:5
81:11,14,16
84:14 86:17
87:11,16 88:25
91:2
**receive** 8:1,19
**received** 21:11,
14 59:8 60:14
62:18 87:3
**recent** 5:17,19
6:9,11
**recently** 45:22
48:16 63:6
**recess** 66:5
**recollection**
38:19 51:22
**record** 5:9 8:6
22:7 25:9
30:14 34:25
57:18
**recorded** 65:10
**redemption**
69:22
**redevelopment**
57:9,13 58:4,
8,16,25 60:1
**reelection**
12:22
**refer** 9:3
**referenced**
74:25
**references**
40:23
**referred** 42:6,
10,13 56:17,20
88:7
**referring** 30:7
43:18 44:16
61:8 68:25
85:21
**refers** 41:20
**refresh** 38:18
51:22
**refute** 39:22
**regarding** 21:18
59:21 78:11
80:12
**regulation**
31:13

**regulations**
26:25
**reintroduced**
29:2
**relate** 5:21
**related** 6:19
7:2,4 21:6
25:20 27:24
34:9 35:15
36:8,17 48:19
49:13 52:22
59:19 63:2
66:11 67:4,5
71:23 72:20
73:3 74:21
76:15 78:14
79:10,21 81:2
87:9 88:17,21
89:19
**relates** 62:24
64:21 73:8,21
76:19 89:17
**relation** 44:9
**relief** 54:20
**remain** 26:25
**remained** 90:18
**remaining** 45:11
**remand** 33:20
53:21 55:5
**remanded** 54:2,6
**remedy** 25:21
27:16,24 28:22
31:12 34:6
49:18
**remember** 36:1
47:18,20,23,25
56:17 68:4,7
87:13 88:12
**removed** 65:7
**rendered** 50:16
**reorient** 65:15
**repayment** 69:22
**reporter** 4:23
7:12 91:9
**represent** 5:9
25:9 51:8 86:9
**representatives**
79:20
**representing**
64:5

**reps** 64:3
**Republican** 42:8
**request** 39:7
  52:2,11
**requested** 50:12
**require** 27:17
**required** 22:1,5
  24:7,13 50:16
  83:23
**requirements**
  24:12
**requiring** 84:16
**resent** 43:5
**reside** 8:24
**residential**
  27:18 85:5,6
**residents** 36:22
  37:25 40:17
  67:14
**resolution**
  4:14,20 49:11
  52:22 53:2
  72:6 73:9,15,
  17,20,22,25
  81:6
**resolve** 24:22
**resolved** 88:2
**respond** 87:1
**responds** 41:12
**response** 55:7
**responsibility**
  67:2 84:22
**restroom** 8:11
**result** 27:13
  28:7 31:12
  63:8 78:2
**resulted** 35:2
**retained** 4:23
**retired** 9:6
**retirement** 9:9,
  12 11:3 20:10
**retract** 76:20
**reversing** 33:22
**review** 67:11
  78:21
**reviewed** 40:4
  75:17 82:19
**rezoned** 28:12
**right** 5:9 7:11,
  20 9:6 13:8,11

19:1 23:16
24:11 28:4,13
31:9 35:18
39:12,23 43:2,
20 45:10,16
47:1 48:17
49:19 51:13
52:4,16 55:12
56:24 59:3,4,
9,12 61:11,25
62:4,7,12
65:16,25 70:10
73:23 75:23
76:12 77:22,25
78:4 81:22
85:16 87:22,25
89:19 91:1
**right-of-way**
  59:5 60:5
  61:25 62:2,5,
  8,12 63:24
  64:19 65:9
  84:18,20 89:18
**rights** 68:1
**rink** 21:19 36:5
  52:23
**road** 61:25
  64:7,18 84:23
  85:4
**roads** 64:3
**roadway** 65:1,3,
  4,11,19 85:11
**Rob** 64:9
**Robert** 15:24
**role** 66:24,25
  90:20,25
**roles** 5:22 91:3
**rough** 86:15
**round** 24:9,11,
  12,15,16
**Route** 41:9
  44:22,25 45:4
**ruling** 34:1
**rulings** 34:12
  50:16
**run** 47:4
**running** 12:21
**Rutherford**
  45:18

