# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW WALLINGTON HOME, LLC, a New Jersey limited liability company; and MORNINGSIDE AT WALLINGTON, LLC, a New Jersey limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>BOROUGH OF WALLINGTON; BOROUGH OF WALLINGTON PLANNING BOARD; MARK W. TOMKO, in his official capacity as former Mayor of the Borough of Wallington; DOROTHY B. SIEK, in her official capacity as former Tax Collector for the Borough of Wallington; and CHRISTOPHER ASSENHEIMER, in his official capacity as Certified Tax Collector of the Borough of Wallington,<br><br>Defendants. | Civil Action No. 20-08178<br><br>Hon. Evelyn Padin, U.S.D.J.<br>Hon. Andre M. Espinosa, U.S.M.J.<br><br><br>Civil Action |

## PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Of Counsel:
    James DiGiulio

On the Brief:
    Michael A. Botti
    Amy Sachs

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT..........................................................................1

LEGAL ARGUMENT .................................................................................3

    POINT I: DEFENDANTS CANNOT CARRY THEIR BURDEN ON PLAINTIFFS' FHA CLAIMS AND CANNOT REBUT THE CLEAR DISCRIMINATORY PURPOSE OF THEIR DECADES-LONG DENIALS.......................................................................................3

    POINT II: THE SAME RECORD WARRANTS SUMMARY JUDGMENT ON COUNT III (EQUAL PROTECTION)..........................18

    POINT III: DEFENDANTS' DEFENSES — RES JUDICATA, STATUTE OF LIMITATIONS, AND STANDING —FAIL AS A MATTER OF LAW ..............................................................................20

    POINT IV: DEFENDANTS' CROSS MOTION SHOULD BE DENIED AS A MATTER OF LAW ........................................................33

    POINT V: DEFENDANTS' TAX/COMITY AND DAMAGES ARGUMENTS DO NOT ENTITLE THEM TO SUMMARY JUDGMENT....................................................................................35

CONCLUSION ......................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*431 E. Palisade Ave. Real Est., LLC v. City of Englewood*,
  977 F.3d 277 (3d Cir. 2020)..............................................................................21

*Affinity Healthcare Grp. Voorhees, LLC v. Twp. of Voorhees*,
  624 F. Supp.3d 494 (D.N.J. 2022)......................................................................8

*Bennun v. Rutgers State Univ.*,
  941 F.2d 154 (3d Cir. 1991)..............................................................................24

*CareOne at Birchwood, LLC v. Twp. of Edison*,
  No. 2:20-cv-07976 (BRM) (JSA), slip op. (D.N.J. Mar. 27, 2024)
  (Martinotti, J.)................................................................................*passim*

*City of Philadelphia v. Wells Fargo & Co.*,
  2018 U.S. Dist. LEXIS 6443 (E.D. Pa. Jan. 16, 2018)....................................26

*Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*,
  421 F.3d 170 (3d Cir. 2005)................................................................................7

*Cowell v. Palmer Twp.*,
  263 F.3d 286 (3d Cir. 2001)........................................................................26, 28

*Direct Mktg. Ass'n v. Brohl*,
  575 U.S. 1 (2015)..............................................................................................36

*Eichenlaub v. Township of Indiana*,
  385 F.3d 274 (3d Cir. 2004).................................................................19, 33, 34

*Fair Assessment in Real Estate Ass'n v. McNary*,
  454 U.S. 100 (1981)....................................................................................36, 37

*Frybarger v. N.J. Dep't of the Treasury*,
  No. 05-4648 (KSH), 2006 U.S. Dist. LEXIS 93365 (D.N.J. Dec.
  27, 2006) ....................................................................................................36, 37

*Groome Res. Ltd. v. Parish of Jefferson*,
  234 F.3d 192 (5th Cir. 2000)............................................................................16

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982)..............................................................................*passim*

*Hibbs v. Winn,*
   542 U.S. 88 (2004)..............................................................................36

*Hovsons, Inc. v. Twp. of Brick,*
   89 F.3d 1096 (3d Cir. 1996)..............................................................21

*Iberia Foods Corp. v. Romeo,*
   150 F.3d 298 (3d Cir. 1998)..............................................................4

*Johnson v. California,*
   543 U.S. 499 (2005)............................................................................18

*Jones v. Flowers,*
   547 U.S. 220 (2006)........................................................................34, 37

*K-Land Corp. No. 28 v. Landis Sewerage Auth.,*
   173 N.J. 59 (2002) ........................................................................24, 25

*Kach v. Hose,*
   589 F.3d 626 (3d Cir. 2009)..............................................................32

*Kaucher v. Cnty. of Bucks,*
   455 F.3d 418 (3d Cir. 2006)..............................................................4

*Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains,*
   284 F.3d 442 (3d Cir. 2002)..........................................................12, 17

*Lawlor v. Nat'l Screen Serv. Corp.,*
   349 U.S. 322 (1955)......................................................................23, 24

*Mennonite Bd. of Missions v. Adams,*
   462 U.S. 791 (1983)......................................................................34, 37

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly,*
   658 F.3d 375 (3d Cir. 2011)..................................................11, 17, 21

*Nebraska v. Wyoming,*
   507 U.S. 584 (1993)..............................................................................4

*New York SMSA v. Board of Adjustment*,
  370 N.J. Super. 319 (App. Div. 2004) .......................................................8, 19

*Nicholas v. Ocean Plaza Condo. Ass'n*,
  2002 U.S. Dist. LEXIS 26755 (D.N.J. June 24, 2002) ..................................26

*Olds v. Donnelly*,
  150 N.J. 424 (1997) .................................................................................24, 25

*Read v. Profeta*,
  397 F. Supp. 3d 597 (D.N.J. 2019) ..................................................................5

*Reagle v. Elliott*,
  80 F. App'x 737 (3d Cir. 2003) ................................................................36, 37

*Res. for Hum. Dev., Inc. v. Lower Providence Twp.*,
  No. 24-2245, 2025 LX 284188 (E.D. Pa. Mar. 27, 2025) ..............................15

*Resident Advisory Bd. v. Rizzo*,
  564 F.2d 126 (3d Cir. 1977) .................................................................7, 9, 17

*Rycoline Prods., Inc. v. C & W Unlimited*,
  109 F.3d 883 (3d Cir. 1997) ...........................................................................25

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
  576 U.S. 519 (2015) ................................................................................13, 17

*Thompson v. N. Am. Stainless, LP*,
  562 U.S. 170 (2011) .......................................................................................21

*Thornton v. Vill. of Ridgewood*,
  17 N.J. 499 (1955) ..........................................................................................23

*Trafficante v. Metro. Life Ins. Co.*,
  409 U.S. 205 (1972) ............................................................................20, 21, 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) .............................................................................7, 9, 19, 27

*Watkins v. Resorts Int'l Hotel & Casino, Inc.*,
  124 N.J. 398 (1991) ........................................................................................24

*West v. Phila. Elec. Co.*,
   45 F.3d 744 (3d Cir. 1995) ...................................................................26, 28

**Statutes**

28 U.S.C. § 1341 ...................................................................................36

42 U.S.C. §§ 3602(k), 3604(a).................................................................7

42 U.S.C. § 3613(a)(1)(A).................................................................26, 28

42 U.S.C. § 3613(c)(1)–(2)...............................................................27, 39

**Other Authorities**

Local Civil Rule 56.1(a).........................................................................13

N.J. Ct. R. 4:69-6(a)..............................................................................23

U.S. Const. amend. XIV, § 1 .................................................................18

## <u>PRELIMINARY STATEMENT</u>

Following Plaintiffs' motion for summary judgment and Defendants' cross-motion, it is now clear that Plaintiffs' claims are ripe for adjudication by way of summary judgment. First, there is no genuine dispute as to any material fact related to Plaintiffs' Fair Housing Act ("FHA") and Equal Protection Clause claims. Second, Defendants are unable to provide a legitimate non-discriminatory purpose for its decade long campaign of arbitrary and capricious denials of Plaintiffs' project. In fact, as it relates to the Borough's refusal to build access to the transit line and the public statements against a transit village, the Borough's opposition is devoid of any legitimate explanation. Third, Dr. Steil's expert opinion that Defendants' actions have led to disparate impact in the Borough of Wallington is unopposed. Finally, it is not disputed that as a direct result of this delay, Plaintiffs have been unable to develop their inclusionary housing development, causing continuous and significant harm. Accordingly, the record militates in favor of granting Plaintiffs' motion.