### S

**sadly** 63:5
**saga** 25:1
**sale** 4:18 67:23
  68:21,24
  69:21,22,24
  70:8,11 71:7
  77:3,5,7
**sat** 12:1 40:11
  60:9
**save** 85:25
**saying** 43:6
  47:23 48:3
  52:5
**says** 27:16 31:1
  34:15 41:6,7
  50:25 51:17
  52:13 62:8
  69:21 73:23
  75:14
**SCHAAL** 4:5
**school** 10:5
  38:15 85:9,13
**school-age**
  56:4,9
**school-aged**
  40:15
**schools** 36:11
  38:16 40:16
  51:9
**Scrivo** 5:8
**second** 22:3
  30:23 37:5,8
  55:23 61:3
  62:3 71:8
**sector** 9:4,5
  11:16
**see** 7:10 27:3,
  14,21 30:24
  31:3,19,20,23
  32:2,6,13,24
  33:5,24 34:19
  37:12,18 38:16
  41:14 42:8
  44:20 49:15
  50:22 51:10
  53:13 56:6
  61:1 62:3,4,8,
  10,14 66:21
  68:22 70:1,22

72:9,14 75:5,
8,14 76:7
**sentence** 26:23
  27:15 32:19
**separate** 50:20
  71:5
**September** 46:4
  50:21
**served** 43:10
**session** 18:24
  80:4,9,10
  81:11 83:6
  84:11
**sessions** 64:13
**set** 32:23 82:23
**settlement** 4:21
  79:10,17,25
  80:6,25 81:6,
  10,15,17
  83:15,21,23
**setup** 15:7
**seven** 12:11
  18:1
**several** 5:12
  35:14 57:21
  81:2
**Shepard** 7:22
  19:3 38:22
  40:5 41:24
  43:3 51:14,19
  54:21 56:11
  58:11 59:20
  64:10 74:10,13
  78:25 81:22
  82:15 83:4,11
  91:7,8,9,11
**shift** 62:2
**Shifting** 66:9
**show** 30:13
  33:13,18 37:1
  46:2 49:10
  60:22 68:19
  72:5 75:2 79:8
**showed** 48:12
**shown** 61:20
**shows** 61:4,25
  62:2
**side** 23:11 47:4
  62:7 63:17
  65:23,24 66:2
**Siek** 70:6 76:6
  90:12,14

signed 64:21
73:17 86:10,
12,14
significant
67:20 68:10
70:18
significantly
66:16 69:13
similar 9:18,21
Simon 64:9,12
simply 87:6
sir 19:24 30:22
35:16 37:1,9
Sireci 89:23
90:13
sister 22:17
sit 12:25
site 4:16 20:14
22:3 29:9,20,
22 30:1 33:22
35:8 40:1 50:1
60:24 61:4,24
62:16,19
63:11,12 65:2,
19
sitting 53:25
54:17 74:17
78:13
situation 29:1
42:22 43:22
skating 21:18
36:5 52:23
sketch 21:13
slave 43:1 44:9
slavery 44:5
Slovakia 44:7
slow 20:8
small 69:18
Smith 17:6
software 71:21
sole 67:2
solid 59:22
son 42:21 89:1
sound 35:18
south 41:8
42:16,23 44:9,
22,25 45:4
southern 59:3
speak 23:19
79:2 80:11

Speaking 21:22
speaks 51:20
specific 10:9
specifically
36:1 46:19
56:1
specifics 36:20
speculate 28:8,
9 36:23 40:5,8
54:16 71:18
74:10
speculating
51:21 73:16
spent 36:8
spoken 19:6
63:24 88:20
89:2
spots 85:8
spouse 79:3
square 77:16
standing 59:21
Stanley 16:3
start 9:9
24:17,24 25:1,
15 38:10 68:2
76:21
started 20:20
21:2,3 23:22
24:1
starting 53:10
starts 30:23
state 5:3 87:15
stated 43:16
53:2
statement 4:15
48:8 53:8
states 10:12,
15,19 42:16
43:1 44:10
station 4:17
19:17 23:4
46:14,15 47:2,
5,13,14,15
48:20,22 60:25
62:14,18
65:20,24 66:3
84:9
statute 69:25
76:23
statutory 12:7
15:9,11,12