Defendants do little by way of admissible evidence to rebut Plaintiffs' FHA and Equal Protection claims. Instead, they offer meritless legal defenses, each of which is weaker than the next, including standing, res judicata and statute of limitations. First, Plaintiffs clearly have standing to seek redress Defendants' FHA and Equal Protection violations. Both legal doctrines afford great latitude to those seeking to remedy discriminatory practices.  Indeed, acutely harmed developers,

1

such as Plaintiffs, are well-settled to have standing to prosecute these claims, particularly since they are best situated to engage in protracted litigation. Second, the factual record and opinions of both Plaintiffs' and Defendants' experts demonstrate a continuous violation of the FHA. Indeed, Defendants' own expert testified Defendants were not FHA compliant until at least 2019, and Dr. Steil's report shows that the disparate impact caused by Defendants has continued at least through 2023 and remains unabated without Plaintiffs' project being built. Defendants' final flailing attempt to summarily dismiss Plaintiffs' claims – res judicata – is wholly inapplicable. As a threshold matter, Plaintiffs' prior litigations against the Borough were summary actions in lieu of prerogative writs, which are limited in time and scope. The crux of those claims was simply to address the arbitrary and capricious denials, each one in turn, to obtain approval to build the project. The purpose of this suit is quite different to address disparate impacts that cannot be remedied without this project being built, providing transit access to those affected by the disparate impact and requiring the Borough to compensate Plaintiffs to make the project financially feasible. The decade of denials by the Borough are the best evidence to corroborate their discriminatory motivations.

Accordingly, it is respectfully submitted that Plaintiffs' motion for summary judgment on the FHA and Equal Protection claims (Counts I, II, and III) should be granted and Defendants' cross-motion for summary judgment be denied.

2

# LEGAL ARGUMENT

## POINT I

### DEFENDANTS CANNOT CARRY THEIR BURDEN ON PLAINTIFFS' FHA CLAIMS AND CANNOT REBUT THE CLEAR DISCRIMINATORY PURPOSE OF THEIR DECADES-LONG DENIALS

Plaintiffs' motion clearly sets forth factual allegations that establish discrimination against protected classes was, at a minimum, a factor in the arbitrary and capricious denials of Plaintiffs' inclusionary development. This discriminatory motivation has been recognized by prior court rulings. Yet, after years of discovery and delay, Defendants have once again failed to present any non-discriminatory purpose for their behavior. This discriminatory motivation is borne out in public statements and policies of the Borough, including its refusal to provide access to public transportation for its citizens, all out of a stated fear of becoming like West New York. As a result of these actions, there has been an unrebutted showing of disparate impact demonstrated by Dr. Steil's expert report. These discriminatory practices have also resulted in substantial documented damages that have made completion of the inclusionary development financially distressed, thereby allowing the disparate impact to continue unabated.

3

Critically, Defendants' cross-motion seeking summary judgment on the same record confirms that the material facts are not genuinely in dispute—rather, the parties disagree only as to their legal import. That posture is precisely what warrants resolution on summary judgment.

## A. Defendants' Rule 56 Responses Do Not Create a Genuine Dispute of Material Fact

"If upon review of cross-motions for summary judgment [the record reveals] no genuine dispute over material facts, then [the court] will order judgment to be entered in favor of the party deserving judgment in light of the law and undisputed facts." *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citing *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145-46 (3d Cir. 1998)). As in this case, if the non-moving party bears the burden of proof at trial, "summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

A factual dispute "is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and "is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Unsupported allegations, subjective beliefs, or argument

4

alone, however, cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019).

After years of discovery and a detailed statement of facts in support of the motion for summary judgment, Defendants do not substantively dispute the facts presented by Plaintiffs' motion – it is merely the import of those facts as applied to the FHA and Equal Protection Clause that are now in dispute. In fact, Defendants either admit the fact, admit the quoted statement, or answer that the evidence "speaks for itself" and then append unsupported argument for all critical facts. (*See, e.g.*, Defs.' Resp. to Pls.' SUMF ¶¶ 3, 7–12, 28, 31–32, 43, 48, 62–66). That does not create a genuine factual dispute. A party opposing summary judgment must cite competent record evidence showing that a material fact is actually disputed - it cannot simply add lawyer gloss to admitted facts.

By way of example, Defendants admit that the Project became part of Wallington's state-mandated affordable-housing compliance. (Defs.' Resp. to Pls.' SUMF ¶ 3). They admit the builder's-remedy litigation and resulting rulings. (*Id.* ¶¶ 7–12). They admit the statements attributed to Tomko, Melfi, and Cedzidlo were made or that the transcripts reflect those statements. (*Id.* ¶¶ 28–36). They admit Judge Farrington approved the applications and noted the Borough's improper consideration of familial status in its denial. (*Id.* ¶ 48). And on Dr. Steil's key statistical findings, they repeatedly say the data "speaks for itself" rather than

submitting competing expert analysis. (*Id.* ¶¶ 62–66). Finally, they do not dispute that their own corporate designee, Jennifer Appice, could not state a single legitimate, non-discriminatory basis for the denials when asked at her deposition. (Ex. P, Appice Dep. 46:1–12). Those are not factual disputes of the kind Rule 56 recognizes. The cumulative weight of Defendants' admissions is indeed dispositive.

**B.       The Record Establishes FHA Disparate Treatment**

The record, when viewed properly under the summary judgment standard, establishes FHA disparate treatment. Plaintiffs' opening brief detailed how Borough officials focused on the familial status and perceived racial composition of future residents. Defendants' opposition does not rebut these admissions; to the contrary, their Rule 56 responses admit the statements were made, then offer only attorney argument characterizing them as "merely discourse," despite prior court rulings finding them as inappropriate considerations (Defs.' Resp. to Pls.' SUMF ¶¶ 31–44).

The direct evidence speaks for itself as there is no dispute that Mayor Tomko invoked the "Mason-Dixon line" when comparing Wallington to neighboring Bergen County municipalities. (Pls.' SUMF ¶ 36; Ex. K, July 18, 2017 Hr'g Tr. at T65:17–21). Board member Rachelski stated that Plaintiffs' project "is a West New York, and this is not the stuff that we want in our town." (Pls.' SUMF ¶¶ 38–42; Ex. L, September 19, 2017 Hr'g Tr. at T71:14–17). Borough Attorney Cedzidlo confirmed that the desire not to "look like West New York" was "the overriding

issue the board has raised." (Pls.' SUMF ¶ 43; Ex. L, September 19, 2017 Hr'g Tr. at T80:16–19). In fact, the Borough Attorney was so brazen that during a public meeting he acknowledged that the Planning Board intentionally approved developments with one bedrooms (as opposed to the multi-bedroom units in Plaintiffs' project) "to try and limit the effect on the school system, **by making them small commuter apartments that aren't going to attract families**." (Ex. K, July 18, 2017 Hr'g Tr. at T102:8-12 (emphasis added)). At the same time, officials repeatedly demanded to know how many children would emanate from the development. (Ex. J, May 16, 2017 Hr'g Tr. at T64:6–12; Ex. K, July 18, 2017 Hr'g Tr. at T60:23–61:5). These statements constitute direct evidence of discriminatory intent under the FHA. *See* 42 U.S.C. §§ 3602(k), 3604(a); *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177-78 (3d Cir. 2005).