16:23
step 60:1
stop 41:2 81:22
stopped 88:14
story 26:7
72:25
straightened
63:16
strain 40:13,17
street 46:21
strip 23:18
strongly 60:7
64:22
structure 21:19
struggle 42:12
students 51:9
stuff 64:12
71:20
subject 29:12
69:21
submitted 20:1,
14 29:16,19,20
30:1 54:10
subsequent 30:4
substance 18:25
39:14 78:20
subsumed 84:1
suggested 64:22
suit 26:19
summer 32:6
35:17
support 48:14
sure 7:21 8:7,
15 13:12 15:7
18:22 19:20
20:9,17 28:10
31:11 34:25
42:18 45:6
57:18 65:8
71:14,15,19,23
72:20 74:8
82:14
surprise 26:2
surprised 55:4
Susanne 13:19
14:14
sworn 5:2 8:20
Szwaczka 17:10,
11

**T**

take 7:12 8:14
12:12 41:4
50:2
taken 66:5
talk 43:13
80:14 84:12
89:18
talked 51:3
63:25 80:15,16
81:21 88:23
89:1,14
talking 38:13,
23 41:13 43:13
57:20 58:15
63:19 64:3
71:4,14 82:17
83:5 84:7
88:4,25
tax 67:1,3,5,
10,20,23,24,25
68:15 72:7
75:14,16 76:7,
16,19,24 77:1,
2,4,7,11 78:3,
14 80:15,17,19
81:2,7 83:7,9,
25 89:22,24
90:1,2,7,11,
13,16,17,18,25
taxes 59:15
66:11,15
67:13,16,19
70:18 74:2
77:10,20,21
83:20
TD 75:3
tell 55:15
telling 86:23
ten 34:7
tenants 19:16
tend 20:7
term 12:18
41:17,20 42:2
43:18,19 44:8,
13
terms 41:25
42:14 82:3,5,
8,16,20,24
83:17,18

84:13,16
**test** 8:10
**testified** 5:4
  38:12 87:11
**testimony** 8:15
  36:8 37:25
**texture** 46:15
**thank** 8:9 9:8
  11:6 20:11
  60:16 63:14,22
  66:7 91:5
**Theresa** 17:16
**thing** 11:2
  38:21 39:4,9
  64:14 86:16
**things** 41:11
  63:16 64:8
  83:5,6 85:8
**think** 7:4 11:6,
  10 12:4 19:11,
  13,14 20:21,23
  21:14 28:14
  29:21 42:14
  43:21 44:2
  47:11 52:24
  58:12 59:2
  61:3 64:20
  68:15 73:16
  80:8 83:4
  90:24
**thinking** 42:15,
  23 43:23 48:5
**third** 8:4
  53:10,13
**thought** 72:16
  82:20
**thousand** 84:8
**thousands** 68:15
**three** 5:16,20
  22:2 28:5
  50:16 55:18
**tie** 58:20
**time** 7:17,22
  8:12 12:5
  18:6,9 20:21
  21:7 26:15
  27:10 29:20
  34:21 36:7
  39:3 40:24
  50:3,6,10
  54:17 55:13,14
  57:7 58:8,20

64:15 70:22
  76:14 88:23
  90:9
**timeline** 31:10
**timely** 77:21
**times** 5:15,21
  7:23,24
**Timing** 34:15
**today** 5:8 7:11
  10:22 32:15
  33:1 34:7
  55:18 66:22
  74:17 78:8,13,
  17 79:4
**Tomas** 15:17
**Tomko** 40:23,24
  41:6,16 43:5,
  17,25 44:6
**top** 25:14 37:12
  50:25 51:1
  60:23 61:21
  62:2
**topic** 39:25
**total** 9:17
  55:19 58:1
  68:13 69:2,19
  72:13 74:18
**town** 6:20 19:3
  24:6 25:3
  44:25 48:15
  59:4,14 60:5
  81:20 82:2,21
  83:2
**town's** 65:9,10
**towns** 41:7
  44:19
**track** 47:1
  58:23 89:13
**tracks** 23:6
  46:24 47:4
  66:2
**traffic** 85:10,
  12
**train** 19:17
  23:3,6 46:14,
  15,21,24 47:2,
  13,14,15
  48:20,22 62:14
  65:20,24 66:2
**transcript**
  4:12,13 8:19
  37:2,16 46:3