This is classic *Arlington Heights* evidence: discriminatory statements from policymakers, contemporaneous comments revealing improper motive, and substantive departures from ordinary land-use principles. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977); *see also Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 144-49 (3d Cir. 1977). The statements came after years of delays and during the very hearings that produced yet another denial later overturned by the state court. This clearly shifts the burden to the Borough to

7

provide a legitimate, non-discriminatory basis for the denials and they have none. (Ex. P, Appice Dep. 46:1–12).

Defendants' attempt to dismiss these statements as "stray remarks" also fails. (Defs.' Br. at 23–24). They are the direct evidence that prove an FHA claim. These statements came from the Mayor, Board members, and the Board's attorney—the very officials responsible for Plaintiffs' applications – and they led to numerous baseless denials of a development that sought to attract low-income families and minorities. There is nothing stray about these remarks.

Defendants' reliance on *New York SMSA v. Board of Adjustment*, 370 N.J. Super. 319, 333–34 (App. Div. 2004) for this proposition is misplaced. That case concerns whether Board remarks may substitute for formal findings—not whether such remarks are probative of discriminatory intent under federal civil rights law. Similarly, *Affinity Healthcare Grp. Voorhees, LLC v. Twp. of Voorhees*, 624 F. Supp.3d 494 (D.N.J. 2022), is distinguishable because there the court found "the underlying concern does not appear to be rooted in bias." *Id.* at 516. Here, the record includes direct discriminatory statements, plus repeated state-court findings that the asserted land use justifications were arbitrary and motivated by improper concerns.

Defendants' principal merits argument is that their actions were driven by legitimate planning concerns—traffic, sewer, aesthetics, and the roller-rink configuration. **But those contentions were already rejected by four different**

8

**courts and do not explain the decade long denials**. (Pls.' Br. at 7–12 (citing Ex. E, Meehan Op.; Ex. I, Meehan Mar. 2, 2016 Order; Ex. B, 2019 Farrington Op.)). Judge Farrington specifically found the Board's resolution "devoid of any factors which would support the denial, other than the improper consideration of fiscal reasons" – which relate to the size of families moving in to the Borough (Ex. B, 2019 Farrington Op. at 9). These findings are powerful evidence of pretext. *See Arlington Heights*, 429 U.S. at 267; *Rizzo*, 564 F.2d at 149.

In a last-ditched effort to supplement an otherwise vacant record, Defendants attempt to create a triable issue by having their expert, Ms. Caldwell, disagree with binding and enforceable court rulings. Not only is that not proper, but also there is nothing presented by Ms. Caldwell to support her speculative conclusions. Ms. Caldwell did not inspect the properties, did not interview Board or Council members, and did not review deposition transcripts of Borough officials. (Ex. Q, Caldwell Dep. 40:18–42:17). She also has no federal FHA expert experience and testified that her firm "rarely" deals with the FHA. (*Id.* 119:13–15; 134:14–135:6). When asked whether Judge Farrington identified any legitimate land-use concerns in the Planning Board's denial, Ms. Caldwell conceded she did not, then testified that she simply "disagreed" with the court. (*Id.* 106:1–107:11). Ms. Caldwell's general disagreement with four separate judicial findings cannot create a genuine dispute of material fact.

9

Critically, Ms. Caldwell's testimony is notable for what it failed to rebut. She offered no alternative explanation for the discriminatory statements made during the 2017 hearings. When asked to explain Mayor Tomko's "Mason-Dixon Line" remark, she provided no benign interpretation. (*Id*. 87:1–90:11). When asked about Board member Rachelski's statement regarding West New York, she similarly offered no legitimate non-discriminatory explanation. (*Id*. 109:24–112:17). She acknowledged the hearings featured concerns about "anticipated school children" and then conceded that families with children are a protected class under the FHA. (*Id*. 87:2–6; 96:8–97:7). Thus, when confronted with the direct evidence of discriminatory intent that permeates this record, Ms. Caldwell had no response.

## C.    The Record Establishes FHA Disparate Impact

Plaintiffs' disparate-impact showing is equally unrebutted, and as a result, Defendants' cross-motion on disparate impact likewise fails. Under *Inclusive Communities*, a plaintiff must identify a policy or practice and show causality linking that practice to the disparity. 576 U.S. at 542–43. Plaintiffs have done exactly that.

In *CareOne at Birchwood, LLC v. Twp. of Edison*, No. 2:20-cv-07976 (BRM) (JSA), slip op. at 16–23 (D.N.J. Mar. 27, 2024) (Martinotti, J.), a Court in this District granted summary judgment on an FHA disparate-impact claim under materially similar principles and expert opinions. (*See* Certification of James J. DiGiulio, Ex. A). In *CareOne at Birchwood, LLC*, the court applied the same *Lapid-*

10

*Laurel/Mt. Holly* framework, held that plaintiffs may prove disparate impact through statistical evidence showing disproportionate effect, and reiterated that once plaintiffs make that prima facie showing, the burden shifts to defendants to demonstrate a legitimate, non-discriminatory reason and the absence of a less discriminatory alternative. (Ex. A, *CareOne* at 16–17, 21–23). Indeed, the Court relied heavily on similar expert opinions now offered here by Dr. Steil.

That is exactly the posture here. The outwardly neutral practices challenged here include: (1) refusing to process applications promptly, leading Judge Meehan to find the "Planning Board has unreasonably delayed action"; (2) inventing a non-statutory "development plan" prerequisite that Judge Farrington found had no basis in law; (3) wrongly insisting on a use variance; (4) denying applications on pretextual grounds four courts found arbitrary; (5) appealing the 2019 judgment and prolonging the delay; and (6) refusing to develop the Borough's right-of-way to provide access to Wesmont Station. (Pls.' SUMF ¶¶ 21–28, 45–48, 70–75).

Those practices made the project infeasible and deprived would-be residents of housing opportunities in a substantially whiter municipality. Dr. Steil measured the effect, opining that the Borough's actions: (1) had a statistically significant adverse impact on the basis of race; (2) had a substantial adverse impact on the basis of family status; and (3) perpetuated residential segregation. (Ex. F, Steil Rep. at 7–8, 20–21). Specifically, he found that more than 55% of the project's expected

11

residents would be non-white in a Borough that is roughly 70% white, that the adverse effect on potential non-white residents was 1.2 times the rate for white residents, and that the adverse effect on households with children was 1.3 times the rate for households without children. (Pls.' SUMF ¶¶ 60–64; Ex. F, Steil Rep. at 1–2, 14–21). His chi-square test found with greater than 99.99% certainty that the racial disparity did not occur by chance. (Ex. F, Steil Rep. at 15–16).

That is precisely the "robust causality" *Inclusive Communities* requires and based on the same expert statistical analyses accepted in *CareOne*. *CareOne* is especially useful on the sufficiency of Plaintiffs' proof. There, the Court, quoting *Mt. Holly*, stressed that "[n]o single test controls in measuring disparate impact," that plaintiffs need only offer proof of disproportionate impact "measured in a plausible way," and that a prima facie case may be established through "gross statistical disparities." (DiGiulio Cert., Ex. A at 19). Critically, the Court then distinguished *Lapid-Laurel* precisely because the plaintiffs in *CareOne*—unlike the plaintiff in *Lapid-Laurel*—had submitted expert statistical evidence establishing disproportionate effect. *Id.* at 19–20. Plaintiffs' proof here is stronger still: Dr. Steil has identified the challenged practices, quantified their effect on non-white residents and households with children, and demonstrated through a chi-square analysis that the racial disparity is not due to chance. (*See generally* Ex. F, Steil Rep).