91:10,12
**transcripts**
  37:6
**transit** 46:9,13
  47:10,16 66:3
**travels** 85:4
**treat** 8:21
**tremendous**
  67:12
**trial** 8:20
**Trust** 58:19
**try** 7:14 44:18
**trying** 39:2
  43:4,7 71:24
  77:16 85:25
**turn** 26:22
  27:14 30:22
  32:18 34:13
  37:14 40:22
  50:24 51:1
  55:21 61:3
**twice** 18:7,8
**two** 5:25 6:25
  7:4 12:24
  19:21 21:16
  27:25 31:14
  46:20 53:7
  71:5,14,25
  79:21
**two-page** 75:25
**typically**
  53:24,25
**typo** 73:11,12

---

**U**

**ugly** 36:3
**ultimately**
  39:11 48:24
  69:5 70:3
  83:14 87:24
  88:2
**unanimous** 52:16
**uncertain** 64:15
**unconstitutional**
  26:25 27:8
**underneath**
  69:18 75:22
**understand** 15:7
  20:5 22:9
  24:25 27:13

28:19 31:11
  35:6 65:8 66:1
  78:6 80:24
  81:5 83:22
  84:2 86:5 89:5
**understanding**
  19:9 21:5,9
  26:18 28:21
  29:15,18 41:20
  42:2,19 43:19
  53:24 54:4
  56:8 57:15
  61:7 63:15
  66:10,17 76:22
  84:21 85:22
**understood** 7:20
  8:17 11:14
  58:19,21 60:9
  65:18 82:6
**undertone** 43:15
**United** 10:11,
  14,19
**units** 21:15,24
  22:1,6 24:13
  27:19 36:22
  38:14 48:12,17
  50:10
**unpaid** 4:18
  11:22 68:21
**unpublished**
  25:10
**unreasonable**
  32:22 33:3
  53:18 54:2
  55:12 56:1
**unreasonably**
  33:19 34:3
**upkeep** 89:3
**upper** 41:10
  42:5

---

**V**

**VAP** 76:5
**variance** 29:12
  56:15
**variances** 50:12
**various** 9:24
  11:17 12:1
  65:14
**verbal** 8:5,7

verified  39:8
  73:10 74:15
verify  71:25
versus  50:8
Vic  16:9 88:7
village  47:10
  89:11
villages  46:9,
  13
violations
  58:18
virtually  9:6
vote  34:15
  48:25 49:5
  52:14 81:14
voted  32:12
voting  15:12
  16:14,15,20,
  21,25 17:12,18
vouch  81:12

─────────────

      W
─────────────

W-I-T-O-L-D
  88:5
walk  13:4 19:19
  31:10
Wallington  4:3,
  17 5:10,11
  8:24 10:23,25
  11:15,18 18:16
  19:22 20:13
  22:15 25:12,13
  27:17 29:16
  30:1,16 31:1,
  17,22 32:1
  33:17 37:3,4
  38:16 44:19
  45:8,15 47:24
  48:6,25 49:13,
  14,23 50:2
  51:7,13,14,17
  59:14 60:24
  62:18 72:6,8
  75:7 76:7,15
Wallington's
  26:24 27:6
  32:12 78:14
want  8:13 15:6
  20:9 24:20,24,
  25 33:13,18
  37:11 40:7

47:24 51:20
  60:22 64:10,14
  71:2 78:20
  82:14 83:13
wanted  45:6
  83:15
waste  58:20
water  8:11
way  20:20 21:21
  42:23,24 44:2
  65:5,20 72:22
  81:20 82:2
Wendysu  13:17,
  18 14:6
went  41:13
  42:21
West  47:25 48:6
  89:25 90:2
Westmont  47:5
  66:3
white  14:4,8,
  12,16 15:3,15
  16:1,2,5 17:8,
  14,20,21,24,25
  45:9,16
wife  90:6
winter  35:18
withdraw  74:11
witness  3:3 5:2
  74:11,14 83:9
Witold  88:4
woman  14:2,6
word  43:20
words  51:17
work  7:2 9:21
  11:16
working  88:14
works  88:9
world  44:18
writes  75:22
written  25:10
  86:2
wrong  51:23
  52:4 73:17
wrongful  6:3
wrote  32:20
Wygonik  17:16

─────────────

      Y
─────────────

Yeah  6:10 45:20
year  6:13 9:10
  12:13,19 18:9
  33:15 34:7
  64:1 67:22
  68:5
years  5:20 6:14
  7:9 9:17 11:19
  12:9,11,24
  18:1 20:20
  28:21 43:11,12
  54:25 68:7
York  47:25 48:7

─────────────

      Z
─────────────

zone  27:17
zoned  59:8
zoning  31:13,16
  56:15
Zoom  7:14