12

Defendants' responses are telling. They fail to offer a competing statistical analysis and identify no methodological flaw rendering Dr. Steil's opinions inadmissible. Instead, they "admit that Dr. Steil's data speaks for itself," then add two lawyerly objections: the data uses 2019–2023 census estimates, and Dr. Steil supposedly ignored other affordable-housing approvals. (Defs.' Resp. to Pls.' SUMF ¶¶ 62–66). Those "responses" are advocacy dressed as fact—exactly what Local Civil Rule 56.1(a) prohibits. Dr. Steil's use of current census and IPUMS data is appropriate because the injury being measured is the contemporary effect of Defendants' obstruction. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542–43 (2015). Furthermore, in *CareOne*, the Court expressly held that plaintiffs may rely on materials outside the local administrative record to prove disparate impact, because such claims concern "a discriminatory pattern resulting from the impact of the municipality's decisions," not merely the correctness of a single land-use ruling. (DiGiulio Cert., Ex. A at 17–18). That point squarely answers any suggestion that Dr. Steil's 2025 analysis is somehow improper because it was not presented during the earlier municipal proceedings.

Defendants here, like the defendants in *CareOne*, offer no competing statistical analysis. Instead, they attack around the edges with lawyer argument and planner criticism untethered to any actual rebuttal methodology. Defendants' entire argument ignores the very injury Plaintiffs proved: the project was delayed,

13

appealed, pushed into an entirely different economic environment, and ultimately rendered financially infeasible. (*See* Ex. O, Linfante Report).

The "other affordable housing" argument similarly fails. As a threshold matter, Plaintiffs' Project consists of the vast majority of the affordable units necessary for the Borough to comply. The fact that the Borough rendered Plaintiffs' project financially infeasible with years of delay undercuts the Borough's attempt to cast itself as fully compliant or open to affordable housing. Defendants' reliance on the 2019 Fair Share Settlement is particularly curious.

The 2019 Fair Share Settlement counts Plaintiffs' project toward Wallington's compliance and assigns it 70 credits, while imposing family-unit and low-income requirements. (Ex. C, Fair Share Settlement at 2–4). Yet only eight of Wallington's 125 third-round affordable units have actually been built. (Ex. Q, Caldwell Dep. 39:5–15). Critically, the majority of the remaining approved units—those not attributable to Plaintiffs' project—are **<u>age-restricted housing units</u>**, which by definition exclude families with children and are likely to be occupied by current elderly white residents. (Ex. C, Fair Share Settlement at 2–4). As the Borough Attorney said in public – the Borough was looking for ways to limit affordable housing units with multiple bedrooms that may attract families. The work around was instead to approve the remaining of the affordable units for age-restricted housing that could not attract families, and was unlikely to attract racial minorities.

14

This 2019 Fair Share Settlement demonstrates the systemic efforts the Borough went to in order to keep people out of its borders, in direct correlation to the public statements made by numerous Borough officials.

Defendants finally rely on generalized planning and neighborhood-character rationales, which is similarly undercut by the caselaw. In *CareOne*, once the plaintiffs established disparate impact, the municipality's asserted interest in protecting the character of zoning districts and neighborhoods was "not…persuasive," and the Court quoted *Huntington* for the proposition that zoning interests cannot "automatically outweigh significant disparate effects." *CareOne* at 21–22. The same is true here. Wallington cannot invoke abstract "planning" interests or partial affordable-housing compliance to excuse years of obstructing the very inclusionary project on which its compliance plan depended.

Interestingly, Defendants rely on *Res. for Hum. Dev., Inc. v. Lower Providence Twp.*, No. 24-2245, 2025 LX 284188 (E.D. Pa. Mar. 27, 2025), to argue that a single permit denial cannot be a "policy." But this case is about a years' long pattern of official conduct embodied in formal municipal acts and omissions. *RHD* was a motion-to-dismiss case where the complaint did not identify a policy for disparate-impact purposes and had not framed a viable disparate-treatment claim. *Id.* at *4–6. Unlike the *RHD* plaintiff, Plaintiffs here have developed a full summary-judgment record with unrebutted expert proof, identifying specific municipal

15

practices, direct discriminatory remarks by policymakers, expert statistical analysis demonstrating adverse impact, repeated denial resolutions, and multiple court rulings finding Defendants' proffered justifications improper.

Despite this robust record relied upon by Plaintiffs, Defendants now attempt to rely on Ms. Caldwell to manufacture a dispute on disparate impact. However, she admitted she is not offering expert opinions on Dr. Steil's statistics. (Ex. Q, Caldwell Dep. 24:1–3, 33:1–16, 34:1–18). When asked directly whether she was offering expert opinion on disparate impact, Ms. Caldwell answered: "No." (*Id.* 34:15–18). She testified her firm "rarely" deals with the FHA, which is borne out by her remarkable testimony that unreasonable delays in permitting housing for protected classes cannot violate the FHA—a position plainly at odds with the statute. (*Id.* 119:13–15; 124:20–125:11; 134:14–135:6); *see Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 198–99 (5th Cir. 2000) ("indeterminate delay has the same effect as an outright denial").

Based upon the foregoing, it is clear that Ms. Caldwell's testimony is gilded but hollow. Her report purports to address FHA compliance, yet she admitted she has never appeared as an expert in federal court on FHA issues, has never offered opinions in an FHA causation analysis, and "rarely" deals with the federal statute. (*Id.* 134:14–135:6). She was unaware of any case featuring comparable facts—four judicial reversals and on-the-record "Mason-Dixon Line" remarks from township

16

officials. (*Id.* 32:1–33:25; 137:1–25). When asked whether she had ever been involved in a case where the court found a municipality improperly considered the impact of children from a project, she answered: "I haven't seen that specifically, no." (*Id.* 137:1–138:25). Her lack of comparable experience—and her inability to address the unique and damning facts of this case—renders her testimony insufficient to create a genuine dispute on any material issue.

Ms. Caldwell's admissions also demonstrate less-discriminatory alternatives were available to the Borough and they failed to take such action. For instance, she acknowledged that if the Borough was worried about fiscal impacts, other options existed. She testified that "probably 75 percent" of affordable-housing developments she was aware of received PILOTs. (Ex. Q, Caldwell Dep. 52:9–23). That admission independently undermines any business-necessity defense. *See Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 149 (3d Cir. 1977).

Under *Mount Holly*, *Lapid-Laurel*, *Inclusive Communities*, and *CareOne*, Plaintiffs have done what the FHA requires: identified outwardly neutral municipal practices, demonstrated a significantly adverse and disproportionate impact on protected classes, and supplied statistical evidence tying that impact to the challenged conduct with robust causality.[1] Accordingly, no reasonable factfinder,

---

[1]     *See Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 381–82 (3d Cir. 2011); *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 466–67 (3d Cir. 2002); *Tex.*

17

based on the competent and admissible evidence presented, could find that the Borough did not violate the FHA or the Equal Protection clause, and therefore, Plaintiff's' motion for summary judgment should be granted.

## POINT II

### THE SAME RECORD WARRANTS SUMMARY JUDGMENT ON COUNT III (EQUAL PROTECTION)

Plaintiffs' equal-protection claim under the Fourteenth Amendment rests on the same direct and circumstantial evidence of intentional discrimination set forth in Point I. The Equal Protection Clause prohibits intentional discrimination on the basis of race or other suspect classifications. U.S. Const. amend. XIV, § 1. Where intentional race discrimination is established, the governmental action is subject to strict scrutiny. *Johnson v. California*, 543 U.S. 499, 507–09 (2005). For the reasons detailed in Point I, Plaintiffs have established purposeful discrimination that led to years of illegal delays and denials.

Defendants' arguments in opposition—that the remarks were isolated, that the denial was based on "legitimate land use concerns," and that Plaintiffs cannot establish discriminatory intent—fail for the reasons set forth in Point I. The "Mason-Dixon line" phrase carries unmistakable racial connotations. Coupled with the desire

---

*Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542–43 (2015); *CareOne at Birchwood, LLC v. Twp. of Edison*, No. 2:20-cv-07976 (BRM) (JSA), slip op. at 19–23 (D.N.J. Mar. 27, 2024).

18

not to "look like West New York"—a community approximately 86% non-white—and the Board Attorney's admission that this was "the overriding issue" and other units were approved to not attract families, the remarks cannot be explained away as neutral commentary. Defendants' reliance on *New York SMSA* for the proposition that Board remarks are merely "transitory thoughts" misses the point: Plaintiffs rely on those remarks as evidence of the true motive behind a resolution multiple courts found arbitrary and unsupported. *See Arlington Heights*, 429 U.S. at 268.

Plaintiffs have far more than speculation on intent—they have direct evidence from the Mayor, Board members, and the Board's Attorney; circumstantial evidence satisfying all four *Arlington Heights* factors; undisputed expert proof of disparate impact; and four state-court rulings finding the Borough's actions were not valid.[2] For all of the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment on Count III.

---

[2] Even if the Court were not inclined to grant Plaintiffs summary judgment on Count III at this time, Defendants' cross-motion must be denied because this record—unlike the disputes in *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 285–86 (3d Cir. 2004)—contains precisely what was absent there: corruption, self-dealing, or bias against a protected group.

19

## POINT III

## DEFENDANTS' DEFENSES — RES JUDICATA, STATUTE OF LIMITATIONS, AND STANDING — FAIL AS A MATTER OF LAW

Defendants raise three threshold defenses—standing, res judicata, and statute of limitations—each of which fails as a matter of law. Standing is a jurisdictional prerequisite that Plaintiffs readily satisfy. Res judicata does not bar federal civil-rights claims arising from conduct broader than a single land-use denial. And the continuing-violation doctrine preserves Plaintiffs' claims where, as here, the discriminatory course of conduct and resulting disparate impact and harm extended well into the limitations period and continues to this day.

## A.    Plaintiffs Have Standing Under the FHA and Article III

Defendants' standing argument conflates injury-in-fact with the merits. Plaintiffs are developers of affordable housing intended to serve protected classes—precisely the parties the FHA protects. FHA standing is exceptionally broad: Congress intended it to "extend to the full limits of Art. III," with "the sole requirement...the Art. III minima of injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372–73 (1982); *see also Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 211–12 (1972) (defining "person aggrieved" "as broadly as is permitted by Article III"). The Third Circuit has consistently applied this broad construction, observing that developers have standing when discriminatory municipal action

20

inflicts economic injury by making housing unavailable to protected classes.[3] Plaintiffs need not be members of a protected class—obstructing this Project was the very means by which Defendants harmed the prospective protected residents the FHA protects. *Cf. Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011).

Plaintiffs satisfy each element of Article III standing. They own the subject properties and suffered paradigmatic concrete injuries: years of discriminatory delay, repeated litigation, the Borough's meritless appeal, the practical loss of a viable development timetable, the continuing refusal to provide direct station access, and millions of dollars in resulting economic harm. (*See* Ex. O, Linfante Appraisal). Those injuries are directly traceable to Defendants' conduct and would be redressed by a favorable judgment, leading to greater compliance with the FHA. Defendants' contention that Plaintiffs already obtained "approvals" and therefore no injury remains (Defs.' Br. at 17–18) misses the point.

Under *Havens* and *Trafficante*, standing turns on whether the plaintiff has alleged "a distinct and palpable injury" traceable to discriminatory housing practices—not on whether the ultimate merits injury has been completed. *Havens*, 455 U.S. at 372–76; *Trafficante*, 409 U.S. at 209–12. The project was never built.

---

[3]   *See Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1100–03 (3d Cir. 1996); *431 E. Palisade Ave. Real Est., LLC v. City of Englewood*, 977 F.3d 277, 286–89 (3d Cir. 2020); *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 381–82 (3d Cir. 2011).

21

The Borough appealed the 2019 judgment, keeping the project in limbo. An approval that never translated into a completed development does not eliminate standing—particularly where, as here, expert evidence establishes that Defendants' conduct rendered the Project financially infeasible. (Ex. O, Linfante Appraisal at 45).

The economic harm is concrete and substantial as Plaintiffs' damages expert calculated $20,500,000 in market/cost gap, plus $3,171,983 in lost opportunity costs, for total damages of $23,672,000—entirely unrebutted. (*See* Ex. O, Linfante Appraisal at 64; Defs.' Resp. to Pls.' SUMF ¶ 78). Construction costs have escalated to the point where development cannot proceed without significant subsidy—a direct consequence of Defendants' obstruction. (*Id.* at 45).

Plaintiffs also satisfy any zone-of-interests inquiry. The project includes 42 affordable units for low- and moderate-income households, with family-sized units. (Pls.' SUMF ¶¶ 2–3). Dr. Steil's analysis demonstrates that over 55% of expected residents would be non-white and that families with children would be disproportionately represented. (Ex. F, Steil Rep. at 14, 20). As *Trafficante* explained, the FHA protects not only direct victims of discrimination, but also those injured by the loss of "important benefits from inter-racial associations" and by the frustration of Congress's aim to replace segregated housing patterns "by truly integrated and balanced living patterns." 409 U.S. at 209–12. Plaintiffs' Project fits that statutory purpose exactly.

Plaintiffs' economic harm - $23,672,000 - is concrete, particularized, and directly traceable to Defendants' discriminatory conduct. Defendants' attempt to recast standing as a merits question should be rejected, and their cross-motion on standing grounds must be denied.

**B.    The Prior State-Court Proceedings Do Not Preclude Plaintiffs' Broader Federal Discrimination and Damages Claims**

Defendants' preclusion theory overreads both the 2018-2019 action in lieu of prerogative writs and the judgment entered there. That action decided only whether the January 2018 denial could stand under state land-use law. (Ex. B, 2019 Farrington Op. at 9–10). This case is materially different. It seeks federal civil-rights relief and damages for a broader discriminatory course of conduct, including pre-denial obstruction, invented procedural hurdles, the Borough's appeal and resulting continued delay, the continuing refusal to provide Wallington-side Wesmont access, and retaliatory tax conduct. Because those claims are broader, later-arising, and materially different from the narrow state-law issues decided in the prerogative writs action, the prior proceedings do not bar this case. *See Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955).

That conclusion is reinforced by the nature of the earlier state proceeding. An action in lieu of prerogative writs is a tightly time-limited vehicle for review of a discrete municipal action, ordinarily brought within forty-five days of accrual under Rule 4:69-6. *See* N.J. Ct. R. 4:69-6(a); *Thornton v. Vill. of Ridgewood*, 17 N.J. 499

23

(1955). The 2018–2019 state action accordingly focused on the validity of a particular denial and the remedy of approval. It was not the functional equivalent of this later federal civil-rights action seeking damages for a broader and continuing pattern of discrimination and obstruction.

Claim preclusion also fails on ordinary principles. Claim preclusion does not bar claims based on later or continuing conduct. *See Watkins v. Resorts Int'l Hotel & Casino, Inc.*, 124 N.J. 398, 412-15 (1991); *Lawlor*, 349 U.S. at 328. Here, Plaintiffs' federal claims rest in substantial part on conduct that post-dated or extended beyond the state judgment, including the Borough's appeal, its continued refusal to develop Wallington-side access, and Plaintiffs' inability to construct the project to this day, not merely the denials. Preclusion therefore does not apply. *See also Bennun v. Rutgers State Univ.*, 941 F.2d 154, 163–67, 180 (3d Cir. 1991).

The same is true of Plaintiffs' damages claims. New Jersey's preclusion doctrines do not require parties to assert claims that are "unknown, unarisen or unaccrued" at the time of the earlier action, and they do not compel the filing of premature claims. *Olds v. Donnelly*, 150 N.J. 424, 431, 440 (1997); *K-Land Corp. No. 28 v. Landis Sewerage Auth.*, 173 N.J. 59, 72–75 (2002). Here, the full measure of Plaintiffs' federal damages was not reasonably ascertainable during the 2018–2019 prerogative writs proceedings. The project was not simply denied and then approved on paper; the Borough appealed, the approvals remained in limbo through

24

most of 2019, and the economic consequences of that delay matured later, culminating in the March 1, 2025 damages valuation and feasibility analysis set forth in the Linfante appraisal. (Ex. O at 1, 46–56, 64–65). Forcing Plaintiffs to assert those damages earlier would have required precisely the sort of premature claim-joinder that *Olds* and *K-Land* forbid.

Defendants' reliance on the entire controversy doctrine fares no better. Plaintiffs do not contend that New Jersey preclusion principles are categorically unavailable in federal court. *See Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886–88 (3d Cir. 1997). The point, however, is more narrow: the doctrine does not bar this action because the prior prerogative writs proceeding did not adjudicate, and could not fairly have encompassed, the present federal discrimination claims, later-accruing damages, and broader continuing-conduct theory. The New Jersey Supreme Court has repeatedly held that the doctrine does not apply to claims that are "unknown, unarisen or unaccrued" at the time of the original action. *Olds*, 150 N.J. at 431; *K-Land*, 173 N.J. at 72–75. *K-Land* further explains that the "polestar" of the doctrine is "judicial fairness," that courts should not require "premature or unaccrued claims," and that the doctrine should not be transformed into one "designed to encourage litigation." *Id.* at 74–75. Applying the doctrine here would do exactly that.

Nor is this merely a case about lingering effects from a completed past wrong. Defendants' discriminatory conduct is continuing – the Borough remains non-compliant as the units attributed to Plaintiffs have never been built. The FHA limitations period runs from the "occurrence or the termination" of the discriminatory housing practice, and Congress's use of the word "termination" preserves the continuing-violation doctrine in housing cases. 42 U.S.C. § 3613(a)(1)(A); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982). A continuing violation exists where the challenged discrimination is manifested in a series of related acts, not merely isolated events. *West v. Phila. Elec. Co.*, 45 F.3d 744, 754–55 & n.9 (3d Cir. 1995). The Third Circuit likewise distinguishes between continuing unlawful acts and the continuing consequences of an earlier act. *Cowell v. Palmer Twp.*, 263 F.3d 286, 293 (3d Cir. 2001). In the FHA context, courts ask whether the same policy or practice continued to cause the protected-group disparity into the limitations period. *See City of Philadelphia v. Wells Fargo & Co.*, 2018 U.S. Dist. LEXIS 6443, at *15–16 (E.D. Pa. Jan. 16, 2018); *see also Nicholas v. Ocean Plaza Condo. Ass'n*, 2002 U.S. Dist. LEXIS 26755, at *9–10 (D.N.J. June 24, 2002). That is exactly what Plaintiffs allege and prove here. The Borough's continuing refusal to improve the Doka right-of-way and provide Wallington-side Wesmont access, its continued frustration of a realistic opportunity to build the Project, and its

26

related retaliatory conduct are recurring acts in furtherance of the same discriminatory policy—not merely downstream effects of the 2018 denial.

The federal claims also differ materially in elements, proof, and relief. Count I requires proof of intentional discrimination under the FHA. Count II requires proof that outwardly neutral municipal practices caused a significantly adverse and disproportionate effect on protected classes. Count III requires proof of purposeful discrimination under *Arlington Heights*. None of those issues were or could have been adjudicated in the limited prerogative writs action, which addressed only whether the January 2018 denial could stand under state land-use law. Furthermore, Count II depends on proof of a continuing discriminatory housing practice and continuing disparate effect, issues outside the scope of the prior appeal which Dr. Steil opined upon. *See Havens*, 455 U.S. at 380–81.

The remedies likewise differ materially. The state proceeding yielded approval orders while this action seeks compensatory damages and declaratory relief for injuries that matured after and beyond those approvals. 42 U.S.C. § 3613(c)(1)–(2). The fact that Plaintiffs eventually obtained paper approvals does not eliminate the federal damages case; to the contrary, the Linfante appraisal quantifies the economic harm caused by the Borough's delay, the 2019 appeal, and the changed post-delay market conditions. (Ex. O at 1, 46–56, 64–65). That later-maturing damages case was not adjudicated in state court and could not fairly have been.

27

At most, the state-court rulings preclude Defendants from relitigating the lawfulness of the denials; they do not prevent Plaintiffs from using those rulings as evidence of arbitrariness and pretext. Judge Farrington expressly found that the Borough relied on "improper consideration of fiscal reasons" tied to "anticipated school age children" and described the Borough as "recalcitrant" in meeting its obligations. (Ex. B at 6–10). Those findings support, rather than bar, Plaintiffs' federal discrimination claims.

## C.   **Plaintiffs' FHA and § 1983 Claims are Timely**

Defendants' limitations argument improperly isolates a handful of 2017 hearing remarks and treats this case as though nothing relevant happened after December 2018. That framing misapprehends both the law and the record. The FHA permits suit within two years after the "occurrence or the termination" of the alleged discriminatory housing practice, 42 U.S.C. § 3613(a)(1)(A), and Congress used "termination" to preserve continuing-violation principles in housing cases. *Havens* 455 U.S. at 380–81. Where, as here, discrimination is manifested in a series of related acts rather than a single isolated event, the limitations period runs from the last act in that series. *West*, 45 F.3d at 754–55; *Cowell*, 263 F.3d at 292-93.

Plaintiffs' theory is precisely that: a continuing discriminatory course of conduct, not merely a single remark or vote. The challenged conduct extended well beyond the 2017 hearings. Indeed, Judge Farrington's final judgment was not

28

entered until January 17, 2019, and the Borough's appeal then remained pending through most of 2019. (Ex. O, Linfante Appraisal at 3–4). Defendants' own expert placed Borough compliance no earlier than January 6, 2020, when the Superior Court approved the 2019 Fair Share Settlement. (Ex. Q, Caldwell Dep. 36:5–37:18). Caldwell's testimony is particularly significant, and it independently defeats Defendants' attempt to cut the case off at the 2017 hearings. She testified that the date she used for Borough compliance was January 6, 2020, when the Superior Court issued the settlement order approving Wallington's third-round Fair Share resolution. (Ex. Q, Caldwell Dep. 36:5–37:4). She further agreed that, prior to that point, the Borough was not yet compliant in any certified sense, but only "in the process," because "there wasn't really a way to be compliant" until completion of the Superior Court "process." (*Id.* 37:17–38:2). That is a striking admission.

Caldwell's testimony becomes even more damaging when read with her admissions about actual production. She testified that the Borough's third-round obligation was 125 units, but that only 8 affordable units had actually been built. (*Id.* 39:11–15). And when asked whether any of the other third-round projects had been approved before the January 2020 settlement, she answered that she did not believe so. (*Id.* 95:16–96:6). Thus, even on Defendants' own expert's account, the Borough was not compliant until January 6, 2020, had built only 8 of 125 units, and had not secured meaningful alternative third-round approvals before that settlement. Those

29

admissions foreclose any argument that the discriminatory course of conduct had "terminated" by 2017 or even by January 2019.

The Borough's ongoing refusal to develop Wallington-side access to Wesmont Station provides additional, independently sufficient continuing conduct. Wood-Ridge developed full station access; Wallington's side remains undeveloped despite the Borough's possession of an approximately 2,000-foot public right-of-way. (Ex. R, Seckler Rep. at 1–2). That is not only a lingering effect of past conduct, it is also an ongoing municipal decision that continues to frustrate the Project and the transit-oriented development Defendants have openly resisted. (Ex. L, Sept. 19, 2017 Hr'g Tr. at T39:1–40:2; 71:14–17). The practical consequences remain substantial: with Wallington-side access, the average travel distance to the station would drop from 2.4 miles to 0.9 miles. (Ex. R, Seckler Rep. at 6–7).

The deliberate inaction on the right-of-way is especially telling given the Borough's own planning documents. The Borough's Master Plan Land Use Element Amendment expressly finds that both the New Wallington Home and Morningside properties "are within 0.25 miles, considered walking distance, to the Wesmont Rail station" and that there is vacant property "directly adjacent to the Wesmont Rail station, presenting an opportunity to create a transit-oriented development." (Defs. Ex. M, Land Use Amendment at 12). The same amendment declares that "[c]oncentrating residential development with convenient access to multiple transit

30

options by both rail and bus for future residents promotes the efficient use of land and creates the benefit of reducing traffic congestion, parking demand and reducing the release of vehicle-generated pollutants into the environment." (Id.) Yet despite these official findings—incorporated into the Borough's own blueprint for municipal development—the Borough has refused to improve the right-of-way.

This inaction is powerful affirmative evidence that the Borough never genuinely intended to become a "transit-oriented village"—a designation central to Defendants' planning rationale. As James Nuckel testified, if you "stand on that platform and look at the Wallington side it's just a field of weeds, and Wallington has the ability to create access to that station, but . . . does not want to." (Ex. A, Nuckel Dep. at 49:14-51:7). Mr. Nuckel explained that the station has been there "almost 20 years, and Wallington's done nothing to develop and make use of that easement," and that he had learned the Borough did not want to create such access. (*Id.* at 51:10–21). This testimony is corroborated by the Borough's admissions in its own interrogatory responses, where its engineering consultants advised that construction of a roadway on the right-of-way would be "prohibitively expensive"— a convenient excuse that ignores the readily achievable pedestrian improvements the Seckler Report identifies. (Defs. Ex. N, Defs.' Interrog. Resp. at 7–8; Ex. R, Seckler Rep. at 6–7). The Borough's intentional failure to develop station access is consistent

31

with the discriminatory motivations expressed during the 2017 hearings. (Ex. L, Sept. 19, 2017 Hr'g Tr. at T71:11–80:19).

While Defendants isolate a few 2017 remarks and argue that nothing relevant happened after December 7, 2018 (Defs.' Br. at 2, 9, 16), the record says otherwise. The January 2019 judgment, the Borough's ensuing appeal, the Borough's noncompliance until at least January 6, 2020 by Caldwell's own testimony, the continued lack of Wallington-side Wesmont access, and the Project's resulting frustration are all part of the same continuing discriminatory course of conduct. Because that conduct did not terminate until well within the limitations period, summary judgment on timeliness grounds must be denied.[4]

As to the tax-related due-process claims, Defendants have not established accrual as a matter of undisputed fact. The Amended Complaint alleges concealed conduct, lack of notice, payment under protest, and retaliatory collection of unlawful penalties and interest. On this record, summary judgment for Defendants on limitations grounds is improper.

---

[4] The same continuing-violation principles apply to Plaintiffs' equal-protection claim under § 1983, which borrows New Jersey's two-year limitations period. See *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009). Because the discriminatory course of conduct underlying that claim is coextensive with the FHA claims, the Equal Protection claim is timely for the same reasons.

## POINT IV

## DEFENDANTS' CROSS MOTION SHOULD BE DENIED AS A MATTER OF LAW

**A.  Defendants Are Not Entitled to Summary Judgment on Plaintiffs' FHA Claims.**

For the reasons set forth in Point I, Defendants are not entitled to summary judgment on Plaintiffs' FHA claims. The record—including direct evidence of discriminatory intent, unrebutted expert statistical analysis, and repeated state-court findings of arbitrariness—independently defeats Defendants' cross-motion. Defendants have failed to raise a genuine dispute as to any material fact that would preclude summary judgment in Plaintiffs' favor. Accordingly, Defendants' cross-motion as to the FHA claims should be denied.

**B.  The Equal-Protection Record is Addressed in Point II; The Same Proof Also Defeats Defendants' Cross-Motion on Count III**

Plaintiffs' equal-protection claim is addressed fully in Point II. For the reasons set forth therein, Plaintiffs are entitled to summary judgment on Count III, and Defendants' cross-motion must be denied.

**C.  Defendants are Not Entitled to Summary Judgment on Plaintiffs' Substantive Due Process Claim**

Defendants seek to recast this case as an ordinary zoning dispute. It is not. In *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 285–86 (3d Cir. 2004), the Third Circuit emphasized what was absent there: corruption, self-dealing, or bias against a protected ethnic group. Those features are present here. Plaintiffs allege, and the

33

summary-judgment record supports, racial and familial bias, extraordinary procedural irregularities, invented land-use hurdles, repeated denials after builder's-remedy rezoning, repeated judicial reversals, a Board found to have "unreasonably delayed action," and conduct Judge Farrington described as reflecting a "recalcitrant stance toward satisfying its Mount Laurel obligation." (Ex. B, 2019 Farrington Op. at 9-10). This is a years' long pattern of arbitrariness undertaken to keep protected classes out of Wallington. Defendants are not entitled to summary judgment on Count IV because this record is materially different from the run-of-the-mill land-use disputes that fail under *Eichenlaub*. Plaintiffs do not merely allege hardball zoning. The combination of bias, arbitrariness, and procedural manipulation is sufficient to defeat Defendants' motion and leave the final adjudication to a jury.

## D. Defendants are Not Entitled to Summary Judgment on Plaintiffs' Procedural Due Process Claim

Count V concerns the retaliatory use of tax-sale procedures without constitutionally adequate notice to jeopardize Plaintiffs' title. Where the State takes action affecting property rights through tax-sale mechanisms, due process requires notice "reasonably calculated" to apprise interested parties and afford an opportunity to be heard. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 796–800 (1983); *Jones v. Flowers*, 547 U.S. 220, 226–30 (2006). Dorothy Siek provided no notice of delinquency for 2016–2018, no adequate notice of the tax sale, and no opportunity to pay the taxes before the Borough took the certificate for itself; the Borough then

34

forced New Wallington Home to pay unlawful interest and penalties under protest to clear title. (Ex. A, Nuckel Dep. 126:5-129:1). At minimum, the undisputed record establishes that the tax sale certificates included improper interest charges after the resolution stated no interest would accrue—a material issue of disputed fact regarding damages that alone precludes summary judgment for Defendants. (*Id.* 143:22-149:17). Defendants' moving papers do not negate these factual assertions. At most, they argue jurisdiction and adequacy of state remedies—not a merits-based entitlement to summary judgment on Count V.

## POINT V

### DEFENDANTS' TAX/COMITY AND DAMAGES ARGUMENTS DO NOT ENTITLE THEM TO SUMMARY JUDGMENT

A. **Defendants' Tax Injunction Act and Comity Argument Does Not Bar Counts I Through III**

Defendants' Tax Injunction Act and comity argument does not justify summary judgment on Counts I through III. At most, it raises a question whether the Court should cabin or defer aspects of the tax-specific claims. But even if the Court were to agree with Defendants in some respect on those claims, that would not convert into a merits victory on the FHA or Equal Protection counts, which rest on a much broader discriminatory course of conduct and independently warrant denial of Defendants' cross-motion.

35

Defendants rely principally on *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100 (1981), *Reagle v. Elliott*, 80 F. App'x 737 (3d Cir. 2003), and *Frybarger v. N.J. Dep't of the Treasury*, No. 05-4648 (KSH), 2006 U.S. Dist. LEXIS 93365 (D.N.J. Dec. 27, 2006). *McNary* and *Reagle* establish that federal courts should not ordinarily entertain § 1983 suits challenging the administration of state taxes where an adequate state remedy exists. *Frybarger* applies that principle in the New Jersey context. But the holdings of those cases are narrower than Defendants suggest, and they do not reach the claims at issue here.

Counts I through III—the FHA disparate treatment, FHA disparate impact, and Equal Protection claims—do not challenge any tax assessment, rate, or collection procedure. They challenge a discriminatory land-use campaign spanning more than a decade, supported by direct evidence of discriminatory animus, unrebutted statistical proof of disparate impact, and repeated judicial findings of arbitrariness. The Tax Injunction Act applies to suits seeking to "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law." 28 U.S.C. § 1341. The Supreme Court has cautioned that those terms are not limitless and must be read in light of the specific relief sought. *See Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 8–14 (2015); *Hibbs v. Winn*, 542 U.S. 88, 104–08 (2004). Nothing in the relief Plaintiffs seek on Counts I through III implicates tax assessment or collection.

The tax-specific claims—Counts V (procedural due process) and VI (unjust enrichment)—are materially different from the ordinary tax-administration challenges addressed in *McNary*, *Reagle*, and *Frybarger*. Plaintiffs do not ask this Court to recalibrate property values, set tax rates, or enjoin future collection in the ordinary course. They allege that Defendants weaponized tax-sale procedures as part of a retaliatory campaign against an inclusionary development, intentionally withheld notice, secretly took the certificate themselves, and then exacted unlawful penalties and interest to clear title. Federal courts routinely adjudicate § 1983 claims alleging unconstitutional deprivation of property through deficient notice procedures, even when taxes are involved. *See Jones v. Flowers*, 547 U.S. 220, 226–30 (2006); *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798–800 (1983).

Even if the Court concludes that some portion of Counts V and VI should be narrowed on comity grounds, that determination would not justify summary judgment on Counts I through III. Nor have Defendants established that the state remedies they invoke were "plain, adequate, and complete" for a concealed and retaliatory tax-certificate taking undertaken without proper notice. *McNary*, 454 U.S. at 116. At minimum, factual disputes remain as to notice, procedures, and whether the Borough's conduct was ordinary tax administration or retaliatory misuse of the tax-sale process. Accordingly, Defendants' comity argument does not entitle them to summary judgment on any count.

37

**B.**     <u>**Defendants Are Not Entitled to Summary Judgment on Count VI**</u>

Defendants likewise have not affirmatively established entitlement to summary judgment on Count VI. At minimum, factual issues remain as to what sums were demanded, what notice was provided, and whether the Borough retained monies it should not have retained. For instance, the Borough issued tax certificate #17-016 and demanded that New Wallington Home pay over $13,000 in interest at 18% plus over $23,000 as a 6% redemption penalty. (Defs. Ex. N at 5-7). Yet, the resolution approving this provided no interest would be charged. New Wallington Home paid these sums under protest and reserved its rights. (Am. Compl. ¶ 161; Ex. A, Nuckel Dep. at 143:22–147:1). These facts raise significant factual disputes that must be adjudicated by a jury. Finally, even if the Court concludes that the tax-specific claims should be narrowed or otherwise addressed separately, that issue should be resolved without affecting Counts I through III.

**C.**     <u>**Defendants' Damages Argument Is Not Supported by Any Competent Evidence and Cannot Defeat Liability**</u>

Plaintiffs' opening brief sought summary judgment on Counts I through III and supported that relief with a developed damages showing. Defendants have offered no rebuttal report or testimony of Mr. Linfante to undercut the damages analysis. Even if the Court concludes that the precise amount or form of damages warrants further proceedings, despite no evidence to the contrary, that has no bearing on whether Plaintiffs have established liability or whether Defendants are entitled to

38

summary judgment now. Plaintiffs' motion on liability and the ultimate quantification of relief are distinct questions. (*See* Pls.' MSJ Br. at 44–46).

Defendants' damages argument does not supply a basis for judgment in their favor. Their critique is limited to the premise that approvals existed earlier and that Mr. Linfante's analysis rests on stated assumptions. But that does not negate the existence of compensable injury, particularly where Plaintiffs' theory of damages is delay-based and tied to the post-obstruction economic realities that rendered the Project infeasible. The Linfante appraisal quantified those damages at $23,672,000, consisting of the difference between stabilized value and development cost plus lost opportunity costs. (Ex. O, Linfante Appraisal at 1–3, 64–66).

Just as important, Defendants admitted that Mr. Linfante determined Plaintiffs' compensatory damages to be $23,672,000, and they separately admitted that they "did not serve an expert report rebutting Mr. Linfante's expert opinion regarding damages." (Defs.' Resp. to Pls.' SUMF ¶¶ 77–78). That record forecloses any claim that Defendants are entitled to summary judgment on damages. At most, Defendants raise a legal argument about the proper measure of relief.

If the Court grants Plaintiffs summary judgment on FHA liability, damages remain available under 42 U.S.C. § 3613(c)(1). And even if the Court determines that the precise quantum of damages should be addressed separately, that conclusion would not justify denying liability relief or entering judgment for Defendants.

## CONCLUSION

For all of the foregoing reasons and those set forth in the moving papers, Plaintiffs respectfully request that the Court grant their motion for summary judgment and deny Defendants' cross-motion for summary judgment.

Dated:  May 4, 2026                    Respectfully submitted,

                                             **O'TOOLE SCRIVO, LLC**
*Attorneys for Plaintiffs*

                                 By: */s/ James DiGiulio*
                                     James DiGiulio

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that after the filing of Defendants' Reply Brief and Opposition, the same will be sent to all counsel of record via the Court's Case Management/Electronic Case Filing System:

DAVID T. PFUND
Pfund McDonnell, P.C.
139 Prospect Street, 2nd Floor
Ridgewood, NJ 07450
201-857-5040
Fax: 201-857-5041
Email: dpfund@pfundmcdonnell.com

GERALD ANTHONY SHEPARD
Pfund McDonnell, PC
139 Prospect Street
Ridgewood, NJ 07450
(201)857-5040
Fax: (201)857-5041
Email: gshepard@pfundmcdonnell.com

LEONARD E. SEAMAN , III
LAW OFFICES OF RICHARD MALAGIERE
250 MOONACHIE ROAD
SUITE 102
MOONACHIE, NJ 07074
201-440-0675
Fax: 201-440-1843
Email: les@malagierelaw.com

MARY C. MCDONNELL
PFUND MCDONNELL, P.C.
139 PROSPECT STREET
2ND FLOOR
RIDGEWOOD, NJ 07450
201-857-5040
Email: mmcdonnell@pfundmcdonnell.com

*/s/ James J. DiGiulio*
James J. DiGiulio